**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| Bobby Sanks, )<br>)<br>    **Plaintiff,** )<br>)<br>    **v.** )<br>)<br>**WestPoint Stevens, Inc., and** )<br>**WestPoint Home, Inc.,** )<br>)<br>    **Defendants.** )<br>_____) | **C. A. No.: 3:06-CV-1092-MHT** |

<u>**DEFENDANTS WESTPOINT STEVENS, INC.'S AND WESTPOINT HOME, INC.'S**</u>
<u>**MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT**</u>

James C. Pennington
(ASB-1287-N62J)
OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama 35203-2118
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
James.Pennington@odnss.com

Fred W. Suggs, Jr.
(ASB-3587-G61F)
OGLTREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
300 North Main Street (29601)
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: (864) 271-1300
Facsimile: (864) 235-4754
Fred.Suggs@ogletreedeakins.com

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION AND SUMMARY OF ARGUMENT...........................................1

II. STATEMENT OF FACTS........................................................................................4

    A. *WestPoint's Operations*.............................................................................4

        1. Sanks' Employment History........................................................4
        2. Sanks Understood WestPoint's Policies.....................................4
           a. Orientation and Handbook...............................................4
           b. Equal Employment Opportunity and Harassment Policies.....................5
           c. Reporting Procedures.......................................................5
           d. Discipline and Termination...............................................5
           e. Tardiness..........................................................................6
        3. Sanks' Duties in the Maintenance Shop .....................................6

    B. *Sanks' Marginal Performance* ...............................................................7

        1. Personnel Notices.........................................................................7
        2. First Final Notice -1990 ..............................................................8
        3. Second Final Notice – 1991.........................................................9
        4. Third Final Notice – 1992............................................................10
        5. Fourth Final Notice – 1998..........................................................10
        6. Fifth Final Notice – 1999.............................................................11
        7. Sixth Final Notice - 2000.............................................................11
        8. Seventh Final Notice – 2005 .......................................................11

    C. *Sanks' Complaint of Discrimination and Harassment and*
        *WestPoint's Thorough Investigation* ...............................................12

    D. *The Termination of Sanks' Employment*........................................13

    E. *WestPoint's Leniency Allowed Sanks to Avoid Termination Many Times*...14

III. ARGUMENT .......................................................................................................15

    A. *Summary Judgment Standard* .............................................................15

    B. *Sanks' EEOC Charge Was Not Timely*...............................................17

        1. Sanks Failed to File His Charge With the EEOC Within 180
           Days of Any Alleged Discriminatory Act .................................17
        2. Sanks Did Not File a Charge of Discrimination on September 8, 2005....18
        3. Sanks' Admits The Most Recent Date of Discrimination Was Not
           The Termination of His Employment, but Months Earlier.......................20

    4.  Sanks' Charge Filed January 27, 2006, Was Untimely and
Insufficient to State a Claim ...................................................21

    5.  Sanks' Amended Charge Alleging Age Discrimination Was Untimely....22

    6.  Sanks' Claims Are Based on Discrete Acts, Not Continuing Violations
and Are Therefore Barred ........................................................23

    7.  Sanks Cannot Save His Time Barred Claims by Mischaracterizing
His Discipline As "Harassment"................................................25

**C.  *Legal Framework for Analyzing Sanks' Claims* ...........................................29**

    1.  *Prima Facie* Standards .............................................................30
       a.  Race and Color ...............................................................30
       b.  Age .................................................................................30
       c.  Retaliation .....................................................................31
    2.  Sanks Cannot Establish a *Prima Facie* Case For Any of His Claims ........31
       a.  Sanks' Race, Color and Age Claims Fail Because He was
Not Qualified .................................................................31
       b.  Sanks' Race and Color Claims Fail Because He Has
No Comparators .............................................................32
       c.  Sanks Cannot Show a Younger Person Replaced Him ..........34
       d.  Personnel Notices and Harsh Speaking Are Not
Adverse Employment Actions .........................................35
       e.  Sanks Cannot Show a *Prima Facie* Case of Retaliation ........36
    3.  WestPoint Had a Legitimate, Non-Discriminatory Reason
for Its Actions ..........................................................................38
    4.  Sanks Has No Evidence of Pretext ............................................40

**IV.  CONCLUSION.................................................................................43**

**Index to Exhibits ..............................................................................iii**

<u>**INDEX OF EXHIBITS**</u>

<u>**TO**</u>

<u>**DEFENDANTS WESTPOINT STEVENS, INC.'S AND WESTPOINT HOME, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

| | |
|---|---|
| Exhibit 1 | Deposition of Bobby Sanks (Cited as "Tr.") |
| Exhibit 2 | Exhibits to the Deposition of Bobby Sanks (Cited as Dx.) |
| Exhibit 3 | Asset Purchase Agreement (WPH 000668-744) |
| Exhibit 4 | Affidavit of Perry Henderson |
| Exhibit 5 | Affidavit of Dudley Gregory |
| Exhibit 6 | Plaintiff's Responses to Requests to Admit |
| Exhibit 7 | Performance Chronology |
| Exhibit 8 | Affidavit of Amber Stephens |
| Exhibit 9 | EEOC Charge Timeline |
| Exhibit 10 | Unpublished Cases |

> *Bradley v. Florida Dept. of Transp.,* 2002 U.S. Dist. LEXIS 27475
> *Daniels v. Mobile*, 2005 U.S. Dist. LEXIS 44875
> *Evans v. Pemco Aeroplex, Inc.,* 1998 U.S. Dist. LEXIS 22954
> *Meneffee v. Montgomery County Bd. Of Educ.,* 2005 U.S. App. LEXIS 12286
> *Potts v. Conecuh-Monroe Counties Gas District,* 2000 U.S. Dist. LEXIS 11822
> *Wadibia v. Auburn University,* 1999 U.S. Dist. LEXIS 14122

| | |
|---|---|
| Exhibit 11 | Notices of Charge (WPH 001092 and 1094) |
| Exhibit 12 | WARN Notices (WPH 001355-1358) |
| Exhibit 13 | Affidavit of Lawrence Williams |

## <u>DEFENDANTS WESTPOINT STEVENS, INC.'S AND WESTPOINT HOME, INC.'S MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT[1]</u>

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The Plaintiff, Bobby Sanks ("Sanks"), asserts that WestPoint Stevens, Inc., and WestPoint Home, Inc. ("WestPoint")[2] violated the Civil Rights Act of 1964 ("Title VII") by discriminating against him because of his race and color, and by retaliating against him for complaining that he allegedly did not receive a scheduled salary increase in 1985.  Sanks also alleges he was discriminated against in violation of the Age Discrimination in Employment Act ("ADEA"), because his position was allegedly filled by a younger employee when his employment was terminated.

WestPoint will show that (1) Sanks has abandoned any claims regarding his termination by admitting that the termination of his employment for being tardy was justified and not discriminatory; (2) Sanks' claims are time barred because he did not timely file a charge with the EEOC within 180 days of any alleged act of discrimination; (3) Sanks' amended charge alleging age discrimination was not timely because it was a new charge based on new facts which were not asserted in his original attempt to file a charge; (4) Sanks' claims of individual acts of discrimination that occurred more than 180 days before the filing of his charge are time barred; (5) Sanks has no direct evidence of discrimination; (6) Sanks can point to no similarly situated comparator outside of his protected class that was treated better than he; (7) Sanks was given preferential treatment; (8) Sanks' employment was terminated for legitimate, non-discriminatory

---

[1] Citations to the Deposition Transcript of Bobby Sanks, located at Exhibit 1 to this Memorandum, are as "Tr." followed by the page and line numbers. Citations to the Deposition Exhibits of Bobby Sanks, located at Exhibit 2, are as "Dx(s)," followed by the Deposition Exhibit Number(s).  All other submissions are cited as "Exhibit ___", with their respective Number(s).  Where applicable, references to Exhibits include the paragraph number(s) where relevant information is located.

[2] To date, only WestPoint has engaged in timely discovery.  Plaintiff's counsel has neither taken nor noticed any depositions and has served untimely written discovery.

reasons; and (9) there is no causal connection between WestPoint's actions and Sanks' race, color, age, or alleged protected activities; and (10) Sanks has only his own subjective opinion that he was subjected to discrimination and retaliation.

Sanks' claims his supervisor, Perry Henderson, denied him an "automatic" increase he was due 90 days after transferring to the maintenance department in 1985. Sanks' contends he received the raise over a year later, and only after complaining to Human Resources Manager, V. R. Dobson (Tr. 238:11-13; 239:10-15). Sanks asserts that after complaining about not receiving the increase, Perry Henderson retaliated against him by speaking to him harshly about his work and giving him unwarranted discipline (Tr. 242:7-17; 284:16-285:21). Sanks generally claims that whites were treated better than blacks in the maintenance department and that he, in particular, was singled out for criticism. (Tr. 242:7-17; 285:4-13; 290:2-293:5). Sanks claims that when his employment was terminated twenty (20) years later, he was replaced with a younger employee (Tr. 294:10-20).

Records clearly show that Sanks received an increase approximately 90 days after his transfer to the maintenance department, and received two additional increases in about four months, both approved by Perry Henderson (Dx. 60, 61). Sanks has no information to dispute the accuracy of the documents (Tr. 239:16-23; 241:18-242:2). There is no record that Sanks' complained about not receiving an increase, and Sanks does not contend he complained that he failed to receive a pay increase because of his race or color.

Sanks received progressive discipline for performance deficiencies, in accordance with the Company's well established policies, which eventually resulted in the termination of his employment. Sanks never complained of discrimination until he was on final notice and feared losing his job due to his poor work record. Sanks admits the tardiness that resulted in his

termination.  Sanks offers no evidence to support his subjective beliefs that any action was taken against him because of his race, color, age or protected activity.  Sanks cannot dispute that WestPoint had legitimate, non-discriminatory reasons for disciplining and ultimately terminating Sanks' employment.

The EEOC refused to file a charge because it determined, based on the information Sanks gave the Agency, that Sanks had no basis for a charge.  Sanks consulted with an attorney, who filed a charge on his behalf for race and color discrimination and retaliation, two days after the deadline to do so had passed.  The EEOC inexplicably accepted this charge as timely.  Sanks later amended his charge to include a claim of age discrimination based on the newly alleged fact that Sanks was told a week after his termination that a younger employee had replaced him.  The allegations in this lawsuit stem from separate acts occurring more than 180 days before the filing of Sanks' EEOC charge, and are untimely.

Sanks cannot prevail:

1.    Sanks' charge was untimely.

2.    Even if Sanks' charges were timely, Sanks has no direct or indirect evidence of discrimination or retaliation and no evidence to contradict the legitimate nondiscriminatory reasons for the termination of Sanks' employment that have been put forth by WestPoint.

3.    Even if Sanks prevailed, he has no damages because Sanks would have lost his job anyway because the plant where he worked closed, and Sanks has now been declared permanently and totally disabled from employment.

4.    Even if Sanks were entitled to damages, his former employer, WestPoint Stevens, has no assets from which to pay them.

## II.    STATEMENT OF FACTS

### A.    WESTPOINT'S OPERATIONS

#### 1.    Sanks' Employment History

WestPoint[3] operates plants in the United States, including Alabama, manufacturing home furnishings, including sheets and towels.  Sanks was employed with WestPoint beginning October 1, 1970, in several positions in the piece goods department during the first few years of his employment, then for more than ten years as a spinning doffer (Tr. 124:2-125:11; 139:12-20; Dx. 19).[4]  On May 4, 1985, Sanks' request for transfer to a position in the shop as a Humidifier and Air Condition Control Technician was approved (Tr. 139:21-140:4; Dx. 25).  This transfer placed Sanks under the supervision of the maintenance department Manager, Perry Henderson (Tr. 140:2-7; 142:3-19).  Sanks reported to supervisor Harold O'Neal, and later, supervisor Dudley Gregory (Tr. 142:11-143:23; Exhibits 4 and 5 at ¶ 4).

#### 2.    Sanks Understood WestPoint's Policies

##### a.    Orientation and Handbook

Sanks attended orientation when he was hired (Tr. 126:2-11).  Sanks was given an employee handbook and received multiple updates to the employee handbook during his

---

[3] On June 1, 2003, WestPoint Stevens, and certain affiliates (collectively, the "Debtors"), commenced bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") pursuant to chapter 11 of Title 11 of the United States Code.  The chapter 11 cases are jointly administered under case number 03-13532 (RDD) and remain pending, although the Debtors' estates are administratively insolvent. Pursuant to an order of the Bankruptcy Court dated July 8, 2005, substantially all of the assets of WestPoint Stevens were sold to WestPoint Home, and that sale closed on August 8, 2005.  Since Sanks was terminated by WestPoint Stevens on July 29, 2005, before the sale of assets, Sanks can assert no viable claims against WestPoint Home, as all of Sanks' claim arose during his employment with WestPoint Stevens and before the sale of assets on August 8, 2005.  Sanks was never employed by WestPoint Home, and WestPoint Home did not assume the liabilities of WestPoint Stevens under the terms of the sale (Exhibit 3).  Since Sanks was never an employee of WestPoint Home, all references to Sanks' employment with "WestPoint" refer to WestPoint Stevens.

[4] Before being employed by WestPoint in 1970, Sanks had limited work experience.  Sanks graduated high school in 1969 and had worked briefly as a grocery clerk (Tr. 34:7-36:3; Dx. 3).

employment (Tr. 126:2-127:8; Dxs. 20-21). The most recent handbook was issued on July 1, 2004, and Sanks acknowledged receiving it on July 14, 2004 (Tr. 127:1-128:9; Dxs. 21-22).

### b.     Equal Employment Opportunity and Harassment Policies

WestPoint has comprehensive policies promoting a workplace free of discrimination and harassment. WestPoint's Equal Employment Opportunity Policy, contained in the employee handbook, declares that WestPoint does not discriminate "because of race, color, religion, sex, national origin, age, disability or veteran's status." The policy forbids "discrimination, harassment, retaliation, coercion, interference or intimidation of any associate" due to any of these characteristics, or against any associate who files a complaint or cooperates in the investigation of a complaint of discrimination or harassment (Dx. 22 at WPH 000761). Sanks was aware of WestPoint's policy prohibiting discrimination and harassment (Tr. 129:2-130:18).

### c.     Reporting Procedures

Sanks was aware of the procedures for making complaints about work-related problems, including discrimination or harassment, which were contained in the handbook and posted throughout the plant (Tr. 131:11-132:21; 133:2-15; Dx. 22 at WPH 782-785; Dx. 23). Sanks knew he could complain about discrimination to his supervisor, department manager, Human Resource Manager, Plant Manager, the Division Director of Human Resources, and ultimately, the Vice President of Human Resources (Tr. 131:11-132:21; 133:2-15; Dx. 22 at WPH000782-785; Dx. 23).

### d.     Discipline and Termination

Sanks admitted he understood WestPoint's disciplinary policy, which provides for a series of progressive warnings for "less than intolerable" offenses, and gives the option of immediate termination for "intolerable" offenses (Exhibit 6 at ¶ 7; Tr. 134:17-136:2; Dx. 22 at

WPH 000790-803).   A first offense for a less-than-intolerable violation results in a formal counseling documented by a Counseling Report.  A second offense results in a verbal warning, with a written warning report to the associate's file.  Each subsequent offense results in a verbal warning, with a written warning placed in the employee's file (Tr. 134:17-136:2; Dx. 22 at WPH 000795-797).  Sanks admitted he understood that three written warnings in a twelve (12)-month period results in the termination of employment (Exhibit 6 at ¶ 8; Tr. 135:22-136:2; 138:10-15; Dx. 22 at WPH 000795).

Sanks admitted he was aware of the kinds of offenses that could result in discipline, including poor job performance (Tr. 133:16-134:16; Dx. 22 at WPH 000790-794, 798-803).  Sanks admitted he understood that he could be terminated immediately for an intolerable offense (Tr. 138:21-139:2).  Intolerable offenses include serious violations of safety practices, including working on equipment without proper lockouts (Dx. 22 at WPH 000798-803).[5]

### e.     Tardiness

The discipline policy, with which Sanks admitted he was familiar, stated that six incidents of tardiness in a six month period would result in disciplinary action (Dx. 22, at WPH 000791).  Sanks admitted he understood the policy prohibiting tardiness (Tr. 283:9-11).  Sanks admitted he was aware that clocking in at 7:00 a. m. resulted in a tardy, and that if an employee were required to report at 7:00 a. m., the employee had to clock in before 7:00 a. m. (Tr. 153:9-19; Dx. 30).

### 3.     Sanks' Duties in the Maintenance Shop

On July 25, 1985, approximately ninety (90) days after Sanks was transferred to the maintenance shop on May 4, 1985, Perry Henderson approved a merit increase for Sanks,

---

[5] See notes 12 and 13, *supra*, and accompanying text where Sanks received warnings instead of having his employment terminated for working on equipment without properly locking out the equipment.

effective August 11, 1985, from $5.50 to $5.85 per hour (Tr. 236:21-2; Dx. 60). Sanks received a second increase effective December 12, 1985, to $6.25 per hour (Dx. 61).[6]

Sanks' position changed to Electrician 3rd Grade on August 8, 1986, Electrician 2nd Grade on June 29, 1987, and Electrician 1st Grade on April 16, 1990 (Tr. 146:1-147:4; Dx. 26). As an Electrician 3rd Grade, Sanks was responsible for changing lights throughout the plant (Tr. 147:5-148:1). Sanks' duties as an Electrician 2nd Grade and Electrician 1st Grade were maintaining hoists and elevators (Tr. 148:13-20). Sanks was responsible for preventative maintenance, troubleshooting, identifying problems and repairing equipment in a timely manner (Tr. 148:21-149:16).

Sanks had no prior education or work experience as an electrician (Tr. 149:17-23). He was trained "on-the-job" at WestPoint (Tr. 150:7-11). Sanks received fixer training, Schlafhorst Training for Electricians, Qualified Hoist & Crane Inspector Training, and training with Royce Crane technicians (Tr. 150:12-153:5; 153:20-155:14; Dx. 27, 28, 29, 31).

### B.    SANKS' MARGINAL PERFORMANCE

#### 1.    Personnel Notices

WestPoint uses Personnel Notices to inform employees or document work related issues in seven different categories: Associate Problem, Associate Complaint, Notice of Change, Request for Change, Associate Request, Commendation, and Miscellaneous Notice (Dx. 24). Sanks admitted he understood that a Personnel Notice could be used to document various events, but was not discipline, and could not lead to the termination of his employment (Tr. 136:8-15; 167:1-168:1).

---

[6] These documents clearly establish that Sanks timely received from Perry Henderson the increase which Sanks alleged Henderson denied him for a year (Tr. 238:11-13). Sanks has no information to dispute the accuracy of the documents (Tr. 239:16-23; 241:18-242:2). Sanks admits to receiving at least a dozen pay increases approved by Henderson (Exhibit 6 at ¶¶ 12-23). Sanks admits he was at top pay for his position (Tr. 306:6-7).

Sanks received multiple nondisciplinary personnel notices over the course of his employment (Tr. 155:15-166:8; Dx. 32).[7] Sanks' got his first Personnel Notice in October 1987, two years after coming under the supervision of Perry Henderson and over a year after he allegedly complained that he had not received an increase (Tr. 169:7-22; Dx. 32 at WPH 000570).[8] Sanks received two additional personnel notices before receiving a Counseling Report on March 1, 1988. A Counseling Report is the first step of discipline under the progressive policy (Dx. 32 atWPH000565). This was the first time Sanks had received discipline. Sanks claims this counseling was retaliatory (Tr. 173:14-20). Sanks received what he claims was a discriminatory counseling report on April 19, 1989 (Tr. 174:8-175:11) (Dx. 32 at WPH 000558).[9]

### 2. First Final Notice - 1990

Sanks received his first written warning for failure to perform job duties on December 18, 1989 (Tr. 182:3-12; Dx. 33). Sanks had allowed a frame to go without repair for eight hours. Sanks does not claim this warning was discriminatory (Tr. 184:18-23). Sanks received a third

---

[7] Though he admits the Personnel Notices are not discipline, Sanks' inconsistently claims that several of the personnel notices he received were retaliatory. Specifically, Sanks alleges that WPH000570, 566, 551, 524, 512, 490, and 467 are retaliatory, as well as counseling reports at 565, 558, 495 and 473 (Tr. 169:7-170:9; 173:1-175:11; 177:4-180:12; Dx. 32). A complete chronology of Sanks' personnel notices and discipline is included as Exhibit 7.

[8] See note 6, *supra.*

[9] Although Sanks sometimes characterizes personnel notices and discipline as discriminatory, his testimony reveals he is actually claiming these actions were in retaliation for his complaint, rather than discrimination based on race (Tr. 177:12-23; 175:1-11; 173:14-20; 169:23-170:9; 178:5-180:12). Sanks uses discrimination and retaliation interchangeably in circular logic alleging that because he complained, he was retaliated against, and because he was retaliated against, it was discrimination. Sanks simply attempts to use one claim to prove the other. Where stated that Sanks did not complain about a warning being discriminatory, it is also meant that Sanks did not claim it was retaliatory.

counseling report on March 10, 1990, which he does not claim was discriminatory (Tr. 168:21-181:14;[10] Dx. 32 at WPH 000553).[11]

Sanks received a second written warning for failure to perform his job duties on June 12, 1990 (Tr. 182:16-183:2; Dx. 34). Sheaves were found to be worn, which was a process of deterioration that would have taken months. However, Sanks' inspection reports on the sheaves for the previous months had recorded no wearing of the sheaves. The only conclusion that could be drawn from these facts was that Sanks had either improperly inspected the sheaves without seeing the damage, or he had not inspected them at all and had falsified his reports. Sanks does not claim this warning was discriminatory (Tr. 184:18-23). Sanks received a Final Notice advising him that he had two written warnings in a twelve month period, and that under WestPoint's policy, a third warning before December 18, 1990, would result in the termination of his employment (Tr. 183:6-16; Dx. 35).

### 3.    Second Final Notice - 1991

Sanks did not receive another written warning before December 18, 1990, so his first written warning from December 18, 1989, was no longer counted against him in the rolling twelve month period. Sanks received a written warning on May 13, 1991, for failure to perform job duties, while his warning from June 12, 1990, was still active (Tr. 185:10-19; Dx. 36, 34). Sanks received this warning because he was behind schedule on his hoist and elevator inspections. As a result of the May 13 warning, Sanks received a Final Notice that a third warning before June 12, 1991 would result in termination (Tr. 185:23-186:10; Dx. 37). Sanks does not claim this warning was discriminatory (Tr. 186:11-19).

---

[10] The transcript shows which of the Personnel Notices located in Dx. 32 Sanks claims were discriminatory retaliation, but Sanks does not name this one. (Dx. 32 at WPH 000553)(See note 7, *supra*).

[11] Since Sanks had received a first written warning, this should have been a second written warning, but Sanks benefited from the apparent oversight.

### 4.     Third Final Notice - 1992

Since Sanks did not receive a third warning before June 12, 1991, his warning from June 12, 1990, was then not within the rolling twelve-month period. Sank received a written warning on January 8, 1992, for working on a machine without proper lockout, which was a potentially fatal safety hazard (Tr. 186:23-187:16; Dx. 38)[12]. Sanks does not claim this was discriminatory (Tr. 187:17-20). Sanks' warning from May 13, 1991, was within twelve months before this warning, so Sanks received a Final Notice that a third warning before May 13, 1992, would result in termination of his employment (Tr. 188:1-18; Dx. 39, 36).

### 5.     Fourth Final Notice - 1998

Sanks did not have another written warning for almost six years (Tr. 188:22-189:11). In the interim, he had a Counseling Report on April 11, 1995, which he claims was retaliation (Tr. 179:3-13) (Dx. 32 at WPH 000495). Sanks was given another Counseling Report on November 19, 1997, which he claims was discriminatory (Tr. 179:18-180:5; Dx. 32 at WPH 000473).

On December 19, 1997, Sanks received a first written warning because oilers which he was responsible for inspecting and monitoring were found to be empty or low on oil after problems were reported (Tr. 189:7-15; Dx. 40). Sanks does not claim this warning was discriminatory (Tr. 189:7-19). Sanks received a second written warning on August 6, 1998 (Tr. 189:23-190:12; Dx. 41). This warning documented that Sanks' inspection reports showed he had inspected one hoist twice, but failed to inspect another. Sanks had also created a safety hazard by improperly repairing a box used for opening an elevator in case of an emergency. Sanks does not claim this warning was discriminatory (Tr. 190:13-16). On August 10, 1998, Sanks received

---

[12]  Sanks' employment could have been terminated for this offense because working without proper lockouts is an intolerable offense under WestPoint policy (Dx. 22 at WPH 000 801); Sanks understood this (Tr. 138:21-139:2). See note 13, *infra.*

a Final Notice indicating that a third warning before December 19, 1998, would result in the termination of his employment (Tr. 190:23-10; Dx. 42).

### 6.    Fifth Final Notice - 1999

Sanks did not receive another warning before December 19, 1998, so his warning from December 19, 1997, was no longer active.  Sanks received a warning on May 30, 1999, for taking unscheduled breaks, which he does not claim was discriminatory (Tr. 191:14-192:4; Dx. 43).  Since Sanks' warning from August 6, 1998, was within the previous twelve months, he received a Final Notice on June 9, 1999, that a third warning before August 6, 1999, would result in termination of his employment (Tr. 192:8-14; Dx. 44, 41).

### 7.    Sixth Final Notice - 2000

Sanks did not receive another warning before August 6, 1999, so his warning from August 6, 1998, was no longer active.  Sanks received a warning on April 4, 2000, for violating the time clock policy (Tr. 192:23-194:11; Dx. 45).  Sanks claims that this warning was discriminatory, but cannot state on what basis, or offer any support for his assertion (Tr. 194:23-196:16).  Since Sanks' warning from May 30, 1990, was within the previous twelve months, he received a Final Notice on April 10, 2000, that a third warning before May 30, 2000, would result in termination of his employment (Tr. 196:20-197:12; Dx. 46, 43).

### 8.    Seventh Final Notice – 2005

Sanks did not have another written warning for four years.  Sanks received a counseling report on April 29, 2004, for failing to properly repair a hoist.  Sanks claims this was discriminatory because of his race because another employee had worked on the hoist before him (Tr. 199:13-203:6; Dx. 48).  On May 25, 2004, Sanks received a first written warning for the serious safety violation of working on a hoist without following proper lockout procedures,

which he does not claim was discriminatory (Tr. 203:17-204:11; Dx. 49).[13]  Sanks received a second written warning on February 22, 2005, because he was unable to determine what was wrong with a hoist and he took too long to repair the defect when it was discovered (Dx. 50).  Sanks claims this warning was discriminatory, because no other employee was warned for poor performance, but admits that he has no knowledge about the discipline administered to other employees (Tr. 204:15-205:21; 205:19-206:8).  Sanks received a Final Notice on March 2, 2005, that a third warning before May 25, 2005, would result in the termination of his employment (Tr. 206:12-208:3; Dx. 51).

### C.  SANK'S COMPLAINT OF DISCRIMINATION AND HARASSMENT AND WESTPOINT'S THOROUGH INVESTIGATION

Human Resource Manager, Amber Stevens, issued this seventh Final Notice to Sanks.  During the meeting, Sanks told Stevens he was being discriminated against by Perry Henderson and Dudley Gregory (Tr. 208:7-12; Exhibit 8 at ¶ 4).  Stevens prepared a formal report of Sanks' complaints, dated March 3, 2005, which included Sanks' own hand written statement (Tr. 208:7-20; Dx. 52; Exhibit 8 at ¶¶ 6-7).

Sanks claimed that Henderson and Dudley had singled him out because of his race and the complaints he had made (Tr. 208:21-209:8; Dx. 52 at WPH000315).  Sanks gave Stephens no specifics about his allegations, only that he had been "the only one they have call[ed] in the office about my job quality" (Tr. 215:2-216:5; Dx. 52 at WPH000315; Exhibit 8 at ¶¶ 8-12).  Despite the lack of details, Stevens thoroughly investigated Sanks' allegations by interviewing nine shop associates, six of whom were also black males (Tr. 216:6-217:7; Dx. 52 at WPH000315; Dx. 53; Exhibit 8 at ¶ 13).

---

[13] Sanks' employment could have been immediately terminated for working on equipment without proper lockout (Dx. 22 at WPH 000801).  See note 12, *supra*.

None of the shop associates reported any racial, discriminatory, or harassing conduct by Henderson or Dudley toward Sanks, or anyone else in the department (Dx. 53; Exhibit 8 at ¶ 13). Both William Walton (White) and Elijah Harris (Black) reported that Henderson and Dudley discussed performance issues with anyone who was not doing their job, regardless of race (Dx. 53 at WPH000822-823, 826-827). All six black associates reported they had witnessed nothing they considered to be racially discriminatory or harassing (Dx. 53 at WPH 000820-821, 824-825, 826-827, 828, 830, 831). Eddie Hall (Black) reported that Henderson and Gregory were "the best folks to work for" (Dx. 53 at WPH 000831).

As a result of the investigation, Stevens concluding there was no race discrimination, and reported the results of her investigation to Sanks (Tr. 216:6-217:7; Dx. 52 at WPH 000316, 319; Exhibit 8 at ¶ 14). Although Sanks initially requested a meeting with the Plant Manager or Division Human Resources Manager, by the end of Stevens' explanation of the results of her investigation, Sanks accepted the results and acknowledged by his signature that the results had been communicated to him (Tr. 219:19-220:22; 222:18-223:18; Dx. 52 at WPH 000319; Exhibit 8 at ¶ 14). Sanks declined to pursue the matter further (Tr. 223:13-18; Exhibit 8 at ¶¶ 14-15). Sanks does not allege that any actions regarding his employment from this point were discriminatory (Tr. 222:5-15; 227:11-15; 236:12-17).

## D.    THE TERMINATION OF SANKS' EMPLOYMENT

On Wednesday, July 27, 2005, Sanks was tardy for the sixth time in six months, which warranted disciplinary action. A second written warning dated Friday, July 29, 2005, was

prepared (Tr. 224:19-225:11; Dx. 22 at WPH000791; Dx. 54).[14]  Sanks does not contest this warning and does not claim it was discriminatory (Tr. 225:5-15).

Sanks was tardy again on Friday, July 29, 2005, the date he was to be given the second written warning for being tardy on July 27.  This tardy resulted in his third written warning within the last twelve months (Tr. 225:19-226:1; Dx. 55).  Sanks does not claim the third warning was discriminatory (Tr. 227:11-15).  Sanks does not deny that he was tardy on all of the days referenced in his warnings (Tr. 229:8-10).

Sanks admitted he understood that WestPoint terminated his employment on July 29, 2005, because he had three written warnings within twelve months (Tr. 229:14-230:17; Tr. 230:21-231:16; Tr. 231:20-232:7; Dx. 56, 57, 58).  Sanks admitted that the termination of his employment was not discriminatory (Sanks Tr. 236:12-17).

### E.    WESTPOINT'S LENIENCY ALLOWED SANKS TO AVOID TERMINATION MANY TIMES

Sanks received multiple personnel notices signed by Perry Henderson before receiving any written warnings (Exhibit 7; Dx. 32).  Sanks could have received discipline instead of these personnel notices, but management was trying to motivate Sanks to improve his performance and follow the well-established rules by notifying him of his mistakes and offenses instead of applying formal discipline (Tr. 243:3-8; Dx. 32; Exhibits 4 and 5 at ¶ 11).  Sanks' employment could have been terminated many times had he not benefited from receiving Personnel Notices rather than discipline.

Only seven days after being placed on Final Notice in January, 1992, Sanks received a Personnel Notice from Harold O'Neal and Perry Henderson, that could have been a third written

---

[14] This was Sanks' second written warning because Sanks had an active warning from February 22, 2005 (Dx. 50), but since his warning from May 25, 2004, fell outside twelve months, Sanks was not given a third written warning (Dx. 49).

warning, meaning his employment would have been terminated (Tr. 243:9-244:14; Dx. 39; Dx. 32 at WPH 000524).

Sanks avoided termination again while on Final Notice issued August 10, 1998, when on October 2, 1998, he received a personnel notice from Perry Henderson, rather than discipline, for poor job performance (Tr. 244:15-246:7; Dx. 42; Dx. 32 at WPH000435).

When Sanks was on Final Notice as of January 9, 1999, he received personnel notices on June 11, 1999, and July 29, 1999, either of which could have resulted in the termination of his employment if Henderson or Gregory had chosen to discipline him (Tr. 246:11-248:1; Dx. 44, Dx. 32 at WPH000428-430).

Sanks was on Final Notice as of March 2, 2005.  Sanks received two separate personnel notices on March 24, 2005, signed by Gregory and Henderson, either of which could have resulted in discipline and the termination of his employment (Tr. 248:2-249:11; Dx. 51; Dx. 32 at WPH 000314, 332).

Sanks twice committed the intolerable offense of working without proper lockouts, which was grounds for immediate termination of his employment, but he was given warnings instead (Dx. 38, 49, 22 at WPH 000798-803).

Sanks admits that on multiple occasions, his employment could have been terminated, but Henderson and/or Gregory chose not to discipline him (Tr. 244:9-14; 245:21-246:7; 247:15-248:1; 249:6-19).

### III.     ARGUMENT

### A.     SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to

15

secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), *quoting*, Fed.R.Civ.P. 1. "Summary judgments for defendants are not rare in employment discrimination cases." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted).

Summary judgment is proper under Federal Rule of Civil Procedure 56(c) where the movant shows there is no genuine issue of material fact and that, based upon the undisputed facts, it is entitled to judgment as a matter of law. *Earley*, 907 F.2d at 1080. For a question of fact to be *genuine*, the party opposing summary judgment "must do more than simply show that there is some *metaphysical doubt* as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). Instead, the evidence must be of such quality that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250; *see also, Earley*, 907 F.2d at 1080.

In considering a motion for summary judgment, the trial court must, of course, consider the evidence in the light most favorable to the non-movant. *Earley*, 907 F.2d at 1080. During this process, however, the court is required to resolve only *reasonable* doubts in the non-movant's favor; it is not required to resolve <u>all</u> doubts in his favor. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987). "A court is not obligated to find that there is no conflict in the evidence; the court must merely find that there is not <u>substantial</u> evidence opposed to the moving party's position." (emphasis in original). *Jones v. Miles Laboratories, Inc.*, 887 F.2d 1576, 1578 (11th Cir. 1989).

A movant is entitled to summary judgment where, "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. Where a movant has properly supported a motion for summary judgment, the burden shifts to the non-movant to demonstrate, through the evidentiary forms listed in Fed. R. Civ. P. 56(c), genuine issues of material fact necessitating a trial. *Id.* The substantive law governing the plaintiff's claims determines which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248.

The first step in assessing a motion for summary judgment is to establish the substantive law governing the plaintiff's claims. After laying this foundation, WestPoint will demonstrate that the application of this law to the undisputed facts of this case leads inescapably to the conclusion that it is entitled to summary judgment.

## B.    SANKS' EEOC CHARGE WAS NOT TIMELY

### 1.    Sanks Failed to File His Charge with the EEOC Within 180 Days of Any Alleged Discriminatory Act

The timeline attached as Exhibit 9 is helpful in seeing that Sanks did not file his EEOC charge within 180 days.

Sanks' claims should not be before the Court because his EEOC charge was untimely. In order to sue for discrimination, Sanks must first exhaust his administrative remedies. *Crawford v. Babbitt,* 186 F.3d 1322, 1326 (11th Cir. 1999). It is well established that a plaintiff alleging Title VII or age discrimination in a non-deferral state like Alabama must exhaust administrative remedies by first filing a charge with the EEOC within 180 days of the alleged discrimination. 42 U.S.C §2000e-(b)(1994); 42 U.S.C. § 2000e-5(e)(1)(1994); 29 U.S.C. §626(d)(1); 29 C.F.R. 1626.7(a); *Riccard v. Prudential Ins. Co.,* 307 F.3d 1277, 1291 (11th Cir. 2002); *Alexander v.*

*Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000); *Robinson v. Regions Fin. Corp.,* 242 F. Supp. 2d 1070 (M.D. Ala. 2003).

The exhaustion rule is central to the policies underlying Title VII.  For example, filing a charge with the EEOC provides the agency with "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Georgia Dep't of Human Res.,* 355 F.3d 1277, 1279 (11th Cir. 2004).  The exhaustion requirement provides an opportunity to remedy unlawful employment practices through the EEOC's informal conciliation.  *See, Clark v. Coats & Clark, Inc.,* 865 F.3d 1237, 1241 (11th Cir. 1989).

The initial charge of discrimination is also designed to provide employers with notice of the allegations against them.  *Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1319 (11th Cir. 2001) ("One of the primary purposes for charge requirement is to provide notice to the employer of the allegations against it.")  Failure to provide employers with adequate notice deprives them of due process and violates the requirements of fundamental fairness written into Title VII.  *See* 42 U.S.C. § 2000e-5(2)(D).   Title VII specifically requires that notice of the charge shall be served within ten days of the filing of a sufficient charge (42 U.S.C. §2000e-5(e)(1)(1994).

### 2.    Sanks Did Not File a Charge of Discrimination on September 8, 2005

Sanks visited the EEOC on September 8, 2005, and alleged he had been discriminated against because of his race, harassed and retaliated against (Tr. 258:12-259:20).  The EEOC file reveals that a charge was not filed on September 8, 2005, because the EEOC concluded that Sanks had no claim (Tr. 261:4-16; 263:12-17; Dx. 64, 65).  Sanks admits that the EEOC did not take his charge on September 8, 2005 (Tr. 266:4-8).  Sanks cannot dispute that based on the

evidence he presented to the EEOC on September 8, 2005, the EEOC could not file a charge because he presented no claim (Tr. 258:4-266:15; Dx. 64, 65).

A charge filed with the EEOC must contain "A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices," and should contain the full name, address, and telephone number of the charging party, full name and address of the employer, and the approximate number of employees. 29 C.F.R. § 1626.8(a)(1)-(5). The purpose of a charge is to allow the EEOC to detect and remedy discriminatory employment practices through a process where prompt notice of the charge is conveyed by the EEOC to the employer and an investigation is conducted by the EEOC. *EEOC v. Shell Oil Co.,* 466 U.S. 54, 62-63, (1984). Upon receipt of a charge, the EEOC is responsible for "promptly notifying the respondent that a charge has been filed." 29 C.F.R. §1626.11.

To determine whether a charge has been filed, factors to be considered are if the alleged discriminatory acts were sufficiently described, whether the EEOC treated it as a charge, and if the EEOC notified the defendant of the alleged discrimination. *Clark*, 865 F.2d at 1240-41. *Pijnenburg v. W. Ga. Health Sys.*, 255 F.3d 1304, 1306-07 (11th Cir. 2001) (an intake questionnaire was not a charge because it neither notified the employer of a claim of discrimination, nor triggered an investigation by the EEOC). Other factors include the intent to file a charge, and the actions of the agency in leading the complainant to believe a charge had been filed. *Bost v. Fed. Express Corp.*, 372 F.3d 1233 (11th Cir. 2004) *cert. denied* 543 U.S. 1020 (2004). *Wilkerson,* 270 F.3d at 1320-21 (intake form was a charge because the plaintiff received misleading information from the EEOC, the form stated it could function as a charge, and the EEOC treated it as a charge); *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999) (letter to the EEOC constituted a charge only because the letter satisfied the

requirements of 29 C.F.R. § 1601.12 (Title VII) [29 C.F.R. § 1626.11 (age)], conveyed the plaintiff's present intent to file an EEOC charge, and was treated as a charge by the EEOC).

Under the Eleventh Circuit's standards, Sanks did not satisfy the requirements to file a charge on September 8, 2006. Sanks admits he did not file a charge on this date (Tr. 266:4-8). It is clear that Sanks did not present sufficient facts on which a charge could be based (Tr. 258:4-266:15; 261:4-16; 263:12-17; Dx 64, 65).

Even when specific information is given by a charging party, the court has found such information insufficient to constitute a charge where other information showed the EEOC did not consider it a charge and did not treat it as such.  *Daniels v. Mobile Register, Inc.*, 2005 U.S. Dist. LEXIS 44875 (letter which identified harasser and description of harassment could have arguably been a charge, but was found not to be because subsequent correspondence showed the EEOC did not consider the letter a charge and did not treat it as such) (Exhibit 10). The EEOC clearly did not treat Sanks' claims as a charge because no charge was filed, no investigation was undertaken, and no notice was given to WestPoint (Tr. 258:4-266:15; 261:4-16; 263:12-17; 266:4-8; Dx 64, 65).[15]

For these reasons, Sanks failed to file a charge within 180 days of his discharge[16] and all of his claims are barred because he failed to file a timely claim with the EEOC.

### 3.    Sanks' Admits The Most Recent Date of Discrimination Was Not The Termination of his Employment but Months Earlier

Even if Sanks had successfully filed a charge on September 8, 2005, it would have been untimely. Since Sanks alleged in his charge dated January 27, 2006, (Dx. 63) that the date of his

---

[15] The EEOC did not initiate an investigation, and did not notify WestPoint after Sanks' visit to the EEOC on September 8, 2005. WestPoint did not receive notice of any charge until March 16, 2006, but was told that no action was necessary at that time (Exhibit 11 at WPH 001094). WestPoint received a second notice and request for a position statement on March 24, 2006 (Exhibit 11 at WPH 001092).

[16] This assumes that Sanks contends that the termination of his employment was discriminatory. Sanks does not make such an assertion. See Section III.3., *infra*.

discharge was the last day on which discrimination occurred, that is the date which was used in the analysis in determining the deadline for Sanks to file a charge. (See discussion of January 27, 2006, charge at Section III.B.4). However, Sanks does not allege that any discriminatory action was taken against him after his March 3, 2005, complaint of discrimination (Dx. 52). Sanks does not claim any of the adverse employment actions that occurred afterward, two warnings and the termination of his employment, were discriminatory on any basis (Tr. 225:5-15; 227:11-15; 236:12-17; Dx. 54, 55, 58). This means that Sanks' time to file a charge expired not 180 days after his July 29, 2005, termination, or January 25, 2006, but 180 days after he complained of discrimination on March 3, 2005, or August 30, 2005. Therefore, Sanks was too late, even on September 8, 2005, to file a charge based on any acts which he claims were discriminatory, and his claims should be dismissed.

**4.    Sanks' Charge Filed January 27, 2006, Was Untimely and Insufficient to State a Claim**

After the EEOC declined to file a charge on September 8, 2005, Sanks consulted with an attorney (Tr. 261:9-16). Sanks' attorney sent a charge dated January 26, 2006, which was received by the EEOC on January 27, 2006, alleging discrimination based on race, color, retaliation and harassment, but not age discrimination (Tr. 255:22-258:11; Dx. 63). The charge alleged that the most recent date of discrimination was July 29, 2005, the day Sanks' employment was terminated.[17]  Based on that date, Sanks' deadline to file a charge of discrimination was January 25, 2007.

---

[17] As previously explained, Sanks now admits that his termination, and the two warnings before his termination, were not discriminatory, but justified, making his deadline to file a charge August 30, 2005 (Tr. 225:5-15; 227:11-15; 229:8-10; 236:12-17; 229:8-10; Dx. 54, 55, 58). However, this alternative analysis is offered to show that even considering events in a light most favorable to Sanks, his charge was still untimely.

Sanks' charge was received by the EEOC two days after the deadline had passed (Dx. 63). This first charge of discrimination purported to be an "Amended Complaint" and contended the "Original Complaint was filed on September 8, 2005" (Dx. 63). This is a complete fraud, since Sanks admitted, and the EEOC documents confirm, that no such timely charge ever existed (Tr. 262:11-15; 266:4-8; 258:4-266:15; Tr. 267:18-268:7; Dx. 64, 65, 66).[18] Even though this charge was filed late, the EEOC determined that the facts presented by Sanks were not sufficient to state a claim under Title VII (Tr. 267:12-23; Dx. 66).[19]

Since the charge filed by Sanks on January 27, 2006, was two days after the deadline to file a charge expired, all of his claims are barred and should be dismissed.

**5.     Sanks' Amended Charge Alleging Age Discrimination Was Untimely**

On May 4, 2006, Sanks submitted an amended charge adding age as a basis of discrimination (Tr. 250:6-251:3; Dx. 62). Sanks based this charge on previously unstated factual allegations, unrelated to the facts presented in his original charge on January 27, 2006 (Tr. 251:4-11; Dx. 62, 63). Sanks made a new allegation that he was told by a third party that a younger employee took his position after he was terminated. Sanks claimed he was given this information a week after he was terminated, however, this was the first time Sanks mentioned these allegations (Tr. 250:6-251:11; Dx. 62, 63).

Since Sanks was terminated on July 29, 2005, his time to file these claims expired on January 25, 2006. Sanks did not allege age discrimination until 280 days after the termination of

---

[18] One can infer from the evidence that both the EEOC and the charging party knew that no charge had been filed on September 8, 2006, but colluded to create the impression in documents presented to WestPoint that a timely charge had been filed.

[19] The EEOC failed to give notice to WestPoint for almost two months after the filing of this charge (See note 15, *supra*).

his employment. Since Sanks was aware of the facts on which this claim was based only a week after his termination, there is no excuse for his delay in presenting them to the EEOC.[20]

Sanks cannot proceed with claims that were made in an amended charge made outside the time period, based on "both a new and independent charge…and new and independent facts to support [his] claim". *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 247 (5th Cir. 1985). In *Hornsby*, the claimant filed a timely charge alleging age and sex discrimination, and retaliation, and seven months later filed an amended charge of sex harassment, based on new facts not in the original charge (*Id.* at 245). The court found that under those circumstances, the amended charge did not relate back to the original charge, but was an addition, and the claim was barred (*Id.* at 247). Such an attempt to relate a new charge back to the original charge can only be successful if the new charge is based on the same set of facts as the original (*Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970).

Sanks' claim of age discrimination rests on his assertion that he was replaced by a younger employee, a fact which was not mentioned until his second charge on May 6, 2007. Sanks' claim cannot be found to reasonably arise from the facts alleged in his original and equally untimely charge on January 27, 2006 (Dx. 63). Sanks never made any assertion in his narrative in the first charge that age was involved in his claims, or that he was replaced by a younger employee. For these reasons, Sanks' claims regarding age discrimination were not brought before the EEOC in a timely manner, and his age claim in this lawsuit should be dismissed.

6.    **Sanks' Claims Are Based on Discrete Acts, Not Continuing Violations And Are Therefore Barred**

Sanks has not pled a continuing violation, and therefore cannot salvage his untimely claims.

---

[20] Even if Sanks had presented this information in his charge on January 27, 2006, it would have been untimely, since that charge was two days late.

23

(Dx. 62, 63) *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1226 (11th Cir. 2001), *cert. denied*, 534 U.S. 1127 (2002); *Bush v. Liberty Nat'l Life Ins. Co.*, 12 F. Supp. 2d 1251, 1258-9, n.11, (M.D. Ala., Mar. 31, 1998), *aff'd*, 196 F.3d 1261 (11th Cir. 1999) ("continuing violation must be clearly asserted both in the EEOC filing and in the complaint") (emphasis added).   Moreover, the continuing violation theory would not apply to Sanks' allegations of discrete employment decisions, pertaining to distinct employment issues:  "in the absence of a continuing discriminatory policy, a plaintiff cannot extend the life of an otherwise barred . . . claim under the continuing violation doctrine. . . ."   *Miller v. Bed, Bath & Beyond, Inc.,* 185 F. Supp. 2d 1253, 1262-63 (N.D. Ala. 2002)(*citing Thigpen v. Bibb County*, 223 F.3d 1231, 1244 (11th Cir. 2000); *Scarlett v. Seaboard Coast Line R. Co.,* 676 F.2d 1043, 1050 (5th Cir. Unit B 1982); *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249-50 (5th Cir. 1980)).  In any event, the continuing violation theory does not apply here because, to the extent that it remains at all after *AMTRAK v. Morgan,* 536 U.S. 101, 113-114 (2002), it is "premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Bradley v. Fla. DOT*, 2002 U.S. Dist. LEXIS 27475, *33-34 (Exhibit 10), (*quoting Hipp*, 252 F.3d at 1222).  On March 3, 2005, Sanks complained to Human Resources that he was being retaliated against and discriminated against on account of his race and color by Perry Henderson and Dudley Gregory.  Therefore, viewing the evidence in a light most favorable to Sanks, he should have filed an EEOC charge based on race and color discrimination, and retaliation, within 180 days of March 3, 2005, or by August 30, 2005.

According to Sanks, he was told by a third party about a week after he was discharged that a younger person had replaced him (Tr. 250:6-251:11; Dx. 62, 63).  Therefore, Sanks should have

filed an age claim within 180 to 187 days of his discharge, or sometime between January 25, 2006, and February 1, 2006.  Sanks did not file his age charge until May 4, 2006.

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred." *Morgan*, 536 U.S. at 113. "Discrete acts . . . are easy to identify.  Each incident . . . constitutes a separate actionable 'unlawful employment practice.'"  *Morgan* 536 U.S. at 114.  The acts alleged to have occurred by Sanks, to the extent they would have been actionable at all, are clearly "discrete acts." The disciplinary actions are clearly separate and discrete, evidenced by the fact that Sanks complains of some, but not others.  Further, the acts are separated by large gaps of time, in some cases, years.

Sanks cannot claim that acts which occurred years before his discharge were relied upon as a basis for the decision to terminate his employment in 2005.  That argument is foreclosed because the Eleventh Circuit has made clear that the "continuing effects" theory is dead. A plaintiff cannot transform untimely complaints to timely ones by claiming that he continues to be affected by an employment decision that is time-barred.  *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648 (11th Cir. 1993), *reh'g, en banc denied*, 16 F.3d 1233 (11th Cir. 1994), *cert. denied*, 513 U.S. 814 (1994).

**7.    Sanks cannot save his time-barred claims by mischaracterizing his discipline as "harassment."**

Sanks cannot be allowed to dredge up every personnel action or disciplinary action since 1985 merely by invoking the magic word "harassment." Under *Morgan*, the court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." 536 U.S. at

120. Sanks cannot fairly characterize 14 discrete events that occurred over 20 years as "part of the same actionable hostile work environment practice" when they are separated by large gaps of time, in some cases, years. *See* Exhibit 7.

In addition, the personnel notices, disciplinary actions, and even Henderson's alleged harsh tone when speaking with Sanks about his work, do not amount to acts of harassment. The courts have made clear that insistence on an employee's performance of duties assigned by a supervisor is not harassing conduct. "Conversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. Ohio 1998), *cert. denied* 525 U.S. 963 (1998). In *Padron v. BellSouth Telecomms. Inc.*, 196 F. Supp. 2d 1250, 1260 (S.D. Fla. 2002), the plaintiff alleged that her employer "routinely reprimanded and threatened her with disciplinary action, and contended that these activities constituted illegal harassment." The court found that harassment was not established by simple disciplinary actions, which "are consistent with any workplace environment where an employee will be corrected by a supervisor." The court went on to remark that, "[e]ven if [plaintiff] was treated rudely by supervisors, this does not constitute harassment." *Id. See also, Wadibia v. Auburn Univ.*, 1999 U.S. Dist. LEXIS 14122 (S.D. Ala. Aug. 26, 1999) (Exhibit 10). In *Campbell v. Dominick's Finer Foods*, 85 F. Supp. 2d 866 (N.D. Ill. 2000), the court held that work-related discipline for, *inter alia*, disrespect toward supervisors and refusal to follow instructions, was not racial harassment. Similarly, in *Hudson v. National Academy of Sciences Inst. of Medicine*, 816 F. Supp. 774 (D.D.C. 1993), *aff'd* 22 F.3d 1184 (1994), the court held that the plaintiff, who spent "much of her time" arguing with her supervisor "rather than trying to meet her supervisor's expectations," was not racially harassed by employer's disciplinary actions. In short, "Title VII does not provide a cause of action for

employees who are exposed to harassment that has no reference to race, sex or national origin." *Potts v. Conecuh-Monroe Counties Gas Dist.*, 2000 U.S. Dist. LEXIS 11822, *63 (S.D. Ala. Aug. 1, 2000) (Exhibit 10), *quoting, St. Hilaire v. Pep Boys,* 73 F. Supp. 2d 1350 (S.D. Fla. 1999).

Even if any of the alleged individual events could be classified as an act of harassment, which it cannot, the entire litany of Sanks' grievances, taken as a whole, do not amount to actionable harassment. In order to establish a harassment claim, the plaintiff must show that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Edwards v. Wallace Community College*, 49 F.3d 1517(11th Cir. Ala 1995). In determining pervasiveness, the courts consider the frequency of the alleged discriminatory conduct; its severity; whether it is physically threatening or humiliating as opposed to merely offensive utterances; and whether it interferes unreasonably with the individual's performance on the job.  Merely engendering "offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21.  Moreover, to be actionable, the action must be offensive to a reasonable person and to the complaining individual.  *Id.*  "Incidents of environmental . . . 'harassment must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'". *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), *quoting Carrero v. New York City Hous. Auth.*, 890 F.2d 569,577 (2d Cir. N. Y. 1989).

The incidents alleged by Sanks are too mild, isolated, disconnected and few to constitute unlawful race or color based harassment under Title VII. None of the events alleged by Sanks can be considered "severe" in comparison to the claims of many other plaintiffs whose complaints the courts have rejected. For example, in *Evans v. Pemco Aeroplex, Inc.,* 1998 U.S.

Dist. LEXIS 22954 (N.D. Ala., Feb. 23, 1998), the court held that the plaintiff had not established unlawful harassment despite the use of nooses and the letters "KKK" in the workplace (Exhibit 10). The conduct Sanks alleges is not so "continuous and concerted" as to be deemed "pervasive." *See, Edwards*, 49 F.3d 1517; *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir. 1981)("must be a steady barrage of opprobrious racial comment"). These incidents were not "sufficiently pervasive as to alter the conditions of employment and create an abusive environment." *Harris, supra; Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985).

Courts have consistently found that such isolated incidents as the actions alleged by Sanks, particularly when they do not directly relate to a protected class, are not sufficiently pervasive to be actionable. See, *e.g.*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999), *cert. denied* 529 U.S. 1068 (2000). (Five incidents over 11-month period are "far too infrequent to alter the conditions under which Mendoza was required to perform her job.")

Even if the events Sanks complains about were found to be "frequent," their lack of a connection to plaintiff's race, color or protected activity overcomes their frequency. "[T]o the extent [plaintiff] showed frequent conduct, the frequency of it does not compensate for the absence of the other factors." *Mendoza*, 195 F.3d at 1248. For an act to be considered part of an actionable hostile work environment claim, it must be related to the protected category. *Meneffee v. Montgomery County Bd. of Educ.*, 2005 U.S. App. LEXIS 12286, *2 (11th Cir. June 21, 2005) (Exhibit 10) (acts must be related of "a sexual or gender-related nature" to be considered part of claim), *citing, Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). Sanks is unable to prove that any act of WestPoint was related to his race, color, or protected activity. There is nothing apparent on the surface of the actions that relates them to race, color, or protected activity. Sanks has failed to present any evidence that any of the acts were based on his race, color or

protected activity. Therefore, these events cannot be considered as part of "the same actionable hostile work environment practice," and are time-barred. *Meneffee*, 2005 U.S. App. LEXIS 12286 at *4 (Exhibit 10).

For these reasons, Sanks cannot show any actionable hostile work environment and the incidents are not, taken individually or as a whole, sufficiently severe or pervasive to rise to the level of actionable harassment. Therefore, any claim based on those actions is barred, and WestPoint is entitled to summary judgment.

### C.     LEGAL FRAMEWORK FOR ANALYZING SANKS' CLAIMS

Sanks alleges that he was terminated because of his race, color and age (Complaint ¶7). Sanks alleged that he was subjected to harassing comments and warnings without cause because of his race, color and age. (Complaint ¶ 7).[21] Sanks alleges that the race discrimination took the form of Perry Henderson speaking to him harshly, and white employees not being subjected to reprimands or similar working conditions (Complaint ¶11 and 12). Sanks alleges Henderson retaliated against him for going to Human Resources in 1985 to complain that he had not received a raise (Complaint ¶8). Sanks alleges he was discriminated against with regard to his age, because a younger employee replaced him.

Sanks may prove discrimination with either direct or circumstantial evidence. *Walker v. NationsBank N.A.,* 53 F.3d 1548, 1555 (11th Cir. 1995).[22] Sanks has made no assertion that he has any direct evidence of discrimination based on his race, color, or age. Therefore, Sanks may proceed with his claim only by relying on circumstantial evidence.

---

[21] Sanks does not allege a hostile work environment, only that individual acts were discriminatory or retaliatory. To the extent Sanks might allege a hostile work environment claim, his claim fails for the reasons set forth in Section III, B, 7.

[22] A third method of establishing a *prima facie* case is showing a statistical pattern of discrimination, but Sanks has made no claim or offered any such evidence. *Carter v. Miami*, 870 F.2d 578, 581 (11th Cir. 1989).

1.    *Prima Facie* **Standards**

    a.    **Race and Color**

    To establish a *prima facie* case of discrimination based on race or color under Title VII the plaintiff must rely on the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). To establish a prima facie case of discrimination, Plaintiff must show that: (1) he is a member of a protected group; (2) that he suffered an adverse employment action; (3) that he was qualified for his job; and (4) he was treated differently than employees outside the protected class who were similarly situated. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802.

    b.    **Age**

    In establishing a *prima facie* case of age discrimination, a plaintiff may also rely on the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (*See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1469 (11th Cir. 1991). In a discharge case, this requires that plaintiff establish: (1) membership in the protected class; (2) an adverse employment action; (3) that a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do to the job. *See Williams v. Vitro Servs. Corp.,* 144 F.3d 1438, 1441 (11th Cir. 1998) (recognizing extension of *McDonnell Douglas* test to circumstantial-evidence ADEA cases); *Tidwell v. Carter Prods.,* 135 F.3d 1422, 1426 (11th Cir. 1998) (applying burden-shifting analysis in circumstantial ADEA case); and *Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1432 (11th Cir. 1998).

    Under the *McDonnell Douglas* framework, whether the basis of discrimination is race,

color, or age, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804.

### c.    Retaliation

To establish a prima facie case of retaliation, plaintiff must show: (1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that there is a causal link between the protected expression and the adverse action. *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999).

### 2.    Sanks Cannot Establish a *Prima Facie* Case For Any Of His Claims

The standards for establishing a *prima facie* case of discrimination for age are the same as those for race and color in three out of four respects in this case. Since Sanks' age claim is based on his allegation that a younger person replaced him, he is required to show that fact to meet this burden, while in his race and color claim, Sanks must show an employee outside of his protected group was not disciplined for nearly identical conduct. Sanks can establish that he was a member of each protected category, being black and over forty.[23] In each analysis, Sanks fails on other grounds.

### a.    Sanks' Race, Color and Age Claims Fail Because He Was Not Qualified

Sanks has failed to demonstrate that he was qualified to perform the duties of the position he held, given his consistent inability to meet his employer's expectations. *See Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1520-21 (11th Cir. 1990) (*per curiam*) (holding that terminated plaintiff failed to establish a *prima facie* case under the ADEA; ruling that she was not qualified

---

[23] Sanks has not established that the color of his skin was any different than the other African-American employees in his department, other than his own subjective assessment that he was darker-skinned than his co-workers (Tr. 254:5-6; 308:13-16). Sanks attempts to bolster his discrimination claim by adding color as a protected category because half of the maintenance department was African American, but none of them confirmed Sanks' internal complaint of discrimination (Tr. 211:16-18; Dx. 53 at WPH 000820-821, 824-825; 826-827; 828; 830; 831).

because of her consistent failure to meet her employer's quota for sale of maintenance agreements, a requirement of the position) (Exhibits 4 and 5 at ¶¶ 5-6, 9-11).

Sanks' position required him to perform preventative maintenance, troubleshooting, identifying problems and repairing equipment in a timely manner (Tr. 148:21-149:16). Sanks received multiple disciplinary actions for his failures to perform in these areas, which he admits were not discriminatory (Tr. 184:18-23; 168:21-181:14; 184:18-23; 186:11-19; 187:17-20; 189:7-19; 190:13-16; 191:14-192:4; 203:17-204:11; Dxs. 32 at WPH000570, 33, 34, 36, 38, 40, 41, 43, 49).[24] In addition, Sanks admits the tardiness that led to his last two warnings, and admits the warnings and his termination were not discriminatory (Tr. 225:5-15; 227:11-15; 229:8-10; 236:12-17; Dx. 54, 55, 56). Sanks even refuses to state that he was qualified to do his job without the qualifying statement "To my best ability…" (Tr. 155:8-14).

Since Sanks acknowledges that he was repeatedly warned for performance issues and was terminated, all for reasons that were not discriminatory, Sanks fails to show he was qualified and met his employers' expectations. Therefore, Sanks has failed to meet this aspect of the *prima facie* case and his claims of discrimination based on age, race and color should be dismissed.

> **b.      Sanks' Race and Color Claims Fail Because He Has No Comparators**

To prevail on his claims of race and color discrimination, Sanks must establish that an employee outside of his protected group was not disciplined for nearly identical conduct. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185-87 (11th Cir. 1984); *see also*, *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989). "In determining whether [employees] are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in

---

[24] These warnings include such performance issues as taking too long to make repairs (Dx. 33), improper inspections (Dxs. 34, 36, 40, 41), and failing to use proper lockout procedures (Dx. 38, 49).

different ways." *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003), *quoting Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.) *opinion modified by* 151 F.3d 1321 (1998). Sanks cannot establish cannot establish a *prima facie* case of discrimination for either his discipline, or his termination, because he cannot name any similarly situated white co-workers who were not disciplined or terminated for similar misconduct.

To establish that his warnings were discriminatory, Sanks could offer no evidence that he was treated differently than similarly situated persons who were either white, or lighter-skinned. Sanks makes the ridiculous assertion, "No one else ever have got a write up of poor work performance during the course of working in this plant" (Tr. 205:15-21). This statement is without merit, and Sanks admits he has no knowledge about warnings given, or not given, to other employees (Tr. 206:2-8).

Sanks cannot say that others were getting by with performance deficiencies that were the same as his (Sanks Tr. 209:9-210:1). Sanks alleges others were not given warnings when machines were down, but that he cannot say they were "…doing the same thing [as Sanks] and getting by with it..." (Sanks Tr. 209:21-23). To establish a *prima facie* case, Sanks must show that the conduct of other employees who were not disciplined was "nearly identical" to his conduct. *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001). Sanks has not presented any evidence to even suggest this. Sanks names comparators who are both black and white who he claims were not disciplined for failing to fix machines, but admits he has no specifics about the incidents, and admits he has no knowledge of whether or not they were actually disciplined (Tr. 209:21-211:11; 205:22-206:8; 212:2-5).[25]

Sanks claims that whites were given preferential treatment regarding breaks and schedules, but in reality has no claim. Sanks claims only whites were allowed to take smoke

---

[25] Three of the five associates that Sanks specifically names as comparators are black (Tr. 209:21-211:11).

breaks, but Sanks admits he does not smoke (Tr. 290:15-19). Sanks claims Rocky Owens, a white male, was allowed to stand around and talk (Tr. 291:6-292:1). However, Sanks cannot say whether these employees were disciplined (Tr. 205:22-206:8).

Sanks believes that Dudley Gregory had partial absences that were not counted against him because he is white, but Gregory is not a proper comparator because he was a supervisor (Tr. 293:20-294:6; 347:5-348:11; Exhibits 4 and 5 at ¶ 17). Sanks has no knowledge of the discipline given to other employees, and specifically, to Gregory (Tr. 345:17-20). Moreover, Sanks can only point to three instances when Gregory was tardy or had a partial absence, which is insufficient to warrant discipline under WestPoint's policy (Tr. 342:5-345:10; Dx. 22 at WPH 000773).

"[T]o prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges," the Eleventh Circuit requires "the quantity and quality of the comparator's misconduct [to] be nearly identical" to that of the Plaintiff's. *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999). Sanks has not presented evidence that anyone made errors or had performance issues with the same frequency or severity as his, or that they did so after repeated warnings. He has not shown that the quantity or quality of his co-workers' conduct was nearly identical to his, and, therefore, he has not presented a *prima facie* case.

### c.     Sanks Cannot Show a Younger Person Replaced Him

Sanks claims he was told by a third party a week after his termination that a younger employee, Danny Oliver, replaced him (Tr. 251:4-11). Sanks has no evidence to support his contention. Sanks does not know the name of the person who told him this information (Tr. 252:9-11). Sanks has no independent knowledge of the facts, and admits he does not know if

Oliver merely assumed some of Sanks' duties (Tr. 294:21-295:2). Sanks is unsure of Oliver's age.

The fact is, Oliver was only given part of Sanks' duties in maintaining the hoists, but did not replace Sanks (Exhibits 4 and 5 at ¶ 16). No one was hired for Sanks' position (Exhibits 4 and 5 at ¶ 16).[26] According to Sanks, he had worked with Oliver for almost two years in the shop (Tr. 251:12-18). Sanks has failed to prove that a substantially younger person replaced him; therefore, he has failed to show a *prima facie* case of age discrimination.

### d. Personnel Notices and Harsh Speaking Are Not Adverse Employment Actions

Sanks cannot establish that he was discriminated or retaliated against in regard to the personnel notices, or because Henderson spoke to him harshly, because those are not adverse employment actions. Therefore, Sanks' claims regarding discrimination and retaliation based on those actions fail.

Personnel Actions are not discipline (Tr. 167:1-168:1). These matters are specifically given, in some cases, instead of a disciplinary action. Sanks admits that on multiple occasions, he benefited from receiving personnel actions, rather than discipline (Tr. 243:3-8; 243:9-244:14; 244:15-246:7; 246:11-248:1; 248:2-249:11). Personnel Actions could not lead to termination from employment (Tr. 167:12-168:1). Personnel Actions do not constitute a "tangible employment action…such as hiring, firing, failing to promote, reassignment with significantly

---

[26] Sanks' position was not filled because the plant where Sanks worked was closing. Even if Sanks were to prevail on his claims, his damages would be minimal. Sanks' plant closed in November, 2006 (Exhibit 12; Exhibits 4 and 5 at ¶ 19. Sanks' would have lost his job as a result of the closure no later than November 4, 2006. (Exhibits 4 and 5 at ¶ 19). Therefore, Sanks' back pay would cut off on that date. Further, Sanks admits he is permanently and totally disabled as of March, 2007, and is receiving Social Security Disability benefits (Tr. 91:17-19; 99:7-100:11). Even if Sanks were to receive a judgment against WestPoint, the company has no assets or ability to pay a judgment (Exhibit 13 at ¶ 7).

different responsibilities, or a decision causing a significant change in benefits." *Burlington Ind., Inc., v. Ellerth*, 524 U. S. 742, 761-62 (1998).

The Supreme Court has declared that Title VII does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience" *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2415 (U. S. 2006).

Sanks claims that Henderson spoke harshly to him, but only in the context of telling him to do his job (Tr. 268:11-287:23). If Henderson spoke in a direct manner to Sanks and issued Personnel Notices to Sanks, it was to impress upon Sanks the importance of doing his job (Exhibit 4 at ¶¶ 8, 11). Even Sanks admits that the notices were beneficial to him because he did not receive discipline (Tr. 243:3-249:19). For these reasons, Henderson's admonishing Sanks about doing his job and preparing Personnel Actions is not adverse, and Sanks' claims regarding these activities should be dismissed.

### e.    Sanks Cannot Show a Prima Facie Case of Retaliation

Sanks fails to show a prima facie case for retaliation because there is no evidence any adverse employment action was motivated by protected activity.

As previously explained, Personnel Notices are not adverse employment actions. However, even assuming they are, the Notices and Warnings about which Sanks' complains were not motivated by protected activity.

Sanks' alleges, without any evidentiary support, he was retaliated against by Perry Henderson after he complained, about a year after coming to the maintenance department in 1985, that he did not receive an increase after 90 days in the department (Tr. 142:3-143:12;

238:11-13; 239:10-15).    Sanks is incorrect.    The undisputed evidence, however, shows that Sanks timely received his 90 day increase, approved by Perry Henderson, effective August 11, 1985 (Dx. 60).    Sanks received a second increase, approved by Perry Henderson, effective December 29, 1985 (Dx. 61).    There are no "automatic" raises, only increases based on job knowledge (Exhibits 4 and 5 at ¶ 10).    Sanks cannot dispute the accuracy of these documents (Tr. 239:16-23; 241:18-242:2).

Sanks claims that personnel notices and discipline he was given after his complaint, some time in 1986, were in retaliation for his complaint about his pay increase.    Sanks never alleges that he believed or complained that he did not receive the increase because of his race or color. Since Sanks did not oppose an unlawful employment practice within the meaning of Title VII, none of the personnel notices or warnings that he complains are discriminatory can be retaliatory.[27]

Even if Sanks had engaged in protected activity in 1986, the facts show that any adverse actions were not motivated by his complaint, but were legitimate attempts to correction his performance.    The chronology shows that there are significant gaps of time in between Sanks' alleged protected activity and any alleged discriminatory act (Exhibit 7).

Sanks came to the maintenance department on May 4, 1985 (Tr. 139:21-140:4; Dx. 25). Sanks claims he complained and received his raise about a year later, or approximately May, 1986 (Tr. 142:3-143:12; 238:11-13; 239:10-15).    The first incident that Sanks claims was retaliatory is a personnel notice he received on October 27, 1987, a year and a half later (Tr.

---

[27] Although Sanks complained of discrimination based on race and color on March 3, 2005, he does not claim that the two warnings and his termination of employment, which occurred afterward, were discriminatory, and he admits his misconduct (Tr. 225:5-15; 227:11-15; 229:8-10; 236:12-17; 229:14-230:17; 230:21-231:16; 231:20-232:7; Dx. 54, 55, 56, 57, 58).    Therefore, Sanks was not retaliated against for his complaint on March 3, 2005.

169:14-170:15; Dx. 32 at 570).[28]    There can be no inference of any causal connection between the complaint and the alleged act of retaliation with such a long period of time in between. Further, Sanks cannot establish a pattern and practice of acts of retaliation. The acts he claims were discriminatory or retaliatory occur with periods of months, and years in between, including one period of four years, and four periods of two years (Exhibit 7).[29] For example, the next act Sanks alleges was retaliatory occurs four months later. Sanks alleges fourteen distinct personnel notices and discipline which he claims were discriminatory/retaliatory spread between 1987 and 2005, a period of eighteen years. That is an average of a less than one discipline or personnel notice per year.[30]

The evidence suggests, rather than retaliating against Sanks, Henderson gave Sanks every opportunity to retain his employment. Sanks admits that he could have been terminated on multiple occasions if not for the leniency of Henderson (Tr. 244:9-14; 245:21-246:7; 247:15-248:1; 249:6-19; Exhibits 4 and 5 at ¶ 11).

### 3.    WestPoint had a Legitimate, Non-Discriminatory Reason for Its Actions

Even if Sanks were to meet his burden of establishing a *prima facie* case, doing so "does not in itself entitle an employment discrimination plaintiff to survive a motion for summary judgment. . . ." *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595 (11th Cir. 1987). The Eleventh Circuit has declared that "the defendant's evidence of a legitimate, non-discriminatory

---

[28] Even though, for the reasons stated above, personnel actions are not adverse employment actions, the personnel actions are used in the analysis to show that giving Sanks the benefit of calling them adverse, his claim fails. If only discipline is considered, Sanks claim is weaker. The first discipline that Sanks alleges was discriminatory came almost two years after his alleged complaint (Tr. 173:13-20; Dx. 32 at 565).

[29] Sanks uses discriminatory and retaliatory almost interchangeably, but basically claims that his performance was criticized in retaliation for his 1986 complaint (See note 9, *supra*).

[30] If personnel notices are excluded, Sanks claims only seven warnings were discriminatory. Sanks received ten warnings during this time period which he does not claim were discriminatory. (See Exhibit 7).

reason for its actions may be so strong as to rebut completely the inference raised by the plaintiff's *prima facie* case." *Id.; see also, Earley*, 907 F.2d at 1081.

If the plaintiff meets his burden of proving his *prima facie* case, the burden of *production* shifts to the defendant. The defendant may rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the alleged adverse employment action. *Eskra v. Provident Life & Accident Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir. 1997) (defendant bears the burden of articulating a non-discriminatory reason). If the defendant satisfies its burden of production, the plaintiff then has the burden of persuading the Court that the reason offered for the employment decision is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-04. The plaintiff satisfies this burden by establishing not only that the defendant's legitimate, non-discriminatory reason for its action was false, but also that a reasonable fact finder could conclude that the true reason for its action was an intent to discriminate. *St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2752 (1993); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 981 n.3; *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184-85 (11th Cir. 1984). "It is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 113 S.Ct. at 2754. Mere conclusory allegations or assertions and subjective beliefs of discrimination do not prove pretext. *Earley*, 907 F.2d at 1081; *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). Instead, in order to show pretext, and thereby overcome a summary judgment motion, the plaintiff has the burden to produce substantial probative evidence on every element necessary to support a finding of discrimination in his favor by a rational trier of fact. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596-97 (11th Cir. 1987).

If the plaintiff successfully carries his burden of establishing that defendant's legitimate, non-discriminatory reasons are pretextual and that the defendant was actually motivated by an intent to discriminate, he has satisfied the required ultimate burden of demonstrating by a preponderance of the evidence that he has been the victim of intentional discrimination. *St. Mary's Honor Center,* 113 S.Ct. 2742. A plaintiff must successfully negotiate this entire burden-shifting process in order to prevail upon the "ultimate question" in a disparate treatment case of "`whether the defendant intentionally discriminated against the plaintiff.'" *Nix*, 738 F.2d at 1184, *quoting, United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983). If the plaintiff is unable to prove the employer's justification to be pretextual, or if the record conclusively reveals some other non-discriminatory reason for the employer's decision, summary judgment must be granted for the employer. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

WestPoint has set forth its legitimate non-discriminatory reasons for issuing warnings to the Plaintiff for poor job performance, and for terminating his employment consistent with its well-established policies.

### 4.    Sanks Has No Evidence of Pretext

Once a reason for the adverse employment action has been proffered by the employer, the burden shifts to plaintiff to put forth sufficient evidence to permit a reasonable fact finder to conclude that WestPoint's reason for the decision was false and that the real reason was discrimination. *See Sullivan v. AMTRAK*, 170 F.3d 1056, 1061 (11th Cir. 1999), *cert. denied*, 528 U.S. 1107 (2000).

A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is

one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

Sanks has failed to "meet [WestPoint's] reason head on and rebut it." Sanks has not presented any evidence that WestPoint's reasons for its actions were a mere pretext for an intent to discriminate. The evidence concerning the decision-making process leading up to the termination of Sanks' employment is clear and undisputed. Sanks' managers and supervisors followed WestPoint's established policies for discipline and termination. Sanks has specifically admitted the conduct that immediately led to his discharge, and has admitted that his last two written warnings, and his termination, were not discriminatory (Tr. 225:5-15; 227:11-15; 229:8-10; 236:12-17; 229:14-230:17; 230:21-231:16; 231:20-232:7; Dx. 54, 55, 56, 57, 58)

Sanks has no credible contention for how his discipline or discharge is related to his race, color or age. Sanks' rationale for his belief that he has been discriminated or retaliated against is little more than a repetition of his allegations, not any offer of proof.

As explained earlier, Sanks fails to point to any proper comparators that establish he was treated less favorably. In addition, when asked about the basis for his claims that warnings were discriminatory, Sanks either has no information, or vague restatements of his allegations [Tr. 173:14-20, Dx. 32 at 565 (the reasons for the warning were not true and it was given to him because of his wage increase complaint); Tr. 174:8-175:11, Dx. 32 at 558 (admits he has no information to support his claim); 194:23-196:16, Dx. 45 (discrimination, but cannot state on what basis); Tr. 199:19-201:20; 202:18-203:1, Dx. 48 (claims discipline discriminatory because another electrician confused him by changing wires, but cannot state how this event makes the warning discriminatory, or name the electrician as a comparator); Tr. 205:15-21; 206:2-8, Dx. 50

41

(discrimination because no one else was ever written up for poor performance, but admits he does not know if this is true)].

Sanks has not offered any evidence at all tending to show that WestPoint considered his age in any way in making its decision to terminate his employment. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522  (11th Cir. 1995) (rejecting plaintiff's discrimination claims which were found to be purely speculation).  Sanks merely speculates, based on hearsay, that he was replaced by a younger employee, and therefore, his employment was terminated because of age.

Sanks fails to state a basis for his claim that he was retaliated against.  Sanks again simply repeats that he was singled out because he did not perform his work to the satisfaction of his supervisors (Tr. 242:3-19).  WestPoint is entitled to discipline employees who are not performing satisfactorily.  It is not retaliation.

Sanks has simply given no evidence of pretext. He cannot name a proper comparator and cannot articulate a reason for his subjective belief that he was treated differently because of his race or color, or that he was retaliated against.  In contrast, the facts show that he was mistaken in his belief that he did not receive a timely increase, which led to his misguided belief that he was being retaliated against for nearly twenty years, and his assumption that the retaliation was because of Henderson.

As previously pointed out, the record makes clear that WestPoint did not want to terminate Sanks' employment.  Sanks acknowledges that Henderson gave him multiple chances to improve his performance and avoid termination (Tr. 243:3-8; 244:9-14; 245:21-246:7; 247:15-248:1; 249:6-19).

The foregoing facts belie any paranoid notion that any of Sanks' supervisors were out to get him for any reason related to his race, color, age, retaliation, or other factor   To the contrary, the record proves that WestPoint exercised great restraint and only reluctantly separated Sanks from employment.

## IV.  CONCLUSION

For the foregoing reasons, WestPoint is entitled to summary judgment.   Defendant therefore respectfully requests that this Court grant its Motion for Summary Judgment, and dismiss this case with prejudice.

Dated this 17th day of December, 2007.

Respectfully submitted,

**/s/ Fred W. Suggs, Jr.**
Fred W. Suggs, Jr.
(ASB-3587-G61F)

OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
300 North Main Street (29601)
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: (864) 271-1300
Facsimile:  (864) 235-4754
Fred.Suggs@odnss.com

James C. Pennington
(ASB-1287-N62J)

OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama  35203-2118
Telephone: (205) 328-1900
Facsimile:  (205) 328-6000
James.Pennington@odnss.com

Attorneys for WestPoint Stevens, Inc.
and WestPoint Home, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 17, 2007, I electronically filed the foregoing

**Defendants' Memorandum in Support of Motion for Summary Judgment** with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to the following:

### *Lateefah Muhammad*

Respectfully submitted,

<u>**/s/ Fred W. Suggs, Jr.**</u>
OF COUNSEL

5285531.1

44

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 1

# Deposition of Bobby Sanks

**In The Matter Of:**

**BOBBY SANKS**
v.
**WESTPOINT STEVENS, INC., ET AL.**

**NO. 3:06-CV-1092-T**

---

**BOBBY SANKS**
**October 17, 2007**

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

**THE HIGHEST QUALITY IN COURT REPORTING**

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


CIVIL ACTION NO. 3:06-CV-1092-T


BOBBY SANKS,

        Plaintiff,

vs.

WESTPOINT STEVENS, INC., and WESTPOINT

HOMES, INC.,

        Defendants.




DEPOSITION

OF

BOBBY SANKS

October 17, 2007


REPORTED BY:  Susan B. Treadaway

              Certified Shorthand

              Reporter and Notary Public

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 2

| 1 | STIPULATION |
| 2 | |
| 3 | IT IS STIPULATED AND AGREED, |
| 4 | by and between the parties, through their |
| 5 | respective counsel, that the deposition of |
| 6 | BOBBY SANKS may be taken before Susan B. |
| 7 | Treadaway, Commissioner, Certified |
| 8 | Shorthand Reporter and Notary Public; |
| 9 | That it shall not be necessary |
| 10 | for any objections to be made by counsel |
| 11 | to any questions, except as to form or |
| 12 | leading questions, and that counsel for |
| 13 | the parties may make objections and assign |
| 14 | grounds at the time of trial, or at the |
| 15 | time said deposition is offered in |
| 16 | evidence, or prior thereto. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 3

| 1 | APPEARANCES |
| 2 | |
| 3 | FOR THE PLAINTIFF: |
| 4 | Ms. Lateefah Muhammad |
| 5 | Attorney at Law |
| 6 | Post Office Box 1096 |
| 7 | Tuskegee, Alabama 36087 |
| 8 | |
| 9 | FOR THE DEFENDANT: |
| 10 | Mr. Fred W. Suggs, Jr. |
| 11 | Attorney at Law |
| 12 | Ogletree, Deakins, Nash, |
| 13 | Smoak & Stewart, P.C. |
| 14 | 300 North Main Street |
| 15 | Post Office Box 2757 |
| 16 | Greenville, South Carolina 29602 |
| 17 | |
| 18 | OTHERS PRESENT: |
| 19 | Mr. Lawrence Williams |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 4

| 1 | INDEX OF EXAMINATION | |
| 2 | PAGE: | |
| 3 | EXAMINATION BY MR. SUGGS | 8 |
| 4 | EXAMINATION BY MS. MUHAMMAD | 311 |
| 5 | | |
| 6 | | |
| 7 | INDEX OF EXHIBITS | |
| 8 | PAGE: | |
| 9 | Plaintiff's Exhibit 74 | 341 |
| 10 | Plaintiff's Exhibit 75 | 343 |
| 11 | Plaintiff's Exhibit 76 | 345 |
| 12 | | |
| 13 | Defendant's Exhibit 1 | 18 |
| 14 | Defendant's Exhibit 2 | 34 |
| 15 | Defendant's Exhibit 3 | 37 |
| 16 | Defendant's Exhibit 4 | 41 |
| 17 | Defendant's Exhibit 5 | 48 |
| 18 | Defendant's Exhibit 6 | 52 |
| 19 | Defendant's Exhibit 7 | 61 |
| 20 | Defendant's Exhibit 8 | 65 |
| 21 | Defendant's Exhibit 9 | 67 |
| 22 | Defendant's Exhibit 10 | 71 |
| 23 | Defendant's Exhibit 11 | 74 |

Page 5

| 1 | INDEX OF EXHIBITS (Continuing) | |
| 2 | PAGE: | |
| 3 | Defendant's Exhibit 12 | 74 |
| 4 | Defendant's Exhibit 13 | 88 |
| 5 | Defendant's Exhibit 14 | 91 |
| 6 | Defendant's Exhibit 15 | 92 |
| 7 | Defendant's Exhibit 16 | 95 |
| 8 | Defendant's Exhibit 17 | 98 |
| 9 | Defendant's Exhibit 18 | 98 |
| 10 | Defendant's Exhibit 19 | 124 |
| 11 | Defendant's Exhibit 20 | 126 |
| 12 | Defendant's Exhibit 21 | 127 |
| 13 | Defendant's Exhibit 22 | 127 |
| 14 | Defendant's Exhibit 23 | 132 |
| 15 | Defendant's Exhibit 24 | 136 |
| 16 | Defendant's Exhibit 25 | 140 |
| 17 | Defendant's Exhibit 26 | 146 |
| 18 | Defendant's Exhibit 27 | 150 |
| 19 | Defendant's Exhibit 28 | 151 |
| 20 | Defendant's Exhibit 29 | 151 |
| 21 | Defendant's Exhibit 30 | 153 |
| 22 | Defendant's Exhibit 31 | 153 |
| 23 | Defendant's Exhibit 32 | 155 |

2 (Pages 2 to 5)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 6

1         INDEX OF EXHIBITS (Continuing)
2                    PAGE:
3    Defendant's Exhibit 33      181
4    Defendant's Exhibit 34      182
5    Defendant's Exhibit 35      183
6    Defendant's Exhibit 36      185
7    Defendant's Exhibit 37      185
8    Defendant's Exhibit 38      186
9    Defendant's Exhibit 39      188
10   Defendant's Exhibit 40      188
11   Defendant's Exhibit 41      189
12   Defendant's Exhibit 42      190
13   Defendant's Exhibit 43      191
14   Defendant's Exhibit 44      192
15   Defendant's Exhibit 45      192
16   Defendant's Exhibit 46      196
17   Defendant's Exhibit 47      197
18   Defendant's Exhibit 48      199
19   Defendant's Exhibit 49      203
20   Defendant's Exhibit 50      204
21   Defendant's Exhibit 51      206
22   Defendant's Exhibit 52      208
23   Defendant's Exhibit 53      217

Page 7

1         INDEX OF EXHIBITS (Continuing)
2                    PAGE:
3    Defendant's Exhibit 54      224
4    Defendant's Exhibit 55      225
5    Defendant's Exhibit 56      229
6    Defendant's Exhibit 57      230
7    Defendant's Exhibit 58      231
8    Defendant's Exhibit 59      235
9    Defendant's Exhibit 60      236
10   Defendant's Exhibit 61      239
11   Defendant's Exhibit 62      249
12   Defendant's Exhibit 63      255
13   Defendant's Exhibit 64      259
14   Defendant's Exhibit 65      263
15   Defendant's Exhibit 66      267
16   Defendant's Exhibit 67      269
17   Defendant's Exhibit 68      270
18   Defendant's Exhibit 69      271
19   Defendant's Exhibit 70      272
20   Defendant's Exhibit 71      277
21   Defendant's Exhibit 72      278
22   Defendant's Exhibit 73      278
23

Page 8

1         I, Susan B. Treadaway, a
2    Certified Shorthand Reporter of
3    Birmingham, Alabama, and a Notary Public
4    for the State of Alabama at Large, acting
5    as Commissioner, certify that on this
6    date, as provided by the Federal Rules of
7    Civil Procedure of the United States
8    District Court, and the foregoing
9    stipulation of counsel, there came before
10   me at 2401 C First Avenue, Opelika,
11   Alabama, on the 17th day of October, 2007,
12   commencing at 9:25 A.M., BOBBY SANKS,
13   witness in the above cause, for oral
14   examination, whereupon the following
15   proceedings were had:
16
17         BOBBY SANKS,
18   being first duly sworn, was examined and
19   testified as follows:
20
21   EXAMINATION BY MR. SUGGS:
22       Q.   Okay.  Mr. Sanks, this
23   deposition is being taken pursuant to the

Page 9

1    federal rules of civil procedure.  All
2    objections are reserved except those which
3    would be waived if not made at the
4    deposition and those necessary to preserve
5    a privilege or present a motion.  My name
6    is Fred Suggs, I introduced myself to you
7    when you came in the door.  I'm an
8    attorney with Ogletree, Deakins, Nash,
9    Smoak & Stewart, we've got an office in
10   Birmingham.  My firm represents WestPoint
11   Home in this lawsuit that you have filed
12   against the company.  The federal rules
13   that govern this deposition give me the
14   right to ask you questions under oath and
15   require that you respond with full,
16   complete and truthful answers.  Your
17   testimony here today is just as important,
18   even though we are in this informal
19   circumstance, as if we were in court with
20   a judge and a jury, and I'm sure
21   Ms. Muhammad has already told you that.
22   Do you understand that you're under oath
23   and that what you say here may be used as

3  (Pages 6 to 9)

BOBBY SANKS

BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.

October 17, 2007

---

Page 10

1  evidence at a later trial?
2      A.  I do.
3      Q.  Okay.  Now, the way we do this
4  is when I ask you a question, you respond
5  to me, that is, you can't talk to your
6  lawyer before you answer my questions.
7  Her job is done before you get here.  And
8  the same if I give you a document, if you
9  have questions about the document, you ask
10  me and you can't confer with your lawyer
11  while I'm asking you about the document.
12  And the reason for that is the court wants
13  your testimony, not the testimony of your
14  lawyer.
15          And during the deposition, Ms.
16  Muhammad must refrain from any activities
17  that would give an answer for you or
18  suggest an answer for you, and I know
19  she'll do that.  We can't go off the
20  record for you to confer with Ms.
21  Muhammad, and you shouldn't have any
22  private conferences with her during the
23  breaks, and I'll ask you after a break if

Page 11

1  you talked to your lawyer, because once
2  you're sworn, you are on your own, you
3  have got to answer truthfully.
4          Now, this lady, the court
5  reporter, will be taking down my question
6  and she'll be taking down your answer.
7  And I anticipate that there will be times
8  when I'll be talking and you'll be talking
9  and we'll have a dialogue going back and
10  forth, well, we've got to be careful not
11  to talk over each other because if we do,
12  she can't get it down.  So, you need to
13  wait until you are pretty sure I have
14  finished asking the question, and I need
15  to wait until you've finished answering
16  the question.  If I ask another question
17  and you haven't finished, you just say
18  wait a minute, I haven't finished and go
19  ahead and give me your full answer because
20  I'm not going to cut you off.
21          And if Ms. Muhammad has got any
22  objections, she'll make them.  Now,
23  usually what happens is, I'll ask a

Page 12

1  question, she may say I object, and then
2  I'll say, well, go ahead and answer the
3  question subject to her objection.  And if
4  that objection throws you off, just say
5  repeat the question and I'll repeat it.
6  And as we said earlier, she shouldn't
7  direct you not to answer a question unless
8  she does so on the grounds of privilege.
9  And if there are no objections, you've got
10  to give full, complete, truthful answers
11  to each question.  Now, you can think
12  about the answer, I mean, you don't have
13  to respond immediately, you have got
14  plenty of time to think.  Take as long as
15  you want.
16          Are you on any medication now
17  that would affect your ability to answer
18  my questions?
19      A.  No, sir.
20      Q.  All right.  Are you currently
21  under the influence of alcohol?
22      A.  No, sir.
23      Q.  Currently under the influence

Page 13

1  of any illegal drug?
2      A.  No, sir.
3      Q.  All right.  Anything happen in
4  your life that has upset you to make you
5  unable to concentrate on my questions and
6  answer them?
7      A.  No.
8      Q.  All right.  Now, in the notice
9  to take deposition, we said you are
10  commanded to bring with you any and all
11  documents in your possession related to
12  the claim or defenses in this matter that
13  have not been previously produced, and
14  your lawyer gave me this stack of
15  documents.  Are you familiar with those?
16  You can flip through them.
17      A.  (Reviewing documents.)
18      Q.  Now, let me just ask you this,
19  have you looked at those enough to know
20  whether those are papers that you gave
21  your lawyer?
22      A.  Yes, it is.
23      Q.  Okay.  Are you aware of any

4  (Pages 10 to 13)

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

|  | Page 14 |
|---|---|
| 1 | other papers that pertain to the claims or |
| 2 | defenses in this lawsuit that you hadn't |
| 3 | given to your lawyer or hadn't been given |
| 4 | to me? |
| 5 | A.   No. |
| 6 | Q.   I am going to ask you about |
| 7 | these, but I'll wait until the end.  Now, |
| 8 | the first questions that I'm going to ask |
| 9 | you don't go directly to your claims |
| 10 | against the company, they are just |
| 11 | background kind of questions, and they are |
| 12 | questions you can just answer like, you |
| 13 | know, right off the top of your head. |
| 14 | Your full name is Bobby Lee Sanks? |
| 15 | A.   That's right. |
| 16 | Q.   You are a male? |
| 17 | A.   Yes, sir. |
| 18 | Q.   Your race is black, |
| 19 | African-American? |
| 20 | A.   Yes. |
| 21 | Q.   Okay.  Your Alabama driver's |
| 22 | license number is 3187134? |
| 23 | A.   I'm not sure. |

|  | Page 15 |
|---|---|
| 1 | Q.   Do you want to look? |
| 2 | A.   Yes. |
| 3 | Q.   I'll repeat it when you are |
| 4 | ready. |
| 5 | A.   I'm ready. |
| 6 | Q.   3187134? |
| 7 | A.   That's correct. |
| 8 | Q.   Okay.  Is it current? |
| 9 | A.   Yes. |
| 10 | Q.   All right.  Your Social |
| 11 | Security number is |
| 12 | A.   Yes, sir. |
| 13 | Q.   You were born |
| 14 | |
| 15 | A.   That's right. |
| 16 | Q.   Where were you born? |
| 17 | A.   Lee County. |
| 18 | Q.   Alabama? |
| 19 | A.   Yes, sir. |
| 20 | Q.   Your present address is 330 |
| 21 | Lee Road, Salem, Alabama? |
| 22 | A.   Well, 175. |
| 23 | Q.   330 Lee Road 175, Salem, |

|  | Page 16 |
|---|---|
| 1 | Alabama 36874? |
| 2 | A.   Yes, sir. |
| 3 | Q.   Is that a single dwelling? |
| 4 | A.   Yes. |
| 5 | Q.   Do you own that place? |
| 6 | A.   No, sir. |
| 7 | Q.   Who owns it? |
| 8 | A.   My mortgage. |
| 9 | Q.   Oh, okay.  So, you live in it |
| 10 | and you owe a bank or some other financial |
| 11 | institution -- |
| 12 | A.   Yes, sir. |
| 13 | Q.   -- money on it? |
| 14 | A.   Yes, sir. |
| 15 | Q.   Okay.  So, you are paying on a |
| 16 | mortgage? |
| 17 | A.   Yes. |
| 18 | Q.   All right.  Have you been |
| 19 | there since about 1982? |
| 20 | A.   Yes, sir. |
| 21 | Q.   Who lives with you there? |
| 22 | A.   My wife and children. |
| 23 | Q.   Anybody else? |

|  | Page 17 |
|---|---|
| 1 | A.   No. |
| 2 | Q.   Your telephone number is |
| 3 | 334-749-4462? |
| 4 | A.   Yes. |
| 5 | Q.   Do you got a cell phone? |
| 6 | A.   Yes, sir. |
| 7 | Q.   What's it? |
| 8 | A.   334-444-9757. |
| 9 | Q.   Do you have an Internet |
| 10 | address? |
| 11 | A.   Yes, sir. |
| 12 | Q.   What is it? |
| 13 | A.   Bobbysanks.com. |
| 14 | Q.   Is there an at, you know, that |
| 15 | doesn't sound like a complete address to |
| 16 | me. |
| 17 | A.   I'm not that familiar with the |
| 18 | computers.  It's Bobbysanks/.com.  Well, I |
| 19 | do have a new address, it's |
| 20 | Sankstravel.com. |
| 21 | Q.   Sanks what? |
| 22 | A.   Sankstravel.com. |
| 23 | Q.   Who is your service provider, |

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                    http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 18

1  like AOL or --
2      A.   AOL.
3          (Whereupon, Defendant's
4          Exhibit 1 was marked
5          for identification.)
6      Q.   Okay.  I'll show you what's
7  been marked as Exhibit 1.  And I'll
8  represent to you that those are tax
9  returns -- you might just give -- tax
10 returns that your lawyer gave us during
11 discovery and they go from 2004 through
12 2006.  Now, is your mother Mary Ellen
13 Sanks?
14     A.   That's right.
15     Q.   Is she still living?
16     A.   Yes, sir.
17     Q.   Before she became Mary Ellen
18 Sanks, was she Mary Kelly?
19     A.   Yes.
20     Q.   Now, she's listed as a
21 dependent on tax returns for 2004, 2005,
22 2006; is that correct, you claim your mama
23 as a dependent?

Page 19

1      A.   Yes, sir.
2      Q.   All right.  But she doesn't
3  live with you?
4      A.   Yes, sir.
5      Q.   Where does she live?
6      A.   She live at the same address I
7  do.
8      Q.   Well, now, earlier, you told
9  me that you live there with your wife and
10 children.
11     A.   Well, that was my immediate
12 family.
13     Q.   Who else lives there besides
14 your wife and children?
15     A.   My mother.
16     Q.   Anybody else?
17     A.   No, sir.
18     Q.   Now, let me just show you this
19 on my copy so you won't have to dig
20 through yours, but what I'm looking at is
21 number thirty-five at the bottom.  See
22 where it says Mary Sanks and it says out
23 beside her name foster child?

Page 20

1      A.   Uh-huh.
2      Q.   That's wrong, isn't it?
3      A.   Yes, sir.
4      Q.   She is not your child, she is
5  your mama?
6      A.   Right.  Yes, sir.
7      Q.   What financial assistance do
8  you provide to your mama?
9      A.   What do you mean?
10     Q.   Well, what do you do for her
11 that it costs you money?
12     A.   Everything.  She's disabled.
13     Q.   Do you buy her food?
14     A.   Yes, sir.
15     Q.   Medicine?
16     A.   Yes, sir.
17     Q.   Can she drive?
18     A.   No, sir.
19     Q.   Now, was your father Noland
20 Stringer?
21     A.   Yes, sir.
22     Q.   Is Nathan Stringer your
23 father's brother?

Page 21

1      A.   Yes, sir.
2      Q.   Are they twins?
3      A.   No, sir.
4      Q.   But Noland and Nathan are
5  brothers?
6      A.   Yes, sir.
7      Q.   Is your father still living?
8      A.   Yes, sir.
9      Q.   Does he work?
10     A.   No, sir.
11     Q.   Retired?
12     A.   Yes, sir.
13     Q.   Where did he live and work?
14     A.   Where he live?
15     Q.   Uh-huh.
16     A.   Salem.
17     Q.   And work?
18     A.   He worked in Columbus.
19     Q.   For who?
20     A.   I'm not sure.
21     Q.   Did your father raise you?
22     A.   No, sir.
23     Q.   Now, before your mama became

6  (Pages 18 to 21)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

**Page 22**

1  disabled, did she work?
2     A.  Yes, sir.
3     Q.  Where did she work?
4     A.  She was some -- just
5  housework.
6     Q.  Domestic worker?
7     A.  Yes.
8     Q.  Now, you say you live at the
9  address on Lee Road with your wife; is
10 that correct?
11    A.  That's correct.
12    Q.  And her name is Jeannette
13 Thomas Sanks?
14    A.  Yes, sir.
15    Q.  Now, your tax return that we
16 just looked at has you filing a tax return
17 as head of household?
18    A.  That's correct.
19    Q.  It doesn't say married filing
20 jointly or married filing separately. Why
21 is that?
22    A.  Because I file separate.
23    Q.  Well, if you file -- if you

---

**Page 23**

1  are married and -- look at page seven.
2  And the pages are numbered at the bottom.
3  Does it say -- that says thirteen. Look
4  at seven.
5     A.  Oh, seven. It did say page
6  seven over in the corner.
7     Q.  Okay. Do you see up here
8  where it says filing status?
9     A.  Yes, sir.
10    Q.  It says single, married filing
11 jointly, married filing separately, head
12 of household, qualifying widow with
13 dependent child. Do you see those five?
14    A.  Yes, sir.
15    Q.  And why is it that you didn't
16 file married filing jointly or married
17 filing separately?
18    A.  That's because my wife get --
19 wanted to get an income credit for the
20 children.
21    Q.  Have you had any other
22 marriages other than to Jeannette Thomas?
23    A.  No, sir.

---

**Page 24**

1     Q.  And what's her occupation?
2     A.  She's a cabinet maker.
3     Q.  What company?
4     A.  Master Brand.
5     Q.  Where are they?
6     A.  Auburn.
7     Q.  Where did she work before
8  that?
9     A.  Ampex.
10    Q.  Is that in Opelika?
11    A.  Yes, sir.
12    Q.  What do they do, Ampex, what
13 do they do?
14    A.  They were -- magnetic tapes.
15    Q.  Now, you talked about your
16 wife wanting to get a tax credit for your
17 children. You have two children?
18    A.  Yes, sir.
19    Q.  Quaneshia M. Sanks and
20 Shanquetta J. Sanks?
21    A.  Yes, sir.
22    Q.  Now, Quaneshia is how old?
23    A.  She's eighteen now.

---

**Page 25**

1     Q.  Born in '88?
2     A.  Yes, sir.
3     Q.  And Shanquetta is how old?
4     A.  Twenty-four.
5     Q.  And you say they both live
6  with you at Lee Road?
7     A.  Yes, sir.
8     Q.  Do they attend school?
9     A.  Yes, sir.
10    Q.  Where do they go to school?
11    A.  Quaneshia go to Southern
12 Union. And Shanquetta, she's not in
13 school at this time. She starts back in
14 the fall.
15    Q.  Well, it's September. When
16 does she start?
17    A.  She's starting the first of
18 the year. Shanquetta?
19    Q.  So, she's going to start this
20 winter?
21    A.  Yes.
22    Q.  Where will she go?
23    A.  Southern Union.

---

7 (Pages 22 to 25)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

| | Page 26 |
|---|---|

1    Q.    Do either of them work?
2    A.    Yes, sir.
3    Q.    Where does Quaneshia work?
4    A.    She's at Kroger's, Starbucks.
5    Q.    Kroger where?
6    A.    Starbucks and Kroger.
7    Q.    At which store?
8    A.    The Tiger Town store.
9    Q.    Right nearby?
10   A.    Yes.
11   Q.    And how about Shanquetta?
12   A.    She's at Target.
13   Q.    Is she a cashier?
14   A.    I'm not sure.
15   Q.    Are either of them married?
16   A.    No, sir.
17   Q.    Now, we know that you are
18   likely related to Sanks who live in this
19   area and Thomases since that was your
20   wife's maiden name and Stringer since that
21   was your daddy's name.  What other last
22   names do people have who are related to
23   you?

| | Page 27 |
|---|---|

1    A.    Williams.
2    Q.    Okay.
3    A.    Owens.
4    Q.    Okay.
5    A.    Grahams, Brooks, Hoods,
6    Edwards.
7    Q.    Okay.  Donny Sanks and Don
8    Sanks, is that the same person?
9    A.    No, sir.
10   Q.    Different people?
11   A.    Yes, sir.
12   Q.    Who are they?
13   A.    My brothers.
14   Q.    Oh, they are your brothers?
15   A.    Yes, sir.
16   Q.    You have got a brother named
17   Donny and a brother named Don?
18   A.    Yes.
19   Q.    All right.  Any other brothers
20   besides Donny and Don?
21   A.    No, sir.
22   Q.    Gloria Sanks Owens, that's
23   your sister?

| | Page 28 |
|---|---|

1    A.    Yes, sir.
2    Q.    Betty Ann Sanks, that's your
3    sister?
4    A.    Yes, sir.
5    Q.    What's her last name now?
6    A.    Knight.
7    Q.    K-n-i-g-h-t?
8    A.    Yes, sir.
9    Q.    Was she ever a Sorrier?
10   A.    Yes, sir.
11   Q.    Who is Rebecca Holloway?
12   A.    Sister.
13   Q.    Your sister?
14   A.    Yes, sir.
15   Q.    Have you got anymore sisters
16   or brothers that we didn't name?
17   A.    No, sir.
18   Q.    Now, your daddy's name is
19   Stringer, your mama was a Kelly, how did
20   you get the name Sanks?
21   A.    Mother.
22   Q.    Oh, she was a -- in what order
23   did her names change?

| | Page 29 |
|---|---|

1    A.    She was never married at the
2    time.
3    Q.    Your mama was not married?
4    A.    No, sir.
5    Q.    Okay.  Well, now, she was Mary
6    Kelly?
7    A.    Right.
8    Q.    And where did she get the name
9    Sanks?
10   A.    Well, she was a Sanks before
11   she was a Kelly.
12   Q.    Oh, I see.  Okay.  So, Nathan
13   Sanks, your father, was never married to
14   Mary Ellen Sanks; is that right?
15   A.    No, sir.
16   Q.    Well, tell me what's right.
17   I'm not trying to put words in your mouth.
18   A.    Noland Stringer wasn't never
19   married to Mary Sanks.
20   Q.    Okay.  Noland Stringer was
21   never married to Mary Sanks and Noland
22   Stringer was your father?
23   A.    Right.

8  (Pages 26 to 29)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 30

1    Q.   All right.  And where did
2  Kelly come in?
3    A.   She married a Kelly.  My
4  mother married a Kelly.
5    Q.   Okay.  Now, is he still
6  living?
7    A.   No.
8    Q.   So, as far as you know, your
9  daddy didn't raise you and he didn't live
10  in the home --
11    A.   That's right.
12    Q.   -- is that right?
13    A.   (Witness nods head.)
14    Q.   Now, when you were coming
15  along, did you have any disciplinary
16  problems with the Department of Social
17  Services or any agency that deals with
18  children or juveniles who borderline on
19  trouble?
20    A.   No, sir.
21    Q.   Okay.  Were you ever the
22  victim of violence?
23    A.   No, sir.

Page 31

1    Q.   Ever the victim of any sexual
2  abuse or trauma?
3    A.   No, sir.
4    Q.   Okay.  Do you have any
5  significant childhood injuries?
6    A.   Give me an example of that.
7    Q.   Well, like, say, a severe
8  concussion playing football or anything
9  like that?
10    A.   No, sir.
11    Q.   Okay.  Significant childhood
12  injury -- not injuries, but illnesses?
13    A.   No, sir.
14    Q.   When you were coming along in
15  school, did any teacher or public official
16  that managed the school tell you that you
17  suffered from attention deficit disorder
18  like so many kids are told today?
19    A.   What is a deficit disorder?
20    Q.   It means you can't pay
21  attention.
22    A.   No, sir.
23    Q.   Were you hyperactive?

Page 32

1    A.   No, sir.
2    Q.   Had a low IQ?
3    A.   No, sir.
4    Q.   Dyslexic?
5    A.   What's that?
6    Q.   Oh, people who are dyslexic
7  transpose letters, they don't see --
8    A.   No, sir.
9    Q.   -- letters like they are
10  written down.  They might have trouble
11  seeing which way a B or a D faces.  Ever
12  been told you had a learning disability?
13    A.   No, sir.
14    Q.   When you were in school, were
15  you ever placed in a self-contained class?
16    A.   No, sir.
17    Q.   A class for the educationally
18  handicapped?
19    A.   No, sir.
20    Q.   Class for emotionally
21  handicapped?
22    A.   No, sir.
23    Q.   Given a special education

Page 33

1  program?
2    A.   No, sir.
3    Q.   An individual education
4  program?
5    A.   No, sir.
6    Q.   Now, let me just ask you if
7  you have ever taken any of these
8  medicines.  Have you ever taken Ritalin?
9    A.   What is that, sir?
10    Q.   I mean, it's a drug they give
11  to kids who can't sit still.
12    A.   No, sir.
13    Q.   Cylert?
14    A.   I don't know what that is.
15    Q.   Dexedrine?
16    A.   No, sir.
17    Q.   Were you ever suspended from
18  school?
19    A.   No, sir.
20    Q.   Expelled from school?
21    A.   No, sir.
22    Q.   As far as you know, have you
23  ever taken the Minnesota Multiphasic

9 (Pages 30 to 33)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                              BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

|  | Page 34 |
|---|---|
| 1 | Personality Inventory? |
| 2 | A.   I don't know what that is, |
| 3 | sir. |
| 4 | Q.   So, as far as you know, you |
| 5 | haven't taken it? |
| 6 | A.   No, sir. |
| 7 | (Whereupon, Defendant's |
| 8 | Exhibit 2 was marked |
| 9 | for identification.) |
| 10 | Q.   Okay.  These are your school |
| 11 | records which we have marked Exhibit 2. |
| 12 | It looks like to me you graduated from |
| 13 | Wacoochee High School in May of 1969; is |
| 14 | that correct? |
| 15 | A.   Yes, sir. |
| 16 | Q.   And made mostly C's and D's |
| 17 | and an occasional A or B, correct? |
| 18 | A.   Correct. |
| 19 | Q.   And you never attended |
| 20 | college? |
| 21 | A.   No, sir. |
| 22 | Q.   You didn't have any notable |
| 23 | educational achievements in high school, |

|  | Page 35 |
|---|---|
| 1 | did you? |
| 2 | A.   Explain that, sir. |
| 3 | Q.   Well, I mean, did you get any |
| 4 | awards for academics or any special |
| 5 | recognition for doing well in a particular |
| 6 | subject? |
| 7 | A.   I can't recall, sir. |
| 8 | Q.   Okay.  Now, before you started |
| 9 | working at WestPoint, where did you work? |
| 10 | A.   I worked at Pelham grocery |
| 11 | store. |
| 12 | Q.   All right.  Is that in Salem, |
| 13 | Alabama? |
| 14 | A.   Yes, sir. |
| 15 | Q.   And did you do that right |
| 16 | after high school? |
| 17 | A.   I was doing that along during |
| 18 | high school. |
| 19 | Q.   All right.  And did you |
| 20 | continue doing it after you graduated from |
| 21 | high school? |
| 22 | A.   Yes, sir. |
| 23 | Q.   And did you continue working |

|  | Page 36 |
|---|---|
| 1 | as a grocery clerk at Pelham Grocery up |
| 2 | until the time you got hired at WestPoint? |
| 3 | A.   Yes, sir. |
| 4 | Q.   What did you do as a grocery |
| 5 | clerk? |
| 6 | A.   Pumped gas, cooked, short |
| 7 | order cook, butcher, stocked shelves, |
| 8 | price, clean, that's pretty much it. |
| 9 | Q.   Is that store still there? |
| 10 | A.   No, sir. |
| 11 | Q.   Who owned it? |
| 12 | A.   Doris and Almond Pelham. |
| 13 | Q.   What's the second guy's name, |
| 14 | Doris and who? |
| 15 | A.   Almond. |
| 16 | Q.   How do you spell it? |
| 17 | A.   I think A-l-m-o-n-d.  I'm not |
| 18 | sure. |
| 19 | Q.   And the last name? |
| 20 | A.   Pelham. |
| 21 | Q.   P-e-l-h-a-m? |
| 22 | A.   Right.  Yes, sir. |
| 23 | Q.   Are they still living? |

|  | Page 37 |
|---|---|
| 1 | A.   No, sir. |
| 2 | Q.   Did you ever get in any |
| 3 | trouble while you worked there? |
| 4 | A.   No, sir. |
| 5 | Q.   Did they ever fire you? |
| 6 | A.   No, sir. |
| 7 | Q.   Did they ever give you any |
| 8 | kind of written warning or anything like |
| 9 | that? |
| 10 | A.   No, sir. |
| 11 | Q.   Ever tell you you did good? |
| 12 | A.   Yes, sir. |
| 13 | Q.   Did you ever get a raise? |
| 14 | A.   Yes, sir. |
| 15 | Q.   How would you characterize |
| 16 | your time there, do you think you had a |
| 17 | successful period of employment at Pelham? |
| 18 | A.   Yes, sir. |
| 19 | (Whereupon, Defendant's |
| 20 | Exhibit 3 was marked |
| 21 | for identification.) |
| 22 | Q.   Do you recognize Exhibit 3 as |
| 23 | your application for employment at |

10 (Pages 34 to 37)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                    October 17, 2007

| Page 38 |
| --- |

1   WestPoint?
2       A.   (Reviewing document.) I'm not
3   sure, sir.
4       Q.   All right.  Turn over to the
5   last page.  It's marked -- well, next to
6   the last page.  It's marked 47B.  And
7   there's a signature there, it says Bobby
8   Lee Sanks.  Is that your signature?
9       A.   Yes, sir.
10      Q.   All right.  Now, looking back
11  at the first page, which is page 45, it's
12  printed.  Does that look like your
13  printing?
14      A.   Yes, sir.
15      Q.   Okay.  Down at the bottom, it
16  says activities, basketball, football,
17  baseball, and racing.  Do you see that?
18      A.   Yes, sir.
19      Q.   What kind of racing did you
20  do?
21      A.   Just running.
22      Q.   Oh, I see.  Track?
23      A.   Yes, sir.

| Page 39 |
| --- |

1       Q.   And it says here you left
2   Pelham Grocery because you were
3   dissatisfied with the pay.  That's on page
4   46; is that correct?  I know it's correct
5   at what it says.  Is that the correct
6   reason that you left, you weren't being
7   paid enough?
8       A.   No, sir.
9       Q.   Why did you leave?
10      A.   I wanted a better job.
11      Q.   Okay.  Including better pay?
12      A.   Yes, sir.
13      Q.   Now, look at page 47 there
14  again.  At the top of the page, it says
15  name of husband or wife and you wrote
16  Jeannette Thomas Sanks.  Now, this
17  application was filled out in 1969.  When
18  did you and Jeannette Thomas get married?
19          MS. MUHAMMAD:  I am going to
20  object to the form.  I don't know if he
21  can testify that he wrote that.
22      Q.   Go ahead.
23          MS. MUHAMMAD:  You can answer.

| Page 40 |
| --- |

1       A.   Answer the question?
2       Q.   Yes, sir.
3       A.   When did we get married?
4       Q.   Yes, sir.
5       A.   1981.
6       Q.   So, at the time you filled out
7   this application in 1969, you and
8   Ms. Thomas weren't married?
9       A.   No, sir.
10      Q.   But you had a relationship, I
11  mean, you listed her as your wife?
12      A.   Sir, I'm not -- I'm not
13  familiar with that at all.
14      Q.   Well, let me ask you this, are
15  the words Jeannette Thomas Sanks and the
16  date of birth and Ampex in your
17  handwriting?
18      A.   No, sir.
19      Q.   Okay.  Looking on down, is
20  Noland Stringer in your handwriting?
21      A.   No, sir.
22      Q.   Is Ms. Mary Sanks in your
23  handwriting?

| Page 41 |
| --- |

1       A.   I'm not sure.
2       Q.   Okay.  Now, look at page 47B.
3       A.   B?
4       Q.   B as in boy, right up here at
5   the top.  It says mentally discarded from
6   Army, March 1969, failed test for Army
7   induction.  Did I read that right?
8       A.   Yes, sir.
9       Q.   Is that a true statement?
10      A.   Yes, sir.
11      Q.   Okay.  And down here it says
12  military 4-F.  Were you classified 4-F?
13      A.   Yes, sir.
14          (Whereupon, Defendant's
15          Exhibit 4 was marked
16          for identification.)
17      Q.   I will show you what's been
18  marked as Exhibit 4.  I will point your
19  attention to the second page, which is
20  page 1026.  This is your selective service
21  system extract of registrant
22  classification record.  If you count down
23  one, two, three, it says three, class, 4-F

                          11 (Pages 38 to 41)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 42

1   4/21/70.  Do you see that?
2       A.   Three?  Yes, sir.
3       Q.   Yes, right there.  And were
4   you in 4-F status because you didn't pass
5   the induction test?
6       A.   I'm not sure why they classed
7   me in the 4-F.  Well, I know they classed
8   me in 4-F for the induction.
9       Q.   All right.  Tell me what your
10  military experience was.
11      A.   I had no military experience.
12      Q.   All right.  Where did you go
13  to take this test?
14      A.   Montgomery.
15      Q.   And you took the test and they
16  sent you back home?
17      A.   Yes, sir.
18      Q.   So, were you there just for
19  like a day?
20      A.   Yes, sir.
21      Q.   Went down there on the bus and
22  came back to Opelika?
23      A.   Yes.

Page 43

1       Q.   Okay.  Well, obviously, that
2   was about the time you were a senior in
3   high school or maybe the summer before you
4   started work at WestPoint, right?
5       A.   Yes, sir.
6       Q.   Now, did you get any kind of
7   discharge paper or anything like that?
8       A.   No, sir.
9       Q.   Have you ever sued anybody
10  before bringing this lawsuit?
11      A.   No, sir.
12      Q.   Have you ever filed a claim
13  against any person or company other than
14  this lawsuit?
15      A.   No, sir.
16      Q.   Have you ever been sued?
17      A.   Yes, sir.
18      Q.   All right.  Tell me about
19  that.
20          MS. MUHAMMAD:  I'm going to
21  object to the question, relevance.
22      Q.   Yes, you can go ahead and
23  answer.

Page 44

1       A.   I can't recall.
2       Q.   You can't recall being sued?
3       A.   No, sir.
4       Q.   When was it?
5       A.   I can't recall that either.
6       Q.   What were you sued about?
7       A.   I can't recall.
8       Q.   Who sued you?
9       A.   I can't recall that either.
10      Q.   About how long ago was it?
11      A.   Five to ten years ago.
12      Q.   Okay.  What county was it in?
13      A.   Lee County.
14      Q.   What court was it in?
15      A.   There wasn't any court.
16      Q.   All right.  I don't know how
17  you get sued if it's not in court.  Can
18  you enlighten me a little bit?
19      A.   It was a personal lawsuit.
20      Q.   All right.  Well, if one
21  person sues another, there's got to be
22  somebody to decide it.  Who was going to
23  decide this lawsuit?

Page 45

1       A.   We met agreement.
2       Q.   I'm sorry?
3       A.   We met agreement, the other
4   party and I met agreement in the lawsuit.
5       Q.   You made an agreement?
6       A.   Yes, sir.
7       Q.   And that resolved it?
8       A.   That resolved it.
9       Q.   All right.  Well, who was the
10  other party?
11      A.   Craig Ray.
12      Q.   R-a-y?
13      A.   Yes.
14      Q.   All right.  What did he claim
15  you had done?
16      A.   Owed him some money.
17      Q.   All right.  Well, did you end
18  up -- he said you owed him an amount of
19  money.  Did you end up paying him some
20  money and then he said, well, that's
21  enough?
22      A.   No, sir.
23      Q.   How did it go -- how did it go

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                    http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 46

```
 1   out?
 2        A.    I paid him some money and I
 3   promised to pay him the rest of it later
 4   on in life.
 5        Q.    Did you ever?
 6        A.    No, sir.
 7        Q.    So, he might claim you still
 8   owe him?
 9        A.    I know I still owe him.
10        Q.    How much are we talking about?
11        A.    Eight hundred dollars.
12        Q.    And how did it happen that he
13   lent you eight hundred dollars?
14        A.    He didn't lend me eight
15   hundred dollars.
16        Q.    What happened?
17        A.    He did some work for me.
18        Q.    Okay.  He did some work for
19   you, he claimed you didn't pay him?
20        A.    Yes, sir.
21        Q.    Was he right?
22        A.    Yes, sir.
23        Q.    All right.  Now, when you say
```

Page 47

```
 1   a lawsuit, just help me out a little bit.
 2   Why did you say it was a lawsuit?
 3        A.    You said suit, been sued.
 4        Q.    Yes.  And you interpreted the
 5   answer to my question as yes, you had been
 6   sued?
 7        A.    Yes, sir.
 8        Q.    Well, did he file it in court
 9   and you just settled it before it went to
10   trial, is that how it was?
11        A.    Yes, sir.
12        Q.    All right.  Tell me his name
13   again.
14        A.    Craig Ray.
15        Q.    R-a-y?
16        A.    Yes, sir.
17        Q.    Craig Ray.  Now, I'm not mad
18   with you, but let me tell you something.
19   If I ask you a question and you give me an
20   answer, you said you would tell me the
21   truth.
22        A.    Yes, sir.
23        Q.    Well, if I ask you a question
```

Page 48

```
 1   and you say you don't recall and you
 2   really do recall, that's just as much of a
 3   lie as telling me something that you know
 4   that's not true, so all I'm asking you is
 5   if you -- if I ask you a question and you
 6   know the answer, tell me, don't say you
 7   don't recall if you do.  Anymore on this
 8   lawsuit than you've told me?
 9        A.    No, sir.
10        Q.    Okay.  Any other lawsuits
11   against you other than the one you
12   mentioned?
13        A.    I can't recall.
14        Q.    You can't recall if anybody
15   else has ever sued you?
16        A.    No, sir.
17        Q.    Have you ever been in
18   bankruptcy?
19        A.    Yes, sir.
20              (Whereupon, Defendant's
21               Exhibit 5 was marked
22               for identification.)
23        Q.    All right.  I'm showing you
```

Page 49

```
 1   Exhibit 5, which is a document received
 2   from the bankruptcy court.  It shows you
 3   filed Chapter 13 on August 7, 2000,
 4   correct?  See that August 7, 2000, and up
 5   here it says Chapter 13?
 6        A.    Yes, sir.
 7        Q.    So, that's correct, isn't it?
 8        A.    Yes, sir.
 9        Q.    And if you will look over on
10   page 1061, that's toward the -- it's about
11   three or four pages, five, maybe, from the
12   bottom.  It looks like that.  Okay.
13   That's it.  And that shows that the
14   petition that was filed in August 2000 was
15   closed down on June 28th, 2005, doesn't
16   it?
17        A.    Yes, sir.
18        Q.    And your lawyer was Charles
19   Ingram, right?
20        A.    Yes, sir.
21        Q.    And if you look at page 1054,
22   it shows that the gross receipts were
23   thirty-four thousand five hundred and
```

13 (Pages 46 to 49)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                           BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

---

Page 50

1    three dollars and twenty-four cents?
2         MS. MUHAMMAD: Object to this
3    document being authenticated by Mr. Sanks.
4    I don't remember him testifying that he
5    prepared this document.
6         Q.   And it shows that the gross
7    receipts were thirty-four thousand five
8    hundred and three dollars and twenty-four
9    cents and disbursements were thirty-four
10   thousand one hundred and forty-five
11   dollars and eighty-five cents, correct?
12        MS. MUHAMMAD: Mr. Sanks, you
13   can answer that if you have knowledge of
14   this document and its preparation.
15        Q.   He knows how to say he doesn't
16   know.  If he doesn't know, he doesn't
17   know, but it's written right on the page.
18   Is that correct, Mr. Sanks?
19        MS. MUHAMMAD:  I don't
20   remember him testifying that he wrote this
21   document.
22        MR. SUGGS:  He doesn't have to
23   testify that he wrote the document to

---

Page 51

1    testify about its accuracy.  Now, I don't
2    want anymore objections trying to tell the
3    witness the answer to the question.
4         MS. MUHAMMAD:  If he can
5    answer the question, he could answer.
6         MR. SUGGS: He knows how to
7    say he doesn't know.  Quit trying to coach
8    the witness.
9         MS. MUHAMMAD:  I just want to
10   make sure the objection is on the record
11   that this document has not been testified
12   to.
13        MR. SUGGS:  Look, we said at
14   the beginning that all objections are
15   reserved except those necessary to
16   preserve a privilege or make a motion.
17   So, you don't have to do that.  If I use
18   the transcript, you could object to it.
19        Q.   Now, Mr. Sanks, I'm going to
20   repeat the question because we've had so
21   much needless discussion on the record.
22   The final accounting shows thirty-four
23   thousand five hundred and three dollars

---

Page 52

1    and twenty-four cents with thirty-four
2    thousand one forty-five eighty-five
3    dispersed, correct?
4         A.   That's correct.
5         MS. MUHAMMAD:  I'm going to
6    object to the question.
7         Q.   All right.  Now --
8         MS. MUHAMMAD:  Object to the
9    form.
10        Q.   -- if you look at 1055, you
11   can see a list of secured and unsecured
12   creditors that got money.  These are the
13   people that you owed and were paid some
14   amount of what you owed them, correct?
15        A.   That's correct.
16        Q.   Now, what was that Ray
17   fellow's name?
18        A.   Craig Ray.
19        Q.   He wasn't listed on there?
20        A.   No, sir.
21        (Whereupon, Defendant's
22        Exhibit 6 was marked
23        for identification.)

---

Page 53

1         Q.   Okay.  All right.  It appears
2    to me that this document, number 21, the
3    mortgage company is asking for a stay of
4    the bankruptcy proceedings where they're
5    going to try to foreclose on your house
6    and the other document down, do you see
7    this in-service withdrawal form, do you
8    see that?
9         A.   Yes, sir.
10        Q.   Okay.  The withdrawal form
11   shows that you asked for a hardship
12   withdrawal from your --
13        MS. MUHAMMAD:  Object to the
14   question.
15        Q.   -- pension and profit sharing
16   plan so that you could pay off the
17   mortgage, right?
18        MS. MUHAMMAD:  Object to the
19   form.  I object to the form.
20        Q.   See, let me show you.  It's a
21   hardship withdrawal form.  Do you
22   recognize your name on that?
23        A.   Yes, sir.

---

14  (Pages 50 to 53)

BOBBY SANKS                                                BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                    October 17, 2007

Page 54

1     Q.   All right. And you see where
2 it's checked hardship, don't you?
3     A.   Yes, sir.
4     Q.   And it says make the payments
5 to me, do you see that?
6     A.   Yes, sir.
7     Q.   And then you flip over and
8 it's got a box checked, says you need the
9 money to prevent your eviction from your
10 principal residence or the foreclosure of
11 the mortgage on your principal residence.
12 Do you see that?
13     A.   Yes, sir.
14        MS. MUHAMMAD:  Object to the
15 form.
16     Q.   All right. Now, am I correct,
17 then, that the mortgage company was trying
18 to get around the bankruptcy to foreclose
19 on your house and you got your money out
20 of your 401K plan to pay off that mortgage
21 and keep your house?
22     A.   No, sir.
23     Q.   Well, tell me what happened.

Page 55

1     A.   I filed a hardship and
2 received the money, that wouldn't have
3 paid off my house. It just caught me
4 up-to-date.
5     Q.   Okay. So, you got the money
6 out of your 401K plan by making this
7 hardship application and you paid that
8 over to the mortgage company and that
9 brought you up-to-date?
10     A.   Yes, sir.
11     Q.   All right. And they didn't
12 kick you out of your house, right, you
13 kept it?
14     A.   Yes, sir.
15     Q.   All right. And is that the
16 house you live in now?
17     A.   Yes, sir.
18     Q.   Have you been able to stay
19 up-to-date?
20     A.   No, sir.
21     Q.   Behind again?
22     A.   Yes, sir.
23     Q.   Look at number two. Do you

Page 56

1 see that?
2     A.   Yes, sir.
3     Q.   All right. I'm going to read
4 it. Do you read okay?
5     A.   Yes, sir.
6     Q.   All right. I'm going to read
7 it with you. At the time the note was
8 executed and in connection therewith, and
9 as a part of the same transaction and in
10 order to secure the debt evidenced by the
11 note, Bobby Lee Sanks, an unmarried man,
12 executed a mortgage. Do you know why it
13 says an unmarried man?
14     A.   Yes, sir.
15     Q.   Why?
16     A.   Because I filed unclaimed
17 married at that time. We were separated,
18 my wife and I.
19     Q.   Were you ever divorced?
20     A.   No, sir.
21     Q.   But you say you were separated
22 at the time you got the mortgage?
23     A.   Yes.  Not got the mortgage.

Page 57

1     Q.   Well, when were you separated?
2     A.   During that mortgage.
3     Q.   Sometime after you got the
4 mortgage?
5     A.   I always had -- I had the
6 mortgage when I first -- when I got
7 married. Well, after I got married.
8     Q.   When you took out the
9 mortgage, were you married at that time?
10     A.   Yes, sir.
11     Q.   You were?
12     A.   Yes, sir.
13     Q.   Okay. Has the finance company
14 taken any action to foreclose on you since
15 you caught up?
16        MS. MUHAMMAD:  Object to the
17 form.
18     A.   Can you repeat that in a way
19 that I would be able to understand?
20     Q.   Sure. Sure. Now, you told me
21 you got your money out of your 401K and
22 you used it to catch up?
23     A.   Yes, sir.

15  (Pages 54 to 57)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS

BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.

October 17, 2007

| | Page 58 |
|---|---|

1      Q.   Since then, you said you have
2  gotten behind?
3      A.   Yes, sir.
4      Q.   My question is:  Has the
5  mortgage company tried to evict you and to
6  foreclose because you've gotten behind?
7      A.   Yes, sir.
8      Q.   And what's happened with that?
9      A.   I always manage to make a
10  payment.
11      Q.   Say that again now.
12      A.   I always manage to make a
13  payment.
14      Q.   You always manage to make a
15  payment?
16      A.   Yes, sir.
17      Q.   So, you haven't fallen so far
18  behind that they're trying to kick you
19  out?
20      A.   No, sir.
21      Q.   All right.  Now, who's
22  responsible for the mortgage?
23      A.   I am.

| | Page 59 |
|---|---|

1      Q.   Is your wife in any way
2  responsible for the mortgage?
3      A.   No, sir.
4      Q.   If you sold that house today,
5  what do you think it would be worth?
6      A.   A hundred and seventy-five
7  thousand.
8      Q.   A hundred and seventy-five?
9      A.   Yes, sir.
10      Q.   And what do you owe on it?
11      A.   What I owe on it?
12      Q.   Yes.
13      A.   A hundred and twenty-three
14  thousand.
15      Q.   So, you would put fifty-two
16  thousand in your pocket, correct?
17      A.   I would clear --
18      MS. MUHAMMAD:  Object to the
19  form.
20      Q.   Sir?
21      A.   I would clear twenty-two
22  thousand?
23      Q.   No.  Well, you said a hundred

| | Page 60 |
|---|---|

1  and seventy-five, you owed a hundred and
2  twenty-three.  And I said you'd put
3  fifty-two thousand in your pocket?
4      MS. MUHAMMAD:  Object to the
5  form.  You can answer if you know the
6  answer.
7      A.   Sir, I would -- I wouldn't put
8  it in my pocket.  I mean, you know, it
9  would be clear money to do something else
10  with.
11      Q.   Okay.  Have you ever been a
12  witness in a lawsuit?
13      A.   No, sir.
14      Q.   Have you ever given a
15  deposition before?
16      A.   No, sir.
17      Q.   You've had some injuries at
18  work from time to time, right?
19      A.   No, sir.
20      Q.   Scraped your shin, cut your
21  hand, bumped your knee, cut your arm, so
22  forth and so on, right?
23      A.   Okay.  I should have asked you

| | Page 61 |
|---|---|

1  to define injuries.
2      Q.   Okay.
3      A.   Okay.
4      Q.   So, you had some minor
5  injuries?
6      A.   Yes, sir.
7      Q.   But you never did have to file
8  a worker's comp claim as a result of those
9  injuries, did you?
10      A.   No, sir.
11      Q.   Now, I don't mean any
12  disrespect by this, but have you ever been
13  arrested?
14      A.   No, sir.
15      Q.   Never have been convicted of a
16  crime, have you?
17      A.   No, sir.
18      (Whereupon, Defendant's
19      Exhibit 7 was marked
20      for identification.)
21      Q.   Okay.  I'll show you what's
22  been marked as Exhibit 7.  And yours is
23  cut off.  Mine shows 6/30, 2006, and gives

16  (Pages 58 to 61)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

**Page 62**

1  an accident number and says commercial
2  vehicle. Did you have an accident in June
3  of 2006?
4      A.  Yes, sir.
5      Q.  Did you get hurt?
6      A.  No, sir.
7      Q.  What were the circumstances of
8  that accident?
9      A.  Sir, you said this is a
10 commercial vehicle?
11     Q.  That's what it says. COMM
12 vehicle. Well, maybe it means commercial
13 vehicle note. Frankly, I'm not sure how
14 to read that. But it does appear to have
15 been an accident.
16     A.  Yes, sir.
17     Q.  And tell me about the
18 accident.
19     A.  I can recall the accident.
20     Q.  What happened?
21     A.  I was coming from work and I
22 dozed off to sleep and I rear-ended a car.
23     Q.  Oh, okay. Well, was anybody

**Page 63**

1  hurt?
2      A.  No, sir.
3      Q.  And the one before that says
4  tires. Did you get some citation for
5  having bad tires on your vehicle?
6      A.  Yes, sir.
7      Q.  But you weren't hurt in any of
8  this stuff?
9      A.  No, sir.
10     Q.  All right. Nobody was?
11     A.  No, sir.
12     Q.  Now, over the past ten years,
13 have you had any major physical illnesses
14 or surgeries?
15     MS. MUHAMMAD: Object to the
16 form.
17     A.  Can you go into detail about
18 that?
19     Q.  Like major physical illnesses,
20 have you had anything you consider a major
21 physical illness in the last ten years?
22     MS. MUHAMMAD: Is that prior
23 to the lawsuit or since the lawsuit?

**Page 64**

1      MR. SUGGS: Last ten years
2  from today.
3      MS. MUHAMMAD: From this year
4  back?
5      MR. SUGGS: This year back,
6  ten years.
7      A.  Any kind of -- rephrase it.
8      Q.  Physical illnesses.
9      A.  Illness, define illness, being
10 sick?
11     Q.  Being sick or having a chronic
12 condition, maybe doesn't put you in the
13 bed, but something, you know, always wrong
14 with you, the same thing over and over?
15     A.  Does surgery apply?
16     Q.  Yes, sure, that would be a
17 surgery.
18     A.  Yes.
19     Q.  Well, let's go to illnesses
20 first. Have you had any serious illnesses
21 in the last ten years?
22     A.  No, sir.
23     Q.  All right. But you have had a

**Page 65**

1  surgery?
2      A.  Yes, sir.
3          (Whereupon, Defendant's
4          Exhibit 8 was marked
5          for identification.)
6      Q.  Okay. Now, I will show you
7  what's been marked as Exhibit 8. Do you
8  see in about the middle of Exhibit 8 it
9  says HCVD?
10     A.  Yes, sir.
11     Q.  All right. You agree with me
12 that that's hypertensive cardiovascular
13 disease?
14     A.  Yes, sir.
15     Q.  All right. That's high blood
16 pressure, isn't it?
17     A.  Yes, sir.
18     Q.  Okay. And do you see here,
19 your doctor was Dr. Whatley?
20     A.  Yes, sir.
21     Q.  All right. And looks like to
22 me he said you needed to be off for about
23 a week, from May 16, 2000, to May 22,

17 (Pages 62 to 65)

BOBBY SANKS                                              BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                    October 17, 2007

Page 66

1  2000. Do you remember being off work for
2  high blood pressure?
3       A.   Yes, sir.
4       Q.   All right. And on the second
5  page of that, which is marked 395, the
6  company said you needed to go to the
7  clinic and have your blood pressure
8  checked every week, correct?
9       A.   Yes, sir.
10      Q.   All right. Your hypertension,
11 your high blood pressure was first
12 diagnosed in 2000, right?
13      A.   Went back further than that,
14 sir.
15      Q.   Oh, it did?
16      A.   Yes, sir.
17      Q.   When was it first diagnosed?
18      A.   I can't recall.
19      Q.   All right. But sometime
20 before 2000?
21      A.   Yes, sir.
22      Q.   Did you take any medicine for
23 it or anything before 2000?

Page 67

1       A.   Yes, sir.
2            (Whereupon, Defendant's
3            Exhibit 9 was marked
4            for identification.)
5       Q.   By the way, while the court
6  reporter is marking this document, this is
7  not an endurance contest. If you say I
8  need a break, want to stand up and stretch
9  or go to the restroom, you just let me
10 know, okay?
11      A.   All right, sir.
12      Q.   Okay. I will show you
13 Exhibit 9, which are the medical records
14 of Dr. Whatley. Now, starting from the
15 back, if you can find 1207, it's marked at
16 the bottom. Okay. It says recently found
17 to have HBP, high blood pressure, correct,
18 that's what it says?
19      A.   Yes, sir.
20      Q.   And that's dated 5/16, 2000,
21 isn't it?
22      A.   Yes, sir.
23      Q.   And it appears to me down at

Page 68

1  the bottom of the page, that Dr. Whatley
2  prescribed Diovan for your high blood
3  pressure, correct?
4       A.   That's correct.
5       Q.   Now, did you continue to take
6  Diovan for several years?
7       A.   Yes, sir.
8       Q.   Okay. And if you will look up
9  at page 1 -- 1197. And you can see this
10 prescription is 3/21/03, right?
11      A.   Yes, sir.
12      Q.   And he's still prescribing
13 Diovan, right?
14      A.   Yes, sir.
15      Q.   And then if you look at the
16 next page, which is 1198, it says been
17 doing well, no problems. Do you see that?
18      A.   Yes, sir.
19      Q.   So, that means that your high
20 blood pressure is under control with the
21 medication, doesn't it?
22           MS. MUHAMMAD: Object to the
23 form.

Page 69

1       Q.   Do you need me to repeat it?
2       A.   Yes, sir.
3       Q.   That means that your high
4  blood pressure is under control with the
5  medication, doesn't it?
6            MS. MUHAMMAD: I object to the
7  form.
8       A.   Yes, sir, that's what it
9  means.
10      Q.   Okay. Now, coming on toward
11 the front just a few pages, let's look at
12 1188 and this is dated 10/9/06. Do you
13 see that?
14      A.   Yes, sir.
15      Q.   And right here it says HCVD,
16 on no meds. Do you see that?
17      A.   Yes, sir.
18      Q.   You stopped taking your blood
19 pressure medication?
20      A.   I probably couldn't afford it,
21 sir.
22      Q.   So, you did stop?
23      A.   Yes, sir.

18 (Pages 66 to 69)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

**Page 70**

1    Q.   Now, let's look on up closer
2  to the front, 1185.  Okay.  Do you see
3  where Dr. Whatley writes, has been doing
4  well, had back surgery?
5    A.   Yes, sir.
6    Q.   All right.  Did Dr. Whatley
7  accurately recall what you told him, that
8  you had had back surgery, but on
9  February 22nd, 2007, you were doing okay?
10   A.   Repeat that.
11   Q.   Did Dr. Whatley correctly
12 record what you told him, that is, that
13 you had had back surgery, but that on
14 February 22nd, 2007, you were doing well?
15   A.   I can't recall that.
16   Q.   But you agree that's what it
17 says?
18   A.   Yes.
19   Q.   All right.  Do you have any
20 current physical limitations as a result
21 of your high blood pressure?
22       MS. MUHAMMAD:  I object to the
23 form.

---

**Page 71**

1    A.   Repeat that again.
2    Q.   Do you have any current
3  physical limitations as a result of high
4  blood pressure?
5    A.   What -- explain that.
6    Q.   Does high blood pressure keep
7  you from doing anything you want to do?
8    A.   No, sir.
9        MR. SUGGS:  Okay.  All right.
10 Do you want to take five minutes?
11       THE WITNESS:  That's fine.
12       (Whereupon, a break was had
13        from 10:35 A.M. until 10:45
14        P.M.)
15       (Whereupon, Defendant's
16        Exhibit 10 was marked
17        for identification.)
18   Q.   (BY MR. SUGGS:)  Let me show
19 you what's been marked as Exhibit 10.
20       MS. MUHAMMAD:  Are we going to
21 go on and not wait for him?
22       MR. SUGGS:  Yes.
23   A.   Back on the high blood

---

**Page 72**

1  pressure, you remember you were
2  questioning me about that, even though you
3  done passed through it.  And I said there
4  wasn't any limitations, but anytime you
5  take a high blood pressure, you know,
6  there are some limitations on it, so --
7  when I was taking high blood pressure.
8    Q.   What are your limitations?
9    A.   Well, you know, I just can't
10 hold my head down for a long period of
11 time, you will get to swimming in the head
12 because of the blood pressure pill I take.
13   Q.   Anything else?
14   A.   Well, there's certain foods
15 I've got to eat, I can't have a whole lot
16 of salt, just little stuff like that.
17   Q.   Okay.  If you would look at
18 page 1173 of Exhibit 10.  See up here it
19 says service date?
20   A.   Uh-huh.
21   Q.   Service date is -- where did
22 it go?  There it is.  10/2, 2006, correct?
23   A.   Yes, sir.

---

**Page 73**

1    Q.   And come on down under that,
2  it says chief complaint.  Do you see that?
3    A.   Yes.
4    Q.   And that's a visit to the
5  emergency room for a hip pain on October
6  the 2nd, 2006, right?
7    A.   I don't see that date, sir.
8    Q.   Well, we already established
9  the service date --
10   A.   Okay.
11   Q.   -- is --
12       MS. MUHAMMAD:  Object to the
13 form.
14   Q.   -- 10/2/06.
15       MS. MUHAMMAD:  I can't recall
16 him testifying that he went to the
17 emergency room.
18   Q.   Did you go to the emergency
19 room on October 2nd, 2006 for hip pain?
20   A.   I don't know exactly what date
21 it was, but I did go to the emergency
22 room.
23   Q.   All right.  It was at Auburn

---

19 (Pages 70 to 73)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                      BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                  October 17, 2007

---

Page 74

1   Urgent Care?
2       A.   Yes, sir.
3       Q.   And it was for hip pain?
4       A.   Well, they said it was for hip
5   pain. I didn't know what it was for. I
6   mean, what was the problem. It was mostly
7   in my -- come to find out it was my back.
8       Q.   On the left side?
9       A.   Yes.
10          (Whereupon, Defendant's
11          Exhibit 11 was marked
12          for identification.)
13          (Whereupon, Defendant's
14          Exhibit 12 was marked
15          for identification.)
16      Q.   All right. The court reporter
17  has given you Exhibit 11. And we are
18  going to go ahead and mark Exhibit 12,
19  too, because they sort of work together.
20  Okay. Now, you see Exhibit 11 is East
21  Alabama Medical Center?
22      A.   Yes.
23      Q.   And if you look at Exhibit 12,

---

Page 75

1   you'll see it's records we got from
2   Dr. Frazier Jones. That's shown on page
3   1216. Do you see that, Dr. Jones?
4       A.   12/16?
5       Q.   Uh-huh.
6       A.   You said --
7       Q.   See?
8       A.   12/16.
9       Q.   That's East Alabama. This
10  one.
11      A.   On 12 --
12      Q.   That one. Dr. Frazier Jones,
13  do you see that?
14      A.   Yes, sir.
15      Q.   All right. So, we've got two
16  stacks of documents. And if you look at
17  page 1338, which is in Exhibit 11, this
18  one right here. Let me fix it for you.
19  Put it over in the corner. Okay. Do you
20  see up here at the top it says 10/4, 2006?
21      A.   Yes.
22      Q.   And it says that you visited
23  the emergency room for evaluation of

---

Page 76

1   reported left thigh pain. Do you see
2   that?
3       A.   Yes.
4       Q.   All right. Is that correct?
5       A.   Yes, sir.
6       Q.   All right. Now, let's look at
7   1329, which is just coming forward. All
8   right. And do you see up at the top it
9   says 10/7/06, 8:20 a.m.?
10      A.   Yes, sir.
11      Q.   And it says emergency room
12  visit for left leg pain. Do you see that?
13          MS. MUHAMMAD: Object to the
14  form.
15      A.   I see left leg, left pain.
16      Q.   Left leg, do you see that L
17  that's circled?
18      A.   Yes, sir.
19      Q.   And then it says leg and then
20  pain?
21      A.   Okay.
22      Q.   I think that circle means
23  left, left leg pain. Do you see that?

---

Page 77

1           MS. MUHAMMAD: Object to the
2   form.
3       A.   Yes, sir.
4       Q.   And if you come on up to 13 --
5   no, I'm sorry. We've got to go to the
6   other one, the other exhibit, which is 12
7   and look at 1224 -- I'm sorry. 1234.
8   Pardon me. 1234. Do you see the date at
9   the top says 10/10, 2006?
10      A.   Yes, sir.
11      Q.   And this is when they did an
12  MRI, correct?
13          MS. MUHAMMAD: Object to the
14  form.
15      A.   That's what it says.
16      Q.   And they found that you had
17  some herniation of the L5-S1 disk, right?
18          MS. MUHAMMAD: I object to the
19  form.
20      A.   That's what it says.
21      Q.   Okay. And if you look at
22  1322, which is back in the other exhibit,
23  Exhibit 11, do you see down here where it

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031              http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

Page 78

1  says diagnosis?
2      A.   Yes, sir.
3      Q.   Herniated disk?
4      A.   Yes, sir.
5      Q.   L5-S1?
6      A.   Yes, sir.
7      Q.   And they gave you an epidural
8  and steroid injection, right?
9      A.   Yes, sir.
10     Q.   All right.  Now, let's look at
11 1322, which is the same exhibit, just
12 coming forward -- I'm sorry, 1300.  Excuse
13 me.  You had more than one epidural,
14 didn't you?
15     A.   Yes, sir.
16     Q.   Let's see.  All right.  And if
17 you look at -- have you got 1300?
18     A.   Yes.
19     Q.   It says procedure performed,
20 microdiskectomy, left L5-S1, do you see
21 that?
22     A.   Procedures?
23     Q.   Uh-huh.  Microdiskectomy.

Page 79

1      A.   Yes, sir.
2      Q.   All right.  So, that's when
3  you had your operation, isn't it?
4      A.   I'm not sure, sir.  You know,
5  I don't know what they call -- what that
6  meant.
7      Q.   All right.  Well, look down at
8  the bottom.
9      A.   All right.
10     Q.   It says an incision, that
11 means a cut?
12     A.   Uh-huh.
13     Q.   Was made about the mid portion
14 of the lumbar spine.  So, you agree that
15 this is when you had your operation?
16     A.   Yes, sir.
17     Q.   And it was on October the
18 26th, 2006?
19     A.   Yes, sir.
20     Q.   And then if you look over in
21 Exhibit 12, and look at 1229.  That's
22 dated November the 6th, 2006, isn't it?
23     A.   Yes, sir.

Page 80

1      Q.   And Dr. Jones says that you
2  got a little bit of pain in the foot and
3  he says that would improve and that your
4  gait is better, correct?
5      A.   Yes, sir.
6      Q.   All right.  So, you were
7  getting better?
8      A.   I'm getting better.
9      Q.   You were getting better at
10 this time?
11     A.   Yes, sir.
12     Q.   Okay.  And look at the next
13 page, 1228 and that's November the 17th,
14 2006, correct?
15     A.   Yes, sir.
16     Q.   It says you're doing well
17 except you've got pain in your left great
18 toe, do you see that?
19     A.   Yes, sir.
20     Q.   And he ends up by saying that
21 he thinks the pain is grout -- gout,
22 excuse me --
23         MS. MUHAMMAD:  I object to the

Page 81

1  form.
2      Q.   -- is that correct?
3      A.   That's what he said, sir.
4      Q.   Did you know whether it was
5  gout or not?
6      A.   It wasn't gout, sir.
7      Q.   It wasn't gout.  Did you find
8  that out later?
9      A.   Can I comment?
10     Q.   Sure.
11     A.   I'm not a doctor, I don't know
12 what it is, but they haven't found out
13 what it is either.
14     Q.   Okay.  But Dr. Jones thought
15 it might be gout, at least back in
16 November of 2000; is that correct?
17     A.   Yes, sir.
18     Q.   All right.  And then if you
19 come forward one page to 1127.  And this
20 is on November the 22nd, and he observes
21 that you are still having pain in your big
22 toe, but that's the only pain you are
23 having, right?

21 (Pages 78 to 81)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

Page 82

1      MS. MUHAMMAD: Object to the
2  form.
3      A.  No, sir.
4      Q.  All right.  Read it with me.
5      A.  Uh-huh.
6      Q.  Here for evaluation, great toe
7  pain.  This is the only pain he is having.
8  Do you see that?
9      A.  Yes, sir.
10     Q.  Did I read it correctly?
11     A.  Yes, sir.
12     Q.  All right.  And if you come
13  forward one page, 1226.  It says the
14  patient returns for follow-up, he is still
15  having more great toe pain than anything
16  else.  Do you see that?
17     A.  Yes, sir.
18     Q.  And you come up one to 1225.
19  Now, it says back and leg pain is better,
20  pain in the great toe only.  Do you see
21  that right up here at the top?  The back
22  pain is better.  The leg pain is better.
23  He is still left with great toe pain.  Do

---

Page 83

1  you see that?
2      MS. MUHAMMAD: Object to the
3  form.  The word "great" is not there.
4      A.  Read it again, sir.
5      Q.  All right.  The back pain is
6  better, the leg pain is better.  He is
7  still left with toe pain.
8      A.  Yes, sir.
9      Q.  All right.  Now --
10     MS. MUHAMMAD: I'm going to
11  object to this.  What's the relevance, I
12  mean, there's nothing in the lawsuit
13  that --
14     MR. SUGGS: At the beginning
15  of this deposition, we reserved the
16  objections, so if you don't mind, you're
17  cluttering up the record.
18     MS. MUHAMMAD: Well, I mean,
19  he never claimed anything regarding his
20  leg or back pain in this lawsuit.
21     MR. SUGGS: He said at the
22  bottom he has been released from his
23  temporary job services and is inquiring

---

Page 84

1  about disability.
2      Q.  Where were you working?
3      A.  At that time, I worked at CV
4  Holdings.
5      Q.  And on this occasion, did you
6  ask Dr. Jones about disability?
7      A.  Yes, sir.
8      Q.  And that was about eight weeks
9  after your operation, right?
10     A.  Yes, sir.
11     Q.  Dr. Jones said that it's too
12  early to be talking about disability,
13  right?
14     A.  Yes, sir.
15     Q.  All right.  Come up one and
16  look at 1224.  This is January 12, 2007,
17  which is this year, correct?
18     A.  Yes, sir.
19     Q.  And you see there it says in
20  the third line, gait is back to normal?
21     A.  Yes, sir.
22     Q.  He says occasionally swelling
23  in the toe toward the end of the day, but

---

Page 85

1  really otherwise not having any other
2  issues.  Do you see that?
3      A.  No, sir.
4      Q.  Okay.  It's hard for me to
5  read upside-down.  He says he occasionally
6  gets some swelling in the toe towards the
7  end of the day, but really otherwise not
8  having any other issues.  Do you see that?
9      A.  Yes, sir.
10     Q.  So, on January 12, 2007, you
11  were substantially better than you had
12  been, correct?
13     MS. MUHAMMAD: Object to the
14  form.
15     A.  I deny that.
16     Q.  Sir?
17     A.  I deny that.
18     Q.  Do you dispute what Dr. Jones
19  wrote?
20     A.  Yes, sir.  He just didn't word
21  it right.
22     Q.  And I will come forward to
23  1223.  Looking to 1223, which is

---

22 (Pages 82 to 85)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

| Page 86 |
| --- |

1  February 23, 2007, it says occasionally
2  gets a twinge in his back. He said he is
3  doing reasonably well. His gait is back
4  to normal. Did I read that correctly?
5      A.   Yes, sir.
6      Q.   Okay. Now, if you look at the
7  next one, which is 1222, it says on the
8  first line, significant foot and back
9  pain. Do you see that?
10     A.   Yes, sir.
11     Q.   All right. And that's
12  March 22, 2007, right?
13     A.   Yes, sir.
14     Q.   And it ends and says we'll
15  keep him out of work until then. And I
16  think "then" refers to a recheck in three
17  or four weeks. Where were you working?
18     A.   I was -- I was a postal
19  service carrier.
20     Q.   What was the reason for the
21  change from February 23, 2007 to March 22,
22  2007?
23         MS. MUHAMMAD: Object to the

| Page 87 |
| --- |

1  form.
2      A.   The reason being, as a rural
3  carrier you have to be hanging out the
4  window trying to put mail in the boxes out
5  of the seat. By leaning forward, reaching
6  from one side to the other one and leaning
7  out of the window, it caused my back and
8  the pains came up.
9      Q.   What dates did you work as a
10  mail carrier?
11     A.   Whenever they need me. Mostly
12  on Saturday, but I filled in during the
13  weekdays.
14     Q.   Are you able to work now?
15     A.   No, sir.
16     Q.   Because of what?
17     A.   My back and my toe -- and
18  toes.
19     Q.   I'm sorry?
20     A.   Toes. Both -- it's affected
21  both foots.
22     Q.   I see. Who's treating you
23  now?

| Page 88 |
| --- |

1      A.   I haven't been back to
2  Dr. Jones.
3      Q.   Anybody treating you now?
4      A.   Not as of now.
5      Q.   Now, you don't claim that any
6  of this back injury is due to your
7  employment with WestPoint, do you?
8      A.   No, sir.
9      Q.   Or your termination from
10  employment from WestPoint, correct?
11         MS. MUHAMMAD: Object to the
12  form.
13     A.   Rephrase that again.
14     Q.   You don't claim that your back
15  problems is due in any way to your
16  termination from employment at WestPoint,
17  do you?
18     A.   No, sir.
19         (Whereupon, Defendant's
20         Exhibit 13 was marked
21         for identification.)
22     Q.   Okay. Do you recognize
23  Exhibit 13 as a Social Security disability

| Page 89 |
| --- |

1  application?
2         MS. MUHAMMAD: I object to the
3  form.
4      A.   Repeat that again, sir.
5      Q.   Do you recognize Exhibit 13 as
6  a disability application summary where you
7  applied for Social Security disability
8  benefits?
9      A.   Yes, sir.
10     Q.   All right. Now, at the very
11  first line, it says that you applied for
12  Social Security disability on March 16,
13  2007. Do you see that?
14     A.   Yes, sir.
15     Q.   All right. Is that the
16  correct date?
17     A.   I'm not sure, sir.
18     Q.   Okay. You don't have any
19  reason to dispute it, do you?
20     A.   No, sir.
21     Q.   I think you may have told me
22  this one, but I want to be sure I
23  understand. Did you do any work between

23  (Pages 86 to 89)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 90

```
 1  October 2006 and March, 2007?
 2      A.  I can't recall, sir.
 3      Q.  Do you think you were working
 4  for the postal service during that period
 5  of time?
 6      A.  My last week with the postal
 7  service was maybe March.
 8      Q.  Of 2007?
 9      A.  No, sir.
10      Q.  This year?
11      A.  I can't recall.
12      Q.  Did you apply for disability
13  right after you stopped working for the
14  postal service?
15      A.  Yes, sir.  I believe that was
16  '06, sir.
17      Q.  You think it was '06?
18      A.  Yes, sir, I haven't worked
19  since '06.
20      Q.  Have you worked in 2007?
21      A.  No, sir.  I can't recall.
22      Q.  Have you worked since
23  October 2006, which is about the time you
```

Page 91

```
 1  had your back surgery?
 2      A.  Yes, sir, I worked up until
 3  December of 2006.
 4      Q.  Now, look at the bottom of
 5  page fifty.  Very bottom.  Now, you made
 6  this application saying it was true under
 7  penalty of perjury, right?
 8      A.  Yes, sir.
 9      Q.  Now, if you look at the top of
10  that page, fourth paragraph down it says
11  I'm married to Jeannette Thomas.  Do you
12  see that?
13      A.  Yes, sir.
14      Q.  It says we were married on
15  August 15, 1981; is that the correct date?
16      A.  Yes, sir.
17      Q.  Okay.  And you claim you are
18  disabled today?
19      A.  Yes, sir.
20          (Whereupon, Defendant's
21          Exhibit 14 was marked
22          for identification.)
23      Q.  Now, Exhibit 14 appears to be
```

Page 92

```
 1  an application for supplemental security
 2  income.  Do you see that?
 3      A.  Yes, sir.
 4      Q.  And it says you've got a
 5  private retirement of ninety-two dollars a
 6  month.  Is that from your work for
 7  WestPoint?
 8      A.  Yes, sir.
 9      Q.  And your wife makes about
10  twenty-five thousand dollars a year?
11      A.  Yes, sir.
12      Q.  And you declared under penalty
13  of perjury that this application was true,
14  correct?
15      A.  Yes, sir.
16          (Whereupon, Defendant's
17          Exhibit 15 was marked
18          for identification.)
19      Q.  Let me show you what's been
20  marked as Exhibit 15.  Is it correct
21  looking at page 65 that you can walk,
22  stand, do light cleaning, and drive for
23  fifteen minutes?
```

Page 93

```
 1          MS. MUHAMMAD:  Object to the
 2  form.  There's no 65 in this particular
 3  document, unless I have the wrong exhibit.
 4      Q.  Do you see page 65?
 5      A.  No.
 6      Q.  Sir?
 7      A.  Repeat the question.
 8      Q.  All right.  Look at
 9  Exhibit 15, page 65.
10          MR. SUGGS:  I think we've had
11  a mistake.  Bear with me just a minute.
12      Q.  All right.  I withdraw that
13  question.  Let me just ask you a question
14  on what we've marked, which is 15, work
15  history report is on page 75.  Is that in
16  your handwriting, Mr. Sanks?
17      A.  No, sir.
18      Q.  Do you know who wrote it?
19      A.  No, sir.
20      Q.  All right.  Is the work
21  history accurate, I mean, is that -- are
22  those things that you've done during your
23  work life?
```

24 (Pages 90 to 93)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 94

1     A.   Yes, sir.
2     Q.   Okay.  Now, let's look at the
3  next page, which is 76 through 81 and it
4  describes your duties at the various jobs
5  you have had.  Is that in your
6  handwriting?
7     A.   No, sir.
8     Q.   Do you know who wrote it?
9     A.   No, sir.
10    Q.   All right.  Are the tasks that
11 are described things that you actually did
12 when you worked for WestPoint?
13         MS. MUHAMMAD:  Object to the
14 form.  I don't see an indication that he
15 worked for WestPoint on that particular
16 page.
17    A.   They are some job duties that
18 I did for WestPoint Stevens.
19    Q.   So, those job duties are
20 accurate?
21    A.   Yes, sir.
22    Q.   All right.
23         (Off-the-record discussion.)

Page 95

1          (Whereupon, Defendant's
2          Exhibit 16 was marked
3          for identification.)
4     Q.   Okay.  Looking at Exhibit 16,
5  page 65, which is the second page down.
6     A.   Page -- repeat the page.
7     Q.   Yes, it's from the top, 65,
8  second page down.
9     A.   I don't have a 65.
10    Q.   Yes, sir.  Hold on a minute.
11 Okay.  Now, you've got a 65?
12    A.   Yes.
13    Q.   Okay.  If you would read
14 what's written by number -- under number
15 one to yourself.
16    A.   (Reading document.)
17    Q.   Have you read it?
18    A.   Yes, sir.
19    Q.   All right.  Now, as I
20 understand number one, it says you can
21 walk, stand, do light cleaning, drive for
22 fifteen minutes, but you can only sit for
23 five minutes and after that you've got

Page 96

1  pain in your back and feet; is that
2  correct?
3     A.   That's correct.
4     Q.   Okay.  Now, is this in your
5  handwriting?
6     A.   No, sir.
7     Q.   Do you know who wrote it?
8     A.   Yes, sir.
9     Q.   Who?
10    A.   John Williams.
11    Q.   Okay.  If you go to page 70.
12 Is that your signature there?
13    A.   Yes, sir.
14    Q.   All right.  And is 3/28/07 the
15 day you signed it?
16    A.   Yes, sir.
17    Q.   Okay.  Now, let's look at 66,
18 up here at the top, C 2.
19    A.   Yes, sir.
20    Q.   Were you using crutches in
21 March 2007, or did you just get them when
22 you were at the emergency room in
23 September of 2006?

Page 97

1     A.   When I was at the emergency
2  room.
3     Q.   All right.  So, you weren't
4  using the crutches in March of 2007?
5     A.   Yes, sir, I used the crutches.
6     Q.   When did you start using
7  crutches?
8     A.   I had crutches when I left the
9  hospital.
10    Q.   Okay.  That was in October of
11 2006?
12    A.   Yes, sir.
13    Q.   All right.  When did you --
14 did you ever stop using them?
15    A.   Occasionally I use them.
16    Q.   After that.  How often?
17    A.   Maybe twice a week or
18 something like that.
19    Q.   For how long at a time?
20    A.   Maybe fifteen or
21 twenty minutes at a time or something like
22 that.
23    Q.   Okay.  Looking back at page

25  (Pages  94 to 97)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 98

1  70, it lists under fifteen some
2  medications, it says Methylprednisolone,
3  Lyrica, Meloxicam, all of those are for
4  pain, aren't they?
5      A.   Yes, sir.
6      Q.   And you've taken all of those
7  in March of 2007?
8      A.   Yes, sir.
9          (Whereupon, Defendant's
10         Exhibit 17 was marked
11         for identification.)
12     Q.   And you can see from
13 Exhibit 17, the first line, that you were
14 denied supplemental security income --
15     A.   Yes, sir.
16     Q.   -- do you see that?  That's
17 correct, isn't it, you did not get that,
18 did you?
19     A.   Correct.
20     Q.   Correct?
21     A.   Correct.
22         (Whereupon, Defendant's
23         Exhibit 18 was marked

Page 99

1          for identification.)
2      Q.   And Exhibit 18 is consistent,
3  isn't it, you didn't get any Social
4  Security income benefits from July, 2005
5  through June 2007, correct?
6      A.   That's correct.
7      Q.   Have you ever been approved
8  for disability?
9      A.   Yes, sir.
10     Q.   By whom?
11     A.   The disability people in
12 Opelika.
13     Q.   All right.  Are they Social
14 Security?
15     A.   Yes, sir.
16     Q.   When were you approved?
17     A.   This is the tenth month.
18 September.
19     Q.   2007?
20     A.   Yes, sir.
21     Q.   Have you gotten any money?
22     A.   Yes, sir.
23     Q.   How much?

Page 100

1      A.   Eleven thousand six hundred
2  dollars.
3      Q.   Did they approve it
4  retroactively?
5      A.   From the -- what do you mean?
6      Q.   Back to a certain date.
7      A.   Yes, sir.
8      Q.   Back to when?
9      A.   I think of March.
10     Q.   What year?
11     A.   Of this year, '07.
12         MR. SUGGS:  Can we go off the
13 record?
14         (Off-the-record discussion.)
15     Q.   All right.  Have you got any
16 papers that say you were approved for
17 disability and that it's retroactive back
18 to March of 2007?
19     A.   Yes, sir.
20     Q.   Where are they?
21     A.   They're at home.
22     Q.   All right.  Will you give them
23 to your lawyer so she can send them to me?

Page 101

1      A.   Yes, sir.
2      Q.   All right.  When are you going
3  to do that?
4      A.   Tomorrow.
5      Q.   Okay.
6          MS. MUHAMMAD:  As soon as he
7  gets them to me.
8      Q.   If you can do it tomorrow,
9  that's great.  On what basis did the
10 Social Security people approve your
11 application for disability?
12     A.   Rephrase that.
13     Q.   Yes.  Why did they approve
14 your application for disability?
15     A.   Because of the surgery I had
16 and I'm not able to go back to work.
17     Q.   So, based on your back?
18     A.   Yes, sir.
19     Q.   Anything else?
20     A.   Foot.
21     Q.   Back and foot.  Anything else?
22     A.   That's it.
23     Q.   All right.  What doctor did

26  (Pages 98 to 101)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 102

```
 1  the Social Security Administration rely
 2  on?
 3       A.   I don't know his name.
 4       Q.   Did you go see him?
 5       A.   Yes, sir.
 6       Q.   Does he work for Social
 7  Security?
 8       A.   Yes, sir.
 9       Q.   But he wasn't Dr. Frazier
10  Jones?
11       A.   No, sir.
12       Q.   All right.  Would the papers
13  that you give Ms. Muhammad have this
14  doctor's name?
15       A.   I wouldn't know.
16       Q.   Can you give her his name?
17       A.   I don't -- well, I guess I
18  would have to get that from the Social
19  Security people.
20       Q.   All right.  But you went to
21  see him?
22       A.   Yes, sir.
23       Q.   Is he in Opelika?
```

Page 103

```
 1       A.   He was in Phenix City when I
 2  went to his office.
 3       Q.   All right.  So, you went to
 4  see a doctor in Phenix City?
 5       A.   Yes, sir.
 6       Q.   Is he in private practice or
 7  does he work for Social Security?
 8       A.   I don't know who he worked
 9  for, sir.
10       Q.   Okay.  All right.  And you
11  don't know his name?
12       A.   No, sir.
13       Q.   All right.  We need his name.
14       A.   Okay, sir.
15       Q.   All right.  I know you saw
16  Dr. Whatley, I know you saw Dr. Frazier
17  Jones.  During the course of this
18  deposition, if you think of this doctor in
19  Phenix City, tell me.
20       A.   All right, sir.
21       Q.   That will save us a bunch of
22  trouble.  Any other doctors that you've
23  seen?
```

Page 104

```
 1       A.   I have seen Dr. -- he's out
 2  here at the -- it was a lady doctor.  She
 3  was -- I can't recall her name, and also a
 4  man doctor for high blood pressure.
 5  Dr. Fuller.
 6       Q.   Where is he?
 7       A.   He's in Opelika, across from
 8  the justice center.
 9       Q.   Okay.  Is Dr. Fuller the male
10  or the female?
11       A.   Male.
12       Q.   And did the female practice in
13  his office or is she somewhere else?
14       A.   Yes, she was there.
15       Q.   Okay.  Excuse me.  Any other
16  doctor?
17       A.   That's it.
18       Q.   Do you see both Dr. Fuller and
19  the female doctor for high blood pressure?
20       A.   Yes, sir.
21       Q.   Been treated for anything else
22  other than high blood pressure and your
23  back?
```

Page 105

```
 1       A.   Not that I can recall.
 2       Q.   Have you seen any therapist or
 3  counselors in the last ten years?
 4       A.   No, sir.
 5       Q.   Visited any rehabilitation
 6  facilities in the last ten years?
 7       A.   No, sir.
 8       Q.   Have you ever been diagnosed
 9  with any mental or emotional condition?
10       A.   No, sir.
11       Q.   Do you drink?
12       A.   Occasionally.
13       Q.   Has drinking ever caused you
14  any kind of problem physically, socially,
15  emotionally or legally?
16       A.   No, sir.
17       Q.   Are you a member of Alcoholics
18  Anonymous?
19       A.   No, sir.
20       Q.   Do you use any street drugs?
21       A.   No, sir.
22       Q.   Marijuana?
23       A.   No, sir.
```

27 (Pages 102 to 105)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 106

1    Q.    Cocaine?
2    A.    No, sir.
3    Q.    Ever been a member of
4  Narcotics Anonymous?
5    A.    No, sir.
6    Q.    Have you ever complained to
7  any health care provider about stress?
8    A.    Yes, sir.  I don't know about
9  a health care provider, but I have
10 complained about stress.
11   Q.    I just want to know if you
12 have complained to a doctor about stress?
13   A.    I can't recall.
14   Q.    All right.  Anxiety?
15   A.    No, sir.
16   Q.    Nervousness?
17   A.    No, sir.
18   Q.    Irritability?
19   A.    What do you mean?  Explain
20 that.
21   Q.    Irritability meaning, you
22 know, you come home and you're irritated
23 with the wife, you're irritated with your

Page 107

1  kids.
2    A.    No, sir.
3    Q.    Insomnia?
4    A.    Explain that.
5    Q.    Can't sleep.
6    A.    No, sir.
7    Q.    Loss of concentration?
8    A.    Sir, can I renege on that
9  can't sleep?
10   Q.    Sure.  Yes.
11   A.    When I had surgery, I couldn't
12 sleep.
13   Q.    Okay.
14   A.    I couldn't rest at all.
15   Q.    Because of pain?
16   A.    Yes, sir.
17   Q.    Did you talk to Frazier Jones,
18 Dr. Frazier Jones about that?
19   A.    Yes, sir, before and after.
20   Q.    Okay.  Loss of concentration?
21   A.    No, sir.
22   Q.    Depression?
23   A.    No, sir.

Page 108

1    Q.    Loss of libido?
2    A.    Explain libido.
3    Q.    Sex drive.
4    A.    Yes, sir.
5    Q.    Who did you complain to?
6    A.    The doctor.
7    Q.    Which one?
8    A.    Dr. Whatley.
9    Q.    When?
10   A.    Between 1995 to 2006,
11 somewhere in there.
12   Q.    Every year?
13   A.    No, it was in between those,
14 between that time.
15   Q.    Sometime during the decade of
16 1995 to 2006?
17   A.    Yes, sir.
18   Q.    Did you start complaining
19 about that in 1995?
20   A.    I -- no, sir.  Between that
21 time period.  I can't put exact what date
22 on it.
23   Q.    All right.  But it could have

Page 109

1  been 1995?
2    A.    Yes.
3    Q.    While you were still working
4  for WestPoint?
5    A.    Yes, sir.
6    Q.    Did you ever complain to any
7  health care provider that you thought you
8  had a life-threatening disease?
9    A.    No, sir.
10   Q.    Okay.  Have you ever taken any
11 muscle relaxers?
12   A.    No, sir.
13   Q.    Not even for your back?
14   A.    No, sir.
15   Q.    Valium?
16   A.    No, sir.
17   Q.    Librium?
18   A.    But, now, I'm going to
19 rephrase that.  When you said for my back,
20 is that, give you something to take for
21 the pain and stuff?
22   Q.    I think a muscle relaxer is
23 different than a pain pill.

28 (Pages 106 to 109)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

| | Page 110 |
|---|---|
| 1 | A.   No, sir. |
| 2 | Q.   Not that you know of? |
| 3 | A.   No, sir. |
| 4 | Q.   Okay.  Valium? |
| 5 | A.   No.  What do you mean Valium? |
| 6 | Q.   Valium is the name of a drug. |
| 7 | A.   No, sir, I don't have |
| 8 | anything. |
| 9 | Q.   Librium? |
| 10 | A.   Unless that was on that paper. |
| 11 | Q.   I'm not trying to trick you. |
| 12 | A.   No. |
| 13 | Q.   Librium, that you know of? |
| 14 | A.   No, sir. |
| 15 | Q.   Prozac? |
| 16 | A.   No, sir. |
| 17 | Q.   Desyrel? |
| 18 | A.   No, sir. |
| 19 | Q.   Zoloft? |
| 20 | A.   No, sir. |
| 21 | Q.   Any kind of sedatives? |
| 22 | A.   Well, a sedative, explain |
| 23 | that. |

| | Page 111 |
|---|---|
| 1 | Q.   Sedative is usually like a |
| 2 | sleeping pill. |
| 3 | A.   Yes, Dr. Jones prescribed that |
| 4 | for me. |
| 5 | Q.   When you had your back |
| 6 | surgery? |
| 7 | A.   Right. |
| 8 | Q.   You don't take them now, do |
| 9 | you? |
| 10 | A.   No, sir. |
| 11 | Q.   Tell me what pharmacies you |
| 12 | use to fill your prescriptions. |
| 13 | A.   I use the CVS. |
| 14 | Q.   Which one? |
| 15 | A.   The one here across from the |
| 16 | medical center, that Pepperell Corner or |
| 17 | something like that. |
| 18 | Q.   In Opelika? |
| 19 | A.   Yes, sir.  I have used |
| 20 | Wal-Mart. |
| 21 | Q.   Here in Opelika? |
| 22 | A.   Yes, sir. |
| 23 | Q.   Any others? |

| | Page 112 |
|---|---|
| 1 | A.   I have used through the mail, |
| 2 | I can't recall what that is as of now. |
| 3 | Q.   Is there just one Wal-Mart in |
| 4 | Opelika? |
| 5 | A.   Yes, sir. |
| 6 | Q.   And you say Pepperell Corner. |
| 7 | Is that over -- I don't know whether I'm |
| 8 | pointing in the right direction. |
| 9 | A.   Across -- |
| 10 | Q.   Over across the road here? |
| 11 | A.   Yes, sir.  Across from the |
| 12 | East Alabama Medical. |
| 13 | Q.   Oh, okay.  Do you know what |
| 14 | street that is? |
| 15 | A.   No, sir. |
| 16 | Q.   Are you a member of any |
| 17 | church? |
| 18 | A.   Yes, sir. |
| 19 | Q.   Which one? |
| 20 | A.   I'm a member of a Methodist |
| 21 | Church, Salem, Alabama. |
| 22 | Q.   Is it AME? |
| 23 | A.   Yes -- CME. |

| | Page 113 |
|---|---|
| 1 | Q.   CME? |
| 2 | A.   Yes, sir. |
| 3 | Q.   Who is the preacher over |
| 4 | there? |
| 5 | A.   Pastor Nathaniel Picket. |
| 6 | Q.   Who? |
| 7 | A.   Nathaniel, N.J. Picket. |
| 8 | Q.   Are you a member of any kind |
| 9 | of civic club? |
| 10 | A.   No, sir. |
| 11 | Q.   Special interest group? |
| 12 | A.   Yes, sir. |
| 13 | Q.   What? |
| 14 | A.   It's called Just Us Club. |
| 15 | Q.   Just us? |
| 16 | A.   (Witness nods head.) |
| 17 | Q.   How often do y'all meet? |
| 18 | A.   Once a month. |
| 19 | Q.   Where? |
| 20 | A.   At each individual homes. |
| 21 | Q.   Okay.  Y'all have any kind of |
| 22 | a program? |
| 23 | A.   Which one, the -- |

29 (Pages 110 to 113)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 114

| | | |
|---|---|---|
| 1 | Q. | Just Us Club. |
| 2 | A. | No, sir. |
| 3 | Q. | Serve refreshments? |
| 4 | A. | Yes, we do. |
| 5 | Q. | Do you still enjoy doing that? |
| 6 | A. | Beg your pardon? |
| 7 | Q. | Do you still enjoy doing that? |
| 8 | A. | Yes, sir. |
| 9 | Q. | You go when you can? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Do you try to go every month? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Okay. Are you a member of any |
| 14 | professional organizations? | |
| 15 | A. | Explain professional. |
| 16 | Q. | Oh, like a professional |
| 17 | electricians group or anything like that? | |
| 18 | A. | No, sir. |
| 19 | Q. | Have you ever received any |
| 20 | rewards based on religious, civic, | |
| 21 | professional or special interest | |
| 22 | activities? | |
| 23 | A. | Yes, sir. |

Page 115

| | | |
|---|---|---|
| 1 | Q. | What? |
| 2 | A. | I received awards from Bible |
| 3 | studies, Bible schools. | |
| 4 | Q. | Is this through your church? |
| 5 | A. | Yes, sir. |
| 6 | Q. | All right. What else? |
| 7 | A. | Stewardess -- steward |
| 8 | programs. | |
| 9 | Q. | At the church? |
| 10 | A. | Yes, sir. |
| 11 | Q. | All right. |
| 12 | A. | Trustee. |
| 13 | Q. | Okay. What else? |
| 14 | A. | And Sunday school. |
| 15 | Q. | You got an award in Sunday |
| 16 | school? | |
| 17 | A. | Yes, sir. |
| 18 | Q. | For what? |
| 19 | A. | Being one of the good |
| 20 | superintendents there. | |
| 21 | Q. | Okay. What else? |
| 22 | A. | That's it. |
| 23 | Q. | What hobbies do you have? |

Page 116

| | | |
|---|---|---|
| 1 | A. | Explain hobbies. |
| 2 | Q. | Well, something that's not |
| 3 | work that you enjoy doing, stamp | |
| 4 | collecting, playing sports, or going | |
| 5 | fishing, hunting, working in the flower | |
| 6 | garden, you know, hobbies, things that you | |
| 7 | do routinely that you enjoy. | |
| 8 | A. | As of now? |
| 9 | Q. | As of now. |
| 10 | A. | There ain't very many that I |
| 11 | can do as of now. I just enjoy being | |
| 12 | outside. Just out in the yard. | |
| 13 | Q. | You are able to do that? |
| 14 | A. | I am able to get out in the |
| 15 | yard. | |
| 16 | Q. | Okay. What do you do when you |
| 17 | are out there? | |
| 18 | A. | Just walk around, look around. |
| 19 | Q. | Anything else? |
| 20 | A. | That's mostly it. |
| 21 | Q. | Do you own a car? |
| 22 | A. | Yes, sir. |
| 23 | Q. | How many cars? |

Page 117

| | | |
|---|---|---|
| 1 | A. | About four. |
| 2 | Q. | You own four cars? |
| 3 | A. | Yes. |
| 4 | Q. | Do you owe any money on them? |
| 5 | A. | No, sir. |
| 6 | Q. | Now, you told me about your |
| 7 | house and you told me you just got this | |
| 8 | money from Social Security. What | |
| 9 | significant assets do you have right now? | |
| 10 | A. | Mortgage. |
| 11 | Q. | No, assets. |
| 12 | A. | Oh, assets. |
| 13 | Q. | Other than your house, I know |
| 14 | about your house, you've told me about | |
| 15 | that. | |
| 16 | A. | Explain -- |
| 17 | | MS. MUHAMMAD: Things you own. |
| 18 | A. | Assets that's -- explain that |
| 19 | again. | |
| 20 | Q. | All right. You've got four |
| 21 | cars. Those are assets. How much are | |
| 22 | those four cars worth altogether? | |
| 23 | A. | About fifteen thousand. |

30 (Pages 114 to 117)

BOBBY SANKS

BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.

October 17, 2007

| Page 118 | Page 120 |
|---|---|

**Page 118**

1    Q.   All right.  So, you've got
2 fifteen thousand dollars worth of cars, we
3 know what you have got in your mortgage.
4 Have you got any money in the bank?
5    A.   No, sir.
6    Q.   All right.  You spent that
7 eleven thousand already?
8    A.   Yes, sir.
9        MS. MUHAMMAD:  Objection.
10    Q.   What other kind of assets have
11 you got?
12    A.   Property.
13    Q.   Rental property?
14    A.   Yes, sir.
15    Q.   Go back and look at your tax
16 return, you list rental property, lot one
17 seventy-five -- Highway 175, lot 350,
18 Salem; Highway 75, lot 349, Salem; 1419
19 Hooper Avenue, those are all places you
20 own?
21    A.   Yes, sir.
22    Q.   What are they?
23    A.   What do you mean, what are

**Page 119**

1 they?
2    Q.   Are they homes?
3    A.   Well, one of them, Hooper
4 Avenue, that's a home, that's a house.
5    Q.   Okay.  Have you got renters in
6 all of these?
7    A.   No, sir.
8    Q.   Have you got renters in any of
9 them?
10    A.   As of now, no, sir.
11    Q.   When they do rent, do you get
12 the money?
13    A.   Yes, sir.
14    Q.   All right.  How come you don't
15 have renters right now?
16    A.   People just ain't renting,
17 they don't have any money.  They're down
18 for repairs, too.
19    Q.   They're sitting vacant?
20    A.   Yes, sir.
21    Q.   Is the electricity running?
22    A.   In those places?
23    Q.   Yes.

**Page 120**

1    A.   No, sir.
2    Q.   Water running?
3    A.   No, sir.
4    Q.   You don't have any homeless
5 people living in them, do you?
6    A.   No, sir.
7    Q.   Do you owe any money?
8    A.   Yes, sir.
9    Q.   Who do you owe?
10    A.   I owe HFC, the mortgage, I owe
11 City Finance.
12    Q.   All right.  Who else?
13        MS. MUHAMMAD:  I am going to
14 object to this line of questioning.  I
15 don't see the relevance.
16    Q.   Go ahead.
17    A.   I owe the insurance company.
18    Q.   All right.  Anybody else?
19    A.   That's mostly it.
20    Q.   All right.  Well, you told me
21 you had fifteen thousand dollars worth of
22 assets in these cars.  About what do you
23 owe?

**Page 121**

1    A.   Thirty-five thousand.  Besides
2 the mortgage.
3    Q.   Yes, besides the mortgage.
4 Any other assets to offset this
5 thirty-five thousand?
6    A.   I can't recall at this time.
7    Q.   Surely you know what you've
8 got.
9        MS. MUHAMMAD:  Objection.
10    A.   I can't recall at this time.
11    Q.   Have you got furniture in your
12 house?
13    A.   Yes, sir.
14    Q.   Appliances?
15    A.   Yes, sir.
16    Q.   That mortgage property -- that
17 rental property is worth something, isn't
18 it?
19    A.   Yes, sir.
20    Q.   I mean, you've got land you
21 own that's got buildings on it, right?
22        MS. MUHAMMAD:  Objection, and
23 I am going to instruct the witness to not

31 (Pages 118 to 121)

BOBBY SANKS                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.          October 17, 2007

| Page 122 |
| --- |

1 answer anymore of those questions, they
2 have no relevance to this lawsuit.
3        MR. SUGGS: All right. If you
4 are going to instruct the witness not to
5 answer them under the federal rules, you
6 need to move for a protective order and
7 hope the Judge grants it --
8        MS. MUHAMMAD: So moved.
9        MR. SUGGS: -- within five
10 days. I got a right to ask these
11 questions. If we get our cost and fees, I
12 need to know whether there is any money
13 and that's the reason I'm asking the
14 question.
15       MS. MUHAMMAD: Well, as the
16 relevance that you can show, then I
17 withdraw my objection.
18    Q.   All right. How much is this
19 rental property worth?
20    A.   In the neighborhood of
21 thirty-five thousand.
22    Q.   Altogether?
23    A.   Yes, sir.

| Page 123 |
| --- |

1    Q.   All right. And you don't have
2 any debt on it?
3    A.   No, sir.
4    Q.   Okay.
5    A.   Except for the -- now, except
6 for the City Finance, that house is
7 mortgaged with them.
8    Q.   That's the house you live in?
9    A.   No, sir.
10   Q.   Oh, which house is that?
11   A.   That's the one on Hooper
12 Avenue.
13   Q.   Okay. How much do you owe
14 City Finance on Hooper Avenue?
15   A.   Twenty-four thousand.
16   Q.   Okay. Do you have to pay them
17 every month?
18   A.   Yes, sir.
19   Q.   Who hired you at WestPoint?
20   A.   I don't know, it's been so --
21 I don't know who hired me back then. I'm
22 not sure.
23   Q.   That was back in 1970, right?

| Page 124 |
| --- |

1    A.   Yes, sir.
2    Q.   And you started your
3 employment at WestPoint on October the
4 1st, 1970?
5    A.   I started with the company in
6 October. I don't know what the date was,
7 but it was 1970.
8        (Whereupon, Defendant's
9        Exhibit 19 was marked
10       for identification.)
11   Q.   I will show you what's been
12 marked as Exhibit 19. The first entry
13 shows a date, and yours might be cut off a
14 little bit, but mine shows 10/01/07 -- I
15 mean, 10/01/70. Excuse me. And started
16 as a roller operator, looks like Opelika
17 finishing. You don't have any reason to
18 dispute that, do you?
19   A.   No, sir.
20   Q.   Do you have any reason to
21 dispute the progression that's shown on
22 this exhibit from job to job?
23       MS. MUHAMMAD: Object to the

| Page 125 |
| --- |

1 form. He is not able to see the dates,
2 there's no way he could answer that. Do
3 you see the dates on all of those?
4        MR. SUGGS: Yes, all of the
5 dates are there except the first one, it's
6 cut off. I will write in a 10 and --
7    Q.   I will show you my copy.
8 Somehow the dates got cut off a little
9 bit. Do you have any reason to dispute
10 that progression?
11   A.   No, sir.
12   Q.   Okay. Now, how did you find
13 out about the job at WestPoint?
14   A.   Explain that, sir.
15   Q.   How did you find out about a
16 job at WestPoint?
17   A.   Friends that was at WestPoint
18 Pepperell was hiring.
19   Q.   And you were working at the
20 grocery store?
21   A.   Yes, sir.
22   Q.   So, you came down and put in
23 an application?

32 (Pages 122 to 125)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

October 17, 2007

---

Page 126

```
 1      A.  Yes, sir.
 2      Q.  And after you were hired, you
 3 went through an orientation process?
 4      A.  Yes, sir.
 5      Q.  And the orientation process
 6 included an explanation and review of the
 7 employee handbook, didn't it?
 8      A.  Yes, sir.
 9      Q.  And you were given a copy of
10 the employee handbook?
11      A.  Yes, sir.
12          (Whereupon, Defendant's
13          Exhibit 20 was marked
14          for identification.)
15      Q.  Okay.  I will show you what's
16 been marked as Exhibit 20, and it has
17 pages -- starts with page 655 and has
18 other numbered pages beginning in 1983 and
19 going through 2003.  Just go through each
20 of these on your own and tell me if you
21 recognize your signature on each page.
22      A.  (Reviewing document.)  Yes,
23 sir.
```

Page 127

```
 1      Q.  Thank you.  I will show you
 2 Exhibit 21.  Do you recognize your
 3 signature on both places for July 14, 2004
 4 on Exhibit 21?
 5          (Whereupon, Defendant's
 6          Exhibit 21 was marked
 7          for identification.)
 8      A.  Yes, sir.
 9      Q.  Did you read the guide book
10 for hourly associates?
11      A.  I can't recall reading that
12 book, sir.
13      Q.  Okay.  Do you recall asking
14 any questions about it, anything you
15 didn't understand?
16      A.  No, sir.
17          (Whereupon, Defendant's
18          Exhibit 22 was marked
19          for identification.)
20      Q.  Okay.  Exhibit 22 is the guide
21 book that you acknowledged when you signed
22 Exhibit 21, isn't it?
23          MS. MUHAMMAD:  Object to the
```

Page 128

```
 1 form.
 2      A.  Repeat that again.
 3      Q.  All right.  Exhibit 22 --
 4      A.  Uh-huh.
 5      Q.  -- which was revised 7/10/04,
 6 is the guide book that you acknowledged
 7 receiving when you signed Exhibit 21 on
 8 7/14/04, isn't it?
 9      A.  Yes, sir.
10          MS. MUHAMMAD:  Object to the
11 form.
12      Q.  And you read this guide book
13 which is marked Exhibit 21?
14      A.  I deny that.
15      Q.  Sir?
16      A.  I -- no, I can't say I did.
17          MS. MUHAMMAD:  Object to the
18 form.
19      Q.  Okay.  Did you read parts of
20 it?
21      A.  I can't say.
22      Q.  Okay.  Did you have any of it
23 read to you?
```

Page 129

```
 1      A.  I can't say that.
 2      Q.  Okay.  You knew that WestPoint
 3 had a policy on equal employment
 4 opportunity antiharassment and
 5 retaliation, didn't you?
 6      A.  Yes, sir.
 7      Q.  All right.  And look at page
 8 761 of Exhibit 22.  Now, this policy
 9 states that WestPoint does not
10 discriminate because of race, color,
11 religion, sex, national origin, age,
12 disability or veteran's status, correct?
13      A.  Yes, sir.
14      Q.  And the policy forbids
15 discrimination, harassment, retaliation,
16 coercion, interference or intimidation due
17 to an associate's race, color, religion,
18 sex, national origin, age, disability or
19 veteran's status, correct?
20      A.  You'll have to read -- you
21 lost me.
22      Q.  All right.  Second paragraph.
23 This policy forbids discrimination,
```

33 (Pages 126 to 129)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031            http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 130

```
1   harassment --
2       A.   I don't see. I've got the
3   policy.
4       Q.   Discrimination.
5       A.   Right.
6       Q.   Harassment.
7       A.   Uh-huh.
8       Q.   Retaliation, coercion,
9   interference or intimidation due to an
10  associate's race, color, religion, sex,
11  national origin, age, disability or
12  veteran's status, doesn't it?
13      A.   Yes, sir.
14      Q.   And this policy states that
15  harassing or retaliating against an
16  associate because of filing a complaint is
17  prohibited, doesn't it?
18      A.   Yes, sir.
19      Q.   And look at 776. And that's
20  the company's policy on safety, isn't it?
21      A.   Yes.
22      Q.   All right. Look at 777.
23  That's the company's policy on reducing
```

Page 131

```
1   waste, isn't it?
2       A.   Yes, sir.
3       Q.   All right. Look at 778.
4   That's the company's policy on producing
5   good quality, isn't it?
6       A.   Yes, sir.
7       Q.   All right. And look at 779.
8   That's the company's policy on conserving
9   time, supplies and equipment, right?
10      A.   Yes, sir.
11      Q.   All right. Look at 782. And
12  this was the company's policy if you had
13  job related complaints and problems,
14  correct?
15      A.   Yes, sir.
16      Q.   All right. Look at 783. The
17  first thing you would do is see your
18  supervisor, right?
19      A.   Yes, sir.
20      Q.   And if that didn't work, look
21  at 784, you see your department manager,
22  right?
23      A.   Yes, sir.
```

Page 132

```
1       Q.   And if that didn't work, you
2   see your human resources manager, right?
3       A.   Yes, sir.
4       Q.   And then look at 775. If that
5   didn't work, you would go to the assistant
6   manager, superintendent or manager,
7   correct?
8       A.   That's correct.
9           MS. MUHAMMAD: Object to the
10  form.
11      Q.   And if that didn't work, you
12  would go to the human resource director,
13  correct?
14      A.   Yes, sir.
15      Q.   And look at the next page.
16  Final stop was vice president of human
17  resources, right?
18      A.   Yes, sir.
19      Q.   So, that's a six-step
20  complaint procedure, correct?
21      A.   That's correct.
22          (Whereupon, Defendant's
23          Exhibit 23 was marked
```

Page 133

```
1           for identification.)
2       Q.   Now, Exhibit 23 is entitled
3   what to do if you have a complaint or a
4   problem and it's document number 819.
5   This was posted out in the plant, wasn't
6   it?
7       A.   As I recall, yes, sir.
8       Q.   And the poster gave you the
9   same steps for reporting a problem or
10  complaint as we just saw in the guide
11  book, right?
12      A.   Yes, sir.
13      Q.   All right. So, you were aware
14  of that complaint procedure, weren't you?
15      A.   Yes, sir.
16      Q.   All right. Now, let's go back
17  and look again at that guide book and
18  let's look at 790. All right. Does yours
19  say some things to avoid?
20      A.   Yes, sir.
21      Q.   All right. Look at 791,
22  number six. Interfering with work of
23  others. Do you see that?
```

34 (Pages 130 to 133)

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                    http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

Page 134

1      A.   Yes, sir.
2      Q.   And number seven, poor job
3  performance, do you see that?
4      A.   Yes, sir.
5      Q.   All right.  Look at number
6  792.  It says violation of safe practices
7  and it's got A through H, do you see that?
8      A.   Yes, sir.
9      Q.   And then look at 794, number
10  eighteen says failure to wear protective
11  equipment.  Do you see that?
12      A.   Repeat that again.
13      Q.   Number eighteen says failure
14  to wear protective equipment, do you see
15  that?
16      A.   Yes, sir.
17      Q.   All right.  And then if you
18  look at the next page, which is 795, it
19  gives the discipline procedure, doesn't
20  it?
21      A.   Yes.
22      Q.   And it talks about the first
23  offense being a formal counseling with a

---

Page 135

1  written counseling report placed in the
2  employee's file, correct?
3      A.   That's what it says, yes, sir.
4      Q.   And then the second offense
5  was a verbal warning with the report being
6  placed in the employee's file, correct?
7      A.   Yes, sir.
8      Q.   And then after that, you get a
9  verbal warning with a warning placed in
10  the employee's file, right?
11      A.   Yes, sir.
12      Q.   And then D part says three
13  written warnings within a twelve-month
14  period, whether the same or different
15  offense, shall constitute discharge, do
16  you see that?
17      A.   Yes, sir.
18      Q.   Is that the procedure as you
19  understood it during the time you worked
20  at WestPoint?
21      A.   As I can recall, yes, sir.
22      Q.   So, if you got three warnings
23  in twelve months, it was automatic

---

Page 136

1  discharge?
2      A.   Yes, sir.
3      Q.   Okay.
4      A.   Providing it was the truth.
5          (Whereupon, Defendant's
6           Exhibit 24 was marked
7           for identification.)
8      Q.   Okay.  Do you have before you
9  Exhibit 24?
10      A.   Yes, sir.
11      Q.   All right.  And up at the top,
12  it says personnel notice, right?
13      A.   Yes, sir.
14      Q.   Now, do you see over here in
15  this box, it says type of notice?
16      A.   Yes, sir.
17      Q.   So, a personnel notice could
18  be used to document an associate problem,
19  to document an associate complaint, to
20  provide a notice of a change for the
21  employee or the company, to request a
22  change, to make some other associate
23  request, to issue a commendation to an

---

Page 137

1  employee or for miscellaneous purposes,
2  correct?
3      A.   Yes, sir.
4      Q.   And a personnel notice was not
5  discipline like a counseling or warning,
6  was it?
7      A.   Explain that, sir.
8      Q.   All right.  A personnel notice
9  was just a reminder, it was not
10  discipline, that is, if you got a
11  personnel notice, it wasn't going to count
12  towards the number of warnings that could
13  result in three in a twelve-month period,
14  correct?
15      A.   Correct.
16      Q.   And look back in the booklet
17  here.  Let's look at 797.  Do you see down
18  here it says notwithstanding these
19  discipline procedures as explained in the
20  disclaimer and acknowledgment on the first
21  page of this guide book, WestPoint Stevens
22  may at its discretion terminate an
23  associate at any time for any reason.  Do

---

35 (Pages 134 to 137)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                     October 17, 2007

Page 138

1  you see that?
2       A.   Yes, sir.
3       Q.   So, you understood that if you
4  got three warnings in a twelve-month
5  period, you could be discharged?
6       A.   May I comment?
7       Q.   Yes, sure.
8       A.   What it's saying, at any time
9  for any reason.
10      Q.   Yes, that's right.  But my
11 question was a little bit different.  You
12 understood that if you got three warnings
13 in a twelve-month period, you were going
14 to lose your job, right?
15      A.   Yes, sir.
16      Q.   You also understood that
17 WestPoint could terminate your employment
18 at any time for any reason?
19      A.   Well, that's what it say here,
20 but I didn't know that in the beginning.
21      Q.   And you knew that if you
22 committed an intolerable offense, that
23 your employment was going to be terminated

Page 139

1  right then, correct?
2       A.   Yes, sir.
3       Q.   Okay.  When you started out
4  working, were you working right over here?
5       A.   Yes, sir.  Not across the
6  street.  It was down on the lower end.
7       Q.   Down on the low end?
8       A.   Yes, sir.
9       Q.   It was a gray mill or
10 finishing plant?
11      A.   Gray mill.
12      Q.   Gray mill.  All right.  You
13 were working in the gray mill and you
14 became a doffer at some point, right?
15      A.   Yes, sir, and transferred back
16 here.
17      Q.   All right.  And you worked --
18 before you went to maintenance, you worked
19 for about fifteen years, right?
20      A.   Yes, sir.
21      Q.   And then you transferred to
22 maintenance and you became a humidifier
23 control technician?

Page 140

1       A.   Yes, sir.
2       Q.   And that was in April of
3  '95 -- of '85, excuse me?
4       A.   Yes, sir.
5       Q.   And that's when you came under
6  the supervision of Perry Henderson?
7       A.   Yes, sir.  May I be excused?
8  I need to go to the restroom.
9            MR. SUGGS:  Yes, absolutely.
10 We'll take a stretch break.
11           (Whereupon a break was had from
12           12:05 P.M. until 12:20 P.M.)
13           (Whereupon, Defendant's
14           Exhibit 25 was marked
15           for identification.)
16      Q.   Now, Exhibit 25 is dated
17 May 4, 1985, and it shows a job change
18 from first shift in department 94 where
19 you were a spinning mechanic, to the first
20 shift in the maintenance department as a
21 humidifier control technician.  Any reason
22 to dispute that?
23      A.   Explain this right here, is

Page 141

1  that saying what my rate were then?
2       Q.   Looks like to me that you took
3  a cut in pay.
4       A.   Okay.
5       Q.   That you took a cut from five
6  sixty-two in the spinning room to five
7  fifty in the maintenance department.
8       A.   I can't deny -- I can deny
9  that because, you know, I was making more
10 than that as a doffer, and I would assume
11 that going to be a fixer would be more
12 than that.
13      Q.   You think the pay rate is
14 wrong --
15      A.   Yes, sir.
16      Q.   -- in the spinning department?
17      A.   Yes, sir.
18      Q.   You think the pay rate is
19 right in the maintenance department?
20      A.   Yes, sir.
21      Q.   All right.  And you think the
22 date is right?
23      A.   I don't see a date.  5/4/85.

36 (Pages 138 to 141)

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                October 17, 2007

Page 142

1    Q.   Correct?
2    A.   Correct.
3    Q.   All right.  And Perry
4  Henderson was the maintenance department
5  manager at the time, right?
6    A.   Yes.
7    Q.   And Perry Henderson had the
8  same position when your employment was
9  ultimately terminated, right?
10   A.   Yes, sir.
11   Q.   Now, did you report directly
12 to Perry Henderson or did you report to
13 somebody else?
14   A.   Explain.
15   Q.   Well, who did you report to?
16   A.   When I transferred out to the
17 maintenance shop?
18   Q.   Yes.
19   A.   To Perry Henderson.
20   Q.   All right.  Who else was back
21 there as a supervisor?
22   A.   Harold O'Neal.
23   Q.   Okay.

Page 143

1    A.   And he was over the
2  electricians and Dudley Gregory was over
3  the mechanics.
4    Q.   Did you report to -- you say
5  O'Neal?
6    A.   Yes, sir.
7    Q.   Did you ever report to Harold
8  O'Neal?
9    A.   Explain that.
10   Q.   Was Harold O'Neal your
11 supervisor?
12   A.   Yes, sir.
13   Q.   Okay.  And did Dudley Gregory
14 eventually take Harold O'Neal's place?
15   A.   Yes, sir.
16   Q.   All right.  So, Harold O'Neal
17 was the maintenance department supervisor?
18   A.   Yes, sir.
19   Q.   And Dudley Gregory became the
20 maintenance department supervisor at some
21 point in time when you were working in the
22 maintenance department, right?
23   A.   Yes, sir.

Page 144

1    Q.   Well, after Dudley Gregory
2  became the supervisor, did he oversee your
3  work?
4    A.   Yes, sir.
5    Q.   Did he give you assignments?
6    A.   Yes, sir.
7    Q.   Did he have authority to
8  discipline you?
9    A.   Well, he did, yes, sir.
10   Q.   Okay.  Tell me what you did as
11 a humidifier and air control technician.
12   A.   My job was to go around and
13 check the temperature in each department
14 and make sure it was the right temperature
15 for those looms and all to work in the
16 weave department.  I had them all over the
17 plant from the first floor to the third
18 floor.  As humidifier, I rebuilt spray
19 heads, I had -- at that time, they were
20 spraying out air to keep the department
21 cool.  Also, I had to change the charts
22 out of them, make sure that the
23 temperature was showing whatever was on

Page 145

1  the chart was right, with the ink pen as
2  well.  As a humidifier, I also had to
3  clean air washes when the mill was shut
4  down.  As a humidifier, I had to take
5  readings in all of the departments.
6  Rebuild the spray heads that wasn't
7  working properly, take them down and put
8  new ones up.  On the weekend, we would
9  clean all air washers on all three floors,
10 and make sure that those chambers and
11 stuff were clean and we did cleaning on
12 the top of the building to the huge air
13 washers up there.  Also, there were some
14 compressors, well, chillers and water
15 chillers, return water and regular water
16 and all for the humidity stuff to work,
17 there was return stuff for that.
18 Machinery, and when they was down, we had
19 to start them up and stop them off and get
20 those clean, the electrical
21 troubleshooting on them and some
22 mechanical troubleshooting.
23   Q.   Okay.  Thank you.  I will show

37 (Pages 142 to 145)

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                      October 17, 2007

Page 146

1   you what's been marked as Exhibit 26 and
2   this shows that on August 8th, 1986, you
3   changed from humidifier and air control
4   technician to electrician third grade. Do
5   you see that?
6            (Whereupon, Defendant's
7            Exhibit 26 was marked
8            for identification.)
9       A.   Yes, sir.
10      Q.   Do you have any reason to
11  dispute any of the information that's
12  listed on Exhibit 26?
13      A.   I don't see anything wrong
14  with that.
15      Q.   All right. Now, let me
16  just -- don't bother to find yours, I'll
17  find mine. I want to go back to
18  Exhibit 19. I'll find a copy. And
19  Exhibit 19 shows that you went to
20  electrician second grade on June 29, 1987,
21  right; is that correct?
22      A.   Yes, that's what it shows.
23      Q.   All right. And then

Page 147

1   electrician first grade on April 16, 1990,
2   correct?
3       A.   That's what it shows, yes,
4   sir.
5       Q.   All right. Now, tell me what
6   your duties were as an electrician third
7   grade.
8       A.   Third -- explain that third
9   grade again. When I --
10      Q.   I'm sorry. I don't know. All
11  I know is what's written on that paper.
12      A.   All right. Okay. When I went
13  right here?
14      Q.   Right.
15      A.   That's for light job. I was
16  changing out lights throughout the plant.
17  And my job duties were to make sure all of
18  the lights and stuff were working in the
19  plant, change out ballasts, keeping them
20  clean. That is as much as I can recall as
21  far as doing the lights. Make sure all
22  lights were working all through the mill
23  and compressor room and wherever,

Page 148

1   throughout the whole plant.
2       Q.   Okay. What about the second
3   grade?
4       A.   The second grade was -- if not
5   mistaken, that is what I was doing before
6   I was terminated.
7       Q.   Okay. Well, now, according to
8   Exhibit 19, when you were terminated, you
9   were a first grade.
10      A.   First grade. Okay. So now
11  you said --
12      Q.   Second grade.
13      A.   Second grade. Okay. Second
14  grade. Well, the next job I had was, you
15  know, in the maintenance, as far as parts
16  and elevators and all of that.
17      Q.   And did you continue to do the
18  hoists and elevators after you became a
19  first grade?
20      A.   Yes, sir.
21      Q.   And when you had the hoists
22  and elevators, was preventive maintenance
23  part of your duties?

Page 149

1       A.   Yes, sir.
2       Q.   And were you responsible for
3   troubleshooting and fixing broken
4   equipment?
5       A.   Yes, sir.
6       Q.   And were you expected to be
7   able to identify the cause of a problem
8   and repair the hoist or the elevator or
9   other machinery in a timely manner?
10      A.   At my expectation, yes, sir,
11  if I knew exactly what the problem was at
12  that time, in a timely manner, yes, sir.
13      Q.   And those were your duties
14  when you were a second grade and a first
15  grade?
16      A.   Yes, sir.
17      Q.   Now, you didn't have any
18  training as an electrician before you went
19  to the maintenance department, did you?
20      A.   No, sir.
21      Q.   And you didn't have any prior
22  education as an electrician, did you?
23      A.   No, sir.

38 (Pages 146 to 149)

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031          http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                      BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

---

Page 150

1       Q.   In fact, the only job that you
2    had before you went to the maintenance
3    department was working in a grocery store
4    and working in the spinning room at
5    WestPoint, right?
6       A.   Yes, sir.
7       Q.   So, you learned your
8    maintenance duties through on-the-job
9    training in the maintenance department at
10   WestPoint?
11      A.   Yes, sir.
12           (Whereupon, Defendant's
13           Exhibit 27 was marked
14           for identification.)
15      Q.   It appears from Exhibit 27
16   that you elected to go to fixer training
17   in spinning; is that correct?
18      A.   Yes, sir.
19      Q.   And then when that training
20   was over, that you would go back to your
21   previous job, which I think was a
22   doffer --
23      A.   Yes, sir.

---

Page 151

1       Q.   -- until a fixer job opened
2    up, correct?
3       A.   Yes, sir.
4       Q.   Did you complete the fixer
5    training?
6       A.   I think I was called to the
7    shop before I completed that.
8       Q.   Okay.
9       A.   Because I had put it on a
10   transfer roster.
11      Q.   But you voluntarily said I
12   don't want to be a fixer, I want to go to
13   the shop?
14      A.   Yes, sir.
15           (Whereupon, Defendant's
16           Exhibit 28 was marked
17           for identification.)
18      Q.   And if you look at Exhibit 28,
19   it shows that you received Schlafhorst
20   training for electricians as well,
21   correct?
22      A.   Yes, sir.
23           (Whereupon, Defendant's

---

Page 152

1            Exhibit 29 was marked
2            for identification.)
3       Q.   And if you look at Exhibit 29,
4    it appears that you became a qualified
5    hoist and crane inspector; is that
6    correct?
7       A.   Yes, sir.
8       Q.   Were you trained by Royce
9    Crane Company?
10      A.   Yes, sir.
11      Q.   And that was on freight and
12   passenger elevators?
13      A.   No, sir.  That's not --
14      Q.   All right.  Look down at 419.
15   All right.  The above named associate has
16   been given the proper training to qualify
17   him as an inspector for hoist and crane
18   systems here at Opelika mill using our
19   standard form, do you see that?
20      A.   Yes, sir.
21      Q.   All right.  Look down one at
22   423.  And that talks about freight and
23   passenger elevators, correct?

---

Page 153

1       A.   Yes, sir.
2       Q.   So, you were qualified as an
3    inspector for hoist and crane and freight
4    and passenger elevators, correct?
5       A.   Yes, sir.
6            (Whereupon, Defendant's
7            Exhibit 30 was marked
8            for identification.)
9       Q.   Okay.  Do you recognize your
10   signature on Exhibit 30 down at the bottom
11   right-hand corner?
12      A.   Yes, sir.
13      Q.   All right.  And you were
14   instructed on the time clock punching
15   procedure and the tardiness policy, right?
16      A.   Yes, sir.
17      Q.   All right.  And, so, 7.0 was
18   late, correct?
19      A.   Yes, sir.
20           (Whereupon, Defendant's
21           Exhibit 31 was marked
22           for identification.)
23      Q.   You have Exhibit 31 in front

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                    http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

*Personnel Notices – p. 108   did not count as discipline*

---

Page 154

1  of you?
2      A.  Yes, sir.
3      Q.  And you see this is a
4  personnel notice for March 10, 2005 saying
5  that a representative from Royce Crane was
6  in the plant and that he was doing an
7  annual inspection and that you worked with
8  him during that inspection and had a
9  chance to ask him any questions about the
10  hoist systems; is that correct?
11      A.  Yes, sir.
12      Q.  Well, did you receive -- or
13  you did receive adequate training to do
14  your job on the hoist and elevators,
15  didn't you?
16      A.  I received training, yes, sir.
17      Q.  Was it adequate?
18      A.  What do you mean adequate?
19      Q.  Adequate for you to do your
20  job.
21      A.  I received training, yes, sir.
22      Q.  Did you want anymore training?
23      A.  I could always use training,

---

Page 155

1  sir.
2      Q.  Okay.  So, you took what
3  training they gave you and they gave you
4  periodic training?
5      A.  Yes, sir.
6      Q.  Every year?
7      A.  Yes, sir.
8      Q.  Were you qualified to do your
9  job on inspecting the hoists and repairing
10  the hoists?
11      A.  To my best ability, yes, sir.
12      Q.  Were you qualified to do your
13  job in inspecting and repairing elevators?
14      A.  To my best ability, yes, sir.
15          (Whereupon, Defendant's
16          Exhibit 32 was marked
17          for identification.)
18      Q.  All right.  Remember when we
19  went over earlier what personnel notices
20  are?
21      A.  Yes, sir.
22      Q.  All right.  Well, Exhibit 32
23  is a stack of personnel notices.  Now,

---

Page 156

1  just go through them with me.  571 -- and
2  if I say something wrong, tell me.  571,
3  you were counseled regarding the proper
4  use of lockouts, correct?
5          MS. MUHAMMAD:  Object to the
6  form.
7      Q.  You have to answer verbally.
8      A.  I deny it.  I mean, you know,
9  I don't know if that exact date was proper
10  or not.
11      Q.  All right.  But you admit
12  that's what the form says?
13      A.  Yes, that's what the form
14  says.
15      Q.  All right.  And 570 says you
16  were counseled regarding another employee
17  complaining about you talking to her on
18  the job, correct?
19      A.  Repeat that again.
20      Q.  You were counseled because
21  another employee complained about you
22  talking to her on her job?
23          MS. MUHAMMAD:  Object to the

---

Page 157

1  form.
2      Q.  That's what it says, isn't it?
3      A.  Yes, that's what it says.
4      Q.  All right.  566 says you were
5  counseled for talking with a spinner and
6  interfering with her work and there had
7  been complaints about that in the plant,
8  correct?
9      A.  Where we are?
10      Q.  566.
11      A.  And that's the third page?
12      Q.  Yes, it's actually numbered at
13  the top.
14      A.  Okay.
15      Q.  Do you see it?
16      A.  Yes, sir.
17      Q.  That's what it says, correct?
18      A.  Read it again.
19      Q.  It says you were counseled for
20  talking with a spinner, it names her,
21  Linda Footes, and interfering with her
22  work and that there had been numerous
23  complaints in the past?

---

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 158

1    A.   That's what it says.
2    Q.   Okay.  And 565 says that you
3  were counseled for talking with another
4  employee on the job after a complaint from
5  a supervisor, correct?
6    A.   That's what it says.
7    Q.   And 560 said that you failed
8  to make preparation for dust mask fitting,
9  correct?
10     MS. MUHAMMAD:  Object to the
11  form.
12     A.   I see dust mask, but I don't
13  see what you read.
14     Q.   It says that you were sent to
15  the clinic to be fitted but could not be
16  fitted because your sideburns were too
17  long.  It says employees were asked to
18  make the necessary preparations, so this
19  is a personnel notice for failure to make
20  preparations for a dust mask fitting,
21  correct?
22     MS. MUHAMMAD:  Object to the
23  form.

Page 159

1    A.   I mean, I just can't see what
2  you are reading because it doesn't say all
3  of this on this page here.
4    Q.   Well, I am just summarizing, I
5  am not reading it word for word.  I mean,
6  you can read it to yourself.
7    A.   All right.  Yes, sir.
8    Q.   All right.  Let's look at the
9  next one, 558.  You were given a
10  counseling for failure to carry out job
11  assignments by not repairing lights,
12  correct?
13     A.   That's what it says.
14     Q.   All right.  557, counseled for
15  failing to lock out while installing the
16  hoists in the weave room, correct?
17     A.   That's what it says.
18     Q.   553, counseled for failure to
19  comply with dust mask regulations,
20  correct?
21     A.   That's what it says.
22     Q.   All right.  552, counseled for
23  failure to use an OSHA nozzle on an air

Page 160

1  hose, correct?
2    A.   That's what it says.
3    Q.   551, counseled for failure to
4  observe the break schedule, correct?
5    A.   That's what it says.
6    Q.   All right.  539, counseled for
7  making repairs without proper lockout on
8  the hoist, correct?
9    A.   That's what it says.
10     Q.   Okay.  524, counseled for
11  wasting time, correct?
12     A.   That's what it says.
13     Q.   512, counseled for taking too
14  long to repair a hoist, right?
15     A.   That's what it says.
16     MS. MUHAMMAD:  Object to the
17  form.
18     Q.   508, counseled for poor
19  attendance?
20     A.   That's what it says.
21     Q.   All right.  495, and this goes
22  actually through 497.  Counseled for
23  failing to carry out your duties properly?

Page 161

1    A.   That's what it says.
2    Q.   All right.  494, counseled for
3  abuse of break schedule and telephone use,
4  right?
5    A.   That's what it says.
6    Q.   483, going into the elevator
7  pit without a permit and without
8  assistance, correct?
9    MS. MUHAMMAD:  494 said
10  counseled, I object to the form.  There's
11  no indication of counseled.
12     Q.   All right.  483.  Are you with
13  me?
14     A.   483?
15     Q.   Yes.
16     A.   490?
17     Q.   No, 483.
18     A.   483?
19     Q.   Right.  Going into the
20  elevator pit without a permit, correct?
21     A.   Correct.
22     Q.   All right.  473, poor job
23  performance, correct?

41 (Pages 158 to 161)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                     October 17, 2007

Page 162

1      A.   That's what it says.
2      Q.   470, chain was not properly
3   lubricated and oilers were empty or low,
4   correct?
5      A.   That's what it says.
6      Q.   468, another problem with
7   facial hair causing improper fit for the
8   respirator, correct?
9      A.   That's what it says.
10     Q.   All right. 467, load limit
11  was not on the hoist and you failed to
12  check it according to this, correct?
13     A.   That's what it says.
14     Q.   457, and actually this goes
15  through 465, so there's a bunch of pages
16  here. And it has to do with inspecting
17  hoists that were no longer in service and
18  been taken off the inspection list,
19  correct?
20     A.   That's what it says.
21     Q.   All right. 447.
22     A.   447?
23     Q.   Uh-huh. Do you see it?

Page 163

1      A.   Yes.
2      Q.   Poor job performance, having
3   to do with crane and tractor motor and so
4   forth, slasher room and cloth room,
5   correct?
6      A.   That's what it says.
7      Q.   All right. 435, poor job
8   performance in that there was a two-ton
9   hoist that had a ton and a half
10  singletree, correct?
11     A.   That's what it says.
12     Q.   All right. 430. Inspection
13  reports were greasy and dirty, correct?
14     A.   That's what it says.
15     Q.   428 and 429, failure to report
16  wear to a singletree on the inspection
17  report, correct?
18     A.   That's what it says.
19     Q.   All right. 374, and that's
20  numbered at the top on 374.
21     A.   Uh-huh.
22     Q.   It's handwritten. It says
23  hoist problems, poor job performance,

Page 164

1   correct?
2      A.   Hoist problem, that's what it
3   says.
4      Q.   All right. 360, unsafe act
5   and it has to do with walking over rolls
6   of cloth, correct?
7      A.   That's what it says.
8      Q.   All right. 344. It's
9   numbered at the top. 344 through 350 has
10  to do with poor maintenance on the hoist,
11  right?
12     A.   Yes, sir, that's what it says.
13     Q.   All right. And then if you
14  look at 339 -- wait a minute. Make sure I
15  didn't miss one. No. 339, left machinery
16  locked out and not repaired without
17  telling the supervisor, correct?
18     A.   That's what it says.
19        MS. MUHAMMAD:  What was that
20  number again?
21        MR. SUGGS:  339.
22     Q.   327 --
23        MS. MUHAMMAD:  I don't think I

Page 165

1   have that.
2      Q.   -- it's a personnel notice for
3   taking six hours to change out a motor.
4   Do you see that?
5      A.   327?
6      Q.   Uh-huh.
7      A.   Poor work performance.
8      Q.   It says Bobby took over six
9   hours to change a motor on a trolley which
10  should have taken only two hours at the
11  most.
12     A.   Yes, I see that, yes, sir.
13     Q.   All right. Now, let's look at
14  325. Clocked in and had to go back to car
15  to check the car alarm. Do you see that?
16     A.   Yes, sir.
17     Q.   All right. Do you recall that
18  happening?
19     A.   Yes, sir.
20     Q.   All right. 332, signing off
21  on preventive maintenance, but not doing
22  the work, do you see that?
23     A.   Yes, sir.

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                         October 17, 2007

---

Page 166

1     Q.   And then --
2     MS. MUHAMMAD:  Wait a minute.
3   332 said what now?
4     Q.   332, signing off on preventive
5   maintenance reports and not doing the
6   work.  And then 314, violation of cell
7   phone policy, do you see that?
8     A.   Yes, sir, I see that.
9     Q.   Okay.  Now, you understood
10  that all of these reports were not
11  discipline, right?
12    A.   No, I didn't understand, I
13  really didn't understand them at all.
14    Q.   All right.  But you know that
15  now, that that's not discipline, I mean,
16  it's not a warning, it's not the kind of
17  document that if you got three of, you
18  would lose your job because of, you
19  understand that now, don't you?
20    A.   Can I comment?
21    Q.   Well, just answer my question,
22  then comment.
23    A.   Okay.  Repeat that again.

---

Page 167

1     Q.   All right.  You understood
2   that these personnel notices that we just
3   went through are not discipline, correct?
4     A.   Correct.
5     MS. MUHAMMAD:  Object to the
6   form.
7     Q.   You understood that?
8     A.   Beg your pardon?
9     Q.   You understand that?
10    A.   I understand you're saying
11  that, yes, sir.
12    Q.   Okay.  Well, you understood
13  that if you got three personnel notices,
14  that it would not lead to your discharge,
15  correct?
16    A.   Yes, sir.
17    Q.   Not the same as a warning, I
18  mean, three warnings would lead to your
19  discharge, right?
20    A.   Right.
21    Q.   And a personnel notice doesn't
22  count in that disciplinary progression,
23  correct?

---

Page 168

1     A.   Correct.
2     Q.   All right.  Now, what comment
3   did you want to make?
4     A.   Some of this, what we
5   reviewed, poor job performance, it was
6   written up in my file as a warning.
7     Q.   All of those came out of your
8   file.
9     A.   Yes, but some was taken out
10  and counted against me in my file.
11    Q.   Well, not those, there might
12  be some similar that are warnings, but
13  those didn't count against you, okay,
14  follow me?
15    A.   I follow you.
16    Q.   Okay.  Those papers are simply
17  documentation of some work related issue,
18  correct?
19    A.   Yes, sir, I understand what
20  you're saying.
21    Q.   Okay.  And since those are not
22  discipline, you don't claim that any of
23  those were discriminatory, do you?

---

Page 169

1     A.   Yes, sir.
2     Q.   You do?
3     A.   Yes, sir.
4     Q.   Well, tell me which ones.
5     A.   Over half of them in here,
6   sir.
7     Q.   Well, one by one.  Just go
8   back to the beginning and tell me which
9   ones you claim were discriminatory and on
10  what basis.
11    A.   Interfering with the work of
12  others.
13    Q.   Tell me the number.
14    A.   570.
15    Q.   Okay.  Why?
16    A.   Interfering with other's work,
17  you know, that's something I don't
18  consider doing, interfering with another
19  man's job.
20    Q.   You just deny that it
21  happened?
22    A.   Yes, sir.
23    Q.   All right.  Are you claiming

---

43 (Pages 166 to 169)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 170

1  it was given to you on account of what?
2      A.   Because of retaliation.
3      Q.   For what?
4      A.   Something that already has
5  been done.
6      Q.   What were they retaliating
7  against you for, what had you done?
8      A.   My complaint against Perry
9  Henderson.
10      Q.   On account of not giving you a
11  wage increase within the first ninety
12  days --
13      A.   That's --
14      Q.   -- is that it?
15      A.   That was one of them.
16      Q.   What else?
17      A.   Because any time you file --
18  the reason, because I filed a complaint
19  against them.
20      Q.   Well, now, did you file any
21  complaints other than your complaint that
22  you didn't get an automatic wage increase
23  after you had been there ninety days?

Page 171

1      A.   No, sir.
2      Q.   That's the only one you filed?
3      A.   That's the only one at that
4  time I filed.
5      Q.   Well, when did you ever file
6  another one?
7      A.   Well, I filed other complaints
8  against Perry Henderson the way he has
9  treated me altogether.
10      Q.   When did you do that?
11      A.   I verbally did it to the
12  personnel.
13      Q.   When?
14      A.   I don't know exactly what
15  date.
16      Q.   About?
17      A.   From approximately 1995 to
18  2003.
19      Q.   Who was in personnel at the
20  time?
21      A.   Ken Henderson was in personnel
22  at that time.
23      Q.   All right.

Page 172

1      A.   Later on, I did make it in
2  2004, I believe, Amber Stevens was in
3  personnel.
4      Q.   All right.  Anything else?
5      A.   No.
6      Q.   Well, this 570 is dated 1987,
7  right?
8      A.   Yes, sir.
9      Q.   So, the only thing that Perry
10  Henderson could have been retaliating
11  against you about back in 1987 was your
12  complaint about not getting an automatic
13  wage increase, right?
14      A.   That's true.
15      MS. MUHAMMAD:  Object to the
16  form.
17      Q.   All right.  And you claim that
18  this personnel notice, which was not
19  discipline, was given to you for
20  discriminatory reasons in retaliation for
21  you complaining about failing to get a
22  wage increase?
23      A.   That's right.  Yes, sir.

Page 173

1      Q.   All right.  Any of the others
2  of these nondisciplinary notices you claim
3  were discriminatory?
4      A.   Yes, sir.  My interfering with
5  another coworker.
6      Q.   What number is that?
7      A.   I think it's 566.
8      Q.   All right.  Is that the
9  same -- you put forth the same reasons as
10  you put forth for number 570?
11      A.   Yes, sir.
12      Q.   All right.  What else?
13      A.   565 apply, too.
14      Q.   And you say that 565 is
15  discriminatory because it was not true and
16  it was given to you in retaliation for
17  complaining about failing to get a wage
18  increase after ninety days by Perry
19  Henderson?
20      A.   Yes, sir.
21      Q.   All right.
22      A.   I understand this -- what is
23  this, 558, failure to carry out job

44  (Pages 170 to 173)

058999a3-34e5-4569-8dba-ed2a434cfc8b

Page 174

1  assignment. I mean, I don't understand
2  why would they say that because, you know,
3  when you make a round and go inspect
4  lights and stuff, and if you haven't got
5  there and then they go around ahead of you
6  and check it, how can that be failure to
7  not do the job assignment?
8      Q.   Are you saying 558, which is
9  dated April 19, 1989, was given to you for
10  discriminatory reasons?
11     A.   I'm sure, yes, sir.
12     Q.   What information do you have
13  that it was given to you for
14  discriminatory reasons and on what basis
15  was it discriminatory?
16     A.   Well, once you're going to
17  file a complaint, there's always a
18  follow-up to follow you around and see
19  what's going on with your job.
20     Q.   Was it given to you on account
21  of your race, is that what you're
22  claiming?
23     A.   Exactly.

Page 175

1      Q.   All right. And what
2  information do you have that supports your
3  claim that you were given number 558 on
4  account of your race?
5      A.   Not only that, but all of the
6  rest of it that apply.
7      Q.   Well, just talk about this
8  one. What information do you have to
9  support your claim that 558 was given to
10  you on account of your race?
11     A.   I can't recall at this time.
12     Q.   All right. Next.
13     A.   This unsafe act.
14     Q.   What number is that?
15     A.   That's 552.
16     Q.   Okay. Do you claim that 552
17  was given to you on account of your race?
18     A.   I think that was a lack of
19  information, I didn't probably know about
20  OSHA's nozzle.
21     Q.   Yes or no, do you claim it was
22  given to you on account of your race?
23     A.   No, sir.

Page 176

1      Q.   All right. Do you claim it
2  was discriminatory on some other basis?
3      A.   Well, just the lack of not
4  telling me, no, sir.
5      Q.   I'm sorry?
6      A.   Just the lack of not knowing.
7      Q.   Not knowing what?
8      A.   Knowing that it was against
9  the OSHA rules.
10     Q.   Well, it's not discipline --
11     A.   Well --
12     Q.   -- is it?
13     A.   Yes, it's a discipline.
14     Q.   No, it's not, it's a personnel
15  notice.
16     A.   Well, I mean, it's against the
17  company policy to not have the nozzle on
18  there.
19     Q.   Okay. But you didn't get
20  disciplined for it, you just got reminded,
21  correct?
22     A.   Yes, that's correct.
23     Q.   All right. So, you don't

Page 177

1  claim that's discriminatory?
2      A.   No, sir.
3      Q.   All right.
4      A.   And this 551. That is -- you
5  know, it doesn't even apply, failure to
6  observe post break schedule.
7      Q.   Do you claim that that
8  personnel notice, 551, for failure to
9  observe break schedule was given to you
10  for discriminatory reasons?
11     A.   Yes, sir.
12     Q.   Do you claim it was on account
13  of your race?
14     A.   Yes, sir.
15     Q.   What information do you have
16  to support that claim?
17     A.   Because of the retaliation of
18  Dudley and Perry.
19     Q.   The same retaliation you've
20  already told me about because of
21  failing -- because of not getting the
22  increase and complaining about it?
23     A.   Yes, sir.

45 (Pages 174 to 177)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 178

1    Q.   All right.  Anything else?
2    A.   That's it.
3    Q.   All right.
4    A.   524.
5    Q.   All right.  You claim it's
6  discriminatory?
7    A.   Yes, sir.
8    Q.   On account of your race?
9    A.   Yes, sir.
10   Q.   For what reason?
11   A.   The same reason I give before.
12   Q.   All right.  Next.
13   A.   512.
14   Q.   Okay.  Do you claim it's
15  discriminatory?
16   A.   Yes, sir.
17   Q.   On account of your race?
18   A.   Yes, sir.
19   Q.   For what reason?
20   A.   That's retaliation.
21   Q.   The same things you've told me
22  before?
23   A.   Yes, sir.

Page 179

1    Q.   All right.  What else in that
2  whole stack?
3    A.   And 495.
4    Q.   All right.  You claim that
5  was --
6    A.   Same reason.
7    Q.   -- discriminatory?
8    A.   Yes, sir.
9    Q.   On account of your race?
10   A.   Yes, sir.
11   Q.   Retaliation for the same
12  reasons you've already given me?
13   A.   Yes, sir.
14   Q.   All right.
15   A.   490, the same reason.
16   Q.   Okay.  The same thing?
17   A.   Yes, sir.
18   Q.   All right.
19   A.   473.
20   Q.   Okay.  Do you claim that was
21  discriminatory on account of your race?
22   A.   Yes, sir.
23   Q.   For what reasons do you make

Page 180

1  that claim?
2    A.   For the claim that I have
3  already filed a complaint against Perry
4  Henderson.
5    Q.   All right.
6    A.   467, the same reason.
7    Q.   Okay.  Discrimination on
8  account of your race because you
9  complained about Perry Henderson not
10  giving you a raise after your first ninety
11  days on the job, correct?
12   A.   That's correct.
13   Q.   All right.  I will hold them
14  up for you.
15   A.   Violation of -- this was '04,
16  violation of safety practice.
17        MS. MUHAMMAD:  What number?
18   Q.   Which one are we on?
19   A.   351.
20        MS. MUHAMMAD:  So, there was
21  nothing on 357 -- I'm sorry, 457?
22   Q.   Tell me what you're saying
23  about 351.

Page 181

1    A.   I don't see the page to go
2  with 351.
3    Q.   I'm sorry, you don't see what?
4    A.   The comments that went with
5  351.
6    Q.   It says see attachment, so
7  they're attached.  351 is not one I asked
8  you about.  That's actually a warning.
9  Why don't we skip that one and we'll come
10  back to it.  I'll make a note to come back
11  to it.
12   A.   That will do it for now.
13   Q.   All right.  That's it?
14   A.   Yes, sir.
15   Q.   Okay.  Thank you.  Now, those
16  documents that we just went through as
17  Exhibit 32 were not warnings, but the
18  documents I'm going to show you now are,
19  okay?
20   A.   Okay.
21        MS. MUHAMMAD:  Object to the
22  form.
23        (Whereupon, Defendant's

46 (Pages 178 to 181)

BOBBY SANKS                                              BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

---

Page 182

1         Exhibit 33 was marked
2         for identification.)
3    Q.   Do you have before you
4  Exhibit 33?
5    A.   Yes, sir.
6    Q.   And that's a warning report
7  marked first warning, correct?
8    A.   Yes.
9    Q.   All right. And it has to do
10  with letting a frame go unrepaired for
11  eight hours, correct?
12    A.   That's what it says.
13         (Whereupon, Defendant's
14         Exhibit 34 was marked
15         for identification.)
16    Q.   All right. Now, Exhibit 34 is
17  marked second warning, correct?
18    A.   Yes, sir.
19    Q.   And that's June the 12th,
20  1990, right?
21    A.   Yes, sir.
22    Q.   And that has to do with not
23  properly inspecting or falsifying

---

Page 184

1  of these warnings, Exhibits 34, 35 -- I'm
2  sorry, 33 or 34, which ended with the
3  final notice marked 35?
4    A.   Do you want me to comment on
5  them?
6    Q.   I just want to know if you
7  dispute them, do you claim they are wrong?
8    A.   I mean, I'm going to say they
9  can write you up no matter what, but, now,
10  as far as 33, the frame was standing for
11  eight hours. I have no knowledge of
12  fixing that frame, knowing how to fix that
13  frame.
14    Q.   You didn't know how to fix it?
15    A.   No, sir.
16    Q.   Okay.
17    A.   You know, at that time --
18    Q.   All right. You don't claim
19  that either 34 or 33 were given to you for
20  discriminatory reasons, do you?
21         MS. MUHAMMAD:  Object to the
22  form.
23    A.   No.

---

Page 183

1  maintenance reports, correct?
2    A.   That's what it says.
3         (Whereupon, Defendant's
4         Exhibit 35 was marked
5         For identification.)
6    Q.   Now, Exhibit 35 is marked
7  final notice up at the top, right?
8    A.   Yes, sir.
9    Q.   June 15th, 1990. And you're
10  getting that final notice because of
11  Exhibit 33, which was the warning for
12  12/18/89, and Exhibit 34, which was the
13  warning for 6/12/90, and it says you can't
14  have another warning before 12/18/90 or
15  you'll be discharged, correct?
16    A.   Yes, sir.
17    Q.   All right. Now, do you see
18  your signature on Exhibit 35?
19    A.   Yes, sir.
20    Q.   Now, those two warnings, the
21  one for letting the frame go unrepaired
22  for eight hours and the one about the
23  inspection reports, do you dispute either

---

Page 185

1    Q.   All right.
2    A.   I don't know, sir, about that.
3    Q.   I'm sorry?
4    A.   I don't know.
5    Q.   You don't know?
6    A.   No, sir.
7         (Whereupon, Defendant's
8         Exhibit 36 was marked
9         for identification.)
10    Q.   All right. Exhibit 36 is
11  dated May 13, 1991. It's the second
12  warning for failure to inspect hoist and
13  elevators, correct?
14    A.   Failure to perform job duties.
15    Q.   Yes. And the first line says
16  it was noted that Bobby was behind on his
17  hoist and elevator inspections, do you see
18  that?
19    A.   Yes, sir.
20         (Whereupon, Defendant's
21         Exhibit 37 was marked
22         for identification.)
23    Q.   All right. So, you get a

---

47 (Pages 182 to 185)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

---

Page 186

1  final notice, which is marked Exhibit 37,
2  and it lists the 6/12/90 warning, which
3  was Exhibit 34, and the warning we just
4  looked at, which is Exhibit 36, and says
5  if you get another warning before 6/12/91,
6  you are going to lose your job, correct?
7      A.   That's what it says.
8      Q.   And that's your signature on
9  Exhibit 37, isn't it?
10     A.   Yes, sir.
11     Q.   Do you claim that Exhibit 36
12  was given to you for discriminatory
13  reasons?
14     A.   I can't recall.
15     Q.   All right. And you don't
16  claim that any information on Exhibit 36
17  is wrong, do you?
18     A.   I can't recall that either,
19  sir.
20         (Whereupon, Defendant's
21         Exhibit 38 was marked
22         for identification.)
23     Q.   All right. You have before

Page 187

1  you Exhibit 38, which is marked as second
2  warning, correct?
3      A.   Yes, sir.
4      Q.   And it says that you were
5  working on a machine without proper
6  lockout. Now, that meant locking out the
7  electricity, right?
8      A.   Yes, sir.
9      Q.   And if you don't lock out, you
10  can get killed, right?
11     A.   Yes, sir.
12     Q.   Somebody comes along and turns
13  the switch on, if you're working on the
14  machinery, it could be a dangerous
15  situation for you, right?
16     A.   Yes, sir.
17     Q.   You don't claim that
18  Exhibit 38 was given to you for
19  discriminatory reasons, do you?
20     A.   I can't recall at this time.
21     Q.   All right. Is that your
22  signature at the bottom of Exhibit 38?
23     A.   Yes, sir.

Page 188

1      Q.   And when you got Exhibit 38,
2  that puts you on a final notice again,
3  didn't it?
4      A.   Yes, sir, I guess that's
5  showing two up at the top.
6         (Whereupon, Defendant's
7         Exhibit 39 was marked
8         for identification.)
9      Q.   And that final notice is shown
10  as Exhibit 39, correct?
11     A.   Yes, sir.
12         MR. SUGGS: Bear with me just
13  a second. Let me make sure I don't get
14  lost.
15     Q.   Okay. On this Exhibit 39, the
16  5/13/91 was Exhibit 36 and the 1/8/92 was
17  Exhibit 38, correct?
18     A.   Yes, sir.
19         (Whereupon, Defendant's
20         Exhibit 40 was marked
21         for identification.)
22     Q.   Now, let me point out
23  something. It appears to me if we look at

Page 189

1  Exhibit 39, that you got a warning on
2  January 8, 1992, right?
3      A.   Yes, sir.
4      Q.   And you didn't get another
5  warning for five years, until 1997, right?
6      A.   That's what it says.
7      Q.   All right. And you have in
8  front of you Exhibit 40, and because it
9  had been so long, you started over with
10  the first warning, right?
11     A.   Yes, sir.
12     Q.   All right. And that warning
13  had to do with the oilers being empty or
14  low, correct?
15     A.   That's what it says.
16     Q.   All right. Now, you don't
17  claim that that warning is discriminatory,
18  do you?
19     A.   No, sir.
20         (Whereupon, Defendant's
21         Exhibit 41 was marked
22         for identification.)
23     Q.   Okay. Exhibit 41 goes from

48 (Pages 186 to 189)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

Page 190

1 page 450 through page 456. It's a warning
2 for poor job performance and it's marked
3 second warning, correct?
4    A.   Yes, sir.
5    Q.   All right. Now, this has to
6 do with hoist inspections and elevator
7 inspections and it talks about some box
8 for opening the elevator door in case of
9 emergencies, says it was put together with
10 wrapping tape, strap wrapping tape. Do
11 you recall that?
12    A.   Yes, sir.
13    Q.   You don't claim you got this
14 warning for discriminatory reasons, do
15 you?
16    A.   No, sir.
17    Q.   Is that your signature down at
18 the bottom, Mr. Sanks?
19    A.   Yes, sir.
20       (Whereupon, Defendant's
21       Exhibit 42 was marked
22       for identification.)
23    Q.   Now, after you got those

---

Page 191

1 warnings that we just looked at on
2 December the 19th, 1997 and August the
3 6th, 1998, on August the 10th, you got a
4 final notice saying that if you had
5 another warning before December 19, 1998,
6 you would lose your job, correct?
7    A.   That's what it says.
8    Q.   And that's Exhibit 42, isn't
9 it?
10    A.   Yes, sir.
11       (Whereupon, Defendant's
12       Exhibit 43 was marked
13       for identification.)
14    Q.   Exhibit 43 is a second written
15 warning for taking unscheduled breaks. Is
16 that your signature at the bottom?
17    A.   Yes, sir.
18    Q.   You don't claim that this
19 warning for taking unscheduled breaks back
20 in 1999 was discriminatory, do you?
21    A.   I can't --
22    Q.   I'm sorry?
23    A.   I can't deny that, I mean, I

---

Page 192

1 can't say.
2    Q.   You can't say whether it was
3 or not?
4    A.   Yes, sir.
5       (Whereupon, Defendant's
6       Exhibit 44 was marked
7       for identification.)
8    Q.   Okay. But those two warnings
9 that we just looked at, May 30, 1999 and
10 August 6th, 1998, resulted in another
11 final notice saying if you got a warning
12 before August 6th, 1999, you would lose
13 your job, right?
14    A.   That's what it says.
15       MS. MUHAMMAD: Object to the
16 form.
17    Q.   And that's Exhibit 44,
18 correct?
19    A.   Yes, sir.
20       (Whereupon, Defendant's
21       Exhibit 45 was marked
22       for identification.)
23    Q.   Now, Exhibit 45 is marked

---

Page 193

1 second warning. And it says that you got
2 the warning because you parked at the main
3 entrance and jumped out to punch in so you
4 wouldn't be late and then you went back to
5 get your car. Do you remember that
6 incident?
7    A.   I remember the incident, but
8 if it was worded different, say so.
9    Q.   All right. It says I asked
10 Bobby if the van parked in the roadway was
11 his and he said yes. He stated he was
12 running late and he parked there to jump
13 out and run into the plant to punch his
14 time card and then returned to move his
15 vehicle. Now, did that conversation occur
16 like that?
17    A.   No, sir.
18    Q.   Tell me how it occurred.
19    A.   As far as I can remember?
20    Q.   (Nods head.)
21    A.   I pulled up there, but I
22 didn't jump out. I got out of the van and
23 went in there at the time clock because I

---

49 (Pages 190 to 193)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 194

1  was running -- I was about to be late. I
2  went in and did the time clock. I guess
3  Dudley came up and asked me could I go
4  back out and move my van, I didn't want to
5  be late.
6      Q.   Did Dudley tell you that it
7  was against policy to leave the plant
8  without permission after you had punched
9  in?
10     A.   I knew it was against the
11 policy to leave.
12     Q.   All right. And you got a
13 warning for it, right?
14     A.   I got permission to go back.
15     Q.   All right. But this is a
16 warning for parking, going in the mill,
17 punching in and going back to move your
18 car, correct?
19     A.   That's what it --
20         MS. MUHAMMAD:  Object to the
21 form.
22     A.   That's what it states.
23     Q.   All right. You don't claim

Page 195

1  that you were given this warning for
2  discriminatory reasons, do you?
3      A.   Yes, sir.
4      Q.   And do you claim -- what do
5  you claim that discriminatory reason was?
6      A.   I can't recall at this moment.
7      Q.   You don't have any -- well,
8  let me ask you this: Do you claim it was
9  on account of your race?
10     A.   Not only because of my race,
11 no, sir.
12     Q.   What do you claim it was
13 because of?
14     A.   I can't recall that at the
15 moment, what it was about.
16     Q.   You can't -- you don't know
17 whether you claim it was given to you on
18 account of your race or something else?
19     A.   Yes, sir.
20     Q.   You don't know whether it was
21 given to you because of your race and
22 something else?
23     A.   I can't say at this moment.

Page 196

1      Q.   What information do you have
2  to support your claim that Exhibit 45 was
3  given to you on account of your race?
4      A.   I can't recall at this moment.
5      Q.   You don't have any information
6  at this point?
7      A.   Not at this moment.
8      Q.   How are you going to get
9  information?
10     A.   Memories come back to you.
11     Q.   Remember what I told you, it's
12 as much a violation of your oath to say
13 you don't know if you do know than it is
14 just to tell a flat lie.
15     A.   I'm not going to lie. I can't
16 recall at this moment.
17         (Whereupon, Defendant's
18         Exhibit 46 was marked
19         for identification.)
20     Q.   You have before you Exhibit 46
21 and that's a final notice because of the
22 warning for taking unscheduled breaks back
23 on May 30th, 1999, and the one we just

Page 197

1  looked at for leaving the plant without
2  permission, correct?
3      A.   Yes, sir. That's what it
4  says.
5      Q.   And it says if you get another
6  warning before May 30th, it says 2000, I
7  think it should have been 2001, don't you?
8      A.   I don't know, sir.
9      Q.   All right. But it says if you
10 get a third warning within the year, you
11 are going to lose your job, right?
12     A.   Yes, sir.
13         (Whereupon, Defendant's
14         Exhibit 47 was marked
15         for identification.)
16     Q.   A partial absence is different
17 from a tardy, isn't it?
18     A.   Yes, sir.
19     Q.   A partial absence could be
20 coming in more than half an hour late?
21     A.   Yes, sir.
22     Q.   Or leaving early?
23     A.   Yes, sir.

50  (Pages 194 to 197)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 198

1    Q.   All right. And Exhibit 47
2  says you got six partials in six months,
3  right?
4    A.   That's what it says.
5    Q.   Was that true?
6    A.   I'm not sure, sir.
7    Q.   Well, it's just a counseling
8  report, right, not a warning?
9    A.   What do you mean by is it
10 true?
11   Q.   I'm sorry?
12   A.   What do you mean by is it
13 true?
14   Q.   Is it true that you had six
15 partials?
16   A.   If that's what it stated.
17   Q.   Well --
18   A.   I mean, I can't recall at this
19 time.
20   Q.   Okay. Is that your signature
21 at the bottom of the page?
22   A.   Yes, sir.
23   Q.   You don't claim that this

Page 199

1  counseling report was discriminatory, do
2  you?
3    A.   I can't recall it, sir.
4    Q.   What is it that you can't
5  recall?
6    A.   Whether it being
7  discriminatory or not.
8    Q.   You just don't know?
9    A.   Not at this time, I don't.
10         (Whereupon, Defendant's
11         Exhibit 48 was marked
12         for identification.)
13   Q.   Okay. Exhibit 48 is another
14 counseling report, correct?
15   A.   Yes, sir.
16   Q.   And it has to do with failing
17 to properly repair a hoist, doesn't it?
18   A.   Yes, sir.
19   Q.   You don't claim that
20 Exhibit 48 is discriminatory, do you?
21   A.   Yes, sir.
22   Q.   Now, you understand it's just
23 a counseling report, it's not a warning?

Page 200

1    A.   Yes, sir.
2    Q.   Why do you claim it's
3  discriminatory?
4    A.   Because an electrician worked
5  on it and I got a write-up for it, a
6  counseling.
7    Q.   It says Bobby worked on --
8  now, read along with me, Bobby worked on
9  replacing hand control cable all day
10 Saturday on first shift. Bobby did not
11 get hoist running on Saturday and left it
12 locked out. Bobby worked on hoist Sunday
13 morning and turned it over for use around
14 10:00 a.m. Sunday. On Sunday, 4/25/04,
15 another work order was wrote around 5:30
16 p.m. This time someone raised the hoist
17 up and hit upper limit switch and hoist
18 reversed and continued to run down. The
19 next page. And you can see it runs
20 through all of that on page 357 and then
21 look at 358. It says Bobby has been
22 working on hoist for years and should know
23 how hand controls should be wired. Now,

Page 201

1  does that refresh your recollection?
2    A.   Yes, sir.
3    Q.   All right. Do you still claim
4  that this counseling report, which was not
5  discipline, was given to you for
6  discriminatory reasons?
7    A.   Yes, sir.
8    Q.   All right. Tell me why.
9    A.   For one reason, the other
10 electrician it speaks of before had worked
11 on it.
12   Q.   Who was the other electrician?
13   A.   I don't know his name at the
14 time. He's not no longer with that
15 company. I can't remember his name.
16   Q.   All right. Do you claim --
17 excuse me, do you claim it was
18 discrimination against you because of your
19 race?
20   A.   Yes, sir.
21   Q.   All right. And who gave you
22 this warning?
23   A.   Dudley Gregory.

51 (Pages 198 to 201)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS

October 17, 2007

Page 202

1    Q.   All right. And what
2  information do you have to support your
3  claim that Dudley gave you this counseling
4  report for racially discriminatory
5  reasons?
6    A.   Dudley, he just got his ways
7  of wanting to do things.
8    Q.   Anything else?
9    A.   I mean, he follow up behind
10 Perry, he steps in and try to take, you
11 know -- well, he just steps in and takes
12 things that are against Perry, take it on
13 himself.
14   Q.   All right. Anything else?
15   A.   And everything that I said, it
16 related to Perry and Dudley.
17   Q.   All right. Anything else?
18   A.   And the latter part of that
19 question about working on hoists for
20 years. The other electrician had changed
21 the wires and how was I supposed to know
22 how it works after that. My job is
23 performing -- put another control on and

Page 203

1  that's what I did.
2    Q.   Any other information that you
3  have to support your claim that this
4  report was given to you for racially
5  discriminatory reasons?
6    A.   That's it at this time.
7    Q.   Remember I told you we would
8  come back to 351?
9    A.   Yes, sir.
10   Q.   It really got in that
11 Exhibit 32 by mistake. Okay. You have
12 before you Exhibit 41?
13       (Whereupon, Defendant's
14       Exhibit 49 was marked
15       for identification.)
16   A.   49.
17   Q.   49, pardon me, thank you. And
18 that's your signature on 49 at the bottom,
19 isn't it?
20   A.   Yes, sir.
21   Q.   All right. And this is a
22 first warning, isn't it?
23   A.   Yes, sir.

Page 204

1    Q.   And it says it's a warning for
2  improper lockout on the crane system. It
3  says I checked to see if the power to the
4  crane system was off and locked out and it
5  was not. I called Bobby's attention to
6  this and asked him to stop work and to
7  lock out the disconnect for this system.
8  You don't claim that this first warning
9  marked Exhibit 49 was given to you for
10 discriminatory reasons, do you?
11   A.   No, sir.
12       (Whereupon, Defendant's
13       Exhibit 50 was marked
14       for identification.)
15   Q.   You have before you
16 Exhibit 50, which is marked second
17 warning?
18   A.   Yes, sir.
19   Q.   All right. Next to the
20 last -- well, the last paragraph of the
21 details says Bobby had started working on
22 this hoist before 11:00 a.m., and it was
23 4:45 p.m. when Bobby and Ed finished with

Page 205

1  it. Bobby has been working on the hoist
2  job for more than fourteen years now and
3  he should be the best troubleshooter in
4  the plant on hoist problems. Now, this
5  warning is for poor work performance and
6  it's for being unable to find the problems
7  with the hoist and taking too long to
8  repair it. Do you claim that this warning
9  was given to you for discriminatory
10 reasons?
11   A.   Yes, sir.
12   Q.   All right. On account of your
13 race?
14   A.   Yes, sir.
15   Q.   What information do you have
16 to support your claim that Exhibit 50 was
17 given to you for racially discriminatory
18 reasons?
19   A.   No one else ever have got a
20 write-up of poor work performance during
21 the course of working in this plant.
22   Q.   Do you have access to the
23 other shop employees' files?

52 (Pages 202 to 205)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS

October 17, 2007

Page 206

1    A.   No, sir.
2    Q.   Do you have any way of knowing
3 who gets a warning and who doesn't?
4    A.   No, sir.
5    Q.   So, you don't know what
6 warnings other shop employees were given,
7 do you?
8    A.   No, sir.
9        (Whereupon, Defendant's
10       Exhibit 51 was marked
11       for identification.)
12   Q.   Now, Exhibit 51 is a final
13 notice dated March the 2nd, 2005 saying
14 that because you got these two warnings on
15 5/25/04, then again on 2/22/05, that if
16 you got another warning before 5/25/05,
17 that you would lose your job, correct?
18   A.   That's what it says.
19   Q.   All right.  Now, do you
20 remember Amber Stevens giving you this
21 final notice and saying Bobby, you can't
22 get another warning?
23   A.   I can't recall.

Page 207

1    Q.   Do you see Amber Stevens' name
2 at the bottom?
3    A.   Yes, sir.
4    Q.   And you don't recall sitting
5 down with her and her going over this
6 final notice with you?
7    A.   I remember she was -- I do
8 remember that, sir.
9    Q.   You do remember it?
10   A.   I do remember she saying that.
11   Q.   What do you recall about that
12 conversation?
13   A.   Very vague.  I don't have
14 another write-up to get before the
15 termination, I believe.
16   Q.   All right.  So, she was saying
17 she wanted you to stay out of trouble and
18 not get another warning, right?
19       MS. MUHAMMAD:  Object to the
20 form.
21   A.   I don't think the words were
22 staying out of trouble.
23   Q.   She didn't want you to make

Page 208

1 any mistakes, correct?
2    A.   Well, I just didn't need to
3 get another write-up.
4        (Whereupon, Defendant's
5        Exhibit 52 was marked
6        for identification.)
7    Q.   All right.  Now, was it on
8 this occasion that you got this final
9 notice, which was marked Exhibit 51, that
10 you told Amber Stevens that you thought
11 you were being discriminated against?
12   A.   Yes, sir.
13   Q.   All right.  Did she tell you
14 she was going to do an investigation?
15   A.   Yes, sir.
16   Q.   And is what's written here on
17 Exhibit 52 by associate's statement an
18 accurate description of what you told her?
19   A.   (Reviewing document.)  Yes,
20 sir.
21   Q.   All right.  Your complaint
22 says that you were singled out for
23 discipline because of your race, correct?

Page 209

1    A.   Yes, sir.
2    Q.   Any other reason you were
3 singled out?
4    A.   Because of my complaints I
5 made against them, sir.
6    Q.   All right.  Your race and the
7 complaints.  Anything else?
8    A.   That's it.
9    Q.   All right.  Now, who did you
10 believe was violating the rules or not
11 repairing machines or other items and not
12 being disciplined?
13   A.   Now, you said repairing
14 machines?
15   Q.   Well, who did you think -- you
16 were getting disciplined for certain
17 things?
18   A.   Yes, sir.
19   Q.   Who did you think was doing
20 the same thing and getting by with it?
21   A.   I can't say doing the same
22 thing and getting by with it, sir, I can
23 only say that other machines was down and

53 (Pages 206 to 209)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                        http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

**Page 210**

1 they didn't get wrote up for it.
2     Q.   And who was that?
3     A.   The people that worked on them
4 on other shifts, other electricians.
5     Q.   Do you know their names?
6     A.   We had -- all electricians in
7 the shop have machines down.
8     Q.   Did you know any of their
9 names?
10     A.   Yes, sir, I do.
11     Q.   Who?
12     A.   Ladolphus Floyd.
13     Q.   You claim -- and Ladolphus
14 Floyd is a black man?
15     A.   Yes, sir.
16     Q.   All right.  Who else?
17     A.   Quintin Martin.
18     Q.   Is Quintin Martin black or
19 white?
20     A.   Black.
21     Q.   All right.  Anybody else?
22     A.   Ed Walton.
23     Q.   Is Ed Walton black or white?

**Page 211**

1     A.   White.
2     Q.   Anybody else?
3     A.   I can't think of his name.
4 Steve Moss.
5     Q.   Is Steve Moss black or white?
6     A.   He's black.
7     Q.   All right.  Anybody else?
8     A.   Larry -- Larry, I don't know
9 his last name.  All I know is Larry.
10     Q.   Black or white?
11     A.   He's white.
12     Q.   Anybody else?
13     A.   There's some more in there,
14 but I can't recall their names at this
15 time.
16     Q.   The shop employees were about
17 half black and half white, weren't they?
18     A.   Yes, sir.
19     Q.   What did Walton do that you
20 claim he should have been disciplined for?
21     A.   I'm just -- I'm not saying he
22 should have been disciplined, but he have
23 had machines that were down, he have left

**Page 212**

1 machines standing.
2     Q.   You already told me you might
3 not know if somebody got disciplined or
4 not, right?
5     A.   Right.
6     Q.   And Larry, last name unknown,
7 what did he do that you thought he should
8 have gotten disciplined for?
9     A.   Machines, not able to fix his
10 machines.
11     Q.   All right.  Do you know
12 whether he did or not?
13     A.   He didn't.
14     Q.   How do you know?
15     A.   I was told that.
16     Q.   By whom?
17     A.   Coworkers.
18     Q.   Who?
19     A.   Eddie Hall.
20     Q.   How would Eddie Hall know?
21     A.   He work on the same job he
22 does.
23     Q.   Well, how would he know

**Page 213**

1 whether Larry got disciplined or not?
2     A.   Because he had to fix the
3 machines.
4     Q.   But how would having to fix a
5 machine give him information on whether
6 Larry, last name unknown, got a warning?
7     A.   It doesn't.
8     Q.   Okay.  So, an employee could
9 be disciplined without you knowing about
10 it?
11     A.   True, yes, sir.
12     Q.   Now, Amber Hall says that you
13 didn't give her any specifics, says
14 associate did not give any specifics.  Is
15 that true?
16     A.   I didn't understand the
17 question.
18     MS. MUHAMMAD:  Object to the
19 form.
20     Q.   Right down here, Amber Hall
21 writes, associate did not give any
22 specifics.  Do you see that?
23     MS. MUHAMMAD:  Object to the

54 (Pages 210 to 213)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 214

1  form.
2      A.   No, sir, I don't see that.
3      Q.   You don't -- right here
4  (indicating).  Do you see it now?
5      A.   The investigation?
6      Q.   Right.  Associate did not give
7  any specifics.  Do you see that?
8      A.   Yes, sir.
9      Q.   Okay.  Is that true?
10     A.   Specific about --
11     Q.   About your complaint?
12         MS. MUHAMMAD:  Object to the
13 form.
14     A.   I don't understand where we
15 are going, sir.
16     Q.   All right.
17         MS. MUHAMMAD:  I think if he
18 reads the entire statement that she wrote,
19 maybe he might understand it.
20         MR. SUGGS:  I'm going to ask
21 the questions.
22         MS. MUHAMMAD:  Well, stop
23 telling him to read a part of the

Page 215

1  statement.
2      Q.   It says associate did not give
3  any specifics.
4          MS. MUHAMMAD:  The sentence
5  continues --
6      Q.   And my question is:  Is that
7  correct that you did not give Amber
8  Stevens any specifics about your
9  complaint?
10         MS. MUHAMMAD:  I am going to
11 instruct the witness to read the entire
12 statement before he answers.
13         MR. SUGGS:  Read whatever you
14 want, you've got it right there in front
15 of you.
16     A.   Yes, I understand this now.
17 My specifics were in the document I
18 presented to her, those were my
19 complaints.
20     Q.   Where it says associate's
21 statement, that was your complaint?
22     A.   Yes, sir.
23     Q.   Okay.  And this is the

Page 216

1  document that you presented to her?
2      A.   Yes, sir.
3      Q.   Okay.  And this is all you
4  told her; is that correct?
5      A.   Yes, sir.
6      Q.   All right.  So, if you look
7  over to the next page, 316, Amber Stevens
8  writes, an investigation was conducted,
9  both white and minority shop associates
10 were interviewed, no one verified there
11 are any issues of race with Perry or
12 Dudley.  All of the associates interviewed
13 say Perry expects you, everyone, to run
14 their job.  If they are not running their
15 job, Perry will talk to them about it.
16 None of the associates felt there was an
17 issue of race discrimination or
18 harassment.  The investigation is
19 concluded and no findings of race
20 discrimination.  Now, did Amber Stevens
21 meet with you and tell you that?
22     A.   Yes, sir.
23     Q.   Did she tell you she had

Page 217

1  interviewed nine associates, six blacks
2  and three whites?
3      A.   Yes, sir.
4      Q.   And she said none of them
5  backed you up on your claim that you were
6  being mistreated because of your race?
7      A.   That's what she said, sir.
8          (Whereupon, Defendant's
9          Exhibit 53 was marked
10         for identification.)
11     Q.   Have you got before you
12 Exhibit 53?
13     A.   Yes, sir.
14     Q.   Okay.  Now, turn to page 821,
15 please.  Do you know Steve Moss?
16     A.   Yes, sir.
17     Q.   You just mentioned him as
18 being a black employee, right?
19     A.   Yes, sir.
20     Q.   All right.  Look at 823.  Ed
21 Walton.  Didn't you just mention him?
22     A.   Yes, sir.
23     Q.   All right.  And look at 824.

55 (Pages 214 to 217)

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                          http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 218

1  The Ladolphus Floyd, didn't you just
2  mention him?
3      A.   Yes, sir.
4      Q.   And look at 827.  Elijah
5  Harris.  Is he the black man?
6      A.   Yes, sir.
7      Q.   Did he work in the shop?
8      A.   Yes, sir.
9      Q.   Robert Strozer, do you know
10 him?
11     A.   Yes, sir.
12     Q.   Did he work in the shop?
13     A.   Yes, sir.
14     Q.   Black or white?
15     A.   Black.
16     Q.   All right.  The next one down,
17 Donald Craig Arwood, do you know him?
18     A.   Yes, sir.
19     Q.   Did he work in the shop?
20     A.   Yes, sir.
21     Q.   White man?
22     A.   Yes, sir.
23     Q.   All right.  And then the next

Page 219

1  one is Danny Oliver, he's a black man,
2  too, isn't he?
3      A.   Yes, sir.
4      Q.   And then Eddie Hall, do you
5  know him?
6      A.   Yes, sir.
7      Q.   He's a black man, isn't he?
8      A.   Yes, sir.
9      Q.   All right.  Would you say that
10 Steve Moss, Lou Floyd, Elijah Harris,
11 Robert Strozer, and Eddie Hall were your
12 friends?
13     A.   I would say so, yes, sir.
14     Q.   And if there had been race
15 discrimination that had been going on in
16 the shop, wouldn't you have trusted them
17 to have told it?
18     A.   I can't say, sir.
19     Q.   Now, if you will, you're going
20 to have to look back at 52, and if you
21 would look at 316, it says refused to
22 sign, but then up at the top of it over
23 there, it's got Bobby L. Sanks.  Is that

Page 220

1  your signature?
2      A.   Yes, sir.
3      Q.   So, you did sign it after all?
4      A.   Yes, sir.
5          MS. MUHAMMAD:  What exhibit
6  was that?
7      A.   52.
8          MS. MUHAMMAD:  Which one did
9  you say?
10     A.   52.
11         MR. SUGGS:  52, page 316.  I
12 think you have got 52 in your hand.  I'm
13 not certain.
14         MS. MUHAMMAD:  Okay.  Oh, yes,
15 it's on the second page of 316?
16         MR. SUGGS:  Yes.
17         MS. MUHAMMAD:  Okay.  Yes.
18     Q.   And when you signed, you were
19 acknowledging to Amber Stevens
20 communicating the results of the
21 investigation to you, correct?
22     A.   That's correct.
23     Q.   And didn't Amber Stevens tell

Page 221

1  you if you weren't satisfied, you could
2  follow those posted complaint procedures
3  that we looked at earlier?
4          MS. MUHAMMAD:  Object to the
5  form.
6      A.   Yes, sir.
7      Q.   In fact, look at 319, please.
8  And this is sort of a continuation from
9  the first page where she says the
10 investigation is concluded, no finding of
11 race discrimination or harassment were
12 made.  If you are not satisfied or
13 disagree, you need to follow the company's
14 complaint procedure which is posted.  Do
15 you see that?
16     A.   Yes, sir.
17     Q.   And that's what you just told
18 me she said, isn't it?
19         MS. MUHAMMAD:  Object to the
20 form.
21     Q.   Isn't it?
22     A.   Yes, sir.
23     Q.   All right.  And you didn't

56  (Pages 218 to 221)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                         BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

Page 222

1  take your complaint to the plant manager,
2  did you?
3      A.  No, sir.
4      Q.  Or to the division HR manager?
5      A.  No, sir.
6      Q.  Or to anybody else, did you?
7      A.  Yes, sir.
8      Q.  You did?
9      A.  Yes, sir.
10     Q.  Who?
11     A.  I went to the EECO.
12     Q.  Oh, okay.  EEOC?
13     A.  EEOC.  Yes, sir.
14     Q.  But you told Amber Stevens you
15  didn't want to meet with anybody else at
16  the plant?
17     A.  Yes, sir.
18     Q.  So, you complained, right?
19     A.  Yes, sir.
20     Q.  To Amber Stevens, right?
21     A.  Yes, sir.
22     Q.  She investigated it, correct?
23     A.  She told me she did, I don't

Page 223

1  know whether she did or not, sir.
2      Q.  She told you she talked to
3  nine witnesses?
4      A.  That's what she told me, sir.
5      Q.  She documented the
6  investigation?
7      A.  That's what she told me.
8      Q.  Showed you the documents?
9      A.  She showed me some.
10     Q.  You signed for the results,
11  right?
12     A.  Yes, sir.
13     Q.  And she gave you the option to
14  pursue it further?
15     A.  Yes, sir.
16     Q.  Okay.  And you declined that
17  offer?
18     A.  Yes, sir.
19     Q.  We looked at this earlier just
20  to see what a personnel notice is.  It's
21  Exhibit 24.  Do you see that?
22     A.  Yes, sir.
23     Q.  And it's dated July 12, 2005,

Page 224

1  right?
2      A.  Yes, sir.
3      Q.  And it's saying that as of
4  July 12th, you've got four tardies in six
5  months and just reminding you of that,
6  correct?
7          MS. MUHAMMAD:  Is that an
8  exhibit, I'm sorry?
9          MR. SUGGS:  It's 24.
10     A.  Yes, sir.
11     Q.  All right.  And you don't
12  claim that that reminder that you had four
13  tardies within six months was
14  discriminatory in any way, do you?
15     A.  No, sir.
16         (Whereupon, Defendant's
17         Exhibit 54 was marked
18         for identification.)
19     Q.  Now, you have Exhibit 54 in
20  front of you?
21     A.  Yes, sir.
22     Q.  And that's entitled a second
23  warning, isn't it?

Page 225

1      A.  Yes, sir.
2      Q.  And that says six tardies in
3  six months.  Do you see that?
4      A.  Yes, sir.
5      Q.  Okay.  Now, you admit that you
6  were tardy on these occasions that are
7  listed?
8      A.  I can't recall them, sir.
9      Q.  Okay.  But you do confess that
10  clocking in at 7.0 is late, correct?
11     A.  Yes, sir.
12     Q.  All right.  You don't claim
13  that Exhibit 54 was given to you for
14  discriminatory reasons, do you?
15     A.  No, sir.
16         (Whereupon, Defendant's
17         Exhibit 55 was marked
18         for identification.)
19     Q.  Okay.  You have before you
20  Exhibit 55?
21     A.  Yes, sir.
22     Q.  And that's a third warning,
23  right?

57 (Pages 222 to 225)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                     October 17, 2007

Page 226

1     A.   Yes, sir.
2     Q.   And July 27, 2005 was a
3  Wednesday, right?
4     A.   I'm not sure, sir.
5     Q.   All right. Well, I'll
6  represent to you that it was.
7        MS. MUHAMMAD: Object to the
8  form.
9     Q.   In July, if you would look
10 back to Exhibit 54, you see your last
11 tardy was July 27, the warning is dated
12 July 29th. Do you see that?
13    A.   Yes, sir.
14    Q.   All right. And Exhibit 55,
15 the last warning is July 29, and it's also
16 dated 7/29. Do you see that?
17    A.   Yes, sir.
18    Q.   So, you agree that you were
19 tardy on Wednesday, but you weren't
20 presented with this second warning until
21 Friday?
22       MS. MUHAMMAD: I object to the
23 form. I don't remember him testifying

Page 227

1  that he was -- he admitted he was tardy.
2     A.   I can't recall that, sir.
3     Q.   And then when you were tardy
4  again on Friday, which justified this
5  third warning, you were presented the
6  second and the third warning together on
7  July 29, 2005, correct?
8        MS. MUHAMMAD: Object to the
9  form.
10    A.   I can't recall it.
11    Q.   You don't claim this third
12 warning that we were just looking at,
13 Exhibit 55, was given to you for
14 discriminatory reasons, do you?
15    A.   No, sir.
16    Q.   You don't claim there's
17 anything the matter with the time clock,
18 do you?
19    A.   Yes, sir.
20    Q.   What?
21    A.   It ain't been right.
22    Q.   I'm sorry?
23    A.   The clock dummy don't be right

Page 228

1  all the time.
2     Q.   Say that slowly.
3     A.   The time clocks are never
4  right we had. If I could go into detail
5  for a second.
6     Q.   Well, when you say dummy
7  clock, what are you talking about?
8     A.   Well, there was another clock
9  sitting there. The original clock was
10 broken down, and they had a dummy clock
11 there.
12    Q.   Why do you call it a dummy
13 clock?
14    A.   Because it had a stop button
15 on it, that's a secondary clock, that's
16 why I call it a dummy clock.
17    Q.   All right. But if you stuck
18 your time -- do you stick your time card
19 in a slot or something to be punched --
20    A.   Yes, sir.
21    Q.   -- or recorded?
22    A.   Yes, sir.
23    Q.   And the time on the dummy

Page 229

1  clock would go on your time card?
2     A.   Yes, sir.
3     Q.   Okay. And everybody was going
4  by the same clock?
5     A.   Yes, sir.
6     Q.   Everybody in the shop, anyway?
7     A.   Yes, sir.
8     Q.   And you admit that you were
9  tardy on all of these days?
10    A.   I can't deny that.
11       (Whereupon, Defendant's
12       Exhibit 56 was marked
13       for identification.)
14    Q.   Exhibit 56 is entitled
15 discussion of termination, and isn't it
16 true that Amber Stevens told you that
17 since you were tardy on July the 29th,
18 which resulted in your third warning
19 within twelve months, that she hated it
20 but she had to terminate your employment?
21       MS. MUHAMMAD: Object to the
22 form.
23    A.   I don't know whether the word

58 (Pages 226 to 229)

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.          October 17, 2007

Page 230

1  hated it come in there about.
2      Q.   Well, let me just read to you
3  what she says.  She says I hate it, but
4  there is no way around it, he said he
5  understood.
6      A.   I deny that.  I don't think I
7  used that term.  I understood that part,
8  but as far as she saying I hated it.
9      Q.   You don't recall her saying
10 she hated it?
11     A.   No, sir.
12     Q.   All right.  But you did tell
13 her you understood?
14     A.   Understood at the time why
15 they terminated me?
16     Q.   Yes.
17     A.   Yes, sir.
18         (Whereupon, Defendant's
19         Exhibit 57 was marked
20         for identification.)
21     Q.   Mr. Sanks, is that your
22 signature on the bottom of Exhibit 57,
23 which is the exit interview form?

Page 231

1      A.   Yes, sir.
2      Q.   Did you fill out the writing
3  on there and the various check marks?
4      A.   Yes, sir.
5      Q.   And where it says involuntary
6  separation, it says do you understand why
7  you are being separated, you checked yes,
8  right?
9      A.   Yes, sir.
10     Q.   And it says do you think your
11 separation could have been avoided and you
12 checked no, correct?
13     A.   Yes, sir.
14     Q.   And you didn't have any
15 comments, you wrote none, right?
16     A.   Yes, sir.
17         (Whereupon, Defendant's
18         Exhibit 58 was marked
19         for identification.)
20     Q.   Exhibit 58 says separation
21 notice on the top, right?
22     A.   Yes, sir.
23     Q.   And it just is written there,

Page 232

1  explanation to associate, three warnings
2  within a twelve-month period.  Do you see
3  that?
4      A.   Yes, sir.
5      Q.   And that's what you were told,
6  isn't it?
7      A.   Yes, sir.
8      Q.   And that's your signature at
9  the bottom there on the left?
10     A.   Yes, sir.
11     Q.   And if you look down at the
12 next document, which is marked document
13 11, and starting over here, you see
14 tardies on July 29, July 27, and July 19.
15 Do you see that?
16     A.   That's what -- what, crossed
17 out?
18     Q.   Marked with a T.
19     A.   Yes.
20     Q.   All right.  And if you look
21 down here in June, you see tardies on June
22 the 12th and June the 19th, correct?
23     A.   No, sir.  I see a June 13th

Page 233

1  and June 20th.
2      Q.   Correct.  June 13th and
3  June 20th, you were tardy.  And then if
4  you look at February, you were tardy on
5  February the 4th?
6      A.   Yes, sir.
7      Q.   And on January the 30th?
8      A.   Yes, sir.
9      Q.   All right.  And if you look
10 down at the time cards, that's your
11 signature on that time card marked
12 7/31/05?
13     A.   Yes, sir.
14     Q.   All right.  And that shows on
15 July 29, that you were tardy, correct?
16     A.   Yes, sir.
17     Q.   And the same on July the 27th?
18     A.   Yes, sir.
19     Q.   All right.  Now, let's look
20 down one at document 14.  That shows,
21 again, a tardy on July 19th, doesn't it?
22     A.   Where are we?
23     Q.   Right there, I think; is that

                          59 (Pages 230 to 233)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

Page 234

1  right?
2      A.   June.  You said 14.  That's
3  13.
4      Q.   Oh.
5      A.   That's 12.
6      Q.   There we go.
7      A.   July.
8      Q.   July 19th.
9          MS. MUHAMMAD:  What page are
10  you on?
11      Q.   Right there (indicating).
12          MR. SUGGS:  14.
13      Q.   Is that it?
14      A.   That's the July 27th.
15      Q.   Okay.  So, the 27th shows you
16  were tardy, and then July 19th --
17      A.   Yes.
18      Q.   -- correct?  Okay.  And then
19  let's look at 13, which I think was this
20  way.  And that shows you were tardy on
21  June the 13th and June the 20th, correct?
22      A.   Yes.
23      Q.   And those are your signatures

Page 235

1  on those time cards?
2      A.   Yes, sir.
3      Q.   All right.  And then look at
4  page 15, please.  And that shows a tardy
5  on January the 30th, and on February the
6  4th, right?
7      A.   Yes, sir.
8      Q.   Okay.  Now, all of these time
9  cards contain your signature, correct?
10      A.   Yes.
11      Q.   Did you also date the time
12  card or did somebody else do that?
13      A.   I dated them.
14      Q.   As far as you know, are
15  these -- do these punches accurately
16  reflect the times that you reported and
17  left work?
18      A.   I can't recall.
19          (Whereupon, Defendant's
20          Exhibit 59 was marked
21          for identification.)
22      Q.   On 10, which is marked Exhibit
23  59, you do recognize your signature on

Page 236

1  this time punching procedure, right?
2      A.   Yes, sir.
3      Q.   And 9/8/03 is the date you
4  signed it?
5      A.   Yes.
6      Q.   And you acknowledge that
7  clocking in at 7.0 means you are going to
8  be charged with a tardy?
9          MS. MUHAMMAD:  Object to the
10  form.
11      A.   Yes, sir.
12      Q.   Now, you don't claim that your
13  termination for tardiness was
14  discriminatory, do you?
15          MS. MUHAMMAD:  Object to the
16  form.
17      A.   Discriminatory, no.
18          (Whereupon, Defendant's
19          Exhibit 60 was marked
20          for identification.)
21      Q.   Now, Exhibit 60 is a request
22  to change your pay as a humidity and air
23  control tech from five fifty to five

Page 237

1  eighty-five an hour, right?
2      A.   That's correct.
3          MS. MUHAMMAD:  Object to the
4  form.
5      Q.   And that was on July the
6  25th -- excuse me.  No.  I'm sorry.  Yes,
7  the notice date was 7/25/85, right?
8      A.   Yes.
9      Q.   But the effective date of the
10  pay raise was August the 11th, 1985,
11  right?
12      A.   Explain what -- where you're
13  going.
14      Q.   Well, the date that you were
15  going to see it in your paycheck would
16  have been after August 11, 1985, I mean,
17  August 11, 1985 would have been the day
18  that you started getting five eighty-five
19  an hour.
20      A.   I can't comprehend that.  I
21  don't know where you're coming from
22  with --
23      Q.   All right.  Well, I'm just

60 (Pages 234 to 237)

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031              http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 238

1  looking at what the form says. If there's
2  something that I'm incorrect about, let me
3  know. But as I understand the effective
4  date of change, it means effective date of
5  the increase. So, as I read this form,
6  you got an increase in pay from five fifty
7  to five eighty-five on August the 11th,
8  1985.
9      A.   That's not true, sir.
10     Q.   What's true?
11     A.   What's true is I didn't get a
12 raise until almost a year after I had been
13 there. It wasn't ninety days.
14     Q.   Well, do you recognize Perry
15 Henderson's signature?
16     A.   Occasionally, yes, sir.
17     Q.   Do you recognize it on this
18 form?
19     A.   This looks like his signature.
20     Q.   You just don't remember
21 getting this raise from five fifty to five
22 eighty-five in August of 1985, correct?
23          MS. MUHAMMAD: Object to the

Page 239

1  form.
2      A.   I didn't get the raise, sir.
3          (Whereupon, Defendant's
4          Exhibit 61 was marked
5          for identification.)
6      Q.   What information do you have
7  to establish that you didn't get the raise
8  in August of 1985 from five fifty to five
9  eighty-five?
10     A.   The information I got, that I
11 had -- that's when I filed my complaint to
12 human resource that I wasn't getting -- I
13 didn't get a raise after the ninety days,
14 and almost a year. That's when I made my
15 complaint.
16     Q.   What information do you have
17 to establish that you did not, in fact,
18 get it, I'm not saying you didn't complain
19 about it, I'm just saying what information
20 do you have to show that you didn't get
21 it?
22     A.   I don't have any information
23 that shows that I didn't get it. It's

Page 240

1  just that I know it wasn't on my paycheck.
2      Q.   All right. Now, you have
3  Exhibit 61 in front of you?
4      A.   Yes, sir.
5      Q.   Exhibit 61 shows that on
6  December the 29th, 1985, your pay went on
7  up from five eighty-five to six
8  twenty-five, right?
9      A.   Yes, sir.
10     Q.   Did you get that raise?
11          MS. MUHAMMAD: Object to the
12 form. I think he already testified that
13 he didn't get the raise until a year --
14 almost a year.
15          MR. SUGGS: Would you please
16 quit cluttering up the record? The
17 witness testified about another document.
18          MS. MUHAMMAD: This is the
19 same document.
20          MR. SUGGS: No, it isn't.
21     A.   I got a raise after I made my
22 request to V. R. Dobbs.
23     Q.   All right. Did you get this

Page 241

1  raise from five eighty-five to six
2  twenty-five on December the 29th, 1985?
3      A.   I can't recall the date.
4      Q.   All right. Do you recall
5  getting a raise from five eighty-five to
6  six twenty-five?
7      A.   I can't recall, sir.
8      Q.   Okay. Do you have any
9  information to dispute the
10 documentation -- or put it this way, do
11 you have any information to dispute the
12 information listed on Exhibit 61?
13     A.   Sir, the only information I
14 have that after I made my request to V. R.
15 Dobbs, then I got a raise. And where that
16 document is from his request to Perry
17 Henderson.
18     Q.   So you don't have any
19 information that would dispute the data
20 contained on Exhibit 61?
21     A.   No, sir.
22     Q.   Okay. And you don't have any
23 information that would dispute the data

61 (Pages 238 to 241)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 242

1  contained on Exhibit 60?
2      A.   No, sir.
3      Q.   What information do you rely
4  on to support your claim that you were
5  retaliated against?
6      A.   Rephrase that question again.
7      Q.   What information do you have
8  to support your claim that you were
9  retaliated against?
10     A.   My complaints that I made with
11 personnel.
12     Q.   Anything else?
13     A.   That I was singled out, they
14 came after my work that I performed and it
15 just wasn't to their satisfaction.
16 Because I made my complaints against Perry
17 and Dudley as supervisors.
18     Q.   Anything else?
19     A.   That's it as of now.
20     Q.   All right.  Look back, please,
21 at Exhibit 32.  That's one of those pretty
22 thick exhibits.  All right.  Now, and we
23 went through this earlier.  Do you

Page 243

1  remember?
2      A.   Yes, sir.
3      Q.   And there were thirty-five
4  personnel notices regarding issues with
5  lockouts, job performance, safety, and
6  violations of policies where you could
7  have been disciplined but weren't, right?
8      A.   Yes, sir.
9      Q.   All right.  Now, pull out
10 Exhibit 39.  Okay.  Now, doesn't 39 show
11 that you were on final notice on
12 January 10, 1992?
13     A.   Yes, sir.
14     Q.   And doesn't it say that a
15 third warning before May 13, 1992 would
16 result in termination of your employment?
17     A.   Yes, sir.
18     Q.   Okay.  Now, looking at
19 Exhibit 32, look at page 524.
20     A.   524?
21     Q.   Yes.  Maybe I can find it
22 quicker than you can.  Did you find it?
23     A.   Yes, sir.

Page 244

1      Q.   All right.  Now, 524, you got
2  a notice on January 17, 1992 for wasting
3  time, right?
4      A.   That's what it says.
5      Q.   And it was given by Perry
6  Henderson, right?
7      A.   Perry Henderson signed it.  It
8  was wrote up by Harold O'Neal.
9      Q.   Okay.  And if they had wanted
10 to terminate you, this could have been a
11 third warning for wasting time, but they
12 didn't, they gave you a nondisciplinary
13 personnel notice instead, correct?
14     A.   That's what it says.
15     Q.   All right.  Here, you can --
16 we'll look at mine.  We'll just put yours
17 aside for right now.  Now, pull out, if
18 you will, Exhibit 42.  And that shows that
19 you were on final notice on August 10,
20 1998, correct?
21     A.   Yes, sir.
22     Q.   And the third warning before
23 December the 19th, 1998 would result in

Page 245

1  termination of your employment, right?
2      A.   Yes, sir.
3      Q.   But looking at Exhibit 32,
4  page 435, on October the 2nd, 1998, you
5  got a personnel notice documenting poor
6  job performance for failing to observe
7  that a two-ton hoist had a ton and a half
8  singletree, right?
9          MS. MUHAMMAD:  Object to the
10 form.
11     A.   That's what it says.
12     Q.   Okay.  And do you -- was this
13 documented by Perry Henderson or somebody
14 else?
15     A.   It's got his initials there.
16         MS. MUHAMMAD:  Object to the
17 form.
18     Q.   Do you recognize the initials?
19     A.   Yes, that's -- I assume that's
20 Perry Henderson's initials.
21     Q.   Okay.  That's what I thought.
22 And if Henderson wanted you to be
23 terminated, he could have given you a

62  (Pages 242 to 245)

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.          October 17, 2007

Page 246

1  third warning for this singletree issue
2  instead of this personnel notice, but
3  instead, he gave you this nondisciplinary
4  personnel notice, right?
5      MS. MUHAMMAD:  Object to the
6  form.
7      A.  Yes, sir.
8      Q.  Let's look at Exhibit 44.  Got
9  it?
10     A.  Yes, sir.
11     Q.  Exhibit 44 shows that you were
12  on final notice on January the 9th, 1999,
13  doesn't it?
14     A.  No, sir.
15     Q.  What does it show?  I'm sorry,
16  June the 9th, 1999; is that right?
17     A.  That's --
18     Q.  6/9/99, isn't that June 9,
19  1999?
20     A.  Yes, sir.
21     Q.  Okay.  And it says if you get
22  a third warning before August 6, 1999,
23  that you would lose your job, right?

Page 247

1      A.  Yes, sir.
2      Q.  All right.  Let's look at 430
3  in Exhibit 32.  On 6/11/99, you got a
4  personnel notice for wasting time,
5  correct?
6      A.  That's what it says.
7      Q.  And if you look at 428, 429 on
8  July 29, 1999, you got a personnel notice
9  for failing to report where on a
10  singletree, correct?
11     A.  That's what it says.
12     Q.  And this was documented by
13  Gregory and Henderson, correct?
14     A.  Yes.
15     Q.  So, if Gregory and Henderson
16  wanted to have you terminated, they could
17  have given you a third warning for either
18  of these personnel incidents that are
19  recorded by Exhibit 32, pages 430, 429 and
20  428, but they didn't, they gave you the
21  personnel notices instead, correct?
22     MS. MUHAMMAD:  Object to the
23  form.

Page 248

1      A.  That's what it says.
2      Q.  Okay.  Let's look at
3  Exhibit 51.  Now, Exhibit 51 shows you
4  were on a final notice on March the 2nd,
5  2005, correct?
6      A.  Yes, sir.
7      Q.  And that a final -- that a
8  third warning before May 25, 2005 would
9  result in termination, correct?
10     A.  That's what it says.
11     Q.  If we look at Exhibit 32,
12  number 332, you see a personnel notice for
13  3/24/05, right?
14     A.  Yes, sir.
15     Q.  And that had to do with
16  deficiencies in preventive maintenance
17  reports, correct?
18     A.  That's what it says.
19     Q.  And if we look at 314, that's
20  a personnel notice for March 24, 2005
21  documenting that you had violated the cell
22  phone policy, right?
23     A.  That's what it says.

Page 249

1      Q.  And that was by Henderson and
2  Dudley, right?
3      A.  Yes, sir.
4      Q.  Dudley Gregory; is that right?
5      A.  That's right.
6      Q.  And if they had wanted you
7  terminated, then either 332 to 333 or 314
8  of Exhibit 32, if they had been warnings,
9  that would have resulted in your
10  termination, correct?
11     A.  That's correct.
12     Q.  So, there were six occasions
13  when if you had of gotten a written
14  warning, your employment would have been
15  terminated, but you got a personnel notice
16  instead, and that saved your job, right?
17     MS. MUHAMMAD:  Object to the
18  form.
19     A.  That's what it says.
20        (Whereupon, Defendant's
21         Exhibit 62 was marked
22         for identification.)
23     Q.  Okay.  You've got Exhibit 62

63 (Pages 246 to 249)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                   October 17, 2007

| Page 250 |
| --- |

1  in front of you?
2      A.    Yes, sir.
3      Q.    And that's your May 10, 2006
4  notice of charge of discrimination, right?
5      A.    Yes, sir.
6      Q.    And if you look at the next
7  document down, it says charge of
8  discrimination, right?
9      A.    Yes, sir.
10     Q.    And it's dated 5/4/06,
11  correct?
12     A.    Yes, sir.
13     Q.    Now, this document starts out,
14  this is an amendment to the original
15  charge of discrimination that was filed on
16  September 8, 2005.  Do you see that?
17     A.    Yes, sir.
18     Q.    Now, this charge claims
19  discrimination on the basis of race,
20  color, age, retaliation and harassment,
21  correct?
22     A.    Yes, sir.
23     Q.    And it appears to be a charge

| Page 251 |
| --- |

1  adding age discrimination to the prior
2  charge; is that right?
3      A.    That's right.
4      Q.    And you claim that about a
5  week after I was terminated, I was
6  informed by another employee that
7  Mr. Oliver had been moved into my former
8  position, correct?
9          MS. MUHAMMAD:  Object to the
10  form.
11     A.    That's correct.
12     Q.    Now, did you work with Danny
13  Oliver at the plant?
14     A.    Yes, he worked in the same
15  shop.
16     Q.    All right.  And when was that,
17  for how long?
18     A.    Almost two years.
19     Q.    All right.  Were you aware
20  during that two-year period that
21  Mr. Oliver was younger than you?
22     A.    Yes, sir.
23     Q.    Okay.  Younger than forty?

| Page 252 |
| --- |

1      A.    I would say so, yes, sir.
2      Q.    How old did he appear to be?
3      A.    Thirty-five.
4      Q.    So, right after you lost your
5  employment at the end of July, first of
6  August, 2005, you knew that Oliver was
7  younger than you, correct?
8      A.    Yes, sir.
9      Q.    Who was the employee who told
10  you that Oliver had replaced you?
11     A.    I can't recall, sir.
12     Q.    It says about a week after I
13  was terminated, I was informed by another
14  employee that Mr. Oliver had been moved
15  into my former position.  Does that
16  refresh your recollection of who told you
17  that?
18     A.    No, sir, I really can't
19  remember who told me that.
20     Q.    Now, how does Danny Oliver
21  replacing you relate in any way to the
22  claims that you made in your alleged first
23  charge of discrimination?

| Page 253 |
| --- |

1      A.    Repeat that again, sir.
2      Q.    Yes.  How does Danny Oliver
3  replacing you relate in any way to your
4  first charge of discrimination?
5          MS. MUHAMMAD:  I object to the
6  form.
7      A.    Can you give me an example of
8  that?
9      Q.    No, I just want to know how it
10  relates to your first charge because I
11  have never seen the first charge.  I mean,
12  your answer just don't know.  I'm not
13  trying to put words in your mouth.
14     A.    All right.  Repeat the
15  question once again.
16     Q.    All right.  How does Danny
17  Oliver replacing you on your job relate in
18  any way to your first charge of
19  discrimination?
20     A.    I will say he is a lot younger
21  than I am and they just wanted to get me
22  out of there because I'm old and maybe not
23  capable of learning as quick as he is.

64 (Pages 250 to 253)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                October 17, 2007

| | |
|---|---|
| Page 254 | Page 256 |

**Page 254**

1    Q.   Any other information you have
2 of how Danny Oliver replacing you on your
3 job relates to your first job -- first
4 charge of discrimination?
5    A.   He was a light complexion guy
6 compared to me.
7    Q.   Any other information that you
8 have about Danny Oliver replacing you on
9 your job that relates to your first
10 charge?
11    A.   I can't think of anything else
12 at this time, sir.
13    Q.   All right.  There are some
14 documents that the EEOC attached to this
15 charge of discrimination.  It's an EEOC
16 form five.
17    A.   Yes.
18    Q.   Did you type that up?
19    A.   No, sir.
20    Q.   Who did?
21    A.   I have no idea, sir.
22    Q.   Did Ms. Muhammad type it up or
23 her office?

**Page 255**

1    A.   I can't recall, sir.
2    Q.   Okay.  You don't know where it
3 came from?
4       MS. MUHAMMAD:  Object to the
5 form.
6    A.   I can't recall, sir, at this
7 time.
8    Q.   All right.  Look at -- it
9 appears to have been received by the EEOC
10 on January the 27th, 2006, right?
11    A.   Yes, sir.
12    Q.   And this document appears to
13 be incomplete.  If you look at the last
14 page, 1089, it says my life has been
15 ruined because of the, and there appears
16 to be a missing page, right?
17    A.   Yes, sir, it seems like it
18 would be missing.
19       (Whereupon, Defendant's
20       Exhibit 63 was marked
21       for identification.)
22    Q.   You have before you Exhibit
23 63?

**Page 256**

1    A.   Yes, sir.
2    Q.   Now, does this appear to be a
3 charge you filed on January 26, 2006?
4    A.   Yes, sir.
5    Q.   All right.  And it's got a
6 complete statement attached, doesn't it,
7 it's got that missing page?
8    A.   Yes, sir.
9    Q.   All right.  Now, turn back to
10 750.  This document is written in the
11 first person.  It says I, Bobby Lee Sanks,
12 began working with WestPoint Pepperell
13 Stevens in October 1970 and so on.  Do you
14 see that?
15    A.   Yes, sir.
16    Q.   All right.  Did you -- is this
17 your statement?
18    A.   Yes, sir.
19    Q.   All right.  Do you remember
20 now who took your statement?
21    A.   If I wrote it down, sir, yes,
22 sir.
23    Q.   Who did?

**Page 257**

1    A.   My attorney.
2    Q.   Ms. Muhammad?
3    A.   Yes, sir.
4    Q.   Okay.  So, Ms. Muhammad's
5 office typed that up?
6    A.   I can't recall who typed it
7 up, sir, but she took my statement.
8    Q.   You don't type?
9    A.   No, sir.
10    Q.   All right.  So, you gave the
11 information that is recorded in Exhibit
12 63, pages 750 through 753 to Ms. Muhammad?
13    A.   Yes, sir.
14    Q.   Okay.  Now, going back to the
15 charge form, Exhibit 63, it starts out, it
16 says please see attached and then it says
17 original complaint was filed on
18 September 8, 2005.  You don't have a copy
19 of the complaint that was allegedly filed
20 on September the 8th, 2005, do you?
21    A.   No, sir, I don't.
22    Q.   All right.  And this statement
23 as we've already seen, the attached

65 (Pages 254 to 257)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                            BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

Page 258

1   statement is dated January 27, 2006,
2   right?
3        A.   Yes, sir.
4        Q.   And the charge is dated
5   January 26, 2006, right?
6        A.   Yes, sir.
7        Q.   In this charge, Exhibit 63,
8   alleges race, color, retaliation, and
9   harassment, right?  Right here
10  (indicating).
11       A.   Yes.
12       Q.   You didn't file a charge on
13  September the 8th, 2005, did you?
14           MS. MUHAMMAD:  Object to the
15  form.
16       A.   Yes, sir.
17       Q.   Where is it?
18       A.   I filed it with the EEOC.
19       Q.   Where is it?
20       A.   I don't have it present with
21  me, sir.
22       Q.   Well, you've got it at home?
23       A.   I can't recall.

Page 259

1        Q.   You didn't file one, did you?
2        A.   I carried my statement to
3   them.
4        Q.   What statement?
5        A.   My charges that I brought.
6        Q.   Well, what is it that you say
7   you carried to them?
8        A.   My claim that being
9   discriminated, harassed, retaliated, and
10  race.
11       Q.   Is that something written
12  down?
13       A.   Yes, sir.
14       Q.   On what?
15       A.   Paper.
16       Q.   Have you got a copy of it?
17       A.   No, sir.
18       Q.   If you gave it to the EEOC, do
19  you think they would have a copy of it?
20       A.   I'm not sure, sir.
21           (Whereupon, Defendant's
22           Exhibit 64 was marked
23           for identification.)

Page 260

1        Q.   You have before you Exhibit
2   64?
3        A.   Yes, sir.
4        Q.   And that says it's the EEOC's
5   case log, doesn't it?
6        A.   Yes, sir.
7        Q.   Okay.  And the case log entry
8   for 1/27, 2006 is the same date that the
9   EEOC received your statement in Exhibit 63
10  that we just looked at, right?
11       A.   Yes, sir.
12       Q.   And this case log says that
13  the EEOC did not take a charge from you on
14  September 8, 2005, but told you to go to
15  an attorney, correct?
16           MS. MUHAMMAD:  Object to the
17  form.  Have you read this statement to see
18  that it says that?
19           MR. SUGGS:  Ms. Muhammad, if
20  you want to object, object.  I'll question
21  the witness.  Don't interrupt.
22           MS. MUHAMMAD:  I'm going to
23  instruct the witness not to answer until

Page 261

1   he's read the statement, if he hasn't read
2   it.
3        A.   What was the question again?
4        Q.   The case log says that the
5   EEOC did not take a charge from you on
6   September the 8th, 2005, but told you to
7   go to an attorney, correct?
8        A.   I can't recall that, sir.
9        Q.   All right.  Let me read it to
10  you.  Wanda Osborne did not take the
11  charge, so charging party had to go to an
12  attorney.  Do you see that?
13       A.   Yes, sir.
14       Q.   And was the attorney you went
15  to Ms. Muhammad?
16       A.   Yes, sir.
17       Q.   Now, look at the very bottom.
18  Intake supervisor states that charging
19  party was untimely by two days.  However,
20  had charge been taken when charging party
21  entered, BIDO, which I take it to mean is
22  the Birmingham district office, this would
23  not have happened.  ISA does not believe

66 (Pages 258 to 261)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 262

1  that the charging party should be
2  penalized because of a lack of will to
3  perform our jobs.  Do you see that?
4      A.  Yes, but I can't get an
5  understanding of it.
6      Q.  All right.  Well, when you
7  talked to the EEOC on January the 27th,
8  2006, did they tell you your charge was
9  late?
10     A.  No, sir.
11     Q.  You do -- did you go to the
12  EEOC on September the 8th, 2005?
13     A.  Yes, sir.
14     Q.  But you did not file a charge?
15     A.  I can't recall that, sir.
16     Q.  Okay.  Do you recall talking
17  to a lady named Ms. Osborne?
18     A.  Yes, sir.
19     Q.  Did she tell you she couldn't
20  take your charge because you didn't have a
21  claim?
22         MS. MUHAMMAD:  I object to the
23  form.

Page 263

1      A.  I can't recall what she said,
2  sir, at that time.
3         (Whereupon, Defendant's
4         Exhibit 65 was marked
5         for identification.)
6         THE WITNESS:  You need to
7  excuse me.  I need to go to the restroom.
8         MR. SUGGS:  Sure.
9         (Whereupon a break was had from
10        2:55 P.M. until 3:10 P.M.)
11     Q.  (BY MR. SUGGS:)  All right.
12  You have before you Exhibit 65?
13     A.  Yes, sir.
14     Q.  All right.  We got this
15  document from the EEOC.  Do you recognize
16  your name, Bobby Sanks?
17     A.  Yes, sir.
18     Q.  The date of hire says October
19  '71, and actually I think we agreed that
20  it was 1970, didn't we?
21     A.  Yes.
22     Q.  And terminated 7/29/05 for
23  tardiness, correct?

Page 264

1      A.  That's what it says.
2      Q.  So, these are notes of the
3  EEOC dated September the 8th, 2005,
4  correct?
5         MS. MUHAMMAD:  Object to the
6  form.
7      A.  Yes, sir, that's what it says.
8      Q.  All right.  And does this look
9  like the information you gave the EEOC on
10  September the 8th, 2005?
11     A.  Is this what they wrote?
12     Q.  That's what they wrote based
13  on what you told them, as I understand it.
14     A.  Yes, I can't even understand
15  what this is, really.
16     Q.  All right.  It says 7/05, CP
17  complained, that's charging party, that's
18  you, about immediate supervisor, Perry
19  Henderson, and also Dudley Gregory to HR
20  about harassing him --
21         MS. MUHAMMAD:  Object to the
22  form.
23     Q.  -- i.e., not doing his work

Page 265

1  properly, et cetera.  Charging party
2  stated he did not have knowledge, wrote up
3  for not performing job, investigation done
4  and nothing found wrong.  After
5  complaining, charging party was late,
6  subsequently discharged, three instances
7  in a year period.  Is that what you told
8  them?
9      A.  I can't recall telling them
10  that, sir.
11     Q.  All right.  But you did go to
12  see them on September the 8th, 2005,
13  that's when you went to the EEOC, correct?
14     A.  Yes.
15     Q.  And it says at the bottom, no
16  claim, right?
17     A.  That's what it says.
18     Q.  And that's what Ms. Osborne
19  told you, you didn't have a claim of
20  discrimination and she did not take your
21  charge, correct?
22         MS. MUHAMMAD:  Object to the
23  form.

67 (Pages 262 to 265)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 266

1    Q.   Correct?
2    A.   I can't recall exactly what
3  she said, sir.
4    Q.   She didn't take your charge on
5  September the 8th, 2005, did she?
6    A.   No, sir.
7    Q.   I'm sorry?
8    A.   No, sir.
9    Q.   Okay.  So, you didn't file a
10  charge on September the 8th, 2005, did
11  you?
12        MS. MUHAMMAD:  Object to the
13  form.
14    A.   I presented her with what I
15  had.
16    Q.   You presented her with
17  information that's listed in Exhibit 65,
18  right?
19        MS. MUHAMMAD:  I object to the
20  form.
21    A.   I can't deny what this is,
22  what I had on that paper at the time, sir.
23    Q.   I'm sorry?

Page 267

1    A.   I can't recall what exactly I
2  had on that paper at that time.
3        (Whereupon, Defendant's
4        Exhibit 66 was marked
5        for identification.)
6    Q.   You have before you
7  Exhibit 66?
8    A.   Yes, sir.
9    Q.   And Lateefah Muhammad, your
10  attorney, right?
11    A.   Yes, sir.
12    Q.   And this has to do --
13  Exhibit 66 has to do with your charge,
14  right?
15    A.   Predetermination interview?
16    Q.   Correct.
17    A.   Yes, sir.
18    Q.   All right.  Read along with
19  me.  This charge was filed on 1/27/06.
20  The charge does not give dates of events.
21  The charging party failed to state a claim
22  under Title VII.  Do you see that?
23    A.   Yes, sir.

Page 268

1    Q.   Did I read it correctly?
2    A.   Yes, sir.
3    Q.   And this predetermined
4  interview doesn't make any mention of a
5  charge filed on September the 8th, 2005,
6  does it?
7    A.   No, sir.
8    Q.   Now, I just want to make
9  certain that I'm correct on this.  You are
10  not working now?
11    A.   No, sir.
12    Q.   Tell me when you worked for
13  the postal service.
14    A.   '06, the year '06.  I was -- I
15  worked until the end of December '06.
16    Q.   You worked until the end of
17  December, 2006?
18    A.   Yes, sir.
19    Q.   Is that after you had your
20  back surgery?
21    A.   Yes, sir.
22    Q.   Okay.  Was that as like a
23  substitute?

Page 269

1    A.   Subcarrier.
2    Q.   Huh?
3    A.   A subcarrier.
4    Q.   What does subcarrier mean?
5    A.   That means you just mostly
6  work on the weekends, on Saturdays and
7  fill in if they need somebody during the
8  weekdays.
9    Q.   So, you filled in when
10  somebody was absent or on vacation or
11  something like that?
12    A.   Yes, sir.
13    Q.   A rural route?
14    A.   Yes, sir.
15    Q.   And why did you stop doing
16  that job?
17    A.   I couldn't -- my back wouldn't
18  let me perform.
19        (Whereupon, Defendant's
20        Exhibit 67 was marked
21        for identification.)
22    Q.   Now, according to Exhibit 67,
23  you worked for CV Holdings through Kelly

68 (Pages 266 to 269)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                    October 17, 2007

Page 270

1   Temporary Services from September the 5th,
2   2006 to October the 2nd, 2006. Does that
3   comport with your recollection?
4       A.   Yes, sir.
5       Q.   And that you worked a total of
6   168.15 regular hours and forty-eight hours
7   of overtime?
8       A.   I don't know exactly what --
9   how much overtime I had. The hours, sir,
10  could be about right.
11      Q.   Well, you can see what the
12  form says, it says 168.15 and overtime,
13  forty-eight. Do you have any reason to
14  dispute that?
15      A.   No, sir.
16      Q.   What was your hourly rate of
17  pay?
18      A.   Nine dollars an hour.
19           (Whereupon, Defendant's
20           Exhibit 68 was marked
21           for identification.)
22      Q.   Now, Exhibit 68 appears to be
23  earnings summary report from Kelly

Page 271

1   Services that show hours worked from May,
2   2006 through October 2006, which I think
3   would include your pay from CV Holdings.
4   Do you agree?
5       A.   I didn't understand you, sir.
6       Q.   This shows -- Exhibit 68 shows
7   earnings from May 14, 2006 to September 3,
8   2006, which would overlap with the time
9   that you worked at CV Holdings, so it
10  appears to me that this record from Kelly
11  covers work at CV Holdings plus, perhaps,
12  other work?
13      A.   Yes, sir.
14      Q.   Okay. Did you apply at
15  Wal-Mart?
16      A.   Did I apply at Wal-Mart?
17      Q.   (Nods head.)
18      A.   Yes, sir.
19           (Whereupon, Defendant's
20           Exhibit 69 was marked
21           for identification.)
22      Q.   Can you identify your
23  application at Wal-Mart as Exhibit 69?

Page 272

1       A.   Yes, sir.
2       Q.   If you look over on the very
3   last page, it appears that you applied on
4   April the 12th, 2006. Do you have any
5   reason to dispute that?
6       A.   No, sir.
7       Q.   Were you interviewed for a job
8   at Wal-Mart?
9       A.   No, sir.
10      Q.   Did you apply for any
11  particular position?
12      A.   Yes, sir.
13      Q.   What?
14      A.   Just a job.
15      Q.   Oh, just any job?
16      A.   Just any job.
17      Q.   All right. And do you know
18  why you weren't hired?
19      A.   No, sir.
20           (Whereupon, Defendant's
21           Exhibit 70 was marked
22           for identification.)
23      Q.   Exhibit 70 appears to be an

Page 273

1   application that you submitted at A-1
2   Employment. Do you recall applying with
3   A-1?
4       A.   Yes, sir.
5       Q.   Are those your signatures on
6   page 970?
7       A.   Yes, sir.
8       Q.   Is October 18, 2005 the date
9   you signed?
10      A.   Yes, sir.
11      Q.   All right. Now, up here, it
12  says have you ever been self-employed,
13  yes, business name, Bobby Sanks, length of
14  time, three and a half months. What did
15  you do by way of self employment?
16      A.   Doing lawn service.
17      Q.   From when to when?
18      A.   In the off season, I just did
19  it for about -- well, during the time that
20  I was out of work. I can't recall exactly
21  when that were.
22      Q.   Was it after your employment
23  at WestPoint was terminated?

                                    69 (Pages 270 to 273)

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031              http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

Page 274

1    A.   Yes, sir.
2    Q.   How much money did you earn?
3    A.   What do you mean by how much
4  did I earn?
5    Q.   Through your lawn service.
6    A.   About three hundred dollars a
7  month.
8    Q.   That's net after you paid your
9  expenses?
10    A.   It was just three hundred
11  dollars.
12    Q.   I'm sorry?
13    A.   It was just three hundred
14  dollars expenses, you know, all of that
15  just went in together.  You're talking
16  about after I cleared?
17    Q.   Did you clear three hundred
18  dollars a month?
19    A.   I never did try to clear
20  nothing like -- deducting anything like
21  that, you know, it was just three hundred
22  dollars, three hundred dollars, sir.
23    Q.   What jobs did you get through

Page 275

1  A-1?
2    A.   I got -- I worked at Benteler
3  Automotive.
4    Q.   What did you do at Benteler?
5    A.   Three or four different --
6  they train you doing three or four
7  different things, sir.
8    Q.   Look at 971.  Did you start at
9  Benteler on 10/29/05?
10    A.   Yes, sir.
11    Q.   And did you quit on
12  February 4, 2006?
13    A.   Yes, sir.
14    Q.   Why did you quit?
15    A.   They was no longer hiring.  It
16  was just through a temp service.  They put
17  a freeze on hiring people.
18    Q.   Well, you already had a job,
19  they didn't have to hire you?
20    A.   No, sir, I was just temporary.
21    Q.   This says you voluntarily
22  quit.
23    A.   Well, any time -- once you're

Page 276

1  a temp and then they put a freeze on
2  hiring, you're just working for them, you
3  know, and ain't expected to get hired.
4    Q.   Oh, I see.  You could have
5  continued working as a temp, but you
6  didn't want to because you didn't think
7  you would get hired permanently?
8    A.   No, sir.
9    Q.   That's not right?
10    A.   Yes, sir, that's right.
11    Q.   Okay.  All right.  So, you
12  were working temporarily, you thought
13  there would be some chance of getting on
14  permanently, they put a freeze on hiring
15  permanent folks, so you said I'm not going
16  to get hired permanently, I quit?
17    A.   Yes, sir.
18    Q.   Did that keep you from drawing
19  unemployment?
20    A.   No, sir.
21    Q.   You did draw unemployment
22  after Benteler?
23    A.   No, sir.

Page 277

1    Q.   You did not?
2    A.   No, sir.
3       (Whereupon, Defendant's
4       Exhibit 71 was marked
5       for identification.)
6    Q.   You have got Exhibit 71 in
7  front of you?
8    A.   Yes, sir.
9    Q.   How about turn with me to page
10  919.  And the top window says last day
11  worked, 2/4/06, I was working an
12  assignment at Bentley, I had been told by
13  my supervisor, Jeff, that I would be hired
14  on permanent after my ninety-day probation
15  was over.  The company put on a hiring
16  freeze and I was not hired permanent.  I
17  would have been making three to four
18  dollars more per hour and I felt I had no
19  choice but to quit when I was not hired on
20  permanent.  Did they get it right?
21    A.   That's right.
22    Q.   And the bottom block filled
23  out by the company says, he had not been

70 (Pages 274 to 277)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 278

1  told he would be hired on permanent. We
2  have no information on anyone telling him
3  he would be hired permanent. He was told
4  that after ninety days, the company may
5  hire temporary employees on a permanent
6  basis. Did I read that correctly?
7      A.   You read it correctly.
8      Q.   Now, you could have kept on
9  working at Benteler as a temp, right?
10     A.   Yes, sir.
11         (Whereupon, Defendant's
12         Exhibit 72 was marked
13         for identification.)
14     Q.   Look at page 883, please.
15 This is from the Alabama Department of
16 Industrial Relations. Page six says job
17 referrals for Benteler, that's where you
18 worked as a temp, Hightex, and Leonard
19 Peterson & Company. Did you get hired at
20 any of those places?
21     A.   No, sir.
22         (Whereupon, Defendant's
23         Exhibit 73 was marked

Page 279

1         for identification.)
2      Q.   Now, this is Exhibit 73 and
3  you see at the top it says Alabama
4  Department of Industrial Relations?
5      A.   Yes, sir.
6      Q.   All right. And you see it
7  says certified, true copy?
8      A.   Yes, sir.
9      Q.   All right. And this has to do
10 with your application for unemployment
11 benefits after you left WestPoint. Look
12 at 931, please. And you see that this
13 window is entitled discharge?
14     A.   Yes, sir.
15     Q.   And says reasons, tardiness?
16     A.   Yes, sir.
17     Q.   And says Perry Henderson,
18 supervisor?
19     A.   Yes, sir.
20     Q.   And it says I was late for
21 work on 7/27/05. Did you commit the act
22 your employer alleges, yes. Any prior
23 warnings for same or similar act, yes. Is

Page 280

1  that what you told them?
2      A.   Repeat this again, now.
3      Q.   All right. It says did you
4  commit the act your employer alleges, yes.
5  Any prior warnings for the same or similar
6  act, yes. My question was: Is that what
7  you told them at the Alabama Department of
8  Industrial Relations?
9      A.   I can't recall.
10     Q.   But you agree the box says
11 what I said it does?
12     A.   Yes.
13     Q.   All right. Look over at 933.
14 And this is the same kind of box we looked
15 at earlier. Claimant's statement. Last
16 day worked, 7/29/05. Are you with me?
17     A.   Yes, sir.
18     Q.   I was fired on 7/29/05 for
19 excessive tardies. According to policy,
20 you have to be clocked in by 6:59 a.m.,
21 7:00 a.m. is late. I was not clocked in
22 by 7:00 a.m. I was just a few seconds
23 late. I had been warned before on 7/21/05

Page 281

1  about being tardy. I had also been
2  tardy --
3         MS. MUHAMMAD: 7/12.
4      Q.   -- on 7/27/05, but I didn't
5  get that warning until the day I was
6  fired. I was told on 7/12/05 that I only
7  would be allowed two more tardies and
8  would be fired. I did get the policy at
9  hire. There was no reason that I was late
10 on 7/29/05. I was just running late. I
11 didn't call to let anyone know I would be
12 late because I thought I was going to make
13 it. Did I read that correctly?
14     A.   Yes, sir.
15     Q.   Except I think I said at one
16 point 7/21 and it should have been 7/12.
17 Is that what you told them?
18     A.   I can't recall, sir, but
19 that's what you read.
20     Q.   Yes, you don't have any reason
21 to dispute the way they put it down, do
22 you?
23     A.   I can't recall exactly what

71 (Pages 278 to 281)

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 282

1  that is, sir.
2      Q.   All right.  But they got it
3  substantially -- listening to what I read,
4  that's substantially correct, isn't it?
5      A.   I can't recall it, sir, you
6  know.
7      Q.   What is it that you can't
8  recall?
9      A.   I can't recall --
10     Q.   I'm not asking you to recall
11 what you told them.  I am just asking you
12 to reflect on what I just read and I'm
13 asking you if that's correct?
14     A.   Yes, that's correct.
15     Q.   Okay.  And you admit you were
16 warned on 7/12/05, that if you were late
17 two more times, you would be discharged?
18         MS. MUHAMMAD:  Object to the
19 form.  He said he didn't recall.
20     A.   I didn't recall it, sir.
21     Q.   Well, you knew you couldn't
22 get three warnings in a twelve-month
23 period, correct?

Page 284

1  was in my file, it deal with all of those
2  categories you just named.
3      Q.   All right.  Well, I don't want
4  to go read your file, I just want you to
5  tell me.
6      A.   It have to do with race, it
7  have to do with age discrimination, it
8  have to do with discrimination and
9  retaliation.
10     Q.   All right.  Well, do you have
11 any other events that you claim were
12 discriminatory that you haven't already
13 told me about?
14     A.   I can't recall at this time,
15 sir.
16     Q.   All right.  You don't have any
17 claims that your supervisor, Perry
18 Henderson, talked to you in a harsh tone
19 of voice on account of your race, do you?
20     A.   Yes, sir.
21     Q.   You do?
22     A.   Yes, sir.
23     Q.   Tell me about that.

Page 283

1      A.   Six months, sir.
2      Q.   Six months, you knew you
3  couldn't get three warnings in a six-month
4  period, you knew that?
5      A.   Yes.
6      Q.   You have got to answer
7  verbally.
8      A.   Yes.
9      Q.   And you understood the
10 tardiness policy?
11     A.   Yes, sir.
12     Q.   And you were late two more
13 times, right, the 27th and 29th, correct?
14     A.   Yes, sir, according to the
15 clock.
16     Q.   Now, we have been talking for
17 a good while and I want to make sure I
18 understand all of your claims.  Do you
19 have any other claims of discrimination or
20 retaliation or, you know, age or race or
21 color, whatever, that we haven't talked
22 about?
23     A.   Sir, all of my claims and what

Page 285

1      A.   Well, it was just the way he
2  act towards me, just, you know, race wise,
3  and just in a harsh tone of voice.
4      Q.   What information do you have,
5  assuming that he did speak to you in a
6  harsh tone of voice, that he spoke to you
7  in a harsh tone of voice because of your
8  race?
9      A.   What information do I have on
10 that?
11     Q.   Yes.
12     A.   Just that it happened to me,
13 sir.
14     Q.   Okay.  Any other information
15 you have to support your claim that it was
16 racially discriminatory for Perry
17 Henderson to speak to you in a harsh tone
18 of voice?
19     A.   Just only that he made his --
20 you know, he just didn't like the fact
21 that I had made my claims against him.
22     Q.   Back in 1985?
23     A.   It led all the way through

72 (Pages 282 to 285)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.          October 17, 2007

Page 286

1 2005.
2    Q.   I'm sorry?
3    A.   From '85 to 2005.
4    Q.   Well, now, I know you claimed
5 that you protested the failure to give you
6 an automatic increase, as you call it,
7 right?
8    A.   That's right.
9    Q.   And I know you went to Amber
10 Stevens, we went through all of that.
11 What other claims did you make or
12 complaints did you make against Perry
13 Henderson?
14    A.   Just verbal complaints.
15    Q.   To whom?
16    A.   To personnel.
17    Q.   Who?
18    A.   Ken Henderson.
19    Q.   When?
20    A.   I'm not familiar with the
21 year, sir.
22    Q.   About what?
23    A.   About the way Perry was

Page 287

1 addressing me when he talked to me.
2    Q.   Anything else to support your
3 claim that you were racially discriminated
4 against by Perry Henderson talking harshly
5 to you?
6    A.   Like I say, they talked about
7 my job.
8    Q.   No, I'm talking about talking
9 harshly to you.
10    A.   Harshly.  He told me that, you
11 know, I had better have all of those
12 bullet hooks working, I had better have
13 lights and stuff, they all better be
14 working.
15    Q.   Are those parts of your job?
16    A.   Yes, sir.
17    Q.   Okay.  You were supposed to
18 have the bullet hooks and pens properly
19 fixed, weren't you?
20    A.   I understand that, yes, sir.
21    Q.   And you were supposed to have
22 the emergency lights working, right?
23    A.   Yes, sir.

Page 288

1    Q.   Okay.  Any other claims -- or
2 any other information that you have to
3 support your claim that you were racially
4 discriminated against by Perry Henderson
5 talking to you harshly?
6    A.   That's it.  I can't think of
7 anything at this time, sir.
8    Q.   Now, any information that you
9 have to support your claim that you were
10 treated differently because you are a dark
11 complected black person as opposed to a
12 lighter skinned black person?
13    A.   Yes, sir.
14    Q.   What?
15    A.   I couldn't get proper tools to
16 do my job.
17    Q.   From whom?
18    A.   From Dudley.
19    Q.   When?
20    A.   I don't know what year it was.
21 From '80 -- from 1985 until 2003 or '4.
22    Q.   What kind of tool did you
23 want?

Page 289

1    A.   Hand drill, portable electric
2 drill, a knock out, bits and stuff,
3 control boxes.
4    Q.   Any witnesses?
5    A.   Yes, sir.
6    Q.   Who?
7    A.   I had to borrow my tools, so
8 there were witnesses I had to borrow tools
9 from.  That was Steve Moss, that was Danny
10 Oliver.
11    Q.   Anything else to support your
12 claim that you were discriminated against
13 because of your dark complexion?
14    A.   I can't recall at this time.
15    Q.   Do you have any other events
16 that you want to complain about in this
17 lawsuit that you haven't already told me
18 about?
19    A.   Rephrase that again.
20    Q.   Do you have any other events
21 that you claim are discriminatory that you
22 want to complain about in this lawsuit
23 that you haven't already told me about?

73 (Pages 286 to 289)

Page 290

1     A.   Not at this time, sir.
2     Q.   Okay. You don't have any
3  claims about white shop employees being
4  given the easier work orders, less work,
5  allowed to take unscheduled breaks,
6  allowed to talk, so on?
7     A.   Well, since you brought that
8  up, sir.
9     Q.   Do you or not?
10    A.   Yes, sir.
11    Q.   What's your claim?
12    A.   I claim exactly what you said,
13  white was --
14    Q.   I'm sorry?
15    A.   White were having smoke
16  schedules, smoke breaks and blacks wasn't
17  allowed.
18    Q.   Do you smoke?
19    A.   No, sir.
20    Q.   Eddie Moss smoke?
21    A.   Yes, sir. Eddie, no, his name
22  is Steve Moss.
23    Q.   Oh, Steve Moss.

Page 291

1     A.   Yes, sir.
2     Q.   He smokes?
3     A.   Yes, sir.
4     Q.   How about Eddie Hall?
5     A.   No, sir.
6     Q.   Who are the white people that
7  you claim were given easier jobs and more
8  frequent breaks, so forth?
9     A.   Rocky Owens.
10    Q.   When?
11    A.   2004, 2005.
12    Q.   And on what occasion?
13    A.   On many occasions. I can't be
14  specific on what occasion.
15    Q.   And what do you claim that he
16  was permitted to do?
17    A.   What do you mean, sir?
18    Q.   Well, what is it that you
19  claim he got to do that you didn't get to
20  do?
21    A.   Well, they stand around and
22  talk, wasn't nothing ever said as far as
23  you need to be performing your job duties

Page 292

1  and stuff like that.
2     Q.   All right. Any other
3  information you have to support your claim
4  that whites were given easier work orders,
5  less work, given unscheduled breaks,
6  allowed to talk, so on?
7     A.   All of that, sir, comes up,
8  all of that is what has been said about
9  them as well, that's true.
10    Q.   All right. Anything else you
11  want to tell me about your claims in that
12  regard of easier work orders, less work,
13  unscheduled breaks, allowed to talk, so
14  on?
15    A.   The work schedule is
16  performing my p.m. work jobs is that when
17  you're working on those jobs, you work to
18  try to get those operating and get them
19  running, and, you know, you look forward
20  to doing that. And then when they come
21  around and say that, you know, you are
22  taking a break, well, you done stayed over
23  out there working on the job to get it

Page 293

1  performed, get it running, so --
2     Q.   Any other information you want
3  to give me about your allegations that
4  whites had an easier time of it?
5     A.   No, sir.
6     Q.   Okay. Now, you don't have any
7  claims that Dudley Gregory was allowed to
8  be tardy without discipline, do you?
9     A.   Rephrase that, sir. Repeat
10  that.
11    Q.   You don't have any claims that
12  Dudley Gregory was allowed to be tardy
13  without discipline, do you?
14    A.   Dudley Gregory wasn't tardy,
15  sir.
16    Q.   He was?
17    A.   He wasn't.
18    Q.   He wasn't tardy?
19    A.   No, sir.
20    Q.   Okay. He was a supervisor,
21  wasn't he?
22    A.   He was a supervisor.
23    Q.   Well, you say he wasn't tardy.

74 (Pages 290 to 293)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                        October 17, 2007

---

Page 294

1  Did he have partial absences?
2      A.   He had all of those, sir, but
3  I don't think they counted against him.
4      Q.   What evidence do you have that
5  they weren't counted against him?
6      A.   He was writing his own time.
7      Q.   You don't have any age
8  discrimination claims, do you?
9      A.   What do you mean, sir?
10     Q.   You don't claim that you were
11 discriminated against because of your age,
12 do you?
13     A.   Well, if they hire someone
14 younger than me, yes, sir.
15     Q.   All right.  What information
16 do you have that someone younger than you
17 was hired?
18     A.   Well, I know for a fact that
19 Danny Oliver was hired and took my job
20 position.
21     Q.   Do you know whether Danny
22 Oliver was just given the hoist as an
23 additional duty to whatever he was already

---

Page 295

1  doing?
2      A.   No, sir.
3      Q.   Have you given me all of the
4  information that you have about your
5  claims of retaliation?
6      A.   I can't know right as of yet,
7  sir.
8      Q.   Sorry?
9      A.   I don't know.
10     Q.   Well, I don't want to be
11 surprised later.  I want to know
12 everything that you are complaining about.
13     A.   I can't remember everything,
14 sir.
15     Q.   Well, can you remember
16 anything that you haven't already told me
17 about your claims of retaliation?
18     A.   Well, retaliation, I can't
19 hardly remember some stuff, sir.  Claims
20 of retaliation.  For instance, Dudley
21 would send me out on a work order and then
22 he would come back and say that I need to
23 shave, that, you know, I need to be sent

---

Page 296

1  home because I have a facial beard or
2  something like that.
3      Q.   So, the dust mask wouldn't
4  fit, right?
5      A.   That's what he claimed.
6      Q.   Okay.  Any other information
7  that you have that you haven't already
8  told me about your claims of retaliation?
9      A.   No, sir.  I can't think of
10 anything.
11     Q.   Now, if we ever get to trial,
12 who would you call to testify to support
13 your claims?
14     A.   Am I allowed to tell you that,
15 sir?
16     Q.   Sure.  You are required to.
17     A.   Well, I would call Steve Moss,
18 Eddie Hall.  Now, sir, would this -- what
19 would this -- you said no matter -- who
20 the witnesses are?
21     Q.   Yes.
22     A.   To testify in my behalf?
23     Q.   Yes.

---

Page 297

1      A.   Is that what you said?
2      Q.   Yes, that's what I want to
3  know.  Steve Moss, Eddie Hall, who else?
4      A.   Doris Wilson.  Doris Wilson.
5      Q.   Doris?
6      A.   Yes, sir.  Billy Hill, Elijah
7  Harris.
8      Q.   Clyde?
9      A.   Elijah Harris.
10     Q.   Elijah.
11     A.   Ladolphus Floyd, Carlton
12 Jones, Quintin Martin.
13     Q.   First name?
14     A.   Quinton.
15     Q.   Q-u-i-n-t-i-n?
16     A.   Yes, sir.
17     Q.   Okay.
18     A.   Lawrence Lunceford.
19     Q.   Last name?
20     A.   Lunceford, Ed Walton, James
21 Smith.  I don't know the name, but I know
22 the company.  That would be the elevator
23 service.

---

75 (Pages 294 to 297)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

Page 298

1    Q.   Otis or --
2    A.   Otis Elevator Service out of
3  Columbus, Georgia.
4    Q.   All right.  Who else?
5    A.   Royce Crane.
6    Q.   All right.  Who else?
7    A.   Jimmy Richardson.
8    Q.   All right.
9    A.   Gloria Owens, Jeannette Sanks,
10  Don Sanks.
11   Q.   Don?
12   A.   Yes, sir.  Margaret Long,
13  Rocky Owens, Roy Lawson, and that's all I
14  can think of as of now.
15   Q.   All right.  What would you
16  expect Steve Moss to say?
17   A.   I would expect him to tell the
18  truth.
19   Q.   Well --
20   A.   I wouldn't know what he would
21  say.
22   Q.   -- specifically.  You don't
23  know what he would say?

Page 299

1    A.   No, sir.
2    Q.   What would you expect Eddie
3  Hall to say?
4    A.   I wouldn't know what he would
5  say.
6    Q.   What would you expect Doris
7  Wilson to say?
8    A.   I wouldn't know what they
9  expect to say.
10   Q.   Who is Doris Wilson?
11   A.   She's an employee at WestPoint
12  Stevens.
13   Q.   Where does she work?
14   A.   Crawford.
15   Q.   How would she know what you
16  did or failed to do?
17   A.   She could testify that I could
18  perform my job.
19   Q.   Billy Hill?
20   A.   Sir, I have no idea what none
21  of them would say, depended on the
22  questions they were asked.
23   Q.   You don't know what any of

Page 300

1  these witnesses would say?
2    A.   No, sir.
3    Q.   Not a one of them?
4    A.   No, sir.
5    Q.   What about your wife?
6    A.   I don't know what she would
7  say.
8    Q.   She doesn't know anything
9  about what you did here other than what
10  you told her, does she?
11   A.   Exactly right, sir.
12   Q.   And that would go for Don
13  Sanks, too, right?
14   A.   Yes, sir.
15   Q.   Did Carlton Jones work at this
16  mill?
17   A.   Yes, sir.
18   Q.   Quintin Martin?
19   A.   Yes, sir.
20   Q.   Lawrence Lunceford?
21   A.   Yes, sir.
22   Q.   James Smith?
23   A.   No, sir.

Page 301

1    Q.   Where did he work?
2    A.   He was an elevator inspector
3  over all of the elevators.
4    Q.   Does he work for the State?
5    A.   Yes, sir.
6    Q.   He does?
7    A.   I think so, sir.
8    Q.   Jeremy -- no, I'm sorry, Jimmy
9  Richardson?
10   A.   He worked in the cloth room,
11  worked for the company.
12   Q.   And would his testimony be
13  like Doris Wilson's?
14   A.   I would say so, sir.
15   Q.   Gloria Owens, who is she?
16   A.   My sister.
17   Q.   What does she know?
18   A.   I don't know, what I've told
19  her.
20   Q.   Margaret Long?
21   A.   She worked for the company as
22  well.
23   Q.   Where?

76 (Pages 298 to 301)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                              BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                October 17, 2007

Page 302

1    A.   Cloth room.
2    Q.   Rocky Owens?
3    A.   He worked for the company.
4    Q.   Roy Lawson?
5    A.   He worked for the company.
6    Q.   All right.  You know this mill
7  is closed, don't you?
8    A.   Yes, sir.
9    Q.   So, if you'd continued to
10  work, you would have eventually lost your
11  job anyway, right?
12    A.   I don't know, sir.
13       MS. MUHAMMAD:  Objection.
14  Object to the form.
15    Q.   Have you identified any expert
16  witness who would testify in this trial?
17    A.   I don't understand that
18  question, sir.
19    Q.   Expert, expert economist,
20  doctor, anything, have you identified any
21  expert?
22    A.   No, sir.
23    Q.   What do you want the court to

Page 303

1  do for you if you win?
2    A.   Whatever my attorney would
3  advise, sir.
4    Q.   You don't have anything in
5  mind?
6    A.   Just whatever she has stated,
7  sir.
8    Q.   Okay.  Is Ms. Muhammad
9  representing you on an hourly or a
10  contingency basis?
11    A.   Rephrase that again, sir.
12    Q.   Is Ms. Muhammad representing
13  you on an hourly basis or a contingency
14  basis?
15    A.   I don't understand that.
16    Q.   Hourly means she charges by
17  the hour, you know, like ten dollars an
18  hour.  Contingency means if you win
19  something, she gets part of it.
20    A.   Yes, sir.
21    Q.   Which is it, or is it both?
22    A.   Continuous.
23    Q.   Contingency?

Page 304

1    A.   Yes, sir.
2    Q.   What's the arrangement?
3       MS. MUHAMMAD:  I object.
4    A.   I don't know the arrangement,
5  sir.
6    Q.   You don't know what the
7  contingency agreement is?
8    A.   What do you mean, sir, explain
9  that.
10    Q.   Well, if you get a recovery,
11  what part does she get?
12    A.   We haven't discussed the
13  percentage or nothing like that, sir.
14    Q.   Do you have a fee agreement?
15    A.   I can't recall, sir.
16    Q.   Have you incurred any expenses
17  to date?
18    A.   No, sir.
19    Q.   You haven't had to pay
20  Ms. Muhammad any money?
21    A.   No, sir.
22    Q.   Do you anticipate any expenses
23  in the future?

Page 305

1    A.   No, sir.
2    Q.   Do you have any written or
3  recorded statements from anybody that you
4  named might be a witness?
5    A.   No, sir.
6    Q.   Now, when you worked as an
7  electrician at the mill, could you follow
8  a schematic?
9    A.   As best I could, sir.
10    Q.   I mean, could you, not as best
11  you could, but could you follow one?
12    A.   No, sir.
13    Q.   No?
14    A.   No, sir.
15    Q.   Are you familiar with people
16  in the shop that complained that they
17  ought to make more money than you because
18  you were at top pay and they had to help
19  you run your job?
20    A.   Say that again, sir.
21    Q.   Are you familiar with people
22  in the shop who complained to Dudley and
23  Henderson, Perry Henderson, that you were

77 (Pages 302 to 305)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                           BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

Page 306

1  at top pay and that you were making more
2  money than they were and they had to help
3  you run your job?
4      A.  No, sir, I'm not familiar with
5  that.
6      Q.  Were you at top pay?
7      A.  Yes, sir.
8      Q.  When you got warnings, were
9  Dudley Gregory and Perry Henderson both
10 there normally?
11     A.  They were there for the
12 write-ups, sir, to sign the paper.
13     Q.  Is it true that you had
14 trouble rewiring hand controls for a
15 hoist?
16     A.  In the beginning, sir, until I
17 learned them.
18     Q.  How about toward the end of
19 your employment?
20     A.  No, sir.
21     Q.  Were you still having trouble?
22     A.  No, sir.
23     Q.  Did the shop weld the pins to

Page 307

1  the hoist?
2      A.  Yes, sir.
3      Q.  And that was a safety
4  function, right?
5      A.  Yes, sir.
6      Q.  So, a lot of your job in
7  inspecting these hoists was safety
8  related, right?
9      A.  Yes, sir.
10     Q.  And the same with the
11 elevators?
12     A.  Yes, sir.
13     Q.  I mean, somebody could get
14 killed with a hoist or an elevator, right?
15     A.  Yes, sir.
16     Q.  And you checked out those pins
17 monthly?
18     A.  Yes, sir.
19     Q.  And then every five years, you
20 replaced the whole thing whether it needed
21 it or not?
22     A.  Yes, sir.
23     Q.  Do you know Roy Lawton?

Page 308

1      A.  Sir?
2      Q.  Do you know Roy Lawton?
3      A.  Roy Lawton.
4      Q.  L-a-w-t-o-n, Roy Lawton, pipe
5  fitter in the shop.
6      A.  I can't recall him, sir.
7      Q.  You do know Ladolphus Floyd?
8      A.  Yes, sir.  Is that Roy Lawson?
9      Q.  It could be Lawson.
10     A.  Yes, sir.
11     Q.  Is that Lawson?
12     A.  Yes, sir, I know a Roy Lawson.
13     Q.  Roy Lawson and Ladolphus
14 Floyd, they both are about the same
15 complexion you are?
16     A.  No, sir.
17     Q.  And most of your work was
18 preventive maintenance work, wasn't it?
19     A.  Yes, sir.
20     Q.  Now, the rule on talking was
21 that you could talk while you worked, you
22 just couldn't stand around and talk and
23 not work, right?

Page 309

1      A.  Sir, I don't know whether that
2  was the rules for that or not.
3      Q.  Is that how it was in
4  practice, I mean, if you and somebody else
5  were working on something, y'all could
6  talk about whatever, but you couldn't just
7  stop work and talk, correct?
8      A.  Sir, I can't say what that is,
9  sir.
10     Q.  Did Eddie Hall have to stay
11 over on many occasions and finish your job
12 because you wanted to leave at the end of
13 the shift?
14     A.  No, sir.
15     Q.  Ever happen?
16     A.  No, sir.
17     Q.  Who is Brenda Simpson?
18     A.  She was Perry's secretary,
19 Perry Henderson's secretary.
20     Q.  This is a document that you
21 gave me.  Is that your writing?
22     A.  That looks like my writing,
23 sir.

78 (Pages 306 to 309)

BOBBY SANKS                                      BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.            October 17, 2007

---

Page 310

1    Q.   I'm sorry?
2    A.   Yes, sir.
3    Q.   It is your writing. Brenda
4  Simpson would bring her lover inside the
5  mill shop every chance she got and no one
6  says nothing, meaning the boss, did you
7  write that?
8    A.   Yes, sir.
9    Q.   Who was her lover?
10   A.   Another female companion, sir.
11   Q.   Oh. What's her name?
12   A.   I had no idea, sir.
13   Q.   Did she work for the company?
14   A.   No, sir.
15   Q.   Dudley going with M. Smith,
16  that's been going on for about eight
17  years. Who is M. Smith?
18   A.   Another female in the supply
19  room, sir.
20   Q.   What does the M. stand for?
21   A.   Martha.
22   Q.   How do you know that?
23   A.   Sir, you see stuff and you

---

Page 311

1  know stuff.
2    Q.   You don't claim there's
3  anything racial about that, do you?
4    A.   No, sir.
5    MR. SUGGS: Well, Mr. Sanks, I
6  appreciate your patience. I don't have
7  anymore questions.
8    A.   Thank you.
9    MS. MUHAMMAD: I do have a few
10  that I need to ask for clarification.
11
12  EXAMINATION BY MS. MUHAMMAD:
13   Q.   Look at Exhibit Number 26, the
14  notice that you received or that you were
15  shown earlier regarding your personnel
16  change from humidifier and air condition
17  control tech to electrician third grade.
18  Do you have it?
19   A.   Yes, ma'am.
20   Q.   Okay. Just leave that so we
21  can put it back in its proper place. I
22  just want to clear up the date. What was
23  the date that is shown you were hired --

---

Page 312

1  or the change, rather, that occurred on
2  that document?
3    A.   Date you're talking about?
4    Q.   Yes.
5    A.   Notice of date?
6    Q.   Yes.
7    A.   8/8 and '86.
8    Q.   Okay. August the 8th of 1986?
9    A.   Yes, ma'am.
10   MR. SUGGS: And what's that
11  date supposed to be, I'm sorry?
12   MS. MUHAMMAD: The date that
13  he was changed to the electrician third
14  grade. I believe you said it was June,
15  some date in June. But on that form it
16  says August the 8th.
17   A.   On 26.
18   Q.   Go to Exhibit 23. Let's go
19  ahead and put that one back in before we
20  lose the place. There it is.
21   A.   That's 26.
22   Q.   Okay. That's 23 right there.
23   A.   Yes, ma'am.

---

Page 313

1    Q.   Yes, let's go ahead and put 26
2  back in its place. Yes. Okay. Now,
3  stack these so that you can just lay that
4  back on top once you finish with 23. Put
5  it here so you can -- yes. And put these
6  together. Okay. A question about
7  Exhibit 23. If you will, you see the
8  little box there toward the top of the
9  page, and this is the poster with the six
10  steps for complaints if you had a
11  complaint at WestPoint Stevens. Do you
12  see the bold language in the box toward
13  the bottom of the box?
14   A.   Yes.
15   Q.   If your complaint is due to
16  discrimination or harassment, you may go
17  directly to step three or outside your
18  facility to step five?
19   A.   Yes.
20   Q.   Okay. You understood that you
21  had the right to go directly to the human
22  resource manager?
23   A.   Yes, I did.

---

79 (Pages 310 to 313)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS
BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.
October 17, 2007

Page 314

1    Q.   And that you had the right to
2  go outside the facility to report your
3  complaint?
4    A.   Yes.
5    Q.   Okay.  Okay.  The very next
6  one is Exhibit 22, the guide book.  It's
7  going to be at the bottom of the stack
8  over there.  Yes.  And the guide book for
9  hourly associates, Exhibit 22.  You
10 testified that you understood a discharge
11 could occur, but you said if it's correct,
12 and you were referring to the rules or the
13 policies on reporting discrimination and
14 harassment -- no, I'm sorry, you were
15 testifying about what reason you could be
16 terminated.
17   A.   Uh-huh.  Yes.
18   Q.   And you said you could be
19 discharged if it's correct.  When you said
20 if it's correct, what were you referring
21 to?
22   A.   That -- I'm referring to that
23 I had false statements in my file.

Page 315

1    Q.   That charges of different --
2    A.   Yes, that wasn't true.  For
3  instance, poor work performance.
4    Q.   The personnel notices that you
5  received that said you had poor work
6  performance were false?
7    A.   Yes, I'm saying that they were
8  false.
9    Q.   And are those the same
10 personnel notices that you said were given
11 as a result of discrimination?
12        MR. SUGGS:  Objection,
13 leading.
14   Q.   You had testified earlier that
15 many of the personnel notices that you
16 received, you identified were as a result
17 of discrimination?
18        MR. SUGGS:  Objection,
19 leading.
20   A.   Yes.
21   Q.   And was that one of those that
22 you considered to be discriminatory?
23        MR. SUGGS:  Objection,

Page 316

1  leading.
2    A.   Yes, I did.
3    Q.   Okay.  Let's go to Exhibit 24.
4  Do you recall testifying about that
5  earlier, that's a personnel notice having
6  to do with your four tardies; is that
7  correct?
8    A.   Yes.
9    Q.   And it's dated July 12th,
10 2005?
11   A.   Yes.
12   Q.   Did you know about this
13 personnel notice at the time that it was
14 written?
15   A.   I didn't understand you.
16   Q.   Did you know about this notice
17 at the time that it was written on July
18 the 12th, 2005?
19   A.   No, I didn't.
20   Q.   I notice your signature is not
21 on it.  Is there a reason why your
22 signature is not on this particular
23 personnel notice?

Page 317

1    A.   I can't recall that.
2    Q.   So, is it your testimony that
3  it was never presented to you before you
4  signed?
5        MR. SUGGS:  Objection,
6  leading, you can't lead like that.
7    Q.   Was this document ever
8  presented to you?
9    A.   Not to my knowledge.
10        MR. SUGGS:  Objection,
11 leading, move to strike.
12        MS. MUHAMMAD:  He's already
13 testified that he didn't see the document.
14        MR. SUGGS:  Don't tell the
15 witness what he's testified to, just ask
16 the questions in a nonleading manner.
17        MS. MUHAMMAD:  He did that.  I
18 didn't tell you how to ask your questions,
19 don't tell me how to ask mine.
20        MR. SUGGS:  I'm telling you
21 not to lead.  Show witness, don't lead
22 him.
23        MS. MUHAMMAD:  I respected you

80 (Pages 314 to 317)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                October 17, 2007

Page 318

1  when you were asking your questions, I
2  expect you to respect me in asking my
3  questions.
4         MR. SUGGS: I don't respect a
5  leading question, I'm going to object to
6  every one of them. He's your witness, you
7  can't lead him.
8      A.  I'm not familiar with this
9  document.
10     Q.  And it says action taken, and
11 it was placed in your file, is that
12 Bobby's file, that's you, right? At the
13 bottom, it says placed notice in Bobby's
14 file.
15     A.  I can't say that's me.
16     Q.  Okay. But --
17        MR. SUGGS: You cannot say
18 that's you?
19     A.  No, sir.
20     Q.  At the top of the document, it
21 says Bobby Sanks as an employee, right?
22        MR. SUGGS: Objection,
23 leading.

Page 319

1         MS. MUHAMMAD: Now, you sat
2  through this deposition all day leading,
3  and you're going to make it an issue that
4  I'm leading.
5         MR. SUGGS: He's your witness,
6  not mine. He's not my witness.
7         MS. MUHAMMAD: You read items
8  off of the document that you presented.
9         MR. SUGGS: He is not your
10 witness, he's your witness, that's the
11 difference. You can't lead your witness,
12 I can lead an adverse witness.
13        MS. MUHAMMAD: I don't think
14 he was ever declared adverse, you didn't
15 declare adverse.
16        MR. SUGGS: He's the
17 plaintiff, I'm the defendant. If he's not
18 adverse, who is?
19        MS. MUHAMMAD: Can we get on
20 with this deposition so we can get
21 finished, please?
22        MR. SUGGS: Yes, if you will
23 stop leading, we'll get finished.

Page 320

1      Q.  Mr. Sanks, do you identify
2  that your name is on this document?
3      A.  Yes.
4      Q.  Okay. And in the body of it
5  where it talks about details, do you
6  understand what it's saying in that space,
7  have you read that?
8         MR. SUGGS: I object to the
9  witness's understanding. The document
10 speaks for itself.
11     A.  I understand that.
12     Q.  Okay. And is your testimony
13 that you had not seen this document
14 before?
15        MR. SUGGS: I object to the
16 leading nature of your question.
17     Q.  Mr. Sanks.
18     A.  I had -- no, I hadn't seen
19 this document before.
20     Q.  Let's go to Exhibit 32. If
21 you will look through each of those
22 notices. On the very first one there on
23 page 571, did you sign that document?

Page 321

1      A.  No, I didn't.
2      Q.  Okay. What about on page 570?
3      A.  No.
4      Q.  566? The number is at the top
5  of the page.
6      A.  No, I didn't.
7      Q.  565?
8      A.  No, I didn't.
9      Q.  5 --
10        MR. SUGGS: We'll stipulate
11 that if his signature does not appear on
12 any of the documents in Exhibit 32 that
13 are Bates stamped, that he didn't sign it.
14     Q.  Okay. Mr. Sanks, you heard
15 the stipulation on all of the documents
16 that are in Exhibit 32 that you did not
17 sign, is there a reason why you did not
18 sign those documents?
19     A.  It wasn't presented to me.
20     Q.  Did you have any knowledge of
21 their existence?
22     A.  No, I didn't.
23     Q.  Okay. Let's go back to

81 (Pages 318 to 321)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                    October 17, 2007

| Page 322 | Page 324 |
|---|---|

**Page 322**

1  Exhibit 30. It talks about the time clock
2  punching procedure. You had testified
3  that 7.0 on the clock meant that you would
4  be late?
5          MR. SUGGS: Objection,
6  leading.
7      A.   That's true.
8      Q.   Was that your testimony?
9      A.   Yes, it was.
10     Q.   Was -- if you clocked out at
11  3.0, was that considered early, or was
12  that overtime?
13         MR. SUGGS: Object to the
14  form.
15     A.   It was just considered time
16  that we clocked out. It wasn't overtime.
17     Q.   You clocked out at 3.0?
18     A.   Yes.
19     Q.   And that was the time that you
20  were required to clock out?
21     A.   Yes.
22     Q.   Was there ever any discussion
23  about the point -- 1.10 percent -- or .10

**Page 324**

1      Q.   Okay. Let's go to Exhibit 51.
2  Do you have it?
3      A.   Yes.
4      Q.   And that's your final notice
5  that was issued on -- I believe it's dated
6  March the 2nd, 2005?
7      A.   Yes. That's correct.
8      Q.   It shows you had a
9  twelve-month anniversary date for May the
10  25th, 2005; is that correct?
11     A.   That's correct.
12     Q.   And according to this final
13  notice, if you were to be terminated, your
14  third write-up would have had to occur by
15  May 25th, 2005?
16         MR. SUGGS: Objection,
17  leading.
18     A.   Yes.
19     Q.   When did your third write-up
20  occur, Mr. Sanks?
21     A.   July the 29th.
22     Q.   Which was after the
23  twelve-month anniversary date of May 25th,

**Page 323**

1  minutes being an issue?
2          MR. SUGGS: Object to the
3  form.
4      A.   I can't recall.
5      Q.   You understood that if you
6  punched in at 7, or if you clocked in at
7  7.0, you were a tenth of a minute late; is
8  that correct?
9      A.   Yes.
10     Q.   But if you clocked out at 3.0,
11  you were a tenth of a minute later than
12  you were coming in --
13         MR. SUGGS: I object to the
14  form.
15     Q.   -- is that right?
16     A.   I didn't have that knowledge
17  of knowing that.
18     Q.   No discussion was ever held on
19  that?
20     A.   No.
21     Q.   Okay.
22         MR. SUGGS: Move to strike,
23  leading.

**Page 325**

1  of 2005?
2      A.   Yes.
3      Q.   So, if you were terminated on
4  July the 29th, 2005, would that date have
5  been outside of the twelve-month
6  anniversary date that you just testified
7  about? You said your anniversary date was
8  May the 25th, 2005; is that correct?
9          MR. SUGGS: Objection,
10  leading.
11     A.   That's correct.
12     Q.   Okay. You were terminated on
13  July the 29th, 2005. Would that date have
14  been outside of your anniversary date, and
15  when I say outside, would it have been
16  beyond your anniversary date?
17     A.   Yes.
18     Q.   Let's go to Exhibit 52,
19  personnel notice of your discrimination
20  and harassment complaint that was
21  submitted to Amber Stevens.
22     A.   Yes.
23     Q.   On page 316 where you had

82 (Pages 322 to 325)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS

BOBBY SANKS

WESTPOINT STEVENS, INC., ET AL.

October 17, 2007

Page 326

1 initially refused to sign and you signed,
2 what did your signing the document mean?
3     A.   It meant that I wasn't going
4 to get any justice any further than where
5 I were.
6     Q.   Were you satisfied with the
7 outcome of the investigation?
8     A.   No, I wasn't.
9     Q.   Did you get the opportunity to
10 review the statements that were made by
11 the nine associates at that time?
12     A.   No, I hadn't.
13     Q.   Let's look at Exhibit 53.  It
14 should have been the very next one from
15 the one you were looking at.
16     A.   I guess I got it misplaced.
17 52.  I don't have 53.
18     Q.   It may be out of order.
19     A.   53.  I have it.
20     Q.   If you would look at page 821.
21 What is the date that you see on that
22 particular document, Mr. Sanks?
23     A.   3/4/05.

Page 327

1     Q.   And on March the 4th, 2005,
2 did you see this document?
3     A.   I can't recall it.
4     Q.   At any time after that and
5 before the date of March the 15th when the
6 investigation was completed, had you seen
7 it?
8     A.   I can't recall.
9     Q.   Look at 823.  Do you know Ed
10 Walton?
11     A.   Yes, I do.
12     Q.   Do you know his signature?
13     A.   I'm not sure.
14     Q.   Is that document signed by Ed
15 Walton?
16     A.   I can't be sure.
17     Q.   But does it show his name
18 there on that document?
19     A.   Yes, it does.
20     Q.   Do you know Ladolphus Floyd?
21     A.   Yes, I do.
22     Q.   Look at 824, please.  Do you
23 see his signature?

Page 328

1     A.   Yes, I do.
2     Q.   Do you recognize that to be
3 his signature?
4     A.   Yes, I do.
5     Q.   In the body of that document,
6 do you recognize that to be his
7 handwriting?
8     A.   Yes.
9     Q.   Look at 825.  Do you recognize
10 that to be his handwriting on that page?
11     A.   Yes.
12     Q.   On the signature or on the
13 entire page?
14     A.   On the signature.
15     Q.   On the signature only?
16     A.   The entire page.
17     Q.   Let's look at Exhibit Number
18 56.  In the last line where it says
19 details, and the last line says, said he
20 understood.  What did you mean by that?
21     A.   I understood why they wanted
22 to terminate me.
23     Q.   When you said you understood,

Page 329

1 what did you understand?
2     A.   That they said that I was
3 tardy.
4     Q.   And when you said you
5 understood, that was what you were
6 referring to there?
7     A.   Yes.
8     Q.   Okay.  Let's look at
9 Exhibit 57.  This is your exit interview.
10 And item number two, the question was
11 asked do you understand why you are being
12 separated and you said you understood why.
13 What did you mean there?
14     A.   I understood why they wanted
15 to terminate me at that time.
16     Q.   And was it the same as the
17 understanding you had on Exhibit Number
18 56?
19     A.   I thought it was I was a
20 threat to the company.
21     Q.   You were a threat to the
22 company?
23     A.   Yes.

83 (Pages 326 to 329)

BOBBY SANKS                                                    BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                       October 17, 2007

Page 330

1     Q.   And that's why you
2  understood -- I mean, that's what you
3  understood why you were being terminated?
4     A.   Yes.
5     Q.   Did your threat to the company
6  have anything to do with this
7  discrimination?
8         MR. SUGGS:  I object to
9  leading this witness.
10     Q.   What did you mean by a threat
11  to the company?
12     A.   That my complaints that I had
13  made.
14     Q.   And what complaints did you
15  make?
16     A.   The complaints I made against
17  race, retaliation, discrimination and age
18  contents and the color.
19     Q.   Let's look at Exhibit Number
20  64. Let's just go ahead and put these on
21  top here because we're done with these.
22  Yes. If you will look at page 1081, which
23  is shown to be page number two of this

Page 331

1  document. Do you see the sentence in the
2  middle of the document where it says I
3  don't know the conversation?
4     A.   Yes.
5     Q.   Would you read the rest of
6  that statement?
7     A.   That went on, but CP.
8     Q.   And do you understand CP
9  stands for charging party?
10     A.   I didn't at the time.
11     Q.   Okay. Continue.
12     A.   CP didn't state on his --
13     Q.   Didn't or did?
14     A.   Did. CP did state on his --
15  is that interview?
16     Q.   Intake.
17     A.   Intake. I don't know.
18     Q.   Intake questionnaire appears
19  to be what that is.
20     A.   Questionnaire that be -- that
21  be?
22     Q.   He.
23     A.   That he wanted to file a --

Page 332

1     Q.   Lawsuit.
2     A.   Okay. Lawsuit. Continue to
3  read?
4     Q.   No, the next sentence, would
5  you read -- do you see on line five from
6  the bottom -- six, I'm sorry, where it
7  begins the record?
8     A.   The record.
9     Q.   Will you read that, please?
10     A.   The record will show that he
11  was timely.
12     Q.   Thank you. Now, let's look at
13  Exhibit 67. You can go ahead and stack
14  these because we're done with those.
15     A.   67.
16     Q.   So, when you finish it, you
17  can just lay it up there and move to the
18  next ones. Okay. Do you know where this
19  document came from?
20     A.   No, I don't.
21     Q.   Is that your handwriting at
22  the top of the page?
23     A.   No, it's not.

Page 333

1     Q.   Do you know whose handwriting
2  that is?
3     A.   No.
4     Q.   If someone asked you about
5  this document, would you know where to say
6  it came from?
7     A.   No.
8     Q.   Okay. That's all I have with
9  that. During your thirty-five years with
10  WestPoint, Mr. Sanks, did you ever receive
11  a performance evaluation over the course
12  of that period?
13     A.   Yes, I have.
14     Q.   From which supervisors or
15  supervisor did you receive the
16  evaluations?
17     A.   All from Dudley Gregory.
18     Q.   Dudley Gregory was your
19  supervisor the entire thirty-five years?
20     A.   No, he wasn't.
21     Q.   Okay. For what period of time
22  was he the supervisor?
23     A.   He become supervisor, I would

84 (Pages 330 to 333)

Page 334

1  say within the last six or seven years.
2      Q.   Six or seven --
3      A.   Yes.
4      Q.   -- years?  And what position
5  did Perry Henderson have with your
6  employment?
7      A.   Perry Henderson were the main
8  supervisor.
9      Q.   And when you say main
10 supervisor, what do you mean?
11     A.   Well, he was the supervisor
12 that we -- that I was hired through and
13 Dudley was his assistant under him as a
14 supervisor over the body of the shop.
15     Q.   So, would Mr. Henderson have
16 asked Mr. Gregory to evaluate your
17 performance?
18     A.   Yes, he -- I don't know
19 whether he did or not.  I can't say.
20     Q.   But Mr. Gregory is the one
21 who, in fact, evaluated your performance?
22     A.   Yes.
23     Q.   Mr. Henderson never did?

Page 335

1      A.   No, I can't recall.
2      Q.   Were you ever given a grade of
3  an evaluation?
4      A.   Yes, I have.
5      Q.   And what grade were you given?
6      A.   There were times that I got
7  very good grades.  There were some times
8  where I needed a little bit more
9  improvement.  Overall, I'm doing a good
10 job.
11     Q.   And would you say that over
12 the entire period of thirty-five years,
13 that that would have been the type grade
14 that you would have received?
15          MR. SUGGS:  Objection,
16 leading.
17     A.   No.
18     Q.   If you were to give your grade
19 over the thirty-five years, what would it
20 be?
21     A.   Very good.
22     Q.   Would your evaluations reflect
23 that?

Page 336

1      A.   No, they wouldn't.
2      Q.   And why wouldn't they?
3      A.   Because of the conflicts that
4  I had between the supervisors.
5      Q.   Why do you think you had those
6  conflicts, Mr. Sanks?
7          MR. SUGGS:  Object to the
8  form.  It calls for speculation.
9      Q.   Why did you have those
10 conflicts?
11     A.   I had them because it wasn't
12 fairness in the shop.
13     Q.   And did you seek to have
14 something done about that?
15     A.   Yes, I did.
16          MR. SUGGS:  Object to the
17 form, leading.
18     Q.   Were there ever occasions when
19 you observed treatment between the
20 employees and the supervisor?
21     A.   Explain that, please.
22     Q.   In other words, were there
23 times when you would observe Mr. Gregory

Page 337

1  or Mr. Henderson treating employees on the
2  job in different ways?
3      A.   Yes.
4      Q.   Did you observe that any of
5  those times involved anyone of different
6  races?
7      A.   Yes.
8      Q.   What did you observe?
9      A.   That they would give -- they
10 would give blacks the difficult orders to
11 go and work on and most of the white
12 mostly stayed in the shop and did the
13 maintenance in there.  Most of the blacks
14 get the dirty jobs.
15     Q.   As a black person in the shop,
16 what would happen to you if you made a
17 complaint?
18     A.   That's the worst thing that
19 could happen to you when you complained
20 against one of the supervisors.  You would
21 be targeted without a doubt.
22     Q.   Is that what happened to you?
23     A.   Yes, it is.

BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.

BOBBY SANKS
October 17, 2007

---

Page 338

1    Q.   Did you ever see it happen to
2  any other black?
3    A.   No.
4    Q.   Why not, if you know?
5    A.   Most blacks just pretty much
6  kept their head down and went on.
7    Q.   Does that mean they would just
8  allow it to happen and --
9         MR. SUGGS:  I object to the
10 form, leading.
11   Q.   -- not say anything?
12   A.   They just wouldn't -- in other
13 words, they just wouldn't man up to what
14 needed to be said.
15   Q.   But you did?
16   A.   When something wasn't right,
17 yes, you're supposed to speak your
18 opinion.  They tell you that, voice your
19 opinion.
20   Q.   Do you think you were harmed
21 in any way as a result of speaking your
22 opinion?
23   A.   Oh, yes, definitely.

---

Page 339

1    Q.   And how were you harmed?
2    A.   I couldn't hardly function in
3  my job every day because of the threat
4  that I knew that I was going to get coming
5  from the supervisors.
6    Q.   And who were your supervisors?
7    A.   Perry Henderson was the head
8  supervisor and Dudley Gregory was under
9  him.  Harold O'Neal was there at the time.
10   Q.   Do you suffer with
11 hypertension, high blood pressure?
12   A.   Yes, I do.
13   Q.   Okay.  Did you have high blood
14 pressure before you were terminated from
15 WestPoint Stevens, WestPoint Home?
16   A.   Yes, I did.
17   Q.   Was your high blood pressure
18 related in any way to your job at
19 WestPoint?
20   A.   Yes, it were.
21   Q.   How was it related?
22   A.   I never had high blood
23 pressure until I was targeted by my

---

Page 340

1  supervisors.  Stress and tension come from
2  that and caused me to have high blood
3  pressure.
4    Q.   Are you being presently
5  treated for high blood pressure?
6    A.   Yes.
7    Q.   And who is your physician?
8    A.   Dr. Whatley.
9    Q.   Were employees -- were all
10 employees required to punch the clock to
11 start their day at work at WestPoint?
12   A.   Yes, they were.
13   Q.   That included supervisors?
14   A.   Well, what do you mean
15 supervisors?
16   Q.   Well, specifically, did that
17 include Dudley Gregory and Perry
18 Henderson?
19   A.   Well, Perry Henderson was the
20 head supervisor.  He wasn't instructed to
21 hit the clock.  But Dudley were.
22   Q.   And did you ever know Dudley
23 to be late for work?

---

Page 341

1    A.   Yes, on a number of occasions.
2    Q.   Was he ever written up, do you
3  know, for being late?
4    A.   No, I can't recall.
5    Q.   I'm going to show you a
6  document that's marked as Plaintiff's
7  Exhibit 1, or going to be marked as
8  Plaintiff's Exhibit 1.  Do you recognize
9  that document?
10        MR. SUGGS:  If you want to
11 keep track of them by making it the next
12 number, it's fine with me, instead of
13 Plaintiff's Exhibit 1, make it whatever.
14        (Whereupon, Plaintiff's
15        Exhibit 74 was marked
16        for identification.)
17   Q.   Do you recognize that
18 document?
19   A.   Yes.
20   Q.   And that's a -- what is that?
21   A.   That's a -- it's a calendar,
22 but it was an old calendar that I was --
23 like a little note tablet.

---

86 (Pages 338 to 341)

BOBBY SANKS                                                BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.                    October 17, 2007

Page 342

1    Q.   Okay. Does it have a date on
2  it?
3    A.   Yes, it does.
4    Q.   What's the date on it?
5    A.   10/11/02.
6    Q.   And there's some writing on
7  that document. Do you recognize what the
8  writing is?
9    A.   Yes. One is Steve Moss phone
10 number and cell number. The other one
11 is -- it says Friday, Dudley was late
12 coming in for work, past 7:00 a.m., excuse
13 me.
14   Q.   You testified a moment ago
15 that you had known him to be late before?
16   A.   Yes.
17   Q.   And on that document, you're
18 looking at -- someone made a note of that.
19 Who made the note of him being late that
20 particular day?
21   A.   I made that note.
22   Q.   And did you on occasion make
23 notes of when employees would be late

Page 343

1  coming into work?
2    A.   Yes, I did.
3    Q.   Was there another time that
4  you noted that Dudley was late coming into
5  work?
6    A.   Yes, I have.
7    Q.   And the Dudley that you're
8  talking about is the same Dudley Gregory
9  that was your supervisor?
10   A.   Yes, it is.
11   Q.   Take a look at that document
12 and -- well, I will have it marked as
13 Plaintiff's Exhibit 75. What's the date
14 on that document, Mr. Sanks?
15        (Whereupon, Plaintiff's
16        Exhibit 75 was marked
17        for identification.)
18   A.   I have more than one date.
19   Q.   Okay. What's the first date?
20   A.   November the 16th, '02 -- oh,
21 I'm sorry. It's on a Sunday, November the
22 4th, '02.
23   Q.   And is that a document from

Page 344

1  that same calendar you referred to a
2  moment ago?
3    A.   Yes, it is.
4    Q.   Is that in your handwriting?
5    A.   Yes, it is.
6    Q.   What does that document state,
7  Mr. Sanks?
8    A.   They pull new wire to the
9  slasher, and did not check it to make sure
10 everything was working. Third shift came
11 in to start up, it did not start up
12 correctly, burned up a transformer and
13 caused some other problems. Anyway, it
14 did not run for the third or the first
15 shift. So, who will get a yellow paper
16 for not knowing who were the problem and
17 fixing it.
18   Q.   Okay. Now, does it say
19 anything about Dudley Gregory at all and
20 being late or leaving work early or
21 anything of that nature?
22   A.   On this paper?
23   Q.   Yes.

Page 345

1    A.   Yes, it's Saturday, November
2  the 16th, '02.
3    Q.   What does it say, Mr. Sanks?
4    A.   Dudley came in to -- came in
5  too late, after 7:05 a.m.
6    Q.   Was there another date on
7  there that shows anything about Dudley
8  arriving late to work?
9    A.   On December the 7, '02, Dudley
10 left work early, 2:50 p.m.
11   Q.   Was that a part of the policy
12 that employees could leave work early?
13   A.   Not for the employees. If you
14 did, you would get a tardy or you would
15 get a write-up or a partial. If you leave
16 early, you get a partial.
17   Q.   And do you know whether or not
18 he was written up for a partial for
19 leaving early?
20   A.   No. No, I don't.
21        (Whereupon, Plaintiff's
22        Exhibit 76 was marked
23        for identification.)

87 (Pages 342 to 345)

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                    http://www.TylerEaton.com

058899a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.              October 17, 2007

---

Page 346

1        (Whereupon, a break was had
2      from 5:04 P.M. until 5:06 P.M.)
3        MR. SUGGS: All right. Thank
4  you.
5        Q.   (BY MS. MUHAMMAD:) What I
6  would like to do is go ahead and mark all
7  of these as Exhibit 76, because they are
8  all referring basically to the same thing.
9  And let me just have you take a look at
10 each of these.
11       A.   (Reviewing document.)
12       Q.   Just take a look at each page,
13 Mr. Sanks, see if you recognize each of
14 those documents and what they represent,
15 what they say.
16       A.   (Reviewing document.)
17       Q.   Are you done?
18       A.   Yes, I am.
19       Q.   Do you recognize those
20 documents?
21       A.   Yes, I do.
22       Q.   Okay. What are those
23 documents, Mr. Sanks?

---

Page 347

1        A.   They are notes that I had
2  noticing Dudley coming in from working,
3  leaving early -- coming in late and
4  leaving early.
5        Q.   Okay. And those are notes
6  that you had taken in your own
7  handwriting?
8        A.   Yes, it is.
9        Q.   Did you put dates on them?
10       A.   Most of them, yes.
11       Q.   Why were you making notes
12 about when Dudley would come in late and
13 leaving early?
14       A.   Because the policy was
15 supposed to apply to everybody in the
16 shop, not just some.
17       Q.   Was the policy being applied
18 to you during that time?
19       A.   Yes, it were.
20       Q.   And is it your testimony that
21 the policy was not being applied to
22 Dudley, and in your reference to Dudley,
23 you're talking about Dudley Gregory,

---

Page 348

1  correct?
2        A.   Yes, I am.
3        Q.   Is it that the policy was not
4  being applied to him during that time?
5        A.   That's correct.
6        Q.   Do you know why the policy
7  wasn't being applied to him?
8        A.   I can only assume. I can't be
9  exactly sure.
10       Q.   What is Dudley Gregory's race?
11       A.   White.
12       Q.   Since leaving the employment
13 of WestPoint in their termination,
14 Mr. Sanks, you have been employed, but
15 have you been employed to earn -- to a
16 level of earning that you had at
17 WestPoint?
18       A.   No.
19       Q.   Have you experienced any
20 suffering as a result of not earning what
21 you were earning at WestPoint?
22       A.   Yes, I have.
23       Q.   And how have you suffered?

---

Page 349

1        A.   I couldn't -- I couldn't get
2  my daughter through high school.
3        Q.   And how is that?
4        A.   Because I didn't have the job
5  to supply her through high school, and get
6  her funds and the college that I wanted to
7  get her to attend to.
8        Q.   So, you had a problem getting
9  her out of high school and you weren't
10 able to get her into the college you
11 wanted her to go to?
12       A.   Yes, ma'am.
13       Q.   Okay. How else has it
14 affected you?
15       A.   I couldn't pay all of my bills
16 as I would like to have. Wasn't able to
17 get all of my prescription drugs that I
18 needed to.
19       Q.   Was that your high blood
20 pressure medication?
21       A.   Yes.
22       Q.   So, you have had some times
23 that you did not take your high blood

---

88 (Pages 346 to 349)

058999a3-34e5-4569-8dba-ed2a434cfc8b

BOBBY SANKS                                          BOBBY SANKS
WESTPOINT STEVENS, INC., ET AL.           October 17, 2007

---

Page 350

1  pressure medication?
2      A.   Yes, I did.
3      Q.   And the reason being?
4      A.   Couldn't afford it.
5      Q.   How else have you suffered --
6  or have you suffered in any other way,
7  Mr. Sanks, since you were terminated from
8  your job at WestPoint?
9      A.   Things are just not, you know,
10 the same at home when you're -- when you
11 don't have a job.
12     Q.   Are you able to enjoy life
13 like you did when you did have a job
14 there?
15     A.   No, I haven't.
16     Q.   Is your wife affected by it at
17 all?
18     A.   Yes.
19     Q.   You said you being at home
20 without a job.  What does that do?
21     A.   It create problems that you
22 are not -- you are not the head of the
23 house anymore.  You are the head, but you

---

Page 351

1  don't have the finance to back it as being
2  the head, so you have to depend on one
3  income coming in.
4      Q.   And how has that made you
5  feel, Mr. Sanks?
6      A.   You get depressed.
7      Q.   Have you had to have treatment
8  for your depression?
9      A.   No.  Just blood pressure
10 keep -- stay up when you are in a
11 depressed mode.
12     Q.   Are you receiving any of your
13 retirement from WestPoint Stevens or --
14 WestPoint Stevens or WestPoint Home?
15     A.   The only retirement I received
16 from WestPoint Stevens is the ninety-two
17 dollars for that GOVP, I believe, GVPS or
18 something like that.
19     Q.   Did you receive a lump sum at
20 any time?
21     A.   No.  Only my retirement
22 savings when I first got terminated.
23     Q.   Are you getting the same

---

Page 352

1  benefits through your retirement that you
2  were getting when you were employed,
3  health insurance, life insurance?
4      A.   No.  Well, life insurance, you
5  still have that, but health insurance, we
6  don't have it.
7      Q.   So, for your health care, do
8  you have to pay for your own medical
9  bills?
10     A.   Well, my wife, she put me on
11 hers as a carrier, carry me on hers at
12 this time, and that helps.
13     Q.   So, are you able to buy your
14 high blood pressure medication on her
15 insurance?
16     A.   I have so much to pay, it's a
17 deductible that we have to meet and I have
18 to pay a -- pay amount.
19     Q.   And where does that money come
20 from for you to pay the deductible?
21     A.   Family, friends, I try to make
22 a hustle, do little odd jobs.
23     Q.   Are you able to do any work at

---

Page 353

1  all now?
2      A.   Not in the factories.  Any
3  kind of company building, no.
4      Q.   What can you do, Mr. Sanks?
5      A.   I haven't did anything since I
6  have been out of work, hasn't nobody hired
7  me.  On my own, I try to still cut some,
8  do some lawn service.
9          MS. MUHAMMAD:  That's all I
10 have.
11         MR. SUGGS:  Nothing further.
12 Thank you.
13
14     FURTHER THE DEPONENT SAITH NOT
15
16 (Deposition concluded at 5:20 P.M.)
17
18
19
20
21
22
23

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                    http://www.TylerEaton.com

058999a3-34e5-4569-8dba-ed2a434cfc8b

Page 354

```
1        DEPONENT'S CERTIFICATE
2
3       I, BOBBY SANKS, the witness herein,
4   have read the transcript of my testimony
5   and the same is true and correct, to the
6   best of my knowledge.  Any corrections
7   and/or additions, if any, are listed
8   separately.
9
10
11
12       BOBBY SANKS
13
14
15       Sworn to and subscribed before me,
16   this the    day of        , 2007, to
17   certify which witness my hand and seal of
18   office.
19
20
21
22       NOTARY PUBLIC IN AND FOR
23       THE STATE OF ALABAMA
```

Page 355

```
1        C E R T I F I C A T E
2
3
4   STATE OF ALABAMA
5   JEFFERSON COUNTY
6
7       I hereby certify that the
8   above and foregoing deposition was taken
9   down by me in stenotypy, and the questions
10  and answers thereto were reduced to
11  typewriting under my supervision, and that
12  the foregoing represents a true and
13  correct transcript of the deposition given
14  by said witness upon said hearing.
15       I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action, nor am I in anywise
18  interested in the result of said cause.
19
20
21
22
         COMMISSIONER-NOTARY PUBLIC
23       ACCR LICENSE NO. 432
```

058999a3-34e5-4569-8dba-ed2a434cfc8b

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

Bobby Sanks,                          )
                                      )
    Plaintiff,                    )
                                      )
    v.                            )          C. A. No.: 3:06-CV-1092-T
                                      )
WestPoint Stevens, Inc., and          )
WestPoint Home, Inc.,                 )
                                      )
    Defendants.                   )
                                      )

# Exhibit 2, Part 1

# Exhibits to the Deposition of Bobby Sanks Dxs. 1-8

# Dx. 1

Form **W-2 Wage and Tax Statement**    2004

| | |
|---|---|
| 7. Social security tips | |
| 8 Allocated tips | 1 Wages, tips, other comp. 44289.96 | 2 Federal income tax withheld 7529.35 |
| c Employer's name, address, and ZIP code | 3 Social security wages 44289.96 | 4 Social security tax withheld 2745.98 |
| 9 Advance EIC payment | 5 Medicare wages and tips 44289.96 | 6 Medicare tax withheld 642.20 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a See instructions for box 12 |

c Employer's name, address, and ZIP code

WESTPOINT STEVENS INC.
OPELIKA MFG
PO BOX 598
WEST POINT GA   31833

e Employee's name, address, and ZIP code       1 041 A 0011 1

13  Statutory employee   Retirement plan  X   Third-party sick pay        14 Other

BOBBY L. SANKS
BOX 44

SALEM AL   36874

b Employer identification number

d Employee's social security no.

12b
12c
12d

COPY

| 15 State | Employer's state I.D. no. | 16 State wages, tips, etc. 44289.96 | 17 State income tax 1689.90 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | | | | | | |

Copy C For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)          OMB No. 1545-0008          Dept. of the Treasury - IRS
                                                                              Visit the IRS Web Site at  www.irs.gov.

---

Form **W-2 Wage and Tax Statement**    2004

| | |
|---|---|
| 7. Social security tips | 1 Wages, tips, other comp. 44289.96 | 2 Federal income tax withheld 7529.35 |
| 8 Allocated tips | 3 Social security wages 44289.96 | 4 Social security tax withheld 2745.98 |
| 9 Advance EIC payment | 5 Medicare wages and tips 44289.96 | 6 Medicare tax withheld 642.20 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a |

c Employer's name, address, and ZIP code

WESTPOINT STEVENS INC.
OPELIKA MFG
PO BOX 598
WEST POINT GA   31833

e Employee's name, address, and ZIP code

13  Statutory employee   Retirement plan  X   Third-party sick pay        14 Other

BOBBY L. SANKS
BOX 44

SALEM AL   36874

b Employer identification number

d Employee's social security no.

12b
12c
12d

| 15 State | Employer's state I.D. no. | 16 State wages, tips, etc. 44289.96 | 17 State income tax 1689.90 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | | | | | | |

Copy 2 To Be Filed With Employee's State, City, or Local Income Tax Return          OMB No. 1545-0008          Dept. of the Treasury - IRS

---

Payer's Name, Street, City, State, and ZIP Code

STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION AGENCY
649 MONROE STREET
MONTGOMERY, AL 36131

Certain
Government
Payments

| Recipient's Identification Number | 1 Unemployment Compensation 210.00 | OMB No. 1545-0120 | Copy B For Recipient |
|---|---|---|---|
| Recipient's Name (first, middle, last) & Address | 4 Federal Income Tax Withheld .00 | 2004 Form 1099G | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |

BOBBY L SANKS
P O BOX 44
SALEM, AL   36874-0044

FEIN:

Account Number (optional)

Form   1099-G                    Department of the Treasury - Internal Revenue Service



DEFENDANT'S
EXHIBIT
1
B Sanks

SANKS
000006

Form **1040**    U.S. Individual Income Tax Return    **2004**    (99)    IRS Use Only-Do not write or staple in this space.

Department of the Treasury—Internal Revenue Service

| Label | | |
|---|---|---|
| (See instructions) | BOBBY SANKS | OMB No.1545-0074 |
| Use the IRS label. | PO BOX 44 | **Your social security number** |
| Otherwise, please print or type. | SALEM | **Spouse's social security no.** |
| | AL   36874-0000-000 | |

**Presidential Election Campaign** (See instructions) ▶ Note. Checking "Yes" will not change your tax or reduce your refund. Do you, or your spouse if filing a joint return, want $3 to go to this fund? ▶ You [ ] Yes [X] No   Spouse [ ] Yes [ ] No

**Important!** You **must** enter your SSN(s) above.

**Filing Status**

Check only one box.

1 [ ] Single
2 [ ] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ▶
4 [X] Head of household (with qualifying person). (See inst.) If the qualifying person is a child but not your dependent, enter the child's name here. ▶
5 [ ] Qualifying widow(er) with dependent child.   (See instructions.)

**Exemptions**

If more than four dependents, see instructions.

6a [X] Yourself. If someone can claim you as a dependent, do not check box 6a . . . . . . . . . .
b [ ] Spouse . . . . . . . . . . . . . . . . . . .

Boxes checked on 6a and 6b . . **1**

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) √ if qualifying child for child tax credit (see inst.) |
|---|---|---|---|
| MARY    SANKS | | PARENT | |
| | | | |
| | | | |
| | | | |

No. of children on 6c who:
• lived with you . . **01**
• did not live with you due to divorce or separation (see inst.)
Dependents on 6c not entered above . . . . .

d Total number of exemptions claimed . . . . . . . . . . . . . . . Add numbers on lines above ▶ | **02** |

**Income**

Attach Form(s) W-2 here. Also attach Form(s) W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 44,290 |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . | 8a | |
| b | Tax-exempt interest. Do not include on line 8a . . . | 8b | | | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | |
| b | Qualified dividends (see instructions) . . . . . | 9b | | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | 834 |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions . . . . . | 15a | | b Taxable amount (see inst) | 15b | |
| 16a | Pensions and annuities . . | 16a | | b Taxable amount (see inst) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | (5,739) |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation | 19 | 210 |
| 20a | Social security benefits . | 20a | | b Taxable amount (see inst.) | 20b | |
| 21 | Other income. List type & amount (see inst.) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 39,595 |

**Adjusted Gross Income**

| 23 | Educator expenses (see instructions) | 23 | |
|---|---|---|---|
| 24 | Certain business expenses of reservists, performing artists, & fee-basis government officials. Attach Form 2106 or 2106-EZ. | 24 | |
| 25 | IRA deduction (see page 29) | 25 | |
| 26 | Student loan interest deduction (see instructions) . . . . | 26 | |
| 27 | Tuition and fees deduction (see instructions) . . . . . | 27 | |
| 28 | Health savings account deduction. Attach Form 8889 | 28 | |
| 29 | Moving expenses. Attach Form 3903 . . . . . . . . | 29 | |
| 30 | One-half of self-employment tax. Attach Schedule SE . . . | 30 | |
| 31 | Self-employed health insurance deduction (see instructions) | 31 | |
| 32 | Self-employed SEP, SIMPLE, and qualified plans . . . . | 32 | |
| 33 | Penalty on early withdrawal of savings . . . . . . . | 33 | |
| 34a | Alimony paid    b Recipient's SSN ▶ | 34a | |
| 35 | Add lines 23 through 34a . . . . . . . . . . | 35 | |
| 36 | Subtract line 35 from line 22. This is your **adjusted gross income** . . . . . . . . ▶ | 36 | 39,595 |

SPA  2004 ||| Petz Enterprises, Inc.  4US011    **For Disclosure, Privacy Act, & Paperwork Reduction Act Notice, see instructions.**    Form **1040** (2004)

Form 1040 (2004)

Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 37 | Amount from line 36 (adjusted gross income) . . . . . . . . . . . . | 37 | 39,595 |
| | 38a | Check if: ☐ You were born before January 2, 1940, ☐ Blind. **Total boxes** ☐ Spouse was born before Jan. 2, 1940, ☐ Blind. **checked** ▶ 38a ☐ | | |
| **Standard Deduction for --** | b | If your spouse itemizes on a separate return or you were a dual-status alien, see page 31 & check here . . . . . . ▶ 38b ☐ | | |
| | 39 | **Itemized deductions** (from Schedule A) or your **standard deduction** (see left margin) | 39 | 20,585 |
| • People who checked any box on line 38a or 38b **or** who can be claimed as a dependent, see page 31. | 40 | Subtract line 39 from line 37 . . . . . . . . . . . . . . . . | 40 | 19,010 |
| | 41 | If line 37 is $107,025 or less, multiply $3,100 by the total number of exemptions claimed on line 6d. If line 37 is over $107,025, see the worksheet in the instructions . . . . . . . . | 41 | 6,200 |
| • All others: | 42 | **Taxable income.** Subtract line 41 from line 40. If line 41 is more than line 40, enter -0- . . . | 42 | 12,810 |
| Single or Married filing separately, $4,850 | 43 | **Tax** (see instr.). Check if any tax is from: a ☐ Form(s) 8814  b ☐ Form 4972 | 43 | 1,414 |
| | 44 | **Alternative minimum tax** (see instructions). Attach Form 6251 . . . | 44 | |
| Married filing jointly or Qualifying widow(er), $9,700 | 45 | Add lines 43 and 44 . . . . . . . . . . . . . . . . . ▶ | 45 | 1,414 |
| | 46 | Foreign tax credit. Attach Form 1116 if required . . . | 46 | |
| Head of household, $7,150 | 47 | Credit for child and dependent care expenses. Attach Form 2441 | 47 | |
| | 48 | Credit for the elderly or the disabled. Attach Schedule R | 48 | |
| | 49 | Education credits. Attach Form 8863 . . . . . | 49 | |
| | 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | |
| | 51 | Child tax credit (see instructions) . . . . . | 51 | |
| | 52 | Adoption credit. Attach Form 8839 . . . . . | 52 | |
| | 53 | Credits from: a ☐ Form 8396  b ☐ Form 8859 | 53 | |
| | 54 | Other credits. Check applicable box(es): a ☐ Form 3800  b ☐ Form 8801  c ☐ Specify | 54 | |
| | 55 | Add lines 46 through 54. These are your **total credits** . . . . | 55 | |
| | 56 | Subtract line 55 from line 45. If line 55 is more than line 45, enter -0- . . . . . . . ▶ | 56 | 1,414 |
| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE . . . . . . | 57 | |
| | 58 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required. | 59 | |
| | 60 | Advance earned income credit payments from Form(s) W-2 . . . | 60 | |
| | 61 | Household employment taxes. Attach Schedule H . . . | 61 | |
| | 62 | Add lines 56 through 61. This is your **total tax** . . . . . . . . . ▶ | 62 | 1,414 |
| **Payments** | 63 | Federal income tax withheld from Forms W-2 and 1099 | 63 | 7,529 |
| | 64 | 2004 estimated tax payments and amount applied from 2003 return | 64 | |
| If you have a qualifying child, attach Schedule EIC. | 65a | Earned income credit (EIC) . . . . . . . . | 65a | |
| | b | Nontaxable combat pay election ▶ 65b | | |
| | 66 | Excess social security and tier 1 RRTA tax withheld (see instructions) | 66 | |
| | 67 | Additional child tax credit. Attach Form 8812 . . . . | 67 | |
| | 68 | Amount paid with request for extension to file (see instructions) | 68 | |
| | 69 | Other pymt from: a ☐ Form 2439  b ☐ Form 4136  c ☐ Form 8885 | 69 | |
| | 70 | Add lines 63, 64, 65a, and 66 through 69. These are your **total payments** . . . . . . ▶ | 70 | 7,529 |
| **Refund** | 71 | If line 70 is more than line 62, subtract line 62 from line 70. This is the amount you **overpaid** . . . | 71 | 6,115 |
| Direct deposit? See instructions and fill in 72b, 72c, and 72d. | 72a | Amount of line 71 you want **refunded to you** . . . . . . | 72a | 6,115 |
| | ▶ b | Routing number 062203298 ▶ c Type: ☒ Checking ☐ Savings | | |
| | ▶ d | Account number 375571706 | | |
| | 73 | Amount of line 71 you want applied to your 2005 estimated tax ▶ | 73 | |
| **Amount You Owe** | 74 | **Amount you owe.** Subtract line 70 from line 62. For details on how to pay, see instructions . . . | 74 | |
| | 75 | Estimated tax penalty (see instructions) . . . . | 75 | |
| **Third Party Designee** | | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ Yes. Complete the following. ☐ No | | |
| | | Designee's name ▶ | Phone ▶ | Personal identification number (PIN) ▶ |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge

Joint return? See instructions. Keep a copy for your records.

| Your signature | Date | Your occupation ELECTRICIAN | Daytime phone number 334-749-9106 |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation | |

**Paid Preparer's Use Only**

| Preparer's signature ▶ LINDA LINSON | Date | Check if self-employed ☒ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code ▶ | LINDA LINSON 1328 AUBURN ST OPELIKA AL 36801 | EIN | Phone no. 334-745-2170 |

2004  Petz Enterprises, Inc.    4US012

SANKS
000008

Form **1040** (2004)

Page 02

# SCHEDULE A&B (Form 1040)
Department of the Treasury
Internal Revenue Service (99).

## Schedule A--Itemized Deductions
(Schedule B is on Side 2)

► **Attach to Form 1040.** ► **See instructions for Schedules A and B. (Form 1040).**

COPY

OMB No. 1545-0074

**2004**

Attachment
Sequence No. 07

Name(s) shown on Form 1040

BOBBY SANKS

Your social security number

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** | **Caution.** Do not include expenses reimbursed or paid by others. | | | |
| | 1 | Medical and dental expenses (see instructions) | 1 | |
| | 2 | Enter amt from Form 1040, line 37 . **2** | | |
| | 3 | Multiply line 2 by 7.5% (.075) . . . . . . . . . . | 3 | |
| | 4 | Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | 4 | |
| **Taxes You Paid** (See instructions) | 5 | State and local (check only one box) | | |
| | | a ☒ Income taxes, or | | |
| | | b ☐ General sales taxes (see page A-2) | 5 | 1,690 |
| | 6 | Real estate taxes (see instructions) | 6 | 414 |
| | 7 | Personal property taxes . . . . . . . . . | 7 | 256 |
| | 8 | Other taxes. List type & amount ► | 8 | |
| | 9 | Add lines 5 through 8 . . . . . . . . . . . . . . | 9 | 2,360 |
| **Interest You Paid** (See instructions) | 10 | Home mortgage interest and points reported to you on Form 1098 | 10 | 13,025 |
| | 11 | Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see inst. & show that person's name, identifying no., & address ► | | |
| **Note.** Personal interest is not deductible. | | | 11 | |
| | 12 | Points not reported to you on Form 1098. See inst. for special rules | 12 | |
| | 13 | Investment interest. Attach Form 4952 if required (See instructions) | 13 | |
| | 14 | Add lines 10 through 13 . . . . . . . . . . . . . . | 14 | 13,025 |
| **Gifts to Charity** If you made a gift and got a benefit for it, see instructions. | 15 | Gifts by cash or check. If you made any gift of $250 or more, see pg. A-4  CASH AND CHECKS      5,200 | 15 | 5,200 |
| | 16 | Other than by cash or check. If any gift of $250 or more, see page A-5. You must attach Form 8283 if over $500 | 16 | |
| | 17 | Carryover from prior year | 17 | |
| | 18 | Add lines 15 through 17 . . . . . . . . . . . . . | 18 | 5,200 |
| **Casualty and Theft Losses** | 19 | Casualty or theft loss(es). Attach Form 4684. (See instructions) | 19 | |
| **Job Expenses and Most Other Miscellaneous Deductions** | 20 | Unreimbursed employee expenses--job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required (See inst) ► | 20 | |
| | 21 | Tax preparation fees | 21 | 125 |
| | 22 | Other expenses-investment, safe deposit box, etc. List type and amount ► | 22 | |
| (See page A-5.) | 23 | Add lines 20 through 22 | 23 | 125 |
| | 24 | Enter amt from Form 1040, line 37  **24**      39,595 | | |
| | 25 | Multiply line 24 by 2% (.02) | 25 | 792 |
| | 26 | Subtract line 25 from line 23. If line 25 is more than line 23, enter -0- | 26 | |
| **Other Miscellaneous Deductions** | 27 | Other--from list on page A-6. List type and amount ► | 27 | |
| **Total Itemized Deductions** | 28 | Is Form 1040, line 37, over $142,700 (over $71,350 if married filing separately)? | | |
| | | ☒ **No.** Your deduction is not limited. Add the amounts in the far right column for lines 4 through 27. Also, enter this amount on Form 1040, line 39. | | |
| | | ☐ **Yes.** Your deduction may be limited. See instructions for the amount to enter. | 28 | 20,585 |

SPA  For Paperwork Reduction Act Notice, see Form 1040 instructions.    2004 | Petz Enterprises, Inc.    4US071    Schedule A (Form 1040) 2004

**SCHEDULE E**
(Form 1040)

Department of the Treasury
Internal Revenue Service (99)

# Supplemental Income and Loss

(From rental real estate, royalties, partnerships,
S corporations, estates, trusts, REMICs, etc.)

► **Attach to Form 1040 or Form 1041.**    ► See Instructions for Schedule E (Form 1040).

OMB No. 1545-0074

**2004**

Attachment
Sequence No. **13**

Name(s) shown on return

BOBBY SANKS

Your social security number

## Part I    Income or Loss From Rental Real Estate and Royalties    Note. If you are in the business of renting personal property, use Schedule C or C-EZ (see instructions). Report farm rental income or loss from **Form 4835** on page 2, line 40.

| 1 | List the type and location of each rental real estate property: | | 2 | For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of: | | Yes | No |
|---|---|---|---|---|---|---|---|
| A | RENTAL PROPERTY HWY 175 LOT 350 SALEM ALABAMA | | | | A | | X |
| B | RENTAL PROPERTY HWY 175 LOT 349 SALEM ALABAMA | | | • 14 days, or | B | | X |
| C | RENTAL PROPERTY 1419 HOOPER AVENUE OPELIKA ALABAMA | | | • 10% of the total days rented at fair rental value? (See instructions) | C | | X |

**Income:**

| | | | Properties | | | Totals |
|---|---|---|---|---|---|---|
| | | | A | B | C | (Add columns A, B, and C.) |
| 3 | Rents received . . . . . . . . | 3 | 4,200 | | 2,004 | 3 | 8,939 |
| 4 | Royalties received . . . . . . . | 4 | | | | 4 | |

**Expenses:**

| 5 | Advertising . . . . . . . . . . | 5 | | | | | |
|---|---|---|---|---|---|---|
| 6 | Auto and travel (see inst.) . . . | 6 | | | | | |
| 7 | Cleaning and maintenance . . | 7 | | | | | |
| 8 | Commissions . . . . . . . . | 8 | | | | | |
| 9 | Insurance . . . . . . . . . . | 9 | 525 | | 610 | | |
| 10 | Legal and other professional fees | 10 | | | | | |
| 11 | Management fees . . . . . . | 11 | | | | | |
| 12 | Mortg int paid to banks, etc. (see instr.) | 12 | | | 4,112 | 12 | 4,112 |
| 13 | Other interest . . . . . . . . | 13 | | | | | |
| 14 | Repairs . . . . . . . . . . | 14 | 3,770 | | 1,845 | | |
| 15 | Supplies . . . . . . . . . . | 15 | | | | | |
| 16 | Taxes . . . . . . . . . . | 16 | 82 | 65 | 661 | | |
| 17 | Utilities . . . . . . . . . . | 17 | | | | | |
| 18 | Other (list) ► | 18 | | | | | |
| | _____ | | | | | | |
| | _____ | | | | | | |
| | _____ | | | | | | |
| 19 | Add lines 5 through 18 . . . . | 19 | 4,377 | 65 | 7,228 | 19 | 13,400 |
| 20 | Depreciation expense or depletion (see instructions) | 20 | 1,278 | | | 20 | 1,278 |
| 21 | Total expenses. Add lines 19 and 20 | 21 | 5,655 | 65 | 7,228 | | |
| 22 | Income or (loss) from rental real estate or royalty properties. Subtract line 21 from line 3 (rents) or line 4 (royalties). If the result is a (loss), see instructions to find out if you must file **Form 6198.** . | 22 | (1,455) | (65) | (5,224) | | |
| 23 | Deductible rental real estate loss. **Caution.** Your rental real estate loss on line 22 may be limited. See instructions to find out if you must file **Form 8582.** Real estate professionals must complete line 43 on page 2. . | 23 | ( 1,455 ) | ( 65 ) | ( 5,224 ) | | |
| 24 | **Income.** Add positive amounts shown on line 22. Do not include any losses . . . . . . . . . . . . . . . . . . | | | | | 24 | 1,048 |
| 25 | **Losses.** Add royalty losses from line 22 and rental real estate losses from line 23. Enter total losses here . . . | | | | | 25 | ( 6,787 ) |
| 26 | **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17. Otherwise, include this amount in the total on line 41 on page 2 . . . . . . . . . . . . . | | | | | 26 | (5,739) |

SPA    **For Paperwork Reduction Act Notice, see instructions.**    2004 | Petz Enterprises, Inc.    4US131    **Schedule E (Form 1040) 2004**

**SCHEDULE E**
(Form 1040)

Department of the Treasury
Internal Revenue Service (99)

**Supplemental Income and Loss**

(From rental real estate, royalties, partnerships,
S corporations, estates, trusts, REMICs, etc.)

▶ **Attach to Form 1040 or Form 1041.**   ▶ **See Instructions for Schedule E (Form 1040).**

OMB No. 1545-0074

**2004**

Attachment
Sequence No. **13**

Name(s) shown on return

BOBBY SANKS

Your social security number

## Part I   Income or Loss From Rental Real Estate and Royalties   Note. If you are in the business of renting personal property, use Schedule C or C-EZ (see instructions). Report farm rental income or loss from Form 4835 on page 2, line 40.

| 1 List the type and location of each rental real estate property: | | 2 For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of: | | Yes | No |
|---|---|---|---|---|---|
| A | RENTAL PROPERTY HWY 175 LOT 352 SALEM ALABAMA | | A | | X |
| B | RENTAL PROPERTY HWY 175 LOT 351 SALEM ALABAMA | • 14 days, or | B | | X |
| C | | • 10% of the total days rented at fair rental value? (See instructions) | C | | |

**Income:**

| | | | Properties | | | Totals |
|---|---|---|---|---|---|---|
| | | | A | B | C | (Add columns A, B, and C.) |
| 3 | Rents received . . . . . . . . | 3 | | 2,735 | | 3 |
| 4 | Royalties received . . . . . . . | 4 | | | | 4 |

**Expenses:**

| | | | | | | |
|---|---|---|---|---|---|---|
| 5 | Advertising . . . . . . . . . | 5 | | | | |
| 6 | Auto and travel (see inst.) . . . | 6 | | | | |
| 7 | Cleaning and maintenance . . | 7 | | | | |
| 8 | Commissions . . . . . . . . | 8 | | | | |
| 9 | Insurance . . . . . . . . . | 9 | | | | |
| 10 | Legal and other professional fees | 10 | | | | |
| 11 | Management fees . . . . . . | 11 | | | | |
| 12 | Mortg int paid to banks, etc. (see inst.) | 12 | | | | |
| 13 | Other interest . . . . . . . . | 13 | | | | 12 |
| 14 | Repairs . . . . . . . . . | 14 | | 1,625 | | |
| 15 | Supplies . . . . . . . . . . | 15 | | | | |
| 16 | Taxes . . . . . . . . . . | 16 | 43 | 62 | | |
| 17 | Utilities . . . . . . . . . | 17 | | | | |
| 18 | Other (list)  ▶ | 18 | | | | |
| 19 | Add lines 5 through 18 . . . | 19 | 43 | 1,687 | | 19 |
| 20 | Depreciation expense or depletion (see instructions) . . | 20 | | | | 20 |
| 21 | Total expenses. Add lines 19 & 20 | 21 | 43 | 1,687 | | |
| 22 | Income or (loss) from rental real estate or royalty properties. Subtract line 21 from line 3 (rents) or line 4 (royalties). If the result is a (loss), see instructions to find out if you must file **Form 6198.**. | 22 | (43) | 1,048 | | |
| 23 | Deductible rental real estate loss. **Caution.** Your rental real estate loss on line 22 may be limited. See instructions to find out if you must file **Form 8582.** Real estate professionals must complete line 43 on page 2. . . . . . . . | 23 ( | 43)( | )( | ) | |
| 24 | **Income.** Add positive amounts shown on line 22. Do not include any losses . . . . . . . . . . . . . . . . . | | | | 24 | |
| 25 | **Losses.** Add royalty losses from line 22 and rental real estate losses from line 23. Enter total losses here . . . | | | 25 ( | ) | |
| 26 | **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17. Otherwise, include this amount in the total on line 41 on page 2 . . . . . . . . . . . . . . . . . . . . . | | | | 26 | |

SPA   For Paperwork Reduction Act Notice, see instructions.   2004   Petz Enterprises, Inc.   4US131   Schedule E (Form 1040) 2004

Form **4562**

# Depreciation and Amortization
### (Including Information on Listed Property)

OMB No. 1545-0172

**2004**

Department of the Treasury
Internal Revenue Service

▶ **See separate instructions.**    ▶ **Attach to your return.**

Attachment
Sequence No. 67

Name(s) shown on return
BOBBY SANKS

Business or activity to which this form relates
RENTAL PROPERTY

Identifying number

## Part I    Election To Expense Certain Property Under Section 179
**Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount. See page 2 of the instructions for a higher limit for certain businesses . . . . . . . . . . | **1** | $102,000 |
| 2 | Total cost of section 179 property placed in service (see instructions) . . . . . . . . . . . | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation . . . . . . . . . . . | **3** | $410,000 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- . . . . . . . . | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | |

| (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|
| 6 | | |
| | | |

| | | |
|---|---|---|
| 7 | Listed property. Enter amount from line 29 . . . . . . . . . . . . . | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 . . . . . . . | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 . . . . . . . . . . . | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2003 Form 4562 . . . . . . . | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instructions) | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 . . . . | **12** | |
| 13 | Carryover of disallowed deduction to 2005. Add lines 9 and 10, less line 12 ▶ | **13** | |

**Note:** Do not use Part II or Part III below for listed property. Instead, use Part V.

## Part II    Special Depreciation Allowance and Other Depreciation (Do **not** include listed property.)

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions) . . . . . . . . . . . | **14** | |
| 15 | Property subject to section 168(f)(1) election (see instructions) . . . . . . . . . | **15** | |
| 16 | Other depreciation (including ACRS) (see instructions) . . . . . . . . . | **16** | |

## Part III    MACRS Depreciation (Do **not** include listed property.) (See the instructions.)

### Section A

| | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2004 . . . . . . . | **17** | |
| 18 | If you are electing under section 168(i)(4) to group any assets placed in service during the tax year into one or more general asset accounts, check here . . . . . . . . . . . . . . . ▶ ☐ | | |

### Section B -- Assets Placed in Service During 2004 Tax Year Using the General Depreciation System

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only–see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a  3-year property | | | | | | |
| b  5-year property | | | | | | |
| c  7-year property | | 9,000 | 7 | MM | SL | 1,278 |
| d  10-year property | | | | | | |
| e  15-year property | | | | | | |
| f  20-year property | | | | | | |
| g  25-year property | | | 25 yrs. | | S/L | |
| h  Residential rental property | | | 27.5 yrs. | MM | S/L | |
| | | | 27.5 yrs. | MM | S/L | |
| i  Nonresidential real property | | | 39 yrs. | MM | S/L | |
| | | | | MM | S/L | |

### Section C -- Assets Placed in Service During 2004 Tax Year Using the Alternative Depreciation System

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b  12-year | | | 12 yrs. | | S/L | |
| c  40-year | | | 40 yrs. | MM | S/L | |

## Part IV    Summary (See instructions.)

| | | |
|---|---|---|
| 21 | Listed property. Enter amount from line 28 . . . . . . . . . . . . . . . | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations --see instructions . . . | **22** | 1,278 |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs . . . . . . . . . . . | **23** | |

SPA    For Paperwork Reduction Act Notice, see instructions.

2004    Petz Enterprises, Inc.    4US671

Form **4562** (2004)

Form 4562 (2004)    Page 2

**Part V**    Listed Property (Include automobiles, certain other vehicles, cellular telephones, certain computers, and property used for entertainment, recreation, or amusement.)

Note: For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete only 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A – Depreciation and Other Information (Caution:** See instructions for limits for passenger automobiles.)

24a  Do you have evidence to support the business/investment use claimed?  ☐ Yes ☐ No  24b If "Yes" is the evidence written?  ☐ Yes ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Bus/investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery Period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|

25  Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use (see instructions) . . . . . . . . . . . . . . . . | 25 |

26  Property used more than 50% in a qualified business use (see instructions):

| | | % | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | % | | | | | | |
| | | % | | | | | | |

27  Property used 50% or less in a qualified business use (see instructions):

| | | % | | | S/L- | | | |
|---|---|---|---|---|---|---|---|---|
| | | % | | | S/L- | | | |
| | | % | | | S/L- | | | |

28  Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 . . . . . . . . | 28 |

29  Add amounts in column (i), line 26. Enter here and on line 7, page 1 . . . . . . . . . . . . | 29 |

**Section B – Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle 1 | (b) Vehicle 2 | (c) Vehicle 3 | (d) Vehicle 4 | (e) Vehicle 5 | (f) Vehicle 6 |
|---|---|---|---|---|---|---|
| 30  Total business/investment miles driven during the year (do not include commuting miles--see instructions) | | | | | | |
| 31  Total commuting miles driven during the year | | | | | | |
| 32  Total other personal (noncommuting) miles driven | | | | | | |
| 33  Total miles driven during the year. Add lines 30 through 32 . . . . . . . | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 34  Was the vehicle available for personal use during off-duty hours? | | | | | | |
| 35  Was the vehicle used primarily by a more than 5% owner or related person? . . . . . . . | | | | | | |
| 36  Is another vehicle available for personal use? | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who are not more than 5% owners or related persons (see instructions).

| | Yes | No |
|---|---|---|
| 37  Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38  Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See instructions for vehicles used by corporate officers, directors, or 1% or more owners . . . . . | | |
| 39  Do you treat all use of vehicles by employees as personal use? | | |
| 40  Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? . . . . . | | |
| 41  Do you meet the requirements concerning qualified automobile demonstration use? (See instructions) . . . . . | | |

Note: If your answer to 37, 38, 39, 40, or 41 is "Yes," do not complete Section B for the covered vehicles.

**Part VI    Amortization**

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|

42  Amortization of costs that begins during your 2004 tax year (see instructions):

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

43  Amortization of costs that began before your 2004 tax year . . . . . . . . . . . . . . . . . . . . . | 43 | |

44  **Total.** Add amounts in column (f). See instructions for where to report . . . . . . . . . . . . . . | 44 | |

2004    Petz Enterprises, Inc.    4US672    Form 4562 (2004)

Form **8582**

Department of the Treasury
Internal Revenue Service (99)

## Passive Activity Loss Limitations

▶ See separate instructions.

▶ Attach to Form 1040 or Form 1041.

OMB No. 1545-1008

**2004**

Attachment
Sequence No. **88**

Name(s) shown on return
BOBBY SANKS

Identifying number

### Part I  2004 Passive Activity Loss

**Caution:** See the instructions for Worksheets 1, 2 and 3 on pages 7 and 8 before completing Part I.

**Rental Real Estate Activities With Active Participation** (For the definition of active participation see **Special Allowance for Rental Real Estate Activities** on page 3 of the instructions.)

| | | | | |
|---|---|---|---|---|
| 1a | Activities with net income (enter the amount from Worksheet 1, column (a)) . | 1a | 1,048 | |
| b | Activities with net loss (enter the amount from Worksheet 1, column (b)) . . . | 1b ( | 6,787 | ) |
| c | Prior years unallowed losses (enter the amount from Worksheet 1, column (c)) . | 1c ( | | ) |
| d | Combine lines 1a, 1b, and 1c . . . . . . . . . . . . . . . . . . . . . | | 1d | (5,739) |

**Commercial Revitalization Deductions From Rental Real Estate Activities**

| | | | | |
|---|---|---|---|---|
| 2a | Commercial revitalization deductions from Worksheet 2, column (a) . . . . . | 2a ( | | ) |
| b | Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2b ( | | ) |
| c | Add lines 2a and 2b . . . . . . . . . . . . . . . . . . . . . . . . | | 2c ( | ) |

**All Other Passive Activities**

| | | | | |
|---|---|---|---|---|
| 3a | Activities with net income (enter the amount from Worksheet 3, column (a)) . . | 3a | | |
| b | Activities with net loss (enter the amount from Worksheet 3, column (b)) . . . | 3b ( | | ) |
| c | Prior years unallowed losses (enter the amount from Worksheet 3, column (c)) . | 3c ( | | ) |
| d | Combine lines 3a, 3b, and 3c . . . . . . . . . . . . . . . . . . . . | | 3d | |

4    Combine lines 1d, 2c, and 3d. If the result is net income or zero, all losses are allowed, including any prior year unallowed losses entered on line 1c, 2b, or 3c. **Do not** complete Form 8582. Report the losses on the forms and schedules normally used ........................................    **4**    (5,739)

If line 4 is a loss and:    • Line 1d is a loss, go to Part II.

  • Line 2c is a loss, (and line 1d is zero or more), skip Part II and go to Part III.

  • Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

**Caution:** If filing status is married filing separately and you lived with your spouse at any time during the year, **do not** complete Part II or III. Instead, go to line 15.

### Part II  Special Allowance for Rental Real Estate With Active Participation

**Note:** Enter all numbers in Part II as positive amounts. See the instructions for an example.

| | | | | |
|---|---|---|---|---|
| 5 | Enter the smaller of the loss on line 1d or the loss on line 4 . . . . . . . . . . . . . . . | | 5 | 5,739 |
| 6 | Enter $150,000. If married filing separately, see the instructions . . . . . | 6 | 150,000 | |
| 7 | Enter modified adjusted gross income, but not less than zero (see instructions) | 7 | 45,334 | |
| | **Note:** If line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8. | | | |
| 8 | Subtract line 7 from line 6 . . . . . . . . . . . . . . . | 8 | 104,666 | |
| 9 | Multiply line 8 by 50% (.5). **Do not** enter more than $25,000. If married filing separately, see the instructions . . | | 9 | 25,000 |
| 10 | Enter the smaller of line 5 or line 9 . . . . . . . . . . . . . . . . . . . . . . . . . | | 10 | 5,739 |

If line 2c is a loss, go to Part III. Otherwise, go to line 15.

### Part III  Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities

**Note:** Enter all numbers in Part III as positive amounts. See the example for Part II on page 8.

| | | | |
|---|---|---|---|
| 11 | Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions . . . . . | 11 | |
| 12 | Enter the loss from line 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 5,739 |
| 13 | Reduce line 12 by the amount on line 10 . . . . . . . . . . . . . . . . . . . . . . . | 13 | |
| 14 | Enter the **smallest** of line 2c (treated as a positive amount), line 11, or line 13 . . . . . . . . . . . | 14 | |

### Part IV  Total Losses Allowed

| | | | |
|---|---|---|---|
| 15 | Add the income, if any, on lines 1a and 3a and enter the total . . . . . . . . . . . . . . | 15 | 1,048 |
| 16 | **Total losses allowed from all passive activities for 2004.** Add lines 10, 14, and 15. See the instructions to find out how to report the losses on your tax return . . . . . . . . . . . . . . . . . . . . . | 16 | 6,787 |

SPA    **For Paperwork Reduction Act Notice, see instructions.**    2004 ▤ Petz Enterprises, Inc.    4US881    Form **8582** (2004)

Form 8582 (2004)

Page 2

**Caution:** The worksheets must be filed with your tax return. Keep a copy for your records.

## Worksheet 1--For Form 8582, Lines 1a, 1b, and 1c (See page 7 of the instructions.)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
|---|---|---|---|---|---|
| | (a) Net income (line 1a) | (b) Net loss (line 1b) | (c) Unallowed loss (line 1c) | (d) Gain | (e) Loss |
| RENTAL PROPERTY | | 1,455 | | | 1,455 |
| RENTAL PROPERTY | | 65 | | | 65 |
| RENTAL PROPERTY | | 5,224 | | | 5,224 |
| RENTAL PROPERTY | | 43 | | | 43 |
| RENTAL PROPERTY | 1,048 | | | 1,048 | |
| Total. Enter on Form 8582, lines 1a, 1b, and 1c ▶ | 1,048 | 6,787 | | | |

## Worksheet 2--For Form 8582, Lines 2a, and 2b (See page 8 of the instructions.)

| Name of activity | (a) Current year deductions (line 2a) | (b) Prior year unallowed deductions (line 2b) | (c) Overall loss |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| Total. Enter on Form 8582, lines 2a and 2b ▶ | | | |

## Worksheet 3--For Form 8582, Lines 3a, 3b, and 3c (See page 8 of the instructions.)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
|---|---|---|---|---|---|
| | (a) Net income (line 3a) | (b) Net loss (line 3b) | (c) Unallowed loss (line 3c) | (d) Gain | (e) Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total. Enter on Form 8582, lines 3a, 3b, and 3c ▶ | | | | | |

## Worksheet 4--Use this worksheet if an amount is shown on Form 8582, line 10 or 14 (See page 9.)

| Name of activity | Form or schedule and line number to be reported on (see insts) | (a) Loss | (b) Ratio | (c) Special allowance | (d) Subtract column (c) from column (a) |
|---|---|---|---|---|---|
| RENTAL PROPERTY | SCH E 1C1 | 1,455 | 0.21438 | 1,230 | 225 |
| RENTAL PROPERTY | SCH E 1C2 | 65 | 0.00958 | 55 | 10 |
| RENTAL PROPERTY | SCH E 1C3 | 5,224 | 0.76971 | 4,417 | 807 |
| RENTAL PROPERTY | SCH E 2C1 | 43 | 0.00634 | 36 | 7 |
| Total ▶ | | 6,787 | 1.00 | 5,739 | 1,049 |

## Worksheet 5--Allocation of Unallowed Losses (See page 9 of the instructions.)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Ratio | (c) Unallowed loss |
|---|---|---|---|---|
| RENTAL PROPERTY | SCH E 1C1 | 225 | 0.21449 | |
| RENTAL PROPERTY | SCH E 1C2 | 10 | 0.00953 | |
| RENTAL PROPERTY | SCH E 1C3 | 807 | 0.76930 | |
| RENTAL PROPERTY | SCH E 2C1 | 7 | 0.00667 | |
| Total ▶ | | 1,049 | 1.00 | |

2004 Petz Enterprises, Inc.    4US882

Form 8582 (2004)

## Worksheet 6--Allowed Losses (See page 10 of the instructions.)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Unallowed loss | (c) Allowed loss |
|---|---|---|---|---|
| RENTAL PROPERTY | SCH E 1C1 | 1,455 | | 1,455 |
| RENTAL PROPERTY | SCH E 1C2 | 65 | | 65 |
| RENTAL PROPERTY | SCH E 1C3 | 5,224 | | 5,224 |
| RENTAL PROPERTY | SCH E 2C1 | 43 | | 43 |
| | | | | |
| Total ▸ | | 6,787 | | 6,787 |

## Worksheet 7--Activities With Losses Reported on Two or More Different Forms or Schedules (See page 10.)

| Name of activity: | (a) | (b) | (c) Ratio | (d) Unallowed loss | (e) Allowed Loss |
|---|---|---|---|---|---|
| Form or schedule and line number to be reported on (see instructions): . . . . . . . . . . . . | | | | | |
| 1a  Net loss plus prior year unallowed loss from form or schedule . . ▸ | | | | | |
| b  Net income from form or schedule . . . . . . . . . . ▸ | | | | | |
| c  Subtract line 1b from line 1a. If zero or less, enter -0- ▸ | | | | | |
| Form or schedule and line number to be reported on (see instructions): . . . . . . . . . . . . | | | | | |
| 1a  Net loss plus prior year unallowed loss from form or schedule . . ▸ | | | | | |
| b  Net income from form or schedule . . . . . . . . . . ▸ | | | | | |
| c  Subtract line 1b from line 1a. If zero or less, enter -0- ▸ | | | | | |
| Form or schedule and line number to be reported on (see instructions): . . . . . . . . . . . . | | | | | |
| 1a  Net loss plus prior year unallowed loss from form or schedule . . ▸ | | | | | |
| b  Net income from form or schedule . . . . . . . . . . ▸ | | | | | |
| c  Subtract line 1b from line 1a. If zero or less, enter -0- ▸ | | | | | |
| Total . . . . . . . . . . . . . . . . . . . . ▸ | | | 1.00 | | |

Declaration Control Number (DCN)

`0 0` - `6 3 2 6 3 2` - `1 1 7 2 3` - `5`

| FORM<br>AL8453 | ALABAMA DEPARTMENT OF REVENUE<br>**Individual Income Tax Declaration for Electronic Filing**<br>For the year January 1 - December 31, 2004 | COPY 2004 |
|---|---|---|

| **Label**<br>Use Alabama label. Otherwise, please type or print. | L A B E L  H E R E | Your first name and initial<br>BOBBY SANKS | Last name | Your social security number |
|---|---|---|---|---|
| | | If a joint return, spouse's first name and initial | Last name | Spouse's soc. sec. no. if joint return |
| | | Home address (number and street). If a P.O. Box, see instructions.<br>PO BOX 44 | Apt. no. | Telephone number (optional)<br>334-749-9106 |
| | | City, town or post office, state, and ZIP code<br>SALEM AL 36874 | | FN (For official use only) |

**PART I**

**Tax Return Information**

(Whole dollars only.)

| | | |
|---|---|---|
| 1 Alabama taxable income (Form 40, line 17) . . . . . . . . . . | 1 | 11,554 |
| 2 Total tax liability (Form 40, line 22) . . . . . . . . . . | 2 | 538 |
| 3 Total payments (Form 40, line 26) . . . . . . . . . . | 3 | 1,690 |
| 4 Refund (Form 40, line 33) . . . . . . . . . . | 4 | 1,152 |
| 5 Amount you owe (Form 40, line 27) | 5 | |

**PART II**

**Direct Deposit**

1 Routing number:  062203298

2 Account number:  375571706

3 Type of account:  ☒ Checking    ☐ Savings

**PART III**

**Declaration of Taxpayer**

(Sign only after Part II is completed.)

Under penalties of perjury, I declare that I have compared the information contained on my return with the information I have provided to my electronic return originator and that the amounts described in Part I above agree with the amounts shown on the corresponding lines of my 2004 Alabama individual income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my ERO described below, any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

☐ I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

**Sign Here**

Your signature _____ Date _____    Spouse's signature. If joint return, BOTH must sign. _____ Date _____

**PART IV**

**Declaration of Electronic Return Originator (ERO) and Paid Preparer**

(See instructions.)

I declare that I have reviewed the above taxpayer's Alabama individual income tax return and that the entries on this form are complete and correctly represented based on all information of which I have any knowledge. I also declare that I have followed all other requirements described in IRS PUB. 1345, Revenue Procedures for Electronic Filing of Individual Income Tax Returns (Tax Year 2004), and the Alabama Handbook for Electronic Filers of Individual Income Tax Returns (Tax Year 2004). If I am also the paid preparer, under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

**ERO's Use Only**

| ERO's signature | Date | Check if also paid preparer ☒ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address | DDS TAX SERVICE<br>1328 AUBURN ST<br>OPELIKA AL | | E.I. No.<br>ZIP Code<br>36801 |

**Paid Preparer's Use Only**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

| Preparer's signature | Date | Check if self-employed ☒ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address | LINDA LINSON | | E.I. No.<br>ZIP Code |

## DO NOT MAIL TO ALABAMA DEPT. OF REVENUE

2004 ▌▌ Petz Enterprises, Inc.    4AL991

SANKS
000017

Form AL8453 2004

| FORM **40** | **Alabama Individual Income Tax Return** RESIDENTS AND PART-YEAR RESIDENTS | **2004** |
|---|---|---|

For the year Jan. 1 - Dec. 31, 2004 or other tax year:  Beginning_____ Ending_____    FN (for official use only)

COPY

Your social security number _____    Spouse's SSN if joint return _____

BOBBY SANKS
PO BOX 44

SALEM AL 36874

**Filing Status and Exemptions**
Check only one box

| 1 | $1,500 Single |
| 2 | $3,000 Married filing joint return (even if only one spouse had income) |
| 3 | $1,500 Married filing sep. return. Complete line 5 with spouse's name & soc. sec. no. |
| 4 X | $3,000 Head of family (with qualifying person). (See instructions.) Complete line 5. |

5  Name **MARY SANKS**
Soc. Sec. No. _____
Relationship **PARENT**

**Income and Adjustments**

6 Wages, salaries, tips, etc. (list each employer and address separately):

|   |   | A - Ala. tax withheld | | B - Income | |
|---|---|---|---|---|---|
| a | WESTPOINT STEVENS INC PO BOX 71 WEST POINT GA | 6a | 1,690 | 6a | 44,290 | 00 |
| b | | 6b | 00 | 6b | | 00 |
| c | | 6c | 00 | 6c | | 00 |
| d | | 6d | 00 | 6d | | 00 |

| 7 | Interest and dividend income (also attach Schedule B if over $1,500) . . . . . . . . . ▶ | 7 | | 00 |
| 8 | Other income (from page 2, Part I, line 9) . . . . . . . . . . . . . . . . . . . . ▶ | 8 | (5,739) | 00 |
| 9 | Total income. Add amounts in the income column for line 6a through line 8 . . . . . . | 9 | 38,551 | 00 |
| 10 | Total adjustments to income (from page 2, Part II, line 8) . . . . . . . . . . . . | 10 | | 00 |
| 11 | Adjusted gross income. Subtract line 10 from line 9 . . . . . . . . . . . . . . . | 11 | 38,551 | 00 |

**Deductions**

You Must Attach page 2 of Federal Form 1040, Federal Form 1040A, page 1 of 1040EZ, or a copy of your Telefile Schedule if claiming a deduction on line 13.

| 12 | Check box a if you itemize deductions, and enter amount from Schedule A, line 26. Check box b if you do not itemize deductions, and enter standard deduction (see instructions) ▶ a☐Itemized Deductions b☒Standard Deductions ▶ | Box a or b MUST be checked | 12 | 22,283 | 00 |
| 13 | Federal tax liability deduction (see instructions) . . . . . . . . . . DO NOT ENTER THE FEDERAL TAX WITHHELD FROM YOUR W-2 (s) | | 13 | 1,414 | 00 |
| 14 | Personal exemption (from line 1, 2, 3, or 4) . . . . . . . . . . | | 14 | 3,000 | 00 |
| 15 | Dependent exemption (from page 2, Part III, line 2) . . . . . . . . | | 15 | 300 | 00 |
| 16 | Total deductions. Add lines 12, 13, 14, and 15 . . . . . . . . . . . . . . . . | | 16 | 26,997 | 00 |

**Tax**
Staple Form(s) W-2, W-2G, and/or 1099 here.

| 17 | Taxable income. Subtract line 16 from line 11 . . . . . . . . . . . . . . . . . | 17 | 11,554 | 00 |
| 18 | Income Tax due. Enter amount from tax table or check if from ☐ Form NOL-85A . . . ▶ | 18 | 538 | 00 |
| 19 | Less credits and/or: ☐ Schedule CR and/or ☐ Schedule OC . . . . . . . . ▶ | 19 | | 00 |
| 20 a | Net tax due Alabama. Subtract line 19 from line 18 . . . . . . . . . . . . . . | 20a | 538 | 00 |
| b | Consumer Use Tax (use worksheet in the instructions) . . . . . . . . . . . . ▶ | 20b | | 00 |

| 21 | You may make a voluntary contribution to any of the following: Alabama Election Campaign Fund, or the Neighbors Helping Neighbors Fund. | a AL Democratic Party ☐ $1 ☐ $2 ☐ none ▶ | 21a | | 00 |
| | | b AL Republican Party ☐ $1 ☐ $2 ☐ none ▶ | 21b | | 00 |
| | | c Neighbors Helping Neighbors . . . . $___ ▶ | 21c | | 00 |
| 22 | Total tax liability and voluntary contribution. Add lines 20a, 20b, 21a, 21b, and 21c | 22 | 538 | 00 |

**Payments**

| 23 | Alabama income tax withheld (from Forms W-2, W-2G, &/or 1099) | 23 | 1,690 | 00 |
| 24 | Amount paid with extension (attach Form 4868A) . . . . . . . . . | 24 | | 00 |
| 25 | 2004 estimated tax payments (see instructions) . . . . . . . . . | 25 | | 00 |
| 26 | Total payments. Add lines 23 through 25 . . . . . . . . . . . . . . . . . . . . | 26 | 1,690 | 00 |

**AMOUNT YOU OWE**

| 27 | If line 22 is larger than line 26, subtract line 26 from line 22, & enter AMOUNT YOU OWE. CN Place payment, along with Form 40V, loose in the mailing envelope. (FORM 40V MUST ACCOMPANY PAYMENT) if paying by credit card do not include Form 40V and check here ☐ ▶ | 27 | .00 |
| 28 | Estimated tax penalty. Also include on line 27 (see instructions page 11) . . . . | 28 | 00 |

**OVERPAID**

| 29 | If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount OVERPAID . . . ▶ | 29 | 1,152 | 00 |
| 30 | Amount of line 29 to be applied to your 2005 estimated tax . . . . ▶ | 30 | | 00 |

**Donation Check-offs**

31 You may donate all or part of your overpayment. (Enter $1, $5, $10, $25, none, or other amount in appropriate boxes)

| a Senior Services Trust Fund . . ▶ | | 00 | f AL Indian Children's Scholarship Fund . . ▶ | | 00 |
| b AL Arts Development Fund . . ▶ | | 00 | g Penny Trust Fund . . . ▶ | | 00 |
| c AL Nongame Wildlife Fund . . ▶ | | 00 | h Foster Care Trust Fund . . ▶ | | 00 |
| d Child Abuse Trust Fund . . ▶ | | 00 | i Mental Health . . . ▶ | | 00 |
| e AL Veterans Program . . ▶ | | 00 | j AL Breast & Cervical Cancer Program . . ▶ | | 00 |
| | | | k AL 4-H Club . . . ▶ | | 00 |

**PLEASE**
• Verify your social security number
• Recheck your math
• Sign return on page 2
• Attach W-2 form(s)

| 32 | Total. Add line 30 and lines 31a, b, c, d, e, f, g, h, i, j, and k . . . . . . . . . | 32 | | 00 |

**REFUND**

| 33 | REFUNDED TO YOU. (CAUTION: You must sign this return on the reverse side.) Subtract line 32 from line 29. For Direct Deposit, check here ☒ and complete Part V, Page 2 . . . ▶ | 33 | 1,152 | 00 |

PEI    2004    Petz Enterprises, Inc.    4AL011

SANKS

000018

Form 40 (2004)                                                                                        Page 2

## PART I
**Other Income**
(see instructions)

| | | | |
|---|---|---|---|
| 1 | Alimony received | 1 | 00 |
| 2 | Business income or (loss) (attach Federal Schedule C or C-EZ) | 2 | 00 |
| 3 | Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. (attach Schedule D) | 3 | 00 |
| 4a | Total IRA distributions [4a] ___ 00 4b Taxable amount (see instructions) | 4b | 00 |
| 5a | Total pensions and annuities [5a] ___ 00 5b Taxable amount (see instructions) | 5b | 00 |
| 6 | Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E) | 6 | (5,739) 00 |
| 7 | Farm income or (loss) (attach Federal Schedule F) | 7 | 00 |
| 8 | Other income (state nature & source -- see instructions) | 8 | 00 |
| 9 | Total other income. Add lines 1 through 8. Enter here and also on page 1, line 8. ▶ | 9 | (5,739) 00 |

## PART II
**Adjustments to Income**
(see instructions)

| | | | |
|---|---|---|---|
| 1a | Your IRA deduction | 1a | 00 |
| b | Spouse's IRA deduction | 1b | 00 |
| 2 | Payments to a Keogh retirement plan and self-employment SEP deduction | 2 | 00 |
| 3 | Penalty on early withdrawal of savings | 3 | 00 |
| 4 | Alimony pd. Recipient's last name ___ SSN ▶ Address, City, State, ZIP | 4 | 00 |
| 5 | Adoption expenses | 5 | 00 |
| 6 | Moving Expenses (Attach Fed. Frm. 3903) to City, State, ZIP | 6 | 00 |
| 7 | Self-employed health insurance deduction | 7 | 00 |
| 8 | Total adjustments. Add lines 1 through 7. Enter here and also on page 1, line 10. ▶ | 8 | 00 |

## PART III
**Dependents**
Do not include yourself or your spouse

(see instructions)

1a Dependents:

| (1) First name    Last name | (2) Dependent's social security number. | (3) Dependent's relationship to you. | (4) Did you provide more than one-half of dependent's support? |
|---|---|---|---|
| MARY        SANKS | | PARENT | YES |

b Total number of dependents claimed above _____ [ 1 ]

2 Amount allowed. (Multiply $300 by the total no. of dep(s) claimed on line 1b.) Enter amt. here & on pg. 1, line 15 ▶ [2] 300

## PART IV
**General Information**

1 Residency  Check only 1 box  [X] Full Year  If you were a part-year resident of Alabama during 2004, indicate your period of residence:
☐ Part Year  From _____ 2004 through _____ 2004. Total months _____

2 Did you file an AL income tax return for year 2003? [X] Yes ☐ No

3 If no, state reason. _____

4 Give name and address of present employer(s). Yours  WESTPOINT STEVENS INC     PO BOX 71 WEST POINT GA 31833
Your Spouse's _____

**All Taxpayers Must Complete This Section.**

5 Enter the Federal AGI $ 39,595 & Federal Taxable Income $ 12,810  as reported on your 2004 Federal Individual Income Tax Return.

6 Do you have income which is reported on your Fed. return, but not reported on your AL return (other than your state tax refund)?
[X] Yes ☐ No If yes, enter source(s) and amount(s) below: (other than state income tax refund).

Source  ALABAMA STATE UNEMPLOYMENT     Amount 210 00
Source  _____                Amount ___ 00

## PART V
**Direct Deposit**

For Direct Deposit of your refund, complete 1, 2, and 3 below. (See instructions to see if you qualify.)
1 Routing Number: 062203298     2 Type: [X] Checking ☐ Savings
3 Account Number: 375571706

## Sign Here
[X] I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Keep a copy of this return for your records.

| Your signature | Date | Daytime telephone no. 334-749-9106 | Your occupation ELECTRICIAN |
|---|---|---|---|
| Spouse's signature (if joint return, BOTH must sign) | Date | Daytime telephone no. | Spouse's occupation |

## Paid Preparer's Use Only

| Preparer's signature ▶ LINDA LINSON | Date | Check if self-employed [X] | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed and address) ▶ 1328 AUBURN ST  OPELIKA AL | Tel. # | E.I. No. | ZIP Code 36801 |

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below.

If you are not making a payment, mail your return to:          If you are making a payment, mail your return, Form 40V, and payment to:

## WHERE TO FILE FORM 40 ▶

Alabama Department of Revenue
P.O. Box 154
Montgomery, AL 36135-0001

Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140-0001

Mail only your 2004 Form 40 to one of the above addresses. Prior year returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P.O. Box 327464, Montgomery, AL 36132-7464.

2004 Petz Enterprises, Inc.     4AL012

SANKS
000019

SCHEDULES
**A, B, & CR**
(FORM 40)

ALABAMA DEPARTMENT OF REVENUE
**Schedule A--Itemized Deductions**
(Schedules B and CR are on back)

COPY

2004

ATTACH TO FORM 40--SEE INSTRUCTIONS FOR SCHEDULE A

Name(s) as shown on Form 40

BOBBY SANKS

Your social security number

The itemized deductions you may claim for the year 2004 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. **PART-YEAR RESIDENTS:** A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

| | | | | | |
|---|---|---|---|---|---|
| **Medical and Dental Expenses** (See instructions) | | CAUTION: Do not include expenses reimbursed or paid by others. | | | |
| | 1 | Medical and dental expenses . . . . . . . . . . . . . | 1 | | 00 |
| | 2 | Enter amount from Form 40, line 11 | 2 | 00 | |
| | 3 | Multiply the amount on line 2 by 4% (.04). Enter the result | 3 | | 00 |
| | 4 | Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- . . . . . . . . . . ▶ | 4 | | 00 |
| **Taxes You Paid** (See instructions) | 5 | Real estate taxes . . . . . . . . . . . . . . . . . | 5 | 414 | 00 |
| | 6 | FICA Tax (Social Security & Medicare) & Federal Self-Employment Tax | 6 | 3,388 | 00 |
| | 7 | Railroad Retirement (Tier 1 only) . . . . . . . . . . . | 7 | | 00 |
| | 8 | Other taxes. (List--include personal prop. taxes.) ▶ ___256___ | 8 | 256 | 00 |
| | 9 | Add the amounts on lines 5 through 8. Enter the total here . . . . . . . . . . . . . . ▶ | 9 | 4,058 | 00 |
| **Interest You Paid** (See instructions) | 10a | Home mortg. interest and points reported to you on Federal Form 1098 | 10a | 13,025 | 00 |
| | b | Home mortgage interest not reported to you on Federal Form 1098. (If pd. to an individual, show that person's name & address). ▶ | | | |
| **NOTE:** Personal interest is not deductible | 11 | Points not reported to you on Form 1098 . . . . | 10b 11 | | 00 00 |
| | 12 | Investment interest. (Attach Form 4952A) . . . . | 12 | | 00 |
| | 13 | Add the amounts on lines 10a through 12. Enter the total here . . . . . . . . . . . . ▶ | 13 | 13,025 | 00 |
| **Gifts to Charity** (See instructions) | | CAUTION: If you made a charitable contribution and received a benefit in return, see instructions. | | | |
| | 14 | Contributions by cash or check . . . . . . . . . . | 14 | 5,200 | 00 |
| | 15 | Other than cash or check. (You MUST attach Fed. Form 8283 if over $500.) | 15 | | 00 |
| | 16 | Carryover from prior year . . . . . . . . . . . . | 16 | | 00 |
| | 17 | Add the amounts on lines 14 through 16. Enter the total here . . . . . . . . . . . ▶ | 17 | 5,200 | 00 |
| **Casualty and Theft Losses** (Attach Frm. 4684) | 18a | Enter amount from Federal Form 4684, line 16 (See instructions) . . . | 18a | | 00 |
| | b | Enter 10% of your Adjusted Gross Income (Form 40, line 11) . . . . . | 18b | | 00 |
| | c | Subtract line 18b from line 18a. If zero or less, enter -0- . . . . . . . . . . . . . . ▶ | 18c | | 00 |
| **Job Expenses & Most Other Miscellaneous Deductions** (See instructions) | 19 | Unreimbursed employee expenses--job travel, union dues, job educ., etc. (You MUST attach Fed. Form 2106 if required. See inst.) ▶ | 19 | | 00 |
| | 20 | Other expenses (investment, tax preparation, safe deposit box, etc.). List type and amount ▶ TAX PREPARATION 125 | 20 | 125 | 00 |
| | 21 | Add the amounts on lines 19 and 20. Enter the total . . . . . . . | 21 | 125 | 00 |
| | 22 | Multiply the amount on Form 40, line 11 by 2% (.02). Enter result here | 22 | 771 | 00 |
| | 23 | Subtract line 22 from line 21. Enter the result. If zero or less, enter -0- . . . . . . | 23 | | 00 |
| **Other Miscellaneous Deductions** | 24 | Other (from list in the instructions). List type and amount. ▶ | 24 | | 00 |
| **Qualified Long-Term Care Ins. Premiums** | | CAUTION: Do not include medical premiums. | | | |
| | 25 | Enter amount here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | 25 | | 00 |
| **Total Itemized Deductions** | 26 | Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12 . . . . . . . . ▶ | 26 | 22,283 | 00 |

PEI   2004   Petz Enterprises, Inc.   4AL111

Schedule A (Form 40) 2004

SANKS
000020

Page 13

# SCHEDULE E (FORM 40)

## Supplemental Income and Loss

(From Rental Real Estate, Royalties, Partnerships, S Corporations, Estates, Trusts, REMICs, etc.)

► **ATTACH TO FORM 40.** ► **SEE INSTRUCTIONS FOR SCHEDULE E (FORM 40).**

**2004**

COPY

Name(s) shown on return

BOBBY SANKS

Your social security number

### PART I  Income or Loss From Rental Real Estate and Royalties

Note: Report income and expenses from your business of renting personal property on Schedule C or C-EZ.

**1** Show the kind and location of each Rental Real Estate Property:

A  RENTAL PROPERTY
HWY 175 LOT 350 SALEM ALABAMA

B  RENTAL PROPERTY
HWY 175 LOT 349 SALEM ALABAMA

C  RENTAL PROPERTY
1419 HOOPER AVENUE OPELIKA ALABAMA

**2** For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of:
- 14 days, **or**
- 10% of the total days rented at fair rental value?

| | Yes | No |
|---|---|---|
| A | | X |
| B | | X |
| C | | X |

| | | | Properties | | Totals (Add Columns A, B, and C) |
|---|---|---|---|---|---|
| | | | A | B | C | |
| **Income:** | | | | | | |
| 3 Rents received . . . . . . . . . | 3 | 4,200 | | 2,004 | 3 | 6,204 |
| 4 Royalties received . . . . . . . | 4 | | | | 4 | |
| **Expenses:** | | | | | | |
| 5 Advertising . . . . . . . . . . | 5 | | | | | |
| 6 Auto and travel . . . . . . . . | 6 | | | | | |
| 7 Cleaning and maintenance . . . . | 7 | | | | | |
| 8 Commissions . . . . . . . . . | 8 | | | | | |
| 9 Insurance . . . . . . . . . . | 9 | 525 | | 610 | | |
| 10 Legal and other professional fees . | 10 | | | | | |
| 11 Management fees . . . . . . . | 11 | | | | | |
| 12 Mortgage interest . . . . . . . | 12 | | | 4,112 | 12 | 4,112 |
| 13 Other interest . . . . . . . . | 13 | | | | | |
| 14 Repairs . . . . . . . . . . . | 14 | 3,770 | | 1,845 | | |
| 15 Supplies . . . . . . . . . . | 15 | | | | | |
| 16 Taxes . . . . . . . . . . . | 16 | 82 | 65 | 661 | | |
| 17 Utilities . . . . . . . . . . | 17 | | | | | |
| 18 Other (list) ► | 18 | | | | | |
| | | | | | | |
| 19 Add lines 5 through 18 . . . . . . | 19 | 4,377 | 65 | 7,228 | 19 | 11,670 |
| 20 Depreciation expense or depletion . . | 20 | 1,278 | | | 20 | 1,278 |
| 21 Total expenses. Add lines 19 and 20 . | 21 | 5,655 | 65 | 7,228 | | |
| 22 Income or (loss). Subtract line 21 from line 3 (rents) or line 4 (royalties) . . | 22 | (1,455) | (65) | (5,224) | | |

**23** Total Real Estate and Royalty income or (loss). Add columns A, B, and C from line 22 and enter the result here . . | **23** | (6,744)

### PART II  Income from Partnerships, S Corporations, Estates & Trusts

| (g) Name and Address | (h) Check One | S Corporation / Estate or Trust / Partnership | (i) Employer Identification Number | (j) Amount |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**24** TOTAL INCOME FROM PARTNERSHIPS, S CORPORATIONS, ESTATES, AND TRUSTS. Add the amounts in column (j). Enter the total here and include on line 25 below . . . . . . . . . . . . . . . . . . ► | **24** |

**25** TOTAL INCOME OR (LOSS). Combine lines 23 and 24. Enter the total here & on Form 40, page 2, Part I, line 6 ► | **25** | (6,744)

PEI  2004  Petz Enterprises, Inc.    4AL151

Schedule E (Form 40) 2004

SANKS
000021

**SCHEDULE E**
**(FORM 40)**

**Supplemental Income and Loss**

(From Rental Real Estate, Royalties, Partnerships, S Corporations, Estates, Trusts, REMICs, etc.)

► **ATTACH TO FORM 40.** ► **SEE INSTRUCTIONS FOR SCHEDULE E (FORM 40).**

**2004**

COPY

Name(s) shown on return
BOBBY SANKS

Your social security number

**PART I**  Income or Loss From Rental Real Estate and Royalties
Note: Report income and expenses from your business of renting personal property on Schedule C or C-EZ.

1  Show the kind and location of each Rental Real Estate Property:

A  RENTAL PROPERTY
   HWY 175 LOT 352 SALEM ALABAMA

B  RENTAL PROPERTY
   HWY 175 LOT 351 SALEM ALABAMA

C  _____

2  For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of:
   • 14 days, or
   • 10% of the total days rented at fair rental value?

| | Yes | No |
|---|---|---|
| A | | X |
| B | | X |
| C | | |

**Income:**

| | | Properties | | | Totals |
|---|---|---|---|---|---|
| | | A | B | C | (Add Columns A, B, and C) |
| 3 Rents received . . . . . . . . . | 3 | | 2,735 | | 3    2,735 |
| 4 Royalties received . . . . . . . | 4 | | | | 4 |

**Expenses:**

| | | | | | |
|---|---|---|---|---|---|
| 5 Advertising . . . . . . . . . | 5 | | | | |
| 6 Auto and travel . . . . . . . . | 6 | | | | |
| 7 Cleaning and maintenance . . . | 7 | | | | |
| 8 Commissions . . . . . . . . | 8 | | | | |
| 9 Insurance . . . . . . . . . | 9 | | | | |
| 10 Legal and other professional fees | 10 | | | | |
| 11 Management fees . . . . . . | 11 | | | | |
| 12 Mortgage interest . . . . . . . | 12 | | | | 12 |
| 13 Other interest . . . . . . . . | 13 | | | | |
| 14 Repairs . . . . . . . . . . | 14 | | 1,625 | | |
| 15 Supplies . . . . . . . . . | 15 | | | | |
| 16 Taxes . . . . . . . . . . | 16 | 43 | 62 | | |
| 17 Utilities . . . . . . . . . | 17 | | | | |
| 18 Other (list) ► | 18 | | | | |
| _____ | | | | | |
| _____ | | | | | |
| 19 Add lines 5 through 18 . . . . . | 19 | 43 | 1,687 | | 19    1,730 |
| 20 Depreciation expense or depletion | 20 | | | | 20 |
| 21 Total expenses. Add lines 19 and 20 . | 21 | 43 | 1,687 | | |
| 22 Income or (loss). Subtract line 21 from line 3 (rents) or line 4 (royalties) . . | 22 | (43) | 1,048 | | |

23  Total Real Estate and Royalty income or (loss). Add columns A, B, and C from line 22 and enter the result here . . ▶  **23**  1,005

**PART II**  Income from Partnerships, S Corporations, Estates & Trusts

| (g) Name and Address | (h) Check One | S Corporation / Estate or Trust / Partnership | (i) Employer Identification Number | (j) Amount |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

24  TOTAL INCOME FROM PARTNERSHIPS, S CORPORATIONS, ESTATES, AND TRUSTS. Add the amounts in column (j). Enter the total here and include on line 25 below . . . . . . . . . . . . . . ▶  **24**

25  TOTAL INCOME OR (LOSS). Combine lines 23 and 24. Enter the total here & on Form 40, page 2, Part I, line 6  ▶  **25**  1,005

PEI  2004  Petz Enterprises, Inc.   4AL151

Schedule E (Form 40) 2004

SANKS
000022

Page 15

Form W-2 Wage and Tax Statement

| | 7 Social security tips | 1 Wages, tips, other comp. |
| c Employer's name, address, and ZIP code | | 5131.78 |
| | 8 Allocated tips | 2 Federal income tax withheld |
| WESTPOINT HOME, INC. | | 28771.17 |
| OPELIKA MFG | 9 Advance EIC payment | 3 Social security tax withheld |
| 2401 FIRST AVE | | 1783.81 |
| OPELIKA AL  36801 | 10 Dependent care benefits | 5 Medicare wages and tips |
| | | 28771.17 |
| | | 6 Medicare tax withheld |
| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 417.18 |
| | 13 Statutory employee / Retirement plan X / Third-party sick pay | 12a See instructions for box 12 |
| BOBBY L. SANKS          1 041 T 0011 1 | 14 Other | 12b |
| BOX 44 | b Employer identification number (EIN) | |
| | | 12c |
| SALEM AL  36874 | d Employee's social security no. | |
| | | 12d |
| 15 State   Employer's state I.D. no. | 16 State wages, tips, etc. | 17 State income tax |
| AL | 28771.17 | 1143.81 |
| | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Copy C For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)

OMB No. 1545-0008

Dept. of the Treasury - IRS
Visit the IRS Web Site at www.irs.gov

---

Copy C For EMPLOYEE'S RECORD
(See Notice to Employee.)

**2005**

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax with |
| | 3733.12 | 255 |
| 1617 | 3 Social security wages | 4 Social security tax with |
| b Employer ID number | 3733.12 | 23 |
| | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 3733.12 | 5 |
| c Employer's name, address, and ZIP code | | |

A-1 EMPLOYMENT, INC.
400 SOUTH 8TH ST.
SUITE 101
OPELIKA                    AL      36801-49

d Employee's social security number

e Employee's name, address, and ZIP code

BOBBY L. SANKS
P.O. BOX 44
SALEM                      AL      36874

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payme |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |
| AL | 3733.12 | 104 |
| 15 State Emplr's state I.D. # | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| 3733.12 | 55.99 | OPELIKA |

Form W-2 Wage and Tax Statement
DAA

Dept. of the Treasury

SANKS
000023

---

| | CORRECTED (IF CHECKED) | |

PAYER'S name, street address, city, state, and ZIP code

STATE STREET RETIREE SERVICES FOR
WESTPOINT STEVENS
P O BOX 5149
BOSTON MA 022065149

| 1 Gross distribution | OMB No. 1545-0119 | Distributions From Pensions, |
| 25,256.06 | | Annuities, Retirement or |
| 2a Taxable amount | **2005** | Profit-Sharing Plans, IRAs, |
| 25,256.06 | Form 1099-R | Insurance Contracts, etc. |
| 2b Taxable amount not determined | Total distribution X | Copy C |
| 3 Capital gain (included in box 2a) | 4 Federal income tax withheld | For Recipient's Records |
| 0.00 | 5,051.21 | |

PAYER'S Federal identification number | RECIPIENT'S identification number

| 5 Employee contributions or insurance premiums | 6 Net unrealized appreciation in employer's securities | |
| 0.00 | 0.00 | This information is being furnished to the Internal Revenue Service. |

RECIPIENT'S name, street address, city, state, and ZIP code

BOBBY L. SANKS
BOX 44
SALEM AL 36874

| 7 Distribution codes | IRA/SEP/SIMPLE | 8 Other |
| 1 | | 0.00 |
| 9a Your percentage of total distribution | 9b Total employee contributions | |
| | 0.00 % | |

Department of the Treasury-Internal Revenue Service

| Form **1040** | **U.S. Individual Income Tax Return** | **2005** | (99) | IRS Use Only-Do not write or staple in this space. |
|---|---|---|---|---|

OMB No. 1545-0074

**Label**
(See instructions)
**Use the IRS label.**
Otherwise, please print or type.

L A B E L   H E R E

BOBBY SANKS

PO BOX 44
SALEM            AL   36874-0000-000

Your social security number

Spouse's social security no.

▲ You must enter your SSN(s) above. ▲

**Presidential Election Campaign** ▶ Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see instr.) . . . . ▶  You ☐  Spouse ☐

Checking a box below will not change your tax or refund.

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☒ Head of household (with qualifying person). (See inst.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child (see instructions)

**Exemptions**

If more than four dependents, see instructions.

6a ☒ Yourself. If someone can claim you as a dependent, **do not check box 6a** . . . . . . . . .
b ☐ Spouse

Boxes checked on 6a and 6b .......... **1**

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see inst.) |
|---|---|---|---|
| MARY          SANKS | | PARENT | |
| | | | |
| | | | |
| | | | |

No. of children on 6c who:
• lived with you .. **01**
• did not live with you due to divorce or separation (see inst.)
Dependents on 6c not entered above ........

d   Total number of exemptions claimed . . . . . . . . . . . . . . . . Add numbers on lines above ▶ **02**

**Income**

**Attach Form(s) W-2 here. Also attach Form(s) W-2G and 1099-R if tax was withheld.**

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 32,504 |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . . | 8a | |
| b | Tax-exempt interest. Do not include on line 8a . . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . | 9a | |
| b | Qualified dividends (see instructions) . . . . . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) . . . | 10 | 1,152 |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . . . | 14 | |
| 15a | IRA distributions . . . . . | 15a | | b Taxable amount (see inst.) | 15b | |
| 16a | Pensions and annuities . . | 16a | | b Taxable amount (see inst.) | 16b | 25,256 |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E . . | 17 | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . . . . . . | 19 | |
| 20a | Social security benefits . . | 20a | | b Taxable amount (see inst.) | 20b | |
| 21 | Other income. List type & amount (see instr.) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 58,912 |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses (see instructions) . . . . . . . . . . | 23 | |
| 24 | Certain business expenses of reservists, performing artists, & fee-basis government officials. Attach Form 2106 or 2106-EZ. | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 . . | 25 | |
| 26 | Moving expenses. Attach Form 3903 . . . . . . . . . | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE . . . | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . . . . | 28 | |
| 29 | Self-employed health insurance deduction (see instructions). | 29 | |
| 30 | Penalty on early withdrawal of savings . . . . . . . . . . | 30 | |
| 31a | Alimony paid    b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction (see instructions) . . . . . . . . . . . . | 32 | |
| 33 | Student loan interest deduction (see instructions) . . . . . | 33 | |
| 34 | Tuition and fees deduction (see instructions) . . . . . . . | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 31a and 32 through 35 . . . . . . . . . . . . . . . . | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . . . . . . ▶ | 37 | 58,912 |

SANKS
000024

| SPA  2005  Petz Enterprises, Inc.  5US011 | **For Disclosure, Privacy Act, & Paperwork Reduction Act Notice, see instructions.** | Form **1040** (2005) |
|---|---|---|

Form 1040 (2005)

Page **2**

| | | | |
|---|---|---|---|
| **Tax and Credits** | **38** Amount from line 37 (adjusted gross income) | **38** | 58,912 |

**39a** Check { ☐ **You were born before January 2, 1941,** ☐ Blind. } **Total boxes**
if: { ☐ **Spouse was born before Jan. 2, 1941,** ☐ Blind. } checked ▶ **39a**

**b** If your spouse itemizes on a separate return or you were a dual-status alien, see page 35 & check here . . **39b** ☐

**Standard Deduction for --**

- People who checked any box on line 39a or 39b **or** who can be claimed as a dependent, see page 36.
- All others:

Single or Married filing separately, $5,000

Married filing jointly or Qualifying widow(er), $10,000

Head of household, $7,300

| | | |
|---|---|---|
| **40** Itemized deductions (from Schedule A) or your **standard deduction** (see left margin) . . . . . | **40** | 15,667 |
| **41** Subtract line 40 from line 38 | **41** | 43,245 |
| **42** If line 38 is over $109,475, or you provided housing to a person displaced by Hurricane Katrina, see instructions. Otherwise, multiply $3,200 by the total number of exemptions claimed on line 6d | **42** | 6,400 |
| **43** Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . . . . | **43** | 36,845 |
| **44** Tax (see inst.). Check if any tax is from: a ☐ Form(s) 8814 b ☐ Form 4972 | **44** | 5,001 |
| **45** Alternative minimum tax (see instructions). Attach Form 6251 . . . . . . . . | **45** | |
| **46** Add lines 44 and 45 . . . . . . . . . . . . . . . . . . . . ▶ | **46** | 5,001 |

| | | |
|---|---|---|
| **47** Foreign tax credit. Attach Form 1116 if required . . . . . . . | **47** | |
| **48** Credit for child and dependent care expenses. Attach Form 2441 . . | **48** | |
| **49** Credit for the elderly or the disabled. Attach Schedule R . . . . | **49** | |
| **50** Education credits. Attach Form 8863 . . . . . . . . . | **50** | |
| **51** Retirement savings contributions credit. Attach Form 8880 . . . | **51** | |
| **52** Child tax credit (see instructions). Attach Form 8901 if required . . | **52** | |
| **53** Adoption credit. Attach Form 8839 . . . . . . . . . . | **53** | |
| **54** Credits from: a ☐ Form 8396 b ☐ Form 8859 . . . | **54** | |
| **55** Other credits. Check applicable box(es): a ☐ Form 3800 | | |
| b ☐ Form 8801 c ☐ Form | **55** | |

| | | |
|---|---|---|
| **56** Add lines 47 through 55. These are your **total credits** . . . . . . . . . . . . | **56** | |
| **57** Subtract line 56 from line 46. If line 56 is more than line 46, enter -0- . . . . . . . ▶ | **57** | 5,001 |

**Other Taxes**

| | | |
|---|---|---|
| **58** Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . . | **58** | |
| **59** Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | **59** | |
| **60** Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required. | **60** | 2,526 |
| **61** Advance earned income credit payments from Form(s) W-2 | **61** | |
| **62** Household employment taxes. Attach Schedule H | **62** | |
| **63** Add lines 57 through 62. This is your **total tax** . . . . . . . . . . . . ▶ | **63** | 7,527 |

**Payments**

If you have a qualifying child, attach Schedule EIC.

| | | | |
|---|---|---|---|
| **64** Federal income tax withheld from Forms W-2 and 1099 . . . . . | **64** | 10,443 | |
| **65** 2005 estimated tax payments and amount applied from 2004 return . | **65** | | |
| **66a** Earned income credit (EIC) . . . . . . . . . . . | **66a** | | |
| **b** Nontaxable combat pay election . . ▶ | **66b** | | |
| **67** Excess social security and tier 1 RRTA tax withheld (see instructions). | **67** | | |
| **68** Additional child tax credit. Attach Form 8812 . . . . . | **68** | | |
| **69** Amount paid with request for extension to file (see instructions) . . . | **69** | | |
| **70** Payments from: a ☐ Form 2439 b ☐ Form 4136 c ☐ Form 8885 | **70** | | |
| **71** Add lines 64, 65, 66a and 67 through 70. These are your **total payments** . . . . . . ▶ | **71** | 10,443 |

**Refund**

Direct deposit? See instructions and fill in 73b, 73c, and 73d.

| | | |
|---|---|---|
| **72** If line 71 is more than line 63, subtract line 63 from line 71. This is the amount you **overpaid**. . . . | **72** | 2,916 |
| **73a** Amount of line 72 you want **refunded to you** . . . . . . . . . . . ▶ | **73a** | 2,916 |
| ▶ **b** Routing number NO DEPOSIT ▶ c Type: ☐ Checking ☐ Savings | | |
| ▶ **d** Account number NO DEPOSIT REQUESTED | | |
| **74** Amount of line 72 you want **applied to your 2006 estimated tax** ▶ | **74** | |

**Amount You Owe**

| | | |
|---|---|---|
| **75** **Amount you owe.** Subtract line 71 from line 63. For details on how to pay, see instructions . . . ▶ | **75** | |
| **76** Estimated tax penalty (see instructions) . . . . . . . . . . . | **76** | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ **Yes.** Complete the following. ☒ **No**

Designee's name ▶ Phone no. ▶ Personal identification number (PIN) ▶

**Sign Here**

Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation | Daytime phone number |
|---|---|---|---|
| ▶ | | ELECTRICIAN | 334-749-9106 |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | |

**Paid Preparer's Use Only**

| Preparer's signature ▶ | LINDA LINSON | Date | Check if self-employed ☒ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | LINDA LINSON 1328 AUBURN STREET OPELIKA AL 36801 | EIN | | |
| | | Phone no. | | 334-745-2170 |

SCHEDULES A&B
(Form 1040)

Department of the Treasury
Internal Revenue Service (99)

OMB No. 1545-0074

**Schedule A—Itemized Deductions**

(Schedule B is on Side 2)

► Attach to Form 1040.  ► See instructions for Schedules A and B (Form 1040).

COPY 2005

Attachment
Sequence No. 07

Name(s) shown on Form 1040

BOBBY SANKS

Your social security number

Attachment
Sequence No. 07

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** | 1 | Caution. Do not include expenses reimbursed or paid by others. Medical and dental expenses (see instructions) _____ | 1 | |
| | 2 | Enter amt from Form 1040, line 38 . | 2 | |
| | 3 | Multiply line 2 by 7.5% (.075) | 3 | |
| | 4 | Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | 4 | |
| **Taxes You Paid** (See instructions) | 5 | State and local (check only one box): a [X] Income taxes, or b [ ] General sales taxes (see page A-3) ► | 5 | 1,304 |
| | 6 | Real estate taxes (see instructions) . . . . . . . . . | 6 | 445 |
| | 7 | Personal property taxes . . . . . . . . . . . | 7 | |
| | 8 | Other taxes. List type & amount ► | 8 | |
| | 9 | Add lines 5 through 8 | 9 | 1,749 |
| **Interest You Paid** (See instructions) Note. Personal interest is not deductible. | 10 | Home mortgage interest and points reported to you on Form 1098 | 10 | 8,693 |
| | 11 | Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see inst. & show that person's name, identifying no., & address ► _____ | 11 | |
| | 12 | Points not reported to you on Form 1098. See inst. for special rules | 12 | |
| | 13 | Investment interest. Attach Form 4952 if required. (See instructions) | 13 | |
| | 14 | Add lines 10 through 13 | 14 | 8,693 |
| **Gifts to Charity** If you made a gift and got a benefit for it, see instructions. | 15a | Total gifts by cash or check. If you made any gift of $250 or more, see pg. A-7 CASH AND CHECKS 5,225 | 15a | 5,225 |
| | b | Gifts by cash or check after Aug. 27, 2005, that you elect to treat as qualified contributions (see instructions) . . . . . | 15b | |
| | 16 | Other than by cash or check. If any gift of $250 or more, see page A-7. You **must** attach Form 8283 if over $500 | 16 | |
| | 17 | Carryover from prior year | 17 | |
| | 18 | Add lines 15a, 16, and 17 | 18 | 5,225 |
| **Casualty and Theft Losses** | 19 | Casualty or theft loss(es). Attach Form 4684. (See instructions) . . . . . . . . | 19 | |
| **Job Expenses and Most Other Miscellaneous Deductions** (See page A-8.) | 20 | Unreimbursed employee expenses - job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required (See inst) ► _____ | 20 | |
| | 21 | Tax preparation fees . . . . . . . . . . . . | 21 | |
| | 22 | Other expenses - investment, safe deposit box, etc. List type and amount ► _____ | 22 | |
| | 23 | Add lines 20 through 22 | 23 | |
| | 24 | Enter amt from Form 1040, line 38 . | 24 | |
| | 25 | Multiply line 24 by 2% (.02) | 25 | |
| | 26 | Subtract line 25 from line 23. If line 25 is more than line 23, enter -0- | 26 | |
| **Other Miscellaneous Deductions** | 27 | Other - from list on page A-9. List type and amount ► _____ | 27 | |
| **Total Itemized Deductions** | 28 | Is Form 1040, line 38, over $145,950 (over $72,975 if married filing separately)? [X] No. Your deduction is not limited. Add the amounts in the far right column for lines 4 through 27. Also, enter this amount on Form 1040, line 40. ► . . ► [ ] Yes. Your deduction may be limited. See instructions for the amount to enter. | 28 | 15,667 |
| | 29 | If you elect to itemize deductions even though they are less than your standard deduction, check here ► [ ] | | |

SANKS
000026

SPA  For Paperwork Reduction Act Notice, see Form 1040 instructions.    2005    Petz Enterprises, Inc.    5US071    **Schedule A (Form 1040) 2005**

Form **5329**

Department of the Treasury
Internal Revenue Service (99)

### Additional Taxes on Qualified Plans
### (Including IRAs) and Other Tax-Favored Accounts

▶ **Attach to Form 1040.**

▶ **See separate instructions.**

OMB No. 1545-0074

**2005**

Attachment
Sequence No. **29**

Name of individual subject to additional tax. If married filing jointly, see instructions.

**Your social security no.**

BOBBY SANKS

**Fill in Your Address Only
If You Are Filing This
Form by Itself and Not
With Your Tax Return** ▶

Home address (number & street), or P.O. box if mail is not delivered to your home

Apt. no.

City, town or post office, state, and ZIP code

If this is an amended
return, check here ▶

If you **only** owe the additional 10% tax on early distributions, you may be able to report this tax directly on Form 1040, line 60, without filing Form 5329. See the instructions for Form 1040, line 60.

### Part I   Additional Tax on Early Distributions

Complete this part if you took a taxable distribution (other than a qualified hurricane distribution), before you reached age 59 1/2, from a qualified retirement plan (including an IRA) or modified endowment contract (unless you are reporting this tax directly on Form 1040 - see above). You may also have to complete this part to indicate that you qualify for an exception to the additional tax on early distributions or for certain Roth IRA distributions (see instructions)

| | | | |
|---|---|---|---|
| 1 | Early distributions included in income. For Roth IRA distributions, see instructions . . . . . . . . . . | 1 | 25,256 |
| 2 | Early distributions included on line 1 that are not subject to the additional tax (see instructions). Enter the appropriate exception number from the instructions: _____ | 2 | |
| 3 | Amount subject to additional tax. Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . | 3 | 25,256 |
| 4 | **Additional tax.** Enter 10% (.10) of line 3. Include this amount on Form 1040, line 60 . . . . . . . . . | 4 | 2,526 |

**Caution:** If any part of the amount on line 3 was a distribution from a SIMPLE IRA, you may have to include 25% of that amount on line 4 instead of 10% (see instructions).

### Part II   Additional Tax on Certain Distributions From Education Accounts

Complete this part if you included an amount in income, on Form 1040, line 21, from a Coverdell education savings account (ESA) or a qualified tuition program (QTP).

| | | | |
|---|---|---|---|
| 5 | Distributions included in income from Coverdell ESAs and QTPs . . . . . . . . . . . . . . . | 5 | |
| 6 | Distributions included on line 5 that are not subject to the additional tax (see instructions) . . . . . . . . | 6 | |
| 7 | Amount subject to additional tax. Subtract line 6 from line 5 . . . . . . . . . . . . . . . . . | 7 | |
| 8 | **Additional tax.** Enter 10% (.10) of line 7. Include this amount on Form 1040, line 60 . . . . . . . . . . | 8 | |

### Part III   Additional Tax on Excess Contributions to Traditional IRAs

Complete this part if you contributed more to your traditional IRAs for 2005 than is allowable or you had an amount on line 17 of your 2004 Form 5329.

| | | | | |
|---|---|---|---|---|
| 9 | Enter your excess contributions from line 16 of your 2004 Form 5329 (see instructions). If zero, go to line 15 . . . | | 9 | |
| 10 | If your traditional IRA contributions for 2005 are less than your maximum allowable contribution, see instructions. Otherwise, enter -0- . . . . . . . . . | 10 | | |
| 11 | 2005 traditional IRA distributions included in income (see instructions) | 11 | | |
| 12 | 2005 distributions of prior year excess contributions (see instructions) . . . . . | 12 | | |
| 13 | Add lines 10, 11, and 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 13 | |
| 14 | Prior year excess contributions. Subtract line 13 from line 9. If zero or less, enter -0- . . . . . . . . . . . | | 14 | |
| 15 | Excess contributions for 2005 (see instructions) . . . . . . . . . . . . . . . . . . . . . . | | 15 | |
| 16 | Total excess contributions. Add lines 14 and 15 . . . . . . . . . . . . . . . . . . . . . | | 16 | |
| 17 | **Additional tax.** Enter 6% (.06) of the **smaller** of line 16 **or** the value of your traditional IRAs on December 31, 2005 (including 2005 contributions made in 2006). Include this amount on Form 1040, line 60 . . . . . . . . . | | 17 | |

### Part IV   Additional Tax on Excess Contributions to Roth IRAs

Complete this part if you contributed more to your Roth IRAs for 2005 than is allowable or you had an amount on line 25 of your 2004 Form 5329.

| | | | | |
|---|---|---|---|---|
| 18 | Enter your excess contributions from line 24 of your 2004 Form 5329 (see instructions). If zero, go to line 23 . . . | | 18 | |
| 19 | If your Roth IRA contributions for 2005 are less than your maximum allowable contribution, see instructions. Otherwise, enter -0- . . . . . . . . . . . | 19 | | |
| 20 | 2005 distributions from your Roth IRAs (see instructions) . . . . . . . . . . . . | 20 | | |
| 21 | Add lines 19 and 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 21 | |
| 22 | Prior year excess contributions. Subtract line 21 from line 18. If zero or less, enter -0- . . . . . . . . . . | | 22 | |
| 23 | Excess contributions for 2005 (see instructions) . . . . . . . . . . . . . . . . . . . . . . | | 23 | |
| 24 | Total excess contributions. Add lines 22 and 23 . . . . . . . . . . . . . . . . . . . . . | | 24 | |
| 25 | **Additional tax.** Enter 6% (.06) of the **smaller** of line 24 **or** the value of your Roth IRAs on December 31, 2005 (including 2005 contributions made in 2006). Include this amount on Form 1040, line 60 . . . . . . . . . . . | | 25 | |

SPA   **For Paperwork Reduction Act Notice, see instructions.**    2005    Petz Enterprises,   Inc.    5US291    Form **5329** (2005)

Form 5329 (2005)

## Part V    Additional Tax on Excess Contributions to Coverdell ESAs

Complete this part if the contributions to your Coverdell ESAs for 2005 were more than is allowable or you had an amount on line 33 of your 2004 Form 5329.

| | | | |
|---|---|---|---|
| 26 | Enter the excess contributions from line 32 of your 2004 Form 5329 (see instructions). If zero, go to line 31 . . . | **26** | |
| 27 | If the contributions to your Coverdell ESAs for 2005 were less than the maximum allowable contribution, see instructions. Otherwise, enter -0- . . . . . . | 27 | |
| 28 | 2005 distributions from your Coverdell ESAs (see instructions) . . . . . . . . . . | 28 | |
| 29 | Add lines 27 and 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **29** | |
| 30 | Prior year excess contributions. Subtract line 29 from line 26. If zero or less, enter -0- . . . . . . . . . | **30** | |
| 31 | Excess contributions for 2005 (see instructions) . . . . . . . . . . . . . . . . . . . . . | **31** | |
| 32 | Total excess contributions. Add lines 30 and 31 . . . . . . . . . . . . . . . . . . . | **32** | |
| 33 | **Additional tax.** Enter 6% (.06) of the **smaller** of line 32 or the value of your Coverdell ESAs on December 31, 2005 (including 2005 contributions made in 2006). Include this amount on Form 1040, line 60 . . . . . . . . . . . . | **33** | |

## Part VI    Additional Tax on Excess Contributions to Archer MSAs

Complete this part if you or your employer contributed more to your Archer MSAs for 2005 than is allowable or you had an amount on line 41 of your 2004 Form 5329.

| | | | |
|---|---|---|---|
| 34 | Enter the excess contributions from line 40 of your 2004 Form 5329 (see instructions). If zero, go to line 39 . . . | **34** | |
| 35 | If the contributions to your Archer MSAs for 2005 are less than the maximum allowable contribution, see instructions. Otherwise, enter -0- . . . . . . . . . | 35 | |
| 36 | 2005 distributions from your Archer MSAs from Form 8853, line 10 . . . . . . | 36 | |
| 37 | Add lines 35 and 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **37** | |
| 38 | Prior year excess contributions. Subtract line 37 from line 34. If zero or less, enter -0- . . . . . . . . . | **38** | |
| 39 | Excess contributions for 2005 (see instructions) . . . . . . . . . . . . . . . . . . . . . | **39** | |
| 40 | Total excess contributions. Add lines 38 and 39 . . . . . . . . . . . . . . . . . . . | **40** | |
| 41 | **Additional tax.** Enter 6% (.06) of the **smaller** of line 40 **or** the value of your Archer MSAs on December 31, 2005 (including 2005 contributions made in 2006). Include this amount on Form 1040, line 60 . . . . . . . . . . | **41** | |

## Part VII    Additional Tax on Excess Contributions to Health Savings Accounts (HSAs)

Complete this part if you, someone on your behalf, or your employer contributed more to your HSAs for 2005 than is allowable or you had an amount on line 43 of your 2004 Form 5329.

| | | | |
|---|---|---|---|
| 42 | Enter the excess contributions from line 42 of your 2004 Form 5329. If zero, go to line 47 . . . . . . . . . . | **42** | |
| 43 | If the contributions to your HSAs for 2005 are less than the maximum allowable contribution, see instructions. Otherwise, enter -0- . . . . . . | 43 | |
| 44 | 2005 distributions from your HSAs from Form 8889, line 14 . . . . . . . . . . | 44 | |
| 45 | Add lines 43 and 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **45** | |
| 46 | Prior year excess contributions. Subtract line 45 from line 42. If zero or less, enter -0- . . . . . . . . . | **46** | |
| 47 | Excess contributions for 2005 (see instructions) . . . . . . . . . . . . . . . . . . . . . | **47** | |
| 48 | Total excess contributions. Add lines 46 and 47 . . . . . . . . . . . . . . . . . . . | **48** | |
| 49 | **Additional tax.** Enter 6% (.06) of the **smaller** of line 48 **or** the value of your HSAs on December 31, 2005 (including 2005 contributions made in 2006). Include this amount on Form 1040, line 60 . . . . . . . . . . | **49** | |

## Part VIII    Additional Tax on Excess Accumulation in Qualified Retirement Plans (Including IRAs)

Complete this part if you did not receive the minimum required distribution from your qualified retirement plan.

| | | | |
|---|---|---|---|
| 50 | Minimum required distribution for 2005 (see instructions) . . . . . . . . . . . . . . . . . | **50** | |
| 51 | Amount actually distributed to you in 2005 . . . . . . . . . . . . . . . . . . . . . . | **51** | |
| 52 | Subtract line 51 from line 50. If zero or less, enter -0- . . . . . . . . . . . . . . . . . | **52** | |
| 53 | **Additional tax.** Enter 50% (.50) of line 52. Include this amount on Form 1040, line 60 . . . . . . . . . . | **53** | |

## Signature. Complete only if you are filing this form by itself and not with your tax return.

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Please Sign Here | ► Your signature | | | Date |
|---|---|---|---|---|

| Paid Preparer's Use Only | Preparer's signature ► | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed) address, and ZIP code ► | | EIN | |
| | | | Phone no. | |

2005    Petz Enterprises, Inc.    5US292                                    Form **5329** (2005)

SANKS
000028

Declaration Control Number (DCN)

0 0 - 6 3 2 6 3 2 - 1 3 5 1 3 - 6

**FORM AL8453**

**ALABAMA DEPARTMENT OF REVENUE**
**Individual Income Tax Declaration for Electronic Filing**
COPY
For the year January 1 - December 31, 2005

**2005**

| Label Use Alabama label. Otherwise, please type or print. | Your first name and initial   Last name | Your social security number |
|---|---|---|
| | BOBBY SANKS | |
| | If a joint return, spouse's first name and initial   Last name | Spouse's soc. sec. no. if joint return |
| | Home address (number and street). If a P.O. Box, see instructions.   Apt. no. | Telephone number (optional) |
| | PO BOX 44 | 334-749-9106 |
| | City, town or post office, state, and ZIP code | FN (For official use only) |
| | SALEM AL 36874 | |

**PART I**

**Tax Return Information**

(Whole dollars only.)

| | | | |
|---|---|---|---|
| 1 | Alabama taxable income (Form 40, line 17) . . . . . . . . . . . . | 1 | 30,028 |
| 2 | Total tax liability (Form 40, line 22) . . . . . . . . . . . . . | 2 | 1,463 |
| 3 | Total payments (Form 40, line 26) . . . . . . . . . . . . . . | 3 | 1,248 |
| 4 | Refund (Form 40, line 33) . . . . . . . . . . . . . | 4 | |
| 5 | Amount you owe (Form 40, line 27) . . . . . . . . . . | 5 | 215 |

**PART II**

**Direct Deposit**

1 Routing number: _____

2 Account number: _____

3 Type of account:  ☐ Checking    ☐ Savings

**PART III**

**Declaration of Taxpayer**
(Sign only after Part I is completed.)

Under penalties of perjury, I have compared the information contained on my return with the information I have provided to my electronic return originator and that the amounts described in Part I above agree with the amounts shown on the corresponding lines of my 2005 Alabama individual income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my ERO described below, any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

☐ I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

**Sign Here** ▶

| Your signature | Date | ▶ Spouse's signature. If joint return, BOTH must sign. | Date |
|---|---|---|---|

**PART IV**

**Declaration of Electronic Return Originator (ERO) and Paid Preparer**
(See instructions.)

I declare that I have reviewed the above taxpayer's Alabama individual income tax return and that the entries on this form are complete and correctly represented based on all information of which I have any knowledge. I also declare that I have followed all other requirements described in IRS PUB. 1345, Revenue Procedures for Electronic Filing of Individual Income Tax Returns (Tax Year 2005), and the Alabama Handbook for Electronic Filers of Individual Income Tax Returns (Tax Year 2005). If I am also the paid preparer, under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

**ERO's Use Only**

| ERO's signature ▶ | Date | Check if also paid preparer ☒ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address | YVONNE STINSON | | E.I. No. |
| | DDS TAX SERVICE | | ZIP Code |
| | OPELIKA AL | | 36801-0000 |

**Paid Preparer's Use Only**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

| Preparer's signature ▶ | Date | Check if self-employed ☒ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address | LINDA LINSON | | E.I. No. |
| | 1328 AUBURN STREET OPELIKA AL | | ZIP Code 36801-0000 |

Form AL8453 2005

2005  Petz Enterprises, Inc.    5AL991

**DO NOT MAIL TO ALABAMA DEPT. OF REVENUE**

| FORM 40 | Alabama Individual Income Tax Return | 2005 |
|---|---|---|
| | RESIDENTS AND PART-YEAR RESIDENTS | |

COPY

BOBBY SANKS

PO BOX 44
SALEM AL 36874

**Filing Status and Exemptions**
Check only one box

| 1 | $1,500 Single |
| 2 | $3,000 Married filing joint return (even if only one spouse had income) |
| 3 | $1,500 Married filing sep. return. Complete line 5 with spouse's name & soc. sec. no. |
| 4 | X | $3,000 Head of family (with qualifying person). (See instructions.) Complete line 5. |

5 Name ● MARY SANKS
Soc. Sec. No ●
Relationship ● PARENT

**Income and Adjustments**

6 Wages, salaries, tips, etc. (list each employer and address separately):

| | | A - Ala. tax withheld | B - Income |
|---|---|---|---|
| a | A-1 EMPLOYMENT 400 SOUTH 8TH STREET OPEL | 6a ● 104 00 | 6a 3,733 00 |
| b | WESTPOINT HOME, INC 1135 TOWEL AVE VALLEY AL | 6b ● 1,144 00 | 6b 28,771 00 |
| c | | 6c ● 00 | 6c 00 |
| d | | 6d ● 00 | 6d 00 |

| 7 | Interest and dividend income (also attach Schedule B if over $1,500) . . . . . . . . | 7 ● | 00 |
| 8 | Other income (from page 2, Part I, line 9) . . . . . . . . . . . . . . . . . . | 8 ● | 25,256 00 |
| 9 | Total income. Add amounts in the income column for line 6a through line 8 . . . . . | 9 ● | 57,760 00 |
| 10 | Total adjustments to income (from page 2, Part II, line 8) . . . . . . . . . . . | 10 ● | 00 |
| 11 | Adjusted gross income. Subtract line 10 from line 9 . . . . . . . . . . . . . | 11 ● | 57,760 00 |

**Deductions**
You Must Attach page 2 of Federal Form 1040, Federal Form 1040A, Federal Form 1040NR, or page 1 of 1040EZ, if claiming a deduction on line 13.

| 12 | Check box a, if you itemize deductions, and enter amount from Schedule A, line 26. Check box b, if you do not itemize deductions, and enter standard deduction (see instructions). ● a X Itemized Deductions ● b Standard Deduction | Box a or b MUST be checked | 12 ● 16,905 00 |
| 13 | Federal tax liability (see instructions) DO NOT ENTER THE FEDERAL TAX WITHHELD FROM YOUR W-2(s) | 13 ● 7,527 00 |
| 14 | Personal exemption (from line 1, 2, 3, or 4 ) . . . . . . . . . | 14 ● 3,000 00 |
| 15 | Dependent exemption (from page 2, Part III, line 2) . . . . . . . | 15 ● 300 00 |
| 16 | Total deductions. Add lines 12, 13, 14, and 15 . . . . . . . . . . . . . . . | 16 ● 27,732 00 |

**Tax**
Staple Form(s) W-2, W-2G, 1099, and/or 40V here.

| 17 | Taxable income. Subtract line 16 from line 11 . . . . . . . . . . . . . . . . | 17 ● | 30,028 00 |
| 18 | Income Tax due. Enter amount from tax table or check if from ● Form NOL-85A . . . . | 18 ● | 1,463 00 |
| 19 | Less credits from: ● Schedule CR and/or ● Schedule OC . . . . . . . . . . | 19 ● | 00 |
| 20a | Net tax due Alabama. Subtract line 19 from line 18 . . . . . . . . . . . . . | 20a ● | 1,463 00 |
| b | Consumer Use Tax (use worksheet in the instructions) . . . . . . . . . . . . | 20b ● | 00 |
| 21 | You may make a voluntary contribution to any of the following: Alabama Election Campaign Fund or the Neighbors Helping Neighbors Fund. | a AL Democratic Party $1 $2 none | 21a ● | 00 |
| | | b AL Republican Party $1 $2 none | 21b ● | 00 |
| | | c Neighbors Helping Neighbors $ | 21c ● | 00 |
| 22 | Total tax liability and voluntary contribution. Add lines 20a, 20b, 21a, 21b, and 21c | 22 ● | 1,463 00 |

**Payments**

| 23 | Alabama income tax withheld (from Forms W-2, W-2G, &/or 1099) | 23 ● 1,248 00 | |
| 24 | Amount paid with extension (attach Form 4868A) . . . . . . . | 24 ● 00 | |
| 25 | 2005 estimated tax payments (see instructions) . . . . . . . . | 25 ● 00 | |
| 26 | Total payments. Add lines 23 through 25 . . . . . . . . . . . . . . . . . . | 26 ● | 1,248 00 |

**AMOUNT YOU OWE**

| 27 | If line 22 is larger than line 26, subtract line 26 from line 22, and enter AMOUNT YOU OWE Place payment, along with Form 40V, loose in the mailing envelope. (FORM 40V MUST ACCOMPANY PAYMENT.) | 27 ● | 215 00 |
| 28 | Estimated tax penalty. Also include on line 27 (see instructions page 11) | 28 ● 00 | |

**OVERPAID**

| 29 | If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount OVERPAID. . . . | 29 ● | 00 |
| 30 | Amount of line 29 to be applied to your 2006 estimated tax . . . | 30 ● 00 | |

**Donation Check-offs**

| 31 | You may donate all or part of your overpayment. (Enter $1, $5, $10, $25, none, or other amount in appropriate boxes). |
| a | Senior Services Trust Fund . . . ● 00 | f | AL Indian Children's Scholarship Fund | 00 |
| b | AL Arts Development Fund . . . ● 00 | g | Penny Trust Fund | 00 |
| c | AL Nongame Wildlife Fund . . . ● 00 | h | Foster Care Trust Fund | 00 |
| d | Child Abuse Trust Fund . . . ● 00 | i | Mental Health | 00 |
| e | AL Veterans Program . . . ● 00 | j | AL Breast & Cervical Cancer Program | 00 |
| | | k | AL 4-H Club | 00 |

| 32 | Total. Add line 30 and lines 31a, b, c, d, e, f, g, h, i, j, and k . . . . . . . . . . . | 32 ● | 00 |

**PLEASE**
► Verify your social security number
► Recheck your math
► Sign return on page 2
► Include W-2 form(s)

**REFUND**

| 33 | REFUNDED TO YOU. (CAUTION: You must sign this return on the reverse side.) Subtract line 32 from line 29. For Direct Deposit check here ● and complete Part V, Page 2 | 33 ● | 00 |

PEI  2005  Petz Enterprises, Inc.  5AL011

SANKS
000030

Page 06

BOBBY SANKS

**Form 40 (2005)** COPY Page 2

| | | | | |
|---|---|---|---|---|
| **PART I** | 1 Alimony received | | 1 ● | 00 |
| | 2 Business income or (loss) (attach Federal Schedule C or C-EZ) | | 2 ● | 00 |
| **Other Income** (see instructions) | 3 Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. (attach Schedule D) | | 3 ● | 00 |
| | 4a Total IRA distributions 4a ● 00 | 4b Taxable amount (see instructions) | 4b ● | 00 |
| | 5a Total pensions and annuities 5a ● 00 | 5b Taxable amount (see instructions) | 5b ● 25,256 | 00 |
| | 6 Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E) | | 6 ● | 00 |
| | 7 Farm income or (loss) (attach Federal Schedule F) | | 7 ● | 00 |
| | 8 Other income (state nature & source -- see instructions) _____ | | 8 ● | 00 |
| | **9 Total other income.** Add lines 1 through 8. Enter here and also on page 1, line 8 | | 9 ● 25,256 | 00 |

| | | | | |
|---|---|---|---|---|
| **PART II** | 1a Your IRA deduction | | 1a ● | 00 |
| | b Spouse's IRA deduction | | 1b ● | 00 |
| | 2 Payments to a Keogh retirement plan and self-employment SEP deduction | | 2 ● | 00 |
| **Adjustments to Income** (see instructions) | 3 Penalty on early withdrawal of savings | | 3 ● | 00 |
| | 4 Alimony pd. Recipient's last name _____ SSN ● _____  Address, City, State, ZIP _____ | | 4 ● | 00 |
| | 5 Adoption expenses | | 5 ● | 00 |
| | 6 Moving Expenses (Attach Fed. Fm. 3903) to City, State, ZIP | | 6 ● | 00 |
| | 7 Self-employed health insurance deduction | | 7 ● | 00 |
| | **8 Total adjustments.** Add lines 1 through 7. Enter here and also on page 1, line 10 | | 8 ● | 00 |

**PART III**
**Dependents**
Do not include yourself or your spouse
(see instructions)

| 1a Dependents: (1) First name    Last name | (2) Dependent's social security number. | (3) Dependent's relationship to you. | (4) Did you provide more than one-half of dependent's support? |
|---|---|---|---|
| MARY    SANKS | ● | PARENT | YES |
| | ● | | |
| | ● | | |

b Total number of dependents claimed above ___ 1

2 **Amount allowed.** (Multiply $300 by the total number of dependents claimed on line 1b.) .... 2 ● 300 00

**PART IV**

**General Information**

**All Taxpayers Must Complete This Section.**

1 **Residency** [X] Full Year  If you were a part-year resident of Alabama during 2005, indicate your period of residence:
Check only one box ● [ ] Part Year  From _____ 2005 through _____ 2005. Total months ___

2 Did you file an AL income tax return for year 2004? [X] Yes [ ] No

3 If no, state reason. _____

4 Give name and address of present employer(s). Yours A-1 EMPLOYMENT  400 SOUTH 8TH STREET OPELIKA AL 36801
Your Spouse's _____

5 Enter the Fed. AGI ●$ 58,912 & Fed. Taxable Income ●$ 36,845 as reported on your 2005 Federal Individual Income Tax Return.

6 Do you have income which is reported on your Fed. return, but not reported on your AL return (other than your state tax refund)?
[ ] Yes [X] No If yes, enter source(s) and amount(s) below: (other than state income tax refund)

| Source _____ | Amount ● | 00 |
| Source _____ | Amount ● | 00 |

**PART V**
**Direct Deposit**

For Direct Deposit of your refund, complete 1, 2, and 3 below. (See instructions to see if you qualify.)
1 Routing Number: ___  2 Type: [ ] Checking [ ] Savings
3 Account Number: ___

**Sign Here**
● [X]

Keep a copy of this return for your records.

I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Daytime telephone no. 334-749-9106 | Your occupation ELECTRICIAN |
| Spouse's signature (if joint return, BOTH must sign) | Date | Daytime telephone no. | Spouse's occupation |

**Paid Preparer's Use Only**

| Preparer's signature LINDA LINSON | Date | Check if self-employed [X] | Preparer's SSN or PTIN |
| Firm's name (or yours if self-employed) and address LINDA LINSON | Daytime 334-745-2170 | E.I. No. |
| DDS TAX SERVICE 1328 AUBURN STREET OPELIKA AL | ZIP Code 36801 |

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below.

If you are not making a payment, mail your return to:    If you are making a payment, mail your return, Form 40V and payment to:

**WHERE TO FILE FORM 40**

Alabama Department of Revenue
P.O. Box 154
Montgomery, AL 36135-0001

Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140-0001

Mail **only** your 2005 Form 40 to one of the above addresses. Prior year returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P.O. Box 327464, Montgomery, AL 36132-7464.

2005 ▩ Petz Enterprises, Inc.    5AL012

SANKS
000031

Page 07

**SCHEDULES**
**A, B, & CR**
**(FORM 40)**

ALABAMA DEPARTMENT OF REVENUE
# Schedule A - Itemized Deductions
(Schedules B and CR are on back)

**2005**

COPY

ATTACH TO FORM 40 - SEE INSTRUCTIONS FOR SCHEDULE A

| Name(s) as shown on Form 40 | Your social security number |
|---|---|
| BOBBY SANKS | |

The itemized deductions you may claim for the year 2005 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. **PART-YEAR RESIDENTS:** A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

CAUTION: Do not include expenses reimbursed or paid by others.

| | | | | | |
|---|---|---|---|---|---|
| **Medical and** | 1 | Medical and dental expenses . . . . . . . . . . . . . . . . | 1 | | 00 |
| **Dental Expenses** | 2 | Enter amount from Form 40, line 11 [ 2 ] | | 00 | |
| (See instructions) | 3 | Multiply the amount on line 2 by 4% (.04). Enter the result . . . . . . | 3 | | 00 |
| | 4 | Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- . . . . . . . . . . . . | 4 | | 00 |
| | 5 | Real estate taxes . . . . . . . . . . . . . . . . . . | 5 | 445 | 00 |
| | 6 | FICA Tax (Social Security & Medicare) & Federal Self-Employment Tax | 6 | 2,486 | 00 |
| **Taxes You Paid** | 7 | Railroad Retirement (Tier 1 only) . . . . . . . . . . . . . | 7 | | 00 |
| (See instructions) | 8 | Other taxes. (List - include personal prop. taxes.) ▶ _____ | | | |
| | | | 8 | 56 | 00 |
| | 9 | Add the amounts on lines 5 through 8. Enter the total here . . . . . . . . . . . . | 9 | 2,987 | 00 |
| **Interest You Paid** | 10a | Home mortg. interest and points reported to you on Federal Form 1098 | 10a | 8,693 | 00 |
| (See instructions) | b | Home mortgage interest not reported to you on Federal Form 1098. (If pd. to an individual, show that person's name & address.) ▶ _____ | | | |
| | | _____ | | | |
| **NOTE:** Personal | | _____ | 10b | | 00 |
| interest is not | 11 | Points not reported to you on Form 1098 . . . . . . . . . | 11 | | 00 |
| deductible | 12 | Investment interest. (Attach Form 4952A) . . . . . . . . . | 12 | | 00 |
| | 13 | Add the amounts on lines 10a through 12. Enter the total here . . . . . . . . . . | 13 | 8,693 | 00 |
| | | CAUTION: If you made a charitable contribution and received a benefit in return, see instructions. | | | |
| **Gifts to** | 14 | Contributions by cash or check . . . . . . . . . . . . . . | 14 | 5,225 | 00 |
| **Charity** | 15 | Other than cash or check. (You MUST attach Fed. Form 8283 if over $500.) | 15 | | 00 |
| (See instructions) | 16 | Carryover from prior year . . . . . . . . . . . . . . . | 16 | | 00 |
| | 17 | Add the amounts on lines 14 through 16. Enter the total here . . . . . . . . . . | 17 | 5,225 | 00 |
| **Casualty and** | 18a | Enter the amount from Federal Form 4684, line 16 (See instructions) . . | 18a | | 00 |
| **Theft Loss** | b | Enter 10% of your Adjusted Gross Income (Form 40, line 11) . . . . . | 18b | | 00 |
| (Attach Fm. 4684) | c | Subtract line 18b from line 18a. If zero or less, enter -0- . . . . . . | 18c | | 00 |
| | 19 | Unreimbursed employee expenses - job travel, union dues, job educ., etc. (You MUST attach Fed. Form 2106 if required. See inst.) ▶ _____ | | | |
| **Job Expenses &** | | | 19 | | 00 |
| **Most Other** | 20 | Other expenses (investment, tax preparation, safe deposit box, etc.). List type and amount. ▶ _____ | | | |
| **Miscellaneous** | | | | | |
| **Deductions** | | | 20 | | 00 |
| (See instructions) | 21 | Add the amounts on lines 19 and 20. Enter the total . . . . . . . . . | 21 | | 00 |
| | 22 | Multiply the amount on Form 40, line 11 by 2% (.02). Enter result here | 22 | | 00 |
| | 23 | Subtract line 22 from line 21. Enter the result. If zero or less, enter -0- . . . . . . . . | 23 | | 00 |
| | 24 | Other (from list in the instructions). List type and amount. ▶ _____ | | | |
| **Other** | | _____ | | | |
| **Miscellaneous** | | _____ | | | |
| **Deductions** | | _____ | | | |
| | | | 24 | | 00 |
| **Qualified Long-** | | CAUTION: Do not include medical premiums. | | | |
| **Term Care Ins.** | | | | | |
| **Premiums** | 25 | Enter amount here . . . . . . . . . . . . . . . . . . | 25 | | 00 |
| **Total Itemized** | 26 | Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the | | | |
| **Deductions** | | total here. Then enter on Form 40, page 1, line 12 . . . . . . . . . . | 26 | 16,905 | 00 |

SANKS
000032

Page 09

2005 | Petz Enterprises, Inc.    SALPV1



**ALABAMA DEPARTMENT OF REVENUE**
**Individual Income Tax Payment Voucher**

**2005**

FORM
**40V**

DO NOT STAPLE OR ATTACH THIS VOUCHER TO YOUR PAYMENT

**Tax Type:** II
**Tax Period:** 12-31-2005
**Primary Taxpayer SSN:** ● _____
**Tax Form:** (mark only one):  ● ☒ 40   ● ☐ 40A   ● ☐ 40NR   ● ☐ E40

**Amount Due:  $** ● _____215_____

| PRIMARY TAXPAYER'S FIRST NAME | SPOUSE'S FIRST NAME | LAST NAME |
|---|---|---|
| ● BOBBY | | SANKS |

MAILING ADDRESS
● PO BOX 44

| CITY | STATE | ZIP | DAYTIME TELEPHONE NUMBER |
|---|---|---|---|
| ● SALEM | AL | 36874 | 334-749-9106 |

SANKS
000033

Page 08

**Form W-2 Wage and Tax Statement** (rotated, Kelly Services form)

Copy C—For EMPLOYEE'S RECORDS. (See Notice to
Employee on back of Copy B).

2006
12/30/06

| | |
|---|---|
| 2 Federal income tax withheld | 560.20 |
| 4 Social security tax withheld | 526.92 |
| 6 Medicare tax withheld | 123.2 |
| 10 Dependent care benefits | |
| 1 Wages, tips, other comp. | 8498.76 |
| 3 Social security wages | 8498.76 |
| 5 Medicare wages and tips | 8498.76 |
| 9 Advance EIC payment | |
| 11 Nonqualified plans | |
| 13 Statutory Employee / Retirement Plan / Third-party Sick Pay | |
| 14 Other | |
| 20 Locality name | AUBURN |
| 18 Local income tax | 84.96 |
| 19 Local wages,etc | 8498.76 |
| 17 State income tax | 341.24 |
| 16 State wages,tips,etc | 8498.76 |
| 15 State Employer's state I.D. number | AL |

**b** Employer's identification number (EIN)
41-0760000

**c** Employer's name, address and ZIP code
KELLY SERVICES, INC.
PO BOX 331179
DETROIT, MI 48266-0051

**d** Employee's social security number
1056

**e** Employee's first name and initial  Last name  Suff.
BOBBY L SANKS
PO BOX 44
SALEM AL 36874-0044

---

**Copy C For EMPLOYEE'S RECORD**
(See Notice to Employee.)

2006

| a Control number 2233 | 1 Wages, tips, other comp. 2081.80 | 2 Federal income tax |
|---|---|---|
| b Employer ID number | 3 Social security wages 2081.80 | 4 Social security tax |
| | 5 Medicare wages and tips 2081.80 | 6 Medicare tax withh |

**c** Employer's name, address, and ZIP code
A-1 EMPLOYMENT, INC.
400 SOUTH 8TH ST.
SUITE 101
OPELIKA                    AL        36801

**d** Employee's social security number

**e** Employee's name, address, and ZIP code
BOBBY L. SANKS
P.O. BOX 44
SALEM                      AL        36874

| 7 Social security tips | 8 Allocated tips | 9 Advance EiC p |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee / Retirement plan / Third-party sick pay | 14 Other | 12b Code |
| | | 12c Code |
| | | 12d Code |

| 15 State Emplr's state I.D. # | 16 State wages, tips, etc. | 17 State incom |
|---|---|---|
| AL | 2081.80 | |
| 18 Local wages, tips, etc. 2081.80 | 19 Local income tax 31.23 | 20 Locality name OPELIKA |

Form W-2 Wage and Tax Statement                DAA                Dept. of the Tr

---

**W-2 City or Local Filing Copy**
**Wage and Tax Statement**   2006

| b Employer identification number 41-0760000 | d Employee's social security number | e/1 Employee's first name and initial Last name address and ZIP code B L SANKS PO BOX 44 SALEM AL 36874-0044 |
|---|---|---|

**c** Employer's name, address, and ZIP code
United States Postal Service
Eagan Accounting Service Center
2825 Lone Oak Parkway
Eagan MN 55121-9611

| 1 Wages, tips,other compensation 2,340.47 | 2 Federal income tax withheld 33.81 | 3 Social security wages 2,340.47 | 4 Social security tax withheld 145.11 |
|---|---|---|---|
| 5 Medicare wages and tips 2,340.47 | 6 Medicare tax withheld 33.94 | 9 Advanced EIC payment NONE | 10 FSA dependent care benefits NONE |
| 12a See instructions for box 12 NONE | 12b See instructions for box 12 NONE | 13 Statutory / Retirement / 3rd party | 14 Other NONE |
| 15 State Employers state ID no. AL | 16 State wages, tips, etc. 2,340.47 | 17 State income tax 26.30 | 18 Local wages, tips, etc. NONE |
| 19 Local income tax NONE | 20 Locality name NONE | 31 TCOLA allowance NONE | 32 Employee business expense 1,240.80 |
| 33 Employee valuable busexp. NONE | 34 Pension plan coverage NO | 35 Imputed income life insurance NONE | 36 Miscellaneous NONE |
| 37 Pre-tax health benefits NONE | 38 Occupation tax withheld NONE | 39 Relocation gross NONE | 40 FSA health care NONE |
| 41 Commuter program NONE | | | |

Copy 2 to be filed with
Employee's Local Income Tax Return

* Amount included in box 1
OMB No. 1585-0008

SANKS
000034

Form **1040**    Department of the Treasury--Internal Revenue Service
**U.S. Individual Income Tax Return**    **2006**    (99)    IRS Use Only--Do not write or staple in this space.

| Label | | |
|---|---|---|
| (See instructions) | BOBBY SANKS | OMB No. 1545-0074 |
| **Use the IRS label.** | | **Your social security number** |
| | | **Spouse's social security no.** |
| Otherwise, please print or type. | PO BOX 44<br>SALEM    AL   36874-0000-000 | ▲ **You must enter your SSN(s) above.** |
| **Presidential** | | Checking a box below will not change your tax or refund. |

**Election Campaign** ► Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see instr.) . . . . ► ☐ You ☐ Spouse

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ►
4 ☒ Head of household (with qualifying person). (See inst.) If the qualifying person is a child but not your dependent, enter this child's name here. ►
5 ☐ Qualifying widow(er) with dependent child (see instructions)

**Exemptions**

If more than four dependents, see instructions.

6a ☒ Yourself. If someone can claim you as a dependent, **do not** check box 6a . . . . . . . . . . ►
b ☐ Spouse . . . . . . . . . . . . . . . . . . . .

| c  Dependents: | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see inst.) |
|---|---|---|---|
| (1) First name    Last name | | | |
| MARY    SANKS | | FOSTERCHILD | |
| | | | |
| | | | |
| | | | |

Boxes checked on 6a and 6b **1**
No. of children on 6c who:
• lived with you **01**
• did not live with you due to divorce or separation (see inst.)
Dependents on 6c not entered above

d  Total number of exemptions claimed . . . . . . . . . . . . . . . . . Add numbers on lines above ► **02**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 12,921 |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . . | 8a | |
| b | Tax-exempt interest. Do not include on line 8a . . . . . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . | 9a | |
| b | Qualified dividends (see instructions) . . . . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) . . . | 10 | |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ► ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . . | 14 | |
| 15a | IRA distributions . . . . . | 15a | | b Taxable amount (see inst.) . . | 15b | |
| 16a | Pensions and annuities . . | 16a | | b Taxable amount (see inst.) . . | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | (908) |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . . . . | 19 | |
| 20a | Social security benefits . . | 20a | | b Taxable amount (see inst.) . . | 20b | |
| 21 | Other income. List type & amount (see inst.) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ► | 22 | 12,013 |

**Adjusted Gross Income**

| 23 | Archer MSA deduction. Attach Form 8853 | 23 | | | |
|---|---|---|---|---|---|
| 24 | Certain business expenses of reservists, performing artists, & fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | | | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | | | |
| 26 | Moving expenses. Attach Form 3903 | 26 | | | |
| 27 | One-half of self-employment tax. Attach Schedule SE . . | 27 | | | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | | | |
| 29 | Self-employed health insurance deduction (see instructions) | 29 | | | |
| 30 | Penalty on early withdrawal of savings . . . . . . . . | 30 | | | |
| 31a | Alimony paid    b Recipient's SSN ► | 31a | | | |
| 32 | IRA deduction (see instructions) . . . . . . . . | 32 | | | |
| 33 | Student loan interest deduction (see instructions) . . . . | 33 | | | |
| 34 | Jury duty pay you gave to your employer | 34 | | | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | | | |
| 36 | Add lines 23 through 31a and 32 through 35 . . . . . . . . . . . . | 36 | | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . . . . . ► | 37 | 12,013 |

SPA  **For Disclosure, Privacy Act, & Paperwork Reduction Act Notice, see instructions.**    2006    Petz Enterprises, Inc.    6US011    Form **1040** (2006)

COPY

Form 1040 (2006)                                                                 Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . | 38 | 12,013 |
| | 39a | Check if: ☐ **You** were born before January 2, 1942, ☐ Blind. **Total boxes** ☐ **Spouse** was born before Jan. 2, 1942, ☐ Blind. checked ▶ 39a | | |
| | b | If your spouse itemizes on a separate return or you were a dual-status alien, see inst. and check here ▶ 39b ☐ | | |
| **Standard Deduction for --** | 40 | **Itemized deductions** (from Schedule A) **or** your **standard deduction** (see left margin) . . . . . | 40 | 8,841 |
| | 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . . . . | 41 | 3,172 |
| ● People who checked any box on line 39a or 39b **or** who can be claimed as a dependent, see inst. | 42 | If line 38 is over $112,875, or you provided housing to a person displaced by Hurricane Katrina, see instructions. Otherwise, multiply $3,300 by the total number of exemptions claimed on line 6d . | 42 | 6,600 |
| | 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . | 43 | |
| | 44 | **Tax** (see inst.). Check if any tax is from: a ☐ Form(s) 8814  b ☐ Form 4972 | 44 | |
| ● All others: | 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 . . . . . . . | 45 | |
| Single or Married filing separately, $5,150 | 46 | Add lines 44 and 45 . . . . . . . . . . . . . . . . . ▶ | 46 | |
| | 47 | Foreign tax credit. Attach Form 1116 if required . . . | 47 | | |
| Married filing jointly or Qualifying widow(er), $10,300 | 48 | Credit for child and dependent care expenses. Attach Form 2441 . . | 48 | | |
| | 49 | Credit for the elderly or the disabled. Attach Schedule R . . | 49 | | |
| Head of household, $7,550 | 50 | Education credits. Attach Form 8863 . . . . . | 50 | | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 . . | 51 | | |
| | 52 | Residential energy credits. Attach Form 5695 . . . . . . . | 52 | | |
| | 53 | Child tax credit (see instructions). Attach Form 8901 if required . . | 53 | | |
| | 54 | Credits from: a ☐ Form 8396  b ☐ Form 8839  c ☐ Form 8859 . | 54 | | |
| | 55 | Other credits: a ☐ Form 3800  b ☐ Form 8801  c ☐ Form _____ | 55 | | |
| | 56 | Add lines 47 through 55. These are your **total credits** . . . . . . . . . | 56 | |
| | 57 | Subtract line 56 from line 46. If line 56 is more than line 46, enter -0- . . . . . . ▶ | 57 | |
| **Other Taxes** | 58 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . . | 58 | |
| | 59 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 . | 59 | |
| | 60 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required . | 60 | |
| | 61 | Advance earned income credit payments from Form(s) W-2, box 9 . . . . . . . | 61 | |
| | 62 | Household employment taxes. Attach Schedule H . . . . . . . . . . . | 62 | |
| | 63 | Add lines 57 through 62. This is your **total tax** . . . . . . . . . . . ▶ | 63 | |
| **Payments** | 64 | Federal income tax withheld from Forms W-2 and 1099 . . . . . | 64 | 221 | |
| If you have a qualifying child, attach Schedule EIC. | 65 | 2006 estimated tax payments and amount applied from 2005 return . | 65 | | |
| | 66a | **Earned income credit (EIC)** . . . . . . . . . . | 66a | 2,747 | |
| | b | Nontaxable combat pay election . . ▶ | 66b | | |
| | 67 | Excess social security and tier 1 RRTA tax withheld (see instructions) . | 67 | | |
| | 68 | Additional child tax credit. Attach Form 8812 . . . . | 68 | | |
| | 69 | Amount paid with request for extension to file (see instructions) . . . | 69 | | |
| | 70 | Payments from: a ☐ Form 2439  b ☐ Form 4136  c ☐ Form 8885 | 70 | | |
| | 71 | Credit for fed. telephone excise tax paid. Attach Form 8913 if required . | 71 | 40 | |
| | 72 | Add lines 64, 65, 66a, and 67 through 71. These are your **total payments** . . . . . . . . ▶ | 72 | 3,008 |
| **Refund** | 73 | If line 72 is more than line 63, subtract line 63 from line 72. This is the amount you **overpaid** . | 73 | 3,008 |
| Direct deposit? See instructions and fill in 74b, 74c, and 74d, or Form 8888. | 74a | Amount of line 73 you want **refunded to you.** If Form 8888 is attached, check here . ▶ ☐ | 74a | 3,008 |
| | ▶ b | Routing number 071002053  ▶ c Type: ☒ Checking ☐ Savings | | |
| | ▶ d | Account number 10877980424729114 | | |
| | 75 | Amount of line 73 you want **applied to your 2007 estimated tax** ▶ | 75 | |
| **Amount You Owe** | 76 | **Amount you owe.** Subtract line 72 from line 63. For details on how to pay, see instructions . . . ▶ | 76 | |
| | 77 | Estimated tax penalty (see instructions) . . . . . . . . | 77 | | |

**Third Party Designee** Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ Yes. Complete the following. ☐ No
Designee's name ▶ _____ Phone no. ▶ _____ Personal identification number (PIN) ▶ _____

**Sign Here**
Joint return? See instr. Keep a copy for your records.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature _____ Date _____ Your occupation ELECTRICIAN  Daytime phone number 334-749-9106

Spouse's signature. If a joint return, **both** must sign. Date _____ Spouse's occupation _____

**Paid Preparer's Use Only**
Preparer's signature LINDA LINSON  Date _____ Check if self-employed ☒  Preparer's SSN or PTIN _____

Firm's name (or yours if self-employed), address, and ZIP code
LINDA LINSON
1328 AUBURN ST
OPELIKA AL 36801
EIN _____
Phone no. 334-745-2170

SANKS
000036

Form **1040** (2006)

# SCHEDULES A&B
# (Form 1040)

Department of the Treasury
Internal Revenue Service (99)

## Schedule A—Itemized Deductions
(Schedule B is on Side 2)

▶ Attach to Form 1040.   ▶ See instructions for Schedules A&B (Form 1040).

OMB No. 1545-0074

**2006**

Attachment
Sequence No. **07**

Name(s) shown on Form 1040

BOBBY SANKS

Your social security number

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** | | **Caution.** Do not include expenses reimbursed or paid by others. | | |
| | 1 | Medical and dental expenses (see instructions) . . . . . . . . . | 1 | |
| | 2 | Enter amt. from Form 1040, line 38 . [ 2 ] | | |
| | 3 | Multiply line 2 by 7.5% (.075) | 3 | |
| | 4 | Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- . . . . . . | 4 | |
| **Taxes You Paid**<br><br>(See instructions.) | 5 | State and local income taxes . . . . . . . . . . . . . . . . | 5 | 754 |
| | 6 | Real estate taxes (see instructions) . . . . . . . . . . . . | 6 | 441 |
| | 7 | Personal property taxes . . . . . . . . . . . . . . . . | 7 | 79 |
| | 8 | Other taxes. List type & amount   ▶ _____ | 8 | |
| | 9 | Add lines 5 through 8 . . . . . . . . . . . . . . . . . . . | 9 | 1,274 |
| **Interest You Paid**<br><br>(See instructions.)<br><br>**Note.** Personal interest is not deductible. | 10 | Home mortgage interest and points reported to you on Form 1098 | 10 | 6,367 |
| | 11 | Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see instructions and show that person's name, identifying no., and address ▶ ___<br>_____<br>_____ | 11 | |
| | 12 | Points not reported to you on Form 1098. See inst. for special rules | 12 | |
| | 13 | Investment interest. Attach Form 4952 if required. (See instructions) | 13 | |
| | 14 | Add lines 10 through 13 . . . . . . . . . . . . . . . . . . | 14 | 6,367 |
| **Gifts to Charity**<br><br>If you made a gift and got a benefit for it, see instructions. | 15 | Gifts by cash or check. If you made any gift of $250 or more, see instructions See STM.01 . . . . . . . . . | 15 | 1,200 |
| | 16 | Other than by cash or check. If any gift of $250 or more, see instructions. You must attach Form 8283 if over $500   . . . . . . | 16 | |
| | 17 | Carryover from prior year . . . . . . . . . . . . . . . | 17 | |
| | 18 | Add lines 15 through 17 . . . . . . . . . . . . . . . . . | 18 | 1,200 |
| **Casualty and Theft Losses** | 19 | Casualty or theft loss(es). Attach Form 4684. (See instructions) . . . . | 19 | |
| **Job Expenses and Certain Miscellaneous Deductions**<br><br><br>(See instructions.) | 20 | Unreimbursed employee expenses--job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required. (See inst.)<br>▶ _____ | 20 | |
| | 21 | Tax preparation fees . . . . . . . . . . . . . . . | 21 | |
| | 22 | Other expenses--investment, safe deposit box, etc. List type and amount ▶ _____<br>_____ | 22 | |
| | 23 | Add lines 20 through 22 . . . . . . . . . . . | 23 | |
| | 24 | Enter amt. from Form 1040, line 38 . [ 24 ] | | |
| | 25 | Multiply line 24 by 2% (.02) | 25 | |
| | 26 | Subtract line 25 from line 23. If line 25 is more than line 23, enter -0- . . . . . . . . | 26 | |
| **Other Miscellaneous Deductions** | 27 | Other--from  list in instructions. List type and amount ▶ _____<br>_____ | 27 | |
| **Total Itemized Deductions** | 28 | Is Form 1040, line 38, over $150,500 (over $75,250 if married filing separately)?<br>[X] **No.**   Your deduction is not limited. Add the amounts in the far right column for lines 4 through 27. Also, enter this amount on Form 1040, line 40. ▶ · · ▶<br>[ ] **Yes.**   Your deduction may be limited. See instructions for the amount to enter. | 28 | 8,841 |
| | 29 | If you elect to itemize deductions even though they are less than your standard deduction, check here . . . . . . . . . . . . . . . . . . . . . ▶ [ ] | | |

SPA  For Paperwork Reduction Act Notice, see Form 1040 instructions.     2006 ▦ Petz Enterprises, Inc.     6US071          Schedule A (Form 1040) 2006

| SCHEDULE E | Supplemental Income and Loss | OMB No. 1545-0074 |
|---|---|---|
| (Form 1040) | (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.) | **2006** |
| Department of the Treasury Internal Revenue Service (99) | ▶ Attach to Form 1040, 1040NR, or Form 1041. ▶ See Instructions for Schedule E (Form 1040). | Attachment Sequence No. **13** |

Name(s) shown on return: **BOBBY SANKS**

Your social security number:

**Part I** Income or Loss From Rental Real Estate and Royalties  Note. If you are in the business of renting personal property, use Schedule C or C-EZ (see instructions). Report farm rental income or loss from Form 4835 on page 2, line 40.

| 1 | List the type and location of each rental real estate property: | | | | | 2 | For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of: | | Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|
| A | RENTAL 1419 HOOPER AVE OPELIKA AL 36801 | | | | | | | A | | X |
| B | | | | | | | • 14 days or | B | | |
| C | | | | | | | • 10% of the total days rented at fair rental value? (See instructions) | C | | |

| | | | Properties | | | Totals |
|---|---|---|---|---|---|---|
| **Income:** | | | A | B | C | (Add columns A, B, and C.) |
| 3 | Rents received . . . . . . . . | 3 | 2,800 | | | 3    2,800 |
| 4 | Royalties received . . . . . . | 4 | | | | 4 |
| **Expenses:** | | | | | | |
| 5 | Advertising . . . . . . . . . | 5 | | | | |
| 6 | Auto and travel (see inst.) . . . | 6 | | | | |
| 7 | Cleaning and maintenance . . | 7 | | | | |
| 8 | Commissions . . . . . . . . | 8 | | | | |
| 9 | Insurance . . . . . . . . . . | 9 | | | | |
| 10 | Legal and other professional fees | 10 | | | | |
| 11 | Management fees . . . . . . | 11 | | | | |
| 12 | Mortgage interest paid to banks, etc. (see instructions) | 12 | 2,905 | | | 12    2,905 |
| 13 | Other interest . . . . . . . . | 13 | | | | |
| 14 | Repairs . . . . . . . . . . | 14 | 500 | | | |
| 15 | Supplies . . . . . . . . . . | 15 | | | | |
| 16 | Taxes . . . . . . . . . . . | 16 | 303 | | | |
| 17 | Utilities . . . . . . . . . . | 17 | | | | |
| 18 | Other (list) ▶ | 18 | | | | |
| 19 | Add lines 5 through 18 . . . . | 19 | 3,708 | | | 19    3,708 |
| 20 | Depreciation expense or depletion (see instructions) . . | 20 | | | | 20 |
| 21 | Total expenses. Add lines 19 and 20 | 21 | 3,708 | | | |
| 22 | Income or (loss) from rental real estate or royalty properties. Subtract line 21 from line 3 (rents) or line 4 (royalties). If the result is a (loss), see instructions to find out if you must file **Form 6198** . | 22 | (908) | | | |
| 23 | Deductible rental real estate loss. **Caution.** Your rental real estate loss on line 22 may be limited. See instructions to find out if you must file **Form 8582**. Real estate professionals must complete line 43 on page 2 . . . . . . . | 23 | (   908) | (          ) | (          ) | |
| 24 | **Income.** Add positive amounts shown on line 22. Do not include any losses . . . . . . . . . . . . . . . . . | | | | 24 | |
| 25 | **Losses.** Add royalty losses from line 22 and rental real estate losses from line 23. Enter total losses here . . . | | | | 25 (          908) |
| 26 | **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17, or Form 1040NR, line 18. Otherwise, include this amount in the total on line 41 on page 2 . . . . . . . | | | | 26 | (908) |

SPA  **For Paperwork Reduction Act Notice, see instructions.**      2006   Petz Enterprises, Inc.   6US131      Schedule E (Form 1040) 2006

**Schedule EIC**
(Form 1040A or 1040)

Department of the Treasury
Internal Revenue Service (99)

**Earned Income Credit**
Qualifying Child Information

Complete and attach to Form 1040A or 1040
only if you have a qualifying child.

OMB No. 1545-0074

**2006**

Attachment
Sequence No. **43**

Name(s) shown on return

BOBBY SANKS

Your social security number

**Before you begin:**
See the instructions for Form 1040A, lines 40a and 40b, or Form 1040, lines 66a and 66b, to make sure that **(a)** you can take the EIC and **(b)** you have a qualifying child.

⚠ **Caution**

- If you take the EIC even though you are not eligible, you may not be allowed to take the credit for up to 10 years. See back of schedule for details.
- It will take us longer to process your return and issue your refund if you do not fill in all lines that apply for each qualifying child.
- Be sure the child's name on line 1 and social security number (SSN) on line 2 agree with the child's social security card. Otherwise, at the time we process your return, we may reduce or disallow your EIC. If the name or SSN on the child's social security card is not correct, call the Social Security Administration at 1-800-772-1213.

| Qualifying Child Information | Child 1 | | Child 2 | |
|---|---|---|---|---|
| **1** **Child's name** <br> If you have more than two qualifying children, you only have to list two to get the maximum credit. | First name | Last name <br> MARY SANKS | First name | Last name |
| **2** **Child's SSN** <br> The child must have an SSN as defined on the Form 1040A instructions or Form 1040 instructions unless the child was born and died in 2006. If your child was born and died in 2006 and did not have an SSN, enter "Died" on this line and attach a copy of the child's birth certificate. | | | | |
| **3** **Child's year of birth** | Year ____1932____ <br> If born after 1987, skip lines 4a and 4b; go to line 5. | | Year _____ <br> If born after 1987, skip lines 4a and 4b; go to line 5. | |
| **4** **If the child was born before 1988--** <br> **a** Was the child under age 24 at the end of 2006 and a student? | ☐ Yes. <br> **Go to line 5.** | ☒ No. <br> **Continue.** | ☐ Yes. <br> **Go to line 5.** | ☐ No. <br> **Continue.** |
| **b** Was the child permanently and totally disabled during any part of 2006? | ☒ Yes. <br> **Continue.** | ☐ No. <br> The child is not a qualifying child. | ☐ Yes. <br> **Continue.** | ☐ No. <br> The child is not a qualifying child. |
| **5** **Child's relationship to you** <br> (for example, son, daughter, grandchild, niece, nephew, foster child, etc.) | FOSTERCHILD | | | |
| **6** **Number of months child lived with you in the United States during 2006** <br> • If the child lived with you for more than half of 2006 but less than 7 months, enter "7". <br> • If the child was born or died in 2006 and your home was the child's home for the entire time he or she was alive during 2006, enter "12". | ____12____ months <br> Do not enter more than 12 months. | | _____ months <br> Do not enter more than 12 months. | |

**TIP**
You may also be able to take the additional child tax credit if your child **(a)** was under age 17 at the end of 2006, **and (b)** is a U.S. citizen or resident alien. For more details, see the instructions for line 41 of Form 1040A or line 68 of Form 1040.

SPA  For Paperwork Reduction Act Notice, see Form 1040A or 1040 instructions.    Schedule EIC (Form 1040A or 1040) 2006

2006  ▌▌▌ Petz Enterprises Inc.    6US431

SANKS
000039

| Form **8582** | **Passive Activity Loss Limitations** | OMB No. 1545-1008 |
|---|---|---|
| | ▶ See separate instructions. | **2006** |
| Department of the Treasury<br>Internal Revenue Service  (99) | ▶ Attach to Form 1040 or Form 1041. | Attachment<br>Sequence No. **88** |

Name(s) shown on return
BOBBY SANKS

Identifying number

## Part I    2006 Passive Activity Loss

**Caution:** Complete Worksheets 1, 2, and 3 on page 2 before completing  Part I.

**Rental Real Estate Activities With Active Participation** (For the definition of active participation see Special Allowance for Rental Real Estate Activities on page 3 of the instructions.)

| | | | |
|---|---|---|---|
| 1a | Activities with net income (enter the amount from Worksheet 1, column (a)) . | **1a** | |
| b | Activities with net loss (enter the amount from Worksheet 1, column (b)) . . . | **1b** | ( 908 ) |
| c | Prior years unallowed losses (enter the amount from Worksheet 1, column (c)) | **1c** | ( ) |
| d | Combine lines 1a, 1b, and 1c . . . . . . . . . . . . . . . . . . . . . . . | **1d** | (908) |

**Commercial Revitalization Deductions From Rental Real Estate Activities**

| | | | |
|---|---|---|---|
| 2a | Commercial revitalization deductions from Worksheet 2, column (a) . . . . . | **2a** | ( ) |
| b | Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2b** | ( ) |
| c | Add lines 2a and 2b . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2c** | ( ) |

**All Other Passive Activities**

| | | | |
|---|---|---|---|
| 3a | Activities with net income (enter the amount from Worksheet 3, column (a)) . | **3a** | |
| b | Activities with net loss (enter the amount from Worksheet 3, column (b)) . . | **3b** | ( ) |
| c | Prior years unallowed losses (enter the amount from Worksheet 3, column (c)) | **3c** | ( ) |
| d | Combine lines 3a, 3b, and 3c . . . . . . . . . . . . . . . . . . . . . . . | **3d** | |
| 4 | Combine lines 1d, 2c, and 3d. If the result is net income or zero, all losses are allowed, including any prior year unallowed  losses entered on line 1c, 2b, or 3c. **Do not** complete Form 8582. Report the losses on the forms and schedules normally used . . . . . . . . . . . . . . . . . . . . . . . | **4** | (908) |

If line 4 is a loss and:   • Line 1d is a loss, go to Part II.

   • Line 2c is a loss, (and line 1d is zero or more), skip Part II and go to Part III.

   • Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

**Caution:** If filing status is married filing separately and you lived with your spouse at any time during the year, **do not** complete Part II or III. Instead, go to line 15.

## Part II    Special Allowance for Rental Real Estate Activities With Active Participation

**Note:** Enter all numbers in Part II as positive amounts. See the instructions for an example.

| | | | | |
|---|---|---|---|---|
| 5 | Enter the **smaller** of the loss on line 1d or the loss on line 4 . . . . . . . . . . . | | **5** | 908 |
| 6 | Enter $150,000. If married filing separately, see the instructions . . . . . . . | **6** | 150,000 | |
| 7 | Enter modified adjusted gross income, but not less than zero (see instructions) . | **7** | 12,921 | |
| | **Note: If** line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8. | | | |
| 8 | Subtract line 7 from line 6 . . . . . . . . . . . . . . . . . . . . . . . . | **8** | 137,079 | |
| 9 | Multiply line 8 by 50% (.5). **Do not** enter more than $25,000. If married filing separately, see the instructions . . | | **9** | 25,000 |
| 10 | Enter the **smaller** of line 5 or line 9 . . . . . . . . . . . . . . . . . . . | | **10** | 908 |
| | If line 2c is a loss, go to Part III. Otherwise, go to line 15. | | | |

## Part III    Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities

**Note:** Enter all numbers in Part III as positive amounts. See the example for Part II on page 8 of the instructions.

| | | | |
|---|---|---|---|
| 11 | Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions  . . . . . . | **11** | 24,092 |
| 12 | Enter the loss from line 4 . . . . . . . . . . . . . . . . . . . . . . . . | **12** | 908 |
| 13 | Reduce line 12 by the amount on line 10 . . . . . . . . . . . . . . . . . . | **13** | |
| 14 | Enter the **smallest** of line 2c (treated as a positive amount), line 11, or line 13. . . . . . . . . . . . . | **14** | |

## Part IV    Total Losses Allowed

| | | | |
|---|---|---|---|
| 15 | Add the income, if any, on lines 1a and 3a and enter the total  . . . . . . . . . . . . | **15** | |
| 16 | **Total losses allowed from all passive activities for 2006.** Add lines 10, 14, and 15. See the instructions to find out how to report the losses on your tax return . . . . . . . . . . . . . . . . . . . . . . . . . . . | **16** | 908 |

| SPA | **For Paperwork Reduction Act Notice, see instructions.** | 2006  Petz Enterprises, Inc.   6US881 | Form **8582** (2006) |

SANKS
000040

Form 8582 (2006)

**Caution:** The worksheets must be filed with your tax return. Keep a copy for your records.

### Worksheet 1—For Form 8582, Lines 1a, 1b, and 1c (See the instructions.)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
|---|---|---|---|---|---|
| | (a) Net income (line 1a) | (b) Net loss (line 1b) | (c) Unallowed loss (line 1c) | (d) Gain | (e) Loss |
| RENTAL | | 908 | | | 908 |
| | | | | | |
| | | | | | |
| | | | | | |
| Total. Enter on Form 8582, lines 1a, 1b, and 1c . . . . . . . . . . . ▶ | | 908 | | | |

### Worksheet 2--For Form 8582, Lines 2a and 2b (See the instructions.)

| Name of activity | (a) Current year deductions (line 2a) | (b) Prior year unallowed deductions (line 2b) | (c) Overall loss |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| Total. Enter on Form 8582, lines 2a and 2b . . . . . . . . . . ▶ | | | |

### Worksheet 3--For Form 8582, Lines 3a, 3b, and 3c (See the instructions.)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
|---|---|---|---|---|---|
| | (a) Net income (line 3a) | (b) Net loss (line 3b) | (c) Unallowed loss (line 3c) | (d) Gain | (e) Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total. Enter on Form 8582, lines 3a, 3b, and 3c . . . . . . . . . . . ▶ | | | | | |

### Worksheet 4--Use this worksheet if an amount is shown on Form 8582, line 10 or 14 (See the instructions.)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Ratio | (c) Special allowance | (d) Subtract column (c) from column (a) |
|---|---|---|---|---|---|
| RENTAL | SCH E 1C1 | 908 | 1.00000 | 908 | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . ▶ | | 908 | 1.00 | 908 | |

### Worksheet 5--Allocation of Unallowed Losses (See the instructions.)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Ratio | (c) Unallowed loss |
|---|---|---|---|---|
| RENTAL | SCH E 1C1 | | | |
| | | | | |
| | | | | |
| | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . ▶ | | | 1.00 | |

2006 Petz Enterprises, Inc.   6US882

Form **8582** (2006)

## Worksheet 6--Allowed Losses (See the instructions.)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Unallowed loss | (c) Allowed loss |
|---|---|---|---|---|
| RENTAL | SCH E 1C1 | 908 | | 908 |
| | | | | |
| | | | | |
| | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | 908 | | 908 |

## Worksheet 7--Activities With Losses Reported on Two or More Forms or Schedules (See the instructions.)

| Name of activity: | (a) | (b) | (c) Ratio | (d) Unallowed loss | (e) Allowed loss |
|---|---|---|---|---|---|
| **Form or schedule and line number to be reported on (see instructions):** | | | | | |
| 1a  Net loss plus prior year unallowed loss from form or schedule . . ▶ | | | | | |
| b   Net income from form or schedule . . . . . . . . . ▶ | | | | | |
| c   Subtract line 1b from line 1a. If zero or less, enter -0-   ▶ | | | | | |
| **Form or schedule and line number to be reported on (see instructions):** | | | | | |
| 1a  Net loss plus prior year unallowed loss from form or schedule   . ▶ | | | | | |
| b   Net income from form or schedule . . . . . . . . . ▶ | | | | | |
| c   Subtract line 1b from line 1a. If zero or less, enter -0-   ▶ | | | | | |
| **Form or schedule and line number to be reported on (see instructions):** | | | | | |
| 1a  Net loss plus prior year unallowed loss from form or schedule   . ▶ | | | | | |
| b   Net income from form or schedule . . . . . . . . . ▶ | | | | | |
| c   Subtract line 1b from line 1a. If zero or less, enter -0-   ▶ | | | | | |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | | 1.00 | | |

BBY SANKS

M 01 - US SCH A          Line 15 - Gifts by Cash or Check

escription                              Amount

ASH AND CHECKS                          1,200

otal                                    1,200

Declaration Control Number (DCN)

0 0 - 6 3 2 6 3 2 - 1 4 9 1 3 - 7

COPY

**FORM AL8453**

**ALABAMA DEPARTMENT OF REVENUE**
**Individual Income Tax Declaration for Electronic Filing**
For the year January 1 - December 31, 2006

**2006**

**Label**
Use Alabama label. Otherwise, please type or print.

L A B E L   H E R E

| Your first name and initial | Last name | | Your social security number |
|---|---|---|---|
| BOBBY SANKS | | | |
| If a joint return, spouse's first name and initial | Last name | | Spouse's soc. sec. no. if joint return |
| | | | |

Home address (number and street). If a P.O. Box, see instructions.   Apt. no.
PO BOX 44

Telephone number (optional)
334-749-9106
FN (For official use only)

City, town or post office, state, and ZIP code
SALEM AL 36874

**PART I**

**Tax Return Information**

**(Whole dollars only.)**

| | | |
|---|---|---|
| 1 Alabama taxable income (Form 40, line 17) . . . . . . . . . . | 1 | 1,322 |
| 2 Total tax liability (Form 40, line 22) . . . . . . . . . . | 2 | 44 |
| 3 Total payments (Form 40, line 26) . . . . . . . . . . | 3 | 423 |
| 4 Refund (Form 40, line 33) . . . . . . . . . . | 4 | 379 |
| 5 Amount you owe (Form 40, line 27) . . . . . . . . . . | 5 | |

**PART II**

**Direct Deposit**

1 Routing number: _____

2 Account number: _____

3 Type of account: ☐ Checking   ☐ Savings

**PART III**

**Declaration of Taxpayer**
(Sign only after Part I is completed.)

Under penalties of perjury, I declare that I have compared the information contained on my return with the information I have provided to my electronic return originator and that the amounts described in Part I above agree with the amounts shown on the corresponding lines of my 2006 Alabama income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my ERO described below, any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

☐ I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

**Sign Here** ▶

Your signature         Date         Spouse's signature. If joint return, BOTH must sign.   Date

**PART IV**

**Declaration of Electronic Return Originator (ERO) and Paid Preparer**
(See instructions.)

I declare that I have reviewed the above taxpayer's Alabama individual income tax return and that the entries on this form are complete and correctly represented based on all information of which I have any knowledge. I also declare that I have followed all other requirements described in IRS PUB. 1345, Revenue Procedures for Electronic Filing of Individual Income Tax Returns (Tax Year 2006), and the Alabama Handbook for Electronic Filers of Individual Income Tax Returns (Tax Year 2006). **If I am also the paid preparer, under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.**

**ERO's Use Only**

| ERO's signature | | Date | Check if also paid preparer | X | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| Firm's name (or yours if self-employed) and address | YVONNE STINSON 1328 AUBURN AL OPELIKA AL | | | | E.I. No. |
| | | | | | ZIP Code 36801-0000 |

**Paid Preparer's Use Only**
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

| Preparer's signature | | Date | Check if self-employed | X | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| Firm's name (or yours if self-employed) and address | LINDA LINSON 1328 AUBURN ST OPELIKA AL | | | | E.I. No. |
| | | | | | ZIP Code 36801-0000 |

2006 | Petz Enterprises, Inc.   6AL991

Form AL8453 2006

## DO NOT MAIL TO ALABAMA DEPT. OF REVENUE

SANKS
000044

Page 02

FORM
**40**
Alabama
Individual Income Tax Return

**2006**

RESIDENTS & PART-YEAR RESIDENTS

For the year Jan. 1 - Dec. 31, 2006, or other tax year:    Beginning:          Ending: ●

BOBBY SANKS
PO BOX 44
SALEM AL 36874



| Filing Status and Exemptions | 1 ● | X | $1,500 Single |
|---|---|---|---|
| | 2 ● | | $3,000 Married filing joint return (even if only one spouse had income) |
| Check only one box | 3 ● | | $1,500 Married filing sep. return. Complete line 5 with spouse's name & soc. sec. no. |
| | 4 ● | | $3,000 Head of family (with qualifying person). (See instructions) Complete line 5. |

5    Name ●
     Soc. Sec. No. ●
     Relationship ●

**Income and Adjustments**

6  Wages, salaries, tips, etc. (list each employer and address separately):

| | | | A - Ala. tax withheld | | B - Income | |
|---|---|---|---|---|---|---|
| 6a | UNITED STATES POSTAL SERV  2825 LONE OAK PARK EAG | | 26 | 00 | 6a | 2,340 | 00 |
| 6b | A-1 EMPLOYMENT  400 SOUTH 8TH STREET OPEL | | 56 | 00 | 6b | 2,082 | 00 |
| 6c | KELLY SERVICES INC  PO BOX 331179 DETROIT MI | | 341 | 00 | 6c | 8,499 | 00 |
| 6d | | | | 00 | 6d | | 00 |

7   Interest and dividend income (also attach Schedule B if over $1,500) . . . . . . . . . . . . .   7 ●          00
8   Other income (from page 2, Part I, line 9) . . . . . . . . . . . . . . . . . . . . . . . . .   8 ●   (908)  00
9   Total income. Add amounts in the income column for line 6a through line 8 . . . . . . . . .   9 ●  12,013  00
10  Total adjustments to income (from page 2, Part II, line 8) . . . . . . . . . . . . . . . . .  10 ●          00
11  Adjusted gross income. Subtract line 10 from line 9 . . . . . . . . . . . . . . . . . . . .  11   12,013  00

**Deductions**

You Must Attach page 2 of Federal Form 1040, Federal Form 1040A, Federal Form 1040NR, or page 1 of 1040EZ, if claiming a deduction on line 13.

12  Check box a, if you **itemize** deductions, and enter amount from Schedule A, line 26. Check box b, if you **do not** itemize deductions, and enter standard deduction (see instructions).
    ● a X **Itemized Deductions**   ● b ☐ **Standard Deduction** . .   Box a or b **MUST be checked**   12 ●   9,191  00
13  Federal tax deductions (see instructions)   DO NOT ENTER THE FEDERAL TAX WITHHELD FROM YOUR W-2(s)   13 ●          00
14  Personal exemption (from line 1, 2, 3, or 4 ) . . . . . . . . . . . . .   14 ●   1,500  00
15  Dependent exemption (from page 2, Part III, line 2) . . . . . . . . .   15 ●          00
16  **Total deductions.** Add lines 12, 13, 14, and 15 . . . . . . . . . . . . . . . . . . . . .  16   10,691  00

**Tax**

Do Not Staple Form(s) W-2, W-2G, 1099, and/or 40V to this form.

17  Taxable income. Subtract line 16 from line 11 . . . . . . . . . . . . . . . . . . . . . . .  17    1,322  00
18  Income Tax due. Enter amount from tax table or check if from ● ☐ Form NOL-85A . . . . . .  18 ●      44  00
19  Less credits from: ● ☐ Schedule CR  and/or  ☐ Schedule OC . . . . . . . . . . . . . .  19 ●          00
20a Net tax due Alabama. Subtract line 19 from line 18 . . . . . . . . . . . . . . . . . . . . 20a ●      44  00
  b Consumer Use Tax (use worksheet in the instructions) . . . . . . . . . . . . . . . . . . 20b ●          00
21  Alabama Election Campaign Fund. You may make a voluntary contribution to the following:
    a Alabama Democratic Party    ☐ $1  ☐ $2  ☐ none                                           21a ●          00
    b Alabama Republican Party    ☐ $1  ☐ $2  ☐ none                                           21b ●          00
22  **Total tax liability and voluntary contribution.** Add lines 20a, 20b, 21a, and 21b . . . . . .  22 ●      44  00

**Payments**

23  Alabama income tax withheld (from Forms W-2, W-2G, &/or 1099) .  23 ●   423  00
24  Amount paid with extension (attach Form 4868A) . . . . . . . . .   24 ●          00
25  2006 estimated tax payments (see instructions) . . . . . . . . . .   25 ●          00
26  **Total payments.** Add lines 23 through 25 . . . . . . . . . . . . . . . . . . . . . . . . .  26 ●     423  00

**AMOUNT YOU OWE**

27  If line 22 is larger than line 26, subtract line 26 from line 22, and enter **AMOUNT YOU OWE.** Place payment, along with Form 40V, loose in the mailing envelope. (FORM 40V MUST ACCOMPANY PAYMENT.)   27 ●          00
28  Estimated tax penalty. Also include on line 27 (see instructions page 11) .  28 ●          00

**OVERPAID**

29  If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount **OVERPAID.** . . . .  29 ●     379  00
30  Amount of line 29 to be applied to your **2007** estimated tax . . . . .   30 ●          00

**Donation Check-offs**

31  Total Donation Check-off from Schedule DC, line 2 . . . . . . . . .   31 ●          00
32  **Total.** Add line 30 and lines 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32 ●          00

**REFUND**

33  **REFUNDED TO YOU.** (CAUTION: You must **sign** this return on the reverse side.)
    Subtract line 32 from line 29. For Direct Deposit, check here ● ☐ and complete Part V, Page 2   33 ●     379  00

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below.

**WHERE TO FILE FORM 40** ▶

If you are not making a payment, mail your return to:
Alabama Department of Revenue
P.O. Box 154
Montgomery, AL 36135-0001

If you are making a payment, mail your return, Form 40V and payment to:
Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140-0001

Mail **only** your 2006 Form 40 to one of the above addresses. Prior year returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P.O. Box 327464, Montgomery, AL 36132-7464.

PEI 2006   Petz Enterprises, Inc.   6AL011

Form 40 (2006)                                                                                    Page 2

**PART I**

**Other Income**
(see instructions)

| | | | |
|---|---|---|---|
| 1 | Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 00 |
| 2 | Business income or (loss) (attach Federal Schedule C or C-EZ) | 2 | 00 |
| 3 | Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. (attach Schedule D) | 3 | 00 |
| 4a | Total IRA distributions  4a ● | 00 | 4b Taxable amount (see instructions) . . . 4b | 00 |
| 5a | Total pensions and annuities  5a ● | 00 | 5b Taxable amount (see instructions) . . . 5b | 00 |
| 6 | Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E) . . . . . . . . . | 6  (908) | 00 |
| 7 | Farm income or (loss) (attach Federal Schedule F) . . . . . . . . . . . . . . . | 7 | 00 |
| 8 | Other income (state nature & source -- see instructions) _____ | 8 | 00 |
| 9 | **Total other income.** Add lines 1 through 8. Enter here and also on page 1, line 8 . . . . . . . | 9  (908) | 00 |

**PART II**

**Adjustments to Income**
(see instructions)

| | | | |
|---|---|---|---|
| 1a | Your IRA deduction . . . . . . . . . . . . . . . . . . . . . | 1a | 00 |
| b | Spouse's IRA deduction . . . . . . . . . . . . . . . . . . . | 1b | 00 |
| 2 | Payments to a Keogh retirement plan and self-employment SEP deduction | 2 | 00 |
| 3 | Penalty on early withdrawal of savings . . . . . . . . . . . . . . | 3 | 00 |
| 4 | Alimony pd. Recipient's last name _____ SSN ● | | |
| | Address, City, State, ZIP _____ | 4 | 00 |
| 5 | Adoption expenses . . . . . . . . . . . . . . . . . . . . . | 5 | 00 |
| 6 | Moving Expenses (Attach Fed. Frm. 3903) to City, State, ZIP | 6 | 00 |
| 7 | Self-employed health insurance deduction . . . . . . . . . . . . | 7 | 00 |
| 8 | **Total adjustments.** Add lines 1 through 7. Enter here and also on page 1, line 10 . . | 8 | 00 |

**PART III**

**Dependents**
Do not include yourself or your spouse

(see instructions)

| 1a Dependents: (1) First name    Last name | (2) Dependent's social security number. | (3) Dependent's relationship to you. | (4) Did you provide more than one-half of dependent's support? |
|---|---|---|---|
| _____ | ● | | |
| _____ | ● | | |
| _____ | ● | | |
| _____ | ● | | |

| | | | |
|---|---|---|---|
| b | Total number of dependents claimed above . . . . . . . . . . . . . . . . . . ● | | |
| 2 | **Amount allowed.** (Multiply $300 by the total number of dependents claimed on line 1b.) . . . . 2 | | 00 |
| | Enter amount here and on page 1, line 15 | | |

**PART IV**

**General Information**

**All Taxpayers Must Complete This Section.**

1 Residency ▶ [X] Full Year   If you were a part-year resident of Alabama during 2006, indicate your period of residence:
   Check only one box ● [ ] Part Year   From _____ 2006 through _____ 2006. Total months ____

2 Did you file an AL income tax return for year 2005? [X] Yes [ ] No

3 If no, state reason.

4 Give name and address of present employer(s). Yours  UNITED STATES POSTAL SERVICE  2825 LONE OAK PARKWAY  EAGAN MN 55121
   Your Spouse's

5 Enter the Fed. AGI ● $    12,013  & Fed. Taxable Income ● $ _____   as reported on your 2006 Federal Individual Income Tax Return.

6 Do you have income which is reported on your Fed. return, but not reported on your AL return (other than your state tax refund)?
   [ ] Yes [X] No  If yes, enter source(s) and amount(s) below: (other than state income tax refund)
   Source _____ Amount ● _____ 00
   Source _____ Amount ● _____ 00

7 Do you have income income included in this return from a grantor trust? [ ] Yes [X] No

**PART V**

**Direct Deposit**

For Direct Deposit of your refund, complete 1, 2, and 3 below. (See instructions to see if you qualify.)
1 Routing Number:              2 Type: [ ] Checking [ ] Savings
3 Account Number:

**Sign Here**

Keep a copy of this return for your records.

[X] I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Daytime telephone no. 334-749-9106 | Your occupation ELECTRICIAN |
|---|---|---|---|
| Spouse's signature (if joint return, BOTH must sign) | Date | Daytime telephone no. | Spouse's occupation |

**Paid Preparer's Use Only**

| Preparer's signature | Date | Check if self-employed [X] | Preparer's SSN or PTIN ◀ |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address  LINDA LINSON   DDS TAX SERVICE  1328 AUBURN ST OPELIKA AL | Daytime Tel. # 334-745-2170 | E.I. No. | ZIP Code 36801 |

SCHEDULES
A, B, CR, & DC
(FORM 40)

**ALABAMA DEPARTMENT OF REVENUE**
**Schedule A - Itemized Deductions**   **2006**
(Schedules B, CR, and DC are on page 2)
ATTACH TO FORM 40 - SEE INSTRUCTIONS FOR SCHEDULE A

Name(s) as shown on Form 40
BOBBY SANKS

Your social security number

The itemized deductions you may claim for the year 2006 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. **PART-YEAR RESIDENTS:** A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** (See instructions) | CAUTION: Do not include expenses reimbursed or paid by others. | | | |
| | 1 Medical and dental expenses | 1 | 00 | |
| | 2 Enter amount from Form 40, line 11 [2] 00 | | | |
| | 3 Multiply the amount on line 2 by 4% (.04). Enter the result | 3 | 00 | |
| | 4 Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- | | | 4 ● 00 |
| **Taxes You Paid** (See instructions) | 5 Real estate taxes | 5 | 441 00 | |
| | 6 FICA Tax (Social Security & Medicare) & Federal Self-Employment Tax | 6 | 988 00 | |
| | 7 Railroad Retirement (Tier 1 only) | 7 | 00 | |
| | 8 Other taxes. (List - include personal prop. taxes.) ▶ 79 | 8 | 195 00 | |
| | 9 Add the amounts on lines 5 through 8. Enter the total here | | | 9 ● 1,624 00 |
| **Interest You Paid** (See instructions) | 10a Home mortg. interest and points reported to you on Federal Form 1098 | 10a | 6,367 00 | |
| | b Home mortgage interest not reported to you on Federal Form 1098. (If pd. to an individual, show that person's name & address.) ▶ | | | |
| **NOTE: Personal interest is not deductible.** | | 10b | 00 | |
| | 11 Points not reported to you on Form 1098 | 11 | 00 | |
| | 12 Investment interest. (Attach Form 4952A.) | 12 | 00 | |
| | 13 Add the amounts on lines 10a through 12. Enter the total here | | | 13 ● 6,367 00 |
| **Gifts to Charity** (See instructions) | CAUTION: If you made a charitable contribution and received a benefit in return, see instructions. | | | |
| | 14 Contributions by cash or check | 14 | 1,200 00 | |
| | 15 Other than cash or check. (You MUST attach Fed. Form 8283 if over $500.) | 15 | 00 | |
| | 16 Carryover from prior year | 16 | 00 | |
| | 17 Add the amounts on lines 14 through 16. Enter the total here | | | 17 ● 1,200 00 |
| **Casualty and Theft Loss** (Attach Fm. 4684) | 18a Enter the amount from Federal Form 4684, line 16 (See instructions) | 18a | 00 | |
| | b Enter 10% of your Adjusted Gross Income (Form 40, line 11) | 18b | 00 | |
| | c Subtract line 18b from line 18a. If zero or less, enter -0- | | | 18c ● 00 |
| **Job Expenses & Most Other Miscellaneous Deductions** (See instructions) | 19 Unreimbursed employee expenses - job travel, union dues, job educ., etc. (You MUST attach Fed. Form 2106 if required. See inst.) ▶ | 19 | 00 | |
| | 20 Other expenses (investment, tax preparation, safe deposit box, etc.). List type and amount. ▶ | 20 | 00 | |
| | 21 Add the amounts on lines 19 and 20. Enter the total | 21 | 00 | |
| | 22 Multiply the amount on Form 40, line 11 by 2% (.02). Enter the result here | 22 | 00 | |
| | 23 Subtract line 22 from line 21. Enter the result. If zero or less, enter -0- | | | 23 ● 00 |
| **Other Miscellaneous Deductions** | 24 Other (from list in the instructions). List type and amount. ▶ | | | 24 ● 00 |
| **Qualified Long-Term Care Ins. Premiums** | CAUTION: Do not include medical premiums. | | | |
| | 25 Enter amount here | | | 25 ● 00 |
| **Total Itemized Deductions** | 26 Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12 | | | 26 ● 9,191 00 |

# SCHEDULE E (FORM 40)

## Supplemental Income and Loss

(From Rental Real Estate, Royalties, Partnerships, S Corporations, Estates, Trusts, REMICs, etc.)

▶ ATTACH TO FORM 40.  ▶ SEE INSTRUCTIONS FOR SCHEDULE E (FORM 40).

**2006**

Name(s) shown on return

BOBBY SANKS

Your social security number

### PART I — Income or Loss From Rental Real Estate and Royalties

Note: Report income and expenses from your business of renting personal property on **Schedule C or C-EZ.**

| 1 | Show the kind and location of each Rental Real Estate Property: | 2 For each real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of: <br> • 14 days, or <br> • 10% of the total days rented at fair rental value? | | Yes | No |
|---|---|---|---|---|---|
| A | RENTAL <br> 1419 HOOPER AVE OPELIKA AL 36801 | | A | | X |
| B | | | B | | |
| C | | | C | | |

|  | | | Properties | | | Totals (Add Columns A, B, and C) |
|---|---|---|---|---|---|---|
| | | | A | B | C | |
| **Income:** | | | | | | |
| 3 | Rents received | 3 | 2,800 | | | 3    2,800 |
| 4 | Royalties received | 4 | | | | 4 |
| **Expenses:** | | | | | | |
| 5 | Advertising | 5 | | | | |
| 6 | Auto and travel | 6 | | | | |
| 7 | Cleaning and maintenance | 7 | | | | |
| 8 | Commissions | 8 | | | | |
| 9 | Insurance | 9 | | | | |
| 10 | Legal and other professional fees | 10 | | | | |
| 11 | Management fees | 11 | | | | |
| 12 | Mortgage interest | 12 | 2,905 | | | 12    2,905 |
| 13 | Other interest | 13 | | | | |
| 14 | Repairs | 14 | 500 | | | |
| 15 | Supplies | 15 | | | | |
| 16 | Taxes | 16 | 303 | | | |
| 17 | Utilities | 17 | | | | |
| 18 | Other (list) ▶ | 18 | | | | |
| 19 | Add lines 5 through 18 | 19 | 3,708 | | | 19    3,708 |
| 20 | Depreciation expense or depletion | 20 | | | | 20 |
| 21 | Total expenses. Add lines 19 and 20 | 21 | 3,708 | | | |
| 22 | Income or (loss). Subtract line 21 from line 3 (rents) or line 4 (royalties) | 22 | (908) | | | |
| 23 | Total Real Estate and Royalty income or (loss). Add columns A, B, and C from line 22 and enter the result here | | | | 23 | (908) |

### PART II — Income from Partnerships, S Corporations, Estates & Trusts

| (g) Name and Address | (h) Check One <br> S Corporation / Estate or Trust / Partnership | (i) Employer Identification Number | (j) Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

| 24 | TOTAL INCOME FROM PARTNERSHIPS, S CORPORATIONS, ESTATES, AND TRUSTS. Add the amounts in column (j). Enter the total here and include on line 25 below ▶ | 24 | |
|---|---|---|---|
| 25 | TOTAL INCOME OR (LOSS). Combine lines 23 and 24. Enter the total here & on Form 40, page 2, Part I, line 6 ▶ | 25 | (908) |

PEI  2006  Petz Enterprises, Inc.  6AL151

Schedule E (Form 40) 2006

# Dx. 2

Alabama Education Association, Montgomery, Ala.

CUMULATIVE RECORD

NAME OF PUPIL *Sanks, Bobby*

Pupil *Sanks, Bobby*    Home Address *P.O. Box 15, Salem*

Place & Date of Birth: *Lee County*    *January 5, 1951*    |M|F| Race _____

Parents: Living ✓  Deceased _____   No. Children in family: Older _____ Younger *5*   Relig. Pref. *Methodist*

Father  *Strangler*      *Nolen*        M  *Mill*
         Last Name      First      Middle       Occupation

Mother  *Sanks*      *Mary*      *Ellen*       *Domestic*
         Last Name      First      Middle       Occupation

## TEST RECORD

| Date | Name and/or Type of Test | IQ | Ala. %ile | Natl. %ile | Natl. G.P. | Date | Name and/or Type of Test | IQ | Ala. %ile | Natl. %ile | Natl. G.P. |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |

## SCHOLARSHIP RECORD

| Junior High Subjects | Year | Marks | Repeat Work | Senior High Subjects | Year | Unit | Marks 1st | Marks 2nd | Senior High Subjects | Year | Unit | Marks 1st | Marks 2nd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade | 63/64 | F |  | English |  |  |  |  | Science |  |  |  |  |
| English | F | D |  | 10th | 66/67 |  | C | C | Biology 10th | 64/65 |  | D | C |
| Math | D | D |  | 11th | 67/68 |  | B | B | Chem. 11th | 67/68 |  | C | C |
| Science | D | D |  | 12th | 68/69 |  | C | C | Physics 12th | 68/69 |  | D | C |
| Social Studies | D | D |  |  |  |  |  |  |  |  |  |  |  |
| Phys. Ed. | C | C |  | Social Studies |  |  |  |  | Commercial |  |  |  |  |
| Grade | 64/65 |  |  | 10th | 66/67 |  | C | C |  |  |  |  |  |
| English | D | D |  | 11th | 67/68 |  | C | D |  |  |  |  |  |
| Math | F | C |  | 12th | 68/69 |  | C | D |  |  |  |  |  |
| Science | D | C |  |  |  |  |  |  |  |  |  |  |  |
| Social Studies | F | C |  |  |  |  |  |  |  |  |  |  |  |
| Phys. Ed. | D | C |  | Phys. Ed. |  |  |  |  |  |  |  |  |  |
|  |  |  |  | 10th | 66/67 |  | C | C | Vocational |  |  |  |  |
|  |  |  |  | 11th | 67/68 |  | C | B |  |  |  |  |  |

| Junior High Subjects | Year | Unit | Marks 1st | Marks 2nd | Foreign Language |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade | 65/66 |  |  |  | French 12 | 68/69 |  | C | C |  |  |  |  |
| English |  |  | C | C |  |  |  |  |  | Other Subjects |  |  |  |
| Science |  |  | C | C |  |  |  |  |  |  |  |  |  |
| Social Studies |  |  | C | C |  |  |  |  |  |  |  |  |  |
| Phys. Ed. |  |  | D | C | Math |  |  |  |  |  |  |  |  |
| Math |  |  | D | D | Geometry 10th | 66/67 |  | C | C |  |  |  |
| Algebra |  |  | D | D | Alg. II 11th | 67/68 |  | D | D |  |  |  |

Marks: A—Excellent    B—Good    C—Fair    D—Poor    F—Failure    I—Incomplete    *Cand 20*

Date Graduated *May 28, 1969*  Number in Graduating Class *54*  Quarter Rank: Highest _____ 2nd _____ 3rd _____ Lowest

Name of High School *Wacoochee High*    Address _____

Accredited by: ( ) State Department of Education

( ) Southern Association of Secondary Schools

Record Sent To: 1. _____ Date _____    Regis. _____

2. _____ Date _____    Prin. _____

3. _____ Date _____

DEFENDANT'S EXHIBIT

WPH
001031

NAME OF PUPIL _____ (Last) (First) (Middle)

<table>
<tr><th>CHANGE IN ADDRESS</th><th colspan="2">PREVIOUS SCHOOLS ATTENDED</th></tr>
<tr><th>YEAR</th><th>Mailing Address</th><th>Name of School</th><th>Mailing Address</th></tr>
<tr><td></td><td>P.O. Bx 5, Clbrn, Alaba</td><td>Wadley Jr. High</td><td>Wadley, Alabama<br>P.O. Bx 28</td></tr>
</table>

## ATTENDANCE RECORD

| Year | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 | 19__ | 19__ | 19__ |
|---|---|---|---|---|---|---|---|---|---|
| Grade | 7 | 8 | 9 | 10 | 11 | 12 | | | |
| Days Present | 178 | 176 | 170 | 173 | 172 | | | | |
| Days Absent | 0 | 0 | 7 | 3 | 4 | | | | |
| Times Tardy | 0 | 0 | 0 | | | | | | |
| Chief Cause of Abs. | 0 | 0 | 0 | | | | | | |

## STUDENT EMPLOYMENT RECORD

| Year | Kind of Work | Employer |
|---|---|---|
| | | |

## TRANSFER—WITHDRAWAL—RE-ENTRY

| Date | T. W. R. | From | To |
|---|---|---|---|
| | | | |

## FOLLOW UP RECORD (After Graduation)

| Year | College or Work | Institution or Employer |
|---|---|---|
| | | |

| | Grade 7 | Grade 8 | Grade 9 | Grade 10 | Grade 11 | Grade __ |
|---|---|---|---|---|---|---|
| Significant Health Facts | | | | | | |
| Education Plans | None | None | None | Truck School | Trade School | |
| Vocational Plans | Carpenter | Mechanic | Undecided | Carpenter | Carpenter | |
| Extra-Curricular Activities | Soccer Club | | 4-H Club | Science club<br>baseball & rec. general team | Science club | |
| Community Activities | Church | 4-H Club<br>Church | Church | Baptist Assn. program. Baptist<br>Church League Church | Baptist<br>Church | |
| Interests and Hobbies | Playing | Baseball | Baseball | Baseball | Baseball |

WPH
001032

COMMENTS:

## PERSONAL RATING SCALE
(Combined rating of all teachers) 1—4; 4=highest

| | Jr. I | Jr. II | Jr. III | Sr. I | Sr. II | Sr. III |
|---|---|---|---|---|---|---|
| Responsibility | 2 | 2 | 2 | 2 | 2 | 3 |
| Motivation | 2 | 2 | 2 | 2 | 2 | 2 |
| Initiative | 2 | 2 | 2 | 2 | 2 | 3 |
| Emotional Maturity | 2 | 2 | 2 | 2 | 2 | 3 |
| Social Maturity | 1 | 1 | 1 | 2 | 2 | 3 |

CUMULATIVE RECORD CARD

Lee County
or City, Alabama

| Last Name | First | Middle | Birthplace | Nation-ality | Pupil lives with |
|---|---|---|---|---|---|
| Sanks | Bobby | Lee | Lee County | American | Parents |
| Wesley | Joe | | | | Occupation of Parent |
| Sanks | Mary | Ellen | Lee County | American | Church Affiliation — Newtyer C.M.E. |

| Birth | | | Sex | | Race | | |
|---|---|---|---|---|---|---|---|
| Mo. | Day | Yr. | M | F | W | C | |
| 1 | 5 | 51 | ✓ | | | ✓ | |
| | | | | | | | |
| | | 32 | | ✓ | | ✓ | |

## ATTENDANCE AND SCHOLARSHIP

CODE: E—Excellent. G—Good. S—Satisfactory. U—Unsatisfactory.

| Data | 19 58-59 | 19 59-60 | 19 60-61 | 19 61-62 | 19 62-63 | 19 | 19 |
|---|---|---|---|---|---|---|---|
| Grade | 0(e) | two | third | 4th | 5th | 6th | |
| No. Days in School | 169 | 175 | 134 | 170 | 172 | 175 | |
| No. Days on Roll | 176 | 176 | 176 | 176 | 177 | 176 | |
| No. Days Present | 169 | 175 | 134 | 151 | 166 | 175 | |
| No. Days Unex. Ab. | 2 | 1 | 42 | 25 | 11 | 0 | |
| No. Times Tardy | 0 | 0 | 0 | 0 | 0 | 0 | |
| Arithmetic | S | S | S | S | S+ | S | |
| Language | E | S | S | S | S | S | |
| Reading | S | S | S | S | S+ | S | |
| Science | S | S | S | S | S | S | |
| Social Studies | S | S | S | S | S | S | |
| Spelling | S | S | S | F | S | S | |
| Writing | S | S | S | S | S+ | S | |
| Physical Educ. | S | S | S | S | S | S | |
| Art | S | S | S | S | S | S | |
| Music | S | S | S | S | S | S | |
| Cooperation | E | S | S | S | S+ | S | |
| Self Control | E | S | E | E | E— | S | |
| Study Habits | S | S | S | E | S+ | S | |

REMARKS BY TEACHERS: Sanks is a very nice little boy. He gives me no trouble at all.

## ACHIEVEMENT TEST RECORD

| DATE | | | Name of Test | Arith. Reas. | Arith. Fund. | Total Rating Voc. | Read. Comp. | Lang. |
|---|---|---|---|---|---|---|---|---|
| MO. | DA. | YR. | | | | | | |
| | | | | | | | | |

## INTELLIGENCE TEST RECORD

| DATE | | | Name of Test | Chron. Age | M.A. | I.Q. | Grade Placement |
|---|---|---|---|---|---|---|---|
| MO. | DA. | YR. | | | | | |
| | | | | | | | |

WPH
001033

# RESIDENCE RECORD

## Schools Attended

## Final Withdrawal From School

| Address | Tel. No. | Trans. | Non-tr | Name of School | City | Teacher | Ent. | Left | Date of Completion / Other cause of withdrawal / Remarks |
|---|---|---|---|---|---|---|---|---|---|
| Box 45 Salem Ala | | | ✓ | Wacoochee High | Salem, Ala. | A. B. Fitz-patrick | 9/1/57 | | |
| Box 45 Salem Ala | | | ✓ | Wacoochee High | Salem, Ala | M. L. Brooks | | 5/09 | |
| P.O. Box 45, Salem Ala | | | ✓ | Wacoochee High | Salem, Ala | M. L. Jordan | | 9/14/17 | |
| " " | | | ✓ | " " | " | Mrs. B.N.Williams | | | |
| P.O. Box 45, Salem Ala. | | | ✓ | Wacoochee | Salem, Ala. | F. N. | | | East |
| " " | | | ✓ | " | " | Mrs. G. B. | | | West |
| '63 | | | | | | | | | |

## Health Data

Polio vaccine 2

2 Vaccine 2/5/59

ster 1960

12. Typhoid June 59

'62 63 Booster

## Aptitudes and Special Abilities

Band

## Handicaps

none
Basketball

## Hobbies

Drawing & Coloring
" "

## Summary Statements

Basketball

WPH
001034

# TURSE CLERICAL APTITUDES TEST

BY **Paul L. Turse**, *Senior High School, Peekskill, New York*

NAME *Bobby Lee Sanks*          AGE *18*   SEX: M *X*   F___   DATE *2/12/69*

SCHOOL or FIRM *Wacoochee High*   CITY *Salem*   STATE *ALABAMA*

HIGHEST GRADE REACHED (Circle one):   8   9   10   11   (12)        F   S   J   S
                                                    (Jr.-Sr. High School)              (College)

COURSE OF STUDY (Circle one):   Commercial   General   Scientific   Academic   Other (Specify)_____

**GENERAL INSTRUCTIONS:** *This booklet contains six tests which measure your ability to do different kinds of clerical tasks. Do not turn the page until you are told to do so. All the tests have time limits; so you must work as rapidly and accurately as you can. Below you will find directions for Test 1, Verbal Skills. The directions for the other tests will be given later.*

## Test 1  *Verbal Skills*

**DIRECTIONS:** In this test there are several different types of questions which measure your word knowledge. Read the sample questions and note how the answers are marked in the blank space at the right of each question.

SAMPLES:                                         *Answers*

A.  *A* gerl      *B* girl      *C* girrl......      *B*

B.  cherch...........................      *church*

C.  On unpainted buildings   (1 where   2 **ware**   3 **aware**   4 wear) occurs very rapidly...............      *4*

D.  The students visited the museum **bldg** at Tenth Avenue............      *building*

In Sample A, three possible spellings of a word are given. The problem is to choose the correct spelling, notice which letter it is, and write that letter in the answer space. Notice how this has been done.

In Sample B, a word is written as it is pronounced. Here the problem is to write the correct spelling of the word in the answer space. Notice how this has been done.

In Sample C, a sentence is given in which one word is written in four different ways. Choose the word which best completes the meaning of the sentence and write the number of that word in the answer space. Notice how this has been done.

In Sample D, several letters have been omitted from the word in heavy black type. The problem is to write the whole word correctly spelled. Notice how this has been done.

In Test 1 you will find some questions like each of the samples above. Answer them just as the samples have been answered.

*Do not open this booklet until you are told to do so.*

| TEST | SCORE | %-ILE | STANINE |
|---|---|---|---|
| 1.  Verbal Skills | 0 | 1 | 1 |
| 2.  Number Skills | 11 | 1 | 3 |
| 3.  Written Directions | 8 | 5 | 2 |
| *Learning Ability (1–3)* | 19 | 1 | 1 |
| 4.  Checking Speed | 53 | X | X |
| 5.  Classifying–Sorting | 42 | X | X |
| 6.  Alphabetizing | 13 | X | X |
| *Clerical Speed (4–6)* | 108 | 85 | 7 |
| 2 × Learn. Abil. | 38 | X | X |
| Cler. Speed | 108 | X | X |
| *Gen. Clerical Aptitude* | 146 | 10 | 2 |



Norms Used (Specify) *Joint High School Norms*

*Copyright 1953 by Harcourt, Brace & World, Inc., New York*
*Copyright in Great Britain. All rights reserved.*   PRINTED IN U.S.A. TCAT: 10

*b*

WPH
001035

# Test 1    *Verbal Skills*

1. *A* tariff    *B* tarrif    *C* tarriff .1
2. serten . . . . . . . . . . . . . . . . . . . . . .2
3. The (1 leak    2 lick    3 lack    4 lake) of water made irrigation necessary. . . . . . . . . . . . . . . . . .3
4. The owners of most businesses aim primarily at **rng** a living and making a profit. . . . . . . . . . . . . . . .4
5. *A* testamony    *B* testimoney    *C* testimony . . . . . . . . . . . . . . . .5
6. vois . . . . . . . . . . . . . . . . . . . . . . .6
7. The board of directors elected an (1 executor    2 executive    3 executrix    4 executioner) for the corporation. . . . . . . . . . . .7
8. According to one **dctry** definition, a business differs from a profession in that a profession requires higher scholarship. . . . . . . . . . . . . . . . .8
9. *A* remitance    *B* remittance    *C* remmittance . . . . . . . . . . . . .9
10. nif . . . . . . . . . . . . . . . . . . . . . .10
11. The missionary found himself (1 holy    2 holly    3 wholly    4 holey) at the mercy of the savages. . . . . . . . . . . . . . . . . . .11
12. Business in the narrow profit-seeking sense has had a major role in **shpng** the destinies of modern nations. . . . . . . . . . . . . . . . . . . .12
13. *A* souvenir    *B* souvenir    *C* souviner . . . . . . . . . . . . . .13
14. kwer . . . . . . . . . . . . . . . . . . . . .14
15. The (1 counsel    2 consul    3 council    4 console) for the defense met with his client after the trial. . . . . . . . . . . . . . . . .15
16. Business may be **dfnd** in many ways, but reduced to its lowest terms it is a system whereby people in an organized society satisfy their wants. . . . . . . . . . . . . . . . .16
17. *A* sepperate    *B* seperate    *C* separate . . . . . . . . . . . . . .17
18. sist . . . . . . . . . . . . . . . . . . . . . .18
19. The (1 sear    2 seer    3 sere    4 sire) foretold the destruction of the mill. . . . . . . . . . . . . . . . . .19
20. Changes in business organization have tended to put **cntrl** in the hands of a few individuals. . . . . . .20

21. *A* maintenance    *B* maintainance    *C* maintanence . . . . . . . . . . . . . .21
22. kwen . . . . . . . . . . . . . . . . . . . .22
23. When asked his opinion, the aviator (1 discerned    2 dissented    3 desisted    4 descended) with the Airway Company's policy. . . .23
24. It is well for everyone to know something about the business **mtrs** which affect his personal welfare. 24
25. *A* innadequate    *B* inadequate    *C* inedaquate . . . . . . . . . . . . . .25
26. kozd . . . . . . . . . . . . . . . . . . . . .26
27. Under "seniority rule" promotions are granted by (1 presidents    2 persistence    3 precedence    4 presumptions). . . . . . . . . . .27
28. In any modern society, business makes it possible for people **tststfy** their material wants. . . . . . . . . . .28
29. *A* rythm    *B* rhythym    *C* rhythm . . . . . . . . . . . . . . . . . . .29
30. wokt . . . . . . . . . . . . . . . . . . . . .30
31. The burglar (1 stilted    2 steeled    3 stilled    4 stalled) himself for the alarm. . . . . . . . . . .31
32. The terms "big business" and "**cptsm**" may have an anti-social significance to some citizens. 32
33. *A* comitment    *B* commitment    *C* comittment . . . . . . . . . . . . . .33
34. sest . . . . . . . . . . . . . . . . . . . . . .34
35. He will (1 cull    2 cool    3 cole    4 coal) the hot potatoes from the others in the oven. 35
36. There is no **dbt** that unethical practices sometimes exist in business deals. . . . . . . . . . . . . . . . . . .36
37. *A* foreward    *B* forward    *C* farword . . . . . . . . . . . . . . . .37
38. tox . . . . . . . . . . . . . . . . . . . . . .38
39. Her crude manners made her a (1 boar    2 bore    3 booer    4 boor). . . . . . . . . . . . . . . . . . . .39
40. Business can be made a more effective **mdm** for the satisfaction of human wants. . . . . . . . . . . . . . .40

[ 2 ]    *Stop. Do not turn the page.*    SCORE

# Test 1  *Verbal Skills*

Turse Clerical Aptitudes

1. *A* tariff    *B* tarrif    *C* tarriff . 1
2. serten . . . . . . . . . . . . . . . . . . . . 2
3. The (1 leak    2 lick    3 lack    4 lake) of water made irrigation necessary. . . . . . . . . . . . . . . . .3
4. The owners of most businesses aim primarily at rng a living and making a profit. . . . . . . . . . . . . . . .4
5. *A* testamony    *B* testimoney    *C* testimony . . . . . . . . . . . . . .5
6. vois . . . . . . . . . . . . . . . . . . . . . .6
7. The board of directors elected an (1 executor    2 executive    3 executrix    4 executioner) for the corporation. . . . . . . . . . .7
8. According to one dctry definition, a business differs from a profession in that a profession requires higher scholarship. . . . . . . . . . . . . . .8
9. *A* remitance    *B* remittance    *C* remmittance . . . . . . . . . . . . .9
10. nif . . . . . . . . . . . . . . . . . . . . . 10
11. The missionary found himself (1 holy    2 holly    3 wholly    4 holey) at the mercy of the savages. . . . . . . . . . . . . . . . . . . 11
12. Business in the narrow profit-seeking sense has had a major role in shpng the destinies of modern nations. . . . . . . . . . . . . . . . . . . 12
13. *A* souvenir    *B* suovenir    *C* souviner . . . . . . . . . . . . . . 13
14. kwer . . . . . . . . . . . . . . . . . . . 14
15. The (1 counsel    2 consul    3 council    4 console) for the defense met with his client after the trial. . . . . . . . . . . . . . . . 15
16. Business may be dfnd in many ways, but reduced to its lowest terms it is a system whereby people in an organized society satisfy their wants. . . . . . . . . . . . . . . 16
17. *A* sepperate    *B* seperate    *C* separate . . . . . . . . . . . . . 17
18. sust . . . . . . . . . . . . . . . . . . . . 18
19. The (1 sear    2 seer    3 sere    4 sire) foretold the destruction of the mill. . . . . . . . . . . . . . . . 19
20. Changes in business organization have tended to put cntrl in the hands of a few individuals. . . . . . 20

21. *A* maintenance    *B* maintainance    *C* maintanance . . . . . . . . . . . . . 21
22. kwen . . . . . . . . . . . . . . . . . . . 22
23. When asked his opinion, the aviator (1 discerned    2 dissented    3 desisted    4 descended) with the Airway Company's policy. . . 23
24. It is well for everyone to know something about the business mtrs which affect his personal welfare. 24
25. *A* innadequate    *B* inadequate    *C* inedaquate . . . . . . . . . . . . . 25
26. kozd . . . . . . . . . . . . . . . . . . . 26
27. Under "seniority rule" promotions are granted by (1 presidents    2 persistence    3 precedence    4 presumptions). . . . . . . . . . 27
28. In any modern society, business makes it possible for people tststfy their material wants. . . . . . . . . 28
29. *A* rythm    *B* rhythym    *C* rhythm . . . . . . . . . . . . . . . 29
30. wokt . . . . . . . . . . . . . . . . . . . 30
31. The burglar (1 stilted    2 steeled    3 stilled    4 stalled) himself for the alarm. . . . . . . . . 31
32. The terms "big business" and "cptsm" may have an anti-social significance to some citizens. 32
33. *A* comitment    *B* commitment    *C* comittment . . . . . . . . . . . . 33
34. sest . . . . . . . . . . . . . . . . . . . . 34
35. He will (1 cull    2 cool    3 cole    4 coal) the hot potatoes from the others in the oven. 35
36. There is no dbt that unethical practices sometimes exist in business deals. . . . . . . . . . . . . . . . 36
37. *A* foreward    *B* forward    *C* farword . . . . . . . . . . . . . . 37
38. tox . . . . . . . . . . . . . . . . . . . . 38
39. Her crude manners made her a (1 boar    2 bore    3 booer    4 boor). . . . . . . . . . . . . . . . 39
40. Business can be made a more effective mdm for the satisfaction of human wants. . . . . . . . . . . . . 40

Stop. Do not turn the page.    SCORE

# Test 2 — *Number Skills*

Turse Clerical Aptitudes

**DIRECTIONS:** Write the answers to the following problems in the spaces at the right.  Do all your computations in the boxes provided for each problem.  In division problems, indicate a remainder by separating it from the rest of the answer with a hyphen (as in Sample D).  Work as *rapidly* and as *accurately* as you can, taking each problem in its turn from left to right.  Be sure to transfer your answers to the spaces at the right.

| SAMPLES: A | B | C | D | E | Answers |
|---|---|---|---|---|---|
| 37 <br> +14 <br> 51 | 25 <br> ×34 <br> 100 <br> 75 <br> 850 | 125 <br> −89 <br> 36 | 18−2 <br> 25)452 <br> 25 <br> 202 <br> 200 <br> 2 | 6 1/2 <br> +4 1/4 <br> 10 3/4 | A  51 <br> B  850 <br> C  36 <br> D  18−2 <br> E  10 3/4 |
| **1** <br> 27 <br> +24 <br> +51 | **2** <br> 84 <br> −26 <br> −58 | **3** <br> 47 <br> ×44 <br> 188 <br> 188 <br> 2,068 | **4** <br> 9 <br> 8)75 <br> 72 <br> 3 | **5** <br> 774 <br> +376 <br> 1,150 | 1  +51 <br> 2  −58 <br> 3  2,068 <br> 4  9-3 <br> 5  )50 |
| **6** <br> 48 <br> −29 <br> 19 | **7** <br> 258 <br> ×76 <br> 1541 <br> 1807 <br> 19588 | **8** <br> 0 <br> 9)0 | **9** <br> 46 <br> 39 <br> 76 <br> 161 | **10** <br> 7090 <br> 6231 <br> −0859 | 6  −19 <br> 7  19,588 <br> 8  0 <br> 9  161 <br> 10  −0859 |
| **11** <br> 8×4×3×2 = <br> 36 ‖ 12 ‖ 6 <br> ×× <br> 144 <br> 144 <br> 161 | **12** <br> 0 <br> 109 | **13** <br> 3578 <br> +274 <br> 3852 | **14** <br> 2739 <br> −1548 <br> −1191 | **15** <br> 7×3×2 = <br> 21 <br> ×2 <br> 42 | 11  864 <br> 12  0 <br> 13  3852 <br> 14  −1191 <br> 15  42 |
| **16** <br> 2054 <br> 255 <br> 365 | **17** <br> 3739 <br> −2545 | **18** <br> 6×4×0×2 = | **19** <br> 12)1.08 | **20** <br> 231 1/5 <br> +44 1/10 | 16 <br> 17 <br> 18 <br> 19 <br> 20 |

WPH <br> 001038

58  *(Go on to the next page.)*

Test 2 — *Number Skills* (Continued)

| | | | | Answers |
|---|---|---|---|---|
| **21** $\begin{array}{r} 8898 \\ -7889 \end{array}$ | **22** $\begin{array}{r} 48 \\ \times 76 \end{array}$ | **23** $2\tfrac{1}{2}\overline{)7\tfrac{1}{2}}$ | **24** $148 + 96 + 247 =$ | 21 _____ <br> 22 _____ <br> 23 _____ <br> 24 _____ |
| **25** $\begin{array}{r} 45796 \\ -32697 \end{array}$ | **26** $\begin{array}{r} 574.1 \\ \times .87 \end{array}$ | **27** $24\overline{)4848}$ | **28** $17 - 15 + 23 - 24 + 25 =$ | 25 _____ <br> 26 _____ <br> 27 _____ <br> 28 _____ |
| **29** $\begin{array}{r} 867 \\ 249 \\ 628 \\ 735 \end{array}$ | **30** $\begin{array}{r} 74 \\ \times 53 \end{array}$ | **31** $\begin{array}{r} 38\tfrac{1}{4} \\ +46\tfrac{3}{8} \end{array}$ | **32** $426 + 138 + 846 =$ | 29 _____ <br> 30 _____ <br> 31 _____ <br> 32 _____ |
| **33** $\begin{array}{r} 78652 \\ -67869 \end{array}$ | **34** $\begin{array}{r} 1.4 \\ \times .35 \end{array}$ | **35** $25\overline{)425}$ | **36** $198 - 79 - 20 - 34 =$ | 33 _____ <br> 34 _____ <br> 35 _____ <br> 36 _____ |
| **37** $\begin{array}{r} 725 \\ +650 \\ 25 \\ +555 \\ +750 \end{array}$ | **38** $\begin{array}{r} 24\tfrac{1}{4} \\ \times 78\tfrac{1}{4} \end{array}$ | **39** $61\overline{).3294}$ | **40** $5 \times 28 \times \tfrac{1}{16} =$ | 37 _____ <br> 38 _____ <br> 39 _____ <br> 40 _____ |
| **41** $\begin{array}{r} +56 \\ +48 \\ +43 \\ -48 \end{array}$ | **42** $\begin{array}{r} 38\tfrac{1}{2} \\ -24\tfrac{2}{3} \end{array}$ | **43** $15.3\overline{)23562}$ | **44** $977 - 284 - 483 - 284 =$ | 41 _____ <br> 42 _____ <br> 43 _____ <br> 44 _____ |

WPH
001039

Turse Clerical Aptitudes

## Test 3   Written Directions

*This is a test to determine how well and how rapidly you can follow directions.   Read the directions below and do exactly as they tell you.   Work as rapidly as you can.*

Start by placing the figure "4" in space #1, which appears at the right of this column, and the figure "1" in space #2.   Then in space #3, print the capital letter "b."   In space #4, write the number of the middle answer space in this test.   In space #5, place the figure "6" and leave space #6 blank.   If the fifth word in the first line ends with "e," write the first letter of that word in space #7; if it does not, write the last letter of that word in space #7.   Place an "x" in space #9 and place the figure "9" in space #8.   In space #10, print the 12th letter of the alphabet.

If "x" comes after "y" in the alphabet, print the first letter of the alphabet in space #11; if not, leave the space blank.   In spaces #12 and #13, interchange space numbers assigned to each of these spaces.   If "w" comes after "u," print the last letter of the alphabet in space #11; if not, leave space #11 blank.

If the answer to 1 times 0 is zero, write an "x" in space #15.   In space #16, write the first vowel which is repeated in this sentence.   In space #17, write the vowel most often used in this sentence.   If 7 × 8 is greater than 9 × 6, write the smaller number in space #18.   If the difference between 1 and 8 is not the same as the difference between 7 and 15, write "no" in space #19, and zero in space #14; if it is the same, write an "x" in space #19.

If there are less than 25 answer spaces in this test, write "x" in space #20; if not, write "x" in space #21 and "4" in space #20.   If space #6 is blank, write "15" in it.   If the answer in space #12 is the same as the answer in space #4, write the same answer in space #23; if it is not the same, write "7" in space #23.

In space #22, write the number of the second answer space in which a letter of the alphabet appears.   If the last letter of the fourth word in the line opposite answer space #6 is not "e," write "10" in space #24; if it is, leave the space blank.   In space #25, print the next to the last letter of the second word which begins with "t" in the line opposite answer space #11.

STOP   SCORE   [ 6 ]

| | |
|---|---|
| 1 | 4 |
| 2 | 1 |
| 3 | B |
| 4 | 2 |
| 5 | 6 |
| 6 | |
| 7 | b |
| 8 | 9 |
| 9 | x |
| 10 | K |
| 11 | A |
| 12 | 13 |
| 13 | 12 |
| 14 | |
| 15 | x |
| 16 | i |
| 17 | i |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

---

*Read the directions below and study the samples for Test 4, Test 5, and Test 6, but do not turn the page until told to do so.*

### DIRECTIONS FOR Test 4   *Checking Speed*

Look carefully at each pair of letters and numbers; then, after each pair, make an "X" on the letter **S** if the pair is *exactly* the same, on the **D** if it is different.   Work as *rapidly* and as *accurately* as possible.   Take each item in turn.   Do not skip items.

SAMPLES:  A. 34567   34567 . . . . . . . . . X   D

B. TVTVT   TVTTV . . . . . . . . . S   X

C. e71M4e   e71m4e . . . . . . . . . S   X

### DIRECTIONS FOR Test 5   *Classifying   Sorting*

After each item, mark the GROUP number (1, 2, 3, or 4) according to the following classification.   Do not skip items, but work each item in turn.   Work as *rapidly* and as *accurately* as possible.

| If names begin with | Mark group number | If numbers are |
|---|---|---|
| A to F | 3 | 244 to 258 |
| G to K | 1 | 259 to 264 |
| L to R | 4 | 265 to 273 |
| S to Z | 2 | 274 to 279 |

SAMPLES:  A.  Gilman . . . . . . . . . X   2   3   4

B.  263 . . . . . . . . . . . . X   2   3   4

C.  Palmer . . . . . . . . . 1   2   3   X

D.  250 . . . . . . . . . . . 1   2   X   4

### DIRECTIONS FOR Test 6   *Alphabetizing*

After each item, mark the letter **Y** (for Yes) if the names in the group are in correct alphabetical order; the **N** (for No) if the names are not in correct order.   Work as *rapidly* and as *accurately* as possible.

| SAMPLES: | A. Hall | | B. Jones | |
|---|---|---|---|---|
| | Jill | X   N | Jeppa | Y   X |
| | Kell | | Jodar | |

These three tests have time limits, so work as rapidly as you can.   The directions are printed at the top of each test for anyone who needs them, but no extra time is allowed for reading them.

*Do not turn this page until you are told to do so.*

WPH
001040

**DIRECTIONS:** Look carefully at each pair of letters and numbers; then, after each pair, mark the letter **S** if the pair is *exactly* the same, the **D** if it is different. Work as *rapidly* and as *accurately* as possible. Take each item in turn. *Do not skip items.*

SAMPLES: A. 34567    34567 ...... S **D**
B. TVTVT    TVTTV ...... **S** D
C. e71M4e    e71m4e. ...... **S** D

| # | | | | # | | | |
|---|---|---|---|---|---|---|---|
| 1. uvwxyz | uvwxyz | **S** | D | 31. tRfGmL | tRfGmL | **S** | D |
| 2. 614644 | 614644 | **S** | D | 32. 696966 | 696996 | S | **D** |
| 3. A5Tf7R | A5Tf7R | S | **D** | 33. ZbFr6W | ZbFr6W | **S** | D |
| 4. QWERTY | QWERTY | **S** | D | 34. zyxyvu | zyxyvu | **S** | D |
| 5. 589889 | 589889 | **S** | D | 35. 879346 | 879436 | S | **D** |
| 6. 9u8erC | 9u8erC | **S** | D | 36. CoLOc4c | CoLoc4c | S | **D** |
| 7. StrSsb | StrSsb | S | **D** | 37. ghijklk | ghijklk | S | **D** |
| 8. 322332 | 322332 | **S** | D | 38. 6404446 | 6440446 | S | **D** |
| 9. RmBmMa | RmBnMa | S | **D** | 39. s3rMV3rs | S3rVM3rs | S | **D** |
| 10. YtrEWQ | YtrEWQ | **S** | D | 40. SrtbfzlA | SrtbfzlA | **S** | D |
| 11. 724889 | 724899 | S | **D** | 41. 235467 | 235467 | **S** | D |
| 12. T86WSE | T8W6SE | S | **D** | 42. D3r98r3D | D3r89r3D | S | **D** |
| 13. beCede | beCede | **S** | D | 43. BeGeCReB | BeCeGReb | S | **D** |
| 14. 498726 | 498726 | **S** | D | 44. 7142686 | 7142686 | **S** | D |
| 15. S8CV7S | S8CV7S | **S** | D | 45. V3aXdbV | V3aXbdV | S | **D** |
| 16. BFECRL | BFEGRL | S | **D** | 46. lastrpbx | lastrpbx | **S** | D |
| 17. 137582 | 135782 | S | **D** | 47. 4289237 | 4289237 | **S** | D |
| 18. A6fT4R | A6fT4R | S | **D** | 48. E8F6P3L7D | E8F6P3L7D | **S** | D |
| 19. zbzddz | zbzddz | **S** | D | 49. lmndpdpd | lmnddpdpd | S | **D** |
| 20. 198761 | 198761 | **S** | D | 50. 2156486 | 2156486 | **S** | D |
| 21. tR6Sot | tR6sot | S | **D** | 51. a7s8d9f0a | a7s8d9f0a | **S** | D |
| 22. bUvSmN | bUvSmN | **S** | D | 52. rnmrnmrnm | rnmrmnrnm | S | **D** |
| 23. 211212 | 211212 | **S** | D | 53. 39767866 | 39767866 | **S** | D |
| 24. 6LT9R5 | 6LT9R5 | S | **D** | 54. CW96WC9C | CW96WC9C | **S** | D |
| 25. GHIJKL | GHJIKL | S | **D** | 55. evwevevwy | evwewevwy | S | **D** |
| 26. 243546 | 243546 | **S** | D | 56. 98989898 | 98989898 | **S** | D |
| 27. 3vAbDX | 3vAbDX | **S** | D | 57. 4Ef1P31d7C | 4Ef1P31d7C | **S** | D |
| 28. YzxaxY | YzxaxY | **S** | D | 58. ilillilil | ilillilil | **S** | D |
| 29. 731289 | 731289 | **S** | D | 59. 986769438 | 986796438 | S | **D** |
| 30. 9BFL8R | 9BFl8R | S | **D** | 60. JLu2r8aE8 | JLu2r8aE8 | **S** | D |

[ 6 ]

*Stop. Do not turn the page.*    SCORE 53

WPH
001041

Turse Clerical Aptitudes

# Test 5  *Classifying–Sorting*

**DIRECTIONS:** After each item, mark the GROUP number (1, 2, 3, or 4) according to the following classification. *Do not skip items*, but work each item in turn. Work as *rapidly* and as *accurately* as possible.

| If names begin with | Mark group number | If numbers are |
|---|---|---|
| A to F | 3 | 244 to 258 |
| G to K | 1 | 259 to 264 |
| L to R | 4 | 265 to 273 |
| S to Z | 2 | 274 to 279 |

SAMPLES:

A. Gilman.......... 1̶  2  3  4
B. 263.............. 1̶  2  3  4
C. Palmer......... 1  2  3  4̶
D. 250............. 1  2  3̶  4

**WPH**
**001042**

| | | | | | |
|---|---|---|---|---|---|
| 1. Martin | 1 2 3 (4) | | 31. Ikler | (1) 2 3 4 |
| 2. 273 | 1 2 3 (4) | | 32. 254 | 1 2 (3) 4 |
| 3. Paulman | 1 2 3 (4) | | 33. Williams | 1 (2) 3 4 |
| 4. 255 | (1) 2 3 4 | | 34. 278 | 1 (2) 3 4 |
| 5. Brogan | 1 2 (3) 4 | | 35. Norton | 1 2 3 (4) |
| 6. 274 | 1 (2) 3 4 | | 36. 253 | 1 2 (3) 4 |
| 7. Tracey | 1 (2) 3 4 | | 37. Harmon | (1) 2 3 4 |
| 8. 258 | 1 2 (3) 4 | | 38. 245 | 1 2 (3) 4 |
| 9. Ames | 1 2 (3) 4 | | 39. Voeth | 1 (2) 3 4 |
| 10. 260 | (1) 2 3 4 | | 40. 249 | 1 2 (3) 4 |
| 11. Queen | 1 2 3 (4) | | 41. Evans | 1 2 (3) 4 |
| 12. 252 | 1 2 (3) 4 | | 42. 271 | 1 2 3 (4) |
| 13. Dickson | 1 2 (3) 4 | | 43. Young | 1 (2) 3 4 |
| 14. 259 | (1) 2 3 4 | | 44. 277 | 1 2 3 4 |
| 15. Nichols | 1 2 3 (4) | | 45. Hill | 1 2 3 4 |
| 16. 279 | 1 (2) 3 4 | | 46. 264 | 1 2 3 4 |
| 17. Xavier | 1 (2) 3 4 | | 47. Underwood | 1 2 3 4 |
| 18. 250 | 1 2 (3) 4 | | 48. 262 | 1 2 3 4 |
| 19. Crane | 1 2 (3) 4 | | 49. Jones | 1 2 3 4 |
| 20. 276 | 1 (2) 3 4 | | 50. 267 | 1 2 3 4 |
| 21. Jacobs | (1) 2 3 4 | | 51. Mills | 1 2 3 4 |
| 22. 248 | 1 2 (3) 4 | | 52. 275 | 1 2 3 4 |
| 23. Ullman | 1 (2) 3 4 | | 53. Pane | 1 2 3 4 |
| 24. 269 | 1 2 3 (4) | | 54. 268 | 1 2 3 4 |
| 25. Earl | 1 2 (3) 4 | | 55. Turner | 1 2 3 4 |
| 26. 261 | (1) 2 3 4 | | 56. 257 | 1 2 3 4 |
| 27. Hall | (1) 2 3 4 | | 57. Dale | 1 2 3 4 |
| 28. 247 | 1 2 (3) 4 | | 58. 272 | 1 2 3 4 |
| 29. Weaver | 1 (2) 3 4 | | 59. Naylor | 1 2 3 4 |
| 30. 263 | (1) 2 3 4 | | 60. 266 | 1 2 3 4 |

WPH
001043

# Test 6   Alphabetizing

DIRECTIONS: After each item mark the letter Y (for Yes) if the names in the group are in correct alphabetical order, the N (for No) if the names are not in correct order. Work as *rapidly* and as *accurately* as possible.

SAMPLES:   A.  Hall      Y   N       B.  Jones      Y   X
              Jill                        Jeppa
              Kell                        Jodar

| | | | |
|---|---|---|---|
| 1. Veega | 11. Nugent | 21. Sader | 31. Thomas |
| Wanth  Y  N | Nuart  Y  N | Lamot  Y  N | Thush  Y  N |
| Xavier | Nujenk | Rabon | Thuts |
| 2. Aaron | 12. Dewir | 22. Plunt | 32. Gordon |
| Abner  Y  N | Dewur  Y  N | Prang  Y  N | Gortan  Y  N |
| Acrot | Dewor | Porta | Gorwin |
| 3. Brawn | 13. Selk | 23. Queen | 33. King |
| Bruwn  Y  N | Tond  Y  N | Quinn  Y  N | Nath  Y  N |
| Brown | Vatt | Quill | Reth |
| 4. Caller | 14. Dover | 24. Lennan | 34. Reed |
| Calner  Y  N | Dring  Y  N | Lennon  Y  N | Roth  Y  N |
| Calmer | Dunne | Lenonn | Rhet |
| 5. Jones | 15. Odinka | 25. Peters | 35. Zader |
| North  Y  N | Odonna  Y  N | Ulman  Y  N | Zahor  Y  N |
| Plant | Odsend | Quinn | Zaffs |
| 6. Black | 16. Pults | 26. Mackey | 36. Masers |
| Borga  Y  N | Pulwa  Y  N | Madden  Y  N | Masors  Y  N |
| Brigg | Pulyo | McDave | Masirs |
| 7. Innes | 17. Ullman | 27. Emary | 37. Cole |
| Inmor  Y  N | Wilman  Y  N | Emery  Y  N | Earl  Y  N |
| Inter | Vilman | Emory | Dong |
| 8. Kirbey | 18. Lang | 28. Fernton | 38. Sneed |
| Kirlar  Y  N | Lunt  Y  N | Fergsly  Y  N | Swank  Y  N |
| Kirgot | Long | Ferpson | Stalk |
| 9. Emery | 19. James | 29. Lant | 39. Whalt |
| Haver  Y  N | Janes  Y  N | Senk  Y  N | Whaot  Y  N |
| Gopan | Johns | Yoga | Whand |
| 10. Craig | 20. Obersa | 30. Niblo | 40. Jekil |
| Cvells  Y  N | Oberta  Y  N | Notar  Y  N | Jeort  Y  N |
| Cupp | Oberso | Nulls | Jeurg |

SCORE  13

| Clerical Accuracy Score | | | |
|---|---|---|---|
| TEST | NO. RIGHT | NO. ATTEMPTED | |
| 4 | | | Cl. Acc. Sc. (%) = $\frac{\text{No. Right}}{\text{No. Att.}} \times 100$ |
| 5 | | | |
| 6 | | | Cl. Acc. Sc. (%) = ——— $\times 100$ |
| TOTAL | | | Cl. Acc. Sc. (%) = |

[ 8 ]



WPH
001044

# Dx. 3

# West Point Pepperell

**APPLICATION FOR EMPLOYMENT**

DEFENDANT'S EXHIBIT 3
B. Sanks
PENGAD 800-631-6989

**NAME**

| First | Middle | Maiden | Last |
|---|---|---|---|
| Bobby | Lee | | Sanks |

**GENERAL**

| Mailing Address &/ Number | Street | City | State | Zip Code |
|---|---|---|---|---|
| P.O. Box 44 | | Salem | Alabama | 36874 |

Residence (If Different From Above) — City / State / Zip Code

| Birth Date (Mo., Day, Yr.) | Age | Sex | Blood Type (Rh?) | Birth Certificate No.? (If you are under 19 years old) |
|---|---|---|---|---|
| | 19 | M | A | 7708 |

| Height | Weight | Color of Hair | Color of Eyes | Home Phone |
|---|---|---|---|---|
| 5'8 | 131 | Black | Brown | Friend's Phone 745-798 |

Housing Status: 1. Own Your Own Home ☐  2. Rent Home ☑  3. Board ☐  4. Live With Parents ☑

Marital Status: 1. Single ☒  2. Married ☐  3. Separated ☐  4. Divorced ☐  5. Widowed ☐

Registered to Vote? No    Have you ever been arrested for other than minor traffic violations? No    Has your driver's license ever been revoked? No

**JOB PREFERENCE**

| 1st Job Choice | 2nd Job Choice | 3rd Job Choice |
|---|---|---|
| Any | | |

| 1st Plant or Office Choice | 2nd Plant or Office Choice | 3rd Plant or Office Choice |
|---|---|---|
| | | |

| Which Shift can you work? | When can you report to work? | Second Choice of Shift (1.2.3) |
|---|---|---|
| | 2nd | |

**EDUCATION AND TRAINING**

| | City & State | Dates Entered and Left |
|---|---|---|
| Elementary or Junior High School    Wacoochee 103 | Salem, Ala | 8th (6d) |
| Trade, College, or Vocational Schools | City & State | Dates Entered and Left |
| | City & State | Dates Entered and Left |
| | City & State | Dates Entered and Left |

| Major Field or Courses of Study | Years Completed and/or Degrees Earned | Did you graduate? | Show Date |
|---|---|---|---|
| | 12  Diploma | Yes | 1969 |

Correspondence Courses or Seminars — Date Completed

Other Approved Training — Location — Date Completed

**OFFICE SKILLS:** Typing Speed (WPM) — Dictation (WPM)

Machines and Other Skills

**ACTIVITIES**

School Activities and Honors: Basketball, football, Baseball and Raceing

Community Organizations and Activities:

Hobbies and Recreational Activities: Play all the sports

WPH
000045

## EMPLOYMENT RECORD

**Have you ever worked for?**

- [ ] 1. WEST POINT MFG. CO.
- [ ] 2. PEPPERELL MFG. CO.
- [ ] 3. WEST POINT-PEPPERELL
- [ ] 4. WELLINGTON SEARS CO.
- [ ] 5. CABIN CRAFTS, INC.
- [ ] 6. OTHER SUBSIDIARIES

## EMPLOYMENT HISTORY (Start with present or last job and work back)

| Employer | | Job | |
|---|---|---|---|
| *Mfg Unemp - 2 mos -* | | | |
| Address | From | Name of Supervisor | Rate of Pay |
| City & State | To | Why did you leave? | |
| What did you do? | | | |

| Employer | | Job | |
|---|---|---|---|
| *A. B. Pelham Bro.* | | *Clerk* | |
| Address | From | Name of Supervisor | Rate of Pay |
| *Salem Mills* | *July 61* | | *60.00* |
| City & State | To | Why did you leave? | |
| What did you do? | *July* | *Business & not...* | |

| Employer | | Job | |
|---|---|---|---|
| Address | | | Rate of Pay |
| City & State | | Why did you leave? | |
| What did you do? | | | |

| Employer | | | Rate of Pay |
|---|---|---|---|
| Address | | | |

| Employer | | | Rate of Pay |
|---|---|---|---|
| Address | | | |

| Employer | | | Rate of Pay |
|---|---|---|---|
| Address | To | DATES | Why did you leave? |

| Employer | From | Job | Rate of Pay |
|---|---|---|---|
| Address | To — DATES | Why did you leave? | |

| Employer | From | Job | Rate of Pay |
|---|---|---|---|
| Address | To — DATES | Why did you leave? | |

| Employer | From | Job | Rate of Pay |
|---|---|---|---|
| Address | To — DATES | Why did you leave? | |

| Employer | From | Job | Rate of Pay |
|---|---|---|---|
| Address | To — DATES | Why did you leave? | |

List any other previous jobs on a separate sheet.

WPH
000046

# FAMILY RECORD

| Full Name of Husband or Wife (Include Wife's Maiden Name) | Date of Birth | Employed by |
|---|---|---|
| Jeannette Thomas Sanks | 10-12-54 | Ampex |
| Address | X if dependent on you | Address |
| | | |
| Son or Daughter | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Son or Daughter | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Son or Daughter | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Son or Daughter | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Son or Daughter | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Father | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Mother (Include Maiden Name) Mrs. Mae Sanks | Date of Birth 2-2-36 | Employed by None |
| Address P.O. Box 44 | X if dependent on you | Address |
| Brother or Sister Gloria J. Sanks | Date of Birth 6-10-52 | Employed by |
| Address P.O. Box 44 | X if dependent on you | Address |
| Brother or Sister Donnie Sanks | Date of Birth | Employed by |
| Address P.O. Box 44 | X if dependent on you | Address |
| Brother or Sister | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Brother or Sister | Date of Birth | Employed by |
| Address | X if dependent on you | Address |
| Brother or Sister | Date of Birth | Employed by |

Any Other Members of Household Not Listed Above:

Name All Former Husbands or Wives:

In case of emergency notify:

| | Telephone No. or Other Means of Location |
|---|---|
| Relationship: | Address: |

List any other children or brothers and sisters on a separate sheet.

WPH
000047A

# HEALTH RECORD

DO YOU HAVE OR HAVE YOU EVER HAD DEFECTS, INJURIES OR ILLNESS OF ANY OF THE FOLLOWING?

| | | Explain any "yes" answers |
|---|---|---|
| No | EYES | |
| No | EARS | |
| No | ARMS | *Discharged* |
| No | HANDS | *Mentally* |
| No | FEET | *from Army — March 1969* |
| No | LEGS | *Failed test for Army induction* |
| No | BACK | |
| No | HEART | |
| No | OTHER | |

ANSWER EACH ITEM "Yes" or "No"

List any serious illnesses during last five years

No

List any lost time accidents. Explain

Have you ever been rejected for insurance or military service? Explain

Do you have, or have you ever had a hernia, epilepsy, fainting spells, nervous disorder or mental illness? Explain

Have you ever received compensation for injury, either in civilian or military life?

List all operations

## MILITARY

| Have you served in Armed Forces? | Branch? | Date Entered | Date Discharged | Type Discharge | Last Rank |
|---|---|---|---|---|---|
| | | | | | |

| Special Training | | Duties Performed | | | |
|---|---|---|---|---|---|
| | | | | | |

| What is your status? | Are you a reservist? | Attend Training Camp? | When and Where | | Number of Weeks |
|---|---|---|---|---|---|
| | | | | | |

## RELATIVES AND CLOSE FRIENDS WHO WORK FOR WEST POINT PEPPERELL AT ANY PLANT OR OFFICE

West Point Mfg. Co.    Wellington Sears Co.
Pepperell Mfg. Co.    Cabin Crafts, Inc.

| Name | Relationship | Plant or Office |
|---|---|---|
| Otis Edward | Friend | Plant |
| Jackson Thomas | Friend | Plant |
| | | |
| | | |

## REFERENCES — Do not name former employers or relatives

| Personal References | Occupation | Phone Number | Address |
|---|---|---|---|
| None | | | |
| | | | |

| Credit references | Type of Business | Phone Number | Address |
|---|---|---|---|
| | | | |
| | Type of Business | Phone Number | Address |
| | | | |

I understand that false statements on this application may be considered sufficient cause for dismissal. I further understand that the use of this application does not indicate there are any positions open and does not in any way obligate this Company. This application will remain active for a period of ninety days, after which time it may be renewed. MY PAST EMPLOYERS MAY BE CONTACTED.

MY PRESENT EMPLOYER ✓ MAY            MAY NOT            BE CONTACTED.

| Applicant's Signature | Bobby Lee Sanks | Witness | Eddie Lashy | WPH 000047B |
|---|---|---|---|---|
| Reviewed By | | | | |

Facility Personnel Director                Operating Head of Facility

WEST POINT — PEPPERELL, INC.

9-24-70 - Will be back - Maybe
will hiv -

B.D.

# Dx. 4



# National Archives and Records Administration

**SOUTHEAST REGION**
5780 Jonesboro Road
MORROW, GEORGIA 30260

*www.archives..gov*

September 13, 2007

Sheri M. Childress
Ogletree, Deakins, Nash,
Smoak & Steward, P.C.
The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina  29602

Dear Sheri M. Childress:

We have conducted a search for the Selective Service System Registration Card and Classification Record of Bobby Lee Banks, born 5 January 1951.

(X)  We have located the record(s) you requested.

(X) Please find enclosed copy/copies of the record(s) you requested.

( ) We did not have enough information to complete your request.

( ) We have conducted a search for the record(s) you requested and were not
    able to locate them.

( ) The copies you requested are complete.  The cost for your copies is $10.00.  Make your **check** or **money order** payable to **The National Archives Trust Fund** at the mailing address listed in the upper right hand corner of this page.  Please write reference number NRC-07-XXXX on your payment.  If you prefer, you may also call the below listed telephone number and pay with a credit card.  We accept VISA, Mastercard, American Express, and Discover credit cards.

Sincerely,

Harold M. Starn
Archives Technician
770-968-2482

**WPH**
**001025**

DEFENDANT'S
EXHIBIT
4
B. Sanks
PENGAD 800-631-6989

SELECTIVE SERVICE SYSTEM

# EXTRACT OF REGISTRANT CLASSIFICATION RECORD

The following information concerning the Selective Service registrant named has been extracted from the Classification Record (SSS Form 102). Unless otherwise noted, all entries on this record are included. See reverse side for brief explanation of classification descriptions.

Name of registrant: Bobby Lee Sanks

Selective Service No.: 1 - 41 - 51 - 36     Date of Birth: _____

Classification Questionnaire: Date Mailed 2/19/69     Date Returned 2/19/69

Classification and Date of Mailing Notice:

| | | | | | |
|---|---|---|---|---|---|
| 1. Class 1-S (H) Date 3/18/69 | | 5. Class _____ | Date _____ |
| 2. Class 1-A Date 11/18/69 | | 6. Class _____ | Date _____ |
| 3. Class 4-F Date 4/21/70 | | 7. Class _____ | Date _____ |
| FF FWD TO FRC | | | |
| 4. Class _____ Date _____ | | 8. Class _____ | Date _____ |

Armed Forces Physical Examination: Date(s): 3/18/70     Results: NA

(Qual - Qualified; Acc - Accepted; NQ - Not Qualified; Rej - Rejected)

Entry on Active Duty or Civilian Work:  Date: _____

Branch of Service (if indicated): _____

Mode of Entry:  ☐ Inducted (IND)     ☐ Enlisted (ENL)

☐ Commissioned (COMM)     ☐ Ordered

Date of Separation from Active Duty or Civilian Work: _____

Entries from Remarks Column: X-Z-X     (71)   033

OTHER ENTRIES:  Entered below are any entries (with the appropriate column headings) which appear on the original classification record and for which there is no fill-in space above:

TO:
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina  29602

Archival Operations USE ONLY

Date Prepared: 9/6/07

Prepared By: Harold M. Starn

SSS FORM 708
JUL 77

30020(5-83)GL

WPH
001026

132

| 1. NAME IN FULL | Last | First | Middle | SELECTIVE SERVICE NUMBER | | | |
|---|---|---|---|---|---|---|---|
| | SANKS | Bobby | Lee | 1 | 41 | 51 | 36 |

| 2. PLACE OF RESIDENCE | Street and Number or RFD Route | | 3. DATE OF BIRTH |
|---|---|---|---|
| Lee Co Rd 32 Approx ½ mi from PO | | | |

| City, Town, or Village | County | State | Zip Code | 4. PLACE OF BIRTH |
|---|---|---|---|---|
| Salem | Lee | Ala. | 36874 | City Lee Co. |

| 5. MAILING ADDRESS (If different than Item 2) Street and Number or RFD Route | State or Country Ala. |
|---|---|
| P. O. Box 44 | |

| City, Town, or Village | County | State | Zip Code | 6. DATE OF REGISTRATION |
|---|---|---|---|---|
| Opelika | Lee | Ala. | 36874 | Feb. 19, 1969 |

7. Name and address of person other than a member of your household who will always know your address.

Nathan Stringer, P. O. Box 45, Salem, Ala.     (uncle)

| 8. COLOR OF EYES | 9. COLOR OF HAIR | 10. HEIGHT (APPROX.) | 11. WEIGHT (APPROX.) |
|---|---|---|---|
| Brown | Black | 5 ft. 8 in. | 127 |

12. OTHER OBVIOUS PHYSICAL CHARACTERISTICS THAT WILL AID IN IDENTIFICATION:

None

Form Approved
Budget Bureau No. 33-R099.7          SELECTIVE SERVICE SYSTEM          REGISTRATION CARD

SSS Form I-A (Original ) ( Revised 8-30-65)          (over)

| 13. OCCUPATION | 14. NATURE OF BUSINESS, SERVICE RENDERED, OR CHIEF PRODUCT |
|---|---|
| Student | 12th grade |

| 15. FIRM OR INDIVIDUAL BY WHOM EMPLOYED |
|---|
| Wacoochee High School |

| 16. PLACE OF EMPLOYMENT OR BUSINESS |
|---|
| Salem, Ala. |

17. Active duty in the Armed Forces of the United States or a cobelligerant nation since Sept. 16, 1940:

| A. ARMED FORCE OR COUNTRY | B. SERVICE NO. | C. DATE OF ENTRY | D. DATE OF SEPARATION |
|---|---|---|---|
| None | | | |

18. Present membership in a reserve component of the Armed Forces:

| A. ARMED FORCE | B. SERVICE NO. | C. DATE OF ENTRY | D. GRADE |
|---|---|---|---|
| None | | | |

| E. ORGANIZATION | I affirm that I have verified the foregoing and that they are true: |
|---|---|
| | *Bobby Lee Sanks* |
| | (Signature of registrant) |

I certify that the person registered has read or has had read to him his answers; that I have witnessed his signature or mark; and that all of his answers of which I have knowledge are true, except as follows:

None to my knowledge

*Margaret H. Sellers*
(Signature of registrar)

Registrar for Local Board ___ 41 ___ Opelika ___ Ala.
                          (Number)    (City or county)    (State)     ☆ GPO: 1966–230-497

WPH
001028

# Dx. 5

# U.S. Bankruptcy Court
## Middle District of Alabama (Opelika)
### Bankruptcy Petition #: 00-04112

*Assigned to:* William R. Sawyer
·Chapter 13
Previous chapter 13
Voluntary
Asset

*Date Filed:* 08/07/2000
*Date Terminated:* 07/01/2005
*Date Discharged:* 06/28/2005

**Debtor**
**Bobby Lee Sanks**
PO Box 44
Salem, AL 36874
SSN: xxx-xx-9114

represented by **Charles M. Ingrum, Sr.**
Charles M. Ingrum, Attorney At
Law
P. O. Box 142
Opelika, AL 36803-0142
334-745-4648
Email:
cingrum@charlesingrum.com

**Trustee**
**Curtis C. Reding**
P. O. Box 173
Montgomery, AL 36101
· 334 262-8371



| Filing Date | # | Docket Text |
|---|---|---|
| 08/07/2000 | 1 | VOLUNTARY petition under chapter 13 , [JF], ORIGINAL NIBS DOCKET ENTRY #1 (Entered: 08/08/2000) |
| 08/07/2000 | 2 | SCHEDULES and Statement of Affairs , [JF], ORIGINAL NIBS DOCKET ENTRY #2 (Entered: 08/08/2000) |
| 08/07/2000 | 3 | ATTORNEY Statement of Compensation , [JF], ORIGINAL NIBS DOCKET ENTRY #3 (Entered: 08/08/2000) |
| 08/07/2000 | 4 | NOTICE of 341 meeting on 10/03/00 at 09:00 A.M. at U.S. Bankruptcy Court, Federal Courthouse, Opelika, AL, [JF], ORIGINAL NIBS DOCKET ENTRY #4 (Entered: 08/08/2000) |
| 08/07/2000 | 5 | CLAIMS Bar Date due on 01/02/01, [JF], ORIGINAL NIBS DOCKET ENTRY #5 (Entered: 08/08/2000) |
| 08/07/2000 | 6 | NOTICE of Confirmation Hearing on 11/01/00 at 10:00 A.M. at U.S. Bankruptcy Court, Federal Courthouse, Opelika, AL, [JF], ORIGINAL NIBS DOCKET ENTRY #6 (Entered: 08/08/2000) |
| 08/09/2000 | 7 | MOTION To Pay Trustee Directly , [CC], ORIGINAL NIBS DOCKET ENTRY #7 (Entered: 08/09/2000) |

| | | |
|---|---|---|
| 08/15/2000 | | ...setting hearing on 09/06/00 at 10:00 A.M. at U.S Bankruptcy Court, Federal Courthouse, Opelika, AL Re: Item # 7, [CC], ORIGINAL NIBS DOCKET ENTRY #8 (Entered: 08/15/2000) |
| 08/21/2000 | 9 | CERTIFICATE of Service Re: Item # 8, [CC], ORIGINAL NIBS DOCKET ENTRY #9 (Entered: 08/22/2000) |
| 08/25/2000 | 10 | CERTIFICATE OF SERVICE for 341 Meeting & Confirmation Hearing , [CC], ORIGINAL NIBS DOCKET ENTRY #10 (Entered: 08/28/2000) |
| 09/07/2000 | 11 | MEMORANDUM ; Denied Re: Item # 7, [CC], ORIGINAL NIBS DOCKET ENTRY #11 (Entered: 09/13/2000) |
| 09/13/2000 | 12 | ORDER Denying Direct Payment to Trustee Re: Item # 7, [CC], ORIGINAL NIBS DOCKET ENTRY #12 (Entered: 09/13/2000) |
| 09/19/2000 | 13 | AMENDED Order to Debtor's Employer [Wage Order] , [CC], ORIGINAL NIBS DOCKET ENTRY #13 (Entered: 09/19/2000) |
| 10/05/2000 | 14 | 341 Meeting was Held [Proceeding Memo] [Proof of post petition] , [CS], ORIGINAL NIBS DOCKET ENTRY #14 (Entered: 10/06/2000) |
| 10/30/2000 | 15 | OBJECTION to Confirmation [Colonial Bank] [Disposed], [JF], ORIGINAL NIBS DOCKET ENTRY #15 (Entered: 10/30/2000) |
| 11/07/2000 | 16 | ORDER to Debtor's Employer [Wage Order] , [CC], ORIGINAL NIBS DOCKET ENTRY #16 (Entered: 11/08/2000) |
| 11/07/2000 | 17 | ORDER Confirming Plan , [CC], ORIGINAL NIBS DOCKET ENTRY #17 (Entered: 11/08/2000) |
| 11/07/2000 | 18 | Order Allowing Withdrawal of Objection Re: Item # 15 [Entered: 11/09/00], [CC] ORDER GRANTING Relief from Stay Conditionally Re: Item # 15, [CC], ORIGINAL NIBS DOCKET ENTRY #18 (Entered: 11/09/2000) |
| 12/05/2000 | 19 | NOTICE of Appearance [Edward A. Bailey] , [CC], ORIGINAL NIBS DOCKET ENTRY #19 (Entered: 12/05/2000) |
| 02/08/2001 | 20 | MOTION for Relief from Stay [Household Fin. Corp., Rec#1315] [Disposed], [CC], ORIGINAL NIBS DOCKET ENTRY #20 (Entered: 02/09/2001) |
| 02/12/2001 | 21 | ANSWER To Motion To Lift Stay [Debtor] Re: Item # 20, [CC], ORIGINAL NIBS DOCKET ENTRY #21 (Entered: 02/12/2001) |
| 02/13/2001 | 22 | NOTICE of Hearing on 02/28/01 at 10:00 A.M. at U.S. Bankruptcy Court, Federal Courthouse, Opelika, AL Re: Item # 20, [CC], ORIGINAL NIBS DOCKET ENTRY #22 (Entered: 02/13/2001) |
| 02/15/2001 | 23 | CERTIFICATE of Service Re: Item # 22, [CC], ORIGINAL NIBS DOCKET |

| | | ENTRY #23 (Entered: 02/16/2001) |
|---|---|---|
| 02/28/2001 | 24 | MEMORANDUM - cont. to 3/28 @10 a.m. in Opelika Re: Item # 22, [CC], ORIGINAL NIBS DOCKET ENTRY #24 (Entered: 03/05/2001) |
| 03/22/2001 | 25 | CONSENT ORDER ON RELIEF FROM STAY Re: Item # 20, [CC], ORIGINAL NIBS DOCKET ENTRY #25 (Entered: 03/26/2001) |
| 04/03/2001 | 26 | AMENDED Order to Debtor's Employer [Wage Order] , [CC], ORIGINAL NIBS DOCKET ENTRY #26 (Entered: 04/04/2001) |
| 03/12/2003 | 27 | Claim Reduction on Claim Number(s): Filed by Sabrina L. McKinney on behalf of Colonial Bank. (NJ, ) (Entered: 03/12/2003) |
| 06/27/2005 | 28 | Final Report and Final Account of Ch 13 Trustee (Payments to Creditors) and Motion to Discharge Debtor After Completion of Ch 13 Plan. (Reding, Curtis-EC) (Entered: 06/27/2005) |
| 06/27/2005 | 29 | Trustee's Order Releasing Wages. (Reding, Curtis-EC) (Entered: 06/27/2005) |
| 06/28/2005 | 30 | Order Discharging Debtor After Completion of Ch 13 Plan Entered On 6/28/2005 (RE: related document(s)28 Final Report and Final Account of Ch 13 Trustee (Payments to Creditors) and Motion to Discharge Debtor After Completion of Ch 13 Plan). (CO, ) (Entered: 06/28/2005) |
| 06/30/2005 | 31 | BNC Certificate of Service - Order of Discharge - (RE: related document(s) 30 Order Discharging Debtor After Completion of Ch 13 Plan). No. of Notices: 13. Service Date 06/30/2005. (Admin.) (Entered: 07/01/2005) |
| 07/01/2005 | 32 | Order Discharging Standing Trustee,Releasing Bond Liability and Closing Case: It appearing to the Court that the trustee in this case has performed all of the duties required of him in the administration of this case; that he has made distribution by order of this Court, and has rendered a full and complete account thereof, and no adverse interest being represented; It is therefore ORDERED that the Ch 12/13 trustee be discharged and relieved of his trust, and that he and the sureties on this bond be released from further liability thereunder; It is further Ordered that this case be, and the same is hereby CLOSED. U.S. Bankruptcy Judge (Non-Image Entry). (RLW, ) (Entered: 07/01/2005) |
| 07/01/2005 | 33 | Bankruptcy Case Closed (Non-Image Entry). (RLW, ) (Entered: 07/01/2005) |
| 02/27/2006 | 34 | Trustee's Report of Unclaimed Funds. Receipt Number 6000404.. (LB, ) (Entered: 02/28/2006) |

WPH
001047

**PACER Service Center**

**Transaction Receipt**

| PACER Login: | od0028 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 00-04112 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: HTML |
| Billable Pages: | 2 | Cost: | 0.16 |

WPH
001048

CHAPTER THIRTEEN TRUSTEE
FOR THE MIDDLE DISTRICT OF ALABAMA
166 COMMERCE STREET • SUITE 202
P. O. BOX 173
MONTGOMERY, AL 36101-0173
PHONE (334) 262-8371
FAX (334) 262-8599
www.ch13mdol.com

**FILED**

FEB 27 2006

U.S. BANKRUPTCY COURT
MONTGOMERY, ALABAMA

CURTIS C. REDING
TRUSTEE

BETH PEEK
ASSISTANT TRUSTEE

February 13, 2006

Richard S. Oda, Clerk
United States Bankruptcy Court
Post Office Box 1248
Montgomery, Alabama  36192

RE:  Report of Unclaimed Funds

Dear Mr. Oda:

The following Chapter 13 cases have been closed by Order of the Court; however, certain funds of the estates have been unpaid.  Enclosed is check #5116 for $6,394.92 representing those unpaid funds.  Pursuant to Rule 3011 of the Rules of the Bankruptcy Procedure, below is an itemized listing of the names and addresses of those creditors, or debtors, not receiving full payment or refund, under the plans (due to checks not being negotiated).

| Debtor & Case No. | Creditor (Debtor) & Address | Amount |
|---|---|---|
| Elnora S. Love<br>99-02743 | FCNB Processing Center<br>P O Box 23356<br>Pittsburgh, PA.  15222 | $71.25 |
| Bobby Lee Sanks<br>00-04112 | Household Finance Co.<br>P O Box 8632<br>Elmhurst, IL.  60126 | $3,660.71 |
| Andrew L. and Theresa L. Vinson<br>03-10692 | Fleet Credit Card Services LP<br>P O Box 1016<br>Horsham, PA.  19044 | $6.64 |
| John R. Fowler<br>05-31114 | Federal Land Bank Association<br>7602 Halcyon Summit Dr.<br>Montgomery, Al. 36124 | $1.54 |
| Kevin O'Neil Abbott<br>03-33729 | Chase Manhattan Mortgage Corp.<br>250 West Heron Rd.<br>Cleveland, OH.  44113 | $3.53 |
| Jackqulyn Y. Head<br>00-02395 | Jackqulyn Y. Head<br>2085 N. Anne St.<br>Eclectic, Al.  36024 | $.69 |
| Michael L. Bell<br>01-01795 | Michael L. Bell<br>5025 Gibbs Dr.<br>Columbus, Ga. 31907 | $1,185.00 |

RECEIPT #: 6000404

$ 4,929.36

WPH
001049

-2-



James W. and Amy Bullock
01-06284

James W. and Amy Bullock
90 Holiday Dr.
Titus, Al. 36080

$3.65

Jon Gilbert and Belva Lee Shultz
01-07204

Jon Gilbert and Belva Lee Shultz
594 Claud Rd.
Eclectic, Al. 36024

$81.74

Myrtle Bozeman
02-31531

Myrtle Bozeman
915 Ridgemont Ave.
Montgomery, Al. 36105

$3.62

Curtis D. and Nyra K. Watson
03-10572

Curtis D. and Nyra K. Watson
515 Old Newton Rd.
Daleville, Al. 36322

$3.96

Randal B. and Essie Dianne Senn
03-12158

Randal B. and Essie Dianne Senn
224 Malvern Rd.
Dothan, Al. 36301

$16.08

Lenora Aritha Pinkard
03-30745

Lenora Aritha Pinkard
3952 Thomas Ave.
Montgomery, Al. 36111

$345.00

Penny Stringfellow Hull
03-81805

Penny Stringfellow Hall
1221 3rd. Ave.
Lanett, Al. 36863

$8.92

Deborah K. Croley
04-33127

Deborah K. Croley
314 S. Pine St.
Greenville, Al. 36037

$229.00

Michael K. Murray
05-80732

Michael K. Murray
3742 Old Opelika Hwy #5
Phenix City, Al. 36870

$84.00

Johnny L. and Vivian V. Floyd
02-30920

Pay Day Now
4204 Norman Bridge Rd.
Montgomery, Al. 36105

$8.65

Beverly M. Moses
01-06310

Student Finance Group
P O Box 452
Bear, DE. 19701

$65.81

Ronald Patterson Mullen
04-10879

Crown Asset Management Assignee of
Chase Manhattan Bank
P O Box 1715
Birmingham, Al. 35201

$65.91

Charles E. and Dorothy J. Williams
00-03084

First Med of Dothan
c/o Total Data Management Inc.
832 Saunders Rd. Dept C
Dothan, Al. 36301

$2.06

RECEIPT #: 6000405

WPH
001050

-3-

| | | |
|---|---|---|
| Johnny L. and Vivian V. Floyd<br>02-30920 | Jackson Hospital<br>c/o Frederick T. Enslen<br>P O Box 240848<br>Montgomery, Al. 36124 | $2.32 |
| Kimberly W. and James D. Bentley<br>03-80919 | Kimberly W. and James D. Bentley<br>54 Lee Rd 2025<br>Smiths Station, Al. 36877 | $10.89 |
| Wanda D. Hodnett<br>01-04563 | Southern Catalog<br>Attn: Collections Dept.<br>5000 Burnham Blvd. Bldg C.<br>Columbus, Ga. 31907 | $131.54 |
| Carolyn Dixon<br>01-05271 | Wells Fargo Financial Bank<br>P O Box 5943<br>Sioux Falls, SD. 57117 | $18.45 |
| Leonard and Janice Bice<br>02-30333 | Wells Fargo Financial Bank<br>P O Box 5943<br>Sioux Falls, SD. 57117 | $95.31 |
| Johnnie Mae Bogan<br>00-05982 | Thomley & Wood, MDS<br>c/o Dynamic Effective Management, Inc.<br>2815 Bessemer Rd.<br>Birmingham, Al. 35208 | $288.65 |

$6,394.92

This does certify that the information shown above is true and correct to the best of my knowledge and belief.

Sincerely,

Curtis C. Reding
Chapter 13 Trustee
CCR/syf

RECEIPT #: 6000406

$547.16

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                        Case No. 00-04112-WRS
                                             Chapter 13
BOBBY LEE SANKS
Soc. Sec. No.

                    Debtor.

### TRUSTEE'S MOTION FOR DISCHARGE OF DEBTOR AFTER COMPLETION OF CHAPTER 13 PLAN

Comes now the Chapter 13 Trustee in the above styled case and moves this Honorable Court for an Order Discharging the debtor(s) after completion of the Chapter 13 plan, and as grounds states as follows: the debtor filed a petition under Title 11, United States Code, on August 7, 2000   .  The debtor's plan has been confirmed, and that the debtor(s) has fulfilled all requirements under the confirmed plan.

Wherefore, the above premises considered, the Trustee moves this Honorable Court to issue an Order Discharging the debtor(s) upon the completion of the plan.  The Trustee further moves this Honorable Court to Approve the Final Report and accounting filed contemporaneously with this motion and issue an order discharging the Trustee.

Done this 24th day of June, 2005.

Office of the Chapter 13 Trustee
P. O. Box 173                            _Curtis C. Reding_, Trustee
Montgomery, AL  36101
Phone: (334)262-83711
Fax: (334)262-8599
email: Ch13Trustee@ch13mdal.com

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Motion for Discharge of debtor on all parties in interest, by placing them in the United States Mail, postage prepaid, and properly addressed, or by electronic mail.

Done, this 24th day of June, 2005.

                          /S/ Curtis C. Reding
                          Curtis C. Reding, Trustee

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                        Case No. 00-04112-WRS
                                             Chapter 13

BOBBY LEE SANKS
P O BOX 44
SALEM AL  36874

Soc. Sec. No.

            Debtor.

### FINAL REPORT

The Chapter 13 Trustee, Curtis C. Reding, respectfully reports to the Court as follows:

The costs of administration and all claims filed and allowed in this case have been paid according to the records of my office as evidenced by the attached final account.

The Trustee requests that notice of the account be given to the debtor, the attorney for the debtor, and any other parties in interest.

The Trustee further requests that the account be approved and that the Trustee be released and relieved of his trust.

This the 24th day of June, 2005.

Office of the Chapter 13 Trustee
P. O. Box 173
Montgomery, AL  36101-0173
Phone: (334)262-8371          /S/ Curtis C. Reding
Fax: (334)262-8599           Curtis C. Reding, Trustee
email: Ch13Trustee@ch13mdal.com

cc: Debtor
    Attorney for Debtor
    All Creditors

WPH
001053

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                          Case No. 00-04112-WRS
                                               Chapter 13
BOBBY LEE SANKS
P O BOX 44
SALEM AL  36874


                        Debtor.

### FINAL ACCOUNT OF TRUSTEE

    I, Curtis C. Reding, respectfully  file this my final account
disclosing receipts and disbursements in this case.

                            RECEIPTS

GROSS RECEIPTS                                      34,503.24
    Less Refunds While Case Active                        .00
    Less Refunds to Debtor at Closing                  357.39
NET RECEIPTS                                        34,145.85

                          DISBURSEMENTS

Payments to Creditors (see attached)               31,143.16
    Secured Creditors            15,507.86
        Interest                  1,653.57
    Unsecured Creditors          13,981.73
        Interest                       .00
    Priority Creditors                 .00
        Interest                       .00
Filing Fee                                            185.00
Trustee Expense and Commission Fee                  1,745.69
Attorney Fee                                        1,050.00
Insurance                                                .00
Notice Fee                                             22.00
TOTAL DISBURSEMENTS                                 34,145.85

    I,  Curtis  C.  Reding,  certify  that  the  above  record  of
receipts and disbursements in this  case is true and complete, and
the estate has been fully administered.

                         /S/ _____
                         Curtis C. Reding, Trustee


    Sworn to and subscribed before me
    this 24th day of June, 2005.
                         /LS/ _____
                         Phyllis A. Womack, Notary Public



WPH
001054

PAYMENTS TO CREDITORS

Case Number - 00-04112

**SECURED CREDITORS**

| Clm# | Cred# | | Interest | Principal |
|------|-------|--|----------|-----------|
| 0001 | 000118 | ALABAMA EXCHANGE BANK | $ 389.11 | $ 3,005.14 |
| 0002 | 045510 | ALABAMA EXCHANGE BANK | $ .00 | $ .00 |
| 0003 | 144903 | CITIFINANCIAL | $ 101.09 | $ 1,072.83 |
| 0004 | 144903 | CITIFINANCIAL | $ .00 | $ .00 |
| 0005 | 058110 | COLONIAL BANK | $ 77.10 | $ 565.52 |
| 0006 | 058110 | COLONIAL BANK | $ .00 | $ .00 |
| 0007 | 032526 | *HOUSEHOLD FINANCE CORP | $ 919.86 | $ 6,609.86 |
| 0007 | 121420 | HOUSEHOLD FINANCE CO | $ 24.24 | $ 3,636.47 |
| 0007 | 313614 | *HOUSEHOLD FINANCE | $ 142.17 | $ 618.04 |
| 0008 | 029071 | HOUSEHOLD FINANCE CORP | $ .00 | $ .00 |

TOTAL PAYMENTS TO SECURED CREDITORS    $   17,161.43

**UNSECURED CREDITORS**

| Clm# | Cred# | | Interest | Principal |
|------|-------|--|----------|-----------|
| 0009 | 370399 | STERLING INC | $ .00 | $ 1,130.61 |
| 0010 | 003751 | INTERNAL REVENUE SERVICE | $ .00 | $ 1,090.56 |
| 0011 | 012537 | INTERNAL REVENUE SERVICE | $ .00 | $ .00 |
| 0012 | 106523 | INTERNAL REVENUE SERVICE | $ .00 | $ .00 |
| 0013 | 121583 | MAX FLOW CORP | $ .00 | $ 5,501.25 |
| 0014 | 004856 | MONTGOMERY WARD | $ .00 | $ .00 |
| 0015 | 040061 | HURLEY STATE BANK | $ .00 | $ 2,579.14 |
| 0016 | 038118 | WEST POINT STEVENS ECA FC | $ .00 | $ 3,680.17 |
| 0017 | 111638 | JEANETTE T SANKS | $ .00 | $ .00 |
| 0018 | 370399 | STERLING INC | $ .00 | $ .00 |

TOTAL PAYMENTS TO UNSECURED CREDITORS    $   13,981.73

WPH
001055

```
00-04112   BOBBY LEE SANKS                                    PAGE:    1

C L A I M    R E C O R D S
```

```
ALABAMA EXCHANGE BANK     SCHD :    1,200.00   INT %:       8.00   ARREARS
P O BOX 830728            VALUE:    3,005.14   INTPD:     389.11   L21
TUSKEGEE AL               CLAIM:    3,005.14   INTDU:        .00
                          TOTPD:    3,005.14   CRED%:     100.00   LAND/ARREARAGE
              36083-0728  BAL  :         .00   PERMO:      65.00   9671608
CRED:000118   CLAIM:0001  FILED:Sep 14, 2000                PDUE:         .00
```

```
ALABAMA EXCHANGE BANK     SCHD :   10,000.00   INT %:        .00   SECURED
P O BOX 728               VALUE:   10,000.00   INTPD:        .00   S21 O
TUSKEGEE AL               CLAIM:         .00   INTDU:        .00
                          TOTPD:         .00   CRED%:     100.00   LAND / DIRECT
              36083       BAL  :         .00   PERMO:     400.00   00009671608
CRED:045510   CLAIM:0002  FILED:                            PDUE:         .00
```

```
CITIFINANCIAL             SCHD :    1,050.00   INT %:       8.00   ARREARS
3909 B PEPPERELL PKWY     VALUE:    1,072.83   INTPD:     101.09   L21
OPELIKA AL                CLAIM:    1,072.83   INTDU:        .00
                          TOTPD:    1,072.83   CRED%:     100.00   MORTGAGE ARREA
              36801       BAL  :         .00   PERMO:      28.00   01-0173/201111
CRED:144903   CLAIM:0003  FILED:Sep 21, 2000                PDUE:         .00
```

```
CITIFINANCIAL             SCHD :   24,726.52   INT %:        .00   SECURED
3909 B PEPPERELL PKWY     VALUE:   38,000.00   INTPD:        .00   S21 O
OPELIKA AL                CLAIM:         .00   INTDU:        .00
                          TOTPD:         .00   CRED%:     100.00   MORTGAGE / DIR
              36801       BAL  :         .00   PERMO:     350.00   201111 010173
CRED:144903   CLAIM:0004  FILED:                            PDUE:         .00
```

```
COLONIAL BANK             SCHD :      645.00   INT %:       8.00   ARREARS
P O BOX 1108              VALUE:      751.80   INTPD:      77.10   L21
MONTGOMERY AL             CLAIM:      565.52   INTDU:        .00
                          TOTPD:      565.52   CRED%:     100.00   MORTGAGE ARREA
              36101       BAL  :         .00   PERMO:      17.00   042802245867
CRED:058110   CLAIM:0005  FILED:Oct 12, 2000                PDUE:         .00
```

```
COLONIAL BANK             SCHD :    4,200.00   INT %:        .00   SECURED
P O BOX 1108              VALUE:   28,000.00   INTPD:        .00   S21 O
MONTGOMERY AL             CLAIM:         .00   INTDU:        .00
                          TOTPD:         .00   CRED%:     100.00   MORTGAGE / DIR
              36101       BAL  :         .00   PERMO:     215.00   0428022458767
CRED:058110   CLAIM:0006  FILED:                            PDUE:         .00
```

WPH
001056

```
00-04112   BOBBY LEE SANKS                                      PAGE:    2

C L A I M    R E C O R D S
```

| | | | |
|---|---|---|---|
| HOUSEHOLD FINANCE CO | SCHD :  3,405.00 | INT %:  8.00 | ARREARS |
| P O BOX 8632 | VALUE: 10,864.37 | INTPD: 1,086.27 | L21 |
| ELMHURST IL | CLAIM: 10,864.37 | INTDU:  .00 | |
| | TOTPD: 10,864.37 | CRED%:  100.00 | MORTGAGE/ARREA |
| 60126 | BAL :  .00 | PERMO:  260.00 | 015200 00 9336 |
| CRED:121420   CLAIM:0007 | FILED:Aug 25, 2000 | PDUE:  .00 | |

| | | | |
|---|---|---|---|
| HOUSEHOLD FINANCE CORP | SCHD : 110,101.24 | INT %:  .00 | SECURED |
| P O BOX 88000 | VALUE: 100,000.00 | INTPD:  .00 | S21 O |
| BALTIMORE MD | CLAIM:  .00 | INTDU:  .00 | |
| | TOTPD:  .00 | CRED%:  100.00 | MORTGAGE / DIR |
| 21288 | BAL :  .00 | PERMO: 1,134.93 | 1134.93 |
| CRED:029071   CLAIM:0008 | FILED: | PDUE:  .00 | |

| | | | |
|---|---|---|---|
| STERLING INC | SCHD :  1,083.14 | INT %:  .00 | UNSECURED |
| C/O WELTMAN WEINBERG & RE | VALUE:  .00 | INTPD:  .00 | U40 |
| 323 LAKESIDE AVE STE 200 | CLAIM:  1,130.61 | INTDU:  .00 | |
| CLEVALND OH | TOTPD:  1,130.61 | CRED%:  100.00 | JEWELRY |
| 44113-1099 | BAL :  .00 | PERMO:  .00 | 2101387 |
| CRED:370399   CLAIM:0009 | FILED:Dec 05, 2000 | PDUE:  .00 | |

| | | | |
|---|---|---|---|
| INTERNAL REVENUE SERVICE | SCHD :  1,000.00 | INT %:  .00 | SPECIAL UNSE |
| ATTN BANKRUPTCY MAIL CLER | VALUE:  1,090.56 | INTPD:  .00 | X35 |
| 801 TOM MARTIN DR ROOM 12 | CLAIM:  1,090.56 | INTDU:  .00 | |
| BIRMINGHAM AL | TOTPD:  1,090.56 | CRED%:  100.00 | 99 INCOME TAXE |
| 35211 | BAL :  .00 | PERMO:  21.00 | 424 72 9114 |
| CRED:003751   CLAIM:0010 | FILED:Oct 27, 2000 | PDUE:  .00 | |

| | | | |
|---|---|---|---|
| INTERNAL REVENUE SERVICE | SCHD :  .00 | INT %:  .00 | UNSECURED |
| P O BOX 2502 | VALUE:  .00 | INTPD:  .00 | U40 |
| MEMPHIS TN | CLAIM:  .00 | INTDU:  .00 | |
| | TOTPD:  .00 | CRED%:  100.00 | NOTICES |
| 38101 | BAL :  .00 | PERMO:  .00 | 424 72 9114 |
| CRED:012537   CLAIM:0011 | FILED: | PDUE:  .00 | |

| | | | |
|---|---|---|---|
| INTERNAL REVENUE SERVICE | SCHD :  .00 | INT %:  .00 | UNSECURED |
| PATRICIA CONOVER | VALUE:  .00 | INTPD:  .00 | U40 |
| P O BOX 197 | CLAIM:  .00 | INTDU:  .00 | |
| MONTGOMERY AL | TOTPD:  .00 | CRED%:  100.00 | NOTICES |
| 36101 | BAL :  .00 | PERMO:  .00 | 424 72 9114 |
| CRED:106523   CLAIM:0012 | FILED: | PDUE:  .00 | |

```
00-04112   BOBBY LEE SANKS                                         PAGE:    3

C L A I M     R E C O R D S

MAX FLOW CORP               SCHD :   5,895.30   INT %:        .00   UNSECURED
P O BOX 2434               VALUE:        .00    INTPD:        .00   U40
CAROL STREAM IL            CLAIM:   5,501.25    INTDU:        .00
                          TOTPD:   5,501.25    CRED%:     100.00   CREDIT CARD
         60132-2434       BAL  :        .00    PERMO:        .00   CS1F8404555386
CRED:121583   CLAIM:0013   FILED:Sep 18, 2000                      PDUE:        .00

MONTGOMERY WARD            SCHD :        .00    INT %:        .00   UNSECURED
MONOGRAM RETAILER CREDIT   VALUE:        .00    INTPD:        .00   U40
P O BOX 103103            CLAIM:        .00    INTDU:        .00
ROSWELL GA                TOTPD:        .00    CRED%:     100.00   NOTICES
         30076            BAL  :        .00    PERMO:        .00
CRED:004856   CLAIM:0014   FILED:                                  PDUE:        .00

HURLEY STATE BANK          SCHD :   2,629.14   INT %:        .00   UNSECURED
CITICARDS                 VALUE:        .00    INTPD:        .00   U40
P O BOX 9025              CLAIM:   2,579.14    INTDU:        .00
DES MOINES IA             TOTPD:   2,579.14    CRED%:     100.00   CREDIT CARD
         50368           BAL  :        .00    PERMO:        .00   7738184715082
CRED:040061   CLAIM:0015   FILED:Dec 04, 2000                      PDUE:        .00

WEST POINT STEVENS ECA FC  SCHD :   3,290.00   INT %:        .00   UNSECURED
P O BOX 71                VALUE:        .00    INTPD:        .00   U40
WEST POINT GA             CLAIM:   3,680.17    INTDU:        .00
                          TOTPD:   3,680.17    CRED%:     100.00   PERSONAL LOAN
         31833-0071       BAL  :        .00    PERMO:        .00   3204500/1
CRED:038118   CLAIM:0016   FILED:Sep 20, 2000                      PDUE:        .00

JEANETTE T SANKS           SCHD :        .00    INT %:        .00   UNSECURED
175 LEE RD 330            VALUE:        .00    INTPD:        .00   U40
P O BOX 44                CLAIM:        .00    INTDU:        .00
SALEM AL                  TOTPD:        .00    CRED%:     100.00   CODEBTOR NOTIC
         36874           BAL  :        .00    PERMO:        .00
CRED:111638   CLAIM:0017   FILED:                                  PDUE:        .00

STERLING INC               SCHD :        .00    INT %:        .00   UNSECURED
C/O WELTMAN WEINBERG & RE  VALUE:        .00    INTPD:        .00   U40
323 LAKESIDE AVE STE 200   CLAIM:        .00    INTDU:        .00
CLEVALND OH               TOTPD:        .00    CRED%:     100.00   NOTICES
         44113-1099      BAL  :        .00    PERMO:        .00
CRED:370399   CLAIM:0018   FILED:                                  PDUE:        .00
```

```
00-04112   BOBBY LEE SANKS                                          PAGE:    4
```

### C L A I M   R E C O R D S

| TOTAL PRIORITY | SCHEDULED | : | .00 | INTEREST PAID | : | .00 |
|---|---|---|---|---|---|---|
| | VALUE | : | .00 | INTEREST DUE | : | .00 |
| | CLAIM AMOUNT | : | .00 | MONTHLY PAYEMNT: | | .00 |
| | PRINCIPAL PAID: | | .00 | PRINCIPAL DUE | : | .00 |
| | BALANCE | : | .00 | | | |

| TOTAL SECURED | SCHEDULED | : | 155,327.76 | INTEREST PAID | : | 1,653.57 |
|---|---|---|---|---|---|---|
| | VALUE | : | 191,694.14 | INTEREST DUE | : | .00 |
| | CLAIM AMOUNT | : | 15,507.86 | MONTHLY PAYMENT: | | 2,469.93 |
| | PRINCIPAL PAID: | | 15,507.86 | PRINCIPAL DUE | : | .00 |
| | BALANCE | : | .00 | | | |

| TOTAL UNSECURED | SCHEDULED: | : | 13,897.58 | INTEREST PAID | : | .00 |
|---|---|---|---|---|---|---|
| | VALUE | : | 1,090.56 | INTEREST DUE | : | .00 |
| | CLAIM AMOUNT | : | 13,981.73 | MONTHLY PAYMENT: | | 21.00 |
| | PRINCIPAL PAID: | | 13,981.73 | PRINCIPAL DUE | : | .00 |
| | BALANCE | : | .00 | | | |

| TOTAL OTHER | SCHEDULED | : | .00 | INTEREST PAID | : | .00 |
|---|---|---|---|---|---|---|
| | VALUE | : | .00 | INTEREST DUE | : | .00 |
| | CLAIM AMOUNT | : | .00 | MONTHLY PAYMENT: | | .00 |
| | PRINCIPAL PAID: | | .00 | PRINCIPAL DUE | : | .00 |
| | BALANCE | : | .00 | | | |

WPH
001059

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                    Case No. 00-04112-WRS
                                         Chapter 13
BOBBY LEE SANKS
P O BOX 44
SALEM AL  36874

Soc. Sec. No.

        Debtor.


ORDER RELEASING WAGES

   The Income Withholding Order previously issued by the
Court to the following employer is hereby RELEASED:

              WEST POINT STEVENS
              ATTN PAYROLL
              P O BOX 71
              WEST POINT GA  31833

   The above  employer is  authorized to pay all future
wages to the debtor.

   Done this 24th day of June, 2005.


              / S /  WILLIAM R SAWYER
              WILLIAM R SAWYER
              United States Bankruptcy Judge


cc:  BOBBY LEE SANKS
     CHARLES M INGRUM


BOBBY LEE SANKS
P O BOX 44
SALEM AL  36874

**WPH**
001060

B18W (12/03)

# United States Bankruptcy Court

## Middle District of Alabama
### Case No. <u>00-04112</u>

In re:
  Bobby Lee Sanks
  POST OFFICE BOX 44
  SALEM, AL 36874

Social Security No.:

Employer's Tax I.D. No.:


## DISCHARGE OF DEBTOR AFTER COMPLETION
## OF CHAPTER 13 PLAN

It appearing that the debtor is entitled to a discharge,

**IT IS ORDERED:**

The debtor is granted a discharge under section 1328(a) of title 11, United States Code, (the Bankruptcy Code).


                                        BY THE COURT


Dated: <u>6/28/05</u>                  <u>William R. Sawyer</u>
                                        United States Bankruptcy Judge


**SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.**


WPH
001061

FORM B18W continued (7/99)

## EXPLANATION OF BANKRUPTCY DISCHARGE
## IN A CHAPTER 13 CASE

This court order grants a discharge to the person named as the debtor after the debtor has completed all payments under the chapter 13 plan. It is not a dismissal of the case.

### Collection of Discharged Debts Prohibited

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. *[In a case involving community property:]* [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.] A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case. Also, a debtor may voluntarily pay any debt that has been discharged.

### Debts That are Discharged

The chapter 13 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged. Most, but not all, types of debts are discharged if the debt is provided for by the chapter 13 plan or is disallowed by the court pursuant to section 502 of the Bankruptcy Code.

### Debts that are Not Discharged.

Some of the common types of debts which are not discharged in a chapter 13 bankruptcy case are:

a. Debts that are in the nature of alimony, maintenance, or support;

b. Debts for most student loans;

c. Debts for most fines, penalties, forfeitures, or criminal restitution obligations;

d. Debts for personal injuries or death caused by the debtor's operation of a motor vehicle while intoxicated;

e. Debts provided for under section 1322(b)(5) of the Bankruptcy Code and on which the last payment is due after the date on which the final payment under the plan was due; and

f. Debts for certain consumer purchases made after the bankruptcy case was filed if prior approval by the trustee of the debtor's incurring the debt was practicable but was not obtained.

This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.

B18W (12/03)

# United States Bankruptcy Court

## Middle District of Alabama
### Case No. 00-04112

In re:
    Bobby Lee Sanks
    POST OFFICE BOX 44
    SALEM, AL 36874

Social Security No.:

Employer's Tax I.D. No.:

## DISCHARGE OF DEBTOR AFTER COMPLETION
## OF CHAPTER 13 PLAN

It appearing that the debtor is entitled to a discharge,

**IT IS ORDERED:**

The debtor is granted a discharge under section 1328(a) of title 11, United States Code, (the Bankruptcy Code).

BY THE COURT

Dated: 6/28/05

William R. Sawyer
United States Bankruptcy Judge

## SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.

**WPH
001063**

FORM B18W continued (7/99)

## EXPLANATION OF BANKRUPTCY DISCHARGE
## IN A CHAPTER 13 CASE

This court order grants a discharge to the person named as the debtor after the debtor has completed all payments under the chapter 13 plan. It is not a dismissal of the case.

### Collection of Discharged Debts Prohibited

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. *[In a case involving community property:]* [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.] A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case. Also, a debtor may voluntarily pay any debt that has been discharged.

### Debts That are Discharged

The chapter 13 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged. Most, but not all, types of debts are discharged if the debt is provided for by the chapter 13 plan or is disallowed by the court pursuant to section 502 of the Bankruptcy Code.

### Debts that are Not Discharged.

Some of the common types of debts which are <u>not</u> discharged in a chapter 13 bankruptcy case are:

a. Debts that are in the nature of alimony, maintenance, or support;

b. Debts for most student loans;

c. Debts for most fines, penalties, forfeitures, or criminal restitution obligations;

d. Debts for personal injuries or death caused by the debtor's operation of a motor vehicle while intoxicated;

e. Debts provided for under section 1322(b)(5) of the Bankruptcy Code and on which the last payment is due after the date on which the final payment under the plan was due; and

f. Debts for certain consumer purchases made after the bankruptcy case was filed if prior approval by the trustee of the debtor's incurring the debt was practicable but was not obtained.

**This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.**

**WPH**
**001064**

**BAE SYSTEMS**

Enterprise Systems Incorporated
11487 Sunset Hills Road
Reston, Virginia 20190-5234

# CERTIFICATE OF SERVICE

District/off: 1127-3          User: cosborne          Page 1 of 1          Date Rcvd: Jun 28, 2005
Case: 00-04112               Form ID: B18W            Total Served: 14

```
The following entities were served by first class mail on Jun 30, 2005.
db        +Bobby Lee Sanks,    POST OFFICE BOX 44,    SALEM, AL 36874-0044
aty        Charles M. Ingrum, Sr.,    Charles M. Ingrum, Attorney At Law,    P. O. Box 142,
           Opelika, AL 36803-0142
aty       +Sabrina L. McKinney,    P. O. Box 173,    Montgomery, AL 36101-0173
tr        .Curtis C. Reding,    P. O. Box 173,    Montgomery, AL 36101
642705     ALABAMA EXCHANGE BANK,    PO BOX 728,    TUSKEGEE AL 36083-0728
642706    +CITIFINANCIAL,    3909-B PEPPERELL PARKWAY,    OPELIKA AL 36801-6025
642707     COLONIAL BANK,    PO BOX 1108,    MONTGOMERY AL 36101-1108
642714     EDWARD A BAILEY ESQ,    WELTMAN WEINBERG & REIS CO LLP,    323 LAKESIDE AVE WEST STE 200,
           CLEVELAND OH 44113-1099
642708     HOUSEHOLD FINANCE CORPORATION,    PO BOX 88000,    BALTIMORE MD 21288-0001
642709    +MARKS & MORGAN,    PO BOX 2260,    GRAY TN 37605-2260
642710    +MONTGOMERY WARD,    C/O HOLLOWAY ELIOTT & MOXLEY,    PO BOX 4953,    MONTGOMERY AL 36103-4953
642711     RADIO SHACK,    PO BOX 9025,    DES MOINES IA 50368-9025
642713    +WESTPOINT-STEVENS ECA/FCU,    PO BOX 8,    VALLEY AL 36854-0008

The following entities were served by electronic transmission on Jun 28, 2005 and receipt of the transmission
was confirmed on:
642708     EDI: HFC.COM Jun 28 2005 19:34:00     HOUSEHOLD FINANCE CORPORATION,    PO BOX 88000,
           BALTIMORE MD 21288-0001
642712    +EDI: IRS.COM Jun 28 2005 19:34:00     SPECIAL PROCEDURES,    INTERNAL REVENUE SERVICE,
           801 TOM MARTIN DRIVE STOP 126,    BIRMINGHAM AL 35211-6425
                                                                          TOTAL: 2


           ***** BYPASSED RECIPIENTS (undeliverable, * duplicate) *****
cr         Colonial Bank
                                                                          TOTALS: 1, * 0


Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.
```

I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.

First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.

Date: Jun 30, 2005                    Signature:  _Joseph Speetjens_

# Dx. 6

# WESTPOINT STEVENS
## RETIREMENT SAVINGS VALUE PLAN
# IN-SERVICE WITHDRAWAL FORM

| Social Security Number | Date of Birth | Date of Hire | Location |
|---|---|---|---|
| | | 10-1-70 | 041 |
| Employee Last Name | First Name | | MI |
| Sanks  Bobby | | | |
| Street Address | City | State | Zip |
| P.O. Box 44 | Salem, AL 36874 | | |

**Type of Withdrawal:**

- [ ] Non-Hardship
- [ ] Fully Taxable-Non Hardship
- [ ] Age 59 1/2
- [X] Hardship (Complete Hardship Approval Form)

**Amount:**

- [ ] Maximum Available
    OR
- [X] Specific Amount
    *see attached*

---

## SECTION A

**CASH DISBURSEMENT INSTRUCTIONS: (Check One)**

- [X] Make the entire distribution payable to me.

- [ ] Rollover the full amount eligible to my IRA or Qualified Plan, with the balance payable to me (complete Section B - Direct Rollover Instructions).

- [ ] Pay $ _____ of my distribution to me, with the balance (up to the amount eligible) paid to my IRA or other Qualified Plan (complete Section B - Direct Rollover Instructions).

- [ ] Rollover $ _____ of my distribution (up to the amount eligible) directly to my IRA or other Qualified Plan, with the balance payable to me (complete Section B - Direct Rollover Instructions).

---

## SECTION B

**DIRECT ROLLOVER INSTRUCTIONS: (Check One)**

- [ ] IRA       - [ ] Qualified Plan

Trustee/Plan Name _____

Acct. Number (If applicable) _____

Mailing Address _____

City, State, Zip Code _____

**DEFENDANT'S EXHIBIT
6
B. Sanks**

---

## SECTION C

**INCOME TAX WITHHOLDING ELECTION: (This is in addition to the 20% mandatory tax withholding, if applicable).**

Federal Income Tax:
- [ ] No, do not withhold
- [ ] Yes, according to tax table or $ _____

State Income Tax:
- [ ] No, do not withhold
- [ ] Yes, $ _____

- [X] I hereby request that WestPoint Stevens increase the amount of my withdrawal/distribution by 25% to cover tax withholding to the extent that my available balance allows. I understand that the amount of the increase is an estimate and may not fully cover the tax withheld.

_Bobby Lee Sanks_                    2/13/01
Employee Signature                    Date

Form# WP-10294-CS        White - Pension Department        Yellow - Human Resources Department        Pink - Employee Copy

WPH
000020

# WESTPOINT STEVENS
## RETIREMENT SAVINGS VALUE PLAN
## FINANCIAL HARDSHIP APPROVAL FORM

| Social Security Number | Employee Name | |
|---|---|---|
| | Bobby Sanks | Approved Amount: _____ |
| P O Box 44 | Salem Al 36874 | |

### SECTION A

**FINANCIAL HARDSHIP WITHDRAWAL RULES:**

Hardship withdrawals must be approved by the Plan Committee and are approved only in the event of an **immediate and heavy financial need** which cannot be met by other available resources. The participant must explain the reason for the request for a hardship withdrawal and must affirm that no other available resources are available to meet the financial need. A hardship withdrawal may not exceed the amount necessary to meet the immediate financial need. To the extent that any other resources are available to the participant, (including any available withdrawals from existing employee benefit plans or assets of a spouse or minor children), to meet the financial need, the hardship withdrawal will not be approved. To comply with this rule you must take any other type of withdrawal that is available to you from the WestPoint Stevens Retirement Savings Value Plan prior to requesting a hardship withdrawal.

The participant must provide satisfactory evidence to the Committee that the financial hardship exists. The participant should attach to this form, copies of any receipts, statements, invoices, estimates or other documentation that would explain or confirm the hardship. The Committee will review the documentation produced by the participant to determine that a hardship exists, and to determine that the amount of the withdrawal request does not exceed the amount necessary to meet the need. The Committee also will confirm that the participant does not have any other available distributions from the Plan or any other plan maintained by the company or its affiliated companies. For a request related to the need to pay medical expenses, the Committee will also check available insurance reimbursements or payments from plans maintained by the Company.

Hardship withdrawals are governed by the Internal Revenue Code and regulations, and therefore, may be subject to additional requirements as new regulations are issued or changes in the Code are enacted.

### SECTION B

**HARDSHIP WITHDRAWAL REASON: (Check applicable reason(s) and attach supporting documentation.)**

☐ Purchase of a principal place of residence for yourself, excluding mortgage payments.

☐ Payment of tuition and related educational fees for the next 12 months of post-secondary education for yourself, your spouse, your children, or your dependents.

☐ Extraordinary medical expense for one or more members of your immediate family which are not covered by insurance.

☒ The need to prevent your eviction from your principal residence or your foreclosure on the mortgage of your principal residence.

### SECTION C

**REPRESENTATIONS BY and SIGNATURE of PARTICIPANT:**

I hereby request to the Committee:
a. The amount that I am requesting to withdraw from the Plan is not more than the amount necessary to satisfy my immediate and heavy financial need;
b. I have attached receipts, invoices, estimates, statements or other documentation or explanation to this form to show the total amount necessary to satisfy my immediate and heavy financial need;
c. I cannot obtain the amount necessary to satisfy my immediate and heavy financial need through the reimbursement or compensation by insurance or otherwise;
d. Neither my spouse nor my minor children have any assets which are reasonably available to me for purposes of satisfying this financial hardship;
e. I cannot obtain the amount necessary to satisfy my immediate and heavy financial need through the reasonable liquidation of my assets, to the extent that a liquidation would not cause an immediate and heavy financial need;
f. I cannot obtain the amount necessary to satisfy my immediate and heavy financial need by ceasing my contributions to the Plan or any other qualified plan;
g. I cannot obtain the amount necessary to satisfy my immediate and heavy financial need through other withdrawals from the Plan or any other plan maintained by the Company (or any of its affiliated companies) or by borrowing on reasonable terms from a commercial lending organization.

I understand that:
1. Federal tax law generally prohibits distributions to me from the Plan before I terminate employment or reach age 59 1/2 unless the distribution is made on account of an **immediate and heavy financial need** and the distribution is **necessary** to meet that need;
2. Federal tax law prohibits any distribution to me for purposes of a hardship to the extent that my needs can be met from other resources directly or indirectly available to me (incuding the resources of my spouse and my minor children);
3. Any misrepresentations made by me in connection with this distributon request may result in disciplinary action as the Plan Administrator deems appropriate under the circumstances.
4. Any distribution made to me on account of a hardship withdrawal generally will be subject to a **federal tax equal to 10% of the taxable portion of the distribution in addition** to applicable federal and state tax.

| | |
|---|---|
| Employee Signature *Bobby Lee Sanks* | Date **2/13/01** |
| Local Personnel Department Approval *June Hamby* | Date **2-13-01** |
| Plan Administrator Approval | Date |
| Committee Approval | Date |

Form# WP-10494-CS        White - Pension Department        Yellow - Human Resources Department        Pink - Employee Copy

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In the matter of:

BOBBY LEE SANKS
SSN:

CASE NO. 00-04112

Debtor(s).

## MOTION TO LIFT AUTOMATIC STAY

COMES NOW Household Finance Corporation of Alabama, hereinafter referred to as Household, Post Office Box 8632, Elmhurst, IL 60126, a creditor to the debtor(s) in the above-styled cause, through its attorney, Carlos E. Heaps, 2322 Second Avenue North, Birmingham, AL 35203, and moves the Court to enter an Order releasing the stay of action as provided by Title 11 USC Section 362 (d), and as grounds states the following:

I. On or about the 25th day of January, 2000 Bobby L.Sanks executed and delivered to Household, a Loan Repayment and Security Agreement (note) for the sum of $110,418.63, plus interest and attorney's fees due in accordance with the terms as listed in said note, copy of which is attached hereto marked Exhibit A and made by this reference a part hereof.

2. At the time the note was executed and in connection therewith and as a part of the same transaction and in order to secure the debt evidenced by the note Bobby Lee Sanks, an unmarried man, executed a mortgage conveying the following described real property to the Movant:

Commence at the Southeast corner of Section 33, Township 19 North, Range 28 East in Lee County, Alabama; run thence North 35 degrees 35 minutes West for 2518 feet to the point of beginning, run North 04 degrees 30 minutes West for 201.2 feet; run thence North 89 degrees 27 minutes East 424.0 feet run thence South 5 degrees 50 minutes East for 205.0 feet; run thence South 88 degrees 55 minutes West 429 feet to said point of beginning.  (Lee County)

3. The above referenced mortgage was duly filed for record in the office of the Judge of Probate, Lee County, Alabama on January 27, 2000 on Mortgage Book 2713, Page 707. A copy of said mortgage is attached hereto marked Exhibit B and made by this reference a part hereof.

4. There is a principal balance of $110,101.24 plus interest of $8923.62, court costs of $75.00 and legal fees of $350.00, now due your Movant under the terms of said agreement.

WPH
000021

5. The monthly installments are in arrears in the amount of $4193.71 plus expenses as outlined in paragraph 4. The standard monthly payment is $1134.93.

6. A proof claim was filed in this case on August 25, 2000 for $4714.72 for the months of May, June, July and August, 2000. A copy is attached as Exhibit C.

7. The debtor(s) has/have not provided creditor with adequate protection.

8. The stay presently in effect is depriving your Movant of its property without compensation.

9. This motion is a core proceeding under the terms of Title 28 U.S.C. Section 157 (b)(l)(2)(G).

10. The debtor(s) do not have any equity in the collateral.

11. The collateral is not necessary for the debtor(s) reorganization.

WHEREFORE, your Movant asks the Court to enter an Order that the stay as to Household be lifted and that Household may pursue foreclosure of its mortgage in accordance with state law.


_Carlos E. Heaps_
Carlos E. Heaps
Its Attorney
2322 Second Avenue North
Birmingham, AL 35203
(205) 328-5496

## CERTIFICATE OF SERVICE

I hereby certify that on this the 7th day of February, 2001 I have served a copy of the foregoing pleading on the following by placing the same in the U.S. Mail, properly addressed and postage prepaid:

Bobby L. Sanks, Debtor(s)
P. O. Box 44
Salem, AL 36874

Curtis C. Reding, Jr., Trustee
P. O. Box 173
Montgomery, AL 36101-0173

Charles M. Ingrum, Esq.
Attorney for Debtor(s)
P. O. Box 142
Opelika, AL 36803-0142


_Carlos E. Heaps_
Carlos E. Heaps, Attorney

WPH
000022

# Dx. 7

# Alabama Department of

# Public Safety

DRIVER LICENSE ABSTRACT

Reply May Be Made To:

Driver License Division
P O Box 1471
Montgomery AL  36102-1471  PAGE    1

03/08/2007

NAME: BOBBY LEE SANKS                    LICENSE NO:              STATUS: CURRENT
ISSUE DATE: 02/02/2007                   LICENSE CLASS: DM  CDL STATUS: UNLICENSED
EXPIRATION DATE: 01/31/2011              BIRTH DATE:              RACE: B   SEX: M
RESTRICTIONS:                            ENDORSEMENTS:

```
CONVICTION    OFFENSE                OFF      COM                              REP
DATE          DESCRIPTION            DATE     VEH    COURT/AGENCY              CNSL

06/30/2006      ACC NO./ 6517570   COMM VEH/N   CNTY/LEE          CITY/AUBURN
03/27/2006 TIRES                   03/23/2006 C  LEE COUNTY DISTRICT COURT      N
```

I hereby certify that this is a true and
correct copy of the records in the Driver
License Division of the Alabama Depart-
ment of Public Safety.

F A BINGHAM, MAJOR
DRIVER LICENSE DIVISION

```
***    THE INCLUSION OF ACCIDENT DATA IN THIS REPORT   ***
***        IN NO WAY IMPLIES FAULT OR LIABILITY.       ***
***                                                    ***
***    THIS REPORT CONTAINS INFORMATION REPORTED TO    ***
***        THIS DEPARTMENT FOR THE LAST 3 YEARS.       ***
```





DEFENDANT'S
EXHIBIT
7
B. Sanks

Alabama Department of

# Public Safety

### Request for Motor Vehicle Record
### Containing Personal Information

**PAID MAR 0 8**

For DPS Use Only

## Information Provided to Request MVR

| Name: Last | First | Middle |
|---|---|---|
| Sanks | Bobby | Lee |

| Driver License Number | Date of Birth | Social Security Number |
|---|---|---|
| | | |

## Identity of Person Requesting Information

| Name: Last | First | Middle |
|---|---|---|
| Suggs | Fred | W. |

| Address | City | State | Zip |
|---|---|---|---|
| Post Office Box 2757 | Greenville | SC | 29602 |

| Daytime Telephone Number | 864-271-1300 |
|---|---|

| Whom Do You Represent? | WestPoint Home, Inc. |
|---|---|

The federal Driver's Privacy Protection Act allows individuals to request that disclosure of certain personal information contained in driver license and vehicle records be restricted. The Alabama Department of Public Safety may disclose that personal information to any person on proof of the identity of the person requesting a record and representation by the requester that the use of the personal information will be strictly limited to one or more of the following:

**Enter your initials in the blank to the left of the appropriate category.**

_____ 1. For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person acting on behalf of a government agency in carrying out its functions.

_____ 2. For use in connection with matters or motor vehicles or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts, and dealers; motor vehicle Market research activities, including survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers.

_____ 3. For use in the normal course of business by a legitimate business or its agents, employees, or contractors;
   a. To verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and
   b. If the information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against the individual.

__X__ 4. For use in connection with any proceeding in any court or government agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of any court.

_____ 5. For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

_____ 6. For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors in connection with claims investigation activities, anti-fraud activities, rating, or underwriting.

_____ 7. For use in providing notice to the owner or lien holder of a towed or impounded vehicle.

_____ 8. For use by any licensed private investigative agency or licensed security service for any purpose permitted under this section.

_____ 9. For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver license which is required under the Commercial Motor Vehicle Safety of Act of 1986 (Title XH of Public Law 99-570).

_____ 10. For use in connection with the operation of private toll transportation facilities.

_____ 11. For any use specifically authorized by law that is related to the operation of a motor vehicle or public safety.

_____ 12. Unrestricted or specified use with written consent of the person who is the subject of the information. (Attach written proof of consent.)

In requesting and using this information, I acknowledge that this disclosure is subject to the federal Driver's Privacy Protection Act (Public Law 103-322) and Alabama state law. This is signed and the request made under the penalties of law.

**Note: A $5.75 fee is required along with this completed and signed form (no personal checks).**

| Signature | Date | 03  06  07 |
|---|---|---|

**WPH**
**001030**

# Dx. 8



# WestPoint Stevens, Inc.

WPH
000250

## EMPLOYEE SHORT TERM DISABILITY CLAIM

### EMPLOYEE INFORMATION

**Please complete and sign this portion of your disability claim.**
**Failure to fully answer all questions may delay processing of your claim.**

| Employee's Name (Please Print) | 2. Sex | 3. Date of Birth | 4. Social Security Number |
|---|---|---|---|
| Bobby Lee Sanks | ☑ Male ☐ Female | | |

| Employee's Street Address |
|---|
| 2401 1st AV  P.O. Box 44 |

| City, State and Zip Code | 7. Telephone Number | 8. Your Occupation |
|---|---|---|
| Opelika AL 36804 | 749-____ | Maintence |

| Employer Name and Location | 10. Date First Disabled | 11. Date First Treatment |
|---|---|---|
| WEST POINT STEVENS Opelika AL | 5-16-2000 | 5-16-2000 |

| 12. Doctor's Name | 13. Doctor's Address |
|---|---|
| DR. Whatley | |

| 14. Is this condition due to any occupational injury or disease? | 15. Is this condition due to injury? | 16. Date of injury | 17. Where did it occur? |
|---|---|---|---|
| ☐ Yes ☑ No | ☐ Yes ☐ No | NONE | None |

| 18. Describe how accident happened |
|---|
| NONE |

I hereby authorize the release of any medical information and any employment related information necessary to evaluate and administer claims for benefits to Southern Administrative Services. This authorization is valid for the duration of the claim.

Employee Signature _Bobby Lee Sanks_   Date 5/23/2000

### PHYSICIAN INFORMATION

| Date of illness (first symptom), injury or if pregnancy, EDC Date | 2. Date first consulted for this condition | 3. Has patient ever had same or like condition? |
|---|---|---|
| | 5/16/00 | ☐ Yes ☐ No |

| Date patient able to return to work | 5. Dates of total disability (must be completed) | 6. Date of last treatment |
|---|---|---|
| 5/22/00 | From 5-16-00  Through 5/22/00 | |

| Diagnosis or nature of illness or injury |
|---|
| HCVD |

| Signature of Physician | 9. Physician SS Number | 10. Physician Name, Address, and Telephone Number |
|---|---|---|
| ____ 5/23/00 | | William B Whatley III |
| signed           Date | 11. Physician ID Number (EIN) | 121 N. 20th Street |
| Your Patient Account Number | NOTE: ITEMS 9, 10 and 11 MUST BE ANSWERED UNDER AUTHORITY OF LAW | Opelika, AL 36801 |
| 25834 | | 334-745-4646 |

### EMPLOYER INFORMATION

**Please certify employee's employment status and sign this portion of the claim**

| Date last worked | 2. Expected return date | 3. Date returned | 4. Weekly A&S Bracket Number |
|---|---|---|---|
| 5-16-00 | | 5-24 | |

| Effective date of coverage | 6. Is this condition due to an occupational injury or disease? | 7. Date coverage terminated |
|---|---|---|
| | | |

| Name and address of employer | 9. Facility |
|---|---|
| WESTPOINT STEVENS INC. | FACILITY NUMBER |

| By (Signature) | 11. Title | 12. Date |
|---|---|---|
| | | |

| Please check one |
|---|
| ☐ Original Claim   ☐ Subsequent Claim |

DEFENDANT'S EXHIBIT 8   B. Sanks

SEND TO SAS, P.O. BOX 8069, COLUMBUS, GA 31908-8069

43   Rev. 3/94   D-08-ABE-000214-0898        _Not enough 4ys_        EFF. 1/1/94

WPH
000395

W E S T P O I N T   S T E V E N S

☐ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE  Bobby Janics | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|

FACILITY  Opelika Mill   DEPARTMENT  Shop   SHIFT  1

SUPERVISOR                                    NOTICE DATE

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

7

**SITUATION IN BRIEF**

BLOOD PRESSURE CHECK

**DETAILS**

WestPoint Steven's medical Protocol may place work restrictions on an associate if specific blood pressure levels are exceeded. Because of this associates may be required to have a blood pressure check on a scheduled basis, usually weekly or monthly.

I acknowledge that I have been instructed to report to the clinic on a weekly or monthly (circle one) basis for a blood pressure check.

SIGNED _Bobby Janks_   DATE 10-5-00

ACTION TAKEN

RECEIVED
OCT - 9 2000

**DISTRIBUTION**
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

(Attach additional sheets as necessary)

RECOMMENDED BY

DEPARTMENT MANAGER _Jerry G. Archer_

ASSOCIATE (If necessary)

OTHER

2-1157-CS REV 11/97

SIGNA...RE                    DATES

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

Bobby Sanks,                              )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        C. A. No.: 3:06-CV-1092-T
                                          )
WestPoint Stevens, Inc., and              )
WestPoint Home, Inc.,                     )
                                          )
        Defendants.                       )
                                          )

# Exhibit 2, Part 2

# Exhibits to the Deposition of Bobby Sanks Dxs. 9-11

# Dx. 9

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

Bobby Sanks,                            )
        Plaintiff,                  )
                   )
v.                                      )   **CIVIL ACTION NO.:  3:06-CV-1092-T**
                   )
WestPoint Stevens, Inc., and            )
WestPoint Home, Inc.,                   )
        Defendant.                  )

---

## AFFIDAVIT OF AUTHENTICITY

---

COMES NOW _Cindy Atkin_ , (print name) who deposes and states as follows:

1.  I am the record custodian for Dr. William B. Whatley, III.  In my position, I am charged with keeping and maintaining those documents and records which Dr. Whatley creates or keeps in the ordinary course of business.

2.  Dr. Whatley is a health care provider operating within the State of Alabama.

3.  I have personal knowledge of the following facts.

4.  On or about _April 1st_, 2007, Dr. Whatley was served with a Subpoena attached as Exhibit A.

5.  I had the responsibility of collecting and producing documents in response to the subpoena.



DEFENDANT'S
EXHIBIT
9
B. Sanks

1

6.   In response to the subpoena, I did in fact review the files and records of Dr. Whatley, collected those records related to Bobby Lee Sanks that were responsive to the subpoena, and copied the same.

7.   I hereby certify that the documents attached hereto are genuine, accurate, and complete copies of the documents copied by me for Dr. Whatley in response to the attached subpoena.

8.   I further certify that the records attached hereto were created by Dr. Whatley, transmitted to or from Dr. Whatley, and that it is in the regularly conducted business activity of Dr. Whatley to keep or store these records for business use.

9.   I certify that as records custodian for Dr. Whatley, I have the official capacity to verify the genuineness of documents produced from the files and records of Dr. Whatley.

Further affiant sayeth naught.

Date: 5/11/07                              Cindy Atkin
                                           Record Custodian for
                                           Dr. William B. Whatley, III


## DECLARATION PURSUANT TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11th, 2007.


                    Cindy Atkin
**Record Custodian for Dr. William B. Whatley, III**

4741360.1

2



OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: 864.271.1300
Facsimile:  864.235.4754
www.ogletreedeakins.com

April 16, 2007

25834

*Via* E-Mail and U.S. Mail

Lateefah Muhammad, Esquire
P.O. Box 1096
Tuskegee Institute, AL  36087

Re:  *Patricia J. Gibson v. WestPoint Stevens, Inc. and WestPoint Home, Inc.*
     Case No.:  3:06-CV-974-MEF

     *Bobby Lee Sanks v. WestPoint Stevens, Inc. and WestPoint Home, Inc.*
     Case No.:  3:06-CV-1092-T

Dear Ms. Muhammad:

    We have re-examined the subpoenas issued regarding your clients and find that they are proper under the circumstances.  If we do not receive prompt responses from those subpoenaed, we will be forced to seek enforcement of the subpoenas.

    Your objections about the scope of the subpoenas goes to the admissibility of any documents that may be produced and not to whether the subpoenas are proper.

    If you will give us proper assurances that the physical and mental conditions of your clients will not be issues at trial, then the subpoenas will not be necessary.

                        Sincerely,

                        OGLETREE, DEAKINS, NASH,
                        SMOAK & STEWART, P.C.

                        Fred W. Suggs, Jr.

FWS, Jr./blg
cc:   Enrique Duprat, M.D.
      David G. Fagan, M.D.
      Ron M. Shiver, M.D.
      James K. Whatley, M.D.
      √ William B. Whatley, M.D.

Atlanta, GA • Austin, TX • Birmingham, AL • Charleston, SC • Charlotte, NC • Chicago, IL • Columbia, SC • Dallas, TX • Greensboro, NC • Greenville, SC • Houston, TX • Indianapolis, IN
Kansas City, MO • Los Angeles, CA • Miami, FL • Morristown, NJ • Nashville, TN • Phoenix, AZ • Raleigh, NC • St. Thomas, VI • San Antonio, TX • Tampa, FL • Torrance, CA • Washington, DC

# Ogletree
# Deakins
#### ATTORNEYS AT LAW

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: 864.271.1300
Facsimile: 864.235.4754
www.ogletreedeakins.com

March 26, 2007

**RECORD CUSTODIAN**
William B. Whatley, III, MD
121 North 20th Street
Opelika, Alabama 36801

      Re:   Bobby Sanks v. WestPoint Stevens, Inc. and WestPoint Home, Inc.
              C. A. No.: 3:06-CV-1092-T

Dear Sir or Madam:

We represent WestPoint Stevens, Inc. and WestPoint Home, Inc., in the above referenced matter. Enclosed is a subpoena authorizing you to release to us any and all documents in your possession relating to the medical treatment of Bobby Lee Sanks, SSN: 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, DOB: 1/5/51. As shown in the attached letter, notice was given to Mr. Sanks' attorney, pursuant to HIPAA, by letter dated March 8, 2007, and we have received no objection to the subpoena from Mr. Sanks' attorney as of this date.

We would appreciate your office mailing copies of the requested records to our attention no later than Friday, April 13, 2007. We ask that you execute the enclosed Affidavit of Record Custodian to authenticate the records you send to us. We will reimburse you for your reasonable copying charges.

With kindest regards, I am

                Very truly yours,

                OGLETREE, DEAKINS, NASH
                SMOAK & STEWART, P.C.

                *Fred W. Suggs, Jr.*

                Fred W. Suggs, Jr.

FWS, Jr./smc
Enclosures

cc:    Lateefah Muhammad, Esq.

                                 **WPH
                                 001178**

Atlanta, GA • Austin, TX • Birmingham, AL • Charleston, SC • Charlotte, NC • Chicago, IL • Columbia, SC • Dallas, TX • Greensboro, NC • Greenville, SC • Houston, TX • Indianapolis, IN
Kansas City, MO • Los Angeles, CA • Miami, FL • Morristown, NJ • Nashville, TN • Phoenix, AZ • Raleigh, NC • St. Thomas, VI • San Antonio, TX • Tampa, FL • Torrance, CA • Washington, DC

# LATEEFAH MUHAMMAD, ATTORNEY AT LAW, P.C.

3805 WEST MARTIN LUTHER HIGHWAY
TUSKEGEE, ALABAMA 36083
**MAILING ADDRESS:**
POST OFFICE BOX 1096
TUSKEGEE INSTITUTE, ALABAMA 36087
(334) 727-1997 TELEPHONE/FACSIMILE
lateefahmuhammad@aol.com

5 April 2007

Fred W. Suggs, Jr., Esquire
OGLETREE DEAKINS, P.C.
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602

James C. Pennington, Esquire
OGLETREE DEAKINS, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama 35203-2118

RE: OUR CLIENT FILE #06-0120/PATRICIA J. GIBSON
*GIBSON v. WEST POINT STEVENS, ET AL.*, 3:06cv974-MEF-TFM

RE: OUR CLIENT FILE #06-0104/BOBBY LEE SANKS
*SANKS v. WEST POINT, INC., ET AL.*, 3:06cv1092-MHT-CSC

Gentlemen:

This is to inform you that the Plaintiffs in the above cases **do not waive** their objections to the subpoenas submitted to their physicians. Formal objections will follow to show cause why the objections should be upheld.

Very truly yours,

Lateefah Muhammad

cc: Mrs. Patricia J. Gibson
Mr. Bobby Lee Sanks
Dr. Enrique Duprat, M.D.
Dr. David G. Fagan, M.D.
Dr. Ron M. Shiver, M.D.
Dr. James K. Whatley, M.D.
Dr. William B. Whatley, M.D.

WPH
001179

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

Bobby Sanks,

      v.

WestPoint Stevens, Inc. and
WestPoint Home, Inc.,

**SUBPOENA DUCES TECUM
IN A CIVIL CASE**

CASE NUMBER: 3:06-CV-1092-T

TO:    RECORD CUSTODIAN:  William B. Whatley, III, M. D., 121 North 20th Street, Opelika, Alabama 36801

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

■ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below: Any and all records maintained in your custody pertaining to **Bobby Lee Sanks, SSN #**    **, DOB**    , including but not limited to medical records, treatment records, counseling records, narratives, nurse's notes, doctor 's notes, diagnostic reports, x-ray reports, disability records, admission records, commitment records, referrals, work excuses, questionnaires, forms, applications, and any other record of any kind in your possession. We want every piece of paper in your file relating to this patient.

| PLACE<br>Ogletree Deakins Nash Smoak & Stewart, P. C.<br>One Federal Place, 1819 5th Avenue North, Suite 1000<br>Birmingham, AL 35203-2118 | DATE AND TIME<br>On or before Friday, April 13, 2007<br>at 10:00 a. m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE<br>March 26, 2007 |
|---|---|
| *Fred W. Suggs Jr.* | |

ISSUING OFFICERS NAME, ADDRESS AND PHONE NUMBER
Fred W. Suggs, Jr. Attorney for Defendant
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
Post Office Box 2757, 300 North Main Street
Greenville, SC  29602
(864)271-1300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

WPH
001180



OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: 864.271.1300
Facsimile: 864.235.4754
www.ogletreedeakins.com

March 8, 2007

Lateefah Muhammad, Esq.
Post Office Box 1096
Tuskegee Institute, Alabama  36087

**Re:    Bobby Sanks v. WestPoint Stevens, Inc. and WestPoint Home, Inc.
         C. A. No.: 3:06-CV-1092-T**

Dear Ms. Muhammad:

Enclosed is an authorization for Mr. Sank's signature allowing Dr. William B. Whatley, III to release any and all records pertaining to the treatment of Mr. Sanks.  Please have Mr. Sanks sign the authorization and return it to us at your earliest convenience.  Should Mr. Sanks fail to authorize the release of the records, we will subpoena the records from Dr. Whatley.  Enclosed is a copy of the subpoena for your review.  In accordance with HIPAA, should we not receive an objection from you within 15 days, or the signed authorization, the subpoena will be forwarded to Dr. Whatley for the records.

Please do not hesitate to contact us with any questions or concerns.

Sincerely,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P. C.

Fred W. Suggs, Jr.

FWS, Jr./smc
Enclosures

**WPH
001181**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF AUTHENTICITY

COMES NOW __Cindy Atkin__, (print name) who deposes and states as follows:

1.    I am the record custodian for Dr. William B. Whatley, III.  In my position, I am charged with keeping and maintaining those documents and records which Dr. Whatley creates or keeps in the ordinary course of business.

2.    Dr. Whatley is a health care provider operating within the State of Alabama.

3.    I have personal knowledge of the following facts.

4.    On or about April 1st, 2007, Dr. Whatley was served with a Subpoena attached as Exhibit A.

5.    I had the responsibility of collecting and producing documents in response to the subpoena.

1

6.    In response to the subpoena, I did in fact review the files and records of Dr. Whatley, collected those records related to Bobby Lee Sanks that were responsive to the subpoena, and copied the same.

7.    I hereby certify that the documents attached hereto are genuine, accurate, and complete copies of the documents copied by me for Dr. Whatley in response to the attached subpoena.

8.    I further certify that the records attached hereto were created by Dr. Whatley, transmitted to or from Dr. Whatley, and that it is in the regularly conducted business activity of Dr. Whatley to keep or store these records for business use.

9.    I certify that as records custodian for Dr. Whatley, I have the official capacity to verify the genuineness of documents produced from the files and records of Dr. Whatley.

Further affiant sayeth naught.

Date: 5/11/07                               Cindy Atkin
                                    Record Custodian for
                                    Dr. William B. Whatley, III

## DECLARATION PURSUANT TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11th, 2007.

                          Cindy Atkin
        **Record Custodian for Dr. William B. Whatley, III**

4741360.1

2

**WPH
001183**

# LATEEFAH MUHAMMAD, ATTORNEY AT LAW, P.C.

3805 WEST MARTIN LUTHER HIGHWAY
TUSKEGEE, ALABAMA 36083
MAILING ADDRESS:
POST OFFICE BOX 1096
TUSKEGEE INSTITUTE, ALABAMA 36087
(334) 727-1997 TELEPHONE/FACSIMILE
lateefahmuhammad@aol.com

10 April 2007

Fred W. Suggs, Jr., Esquire
OGLETREE DEAKINS, P.C.
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602

James C. Pennington, Esquire
OGLETREE DEAKINS, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama 35203-2118

RE: OUR CLIENT FILE #06-0120/PATRICIA J. GIBSON
    *GIBSON v. WEST POINT STEVENS, ET AL.*, 3:06cv974-MEF-TFM

RE: OUR CLIENT FILE #06-0104/BOBBY LEE SANKS
    *SANKS v. WEST POINT, INC., ET AL.*, 3:06cv1092-MHT-CSC

Gentlemen:

This is to confirm the telephone conversation between Attorney Suggs and myself, during which I identified my Clients' reasons for objecting to the subpoenas that have been issued in the above cases. Particularly, I informed Attorney Suggs that my Clients do not agree that the scope of the subpoenas should include **any and all** of their medical records held by their physicians. I told him that the scope of the request is too broad and remote in time as it relates to the lawsuit and the issues in the case. I indicated to him that I was on bereavement and medical leave at the point his request to me expired and did not review his request until a couple of days after the 15-day deadline. Moreover, I indicated that a Motion for Protective Order will be filed with the Court if this dispute is not resolved regarding the broadness, remoteness and scope of the subpoenas. We both agreed to revisit the matter on Thursday, 12 April 2007, to consider what steps should be taken next. Hopefully, a new request will issue and we can get on with the business of these cases.

Very truly yours,

Lateefah Muhammad

cc: Mrs. Patricia J. Gibson
    Mr. Bobby Lee Sanks
    Dr. Enrique Duprat, M.D.
    Dr. David G. Fagan, M.D.
    Dr. Ron M. Shiver, M.D.
    Dr. James K. Whatley, M.D.
    Dr. William B. Whatley, M.D.

WPH
001184

PROGRESS NOTE

Family Medicine Associates of East Alabama, P.C.

Name: Bobby L Sanks    Age: ___ Date: 2/22/07    Time: ___

Data:

BP:Stand ___

Height: ___ Weight: 161    Temp: 96.9 BP:Sit 140/86 Pulse: 72 BS: ___ Last Eaten: ___

R. Tinsley

CC: F/u VI Sit

History: has been doing well - had back surgery c̄ Dr. J. Jones — has been on POP meds — no CP/SOB/PND orthopnea pedal edema

Problem List Reviewed/Updated

ROS:

MEDICATIONS: ✓ List Reviewed/Updated

PMH: SCVD / S/P planned cath    FH:    SH: drugs

Physical Exam:
Gen — NAD
Neck — ∅ JVD
Chest — clear
Heart — M o (no) gallop
Ext — ∅ edema

Laboratory:

Patient Education: ___ Handout given on: ___
___ Drug Info Sheets
___ Counseling done

Diagnoses: HTN

Plan/Treatment:
new Rx
OTC meds

Decision Making: ___ Low ___ Med ___ High  Est. Time: ___    Physician Signature

WPH
001185

Attn: Debra

DEA # _____

**W. B. WHATLEY, III, M.D.**
121 NORTH 20TH STREET
OPELIKA, AL 36801
745-4646

NAME  Bobby Sanks _____

ADDRESS _____  DATE  5/22/00

**Rx**  (Please Print)

May return
to work
BSP 140/100

☐ LABEL

REFILL _____ TIMES   PRN   NR                    M.D.

_____ M.D.       DISPENSE AS WRITTEN

PRODUCT SELECTION PERMITTED            01-100109515-1-5194_0234

30-OCT-98_1666

**FAXED**

MAY 2 3 2000

WPH
001186

## PROGRESS NOTE

Family Medicine Associates of East Alabama, P.C.

Name: Bobby Sanks _____ Age ____ Date: 1/16/07 Time: _____

Data:                           BP:Stand _____

Height: _____ Weight: _____ Temp: _____ BP:Sit _____ Pulse _____ BS: _____ Last Eaten: _____

CC: _____
History

Cx 3month FU) Ooben 9:40

___Problem List Reviewed/Updated

ROS:                              MEDICATIONS: ___ List Reviewed/Updated

PMH:                              FH:

                                 SH:

Physical Exam:                   Laboratory:

                                 Patient Education: ___ Handout given on _____
                                                    ___ Drug Info Sheets
                                                    ___ Counseling done

Diagnoses:                       Plan/Treatment:

WPH
001187

Decision Making: ___ Low ___ Med ___ High    Time: _____    _____ Physician Signature

Chart #
25834

## PROGRESS NOTE

### Family Medicine Associates of East Alabama, P.C.

Name: Bobby Sanus          Age: _____    Date: 10-9-06  Time: _____

Data:                                    BP:Stand

Height: _____  Weight: 155  Temp: 99.3  BP:Sit 183/90  Pulse: 110  BS: _____  Last Eaten: _____

CC: back pain

History

been to urgent care & ER x2 c̄
LBP that goes down into (L) buttock
& leg — no known injury — can't get
comfortable

Problem List Review/Updated

ROS:

FMH:  HCTZ — on no
meds

MEDICATIONS: ___ Last Reviewed/Updated
Naprosyn 375 Bid
PR: Flexeril 10 qd
SP: ∅ig

Physical Exam:

Ge — NAD

Back — ↓ ROM; (+) SLR
at ~30° ; (+) paraspin. muscle
spasm

Laboratory:

Patient Education: ___ Handout given
___ Drug Info Sheet
___ Counseling done

Diagnoses:

LBP c̄ radiculopathy

Plan/Treatment:

appt Dr Frazier friday
forced fluids
RTC 3 wks

WPH
001188

Physician Signature

# FAMILY MEDICINE ASSOCIATES

Dr. William B. Whatley III M..D.
122 North 20ᵗʰ St. Bldg # 24
Opelika, Al. 36801

Phone (334) 745-4646                    Fax (334) 745-0633

DEA # AW7403556
Al License # 7477

PATIENT NAME _Bobby Seamus_    DOB _1-5-51_

| DRUG | DOSE | SIG: | QTN |
|------|------|------|-----|
| Dova—Hct 80/12½ | | T c d | 30 |
| | | | |
| | | | |
| | | | |
| | | | |

REFILLS 1 2 3 4 (5) PRN / NO Refill        LABEL _____

_____    M.D. _____  M.D.

PRODUCT SELECTION PERMITTED        DISPENSE AS WRITTEN

☐  Patient needs an appointment        Pharmacy _____

☐  Patient needs to call our office      Faxed By _____

☐  Please review instructions/dose with patient    Date _11/7/06_

Confidentiality Notice: The information contained on this facsimile may contain confidential information belonging to the sender. The information is intended only for the individual or entity named above. Any disclosure, copying or distribution by others is strictly prohibited. If you have received this transmission in error, please notify the sender by telephone immediately and arrange for the return of the transmission.

**FAXED**

NOV 07 2006    /146

WPH
001189

## Family Medicine Associates

Date: 11-6-06

Caller: Same

Time: 10:40

Doctor: W

nt Name: Bobby Janus
25834-00

Phone: 749.4462

__Chart No.__

Phone:

macy Name: CVS/Opu

Taken By: J.Osbon

SSAGE: 86
ovar 8/12.5 mg.
CTZ
needs refill.
Next Appt 1/16/07

*received message 11/7/06

Completed By [signature]    Date: 11/7/06    Time: 13:00

RESPONSE:

See
Rx sheet

[signature]

Physician: [signature]    Date: _____    Time: _____

WPH
001190

Name: BOBBY SANKS   MRN: 0C  819996

---

**Follow-Up Instructions**

---

**Follow-Up With:**
William B Whatley III MD,
Physician

**Address:**
121 N 20th St;Bldg 24
Opelika, AL  36801
(334) 745-4646  Business

**When:**
Within 2-4 days

**Comments:**
Call physician office for appt.


**Follow-Up With:**
Robert J McAlindon MD,
Physician

**Address:**
161 E University Dr
Auburn, AL  36830
(334) 826-2090  Business

**When:**
Within 2-4 days

**Comments:**
Call physician office for appt.


This referral if for additional evaluation and treatment. Call on the next business day for an appointment. When you call, tell the person that you talk with that you were seen in the Emergency Department and referred to see that physician. If you have problems getting an appointment, please call 705-1150 and ask to speak with a nurse.

**Patient Education Materials**

---

BOBBY SANKS has been given the following patient education materials:
Injury & Illness
## SCIATICA

Sciatica ("Lumbar Radiculopathy") causes a pain that spreads from the lower back down into the buttock or hip and part or all the way down the leg to the toes. Sometimes leg pain can occur without any back pain.

Sciatica is due to irritation or pressure on a spinal nerve as it comes out of the spinal canal. This may be caused by an injury to the nearby muscles or ligaments of the spine; or it may occur when an injured spinal disk (the cartilage cushion between each spinal bone) bulges and pinches a nearby nerve.

Sciatica may begin after a sudden twisting/bending force (such as in a car accident), or sometimes after a simple awkward movement. In either case, muscle spasm is commonly present and contributes to the pain.

<u>HOME CARE:</u>
1) Rest and relax your back muscles. Try to find a position of comfort. Lie flat on your back on a firm surface with pillows under your knees; or lie on your side with your knees bent up towards your chest and a pillow between your knees. (If your mattress sags, place a piece of plywood under it or lie on a floor pad for more support.)
   -- For SEVERE back pain stay in this position until you are feeling better. Get up only to go to the bathroom or for meals.
   -- For LESS SEVERE back pain, strict bed rest is not needed. However, don't do anything that worsens the pain and avoid prolonged sitting. Be aware of safe bending and lifting methods. Do not lift anything over 15 pounds until all pain is gone.
2) <u>Ice packs</u> (crushed or cubed ice in a plastic bag, wrapped in a towel) are best for 20 minutes every 2-4 hours during the first two days after a new injury.  <u>Local heat</u> (hot shower, hot bath or heating pad) and <u>massage</u> will help reduce muscle spasm.  You can start with ice packs then switch to heat after two days. Some patients feel best alternating treatments. Use the method that feels best to you for.
3) You may take Tylenol or ibuprofen (Advil, Motrin) for pain, unless another pain medicine was prescribed.

Name: BOBBY SANKS   MRN: 0C   819996

**FOLLOW UP** with your doctor or this facility if your symptoms do not start to improve after one week. Physical therapy may be needed.

[NOTE: If X-rays were taken, they will be reviewed by a radiologist. You will be notified of any new findings that may affect your care.]

**RETURN PROMPTLY** or contact your doctor if any of the following occurs:
-- Pain becomes worse
-- Weakness in one or both legs
-- Numbness in the groin or legs
-- Loss of bowel or bladder control

**If you get home and do not understand any of these instructions, please call 705-1150 and give the staff the date you were a patient and that you have a question about your visit.**

WPH
001192

10/7/2006 09:17:16



# East Alabama Medical Center
## Discharge Instructions

**Name:** BOBBY SANKS

**DOB:**

**MRN:** 0000819996
**FIN:** 0628000026
**Address:** 330 LEE RD 175 SALEM AL 36874
**Phone:** (334)749-4462

**Arrive Date:** 10/07/2006 08:20
**Discharge Date:** 10/7/2006 09:17:16

**Emergency Department Care Providers:**
**Primary Physician:**

　　East Alabama Medical Center would like to thank you for allowing us to assist you with your healthcare needs.  The following includes patient education materials and information regarding your injury/illness.
-- If you had an x-ray taken in the ED the radiologist will be reading them within 24 hours. The reading of your x-ray by your ED doctor or nurse practitioner is a preliminary reading only. If the final reading shows anything that was not seen on the preliminary reading by the ED doctor, **we will call you if you need additional treatment or test**. If you do not need additional treatment or test, we will not call.This would typically be within 4 days of your visit.
-- If you had a culture done today, it takes 2-3 days to get the results. If you need additional treatment based on the results of the culture we will call you. **Please be sure the phone number that you gave the registration clerk is accurate, in case we do need to contact you.**
-- If you were given a prescription for medication, be sure to follow the label instructions. Ask your pharmacist if the medication will make you drowsy and be sure not to drive or operate machinery while taking medication that will make you drowsy.
-- If you received medication while in the ED, be sure the effects of those medications have had time to wear off before you drive or operate machinery. This typically takes 6-8 hours.

**WPH**
**001193**

10/7/2006 09:17:16

1 of 5

Name: BOBBY SANKS
MRN: 0000819996

ame: BOBBY SANKS   MRN: 00   319996

ur goals in the ED -based on you symptoms, medical history, and exam are to:
Find any emergency medical condition that might exist
Treat any urgent problems that we discover
Stabilize any unstable chronic conditions that you have
Provide or initiate treatment of new conditions such as infections or injuries
Give you advice for further care of you problems,including referral to other specialists or your
personal  physician for further evaluations; and coordinate admission for you if you have a
condition, which in our judgement, needs treatment or monitoring in the hospital rather than at
home.

While we make a sincere and reasonable effort to reach these goals, it is a complex undertaking
and it is important for you to realize that the medical condition(s) causing your symptoms may not
be clear while you are here. Not every medical condition-even a potentially serious one- produce
abnormalities on your exam or tests during the early stages. So, it is important that you see a
doctor again when we instruct you to do so or if you condition gets worse or if you are not getting
well like you think you should be.

It is best if you have a personal physician to manage your health care on a regular basis. Ideally, this
is the doctor who knows you best and is who you should see if you are not getting better after your
ED visit. However, if you do not nave a personal physician or if you can not get in to see your
doctor and you feel that you are getting worse, you are always welcome to come back to the
Emergency Department and let us see you again.

Remember, "an ounce of prevention is worth a pound of cure". Keeping in regular contact with your
personal physician will keep you better informed about your health, keep you medical problems
under better control, and reduce your chances of developing an emergency medical condition. But,
if you do develop a condition you think is an emergency, we are always here for you- 24 hours a
day, 365 days a year.

**WPH**
**001194**

10/7/2006 09:17:16

Name: BOBBY SANKS
MRN: 0000819996

# PROGRESS NOTE

## Family Medicine Associates of East Alabama, P.C.

Name: _Bobby James_      Age:_____ Date: _9/19/03_ Time:_____

Data:                  BP:Stand_____

Height:_____ Weight:_____ Temp:_____ BP:Sit_____ Pulse_____ BS:_____ Last Eaten:_____

CC:_____

History

___Problem List Reviewed/Updated

ROS:

PMH:

MEDICATIONS: ____ List Reviewed/Updated

FH:

SH:

Physical Exam:

Laboratory:

Patient Education: ___ Handout given on:_____
            ___ Drug Info Sheets
            ___ Counseling done

Diagnoses:

Plan/Treatment:

**WPH
001195**

Physician Signature

## Family Medicine Associates

Date: 3·21·03

nt Name: Bobby Sanks        Caller: _____    Time: 4:55

Chart No.: 25834-00    Phone: 749.4462    Doctor: W

3: ___

rmacy Name: Echols Express Pharm    Phone: _____

ESSAGE:        Taken By: Shelton

Wants Sheila to fax
in his px for his
meds. He said she'll
have the inform. un
his chart.

RESPONSE:

Completed By: S Duffey 3/21/03  Time: 5:05 pm

Physician: _____    Date: _____    Time: _____

WPH
001196

# PROGRESS NOTES
Family Medicine Associates of East Alabama, P.C.

NAME: _Bobby Sanks_

Date:

Weight:

Temp:

BP:

## FAMILY MEDICINE ASSOCIATES

M. J. LISENBY, M.D.                                    J. R. COOPER, M.D.
R. S. CASON, M.D.        W. B. WHATLEY, III, M.D.      BRIAN ROGERS, M.D.
DEA # AL1041829                                        DEA # AC2698302
DEA # BC2787387          DEA # AW7403556               DEA # BR3702239
  AL LIC. NO. 9691   AL LIC. NO 18063   AL LIC. NO. 7477   AL LIC. NO. 1220   AL LIC. NO. 18306

122 N. 20th St. #24                                    832 Stage Road
Opelika, AL 36801-5442                                 Auburn, AL 36830
745-4646                                               887-5501

NAME _Bobby Sanks_

ADDRESS _____ DATE _8/21/03_

R̀

_Diovan HCT 160/12½_

_# 90_

_† q am_

☑ LABEL

REFILL __1__ TIMES    PRN        NR _____

_____ M.D.    DISPENSE AS WRITTEN    M.D.
PRODUCT SELECTION PERMITTED



**FAXED**

MAR 2 1 2003

WPH
001197

# PROGRESS NOTE

| Family Medicine Associates of East Alabama, P.C. |
|---|

Name: Bobby Santos     Age: ___ Date: 3-21-03 Time: _____

Data:
Height: _____ Weight: 176 Temp: 98.2 BP:Stand _____ BP:Sit 150/82 Pulse 84 BS: _____ Last Eaten: _____

CC: BP V upp
History
been doing well — no problems
no CP/SOB/PND/edema

Problem List Reviewed/Updated

ROS:

MEDICATIONS: ✓ List Reviewed/Updated

PMH: HTN

FH:
SH: ⊖ cigs /⊕ etoh

Physical Exam:
Gen NAD
Chest — clear
Heart — RRR s̄ m or gallop
⊘ edema

Laboratory:

Patient Education: ___ Handout given on: _____
___ Drug Info Sheets
___ Counseling done

Diagnoses:
HTN

Plan/Treatment:
cont Rx

**WPH
001198**

Physician Signature

# PROGRESS NOTE

## Family Medicine Associates of East Alabama, P.C.

Name: Bobby Sants _____ Age:____ Date: 3-10-03 Time: _____

Data:                                   BP:Stand_____

Height: _____ Weight: _____ Temp:_____ BP:Sit_____ Pulse_____ BS:_____ Last Eaten:_____

CC:_____

History

___Problem List Reviewed/Updated

ROS:                                    MEDICATIONS: ____ List Reviewed/Updated

PMH:                                    FH:

                                        SH:

Physical Exam:                          Laboratory:

                                        Patient Education: ___ Handout given on:_____
                                                           ___ Drug Info Sheets
                                                           ___ Counseling done

Diagnoses:                              Plan/Treatment:

                                        **WPH**
                                        **001199**

Decision Making:    Low    Med ___High    Est. Time:_____    _____ Physician Signature

# PROGRESS NOTES
## Family Medicine Associates of East Alabama, P.C.

NAME: _Bobby Sanks_

Date: 9-10-02

Weight: 175 lbs

Temp: 97.7

BP: 140/94

NKA

Meds
Dionar - 10mg

Omltp

HCVD

Ocif
Destroh

S→ here for ung - been
out of meds x 4-50 days -
no CP/SOB/PND/ - No
edema

O→ Gen - NAD
Chest - clear
Heart - MoRm
Neuro A+OX3
Motor intact
∅ edema

A→ HCVD

P→ Cont Ap — DTC 6 wo

WPH
001200

# PROGRESS NOTES
## Family Medicine Associates of East Alabama, P.C.

NAME: Bobby Sanks

Date: 2-22-02

Weight: 177

Temp: 98.1

BP: 148/84

Meds
See list

Allergies
Ø

nonsmoker
Ø etoh

PMHx
HCVD

here for f/u on his BP
- no problems c meds -
he denies CP/SOB/PND

O→

Chest - Clear
Heart - RRR o murmur orgallop
   Ø edema

A → HCVD
O → cont Rx - Reclems

MA

WPH
001201

# PROGRESS NOTES

### Family Medicine Associates of East Alabama, P.C.

NAME: _Bobby Sanders_

| | |
|---|---|
| Date: 11-14-01 | DioVan 160/12.5 mg # 90 i q d №️ |
| Weight: | HCT |
| Temp: | Express |
| BP: | Pharmacy 1/83 |

FEB 20 2002

**Date:**

**Weight:**

Temp:

BP: 124/74

BP ✓

BP ok —
Make F/u appt.

WPH
001202

# PROGRESS NOTES
## Family Medicine Associates of East Alabama, P.C.

NAME: _Bobby Sants_

Date: 8-23-01

Weight: 173

Temp: 97.3

BP: 138/86
pulse - 64

meds
See lists

allergies
Ø

Soc. hx
⊖ aig/etoh

Pmhx
(HCVD)

9/20/01

here for ✓ up on his
BP - PMCP/SOB/PND
— exercises regularly

Ⓞ→ Chest — clear
Heart — RRR S M S rub
Ø edema

A → Stable
Ⓟ →cont BP — RTC 6 mo.

Diovan 160/12.5 mg #90 ÷ po qd
refill   written   8s

WPH
001203

# PROGRESS NOTES

## Family Medicine Associates of East Alabama, P.C.

NAME: Bobby Banks

Date: 2/02/01

Weight: 173½

Temp: 98°  P 68

BP: 142/94

meds
see list

Allergies
∅

Soc. hx

⊖ cig
⊖ EtOH

S→ here reluctantly to
have a Vap for his BP
- ran out of his meds last
weeks x 2 + 3 days — BP
denies CP/SOB/PND

O →  BP 156/94

Chest — clean

Heart — RRR ⊗ (M)

∅ edema

WPH
001204

A → HCVD

P → Diovan — Hct 160/12½
          ↑ qd

RTC ← 1 mor          MA

8/8/01    Diovan 160/12.5mg QD #15 NR

# PROGRESS NOTES
## Family Medicine Associates of East Alabama, P.C.

NAME: _Bobby Sanks_

| | |
|---|---|
| Date: 9-1-00 | Viagra 100mg #10 + PRN refx10 |
| Weight: Written | |
| Temp: | |
| BP: | |
| 12/21/00 | Diovan 160/12.5mg īqd #30 NR (needs appt) CVS Opelika |
| 1-25-01 | Diovan 160/12.5mg #15 īqd NR CVSOp Appnt made |

WPH
001205

# PROGRESS NOTES

## Family Medicine Associates of East Alabama, P.C.

NAME: Bobby Sparks

Date: 5/18/2000

Weight:

Temp:

BP:

BP ✓

♀ 150/100          ♂ 152/104          <u>Meds</u>
                                      Diovan HCT 160/12.5 mg qd

Recheck Monday — continue meds — (S)

DATE 5-22-00   BP ✓ 140/100

Diovan HCT 160/12.5 qd

rev next week

NS

DATE 6-27-00
BP:
WC:
TE:

8-12-00      BP ✓ 140/80

Diovan/HCT 160/12.5 mg

Med is causing sexual problems.

Rx: Viagra 50 —
              # 10

WPH
001206

# PROGRESS NOTES
## Family Medicine Associates of East Alabama, P.C.

NAME: Bobby Smks

Date: 5/16/2000

Weight: 173

Temp: 98.7

BP: 172/110

meds
Ø

Allergies Allergies
Ø

S→ 49 yo BM recently found
to have HBP — strong family
hx HCVD — no hx of
heart dry or CVA
non smoker

O→
Chest — clear
Heart — RRR
Ø Edema

A→ HCVD

P→ Diovan HCt 160/12½
BRV Thur Fri
RTC 6wks

WPH
001207

**\*\*\* THIS PRESCRIPTION HAS NO REFILLS REMAINING \*\*\***

DIOVAN/HCTZ        160/12.5MG TAB

TO RENEW, PLEASE HAVE YOUR DOCTOR REVIEW AND COMPLETE PRESCRIPTION FORM
PROVIDED BELOW.  PLEASE RESUBMIT PRESCRIPTION ON OR AFTER 01/07/02.

**INSTRUCTIONS:**

FOR DOCTOR FAXING:    For each Prescription Renewal Form, please complete renewal information below and have your doctor
complete and sign the prescription provided. Your doctor should then fax this entire form.

**NOTE:** Only doctors can fax new prescriptions. (Schedule II medications cannot be faxed.)

WPH
001208

FAX NUMBER: 1-800-243-9582

FOR MAILING............:    For each Prescription Renewal Form, have your doctor complete and sign the prescription below.
Detach signed prescription and mail with completed Prescription Order Form in the envelope provided.

**NOTE:** The Prescription Order Form is at the bottom of your Customer Receipt.

**RENEWAL INFORMATION**
**(COMPLETE SECTION ONLY IF DOCTOR IS FAXING)**

**MEMBER NAME/ADDRESS:**

| | | |
|---|---|---|
| Changes: | (____) Temporary | (____) Permanent |
| Street | | Apt |

**MEMBER NUMBER:**

SANKS      BOBBY    L

BOX 44

SALEM        AL 36874

334 749-4462

City        State      Zip

Phone   (    )      -

42472916

FAXED

FEB 22 2002

**CREDIT CARD INFORMATION:**      VISA    MASTERCARD    DISCOVER    AMERICAN EXPRESS    JCPENNEY

**ACCOUNT NUMBER:** _____      **EXPIRATION DATE:** _____

☞One day processing and delivery is available with **FAX, PHONE,** or **MAIL** orders for an additional    charge. Orders
weighing over    pounds will incur additional charges. (____) Check here if you would like this service. $15.00

☞Childproof caps are required for safety in shipping. (____) Check here if you would like non-childproof caps with this order.

☞Other Requests: _____

☞This prescription is for: (____) Employee/Retiree (____) Spouse (____) Son (____) Daughter (____) Other _____

The person for whom the prescription is for is an eligible participant and does not have primary prescription coverage through another medical benefits plan.

I authorize that the information provided is correct. Signature: _____    Date: _____

-------------- DETACH ONLY IF MAILING ----------------

DEAR DOCTOR WHATLEY:
PLEASE INITIAL ANY CHANGES YOU MAKE TO THE
PRESCRIPTION INFORMATION PROVIDED AND SIGN
THE PRESCRIPTION.

DIOVAN/HCTZ      160/12.5MG TAB
QTY = 90

PLEASE INCLUDE YOUR ADDRESS, TELEPHONE
NUMBER, DEA NUMBER AND SIGNATURE ON THE
PRESCRIPTION.  THANK YOU.

**MEMBER NAME/ADDRESS:**    FOR MD USE ONLY    PRESCRIPTION NUMBER:

SANKS      BOBBY    L

BOX 44

SALEM        AL 36874

334 749-4462

**DOCTOR NAME:**    WHATLEY

DATE 419088

**PATIENT NAME:** BOBBY    SANKS

**DIOVAN/HCTZ**      **160/12.5MG TAB**      **QTY: 90**

TAKE 1 TABLET DAILY

NDC # 00078-0315-05
NEXT FILL DATE = 01/07/02

M.D. MUST INITIAL ANY CHANGES

SIGNATURE _____

DISPENSE AS WRITTEN

ADDRESS.... 122 N 20th # 24 Opelika, AL 36801

PHONE........ 334 745-4646

**NUMBER OF REFILLS:** ___1___

SUBSTITUTION PERMISSIBLE

DEA#: AW 7403556



# WestPoint Stevens, Inc.

## EMPLOYEE SHORT TERM DISABILITY CLAIM

### EMPLOYEE INFORMATION

*Please complete and sign this portion of your disability claim.*
**Failure to fully answer all questions may delay processing of your claim.**

| 1. Employee's Name (Please Print) | 2. Sex | 3. Date of Birth | 4. Social Security Number |
|---|---|---|---|
| Bobby Lee Sanks | ☑ Male ☐ Female | | |

5. Employee's Street Address: 2401 1st AV P.O. Box 44

| 6. City, State, and Zip Code | 7. Telephone Number | 8. Your Occupation |
|---|---|---|
| Opelika Al 36804 | 749- | Maintinee |

| 9. Employer Name and Location | 10. Date First Disabled | 11. Date First Treatment |
|---|---|---|
| WEST POINT STEVENS Opel. Al | 5-16-2000 | 5-16-2000 |

| 12. Doctor's Name | 13. Doctor's Address |
|---|---|
| DR Whalley | |

| 14. Is this condition due to any occupational injury or disease? | 15. Is this condition due to injury? | 16. Date of injury | 17. Where did it occur? |
|---|---|---|---|
| ☐ Yes ☑ No | ☐ Yes ☑ No | NONE | None |

18. Describe how accident happened

NONE

I hereby authorize the release of any medical information and any employment related information necessary to evaluate and administer claims for benefits to Southern Administrative Services. This authorization is valid for the duration of the claim.

Employee Signature _Bobby Lee Sanks_   Date 5/23/2000

### PHYSICIAN INFORMATION

| 1. Date of illness (first symptom), injury or if pregnancy, EDC Date | 2. Date first consulted for this condition | 3. Has patient ever had same or like condition? ☐ Yes ☐ No |
|---|---|---|

| 4. Date patient able to return to work | 5. Dates of total disability (must be completed) From ___ Through ___ | 6. Date of last treatment |
|---|---|---|
| 5/24/00 | | |

7. Diagnosis or nature of illness or injury

HCVD

| 8. Signature of Physician | 9. Physician SS Number | 10. Physician Name, Address, and Telephone Number |
|---|---|---|
| Signed ___  Date 5/23/00 | 11. Physician ID Number (EIN) 63-1014232 | William B Whatley III 121 N. 20th Street Opelika, Al 36801 334-745-4646 |

| 12. Your Patient Account Number | NOTE: ITEMS 9, 10 and 11 MUST BE ANSWERED UNDER AUTHORITY OF LAW |
|---|---|
| 25834 | |

### EMPLOYER INFORMATION

*Please certify employee's employment status and sign this portion of the claim*

| 1. Date last worked | 2. Expected return date | 3. Date returned | 4. Weekly A&S Bracket Number |
|---|---|---|---|

| 5. Effective date of coverage | 6. Is this condition due to an occupational injury or disease? | 7. Date coverage terminated |
|---|---|---|

| 8. Name and address of employer WESTPOINT STEVENS INC. | 9. Facility FACILITY NUMBER |
|---|---|

| 10. By (Signature) | 11. Title | 12. Date |
|---|---|---|

13. Please check one
☐ Original Claim   ☐ Subsequent Claim

*SEND TO SAS, P.O. BOX 8069, COLUMBUS, GA 31908-8069*

SAS.43   Rev. 3/94   D-08-ABE-000214-0898

**WPH 001209**

EFF. 1/1/94

**DISABILITY DETERMINATION SERVICE**

UNIT: 04/40

DMAF

POST OFFICE BOX 830300
BIRMINGHAM, ALABAMA 35283-0300

25834

Birmingham Number 205-989-2100
Toll-Free Number 1-800-292-8106

Toll-Free Fax Number 1-800-524-6489

March 19, 2007

TAX ID: 631014232

CLAIM: 483777

PAY TO: FAMILY MEDICINE ASSOCIATES OF

TDN: 1763808640

FAMILY MEDICINE ASSOCIATES OF
EAST AL PC
122 NORTH 20TH STREET SUITE 24
OPELIKA AL 36801-5442

RE:     BOBBY LEE SANKS
AKA:

P O BOX 44
SALEM AL 36874

A/N:                   'NT/SSA
DOB:

William B Whatley III MD

The Disability Determination Service (DDS) is writing to obtain medical evidence on behalf of this individual who has applied for disability or blindness benefits under the Social Security Act. The DDS is responsible for determining if the person is disabled or blind. A signed authorization for release of information is enclosed.

Please furnish either a summary and/or copies of your medical office records along with laboratory findings, x-ray interpretations, EKG tracings, and other studies that you may have on this individual.

The DDS would like to have a statement based on your medical findings and observations, expressing your opinion on the limiting effects of the individual's physical and mental abilities to perform basic work related functions, i.e. lifting, walking, standing, sitting, etc. If the claim involves a child, we need to know how the child's ability to function is limited compared to children of the same age who are unimpaired.

The DDS is authorized to pay for this information. This payment does not apply to Federal records. This authorization cannot be transferred to a third party or another tax number. A reply within 10 days would be appreciated. Unless the information is received within 60 days, no payment can be made.

PLEASE SIGN THE LETTER IN THE SPACE BELOW, AND RETURN IT TO THE DDS WITH THE REQUESTED INFORMATION. NO OTHER BILLING IS NECESSARY.

AUTHORIZED AMOUNT   $ 16.00

VENDOR: FAMIL0080

_____
SIGNATURE OF PHYSICIAN OR AUTHORIZED REPRESENTATIVE

Sincerely,

4/4/07

WPH
001210

*Jami L Judkins*
Jami L Judkins
Disability Specialist, Telephone Ext. 517

Enclosures

MD01 - DDH

RQID: 1763808640483777     SITE: S01  DR: S
SSN: 424729114 DOCTYPE: 0001 RF: D CS: 55de

FROM SOCIAL SECURITY

Form SSA-827 EDCS  Bobby Lee Sanks  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

| | Form Approved OMB No. 0960-0623 |
|---|---|
| **WHOSE** *Records to be Disclosed* | |
| NAME (*First Middle Last*) | |
| Bobby Lee Sanks | |
| SSN | Birthday (mm/dd/yy) |
| SSA USE ONLY    NUMBER HOLDER (If other than above) | |
| NAME | |
| SSN | |

# AUTHORIZATION TO DISCLOSE INFORMATION TO
# SOCIAL SECURITY ADMINISTRATION (SSA)

## ** PLEASE READ THE ENTIRE FORM, BOTH PAGES, BEFORE SIGNING BELOW **

I voluntarily authorize and request disclosure (including paper, oral, and electronic interchange):
**OF WHAT**  All my medical records; also education records and other information related to my ability to perform tasks. This includes specific permission to release:

1. All records and other information regarding my treatment, hospitalization, and outpatient care for my impairment(s) *including*, and not limited to:
   — Psychological, psychiatric, or other mental impairment(s) (excludes "psychotherapy notes" as defined in 45 CFR 164.501)
   — Drug abuse, alcoholism, or other substance abuse
   — Sickle cell anemia
   — Records which may indicate the presence of a communicable or venereal disease which may include, but are not limited to, diseases such as hepatitis, syphilis, gonorrhea and the human immunodeficiency virus, also known as Acquired Immune Deficiency Syndrome (AIDS); and tests for HIV.
   — Gene-related impairments (including genetic test results)
2. Information about how my impairment(s) affects my ability to complete tasks and activities of daily living, and affects my ability to work.
3. Copies of educational tests or evaluations, including Individualized Educational Programs, triennial assessments, psychological and speech evaluations, and any other records that can help evaluate function; also teachers' observations and evaluations.
4. Information created within 12 months after the date this authorization is signed, as well as past information.

**FROM WHOM**
- All medical sources (hospitals, clinics, labs, physicians, psychologists, etc.) including mental health, correctional, addiction treatment, and VA health care facilities
- All educational sources (schools, teachers, records administrators, counselors, etc.)
- Social workers/rehabilitation counselors
- Consulting examiners used by SSA
- Employers
- Others who may know about my condition (family, neighbors, friends, public officials)

| THIS BOX TO BE COMPLETED BY SSA/DDS (as needed) Additional information to identify the subject (e.g. other names used), the specific source, or the material to be disclosed: |
|---|
| *William B. Whatly III* |

**TO WHOM**  The Social Security Administration and to the State agency authorized to process my case (usually called "disability determination services"), including contract copy services, and doctors or other professionals consulted during the process. [Also, for international claims, to the U.S. Department of State Foreign Service Post.]

**PURPOSE**  Determining my eligibility for benefits, including looking at the combined effect of my impairments that by themselves would not meet SSA's definition of disability; and whether I can manage such benefits.
☐ Determining whether I am capable of managing benefits ONLY (check only if this applies)

**EXPIRES WHEN**  This authorization is good for 12 months from the date signed (below my signature).
- I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.
- I understand that there are some circumstances in which this information may be redisclosed to other parties (see page 2 for details).
- I may write to SSA and my sources to revoke this authorization at any time (see page 2 for details).
- SSA will give me a copy of this form if I ask; I may ask the source to allow me to inspect or get a copy of material to be disclosed.
- I have read both pages of this form and agree to the disclosures above from the types of sources listed.

***PLEASE SIGN USING BLUE OR BLACK INK ONLY.**

| INDIVIDUAL authorizing disclosure | IF not signed by subject of disclosure, specify basis for authority to sign |
|---|---|
| SIGN ►► *Bobby L Sanks* | ☐ Parent of minor  ☐ Guardian  ☐ Other personal representative (explain) |
| | (Parent/guardian/personal representative sign here if two signatures required by State law) ► |
| Date Signed 3/16/07 | Street Address P O BOX 44 | State AL | ZIP 36874 |
| Phone Number (with area code) 334-749-4462 | City SALEM | | |
| **WITNESS** I know the person signing this form or am satisfied of this person's identity: | If needed, second witness sign here (e.g., if signed with "X" above) |
| SIGN ► *C. Ayers MER* | SIGN ► |
| Phone Number (or Address) | Phone Number (or Address) |

SSA FO/2 633

SSA will give me a copy of this form if I ask; I may ask the source to allow me to inspect or get a copy of material, educational, and other information under P.L. 104-191 ("HIPAA"); 45 CFR parts 160 and 164; 42 U.S. Code section 290dd-2; 42 CFR part 2; 38 U.S. Code section 7332; 38 CFR 1.475; 20 U.S. Code section 1232g ("FERPA"); 34 CFR parts 99 and 300; and State law.

WPH
001211

# Dx. 10

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Bobby Lee Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

---

**AFFIDAVIT OF AUTHENTICITY**

---

COMES NOW _____, (print name) who deposes and states as follows:

1.    I am the record custodian for Auburn Urgent Care. In my position, I am charged with keeping and maintaining those documents and records which Auburn Urgent Care creates or keeps in the ordinary course of business.

2.    Auburn Urgent Care is a physician in the State of Alabama.

3.    I have personal knowledge of the following facts.

4.    On or about _____, 2007, Auburn Urgent Care was served with a Subpoena attached as Exhibit A.

5.    I had the responsibility of collecting and producing documents in response to the subpoena.

6.    In response to the subpoena, I did in fact review the files and records of Auburn Urgent Care, collected those records related to Bobby Lee Sanks that were responsive to the subpoena; and

1


DEFENDANT'S
EXHIBIT
10
B. Sanks

WPH
001171

copied the same.

7.    I hereby certify that the documents attached hereto are genuine, accurate, and complete copies of the documents copied by me for Auburn Urgent Care in response to the attached subpoena.

8.    I further certify that the records attached hereto were created by Auburn Urgent Care, transmitted to or from Auburn Urgent Care, and that it is in the regularly conducted business activity of Auburn Urgent Care to keep or store these records for business use.

9.    I certify that as records custodian for Auburn Urgent Care, I have the official capacity to verify the genuineness of documents produced from the files and records of Auburn Urgent Care.

Further affiant sayeth naught.

Date: 7-11-07                                     _Melissa Irwin_
                                          Record Custodian for Auburn Urgent Care

### DECLARATION PURSUANT TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 7-11____, 2007.

_Melissa Irwin_
Record Custodian for Auburn Urgent Care

5059105.1

2

Auburn Urgent Care
1650 A Opelika College Street
Auburn, AL 36832-0000
Phone: (334)826-8950 Fax: (334)826-1144

---

CLINICAL RECORDS
SUPER BILL
Diagnosis:

| Code | Description |
|------|-------------|
| 847.2 | SPRAIN STRAIN LUMBAR SPINE |

Procedures:

| Code | Description |
|------|-------------|
| 99202 | NEW PATIENT OFFICE VISIT L2 |

PROVIDER INFORMATION
Physician: BEDNARSKI,ZENON,JOHN:MD
Service Date: 10/02/2006
DEMOGRAPHICS
SANKS,BOBBY,L
330 Lee Rd. 175
SALEM, AL 36874
Home Phone: (334)749-4462
DOB: Sex: Male, Race: Unknown, SSN:
HCFA CLAIM
CHIEF COMPLAINT
Ihr.
OTHER %SpO2 98.
left hip pain x2 days pain goes all the way down left leg.
difficulty sleeping.
Medical Assistant: RAIFORD,LISA,H:
HISTORY OF PRESENT ILLNESS
BACK pain radiates down into leg pos pain lower left.
REVIEW OF SYSTEMS
Review of Systems Constitutional malaise Musculoskeletal acute back pain.
PERTINENT PAST HISTORY
HISTORY --- -PERSON MEDICAL HISTORY: [Cardiovascular DZ] Hypertension.
FAMILY AND PERSONAL HISTORY
HISTORY --- -FAMILY MEDICAL HISTORY: [Cancer] Lung, Father [Endocrine Dz] Diabetes Mellitus: Type I, Mother -[Neurological Dz] Stroke Mother [Cardiovascular Dz] Hypertension, Mother Grandmother Brother Sister -SOCIAL HISTORY: neg smoking neg ETOH marital statis married occupation machine operator/inspector.
UNKNOWN
VITAL SIGNS

| Line | Temperature | Weight | Pulse | Systolic BP | Diastolic BP | Respiration | Height | Head Circ |
|------|-------------|--------|-------|-------------|--------------|-------------|--------|-----------|
| 1. | 98.6 | 159 | 61 | 178 | 99 | 20 | 65 | 17 |

LAB
PHYSICAL
PHYSICAL EXAMINATION --- HEENT: Mormocephalic. Perrla and EOM's full, TM's normal. Musculoskeletal Back lower left movement slow and guarded pain aggrevated by movement radiates down leg left.
ASSESSMENT AND PLAN
PLAN --- Return for recheck 2-3 days if not improved.
CLAIM ACCOUNTING
INJECTIONS
MEDICATIONS

MEDICATION ALLERGIES
NKDA        MODERATE        No known drug allergies

| MED | DOSE | UNIT | QTY | TYPE | REFLS | DOSES | UNIT | FREQUENCY | NOTATION |
|-----|------|------|-----|------|-------|-------|------|-----------|----------|

MEDICATIONS PRESCRIBED FOR THIS ENCOUNTER

| MED | DOSE | UNIT | QTY | TYPE | REFLS | DOSES | UNIT | FREQUENCY | NOTATION |
|-----|------|------|-----|------|-------|-------|------|-----------|----------|
| Lortab | 7.5 | mg | 16 | tab | 0 | 1 | tab | Q 4-6 Hrs | prn pain, caution drowsiness |

---

WPH
001173

# Dx. 11



east
alabama
medical
center

I, Glen Coleman, hereby certify and affirm in writing that I am the Manager of the
Medical Record Department of East Alabama Medical Center, a hospital organized or
operated pursuant to or under the laws of Alabama, located at Opelika, Alabama. I
certify that I am custodian of the hospital records of said hospital and that the within copy
of said hospital records are a true and correct copy of said hospital records that could be
located pertaining to:

*Sanks, Bobby Lee ( DOB _____*

All of which I hereby certify and affirm on this _____ 26 day of

_____ July , 2007.


W. Colen Coleman
Manager, Medical Records


Sworn to and subscribed before me this
26th _____ day of

July _____, 2007

My commission expires 6/30/2010

Robin Lee
Notary Public



DEFENDANT'S
EXHIBIT
11
B. Sanks

**WPH
001270**

**Ogletree Deakins**
ATTORNEYS AT LAW

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: 864.271.1300
Facsimile: 864.235.4754
www.ogletreedeakins.com

July 6, 2007

**RECORD CUSTODIAN**
East Alabama Medical Center
2000 Pepperell Parkway
Opelika, Alabama 36801



Certified Article Number

7160 3901 9849 7283 7394

SENDERS RECORD

Re:   Bobby Lee Sanks v. WestPoint Stevens, Inc. and WestPoint Home, Inc.
      C. A. No.:  3:06-CV-1092-T

Dear Sir or Madam:

    We represent WestPoint Stevens, Inc. and WestPoint Home, Inc., in the above referenced matter.  Enclosed is a subpoena authorizing you to release to us any and all documents in your possession relating to the employment of Bobby Lee Sanks, SSN          , DOB:

    We would appreciate your office mailing copies of the requested records to our attention no later than Monday, July 23, 2007.  We ask that you execute the enclosed Affidavit of Record Custodian to authenticate the records you send to us. We will reimburse you for your reasonable copying charges.

    With kindest regards, I am

                    Very truly yours,

                    OGLETREE, DEAKINS, NASH
                    SMOAK & STEWART, P.C.

                    Fred W. Suggs, Jr.

FWS, Jr./smc                                        **WPH**
Enclosures                                          **001271**

cc:   Lateefah Muhammad, Esq.

---

Atlanta, GA • Austin, TX • Birmingham, AL • Charleston, SC • Charlotte, NC • Chicago, IL • Columbia, SC • Dallas, TX • Greensboro, NC • Greenville, SC • Houston, TX • Indianapolis, IN
Kansas City, MO • Los Angeles, CA • Miami, FL • Morristown, NJ • Nashville, TN • Phoenix, AZ • Raleigh, NC • St. Thomas, VI • San Antonio, TX • Tampa, FL • Torrance, CA • Washington, DC

Extra Copy #1

# East Alabama Medical Center

OUTPATIENT ADMISSION

| ACCOUNT NO | ADMISSION DATE & TIME | FC | DATE OF BIRTH | AGE | SEX | RACE | MS | DEPARTMENT LOCATION CODE | PAT TYPE | BY | UNIT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06297-00140 | 10/24/06 10:01a | BC | | 55Y | M | 2 | S | OP SURGERY | PAT | | 819996 |

| ADMITTING DOCTOR | ATTENDING DOCTOR | REFERRING DOCTOR | PRIMARY CARE DOCTOR |
|---|---|---|---|
| JONES,FRAZIER K | JONES,FRAZIER K | | |

**PATIENT**

| PATIENT NAME AND ADDRESS | SOC-SEC-NO | PATIENT EMPLOYER | TELEPHONE NO. |
|---|---|---|---|
| SANKS,BOBBY L PO BOX 44 SALEM    AL 36874 | TELEPHONE NO. (334)749-4462 | NC HOLDINGS | not-applicable |

**EMPLOYERS**

**GUARANTOR**

| GUARANTOR NAME AND ADDRESS | SOC-SEC-NO | GUARANTOR EMPLOYER | TELEPHONE NO. |
|---|---|---|---|
| SANKS,BOBBY L PO BOX 44 SALEM    AL 36874 | TELEPHONE NO. (334)749-4462 RELATION SELF | NC HOLDINGS | not-applicable |

**INSURANCE**

| INSURANCE 1 | INSURANCE 2 | INSURANCE 3 | INSURANCE 4 |
|---|---|---|---|
| BCBS OUT OF STATE <<ENTER ADDRESS>> <<ENTER CITY/ZIP>>AL35 (800)318-4769 SANKS,JEANNETTE        014405 MKR841475215 | 1500 BLUE SHIELD <<ENTER ADDRESS>> 520<<ENTER CITY/ZI AL 35201 (800)318-4769 SANKS,JEANNETTE        014405 MKR841475215 | | |

**RELAT.**

| RELATIVE 1 | |
|---|---|
| SANKS,JEANETTE | (334)749-4462 |

**MISC**

| DIAGNOSIS/COMPLAINT | | PAT CLASS | ADM TYPE | SOURCE |
|---|---|---|---|---|
| HNP L LS/5 | | | 3 | 1 |

| PREVIOUS ADMIT NAME & DATE | | | |
|---|---|---|---|
| SANKS,BOBBY L | 10/11/06 | EXPECTED DATE OF ARRIVAL | 10/26/06 |

| INFECTION CONTROL NOTICE | DATE OF LAST PNEUMOCOCCAL PNEUMONIA VACCINE |
|---|---|
| | |

INS VERIFIED BY:                    VERIFIED DATE:

```
MRN:      0000819996
ACCT#: 629700140          01/05/51
SANKS, BOBBY L
```

PC-0002400459

```
Volume 01 of 01    OPS
Adm: 10/26/06
                Dis: 10/26/06
```

WPH
001272

SANKS,BOBBY L
06297-00140
819996

OutPatient Admission
Tobacco / smoking cessation counseling provided

East Alabama Medical Center

0000819996 0629700140 Bobby Sanks
Gender    : Male
Age       : 55

## Claim Type
**01**    Single day procedure claim (Status = S and/or T, without V)

## APC Overall Claim Disposition
**0**    No edits present on claim

## APC Bill Type
**13X**

## APC Condition Code
**9999**    No/Unknown Condition Code

## APC Detailed CPT Procedures
**63030**    Lamintmy,decom/exc dis;1 lumb
    APC: 00208 - Laminotomies and Laminectomies
    REV: 9999 - No Rev Code entered; partial OCE edits only
    Status: T - Significant procedure subject to multiple procedure discounting.
    10/26/2006        jones,frazier

## Admit Dx
**72210**    Displacement of lumbar intervertebral disc without myelopathy

## Primary Diagnosis
**72210**    Displacement of lumbar intervertebral disc without myelopathy

## Secondary Diagnoses
**4019**    Essential hypertension, unspecified benign or malignant

## ICD-9-CM Procedures
**8051**    Excision of intervertebral disc
    10/26/2006        jones,frazier

CPT-4 five-digit codes and/or nomenclature are copyright
2005 American Medical Association.

# East Alabama Medical Center

## Authorization for Medical, Emergency, and Diagnostic Treatments

(1)  I wish to be admitted or receive treatment at East Alabama Medical Center (EAMC) or an associated facility of EAMC. While I am at EAMC, I permit my doctor, EAMC and its employees, and all other persons caring for me to treat me in ways they judge are beneficial to me.  I understand that treatment in the Emergency Department will be provided by a physician and/or nurse practitioner based upon the level of severity of my illness/injury.   I understand that this care may include examinations, tests, medical and surgical treatment.  No guarantees have been made to me about the outcome of this care. (2) EAMC serves as a training center for students in a variety of different health care professions.  Students will sometimes be allowed to observe procedures which would benefit their educational experience.  I do not object to students observing my care, treatment or procedures performed upon me. (3) I understand that medical equipment/supply company representatives will sometimes be present during a procedure to instruct medical personnel on new equipment or supplies.  I do not object to these representatives being present during my care, treatment, or procedures performed upon me.  (4) I understand that photographs or films may be taken during the course of my treatment to be made a part of my medical record.  I do not object to the taking of these photographs or films. (5)  I understand that all the physicians involved in my care are independent contractors and not agents, servants or employees of the hospital.

## Release of Medical Information

I, the undersigned as the patient or his/her authorized representative, authorize EAMC and any other professionals who provided care, treatment or services to release to my insurance company(ies) or their authorized representative or other appropriate agency(ies) that information which is necessary to validate this claim for payment purposes.  This includes my employer if workers' compensation is claimed.  EAMC is also authorized to release to my physician(s), or the persons authorized to bill for them, such information as necessary for billing purposes, including, without limitation, all records and information pertaining to my medical treatment (including that for drug & alcohol abuse), laboratory & other diagnostic tests results, x-rays, therapy, diagnoses and prognosis.  In the event that I am transferred to another healthcare facility, I authorize EAMC to make a copy of my medical records for the receiving healthcare facility.

## Release of Responsibility for Loss of Valuables

I understand that EAMC will not be responsible for valuables, including jewelry, watches, money, etc., not specifically placed in the care of EAMC through proper procedures.  I also understand that EAMC cannot be responsible for personal items such as clothing, glasses, dentures, etc., inadvertently damaged or misplaced during my course of treatment.  I accept full responsibility for those valuables or personal items which I choose to keep in my possession.

## Medicare and/or Medicaid Patient's Certification

I certify that the information given by me in applying for payment under Title XVIII or Title XIX of the Social Security Act is correct.  I authorize any holder of medical or other information about me to release such information to the Social Security Administration of the State of Alabama or any of their intermediaries or carriers for this or a related Medicare or Medicaid claim.  I request that payment of authorized benefits be made to EAMC, EAPS, Alabama Imaging, Emergency Transport Systems, ED Physicians,  Anesthesia Associates of East Alabama and/or other physicians involved in my care on my behalf. **Alabama Imaging Patients:** I understand that Medicare will not pay for routine chest x-rays or screening mammograms that are done within 11 months following the month in which a previous screening mammogram was done and that I will be responsible for payment of these services.  I understand that I am responsible for any health care deductibles and 20% of the reasonable charges for out-patient services.  I realize that I am financially responsible for all services performed by Alabama Imaging, P.C. whether or not insurance is involved.

Patient's Signature: _Bobby Lee Sanks_                                  Date: _10/24/06_
or their Authorized Representative:  Relationship _____                Witness: _____
If the patient or their authorized representative is unable to sign, state the reason why here: _____

## Assignment of Insurance and Financial Responsibility

I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency and/or diagnostic treatments, to be made directly to EAMC, EAPS, Alabama Imaging, Emergency Transport Systems, ED Physicians and/or Anesthesia Associates of East Alabama.  I understand that I am financially responsible for all charges not covered by insurance payments, including private-room differentials, and that all efforts for collection of the benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by EAMC, EAPS, Alabama Imaging, Emergency Transport Systems, ED Physicians and/or Anesthesia Associates of East Alabama.  I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, or authorize such physician or physician group to submit a claim to my insurance company(ies), Medicare and/or Medicaid.  I will be responsible for any collection fees, court costs and/or attorney fees incurred by EAMC or any physician participating in my care while collecting on my account(s).  Photocopies of this authorization are as valid as the original.

Patient's Signature: _Bobby Lee Sanks_                                  Date: _10/24/06_
or their Authorized Representative:  Relationship _____                Witness: _____
If the patient or their authorized representative is unable to sign, state the reason why here: _____

| Patient Rights and Responsibilities: I have received a copy of and understand my rights and responsibilities as a patient of EAMC | Patient's Initials: _B.L.S._ |
|---|---|

SCAN-CONSENT

WPH
001274

Bobby Sanks

| Date | Chief Complaint: OR |
|---|---|

**History of Present Illness:**

**Pertinent Tests:** MVI. (L) LSK, MVP

**Diagnosis:**

**Planned Surgical Procedure:** Microdisk (L) LSK.

**Allergies:** Ø

**Current Medications:** prn meds , HTN , Diovan 12.5

**Personal History**

| | | | | | | |
|---|---|---|---|---|---|---|
| Tobacco Use: | ☐ Yes ☑ No | Abnormal EKG | ☐ Yes ☑ No | Mitral Valve Prolapse | ☐ Yes ☑ No | |
| ☐ Snuff ☐ Cigar ☐ Cigarettes ☐ Pipe | | Angina: | ☐ Yes ☑ No | Valve Replacement: | ☐ Yes ☑ No | |
| Alcohol Use: | ☐ Yes ☑ No | Coronary Artery Disease: | ☐ Yes ☑ No | Liver Disease | ☐ Yes ☑ No | |
| Recreational Drug Use: | ☐ Yes ☑ No | CABG. | ☐ Yes ☑ No | Diabetes | ☐ Yes ☑ No | |
| Asthma: | ☐ Yes ☑ No | Hypertension | ☑ Yes ☐ No | Kidney Disease | ☐ Yes ☑ No | |
| COPD | ☐ Yes ☑ No | Cardiomyopathy | ☐ Yes ☑ No | Type of Kidney Dx | | |
| Pneumothorax: | ☐ Yes ☑ No | CVA. | ☐ Yes ☑ No | Bleeding Disorder | ☐ Yes ☐ No | |
| Epilepsy | ☐ Yes ☑ No | PVD: | ☐ Yes ☑ No | Blood Transfusion | ☐ Yes ☑ No | |
| Cancer | ☐ Yes ☑ No Type | | | GI Disease Type | ☐ Yes ☑ No | |

Personal History of Anesthetic Problems: none

Family History of Anesthetic Problems: none

Family History of Bleeding Problems:

Past Surgeries (dates): Ø

Alternative Medicine:

| Physical Examination: | BP: 150/99 | HR: 91 | RR: | Temp: 97.2 | Wt: 168 | Ht: 5'7 |
|---|---|---|---|---|---|---|
| System | WNL | Not Examined | Comments | | | |
| HEENT: | | | | | | |
| Neck: | | | | | | |
| Lungs: | / | | | | | |
| Heart: | | | | | | |
| Abdomen: | | | . | | | |
| Breast: | | | | | | |
| Lymph: | | | | | | |
| GU: | | | | | | |
| Neuro: | SLR (L) | | / achilles reflex | | | |
| Extremities: | | | | | | |
| Other: | | | | | | |

Risks, benefits, and alternatives have been explained to the patient.

MD Signature: _____    Date: 10/24

Comments:

WPH
001275

**East Alabama Medical Center**
**History and Physical Examination**
**In-Patient and Out-Patient Surgery**
Fax form to:

06297-00140          819996
**SANKS, BOBBY L**
LOC:OS  DOB:01/05/51  M55Y
JONES, FRAZIER K
Adm:10/26/06          36874



East Alabama Medical Center
Name: SANKS
      ,BOBBY L
MRN : 819996
Age : 55 years
Acct #: 629700140         DOB :
Req: #:43072423
Race: Black                Sex : Male
Ordering MD: JONES, FRAZIER K
Attending MD: JONES, FRAZIER K
Tech: POPWELLS
Comment :
Diagnosis:
Dept: OS            Room:
Date: 10/24/06     Time: 10.52.32
Speed: 25 mm/s     Limb Lead Gain: 10.0 mm/mV   Chest Lead Gain: 10.0 mm/mV

Vent rate: 77          | Sinus rhythm
RR : 771               | Possible left ventricular hypertrophy
--Durations--          | Anterolateral T wave changes may be due to hypertrophy and/or ischemia
P : 70
QRS: 94                Abnormal ECG
--Intervals--
PR : 122
QT : 356
QTcH: 385
QTd: 22
--Axes--
P : 76
QRS: 31                Unconfirmed test
T : 86

Filters(s): Notch 60 Hz Artifact 40 Hz Stable On

ECG Printed 10/25/06   20.58.08

WPH
001276



Name: SANKS,           ,BOBBY L
MRN : 819996
Age : 55 YEARS    DOB :
Acct.#:629700140
Req. #:49072423
Race: BLACK         Sex : MALE
Ordering MD:JONES, FRAZIER K
Attending MD:JONES, FRAZIER K
Tech: POPWELLS
Diagnosis:
Comment :
Dept: OS           Room:
Date: 10/24/06    Time: 10:52:32

--Durations--
QRS:  94 ms
--Intervals--
RR : 771 ms
PR : 122 ms
QT : 356 ms
QTc: 385 ms
QTd:  22 ms
--Axes--
P :  76 °
QRS:  31 °
T :  86 °

Possible left ventricular hypertrophy
Anterolateral T wave changes may be due to hypertrophy and/or ischemia

* Unconfirmed Analysis *

Abnormal ECG

aVR    aVL    aVF

V1    V2    V3    V4    V5    V6

EAST ALABAMA MEDICAL CENTER

25 mm/s
~STAB F 40 Hz

Limb: 1.0 mm/mV

WPH
001277



Time: _____
Remarks: _____
_____
_____

Time: _____
Rem: _____

06297-00140                    819996
SANKS,BOBBY L
LOC: OS  DOB:                  M55Y
JONES,FRAZIER K
Adm:10/26/06                   36874

Time: _____
Remarks: _____

Time: _____
Remarks: _____
_____
_____

Time: _____
Remarks: _____
_____
_____

# EAST ALABAMA MEDICAL CENTER

## EKG Strips

HIM0068-0402-1-1

06297-00140                    819996
SANKS,BOBBY L
LOC: OS  DOB:                  M55Y
JONES,FRAZIER K
Adm:10/26/06                   36874

WPH
001278

DATE: _10 - 26 - 06_    TIME: _1115_

## DATA COLLECTION AND ASSESSMENT

History & Physical: On Chart: ☒    Vital Signs: BP _190/102_ T: _97.8_ p: _76_ RR: _20_

LOC: ☒ Alert  ☒ Oriented  ☐ Confused  ☐ Non-Responsive  ☐ Pre-Op SaO₂ _96_

Ability to demonstrate deep breathing: ☐ Yes

Family Member Present: ☐ Yes  ☐ N/A

Allergies: _NKA_

SKIN CONDITION: ☐ Intact Op Site  ☐ Flushed  ☒ Pink  ☐ Pale  ☒ Dry  ☐ Diaphoretic  ☐ Cool  ☒ Warm

Operative site marked by: ☐ N/A  ☐ Nurse  ☐ Physician  ☐ Other:____  ☐ Site: _(l)hip_

NURSES NOTES: ____

## POTENTIAL FOR INFECTION

GOAL: Avoidance of patient infection.    Precautions in effect on admission: ☐ Standard Precautions

Clip Area: _N/A_    By: _LM_    Prep: ☒ Betadine  ☐ Hibiclens

I.V. SOLUTION _LR_    CATH SIZE _20_    SITE _(l) hand_    STARTED BY: _LM_

ARTERIAL: ☒ N/A    STARTED BY: ____

BLOCKS: ☒ N/A  ☐ Axillary  ☐ Interscaline  ☐ Supraclavicular  ☐ Digital  ☐ Ankle  ☐ Wrist  ☐ Cervical Plexus

| VITAL SIGNS TIME | TEMP | SAO₂ | PULSE | RR | BP | LOC | |
|---|---|---|---|---|---|---|---|
| | ☐ N/A | | | | | ☐ Alert | ☐ Sedated, but easily aroused |
| | ☐ N/A | | | | | ☐ Alert | ☐ Sedated, but easily aroused |
| | ☐ N/A | | | | | ☐ Alert | ☐ Sedated, but easily aroused |

Accucheck: ☒ N/A ____    IDDM: ____    NIDDM: ____

Outcome: Infection control methods implemented: ☐ Yes  ☐ No

MISCELLANEOUS: ☐ TEDs applied  ☐ SCD Applied  ☒ N/A  ☐ Warming device _IV F_    ☐ N/A

| MEDICATION | DOSAGE | ROUTE | TIME GIVEN | ORDERED BY | FULL SIGNATURE |
|---|---|---|---|---|---|
| Versed | 2 mg | IV or po | 1125 | | RN/dm |
| Tylenol Elixir | 10cc | po | | | |
| Reglan | ___ mg | IV | | | |
| Phenergan | ___ mg | IV | | | |
| Antibiotic | Ancef 1 | given | 1215 | Jones | SP/RN |
| G | | | | | |
| Atenolol | 12.5 mg | | | | |
| Morphine | ___ mg | | | | |

Initial Assessment Signature: _Rene Munoz, RN_

Discharge Time to O.R. _1210_    LOC on leaving pre-op: ☐ Awake  ☒ Sedated, but easily aroused _92_ SaO₂

IV Fluids: _LR_    Left to Count: _600_    IV Site: _UNC_    on Discharge from Pre-op Holding.

Discharge Signature: _S. Arnold RN_

**EAST ALABAMA MEDICAL CENTER**
**PREOP PLAN OF CARE**

HIM1001-0606-1-1

WPH
001279

Patient Identification
06297-00140          819996
SANKS,BOBBY L
DOB:
JONES,FRAZIER K    Adm:10/26/06

| Date of Surgery 10:26:06 OR # 3 | | | | Adm. Status: □ IP ☑ OP □ AM □ 23hr □ ER | | | |
|---|---|---|---|---|---|---|---|
| ☑ Armband ☑ Consent □ Blood Band | | | | ☑ Scheduled □ Add On □ Emergency | | | |
| ☑ H&P □ Lab □ Blood Consent | | | | Delay: □ Y ☑ N Reason: _____ | | | |
| Allergies NKDA | | | | LOC: ☑ Alert □ Drowsy □ Confused □ Unresponsive | | | |

| OR Room In | Induction | MD In | Pre-Start | Proc End | MD Out | Room End | Total |
|---|---|---|---|---|---|---|---|
| 1218 | 1223 | 1230 | 1242 | 1315 | 1312 | 1332 | |

**Preop Dx:** HNP LEFT L5 S1

**Operation:** Micro Dissectomy L5-S1

**Postop Dx:** Same

**Service:** □ Gen ☑ Ortho □ GU □ Neuro □ GYN □ Anes □ Vas □ Ophth □ ENT □ Oral/Dent □ Plastic □ Onc

**Surgeon:** F. JONES, MD

**Assist:** J. BEASON SA

**Other:** _____

**Anes Type:** ☑ Gen □ Spi □ MAC □ Loc □ Epi □ Block

**Anesthesiologist:** McARTHUR

**CRNA:** GIBSON

| Scrub | In | Out | In | Out | In | Out |
|---|---|---|---|---|---|---|
| J MCLENDONS | | | | | | |

□ Family provided status report: by ARNOLD @ BEDSIDE
Comments: _____        □ N/A

| Circulator | In | Out | In | Out | In | Out |
|---|---|---|---|---|---|---|
| S ARNOLD, RN | — | 1225 | 1255 | | | |
| J PERRYMAN, RN | 1230 | 1255 | | | | |

**Potential for Infection:**
**Goal: Avoidance of Patient Infection**

**Precautions in Effect:** ☑ Standard □ Respiratory □ Contact Droplets
**Devices Present:** □ N/A ☑ IV □ NG □ ET □ Swanz □ CT □ Central line □ A-line □ Foley □ Perm/Vas cath □ Other

**Prep:** □ N/A
□ Betadine □ CHG 4% ☑ Prevail
□ Dial soap □ Technicare □ Hibiclens
□ Povidine Iodine □ Other
Lot: 1da046 1407
Area: BACK
By Whom: JONES

**Hair Removal:** ☑ N/A □ Clip □ Shave
Area: _____    By Whom: _____

**Wound Classification:** ☑ Clean □ Contaminated □ Clean/Contaminated □ Dirty

**Implant/Prosthesis:** ☑ N/A
□ Implanted □ Removed □ See Surgical Implant Record

**Potential for Impairment of Skin:**
**Goal: Patient's skin integrity will not be compromised**

**Presence of skin lesions:** □ Y ☑ N Site: _____

**Potential skin lesions:** □ Cachexia □ Obesity □ Edema □ Poor Skin Turgor □ Elderly ☑ N/A

**Position in the OR:** □ Supine ☑ Prone □ Lateral L / R □ Sitting □ Frog Leg □ Lithotomy □ Other

**Pressure Points Padded:** ☑ Y □ N
**Feet Uncrossed:** ☑ Y □ N □ N/A

**Position of Arms:** Arm board: □ Left ☑ Right
Hand table □ Left □ Right Tucked: □ Left □ Right
Padded across chest □ Lt □ Rt Arm in Sterile Field □ Lt □ Rt

**Position Devices Used:** □ N/A
□ Mayfield □ Beanbag ☑ Chest Roll □ Fracture Table
☑ Spinal Frame □ Headrest ☑ Egg crate □ Hip Grip
□ Allen Stirrups □ Jackson table □ Beach/shoulder device
□ Foot Board □ Leg Holders □ Neck Roll □ Sleds □ Pillows
□ Axillary roll L or R □ Sheppard Hooks □ Wrist rest
□ Shoulder roll □ Left □ Right □ Arm in Sterile Field

East Alabama Medical Center        rative Record

06297-00140        819996
**SANKS, BOBBY L**
LOC: OS DOB:        M55Y
JONES, FRAZIER K
Adm: 10/26/06        36874        Page 1

WPH
001280

Form #99302 - ASP 40278-06

| Potential for Injury: | Potential for Fluid and Electrolyte Imbalance |
|---|---|

**Potential for Injury:**
Goal: Patient will remain injury free

**Safety Belt in place:** ☐ Y ☑ N Site: MIXED O PT. BOTTOM
☐ Patient remains on stretcher/bed ☐ SR up ☐ SR down ☐ N/A

**Alignment Maintained:** ☑ Y ☐ N
**Athrombic Pump:** ☐ Y ☑ N Unit#: PT

**Unipolar** ☑ ☐ N/A Unit#: 6757
**Bipolar** ☐ ☑ N/A Unit#:
Coag Setting: 50 Cut Setting: 50
Grounding Pad Applied:☑ Y ☐ N ☐ N/A Site: R THIGH
By Whom: JP Lot # 06060072 /8

**Laser:** ☐ Y ☑ N/A Type: ☐ Holmium ☐ CO2 ☐ Other
Operator: _____ Safety checklist completed ☐ Y ☐ N

**Tourniquet:** ☐ Y ☑ N/A Unit#: _____
Location: _____
Applied By: _____ Monitored By: _____

**Bair Hugger/ Warming Pad :** ☐ N/A ☑ Y Unit#: _____
☑ Upper Body ☐ Lower Body ☐ Other _____
Applied By: SG ☑ Warm blanket applied by JP

**X-Rays taken in OR:** ☐ N/A ☑ Y
Area Exposed: _____ Tech: _____

| Counts: | Sponge | Needle | Instruments |
|---|---|---|---|
| Initial Count | SA JM | SA JM | SA JM |
| First Count | SA JM | SA JM | SA JM |
| Second Count | SA JM | SA JM | SA JM |
| Third Count | | | |

☐ Correct    ☐ Incorrect    ☐ Non-applicable

**Devices Placed in OR:** ☐ N/A ☐ IV ☐ NG ☐ JP/Blake ☐ Penrose
☐ A-line ☐ Foley Size: ___ ☐ 3-way ☐ Davol ☐ Hemovac
☐ Packing ☐ Triple/Central line
☐ Other _____

**Dressings:** ☐ None ☐ Steristrips/Mastisol ☑ ABD
☐ Telfa ☑ 4X4s ☐ Ace ☐ Island
☑ Xeroform ☐ Kling ☐ Castpadding ☐ Opsite
☐ Owen's silk ☐ Tape ☐ Peri pad ☐ Cotton balls
☐ Eye pad & shield ☐ Nasal dressing ☐ Bandaids ☐ Bra
☐ Other _____

**Cast/Splint/Immobilizer Applied:** ☑ N/A ☐ Y
Loc: _____

**Accucheck:** ☑ N/A _____

**Comments & Interventions:** Ø

**Complications:** NONE

**Goal: Fluid and Electrolyte Balance will be maintained**

**Intake:** ☑ See Anes Record
**IV Fluids:** _____
**Blood Products:** _____
**Other:** _____
**Output:** _____
**Urine:** _____
**Wound Drainage:** _____
**EBL:** _____

**Medications:** ☐ N/A
Garam

**Contrast** _____ used _____ waste
**Wound Irrigation:** ☐ N/A ☐ Sterile H2O ☐ Glycine ☐ LR
☐ Saline ☐ BSS w/ 0.3cc Epinephrine ☐ Other
☑ 1000 cc N/S w/ 1 gm Ancef & 80mg Gentamycin X 2
☐ 3000cc N/S w/ 1cc Epinephrine X _____
Amount: 1 L

**Pathology:** ☑ N/A
Cultures: _____
Specimens: DISC (L) L5 - S1
Frozen Section _____

**Outcome:** Infection Control Measures Maintained. ☑ Y ☐ N
**Outcome:** Tolerated Procedure with no apparent injury. ☑ Y ☐ N
**Outcome:** Patient's Fluid/electrolyte balance maintained. ☑ Y ☐ N
**Outcome:** Integrity of patient's skin maintained. ☑ Y ☐ N
Comments: _____

**Aseptic Technique Maintained** ☑ Y ☐ N
Comment: _____

**Bovie Pad site free from injury:** ☑ Y ☐ N ☐ N/A

**Discharge to:** ☑ PACU ☐ PHASE II ☐ ICU
☐ SCU ☐ Hospital Room # _____
☐ Other _____ ☐ Morgue

**Discharge Status:**
☐ Ambu ☑ Extubated ☐ Intubated ☐ LMA
☐ Airway (Oral/Nasal) ☐ Trach ☐ Sedated ☐ LMA removed
☐ Awakening ☑ Awake ☐ Drowsy but arousable

**Post Op Condition:**
☑ Good ☐ Fair ☐ Serious ☐ Critical

**Report Given To:** R. BOOTH RN
**Signature:** S. REDD RN

06297-00140          819996
SANKS, BOBBY L
LOC: OS DOB:          M55Y          WPH
JONES,FRAZIER K                     001281
Adm:10/26/06
36874

# EAST ALABAMA MEDICAL CENTER - ANESTHESIA RECORD

☐ POHA
☐ OR
☐ PACU
☐ SPINAL
☐ EPIDURAL
☐ AXILLARY
☐ INTERSCALENE
☐ FEMORAL N.
☐ SUPERFICIAL/DEEP CPB

| MO. | DAY | YR | ROOM NO | RACE | SEX | AGE | ASA STATUS | WT | HT |
|---|---|---|---|---|---|---|---|---|---|
| PRE-OP EVAL 26 | - 06 | | 13 | | M | 55 | 2 | 165 | 57 |

PROPOSED OPERATION H30    MICRODISKECTOMY    L5/S1
PRE-OP DIAG.    HNP
BP 194/102   TEMP 97   PULSE 76   RESP. 20   HGB —   HCT —   WBC —
PREMED    VERSED 2

TEETH & AIRWAY  NR AP
ALLERGIES  φ
PRIOR ANESTHETICS  yes
DRUG THERAPY  Diovan
RESP. STATUS  a
CV SUMMARY  HTN
SUMMARY    EKG SR LVH
iNPO  MN Lø

## ANESTHESIA PLAN
☐ SPINAL    ☐ BLOCK
☐ GENERAL    ☐ EPIDURAL
☐ M.A.C.    R & B Explained
☑ PT. UNDERSTANDS & ACCEPTS PLAN

| | | | | ANES. BEGIN | 1218 |
|---|---|---|---|---|---|
| POHA / ARR | | | | OPER BEGIN | 1242 |
| | | | | OPER END | 1320 |
| | | | | ANES END | 1335 |
| | | | | PACU D/C | 1440 |
| | | | | TOT MG | 180 |
| | | | | TOT MG | 50 |
| | | | | TOT MG | 37.5 |

| | 1245 | 1230 | 1300 | 1330 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N2O (L) | 2 | 2 | 2 | | | | | | | | | |
| O2 (L) | 7.2 | 2 | 2 | | | | | | | | | |
| DES 6% | 1½ | .9 | .8 | | | | | | | | | |
| Diprivan | 150 | | | | | | | | | | | |
| 2 Emun | 50 | | | | | | | | | | | |
| Neostig/Rob | | | | 3/6 | | | | | | | | |
| Sub | 1.1 | | | | | | | | | | | |
| IV FLUID | LR | | 100 | | 700 | | | | | | | |
| IV FLUID | | | | | | | | | | | | |
| BLOOD | | | | | | | | | | | | |

| TOT MG | |
|---|---|
| TOT MG | |
| TOT CC | 1200 |
| TOT CC | |
| TOT CC | |

| URINE OUTPUT | | | | | | | | TOT CC | |
|---|---|---|---|---|---|---|---|---|---|
| O2 SATURATION | 100 | 99 | 99 | 99 | 99 | | | TOT CC | |
| E.T. CO2 | 31 | 32 | 30 | 32 | 34 | | | E.B.L. CC | 200 |
| TEMP CORE | 97 | 97 | 97 | 97 | 97 | | | | |
| FiO2 | 1.0 | .49 | .49 | .49 | 1.0 | | | | |
| E.C.G. | SR | SR | SR | SR | SR | | | | |
| PAP/CVP | | | | | | | | | |

☑ EQUIP SAFETY
☑ PT. I.D. REACCESSED PRIOR TO INDUCTION 1220 TIME.
☑ ANESTHETIST REVIEWED & ACCEPTS PLAN
OR # 3

TECHNIQUE
☐ MASK    1243 USC
☑ CIRCLE ABS
☐ NON-REB
AIRWAY
☐ ORAL   Sig i e off by mouth
☐ NASAL
INTUBATION
☑ ORAL   3 mm
☐ NASAL   7.5
☐ LMA
SIZE
☑ CUFF   NO
☑ EASY
☐ DIFFICULT
☐ CRICOID PRESSURE
☑ ATRAUMATIC
☑ BBS
☑ ETCO2
☑ EKG
☑ PS
☑ FLUID WARMER
☑ BAIR HUGGER
☑ PNS
IV SIZE   R _ L 2 _
ART. LINE   R _ L _
BP CUFF   R _ Y _
☐ CENTRAL LINE
☐ SWAN-GANZ
☑ EYES TAPED
☑ LUBRICATED

Chart graph (vital signs plotted 220–0)

WPH
001282

0-26-06
MO./DATE/YR.
M.D. V.S. Check

POSITIONING   ARMS   Padded R☑   Tucked R☐   Restrained R☐   Across Chest   Lateral R☐
ADS:   Armboard L☑   L☐   L☐   Armboard L☐
☐ Supine ☐ Trend ☑ Prone ☐ Lateral ☐ Lithotomy ☐ Sitting ☐ Fx Table ☐ Vac-Pac ☐ Other:
O. DX.

PROC:  Microdiskectomy  L5S1
RNA:  HP Sibs CRNA-MDA:  McArthur   SURGEON:  JONES
1221: preox: smooth induct Fietabe  BISS
1329: on tricep exp. to RR USS
HBS cm

M.D. Present for Induction

RR at 1332   O2 at 40%   BP 170/75   P 72   R 16   O2 Sat 98%

06297-00140
SANKS,BOBBY L
LOC: OS  DOB:
JONES,FRAZIER K
Adm:10/26/06

819996

M55Y

| DATE 10/26 | TIME IN 1337 | TIME OUT 1440 | LEVEL II | AIRWAY OUT: | | O₂ Type mask |
|---|---|---|---|---|---|---|

**AIRWAY OUT:**

| | |
|---|---|
| Nasal: | ETT |
| Nasotracheal | Oral |
| Tracheal | LMA |

**0 – 10 Numeric Pain Intensity Scale**

0  1  2  3  4  5  6  7  8  9  10
No              Moderate          Worst
Pain              Pain              Pain

Arrival ∅       Discharge 7

ALLERGIES: ∅
ACCUCHECK
ANESTHESIA: ☒ General ☐ Spinal ☐ Block ☐ Epidural
I.V. SITE LOCATION:
Condition of IV Site:    ADM _____    DC _____
ARTERIAL LINE:    Site
Temp: 97°
BAIR HUGGER    On    Off
SCD    On    Off
PACK:    Vaginal    Nasal    Other

O₂ Amount 98%
Stop 1440
Vent Setting
TIME  FIO2  RATE  VT  PEEP
Mandible Support ☐ STOP

| TIME | TYPE IV'S | AMOUNT INFUSING/ADDED | TIME | MEDICATION/DOSAGE | INITIAL | PAIN SCORE |
|---|---|---|---|---|---|---|
| 1337 | 1L | 300 LR | 1410 | Dilaudid 1mg – IV | 1413 – 8 | |

**DRAINS**
NG
T-Tube
Gast Tube
Jackson Pratt
Foley
Estimated Blood Loss:
HEMOVAC
Other

| OUTPUT | | | | CODE | Blood Pressure | | Pulse x | x | Respiration 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|
| FOLEY | NG | DRAINS | OTHER | | | | | | | |

**TOTALS**

| INTAKE | | | | |
|---|---|---|---|---|
| po | Pre-op OR | PACU | BLOOD | |
| | 1700 | 200 | | |

**TOTALS**

**ALDRETE SCORE**

| | | ADM | DC |
|---|---|---|---|
| Able to move 4 extremities on command = 2 | | | 2 |
| Able to move 2 extremities on command = 1 | | | |
| Able to move 0 extremities on command = 0 | | ∅ | |
| Able to deep breath & cough freely = 2 | | | 2 |
| Dyspnea or limited breathing = 1 | | | |
| Apneic = 0 | | 2 | |
| BP 20% of preanesthetic level = 2 | | | 1 |
| BP 20-50% of preanesthetic level = 1 | | 2 | |
| BP 50% of preanesthetic level = 0 | | | |
| Fully Awake = 2 | | | 2 |
| Arousable on calling = 1 | | ∅ | |
| Not responding = 0 | | | |
| O₂ Saturation | | | 2 |
| Able to maintain SaO₂ > 92% on room air = 2 | | | |
| Needs O₂ to maintain SaO₂< 90% = 1 | | 1 | |
| SaO₂ < 90% even with O₂ = 0 | | | |

| ACCEPTABLE SCORE 8 | TOTAL | | 9 |
|---|---|---|---|
| Pre Op BP 90/62 | OR BP 170/60 | | |

ANESTHESIOLOGIST:
Patient sent to: SCU

Blood Pressure / Pulse / Respiration chart:
240, 220, 200, 180, 160, 140, 120, 100, 80, 60, 40, 20
SaO₂

INITIALS / FULL SIGNATURE    TITLE
RB – Rhonda R    Brooke RNCPA
BR Sharonkooh    RN

WPH
001283

**EAST ALABAMA MEDICAL CENTER**
**PACU PLAN OF CARE**
**Page 1 of 2**

Patient Identification
06297-00140          819996
SANKS,BOBBY L
LOC: OS  DOB:          M55Y
JONES,FRAZIER K
Adm:10/26/06          36874

TIME IN: — 1332
OPERATION: — See OP
REPORT FROM: — S. Gibson CRNA
FAMILY NOTIFIED: — yes - see

ASSESSMENT
POSITION: — Supine
SKIN: — W/D
BREATH SOUNDS: — Clear + Equal Bil
CARDIAC MONITOR: — SR-72
OPERATIVE SITE/Dsg: — DSG. to back D/T. VS stable will
Monitor RBooth fingers

1410 - Detaudid 1mg given IVP for pain. VS-stable
will Monitor RBooth

| NURSING DIAGNOSIS GOAL | GOAL ACHIEVED | |
|---|---|---|
| | YES | NO |
| 1. Alteration in Level of Consciousness — Arousable | | |
| 2. Alteration in Comfort Level — ↑ Comfort | ✓ | |
| 3. Alteration in Circulation | | |
| 4. Alteration in Mobility | | |
| 5. Alteration in Respiratory Function — O2 Sat. ↑ 91% | | |
| 6. Alteration in Temperature | ✓ | |
| 7. Potential for Presence of Bleeding — ∅ S/S of Bleeding | ✓ | |
| 8. Potential for Injury | | |
| 9. Other / Specify | | |

UNRESOLVED NURSING DIAGNOSIS: ∅

DISCHARGE SUMMARY
Time 1440 Awake & oriented. States pain is getting better
1455 Dsg on back is clean & dry.

Report to: Pt Carolyn          Received by: Carolyn          R
Time: 1443    BP 158/94    PULSE 76    RR 20
Dsg: ✓ Drainage ☐ Scant ☐ Small ☐ Moderate ☐ Large ☐ None
Belongings in Room ☐   None with Patient   Family has Belongings ☐   ☒ None

| INITIALS / FULL SIGNATURE | TITLE | INITIALS / FULL SIGNATURE | TITLE |
|---|---|---|---|
| RB Rhonda R Booth | RN CP | | |
| SR Sharon Rocker RN | | | |

**EAST ALABAMA MEDICAL CENTER**
**PACU PLAN OF CARE**
**Page 2 of 2**

HIM0070-0103-2-2

WPH
001284

Patient Identification
06297-00140          819996
SANKS,BOBBY I
LOC: OS  DOB:                M55Y
JONES,FRAZIER K
Adm:10/26/06               36874

DRUG ALLERGIES:

| DATE&TIME | POST ANESTHESIA CARE UNIT PHYSICIAN'S ORDERS |
|---|---|
| | (circle or check where applicable) |

10/26/06
1400

1. Admit to PACU / Surgical Care Unit          Kg _____
2. Vital signs per PACU routine or
3. Oxygen via (circle one):  Blow by  (mask)  cannula    face tent    t-bar    ventilator
   __95__ %    ____ liters FIO₂ ____ rate ____ tidal volume ____ peep ____
   d/c O₂ per PACU criteria
   For SaO₂ < 91% on room air give nasal O₂ at ____ liters X 24 hours.
   Respiratory to d/c or re-evaluate in 24 hours.
4. Extubate or wean from vent per PACU criteria.
5. Labs:  ☐ CBC  ☐ Hgb/Hct  ☐ Accucheck  ☐ ABG    Other
6. EKG in PACU.
7. Portable CXR in PACU.
8. Pain Management:
   ☐ Buprenex IV.  Titrate q 5 minutes to maximum dose of .3mg
   ☐ Morphine IV.  Titrate q 5 minutes to maximum dose of 0.2mg/kg
   ☐ Merperidine IV.  Titrate q 5 minutes to maximum dose of 1.5mg/kg
   ☐ Percocet 1-2 tabs po prn pain x 1 dose
   ☐ Lortab 5 1-2 tabs po prn pain x 1 dose
   ☐ Darvocet N 100 1 tab po prn pain x 1 dose
   ☐ Infants & children - Morphine IV. Titrate q 10 minutes to maximum dose of 0.1-0.2mg/kg
           Tylenol Elixir po 10mg/kg
           (do not exceed 500 mg in a single dose if child is less than 12 years old)
   ☐ Notify Anesthesiologist for severe unrelieved pain after po meds
9. Nausea Management:    Adults:
   ☐ Reglan 10mg IV.  May repeat X 1 in 20 minutes.
   ☐ Phenergan 6.25mg IV.  Titrate q 10 minutes to maximum dose of 25mg.
   ☐ Anzemet 12.5mg IV.
10. Demerol 12.5 to 25 mg IV for shivering for teens and adults > 50 kg.
11. Vasoactive Drugs:
   ☐ Trandate 5mg IV q 10 minutes, tritrate to maximum dose of 20 mg.
   ☐ Hydralazine 5mg IV q 10 minutes, titrate to maximum dose of 20 mg.
   ☐ IV Nitroglycerine drip 50mg in 250ml of D₅w.  Titrate to maintain B/P at
   ☐ IV Neosynephrine drip 10mg in 250ml of D₅w or NS.  Titrate to maintain B/P at
12. Discharge Orders:     ☐ per discharge criteria if Aldrete Assessment Score ≥ 8
                          ☑ Notify Anesthesiologist for discharge.
13. Soft wrist restraints X ____ minutes or
14. Discontinue IV when tolerating po fluids.
15. Other/Additional Orders:  Dilaudid 1-2mg - IM in RR

_____          _____
                                       Physician Signature

WPH
001285

EAST ALABAMA MEDICAL CENTER
**PHYSICIAN ORDERS**

06297-00140          819996
**SANKS,BOBBY L**
LOC: OS  DOB:          M55Y
JONES,FRAZIER K
Adm:10/26/06          36874

PHY0068-1102-1-1

*LIST BELOW ALL OF THE PATIENT'S MEDICATIONS INCLUDING OTC (ex. ASA) AND HERBAL MEDS.*
*(Herbal medications are non-formulary items-DO NOT ORDER-contact pharmacy for questions).*
*NEW MEDICATIONS FOR THIS ADMISSION SHOULD BE WRITTEN ON A SEPARATE PHYSICIAN ORDER SHEET.*

**Source of Medication list: (check all used)**

☐ Information on Pt medication bottles   ☐ Primary care physician list
☐ Patient medication list                ☐ Other: _____
☐ Patient/Family indicate patient is not taking any medication
☑ Patient/Family recall                  ☐ Pharmacy (name)_____

**Disposition of Medication**
☐ Meds sent home with _____
☐ Meds sent to Pharmacy

☐ **FAXED TO PHARMACY**   ☐ **FILED UNDER PHYSICIAN ORDERS** (flag for physician signature)

| MEDICATION NAME Include OTC and Herbals (WRITE LEGIBLY) | DOSE | ROUTE (by mouth, injection, per tube or other route) | MEDICATION FREQUENCY (q day, QID, BID, etc.) | DATE/TIME of Last Dose of Medications | PHYSICIAN ORDER CIRCLE C to continue, H to Hold |
|---|---|---|---|---|---|
| ☐ **Patient is NPO – All PO medications (as listed below) are on Hold** | | | | | |
| 1. Diovan | 12.5mg | po | 1 cap daily | 10-26-06 | C  H |
| 2. Mag Chloride | | 6/24/06 | | | C  H |
| 3. | | | | | C  H |
| 4. | | | | | C  H |
| 5. | | | | | C  H |
| 6. | | | | | C  H |
| 7. | | | | | C  H |
| 8. | | | | | C  H |
| 9. | | | | | C  H |
| 10. | | | | | C  H |
| 11. | | | | | C  H |
| 12. | | | | | C  H |
| 13. | | | | | C  H |
| 14. | | | | | C  H |
| 15. | | | | | C  H |
| 16. | | | | | C  H |
| 17. | | | | | C  H |
| 18. | | | | | C  H |
| 19. | | | | | C  H |
| 20. | | | | | C  H |

M.D. Signature: _____                          Date/Time: _____
Physician signature not required for outpatient procedures

VORV: _____                                     Date/Time: _____

Nurse Signature: _____                          Date/Time: _____
This listing is to be used as an information source for healthcare providers.  Completion of the physician order column and physician signature of VORV authentication is required if the listing is to function as a medication order.

**EAST ALABAMA MEDICAL CENTER**
**PATIENT ADMISSION INTERVIEW**
HOME MEDICATION LIST
For Verification and Reconciliation

IM0009-0305-5-5

WPH
001286

Patient Identification
06297-00140          819996
SANKS.BOBBY L
DOB:
JONES,FRAZIER K   Adm:10/26/06

Bobby Sanks

DRUG ALLERGIES: None

| DATE & TIME | | STANDARD ADMISSION / PRE-OP ORDERS FOR ORTHOPAEDICS |
|---|---|---|
| 10/26/06 | 1. | **Admission:** ☑ Outpatient Surgery ☐ Inpatient |
| | 2. | **Admit to:** ☑ Ortho ☐ PCU/Telemetry ☐ ICU |
| | 3. | **MD:** |
| | 4. | **Diagnosis:** HNP (L) L5/1 |
| | 5. | **Procedure:** ☑ Get op permit signed for: |
| | 6. | **Vital signs:** ☑ Routine ☐ Other: |
| | 7. | **Diet:** ☑ NPO after MN ☐ Other: |
| | 8. | **Laboratory:** ☑ CBC ☑ EKG ☐ Profile 1 ☐ II ☐ III |
| | | ☐ H&H ☐ CBC with Diff ☐ Type/Screen ___ units of PRBC's |
| | | ☐ PT ☐ C&S Urine ☐ Type/Cross ___ units of PRBC's |
| | | ☐ PTT ☐ U/A ☐ Autogolous ___ units |
| | | ☐ Other labs: |
| | 9. | **Radiographs:** ☐ CXR ☐ G-Film Knees ☐ Other: |
| | 10. | **Allergies:** |
| | 11. | **Medications:** ☐ Tylenol 500 mg 1-2 tabs po q 4-6 hrs prn pain/temp >101 |
| | | (No more than 4gm in 24 hrs) |
| | | ☐ Tylenol #3 or ☐ Percocet 5/325 mg I-II tabs p.o. q 4-6 hrs prn pain |
| | | ☐ Ambien 10 mg po prn q h.s. if patient is <65 yrs old |
| | | ☐ Ambien 5 mg po prn q h.s. if patient is >65 yrs old |
| | | ☐ IV Fluids: |
| | | ☑ Antibiotics: Ancef 1 g IV on Call |
| | 12. | **Other Meds:** |
| | 13. | **Miscellaneous:** ☐ Foley ☐ Straight Cath q 6 hrs prn |
| | | ☐ Compression Sleeves |
| | | ☐ C&S checks q ___ hrs ☐ Traction: |
| | 14. | **Consults:** ☐ SNF if Medicare |
| | | ☐ Physical Therapy RE: |
| | | ☐ Medical M.D. RE: |
| | | Physician: |

WPH
001287

06297-00140
**SANKS, BOBBY L**
LOC:OS    DOB:
JONES, FRAZIER K
Adm:10/26/06

819996

M55Y

36874

EAST ALABAMA MEDICAL CENTER

06297-00140          819996

SANKS,BOBBY L
LOC: OS  DOB:          55Y
JONES,FRAZIER K
Adm:10/26/06          36874

**east**
**alabama**
**medical**
**center**
Opelika, Alabama

# PHYSICIAN'S ORDERS

HEIGHT              WEIGHT

**DATE &**
**TIME**

None

RTC 10 dys

FPrice M
10/26/06

WPH
001288



DATE: _10/26/06_      ARRIVAL TIME: _1443_

**IV SITE:** _at hand_ ☑Benign ☐NA  Edema: ☐Yes ☑No  Redness: ☐Yes ☑No  Discontinued Time: _1532_  Site Benign: ☑Yes ☐No
**DRESSING:** Site: _back_ _____ Site: _____ Site: _____
☐ Wound Edges Approximated
**DRAINAGE:** ☐Scant ☐Small ☐Moderate ☐Large ☑None  **COLOR:** ☐Serous ☐Serous Sanguineous
**OUTPUT:** TYPE: ☐Foley ∅ ☐JP ∅ ☐Other: ∅  Emesis / Amount: ∅ ☑Voided ☑po liquid served

**OPERATIVE EXTREMITY:** ☐Pulses ☐Present ☐Capillary Refill ☐Elevated ☐Ice Pack ☐Other

| VITAL SIGNS: | TIME | SaO₂ | P | RR | BP | Pain Level |
|---|---|---|---|---|---|---|
| | 1443 | | 76 | 20 | 158/94 | 7 |
| | 1503 | | 68 | 20 | 151/92 | |
| | 1522 | | 76 | 20 | 156/77 | |

**ANESTHESIA TYPE:** ☑General ☐Spinal ☐Block ☐Local ☐Special Procedure ☐IV Conscious Sedation

**MENTAL STATUS:** ☑Alert ☐Oriented ☐Drowsy ☐Confused ☐Crying

**NURSES NOTES:**

**POTENTIAL FOR INJURY:**     **GOAL:** Patient is free from injury
☑Siderails Up ☑Bed in Lowest Position ☑Assisted with ambulation ☐Placed in parent's/guardian's arms
*Outcome:* Patient is free from injury ☑Yes ☐No ☐Assisted to Recliner

**ALTERATION IN COMFORT LEVEL RELATED TO:** ☐Pain ☐Nausea or Vomiting
**GOAL:** Patient Comfort Level Will Be Improved

| Pain Level | ANALGESICS / ANTIEMETIC | | | | |
|---|---|---|---|---|---|
| | **MEDICATIONS** | **TIME** | **METHOD** | **INITIAL** | **INDICATION** |
| | See EMAR | | | | |

*OUTCOME:* Comfort Level Improved ☐Yes ☐No ☐No Complaint Voiced ☐Distress Noted

**DISCHARGE CRITERIA / DISCHARGE TEACHING**
**GOAL:** Discharge Criteria / Discharge Teaching accomplished with a Score of Ten (10)
☑VS Stable ☑Awake/Responsive ☐Nausea Vomiting /Dizziness Minimal ☐Dressing and/or Wound Checked
☐Drain Care Instruction Given
☑Voided ☐NA ☑Taking PO fluids ☑Pain Control ☑Optimum level mobility
☑Patient or Patient Representative Verbalizes and Demonstrates Understanding of Discharge Instruction / Teaching
☑Patient Pain Management Information Reviewed ☑Discharge pain level ( 0 – 10 )    Discharge Score _1_
**MODES OF DISCHARGE:** ☑WC ☐AMB ☐Arms ☐Stretcher  **ESCORTED BY:** ☑Transportation ☐Nursing Staff ☐Other
Discharged with ☑Family ☐Responsible Adult/Driver ☑Home ☐Other _____ Mode of Transportation ☑Vehicle ☐Other
Discharge Time _1550_  *OUTCOME:* Patient discharged with acceptable score of ten (10) ☑Yes ☐No
**MISCELLANEOUS:** ☑Belongings ☐Equipment Given: _____ ☑N/A ☑Appointment Date/Time: _11/06 @ 1000_
☑Prescription to Patient / Responsible Party _Vicodin px given to drive_
☑Received medication information       ☐NA

**ADMITTED:** Time: _____ Room No. _____ Reason: _____ Report Given to: _____

| NURSE'S SIGNATURES | INITIALS |
|---|---|
| Carolyn Prichn | CP |

WPH
001289

**EAST ALABAMA MEDICAL CENTER**
**THE SURGERY CENTER/SURGICAL CARE UNIT**
**PACU PLAN OF CARE/DISCHARGE**

HIM0071-0402-1-1

Patient Identification
06297-00140       819996
SANKS,BOBBY L
DOB:
JONES,FRAZIER K    Adm:10/26/06

# Medication Reconciliation Report for Admission

| Patient: | SANKS, BOBBY L | | |
|---|---|---|---|
| Room/Bed: | N/A / N/A | | |
| MRN#: | 0000819996 | | |
| Admitting MD: | Jones, Frazier K | | |

| DOB: | | Age: | 55 Years |
|---|---|---|---|
| Gender: | Male | | |
| Ht: | 67.00 in | Wt: | 76.30 kg |
| FIN#: | 0629700140 | | |
| Date: | 10/24/06 | | |

| Allergies: | NKA |
|---|---|

| Prescription/Home Medication | | | Admission Orders | | | |
|---|---|---|---|---|---|---|
| Drug Details | Last Taken | Continue | Continue with changes (Indicate Changes) | | | Do not continue upon admission |
| **Diovan HCT 12.5 mg–80 mg oral tablet (hydrochlorothiazide–valsartan) 1 tab(s), PO, QDay, 30 tab(s), 0, 0** | | | | | | |
| Indication: | | | | | | |
| Comments: | | | | Source: | | |

| Ordering Physician: | Date | Time | Notes: |
|---|---|---|---|
| | | | |
| | | | |
| Reconciled by (Name and Credentials): | Date | Time | |
| | | | |
| | | | |

06297-00140       819996
**SANKS,BOBBY L**
LOC:OS   DOB:              55Y
JONES,FRAZIER K
Adm:10/26/06              36874

**WPH**
**001290**

*Bobby Sanks*

## STEP 1:

Date of Procedure: 10/26/06

☐ **Check here if site is an excluded site:**

- Single organ cases (e.g., Cesarean section, cardiac surgery)
- Interventional cases for which the catheter/instrument insertion site is not predetermined (e.g. cardiac cath, central venous line)
- Teeth- no mark required, BUT mark on diagram.
- Infants <1 year, for whom the mark may cause a permanent tattoo
- Obvious wound or lesion

**STEP 2: Patient Verification**
*(i.e. Building 17, Registration, At time of admission or entry to facility, Any time care of patient is transferred to another caregiver)*

Person Completing Verification: _____ Dept. ____ 10/26/06
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification: C. Wilson/mCT Dept. 785
☐ Patient asked to state full name, procedure and point to site.
☑ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification: _____ Dept. 20
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification: _____ eN Dept. 904
☑ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

**REFUSAL for SITE MARKING**
I, _____ do hereby refuse to have the site/side of my surgery/procedure marked to indicate the correct site. The purpose of having the site/side marked has been explained to me. The risk of not having the site/side marked has also been explained to me.

Patient's Signature _____ Date _____

☐ **Check here if the site will be determined in the operating room on the day of surgery based on intraoperative testing or intraoperative site marking.**

☐ MD performing procedure must initial here to verify operative field as marked above. (**not required for excluded sites**)

WPH
001291

## STEP 3: SITE MARK *Completed by pre-op, unless patient will bypass pre-op. If pre-op bypassed, then to be completed by RN in department patient leaves prior to entering OR/Procedural area.*

| (√ when completed) | Signature |
|---|---|
| ☐ Invasive or surgical site is marked, by initials of person marking the site, over or adjacent to the surgical/procedural site incision with a surgical marking pen *(unless excluded site)* | xmCauеd |

## STEP 4: TIME-OUT

| (√ when completed) | Signature |
|---|---|
| ☐ "Time-out" immediately before the start of the procedure for final verification of correct patient, correct site, correct procedure *(including availability of x-rays, implants, special equipment if applicable)* | |

*Please explain any discrepancies above:* _____

Signature: _____

06297-00140                        819996
**SANKS,BOBBY L**
LOC:OS   DOB:                       M55Y
JONES,FRAZIER K
Adm:10/26/06                        36874

I authorize the performance upon _myself Bobby Sanks_ of the following operation/procedure: _left ES/S, microdiscectomy_

to be performed under the direction of Dr. _____

It has been explained to me that sometimes during an operation/procedure it is discovered that additional procedures are needed immediately. If I need such additional procedures during my operation/procedure, I permit the doctor to proceed.

I certify that I have removed all dentures, prostheses, glasses and jewelry (including body piercings) or assume responsibility for any loss or damage that result from my failure to do so.

I consent to the administration of such anesthetics as may be considered necessary or advisable by the physician responsible for this service.

I understand that all the physicians involved in my care are independent contractors and not agents, servants or employees of the hospital.

I consent to the disposal by the hospital authorities of any tissue or parts that may be removed.

East Alabama Medical Center serves as a training site for students in a variety of different healthcare professions. With permission of your physician, students may be allowed to observe procedures that would serve to benefit their educational experience. If you object to observers, please indicate here:

☐ Do not allow students to observe any procedure performed on me.

I understand that medical equipment/supply company representatives will sometimes be present during a procedure to instruct medical personnel on new equipment or supplies. If you object to observers, please indicate here:

☐ Do not allow medical equipment/supply company representatives to observe any procedure performed on me.

I understand that my physician may wish to take photographs or films of me during the course of my treatment to be made part of the medical record. I do not object to the taking of these films.

The nature and purpose of the operation/procedure, possible alternative methods or treatment, the risks involved, and the possibility of complications have been explained to me. No guarantee or assurance has been given by anyone as to the results that may be obtained.

I certify that I have read and fully understand the above consent to operation/procedure, that the explanations therein referred to were made, and that all blanks or statements requiring insertion or completion were filled in and applicable paragraphs, if any, were stricken before I signed.

:: _10/24/06_     Patient's Signature: X _Bobby L. Sanks_

e: _____     Witness: _____

tient is a minor or unable to sign, please sign and note reason:

WPH
001292

| Legal Guardian | | Other/Relationship |
|---|---|---|

tify that I have explained the risks and benefits and possible alternative treatment to the patient.

an Signature     Date     Time

06297-00140     819996
**SANKS,BOBBY L**
LOC:OS  DOB:     M55Y
JONES,FRAZIER K
Adm:10/26/06     36874

**East Alabama Medical Center**
CONSENT TO OPERATION, ANESTHETIC,

_10 124,06, 1015_

Month    Day    Year    Time    **Surgery Date:** _10/26/06 Thus.d_

_10/25/06 Wed_

1. You will be called **the day before your surgery** after 1:00 pm and be given the time for you to be at the hospital. If you have not received a telephone message from the hospital by 7:00 pm, please call **Toll Free 1-888-622-3262 before 9:00pm.** If your surgery is on Monday, we will call you on Friday afternoon.

2. **DO NOT** eat or drink anything, including water, gum, or food, after midnight prior to surgery or the morning of surgery, unless otherwise directed by your surgeon.

3. If you take medications every morning for blood pressure, Parkinson Disease, heart, thyroid, seizures, acid reflux or breathing, please take only these the morning of your surgery with a sip of water. **DO NOT** take insulin or oral diabetic medicine unless instructed to do so by your surgeon. Bring all medications in their bottles (including insulin) to the hospital with you.

4. ☐ Bathe or shower the night before and/or the morning of your surgery using an antibacterial soap such as Dial or Zest.
   ☒ Use the surgical scrub brush provided to you by the registration nurse at the time of your presurgical registration session at East Alabama Medical Center. Follow the written preoperative bathing instructions the night before your surgery using the scrub brush provided to you. (This brush contains Chlorahexidine. Do not use if you have known allergies to this product.)

5. Do not wear makeup, false eyelashes, rings, jewelry, wigs, body piercings, lotions and creams. You may use deodorant. You will be required to remove dentures, partials, hearing aides and contacts prior to surgery. Contact lens wearers please bring case and solution.

6. Leave all valuables at home. We cannot be responsible for loss. **Please bring co-pay if one is due and has not been paid.**

7. Dress in loose-fitting clothing and low-heeled shoes.
   - **Orthopedic patients must remove all nail polish if having hand/arm or foot/leg surgery.**

8. For infants, bring at least 2 bottles, with nipples, of formula or favorite liquid. You may also bring a special toy, blanket, pacifier, or sippy cup.

9. If you are to be admitted to hospital and want a private room, tell the admission nurse.

10. You must arrange to have a responsible person to drive you home. This person is **required** to stay in the surgical waiting area to talk with your surgeon and receive discharge instructions for you. Please arrange to have a responsible adult stay with you the first 24 hours after your surgery if you are going home the day of surgery.

11. If you have any questions concerning your surgery, call your surgeon.

**I have received written instructions and verbalized understanding of pre-op instruction.**

_Mary CCisson_                    _Bobby Sanks_
Nurse's Signature                    Patient's Signature / Significant Other

☒ **Copy given to patient**

**USEFUL TELEPHONE NUMBERS:**    Surgical Care Unit    334/528-2007    6am – 5pm
                                 The Surgery Center    334/528-4430    6am – 5pm

WPH
001293

**EAST ALABAMA MEDICAL CENTER**
**PRE-OPERATIVE SURGERY INSTRUCTIONS**
**THE SURGERY CENTER/SURGICAL CARE UNIT**
**23 Hour Observation / AM Admits**

EDU0027-0206-1-1

06297-00140          819996
SANKS,BOBBY L
LOC:OS   DOB.              55Y
JONES,FRAZIER N
Adm:10/26/06              36874

# EAST ALABAMA MEDICAL CENTER
## Discharge Instructions Following General Orthopedic Surgery

1. You may have some nausea or vomiting a few times after leaving the hospital. We recommend you resume eating slowly with mild, bland food. Report any persistant nausea and vomiting to your doctor.

2. You may increase your activity as tolerated.

3. Keep your dressings dry for _____ hours.

4. You may remove the dressings in _____ hours and take a shower.

5. Please keep arm/hand or leg/foot elevated above heart level for first 24 hours after surgery.

6. Wiggle fingers or toes on the surgical site for 1 minute at least 10 times a day for the first 24 hours after surgery.

7. You may apply ice bag to your surgery site for the first 24 hours.

8. No heavy lifting.

9. Call your surgeon for any excessive drainage/bleeding, foul smelling drainage, nausea or vomiting, severe pain not relieved by your pain medication, or fever greater than 101°.

10. Return to work according to your surgeon's instructions.

11. Follow any verbal instructions given to you or your responsible person.

12. You may experience occasional dizziness or become drowsy for the 24 hours after you have received medication or anesthesia. Therefore, you **should not drive** or drink alcoholic beverages.

13. You may feel tired, have a sore throat, neck discomfort, or minor muscle stiffness. Please rest and call your surgeon if you have any questions.

14. If you receive general anesthesia, it is important that you cough and deep breathe at least every two (2) hours while awake for two (2) days.

---

**I have received written instructions and verbalized understanding of the discharge instructions for my surgical procedure.**

Patient: _Bobby L Sanks_     Date: _10/24/06_

Patient given a copy ☑

Nurse Educator: _____

Responsible Driver: X _Johnnie Sanks_     Date: _10/26/06_

Discharge Nurse: _____

Surgeon's Name and Phone #: _Jones, Frazier 719-8303_

Appointment Date and Time: _November 6 at 100 O'Reilley_     WPH
001294

_pain med given at 1450 (350pm)_

06297-00140                        819996
**SANKS,BOBBY L**
LOC:OS   DOB:
JONES,FRAZIER K                    M55Y
Adm:10/26/06

36874

EDU0030-0902-1-1

# East Alabama Medical Center
2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**
| | | | |
|---|---|---|---|
| MRN: | 0000819996 | Admit Date/Time: | 10/26/2006 10:04:00 |
| Financial #: | 0629700140 | Discharge Date/Time: | 10/26/2006 23:59:00 |
| DOB: | | Location: | OS |
| | Age: 56 years  Sex:Male | Patient Type: | OPS |
| | | Attending Dr.: | **JONES, FRAZIER K** |

## Orders

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**gelatin** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Other, X1, 10/26/06 15:31:26, 1 dose(s), Stop date 10/26/06 15:31:26 | | | |

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**gentamicin** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Manual Charge, Other, X1, 10/26/06 15:31:13, 1 dose(s), Stop date 10/26/06 15:31:13 | | | |

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**sodium chloride** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Other, X1, 10/26/06 15:30:53, 1 dose(s), Stop date 10/26/06 15:30:53 | | | |

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**fentanyl** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Manual Charge, Other, X1, 10/26/06 15:28:07, 1 dose(s), Stop date 10/26/06 15:28:07 | | | |

**WPH
001295**

Chart Request ID:   4321208
Print Date/Time:    7/26/2007 2:27 PM
Page  1 of 16

MRN:        0000819996
Financial #: 0629700140
SANKS, BOBBY L

**East Alabama Medical Center**

## Orders

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**rocuronium** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Manual Charge, Other, X1, 10/26/06 15:27:58, 1 dose(s), Stop date 10/26/06 15:27:58 | | | |

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**glycopyrrolate** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Manual Charge, Other, X1, 10/26/06 15:27:51, 1 dose(s), Stop date 10/26/06 15:27:51 | | | |

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**neostigmine** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Manual Charge, Other, X1, 10/26/06 15:27:42, 1 dose(s), Stop date 10/26/06 15:27:42 | | | |

Order Date/Time 10/26/2006  15:31

| Mnemonic<br>**propofol** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>BAUMANN PharmTech, NATHAN Z | |
| Review Information N/A | | | |
| Order Details<br>Manual Charge, Other, X1, 10/26/06 15:27:33, 1 dose(s), Stop date 10/26/06 15:27:33 | | | |

Order Date/Time 10/26/2006  14:49

| Mnemonic<br>**acetaminophen-oxycodone** | Action<br>Order | Order Status<br>Discontinued | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician<br>JONES, FRAZIER K | | Order Placed By<br>PRICE RN, CAROLYN | |
| Review Information<br>Pharmacist Verify, Not Reviewed - | | | |
| Order Details<br>2 tab(s), Tab, PO, PRN, PRN, Pain, Routine, 10/26/06 14:49:00, 90 minute(s), Stop date 10/26/06 16:18:00 | | | |

10/26/2006  14:49: FOR OUTPATIENT SURGERY USE ONLY!

**WPH**
**001296**

MRN:        0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

**East Alabama Medical Center**

| Orders |
|---|

**Order Date/Time 10/26/2006  14:46**

| Mnemonic<br>**acetaminophen-oxycodone** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details<br>Other, Once, PRN, 10/26/06 14:47:54, 1 dose(s), Stop date 10/26/06 14:47:54 | | | |

**Order Date/Time 10/26/2006  14:22**

| Mnemonic<br>**Lactated Ringers** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details<br>PYXIS, Other, 10/26/06 14:23:00, 1 dose(s), Stop date 10/26/06 14:23:00 | | | |

**Order Date/Time 10/26/2006  14:15**

| Mnemonic<br>**Dilaudid 2 mg/mL injection** | Action<br>Order | Order Status<br>Discontinued | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician<br>WOODS, GLENN M | | Order Placed By<br>BOOTHE RN, RHONDA R | |
| Review Information<br>Pharmacist Verify, Not Reviewed - | | | |
| Order Details<br>0.5 mg, Injection, IV Push, PRN, PRN, Pain, Routine, 10/26/06 14:15:00, 2 hr(s), Stop date 10/26/06 16:14:00 | | | |

10/26/2006  14:15: FOR PACU USE ONLY !

**Order Date/Time 10/26/2006  14:10**

| Mnemonic<br>**hydromorphone** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details<br>PYXIS, Other, Once, PRN, 10/26/06 14:12:10, 1 dose(s), Stop date 10/26/06 14:12:10 | | | |

**Order Date/Time 10/26/2006  11:29**

| Mnemonic<br>**Sodium Chloride 0.9%** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details<br>PYXIS, Other, 10/26/06 11:30:00, 1 dose(s), Stop date 10/26/06 11:30:00 | | | |

**WPH**
**001297**

MRN:        0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

**East Alabama Medical Center**

| Orders |
|---|

**Order Date/Time 10/26/2006 11:28**

| Mnemonic<br>**cefazolin** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| PYXIS, Other, Once, 10/26/06 11:29:44, 1 dose(s), Stop date 10/26/06 11:29:44 | | | |

**Order Date/Time 10/26/2006 11:25**

| Mnemonic<br>**midazolam** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| PYXIS, Other, Once, 10/26/06 11:27:33, 1 dose(s), Stop date 10/26/06 11:27:33 | | | |

**Order Date/Time 10/26/2006 11:24**

| Mnemonic<br>**lactated ringers** | Action<br>Order | Order Status<br>Discontinued | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician<br>MCARTHUR, JOHN D | | Order Placed By<br>MCCAIN RN, LINDA H | |
| Review Information | | | |
| Pharmacist Verify, Not Reviewed - | | | |
| Order Details | | | |
| IV, Routine, 10/26/06 11:24:00, 4 hr(s), Stop date 10/26/06 15:23:00, 250 mL/hr, 4 hr(s), 1000 | | | |

**Order Date/Time 10/26/2006 11:24**

| Mnemonic<br>**cefazolin sodium** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician<br>MCARTHUR, JOHN D | | Order Placed By<br>MCCAIN RN, LINDA H | |
| Review Information | | | |
| Pharmacist Verify, Not Reviewed - | | | |
| Order Details | | | |
| 1 gm, Injection, IVPB, Once, PRN, Not Specified, Routine, 10/26/06 11:24:00, 90 minute(s), Stop date 10/26/06 12:53:00 | | | |
| 10/26/2006 11:24: FOR POHA USE ONLY! | | | |

**Order Date/Time 10/26/2006 11:24**

| Mnemonic<br>**Versed 1 mg injection** | Action<br>Order | Order Status<br>Discontinued | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician<br>MCARTHUR, JOHN D | | Order Placed By<br>MCCAIN RN, LINDA H | |
| Review Information | | | |
| Pharmacist Verify, Not Reviewed - | | | |
| Order Details | | | |
| 3 mg, Injection, IV Push, PRN, PRN, Sedation, Routine, 10/26/06 11:24:00, 90 minute(s), Stop date 10/26/06 12:53:00 | | | |
| 10/26/2006 11:24: FOR POHA USE ONLY! | | | |

**WPH**
**001298**

MRN:          0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Orders

Order Date/Time 10/26/2006 11:24

| Mnemonic<br>**Lactated Ringers** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By<br>Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details<br>PYXIS, Other, 10/26/06 11:25:00, 1 dose(s), Stop date 10/26/06 11:25:00 | | | |

Order Date/Time 10/24/2006 10:14

| Mnemonic<br>**EKG (Bldg 17)** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Cardiology |
|---|---|---|---|
| Ordering Physician<br>JONES, FRAZIER K | | Order Placed By<br>POPWELL, SANDRA | |
| Review Information<br>Nurse Review, Not Reviewed - | | | |
| Order Details<br>10/24/06 10:13:00, Once, Routine, Walk | | | |

Order Date/Time 10/24/2006 10:14

| Mnemonic<br>**CBC** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Laboratory |
|---|---|---|---|
| Ordering Physician<br>JONES, FRAZIER K | | Order Placed By<br>POPWELL, SANDRA | |
| Review Information<br>Nurse Review, Not Reviewed - | | | |
| Order Details<br>Blood, Routine collect, 10/24/06 10:13:00, Once, Nurse collect | | | |

## Hematology

### Hemogram

| | Procedure<br>Ref Range<br>Units | Hemoglobin<br>[13.5-17.0]<br>gm/dL | Hematocrit<br>[40.0-50.0]<br>% | RBC<br>[4.20-5.40]<br>x10^6/mcL | WBC<br>[3.5-11.0]<br>x10^3/mcL | PLT<br>[150-400]<br>x10^3/mcL | MCV<br>[82.0-99.0]<br>fL |
|---|---|---|---|---|---|---|---|
| 10/24/2006 | 10:50:00 AM | 14.8 | 43.5 | 4.82 | 5.8 | 259 | 90.2 |

| | Procedure<br>Ref Range<br>Units | MCH<br>[28.0-33.0]<br>pg | MCHC<br>[32.0-36.0]<br>% | RDW<br>[11.2-14.2]<br>% | MPV<br>[7.0-11.0]<br>fL |
|---|---|---|---|---|---|
| 10/24/2006 | 10:50:00 AM | 30.7 | 34.0 | 12.9 | 8.8 |

WPH
001299

MRN:          0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

## Operative Report

Operative Report

| | |
|---|---|
| **PATIENT NAME:** | Sanks, Bobby L. |
| **DATE OF OPERATION:** | 10/26/2006. |
| **SURGEON:** | Frazier Jones, MD. |
| **ASSISTANT:** | Scott Benson, PA. |
| **PREOPERATIVE DIAGNOSIS:** | Left L5-S1 herniated nucleus pulposus. |
| **POSTOPERATIVE DIAGNOSIS:** | Left L5-S1 herniated nucleus pulposus. |
| **PROCEDURE PERFORMED:** | Microdiskectomy left L5-S1. |
| **ANESTHESIA:** | General. |
| **BLOOD LOSS:** | Minimal. |
| **DRAINS:** | None. |
| **COMPLICATIONS:** | None. |

**INDICATIONS:** This is a 55-year-old gentleman with progressive left leg pain despite conservative management. He has MRI documentation of extruded disk left 5-1 foramen.

**PROCEDURE:** An incision was made about the mid portion of the lumbar spine after a localization radiograph was obtained. It was taken down the left side of the interspinous ligament and then over the facet joint. A self-retaining retractor was placed and the ligamentum flavum at that level was removed with a Kerrison punch. The lateral aspect of the dura was then identified and swept medially and a large combination of extruded and subligamentous disk was removed in one large piece and several small pieces. The remaining portion of the disk space was probed and an angled nerve hook was placed and there were no other loose fragments. This was then irrigated with antibiotic saline. A small block of Gelfoam was placed over the exposed dura and the wound was then closed in layers. He tolerated the procedure well. Counts were correct.

Job ID: #000595631

| | |
|---|---|
| DP: Frazier K. Jones, MD | **WPH** |
| TR: dgm | **001300** |

MRN:          0000819996
Financial #:  0629700140

SANKS, BOBBY L

**East Alabama Medical Center**

DD:       10/26/2006  1:13 P
DT:       10/26/2006  3:36 P
          816161
Doc:      000595631
Job#:
cc:

Electronically Signed By:  Frazier K Jones
                On 10/27/06 07:33

DD: 10/26/06  TD: 13:13

Operative Report
**PATIENT NAME:**  Sanks, Bobby L

**DATE OF PROCEDURE:**  10/26/2006

**OPERATIVE PROCEDURE:** Microdiskectomy L5-S1 on the left.

**SURGEON:** Dr. Frazier Jones

**FIRST ASSISTANT:** Scott Benson, PA

**FIRST ASSISTANT TIME IN:** 1221

**FIRST ASSISTANT TIME OUT:** 1317

**OPERATIVE DUTIES AND RESPONSIBILITIES:** The patient was brought to the operating room and after adequate anesthesia was induced, the patient was turned prone on the Andrews frame and all pressure points were padded. The operative site was prepped in a sterile fashion by the circulating nurse. Sterile drapes were applied. The surgeon then made a midline incision over the L5-S1 area and dissected down to the spinous processes. A marker was placed on the interspinous ligament. Fluoroscopy was brought in. The L5-S1 level was determined. The surgeon then continued dissection down to the lamina on the left. The interspace was incised and a hemilaminectomy on the left was performed. The shoulder of the nerve root was identified and a nerve root retractor was placed to protect the nerve root. The microscope was brought in. The surgeon continued his dissection to the anulus of the disk at L5-S1. A rent in the anulus was identified. Fragments of disk were removed using a pituitary rongeur. The disk space was then thoroughly irritated. Retractors were removed. The wound was irrigated. The fascia was closed with #1. The skin was reapproximated and closed with a 2-0 Vicryl and a running 3-0 PDS subcuticular stitch. Steri-Strips were applied. A sterile dressing was applied and the patient was returned to the hospital stretcher in stable condition.

Dictated by: Scott Benson, PA

Job # 595629

DP:       Frazier K. Jones, MD
TR:       sxk
DD:       10/26/2006  1:14 P
DT:       10/26/2006  2:09 P

**WPH**
**001301**

MRN:          0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

**East Alabama Medical Center**

Doc:       816107
Job#:      000595629
cc:        Scott Benson


Electronically Signed By: Frazier K Jones
                    On 10/27/06 07:33


DD: 10/26/06  TD: 13:14


CC: MORRIS SCOTT BENSON

---

## Surgical Tissue Report

Surgical Tissue Report

                                              Specimen S-608534

Specimen Collected: 10/26/06              Path #: 201909

Pre-Op Diagnosis:      L HNP L5-S1
Post-Op Diagnosis:     Same
Procedure:             Microdiskectomy L5-S1
Specimen:              L disk L5-S1

GROSS DESCRIPTION: The specimen is received in a single container of formalin labeled with the patient's name and designated "left L5-S1".  Received are two irregularly shaped fragments of pink-gray firm rubbery tissue that range in size from 0.8 to 1.2 cm. Submitted entirely in a single cassette.

MICROSCOPIC DESCRIPTION:  A microscopic examination has been performed.

FINAL DIAGNOSIS:       INTERVERTEBRAL DISC, L4-S1, MICRODISKECTOMY:
                    -   CONSISTENT WITH INTERVERTEBRAL DISC MATERIAL

TR:     llf
DT:     10/26/2006  3:51 P
DOC:    816169
cc:     Frazier K. Jones, MD


Performed at Lee Pathology Laboratory
503 E. Thomason Circle


**WPH**
**001302**

---

Print Date/Time:   7/26/2007  2:27 PM
Page 8 of 16

MRN:        0000819996
Financial #: 0629700140

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Surgical Tissue Report

Opelika, AL  36801

Electronically Signed By:  KATRIN M KLEMM
On 10/31/06 09:45

DD: 10/26/06  TD:  00:00

CC: Frazier K Jones
    SOFTMED  CONTRIBUTOR_SYSTEM

## Vital Signs

| | Date | 10/26/2006 |
| --- | --- | --- |
| | Time | 10:51 |
| **Procedure** | **Units** | |
| Temp DegF | DegF | 95.0 |
| Peripheral Pulse Rate | | 77 |
| Respiratory Rate | | 16 |
| Systolic Blood Pressure | | 159 |
| Diastolic Blood Pressure | | 98 |
| Mean Arterial Pressure | mmHg | 118 |
| Oxygen Therapy | | Room air |

## Intake/Output

| | Date | 10/26/2006 | 10/26/2006 | 10/26/2006 | 10/26/2006 | 10/26/2006 |
| --- | --- | --- | --- | --- | --- | --- |
| | Time | 14:49 | 14:10 | 12:15 | 11:25 | 11:22 |
| **Procedure** | **Units** | | | | | |
| Lactated Ringers | mL | | | | | 0.000000 |
| Sodium Chloride 0.9% | mL | | | 50.000000 | | |
| acetaminophen-oxycodone | tab(s) | 2.000000 f | | | | |

10/26/2006 14:49  acetaminophen-oxycodone:

**WPH**
**001303**

MRN:        0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Intake/Output

| | | Date | 10/26/2006 | 10/26/2006 | 10/26/2006 | 10/26/2006 | 10/26/2006 |
|---|---|---|---|---|---|---|---|
| | | Time | 14:49 | 14:10 | 12:15 | 11:25 | 11:22 |
| Procedure | Units | | | | | | |
| cefazolin | gm | | | | 1.000000 | | |
| hydromorphone | mg | | | 1.000000 | | | |
| midazolam | mg | | | | | 3.000000 | |

## Allergy List

| Substance: NKA | |
|---|---|
| Update Dt Tm  Updated By | |
| 10/4/2006 16:41:21  COOK RN, ALLISON M | Reaction Status: Active;  Type: Allergy;  Category: Drug; |

## Admission History

Patient History
10/24/06 10:23 am Performed by GIBSON RN, MARY C
Entered on 10/24/06 10:36 am

**General Info**
| | |
|---|---|
| Preferred Name | BOBBY SANKS |
| Admitted From | PRE SURGERY REGISTRATION |
| Mode of Arrival | Other: AMBULATORY WITH CRUTCHES |
| Accompanied by | Other: SELF |
| Chief Complaint | HNPLEFT LS/S1 |
| Information Given by | Patient |
| Preferred Communication Mode | Verbal |
| Languages | English |
| Pregnancy Status | Not applicable |

**Health History I A**
Cardiovascular Medical History Grid
    High Blood Pressure:  Self

**Health History II A**
Musculoskeletal Medical History Grid
    Back Pain:  Self, HNP LEFT LS/S1
Family History                          High Blood Pressure

**Health History III**
| | |
|---|---|
| Medical Devices | None |
| Previous Surgery History Grid | |
|   1. Surgery Description | None |

**Allergy**
| Allergy | Reaction |
|---|---|
| 1. NKA | |

**Home Meds v2**
| Home Meds | Verified |
|---|---|

**WPH**
**001304**

pain score of 7

**East Alabama Medical Center**

## Admission History

Patient History
10/24/06 10:23 am Performed by GIBSON RN, MARY C
Entered on 10/24/06 10:36 am

**Home Meds v2**
Source of Medication List                    Patient/Family recall

**Anesth/Transfusion**
Anesthesia/Transfusions                      Unknown

**TB Screen**
Alcohol and Drug Use
    Alcohol and Drug Use:  No
    Employee of Institutional Living Environment:  No
    Health Care Employee:  No
    History of Exposure to TB:  No
    History of Positive Chest X-Ray for TB:  No
    History of Positive TB Skin Test:  No
    Homeless:  No
    Known Immunosuppression:  No
    Recent Immigrant:  No
    Resident of Institutional Living Environment:  No

**Nutrition**
Home Diet                                    Low sodium
Feeding Ability                              Complete independence
Appetite                                     Good

**Functional**
Living Situation                             Home independently
Current Home Treatments                      None
Sensory Deficits                             Other: GLASSES
Mobility Assistance Prior to Admission       Other: CRUTCHES

**Dependent Habits**
Alcohol Use                                  Current
Tobacco Use                                  None
Recreational Drug Use                        None
Alcohol Amount                               6 BEERS PER YEAR

**Psychosocial**
Domestic Concerns                            None
Concerns About Fx Members at Home            Yes
Emotional Support Available                  Yes
Chronic/Terminal Illness Freq Visits         No
Financial Concerns Re Hospital/Disch         No
Religious Preference                         CHRISTIAN
Hospital Clergy to Visit                      No
Spiritual Advisor/Minister Notified          No

**Advance Directive**
Patient Competent                            Yes
Advanced Directives                          No
AD Booklet Given To                          Patient

**Educ Needs**
General Patient Education Powergrid
    1. Education Topics GE                    Pain management
       Education Level                        High school
       Individuals Taught                     Patient
       Learning Readiness                     Yes
       Barriers to Learning                   None evident
       Teaching Method                        Explanation, Printed materials
       Teaching Evaluation                    Verbalizes understanding

**WPH**
**001305**

MRN:        0000819996
Financial #: 0629700140

**SANKS, BOBBY L**

## East Alabama Medical Center

### Admission History

Patient History
10/24/06 10:23 am Performed by GIBSON RN, MARY C
Entered on 10/24/06 10:36 am

**Educ Needs**
2. Education Topics GE                          Preoperative instructions
  Education Level                          High school
  Individuals Taught                       Patient
  Learning Readiness                       Yes
  Barriers to Learning                     None evident
  Teaching Method                          Explanation, Printed materials
  Teaching Evaluation                      Verbalizes understanding
Learning Style Preference Adult Grid
  Patient:  Demonstration

**DC Needs**
Discharge To, Anticipated                       Home with family care

**CAGE Assessment**
CAGE Cut Down Drinking                          No
CAGE Annoyed                                    No
CAGE Guilty                                     No
CAGE Eye-opener                                 No
CAGE Score                                      0

### Admission Assessment

Short Stay  Admission Assessment
10/26/06 10:51 am Performed by PICKERING RN, MELANIE D
Entered on 10/26/06 11:00 am

**SSA Arrival Information**
Arrival Time                                    10/26/06 10:46
NPO Time                                        10/25/06 23:59
Emergency Contact                               JEANNETTE SANKS
Relation to Patient                             Spouse
Reason for Visit                                SURGERY

**Vital Signs**
Temp DegF                                       95.0 DegF
Peripheral Pulse Rate                           77
Respiratory Rate                                16
Oxygen Therapy                                  Room air
Systolic Blood Pressure                         159
Diastolic Blood Pressure                        98
Mean Arterial Pressure                          118 mmHg

**Height/Weight**
Height                                          67.00 in
Wt (kg)                                         76.00 kg
BSA                                             1.87

**SSA Assessment**
Level of Consciousness                          Alert
Orientation                                     Oriented x 3
Skin Color                                      Normal for ethnicity
Skin Description                                Dry
Skin Temperature                                Warm
Respiratory Pattern                             Regular
Nutrition                                       Adequate
Sensory Perception                              Slightly limited
Activity                                        Walks occasionally

WPH
001306

MRN:        0000819996
Financial #: 0629700140

SANKS, BOBBY L

**East Alabama Medical Center**

---

## Admission Assessment

Short Stay  Admission Assessment
10/26/06 10:51 am Performed by PICKERING RN, MELANIE D
Entered on 10/26/06 11:00 am

**SSA Assessment**
Mobility                                        No limitations

**Pain**
Pain Assessment Grid
   1. Pain Location                          Lower leg, left
      Pain Intensity                       4
      Acceptable Pain Intensity            8

**Integumentary**
Skin Integrity                                  Intact
Moisture                                        Rarely moist
Friction and Shear                              No apparent problem
Braden Score                                    20

**Education**
Pre-hospital Teaching                           Yes
General Patient Education Powergrid
   1. Education Topics GE                     Pain management
      Individuals Taught                   Patient
      Learning Readiness                   Yes
      Barriers to Learning                 None evident
      Teaching Method                      Explanation, Printed materials
      Teaching Evaluation                  Verbalizes understanding
   2. Education Topics GE                     Preoperative instructions
      Individuals Taught                   Patient
      Learning Readiness                   Yes
      Barriers to Learning                 None evident
      Teaching Method                      Explanation, Printed materials
      Teaching Evaluation                  Verbalizes understanding
Patient ID Band Location                        Arm, Left

**UPS**
UPS Patient's Age                               Age < 65
UPS Fall History                                No fall history
UPS Score                                       0

**Valuables/Belongings**
Valuables/Belongings Grid
      Valuables at Bedside
      Clothes, Patient Valuables           Other: Garments in pt belonging bag
      Electronic Devices, Patient Valuables None
      Jewelry, Patient Valuables           None
      Miscellaneous, Patient Valuables     None
      Monetary Items, Patient Valuables    None
      Personal Devices, Patient Valuables  Glasses, Other: crutches
                                           Comment: given to pt's family
                                           Comment: pt belonging bag under stretcher
No Belongings at Bedside                         Electronic Devices, Jewelry, Monetary

---

## Medication Administration Record

**WPH
001307**

---

MRN:          0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

## PRN

---

**acetaminophen-oxycodone(Percocet-5/325)   2 tab(s)**                    (Order Id = 49275027.00)
2 tab(s), Tab, PO, PRN, PRN, Pain, Routine, 10/26/06 14:49:00, 90 minute(s), Stop date 10/26/06 16:18:00
  **Order Comment:** FOR OUTPATIENT SURGERY USE ONLY!
    **Order Entered By:** PRICE RN, CAROLYN

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/26/06 14:49 | 10/26/06 14:49 | acetaminophen-oxycodone 2 tab(s) PO |
|  |  |  | **Result Comment:** pain score of 7 |
|  |  |  | **Reason for Medication:** Pain |
|  |  |  | Perform:PRICE RN, CAROLYN |
| Discontinue |  | 10/27/06 02:01 |  |
|  |  |  | Performed By: SYSTEM |

---

**cefazolin sodium(Ancef)   1 gm**                    (Order Id = 49260306.00)
**sodium chloride 0.9%(Sodium Chloride 0.9%)   50 mL**
1 gm, Injection, IVPB, Once, PRN, Not Specified, Routine, 10/26/06 11:24:00, 90 minute(s), Stop date 10/26/06 12:53:00
  **Order Comment:** FOR POHA USE ONLY!
  **Product Note:** Infuse over 30 minutes.
  **Pharmacy Fill:**Dispensed from Pyxis - do not change from 1 gm dose.
    **Order Entered By:** MCCAIN RN, LINDA H

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/26/06 12:15 | 10/26/06 12:15 | cefazolin 1 gm IVPB |
|  |  |  | **Reason for Medication:** Not Specified |
|  |  |  | Sodium Chloride 0.9% 50 mL IVPB |
|  |  |  | Perform:ARNOLD RN, SHERRY L |
| Complete |  | 10/26/06 12:15 |  |
|  |  |  | Performed By: ARNOLD RN, SHERRY L |

---

**Dilaudid 2 mg/mL injection(Dilaudid)   0.25 mL = 0.5 mg**                    (Order Id = 49272840.00)
0.5 mg, Injection, IV Push, PRN, PRN, Pain, Routine, 10/26/06 14:15:00, 2 hr(s), Stop date 10/26/06 16:14:00
  **Order Comment:** FOR PACU USE ONLY !
  **Product Note:** HIGH RISK DRUG, LEVEL 2.
    **Order Entered By:** BOOTHE RN, RHONDA R

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/26/06 14:16 | 10/26/06 14:10 | hydromorphone 1 mg IV Push |
|  |  |  | **Reason for Medication:** Pain |
|  |  |  | Perform:BOOTHE RN, RHONDA R |
| Discontinue |  | 10/27/06 02:01 |  |
|  |  |  | Performed By: SYSTEM |

---

**Versed 1 mg injection(Versed)   3 mL = 3 mg**                    (Order Id = 49260278.00)
3 mg, Injection, IV Push, PRN, PRN, Sedation, Routine, 10/26/06 11:24:00, 90 minute(s), Stop date 10/26/06 12:53:00
  **Order Comment:** FOR POHA USE ONLY!
  **Product Note:** HIGH RISK DRUG, LEVEL 2.
    **Order Entered By:** MCCAIN RN, LINDA H

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/26/06 11:25 | 10/26/06 11:25 | midazolam 3 mg IV Push |
|  |  |  | **Reason for Medication:** Sedation |
|  |  |  | Perform:MCCAIN RN, LINDA H |
| Discontinue |  | 10/27/06 02:01 |  |
|  |  |  | Performed By: SYSTEM |

## CONTINUOUS INFUSIONS

---

**lactated ringers(Lactated Ringers)   1000 mL   Every Bag**                    (Order Id = 49260307.00)
IV, Routine, 10/26/06 11:24:00, 4 hr(s), Stop date 10/26/06 15:23:00, 250 mL/hr, 4 hr(s), 1000
  **Order Entered By:** MCCAIN RN, LINDA H

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Begin Bag | Bag 1 | 10/26/06 11:22 | 10/26/06 11:22 | Lactated Ringers 1000 mL IV |

**WPH
001308**

Volume: 1000 mL
Rate: 250 mL/hr
Site: Left Hand

Perform:MCCAIN RN, LINDA H

**Discontinue**      **10/27/06 02:01**

Performed By: SYSTEM

**WPH**
**001309**

**East Alabama Medical Center**

**ALL CLINICALLY PERTINENT INFORMATION HAS BEEN PRINTED ON THE PREVIOUS PAGE(S).**

**WPH**
**001310**

Chart Copy

# East Alabama Medical Center

OUTPATIENT ADMISSION

| ACCOUNT NO | ADMISSION DATE & TIME | FC | DATE OF BIRTH | AGE | SEX RACE MS | DEPARTMENT LOCATION CODE | PAT TYPE | BY | UNIT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| 06284-00148 | 10/11/06 9:48am | BC | | 55Y | M - 2 - S | PAIN CLINIC | SER | SM | 819996 |

**PATIENT**

| ADMITTING DOCTOR | ATTENDING DOCTOR | REFERRING DOCTOR | PRIMARY CARE DOCTOR |
|---|---|---|---|
| JONES,FRAZIER K | JONES,FRAZIER K | | |

| PATIENT NAME AND ADDRESS | SOC-SEC-NO | PATIENT EMPLOYER | TELEPHONE NO. |
|---|---|---|---|
| SANKS,BOBBY L<br>PO BOX 44<br>330 LEE RD 175<br>SALEM        AL 36874 | <br><br>TELEPHONE NO.<br>(334)749-4462 | NC HOLDINGS | not-applicable |

**GUARANTOR**

| GUARANTOR NAME AND ADDRESS | SOC-SEC-NO | GUARANTOR EMPLOYER | TELEPHONE NO. |
|---|---|---|---|
| SANKS,BOBBY L<br>PO BOX 44<br>330 LEE RD 175<br>SALEM        AL 36874 | <br><br>TELEPHONE NO.<br>(334)749-4462<br>RELATION<br>SELF | NC HOLDINGS | not-applicable |

**EMPLOYERS**

**INSURANCE**

| INSURANCE 1 | INSURANCE 2 | INSURANCE 3 | INSURANCE 4 |
|---|---|---|---|
| BCBS OUT OF STATE<br><<ENTER ADDRESS>><br><<ENTER CITY/ZIP>>AL3520<br>(800)318-4769<br><br>SANKS,JEANNETTE<br>MASTERBRAND    014405<br>MKR841475215 | 1500 BLUE SHIELD<br><<ENTER ADDRESS>><br><<ENTER CITY/ZI AL 35201<br>(800)318-4769<br><br>SANKS,JEANNETTE<br>MASTERBRAND    014405<br>MKR841475215 | | |

**RELAT.**

| RELATIVE 1 | | |
|---|---|---|
| SANKS,JEANETTE | (334)749-4462 | |

**MISC**

| DIAGNOSIS/COMPLAINT | PAT CLASS | ADM TYPE | SOURCE |
|---|---|---|---|
| LOW BACK PAIN | | 3 | 1 |

| PREVIOUS ADMIT NAME & DATE | |
|---|---|
| SANKS,BOBBY L | 10/07/06 |

| INFECTION CONTROL NOTICE | DATE OF LAST PNEUMOCOCCAL PNEUMONIA VACCINE |
|---|---|
| | |

INS VERIFIED BY:                        VERIFIED DATE:  10/11/06

```
MRN:  0000819996
ACCT#: 628400148
SANKS, BOBBY L
```

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
PC-0002486449

Volume 01 of 01        SER

Adm: 10/11/06        Dis: 10/20/06

WPH
001311

SANKS,BOBBY L

06284-00148

819996

OutPatient Admission

Tobacco / smoking cessation counseling provided

**DATA COLLECTION and ASSESSMENT / Date:** 10/11/06 **Time:** 1010 **Visits #** ___ 1 ___ of ___ 3 ___

| MENTAL STATUS | AFFECT | SKIN | RESPIRAIONS | ARRIVED | PHYSICIANS ORDERS | |
|---|---|---|---|---|---|---|
| ✓Alert | ✓Calm | ✓Warm | ✓Regular | ✓Ambulatory | NaCI 0.9% | 5 cc |
| ✓Identifies Pain | Anxious | Dry | ✓Unlabored | Ambulatory with Assist | Marcaine 0.25% | cc |
| | Crying | Pale | Shallow | Crutch | DepoMedrol | 80 mg |
| DIETARY | | Cyanotic | Dysprea | Cane | Celestone | mg |
| NPO | | Diaphoretic | Retractions | Walker | Demerol | mg |
| LIGHT MEAL | | Hot | Labored | | | |
| FULL MEAL | | Flushed | Rapid | Via: | | |
| | | Cool | | Wheelchair | | |
| | | | | Stretcher | | |

**Indicate Location of Pain on Illustration**
**CIRCLE NUMBER INDICATING PAIN SEVERITY**
1 2 3 4 5 6 7 8 9 10



**Physician Signature:** _____

**Reassessment by:** _____

**NOTES DICTATED:** ✓Yes ☐No
**NOTE HANDWRITTEN:** ☐Yes ☐No
**Blocks:** Lumbar Epidural Injection

**POSITION:** ☐Sitting ☐Lying L thigh
reports hip pain that feels like it's cramping all the time

**Evaluation, explanation, risk benefits and / or alternative discussed:** ✓Yes ☐No
**Consent to proceed given:** ✓Yes ☐No
**Patient teaching completed:** ✓Yes ☐No

**VISITS:** #1 10/10 , #2 _____ , #3 _____

Dx: L5 - S1

**POTENTIAL FOR INFECTION**
**Goal: Avoidance of Patient Infection / Universal Precautions in Effect on Admission:** ✓Yes ☐No

| TIME | IV SOLUTIONS | CATH GAUGE | SITE | RN INITIAL | DISCONTINUE | | INTAKE | | OUTPUT URINE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | TIME | INITIAL | IV | po | |
| | | | | | | | | | |

**OUTCOME: Universal precautions Maintained During OPS Admission:** ✓Yes ☐No

| Time | T | p | RR | BP | SaO₂ % | MEDICATION TREATMENTS | COMMENTS / PATIENT'S RESPONSE |
|---|---|---|---|---|---|---|---|
| 1010 | | 109 | 20 | 130/71 | | | **Admission:** |
| 1053 | - | 97 | 20 | 149/81 | | | **Repositioned:** ☐Rt Side ☐Lt Side ☐Sitting |
| 1103 | - | 90 | 20 | 131/83 | | | ☐Lying ☐Caudal ☐Supine |
| 1113 | - | 8? | 20 | 130/81 | | | |
| 1123 | - | 101 | 20 | 140/96 | | | WPH 001312 |
| | | | | | | | **Wt. Bearing:** ☐Yes ☐No |
| | | | | | | | **Ambulated:** ☐Yes ☐No |

**EAST ALABAMA MEDICAL CENTER**
**PAIN CLINIC PLAN OF CARE**

HIM0144-0904-2-3    **PAGE 2 OF 3**

**Patient Identification**

06284-00148           819996
**SANKS,BOBBY L**
LOC:PO DOB:           M55Y
JONES,FRAZIER K
Adm:10/11/06          36874

Nurses Notes: _____

_____
_____
_____
_____
_____
_____
_____

**GOAL:** Patient remains free from injury  ☑ Side rails up ☐ Bed in lowest position   ☐ Assisted with ambulation
**OUTCOME:** Patient is free from injury upon discharge: ☐ Yes   ☐ No

## Discharge Criteria / Teaching
**GOAL: Discharge criteria / teaching met with a score of ten (10)**
☑ VS Stable   ☑ No Nausea   ☑ Vomiting/dizziness minimal ☑ Dressing and / or wound checked, & with no reportable concerns
☑ Taking & retaining po fluids   ☑ Responsible adult to escort patient home   ☑ Adequate motor and sensory response
☑ Patient or patient representative verbalizes and demonstrated understanding of discharge instruction / teaching
☑ No increase in baseline pain score   ☑ Adequate level of mobility

**Modes of discharge:** ☑ WC   ☐ Ambulance   ☐ Stretcher   **Escorted by:** ☑ Transportation or ☐ Other _____
**Discharged with:** ☐ Family   ☐ Other   **To:** ☑ Private motor vehicle   ☐ Lobby / waiting area
☐ Admitted to Room # _____   with report given to _____ RN

**Patient / Representative Signature:** _Bobby L. Sanks_

**Discharged with:** ☐ Copy of General Discharge Instructions   ☑ Lumbar epidural steroid discharge instructions
☐ Cervical epidural steroid discharge instructions   ☐ Stellate ganglion block discharge instructions
**Nurse Signature:** _____   **Discharge time:** _1130_
**Next Appointment:** _10/20/0.  OFW_

**Pain Clinic follow up date:** _10/13/06_   **Time:** _1204_   **Phone message left:** ☐ Yes   ☐ No

## FOLLOW UP QUESTIONNAIRE:
1. Have you been able to be up and around the house?   ☑ Yes ☐ No   Any comments? _____
2. Have you experienced any nausea or vomiting?   ☐ Yes ☑ No   Any comments? _____
3. Is there any change in your pain scale rating?   ☐ Yes ☑ No   Any comments? _____
4. Have you had any unusual or increased weakness to leg or arm?(extremity depending on procedure) ☐ Yes   ☐ No
   Any comments? _____
5. Have you had any unusual headaches?   ☐ Yes ☑ No   Any comments? _____
6. Have there been any problems?   ☐ Yes ☑ No   Any comments? _____
7. Do you have any questions about the procedures?   ☐ Yes ☑ No   Any comments? _____
8. Did you have adequate instructions from the pain management nurses or physicians? ☑ Yes   ☐ No
   Any comments? _____
9. Were you satisfied overall with the care, the treatments and the procedures of the pain clinic? ☑ Yes ☐ No
   Any comments? _____
10. At completion of Pain Clinic treatments, make an appointment to return to your primary care physician.

WPH
001313

## EAST ALABAMA MEDICAL CENTER
## PAIN CLINIC PLAN OF CARE

IIM0144-0904-3-3          PAGE 3 OF 3

| Patient Identification |
| --- |
| 06284-00148          819996 |
| SANKS,BOBBY L |
| LOC:PO   DOB: |
| JONES,FRAZIER K          M55Y |
| Adm:10/11/06 |
| 36874 |

**STEP 1:**

Date of Procedure: _10/1/06_

RIGHT  LEFT          LEFT  RIGHT

☑ Check here if site is an excluded site:

- Single organ cases (e.g., Cesarean section, cardiac surgery)
- Interventional cases for which the catheter/instrument insertion site is not predetermined (e.g. cardiac cath, central venous line)
- Teeth- no mark required, BUT mark on diagram.
- Infants <1 year, for whom the mark may cause a permanent tattoo
- Obvious wound or lesion

**STEP 2: Patient Verification**
*(i.e. Building 17, Registration, At time of admission or entry to facility, Any time care of patient is transferred to another caregiver)*

Person Completing Verification: _____ Dept. _724_
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification: _____ Dept.____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification: _____ Dept.____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification: _____ Dept.____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

RIGHT  LEFT

RIGHT  LEFT

**REFUSAL for SITE MARKING**
I, _____ do hereby refuse to
have the site/side of my surgery/procedure marked to indicate the correct site.
The purpose of having the site/side marked has been explained to me. The risk
of not having the site/side marked has also been explained to me.

Patient's Signature _____  Date _____

☐ Check here if the site will be determined in the operating room on the day of surgery based on intraoperative testing or intraoperative site marking.

☐ MD performing procedure must initial here to verify operative field as marked above. (**not required for excluded sites**)

**STEP 3:  SITE MARK** *Completed by pre-op, unless patient will bypass pre-op.  If pre-op bypassed, then to be completed by RN in department patient leaves prior to entering OR/Procedural area.*

| (√ when completed) | Signature |
|---|---|
| ☐ Invasive or surgical site is marked, by initials of person marking the site, over or adjacent to the surgical/procedural site incision with a surgical marking pen *(unless excluded site)* | |

**STEP 4:  TIME-OUT**

| (√ when completed) | Signature |
|---|---|
| ☐ "Time-out" immediately before the start of the procedure for final verification of correct patient, correct site, correct procedure *(including availability of x-rays, implants, special equipment if applicable)* | |

*Please explain any discrepancies above:* _____

Signature: _____

WPH
001314

**EAST ALABAMA MEDICAL CENTER**
**Procedure/Surgical Verification Checklist**

HM0152-0305-1-1

Patient Identification

06284-00148          819996
**SANKS,BOBBY L**
LOC:PO   DOB:          M55Y
JONES,FRAZIER K
Adm:10/11/06          36874

1. I authorize the performance upon _____ of the following
   operation/procedure: ____ *Lumbar Epidural Steroid Injection* ____

   _____

   to be performed under the direction of Dr. ____ *Woods* ____.

2. It has been explained to me that sometimes during an operation/procedure it is discovered that additional procedures are needed immediately. If I need such additional procedures during my operation/procedure, I permit the doctor to proceed.

3. I certify that I have removed all dentures, prostheses, glasses and jewelry (including body piercings) or assume responsibility for any loss or damage that result from my failure to do so.

4. I consent to the administration of such anesthetics as may be considered necessary or advisable by the physician responsible for this service.

5. I understand that all the physicians involved in my care are independent contractors and not agents, servants or employees of the hospital.

6. I consent to the disposal by the hospital authorities of any tissue or parts that may be removed.

7. East Alabama Medical Center serves as a training site for students in a variety of different healthcare professions. With permission of your physician, students may be allowed to observe procedures that would serve to benefit their educational experience. If you object to observers, please indicate here:
   ☐ Do not allow students to observe any procedure performed on me.

8. I understand that medical equipment/supply company representatives will sometimes be present during a procedure to instruct medical personnel on new equipment or supplies. If you object to observers, please indicate here:
   ☐ Do not allow medical equipment/supply company representatives to observe any procedure performed on me.

9. I understand that my physician may wish to take photographs or films of me during the course of my treatment to be made part of the medical record. I do not object to the taking of these films.

10. The nature and purpose of the operation/procedure, possible alternative methods or treatment, the risks involved, and the possibility of complications have been explained to me. No guarantee or assurance has been given by anyone as to the results that may be obtained.

11. I certify that I have read and fully understand the above consent to operation/procedure, that the explanations therein referred to were made, and that all blanks or statements requiring insertion or completion were filled in and applicable paragraphs, if any, were stricken before I signed.

Date: ____10/11/06____        Patient's Signature: *Bobby L. Sanks*

Time: ____1010____            Witness: *Chona Caugras*

If patient is a minor or unable to sign, please sign and note reason:

_____

WPH
001315

_____     _____     _____
Parent                   Legal Guardian           Other/Relationship

I certify that I have explained the risks and benefits and possible alternative treatment to the patient.

_____     ____10/11/06____     ____1045____
Physician Signature      Date                 Time

**East Alabama Medical Center**
**CONSENT TO OPERATION, ANESTHETIC,**
**AND/OR INVASIVE PROCEDURE**

06284-00148                      819996
**SANKS,BOBBY L**
LOC:PO   DOB:
JONES,FRAZIE,                    M55Y
Adm:10/11/06
                                 36874

N0001-0804-1-1

DATA COLLECTION and ASSESSMENT / Date: 10/20/06    Time: 0810    Visits # 2    of 3

| MENTAL STATUS | AFFECT | SKIN | RESPIRAIONS | ARRIVED | PHYSICIANS ORDERS | |
|---|---|---|---|---|---|---|
| (Alert) | (Calm) | (Warm) | (Regular) | Ambulatory | NaCl 0.9% | cc |
| (Identifies Pain) | Anxious | (Dry) | (Unlabored) | Ambulatory with Assist | Marcaine 0.25% | cc |
| | Crying | Pale | Shallow | Crutch | DepoMedrol 80 | mg |
| DIETARY | | Cyanotic | Dysprea | Cane | Celestone | mg |
| NPO | | Diaphoretic | Retractions | Walker | Demerol | mg |
| (LIGHT MEAL) | | Hot | Labored | Via: | | |
| FULL MEAL | | Flushed | Rapid | Wheelchair | | |
| | | Cool | | Stretcher | | |

**Indicate Location of Pain on Illustration**
**CIRCLE NUMBER INDICATING PAIN SEVERITY**
1  2  3  4  5  6  7  8  9  (10)   9-10


Left

Physician Signature: _____

Reassessment by: Chris Watson RN

NOTES DICTATED:  ☑Yes  ☐No
NOTE HANDWRITTEN:  ☐Yes  ☐No

Blocks: LESI #2

POSITION:  ☑Sitting  ☐Lying

reports pain to L hip and leg while sitting
or standing. Must use crutch to ambulate. cwrn

Evaluation, explanation, risk benefits and / or alternative discussed:  ☑Yes  ☐No
Consent to proceed given:  ☑Yes  ☐No
Patient teaching completed:  ☑Yes  ☐No

Dx: L disc bulge L5-S1

VISITS: #1 10/10   #2 9-10/10   #3 _____

**POTENTIAL FOR INFECTION**
Goal: Avoidance of Patient Infection / Universal Precautions in Effect on Admission: ☑Yes  ☐No

| TIME | IV SOLUTIONS | CATH GAUGE | SITE | RN INITIAL | DISCONTINUE | | INTAKE | | OUTPUT URINE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | TIME | INITIAL | IV | po | |
| | | | | | | | | | |

**OUTCOME:** Universal precautions Maintained During OPS Admission:  ☑Yes  ☐No

| Time | T | P | RR | BP | SaO2 % | MEDICATION TREATMENTS | COMMENTS / PATIENT'S RESPONSE |
|---|---|---|---|---|---|---|---|
| 810 | 95.6 | 91 | 18 | 162/90 | | 2nd LESI | Admission: Chris Watson RN |
| 755 | — | 78 | 18 | 166/109 | | | Repositioned: ☐Rt Side ☐Lt Side ☐Sitting |
| 905 | — | 80 | 18 | 130/95 | | | ☑Lying ☐Caudal ☐Supine |
| 915 | — | 81 | 20 | 152/103 | | | WPH 001316 |

Wt. Bearing:  ☑Yes  ☐No
Ambulated:  ☑Yes  ☐No

**EAST ALABAMA MEDICAL CENTER**
**PAIN CLINIC PLAN OF CARE**

M0144-0904-2-3    PAGE 2 OF 3

06284-00148    819996
SANKS,BOBBY L
LOC:PO  DOB:    M55Y
JONES,FRAZIER K
Adm:10/11/06    36874

**Nurses Notes:** *Pt. tolerated procedure well c̄ complications.* _____ *C Watson* —

_____

_____

_____

_____

_____

_____

**GOAL:** Patient remains free from injury    ☑ Side rails up ☑ Bed in lowest position    ☑ Assisted with ambulation
**OUTCOME:** Patient is free from injury upon discharge: ☑ Yes    ☐ No

**Discharge Criteria / Teaching**
**GOAL: Discharge criteria / teaching met with a score of ten (10)**
☑ VS Stable    ☐ No Nausea    ☑ Vomiting/dizziness minimal    ☑ Dressing and / or wound checked, & with no reportable concerns
☐ Taking & retaining po fluids    ☑ Responsible adult to escort patient home    ☑ Adequate motor and sensory response
☑ Patient or patient representative verbalizes and demonstrated understanding of discharge instruction / teaching
☑ No increase in baseline pain score    ☑ Adequate level of mobility

**Modes of discharge:** ☑ WC    ☐ Ambulance    ☐ Stretcher    **Escorted by:** ☑ Transportation or ☐ Other _____
**Discharged with:** ☐ Family    ☐ Other    **To:** ☑ Private motor vehicle    ☐ Lobby / waiting area
☐ Admitted to Room # _____    with report given to _____ RN

**Patient / Representative Signature:** x *Bobby L. Sanks*

**Discharged with:** ☐ Copy of General Discharge Instructions    ☑ Lumbar epidural steroid discharge instructions
☐ Cervical epidural steroid discharge instructions    ☐ Stellate ganglion block discharge instructions
**Nurse Signature:** *Chris Watson RN*    **Discharge time:** 0920
**Next Appointment:** x 11-2-06    9:30

**Pain Clinic follow up date:** 10/23/06 **Time:** 1405    **Phone message left:** ☐ Yes    ☐ No

**FOLLOW UP QUESTIONNAIRE:**

1. Have you been able to be up and around the house? ☑ Yes ☐ No Any comments? _____
2. Have you experienced any nausea or vomiting? ☐ Yes ☑ No Any comments? _____
3. Is there any change in your pain scale rating? ☑ Yes ☐ No Any comments? _____
4. Have you had any unusual or increased weakness to leg or arm?(extremity depending on procedure) ☐ Yes ☑ No
   Any comments? _____
5. Have you had any unusual headaches? ☐ Yes ☑ No Any comments? _____
6. Have there been any problems? ☐ Yes ☑ No Any comments? _____
7. Do you have any questions about the procedures? ☐ Yes ☑ No Any comments? _____
8. Did you have adequate instructions from the pain management nurses or physicians? ☑ Yes ☐ No
   Any comments? _____
9. Were you satisfied overall with the care, the treatments and the procedures of the pain clinic? ☑ Yes ☐ No
   Any comments? _____
10. At completion of Pain Clinic treatments, make an appointment to return to your primary care physician.

| | WPH |
| | 001317 |

**EAST ALABAMA MEDICAL CENTER**
**PAIN CLINIC PLAN OF CARE**

IM0144-0904-3-3    **PAGE 3 OF 3**

06284-00148    819996
**SANKS,BOBBY L**
LOC:PO  DOB:    M55Y
JONES,FRAZIER K
Adm:10/11/06    36874

## STEP 1:

Date of Procedure: 10/20/06

☑Check here if site is an excluded site:
- Single organ cases (e.g., Cesarean section, cardiac surgery)
- Interventional cases for which the catheter/instrument insertion site is not predetermined (e.g. cardiac cath, central venous line)
- Teeth- no mark required, BUT mark on diagram.
- Infants <1 year, for whom the mark may cause a permanent tattoo
- Obvious wound or lesion



### STEP 2: Patient Verification
*(i.e. Building 17, Registration, At time of admission or entry to facility, Any time care of patient is transferred to another caregiver)*

Person Completing Verification: Chris Watson RN          Dept. 724
☑ Patient asked to state full name, procedure and point to site.
☑ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification:_____Dept._____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification:_____Dept._____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification:_____Dept._____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

### REFUSAL for SITE MARKING
I, _____ do hereby refuse to have the site/side of my surgery/procedure marked to indicate the correct site. The purpose of having the site/side marked has been explained to me. The risk of not having the site/side marked has also been explained to me.

Patient's Signature _____    Date _____

☐ Check here if the site will be determined in the operating room on the day of surgery based on intraoperative testing or intraoperative site marking.

MD performing procedure must initial here to verify operative field as marked above. (not required for excluded sites)

## STEP 3:  SITE MARK *Completed by pre-op, unless patient will bypass pre-op.  If pre-op bypassed, then to be completed by RN in department patient leaves prior to entering OR/Procedural area.*

| (√ when completed) | Signature |
|---|---|
| ☐ Invasive or surgical site is marked, by initials of person marking the site, over or adjacent to the surgical/procedural site incision with a surgical marking pen *(unless excluded site)* | |

## STEP 4:  TIME-OUT

| (√ when completed) | Signature |
|---|---|
| ☑ "Time-out" immediately before the start of the procedure for final verification of correct patient, correct site, correct procedure *(including availability of x-rays, implants, special equipment if applicable)* | Chris Watson R |

*Please explain any discrepancies above:* _____

Signature:_____

WPH
001318

### EAST ALABAMA MEDICAL CENTER
### Procedure/Surgical Verification Checklist

M0152-0305-1-1

| | |
|---|---|
| 06284-00148 | 819996 |
| SANKS,BOBBY I | |
| LOC:PO  DOB: | /A55Y |
| JONES,FRAZIER K | |

**East Alabama Medical Center**
2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**
MRN:          0000819996
Financial #:   0628400148
DOB:                           Age: 56 years   Sex:Male

Admit Date/Time:      10/11/2006  9:48:00
Discharge Date/Time: 10/20/2006 12:15:00
Location:               PO
Patient Type:           SER
Attending Dr.:        **JONES, FRAZIER K**

---

## Orders

Order Date/Time 10/20/2006  11:40

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Lumbar Epidural Steriod Injection** | Activate | Ordered | Pain Clinic |
| Ordering Physician JONES, FRAZIER K | | Order Placed By BUCHANON, SHEILA | |
| Review Information N/A | | | |
| Order Details 10/20/06 9:00:00, back pain | | | |

Order Date/Time 10/20/2006  10:21

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Sodium chloride 0.9% injection, 10 mL** | Order | Ordered | Pharmacy |
| Ordering Physician WOODS, GLENN M | | Order Placed By WATSON RN, EMILY C | |
| Review Information Pharmacist Verify, Not Reviewed - | | | |
| Order Details 20 mL, Injection, EPI, PRN, PRN, Not Specified, Routine, 10/20/06 10:21:00 | | | |

10/20/2006  10:21: FOR PAIN CLINIC USE ONLY !.

Order Date/Time 10/20/2006  10:21

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Marcaine 0.25% injection, 10 mL** | Order | Completed | Pharmacy |
| Ordering Physician WOODS, GLENN M | | Order Placed By WATSON RN, EMILY C | |
| Review Information Pharmacist Verify, Not Reviewed - | | | |
| Order Details 10 mL, Injection, EPI, Once, PRN, Pain, Routine, 10/20/06 10:21:00 | | | |

10/20/2006  10:21: FOR PAIN CLINIC USE ONLY !

**WPH**
**001319**

---

Chart Request ID:   4321209
Print Date/Time:    7/26/2007 2:28 PM
Page  1 of 10

MRN:          0000819996
Financial #:   0628400148

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Orders

Order Date/Time 10/20/2006 10:21

| Mnemonic **Depo-Medrol 80 mg / 1 mL injection** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician WOODS, GLENN M | | Order Placed By WATSON RN, EMILY C | |
| Review Information Pharmacist Verify, Not Reviewed - | | | |
| Order Details 80 mg, Susp, Other, Once, PRN, Pain, Routine, 10/20/06 10:21:00 | | | |

10/20/2006  10:21: FOR PAIN CLINIC USE ONLY !

Order Date/Time 10/20/2006 08:09

| Mnemonic **sodium chloride** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details Other, Once, 10/20/06 8:11:00, I dose(s), Stop date 10/20/06 8:11:00 | | | |

Order Date/Time 10/20/2006 08:09

| Mnemonic **methylprednisolone** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details PYXIS, Other, Once, 10/20/06 8:11:00, I dose(s), Stop date 10/20/06 8:11:00 | | | |

Order Date/Time 10/20/2006 08:09

| Mnemonic **bupivacaine** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details Other, Once, 10/20/06 8:10:59, I dose(s), Stop date 10/20/06 8:10:59 | | | |

Order Date/Time 10/11/2006 13:17

| Mnemonic **Lumbar Epidural Steriod Injection** | Action Order | Order Status Ordered | Type of Order Pain Clinic |
|---|---|---|---|
| Ordering Physician JONES, FRAZIER K | | Order Placed By BUCHANON, SHEILA | |
| Review Information Nurse Review, Not Reviewed - Doctor Cosign, Accepted - JONES, FRAZIER K, 10/12/2006 07:45 | | | |
| Order Details 10/20/06 9:00:00, back pain | | | |

WPH
001320

MRN:         0000819996
Financial #:  0628400148

**SANKS, BOBBY L**

## East Alabama Medical Center

## Orders

Order Date/Time 10/11/2006  12:01

| Mnemonic **Depo-Medrol 80 mg / 1 mL injection** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician WOODS, GLENN M | | Order Placed By MOTLEY, JACQUELYN | |
| Review Information Nurse Review, Not Reviewed - Pharmacist Verify, Not Reviewed - | | | |
| Order Details 80 mg, Susp, Intra-articular, Once, PRN, Pain, Routine, 10/11/06 12:00:00 | | | |

10/11/2006  12:01: FOR PAIN CLINIC USE ONLY !

Order Date/Time 10/11/2006  12:01

| Mnemonic **Sodium chloride 0.9% injection, 10 mL** | Action Order | Order Status Ordered | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician WOODS, GLENN M | | Order Placed By MOTLEY, JACQUELYN | |
| Review Information Nurse Review, Not Reviewed - Pharmacist Verify, Not Reviewed - | | | |
| Order Details 20 mL, Injection, EPI, PRN, PRN, Not Specified, Routine, 10/11/06 12:00:00 | | | |

10/11/2006  12:01: FOR PAIN CLINIC USE ONLY !.

Order Date/Time 10/11/2006  12:01

| Mnemonic **Marcaine 0.25% injection, 10 mL** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician WOODS, GLENN M | | Order Placed By MOTLEY, JACQUELYN | |
| Review Information Nurse Review, Not Reviewed - Pharmacist Verify, Not Reviewed - | | | |
| Order Details 10 mL, Injection, Perineural, Once, PRN, Pain, Routine, 10/11/06 12:00:00 | | | |

10/11/2006  12:01: FOR PAIN CLINIC USE ONLY !

Order Date/Time 10/11/2006  10:09

| Mnemonic **sodium chloride** | Action Order | Order Status Completed | Type of Order Pharmacy |
|---|---|---|---|
| Ordering Physician | | Order Placed By Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details Other, Once, 10/11/06 10:11:00, 1 dose(s), Stop date 10/11/06 10:11:00 | | | |

**WPH**
**001321**

MRN:        0000819996
Financial #:  0628400148

**SANKS, BOBBY L**

## East Alabama Medical Center

### Orders

| Order Date/Time 10/11/2006 10:09 | | | |
|---|---|---|---|
| Mnemonic **methylprednisolone** | Action Order | Order Status Completed | Type of Order Pharmacy |
| Ordering Physician | | Order Placed By Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| PYXIS, Other, Once, 10/11/06 10:10:59, 1 dose(s), Stop date 10/11/06 10:10:59 | | | |

| Order Date/Time 10/11/2006 10:09 | | | |
|---|---|---|---|
| Mnemonic **bupivacaine** | Action Order | Order Status Completed | Type of Order Pharmacy |
| Ordering Physician | | Order Placed By Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| Other, Once, 10/11/06 10:10:59, 1 dose(s), Stop date 10/11/06 10:10:59 | | | |

### Operative Report

Operative Report

**PATIENT NAME:**   Sanks, Bobby L

**ABBREVIATED CLINICAL RECORD AND OPERATIVE REPORT**

**REFERRING PHYSICIAN:**   Frazier K. Jones, MD

**DATE:**   10/20/2006

**SURGEON:**   Glenn Woods, MD

**DIAGNOSES:**   Herniated disc L5-S1 with left lumbar radiculopathy.

**PROCEDURE:**   Lumbar epidural steroid injection L5-S1.

**SUMMARY:**
Mr. Sanks returns for a second visit to the Pain Clinic after receiving his first epidural injection at L5-S1 nine days ago. This provided him with noticeable improvement, but his pain score remains nearly maxed out at 9/10. He continues to experience significant discomfort radiating down the posterior aspect of his left leg and the foot. This is in the S1 distribution. I will proceed with another injection again today at L5-S1 as before.

WPH
001322

| Print Date/Time: | 7/26/2007 2:28 PM | MRN: | 0000819996 |
|---|---|---|---|
| Page 4 of 10 | | Financial #: | 0628400148 |

**SANKS, BOBBY L**

East Alabama Medical Center

**Operative Report**

**PHYSICAL EXAMINATION:**

VITAL SIGNS--Temperature is 95.6; blood pressure is 162/90; heart rate is 91, and respiratory rate is 18. Musculoskeletal exam reveals positive straight leg raise on the left but not noticeably as severe as on his original examination. There are no other remarkable findings present.

**DESCRIPTION OF PROCEDURE:**

The patient was placed in the sitting position. The back was prepped with Betadine and draped in the usual sterile fashion. The L5-s1 interspace was identified and infiltrated with 1% lidocaine plain with bicarb with a 30-gauge needle. A 25-gauge needle was then used for deeper infiltration. An 18-gauge Tuohy needle was then inserted to a depth of only 3 cm until loss of resistance to saline was obtained. No cerebrospinal fluid or heme was observed so a slow injection of a mixture of Depo-Medrol 80 mg in a total volume of 10 mL of 0.125% Marcaine plain was made without difficulty. The patient tolerated the procedure very well, was returned to the supine position, observed in the Pain Center for 20 minutes and then discharged in satisfactory condition. We will see him back in a couple of weeks for re-evaluation and possible re-injection.

Job ID: #000593836

| | |
|---|---|
| DP: | Glenn Woods, MD |
| TR: | wgl |
| DD: | 10/20/2006 8:56 A |
| DT: | 10/20/2006 10:15 A |
| | 814082 |
| Doc: | 000593836 |
| Job#: | |
| cc: | |

Electronically Signed By: Glenn M Woods
              On 10/23/06 11:22

DD: 10/20/06  TD: 08:56

Operative Report

PATIENT NAME:    Sanks, Bobby L

COMBINED ABBREVIATED CLINICAL RECORD AND OPERATIVE NOTE

SURGEON:  Dr. Glenn Woods

REFERRING PHYSICIAN: Dr. Frazier K. Jones, MD

DATE:    10/11/2006

**WPH
001323**

MRN:        0000819996
Financial #:  0628400148

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Operative Report

**SUMMARY:**    Mr. Sanks is a 55-year-old black gentleman who noticed pain in his left hip about eight days ago. He visited the emergency department, had left hip films done which did not show any abnormalities. He visited Dr. Jones yesterday and had a MRI performed and this shows a herniated disc L5-S1 which is consistent with the symptoms. He is referred now to the pain center to undergo a series of epidural steroid injections to see if this will provide him with some benefit.

**PAST MEDICAL HISTORY:**    High blood pressure.

**PAST SURGICAL HISTORY:**    None.

**MEDICATIONS:** Muscle relaxant, pain medicine, and Diovan.

**ALLERGIES:** None known.

**PHYSICAL EXAMINATION:**    Well-nourished, well-developed black male in marked distress anytime he moves on the stretcher. **VITAL SIGNS:**  Temperature 96.1; blood pressure 130/71; heart rate 109; respiratory rate 20; height 5'7"; weight 168 pounds. **MUSCULOSKELETAL EXAM:** Normal curvature of his lumbar spine with easily palpable spinous processes. Sacroiliac joints are nontender. Straight leg is markedly positive on the left at 45 degrees, negative on the right. Motor and sensory are intact in lower extremities.

**IMPRESSION:**    Herniated disc L5-S1 with left lumbar radiculopathy.

**PLAN:**    Epidural steroid injection L5-S1. I have discussed the risks, benefits and indications with the patient and he agrees to proceed.

**DESCRIPTION OF PROCEDURE:**    The patient was placed in the sitting position. The back was prepped with Betadine and draped in the usual sterile fashion. The L5-S1 interspace was identified and infiltrated with 1% lidocaine plain with bicarb times 5 ml with a 30 gauge needle. A 25 gauge needle was then used for deeper infiltration. An 18 gauge Tuohy needle was then inserted to a depth of 4 centimeters until loss of resistance to saline was obtained. No cerebrospinal fluid or heme was observed so a slow injection of a mixture of Depo-Medrol 80 milligrams in a total volume of 10 cc of 0.125% Marcaine plain plus 2 cc of 1% Lidocaine was made without difficulty. After a 20 minute period of observation his pain was much improved and he was discharged in satisfactory condition. He will return to the pain clinic in a week and a half to 10 days for re-evaluation and reinjection.

Job 591087

| | |
|---|---|
| DP: | Glenn Woods, MD |
| TR: | sgn |
| DD: | 10/11/2006 10:52 A |
| DT: | 10/11/2006 4:17 P |

**WPH**
**001324**

MRN:        0000819996
Financial #:  0628400148

**SANKS, BOBBY L**

**East Alabama Medical Center**

810819
Doc:     000591087
Job#:
cc:     Frazier K. Jones, MD

Electronically Signed By: Glenn M Woods
                On 10/17/06 07:06

DD: 10/11/06  TD: 10:52

CC: Frazier K Jones

## Intake/Output

|  | Date | 10/20/2006 | 10/11/2006 |
|---|---|---|---|
|  | Time | 08:54 | 10:50 |
| Procedure | Units |  |  |
| bupivacaine | mL | 5.000000 | 5.000000 |
| methylPREDNISolone | mg | 80.000000 | 80.000000 |
| sodium chloride | mL | 5.000000 | 15.000000 |

## Allergy List

| Substance: NKA | |
|---|---|
| Update Dt Tm  Updated By | |
| 10/4/2006 16:41:21  COOK, RN, ALLISON M | Reaction Status: Active;  **Type:** Allergy;  **Category:** Drug; |

## Medication Administration Record

WPH
001325

MRN:        0000819996
Financial #:  0628400148

**SANKS, BOBBY L**

**PRN**

---

**Depo-Medrol 80 mg / 1 mL injection(Depo-Medrol)   1 mL = 80 mg**                    (Order Id = 48055780.00)
  80 mg, Susp, Intra-articular, Once, PRN, Pain, Routine, 10/11/06 12:00:00
    **Order Comment:** FOR PAIN CLINIC USE ONLY !
    **Order Entered By:** MOTLEY, JACQUELYN

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/11/06 12:02 | 10/11/06 10:50 | methylPREDNISolone 80 mg EPI |
| | | | **Reason for Medication:** Pain |
| | | | Perform:WOODS, GLENN M |
| | | | Proxy:MOTLEY, JACQUELYN |
| Complete | | 10/11/06 12:02 | |
| | | | Performed By: MOTLEY, JACQUELYN |

---

**Depo-Medrol 80 mg / 1 mL injection(Depo-Medrol)   1 mL = 80 mg**                    (Order Id = 48782249.00)
  80 mg, Susp, Other, Once, PRN, Pain, Routine, 10/20/06 10:21:00
    **Order Comment:** FOR PAIN CLINIC USE ONLY !
    **Order Entered By:** WATSON RN, EMILY C

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/20/06 10:22 | 10/20/06 08:54 | methylPREDNISolone 80 mg EPI |
| | | | **Reason for Medication:** Pain |
| | | | Perform:WOODS, GLENN M |
| | | | Proxy:WATSON RN, EMILY C |
| Complete | | 10/20/06 10:22 | |
| | | | Performed By: WATSON RN, EMILY C |

---

**Marcaine 0.25% injection, 10 mL(Marcaine 0.25%)   10 mL**                    (Order Id = 48055808.00)
  10 mL, Injection, Perineural, Once, PRN, Pain, Routine, 10/11/06 12:00:00
    **Order Comment:** FOR PAIN CLINIC USE ONLY !
    **Order Entered By:** MOTLEY, JACQUELYN

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/11/06 12:02 | 10/11/06 10:50 | bupivacaine 5 mL EPI |
| | | | **Reason for Medication:** Pain |
| | | | Perform:WOODSON, CLARISSA F |
| | | | Proxy:MOTLEY, JACQUELYN |
| Complete | | 10/11/06 12:02 | |
| | | | Performed By: MOTLEY, JACQUELYN |

---

**Marcaine 0.25% injection, 10 mL(Marcaine 0.25%)   10 mL**                    (Order Id = 48782271.00)
  10 mL, Injection, EPI, Once, PRN, Pain, Routine, 10/20/06 10:21:00
    **Order Comment:** FOR PAIN CLINIC USE ONLY !
    **Order Entered By:** WATSON RN, EMILY C

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/20/06 10:22 | 10/20/06 08:54 | bupivacaine 5 mL EPI |
| | | | **Reason for Medication:** Pain |
| | | | Perform:WOODS, GLENN M |
| | | | Proxy:WATSON RN, EMILY C |
| Complete | | 10/20/06 10:22 | |
| | | | Performed By: WATSON RN, EMILY C |

---

**Sodium chloride 0.9% injection, 10 mL(sodium chloride)   20 mL**                    (Order Id = 48055809.00)
  20 mL, Injection, EPI, PRN, PRN, Not Specified, Routine, 10/11/06 12:00:00
    **Order Comment:** FOR PAIN CLINIC USE ONLY !.
    **Order Entered By:** MOTLEY, JACQUELYN

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/11/06 12:03 | 10/11/06 10:50 | sodium chloride 15 mL EPI |
| | | | **Reason for Medication:** Not Specified |
| | | | Perform:WOODS, GLENN M |
| | | | Proxy:MOTLEY, JACQUELYN |
| Med Given | 10/20/06 10:23 | 10/20/06 08:54 | sodium chloride 5 mL EPI |

**WPH
001326**

**Reason for Medication:** Not Specified
Perform: WOODS, GLENN M
Proxy: WATSON RN, EMILY C

---

**Sodium chloride 0.9% injection, 10 mL(sodium chloride)   20 mL**　　　　　　　　　　　　(Order Id = 48782272.00)
　20 mL, Injection, EPI, PRN, PRN, Not Specified, Routine, 10/20/06 10:21:00
　**Order Comment:** FOR PAIN CLINIC USE ONLY !.
　**Order Entered By:** WATSON RN, EMILY C

ACTION(S)　　　CHARTED @　　ADMIN TIME(S)　　ADMIN DETAIL(S)

---

**WPH
001327**

**East Alabama Medical Center**

**ALL CLINICALLY PERTINENT INFORMATION HAS BEEN PRINTED ON THE PREVIOUS PAGE(S).**

**WPH
001328**

MRN:         0000819996
Financial #:  0628400148

**SANKS, BOBBY L**

| ACCOUNT NO. | ADMISSION DATE / TIME | F.C | DATE OF BIRTH | AGE | SEX | RACE | M: | DEPT. LOC. CODE | | PAT TYPE | BY | UNIT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06280-00026 | 10/07/06 8:20am | SP | | 55Y | M - 2 - S | | | ER | | QER | CP | 819996 |

| PATIENT NAME | SOC-SEC-NO | PREVIOUS ADMIT NAME/DATE | ARRIVAL MODE |
|---|---|---|---|
| SANKS,BOBBY L | | SANKS,BOBBY L     10/04/06 | CAR |

**THIS DOCUMENT IS FOR TREATMENT INFORMATION ONLY.**
**FINANCIAL AND DEMOGRAPHIC INFORMATION SHOULD BE OBTAINED FROM THE DEMOGRAPHIC SHEET.**

V.S.: T96.6 P90 R19 BP 233/118  ☐ DICTATED NOTE

| | TEST | RESULTS TIME | TEST RESULTS |
|---|---|---|---|
| | U/A Ur. C & S | | |
| | HCG, U / S | | |
| | Hemogram, CBC | | |
| | PROF 1 / 3 | | |
| | AMYLASE / LIPASE | | |
| | Troponin | | |
| | PT / PTT | | |
| | ETOH | | |
| | ABG | | |
| | G & C PACE | | |
| | EKG | | |
| | CXR, PORT, PA&L | | |
| | C-Sp, XT/Cmpl | | |
| | L-Sp, XT /Cmpl | | |

**MD EVALUATION & NOTES**

CC: (L) leg pain       g @ L RA
APT c/o pain from L hip down
 to l leg. States pain is cramping
has been seen @ Auburn urgent
care + in ER on wed for same
has been taking Lortab & Naproxen
& relief. Has hx of HTN but has not
taken BP meds in temp. denies HIV
has numbness of the toes of extremities
PMH? HTN
PSH? neg
meds! Naproxen, Lortab

ROS: NKA - (S) Fever (S) OB (H) IA (S) HIV
 numbness/tingling of extremities

PE: AOx3 in NAD, resp present
unlabored, skin WD
lungs CTA, CVRRR A&T
soft NT, ND active Bs x4 g
musc: bck/hip PERRL, Nck
supple, Ø midline cervical
thoracic, lumbar, or sacral
tenderness noted, tenderness
in (L) buttocks, muscle spasms
noted @ straight leg raise
on (L) AR, +2 ped pulses
bil, strong plantar flexion
bil, MAE W

CERTIFIED EMERGENCY
YES ☐ SA
NO ☐

OLD CHART ☐
CT, S/C of:

| EVENT | TIME | INITS | MD ORDER TIME | TREATMENT | TIME DONE | INITS |
|---|---|---|---|---|---|---|
| TRIAGE | | | | | | |
| ROOM PLACEMENT | | | | | | |
| EMD ARRIVES | 0830 | 514 | | | | |
| EMD D/C | | | | | | |
| N D/C | | | | | | |
| INPT. BED REQUEST | | | | | | |
| INPT. ADMISSION | | | | | | |
| LOS | | | | | | |
| DATE: | | | | | | |

**DX**  (L) leg pain - probable sciatica

| | Telemetry Monitor ☐ |
| | O2 ☐ |

**DSP** ☐ ADMITTED TO ROOM NO:     LEFT WITH:     VIA:
☐ RELEASED   ☐ TRANSFERRED/REFERRED TO:   INV. OFFICER NAME   CORONER NOTIFIED ☐

| | IV ☐ |
| | Td ☐ |

**DC INSTR**

☐ ABLE TO WORK
☐ UNABLE TO WORK FOR _____ DAYS
☐ LIGHT/LIMITED DUTY _____ DAYS

CONDITION ON DISCHARGE:

☐ GOOD  ☐ IMPROVED  ☐ CRITICAL
INFECTION CONTROL NOTICE

PHYSICIAN's SIGNATURE   S Huff CRNP
DISCHARGE NURSE's SIGNATURE   RN   LPN

**EAST ALABAMA MEDICAL CENTER**
**EMERGENCY DEPARTMENT**
**TREATMENT SHEET**

| Patient Identification |
|---|
| 06280-00026     819996 |
| SANKS,BOBBY L |
| DOB: |
| DOCTOR,ER   Adm:10/07/06 |

WPH
001329

**East Alabama Medical Center**
2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**

| | | | |
|---|---|---|---|
| MRN: | 0000819996 | Admit Date/Time: | 10/7/2006 8:20:00 |
| Financial #: | 0628000026 | Discharge Date/Time: | 10/7/2006 9:54:00 |
| DOB: | | Location: | ED |
| | Age: 56 years  Sex:Male | Patient Type: | ER |
| | | Attending Dr.: | **Huff RN, Stephanie** |

## Emergency Department Forms

### ED Assessment Adult
10/07/06 09:23 am Performed by PRUNESTI RN, TRACY D
Entered on 10/07/06 09:23 am

**Health Hx**

| | |
|---|---|
| Past Medical History | Verified |
| Previous Surgery History Grid | |
| 1. Surgery Description | None |
| Health History ED Grid | |
| High Blood Pressure:  Yes | |
| Medical Devices | None |
| Traveled Abroad | No |

**Home Meds v2**

| | |
|---|---|
| Home Meds | None |

**General**

| | |
|---|---|
| Affect/Behavior | Calm, Cooperative |
| Level of Consciousness | Alert |
| Orientation | Oriented x 3 |
| Skin Color | Normal for ethnicity |
| Skin Description | Dry |
| Skin Temperature | Warm |
| Living Situation | Home independently |
| Appearance | Attire appropriate |
| Eye Contact | Normal |

### ED Triage Adult
10/07/06 08:22 am Performed by Gaiter, Shaconda L RN
Entered on 10/07/06 08:26 am

**General**

| | |
|---|---|
| Allergies | Verified |
| Mode of Arrival | Wheelchair |
| Method of Arrival | Private vehicle |
| Wt (kg) | 76.30 kg |
| Height | 67.00 in |
| Regular Doctor | WHATLEY |
| Allergy | Reaction |
| 1. NKA | |
| Last Tetanus | > 5 years |
| Nutritional Screen | Adequate |
| Unintentional Weight Change | No |
| Preferred Communication Mode | Verbal |
| Languages | English |
| Ambulatory Devices | None |
| Domestic Concerns | None |

**Health Hx**

| | |
|---|---|
| Past Medical History | Verified |
| Previous Surgery History Grid | |
| 1. Surgery Description | None |
| Health History ED Grid | |
| High Blood Pressure:  Yes | |
| Medical Devices | None |
| Traveled Abroad | No |

WPH
001330

| | | | |
|---|---|---|---|
| Chart Request ID: | 4321210 | MRN: | 0000819996 |
| Print Date/Time: | 7/26/2007 2:29 PM | Financial #: | 0628000026 |
| Page 1 of 7 | | | **SANKS, BOBBY L** |

**East Alabama Medical Center**

## Emergency Department Forms

### ED Triage Adult
10/07/06 08:22 am Performed by Gaiter, Shaconda L RN
Entered on 10/07/06 08:26 am

**Home Meds**
| | |
|---|---|
| Home Meds | Verified |

**Vital Signs**
| | |
|---|---|
| Temp DegF | 96.6 DegF |
| Peripheral Pulse Rate | 90 |
| Systolic Blood Pressure | 222 |
| Diastolic Blood Pressure | 118 |
| Respiratory Rate | 18 |
| Oxygen Saturation | 99 % |
| Oxygen Therapy | Room air |

**Assess/Tx**
| | |
|---|---|
| Chief Complaint | COMPLAINS OF PAIN TO LEFT LEG TO HIS CALF FOR FIVE DAYS |
| Pain Intensity | 10 |
| Acceptable Pain Intensity | 0 |
| Level of Consciousness | Alert |
| Orientation | Oriented x 3 |
| Affect/Behavior | Appropriate |
| Distress | None |
| Skin Color | Normal for ethnicity |
| Skin Description | Dry |
| Skin Temperature | Warm |
| Respiratory Symptoms | None |
| Triage Acuity Level | IV-Less Urgent |

**Pain**
Pain Assessment Grid
| | |
|---|---|
| 1. Pain Location | Upper leg, left |
|    Pain Quality | Cramping |
|    Pain Onset | Gradual |
| 2. Pain Radiation Location | Lower leg, left |

## Orders

Order Date/Time 10/7/2006 09:21

| Mnemonic<br>hydrochlorothiazide-<br>valsartan | Action<br>Order | Order Status<br>Ordered | Type of Order<br>Pharmacy |
|---|---|---|---|
| Ordering Physician<br>HUFF CRNP, STEPHANIE D | | Order Placed By<br>HUFF CRNP, STEPHANIE D | |
| Review Information N/A | | | |
| Order Details<br>1 tab(s), PO, QDay, 30 tab(s), 0, 0 | | | |

**WPH**
**001331**

**East Alabama Medical Center**

## Orders

Order Date/Time 10/7/2006  09:21

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **cyclobenzaprine** | Order | Discontinued | Pharmacy |
| Ordering Physician | | Order Placed By | |
| HUFF CRNP, STEPHANIE D | | HUFF CRNP, STEPHANIE D | |
| Review Information N/A | | | |
| Order Details | | | |
| 10 mg, PO, TID, 15 tab(s), 0, 0 | | | |

Order Date/Time 10/7/2006  09:17

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **orphenadrine** | Order | Completed | Pharmacy |
| Ordering Physician | | Order Placed By | |
| | | Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| PYXIS, Other, Once, 10/07/06 9:18:19, 1 dose(s), Stop date 10/07/06 9:18:19 | | | |

Order Date/Time 10/7/2006  09:17

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **promethazine** | Order | Completed | Pharmacy |
| Ordering Physician | | Order Placed By | |
| | | Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| PYXIS, Other, Once, PRN, 10/07/06 9:18:18, 1 dose(s), Stop date 10/07/06 9:18:18 | | | |

Order Date/Time 10/7/2006  09:16

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **meperidine** | Order | Completed | Pharmacy |
| Ordering Physician | | Order Placed By | |
| | | Pharmacy, Pyxis | |
| Review Information N/A | | | |
| Order Details | | | |
| PYXIS, Other, Once, PRN, 10/07/06 9:18:18, 1 dose(s), Stop date 10/07/06 9:18:18 | | | |

Order Date/Time 10/7/2006  08:53

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Norflex 60 mg / 2 mL injection** | Order | Completed | Pharmacy |
| Ordering Physician | | Order Placed By | |
| HUFF CRNP, STEPHANIE D | | HUFF CRNP, STEPHANIE D | |
| Review Information | | | |
| Pharmacist Verify, Not Reviewed - | | | |
| Order Details | | | |
| 60 mg, Injection, IM, Once, Routine, 10/07/06 8:53:00, Stop date 10/07/06 8:53:00 | | | |

**WPH**
**001332**

MRN:          0000819996
Financial #: 0628000026

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Orders

**Order Date/Time 10/7/2006 08:53**

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Demerol 50 mg / 1 mL injection** | Order | Completed | Pharmacy |

| Ordering Physician | Order Placed By |
|---|---|
| HUFF CRNP, STEPHANIE D | HUFF CRNP, STEPHANIE D |

Review Information
Pharmacist Verify, Not Reviewed -

Order Details
50 mg, Injection, IM, Once, PRN, Pain, Routine, 10/07/06 8:51:00, 4 day(s), Stop date 10/11/06 8:50:00

**Order Date/Time 10/7/2006 08:53**

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Phenergan 25 mg / 1 mL injection** | Order | Completed | Pharmacy |

| Ordering Physician | Order Placed By |
|---|---|
| HUFF CRNP, STEPHANIE D | HUFF CRNP, STEPHANIE D |

Review Information
Pharmacist Verify, Not Reviewed -

Order Details
25 mg, Injection, IM, Once, Routine, 10/07/06 8:51:00, Stop date 10/07/06 8:51:00

## Vital Signs

|  | Date | 10/7/2006 |
|---|---|---|
|  | Time | 08:22 |
| Procedure | Units |  |
| Temp DegF | DegF | 96.6 |
| Peripheral Pulse Rate |  | 90 |
| Respiratory Rate |  | 18 |
| Systolic Blood Pressure |  | 222 |
| Diastolic Blood Pressure |  | 118 |
| Oxygen Therapy |  | Room air |
| Oxygen Saturation | % | 99 |

## Intake/Output

|  | Date | 10/7/2006 | 10/7/2006 |
|---|---|---|---|
|  | Time | 09:22 | 09:21 |
| Procedure | Units |  |  |
| meperidine | mg |  | 50.000000 |
| orphenadrine | mg | 60.000000 |  |

**WPH
001333**

| Print Date/Time: | 7/26/2007 2:29 PM | MRN: | 0000819996 |
|---|---|---|---|
| Page 4 of 7 |  | Financial #: | 0628000026 |

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Intake/Output

|  | Date | 10/7/2006 | 10/7/2006 |
|--|------|-----------|-----------|
|  | Time | 09:22 | 09:21 |

| Procedure | Units | |
|-----------|-------|--|
| promethazine | mg | 25.000000 |

## Allergy List

| Substance: **NKA** | |
|---|---|
| Update Dt Tm  Updated By | |
| 10/4/2006 16:41:21  COOK RN, ALLISON M | Reaction Status: Active;  Type: Allergy;  Category: Drug; |

## Medication Administration Record

**WPH**

001334

---

MRN:        0000819996
Financial #:  0628000026

**SANKS, BOBBY L**

## SCHEDULED MEDS

**Norflex 60 mg / 2 mL injection(Norflex)  2 mL = 60 mg**                    (Order Id = 47728023.00)
  60 mg, Injection, IM, Once, Routine, 10/07/06 8:53:00, Stop date 10/07/06 8:53:00
    Order Entered By: HUFF CRNP, STEPHANIE D

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/07/06 09:22 | 10/07/06 09:22 | orphenadrine 60 mg / 2 mL IM |
|  |  |  | Perform:PRUNESTI RN, TRACY D |
| Complete |  | 10/07/06 09:22 |  |
|  |  |  | Performed By: PRUNESTI RN, TRACY D |

**Phenergan 25 mg / 1 mL injection(Phenergan)  1 mL = 25 mg**                    (Order Id = 47727950.00)
  25 mg, Injection, IM, Once, Routine, 10/07/06 8:51:00, Stop date 10/07/06 8:51:00
    Order Entered By: HUFF CRNP, STEPHANIE D

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/07/06 09:22 | 10/07/06 09:22 | promethazine 25 mg / 1 mL IM |
|  |  |  | Perform:PRUNESTI RN, TRACY D |
| Complete |  | 10/07/06 09:22 |  |
|  |  |  | Performed By: PRUNESTI RN, TRACY D |

## PRN

**Demerol 50 mg / 1 mL injection(Demerol HCl)  1 mL = 50 mg**                    (Order Id = 47727937.00)
  50 mg, Injection, IM, Once, PRN, Pain, Routine, 10/07/06 8:51:00, 4 day(s), Stop date 10/11/06 8:50:00
    Product Note:  HIGH RISK DRUG, LEVEL 2.
    Order Entered By: HUFF CRNP, STEPHANIE D

| ACTION(S) | CHARTED @ | ADMIN TIME(S) | ADMIN DETAIL(S) |
|---|---|---|---|
| Med Given | 10/07/06 09:22 | 10/07/06 09:21 | meperidine 50 mg / 1 mL IM |
|  |  |  | Reason for Medication: Pain |
|  |  |  | Perform:PRUNESTI RN, TRACY D |
| *Response* | 10/07/06 09:54 | 10/07/06 09:54 | PRN Pain Response Form |
|  |  |  | PRN Pain Response v2 |
|  |  |  | Pain Intensity: 8 |
|  |  |  | Perform:PRUNESTI RN, TRACY D |
| Complete |  | 10/07/06 09:22 |  |
|  |  |  | Performed By: PRUNESTI RN, TRACY D |

**WPH**
**001335**

East Alabama Medical Center

**ALL CLINICALLY PERTINENT INFORMATION HAS BEEN PRINTED ON THE PREVIOUS PAGE(S).**

WPH
001336

MRN:          0000819996
Financial #:  0628000026
**SANKS, BOBBY L**

| ACCOUNT NO. | ADMISSION DATE / TIME | F.C. | DATE OF BIRTH | AGE | SEX | RACE M-S | DEPT. LOC. CODE | | PAT TYPE | BY | UNIT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06277-00453 | 10/04/06 4:27pm | SP | | 55Y | M - 2 - S | | ER | | OER | RLW | 819996 |

| PATIENT NAME | SOC-SEC-NO | PREVIOUS ADMIT NAME/DATE | ARRIVAL MODE |
|---|---|---|---|
| SANKS,BOBBY L | | SANKS,BOBBY L        07/03/04 | CAR |

**THIS DOCUMENT IS FOR TREATMENT INFORMATION ONLY.**
**FINANCIAL AND DEMOGRAPHIC INFORMATION SHOULD BE OBTAINED FROM THE DEMOGRAPHIC SHEET.**

| V.S.: | T | P | R | BP | | DICTATED NOTE | MD ORDER TIME | CLK ORDER TIME | TEST | RESULTS TIME | TEST RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Chem-6 | | |
| | | | | | | | | | HCG /HS | | |
| | | | | | | | | | Hemogram, CBC | | |
| | | | | | | | | | PROF 1 / 3 | | |
| | | | | | | | | | AMYLASE / LIPASE | | |
| | | | | | | | | | Troponin | | |
| | | | | | | | | | PT / PTT | | |
| | | | | | | | | | ETOH | | |
| | | | | | | | | | ABG | | |
| | | | | | | | | | G & C PACE | | |
| | | | | | | | | | EKG | | |
| | | | | | | | | | CXR PORT, PA&L | | |
| | | | | | | | | | C-Sp. XT/Cmpl | | |
| | | | | | | | | | L-Sp. XT /Cmpl | | |

CERTIFIED EMERGENCY

- [ ] YES
- [ ] NO

OLD CHART

CT, S/C of:

| EVENT | TIME | INITS | MD ORDER TIME | TREATMENT | TIME DONE | INITS |
|---|---|---|---|---|---|---|
| TRIAGE | | | | | | |
| ROOM PLACEMENT | | | | | | |
| EMD ARRIVES | | | | | | |
| EMD D/C | | | | | | |
| N D/C | | | | | | |
| INPT. BED REQUEST | | | | | | |
| INPT. ADMISSION | | | | | | |
| LOS | | | | | | |
| DATE: | | | | | | |

- Telemetry Monitor
- O2
- IV
- Td

- [ ] ADMITTED TO ROOM NO:    LEFT WITH:    VIA:
- [ ] RELEASED  [ ] TRANSFERRED/REFERRED TO:    INV. OFFICER NAME    CORONER NOTIFIED

- [ ] ABLE TO WORK
- [ ] UNABLE TO WORK FOR _____ DAYS
- [ ] LIGHT/LIMITED DUTY _____ DAYS

CONDITION ON DISCHARGE:

- [x] GOOD  [ ] IMPROVED  [ ] CRITICAL

INFECTION CONTROL NOTICE

| PHYSICIAN'S SIGNATURE | DISCHARGE NURSE's SIGNATURE | RN LPN |
|---|---|---|

**EAST ALABAMA MEDICAL CENTER**
**EMERGENCY DEPARTMENT**
**TREATMENT SHEET**

Patient Identification
06277-00453        819996
SANKS,BOBBY L
DOB:
DOCTOR,ER  Adm:10/04/06

WPH
001337

### East Alabama Medical Center
2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**

| | | |
|---|---|---|
| MRN: | 0000819996 | Admit Date/Time: | 10/4/2006 16:27:00 |
| Financial #: | 0627700453 | Discharge Date/Time: | 10/4/2006 20:07:00 |
| DOB: | | Location: | ED |
| | Age: 56 years  Sex:Male | Patient Type: | ER |
| | | Attending Dr.: | **HEIDEPRIEM, PHILLIP M** |

---

## Emergency Department Report

Emergency Department

**PATIENT NAME:**      Sanks, Bobby L

**DATE OF SERVICE:** 10/04/2006

**CHIEF COMPLAINT:** Left thigh pain.

This 55-year-old black male presented to the emergency room for evaluation of reported left thigh pain.  The patient states his symptoms have been present for approximately four days.  The patient was seen and evaluated at Auburn Urgent Care.  The patient was started on Lortab 7.5 and a Medrol Dose Pack.  The patient has only taken two days.  The patient states it is not helping.  The patient denies fever, chills, or rash.  The patient denies trauma or strain.  The patient states it feels like a cramping type pain.  The patient states the pain appears to come and go.  The patient denied any buttocks pain.  The patient denies numbness, tingling or weakness.  The patient denies hip pain.  The patient denies abdominal pain, nausea or vomiting.  The patient denies any dysuria, pyuria, or gross hematuria.

**PAST MEDICAL HISTORY:** Medically, the patient reportedly has been followed for a history of hypertension.  The patient is not taking any antihypertensive medications.

**ALLERGIES:** No known drug allergies.

**PHYSICAL EXAMINATION:**
**VITAL SIGNS:** Temperature 95.9, pulse 71 and regular, respiratory rate 16 and nonlabored and blood pressure 197/119. Oxygen saturation was 99% on room air.

**GENERAL:** The patient was alert and oriented and walked with a slight limp.

**HEENT:** Was grossly normal.

**LUNGS:** Clear, moving air well bilaterally.  No rales, wheeze, rhonchi appreciated.

**CV:** Regular rate and rhythm without murmur, rub, or gallop.

**ABDOMEN:** Soft, nontender, without organomegaly or masses.  Bowel sounds active.  No rebound.  No guarding.

**BACK AND SPINE:** The patient had no dorsal, lumbar, or vertebral tenderness.

**PELVIS:** Was intact to anterior to posterior rocking-type motion.

WPH
001338

**EXTREMITIES:** Negative straight leg lift but the patient had severe pain with stretching of the hamstring muscle.  The patient states that this was the same type of pain that he described above.  The patient had negative straight leg lift, negative knee flexions and rotations to the right lower.  The patient again had some discomfort with stretching the hamstring on the left; otherwise rotations were

---

| | | |
|---|---|---|
| Chart Request ID:  4321211 | | MRN:      0000819996 |
| Print Date/Time:    7/26/2007  2:31 PM | | Financial #:  0627700453 |
| Page  1 of 7 | | |
| | | **SANKS, BOBBY L** |

**East Alabama Medical Center**

## Emergency Department Report

within normal limits. Dorsalis pedis posterior tibial pulses were +2/4 equal and symmetrical. The patient also had some mild tenderness over the left sciatic distribution but it was difficult to reproduce.

**NEUROLOGICAL:**  Glasgow coma scale of 15. Motor strength 5/5, equal and symmetrical.

**SKIN:** Dry without rash, lacerations, abrasions, or ecchymosis.

**PSYCHIATRIC:** Mood and affect are appropriate.

**IMPRESSION:**
1. Left leg pain.
2. Left hamstring pull.
3. Hypertension.

**MEDICAL DECISION MAKING:**    The patient was advised to take his antihypertensive medications.   The patient was cautioned about poorly or uncontrolled hypertension being associated with sudden death, strokes, heart attacks, or other disorders.  The patient was advised no exertional activity for three days.  The patient had a six-inch wrap to the left thigh and placed on crutches.  The patient states he was feeling better.  The patient was advised to stop taking the Medrol Dose Pack.  The patient had not been taking them long enough to get an adrenal insufficiency.   The patient will be treated with Naprosyn.  The patient has a prescription for Lortab.  The patient was advised to follow-up with Dr. Hillyer if further problems.  The possibility of sciatic pain cannot be excluded as well.

Job ID: #000589166

DP:    Phillip Heidepriem, MD
TR:    wgl
DD:    10/04/2006  7:59 P
DT:    10/05/2006  4:47 A
           808568
Doc:    000589166
Job#:
cc:

Electronically Signed By:  PHILLIP M HEIDEPRIEM
                On 10/05/06 23:29

DD:  10/04/06  TD:  19:59

## Emergency Department Forms

ED Assessment Adult
10/04/06 06:27 pm Performed by SMITH RN, ALEXANDRA L
Entered on 10/04/06 06:27 pm

**Health Hx**
Past Medical History                          Verified

WPH
001339

MRN:        0000819996
Financial #:  0627700453

SANKS, BOBBY L

**East Alabama Medical Center**

## Emergency Department Forms

### ED Assessment Adult
**10/04/06 06:27 pm Performed by SMITH RN, ALEXANDRA L**
**Entered on 10/04/06 06:27 pm**

**Health Hx**
Previous Surgery History Grid
  1. Surgery Description                 None
Health History ED Grid
    High Blood Pressure:  Yes
Medical Devices                      None
Traveled Abroad                     No

**Home Meds v2**
Home Meds                         Verified

### ED Education
**10/04/06 08:06 pm Performed by SMITH RN, ALEXANDRA L**
**Entered on 10/04/06 08:07 pm**

**Education**
ED Education Grid
  1. Education Topics ED          Crutch walking
    Individuals Taught          Patient
    Teaching Method           Demonstration, Explanation
    Teaching Evaluation        Returns demonstrations correctly, Verbalizes
                               understanding

### ED Triage Adult
**10/04/06 04:40 pm Performed by COOK RN, ALLISON M**
**Entered on 10/04/06 04:45 pm**

**General**
Allergies                      Verified
Mode of Arrival                  Ambulatory
Method of Arrival              Private vehicle
Wt (kg)                        72.00 kg
Height                         67.00 in
Regular Doctor                   FULLER
Allergy                        Reaction
1. NKA
LMP                           N/A
Last Tetanus                    < 5 years
Nutritional Screen             Adequate
Unintentional Weight Change    No
Preferred Communication Mode   Verbal
Languages                    English
Ambulatory Devices            None
Domestic Concerns             None

**Health Hx**
Past Medical History           Verified
Previous Surgery History Grid
  1. Surgery Description          None
Health History ED Grid
    High Blood Pressure:  Yes
Medical Devices                      None
Traveled Abroad                     No

**Home Meds**
Home Meds                         None

**Vital Signs**
Temp DegF                    95.9 DegF

**WPH**
**001340**

---

MRN:     0000819996
Financial #:  0627700453

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Emergency Department Forms

ED Triage Adult
10/04/06 04:40 pm Performed by COOK RN, ALLISON M
Entered on 10/04/06 04:45 pm

**Vital Signs**
| | |
|---|---|
| Temp Source | Oral |
| Peripheral Pulse Rate | 71 |
| Systolic Blood Pressure | 197 |
| Diastolic Blood Pressure | 119 |
| Respiratory Rate | 16 |
| Oxygen Saturation | 99 % |
| Oxygen Therapy | Room air |

**Assess/Tx**
| | |
|---|---|
| Chief Complaint | LEFT LEG PAIN - STARTED 4 DAYS AGO, DENIES SWELLING/REDNESS/INJURY, STARTS IN LEFT HIP AND RADIATES TO LEFT CALF, PT STATES FEELS LIKE BAD CRAMP IN LEG |
| Pre-Arrival Data | SEEN AT AU URGENT CARE AND GIVEN PAIN MEDS AND STEROIDS BUT NOT HELPING |
| Pain Intensity | 10 |
| Acceptable Pain Intensity | 2 |
| Level of Consciousness | Alert |
| Orientation | Oriented x 3 |
| Affect/Behavior | Calm, Cooperative |
| Distress | None |
| Skin Color | Normal for ethnicity |
| Skin Description | Dry |
| Skin Temperature | Warm |
| Respiratory Symptoms | None |
| Triage Acuity Level | IV-Less Urgent |

## Orders

Order Date/Time 10/4/2006 19:53

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **naproxen** | Order | Discontinued | Pharmacy |
| Ordering Physician HEIDEPRIEM, PHILLIP M | | Order Placed By HEIDEPRIEM, PHILLIP M | |
| Review Information N/A | | | |
| Order Details | | | |
| 375 mg, 1 tab(s), PO, BID, Scheduled / PRN, 14 tab(s), 0, 0, with food | | | |

Order Date/Time 10/4/2006 19:52

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **Crutches** | Order | Completed | Patient Care |
| Ordering Physician HEIDEPRIEM, PHILLIP M | | Order Placed By HEIDEPRIEM, PHILLIP M | |
| Review Information N/A | | | |
| Order Details | | | |
| 10/04/06 19:51:00, Once | | | |

**WPH**
**001341**

MRN:        0000819996
Financial #:  0627700453

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Orders

Order Date/Time 10/4/2006  19:52

| Mnemonic<br>**ACE Wrap Application** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Patient Care |
|---|---|---|---|
| Ordering Physician<br>HEIDEPRIEM, PHILLIP M | | Order Placed By<br>HEIDEPRIEM, PHILLIP M | |
| Review Information N/A | | | |
| Order Details<br>10/04/06 19:51:00, Once, 6 " ace wrap to lt thigh | | | |

Order Date/Time 10/4/2006  19:10

| Mnemonic<br>**XR Hip Complete Left** | Action<br>Order | Order Status<br>Completed | Type of Order<br>Radiology |
|---|---|---|---|
| Ordering Physician<br>HEIDEPRIEM, PHILLIP M | | Order Placed By<br>Gunn, Joshua X | |
| Review Information<br>Nurse Review, Not Reviewed - | | | |
| Order Details<br>Stat, 10/04/06 18:44:00, Stretcher, Rad Type, Hip Pain | | | |

Order Date/Time 10/4/2006  18:44

| Mnemonic<br>**XR Hip Complete Right** | Action<br>Order | Order Status<br>Canceled | Type of Order<br>Radiology |
|---|---|---|---|
| Ordering Physician<br>HEIDEPRIEM, PHILLIP M | | Order Placed By<br>HEIDEPRIEM, PHILLIP M | |
| Review Information N/A | | | |
| Order Details<br>Stat, 10/04/06 18:44:00, Stretcher, Rad Type, Hip Pain | | | |

Order Date/Time 10/4/2006  18:44

| Mnemonic<br>**ED Xrays** | Action<br>Order | Order Status<br>Discontinued | Type of Order<br>Patient Care |
|---|---|---|---|
| Ordering Physician<br>HEIDEPRIEM, PHILLIP M | | Order Placed By<br>HEIDEPRIEM, PHILLIP M | |
| Review Information N/A | | | |
| Order Details<br>N/A | | | |

Order Date/Time 10/4/2006  18:28

| Mnemonic<br>**Vital Signs** | Action<br>Order | Order Status<br>Pending Complete | Type of Order<br>Patient Care |
|---|---|---|---|
| Ordering Physician<br>DOCTOR, ER | | Order Placed By<br>SMITH RN, ALEXANDRA L | |
| Review Information N/A | | | |
| Order Details<br>10/04/06 18:28:00, Q2hrINT for 4 hr(s) | | | |

**WPH**
**001342**

MRN:        0000819996
Financial #:  0627700453

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Orders

Order Date/Time 10/4/2006  18:28

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **ED Common Orders** | Order | Completed | Patient Care |
| Ordering Physician DOCTOR, ER | | Order Placed By SMITH RN, ALEXANDRA L | |
| Review Information N/A | | | |
| Order Details N/A | | | |

Order Date/Time 10/4/2006  16:43

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **methylprednisolone** | Order | Discontinued | Pharmacy |
| Ordering Physician | | Order Placed By COOK RN, ALLISON M | |
| Review Information N/A | | | |
| Order Details See Instructions, 0, 0, as directed on package labeling | | | |

Order Date/Time 10/4/2006  16:43

| Mnemonic | Action | Order Status | Type of Order |
|---|---|---|---|
| **acetaminophen-hydrocodone** | Order | Discontinued | Pharmacy |
| Ordering Physician | | Order Placed By COOK RN, ALLISON M | |
| Review Information N/A | | | |
| Order Details 1 tab(s), PO, Q4hr, Scheduled / PRN, 0, 0 | | | |

## Diagnostic Radiology

| Accession Number | Exam | Exam Date/Time | Ordering Dr. |
|---|---|---|---|
| XR-06-0044340 | XR Hip Complete Left | 10/4/2006 19:15:42 | HEIDEPRIEM, PHILLIP M |

Reason for Exam
**Hip Pain**

**Report**
SANKS, BOBBY

LEFT HIP COMPLETE  10/04/2006:

Two views demonstrate no fracture, subluxation, or arthropathy in the left hip or left sacroiliac joint.

IMPRESSION:  NO FRACTURE.

Dictated date:  10/05/2006

WPH
001343

MRN:      0000819996
Financial #: 0627700453

**SANKS, BOBBY L**

**East Alabama Medical Center**

## Diagnostic Radiology

| | | | |
|---|---|---|---|
| Accession Number | Exam | Exam Date/Time | Ordering Dr. |
| XR-06-0044340 | XR Hip Complete Left | 10/4/2006 19:15:42 | HEIDEPRIEM, PHILLIP M |

Dictated time:  0804 hours

\*\*\* Final Report \*\*\*
Dictating Radiologist:   Ng, Roland
Signed Date and Time:   10/05/2006 10:47
Transcribed by:   SHS
Transcribed Date and Time: 10/05/2006 10:38

## Vital Signs

| | | |
|---|---|---|
| | Date | 10/4/2006 |
| | Time | 16:40 |
| Procedure | Units | |
| Temp DegF | DegF | 95.9 |
| Temp Source | | Oral |
| Peripheral Pulse Rate | | 71 |
| Respiratory Rate | | 16 |
| Systolic Blood Pressure | | 197 |
| Diastolic Blood Pressure | | 119 |
| Oxygen Therapy | | Room air |
| Oxygen Saturation | % | 99 |

## Allergy List

| Substance: NKA | |
|---|---|
| Update Dt Tm  Updated By | |
| 10/4/2006 16:41:21  COOK RN, ALLISON M | Reaction Status: Active;  Type: Allergy;  Category: Drug; |

**WPH**
**001344**

| PATIENT | ACCOUNT NO. | ADMISSION DATE / TIME | F.C | DATE OF BIRTH | AGE | SEX RACE MS | DEPT. LOC. CODE | PAT TYPE | BY | UNIT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04185-00159 | 07/03/04 10:45p | SP | | 53Y | M - S | | QER | KFF | 819996 |

| PATIENT NAME | SOC-SEC-NO | PREVIOUS ADMIT NAME/DATE | ARRIVAL MODE |
|---|---|---|---|
| SANKS,BOBBY L | | SANKS,BOBBY L    10/08/03 | CAR |

**THIS DOCUMENT IS FOR TREATMENT INFORMATION ONLY.**
**FINANCIAL AND DEMOGRAPHIC INFORMATION SHOULD BE OBTAINED FROM THE DEMOGRAPHIC SHEET.**

V.S.: T 99⁵ P 77 R 18 BP 157/89 ☐DICTATED NOTE

Sore throat

| | MD ORDER TIME | CLK ORDER TIME | TEST | RESULTS TIME | TEST RESULTS |
|---|---|---|---|---|---|
| | | | U/A Ur. C & S | | |
| | | | HCG, U / S | | |
| | | | Hemogram, CBC | | |
| | | | PROF 1 / 3 | | |
| | | | AMYLASE / LIPASE | | |
| | | | Troponin | | |
| | | | PT / PTT | | |
| | | | ETOH | | |
| | | | ABG | | |
| | | | G & C PACE | | |
| | | | EKG | | |
| | 0046 | | CXR PORT, Pees | | ⑦ LLL |
| | 0052 | | C-Sp, XT/Cmpl | | |
| | | | L-Sp, XT/Cmpl | | |
| | | | Rapid strep ⊖ | | |

MD EVALUATION & NOTES

| CERTIFIED EMERGENCY | | | | OLD CHART | |
|---|---|---|---|---|---|
| ☒ YES | | | | | |
| ☐ NO | | | | CT, S/C of: | |

| EVENT | TIME | INITS | MD ORDER TIME | TREATMENT | TIME DONE | INITS |
|---|---|---|---|---|---|---|
| Triage | 2252 | | | | | |
| ROOM PLACEMENT | | | | | | |
| EMD ARRIVES | 0017 | | | Gent Drops Ⓡ Eye | 0115 | |
| EMD D/C | | | | | | |
| N D/C | 0135 | | 0114 | Zithromax 500 g × 0Ⓡ | | |
| INPT. BED REQUEST | | | | | | |
| INPT. ADMISSION | | | | End IV 10cc | 0135 | |
| LOS | | | | | | |
| DATE: | 7/4/04 | | | | | |

DX

① Cough - ? Lft ⑦₂
② Conjunctivitis Ⓡ Eye

DSP
☐ ADMITTED TO ROOM NO:    LEFT WITH:    VIA:
☐ RELEASED  ☐ TRANSFERRED/REFERRED TO:    INV. OFFICER NAME    CORONER NOTIFIED ☐

| | ☐ Telemetry Monitor | |
|---|---|---|
| | ☐ O2 | |
| | ☐ IV | |
| | ☐ Td | |

DC INSTR

End IV 4oz    Extra Rest & Fluids
Z-Pak × 5    Return to work
NS  P33

| | ☐ ABLE TO WORK | |
|---|---|---|
| | ☐ UNABLE TO WORK FOR ___ DAYS | |
| | ☐ LIGHT/LIMITED DUTY ___ DAYS | |

CONDITION ON DISCHARGE:

☐ GOOD  ☒ IMPROVED  ☐ CRITICAL

INFECTION CONTROL NOTICE

PHYSICIAN's SIGNATURE    DISCHARGE NURSE's SIGNATURE    RN LPN

WPH
001345

**EAST ALABAMA MEDICAL CENTER**
**EMERGENCY DEPARTMENT**
**TREATMENT SHEET**

Patient Identification
04185-00159        819996
SANKS BOBBY L
DOB:
MOORE,ALAN L  Adm:07/03/04

04185-00159                 819996
**SANKS,BOBBY L**
RM:0033B  DOB:              M53Y
Adm:07/03/04                36874

# East Alabama Medical Ce

## Authorization for Medical, Emergency, and Diagnostic Treatments

(1)  I wish to be admitted or receive treatment at East Alabama Medical Center (EAMC) or an associated facility of EAMC. While I am at EAMC, I permit my doctor, EAMC and its employees, and all other persons caring for me to treat me in ways they judge are beneficial to me.  I understand that treatment in the Emergency Department will be provided by a physician and/or nurse practitioner based upon the level of severity of my illness/injury.   I understand that this care may include examinations, tests, medical and surgical treatment.  No guarantees have been made to me about the outcome of this care. (2) EAMC serves as a training center for students in a variety of different health care professions.  Students will sometimes be allowed to observe procedures which would benefit their educational experience.  I do not object to students observing my care, treatment or procedures performed upon me. (3) I understand that photographs or films may be taken during the course of my treatment to be made a part of my medical record.  I do not object to the taking of these photographs or films. (4)  I understand that all the physicians involved in my care are independent contractors and not agents, servants or employees of the hospital.

## Release of Medical Information

I, the undersigned as the patient or his/her authorized representative, authorize EAMC and any other professionals who provided care, treatment or services to release to my insurance company(ies) or their authorized representative or other appropriate agency(ies) that information which is necessary to validate this claim for payment purposes. This includes my employer if workers' compensation is claimed.  EAMC is also authorized to release to my physician(s), or the persons authorized to bill for them, such information as necessary for billing purposes, including, without limitation, all records and information pertaining to my medical treatment (including that for drug & alcohol abuse), laboratory & other diagnostic tests results, x-rays, therapy, diagnoses and prognosis.  In the event that I am transferred to another healthcare facility, I authorize EAMC to make a copy of my medical records for the receiving healthcare facility.

## Release of Responsibility for Loss of Valuables

I understand that EAMC will not be responsible for valuables, including jewelry, watches, money, etc., not specifically placed in the care of EAMC through proper procedures.  I also understand that EAMC cannot be responsible for personal items such as clothing, glasses, dentures, etc., inadvertently damaged or misplaced during my course of treatment.  I accept full responsibility for those valuables or personal items which I choose to keep in my possession.

## Assignment of Insurance and Financial Responsibility

I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency and/or diagnostic treatments, to be made directly to EAMC, EAPS, Alabama Imaging, Emergency Transport Systems, ED Physicians and/or Anesthesia Associates of East Alabama.  I understand that I am financially responsible for all charges not covered by insurance payments, including private-room differentials, and that all efforts for collection of the benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by EAMC, EAPS, Alabama Imaging, Emergency Transport Systems, ED Physicians and/or Anesthesia Associates of East Alabama.  I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, or authorize such physician or physician group to submit a claim to my insurance company(ies), Medicare and/or Medicaid.  I will be responsible for any collection fees, court costs and/or attorney fees incurred by EAMC or any physician participating in my care while collecting on my account(s).  Photocopies of this authorization are as valid as the original.

## Medicare and/or Medicaid Patient's Certification

I certify that the information given by me in applying for payment under Title XVIII or Title XIX of the Social Security Act is correct.  I authorize any holder of medical or other information about me to release such information to the Social Security Administration of the State of Alabama or any of their intermediaries or carriers for this or a related Medicare or Medicaid claim.  I request that payment of authorized benefits be made to EAMC, EAPS, Alabama Imaging, Emergency Transport Systems, ED Physicians. Anesthesia Associates of East Alabama and/or other physicians involved in my care on my behalf.

**Alabama Imaging Patients:** I understand that Medicare will not pay for routine chest x-rays or screening mammograms that are done within 23 months following the month in which a previous screening mammogram was done and that I will be responsible for payment of these services.  I understand that I am responsible for any health care deductibles and 20% of the reasonable charges for out-patient services.  I realize that I am financially responsible for all services performed by Alabama Imaging, P.C. whether or not insurance is involved.

Patient's Signature: _Bobby L. Sanks_    Date: _7-3-04_
or their Authorized Representative: _____ Relationship: _____    Witness: _____
If the patient or their authorized representative is unable to sign, state the reason why here: _____

| |
|---|
| **Patient Rights and Responsibilities:** I have received a copy of and understand my rights and responsibilities as a patient of EAMC.   Patient's Initials: _B.L.S_ |

SCAN-CONSENT

**WPH
001346**

Patient Name: Bobby Sanks

Date: 7/3/04    Time: 2250

Age: 53    ☒ M    ☐ F

Weight: 74.8    ☒ kg    ☐ lbs.

Immunizations / Tetanus: UTD

ALLERGIES: NKDA

Chief Complaint: Sore throat

PVT M.D. Fuller    / Req. No Yes

LMP: Ø

PMH: HTN

PSH: Ø

Education Barriers: Ø

Language: English

Functional Needs: ☒ Ambulatory  ☐ Cane/Walker
☐ Wheel Chair  ☐ Bed Bound

Nutritional Needs:
Appears adequately nourished: ☒ Yes ☐ No
Unexplained weight loss: _____
Other: _____

Referred patient to M.D. regarding nutritional
status:  ☐ Yes ☒ No
Have you traveled outside US in last 10 days?
☐ Yes ☒ No

**DOMESTIC VIOLENCE ASSESSMENT**

Are you being hurt by someone you live with or who takes care of you?  ☐ Yes  ☒ No

Referral: ☐ No  ☐ Yes
Referral Source

**ASSESSMENT:** Arrived by  ☐ AMB  ☒ POV

| SKIN | PAIN LEVEL | MENTAL | RESPIRATORY |
|---|---|---|---|
| ☒ Warm  ☒ Pink | ☐ (0-10) | ☒ Alert | ☒ Regular |
| ☒ Hot  ☐ Pale | | ☒ Oriented | ☒ Labored |
| ☐ Cool  ☐ Ashen | | ☐ Confused | ☐ Shallow |
| ☐ Dry  ☐ Flushed | ☐ Functional | ☐ To Verbal | ☐ Retractive |
| ☐ Moist  ☐ Cyanotic | Goal (0-10) | ☐ To Pain | ☐ Crying |
| ☐ Clammy  ☐ Jaundice | | ☐ Unresponsive | ☐ None |
| ☐ Bruises  ☐ Burns | | | |

| LUNGS | ABDOMEN | INJURY |
|---|---|---|
| ☒ Clear | ☒ Soft | ☐ Laceration to: |
| ☐ Rales | ☐ Distended | ☐ Length: |
| ☐ Rhonchi | ☐ Tender | ☐ Bleeding: |
| ☐ Wheezing | ☒ Nontender | ☐ + Pulse |
| ☐ Inspiration | ☒ B.S.x4 | ☐ + Deformity to: |
| ☐ expiration | | ☐ Sensation (+) _____ (-) |
| | | ☐ Cap. Refill: |

**BASIC TRAUMA LIFE SUPPORT**

☐ Rhythm (Cardiac):_____  ☐ C-Collar  ☐ Splints to_____
☐ IV / pta Gauge:_____  ☐ B-Board  ☐ O₂ _____ /L
☐ Site:_____  ☐ Bashaw
☐ Fluid:_____

**HOME MEDICATIONS**

Diovan

| TIME | T | P | R | BP | O₂ SAT | ACCUCHEK |
|---|---|---|---|---|---|---|
| 2251 | 99.5 | 77 | 18 | 161/84 | 94% | |

Medication Given in Triage: _____    Time / Initial: _____

**HISTORY / ASSESSMENT**

c/o sore throat  cold symptoms + red eyes x1 week
Coughing up yellow sputum

INITIAL PHYSICIAN NOTE    TIME SEEN: _____

Amy Jordan, RN
Triage Nurse Signature (Full Name)

**TRIAGE CATEGORY:** ☐ RED / STAT  ☐ YELLOW / URGENT  ☐ GREEN / NON-URGENT  ☒ BLUE / CLINIC

**EAST ALABAMA MEDICAL CENTER
EMERGENCY DEPARTMENT
TRIAGE ASSESSMENT FLOWSHEET**

4IM0067-0403-1-1

Patient Identification
04185-00159        819996
SANKS, BOBBY L
RM:0033B   DOB:        M53Y
Adm:07/03/04            36874

EAST ALABAMA MEDICAL CENTER                                    EMERGENCY ROOM NURSES NOTES

DATE: 7/4/04          Pt. Name: _____    Account # _____

| TIME | |
|------|--|
| 0135 | Pt. NC home. Gentamycin drops given to</br>Rp. Endal HD given. To po. Zithromax 500 mg</br>given po. NC instructed on and resc. proc.</br>given. No further complaints or requests. |

WPH
001348

| TIME | TEMP | PULSE | RESP. | BP | 02 SAT | ACCU ✓ | INITIALS |
|------|------|-------|-------|-----|--------|--------|----------|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

East Alabama Medical Center
2000 Pepperell Parkway
Opelika, Alabama 36801-5456
(334)749-3411

Sanks, Bobby L
Physician: Alan Moore, MD
Admit Date: 07/03/2004
Location: ER
Disch Date: 07/04/2004

---

## Emergency Department Report

**CHIEF COMPLAINT:**            Sore throat.

**HISTORY:**            The patient is a 53 year-old black male who presents now complaining of congestion, throat discomfort, chest discomfort, and pinkeye for the past several days. He states when he coughs, his chest feels sore. He coughs up yellow sputum. He denies shortness of breath, vomiting, fever or chills. He states his throat is quite sore, and he has a small amount of sinus drainage, for which he is taking a sinus pill.

**PAST MEDICAL HISTORY:**            Is per patient significant only for hypertension.

**SOCIAL HISTORY:**            The patient does not smoke.

**REVIEW OF SYSTEMS:**            The patient reports no drug allergies. He is not diabetic.

**PHYSICAL EXAMINATION:**            The patient is a healthy appearing 53 year-old in no acute distress, sitting upright in the ENT chair. The patient is afebrile. Vital signs are stable. 02 sat on room air is 94%. Temperature is 99.5.

**HEENT:**            Exam is normocephalic and atraumatic. Pupils are equal, round and reactive to light. Sclerae are nonicteric. TM's are retracted. There is no significant nasal congestion seen. Oropharynx shows no significant tonsillar erythema, exudate or swelling.

**NECK:**            Is supple. No mass or adenopathy.

**CV:**            Examination shows regular rate and rhythm.

**PULMONARY:**            Examination shows good air exchange. No rales, rhonchi, or wheezing.

Sanks, Bobby L
Acct No.            0418500159
MR#:            0000-81-99-96
Location:            ER

**EMERGENCY DEPARTMENT REPORT**   1 of 2

**CHART COPY**

WPH
001349

ABDOMEN: Is soft.  Good bowel sounds.  No masses.

EXTREMITIES:    Show no edema.

SKIN:    Shows no rash.  Good turgor.

NEUROLOGIC EXAM:    Is nonfocal.

EYE EXAM:  Showed there to be impressive right eye conjunctivitis with erythema and swelling of the conjunctiva.

**EMERGENCY DEPARTMENT COURSE:**    In light of his slight rhinorrhea, his cough, his conjunctivitis and sore throat, it certainly appears to be most likely viral in origin.  Will check x-ray of the chest to rule out pneumonia.  Will check rapid strep swab.  If x-ray is clear, and strep swab is negative, I do not feel like antibiotics are indicated.  In that case, will treat with anti-tussives, rest and usual measures.  Will also give the patient Gentamicin drops for his right eye.  If x-ray shows abnormalities or strep swab is positive, will also use antibiotics.

Please see Emergency Department chart for final disposition of this patient.

Electronically signed by
Alan Moore, MD 07/09/2004 15:04
Alan Moore, MD

| | |
|---|---|
| TR: | jbc |
| DD: | 07/04/2004 12:26 A |
| DT: | 07/05/2004 9:22 A |
| Doc: | 672664 |
| cc: | |

Sanks, Bobby L
Acct No:        0418500159
MR#:           0000-81-99-96
Location:       ER

**EMERGENCY DEPARTMENT REPORT**  2 of 2

**CHART COPY**

WPH
001350

EAST ALABAMA MEDICAL CENTER
2000 PEPPERELL PARKWAY
OPELIKA, ALABAMA  36802-3201
(334) 705-1156

**SANKS, BOBBY L**

Age: 53 YRS    Sex: M  DOB: 01/05/1951
Admit Date: 07/03/04
Acct#: 0418500159MR#:(0000)0-000819996
HIS Order#:  007836281

ATTENDING PHYSICIAN: MOORE, ALAN
ORDERING PHYSICIAN:  MOORE, ALAN

Pt. Type: EMERGENCY
Location: ER

---

## DIAGNOSTIC RADIOLOGY

---

Exam: **CHEST**                    Date: 07/04/04   Time   0052
Reason for Exam: ;SORE THROAT, COLD S/S
Folder #: 01-01-000000000819996-01-001          ,          Acces #: RA-04-33331

SANKS, BOBBY

PA AND LATERAL CHEST 07/04/04--0100 HRS:

No prior studies available for comparison.

The mediastinal and cardiac silhouettes are normal.  The lungs are clear.
Bones are intact.

IMPRESSION:  NO ACTIVE DISEASE.


GFL:SHS                         GARY F. LEUNG, M.D.
Trans  07/04/04                 Radiologist

**WPH**
**001351**

ELECTRONICALLY SIGNED

East Alabama Medical Center
Lab Result Sheet
Fast Track
Rapid Strep

Patient: _____

04185-00159          819996
SANKS,BOBBY L
RM:0033B   DOB:          M53Y
Adm:07/03/04          36874

Hospital Number: _____

Date: _7/4/04_ .

Ordering Physician: _Moore_

Time: _0110_ .

Nurse: _CR_

Results

Circle One:     Positive     (Negative)

Normal Result = Negative

WPH
001352

- If you had x-ray(s) taken in the ED, the radiologist (x-ray specialist) will be reading them within 24 hours. The reading of your x-ray(s) by your ED doctor or nurse practitioner is a preliminary reading only. If the final reading by the radiologist shows anything that was not seen on the first reading by your ED doctor, we will call you if you need additional treatment(s) or test(s). If you don't need any additional tests or treatment, we won't call. This call would normally be within four days of your ED visit.
- If you had a culture done today, it takes 2-3 days to get these results. If you need additional treatment based on the results of the culture, we will call you. If you don't need any additional or different treatment, we won't call.
- If you were given a prescription for medication, be sure to follow the label instructions. Ask your pharmacist if the medication will make you drowsy and be sure not to drive or operate machinery while taking medications that cause drowsiness.
- Because it is sometimes necessary to call you when we get all of your test results back, it is important that we have a current phone number for you. Please make sure that the phone number you gave the registration clerk is accurate.

**DETAILS OF TODAY'S VISIT**
Your Doctor or Nurse Practitioner was: Dr. Moore     Your diagnosis was: Cough Conjuactivitis

**INSTRUCTIONS OR REFERRAL FOR FURTHER CARE**
See the boxes checked below, if any, telling you which doctors you need to see and when you need to see them.

☐ Personal Physician or Physician of your choice
☐ Other Physician Referral

_____
Physician's Name

☐ See your personal physician to recheck:
☐ As needed (based on your judgement)
☐ If you aren't getting better within _____ days
☐ In _____ days, whether you are better or not
☐ Tomorrow
☐ Physician's Card Given
☐ _____

This referral is for additional evaluation and treatment. Call on the next business day for an appointment to see him/her. When you call, tell the person you talk with that you were seen in the Emergency Department and referred to see that physician. If you have problems getting an appointment, please call 705-1782.

**SPECIAL OR ADDITIONAL INSTRUCTIONS FOR YOU (If Any):**          **Instruction Sheets Given**

Extra rest and fluids          #33
Return if worse in any way          Gentamicin 1 drop to each eye every 6 hours

**IF YOU GET HOME AND DON'T UNDERSTAND ANY OF THESE INSTRUCTIONS, PLEASE CALL 705-1150 AND GIVE THEM THE DATE YOU WERE A PATIENT AND TELL THEM YOU HAVE A QUESTIONS ABOUT YOUR VISIT.**

**SIGNATURES**
I (the patient or patient's guardian/parent/spouse/domestic partner/responsible party) have had the instructions above given to me verbally and in writing. I understand them and have received a copy of them. I agree to follow the recommendations of the ED physician or nurse practitioner that were given to me today (both those on this form and those given to me directly by the ED physician, nurse practitioner, or nurses) and if directed to do so, will follow-up with my personal physician and/or other physician(s) to which I have been referred.

Signed: _____     Relationship (if patient unable to sign): _____

Date: 7/4/04     Discharge Time: 0135     Nurse Initials: _____

Return to Work on: _____          Return to School on: _____

No Physical Education for _____     day(s)

**EAST ALABAMA MEDICAL CENTER
EMERGENCY DEPARTMENT
DISCHARGE INSTRUCTIONS**

Item # 99076
Revised 04/02

**Patient Information**

04185-00159          819996
SANKS,BOBBY L
RM:0033B  DOB:          M53Y
Adm:07/03/04          36874

WPH
001353



# MORE INFORMATION ABOUT THE EMERGENCY ROOM

east alabama medical center

Our goals in the ER - based on your symptoms, medical history, and exam - are to:

- Find any emergency medical conditions that might exist

- Treat any urgent problems that we discover

- Stabilize any unstable chronic conditions that you have

- Provide or initiate definitive treatment of new conditions such as infections or injuries

- Give you advice for further care of your problems, including referral to other specialists for care after you have left the emergency room or referral back to your personal physician for further evaluation of your condition.

- Coordinate admission for you if you have a condition which, in our judgement, needs treatment or monitoring in the hospital rather than at home.

While we make a sincere and reasonable effort to reach these goals, it is a complex undertaking and it is important for you to realize that the medical condition(s) causing your symptoms may not be clear to us while you are here. Not every medical condition - even a potentially serious one - produces abnormalities on your exam or tests during the early stages. So, it is important that you see a doctor again when we instruct you to do so or if your condition gets worse, or if you're not getting better like you think you should be.

It is best if you have a personal physician to manage your health care on a regular basis. Ideally, this is the doctor who knows you best and is who you should see if you aren't getting better after your ER visit. However, if you don't have a personal physician or if you can't get in to see your doctor and you feel that you are getting worse, you are always welcome to come back to the Emergency Department and let us see you again.

Remember, "an ounce of prevention is worth a pound of cure". Keeping in regular contact with your personal physician will keep you better informed about your health, keep your medical problems under better control, and reduce your chances of developing and emergency medial condition. But, if you do develop a condition you think is an emergency, we are always here for you - 24 hours a day, 365 days a year.

WPH
001354

Item # 99076

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 2, Part 3

# Exhibits to the Deposition of Bobby Sanks Dxs. 12-21

# Dx. 12

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

Bobby Lee Sanks,                    )
            Plaintiff,           )
                       )
v.                                  )     CIVIL ACTION NO.:   3:06-CV-1092-T
                       )
WestPoint Stevens, Inc., and        )
WestPoint Home, Inc.,               )
                       )
            Defendant.           )

---

## AFFIDAVIT OF AUTHENTICITY

---

COMES NOW ____*Adele Holmes*____, (print name) who deposes and states as follows:

1.  I am the record custodian for Dr. Frazier Jones.  In my position, I am charged with keeping and maintaining those documents and records which Dr. Frazier Jones creates or keeps in the ordinary course of business.

2.  Dr. Frazier Jones is a physician in the State of Alabama.

3.  I have personal knowledge of the following facts.

4.  On or about _____, 2007, Dr. Frazier Jones was served with a Subpoena attached as Exhibit A.

5.  I had the responsibility of collecting and producing documents in response to the subpoena.

6.  In response to the subpoena, I did in fact review the files and records of Dr. Frazier Jones, collected those records related to Bobby Lee Sanks that were responsive to the subpoena, and

1



WPH
001212

copied the same.

7.    I hereby certify that the documents attached hereto are genuine, accurate, and complete copies of the documents copied by me for Dr. Frazier Jones in response to the attached subpoena.

8.    I further certify that the records attached hereto were created by Dr. Frazier Jones, transmitted to or from Dr. Frazier Jones, and that it is in the regularly conducted business activity of Dr. Frazier Jones to keep or store these records for business use.

9.    I certify that as records custodian for Dr. Frazier Jones, I have the official capacity to verify the genuineness of documents produced from the files and records of Dr. Frazier Jones.

Further affiant sayeth naught.

Date: _July 23, 2007_                    _Adele Holmes_
                                         **Record Custodian for Dr. Frazier Jones**

## DECLARATION PURSUANT TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _July 23_, 2007.

_Adele Holmes_
**Record Custodian for Dr. Frazier Jones**

5059113.1

2

WPH
001213

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

Bobby Sanks,

       V.

WestPoint Stevens, Inc. and
WestPoint Home, Inc.,

### SUBPOENA DUCES TECUM
### IN A CIVIL CASE

CASE NUMBER: 3:06-CV-1092-T

TO:     RECORD CUSTODIAN: Dr. Frazier Jones, 121 North 20th Street, Building 18, Opelika, Alabama  36801

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

■ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below: Any and all records maintained in your custody pertaining to **Bobby Lee Sanks,** : , including but not limited to medical records, treatment records, counseling records, narratives, nurse's notes, doctor 's notes, diagnostic reports, x-ray reports, disability records, admission records, commitment records, referrals, work excuses, questionnaires, forms, applications, and any other record of any kind in your possession. We want every piece of paper in your file relating to this patient.

| PLACE | DATE AND TIME |
|---|---|
| **Ogletree Deakins Nash Smoak & Stewart, P. C.**<br>**One Federal Place, 1819 5th Avenue North, Suite 1000**<br>**Birmingham, AL 35203-2118** | On or before Monday, July 23, 2007<br>at 10:00 a. m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Fred W. Suggs* | July 6, 2007 |

ISSUING OFFICERS NAME, ADDRESS AND PHONE NUMBER
Fred W. Suggs, Jr. Attorney for Defendant
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
Post Office Box 2757, 300 North Main Street
Greenville, SC  29602
(864)271-1300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

WPH
001214

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE                                                                    SIGNATURE OF SERVER


ADDRESS OF SERVER

WPH
001215

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(C) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that

person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party of an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# Ogletree Deakins
ATTORNEYS AT LAW

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: 864.271.1300
Facsimile: 864.235.4754
www.ogletreedeakins.com

July 6, 2007

**RECORD CUSTODIAN**
Dr. Frazier Jones
121 North 20th Street, Building 18
Opelika, Alabama 36801

> **Certified Article Number**
> 7160 3901 9849 7263 7370
> **SENDERS RECORD**

Re:  Bobby Lee Sanks v. WestPoint Stevens, Inc. and WestPoint Home, Inc.
C. A. No.:  3:06-CV-1092-T

Dear Sir or Madam:

We represent WestPoint Stevens, Inc. and WestPoint Home, Inc., in the above referenced matter. Enclosed is a subpoena authorizing you to release to us any and all documents in your possession relating to the employment of Bobby Lee Sanks,

We would appreciate your office mailing copies of the requested records to our attention no later than Monday, July 23, 2007. We ask that you execute the enclosed Affidavit of Record Custodian to authenticate the records you send to us. We will reimburse you for your reasonable copying charges.

With kindest regards, I am

Very truly yours,

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

*Fred W. Suggs*

Fred W. Suggs, Jr.

FWS, Jr./smc
Enclosures

cc:  Lateefah Muhammad, Esq.

**WPH
001216**

Atlanta, GA • Austin, TX • Birmingham, AL • Charleston, SC • Charlotte, NC • Chicago, IL • Columbia, SC • Dallas, TX • Greensboro, NC • Greenville, SC • Houston, TX • Indianapolis, IN
Kansas City, MO • Los Angeles, CA • Miami, FL • Morristown, NJ • Nashville, TN • Phoenix, AZ • Raleigh, NC • St. Thomas, VI • San Antonio, TX • Tampa, FL • Torrance, CA • Washington, DC

# PATIENT INFORMATION SHEET The Orthopaedic Clinic

Please Fill Out Completely:

## Patient's Information:

Patient's Name: _Bobby Lee Sanks_    MRN: _____    SSN: _

Date of Birth: _____ Age: _55_ Referred By __Friend/Relative __Yellow Pages
_✓_Physician _DR Whatly_

Patient's Address: _330 Lee Rd 175 P.O.Box 44 Salem_ (CITY) _AL_ (STATE) _36874_ (ZIP CODE)

Patient's Home Phone: _334-749-4462_    Work: _NC Holding_    (STATE) Cell: _334-973-9331_ (ZIP CODE)

Marital Status ☑Married ☐Single ☐Divorced    Sex: ☑Male ☐Female    Occupation: _VIM special final Carry_

Employer: _____    Employer Phone: _____

## Responsible Party Information:

Responsible Party: _Jeannette T. Sanks_    Date of Birth: _____

Resp. Party's Address: _330 Lee Rd 175 P.O. Box 44 Salem_ (CITY) _AL_ (STATE) _36874_ (ZIP CODE)

Resp. Party's Phone:    Primary: _749-4462_    Secondary: _749-4285_

Emergency Contact Name: _Tara Sanks_    Emergency Contact Relationship: _Daughter_

Phone _(334) 663 7407_

Employer: _Rue 21_    Employer Phone: _N/A N/S_

## Accident Information

Date of Accident or Injury: _Sep 2, 06_    Is an Attorney Involved?    ☐Yes ☑No

Is this visit related to a car accident?    ☐Yes ☑No    If so, Attorney Name: _____

Is this visit related to a work injury?    ☐Yes ☑No

Where did Accident Occur: _____

## Primary Insurance Information

Primary insurance Co.: _____    Sex: ☐Male ☐Female

Member Name: _____    Member ID No.: _____

Group Number: _____    Group Name _____

Relationship: _____

SSN: _____-____-_____    Date of Birth: _____

## Secondary Insurance Information

Primary insurance Co.: _____    Sex: ☐Male ☐Female

Member Name: _____    Member ID No.: _____

Group Number: _____    Group Name _____

Relationship: _____

SSN: _____-____-_____    Date of Birth: _____

## AUTHORIZATION FOR SERVICES

This signature below serves as authorization for services rendered by The Orthopeadic Clinic for the above named patient, and release of information nessesary to file insurance; and assign benifits otherwise payable to the policy holder, doctor, or group indicated on the claim. I understand that I am financially responsible for any balance not covered by the insurance carrier – a copy of the signature is as valid as the original.

## AUTHORIZATION FOR SERVICES

The signature below serves as authorization for The Orthopaedic Clinic to release or receive medical information for the purpose of patient referral. A Copy of this signature is as valid as the original.

I acknowledge that I have been provided access to notice of practices of The Orthopaedic Clinic.

WPH
001217

Signature _Bobby Sanks_ (Patient)    Signature: _____ (Responsible Party)    Date _10-10-06_

# THE ORTHOPAEDIC CLINIC, P.C.

## MEDICAL RELEASE FORM

Effective April 14, 2003 (due to federal guidelines under HIPAA) we are now required to have a release form signed by the patient before we can give out any medical or financial information to any person other than the patient.

Please list below the names, relationship, and phone numbers of any authorized individuals (spouse, family members, friends, caregivers, etc.) that we may discuss your medical or financial information with.

| | NAME | RELATIONSHIP | PHONE NUMBER |
|---|---|---|---|
| 1. | Jeannette Sanks | Spouse | (334) 749-4460 |
| 2. | Tana Sanks | Daughter | (334) 663-7407 |
| 3. | Don Sanks | Brother | (706) 561-0654 |
| 4. | Gloria Owens | Sister | (334) 501-9770 |

May we leave medical information on your "home" answering machine?    Yes ✓    No _____

May we leave appointment information on your "home" answering machine?    Yes ✓    No _____

_Bobby L. Sanks_                                         10-10-06
Signature of Patient/Parent                              Date

## OR

If you do not want any of your medical or financial information discussed with anyone other than yourself please sign here.

_____
Signature of Patient/Parent                              Date

**The above information is private and confidential and will be placed in your medical chart. The information on this form will remain valid until we are notified otherwise.**

WPH
001218

# THE ORTHOPAEDIC CLINIC, P.C.

## AUTHORIZATION FOR USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION

Patient Name: _Bobby Lee Sank_    Date of Birth: _____

Patients Address: _330 Lee Rd 175  P.O. Box 44_  SSN: _____
_Salem, AL 36874_

By signing below, you hereby authorize us to use or disclose information about yourself (or another person for whom you have the authority to sign) that is protected under federal law, for the sole purpose and time period described below. You may refuse to sign this authorization. Subject to certain exceptions, you have the right to inspect and copy the protected health information.

Information to be used or disclosed (must be identified in a specific and meaningful fashion); and purpose of the use and disclosure:

_____

_____

Information that *may not be used or disclosed:*

_____

_____

The name or other specific identification of the person(s), or class of persons, *authorized to make the requested use or disclosure:*

_____

_____

The name or other specific identification of the person(s), or class of persons, to whom THE CLINIC *may make the requested use or disclosure:*

_____

_____

Expiration date or an expiration event (must relate to the individual or the purpose of the use or disclosure):

_____

This information about you is protected under federal law, and you have the right to revoke this authorization in writing. Please be advised, however that any revocation will be effective only to the extent we have not already taken action in reliance on your authorization. By signing below, you recognize that the protected health information used or disclosed pursuant to this authorization may be subject to re-disclosure by the recipient of this disclosure and may no longer be protected under federal law. We will not condition treatment based on your authorization. You may refuse to sign the authorization.

_Bobby Lee Sank_                    _10-10-06_
Patient Signature or Personal Representative                    Date

As a personal representative, I have authority to act for the individual because I am:

_____

WPH
001219

Medical Arts Center
121 North 20th St. #18
P.O. Box 2125
Opelika, AL 36803-2125
(334) 749-8303

762-A East Glenn Avenue
Auburn, Alabama 36830
(334) 501-2290

10 Medical Park
Valley, AL 36854
(334) 756-3146

EI _____
EO ✓_____
DI _____
DO _____

BCBS

107091    PT. NAME    Bobby Sanks

| Ref. DR. | AD Admit | DXCode ICD-9 | Procedure Code-CPT | Service Date | Description | Price |
|---|---|---|---|---|---|---|
| | | 722.10 | 63030 | 10/16 | L5/S, microdisc | 3772 |
| | | | | | | |
| | | 722.10 | 63030 AS | | Asst | 818 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Total Charges $  4090

WPH
001220

Patient's Name: _____    Chart Number: _____

Medicare Number: _____

# ADVANCED BENEFICIARY NOTICE (ABN)

**NOTE: You need to make a choice about receiving these health care items or services.**

We expect that Medicare will not pay for the item(s) or service(s) that are described below. Medicare does not pay for all of your health care costs. Medicare only pays for covered items and services when Medicare rules are met. The fact that Medicare may not pay for a particular item or service does not mean that you should not receive it. There may be a good reason your doctor recommended it. Right now, in your case, **Medicare probably will not pay for –**

**Items or Services:**

| | | |
|---|---|---|
| ☐ A4460____" Ace Bandage____Qty. | ☐ L3332 Heel Lift | ☐ L3010 Custom molded foot orthosis |
| ☐ A4565 Sling | ☐ L3360 Darco Heeling Shoe | ☐ Toe Separator |
| ☐ A4572 Rib Belt | ☐ L3430 Hard Plastic Heel Cup | ☐ Other _____ |
| ☐ A4580 Cast Shoe | ☐ L3460 Tuli Heel Cup | _____ |
| ☐ L2840 Liner, Walker | ☐ L3480 Visco Soft Spots | _____ |
| ☐ L3050 Metatarsal Arch Support | ☐ L3485 Visco Heel Cup | _____ |
| ☐ L3100 Night Splint; Hallux Valgus | ☐ Metatarsal bump (Cookie) | _____ |
| ☐ L3260 Post-op Shoe | ☐ Hammertoe Crest | _post op shoe_ _____ |

**Because:** _____

_____

_____

_____

The purpose of this form is to help you make an informed choice about whether or not you want to receive these items or services, knowing that you might have to pay for them yourself. Before you make a decision about your options, you should **read this entire notice carefully.**

• Ask us to explain, if you don't understand why Medicare probably won't pay.
• Ask us how much these items or services will cost you (**Estimated Cost: $_____**), in case you have to pay for them yourself or through other insurance.

PLEASE CHOOSE **ONE** OPTION. CHECK **ONE** BOX. **SIGN & DATE** YOUR CHOICE.

☐ **Option 1. YES. I want to receive these items or services.**
I understand that Medicare will not decide whether to pay unless I receive these items or services. Please submit my claim to Medicare. I understand that you may bill me for items or services and that I may have to pay the bill while Medicare is making its decision. If Medicare does pay, you will refund to me any payments I made to you that are due to me. If Medicare denies payment, I agree to be personally and fully responsible for payment. That is, I will pay personally, either out of pocket or through any other insurance that I have. I understand I can appeal Medicare's decision.

☐ **Option 2. NO. I have decided not to receive these items or services.**
I will not receive these items or services. I understand that you will not be able to submit a claim to Medicare and that I will not be able to appeal your opinion that Medicare won't pay.

WPH
001221

_____        _____
**Date**                        **Signature of patient or person acting on patient's behalf**

**NOTE: Your health information will be kept confidential.** Any information that we collect about you on this form will be kept confidential in our offices. If a claim is submitted to Medicare, your health information on this form may be shared with Medicare. Your health information which Medicare sees will be kept confidential by Medicare.

**The**
**Orthopaedic**
**Clinic**

# M107091                          Bobby Sanks                          03/22/07

<u>**CLINIC CHART NOTE**</u>

Here for evaluation.  Still having significant foot and back pain.  Straight leg raise is negative.
His motor function is intact.  His reflexes are symmetric.  He says his foot occasionally swells on
him but that is fairly subjective.  I've never really witnessed any.  He says the Ultram ER we
gave him helps.  He doesn't feel like he can do any significant walking or lifting.  Given his
symptoms, I am going to recheck him here in about 3 to 4 weeks.  We will keep him out of work
until then.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/tp/3066019

WPH
001222



**The**
**Orthopaedic**
**Clinic**

# M107091                              Bobby Sanks                              02/23/07

## CLINIC CHART NOTE

**HISTORY:** Here for evaluation of radicular pain and big toe pain; really two separate issues. He had some fairly significant swelling consistent with gout. The swelling is down. He is back in a shoe. He occasionally gets a twinge in his back. He said that is doing reasonably well. His gait is back to normal. He is doing okay on some Ultram.

**PLAN:**
1. I am going to give him some Ultram ER and let him take that once a day.
2. I will recheck him here in about four weeks.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/kh/2972120

WPH
001223



**The**
**Orthopaedic**
**Clinic**

# M107091                                   Bobby Sanks                                   01/12/07

### CLINIC CHART NOTE

The patient is here for evaluation of back and leg pain. He is doing a little bit better. He says he occasionally gets some swelling in the toe towards the end of the day but really otherwise not having any other issues. Gait is back to normal. I gave him some Ultram to take. I am going to check him in about 6 weeks.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/tp/2846404-2

**WPH**
**001224**



**The**
**Orthopaedic**
**Clinic**

# M107091                                    Bobby Sanks                                    12/15/06

### CLINIC CHART NOTE

Bobby Sanks is here for evaluation of back and leg pain. The back pain is better. The leg pain is better. He is still left with toe pain. He says it swells. He has difficulty getting it in his shoe; but every time I see him, the toe is not swollen. I have had him on different medications. He says all the other radicular pain in his leg is better. I am still a little perplexed about whether the pain he is getting in his toe is related to his disk or not. It is a little bit atypical for everything else to be better and just to be left with isolated toe pain, but his x-rays do not show anything but some mild degenerative changes; and nothing else we have done has really changed his symptoms including anti-inflammatories, pain medicines, nerve-modifying agents, etc. He has been released from his temporary job services and is inquiring about disability. It is a little unusual just eight weeks after a procedure to be already looking at that route, and that is a little pessimistic. I will recheck him here in four weeks.

Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/md/2761668

WPH
001225



**The Orthopaedic Clinic**

# M107091                          Bobby Sanks                          12/01/06

### CLINIC CHART NOTE

The patient returns for follow up.  He is still having more great toe pain than anything else.  He says it swells on him.  X-rays show degenerative changes at the MTP joint, but really nothing else.  He does have a bunion.  He has a little bit of pain with range of motion at the MTP and at the IP joint.  I put him on some twice-a-day Mobic.  The Lyrica did not really change the symptoms and the nerve he had involved in his lumbar spine really does not go along with the great toe type pain anyway.  I will recheck him in about two weeks.  He wants to go back to work at a regular duty situation.  I will see him sooner should he have any worsening problems with pain.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/ds/2724956

WPH
001226



**The**
**Orthopaedic**
**Clinic**

# M107091                          Bobby Sanks                          11/22/06

## CLINIC CHART NOTE

**SUBJECTIVE:** Here for evaluation great toe pain. That is the only pain he is having. He is not having any other radicular pain, back pain or anything else. _____ him at work. He said he had some swelling. He had gouty type symptoms so I put him on a dose pack and that did not change the symptoms. He localizes the pain at the DIP joint of the toe and has some painful range of motion. Radiographs that were done previously other than some minor degenerative changes do not show anything focal or acute there.

**PLAN:** I gave him some Lidoderm patches and also gave him some Lyrica just on the outside chance this is neural compressive type pain, but otherwise everything else seems to have settled down. I am going to recheck him in ten days and also put him in a postop shoe.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/sm/2698504

WPH
001227



**The**
**Orthopaedic**
**Clinic**

# M107091                           Bobby Sanks                           11/17/06

### CLINIC CHART NOTE

Bobby Sanks returns for a follow-up.  He is doing well with the exception of the left great toe.
He says it has been swollen and uncomfortable for the last few days.  No trauma that he knows
of.  He does have some swelling, not a lot of warmth or erythema.  No history of gout that he
knows of.  AP and lateral radiographs show a degenerative MTP joint, which is mild to
moderate.  Based on his symptoms, I am going to put him on a Dosepak and recheck him in four
to five days.  If unimproved, I may consider getting a uric acid level on him; but I think clinically
this is gout.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/md/2685406

WPH
001228



**The
Orthopaedic
Clinic**

# M107091                     Bobby Sanks                        11/06/06

<u>**CLINIC CHART NOTE**</u>

**SUBJECTIVE:** Here for evaluation back and leg. Still has a little bit of pain in the foot down in the 5-1 distribution. That will improve. His gait is better. I would like to recheck him back in about three weeks. Continue with symptomatic management for now.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/sm/2650756

WPH
001229

**The**
**Orthopaedic**
**Clinic**

# M107091                          Bobby Sanks                          10/24/06

## CLINIC CHART NOTE

**HISTORY:** Returns for followup. Still having significant leg pain. Epidural did not do a whole lot. He is still having to use crutches for pain issues and gait control. He has a slightly decreased Achilles reflex but otherwise he is neurovascularly intact.

**X-RAYS:** His MRI scan showed multilevel degenerative changes in the left paracentral and foraminal H&P, which clinically goes along with his symptoms.

**PLAN:** Due to his lack of improvement with p.o. steroids, anti-inflammatories, narcotics, and epidural injection, I think the next step is microdiskectomy. The benefits and risks of surgery include but are not limited to infection, continued pain, recurrence, neurovascular injury, dural tear, adjacent segment changes, wound problems, etc. A full H&P was done. We will plan on doing it later this week.

Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/kh/2617708

**WPH**
**001230**



**The**
**Orthopaedic**
**Clinic**

# M107091                          Bobby Sanks                          10/10/06

## CLINIC CHART NOTE

**ADDENDUM:** Bobby Sanks returns to follow up his MRI scan. He has got an extruded disk at the left L5-S1 region, which goes along with his symptoms. We are going to set him up for an epidural injection at the left L5-S1 interval. I will see him back after his first injection.


Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/md/2578484



**The
Orthopaedic
Clinic**

# M107091                              Bobby Sanks                              10/10/06

## CLINIC CHART NOTE

**SUBJECTIVE:** Here for evaluation of back and left leg pain. It started up in the hip. Now it is going all the way down the leg into the foot. Has been on some analgesics as well as a steroid dose pack, neither which helped his symptoms much. He has had to get on crutches because of discomfort. He has a history of hypertension.

**ALLERGIES: NO ACTIVE ALLERGIES.**

**MEDICATIONS:** Antihypertensive, Naprosyn, Flexeril and hydrocodone.

**OBJECTIVE:** On exam, he has a markedly positive straight leg raise on the left. His motor function is intact. Reflexes are symmetrical. Straight leg raising on the left is positive at about 70 degrees, negative on the right. Easily palpable pulses. No peripheral erythema, warmth, or edema. Otherwise, he is thin and healthy-appearing.

**X-RAYS:** Radiographs, AP and lateral lumbar spine show mild-to-moderate degenerative changes at multiple levels. At L4-5 it looks like there is a little bit of lysis of the end plates. He is having some radicular pain.

**ASSESSMENT:** With changes on radiograph a consideration may be diskitis. Based on this we will get an MRI scan.

**PLAN:** I will see him back after this has been done.

Frazier Jones, M.D.
To expedite delivery, faxed documents are sent prior to physician review.
FJ/sm/2578476

WPH
001232

NAME: _Bobby Sanks_    DATE: _10/10/06_

CHART NO.: _____    REFERRING M.D.: _____

AGE: _55_    SEX: _____    CIVIL STATUS: _____

OCCUPATION: _____    EMPLOYER: _NC Holdings_

WORK STATUS: [] Not Working [] Regular duty [] Disability
[] Restricted, due to injury

[] OJI _____    [] 2nd Opinion    [] MVA

[] Medical-Legal    [] Attorney _____

Complaint: ① hip
History of this problem: ① injury - 7 days pain runs
down ① hip all the way to his calf

Allergies: _____

Medical update: [X] HTN          [] BLOOD DISORDERS

[] DIABETES          [] BLEEDING DISORDERS

[] RA          [] HEART PROBLEMS

[] KIDNEY PROBLEMS          [] LUNG PROBLEMS

[] CANCER          [] GOUT

Regular _____ monday _____ Internist: _Whatley_

Previous _____ NKO

Current Medications:
BP pill
Naproxen
Cyclobenzaprine
hydrocodone

WPH
001233

**Birmingham Radiological Group, PC**
**THE ORTHOPAEDIC CLINIC**
**121 NORTH 20th STREET #18**
**OPELIKA, ALABAMA 36803-2125**
**(334) 749-8303**

PATIENT NAME: SANKS, BOBBY
PATIENT #: 107091  DOB:
REFERRING PHYSICIAN: Dr. Jones
DATE: 10/10/2006

MRI OF THE LUMBOSACRAL SPINE
REASON FOR EXAM: Low back pain, severe left leg pain.

FINDINGS:
Schmorl's nodes are identified along the inferior endplate of L3, inferior endplate of L4, superior and inferior endplates of L5, as well as some marrow signal abnormality at L4 and L5, due to wrecked marrow edema from degeneration. The L3-4 and L4-5 levels demonstrate no disc abnormalities. The L5-S1 level demonstrates a mild to moderate asymmetrical disc bulge on the left, causing moderate inferior neural foraminal canal encroachment on the left. There may be some degree of mild nerve impingement at this level.

OPINION:

Mild to moderate asymmetrical disc bulge on the left at L5-S1, with possible nerve impingement. Clinical correlation is recommended. This report was called to Dr. Jones at 8:45.

Signed electronically by: William Varnell, M.D. - 4503
D: 10/11/06 T: 16:44

William Varnell, M.D.
4503/637
D: 10/11/2006 09:48:00 AM
T:
File # 45032840945182

WPH
001234

User: Gaither,Brooke D        Date: 10/10/2006 1:12:33 PM     East Alabama
**CONFIDENTIAL**

| Location | Ind | Patient Name | Admit Date | Acct# | MR# | Sex | DOB |
|----------|-----|--------------|------------|-------|-----|-----|-----|
| ER - | | SANKS, BOBBY L | 10/07/2006 | 628000026 | 819996 | M | |

**SYSTEM COPY**
**NOT A LEGAL DOCUMENT**
**RE-DISCLOSURE PROHIBITED**



**Report Name:** XR Hip Complete Left
**Date/Time:** 10/04/2006 19:15

SANKS, BOBBY

LEFT HIP COMPLETE 10/04/2006:

Two views demonstrate no fracture, subluxation, or arthropathy in the left hip
or left sacroiliac joint.

IMPRESSION: NO FRACTURE.


Dictated date: 10/05/2006
Dictated time: 0804 hours

Radiologist ID: D02130; Radiologist: Ng Roland
*** Final Report ***
Dictating Radiologist: Ng, Roland
Signed Date and Time: 10/05/2006 10:47
Transcribed by: SHS
Transcribed Date and Time: 10/05/2006 10:38

**WPH**
**001235**

# THE ORTHOPAEDIC CLINIC, P.C.

## RADIOLOGY

| X-RAY # | | DOB | FAMILY NAME | FIRST NAME | MIDDLE NAME |
|---------|--|-----|-------------|------------|-------------|
| **DATE** | **EXAM** | | | **COMMENTS** | |
| 2.10.06 | l. spine | | | | |
| 1.17.06 | (L) foot | | | | |
| 12.1.06 | (L) great toe | | | | |

Sanks, Bobby
DOB:
MRN: M107091
X-Ray #: M75582XR

WPH
001236

# East Alabama Medical Center
2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**

| | | |
|---|---|---|
| MRN: | 0000819996 | |
| Financial #: | 0629700140 | |
| DOB: | Age: 55 years  Sex: Male | |

| | |
|---|---|
| Admit Date/Time: | 10/26/2006 10:04:00 AM |
| Discharge Date/Time: | 10/26/2006 11:59:00 PM |
| Location: | OS |
| Patient Type: | OPS |
| Chart Copy to DR: | **Jones MD, Frazier K** |

## Operative Report ✓

Operative Report

| | |
|---|---|
| **PATIENT NAME:** | Sanks, Bobby L. |
| **DATE OF OPERATION:** | 10/26/2006. |
| **SURGEON:** | Frazier Jones, MD. |
| **ASSISTANT:** | Scott Benson, PA. |
| **PREOPERATIVE DIAGNOSIS:** | Left L5-S1 herniated nucleus pulposus. |
| **POSTOPERATIVE DIAGNOSIS:** | Left L5-S1 herniated nucleus pulposus. |
| **PROCEDURE PERFORMED:** | Microdiskectomy left L5-S1. |
| **ANESTHESIA:** | General. |
| **BLOOD LOSS:** | Minimal. |
| **DRAINS:** | None. |
| **COMPLICATIONS:** | None. |

**INDICATIONS:** This is a 55-year-old gentleman with progressive left leg pain despite conservative management. He has MRI documentation of extruded disk left 5-1 foramen.

**PROCEDURE:** An incision was made about the mid portion of the lumbar spine after a localization radiograph was obtained. It was taken down the left side of the interspinous ligament and then over the facet joint. A self-retaining retractor was placed and the ligamentum flavum at that level was removed with a Kerrison punch. The lateral aspect of the dura was then identified and swept medially and a large combination of extruded and subligamentous disk was removed in one large piece and several small pieces. The remaining portion of the disk space was probed and an angled nerve hook was placed and there were no other loose fragments. This was then irrigated with antibiotic saline. A small block of Gelfoam was placed over the exposed dura and the wound was then closed in layers. He tolerated the procedure well. Counts

Print Date/Time: 10/27/2006 7:25 PM
Page 1 of 2

| | |
|---|---|
| MRN: | 0000819996 |
| Financial #: | 0629700140 |

**SANKS, BOBBY L**

**WPH
001237**

# East Alabama Medical Center

## *Operative Report*

were correct.

Job ID: #000595631

| | |
|---|---|
| DP: | Frazier K. Jones, MD |
| TR: | dgm |
| DD: | 10/26/2006 1:13 P |
| DT: | 10/26/2006 3:36 P |
| | 816161 |
| Doc: | 000595631 |
| Job#: | |
| cc: | |

Electronically Signed By: Frazier K Jones
On 10/27/06 07:33

DD: 10/26/06  TD: 13:13

MRN:        0000819996
Financial #: 0629700140

**SANKS, BOBBY L**

**WPH
001238**

## East Alabama Medical Center

2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**
MRN:    0000819996
Financial #:   0629700140
DOB:         Age:   55 years  Sex: Male

Admit Date/Time:   10/26/2006 10:04:00 AM
Discharge Date/Time: 10/26/2006 11:59:00 PM
Location:       OS
Patient Type:    OPS
Chart Copy to DR:  **Jones MD, Frazier K**

### O p e r a t i v e    R e p o r t

Operative Report
**PATIENT NAME:** Sanks, Bobby L

**DATE OF PROCEDURE:** 10/26/2006

**OPERATIVE PROCEDURE:** Microdiskectomy L5-S1 on the left.

**SURGEON:** Dr. Frazier Jones

**FIRST ASSISTANT:** Scott Benson, PA

**FIRST ASSISTANT TIME IN:** 1221

**FIRST ASSISTANT TIME OUT:** 1317

**OPERATIVE DUTIES AND RESPONSIBILITIES:** The patient was brought to the operating room and after adequate anesthesia was induced, the patient was turned prone on the Andrews frame and all pressure points were padded. The operative site was prepped in a sterile fashion by the circulating nurse. Sterile drapes were applied. The surgeon then made a midline incision over the L5-S1 area and dissected down to the spinous processes. A marker was placed on the interspinous ligament. Fluoroscopy was brought in. The L5-S1 level was determined. The surgeon then continued dissection down to the lamina on the left. The interspace was incised and a hemilaminectomy on the left was performed. The shoulder of the nerve root was identified and a nerve root retractor was placed to protect the nerve root. The microscope was brought in. The surgeon continued his dissection to the anulus of the disk at L5-S1. A rent in the anulus was identified. Fragments of disk were removed using a pituitary rongeur. The disk space was then thoroughly irritated. Retractors were removed. The wound was irrigated. The fascia was closed with #1. The skin was reapproximated and closed with a 2-0 Vicryl and a running 3-0 PDS subcuticular stitch. Steri-Strips were applied. A sterile dressing was applied and the patient was returned to the hospital stretcher in stable condition.

Dictated by: Scott Benson, PA

Job # 595629

DP:    Frazier K. Jones, MD
TR:    sxk
DD:    10/26/2006 1:14 P
DT:    10/26/2006 2:09 P

MRN:    0000819996
Financial #: 0629700140

**SANKS, BOBBY L**

WPH
001239

## East Alabama Medical Center

816107
Doc:      000595629
Job#:
cc:       Scott Benson

Electronically Signed By:  Frazier K Jones
                On 10/27/06 07:33

DD: 10/26/06  TD: 13:14

CC: MORRIS SCOTT BENSON

MRN:        0000819996
Financial #:  0629700140

**SANKS, BOBBY L**

**WPH
001240**

**LEE PATHOLOGY LABORATORY**
503 E. Thomason Circle
Opelika, Alabama 36801-5498
(334) 749-8234

Patient Name: **SANKS, BOBBY L**
DOB           Age: 55 years Sex: Male
Location: OS
Attending Physician: Jones MD, Frazier K                Chart Copy to Dr.: **Jones MD, Frazier K**

---

| **Surgical Tissue Report** |
| --- |

Surgical Tissue Report

                                                    Specimen S-608534

Specimen Collected: 10/26/06                    Path #: 201909

Pre-Op Diagnosis:        L HNP L5-S1
Post-Op Diagnosis:       Same
Procedure:               Microdiskectomy L5-S1
Specimen:                L disk L5-S1

GROSS DESCRIPTION: The specimen is received in a single container of formalin labeled with the patient's name and designated "left L5-S1". Received are two irregularly shaped fragments of pink-gray firm rubbery tissue that range in size from 0.8 to 1.2 cm. Submitted entirely in a single cassette.

MICROSCOPIC DESCRIPTION:  A microscopic examination has been performed.

FINAL DIAGNOSIS:        INTERVERTEBRAL DISC, L4-S1, MICRODISKECTOMY:
                        -   CONSISTENT WITH INTERVERTEBRAL DISC MATERIAL

TR:      llf
DT:      10/26/2006  3:51 P
DOC:     816169
cc:      Frazier K. Jones, MD

Performed at Lee Pathology Laboratory
503 E. Thomason Circle
Opelika, AL  36801

Electronically Signed By:  KATRIN M KLEMM
                On 10/31/06 09:45

DD: 10/26/06  TD: 00:00

CC: Frazier K Jones
     SOFTMED CONTRIBUTOR_SYSTEM

Print Date/Time: 10/31/2006 14:32
Page 1 of 1

MR #:  0000819996
Financial #:  0629700140
              **SANKS, BOBBY L**

WPH
001241

User: Gaither,Brooke D        Date: 11/3/2006 2:43:28 PM    East Alabama
**CONFIDENTIAL**

| Location | Ind | Patient Name | Admit Date | Acct# | MR# | Sex | DOB |
|----------|-----|--------------|------------|-------|-----|-----|-----|
| OS - | | SANKS, BOBBY L | 10/26/2006 | 629700140 | 819996 | M | |

**SYSTEM COPY**
**NOT A LEGAL DOCUMENT**
**RE-DISCLOSURE PROHIBITED**

**Report Name:** Operative Report
**Report Date/Time:** 10/26/2006 23:59

Sanks, Bobby LAcct No: 0629700140MR#: 0000-81-99-96Location:
OSOPERATIVE REPORT 2 of 2
Sanks, Bobby L
0629700140
Sanks, Bobby LAcct No: 0629700140MR#: 0000-81-99-96Location:
OSOPERATIVE REPORT 1 of 2
PATIENT NAME: Sanks, Bobby L.

DATE OF OPERATION: 10/26/2006.

SURGEON: Frazier Jones, MD.

ASSISTANT: Scott Benson, PA.

PREOPERATIVE DIAGNOSIS: Left L5-S1 herniated nucleus pulposus.

POSTOPERATIVE DIAGNOSIS: Left L5-S1 herniated nucleus pulposus.

PROCEDURE PERFORMED: Microdiskectomy left L5-S1.

ANESTHESIA: General.

BLOOD LOSS: Minimal.

DRAINS: None.

COMPLICATIONS: None.

**WPH**
**001242**

INDICATIONS: This is a 55-year-old gentleman with progressive left leg pain
despite conservative management. He has MRI documentation of extruded
disk left 5-1 foramen.

PROCEDURE: An incision was made about the mid portion of the lumbar spine
after a localization radiograph was obtained. It was taken down the left side
of the interspinous ligament and then over the facet joint. A self-retaining
retractor was placed and the ligamentum flavum at that level was removed

with a Kerrison punch. The lateral aspect of the dura was then identified and swept medially and a large combination of extruded and subligamentous disk was removed in one large piece and several small pieces. The remaining portion of the disk space was probed and an angled nerve hook was placed and there were no other loose fragments. This was then irrigated with antibiotic saline. A small block of Gelfoam was placed over the exposed dura and the wound was then closed in layers. He tolerated the procedure well. Counts were correct.

Job ID: #000595631

DP: Frazier K. Jones, MDTR:dgmDD:10/26/2006 1:13 PDT:10/26/2006 3:36
PDoc:
Job#:816161
000595631cc:

Electronically Signed By: Frazier K Jones
On 10/27/06 07:33

DD: 10/26/06 TD: 13:13



WPH
001243

Bobby Sanks

DRUG ALLERGIES: None

| DATE & TIME | STANDARD ADMISSION / PRE-OP ORDERS FOR ORTHOPAEDICS |
|---|---|

1. **Admission:** ☑ Outpatient Surgery   ☐ Inpatient
2. **Admit to:** ☑ Ortho   ☐ PCU/Telemetry   ☐ ICU
3. **MD:**
4. **Diagnosis:** HW? (L L)
5. **Procedure:** ☑ Get op permit signed for:

6. **Vital signs:** ☑ Routine ☐ Other:
7. **Diet:** ☑ NPO after MN   ☐ Other:
8. **Laboratory:** ☑ CBC   ☐ EKG   ☐ Profile 1   ☐ II   ☐ III
   ☐ H&H   ☐ CBC with Diff   ☐ Type/Screen _____ units of PRBC's
   ☐ PT   ☐ C&S Urine   ☐ Type/Cross _____ units of PRBC's
   ☐ PTT   ☐ U/A   ☐ Autogolous _____ units
   ☐ Other labs:
9. **Radiographs:** ☐ CXR   ☐ G-Film Knees   ☐ Other:
10. **Allergies:**
11. **Medications:** ☐ Tylenol 500 mg 1-2 tabs po q 4-6 hrs prn pain/temp >101
    (No more than 4gm in 24 hrs)
    ☐ Tylenol #3 or ☐ Percocet 5/325 mg I-II tabs p.o. q 4-6 hrs prn pain
    ☐ Ambien 10 mg po prn q h.s. if patient is <65 yrs old
    ☐ Ambien 5 mg po prn q h.s. if patient is >65 yrs old
    ☐ IV Fluids:
    ☑ Antibiotics:   Ancet ? g IV en Cnll
12. **Other Meds:**
13. **Miscellaneous:** ☐ Foley   ☐ Straight Cath q 6 hrs prn
    ☐ Compression Sleeves
    ☐ C&S checks q _____ hrs   ☐ Traction:
14. **Consults:** ☐ SNF if Medicare
    ☐ Physical Therapy RE:
    ☐ Medical M.D. RE:

Physician:

WPH
001244

Patient Identification

EAST ALABAMA MEDICAL CENTER

Bodily Sorks

**Date** | **Chief Complaint:** ℅ *f*x

**History of Present Illness:**

**Pertinent Tests:** MVI. Ⓛ LsH, MVP

**Diagnosis:**

**Planned Surgical Procedure:** Mitral Ⓛ LsK.

**Allergies:**

**Current Medications:** βm eds , HTN Diovan 12.5

| Personal History | | | | | | | |
|---|---|---|---|---|---|---|---|
| Tobacco Use: | ☐ Yes ☑ No | Abnormal EKG | ☐ Yes ☑ No | Mitral Valve Prolapse | | ☐ Yes ☑ No | |
| ☐ Snuff ☐ Cigar ☐ Cigarettes ☐ Pipe | | Angina | ☐ Yes ☑ No | Valve Replacement | | ☐ Yes ☑ No | |
| Alcohol Use: | ☐ Yes ☑ No | Coronary Artery Disease | ☐ Yes ☑ No | Liver Disease | | ☐ Yes ☑ No | |
| Recreational Drug Use: | ☐ Yes ☑ No | CABG | ☐ Yes ☑ No | Diabetes | | ☐ Yes ☑ No | |
| Asthma: | ☐ Yes ☑ No | Hypertension | ☑ Yes ☐ No | Kidney Disease | | ☐ Yes ☑ No | |
| COPD | ☐ Yes ☑ No | Cardiomyopathy | ☐ Yes ☑ No | Type of Kidney Dx | | | |
| Pneumothorax | ☐ Yes ☑ No | CVA | ☐ Yes ☑ No | Bleeding Disorder | | ☐ Yes ☑ No | |
| Epilepsy | ☐ Yes ☑ No | PVD | ☐ Yes ☑ No | Blood Transfusion | | ☐ Yes ☑ No | |
| Cancer | ☐ Yes ☐ No Type | | | GI Disease Type | | ☐ Yes ☑ No | |

**Personal History of Anesthetic Problems:** none

**Family History of Anesthetic Problems:** none

**Family History of Bleeding Problems:**

**Past Surgeries (dates):** ∅

**Alternative Medicine:**

| Physical Examination: | BP: 150/99 | HR: 91 | RR: | Temp: 97.2 | Wt: 168 | Ht: 5'7 |
|---|---|---|---|---|---|---|
| System | WNL | Not Examined | Comments | | | |
| HEENT: | | | | | | |
| Neck: | | | | | | |
| Lungs: | | | | | | |
| Heart: | | | | | | |
| Abdomen: | | | | | | |
| Breast: | | | | | | |
| Lymph: | | | | | | |
| GU: | | | | | | |
| Neuro: | | | | | | |
| Extremities: | | | | | | |
| Other: | | | | | | |

Risks, benefits, and alternatives have been explained to the patient.

**MD Signature:** **Date:** 10/24

**Comments:**

East Alabama Medical Center
History and Physical Examination
In-Patient and Out-Patient Surgery
Fax form to:

WPH
001245

authorize the performance upon _mysif| Bobby Sanks_ of the

following operation/procedure: _left L5/S. microdiskectomy_

to be performed under the direction of Dr. _____

It has been explained to me that sometimes during an operation/procedure it is discovered that additional procedures are needed immediately. If I need such additional procedures during my operation/procedure, I permit the doctor to proceed.

I certify that I have removed all dentures, prostheses, glasses and jewelry (including body piercings) or assume responsibility for any loss or damage that result from my failure to do so.

I consent to the administration of such anesthetics as may be considered necessary or advisable by the physician responsible for this service.

I understand that all the physicians involved in my care are independent contractors and not agents, servants or employees of the hospital.

I consent to the disposal by the hospital authorities of any tissue or parts that may be removed.

East Alabama Medical Center serves as a training site for students in a variety of different healthcare professions. With permission of your physician, students may be allowed to observe procedures that would serve to benefit their educational experience. If you object to observers, please indicate here:

☐ Do not allow students to observe any procedure performed on me.

I understand that medical equipment/supply company representatives will sometimes be present during a procedure to instruct medical personnel on new equipment or supplies. If you object to observers, please indicate here:

☐ Do not allow medical equipment/supply company representatives to observe any procedure performed on me.

I understand that my physician may wish to take photographs or films of me during the course of my treatment to be made part of the medical record. I do not object to the taking of these films.

The nature and purpose of the operation/procedure, possible alternative methods or treatment, the risks involved, and the possibility of complications have been explained to me. No guarantee or assurance has been given by anyone as to the results that may be obtained.

I certify that I have read and fully understand the above consent to operation/procedure, that the explanations therein referred to were made, and that all blanks or statements requiring insertion or completion were filled in and applicable paragraphs, if any, were stricken before I signed.

_10/24/06_     Patient's Signature: X_____

Witness: _Barbra Edwards_

**WPH
001246**

If patient is a minor or unable to sign, please sign and note reason: _____

_____                    _____              _____
Legal Guardian            Other/Relationship

I certify that I have explained the risks and benefits and possible alternative treatment to the patient.

_____                    _____              _____
Physician Signature       Date                 Time

East Alabama Medical Center                    Patient Identification

Bobby Sanks

## STEP 1:

Date of Procedure: _10/210/00_

☐ Check here if site is an excluded site:

- Single organ cases (e.g., Cesarean section, cardiac surgery)
- Interventional cases for which the catheter/instrument insertion site is not predetermined (e.g. cardiac cath, central venous line)
- Teeth- no mark required, BUT mark on diagram.
- Infants <1 year, for whom the mark may cause a permanent tattoo
- Obvious wound or lesion



---

**STEP 2: Patient Verification**
*(i.e. Building 17, Registration, At time of admission or entry to facility, Any time care of patient is transferred to another caregiver)*

Person Completing Verification:_____Dept. _____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification:_____Dept._____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification:_____Dept._____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

Person Completing Verification:_____Dept._____
☐ Patient asked to state full name, procedure and point to site.
☐ Patient responses match, if applicable, ID band, consents, x-rays, and all other relevant data.

---

**REFUSAL for SITE MARKING**

I, _____ do hereby refuse to have the site/side of my surgery/procedure marked to indicate the correct site. The purpose of having the site/side marked has been explained to me. The risk of not having the site/side marked has also been explained to me.

_____          _____
Patient's Signature                                          Date

---

☐ Check here if the site will be determined in the operating room on the day of surgery based on intraoperative testing or intraoperative site marking.

☐ MD performing procedure must initial here to verify operative field as marked above. (**not required for excluded sites**)

---

## STEP 3: SITE MARK *Completed by pre-op, unless patient will bypass pre-op. If pre-op bypassed, then to be completed by RN in department patient leaves prior to entering OR/Procedural area.*

| (√ when completed) | Signature |
|---|---|
| ☐ Invasive or surgical site is marked, by initials of person marking the site, over or adjacent to the surgical/procedural site incision with a surgical marking pen *(unless excluded site)* | |

## STEP 4: TIME-OUT

| (√ when completed) | Signature |
|---|---|
| ☐ "Time-out" immediately before the start of the procedure for final verification of correct patient, correct site, correct procedure *(including availability of x-rays, implants, special equipment if applicable)* | |

*Please explain any discrepancies above:*_____

_____

Signature

WPH
001247

107091

# East Alabama Medical Center

2000 Pepperell Parkway
Opelika, Alabama 36801

**SANKS, BOBBY L**
MRN:            0000819996
Financial #:    0628400148
DOB:            Age:    55 years  Sex: Male

Admit Date/Time:    10/11/2006 9:48:00 AM
Discharge Date/Time:
Location:            PO
Patient Type:       SER
Chart Copy to DR:   **Jones MD, Frazier K**

---

## *O p e r a t i v e   R e p o r t*

---

Operative Report

PATIENT NAME:        Sanks, Bobby L

COMBINED ABBREVIATED CLINICAL RECORD AND OPERATIVE NOTE

SURGEON:  Dr. Glenn Woods

REFERRING PHYSICIAN:  Dr. Frazier K. Jones, MD

DATE:    10/11/2006

SUMMARY:    Mr. Sanks is a 55-year-old black gentleman who noticed pain in his left hip about eight days ago. He visited the emergency department, had left hip films done which did not show any abnormalities. He visited Dr. Jones yesterday and had a MRI performed and this shows a herniated disc L5-S1 which is consistent with the symptoms. He is referred now to the pain center to undergo a series of epidural steroid injections to see if this will provide him with some benefit.

PAST MEDICAL HISTORY:        High blood pressure.

PAST SURGICAL HISTORY:        None.

MEDICATIONS: Muscle relaxant, pain medicine, and Diovan.

ALLERGIES:  None known.

PHYSICAL EXAMINATION:    Well-nourished, well-developed black male in marked distress anytime he moves on the stretcher.
VITAL SIGNS:  Temperature 96.1; blood pressure 130/71; heart rate 109; respiratory rate 20; height 5'7"; weight 168 pounds.
MUSCULOSKELETAL EXAM:  Normal curvature of his lumbar spine with easily palpable spinous processes. Sacroiliac joints are nontender. Straight leg is markedly positive on the left at 45 degrees, negative on the right. Motor and sensory are intact in lower extremities.

IMPRESSION:  Herniated disc L5-S1 with left lumbar radiculopathy.

PLAN:        Epidural steroid injection L5-S1. I have discussed the risks, benefits and indications with the patient and he agrees to proceed.

DESCRIPTION OF PROCEDURE:        The patient was placed in the sitting position. The back was prepped with Betadine and draped in the usual sterile fashion. The L5-S1 interspace was identified and infiltrated with 1% lidocaine plain with bicarb times 5 ml with a 30 gauge needle. A 25 gauge needle was then used for deeper infiltration. An 18 gauge Tuohy needle was then inserted to a depth of 4 centimeters until loss of resistance to saline was obtained. No cerebrospinal fluid or heme was observed so a slow injection

---

Print Date/Time: 10/17/2006 7:25 PM
Page 1 of 2

MRN:            0000819996
Financial #:    0628400148

**SANKS, BOBBY L**

**WPH
001248**

# East Alabama Medical Center

## *Operative Report*

of a mixture of Depo-Medrol 80 milligrams in a total volume of 10 cc of 0.125% Marcaine plain plus 2 cc of 1% Lidocaine was made without difficulty. After a 20 minute period of observation his pain was much improved and he was discharged in satisfactory condition. He will return to the pain clinic in a week and a half to 10 days for re-evaluation and reinjection.

Job 591087


DP:     Glenn Woods, MD
TR:     sgn
DD:     10/11/2006 10:52 A
DT:     10/11/2006 4:17 P
        810819
Doc:    000591087
Job#:
cc:     Frazier K. Jones, MD


Electronically Signed By: Glenn M Woods
                On 10/17/06 07:06

DD: 10/11/06  TD: 10:52


CC: Frazier K Jones

MRN:        0000819996
Financial #: 0628400148

**SANKS, BOBBY L**

**WPH
001249**

UNIT: 04/40

**DMAF**

DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 830300
BIRMINGHAM, ALABAMA 35283-0300

*1 7 6 3 8 0 8 6 2 8*

Birmingham Number 205-989-2100
Toll-Free Number 1-800-292-8106        Toll-Free Fax Number 1-800-524-6489

March 19, 2007

TAX ID: 721355541                    CLAIM: 483777

PAY TO: ACTON CORPORATION            TDN: 1763808628

THE ORTHOPAEDIC CLINIC PC            RE:    BOBBY LEE SANKS
POST OFFICE BOX 2125                  AKA:
OPELIKA AL 36803-2125                        P O BOX 44
                                             SALEM AL 36874
                                     A/N:   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 INT/SSA
                                     DOB:

Frazier K Jones MD

The Disability Determination Service (DDS) is writing to obtain medical evidence on behalf of this individual who has applied for disability or blindness benefits under the Social Security Act. The DDS is responsible for determining if the person is disabled or blind. A signed authorization for release of information is enclosed.

Please furnish either a summary and/or copies of your medical office records along with laboratory findings, x-ray interpretations, EKG tracings, and other studies that you may have on this individual.

The DDS would like to have a statement based on your medical findings and observations, expressing your opinion on the limiting effects of the individual's physical and mental abilities to perform basic work related functions, i.e. lifting, walking, standing, sitting, etc. If the claim involves a child, we need to know how the child's ability to function is limited compared to children of the same age who are unimpaired.

The DDS is authorized to pay for this information. This payment does not apply to Federal records. This authorization cannot be transferred to a third party or another tax number. A reply within 10 days would be appreciated. Unless the information is received within 60 days, no payment can be made.

PLEASE SIGN THE LETTER IN THE SPACE BELOW, AND RETURN IT TO THE DDS WITH THE REQUESTED INFORMATION. NO OTHER BILLING IS NECESSARY.

                                     AUTHORIZED AMOUNT    $ 16.00

                                     VENDOR: ACTON0001 C

_____
SIGNATURE OF PHYSICIAN OR AUTHORIZED REPRESENTATIVE

Sincerely,

*Jami Judkins*

Jami L Judkins
Disability Specialist, Telephone Ext. 517

**WPH**
**001250**

Enclosures

MD01 - DDH



RQID: 1763808628483777      SITE: S01  DR: S
DOCTYPE: 0001  RF: D  CS: cf54

FROM SOCIAL SECURITY OPDLD MFFK THREE THREE (FRI)MAR 16 2007 12:57/ST. 12:58/No. 7500000982 P 2
Case 3:06-cv-00591-MHT-CSC Document 38-5 Filed 12/17/2007 Page 3 of 22
Form SSA-827 EDCS Bobby Lee Sanks

Page 1 of 2

| WHOSE Records to be Disclosed | | Form Approved OMB No. 0960-0623 |
|---|---|---|
| NAME (First Middle Last) **Bobby Lee Sanks** | | |
| SSN | Birthday (mm/dd/yy) | |
| SSA USE ONLY    NUMBER HOLDER (If other than above) NAME SSN | | |

# AUTHORIZATION TO DISCLOSE INFORMATION TO SOCIAL SECURITY ADMINISTRATION (SSA)

## ** PLEASE READ THE ENTIRE FORM, BOTH PAGES, BEFORE SIGNING BELOW **

I voluntarily authorize and request disclosure (including paper, oral, and electronic interchange):

**OF WHAT**      *All my medical records; also education records and other information related to my ability to perform tasks. This includes specific permission to release:*

1. All records and other information regarding my treatment, hospitalization, and outpatient care for my impairment(s) *including*, and not limited to:
   -- Psychological, psychiatric, or other mental impairment(s) (excludes "psychotherapy notes" as defined in 45 CFR 164.501)
   -- Drug abuse, alcoholism, or other substance abuse
   -- Sickle cell anemia
   -- Records which may indicate the presence of a communicable or venereal disease which may include, but are not limited to, diseases such as hepatitis, syphilis, gonorrhea and the human immunodeficiency virus, also known as Acquired Immune Deficiency Syndrome (AIDS); and tests for HIV.
   -- Gene-related impairments (including genetic test results)
2. Information about how my impairment(s) affects my ability to complete tasks and activities of daily living, and affects my ability to work.
3. Copies of educational tests or evaluations, including Individualized Educational Programs, triennial assessments, psychological and speech evaluations, and any other records that can help evaluate function; also teachers' observations and evaluations.
4. Information created within 12 months after the date this authorization is signed, as well as past information.

**FROM WHOM**

- All medical sources (hospitals, clinics, labs, physicians, psychologists, etc.) including mental health, correctional, addiction treatment, and VA health care facilities
- All educational sources (schools, teachers, records administrators, counselors, etc.)
- Social workers/rehabilitation counselors
- Consulting examiners used by SSA
- Employers
- Others who may know about my condition (family, neighbors, friends, public officials)

| THIS BOX TO BE COMPLETED BY SSA/DDS (as needed) Additional information to identify the subject (e.g. other names used), the specific source, or the material to be disclosed: |
|---|
| *Frazie K. Jones* |

**TO WHOM**      The Social Security Administration and to the State agency authorized to process my case (usually called "disability determination services"), including contract copy services, and doctors or other professionals consulted during the process. [Also, for international claims, to the U.S. Department of State Foreign Service Post.]

**PURPOSE**      Determining my eligibility for benefits, including looking at the combined effect of any impairments that by themselves would not meet SSA's definition of disability; and whether I can manage such benefits.

☐ Determining whether I am capable of managing benefits ONLY (check only if this applies)

**EXPIRES WHEN**      This authorization is good for 12 months from the date signed (below my signature).
- I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.
- I understand that there are some circumstances in which this information may be redisclosed to other parties (see page 2 for details).
- I may write to SSA and my sources to revoke this authorization at any time (see page 2 for details).
- SSA will give me a copy of this form if I ask; I may ask the source to allow me to inspect or get a copy of material to be disclosed.
- I have read both pages of this form and agree to the disclosures above from the types of sources listed.

***PLEASE SIGN USING BLUE OR BLACK INK ONLY.

| INDIVIDUAL authorizing disclosure | IF not signed by subject of disclosure, specify basis for authority to sign |
|---|---|
| SIGN ► *Bobby L Sanks* | ☐ Parent of minor  ☐ Guardian  ☐ Other personal representative (explain) |
| Date Signed 3/16/07    Street Address P O BOX 44 | (Parent/guardian/personal representative sign here if two signatures required by State law) ► |
| Phone Number (with area code) 334-749-4462 | City SALEM | State AL | Zip 36874 |

| WITNESS    I know the person signing this form or am satisfied of this person's identity: | |
|---|---|
| SIGN ► | IF needed, second witness sign here (e.g., if signed with "X" above) SIGN ► |
| Phone Number (or Address) SSA FO/2 633 | Phone Number (or Address) |

*This general and special authorization to disclose was developed to comply with the provisions regarding disclosure of medical, educational, and other information under P.L. 104-191 ("HIPAA"); 45 CFR parts 160 and 164; 42 U.S. Code section 290dd-2; 42 CFR part 2; 38 U.S. Code section 7332; 38 CFR 1.475; 20 U.S. Code section 1232g ("FERPA"); 34 CFR parts 99 and 300; and State law.*

WPH
001251



The
**Orthopaedic**
**Clinic**

*Disclosure Tracking Log*

Patient Name: _____

Medical Record Number: _____

| Date Received | Name of Requestor | Address (if known) | Authorization or Written Request (Y/N) | Purpose* | PHI Disclosed* | Date Disclosed* | Disclosed By |
|---|---|---|---|---|---|---|---|
| | DDS | PO Box 830300 B'ham, Al 35883 | Y | disability | abstract | 4-501 | Nash |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Requests for Accounting of Disclosures:**

| Requested By (Individual/Legal Rep.): | Date Requested | Date Range Requested | Staff Completing Request | Date Provided |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

WPH
001252



**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**

The Ogletree Building
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: 864.271.1300
Facsimile: 864.235.4754
www.ogletreedeakins.com

April 16, 2007

*Via* E-Mail and U.S. Mail

Lateefah Muhammad, Esquire
P.O. Box 1096
Tuskegee Institute, AL 36087

> Re:   *Patricia J. Gibson v. WestPoint Stevens, Inc. and WestPoint Home, Inc.*
>        Case No.: 3:06-CV-974-MEF
>
>        *Bobby Lee Sanks v. WestPoint Stevens, Inc. and WestPoint Home, Inc.*
>        Case No.: 3:06-CV-1092-T

Dear Ms. Muhammad:

    We have re-examined the subpoenas issued regarding your clients and find that they are proper under the circumstances. If we do not receive prompt responses from those subpoenaed, we will be forced to seek enforcement of the subpoenas.

    Your objections about the scope of the subpoenas goes to the admissibility of any documents that may be produced and not to whether the subpoenas are proper.

    If you will give us proper assurances that the physical and mental conditions of your clients will not be issues at trial, then the subpoenas will not be necessary.

Sincerely,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Fred W. Suggs, Jr.

FWS, Jr./blg
cc:   Enrique Duprat, M.D.
       David G. Fagan, M.D.
       Ron M. Shiver, M.D.
       ✓James K. Whatley, M.D.
       William B. Whatley, M.D.

Atlanta, GA • Austin, TX • Birmingham, AL • Charleston, SC • Charlotte, NC • Chicago, IL • Columbia, SC • Dallas, TX • Greensboro, NC • Greenville, SC • Houston, TX • Indianapolis, IN
Kansas City, MO • Los Angeles, CA • Miami, FL • Morristown, NJ • Nashville, TN • Phoenix, AZ • Raleigh, NC • St. Thomas, VI • San Antonio, TX • Tampa, FL • Torrance, CA • Washington, DC

WPH
001253

## CERTIFICATE

I HEREBY CERTIFY that the attached is a true and complete copy of the billing records pertaining to _____ *Bobby Sanks* _____ which are in my custody, and that I am the legal custodian and keeper of said records, which are required by the laws of the State of Alabama to be kept.

I further certify that said records were made in the regular course of business of _____ *TSC* _____ , and that it was in the regular course of said business for such records to be made at the time of the events, transactions, or occurrences to which they refer, or within a reasonable time thereafter.

Signed this _____ day of _____ *June* _____ , 2007.


_____ *Adele Holmes* _____

**Custodian of Records**

SWORN TO AND SUBSCRIBED before me this _____ day of _____ , 2007.


_____

**Notary Public, State of**

**Alabama**
**(SEAL)**

**My Commission Expires:**

UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

PATRICIA J. GIBSON,                   *
                                      *
        Plaintiff,                    *
                                      *
vs.                                   *    CASE NO. 3:06-CV-0974-MEF
                                      *
WESTPOINT STEVENS, INC. and           *
WESTPOINT HOME, INC.,                 *
                                      *
        Defendants.                   *

## MOTION FOR PROTECTIVE ORDER BY NON-PARTY

COMES now James R. Whatley, M.D., by and through his attorney, Robert H. Pettey,

and represents and shows unto the Court as follows:

1.    The record custodian for James R. Whatley, M.D., has received a subpoena ducas

tecum in this case, which said subpoena is attached hereto as Exhibit 1. The subpoena demands

the record custodian to produce and permit inspection and copying of records pertaining to the

Plaintiff.

2.    The attorney for the Plaintiff has objected to the production of records pursuant to

this subpoena by letters dated April 5, 2007, and April 10, 2007, which letters are attached as

Exhibit 2.

3.    The attorney for the Defendant has taken the position that the objection to the

subpoenas are invalid. A copy of correspondence from the attorney for the Defendant regarding

the objection to the subpoena dated April 16, 2007, is attached as Exhibit 3.

Robert H. Pettey, the attorney for James R. Whatley, M.D., has conferred by telephone

with the attorney for the Defendant in an effort to resolve this dispute, but the attorney for the

Defendant insists on a full response to the subpoena, in spite of the objections raised by the attorney for the Plaintiff.

WHEREFORE, James R. Whatley, M.D., moves the Court to enter a protective order pursuant to Rule 26(c) FRCP directing the said James R. Whatley, M.D., to make whatever response to the subpoena the Court determines to be legally required.

SAMFORD & DENSON, LLP
Attorneys for James R. Whatley, M.D.

By: _____
Robert H. Pettey

SAMFORD & DENSON, LLP
P.O. Box 2345
Opelika, AL 36803-2345
Telephone (334) 745-3504
Facsimile (334) 745-3506
ID Code PET013

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following, by depositing the same, postage prepaid, United States Mail, on this the __17__ day of May, 2007.

Fred W. Suggs, Jr.
Attorney for Defendant
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
P.O. Box 2757
Greenville, SC 29602

Lateefah Muhammad
Attorney for Plaintiff
Lateefah Muhammad, Attorney at Law, P.C.
P.O. Box 1096
Tuskegee, AL 36087



_____
Robert H. Pettey

WPH
001256

# Exhibit 1

WPH
001257

AO 88 (Rev. 1/94) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

Patricia J. Gibson,

V.

WestPoint Stevens, Inc. and
WestPoint Home, Inc.,

**SUBPOENA DUCES TECUM
IN A CIVIL CASE**

CASE NUMBER: 3:06-CV-0974-MEF

TO:    RECORD CUSTODIAN: James K. Whatley, MD, 10 Medical Park, Valley, Alabama 36854

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

■ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below: Any and all records maintained in your custody pertaining to **Patricia J. Gibson, a/k/a Patricia Jones, Patricia Barrow and Patricia Varner**, including but not limited to medical records, treatment records, counseling records, narratives, nurse's notes, doctor's notes, diagnostic reports, x-ray reports, disability records, admission records, commitment records, referrals, work excuses, questionnaires, forms, applications, and any other record of any kind in your possession. We want every piece of paper in your file relating to this patient.

| PLACE | DATE AND TIME |
|---|---|
| Ogletree Deakins Nash Smoak & Stewart, P. C. One Federal Place, 1819 5th Avenue North, Suite 1000 Birmingham, AL 35203-2118 | On or before Monday, April 16, 2007 at 10:00 a. m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* | March 30, 2007 |

ISSUING OFFICERS NAME, ADDRESS AND PHONE NUMBER
Fred W. Suggs, Jr. Attorney for Defendant
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
Post Office Box 2757, 300 North Main Street
Greenville, SC 29602
(864)271-1300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

WPH
001258

# Exhibit 2

WPH
001259

# LATEEFAH MUHAMMAD, ATTORNEY AT LAW, P.C.

3805 WEST MARTIN LUTHER HIGHWAY
TUSKEGEE, ALABAMA 36083
**MAILING ADDRESS:**
POST OFFICE BOX 1096
TUSKEGEE INSTITUTE, ALABAMA 36087
(334) 727-1997 TELEPHONE/FACSIMILE
lateefahmuhammad@aol.com

COPY

5 April 2007

Fred W. Suggs, Jr., Esquire
OGLETREE DEAKINS, P.C.
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602

James C. Pennington, Esquire
OGLETREE DEAKINS, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama 35203-2118

RE: **OUR CLIENT FILE #06-0120/PATRICIA J. GIBSON**
*GIBSON v. WEST POINT STEVENS, ET AL.*, 3:06cv974-MEF-TFM

RE: **OUR CLIENT FILE #06-0104/BOBBY LEE SANKS**
*SANKS v. WEST POINT, INC., ET AL.*, 3:06cv1092-MHT-CSC

Gentlemen:

This is to inform you that the Plaintiffs in the above cases **do not waive** their objections to the subpoenas submitted to their physicians. Formal objections will follow to show cause why the objections should be upheld.

Very truly yours,

*Lateefah Muhammad*

Lateefah Muhammad

cc: Mrs. Patricia J. Gibson
    Mr. Bobby Lee Sanks
    Dr. Enrique Duprat, M.D.
    Dr. David G. Fagan, M.D.
    Dr. Ron M. Shiver, M.D.
    Dr. James K. Whatley, M.D.
    Dr. William B. Whatley, M.D.

# LATEEFAH MUHAMMAD, ATTORNEY AT LAW, P.C.

3805 WEST MARTIN LUTHER HIGHWAY
TUSKEGEE, ALABAMA 36083
MAILING ADDRESS:
POST OFFICE BOX 1096
TUSKEGEE INSTITUTE, ALABAMA 36087
(334) 727-1997 TELEPHONE/FACSIMILE
lateefahmuhammad@aol.com

10 April 2007

Fred W. Suggs, Jr., Esquire
OGLETREE DEAKINS, P.C.
300 North Main Street
Post Office Box 2757
Greenville, South Carolina 29602

James C. Pennington, Esquire
OGLETREE DEAKINS, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama 35203-2118

RE: OUR CLIENT FILE #06-0120/PATRICIA J. GIBSON
   *GIBSON v. WEST POINT STEVENS, ET AL.*, 3:06cv974-MEF-TFM

RE: OUR CLIENT FILE #06-0104/BOBBY LEE SANKS
   *SANKS v. WEST POINT, INC., ET AL.*, 3:06cv1092-MHT-CSC

Gentlemen:

This is to confirm the telephone conversation between Attorney Suggs and myself, during which I identified my Clients' reasons for objecting to the subpoenas that have been issued in the above cases. Particularly, I informed Attorney Suggs that my Clients do not agree that the scope of the subpoenas should include **any and all** of their medical records held by their physicians. I told him that the scope of the request is too broad and remote in time as it relates to the lawsuit and the issues in the case. I indicated to him that I was on bereavement and medical leave at the point his request to me expired and did not review his request until a couple of days after the 15-day deadline. Moreover, I indicated that a Motion for Protective Order will be filed with the Court if this dispute is not resolved regarding the broadness, remoteness and scope of the subpoenas. We both agreed to revisit the matter on Thursday, 12 April 2007, to consider what steps should be taken next. Hopefully, a new request will issue and we can get on with the business of these cases.

Very truly yours,

Lateefah Muhammad

cc: Mrs. Patricia J. Gibson
    Mr. Bobby Lee Sanks
    Dr. Enrique Duprat, M.D.
    Dr. David G. Fagan, M.D.
    Dr. Ron M. Shiver, M.D.
    Dr. James K. Whatley, M.D.
    Dr. William B. Whatley, M.D.

# Exhibit 3

WPH
001262

Date: 10/17/06

Patient: Bobby Janks

The
**Orthopaedic
Clinic**

☑ school
☑ regular work

☐ should return        ☐ light work
☐ should not return    ☐ physical education

The above patient is presently under our care and

Diagnosis: _____

Restriction(s): _____ No work until flu visit

_____

Length of Restriction(s): _____

Next Appointment: _____

M Jones _____ M.D.

0 Medical Park
Valley, Alabama 36854-0095
(334) 756-3146

762-A East Glenn Avenue
Auburn, Alabama 36830
(334) 501-2290

121 North 20th Street
P.O. Box 2125
Opelika, Alabama 36803-2125
(334) 749-8303

WPH
001263

**The**
**Orthopaedic**
**Clinic**

ate: 3·22·07

atient: Bobby Sinks

☒ school
☒ regular work
☐ light work
☐ physical education

☐ should return
☒ should not return

he above patient is presently under our care and

iagnosis: back pain / Left leg

estriction(s): No work until next appointment

ength of Restriction(s): Until next appointment

ext Appointment: 4 weeks

Frazier Jones M.D.

| | | 121 North 20th Street |
| --- | --- | --- |
| ) Medical Park | 762-A East Glenn Avenue | P.O. Box 2125 |
| alley, Alabama 36854-0095 | Auburn, Alabama 36830 | Opelika, Alabama 36803-2125 |
| (34) 756-3146 | (334) 501-2290 | (334) 749-8303 |

WPH
001264

The
**Orthopaedic**
**Clinic**

Date: 12/15/06

Patient: Bobby Sanks

☐ school
☒ regular work
☐ light work
☐ physical education

The above patient is presently under our care and

☐ should return
☒ should not return

Diagnosis: No work until the visit

Restriction(s):

Length of Restriction(s):

Next Appointment: 4 weeks

Dr. Jones                    M.D.

0 Medical Park
Valley, Alabama 36854-0095
(334) 756-3146

762-A East Glenn Avenue
Auburn, Alabama 36830
(334) 501-2290

121 North 20th Street
P.O. Box 2125
Opelika, Alabama 36803-2125
(334) 749-8303

WPH
001265

Date: 12.1.06

Patient: Bobby Sank

The Orthopaedic Clinic

☒ school
☐ regular work
☒ should return          ☐ light work
☐ should not return      ☐ physical education

The above patient is presently under our care and

Diagnosis: Ll. Craq TOC pa.

Restriction(s): no Restrict..

Length of Restriction(s): _____

Next Appointment: _____

_____ M.D.

0 Medical Park
Valley, Alabama 36854-0095
(334) 756-3146

762-A East Glenn Avenue
Auburn, Alabama 36830
(334) 501-2290

121 North 20th Street
P.O. Box 2125
Opelika, Alabama 36803-2125
(334) 749-8303

WPH
001266

NAME: _Bailey Sarks_    DATE: _10/26/06_

DATE OF BIRTH: _____    TELEPHONE #: _____

PHYSICIAN: _FKJ_    CHART #: _____

DIAGNOSIS: _LBP_

PROCEDURE: _Microdiscectomy_    ⓁⓉ _L5-S1_

SCHEDULED DATE: _10/26/06_

☐ PHYSICAL THERAPY REHAB FOR ALL TOTAL JOINTS

☐ INITIAL PT VISIT (3-5 DAYS POST OP)

☐ SCHEDULED DATE: _____

☐ ARTHOGRAM: _____    ☐ VENOUS DOPPLER: _____
☐ MYELOGRAM: _____    ☐ BONE SCAN: _____
☐ CT SCAN: _____    ☐ 3 PHASE BONE SCAN: _____
☐ CT SCAN W/CONTRAST: _____    ☐ MRI: _____
    ☐ MRI W/CONTRAST: _____

LOCATION:
    ☐ ADI    ☐ BLDG 17    ☐ EMAC    ☐ LANIER MEMORIAL    ☐ OTHER _____
INJECTION:
    ☐ EPIDURAL: _____    ☐ FACET BLOCK: _____
    ☐ OTHER: _____

EMG/NCV:: _____

☐ CONSULT PHYSICIAN: _____
        DATE: _____    TIME: _____

INSURANCE INFORMATION: INSURANCE CARRIER NOTIFIED: ☐ YES  ☐ NO  EMPLOYEE INITIALS: _____
PRECERT REQUIRED:  ☐ YES    ☐ NO    VERIFIED BY: _____
PRECERT # _____

_____        _____
SIGNATURE        DATE

**WPH**
**001267**

NAME: Bobby Sanks
DATE: 10/10/06
DATE OF BIRTH:
TELEPHONE #
PHYSICIAN: FKJ
CHART #

DIAGNOSIS: herniated disc

PROCEDURE: _____

SCHEDULED DATE: _____

SCHEDULED DATE: _____

DIAGNOSIS:
- ❏ CAP X-Ray: _____
- ❏ ARTHROGRAM: _____
- ❏ MYELOGRAM: _____
- ❏ CT SCAN: _____
- ❏ CT SCAN W/CONTRAST: _____

- ❏ VENOUS DOPPLER: _____
- ❏ BONE SCAN: _____
- ❏ 3 PHASE BONE SCAN: _____
- ❏ MRI: _____
- ❏ MRI W/CONTRAST: _____

10/11/06 . WJ

LOCATION:
- ❏ ADI   ❏ BLDG 17   ❏ EAMC   ❏ LANIER MEMORIAL   ❏ OTHER _____

INJECTION:
- ❏ EPIDURAL: L 5 S1 _____   ❏ FACET BLOCK: _____
- ❏ OTHER: _____

EMG/NCV: _____

❏ CONSULT PHYSICIAN: _____
DATE: _____   TIME: _____

INSURANCE INFORMATION: INSURANCE CARRIER NOTIFIED: ❏ YES   ❏ NO   EMPLOYEE INITIALS: _____
PRECERT REQUIRED: ❏ YES   ❏ NO   VERIFIED BY: _____
PRECERT # _____

_____                    _____
SIGNATURE                          DATE

WPH
001268

## MEDICATION CHECKLIST

| DATE | MEDICATION AND RX | PHARMACY | # REFILLS | DR. |
|------|-------------------|----------|-----------|-----|
| 11/6/6 | Lortab 7.5mg | OV | | FUP |
| 11/17/6 | Medrol dose pk | OV | | FUP |
| 12-1-06 | 2,0b,12  7-1 | od | ∅ | Flt |
| 3-22-07 | Utram | OOOOV | 1 | FKS |
| 11 | Celebrex | OV | ∅ | FKS |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

WPH
001269

# Dx. 13





```
------------------------
: UNIT: CDRCRE          :
:                        :
:                        :
:                        :
:                        :
------------------------
```

BOBBY LEE SANKS
P O BOX 44
SALEM AL 36874


APPLICATION SUMMARY FOR DISABILITY INSURANCE BENEFITS

n March 16, 2007, we talked with you and completed your application for SOCIAL
ECURITY BENEFITS. We stored the application information electronically in our
ecords and are enclosing a summary of your statements.

APPLY FOR A PERIOD OF DISABILITY AND/OR ALL INSURANCE BENEFITS FOR WHICH I AM
LIGIBLE UNDER TITLE II AND PART A OF TITLE XVIII OF THE SOCIAL SECURITY ACT,
S PRESENTLY AMENDED.

Y NAME IS BOBBY LEE SANKS.

Y SOCIAL SECURITY NUMBER IS

Y DATE OF BIRTH IS

AM A CITIZEN OF THE UNITED STATES.

DO NOT HAVE AN UNSATISFIED FELONY WARRANT(S).

DO NOT HAVE AN UNSATISFIED FEDERAL OR STATE WARRANT(S) FOR VIOLATION OF
ROBATION OR PAROLE.

BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON October 1, 2006.

AM STILL DISABLED.

) PREVIOUS APPLICATION HAS BEEN FILED WITH THE SOCIAL SECURITY ADMINISTRATION
· OR FOR ME.

HAVE FILED OR INTEND TO FILE FOR SSI.



DEFENDANT'S
EXHIBIT
13
B. Sanks

SANKS
000049

I HAVE NOT FILED NOR DO I INTEND TO FILE FOR ANY WORKERS' COMPENSATION, PUBLIC DISABILITY OR BLACK LUNG BENEFITS.

I AM NOT ENTITLED TO NOR DO I EXPECT TO BECOME ENTITLED TO A PENSION OR ANNUITY BASED IN WHOLE OR IN PART ON WORK AFTER 1956 NOT COVERED BY SOCIAL SECURITY.

THE SOCIAL SECURITY ADMINISTRATION AND THE STATE AGENCY REVIEWING MY CLAIM DO HAVE MY PERMISSION TO CONTACT MY EMPLOYER(S).

I AM MARRIED TO JEANNETTE THOMAS. WE WERE MARRIED ON August 15, 1981 IN AL BY A CLERGYMAN OR PUBLIC OFFICIAL. MY SPOUSE'S AGE OR BIRTHDATE IS AND SOCIAL SECURITY NUMBER IS

I WAS NOT PREVIOUSLY MARRIED.

I HAVE THE FOLLOWING CHILD OR CHILDREN UNDER AGE 18; AGE 18-19 ATTENDING ELEMENTARY OR SECONDARY SCHOOL FULL TIME; OR AGE 18 OR OVER AND DISABLED BEFORE AGE 22 WHO MAY BE ELIGIBLE FOR SOCIAL SECURITY BENEFITS ON THIS RECORD. THIS INCLUDES CHILDREN WHO MAY OR MAY NOT BE LIVING WITH ME. QUANESHIA SANKS

I UNDERSTAND THAT I MUST PROVIDE MEDICAL EVIDENCE ABOUT MY DISABILITY, OR ASSIST THE SOCIAL SECURITY ADMINISTRATION IN OBTAINING THE EVIDENCE.

I UNDERSTAND THAT I MAY BE REQUESTED BY THE STATE DISABILITY DETERMINATION SERVICES TO HAVE A CONSULTATIVE EXAMINATION AT THE EXPENSE OF THE SOCIAL SECURITY ADMINISTRATION AND THAT IF I DO NOT GO, MY CLAIM MAY BE DENIED.

I AUTHORIZE ANY PHYSICIAN, HOSPITAL, AGENCY, OR OTHER ORGANIZATION TO DISCLOSE ANY MEDICAL RECORD OR INFORMATION ABOUT MY DISABILITY TO THE SOCIAL SECURITY ADMINISTRATION OR TO THE STATE DISABILITY DETERMINATION SERVICES THAT MAY REVIEW MY CLAIM OR CONTINUING DISABILITY.

I AUTHORIZE THE SOCIAL SECURITY ADMINISTRATION TO RELEASE ANY INFORMATION ABOUT ME TO A PHYSICIAN OR MEDICAL FACILITY PREPARATORY TO AN EXAMINATION OR TEST. RESULTS OF SUCH EXAMINATION OR TEST MAY BE RELEASED TO MY PHYSICIAN OR OTHER TREATING SOURCE.

I AUTHORIZE THAT INFORMATION ABOUT MY DISABILITY MAY BE FURNISHED TO ANY CONTRACTOR FOR CLERICAL SERVICES BY THE STATE DISABILITY DETERMINATION SERVICES.

I AGREE TO NOTIFY THE SOCIAL SECURITY ADMINISTRATION OF ALL EVENTS AS EXPLAINED TO ME.

REMARKS:
THE SUMMARY OF MY EARNINGS APPEARS CORRECT AS POSTED TO MY EARNINGS RECORD MY EARNINGS DECREASED IN 2006 DUE TO BACK SURGERY.

MARRIAGE TO J THOMAS BEGAN IN LEE CO AL

I KNOW THAT ANYONE WHO MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR REPRESENTATION OF MATERIAL FACT IN AN APPLICATION OR FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW BY FINE, IMPRISONMENT OR BOTH. I AFFIRM THAT ALL INFORMATION I HAVE GIVEN IN CONNECTION WITH THIS CLAIM IS TRUE.

SANKS
000050

COPY

MY TELEPHONE NUMBER IS ( 334) 749-4462.

SOCIAL SECURITY ADMINISTRATION
IMPORTANT INFORMATION


RECEIPT FOR YOUR CLAIM FOR SOCIAL SECURITY DISABILITY INSURANCE BENEFITS




BOBBY LEE SANKS
P O BOX 44
SALEM AL 36874


NAME OF PERSON TO CONTACT              : UNIT: CDRCRE            :
ABOUT YOUR CLAIM:  *MR. Rogers*        :                        :
                                       :                        :
                                       :                        :
                                       :                        :


YOUR APPLICATION FOR SOCIAL SECURITY BENEFITS HAS BEEN RECEIVED AND WILL BE
PROCESSED AS QUICKLY AS POSSIBLE.

YOU SHOULD HEAR FROM US WITHIN 120 DAYS AFTER YOU HAVE GIVEN US ALL THE
INFORMATION WE REQUESTED. SOME CLAIMS MAY TAKE LONGER IF ADDITIONAL INFORMATION
IS NEEDED.

IN THE MEANTIME, IF YOU CHANGE YOUR ADDRESS, OR IF THERE IS SOME OTHER CHANGE
THAT MAY AFFECT YOUR CLAIM, YOU - OR SOMEONE FOR YOU - SHOULD REPORT THE
CHANGE.

We are providing the attached application for your records.

We stored your application information electronically so there is no reason for
us to retain a paper copy of your application.

IMPORTANT REMINDER

Penalty of Perjury

You declared under penalty of perjury that you examined all the information on
this form and it is true and correct to the best of your knowledge. You were
told that you could be liable under law for providing false information.

THE TELEPHONE NUMBERS TO CALL IF YOU HAVE A QUESTION OR SOMETHING TO REPORT
ARE:

    BEFORE YOU RECEIVE A NOTICE ABOUT YOUR CLAIM: 334- 745- 7052

    AFTER YOU RECEIVE A NOTICE ABOUT YOUR CLAIM: 1- 800- 772- 1213

                                        SANKS
                                        000052

SOCIAL SECURITY INFORMATION IS ALSO AVAILABLE TO INTERNET USERS AT
WWW.SOCIALSECURITY.GOV.

What You Need To Do

   o   Review the summary to ensure we recorded your statements correctly.

   o   If you agree with all your statements, you may retain the information for
       your records.

   o   If you disagree with any of your statements, you should contact us within
       10 days after the date of this notice to let us know.

ALWAYS GIVE US YOUR CLAIM NUMBER WHEN WRITING OR TELEPHONING ABOUT YOUR
CLAIM. IF YOU HAVE ANY QUESTIONS ABOUT YOUR CLAIM, WE WILL BE GLAD TO
HELP YOU.

WE ARE RETURNING ANY DOCUMENT(S) YOU MAY HAVE SUBMITTED WITH YOUR APPLICATION.

CLAIMANT                              SOCIAL SECURITY CLAIM NO.
BOBBY L SANKS

March 16, 2007 14:43

NH                                          SG-SSA-16    PAGE    6

REPORTING RESPONSIBILITIES FOR DISABILITY INSURANCE BENEFITS

BOBBY LEE SANKS
P O BOX 44
SALEM AL 36874

CHANGES TO BE REPORTED AND HOW TO REPORT

FAILURE TO REPORT MAY RESULT IN OVERPAYMENTS THAT MUST BE REPAID, AND IN POSSIBLE MONETARY PENALTIES

o   You change your mailing address for checks or residence. To avoid delay in receipt of checks you should ALSO file a regular change of address notice with your post office.

o   Your citizenship or immigration status changes.

o   You go outside the U.S.A. for 30 consecutive days or longer.

o   Any beneficiary dies or becomes unable to handle benefits.

o   You are confined to jail, prison, penal institution or correctional facility for conviction of a crime or you are confined to a public institution by court order in connection with a crime.

o   You have an unsatisfied warrant for your arrest for a crime or attempted crime that is a felony (or, in jurisdictions that do not define crimes as felonies, a crime that is punishable by death or imprisonment for a term exceeding 1 year).

o   You have an unsatisfied warrant for a violation of probation or parole under Federal or State law.

o   Your stepchild is entitled to benefits on your record and you and the stepchild's parent divorce. Stepchild benefits are not payable beginning with the month after the month the divorce becomes final.

o   Custody Change - Report if a person for whom you are filing, or who is in your care dies, leaves your care or custody, or changes address.

o   Change of Marital Status - Marriage, divorce, annulment of marriage.

o   You become entitled to a pension or annuity based on your employment after 1956 not covered by Social Security, or if such pension or annuity stops.

o   You return to work (as an employee or self-employed) regardless of the amount of earnings.

SANKS
000054



o  Your condition improves.

o  If you are under age 65 and you apply for or begin to receive Workers' Compensation or another public disability benefit (including Black Lung benefits), or the amount of your present Workers' Compensation or public benefit changes or stops, or you receive a lump sum settlement.

HOW TO REPORT

You can make your reports by telephone, mail, or in person, whichever you prefer.

If you are awarded benefits, and one or more of the above change(s) occur, you should report by:

o  Calling us TOLL FREE at 1-800-772-1213;

o  If you are deaf or hearing impaired, calling us TOLL FREE at TTY 1-800-325-0778; or

o  Calling, visiting or writing your local Social Security Office at the phone number and address above.

For general information about Social Security, visit our website at www.socialsecurity.gov

For those under full retirement age, the law requires that a report of earnings be filed with SSA within 3 months and 15 days after the end of any taxable year in which you earn more than the annual exempt amount. You may contact SSA to file a report. Otherwise, SSA will use the earnings reported by your employer(s) and your self-employment tax return (if applicable) as the report of earnings required by law and adjust benefits under the earnings test. It is your responsibility to ensure that the information you give concerning your earnings is correct. You must furnish additional information as needed when your benefit adjustment is not correct based on the earnings on your record.

---

NOTICE ABOUT DOCUMENTS

We recommend that you keep all documents you submitted to us.
____  We are returning the documents you submitted with this claim.

---

Collection and Use of Information From Your Application -
Privacy Act Notice / Paperwork Reduction Act Notice

The Social Security Administration is authorized to collect the information requested on this form under sections 202, 205 and 223 of the Social Security Act. The information you provide will be used by the Social Security Administration to determine if you or a dependent is eligible to insurance coverage and/or monthly benefits. You do not have to give us the requested information. However, if you do not provide the information, we will be unable to make an accurate and timely decision concerning your entitlement or a dependent's entitlement to benefit payments.

SANKS

000055

# Dx. 14

March 16, 2007  14:49

CLAIMANT:                    BOBBY LEE SANKS                              PAGE    1



BOBBY LEE SANKS
P O BOX 44
SALEM, AL 36874

APPLICATION SUMMARY FOR SUPPLEMENTAL SECURITY INCOME

On March 16, 2007, you applied for Supplemental Security Income and any
federally administered State supplementation under title XVI of the Social
Security Act, for benefits under the other programs administered by the Social
Security Administration, and where applicable, for medical assistance under
title XIX of the Social Security Act. We have stored your application
electronically in our records.

What You Need To Do

o  Review this summary to ensure we recorded your statements correctly.

o  If you agree with all your statements, you should keep this summary for
   your records.

o  If you disagree with any of your statements, you should contact us within
   10 days after the date of this summary to let us know.

IDENTIFICATION

My name is BOBBY LEE SANKS. My social security number is

My date of birth is

I have not used any other name or social security number(s).

I am not blind.

I am disabled. My disability began on October 1, 2006.

I was not disabled prior to age 22.

I am married to JEANNETTE THOMAS SANKS.

FUGITIVE FELON AND PAROLE OR PROBATION VIOLATION INFORMATION

The following statements describe my fugitive felon/parole or probation
violator status as of March 1, 2007.

   I have not been accused or convicted of a felony or an attempt to commit a
   felony.


DEFENDANT'S
EXHIBIT
14
B. Sanks

CLAIMANT:                    BOBBY LEE SANKS    COPY

I am not on parole or probation under Federal or State law.

o LIVING ARRANGEMENTS

The following statements describe my living arrangements as of March 1, 2007.

I began living at 330 LEE RD 175, SALEM, AL 36874 on August 1, 1982.

I live in a house/apartment/mobile home/houseboat.

o INCOME

This report of income is valid for any and all SSI claims in which I am involved.

I receive or expect to receive the following income from March 1, 2007 to continuing:

Social Security

Private retirement pension:

Amount $92.00 monthly

From: March 2007 To: continuing

Source name: WESTPOINT STEVENS

Contact: INFO

Phone: (334)742-2223

I do not receive any other type of income.

ɔ ELIGIBILITY FOR OTHER BENEFITS

I do not currently get food stamps.

ɔ MEDICAID

You may be eligible for Medicaid. However, you must help your State identify other sources that may pay for medical care. Also, you must give information to help the State get medical support for any child(ren) who are your legal responsibility. This includes information to help the State determine who a child's father is.

If you want Medicaid, you must agree to allow your State to seek payments from sources, such as insurance companies, that are available to pay for your medical care. This includes payments for medical care for you or any person who receives Medicaid and is your legal responsibility. The State cannot provide you Medicaid if you do not agree to this Medicaid requirement. If you need further information, you may contact your Medicaid agency.

MEDICAL ASSISTANCE

SANKS
000057

CLAIMANT:                BOBBY LEE SANKS

COPY

I agree that any payments from sources responsible for paying for medical care will go to the State if Medicaid already has paid for this care.

I have health insurance that pays towards the cost of my medical care.

o  INFORMATION ABOUT JEANNETTE THOMAS SANKS

Her birthdate is                     Her social security number is

She has not used any other social security number(s).

She has used the following name(s): JEANNETTE THOMAS and JEANETTE THOMAS.

She is not blind or disabled.

o  INCOME

This report of income is valid for any and all SSI claims in which she is involved.

She receives or expects to receive the following income from March 1, 2007 to continuing:

Wages:

Amount $2,400.00

From: March 2007 To: March 2007

Amount $1,920.00 monthly

From: April 2007 To: May 2007

Amount $2,400.00

From: June 2007 To: June 2007

Amount $1,920.00

From: July 2007 To: July 2007

Amount $2,400.00

From: August 2007 To: August 2007

Amount $1,920.00 monthly

From: September 2007 To: October 2007

Amount $2,400.00

From: November 2007 To: November 2007

Amount $1,920.00 monthly

SANKS
000058

From: December 2007 To: January 2008

Amount $2,400.00

From: February 2008 To: February 2008

Amount $1,920.00 monthly

From: March 2008 To: April 2008

Amount $2,400.00 monthly

From: May 2008 To: continuing

Date last paid: March 2, 2007

Employer name: MASTERBRAND CABINETS

Contact: INFO

Phone: (334)887-5600

She does not receive any other type of income.

IMPORTANT REMINDER

Penalty of Perjury

You declared under penalty of perjury that all the information on this summary
is true and correct to the best of your knowledge. Anyone who knowingly gives a
false or misleading statement about a material fact in an application, or
causes someone else to do so, commits a crime and may be sent to prison or may
face other penalties, or both.

IMPORTANT INFORMATION--PLEASE READ CAREFULLY

We will check your statements and compare our records with records from other
state and Federal agencies, including the Internal Revenue Service.

We will process this application for Supplemental Security Income as quickly as
possible. You should hear from us within __120__ days. If you do not hear from
us by then, please get in touch with us.

Always give the Social Security number when writing or telephoning about this
claim. If you have any questions about this claim, we will be glad to help you.

If you have a question or something to report, call (334) 745-7052 and ask for
_____Claims_____. If you call or visit our office, please have this summary
with you. For general information about Social Security, visit our web site at
www.socialsecurity.gov on the Internet.

March 16, 2007  14:49
PAGE   5

CLAIMANT:                    BOBBY LEE SANKS    COPY

You may visit or write to the Social Security Office at:

SOCIAL SECURITY
1800 CORPORATE DR
OPELIKA AL 36801

SANKS
000060

March 16, 2007, 14:42
PAGE    1

FACTS ABOUT YOUR SOCIAL SECURITY COPY

THE FACTS WE USED FOR YOUR CLAIM

Your Name.......................................................BOBBY L SANKS
Your Social Security Number....................................
Your Date of Birth.............................................

We used these facts and the information already on our records to decide
whether you qualify for benefits.

YOUR SOCIAL SECURITY CREDITS

You need 33 credits to qualify for disability benefits. Our review of your
earnings record shows that you meet this requirement. You first met these
requirements on October 2001. You last meet these requirements on December
2011.

YOUR DISABILITY BENEFITS

You must meet certain medical requirements in addition to having the required
Social Security credits. If you meet these medical requirements and have the
required credits, your monthly disability benefit would be $1,698.00. You and
your eligible family members could get up to a monthly total of $2,547.40.

YOUR SOCIAL SECURITY EARNINGS

The attached chart shows the earnings on your Social Security record. It also
estimates the amount of Social Security taxes you paid each year to finance
benefits under Social Security and Medicare. If you have government earnings
that help you qualify for Medicare, those earnings also are included on the
chart under the heading "Medicare".

If you worked in the railroad industry at any time since 1951 but have less
than 10 years service and performed less than 5 years of service after 1995,
your railroad earnings are included with your Social Security earnings. We
considered these earnings when we counted your credits of coverage and
calculated your estimated benefits. If you have 10 years or more of railroad
service or performed 5 years of railroad service after 1995, we have not shown
or used those earnings. Instead, you should contact your nearest Railroad
Retirement Board office for information about possible additional railroad
pension benefits.

We show earnings only up to the maximum amount covered by Social Security and
Medicare. Beginning in 1994, there is no maximum for Medicare. You now pay the
Medicare tax on all your wages and self-employment earnings. There is still a
limit on taxable Social Security earnings, however. This chart includes any
earnings that you told us about.

Review the information on this chart to be sure the facts we used are correct.
If you disagree with our records, notify your Social Security claims
representative.

YOUR EARNINGS RECORD

|  | SOCIAL SECURITY | | | MEDICARE | | |
|---|---|---|---|---|---|---|
| YEARS | Maximum Yearly Earnings | Your Taxed Earnings | Estimated Taxes You Paid | Maximum Yearly Earnings | Your Taxed Earnings | Estimated Taxes You Paid |
| 1937-50 | $ 3,000 ea yr | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| 1951 | 3,600 | 0 | 0 | 0 | 0 | 0 |
| 1952 | 3,600 | 0 | 0 | 0 | 0 | 0 |
| 1953 | 3,600 | 0 | 0 | 0 | 0 | 0 |
| 1954 | 3,600 | 0 | 0 | 0 | 0 | 0 |
| 1955 | 4,200 | 0 | 0 | 0 | 0 | 0 |
| 1956 | 4,200 | 0 | 0 | 0 | 0 | 0 |
| 1957 | 4,200 | 0 | 0 | 0 | 0 | 0 |
| 1958 | 4,200 | 0 | 0 | 0 | 0 | 0 |
| 1959 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1960 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1961 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1962 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1963 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1964 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1965 | 4,800 | 0 | 0 | 0 | 0 | 0 |
| 1966 | 6,600 | 0 | 0 | 6,600 | 0 | 0 |
| 1967 | 6,600 | 0 | 0 | 6,600 | 0 | 0 |
| 1968 | 7,800 | 0 | 0 | 7,800 | 0 | 0 |
| 1969 | 7,800 | 1,195 | 50 | 7,800 | 1,195 | 7 |
| 1970 | 7,800 | 3,281 | 137 | 7,800 | 3,281 | 19 |
| 1971 | 7,800 | 5,014 | 230 | 7,800 | 5,014 | 30 |
| 1972 | 9,000 | 5,300 | 243 | 9,000 | 5,300 | 31 |
| 1973 | 10,800 | 5,697 | 276 | 10,800 | 5,697 | 56 |
| 1974 | 13,200 | 8,976 | 444 | 13,200 | 8,976 | 80 |
| 1975 | 14,100 | 8,727 | 431 | 14,100 | 8,727 | 78 |
| 1976 | 15,300 | 12,484 | 617 | 15,300 | 12,484 | 112 |
| 1977 | 16,500 | 11,706 | 579 | 16,500 | 11,706 | 105 |
| 1978 | 17,700 | 12,863 | 649 | 17,700 | 12,863 | 128 |
| 1979 | 22,900 | 13,530 | 687 | 22,900 | 13,530 | 142 |
| 1980 | 25,900 | 15,374 | 780 | 25,900 | 15,374 | 161 |

SANKS
000062

YOUR EARNINGS RECORD

| | SOCIAL SECURITY | | | MEDICARE | | |
| YEARS | Maximum Yearly Earnings | Your Taxed Earnings | Estimated Taxes You Paid | Maximum Yearly Earnings | Your Taxed Earnings | Estimated Taxes You Paid |
| --- | --- | --- | --- | --- | --- | --- |
| 1981 | 29,700 | 15,637 | 836 | 29,700 | 15,637 | 203 |
| 1982 | 32,400 | 14,884 | 803 | 32,400 | 14,884 | 193 |
| 1983 | 35,700 | 17,150 | 926 | 35,700 | 17,150 | 222 |
| 1984 | 37,800 | 17,284 | 933 | 37,800 | 17,284 | 224 |
| 1985 | 39,600 | 17,090 | 974 | 39,600 | 17,090 | 230 |
| 1986 | 42,000 | 20,390 | 1,162 | 42,000 | 20,390 | 295 |
| 1987 | 43,800 | 24,951 | 1,422 | 43,800 | 24,951 | 361 |
| 1988 | 45,000 | 26,670 | 1,616 | 45,000 | 26,670 | 386 |
| 1989 | 48,000 | 26,555 | 1,609 | 48,000 | 26,555 | 385 |
| 1990 | 51,300 | 27,441 | 1,701 | 51,300 | 27,441 | 397 |
| 1991 | 53,400 | 28,914 | 1,792 | 125,000 | 28,914 | 419 |
| 1992 | 55,500 | 34,861 | 2,161 | 130,200 | 34,861 | 505 |
| 1993 | 57,600 | 37,507 | 2,325 | 135,000 | 37,507 | 543 |
| 1994 | 60,600 | 38,769 | 2,403 | NO LIMIT | 38,769 | 562 |
| 1995 | 61,200 | 40,474 | 2,509 | NO LIMIT | 40,474 | 586 |
| 1996 | 62,700 | 40,710 | 2,524 | NO LIMIT | 40,710 | 590 |
| 1997 | 65,400 | 42,087 | 2,609 | NO LIMIT | 42,087 | 610 |
| 1998 | 68,400 | 41,935 | 2,599 | NO LIMIT | 41,935 | 608 |
| 1999 | 72,600 | 43,510 | 2,697 | NO LIMIT | 43,510 | 630 |
| 2000 | 76,200 | 44,699 | 2,771 | NO LIMIT | 44,699 | 648 |
| 2001 | 80,400 | 41,501 | 2,573 | NO LIMIT | 41,501 | 601 |
| 2002 | 84,900 | 42,142 | 2,612 | NO LIMIT | 42,142 | 611 |
| 2003 | 87,000 | 40,207 | 2,492 | NO LIMIT | 40,207 | 583 |
| 2004 | 87,900 | 44,289 | 2,745 | NO LIMIT | 44,289 | 642 |
| 2005 | 90,000 | 32,504 | 2,015 | NO LIMIT | 32,504 | 471 |
| 2006 | 94,200 | 12,921 | 801 | NO LIMIT | 12,921 | 187 |
| 2007 | 97,500 | 0 | 0 | NO LIMIT | 0 | 0 |

Estimate of total Social Security taxes paid- $54,733.00

Estimate of total Medicare taxes paid-         $12,641.00

Earnings were taxed for Medicare beginning in 1966. From 1983 on, these earnings include Medicare-Qualified Government Earnings.

SANKS
000063

# Dx. 15

UNIT: 04/40

DMAF

**DISABILITY DETERMINATION SERVICE**
**POST OFFICE BOX 830300**
**BIRMINGHAM, ALABAMA 35283-0300**



Birmingham Number 205-989-2100
Toll-Free Number 1-800-292-8106    Toll-Free Fax Number 1-800-524-6489

COPY

March 19, 2007

CLAIM: 483777

BOBBY LEE SANKS
P O BOX 44
SALEM AL 36874

TDN:   1763809980

A/N:    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 INT/SSA

Dear BOBBY LEE SANKS

Your claim for disability or blindness benefits under the Social Security Act is being reviewed by the Disability Determination Service (DDS). Before your claim can be processed, information about your work history is needed. Please complete the enclosed form and return it within ten (10) days from the date on this letter. Please return the completed form in the pre-addressed, stamped envelope. If the completed form is not returned within 10 days, a determination may be made based on the evidence in the file.

Please read the entire form before completing it and use the enclosed guide when completing the items:

Be sure to list all of the different jobs you have done in the last 15 years before you stopped working.

If you need more space, please attach additional pages or use the "Remarks" section on page 6.

**TO AVOID DELAYS IN PROCESSING YOUR CLAIM, PLEASE RETURN THE COMPLETED FORM AND THIS LETTER WITHIN TEN (10) DAYS.** If you need any help or need more information, please call the DDS or take the form to your local Social Security office. Also, please complete the form(s) in BLACK or BLUE INK ONLY, do not use pencil.

<u>**VERY IMPORTANT: CHECK HERE ( ✓ ) SHOWING YOU COMPLETED THE FORM. ALSO, YOU MUST LEAVE THIS PAGE ATTACHED TO THE FORM AND RETURN IN THE ENCLOSED ENVELOPE.**</u>

If you do not speak English, or do not speak English well, we will provide you with an interpreter at no cost to you. Or, you may wish to bring your own interpreter with you such as a friend or family member. If you want us to provide an interpreter, please tell us ahead of time.

Sincerely,

Jami L Judkins
Disability Specialist, Telephone Ext. 517

SANKS
000073

Enclosures:    Work History Form

DEFENDANT'S
EXHIBIT
15
B. Sanks



WORK HISTORY REPORT 

### READ ALL OF THIS INFORMATION BEFORE
### YOU BEGIN COMPLETING THIS FORM

#### IF YOU NEED HELP

If you need help with this form, complete as much of it as you can, and your interviewer will help you finish it.

#### HOW TO COMPLETE THIS FORM

The information that you give us on this form will be used by the office that makes the disability decision on your disability clai You can help them by completing as much of the form as you can.

* Print or type.

* When a question refers to "you", "your", or "the Disabled Person", it refers to the person who is applying for disability benefits. If you are filling out the form for someone else, provide information about him or her.

* Be sure to explain an answer if the question asks for an explanation, or if you think you need to explain an answer.

* If more space is needed to answer any questions, use the "Remarks" section on Page 7 and show the number of the question being answered.

#### WHY THIS INFORMATION IS IMPORTANT

The information we ask for on this form will help us understand how your illnesses or injuries or conditions might affect any wc you are qualified to do. The information tells us about the kinds of work you did, including the types of skills you need and the physical and mental requirements of each job. In Section 2, be sure to give us all of the different kinds of work you have done i the last 15 years before you stopped working.

#### REMEMBER TO SIGN THE FORM IN THE SIGNATURE SPACES ON PAGE 9.

SANKS
000074

UNIT: 04/40
Page 1

* 1 7 6 3 8 0 9 9 8 0 *

DATE: March 19, 2007                DISABILITY SPECIALIST: Jami L Judkins

WORK HISTORY REPORT

SECTION 1 - INFORMATION ABOUT THE DISABLED PERSON

A.  NAME OF CLAIMANT: BOBBY LEE SANKS

B.  SOCIAL SECURITY NUMBER:            INT/SSA

C.  DAYTIME TELEPHONE NUMBER (If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)

<u>334</u>      <u>444-9957</u>      (✗) Your Number    ( ) Message Number    ( ) None
Area Code)      (Number)

SECTION 2 - INFORMATION ABOUT YOUR WORK HISTORY
List the kinds of jobs that you have had in the last 15 years that you worked.

| JOB TITLE (Example: Cook) | TYPE OF BUSINESS (Example: Restaurant) | DATES WORKED (Month & Year) FROM        TO |
|---|---|---|
| Maintenance Technician | Textile MFG. | 1972 - July 2005 |
| Laborer | Automobile Parts | 10/2005 - 12/2005 |
| Laborer | Hydraulic MFG. | 01/2006 - 4/2006 |
| Inspector | Vials MFG. | 05/2006 - 10/2006 |
| Mail Carrier | Postal Service | 05/2006 - 12/2006 |

Page 2

JOB TITLE NO. 1     COPY

BOBBY LEE SANKS                                    SSN:                INT/SSA

GIVE US MORE INFORMATION ABOUT JOB NO. 1 LISTED ABOVE.  ESTIMATE HOURS AND PAY, IF YOU NEED TO.

JOB TITLE NO. 1     _Maintenance Technician_

| Rate of Pay | Per (Circle One) | | | | Hours per day | 8 |
|---|---|---|---|---|---|---|
| $ 15.25 | (Hour) | Week | Month | Year | Days per week | 5 - 6 |

In this job, did you:

Use machines, tools, or equipment?              Yes (explain below) (X)       No ( )

Use technical knowledge or skills?              Yes (explain below) (X)       No ( )

Write reports or complete forms?                Yes (explain below) (X)       No ( )

Describe this job.  What did you do all day?  (If you need more space, write in the "Remarks" section or on the back of this page.)

Repaired hoists, cranes, elevators, carosels, including lubrication, cleaning, painting, inspecting, troubleshooting, adjusting all gears & bolts, troubleshooting electrical & mechanical aspects of machinery throughout plant, performed preventive maintenance on machines

In this job, how many total hours did you work each day?  8

In this job, how many total hours each day did you :

| | | | |
|---|---|---|---|
| Walk? | 5 | Kneel? (Bend legs to rest on knees.) | 1 |
| Stand? | 1 | Crouch? (Bend legs & back down & forward.) | 2 |
| Sit? | 0 | Crawl? (Move on hands & knees.) | 0 |
| Climb? | 2 | Handle, grab or grasp big objects? | 1 |
| Stoop? (Bend down and forward at waist.) | 7 | | |
| Write, type or handle small objects? | 8 | | |

Lifting and Carrying: (Explain what you lifted, how far you carried it, and how often you did this.)

lifted 85-lb ladder & carried about 50 feet daily, work tools - approx. 25 lbs approx. 35 feet 45 times daily, hoists approx. 10 ft weight 50 lbs, once daily

Check heaviest weight you lifted?

( ) Less than 10 lbs.       ( ) 10 lbs.       ( ) 20 lbs.       ( ) 50 lbs.
( ) 100 lbs. or more       (X) Other  85

SANKS
000076

Page 3

BOBBY LEE SANKS                                    COPY    SSN:            INT/SSA

Did you supervise other people in this job?        Yes (✓) (Complete items below.)
                                                   No  ( ) (Skip to Job Title No. 2)

How many people did you supervise?  _2 - 3_

What part of your time was spent supervising people?  _15 min. daily_

Did you hire and fire employees?    Yes ( )   No (✓)

Were you a lead worker?    Yes (✓)   No ( )

### JOB TITLE NO. 2

GIVE US MORE INFORMATION ABOUT JOB NO. 2 LISTED ABOVE.  ESTIMATE HOURS AND PAY, IF YOU NEED
TO.  _Laborer_

JOB TITLE NO. 2
_8.00_

| Rate of Pay | Per (Circle One) | | | Hours per day | _8_ |
|---|---|---|---|---|---|
| _8.00/hr_ | (Hour) Week | Month | Year | Days per week | _6_ |

In this job, did you:

Use machines, tools, or equipment?              Yes (explain below) (✓)    No ( )

Use technical knowledge or skills?              Yes (explain below) (✓)    No ( )

Write reports or complete forms?                Yes (explain below) ( )    No (✓)

Describe this job.  What did you do all day?  (If you need more space, write in the "Remarks" section or on the back of this page.)

_Machine Operator - Inserted Parts into machine to build automotive frames_

In this job, how many total hours did you work each day? _____
In this job, how many total hours each day did you :

| Walk? | _7_ | Kneel? (Bend legs to rest on knees.) | _0_ |
|---|---|---|---|
| Stand? | _7_ | Crouch? (Bend legs & back down & forward.) | _0_ |
| ? | _0_ | Crawl? (Move on hands & knees.) | _0_ |
| Climb? | _0_ | Handle, grab or grasp big objects? | _7_ |
| Stoop? (Bend down and forward at waist.) | _7_ | | |

SANKS
000077

Page 4

BOBBY LEE SANKS                                    SSN                    INT/SSA

Lifting and Carrying: (Explain what you lifted, how far you carried it, and how often you did this.)

Assembly Parts, 25 lbs for 15 ft.

Check heaviest weight you lifted?

( ) Less than 10 lbs.          ( ) 10 lbs.          ( ) 20 lbs.          ( ) 50 lbs.
( ) 100 lbs. or more          (X) Other _25 lbs_

Check weight you frequently lifted:  (By frequently, we mean from 1/3 to 2/3/ of the workday.)

( ) Less than 10 lbs.     ( ) 10 lbs.     (X) 25 lbs     ( ) 50 lbs. or more     ( ) Other _____

Did you supervise other people in this job?                Yes ( )  (Complete items below.)
                                                           No (X) (Skip to Job Title No. 2)

How many people did you supervise?  _N/A_

What part of your time was spent supervising people?  _N/A_

Did you hire and fire employees?     Yes ( )   No (X)

Were you a lead worker?              Yes ( )   No (X)


### JOB TITLE NO. 3

GIVE US MORE INFORMATION ABOUT JOB NO. 3 LISTED ABOVE.  ESTIMATE HOURS AND PAY, IF YOU NEED TO.

_Hydraulic Laborer_

JOB TITLE NO. 3

| Rate of Pay | | Per (Circle One) | | | Hours per day _____ |
|---|---|---|---|---|---|
| 6.00 | (Hour) | Week | Month | Year | Days per week _____ |

In this job, did you:

Use machines, tools, or equipment?          Yes (explain below) (X)   No ( )

Use technical knowledge or skills?          Yes (explain below) (X)   No ( )

Write reports or complete forms?            Yes (explain below) (X)   No ( )

Describe this job.  What did you do all day?  (If you need more space, write in the "Remarks" section or on the back of this page.)

Assemble Parts, lifting, Inspecting, Pulling

SANKS
000078

age 5
OBBY LEE SANKS                    COPY      SSN          INT/SSA

ı this job, how many total hours did you work each day? ___8___

ı this job, how many total hours each day did you :

/alk? __3__                          Kneel? (Bend legs to rest on knees.)            __1__
tand? __8__                          Crouch? (Bend legs & back down & forward.)     __5__
it? __9__                            Crawl? (Move on hands & knees.)                __0__
limb? __0__                          Handle, grab or grasp big objects?             __4__
toop? (Bend down and forward at waist.)     __1__
/rite, type or handle small objects?        __3__

ifting and Carrying: (Explain what you lifted, how far you carried it, and how often you did this.)

Hydraulic Pump Parts, about 5 feet 6 hrs per day (8-10 lb box)
Empty Crate buy, 10-20 lbs - 20 ft. about 6 hrs

heck heaviest weight you lifted?

) Less than 10 lbs.        ( ) 10 lbs.           (✗) 20 lbs.            ( ) 50 lbs.
) 100 lbs. or more         ( ) Other _____

heck weight you frequently lifted:  (By frequently, we mean from 1/3 to 2/3/ of the workday.)

) Less than 10 lbs.    ( ) 10 lbs.    ( ) 25 lbs    ( ) 50 lbs. or more    (✗) Other _20 lbs_

id you supervise other people in this job?        Yes ( )  (Complete items below.)
                                                  No (✓)  (Skip to Job Title No. 2)

ow many people did you supervise? _N/A_

'hat part of your time was spent supervising people? _N/A_

id you hire and fire employees?   Yes ( )   No (✓)

'ere you a lead worker?            Yes ( )   No (✓)

JOB TITLE NO. 4

IVE US MORE INFORMATION ABOUT JOB NO. 4 LISTED ABOVE.  ESTIMATE HOURS AND PAY, IF YOU NEED
).

_Inspector_

)B TITLE NO. 4

| Rate of Pay | | Per (Circle One) | | Hours per day | |
| _9.00_ | (Hour) | Week    Month    Year | | Days per week | |

SANKS
000079

ge 6

BBY LEE SANKS                              COPY        SSN:              INT/SSA

this job, did you:

e machines, tools, or equipment?              Yes (explain below) (X)    No ( )

e technical knowledge or skills?              Yes (explain below) (X)    No ( )

rite reports or complete forms?               Yes (explain below) (X)    No ( )

escribe this job.  What did you do all day?  (If you need more space, write in the "Remarks" section or on the back of this page.)

nspected vials, load + unload on Conveyor/Crapes, weigh vials,
lace on pallet for Shipping

this job, how many total hours did you work each day?  8

alk?  1                          Kneel? (Bend legs to rest on knees.)              8
and?  2                          Crouch? (Bend legs & back down & forward.)         7
t?  0                            Crawl? (Move on hands & knees.)                    1
imb?  0                          Handle, grab or grasp big objects?
oop?  (Bend down and forward at waist.)  8
rite, type or handle small objects?  3

fting and Carrying: (Explain what you lifted, how far you carried it, and how often you did this.)

rapes/Crates weighed 10 lbs. for ten feet, 7 hrs. daily - carried
3 at a time

heck heaviest weight you lifted?

Less than 10 lbs.      ( ) 10 lbs.          ( ) 20 lbs.          ( ) 50 lbs.
100 lbs. or more      (X) Other  30

heck weight you frequently lifted:  (By frequently, we mean from 1/3 to 2/3/ of the workday.)

Less than 10 lbs.    ( ) 10 lbs.        ( ) 25 lbs        ( ) 50 lbs. or more        (X) Other  30

d you supervise other people in this job?         Yes ( )  (Complete items below.)
                                                   No (X) (Skip to Job Title No. 2)

w many people did you supervise?  N/A

hat part of your time was spent supervising people?  N/A

d you hire and fire employees?   Yes ( )  No (X)

ere you a lead worker?   Yes ( )  No (X)

SANKS
000080

age 7

COPY

JOB TITLE NO. 5

OBBY LEE SANKS                                    SSN:              INT/SSA

IVE US MORE INFORMATION ABOUT JOB NO. 5 LISTED ABOVE.  ESTIMATE HOURS AND PAY, IF YOU NEED
O.

*Mail Carrier*

OB TITLE NO. 5

9.55

| Rate of Pay | Per (Circle One) | | | Hours per day | 6 |
| --- | --- | --- | --- | --- | --- |
| | (Hour)  Week | Month | Year | Days per week | 2 |

this job, did you:

se machines, tools, or equipment?              Yes (explain below) ( )      No (X)

se technical knowledge or skills?              Yes (explain below) (X)      No ( )

rite reports or complete forms?              Yes (explain below) (X)      No ( )

escribe this job.  What did you do all day?  (If you need more space, write in the "Remarks" section or on the back of this page.)

*sort mail + delivered (carrier), Supply Customers with postal
supplies*

this job, how many total hours did you work each day?  6

this job, how many total hours each day did you :

alk?   1
and?   3
t?   4
limb?   6

Kneel? (Bend legs to rest on knees.)   1
Crouch? (Bend legs & back down & forward.)   1
Crawl? (Move on hands & knees.)   0
Handle, grab or grasp big objects?   3

oop?  (Bend down and forward at waist.)

rite, type or handle small objects?

fting and Carrying: (Explain what you lifted, how far you carried it, and how often you did this.)

*7 lb. Mail, 50 feet throughout day, transporting mail for delivery
vehicle (20 lbs. per load)*

eck heaviest weight you lifted?

Less than 10 lbs.              ( ) 10 lbs.              (X) 20 lbs.              ( ) 50 lbs.
100 lbs. or more              ( ) Other _____

eck weight you frequently lifted:  (By frequently, we mean from 1/3 to 2/3/ of the workday.)

SANKS
000081

;e 8

BBY LEE SANKS                                    SSN:            INT/SSA

COPY

I you supervise other people in this job?          Yes ( )  (Complete items below.)
                                                   No (✓) (Skip to Job Title No. 2)

w many people did you supervise?  N/A

lat part of your time was spent supervising people?  N/A

I you hire and fire employees?    Yes ( )   No (✓)

:re you a lead worker?            Yes ( )   No (✓)

**PART III - REMARKS**

E THIS SECTION FOR ANY ADDED INFORMATION YOU DID NOT SHOW IN EARLIER PARTS OF THIS FORM

N/A

SANKS
000082

# Dx. 16

Toll-Free Number 1-800-292-8106                                      Toll-Free Fax Number 1-800-524-6489

March 19, 2007    COPY    CLAIM: 483777

BOBBY LEE SANKS
P O BOX 44                                              TDN:   1763809971
SALEM AL 36874
                                                        A/N:              INT/SSA

Dear BOBBY LEE SANKS

IMPORTANT INFORMATION ABOUT YOUR DISABILITY CLAIM

Your claim for Social Security Disability or Supplemental Security Income (SSI) Disability Benefits is being reviewed.
Before your claim can be processed, some additional information is needed.

Please complete the attached Physical Activities Questionnaire and return it to me within 10 days from the date of this
letter in the attached self-addressed, stamped envelope.  If you have difficulty completing the form, please ask a friend,
neighbor or relative to help you.  Do the best you can in completing the form.

IT IS VERY IMPORTANT THAT YOU RETURN THIS QUESTIONNAIRE.  YOUR CLAIM CANNOT BE
PROCESSED UNTIL THIS COMPLETED QUESTIONNAIRE IS RECEIVED.  **PLEASE RETURN THIS LETTER
WITH THE COMPLETED QUESTIONNAIRE.**  A PROMPT RESPONSE TO THIS WILL HELP US PROCESS
YOUR CLAIM FASTER.  Also, please complete the form(s) in BLACK or BLUE INK ONLY, do not use pencil.

**VERY IMPORTANT: CHECK HERE ( ✓ ) SHOWING YOU COMPLETED THE
FORM.  ALSO, YOU MUST LEAVE THIS PAGE ATTACHED TO THE FORM AND
RETURN IN THE ENCLOSED ENVELOPE.**

Sincerely,

Jami L Judkins
Disability Specialist, Telephone Ext. 517

Enclosure(s):    Adult Physical Activities Questionnaire


DEFENDANT'S
EXHIBIT
16
B. Sanks

CLAM - JLJ

RQID: 1763809971483777      SITE: S01  DR: S
SSN:              DOCTYPE: 0050  RF: D  CS: acee

Toll-Free Number 1-800-292-8106          Toll-Free Fax Number 1-800-524-6489

COPY

TDN: 1763809971

DISABILITY SPECIALIST:   Jami L Judkins
CLAIMANT:                BOBBY LEE SANKS
CLAIM:   483777          A/N:          INT/SSA

## PHYSICAL ACTIVITIES QUESTIONNAIRE

It is very important that you provide as much detail as possible when answering the following questions about your daily activities. This information will enable us to fully consider how your condition(s) limit your functioning on a daily basis. If you need additional space for your answers, you may write on the back of the form or attach additional paper. Be sure to include your name on any additional sheets.

1. Describe your usual daily activities, commenting on things such as household chores, shopping, errands, walking, driving, yard work, hobbies, doing small repairs, etc. Include how long it takes you to complete some of these activities. Please give details and examples of activities.

   Walk around house + yard until pains become unbearable. (15 min) Physicians' order to exercise legs + feet, drive 1 mile to post office, (10 min) light cleaning or dusting (15 minutes)

2. What difficulties, if any do you have completing routine or familiar tasks.

   Standing more than 15 minutes causes back + feet pain
   Driving more than 10 minutes causes back + feet pain

3. A. If you have problems standing, walking or sitting, describe the problem(s) you have with each of these activities.

   Standing more than 15 minutes causes back + feet pain
   Walking more than 15 minutes causes back + feet pain
   Sitting more than 5 minutes causes back + feet pain

   B. If you are able to stand, walk and sit, how LONG can you do each of these?

   Stand  15 min     Walk  15 min     Sit  5 Min

CL09                                    Printed by JLJ

SANKS
000065

Disability Determination Service     Page 2
Physical Activities of Daily Living Questionnaire
BOBBY LEE SANKS                                    CLAIM: 483777

    C.  1.  If you use crutches, a cane, a walker or a wheelchair, tell which one is used and explain why you must use the assistive device. *for balance of body + relieving pressure @ spine + feet*

        2.  If you use crutches, a cane, a walker or a wheelchair, who prescribed the assistive device and when was it prescribed?

*Crutches received @ Emergency Room visit by physician, Sept 2006*

4.  Does anyone depend on you for care (spouse, children, parents, pets, etc.)?
   (X) Yes  ( ) No

If yes, tell who you are responsible for and what assistance you give them. If you are unable to provide the needed assistance, please explain.

*Mother — Provide medicines for disabled Mother*

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING EACH OF THE FOLLOWING ACTIVITIES:

5.  Personal Care (such as bathing, showering, dressing, shaving, doing your hair, etc.)
   Does your condition(s) limit you in performing these activities?
   ( ) Yes  (X) No

If yes, explain the limitation(s):

*N/A*

Explain any changes in doing these activities since the beginning of your condition(s):

*N/A*

Describe any assistance you require to perform these activities:

*N/A*

SANKS
000066

Disability Determination Service                                    Page 3
Physical Activities of Daily Living Questionnaire
BOBBY LEE SANKS                                      CLAIM: 483777

6.    Cooking and Preparing Meals
      Does your condition(s) limit you in performing these activities?
      (X) Yes  ( ) No

      If yes, explain the limitation(s):

      Cannot stand more than 15 minutes

      Explain any changes in doing these activities since the beginning of your condition(s):

      Exceeding 15 min. of Standing Causes back + feet pains

      Describe any assistance you require to perform these activities:

      N/A

7.    Household Chores (such as cleaning, using a vacuum cleaner, doing laundry, making beds, taking out trash, etc.)
      Does your condition(s) limit you in performing these activities?
      (X) Yes  ( ) No

      If yes, explain the limitation(s):

      Making beds + doing laundry Causes back pains, including
      Vacuuming.

      Explain any changes in doing these activities since the beginning of your condition(s):

      These activities Causes back/foot pains

      Describe any assistance you require to perform these activities:

      N/A

Disability Determination Service
Physical Activities of Daily Living Questionnaire
BOBBY LEE SANKS

Page 4

CLAIM: 483777

8. Yard Work (such as mowing grass, raking, sweeping sidewalks, gardening, etc.)
Does your condition(s) limit you in performing these activities?
(X) Yes ( ) No

If yes, explain the limitation(s):

Any bending, Stooping, Pushing, raking, etc.
Causes Severe back Pain & feet Pain

Explain any changes in doing the activities since the beginning of your condition(s):

These tasks cause pain in back & feet

Describe any assistance you require to perform these activities:

N/A

9. Shopping (such as shopping for groceries, clothes, household items, etc.)
Does your condition(s) limit you in performing these activities?
(X) Yes ( ) No

If yes, explain the limitation(s):

~~Does~~ Occasionally, but not often, as bending &
lifting & walking causes Pain, in legs/back/feet

Explain any changes in doing these activities since the beginning of your condition(s):

These activities causes back/foot pains

Describe any assistance you require to perform these activities:

N/A

SANKS
000068

Disability Determination Service                                    Page 5
Physical Activities of Daily Living Questionnaire
BOBBY LEE SANKS                                          CLAIM: 483777

10.  Loading and unloading groceries or other items to and from the car
     Does your condition(s) limit you in performing these activities?
     (X) Yes  ( ) No

     If yes, explain the limitation(s):

     Bending, lifting, excess walking — over 15 min.
     Causes pains in back/feet

     Explain any changes in doing these activities since the beginning of your condition(s):

     Minimal lifting — this causes back/foot pains

     Describe any assistance you require to perform these activities:

     N/A


11.  Driving a car
     Does your condition(s) limit you from performing this activity?
     (X) Yes  ( ) No

     If yes, explain the limitation(s):  feet pains & back pains begin
     after driving more than 10 minutes

     Explain any changes in doing the activities since the beginning of your condition(s):

     Back & feet pains increase after driving more
     than 10 minutes.
     Describe any assistance you require to perform this activity:

     N/A


                              SANKS
                              000069

Disability Determination Service                                           Page 6
Physical Activities of Daily Living Questionnaire
BOBBY LEE SANKS                                          CLAIM: 483777

12. How long can you perform most activities before you have to take a break because of your condition(s)?

*10-15 minutes*

13. What causes you to stop doing your usual activities?

*Pain In back & feet*

14. Please provide any additional information about any other limitations caused by your condition(s).

*N/A*

15. List any medication(s) you take for your condition(s) and how often you take the medicine.

*Methyl Prednisolone*
*Lyrica*            *} Spinal/foot pain, One ea. daily*
*Meloxicam*

*Bobby Lee Sanks* _____        *3/28/07*
          Signature of Applicant                          Date

Home telephone number: (334) 749-4462

*Self* _____               *N/A* _____
Name of person completing this form              Relationship to (if other than the applicant)
                                                 applicant

_____                      _____
Disability Specialist's signature                         Date
(if this information was taken over the phone)

SANKS
000070

Completing this worksheet will help you get ready for the interview. If you can, complete the Adult Disability Report on the Internet at **www.socialsecurity.gov/adultdisabilityreport**. We may ask for additional information at the interview. *If you need more space, use blank sheets of paper.*

**A. Illnesses, injuries or conditions** limiting your ability to work. Spinal Surgery, Swelling of toes on left foot, Pains with elbow-right arm, hypertension, limited vision

**B.** Date you became unable to work because of your medical condition *(month/day/year)*. 10/16/2006

**C.** If applicable, **Medical Assistance Number** *(Medicaid or other)*. N/A

**D. Doctor/HMO/therapist/ or other person** who treated your illnesses, injuries, or conditions, or who you expect to treat you in the future.

| NAME | ADDRESS, ZIP CODE, and PHONE NUMBER | PATIENT I.D. NUMBER | DATE FIRST SEEN | DATE LAST SEEN |
|---|---|---|---|---|
| Frazier Jones, MD | 121 N. 20th St, Bldg. 18, Opelika, AL 36801 (334) 749-8803 | MKR8414752-15 | 10/17/06 | 3/23/07 |
| W.B. Whatley, III, MD | 122 N. 20th St, Opelika, AL 36801 (334) 745-4646 | 24334 | 1995 | 3/23/07 |
| G. Woods, MD | 2000 Peppercel Parkway, Opelika, AL (334) 528-3400 | 67089 | Oct. 2006 | Nov. 2006 |
| N/A | N/A | N/A | N/A | N/A |

**E. Hospitals, clinics, or emergency rooms** you visited or expect to visit because of your **illnesses, injuries, or conditions.**

| NAME | ADDRESS, ZIP CODE, and PHONE NUMBER | PATIENT I.D. NUMBER | DATE IN | DATE OUT |
|---|---|---|---|---|
| Auburn Urgent Care | 1456 Opelika Road, Auburn, AL (334) 826-8050 | | 10/16/06 | 10/16/06 |
| E.AL Medical Center | 2000 Pepperell Parkway, Opelika, AL 749-3411 | Emerg. Room | 10/16/06 | 10/16/06 |
| Orthopaedic Clinic | 122 N. 20th St, Bldg. 24, Opelika, AL (334) 749-8303 | | 11/2006 | 11/2006 |
| N/A | N/A | N/A | N/A | N/A |

Form SSA-3381 (4-2005) Use prior editions                    **OVER**

| NAME OF MEDICINE | WHY YOU TAKE IT | PRESCRIBED BY |
|---|---|---|
| Ultram ER | Foot Pain | Dr. Jones |
| Methylprednisolone | Pain - Spine/foot | Dr. Jones |
| Lyrica | Pain - foot | Dr. Jones |
| Diovan | Hypertension | Dr. Whatley |
| Meloxicam | Pain - Spinal | Dr. Jones |
| N/A | | N/A |

**G. Medical tests** you had or are going to have in the future.

| NAME OF TEST | PLACE OF TEST | PERSON WHO SENT YOU | DATE(S) |
|---|---|---|---|
| MRI | EAST AL Medical Center | Frazier Jones, MD | 11/2006 |
| N/A | | | |
| N/A | | NA | |
| N/A | | | |
| N/A | N/A | | |
| N/A | | | |

**H. Jobs** you had in the 15 years before you became unable to work because of your illnesses, injuries, or conditions.

| JOB TITLE (e.g., cook) | TYPE OF BUSINESS (e.g., restaurant) | DATES WORKED (month/year) FROM - TO | HOURS PER DAY | DAYS PER WEEK | RATE OF PAY (per hour/ week/year) |
|---|---|---|---|---|---|
| Maintenance Technician | Textile | 1972 - 2005 | 8 | 5 | 15.25/hr |
| Laborer | Automotive Parts | 10/06 - 12/05 01/06 | 8 | 5-7 | 0.00/hr |
| Laborer | hydraulic Mfg. | 01/06 - 4/06 | 10 | 6 | 0.00/hr |
| C.V. Holding | Manufacturer of Vials | 05/06 - 10/06 | 10 | 6 | 9.00/hr |
| N/A | | | | | |

# Dx. 17

# Social Security Administration
## Supplemental Security Income
Notice of Disapproved Claim

Date: March 23, 2007
Claim Number:        DI

633

BOBBY LEE SANKS
P O BOX 44
SALEM AL 36874-0044

* Application Filed *
March 1, 2007

* Type of Claim *
Individual-Disabled

You cannot get Supplemental Security Income for the reason given below.

### Why We Can't Pay You

Because of your income, you are not eligible to receive Supplemental Security Income payments for March 2007 on.

### Our Decision Is Based On These Facts

- The amount of SSI we pay depends on your living arrangements. Your living arrangements are where you live, with whom you live, and how your food and shelter expenses are paid. Based on the information we have, your Federal living arrangement is:

  -- Category A for March 2007 on

  Please see the enclosed "Fact Sheet on SSI Federal Living Arrangement Categories" for a description of this Federal living arrangement category and others.

- You have monthly income which must be considered in figuring your eligibility as follows:

  -- Your employment related pension of $92.00 for March 2007 through April 2007.

  -- The estimated wages received by your spouse of $2,400.00 for March 2007 and $1,920.00 for April 2007.

See Next Page

SSA-L8030


DEFENDANT'S
EXHIBIT
17
B. Sanks

WPH
000839

03/23/2007

## Information About Medicaid And Other Benefits

- An agency of your State will advise you about the Medicaid program. If you have any questions about your eligibility for Medicaid or need immediate medical assistance, you should get in touch with the State agency which handles eligibility for medical assistance.

- You may want to contact your local public assistance office to find out if you qualify for payments from them.

## You Can Review The Information in Your Case

The decisions in this letter are based on the law. You have a right to review and get copies of the information in our records that we used to make the decisions explained in this letter. You also have a right to review and copy the laws, regulations and policy statements used in deciding your case. To do so, please contact us. Our telephone number and address are shown under the heading "If You Have Any Questions."

## Things To Remember

- Because you are not eligible for the reasons given above, we have not determined whether or not you are disabled.

- This decision refers only to your claim for Supplemental Security Income payments. Any decision about your benefits under other Social Security programs will be sent to you in a separate letter.

- If at any time in the future you think you qualify for payment, please contact us immediately about filing a new application. The earliest month for which we can pay you is the month after you file a new application.

## If You Disagree With The Decision

If you disagree with the decision, you have the right to appeal. We will review your case and consider any new facts you have.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you get this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason for waiting more than 60 days to ask for an appeal.

- To appeal, you must fill out a form called "Request for Reconsideration." The form number is SSA-561. To get this form, contact one of our offices. We can help you fill out the form.

SSA-L8030

03/23/2007

## How To Appeal

There are two ways to appeal. <u>You can pick the one you want. If you meet with u⁴ in per⁴on, it may he⁴p u⁴ ⁴eci⁴e your ca⁴e.</u>

- <u>Ca⁴e Re⁴iew.</u> You have a right to review the facts in your file. You can give us more facts to add to your file. Then we'll decide your case again. You won't meet with the person who decides your case. This is the only kind of appeal you can have to appeal a medical decision.

- <u>Informa⁴ Conference.</u> You'll meet with the person who decides your case. You can tell that person why you think you're right. You can give us more facts to help prove you're right. You can bring other people to help explain your case.

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your SSI Claim." It contains more information about the appeal.

## If You Want Help With Your Appeal

You can have a friend, lawyer or someone else help you. <u>There are ⁴roup⁴ that can he⁴p you fin⁴ a ⁴awyer or ⁴i⁴e you free ⁴e⁴a⁴ ⁴er⁴ice⁴ if you ⁴ua⁴ify.</u> There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it.

## New Application

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. If you disagree with this decision and you file a new application instead of appealing you might lose some benefits, or not qualify for any benefits. So, if you disagree with this decision, you should ask for an appeal within 60 days.

## If You Have Any Questions

For general information about SSI, visit our website at www.socialsecurity.gov on the Internet. There, you will also find the law and regulations about SSI eligibility and SSI payment amounts.

SSA-L8030

WPH
000841

03/23/2007

For general questions about SSI or specific questions about your case, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 334-745-7052. Our lines are busiest early in the week and early in the month, so if your business can wait, it's best to call at other times. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
1800 CORPORATE DR
OPELIKA AL 36801

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

We are sending you a pamphlet which contains important information you should know. The pamphlet is called "Your Right To Question The Decision Made On Your SSI Claim."

Linda S. McMahon
Deputy Commissioner
for Operations

Enclosure(s):
Pub 05-11008
Fact Sheet on SSI Federal Living Arrangement Categories

SSA-L8030

WPH
000842

03/23/2007

## Fact Sheet on SSI
## Federal Living Arrangement Categories

| Category | Definition |
| --- | --- |

**A**  Living in Own Household -- You fit in this category if you are eligible for SSI and you meet one of the following conditions:

1. You live in your own household whether or not you receive help paying your food or housing costs.
2. You live in a foster care or family care situation.
3. You are homeless or have no permanent living arrangement.
4. You live in an institution for all or part of a month and Medicaid does not pay more than 50 percent of the cost of your care. You do not fit in this category if you are considered an inmate of a public institution such as a prison.
5. You live alone.
6. You live only with your child, spouse, or persons whose income is being used to compute the amount of your SSI check.
7. You do not fit in categories B, C or D described below.

In Category "A" The Maximum Federal SSI Money Is Used To Compute Your SSI Check.

**B**  Living in the Household of Another -- You fit in this category if you are eligible for SSI and you meet both of the following conditions:

1. You live in a household other than your own throughout a month with at least one other person who is not your child, your spouse or an ineligible person whose income is being used to compute the amount of your SSI check.
2. And you receive food and housing from someone in that household.

In Category "B" The Federal SSI Money is Reduced By One-Third Because Another Person Helps Pay For Your Food And Housing Costs.

**C**  Child Living in Parents' Household -- You fit in this category if you are eligible for SSI and you meet both of the following conditions:

1. You are under 18 years old.
2. You live in the same household as your parents.

In Category "C" The Maximum Federal SSI Money Is Used To Compute Your SSI Check.

SSA-L8030

03/23/2007

D        Medicaid Facility -- You fit in this category if you are eligible for SSI and meet both of the following conditions:

1.    You live in a public or private medical institution throughout a month.
2.    Medicaid is paying more than 50 percent of the cost of your care.

In Category "D" The Federal SSI Money Cannot Exceed $30.

SSA-L8030

WPH
000844

# Dx. 18

# Social Security Administration
Opelika AL

| | |
|---|---|
| Date: | June 16, 2007 |
| Claim Number: | DI |
| Name: | BOBBY LEE SANKS |

BOBBY LEE SANKS
P O BOX 44
SALEM, AL 36874-0044

You asked us for information from your record. The information that you requested is shown below. If you want anyone else to have this information, you may send them this letter.

**Other Important Information**

For the period 07/01/05 to 06/01/07 you received a total of $0.00 in Supplemental Security Income benefits.

Our records show that you became disabled on 10/01/06.

**If You Have Any Questions**

If you have any questions, you may call us at 1-800-772-1213, or call your local Social Security office at 334-745-7052. We can answer most questions over the phone. You can also write or visit any Social Security office. Your closest office is located at:

SOCIAL SECURITY ADMINISTRATION
1800 CORPORATE DR
OPELIKA, AL 36801

If you do call or visit an office, please have this letter with you. It will help us answer your questions.

Jimmy Brown
Office Manager



DEFENDANT'S
EXHIBIT
18
B. Sanks

WPH
000835

SSN:                        NAME: BOBBY LEE SANKS

Payment dates and amounts are as follows:

| Month | Payment | Month | Payment | Month | Payment |
|---|---|---|---|---|---|
| 07/01/05 | $0.00 | 03/01/06 | $0.00 | 11/01/06 | $0.00 |
| 08/01/05 | $0.00 | 04/01/06 | $0.00 | 12/01/06 | $0.00 |
| 09/01/05 | $0.00 | 05/01/06 | $0.00 | 01/01/07 | $0.00 |
| 10/01/05 | $0.00 | 06/01/06 | $0.00 | 02/01/07 | $0.00 |
| 11/01/05 | $0.00 | 07/01/06 | $0.00 | 03/01/07 | $0.00 |
| 12/01/05 | $0.00 | 08/01/06 | $0.00 | 04/01/07 | $0.00 |
| 01/01/06 | $0.00 | 09/01/06 | $0.00 | 05/01/07 | $0.00 |
| 02/01/06 | $0.00 | 10/01/06 | $0.00 | 06/01/07 | $0.00 |



RECEIVED

JUN 20 2007

# Dx. 19

# 'est Point Pepperell

# EMPLOYMENT RECORD

| ME | SOCIAL SECURITY NO. |
|---|---|
| OBBY LEE SANKS | |

| DRESS | EMPLOYEE NO. |
|---|---|
| OX 44 | 32045 |

| ALEM, AL  36874 | | DATE OF BIRTH | SEX | MARITAL STATUS |
|---|---|---|---|---|
| | | | M | Married |

| DATE ON JOB | PLANT ABBR. | DEPARTMENT | OCCUPATION | DATE SEPARATED | REASON FOR LEAVING |
|---|---|---|---|---|---|
| 01/70 | OPF | Piece Goods | Roll oper. | | |
| 22/70 | OPF | PIece Goods | Roll Wrapper | | |
| 22/70 | OPF | Piece Goods | Roll Mch Oper. | 9/10/73 | Transferred to Op Mill |
| 10/73 | OPK | Spin | Doffer Tran. | | |
| 19/73 | OPK | Spin | Doffer | | |
| 02/85 | OPK | Spin | Spin Mechanic | | |
| 24/85 | OPK | Shop | Hum Control Tech | | |
| 29/86 | OPK | Shop | Electrician 3rd Gr | | |
| 29/87 | OPK | Shop | Electrician 2nd Gr | | |
| 16/90 | OPK | Shop | Electrician 1st Gr. | 7-29-05 | *Three written warnings* |

DEFENDANT'S EXHIBIT
19
B Sanks
PENGAD 800-631-6989

.RVIUS SERVICE DATE

1 0 G R · C S
S0606

00975-WPPG

# Dx. 20

WestPoint Pepperell

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Opelika_

Employee: _Bobby Lee Sanks_

### EMPLOYEE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY - A GUIDE-BOOK FOR EMPLOYEES - (Revised 1-1-83)." I understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_Harold First_

Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Employee Signature

_Billy Lee Sanks_

Employee Signature

_2/25/83_

Date

EC-010183-EA-BYJS

DEFENDANT'S EXHIBIT
20
B Sanks

PENGAD 800-631-6989

WPH
000655

# West Point-Pepperell

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _____ 041 OPELIKA MILL          Employee: _____ BOBBY SANKS

### EMPLOYEE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR EMPLOYEES - (Revised 1-1-91)," and I understand that the statements contained in this guidebook which I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each employee enjoy long-lasting employment with the Company, it is recognized that employees are free to resign at any time, just as the Company may terminate employees at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_____
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Employee Signature

_____
Employee Signature

Date _____ 3/23/91

EC-013191-EA-BYJS

# WESTPOINT STEVENS

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Opelika Mill_    Employee: _Bobby Lee Sanford_

### EMPLOYEE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR EMPLOYEES - (Revised 5-1-94)," and I understand that the statements contained in this guidebook which I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each employee enjoy long-lasting employment with the Company, it is recognized that employees are free to resign at any time, just as the Company may terminate employees at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_[signature]_ _____
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Employee Signature

_[signature]_ _____
Employee Signature

Date _6-14-94_

EC-050194-BAF

WPH
000173

WestPoint Pepperell

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Belita Hill_    Employee: _Bobby L. Sparks_

### EMPLOYEE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY - A GUIDE-BOOK FOR EMPLOYEES - (Revised 5-1-88)," and I understand that the statements contained in this guidebook which is the Company's desire that each employee enjoy long-lasting employment with the Company, it is recognized that employees are free to resign at any time, just as the Company may terminate employees at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_[signature]_
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Employee Signature

_Bobby L. Sparks_
Employee Signature

_6-2-88_
Date

EC-050188-EA-BVJS

WestPoint Pepperell

**EMPLOYEE EDUCATION AND TRAINING**

**OSHA COTTON DUST STANDARD**

Facility: _Opelika_          Employee: _West Point Pepperell_

**EMPLOYEE ACKNOWLEDGMENT**

I have seen the WestPoint Pepperell film entitled "The Cotton Dust Connection," which relates to the OSHA Cotton Dust Standard and the effects of employee exposure to cotton dust, and have received a copy of the Company's brochure on respirator usage under the Standard. Also, I have been given the opportunity to ask questions about the film and the brochure and the information presented therein, including but not limited to the proper way to wear protective equipment and the correct work practices for my job. I have been informed of my right to review the Standard and the correct procedure for doing so.

_David O. Hogg_ _____

Signature of Supervisor or Other
Person Conducting Training

_Bobby Lee Banks_ _____
Employee Signature

_2-9-84_ _____
Date

EC-092283-EA-OSHA-CDS

WPH
000175

WestPoint Pepperell

**EMPLOYEE EDUCATION AND TRAINING**
**OSHA OCCUPATIONAL NOISE EXPOSURE STANDARD**

Facility: Opelika          Employee: West Point Pepperell

**OPELIKA**
**MILL**

**EMPLOYEE ACKNOWLEDGMENT**

I have seen the WestPoint Pepperell film entitled "Keeping the Soft Sounds," which relates to the OSHA Occupational Noise Exposure Standard and the effects of employee exposure to high-level noise. Also, I have been given the opportunity to ask questions about the film and the information presented therein, including but not limited to the proper way to wear protective equipment. I have been informed of my right to review the Standard and the correct procedure for doing so.

David Higg
Signature of Supervisor or Other
Person Conducting Training

Bobby Lee Sandy
Employee Signature

2-2-84
Date

SEC-082883-EA-OSHA-ONES

**WPH**
**000176**

# W E S T P O I N T   S T E V E N S

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Opelika Mill_     Associate: _Bobby Sanks_

### ASSOCIATE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR ASSOCIATES - (Revised 7-15-98)," and I understand that the statements contained in this guidebook which I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each associate enjoy long-lasting employment with the Company, it is recognized that associates are free to resign at any time, just as the Company may terminate associates at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_[signature]_
Associate Signature

_8/22/98_
Date

_[signature]_
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

EC-071598-BAF

WPH
000177

# W E S T P O I N T   S T E V E N S

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Opelika Mill_    Associate: _Bobby Sanks_

### ASSOCIATE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR ASSOCIATES - (Revised 12-1-00)," and I understand that the statements contained in this guidebook that I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each associate enjoy long-lasting employment with the Company, it is recognized that associates are free to resign at any time, just as the Company may terminate associates at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_Stanley Jones_
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

_Bobby J. Sanks_
Associate Signature

_9-11-02_
Date

CC-12010C-BAF

WPH
000397

CC-051503-BAF

# W E S T P O I N T   S T E V E N S

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Opelika Mill_     Associate: _Bobby Sanks_

### ASSOCIATE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR ASSOCIATES - (Revised 05-07-03)," and I understand that the statements contained in this guidebook that I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each associate enjoy long-lasting employment with the Company, it is recognized that associates are free to resign at any time, just as the Company may terminate associates at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_Bobby Sanks_
Associate Signature

_7-17-03_
Date

_Dudley Gregory_
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

WPH
000398

# Dx. 21

WPH
000343

# WESTPOINT STEVENS
## "A GUIDEBOOK FOR HOURLY ASSOCIATES" BOOKLET

Facility: 041 Opelika Mill          Associate: Bobby Sanks

PRINT NAME

I have received a copy of the Company's booklet entitled "A GUIDEBOOK FOR HOURLY ASSOCIATES" (Revised 07-01-04)." THIS GUIDEBOOK FOR ASSOCIATES IS INTENDED TO SUMMARIZE DESIGNATED POLICIES, PROCEDURES, AND PRACTICES OF WESTPOINT STEVENS INC. THE ASSOCIATE IS ADVISED THAT BECAUSE BUSINESS CONDITIONS AND CONSIDERATIONS MAY CHANGE FROM TIME TO TIME, WESTPOINT STEVENS INC. RESERVES THE RIGHT TO MODIFY, AMEND, ELIMINATE, OR DEVIATE FROM ANY OR ALL OF ITS POLICIES, PROCEDURES, OR PRACTICES IN ITS SOLE DISCRETION AS IT MAY CONSIDER APPROPRIATE FOR ITS BUSINESS PURPOSES. THIS GUIDEBOOK SUPERSEDES AND REPLACES ANY AND ALL PRIOR GUIDEBOOKS WHICH ARE HEREBY REVOKED, AND DECLARED NULL AND VOID.

ALL ASSOCIATES ARE FURTHER ADVISED THAT THIS GUIDEBOOK IS NOT A CONTRACT OF EMPLOYMENT. THE EMPLOYMENT RELATIONSHIP BETWEEN WESTPOINT STEVENS INC. AND ITS ASSOCIATES IS AT-WILL AND VOLUNTARY. THIS MEANS THAT EITHER WESTPOINT STEVENS INC. OR AN ASSOCIATE CAN TERMINATE THE EMPLOYMENT RELATIONSHIP AT-WILL AND AT ANY TIME WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE. THE EMPLOYMENT AT-WILL STATUS OF EACH ASSOCIATE CANNOT BE ALTERED BY ANY ORAL STATEMENT OR REPRESENTATION, BUT CAN ONLY BE CHANGED BY A WRITTEN CONTRACT, WHICH MUST BE SIGNED BY THE PRESIDENT OF THE COMPANY.

### ACKNOWLEDGEMENT

MY SIGNATURE BELOW ACKNOWLEDGES RECEIPT OF THE NEW GUIDEBOOK, WHICH TAKES EFFECT IMMEDIATELY. I HAVE READ THE DISCLAIMER WRITTEN ABOVE, AND I UNDERSTAND IT AND ACKNOWLEDGE THAT THE GUIDEBOOK IS NOT AN EMPLOYMENT CONTRACT. I KNOW THAT MY EMPLOYMENT IS "AT-WILL" AND VOLUNTARY AS DESCRIBED ABOVE. I ALSO UNDERSTAND THAT IF I HAVE ANY QUESTIONS ABOUT THE CONTENTS AFTER READING THE BOOKLET, I SHOULD CONTACT MY SUPERVISOR/MANAGER.

Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

Associate Signature

7-14-04

Date

CC-070104-BAF

# HUMAN RESOURCES POLICY MANUAL
### DISCLAIMER

THE HUMAN RESOURCES POLICY MANUAL IS INTENDED TO SUMMARIZE DESIGNATED POLICIES, PROCEDURES, AND PRACTICES OF WESTPOINT STEVENS INC. THE POLICY IS ISSUED TO MEMBERS OF WESTPOINT STEVENS' MANAGEMENT AND IS NOT INTENDED TO BE DISTRIBUTED TO ASSOCIATES. THE HUMAN RESOURCES POLICY MANUAL IS DESIGNED FOR USE BY MANAGEMENT ONLY; IT IS NOT INTENDED FOR USE BY NONMANAGEMENT ASSOCIATES AND IS NOT A HANDBOOK FOR ASSOCIATES.

ALL ASSOCIATES ARE ADVISED THAT BECAUSE BUSINESS CONDITIONS AND CONSIDERATIONS MAY CHANGE FROM TIME TO TIME, WESTPOINT STEVENS INC. RESERVES THE RIGHT TO MODIFY, AMEND, ELIMINATE, OR DEVIATE FROM ANY AND ALL OF ITS POLICIES, PROCEDURES, AND PRACTICES IN ITS SOLE DISCRETION AS IT MAY CONSIDER APPROPRIATE FOR ITS BUSINESS PURPOSES. ACCORDINGLY, THE MANUAL IS IN LOOSE-LEAF FORMAT FOR MAXIMUM FLEXIBILITY, WITH MULTIPLE SECTIONS. IT IS ANTICIPATED THAT MATERIAL WILL BE ADDED AND DELETED PERIODICALLY.

THE HUMAN RESOURCES POLICY MANUAL SUPERSEDES AND REPLACES ANY AND ALL PRIOR HUMAN RESOURCES POLICY MANUALS, WHICH ARE HEREBY REVOKED, AND DECLARED NULL AND VOID. ALL ASSOCIATES ARE FURTHER ADVISED THAT THIS HUMAN RESOURCES POLICY MANUAL IS NOT A CONTRACT OF EMPLOYMENT. THE EMPLOYMENT RELATIONSHIP BETWEEN WESTPOINT STEVENS INC. AND ITS ASSOCIATES IS AT-WILL AND VOLUNTARY. THIS MEANS THAT EITHER WESTPOINT STEVENS INC. OR AN ASSOCIATE CAN TERMINATE THE EMPLOYMENT RELATIONSHIP AT-WILL AND AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. THE EMPLOYMENT-AT-WILL STATUS OF EACH ASSOCIATE CANNOT BE ALTERED BY ANY ORAL STATEMENT OR REPRESENTATION, BUT CAN ONLY BE CHANGED BY A WRITTEN CONTRACT, WHICH MUST BE SIGNED BY THE PRESIDENT OF THE COMPANY.

### ACKNOWLEDGEMENT

MY SIGNATURE BELOW ACKNOWLEDGES THE PUBLICATION OF THE NEW WESTPOINT STEVENS HUMAN RESOURCES POLICY MANUAL, WHICH TAKES EFFECT IMMEDIATELY. I HAVE READ THE DISCLAIMER WRITTEN ABOVE AND UNDERSTAND AND ACKNOWLEDGE THAT THE MANUAL IS NOT AN EMPLOYMENT CONTRACT. I KNOW THAT MY EMPLOYMENT IS "AT-WILL" AND VOLUNTARY, AS DESCRIBED ABOVE.

Signature of Supervisor or Other
Person Witnessing Associate Signature

Associate Signature

7-14-04

Date

DEFENDANT'S
EXHIBIT
21
B. Sanks
PENGAD 800-631-6989

CC-070104-HRP

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

# Exhibit 2, Part 4

# Exhibits to the Deposition of Bobby Sanks Dxs. 22-32

# Dx. 22

# A Guidebook
# for
# Hourly Associates

### (Revised 07-01-04)



## W E S T P O I N T   S T E V E N S

WPH
000755



DEFENDANT'S
EXHIBIT
22
B. Sanks

THIS GUIDEBOOK FOR ASSOCIATES IS INTENDED TO SUMMARIZE DESIGNATED POLICIES, PROCEDURES, AND PRACTICES OF WESTPOINT STEVENS INC. THE ASSOCIATE IS ADVISED THAT BECAUSE BUSINESS CONDITIONS AND CONSIDERATIONS MAY CHANGE FROM TIME TO TIME, WESTPOINT STEVENS INC. RESERVES THE RIGHT TO MODIFY, AMEND, ELIMINATE, OR DEVIATE FROM ANY OR ALL OF ITS POLICIES, PROCEDURES, OR PRACTICES IN ITS SOLE DISCRETION AS IT MAY CONSIDER APPROPRIATE FOR ITS BUSINESS PURPOSES. THIS GUIDEBOOK SUPERSEDES AND REPLACES ANY AND ALL PRIOR GUIDEBOOKS, WHICH ARE HEREBY REVOKED, AND DECLARED NULL AND VOID.

ALL ASSOCIATES ARE FURTHER ADVISED THAT THIS GUIDEBOOK IS NOT A CONTRACT OF EMPLOYMENT. THE EMPLOYMENT RELATIONSHIP BETWEEN WESTPOINT STEVENS INC. AND ITS ASSOCIATES IS AT-WILL AND VOLUNTARY. THIS MEANS THAT EITHER WESTPOINT STEVENS INC. OR AN ASSOCIATE CAN TERMINATE THE EMPLOYMENT RELATIONSHIP AT-WILL AND AT ANY TIME WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE. THE EMPLOYMENT AT-WILL STATUS OF EACH ASSOCIATE CANNOT BE ALTERED BY ANY ORAL STATEMENT OR REPRESENTATION, BUT CAN ONLY BE CHANGED BY A WRITTEN CONTRACT, WHICH MUST BE SIGNED BY THE PRESIDENT OF THE COMPANY.

## ACKNOWLEDGEMENT

MY SIGNATURE BELOW ACKNOWLEDGES RECEIPT OF THE NEW GUIDEBOOK, WHICH TAKES EFFECT IMMEDIATELY. I HAVE READ THE DISCLAIMER WRITTEN ABOVE, AND I UNDERSTAND IT AND ACKNOWLEDGE THAT THE GUIDEBOOK IS NOT AN EMPLOYMENT CONTRACT. I KNOW THAT MY EMPLOYMENT IS "AT-WILL" AND VOLUNTARY AS DESCRIBED ABOVE. I ALSO UNDERSTAND THAT IF I HAVE ANY QUESTIONS ABOUT THE CONTENTS AFTER READING THIS BOOKLET, I SHOULD CONTACT MY SUPERVISOR/ MANAGER

_____        _____
Associate Signature              Date

_____
Print Name

WPH
000756

# Table of Contents

Your job is important . . . . . . . . . . . . . . . 1

Our policy on Equal Employment
     Opportunity . . . . . . . . . . . . . . . . . . . . 3

Our policy on sexual harassment . . . . . . 4

Zero tolerance for violence . . . . . . . . . . 5

We abide by FMLA . . . . . . . . . . . . . . . 6

Positive associate relations . . . . . . . . . . 8

You and your supervisor . . . . . . . . . . . . 10

Probationary period helps
     you settle in . . . . . . . . . . . . . . . . . . . 12

Be regular in your attendance . . . . . . . . 13

Start your job on time . . . . . . . . . . . . . . 17

Always put safety first . . . . . . . . . . . . . 18

Reduce waste wherever possible . . . . . . 19

Strive for the best in quality . . . . . . . . 20

Conserve time, supplies
     and equipment . . . . . . . . . . . . . . . . . 21

In doubt? Ask questions . . . . . . . . . . . . 22

Tell us when things go wrong . . . . . . . . 23

Our policy on job-related complaints
     and problems . . . . . . . . . . . . . . . . . . 24

**WPH**
**000757**

Follow the rules of your job . . . . . . . . 29

Some things to avoid . . . . . . . . . . . . . . 32

It shouldn't happen to you . . . . . . . . . 40

Seniority is important to you . . . . . . . . 46

Wide range of benefits
    available to associates . . . . . . . . . . 48

Keep your records straight . . . . . . . . . 50

Your access to records . . . . . . . . . . . . 53

Bulletin boards provide facts . . . . . . . 55

Our policy concerning
    a drug-free workplace . . . . . . . . . . . 56

Our Goals . . . . . . . . . . . Inside back cover

# Your job is important

WestPoint Stevens is a fine team of thousands of associates in several states working together to help meet the home fashions consumer product needs of people in every walk of life.

Around the clock, day in and day out, customers across the land and around the world depend upon our products for their comfort, health and general well-being.

No matter what your job may be, you can be sure that it is important to our continued successful operation. Otherwise, that job wouldn't exist.

Each associate who does his or her job well is a help to everyone else in the organization. Your welfare, progress and future depend on how well other team members do their jobs. And their welfare depends on how well you do yours.

Also, keep this in mind: Your job is like a savings bank account. The more you put into it, the more important you make it … and the more satisfying and rewarding it will be.

In other words, when YOU make your job important, it is likely to return the favor.

2

# Our Policy On Equal Employment Opportunity; Anti-Harassment, Retaliation

A fundamental philosophy that has guided the Company and its predecessors through the years is belief in the importance of good employee relations and treating individuals with dignity and respect. Consistent with this philosophy, it is WestPoint Stevens policy not to discriminate against any individual because of race, color, religion, sex, national origin, age, disability or veteran's status. All associate facilities will be maintained on a nonsegregated basis, and all qualified associates are free to participate in Company-sponsored activities and educational programs.

Discrimination, harassment, retaliation, coercion, interference or intimidation of any associate due to his/her race, religion, color, national origin, sex, age, disability or veteran's status is strictly forbidden. It is also against Company policy to harass or retaliate against any associate due to the associate filing a complaint of discrimination/harassment or due to the associate's cooperation in the Company's investigation of a complaint. Any associate who experiences such activity should follow the regular complaint procedure or notify his/her Human Resources Manager or Division Director of Human Resources. Complaints will be investigated promptly and thoroughly and confidentiality will be maintained to the extent possible.

3

# Our Policy On Sexual Harassment

This policy affirms the Company's position of zero tolerance regarding sexual harassment. It is WestPoint Stevens policy to promote an atmosphere free of sexual harassment in any form at all levels of employment — including, but not limited to, unwelcome sexual advances, requests for sexual favors, spoken or written abuse related to an associate's sex, showing or displaying pornographic or sexually explicit objects in the workplace and other verbal or physical conduct of a sexual nature.

Such actions or conduct are viewed as creating an intimidating, harmful and offensive work environment and are therefore prohibited. Any associate found to be involved in such behavior is subject to discipline up to and including discharge.

We encourage any associate who is subject to treatment he/she believes is sexual harassment to follow the regular complaint procedure or report it to his/her Human Resources Manager or Division Director of Human Resources, whose name and number can be found on the Complaints Poster on facility bulletin boards. Charges of sexual harassment will be investigated immediately and in a manner as confidential as possible.

Harassment, retaliation, coercion, interference or intimidation of any associate due to the associate's filing a complaint of sexual harassment is strictly forbidden.

4

# Zero Tolerance for Violence

WestPoint Stevens mandates a "zero tolerance for violence" environment and will make every effort to prevent violent incidents from occurring. Violence for purpose of the policy includes but is not restricted to physically harming another, verbal abuse, shoving, pushing, harassment, intimidation, coercion, threatened or actual use of weapons and threats or talk of violence. Any associate who violates this policy will be subject to discipline up to and including discharge.

# We abide by FMLA

WestPoint Stevens abides by provisions of the Family and Medical Leave Act (FMLA) of 1993.

In most cases, the Company's Leave of Absence Policy requires fewer qualifications and provides better leave benefits than FMLA. Ask your Human Resources Manager for details.

The basic provisions of the FMLA are posted on facility bulletin boards, and information on the provisions of the Company's Leave of Absence policy is available in your Human Resources Department.

Generally, an associate, after meeting certain qualifications, may take a leave of absence for the following reasons: an associate's own serious health condition, to care for an associate's spouse, child or parent who has a serious health condition and/or to care for an associate's child after birth or placement with the associate for adoption or

6

foster care. Advance notice and medical certification may be required.

Please see your supervisor or Human Resources Manager if you have any questions regarding leaves of absence.

**NOTE: A leave of absence is normally issued for a specified length of time. Be sure you know when your leave expires by requesting a copy of your leave of absence. Failure to return to work at the expiration of your leave or failure to extend your leave will result in termination of your employment.**

**An associate who works elsewhere while on leave of absence (except for no work available) is subject to termination.**

# Positive associate relations

We realize that our strength and future growth depend directly upon the contribution made by each of us. We also know that high productivity and efficiency result from your individual job satisfaction and happiness.

WestPoint Stevens' policy is to always be fair and honest with you and to respect your rights as an individual. We shall continue to work to achieve mutual respect in our working relationships. We will always insist that everyone does all in his/her power to carry out this policy.

To continue working together successfully, everyone must realize that harmonious relationships are not entirely a matter of rules, but are the outgrowth of daily decisions and friendly attitudes of team spirit.

WestPoint Stevens will remain strong only if we continue to improve. The

8

Company needs the assistance and cooperation of each and every associate that we may earn a profit and have the means to keep abreast of modern developments and ahead of our competition. It is your responsibility to help keep our Company growing and progressing every day you're on the job.

WPH
000767

9

# You and your supervisor

In your work, it's good to remember one fact: No one wants you to succeed in your job more than your immediate supervisor. In most instances, your immediate supervisor will be a Shift Supervisor/Manager. In the first few weeks or months you are on the job, your immediate supervisor and others in the Company will invest in you one of their most valuable assets — time.

Supervisors are in their jobs because of demonstrated ability to work with others, to help those for whom they have responsibility and to approach job problems objectively and with a determination to act in the best interest of all concerned.

Your performance directly affects your supervisor's performance, by which he/she, in turn, is measured. He/she will do everything in his/her power to help you succeed on your job. Keep your supervisor informed on the work you're doing. If there's anything

10

affecting your work in any way, he/she will want to know about it and — working with you — deal with it promptly.

Your best source of information about your job is your supervisor. When you have a question about any job duties, do not hesitate to ask your supervisor for the answer. He/she will generally give it to you at once. If he/she cannot, he/she will get the answer for you as soon as he/she can.

It is a part of the supervisor's job, and he/she will cooperate with you at all times.

# Probationary period helps you settle in

Newly hired and re-hired associates are required to serve a probationary period of up to three calendar months.

"Probationary period" is defined as a period of time in which the associate becomes oriented to the job and surroundings, demonstrates potential abilities on the job and gives the supervisor an opportunity to evaluate these abilities.

At the same time, you have the opportunity to decide if you like your new job and surroundings.

During the probationary period, if the supervisor determines you lack the ability to meet required standards of the job, he/she may recommend transfer to another job or termination of employment.

12

# Be regular in your attendance

Your supervisor, co-workers, and our Company are counting on you to help meet production schedules, deliver orders on time and provide the services our customers require. You therefore are expected to be at your assigned place on time each day that you are scheduled to work.

If you must be absent for a legitimate cause that can be anticipated, be sure to talk with your supervisor in advance.

If you cannot report for work because of an unexpected illness or happening, you should notify your supervisor promptly. Tell your supervisor WHY you must be absent and WHEN you expect to return. Your supervisor will decide whether your absence meets the guidelines and is excusable.

Failure to give proper notice, unexcused

absences and excessive excused absences can lead to disciplinary action ... and, in some cases, discharge.

Remember, too, that absences from scheduled work result in the loss of wages and can affect your eligibility for Holiday Pay, as well as the amount of your Vacation Pay.

Absenteeism hurts us all. Let's work together each day to avoid it!

# According to Company policy:

1.   You will be subject to disciplinary action if you fail to give proper notice of an absence which you can anticipate more than one hour. (This type of absence is referred to as a "No Report.")

2.   You will be subject to disciplinary action if you fail to give proper notice within one working day after the beginning of an absence that is caused by emergency conditions and could not be anticipated.

3.   Three consecutive workdays of absence without notification ("No Report") is

14

considered as a voluntary quit.

4. In standard three-shift operations, three consecutive workdays of unexcused absence will result in the employee's discharge.

5. In four-shift continuous operations, two consecutive workdays of unexcused absence will result in the employee's discharge.

6. Excessive excused absences:

a. Standard three-shift operations — six partial- or full-day periods of excused absence (other than written leaves of absence or absence for which an associate is paid) within any six-month period will result in disciplinary action.

b. Four-shift continuous operations — three partial- or full-day periods of excused absence (other than written leaves of absence or absence for which an associate is paid) within any six-month period will result in disciplinary action.

**NOTE:** Any number of consecutive days of excused full-day absences for the same cause is considered one period of absence.

Consecutive partial-day absences are considered separate periods of absence if separated by a period of worktime.

Any time on leave is not considered "active employment" in determining a six-month period.

To determine the number of excused periods of absence, measure backward six months from the latest absence (plus a period equal to any time spent on written leave of absence). All periods of excused absence within that six months are counted, even if they have figures in previous disciplinary action.

For disciplinary action, full-day absences and partial-day absences are handled separately.

16

# Start your job on time

An associate not at his/her assigned work station at the beginning of the first hour of his/her work schedule is considered tardy.

Lateness not only can affect your own performance and paycheck, but also can waste the time of others whose work may be delayed by your tardiness.

If you think you will be late for work, contact your supervisor immediately. Give the reason for your delay and the time you expect to arrive.

Help your department get off to a good start each workday. Begin your job on time.

# Always put safety first

We believe in putting safety FIRST. This means doing each job the safe way all of the time.

Your Company provides you a safe place in which to work. Safety, however, is a two-way street. The responsibility for accident prevention must be shared by all — the Company and every associate.

You should know the safety rules and follow them in your daily work. If you see any unsafe conditions or practices, report them promptly.

And be sure to notify your supervisor immediately of any accident, no matter how slight the injury may be.

18

# Reduce waste wherever possible

Every time we waste a little material, misuse a little time or make a little error, the cost of our work goes up and our efficiency goes down.

Like the drip-drip-drip of a leaking faucet, waste slowly but surely adds up to much needless expense.

The higher our costs, the harder it is to attract and hold customers, operate at a profit and stay in business.

Whatever your job, you can help reduce costs. Join our team of waste-watchers. Be careful with materials, supplies and goods in process. Use every minute wisely. Learn from your past mistakes. Eliminate errors.

WPH
000777

19

# Strive for the best in quality

WestPoint Stevens has long been noted for the quality of its people and its products. We value this fine reputation and want to preserve it.

Our team takes great pride in quality workmanship, and we look to our new associates for the same careful and prideful work.

The need for excellence in our products and services has never been greater. Customers expect it more than ever. To keep our sales up and our jobs secure, we must satisfy their requirements.

Top quality doesn't just happen. It's the result of you and your co-workers doing your BEST at all times.

WPH
000778

# Conserve time, supplies and equipment

"Conserve" means "to keep from being damaged, lost or wasted." This, in a nutshell, is exactly what we need to do with our time, our supplies and our equipment.

Listen to and follow instructions. Stick to the procedures and meet the standards of your job. Avoid interfering with the work of others.

Take good care of all equipment for which you are responsible. Don't operate or attempt to repair machinery without training or authorization.

Handle supplies carefully. Guard against damage. Use only what your job requires. Store surplus items properly. Practice good housekeeping.

# In doubt?
# Ask questions

Puzzled about what to do and how to do it? Find out the right way before you start. Never hesitate to ask questions about your work or anything related to it. You will save valuable time and avoid unnecessary problems by making this a habit in your job.

Whenever you do have questions at work, the person to talk with is your supervisor. An important part of his/her job is to see that you are properly instructed, that your questions are answered and that you have opportunities to express your ideas or suggestions. Help your supervisor help you. Listen carefully to instructions. Ask questions when in doubt.

22

# Tell us when things go wrong

---

In a family or in a group of people at work, it is not unusual for some misunderstandings and problems to come up from time to time.

At WestPoint Stevens, when something about your job is bothering you, we want to know about it as soon as possible.

Our policy is to give prompt, careful and courteous consideration to all problems/complaints of associates.

To get results without delay, discuss your problem or complaint with management. You should, of course, start with your immediate supervisor. But, if you prefer, go directly to your Department Manager first or, if necessary, Human Resources Manager.

# Our policy on job-related complaints and problems

Our policy is to give prompt, careful, courteous attention to all associate problems or complaints. You are encouraged to bring anything bothering you to management's attention.

Our intent is to provide a friendly hearing in a spirit of understanding and helpfulness at all levels of management. Be assured that your standing with the Company will not be jeopardized because of bringing your complaint or problem to management's attention.

The goodwill of our associates is a highly valuable Company asset. To keep the informal personal relationship that has characterized our management-associate teamwork over the years, we follow a simple procedure for handling complaints and problems, questions and suggestions as outlined on the next four pages.

24

WPH
000782

Follow these steps to give your facility management the opportunity to resolve your complaint or problem and to avoid unnecessary delay. If you feel it is necessary, go directly to your Department Manager or Human Resources Manager instead of your immediate Supervisor. In any event, you can be sure of a friendly, helpful hearing and responsible guidance.

If your complaint is due to discrimination or harassment, you may go DIRECTLY to step 3 or outside your facility to step 5.

# Step 1:

# See your Supervisor

**Talk with him/her about your problem. He/she has the authority to settle most matters. If he/she cannot settle matters or help you solve your problem, he/she will arrange for you to talk with your Department Manager.**

# Step 2:
# See your Department Manager

He/she will listen carefully and make every reasonable effort to suggest a satisfactory solution. If the problem cannot be resolved, he/she will direct you to your Human Resources Manager.

# Step 3:
# See your Human Resources Manager

Your Human Resources Manager will make a conscientious effort to bring about understanding and reach a solution that is fair to all concerned. If he/she cannot, he/she will arrange for you to see your Assistant Manager or Manager.

26

WPH
000784

# Step 4:
# See your Assistant Manager, Superintendent, or Manager

In seeking to reach a fair solution, he/she will consider all of the facts. It is hoped that all problems and complaints can be settled within the facility in which they occur. However, if you feel it is necessary to go still further, your Manager will arrange for you to see your General Manager, where applicable, or the Director of Human Resources for your Division.

# Step 5:
# See Your Division Director of Human Resources
(Name and telephone number appears in Complaint Poster on bulletin boards)

He/she will investigate thoroughly and try to reach a mutually satisfactory

solution. If you wish, he/she will arrange for you to see the Vice President - Manufacturing of your Division.

# Step 6:
# See Your Vice President of Human Resources

As a final step, you may see the Corporate Vice President - Human Resources or, if you prefer, another appropriate Corporate Vice President. It is, of course, hoped that only the rarest of complaints or problems will require this level of review for a solution, but it is an available step to each associate when all other steps have failed to provide a fair and satisfactory solution to your problem or complaint.

28

# Follow the rules of your job

Rules and regulations are a necessary and accepted part of everyday living. Whether in the plant, office or community — at work or play — we depend upon them for the guidance, protection and well-being of everyone.

At WestPoint Stevens, we have a number of important rules and regulations that apply to each job. It is management's responsibility to enforce these rules and regulations impartially in each department and facility for the benefit of all.

Your cooperation in following the rules and regulations of your job will not only help you and your department achieve maximum efficiency, but also can help your development on the job.

Failure by anyone to follow established rules and regulations can lead to disciplinary

action, ranging from formal counseling to dismissal — depending upon the seriousness and frequency of offenses. Violations will be dealt with firmly in keeping with established Company policies.

If you do not know or understand the rules and regulations of your job, now is the time to tell your supervisor. Management sincerely wants to help each associate in every possible way to have and hold satisfying and rewarding employment with the Company.

WestPoint Stevens believes in the fundamental principle of fair and honest dealings with associates. Good employee relations and human dignity on the job are the cornerstones on which the Company was built and which it has grown. WestPoint Stevens' progressive disciplinary policy was written with this philosophy in mind. However, as explained in the Disclaimer and Acknowledgement on the first page of the Guidebook, WestPoint Stevens may, at its discretion, terminate an associate at any time for any reason.

WPH
000788

# Appeals

Should an associate who has been disciplined or discharged feel that he/she has been dealt with unjustly, the person may use the Company's Problems and Complaints Procedure to seek relief. The procedure is outlined in detail on pages 25 through 28 of this booklet.

# Some things to avoid

### (Violations considered "less than intolerable")

Here are some — <u>but not all</u> — of the things that normally will result in disciplinary action:

1.  Failure to give proper notice on an absence (No Report);

2.  In standard three-shift operations, unexcused absences up through **two** consecutive workdays (note: three consecutive days of unexcused absence will result in associate's discharge);

3.  In four-shift continuous operations, **one** workday of unexcused absence (note: two consecutive days of unexcused absence will result in associate's discharge);

4.  Excessive excused absences:

    a.  Standard three-shift operations — six partial- or full-day periods of excused absence (other

32

than written leaves of absence or those absences for which an associate is paid) within any six-month period of active employment;

b.  Four-shift continuous operations — three partial- or full-day periods of excused absence (other than written leaves of absence or those absences for which an associate is paid) within any six-month period of active employment;

5.  Excessive Tardiness:

a.  Standard three-shift operations — six periods of tardiness within any six-month period of active employment;

b.  Four-shift continuous operations — three periods of tardiness within any six-month period of active employment.

6.  Interfering with the work of others — offensive personal habits that interfere with production and efficiency;

7.  Poor job performance — low production, defective workmanship, excessive waste, loafing, leaving job without permission, etc.;

8. Violation of safe practices and exposing self or others to possible injury (other than serious violations that endanger life and safety of associates), also failure to report a work-connected accident or injury. Examples of such violations are:

   a. Blowing off the person with compressed air;

   b. Blowing off machinery, walls, etc., without checking for other people in the area;

   c. Pushing loads while "blind" (when path of travel is obscured);

   d. Operating equipment without proper training and authorization;

   e. Running in the plant;

   f. Smoking in unauthorized area;

   g. Failure to properly report an injury;

   h. Taking shortcuts that violate proper procedure;

9. Improper use or care of Company property;

10. Reporting (but prior to actually

34

beginning work) under the influence of intoxicants — such as alcohol and unprescribed dangerous drugs, as well as prescribed drugs, which induce unsafe mental or physical state (note: for drivers of Company vehicles, this will result in immediate discharge);

11.   Violation of Solicitation, Distribution of Literature, Associate Contributions and/or Sale of Products or Collection of Money policies;

12.   Sleeping on the job (note: in certain jobs where associates may be endangered or Company property may be damaged by such action, this will result in immediate discharge);

13.   Misconduct — failure to follow instructions and/or work rules;

14.   Sexual misconduct of a nature considered to be less than intolerable;

15.   Unauthorized audio or video recording or photography on Company property or in Company facilities (note: in certain cases involving investigation of potentially illegal conduct or activity that concerns security of a facility

or its personnel, recording may be authorized by Corporate Security Director);

16. Entering the facility during non-work hours without authorization or approval of an appropriate member of management;

17. Failure to cooperate in Company investigations relating to security when activity warranting such investigations is considered less than intolerable;

18. Failure to wear proper protective equipment (hearing, respirator, chemical exposure, etc.) when required;

19. Failure to wear or have security badge (for facilities having such security measures in place) as required.

20. Acts of violence in the workplace considered to be less than intolerable including but not restricted to verbal abuse, harassment, intimidation, coercion and threats or talk of violence.

21. Garnishments (see pages 38-39.)

36

WPH
000794

# Discipline procedures

Summarized here through page 39 are procedures which management follows in administering disciplinary action for type of offenses listed on preceding pages: Items No. 1 through No. 21:

a. First Offense — Formal Counseling, with written Counseling Report placed in associate's personnel file.

b. Second Offense — Verbal Warning, with written Warning Report placed in associate's personnel file.

c. Subsequent Offenses — Verbal Warning, with written Warning Report of each such offense placed in associate's personnel file.

d. Three written warnings within a 12-month period, whether for same or a different offense, shall constitute discharge (Note: These procedures are to be applied to probationary associates, in whole or in part,

37

solely at management's discretion.)

**(The written report of each verbal warning will be prepared and signed by the associate's immediate supervisor. The associate is asked to sign each such report.)**

Item No. 21 (garnishments) (note: discipline administered in connection with garnishments is subject to restrictions of applicable state laws and administrative provisions of the Company's Garnishments Policy):

a.   First Garnishment - Formal Counseling (Counseling Report);

*b.   Second Garnishment within any 12-month period - First Warning Report;

*c.   Third Garnishment within any 12-month period — Second Warning Report;

d.   Fourth Garnishment within any 12-month period — Third Warning Report and automatic discharge.

*   Failure by associate to get a release within one week from

38

second or third garnishment within any 12-month period also will result in automatic discharge.

Any time on leave of absence is not considered "active employment" in determining a 12-month period.

**NOTE:** **Also see following pages for some other types of offenses that are considered sufficient reason for immediate discharge.**

**Notwithstanding these discipline procedures, as explained in the Disclaimer and Acknowledgement on the first page of this Guidebook, WestPoint Stevens may, at its discretion, terminate an associate at any time for any reason.**

# It shouldn't happen to you

(Violations considered to be "intolerable")

Immediate discharge of an associate for a serious offense is unpleasant for everyone. Management prefers, of course, that it never happen at WestPoint Stevens. Occasionally, however, someone goes beyond limits of acceptable conduct. Violations of this type simply cannot be tolerated. Among other things, they interfere with our operations — and, in some cases, even endanger lives of our associates and other people.

Therefore, for our mutual protection, any associate who commits an intolerable offense will be promptly discharged in keeping with procedures established by Company policy.

Intolerable offenses shall include, but are not restricted to, the following:

WPH
000798

1.    Unexcused absence:

    a.    In standard three-shift operations, **three** consecutive workdays of unexcused absence;

    b.    In four-shift continuous operations, **two** consecutive workdays of unexcused absence;

2.    Possession and/or use of alcohol, unprescribed dangerous drugs or similar dangerous intoxicants in the facility;

3.    Drivers of Company vehicles reporting under the influence of intoxicants — such as alcohol and unprescribed dangerous drugs, as well as prescribed drugs which induce unsafe mental or physical state — and/or possessing and/or using such intoxicants on the job;

4.    Possession or use of deadly weapons in the facility;

5.    Deliberate falsification or misrepresentation of records;

6.    Theft on Company property;

7.    Fighting or physical assault, except in the case of a victim of unwarrant-

ed physical assault;

8. Gross insubordination and/or deliberate refusal to follow instructions;

9. Criminal acts, promiscuous or indecent behavior or other conduct within the facility that may make an associate's continued employment not in the best interest of the Company or its associates;

10. Willful damage to Company property or to property of others;

11. Dangerous horseplay; examples:

   a. Intentionally pointing compressed air toward a person;

   b. Aiming a moving lift truck toward a person;

   c. Tripping a person near machinery in motion;

   d. "Tickling" a person known to be highly nervous near machinery in motion.

12. Serious violations of safe practice endangering life or health of self or others. Some examples are:

   a. Starting machinery without

42

checking to see if everyone is clear;

b.    By-passing interlocks on elevators and production machinery;

c.    Driving lift trucks too fast and failure to use flashing lights and horns;

d.    Working on electrical equipment without power being locked out;

e.    Repairing, oiling, cleaning and adjusting machinery while it is in motion.

f.    Hoisting loads over the heads of other associates;

g.    Failure to use proper protective equipment — welder's shield, gloves, aprons, goggles, etc. — where required;

h.    Rendering inoperative or removing guards.

13.    Unauthorized work elsewhere while on leave of absence.

14.    Misconduct or activities away from

the facility, including criminal activity, the nature of which may make an associate's continued employment not in the best interest of the Company or its associates;

15. Sleeping on the job when the nature of the associate's job (such as, but not limited to, watchman or boiler tender) is such that his/her sleeping on the job tends to endanger associates and/or damage Company property; also, an associate's deliberate attempt to sleep while at work;

16. Sexual misconduct of a nature considered to be intolerable.

17. Refusal to cooperate in Company investigations relating to security when activity warranting such investigations is considered intolerable;

18. Testing positive on a drug test;

19. Refusal to submit to drug test;

20. Working or attempting to work when obviously under the influence of alcohol or drugs and endangering the life or health of self or others;

44

21. Failure by associate to get a release within stated time frame from second or third garnishment within any 12-month period or occurrence of a fourth garnishment in any 12-month period;

22. Employment with a direct competitor when the Company determines such employment could have a detrimental effect on Company operations.

23. Retaliating against, harassing or intimidating a fellow associate for opposing discrimination/harassment or filing a complaint of discrimination/harassment or for cooperating in an investigation of discrimination/harassment.

24. Acts of violence in the workplace considered to be intolerable including but not restricted to verbal abuse, shoving, pushing, harassment, intimidation, coercion, threatened or actual use of weapons and threats or talk of violence.

WPH
000803

45

# Seniority is important to you

---

The Company recognizes that an associate's length of service, or seniority, is an important factor in many aspects of his/her job, including benefit programs, transfers, layoffs and recalls and the filling of job vacancies. The Company also recognizes that the full utilization of the skills and efforts of its associates provides the most effective utilization of its work force; consequently, length of service, skills, work experience and job performance are interrelated to achieve a more effective and better satisfied work force.

**Company seniority** is the length of time that a person has been continuously employed by the Company at any of its locations. Company seniority determines eligibility for insurance, vacations, vacation pay, awards under the Service Recognition

46

WPH
000804

Program and other benefits.

**Plant seniority** is the length of time that a person has been continuously employed by the plant. Plant seniority within departments applies, to the extent indicated by the Seniority Policy, in layoffs, recalls, transfers and job bidding.

Make sure that you know your seniority dates. If you do not, ask your supervisor.

47

# Wide range of benefits available to associates

A wide range of benefits is available to WestPoint Stevens associates. In some cases, certain eligibility requirements must be met; other benefits become available upon employment.

Your benefits will be explained to you during your orientation as a new associate and for several such benefits, there are brochures and summary plan description booklets that provide the details in a greater degree.

If you have questions, please ask your supervisor or Human Resources Manager.

Among the benefits for eligible associates are:

**WPH
000806**

Group Health (Medical, Dental, Drug and Vision)

Group Life Insurance

Retirement Plan

Retirement Savings Value (401K) Plan

Universal Life Insurance Plan

Employees' Credit Association

Accident and Sickness Plan

Early Retiree Medical Coverage

Medicare Supplement Plan

Tuition Reimbursement

Vacations and Vacation Pay

Holiday Pay

Service Awards

Associate Purchase Card

Retirement Plaque

Call-In Pay

Reporting Pay

Funeral Pay

Jury-Duty Pay

Leaves of Absence

NOTE: All benefit plans are subject to change. If and when changes do occur, affected associates will be notified.

# Keep your records straight

While you are employed with WestPoint Stevens, your Human Resources Department must maintain accurate and complete records covering your service with the Company.

It is to your advantage to help us keep information about you and your family status up to date. This is important:

—    to YOU, because it helps ensure that you will receive all of the advantages and benefits to which you and your family are entitled;

—    to the GOVERNMENT, because various laws require the maintenance of records and withholding of wages for income tax, social security and other federal and state programs;

50

— to the COMPANY, so that we may carry out our responsibilities as an employer.

All of the necessary information normally is obtained from each new associate at the time of employment. However, because personal circumstances change from time to time, each associate must cooperate in updating such information as changes take place.

When any of the following conditions occur, please talk with your supervisor for guidance and assistance in getting the necessary changes made at the Human Resources Department:

1.   Change of mailing address, residence address or telephone number;

2.   Change of person to be notified in case of accident or emergency;

3.   Change in your legal name;

4.   Change in marriage status;

5.   Change in number of income tax exemptions;

6.   A birth or death in the immediate family;

7.   A desire on your part to change your

Group Life Insurance and/or Retirement Plan beneficiary or beneficiaries;

8. Any change affecting the eligibility of your dependents for coverage under the Company's Group Health, Life Insurance and Retirement Savings plans.

Among other things, the Internal Revenue Service says that a new Withholding Exemption Certificate (Form W-4 or W-4A) MUST be filed by you within 10 days if the number of exemptions you previously claimed DECREASES. (Also, you may file a new W-4 or W-4A at any time if the number of your exemptions increases.) These forms, as well as additional information on this subject, are available at your Human Resources Office.

# Your access to records

As an associate, you have the right to review and/or obtain copies of certain records that pertain to you.

WestPoint Stevens has for many years had various programs designed to protect associates from potential hazards and, under these programs, the Company has compiled medical records. It has long been Company policy to provide our associates access to these records. To review or obtain a copy of these medical records, contact the Occupational Health Nurse at your facility. She will provide a medical authorization and release form for you to sign and will arrange for you to review your records or to receive copies of them.

These same protective programs also generate exposure records — i.e., a record of hazardous substances to which you may be exposed on the job and the level to which you're exposed. Associates are made aware of their exposures as a result of periodic moni-

toring in the workplace and notification of the results afterwards. Again, you may obtain a copy of your exposure records. To do so, contact your Human Resources Manager.

You may also have health records associated with your health coverage under the WestPoint Stevens Welfare Benefits Plan. While generally these records are held by the provider of the coverage (for example, Blue Cross and Blue Shield of Georgia), if WestPoint Stevens has any records associated with your health coverage, you have certain rights with regard to these records under the privacy regulations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Please refer to the Notices of Privacy Practices for a more complete description of the HIPAA practices of WestPoint Stevens Inc. and your rights with regard to your health information.

Your personal records are also open to review by you. Although copies are not made available, your Human Resources Manager will be glad to arrange a time to sit down and review with you the personnel records relating to your employment with the Company.

54

WPH
000812

# Bulletin boards provide facts

Our plant bulletin boards are used to convey important information such as job vacancies, governmental notices and plant and departmental notices. Notices originated by associates must be submitted to the Human Resources Department for approval and posting. Notices relating to the sale or purchase of any item or other solicitations cannot be posted.

# Our policy concerning a drug-free workplace

It is WestPoint Stevens policy to maintain a work environment free from use of illegal drugs at all Company locations. It is against Company policy to hire persons using illegal drugs. In order to be considered for employment, applicants must submit to a urine test to determine if the applicant may be using illegal drugs.

Associates are also subject to urine testing for illegal drugs if there is reasonable cause to believe an associate is under the influence of drugs. Associates who return to work after rehabilitation for drug or alcohol abuse are subject to periodic unannounced testing.

Associates may also be subject to random drug testing and testing after an on-the-job injury requiring treatment by a medical care

56

provider away from the facility. An associate testing positive for illegal drugs (including prescription drugs if not prescribed for the associate tested) will be terminated.

The Company will also comply with all federal, state and local laws and regulations related to drug and alcohol testing.

The unlawful manufacture, distribution, dispensation, possession, use or abuse of a controlled substance is prohibited in the workplace. Any associate found guilty of any one of these prohibitions shall be subject to immediate discharge.

In compliance with the Federal Drug-Free Workplace Act of 1988, the Company requires, as a condition of employment, that associates abide by this policy statement and notify Company management of any criminal drug statute conviction for a violation occurring in the workplace no later than five days after such a conviction.

If you have any questions concerning this policy or if you have any questions concerning drug rehabilitation, ask your supervisor or Human Resources Manager. This policy, like others, is subject to revision at any time. You will be notified at your facility of any revisions that may affect you.

57

# NOTES:

WPH
000816

# OUR GOALS

WestPoint Stevens is in business to make a profit. Clearly and simply stated, this is the reason for our continued existence.

To do so, management recognizes that it must conduct the affairs of the Company so as to serve best the interests of the customer, the associate and the community.

WestPoint Stevens, therefore, has at least four basic objectives:

1. To provide products of the highest quality at a price and with a service to justify the continued patronage of our customers;

2. To provide maximum employment under safe, healthy, satisfying conditions at the highest rates of pay and benefits that competition permits;

3. To make an adequate profit so as to provide a fair return and to attract additional capital for corporate purposes and growth;

4. To be a good citizen.

Each associate, by doing his or her work properly, helps the Company achieve these objectives and thereby builds job security.



WESTPOINT
STEVENS

CC-070104-BYJS

WPH
000818

# Dx. 23

# What to do if you have a complaint or problem

WestPoint Steven's policy is to give prompt, careful and courteous consideration to all problems or complaints of associates. You are encouraged to bring anything that is bothering you to the attention of management.

To provide a friendly hearing in a spirit of understanding and helpfulness at all levels of management is the purpose of our policy. You are assured that your standing with the Company will not be jeopardized because of your having brought your complaint or problem to management's attention.

The goodwill of our associates is a highly regarded Company asset. To maintain the informal personal relationship which has characterized our management-associate teamwork through the years, we follow a simple procedure for handling complaints and problems, as well as questions and suggestions. An outline of this procedure is provided below.

> Follow these steps to give your facility management the opportunity to resolve your complaint or problem and to avoid unnecessary delay. If you feel it is necessary, go directly to your Department Manager or Human Resources Manager instead of your immediate Supervisor. In any event, you can be sure of a friendly, helpful hearing and responsible guidance.
>
> **If your complaint is due to discrimination or harassment, you may go DIRECTLY to step 3 or outside your facility to step 5**

## 1 See Your Supervisor

Talk with him/her about your problem. He/she has the authority to settle most matters. If he/she cannot settle matters or help you solve your problem, he/she will arrange for you to talk with your Department Manager.

## 4 See Your Assistant Manager, Superintendent or Manager

In seeking to reach a fair solution, he/she will consider all of the facts. It is hoped that all problems and complaints can be settled within the facility in which they occur. However, if you feel it is necessary to go still further, your Manager will arrange for you to see your General Manager, where applicable, or the Director of Human Resources for your Division.

## 2 See Your Department Manager

He/she will listen carefully and make every reasonable effort to suggest a satisfactory solution. If the problem cannot be resolved, he/she will direct you to your Human Resources Manager.

## 5 See Your Division Director of Human Resources

He/she will investigate thoroughly and try to reach a mutually satisfactory solution. If you wish, he/she will arrange for you to see your Vice President - Manufacturing.

Name and Telephone Number
of Director of Human Resources
Inserted Here

## 3 See Your Human Resources Manager

Your Human Resources Manager will make a conscientious effort to bring about understanding and reach a solution that is fair to all concerned. If he/she cannot, he/she will arrange for you to see your Assistant Manager or Manager.

## 6 See Your Vice President of Human Resources

As a final step, you may see the Corporate Vice President - Human Resources or, if you prefer, another appropriate Corporate Vice President. It is hoped that only the rarest complaints or problems will require this level of review for solution, but it is an available step to each associate when all other steps have failed to provide a fair and satisfactory solution to your problem or complaint.





# ⚜ WESTPOINT STEVENS

CC-110189-CP

DEFENDANT'S
EXHIBIT
23
B Sanks
PENGAD 800-631-6989

# Dx. 24

## PERSONNEL NOTICE    **WestPoint Stevens**

[X] INITIATED BY COMPANY    [ ] AT REQUEST OF ASSOCIATE

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | 7 | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | |
|---|---|---|---|---|
| 041 Opelika Mill | Shop | | 1st | 2. ASSOCIATE COMPLAINT |

3. NOTICE OF CHANGE

| SUPERVISOR | NOTICE DATE | |
|---|---|---|
| Dudley Gregory | 07/12/05 | 4. REQUEST FOR CHANGE |

5. ASSOCIATE REQUEST

EFFECTIVE DATE OF CHANGE

6. COMMENDATION

7 MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Tardies

**DETAILS**

On Tuesday, 7/12/05, I told Bobby that he had accumulated 4 tardies over the last six months. I told Bobby that he needed to get through July without having anymore tardies because he would lose two on August 5th.

RECEIVED
AUG — 1 2005

**ACTION TAKEN**

Placed notice in Bobby's file.

**DISTRIBUTION**

| | | | | | RECOMMENDED BY |
|---|---|---|---|---|---|
| [ ] | COST DEPT | [X] | VICE-PRESIDENT | | Dudley Gregory    *Dudley Gregory* |
| [ ] | DEPT. FILES | [ ] | MANAGER | | DEPARTMENT HEAD |
| [ ] | INDUSTRIAL RELATIONS | [ ] | ASST. MANAGER | | Perry Henderson    *Perry B H Hent* |
| [ ] | OFFICE MANAGER | [ ] | OVERSEER | | OTHER |
| [ ] | PAYROLL DEPT. | [ ] | PRODUCTION DEPT. | | |
| [ ] | PERSONNEL DEPT. | [ ] | SUPPLY ROOM | | SIGNATURE         DATE |

I167-CS

00415

WPH
000009


DEFENDANT'S EXHIBIT 24    B. Sanks

# Dx. 25

# PERSONNEL NOTICE

☐ INITIATED BY COMPANY    ☑ AT REQUEST OF EMPLOYEE

| EMPLOYEE Bobby L. Sanks | | | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|---|---|

| FACILITY 041 | DEPARTMENT 04 | ROOM 1 | SHIFT 1st |
|---|---|---|---|

| SUPERVISOR Andy Jordan | | NOTICE DATE 5/4/85 |
|---|---|---|

EFFECTIVE DATE OF CHANGE   5/4/1985

**TYPE OF NOTICE**

3

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
③ NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Job Change

**DETAILS**

Change From: 1st shift, Department 04, Rate-$5.62/hr.
Job # - 200. Mech. Spin -

Change To: 1st Shift, Department - 10, Rate-$5.50/hr
Job # - 724, Humidifier Air Control Tech -

JSD - 4/24/85
DSD - 4/24/85

**ACTION TAKEN**

File Copy in Employees

DEFENDANT'S EXHIBIT 25 B. Sanks

**DISTRIBUTION**

☐ COST DEPT
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.
☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☑ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY   Andy Jordan

DEPARTMENT HEAD   Lomax Davis

OTHER

SIGNATURE                    DATE

WP-1157-CS

WPH
000582

00415

# Dx. 26

# PERSONNEL NOTICE

West Point Pepperell

[X] INITIATED BY COMPANY    [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| BOBBY L. SANKS | 32045 | 4 |

| FACILITY • DEPARTMENT • ROOM • SHIFT |
|---|
| 041 Opelika Mill    Shop    First |

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

| SUPERVISOR | NOTICE DATE |
|---|---|
| Perry G. Henderson | 8-8-86 |

EFFECTIVE DATE OF CHANGE
8-8-86 *(initials)*

**SITUATION IN BRIEF**

Request for Change

**DETAILS**

CHANGE FROM:    Humidifier and Air Con, Ctl Tech (Job 724)

Dept: 10

Shift: First

Rate of Pay: $6.50

**WPH
000574**

CHANGE TO:    Electrician 3rd Grade  (Job 751) ✓

Dept: 10  ✓

Shift First  ✓

Rate of Pay: $6.50 ✓

DEFENDANT'S
EXHIBIT
26
B. Sanks

H/RS
2-16
8-19-86

(Bobby will replace Craig Arwood.)

**ACTION TAKEN**

JSP 6/21/86
PSD 4/24/05

*(stamp: AUG 13 1986 JBD PRODUCTS)*

| DISTRIBUTION | | RECOMMENDED BY |
|---|---|---|
| [ ] COST DEPT | [ ] VICE-PRESIDENT | |
| [ ] DEPT. FILES | [ ] MANAGER | |
| [ ] INDUSTRIAL RELATIONS | [ ] ASST. MANAGER | DEPARTMENT HEAD |
| [ ] OFFICE MANAGER | [ ] OVERSEER | Perry G. Henderson    *Perry G. Henderson* |
| [ ] PAYROLL DEPT. | [ ] PRODUCTION DEPT. | [ ] OTHER |
| [ ] PERSONNEL DEPT. | [ ] SUPPLY ROOM | SIGNATURE                    DATE |

WP-1157-CS

00415

# Dx. 27

PERSONNEL NOTICE

☐ INITIATED BY COMPANY    ☒ AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| BOBBY Lee Sinks | | |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 | 04 | 1 | 1st |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Andy Jordan | 4/11/85 |

EFFECTIVE DATE OF CHANGE
3/26/85

TYPE OF NOTICE
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

JOB Change:

JSD - 3/2/85 changed

DEFENDANT'S EXHIBIT 27 B. Sinks

DETAILS

| | Dept | Shift | JOB | Rate |
|---|---|---|---|---|
| Change From: | 04 | 1st | 222 | Incentive |
| Change TO: | Dept. 04 | Shift 1st | JOB 200 spinmech | Rate $5.62/hr |

Bobby has elected to go into Fixer Training in Spinning. Due to Bobbys' familarity with our Spinning Frames and his Ability to doff and piece up, we are starting Bobby out at 40% of running A Fixers JoB which calls for a rate of $5.62/hr. Bobby will be a on the JoB trainee and will be paid on a progressive scale as he learns the job, in accordance with Company Policy.

ACTION TAKEN

Place copy of this Change in Employee's Work Record.

Note ✳ Employee understands that after completion of training he will go back to previous JOB until vacancy in maintenance position comes open.

| DISTRIBUTION | | RECOMMENDED BY |
|---|---|---|
| ☐ COST DEPT | ☐ VICE-PRESIDENT | Andy Jordan |
| ☐ DEPT. FILES | ☐ MANAGER | DEPARTMENT HEAD |
| ☐ INDUSTRIAL RELATIONS | ☒ ASST MANAGER | Tomas Adams |
| ☐ OFFICE MANAGER | ☐ OVERSEER | OTHER |
| ☐ PAYROLL DEPT. | ☐ PRODUCTION DEPT. | |
| ☐ PERSONNEL DEPT. | ☐ SUPPLY ROOM | |

SIGNATURE          DATE

WP-1157-CS

WPH
000588

00415

# Dx. 28

*File*



8801 SOUTH BOULEVARD  •  P. O. BOX 240828  •  CHARLOTTE, N. C. 28224

February 7, 1994

West Point Pepperell
Opelika Mill
2401 C First Avenue
Opelika, Al.  36801

Attention: Mr. Calvin Turner

Re:  AUTOCORO 288 ELECTRICIAN SCHOOL Performance Rating,
     BOBBY SANKS

It is our policy to advise you of the performance of your per-
sonnel who attend Schlafhorst Inc. schools.  Consequently,
the attached rating sheet is furnished to you, confidentially,
and is based on the instructor's observations and student's
test scores.

Please feel free to contact me if you have a question concerning
this student's rating or if I can be of some further service.

Very truly yours,

SCHLAFHORST INC.

*Edward Cavallone*

Edward Cavallone
Director of Training

EC/jd

Attachments

**WPH
000503**





TELEPHONE: 704 554-0800  •  TELEX: 802-171  •  TELEFAX: 704 554-7350
*AUTOCONER, AUTOCORO Registered U.S. Patent and Trademark Offices

# Dx. 29

# PERSONNEL NOTICE    WestPoint Stevens

| X | INITIATED BY COMPANY | | AT REQUEST OF ASSOCIATE |

| EMPLOYEE | | EMPLOYEE NUMBER | | TYPE OF NOTICE |
| --- | --- | --- | --- | --- |
| obby Sanks | | 32045 | | 1. ASSOCIATE PROBLEM |
| ACILITY | DEPARTMENT | ROOM | SHIFT | 7 | 2. ASSOCIATE COMPLAINT |
| 41 Opelika Mill | | Mechanical (11) | First | | 3. NOTICE OF CHANGE |
| UPERVISOR | | NOTICE DATE | | 4. REQUEST FOR CHANGE |
| udley Gregory | | 09-27-99 | | 5. ASSOCIATE REQUEST |
| FFECTIVE DATE OF CHANGE | | | | 6. COMMENDATION |
| | | | | 7. MISCELLANEOUS NOTICE |

| TUATION IN BRIEF | Qualified Hoist & Crane Inspector |

ETAILS

The above named Associate has been given the proper training to qualify him as an inspector for Hoist and Crane Systems here at Opelika Mill using our standard form.

The training was given by Plant Maintenance Supervision and an outside vendor who installs our systems.

(Attachment)

TION TAKEN

Placed notice in Associates file and routed copies as appropriate.

| ISTRIBUTION | | | | RECOMMENDED BY |
| --- | --- | --- | --- | --- |
| | COST DEPT | | VICE-PRESIDENT | |
| < | DEPT. FILES | X | MANAGER | DEPARTMENT HEAD |
| | INDUSTRIAL RELATIONS | | ASST.MANAGER | PERRY G. HENDERSON |
| | OFFICE MANAGER | | OVERSEER | OTHER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | |
| < | PERSONNEL DEPT. | | SUPPLY ROOM | SIGNATURE          DATE |
| 1157-CS | | | | |



DEFENDANT'S EXHIBIT

00415

# ROYCE CRANE CO,
1210 WARSAW RD. SUITE 400 ROSWELL, GA 30076
(770) 641-1111, (770) 992-8200

WPH
000185

## SERVICE / ERECTION

| CUSTOMER & INVOICE ADDRESS | PLANT LOCATION (IF DIFFERENT) |
|---|---|
| West Point Stevens Opelica Ala | |

| P.O. NUMBER: | CONTACT NAME & NUMBER Perry Henderson |
|---|---|

**SERVICE CALL FOR:**

**WORK PERFORMED:** Instructed Maintenance Personel on Proper Hoist and Crane Inspection Procedures.

| DAY | DATE | TIME | | WORK HRS. | TRAVEL HRS. | O/T HRS. |
|---|---|---|---|---|---|---|
| Mo | 9/27/99 | 6:30 | 5:00 | 5 | 5 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | TOTAL | | | | |

MILES TRAVELED **250**

ADDITIONAL EXPENSES

| | |
|---|---|
| | |
| | |
| | |

**WORK COMPLETED**

| YES | ✓ | NO | |
|---|---|---|---|

**WARRANTY**

| YES | | NO | |
|---|---|---|---|

| REQ'D | PART NO. | PARTS SUPPLIED | REQ'D | PART NO. | PARTS SUPPLIED |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

THE REQUIRED WORK HAS BEEN COMPLETED IN A PROPER MANNER. THE EQUIPMENT IS WORKING AND HAS BEEN FOUND O.K. WE HAVE RECEIVED A COPY OF THIS SERVICE SLIP. THE TOTAL WORKING AND TRAVELING HOURS ARE CERTIFIED.

| SERVICEMAN | 9/27/99 | CUSTOMER |
|---|---|---|
| | DATE | |

## PERSONNEL NOTICE     WestPoint Stevens

| X | INITIATED BY COMPANY | | AT REQUEST OF ASSOCIATE |

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |

EMPLOYEE
Bobby Sanks

EMPLOYEE NUMBER
32045

FACILITY
041 Opelika Mill

DEPARTMENT

ROOM
Mechanical (11)

SHIFT
First

7

SUPERVISOR
Dudley Gregory

NOTICE DATE
09-27-99

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE
1. ASSOCIATE PROBLEM
2. ASSOCIATE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. ASSOCIATE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

SITUATION IN BRIEF     Qualified Elevator Inspector

DETAILS

The above named Associate has been given the proper training to qualify him as an inspector for the freight and passenger Elevators here at Opelika Mill using our standard form.

(Attachment)

ACTION TAKEN

Placed notice in Associates file and routed copies as appropriate.

DISTRIBUTION

| | COST DEPT | | VICE-PRESIDENT | RECOMMENDED BY |
| X | DEPT. FILES | X | MANAGER | |
| | INDUSTRIAL RELATIONS | | ASST. MANAGER | DEPARTMENT HEAD |
| | OFFICE MANAGER | | OVERSEER | PERRY G. HENDERSON |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | OTHER |
| X | PERSONNEL DEPT. | | SUPPLY ROOM | |

RECOMMENDED BY

DEPARTMENT HEAD
PERRY G. HENDERSON

OTHER

SIGNATURE                    DATE

P-1137-CS

00415

WPH
000186

## PERSONNEL NOTICE    WestPoint Stevens

[X] INITIATED BY COMPANY          [ ] AT REQUEST OF ASSOCIATE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 7 | 2. ASSOCIATE COMPLAINT |
|---|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical (11) | First | | 3. NOTICE OF CHANGE |

| SUPERVISOR | NOTICE DATE | 4. REQUEST FOR CHANGE |
|---|---|---|
| Dudley Gregory | 09-27-99 | 5. ASSOCIATE REQUEST |

| EFFECTIVE DATE OF CHANGE | 6. COMMENDATION |
|---|---|
| | 7. MISCELLANEOUS NOTICE |

SITUATION IN BRIEF          Qualified Hoist & Crane Inspector

DETAILS

    The above named Associate has been given the proper training to qualify him as an inspector for Hoist and Crane Systems here at Opelika Mill using our standard form.

    The training was given by Plant Maintenance Supervision and an outside vendor who installs our systems.

(Attachment)

ACTION TAKEN

Placed notice in Associates file and routed copies as appropriate.

### DISTRIBUTION

| | | | | |
|---|---|---|---|---|
| [ ] | COST DEPT | [ ] | VICE-PRESIDENT | |
| [X] | DEPT. FILES | [X] | MANAGER | |
| [ ] | INDUSTRIAL RELATIONS | [ ] | ASST. MANAGER | |
| [ ] | OFFICE MANAGER | [ ] | OVERSEER | |
| [ ] | PAYROLL DEPT. | [ ] | PRODUCTION DEPT. | |
| [X] | PERSONNEL DEPT. | [ ] | SUPPLY ROOM | |

RECOMMENDED BY

DEPARTMENT HEAD
PERRY G. HENDERSON

OTHER

SIGNATURE          DATE

WP-1157-CS

00415

# PERSONNEL NOTICE    **WestPoint Stevens**

X INITIATED BY COMPANY        ☐ AT REQUEST OF ASSOCIATE

| EMPLOYEE<br>Bobby Sanks | EMPLOYEE NUMBER<br>32045 | | | | TYPE OF NOTICE |
|---|---|---|---|---|---|
| FACILITY<br>041 Opelika Mill | DEPARTMENT | ROOM<br>Mechanical (11) | SHIFT<br>First | 7 | 1. ASSOCIATE PROBLEM |
| | | | | | 2. ASSOCIATE COMPLAINT |
| SUPERVISOR<br>Dudley Gregory | | NOTICE DATE<br>09-27-99 | | | 3. NOTICE OF CHANGE |
| | | | | | 4. REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE | | | | | 5. ASSOCIATE REQUEST |
| | | | | | 6. COMMENDATION |
| | | | | | 7. MISCELLANEOUS NOTICE |

SITUATION IN BRIEF        Qualified Elevator Inspector

DETAILS

The above named Associate has been given the proper training to qualify him as an inspector for the freight and passenger Elevators here at Opelika Mill using our standard form.

(Attachment)

ACTION TAKEN

Placed notice in Associates file and routed copies as appropriate.

| DISTRIBUTION | | | RECOMMENDED BY |
|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT | |
| X | DEPT. FILES | X | MANAGER | DEPARTMENT HEAD |
| | INDUSTRIAL RELATIONS | | ASST. MANAGER | PERRY G. HENDERSON |
| | OFFICE MANAGER | | OVERSEER | OTHER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | |
| X | PERSONNEL DEPT. | | SUPPLY ROOM | SIGNATURE        DATE |

WP-1157-CS

00415

# Dx. 30

## PERSONNEL NOTICE                   WestPoint Stevens

[ X ] INITIATED BY COMPANY          [  ] AT REQUEST OF ASSOCIATE

| ASSOCIATE | ASSOCIATE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 7 |
|---|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First | |

- 1. ASSOCIATE PROBLEM
- 2. ASSOCIATE COMPLAINT
- 3. NOTICE OF CHANGE
- 4. REQUEST FOR CHANGE
- 5. ASSOCIATE REQUEST
- 6. COMMENDATION
- 7 MISCELLANEOUS NOTICE

| SUPERVISOR | NOTICE DATE |
|---|---|
| Dudley Gregory | 9/08/03 |

EFFECTIVE DATE OF CHANGE

**SITUATION IN BRIEF**

TIME CLOCK PUNCHING PROCEDURE

**DETAILS**

The shop time clock punches the time in tenths of the hour increments. So the hour is .0 ; 6 minutes after is .1 ; 12 minutes after is .2 ; 18 minutes after is .3 ; 24 minutes after is .4 ; 30 minutes is .5 ; 36 minutes is .6 ; 42 minutes after is .7 ; 48 minutes after is .8 ; 54 minutes after is .9 . Your time is paid in 1/4 of the hour so .1 to .3 equals 1/4 hour, .4 to .6 equals 1/2 hour, .7 to .8 equals 3/4 hour, and .9 to .0 equals 1 hour.

When you clock in you should punch your card between 12 minutes before and 1 minute before the hour of your scheduled shift. This would be 6.8 or 6.9 for first shift, 2.8 or 2.9 for second shift, and 10.8 or 10.9 for third shift. If the clock punches your time at 7.0, 3.0, or 11.0 you are charged with a tardy. If you are as late as 7.5, 3.5, or 11.5 you will be charged with a partial absence. Also, if you have to leave work early, if you punch out at 2.5, 10.5, or 6.5 you will be charged with a partial absence. Company policy states that six tardies or six partial absences within six months will result in displinary action.

Do not write anything except your name and week-ending date on your time card. If you forget to punch in or out, get with your supervisor as soon as possible and he will make the necessary adjustment. If you are scheduled for a physical or breathing test , report to the clinic at your scheduled time then punch in at the shop when you get finished.

**ACTION TAKEN**

Placed notice in associates file.

| | | | |
|---|---|---|---|
| [ ] COST DEPT. | [ ] VICE PRESIDENT | RECOMMENDED BY | *Dudley Gregg* |
| [ ] DEPT. FILES | [ ] MANAGER | DUDLEY GREGORY | |
| [ ] IND. RELATIONS | [ ] ASST. MANAGER | DEPARTMENT HEAD | |
| [ ] OFFICE MANAGER | [ ] OVERSEER | PERRY G. HENDERSON | |
| [ ] PAYROLL DEPT. | [ ] PROD. DEPT. | OTHER | |
| [ ] PERSONNEL DEPT. | [ ] SUPPLY ROOM | *Bobby Sanks* | 9-8-03 |
| | | SIGNATURE | DATE |

?-1157-CS

DEFENDANT'S
EXHIBIT
30
B. Sanks

# Dx. 31

PERSONNEL NOTICE               WestPoint Stevens

| [X] INITIATED BY COMPANY | [ ] AT REQUEST OF ASSOCIATE |
|---|---|

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 2. ASSOCIATE COMPLAINT |
|---|---|---|---|---|
| 041 Opelika Mill | Shop | | 1st | 3. NOTICE OF CHANGE |

| SUPERVISOR | | 4. REQUEST FOR CHANGE |
|---|---|---|
| Dudley Gregory | NOTICE DATE | 5. ASSOCIATE REQUEST |
| | 3/10/05 | 6. COMMENDATION |
| EFFECTIVE DATE OF CHANGE | | 7  7 MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

hoist inspection

**DETAILS**

A representative from Royce Crane was here from 3/7/05 through 3/10/05 to perform an annual

inspection on the plant hoist systems. Bobby works with him during this time to assist him and

also to receive on the job training from a professional. Bobby is asked to bring up any questions

he may have about the plant hoist systems at this time. The representative is also asked to work

with Bobby and help him with any questions that he may have.

MAR 1 7

**CTION TAKEN**

Placed notice in employees file.

DEFENDANT'S EXHIBIT 31 B. Sanks

| DISTRIBUTION | | |
|---|---|---|
| COST DEPT | VICE-PRESIDENT | RECOMMENDED BY |
| DEPT. FILES | MANAGER | Dudley Gregory |
| INDUSTRIAL RELATIONS | ASST. MANAGER | DEPARTMENT HEAD |
| OFFICE MANAGER | OVERSEER | Perry Henderson |
| PAYROLL DEPT. | PRODUCTION DEPT. | OTHER |
| PERSONNEL DEPT. | SUPPLY ROOM | SIGNATURE          DATE |

7-CS

WPH
000321

00415

# Dx. 32

## PERSONNEL NOTICE

**WestPoint Pepperell**

[X] INITIATED BY COMPANY          [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| | 041 Opelika Mill | Shop | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Perry G. Henderson | 9-21-87 |

EFFECTIVE DATE OF CHANGE

**TYPE OF NOTICE**
1 – EMPLOYEE PROBLEM
2 – EMPLOYEE COMPLAINT
3 – NOTICE OF CHANGE
4 – REQUEST FOR CHANGE
5 – EMPLOYEE REQUEST
6 – COMMENDATION
7 – MISCELLANEOUS NOTICE

### SITUATION IN BRIEF

Unsafe Act

### DETAILS

Counseled with Bobby concerning the proper use of lockouts on

9-18-87.

Copy-Burt

DEFENDANT'S
EXHIBIT
32
B. Sanks

### ACTION TAKEN

Disciplinary and discharge procedures were discussed with Bobby.

**WPH
000571**

| DISTRIBUTION | |
|---|---|
| [ ] COST DEPT | [ ] VICE-PRESIDENT |
| [ ] DEPT. FILES | [ ] MANAGER |
| [ ] INDUSTRIAL RELATIONS | [ ] ASST. MANAGER |
| [ ] OFFICE MANAGER | [ ] OVERSEER |
| [ ] PAYROLL DEPT. | [ ] PRODUCTION DEPT. |
| [ ] PERSONNEL DEPT. | [ ] SUPPLY ROOM |

WP-1157-CS

RECOMMENDED BY

DEPARTMENT HEAD
PERRY G. HENDERSON
OTHER

SIGNATURE                    DATE

00415

## PERSONNEL NOTICE

WestPoint Pepperell

[X] INITIATED BY COMPANY        [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 7 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mill | Shop | | First |

**TYPE OF NOTICE**

7
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

| SUPERVISOR | NOTICE DATE |
|---|---|
| Perry G. Henderson | 10-27-87 |

EFFECTIVE DATE OF CHANGE

**SITUATION IN BRIEF**

Interfering with the work of Others

**DETAILS**

Counseled with Bobby about talking with another employee on her job. She had complained to her Supervisor about this.

**ACTION TAKEN**

Counseled with employee concerning this and explained disciplinary and discharge procedures.

**WPH
000570**

**DISTRIBUTION**

[ ] COST DEPT          [ ] VICE-PRESIDENT
[ ] DEPT. FILES        [ ] MANAGER
[ ] INDUSTRIAL RELATIONS [ ] ASST. MANAGER
[ ] OFFICE MANAGER     [ ] OVERSEER
[ ] PAYROLL DEPT.      [ ] PRODUCTION DEPT.
[ ] PERSONNEL DEPT.    [ ] SUPPLY ROOM
WP-1157-CS

RECOMMENDED BY

DEPARTMENT HEAD
PERRY G. HENDERSON
OTHER

SIGNATURE                    DATE

00415

## PERSONNEL NOTICE

000566                    **West Point Pepperell**

☑ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

EMPLOYEE : Andy Jordan

| | | | |
|---|---|---|---|
| FACILITY • | DEPARTMENT • | ROOM • | SHIFT |
| 041 | 04 | 1 | 1st |

SUPERVISOR : Lamar Davis

NOTICE DATE: 2-27-88

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

### SITUATION IN BRIEF

Shop employee interfering with spinner.

### DETAILS

I saw Bobby Sanks on Linda Foote's job today at 2:30 PM. They were standing around talking. There has been numerous complaints about this in the past and this practice by shop employee's should be stopped.

### ACTION TAKEN

Pass complaint to Perry Henderson

DISTRIBUTION

☐ COST DEPT
☑ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☑ PERSONNEL DEPT.
WP-1157-CS

☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY: Andy Jordan

DEPARTMENT HEAD: Lamar Davis

OTHER

SIGNATURE                    DATE

MAR  7 1988                    00415

West Point Pepperell

THIS IS THE
☐ FIRST   ☐ SECOND   ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE — — — ┐

[XX] COUNSELING REPORT          ☐ WARNING REPORT *

| EMPLOYEE | | EMPLOYEE NUMBER | COUNSELING DATE |
|---|---|---|---|
| Bobby Sanks | | 32045 | 3-01-88 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill Shop | | | First | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Perry G. Henderson | |

**SITUATION IN BRIEF**

Interfering with the work of others.

**DETAILS**

Counseled with Bobby about talking with another employee while on their job. I received a complaint from the employees Supervisor concerning this dated 2-27-88.

**ACTION TAKEN**

Counseled with employee concerning this and explained disciplinary and discharge procedures.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| | |
| DEPARTMENT HEAD | ADDITIONAL WITNESS, IF APPLICABLE |
| PERRY G. HENDERSON   Perry G. Henderson | |

SIGNATURES

MAR 3 1988

WP-1097-CS-REV. 8/82

WPH
000565

01189

**PERSONNEL NOTICE**

[X] INITIATED BY COMPANY     [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | | | | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|---|---|---|
| Bobby Sanks | | | | 32045 | 1 |

| FACILITY | • | DEPARTMENT | • | ROOM | • | SHIFT |
|---|---|---|---|---|---|---|
| | | 041 Opelika Mill | | Mechanical (11) | | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Harold O'Neal | 2-23-89 |

EFFECTIVE DATE OF CHANGE

**TYPE OF NOTICE**
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Dust Masks

**DETAILS**

On February 16, 1989 a notice was posted on the Shop bulletin board that the nurses would fit each employee with dust masks and ear plugs the next day. Employees were asked to make necessary preparations.

Bobby could not be fitted because of beard growth.

Bobby was sent to the Clinic the following day to be fitted but could not be fitted because his sideburns were to long.

At this time Bobby was given a dust mask to hold up to his face in order to make sure he shaved enough of his sideburns off.

Bobby went back to the Clinic the following day and was fitted.

**ACTION TAKEN**

Discussed dust mask regulations and above with Bobby. Disciplinary and discharge procedures were discussed.

**DISTRIBUTION**
[ ] COST DEPT
[ ] DEPT. FILES
[ ] INDUSTRIAL RELATIONS
[ ] OFFICE MANAGER
[ ] PAYROLL DEPT.
[ ] PERSONNEL DEPT.

[ ] VICE-PRESIDENT
[ ] MANAGER
[ ] ASST. MANAGER
[ ] OVERSEER
[ ] PRODUCTION DEPT.
[ ] SUPPLY ROOM
[ ]

RECOMMENDED BY
HAROLD O'NEAL

DEPARTMENT HEAD

OTHER

SIGNATURE                    DATE

WP-1157-CS

WPH
000560

FEB 27 1989

00415

WestPoint Pepperell

[X] COUNSELING REPORT          [ ] WARNING REPORT*

| EMPLOYEE | | EMPLOYEE NUMBER | COUNSELING DATE |
|---|---|---|---|
| Bobby Sanks | | 32045 | 4-19-89 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O'Neal | Perry G. Henderson |

**SITUATION IN BRIEF**

Failure to Carry Out Job Assignment

**DETAILS**

It is part of Bobby's job assignments to check and repair lights in the Air Washers each Friday.

A Safety Inspection was made on Thursday, March 30, 1989 and lights were reported out in 8 of the Air Washers.

An inspection was again made on Monday, April 17, 1989 and the lights had not be repaired.

**ACTION TAKEN**

Discussed this with Bobby. Disciplinary and discharge procedures were explained to Bobby.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O'Neal | |
| DEPARTMENT HEAD | ADDITIONAL WITNESS, IF APPLICABLE |
| Perry G. Henderson | |
| | SIGNATURES |

WP-1097-CS-REV. 8/82

**WPH
000558**

APR 2 4 1989          01189

# PERSONNEL NOTICE

West Point Pepperell

| | |
|---|---|
| ☒ INITIATED BY COMPANY | ☐ AT REQUEST OF EMPLOYEE |

EMPLOYEE
**Bobby Sanks**

EMPLOYEE NUMBER
**32045**

TYPE OF NOTICE
**1**

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

FACILITY • DEPARTMENT • ROOM • SHIFT
**041 Opelika Mill    Mechanical (11)    First**

SUPERVISOR
**Harold O'Neal**

NOTICE DATE
**5-8-89**

EFFECTIVE DATE OF CHANGE

SITUATION IN BRIEF

Lock Outs

DETAILS

Failure to have disconnect locked out while installing a hoist in

Weave Room #1.

ACTION TAKEN

Counseled with Bobby concerning this and cautioned him about the danger.

DISTRIBUTION

☐ COST DEPT
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM

RECOMMENDED BY
HAROLD O'NEAL

DEPARTMENT HEAD
PERRY G. HENDERSON

OTHER

SIGNATURE

DATE
MAY 1 8 1989

WP-1157-CS

WPH
000557

00415

# West Point Pepperell

*THIS IS THE
☐ FIRST ☐ SECOND ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE — — —

[X] COUNSELING REPORT       ☐ WARNING REPORT*

| EMPLOYEE | | EMPLOYEE NUMBER | COUNSELING DATE |
|---|---|---|---|
| Bobby Sanks | | 32045 | 3-10-90 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal | Harold O' Neal |

**SITUATION IN BRIEF**

Failure to comply with Dust Mask Regulations

**DETAILS**

Bobby was blowing down the elevators as part of his routine p. m.
on the elevators and was observed with excess facial hair protruding from
under his dust mask preventing him from attaining a good seal as required.

Bobby was asked to leave the plant and shave so that he could properly
wear the dust mask, as he had previously elected.

Bobby had to be sent back the second time because he did not shave
enough to wear the dust mask.

**ACTION TAKEN**

Counseled with Bobby about the proper wearing of respirators.
Disciplinary and discharge procedures were explained.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal | Harold O' Neal |
| DEPARTMENT HEAD | ADDITIONAL WITNESS, IF APPLICABLE |
| Perry G. Henderson | |

SIGNATURES

WP-1097-CS-REV. 8/82

WPH
000553    MAR 1     01189

## PERSONNEL NOTICE

West Point Pepperell

[X] INITIATED BY COMPANY     [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1 |

| FACILITY • DEPARTMENT • ROOM • | SHIFT |
|---|---|
| 041 Opelika Mill   Mechanical (11) | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Harold O' Neal | 3-10-90 |

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Unsafe Act

**DETAILS**

Bobby was blowing down the elevator as part of his routine p. m.

on the elevators and was not using a OSHA nozzle on the air hose while

blowing down #2 elevator hoistway walls.

**ACTION TAKEN**

Counseled with Bobby and told him any further violations of this plant

rule would result in disciplinary action.

**DISTRIBUTION**

[ ] COST DEPT
[ ] DEPT. FILES
[ ] INDUSTRIAL RELATIONS
[ ] OFFICE MANAGER
[ ] PAYROLL DEPT.
[ ] PERSONNEL DEPT.

[ ] VICE-PRESIDENT
[ ] MANAGER
[ ] ASST. MANAGER
[ ] OVERSEER
[ ] PRODUCTION DEPT.
[ ] SUPPLY ROOM
[ ]

RECOMMENDED BY

DEPARTMENT HEAD
PERRY G. HENDERSON

OTHER

SIGNATURE      DATE

WP-1157-CS

WPH
000552

MAR 1 3 1990

00415

# PERSONNEL NOTICE

WestPoint Pepperell

☒ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mill | Mechanical | (11) | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Harold O' Neal | 3-26-90 |

EFFECTIVE DATE OF CHANGE

**TYPE OF NOTICE**

1 ◄ 1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Failure to Observe Posted Break Schedule

**DETAILS**

On 3-25-90 Bobby was observed in the Spinning Room canteen at 10:15 a. m. He was sitting down drinking a coke. When Bobby was asked what he was doing. He said he had come down from #2 Elevator penthouse and was hot. Bobby was asked if he had got his morning break and he said yes. Bobby was told to take breaks only at scheduled times.

The area where he was working was not abnormally hot nor was the ambient weather.

The Shop break schedule for 1st Shift;          8:45 to 9:00 a. m.

10:45 to 11:15 a. m.

12:45 to 1:00 p. m.

**ACTION TAKEN**

Bobby was aware of the Shop break schedule and knew he was not coinciding with that schedule. Notice was written to go in employee's file. Counseled with Bobby. Disciplinary and discharge procedures were explained.

**DISTRIBUTION**

☐ COST DEPT
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

| RECOMMENDED BY | |
|---|---|
| DEPARTMENT HEAD | |
| PERRY G. HENDERSON | Perry G. Henderson |
| OTHER | Dudley Gregory |
| | SIGNATURE    DATE |

WP-1157-CS

WPH
000551

MAR 30 1990

00415

## PERSONNEL NOTICE

WestPoint Pepperell

☒ INITIATED BY COMPANY        ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1 - EMPLOYEE PROBLEM |

| FACILITY • DEPARTMENT • ROOM • | SHIFT | 2 - EMPLOYEE COMPLAINT |
|---|---|---|
| 041 Opelika Mill   Mechanical (11) | First | 3 - NOTICE OF CHANGE |

| SUPERVISOR | NOTICE DATE | 4 - REQUEST FOR CHANGE |
|---|---|---|
| Harold O' Neal | 5-01-91 | 5 - EMPLOYEE REQUEST |

EFFECTIVE DATE OF CHANGE

6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Improper Lock-Out of Electrical Switch

**DETAILS**

Bobby was observed making repairs to a electrical hoist in the Slasher Room on 5-1-91 and it was noticed that he just had his padlock hanging in the lockout and not locked as it should have been.

Bobby has been counseled with on the proper lock-out procedures for the Shop.

**ACTION TAKEN**

Counseled with employee.

**WPH
000539**

MAY 06 1991

**DISTRIBUTION**

☐ COST DEPT          ☐ VICE-PRESIDENT
☐ DEPT. FILES        ☐ MANAGER
☐ INDUSTRIAL RELATIONS ☐ ASST. MANAGER
☐ OFFICE MANAGER     ☐ OVERSEER
☐ PAYROLL DEPT.      ☐ PRODUCTION DEPT.
☐ PERSONNEL DEPT.    ☐ SUPPLY ROOM
☐

RECOMMENDED BY

DEPARTMENT HEAD
PERRY G. HENDERSON

OTHER

SIGNATURE                    DATE

WP-1157-CS

00418

## PERSONNEL NOTICE

**West Point Pepperell**

[X] INITIATED BY COMPANY      [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Harold O' Neal | 1-17-92 |

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Wasting Time

**DETAILS**

At approximately 12:40 p. m. on Friday, 1-17-92, Bobby was seen sitting in the basement beside the #2 elevator with his coat lying on a box beside him. I don't know how long Bobby had been sitting there but when I talked to him about this Bobby stated that he had just got there and sat down on the box.

Bobby said he was going to the penthouse to do something but he had no tools with him.

Bobby got on the elevator and realized that it was near his scheduled break time, went to the Card Room, got off the elevator and walked down the stairs back to the Shop to take his break.

This is not a proper way for a person to conduct himself and keep his job in top condition as required.

**ACTION TAKEN**

Discussed incident with Bobby and placed notice in employees file.

WPH
000524

**DISTRIBUTION**

[ ] COST DEPT
[ ] DEPT. FILES
[ ] INDUSTRIAL RELATIONS
[ ] OFFICE MANAGER
[ ] PAYROLL DEPT.
[ ] PERSONNEL DEPT.

[ ] VICE-PRESIDENT
[ ] MANAGER
[ ] ASST. MANAGER
[ ] OVERSEER
[ ] PRODUCTION DEPT.
[ ] SUPPLY ROOM
[ ]

RECOMMENDED BY
HAROLD O' NEAL
DEPARTMENT HEAD
PERRY HENDERSON
OTHER

SIGNATURE                    DATE

WP-1157-CS

00415

## PERSONNEL NOTICE

**WestPoint Pepperell**

[X] INITIATED BY COMPANY          [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | | | |
|---|---|---|---|
| Bobby Sanks | | EMPLOYEE NUMBER 32045 | TYPE OF NOTICE |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| | 4-23-93 |

**EFFECTIVE DATE OF CHANGE**

**TYPE OF NOTICE**

7
- 1 - EMPLOYEE PROBLEM
- 2 - EMPLOYEE COMPLAINT
- 3 - NOTICE OF CHANGE
- 4 - REQUEST FOR CHANGE
- 5 - EMPLOYEE REQUEST
- 6 - COMMENDATION
- 7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Taking to long to repair Hoist

**DETAILS**

On 4-23-93 Bobby started working in the Cloth Room on a hoist at 1:00 p. m.  Bobby could not find the problem so he changed out the control cable and the cable from the contactor.  Bobby still couldn't get the hoist fixed so he called me around 6:00 p.m. that afternoon and said that the hoist had a bad transformer in it and wanted to know if we had one.  I told Bobby to see if there was one in the new hoist in the basement and if there was not one to put up another hoist.

Bobby put up another hoist and it took him until 12:00 o'clock that night to get the hoist running.  When I asked why it took so long Bobby told me that he had to disassemble the old hoist and change trolley on the other hoist.  This is entirely to long.

**WPH 000512**

**ACTION TAKEN**

Talked with Bobby about this and told him that this was just entirely to long and was not acceptable.

MAY 4 1993

| DISTRIBUTION | | |
|---|---|---|
| [ ] COST DEPT | [ ] VICE-PRESIDENT | RECOMMENDED BY |
| [ ] DEPT. FILES | [ ] MANAGER | HAROLD O' NEAL |
| [ ] INDUSTRIAL RELATIONS | [ ] ASST. MANAGER | DEPARTMENT HEAD |
| [ ] OFFICE MANAGER | [ ] OVERSEER | PERRY G. HENDERSON |
| [ ] PAYROLL DEPT. | [ ] PRODUCTION DEPT. | OTHER |
| [ ] PERSONNEL DEPT. | [ ] SUPPLY ROOM | |
| | | SIGNATURE          DATE |

PERSONNEL NOTICE

**WestPoint Pepperell**

[X] INITIATED BY COMPANY       [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | | | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|---|---|
| Bobby Sanks | | | 32045 | |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mill | Mechanical(11) | First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Harold O' Neal | 12-20-93 |

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

# ATTENDANCE NOTICE

DETAILS

I understand effective January 1, 1994, under WestPoint Stevens attendance policy, six (6) full or six (6) partial periods of absence within a six (6) month period will result in disciplinary action. As of ~~January 1, 1994~~ Dec 05 - 1993, I have accumulated _4_ excused partial periods and/or _0_ excused full periods. I also understand that if I should accumulate _6_ excused partial periods by _1-31-94_ (date) and/or _6_ excused full day periods by _1-31-94_ (date), disciplinary action shall be taken.

WPH
000508

ACTION TAKEN

Sign _Bobby L Sanks_

Date _12/20/93_

DISTRIBUTION

[ ] COST DEPT
[ ] DEPT. FILES
[ ] INDUSTRIAL RELATIONS
[ ] OFFICE MANAGER
[ ] PAYROLL DEPT.
[ ] PERSONNEL DEPT.

[ ] VICE-PRESIDENT
[ ] MANAGER
[ ] ASST. MANAGER
[ ] OVERSEER
[ ] PRODUCTION DEPT.
[ ] SUPPLY ROOM

WP-1187-CS

| RECOMMENDED BY | |
|---|---|
| HAROLD O' NEAL | |
| DEPARTMENT HEAD | |
| PERRY G. HENDERSON | |
| OTHER | DEC 27 1993 |

SIGNATURE                    DATE

# WEST POINT STEVENS

[X] COUNSELING REPORT     [ ] WARNING REPORT*     [ ] FIRST     [ ] SECOND     [ ] THIRD

*THIS IS THE

WARNING WITHIN 12 MONTHS
OF THIS DATE . . . . . . . .

| EMPLOYEE<br>Bobby Sanks | | | | COUNSELING DATE<br>04–11–95 |
|---|---|---|---|---|
| FACILITY<br>041 Opelika Mill | DEPARTMENT<br>Mechanical (11) | ROOM | SHIFT<br>First | WARNING DATE < . . . . . |
| SUPERVISOR<br>Harold O' Neal | | SUPERVISOR WITNESSING WARNING | | |

SITUATION IN BRIEF

Failure to Carry Out Job Duties Properly

DETAILS

On 4–9–95 Rodney Mathis wrote a work order on a hoist in the Cloth Room, the one that doff's the cloth off of the Shearing machine. This work order was written at 1:40 p.m. and it got to the Shop at 1:45 p.m., "leaking oil bad, can't doff shearer. Bobby checked the hoist about 2:45 p.m. He was blowing down #1 Elevator. Bobby told the operator not to use the hoist that it would damage it, that it didn't have any oil in it and he didn't have another hoist to replace it with.

Bobby came to the Shop and told me that he had to leave at 3:00, that he just could not stay over. Bobby did not say anything about the hoist being damaged and had a bad oil leak in it. They had a big blue buggy under the hoist to catch the oil. I told Bobby to go ahead that Lawrence would fix the hoist not knowing that the hoist was busted. About 3 or 4 minutes after 3:00 p.m., I met Rodney Mathis in back of the Slasher Room and Rodney asked me if we was going to be able to get them a hoist to doff off the Shearer, so that's when I found out that the hoist was busted and had no oil in it.

Rodney, Lawrence and myself went to the Cloth Room to see about the hoist, there was a big blue buggy under it and you could see a hole in the hoist. This was a concern to me knowing that Bobby had left the hoist in that condition and telling one of the operators not to use it because it didn't have any oil in it and he didn't have one to replace it with.          (Continued)

ACTION TAKEN

Counseled with Bobby. Disciplinary and discharge procedures were explained.

RECEIVED
APR 18 1995

| SUPERVISOR<br>Harold O' Neal | _(signature)_ 4-13-95 | SUPERVISOR WITNESSING WARNING<br>_(signature)_ |
|---|---|---|
| DEPARTMENT MANAGER<br>Perry G. Henderson | _(signature)_ | EMPLOYEE<br>_(signature)_ Bobby Sanks 4/1/95 |

4-14-95

SIGNATURES

WF–1097–CS–REV.10/89

250939

01189

Bobby denied that he had said anything to the Operator so I got back with Rodney and Rodney got back with the Operator. The Operator stated that Bobby said not to use the hoist that it would ruin it because it didn't have any oil in it.

I got Lawrence to patch the hoist so it could be used until Monday, 4—10—95. I had Bobby and David Thomas to get the 2 ton hoist out of the basement and take it to the Cloth Room where we could change the hoist out. They started taking back end cover off of 2 ton hoist and water started running out of it. Bobby had the 2 ton hoist sitting on the floor of the Hoist room instead of on a shelf where it was supposed to be.

After checking the Hoist room I noticed that a couple of hoists had parts missing off of them. '#34 and #23 which was listed on the Hoist Inspection as being okay.

Bobby was told on 4—10—95 to put the parts back on these hoists so they would be ready if needed to be put in use. These hoists have not been touched as of 10:00 a.m. 4—11—95. I did not write a work order. I just told Bobby when I was talking to him on 4—10—95.

WPH
000496

DEPT. NO. ____

WORK REQUESTED:

SECT. NO. ____

MACH. NO. ____

Hoist # CLR 862 Cab oil Leak

TIME 1:40

Con't lift Sheave!

REQUESTED BY: Rodney Williams

DATE: 4/9/95

Cloth Room

WORK PERFORMED:

Case is broken
but hoist is not fixed LLL
repaired leak
4-9-95

COMPLETED BY:

WORK ORDER NUMBER
N⁰ 2326

DATE: ____

| | MEN | SHIFT | ACTUAL HOURS |
|---|---|---|---|
| OUT | | | |
| IN | | | |
| OUT | | | |
| IN | | | |
| OUT | | | |
| IN | | | |
| OUT | | | |
| IN | | | |
| OUT | | | |
| IN | | | |
| OUT | | | |
| IN | | | |
| OUT | | | |
| IN | | | |

21006

WPH
000497

# PERSONNEL NOTICE    *WestPoint Stevens*

[X] INITIATED BY COMPANY    [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | | 1. EMPLOYEE PROBLEM |
| FACILITY    DEPARTMENT    ROOM    SHIFT | | 7 | 2. EMPLOYEE COMPLAINT |
| 041 Opelika Mill    Mechanical (11)    First | | | 3. NOTICE OF CHANGE |
| SUPERVISOR    NOTICE DATE | | | 4. REQUEST FOR CHANGE |
| Harold O' Neal    06—09—95 | | | 5. EMPLOYEE REQUEST |
| EFFECTIVE DATE OF CHANGE | | | 6. COMMENDATION |
| | | | 7. MISCELLANEOUS NOTICE |

SITUATION IN BRIEF

Abuse of Break Schedule and Telephone Usage

DETAILS

On 5—30—95 I discussed with Bobby concerning abuse of break schedule and telephone usage.  I explained to Bobby the break schedule for the 1st Shift Shop employees.

| 1st Break: | 8:45 a.m. to 9:00 a.m. |
|---|---|
| Lunch: | 10:45 a.m. to 11:15 a.m. |
| 2nd Break: | 12:45 p.m. to 1:00 p.m. |
| Shop Cleanup: | 2:40 p.m. |

I explained to Bobby also that he should limit his telephone calls to 2 a day and 3 minutes a time so everyone may have access to the telephone.

RECEIVED JUN 1 2 1995

ACTION TAKEN

Placed notice in employee's file.

| DISTRIBUTION | | | | RECOMMENDED BY |
|---|---|---|---|---|
| [ ] COST DEPT | | [ ] VICE—PRESIDENT | | Harold O' Neal    *Harold O'Neal* |
| [ ] DEPT. FILES | | [ ] MANAGER | | DEPARTMENT HEAD |
| [ ] INDUSTRIAL RELATIONS | | [ ] ASST.MANAGER | | PERRY G. HENDERSON    *Perry G. Henderson* |
| [ ] OFFICE MANAGER | | [ ] OVERSEER | | OTHER |
| [ ] PAYROLL DEPT. | | [ ] PRODUCTION DEPT. | | |
| [ ] PERSONNEL DEPT. | | [ ] SUPPLY ROOM | | SIGNATURE    DATE |

WP—1157—CS

WPH
000494

00415

## PERSONNEL NOTICE          *WestPoint Stevens*

[ X ] INITIATED BY COMPANY          [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE<br>Bobby Sanks | EMPLOYEE NUMBER<br>32045 | | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY          DEPARTMENT          ROOM          SHIFT<br>041 Opelika Mill          Mechanical (11)          First | | 1 | 1. EMPLOYEE PROBLEM<br>2. EMPLOYEE COMPLAINT<br>3. NOTICE OF CHANGE |
| SUPERVISOR<br>Harold O' Neal | NOTICE DATE<br>11−04−95 | | 4. REQUEST FOR CHANGE<br>5. EMPLOYEE REQUEST |
| EFFECTIVE DATE OF CHANGE | | | 6. COMMENDATION<br>7. MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

Poor Job Performance

**DETAILS**

I talked with Bobby about Hoist ECL−36 in the Cloth Room. An order had been written to the Shop stating the hoist was leaking oil. (Bobby was taking a vacation day.) I got one of the electricians and we looked at the hoist and found that it had been patched before and painted over. Also, the hoist controls and small junction box was in bad shape. The hoist would work sometimes and sometimes it wouldn't. We started looking at the control and wiring.

A work order was written on this hoist on 10−16−95 for the repair of the oil leak and to change out the small junction box.

The hoist control cable and junction box was changed out that day, 10−27−95 and the oil leak was repaired.

**ACTION TAKEN**

I talked to Bobby about this and he was told that this was not what was expected of him. Also he was reminded of how important his job was and that under the right circumstances someone could have gotten hurt.

**DISTRIBUTION**

| | | | | |
|---|---|---|---|---|
| [ ] COST DEPT | | [ ] VICE−PRESIDENT | RECOMMENDED BY | |
| [✓] DEPT. FILES | | [ ] MANAGER | HAROLD O' NEAL | *Harold O'Neal* |
| [ ] INDUSTRIAL RELATIONS | | [ ] ASST. MANAGER | DEPARTMENT HEAD | *Jerry G. Henderson* |
| [ ] OFFICE MANAGER | | [ ] OVERSEER | PERRY G. HENDERSON | |
| [ ] PAYROLL DEPT. | | [ ] PRODUCTION DEPT. | OTHER | |
| [✓] PERSONNEL DEPT. | | [ ] SUPPLY ROOM | SIGNATURE          DATE | |

WP−1157−CS

RECEIVED NOV 1 3 1995

00415

WPH
000490

## PERSONNEL NOTICE     *WestPoint Stevens*

| [ X ] INITIATED BY COMPANY | [ ] AT REQUEST OF EMPLOYEE |

| EMPLOYEE Bobby Sanks | EMPLOYEE NUMBER 32045 | | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY     DEPARTMENT     ROOM     SHIFT 041 Opelika Mill     Mechanical (11)     First | | 7 | 1. EMPLOYEE PROBLEM 2. EMPLOYEE COMPLAINT |
| SUPERVISOR Harold O' Neal | NOTICE DATE 02−09−96 | | 3. NOTICE OF CHANGE 4. REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE | | | 5. EMPLOYER REQUEST 6. COMMENDATION 7. MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

Confined Space Entry Permit

**DETAILS**

On 2−8−96, Bobby entered # 1 Elevator pit without a permit and without another person assisting him.

Bobby knows better than this and he admitted that he was wrong and would not do it again.

RECEIVED FEB 19 1996

**ACTION TAKEN**

Talked to Bobby about this and Bobby understands not to enter a confined space without a permit and assistance.

A copy to be placed in Bobby's file.

| DISTRIBUTION | | | RECOMMENDED BY |
|---|---|---|---|
| [ ] COST DEPT | [ ] VICE−PRESIDENT | | HAROLD O'NEAL     *Harold O'Neal* |
| [ ] DEPT. FILES | [ ] MANAGER | | DEPARTMENT HEAD |
| [ ] INDUSTRIAL RELATIONS | [ ] ASST. MANAGER | | PERRY G. HENDERSON     *Perry G. Henderson* |
| [ ] OFFICE MANAGER | [ ] OVERSEER | | OTHER |
| [ ] PAYROLL DEPT. | [ ] PRODUCTION DEPT. | | SIGNATURE                    DATE |
| [ ] PERSONNEL DEPT. | [ ] SUPPLY ROOM | | |

WP−1157−CS

00415

**WPH 000483**

# WEST POINT STEVENS

| [ X ] COUNSELING REPORT | [ ] WARNING REPORT* | [ ] FIRST | [ ] SECOND | [ ] THIRD |

**\*THIS IS THE**

**WARNING WITHIN 12 MONTHS OF THIS DATE** . . . . . . . . . .

| EMPLOYEE | | | | COUNSELING DATE |
|---|---|---|---|---|
| Bobby Sanks | | | | 11-19-97 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE  < . . . . . |
|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical (11) | First | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal | |

**SITUATION IN BRIEF**

Poor Job Performance

**DETAILS**

Bobby has a P. M. to check all Hoist structures in the Plant once a year on the 4th of July shutdown.  P. M. 214 states #2 Weave, inspect rail/support structure, all warp handling hoist/cloth doffing hoist, beam rack/Weave 2/Slasher.

On 11-14-97, at 11:30 p. m. the Weave Supervisor wrote a work order that chain hoist rail came down.  Lawrence Lunceford called me and I came in to investigate it.  Upon arrival I found the hoist rail next to the Size Cooking area on the South wall.  Very unsafe, we put duct lift under it to start with, then put a chain fall around it.  It was determined that the nut holding the support rod had backed off causing the rail to fall.  All of the rods are supposed to be pinned to keep this from happening.  This rail was inspected on 7-6-97, that it was o.k. and the P. M. card was signed off.

We had a crew to inspect the rest of the rods on that system and everything was o.k.  If this rail had been inspected properly back in July this would not have happened.  This one rod was never drilled or pinned as it should have been.

NOV 21 1997

**ACTION TAKEN**

Counseled with Bobby about this and told him how serious this was and that someone could have been seriously injured.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal  *Harold O'Neal* | *Dudley Spoon* |
| DEPARTMENT MANAGER  *Perry G. Henderson* | EMPLOYEE  *Bobby P. Sanks* |
| Perry G. Henderson | |

WP-1097-CS-REV.10/89

250939

SIGNATURES

01189

WPH
000473

WPH
000470

PERSONNEL NOTICE

WestPoint Pepperell

☒ INITIATED BY COMPANY        ☐ AT REQUEST OF EMPLOYEE

EMPLOYEE
Bobby Sanks

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|

EMPLOYEE NUMBER

SUPERVISOR
Dudley Gregory

EFFECTIVE DATE OF CHANGE

NOTICE DATE
12-18-97

TYPE OF NOTICE

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Lubricator found empty

DETAILS

On Wednesday, 12-17-97, two employee's of Southco Industry were in the plant to look at a problem we were having with our #2 beam conveyor. One of the men stated that the conveyor chain was dry and not properly lubricated. In checking conveyor over he found a manuelly operated lubricator which was empty and another almost empty. He pointed out that improperly lubricated chain would wear out quicker and cause problems with operation of beam conveyor.

RECEIVED
DEC 23 1997

ACTION TAKEN

I notified Harold O'Neal of problem found with oiler as he is Bobby's immediate supervisor.

DISTRIBUTION
☐ COST DEPT
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPP ROOM
☐

RECOMMENDED BY
Dudley Gregory

DEPARTMENT HEAD

OTHER

SIGNATURE                    DATE

WP-1157-CS

00415

## PERSONNEL NOTICE          *WestPoint Stevens*

| X | INITIATED BY COMPANY | | AT REQUEST OF EMPLOYEE |

| EMPLOYEE | | | | TYPE OF NOTICE |
|---|---|---|---|---|
| Bobby Sanks | | EMPLOYEE NUMBER 32045 | | 1. EMPLOYEE PROBLEM |

EMPLOYEE
Bobby Sanks          EMPLOYEE NUMBER   32045

FACILITY        DEPARTMENT        ROOM    Mech  <11)        SHIFT
041 Opelika Mill          Bldg & Maint (10)          First          7

SUPERVISOR                NOTICE DATE
Harold O' Neal            03-09-98

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE
1. EMPLOYEE PROBLEM
2. EMPLOYEE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. EMPLOYEE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

SITUATION IN BRIEF
Facial Hair under Respirator

DETAILS
          On Saturday, 3-7-98, I asked Bobby to blow out hoist disconnects on north wall
of Slasher Room as they had a build up of lint inside which is a safety problem.
          Bobby got his personal protective equipment and started to clean out boxes.
I noticed Bobby had facial hair under his respirator which is failure to comply with OSHA
and WestPoint Stevens rules.  I asked Bobby to go to the Clinic and get checked for proper
respirator fit.  The Clinic was not open due to a conference the Nurses' were attending.  I
contacted Jerry Dumas in the Card Room and had him give his opinion on Bobby's fit.
Bobby put the dust mask on and stated he had a good seal.  After Bobby left the office
Jerry expressed to me that Bobby was not in compliance with our dust mask rules.

RECEIVED
APR 13 1998

ACTION TAKEN
          Since the Clinic was closed and we could not get a Nurses opinion I placed
personnel notice in employee's file.
          Disciplinary and discharge procedures were explained to Bobby.

DISTRIBUTION

| | | | | |
|---|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT | RECOMMENDED BY |
| | DEPT. FILES | | MANAGER | DUDLEY C. GREGORY |
| | INDUSTRIAL RELATIONS | | ASST.MANAGER | DEPARTMENT HEAD |
| | OFFICE MANAGER | | OVERSEER | PERRY G. HENDERSON |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | OTHER |
| | PERSONNEL DEPT. | | SUPPLY ROOM | SIGNATURE          DATE |

WP-1157-CS

00415

# PERSONNEL NOTICE     *WestPoint Stevens*

| X | INITIATED BY COMPANY | | AT REQUEST OF EMPLOYEE |
|---|---|---|---|

| EMPLOYEE<br>Bobby Sanks | EMPLOYEE NUMBER<br>32045 | | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY     DEPARTMENT     ROOM     SHIFT<br>041 Opelika Mill     Mechanical (11)     First | | 1 | 1. EMPLOYEE PROBLEM |
| SUPERVISOR<br>Harold O' Neal | NOTICE DATE<br>03-26-98 | | 2. EMPLOYEE COMPLAINT |
| EFFECTIVE DATE OF CHANGE | | | 3. NOTICE OF CHANGE |

TYPE OF NOTICE
1. EMPLOYEE PROBLEM
2. EMPLOYEE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. EMPLOYEE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Taking Job for Granted

**DETAILS**

On a preliminary inspection it was found that a hoist in the lower end of Weave #1 did not have a load limit on it. It was brought to my attention on the 23rd of March and Ken Henderson wrote a work order on the 25th of March at 3 p.m.

I told Bobby about this on the 23rd of March and it was taken care of on the 24th.

I talked to Bobby about this and he told me that he had stenciled every track in the plant and he did not know how it had got off the track. I asked him how long it had been off the track and he did not know. I also asked Bobby if he didn't have a p.m. to check the hoist track for proper labeling and he said that he did and he had just took it for granted that it was still on there. (Probably painted over during July 4, 1997.)

**ACTION TAKEN**

I told Bobby that from now on to make sure that he checked his hoist track for proper marking each time he did his hoist inspection and he said that he would.

**DISTRIBUTION**

| | | | | |
|---|---|---|---|---|
| | COST DEPT. | | VICE-PRESIDENT | |
| | DEPT. FILES | | MANAGER | |
| | INDUSTRIAL RELATIONS | | ASST. MANAGER | |
| | OFFICE MANAGER | | OVERSEER | |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | |
| | PERSONNEL DEPT. | | SUPPLY ROOM | |

RECOMMENDED BY
HAROLD O' NEAL
DEPARTMENT HEAD
PERRY G. HENDERSON
OTHER

SIGNATURE          DATE

APR 8 1998

WP-1157-CS

## PERSONNEL NOTICE        *WestPoint Stevens*

[X] INITIATED BY COMPANY        [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | | 1. EMPLOYEE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 1 | 2. EMPLOYEE COMPLAINT |
|---|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical (11) | First | | 3. NOTICE OF CHANGE |

| SUPERVISOR | NOTICE DATE | 4. REQUEST FOR CHANGE |
|---|---|---|
| Harold O' Neal | 05-22-98 | 5. EMPLOYEE REQUEST |

| EFFECTIVE DATE OF CHANGE | 6. COMMENDATION |
|---|---|
| | 7. MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

Hoist Inspections

**DETAILS**

On 3-17-98, Hoist HCL 3, 4 and 6 were taken off the Hoist Inspection list.  Bobby did a hoist inspection on 3-18-98 and stated that HCL 3, 4 and 6 were no longer in service and discontinued.

Bobby did a hoist inspection on 4-14-98, stating that hoist HCL 3, 4 and 6 were all in good shape.

Brenda does a hoist inspection checklist and turns it into the Department Head for his review. There were questions about hoist being in different places but these were quickly resolved because of the hoist being portable.

Also on the hoist inspection checklist were hoist HCL 3 and HCL6 written down with a circle around them.  Perry asked me to find out what was going on.  Upon talking to Brenda I found that Bobby had done a hoist inspection on hoist HCL 3, 4 and 6 in the month of April and all were in good shape.  Bobby had done his hoist inspections on 4-14-98.

I talked to Bobby about this on 4-30-98 and he told me that he didn't know how this could have happened.  I told Bobby that I could not accept this and we went into the Department Heads office.  Bobby told Perry that he could not understand how this could have happened.

On Friday, 5-1-98 Bobby wanted to talk to Perry about this again so we went back to Perry's office.  Bobby told Perry that he still didn't understand how this had happened.  He stated that the only explanation was that he had already had some forms made out and that they had gotten in with the other forms.          (See attachments)

**ACTION TAKEN**

**DISTRIBUTION**

| | | | | RECOMMENDED BY |
|---|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT | HAROLD O' NEAL |
| | DEPT. FILES | | MANAGER | DEPARTMENT HEAD |
| | INDUSTRIAL RELATIONS | | ASST.MANAGER | PERRY G. HENDERSON |
| | OFFICE MANAGER | | OVERSEER | OTHER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | |
| | PERSONNEL DEPT. | | SUPPLY ROOM | SIGNATURE          DATE |

WP-1157-CS

00415

*WestPoint Stevens*
*Opelika Mill*

*Hoist Inspection*

**DATE:**   4-30-98

**FOR MONTH OF:**   April           INSPECTOR:   BOBBY SANKS

| HOIST # | LOCATION | INSP. | COMMENTS |
|---------|----------|-------|----------|
| BC-1 | SPIN 1 | ✓ | |
| BC-2 | SPIN 1 | ✓ | |
| DL-1 | BASEMENT - SHOP | ✓ | |
| DL-2 | BASEMENT - SHOP | ✓ | |
| EC-8 | WEAVE 2 | ✓ | |
| EC-9 | WEAVE 2 | ✓ | |
| EC-10 | WEAVE 2 | ✓ | |
| ECL 5 | HOIST ROOM | ✓ | |
| ECL-6 | HOIST ROOM | ✓ | |
| ECL-7 | WINDER ROOM | ✓ | |
| ECL-8 | HOIST ROOM | ✓ | |
| ECL-9 | CLOTH ROOM | ✓ | |
| ECL-10 | CLOTH ROOM | ✓ | |
| ECL-11 | HOIST ROOM | ✓ | |
| ECL-12 | HOIST ROOM | ✓ | |
| ECL-13 | HOIST ROOM | ✓ | |
| ECL-14 | HOIST ROOM | ✓ | |
| ECL-15 | WEAVE 2 | ✓ | |
| ECL-16 | HOIST ROOM | ✓ | |
| ECL-17 | SLASHER ROOM | ✓ | |
| ECL-18 | SLASHER ROOM | ✓ | |
| ECL-19 | WINDER ROOM | ✓ | |
| ECL-20 | CLOTH ROOM | ✓ | |
| ECL-21 | HOIST ROOM | ✓ | |
| ECL-22 | SLASHER ROOM | ✓ | |
| ECL-23 | WEAVE 1 | ✓ | |
| ECL-24 | HOIST ROOM | ✓ | |
| ECL-25 | SLASHER ROOM | ✓ | |
| ECL-26 | SLASHER ROOM | ✓ | |
| ECL-27 | HOIST ROOM | ✓ | |
| ECL-28 | SLASHER ROOM   *Hoist Rm* | ✓ | *Was Slasher Room last month?* |
| ECL-29 | HOIST ROOM | ✓ | |
| ECL-30 | WAREHOUSE 6-3 | ✓ | |
| ECL-31 | SHOP | ✓ | |
| ECL-32 | SLASHER ROOM | ✓ | |
| ECL-33 | SLASHER ROOM | ✓ | |
| ECL-34 | HOIST ROOM | ✓ | |
| ECL-35 | BATTERY ROOM | ✓ | |

PAGE 2

| HOIST # | LOCATION | INSP. | COMMENTS |
|---------|----------|-------|----------|
| ECL-36 | CLOTH ROOM | ✓ | |
| ECL-37 | SPIN 1 | ✓ | |
| ECL-38 | WASTE HOUSE | ✓ | |
| EPL-1 | CLOTH ROOM | ✓ | |
| EPL-2 | CLOTH ROOM | ✓ | |
| HCL-1 | A/C ROOM | ✓ | |
| HCL-2 | HOIST ROOM | ✓ | HCL-3  Hoist Room ✓ |
| HCL-5 | CARD ROOM | ✓ | HCL-6  Hoist Room ✓ |
| HCL-7 | WEAVE 2 BASEMENT | ✓ | |
| HCL-8 | CARPENTER SHOP | ✓ | |
| HCL-9 | SHOP | ✓ | |
| HCL 10 | CLOTH ROOM | ✓ | |
| HCL-18 | CARD ROOM | ✓ | |
| HCL-21 | HOIST ROOM | ✓ | |
| HCL-22 | COMPRESSOR ROOM | ✓ | |
| HCL-23 | COMPRESSOR ROOM | ✓ | |
| HCL-24 | HOIST ROOM | ✓ | |
| HCL-25 | CARD ROOM | ✓ | |
| HCL-26 | CARD ROOM | ✓ | |
| HCL-29 | HOIST ROOM | ✓ | |
| HCL-30 | HOIST ROOM | ✓ | |
| HCR-1 | DRAW-IN/CLOTH ROOM | ✓ | |
| MHL-1 | WEAVE 1 | ✓ | |
| MHL-2 | ~~WEAVE 2~~  WV #1 | ✓ | WAS  Weave #2 last month per insp.? |
| MHL-3 | WEAVE 2 | ✓ | |
| MPL-1 | CLOTH ROOM | ✓ | |
| MPL-2 | CLOTH ROOM | ✓ | |
| PHL-1 | CARD ROOM | ✓ | |
| PL-1 | ~~COMPRESSOR ROOM~~  Shop | ✓ | Was compressor room last month ? |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

HOIST INSPECTION

TYPE OF HOIST *HCL* 
MANUFACTURER *Gulf* 
LOAD RATING 
SERIAL NUMBER *None*

HOIST NUMBER *3* 
DATE INSPECTED 
LOCATION *Hoist Rm*

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | | *No Longer In Service.* |
| LOAD CHAIN OR CABLE | | | | |
| MOTOR BRAKE (ADJ & WEAR) | | | | *Discont* |
| LIMIT SWITCHES | | | | |
| CONTROL CONTACTS | | | | |
| OPERATORS CONTROL | | | | |
| HOIST TROLLEY | | | | |
| HAND CHAIN | | | | |
| OIL LEAKS | | | | |
| CURRENT COLLECTORS | | | | |
| POWER LEADS | | | | |
| AIR LINES | | | | |
| LOAD HOOK BLOCK | | | | |
| LUBRICATION | | | | |
| HOIST SUPPORTS | | | | |
| UNUSUAL NOISES | | | | |
| CABLE FASTENERS | | | | |
| GUIDES | | | | |
| ELEVATOR | | | | |
| OPERATORS | | | | |

INSPECTED BY: *Bobby L Sirch* 
REPAIRED BY: _____     APPROVED BY: _____

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)      HCL (HAND HELD LINK) 
ECL (ELECTRIC CHAIN LINK)   PCR (PNEUMATIC CHAIN ROLLER)   PC (PNEUMATIC CABLE)

WPH 
000460

**HOIST INSPECTION**

| TYPE OF HOIST | *HCL* |
| MANUFACTURER | *Yate* |
| LOAD RATING | *1 Ton* |
| SERIAL NUMBER | *none* |

| HOIST NUMBER | *3-1* |
| DATE INSPECTED | *2/14/97* |
| LOCATION | *position* |

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | | *NONE* |
| LIMIT SWITCHES | | | | *NONE* |
| CONTROL CONTACTS | | | | *NONE* |
| OPERATORS CONTROL | | | | *NONE* |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | ✓ | |
| OIL LEAKS | | | ✓ | |
| CURRENT COLLECTORS | | | | *NONE* |
| POWER LEADS | | | | *NONE* |
| AIR LINES | | | | *NONE* |
| LOAD HOOK BLOCK | | | ✓ | |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | | *NONE* |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |
| LABELING/MARKING OF HOIST & RAIL SYSTEM | | | ✓ | |

INSPECTED BY: *Bradley Stark*

REPAIRED BY: _____    APPROVED BY: _____

EC (ELECTRIC CABLE)    ECR (ELECTRIC CHAIN ROLLER)    HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)    PCR (PNEUMATIC CHAIN ROLLER)    PC (PNEUMATIC CABLE)

**WPH**
**000461**

HOIST INSPECTION

TYPE OF HOIST
MANUFACTURER
LOAD RATING
SERIAL NUMBER

HOIST NUMBER
DATE INSPECTED
LOCATION

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | | *No Longer In Service.* |
| LOAD CHAIN OR CABLE | | | | |
| MOTOR BRAKE (ADJ & WEAR) | | | | |
| LIMIT SWITCHES | | | | *Discont.* |
| CONTROL CONTACTS | | | | |
| OPERATORS CONTROL | | | | |
| HOIST TROLLEY | | | | |
| HAND CHAIN | | | | |
| OIL LEAKS | | | | |
| CURRENT COLLECTORS | | | | |
| POWER LEADS | | | | |
| AIR LINES | | | | |
| LOAD HOOK BLOCK | | | | |
| LUBRICATION | | | | |
| HOIST SUPPORTS | | | | |
| UNUSUAL NOISES | | | | |
| CABLE FASTENERS | | | | |
| GUIDES | | | | |
| ELEVATOR | | | | |
| OPERATORS | | | | |

INSPECTED BY:
REPAIRED BY: _____          APPROVED BY: _____

EC (ELECTRIC CABLE)              ECR (ELECTRIC CHAIN ROLLER)
ECL (ELECTRIC CHAIN LINK)        PCR (PNEUMATIC CHAIN ROLLER)

HCL (HAND HELD LINK)
PC (PNEUMATIC CABLE)

WPH
000462

**HOIST INSPECTION**

TYPE OF HOIST *ACI*
MANUFACTURER *CM*
LOAD RATING *1 TON*
SERIAL NUMBER *NONE*

HOIST NUMBER *4*
DATE INSPECTED *4/10/04*
LOCATION *HOIST RM*

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | | NONE |
| LIMIT SWITCHES | | | | NONE |
| CONTROL CONTACTS | | | | NONE |
| OPERATORS CONTROL | | | | NONE |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | ✓ | |
| OIL LEAKS | | | ✓ | |
| CURRENT COLLECTORS | | | | NONE |
| POWER LEADS | | | | NONE |
| AIR LINES | | | | NONE |
| LOAD HOOK BLOCK | | | ✓ | |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | | NONE |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |
| LABELING/MARKING OF HOIST & RAIL SYSTEM | | | ✓ | |

INSPECTED BY: *Bobby R. Scott*
REPAIRED BY: _____    APPROVED BY: _____

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)          HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)     PCR (PNEUMATIC CHAIN ROLLER)         PC (PNEUMATIC CABLE)

**WPH**
**000463**

*HOIST INSPECTION*

TYPE OF HOIST      *HCL*
MANUFACTURER      *Acco*
LOAD RATING       *1 Ton*
SERIAL NUMBER     *None*

HOIST NUMBER      *1868*
DATE INSPECTED    *3/18/98*
LOCATION          *HOIST RM*

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | | *NO Longer In Service.* |
| LOAD CHAIN OR CABLE | | | | |
| MOTOR BRAKE (ADJ & WEAR) | | | | |
| LIMIT SWITCHES | | | | *Discont.* |
| CONTROL CONTACTS | | | | |
| OPERATORS CONTROL | | | | |
| HOIST TROLLEY | | | | |
| HAND CHAIN | | | | |
| OIL LEAKS | | | | |
| CURRENT COLLECTORS | | | | |
| POWER LEADS | | | | |
| AIR LINES | | | | |
| LOAD HOOK BLOCK | | | | |
| LUBRICATION | | | | |
| HOIST SUPPORTS | | | | |
| UNUSUAL NOISES | | | | |
| CABLE FASTENERS | | | | |
| GUIDES | | | | |
| ELEVATOR | | | | |
| OPERATORS | | | | |

INSPECTED BY: *Bobby R. Hinds*
REPAIRED BY: _____          APPROVED BY: _____

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)      HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)    PCR (PNEUMATIC CHAIN ROLLER)     PC (PNEUMATIC CABLE)

WPH
000464

**HOIST INSPECTION**

TYPE OF HOIST
MANUFACTURER
LOAD RATING
SERIAL NUMBER

HOIST NUMBER
DATE INSPECTED
LOCATION

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | | NONE |
| LIMIT SWITCHES | | | | NONE |
| CONTROL CONTACTS | | | | NONE |
| OPERATORS CONTROL | | | | NONE |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | ✓ | |
| OIL LEAKS | | | ✓ | |
| CURRENT COLLECTORS | | | | NONE |
| POWER LEADS | | | | NONE |
| AIR LINES | | | | NONE |
| LOAD HOOK BLOCK | | | ✓ | |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | | NONE |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |
| LABELING/MARKING OF HOIST & RAIL SYSTEM | | | ✓ | |

INSPECTED BY:
REPAIRED BY:                    APPROVED BY:

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)      HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)    PCR (PNEUMATIC CHAIN ROLLER)     PC (PNEUMATIC CABLE)

WPH
000465

# PERSONNEL NOTICE      *WestPoint Stevens*

[X] INITIATED BY COMPANY     [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | | 1. EMPLOYEE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 1 | 2. EMPLOYEE COMPLAINT |
|---|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical (11) | First | | 3. NOTICE OF CHANGE |

| SUPERVISOR | NOTICE DATE | 4. REQUEST FOR CHANGE |
|---|---|---|
| Harold O' Neal | 08-08-98 | 5. EMPLOYEE REQUEST |

| EFFECTIVE DATE OF CHANGE | 6. COMMENDATION |
|---|---|
| | 7. MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

Poor Job Performance

**DETAILS**

Bobby told me that one of the green tires on the bridge crane in the Slasher Room was worn on one side and that we needed a new one.

The new tire came in and I gave it to Bobby to put on. Bobby came back a while later and told me that he didn't see any way for the tire to go on the tractor motor. I asked Bobby if the new tire was the same as the old one and he said that it was. I asked him to bring the tractor motor to the Shop. After looking a minute or two, it took about 25 minutes to get the old one off and the new one back on.

Bobby has changed the tractor motor tires in the Cloth Room and he should have been able to handle this.

**ACTION TAKEN**

Placed notice in file.

RECEIVED AUG 12 1998

**DISTRIBUTION**

| | | | | | RECOMMENDED BY |
|---|---|---|---|---|---|
| | COST DEPT | | | VICE-PRESIDENT | HAROLD O' NEAL |
| X | DEPT. FILES | | X | MANAGER | DEPARTMENT HEAD |
| | INDUSTRIAL RELATIONS | | | ASST. MANAGER | PERRY G. HENDERSON |
| | OFFICE MANAGER | | | OVERSEER | OTHER |
| | PAYROLL DEPT. | | | PRODUCTION DEPT. | |
| X | PERSONNEL DEPT. | | | SUPPLY ROOM | SIGNATURE          DATE |

WP-1157-CS

00415

**WPH
000447**

# PERSONNEL NOTICE

WestPoint Pepperell

☐ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | | | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|---|---|
| *Bobby Sanks* | | | | |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| *Opelika Mill* | *Shop* | | *1* |

| SUPERVISOR | NOTICE DATE |
|---|---|
| *Perry Henderson* | *10-2-98* |

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

*7*

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

*Poor Job Performance*
*"Not Observant"*

**DETAILS**

*It was brought to Bobby attension at #3 slasher where a two ton hoist is that it had a ton & one half single tree on it. Bobby said that it shouldn't have been that way, so he took the single tree to fix it.*

RECEIVED
OCT 6 1998

**ACTION TAKEN**

*Placed in his file for future reference.*

**WPH**
**000435**

| DISTRIBUTION | | |
|---|---|---|
| ☐ COST DEPT | ☐ VICE-PRESIDENT | RECOMMENDED BY |
| ☐ DEPT. FILES | ☐ MANAGER | |
| ☐ INDUSTRIAL RELATIONS | ☐ ASST. MANAGER | DEPARTMENT HEAD |
| ☐ OFFICE MANAGER | ☐ OVERSEER | |
| ☐ PAYROLL DEPT. | ☐ PRODUCTION DEPT. | OTHER |
| ☐ PERSONNEL DEPT. | ☐ SUPPLY ROOM | |

WP-1157-CS

SIGNATURE          DATE

00415

## PERSONNEL NOTICE     WestPoint Stevens

[ X ] INITIATED BY COMPANY     [ ] AT REQUEST OF ASSOCIATE

| EMPLOYEE<br>Bobby Sanks | EMPLOYEE NUMBER<br>32045 | | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY    DEPARTMENT    ROOM    SHIFT<br>041 Opelika Mill    Mechanical (11)    First | | 1 | 1. ASSOCIATE PROBLEM<br>2. ASSOCIATE COMPLAINT<br>3. NOTICE OF CHANGE |
| SUPERVISOR<br>Dudley Gregory | NOTICE DATE<br>6-11-99 | | 4. REQUEST FOR CHANGE<br>5. ASSOCIATE REQUEST |
| EFFECTIVE DATE OF CHANGE | | | 6. COMMENDATION<br>7. MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

Wasting Time

**DETAILS**

On Friday, 6-18-99, the Shop Clerk was making copies of the June Elevator Inspections for Corporate and commented that they were so greasy that she was going to have to wash her hands when she finished.  Upon checking previous inspections the June inspection was very dirty with grease.  Also March inspection was not dated.

On 6-19-99, the Department Manager talked to Bobby about the Elevator and Hoist Inspections.  Bobby was informed that Corporate received copies of Elevator and Hoist Inspections and that the inspections were looked at by Safety Auditors and the paperwork needed to be legible and not covered in grease.  He asked Bobby to take a little extra effort to keep his paperwork neat.

**ACTION TAKEN**

Placed notice in Bobby's file.

RECEIVED JUN 22 1999

**DISTRIBUTION**

| | | | | | |
|---|---|---|---|---|---|
| | COST DEPT | | | VICE-PRESIDENT | |
| X | DEPT. FILES | | X | MANAGER | |
| | INDUSTRIAL RELATIONS | | | ASST.MANAGER | |
| | OFFICE MANAGER | | | OVERSEER | |
| | PAYROLL DEPT. | | | PRODUCTION DEPT. | |
| X | PERSONNEL DEPT. | | | SUPPLY ROOM | |

RECOMMENDED BY
DUDLEY GREGORY *(signature)*

DEPARTMENT HEAD
PERRY G. HENDERSON *(signature)*

OTHER

SIGNATURE     DATE

WP-1157-CS

00415

## PERSONNEL NOTICE        WestPoint Stevens

[ X ] INITIATED BY COMPANY        [ ] AT REQUEST OF ASSOCIATE

| EMPLOYEE Bobby Sanks | EMPLOYEE NUMBER 32045 | | | TYPE OF NOTICE |
|---|---|---|---|---|
| FACILITY 041 Opelika Mill | DEPARTMENT Mechanical (11) | ROOM | SHIFT First | 7 |

TYPE OF NOTICE
1. ASSOCIATE PROBLEM
2. ASSOCIATE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. ASSOCIATE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

| SUPERVISOR Dudley Gregory | NOTICE DATE 07-29-99 |
|---|---|
| EFFECTIVE DATE OF CHANGE | |

**SITUATION IN BRIEF**

Singletree Wear

**DETAILS**

An Associate mentioned to me on 6-11-99 that the hoist eye on the singletree in Cloth Room had excess wear, but not hazardous.  Upon inspection by the Department Manager and myself it was agreed that the singletree was worn and in need of repair.  The welder repaired the eye and put the hoist back in service.

Bobby is responsible for inspection and P. M. work on the singletrees used for lifting through-out the plant and this was not reported as a discrepancy on his inspection report dated 6-11-99.

RECEIVED
AUG - 6 1999

**ACTION TAKEN**

Talked to Bobby about this situation.  Showed Bobby pictures of how the singletree was worn so he would know what to look for in the future.  Bobby was informed not to let eyes of a singletree get so worn in the future.  Informed Bobby to bring any worn singletree to the Supervisor's attention or bring it to the Shop to repair.

**DISTRIBUTION**

| | | | | |
|---|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT | RECOMMENDED BY DUDLEY GREGORY |
| X | DEPT. FILES | X | MANAGER | DEPARTMENT HEAD |
| | INDUSTRIAL RELATIONS | | ASST.MANAGER | PERRY G. HENDERSON |
| | OFFICE MANAGER | | OVERSEER | OTHER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | |
| X | PERSONNEL DEPT. | | SUPPLY ROOM | SIGNATURE          DATE |

WP-1157-CS

00415







WORN



WORN



CORRECT



WORN

**WPH**
**000429**

WPII
000374

**PERSONNEL NOTICE**

**West Point Pepperell**

☒ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

EMPLOYEE: Bobby Sanks

EMPLOYEE NUMBER:

FACILITY          DEPARTMENT          ROOM          SHIFT: 3

SUPERVISOR: Dudley Gregory

NOTICE DATE: 10-28-02

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Hoist problems.

**DETAILS**

On Sunday, 10-27-02, Bobby put a hoist up in cloth room to get all wiring standard on our cloth room hoist. After wire up hoist Bobby found it would not raise or lower. He asked if I could send someone to help. The second shift electrician found the hoist coil wired for 460 volts instead of 230 they changed the voltage to 230 on coil. On Monday, 10-28-02, Bobby was still having problems with the hoist. Another electrician found the motor was also wired for 460 volts. Also Bobby noticed the hoist was going slower up & down than his other hoist.

Bobby has been working on hoist for several years now and should be able to troubleshoot hoist problems. He should have notice

**ACTION TAKEN**

Discussed this problem with Bobby. Informed him he is responsible for hoist and any problem with them. Placed notice in Bobby's file.

NOV - 4 2002

**DISTRIBUTION**

☐ COST DEPT
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY: Dudley Gregory

DEPARTMENT HEAD: Gregory

OTHER

SIGNATURE          DATE

WP-1157-CS

speed & voltage reading on nameplate before hoist was installed

WPH
000375

## PERSONNEL NOTICE     WestPoint Stevens

| X | INITIATED BY COMPANY | | AT REQUEST OF ASSOCIATE |
|---|---|---|---|

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | 1 | |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mil 11 | Mechanical | | 1st |

**TYPE OF NOTICE**
1. ASSOCIATE PROBLEM
2. ASSOCIATE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. ASSOCIATE REQUEST
6. COMMENDATION

| SUPERVISOR | NOTICE DATE |
|---|---|
| Dudley Gregory | 04/06/04 |

EFFECTIVE DATE OF CHANGE

**SITUATION IN BRIEF**

Unsafe Act

**DETAILS**

On Thursday, 04/01/04, Bobby was working on a hoist in the cloth room. The supervisor for that department saw Bobby walking across two rolls of cloth. He stopped Bobby and asked him not to walk across the rolls as it might damage the cloth but more important Bobby's feet might slip or roll might shift causing Bobby to fall.

On Friday, 04/02/04, I talked to Bobby about this incident. I explained to Bobby that he should not walk on or over obstacles that could cause an injury. Bobby said he could not get around cloth on the floor to work on hoist. I told Bobby if something was in his way of workin safely on hoist for him to get with me and we would look at what needed to be moved so he c get to the hoist in a safe manner.

*[stamp]* RECEIVED APR 12 2004

**ACTION TAKEN**

Placed notice in associate's file.

**DISTRIBUTION**

| | | | |
|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT |
| | DEPT. FILES | | MANAGER |
| | INDUSTRIAL RELATIONS | | ASST. MANAGER |
| | OFFICE MANAGER | | OVERSEER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. |
| | PERSONNEL DEPT. | | SUPPLY ROOM |

RECOMMENDED BY
Dudley Gregory     *[signature]*
DEPARTMENT HEAD
Perry Henderson     *[signature]*
OTHER

SIGNATURE                          DATE

157-CS

00415

WPH
000344

**PERSONNEL NOTICE**

WESTPOINT STEVENS

☒ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | | 32045 | 1 |

**TYPE OF NOTICE**
- 1 - ASSOCIATE PROBLEM
- 2 - ASSOCIATE COMPLAINT
- 3 - NOTICE OF CHANGE
- 4 - REQUEST FOR CHANGE
- 5 - ASSOCIATE REQUEST
- 6 - COMMENDATION
- 7 - MISCELLANEOUS NOTICE

| FACILITY | DEPARTMENT | SHIFT |
|---|---|---|
| Opelika Mill | Shop | |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Dudley Gregory | 5-12-04 |

EFFECTIVE DATE OF CHANGE

**SITUATION IN BRIEF**

Poor Maintenence on Hoists.

**DETAILS**

On Thursday, 5-13-04, an order came to shop on hoist ECL-29 in Slasher Room about brakes not working and making a noise. The second shift electrician was moving ECL-29 to spare rail when conductor bars arced at spur. It was determined that the end caps were not on spur as they were supposed to be. The electrician put spare hoist in service (ECL-26) until ECL-29 could be checked out further. When the slasher operators tried to set ECL 26 the up and down limit had not been set to proper distance. The second shift electrician set limits and checked hoist for proper operation.

On Friday, 5-14-04, I had 1st shift electrician put correct end caps on conductor bars to correct arcing problem. (over)

**ACTION TAKEN**

Discussed these problems with Bobby.

Placed notice in associates file.

MAY 26 2004

| DISTRIBUTION | | RECOMMENDED BY |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (if necessary) |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER |
| | ☐ SUPPLY ROOM | |

(Attach additional sheets as necessary)

I had another electrician check the problem on hoist ECL-29 brakes. He found the bolt on brake tension arm loose and arm worn. He replaced the worn brake tension arm and tighten screw and hoist worked good.

Bobby had turned in hoist inspection on both ECL-29 and ECL-26 on 4-28-04 with no problems found on hoists.

WPH
000345

# HOIST INSPECTION

| | | |
|---|---|---|
| TYPE OF HOIST | | *Italy* |
| MANUFACTURER | | *4 Ton* |
| LOAD RATING | | HOIST NUMBER |
| SERIAL NUMBER | KE-1100680 | DATE INSPECTED |
| | | LOCATION |

HOIST NUMBER: 26
DATE INSPECTED: 4-28-14
LOCATION: *Sister Rm*

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | ✓ | |
| LIMIT SWITCHES | | | ✓ | |
| CONTROL CONTACTS | | | ✓ | |
| OPERATORS CONTROL | | | ✓ | |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | | *None* |
| OIL LEAKS | | | ✓ | |
| CURRENT COLLECTORS | | | ✓ | |
| POWER LEADS | | | ✓ | |
| AIR LINES | | | | *None* |
| LOAD HOOK BLOCK | | | ✓ | |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | | *None* |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |
| LABELING/MARKING OF HOIST & RAIL SYSTEM | | | ✓ | |

INSPECTED BY: *Betty L. Sink*
REPAIRED BY: _____  APPROVED BY: _____

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)       HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)    PCR (PNEUMATIC CHAIN ROLLER)      PC (PNEUMATIC CABLE)



WPH
000347



WPH
000348

WPH
000349

DEPT. NO. 06    SECT. NO. Steel    MACH.

WORK REQUESTED: Please repair ECL #29

Dudley

I adjusted the brackets to limit chain

5-13-04

TIME 730A

REQUESTED BY: _____    DATE: 5-1-06

WORK PERFORMED: Adjusted brackes

COMPLETED BY: Floyd    DATE: 5-1-04

WORK ORDER NUMBER 65770

WPH
000350

# WESTPOINT STEVENS

☐ **COUNSELING REPORT**          ☒ **WARNING REPORT***

*THIS IS THE
☒FIRST ☐SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE | ASSOCIATE NUMBER | COUNSELING DATE |
|---|---|---|
| Bobby Sanks | 32045 | 4-29-04 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| Opelika Mill Shop | | | 1st | 5-25-04 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | Dudley Gregory |

**SITUATION IN BRIEF**

Violation of Safe Work Practices
Section O-1-III-A1-h

**DETAILS**

see Attachment

MAY 27 2004

**ACTION TAKEN**

Discussed this WARNING with Bobby And
explained Discipline And Discharge
Policy to Bobby

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | |
| DEPARTMENT MANAGER | ASSOCIATE  Bobby L. Sanks |
| Jerry L. Sanderson | SIGNATURES |

CC-062503-C/WR

WPH
000351

*Attachment 1*

On Saturday 5/22/04 around 10:15 a.m. I was following-up on a hoist repair job that Bobby was performing to a bridge crane system in the slasher room. I noticed Bobby was fully involved in removing one of the tractor motors from the bridge crane system.

Bobby was working from a man-lift that he had positioned between number two slasher creel and the bridge crane. I checked to see if the power to the crane system was off and locked-out, and it was not. I called Bobby's attention to this and asked him to stop work and lock-out the disconnect for this system. I reminded Bobby that without proper lock-out it could very possibly result in a serious injury to himself.

Bobby stated he was leaving the power on so the slasher operators or cloth doffers could use the other hoists.

I told Bobby that improper lock-out was not excusable because it placed him in a dangerous position and we would take whatever actions we needed to do to allow the proper lock-out of equipment

| X | INITIATED BY COMPANY | | AT REQUEST OF ASSOCIATE |

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | 7 | 1. ASSOCIATE PROBLEM |

**EMPLOYEE** Bobby Sanks

**EMPLOYEE NUMBER** 32045    7

**TYPE OF NOTICE**

1. ASSOCIATE PROBLEM

**FACILITY** 041 Opelika Mil    **DEPARTMENT** 11 Mechanical    **ROOM**    **SHIFT** 1st

2. ASSOCIATE COMPLAINT

3. NOTICE OF CHANGE

**SUPERVISOR** Dudley Gregory    **NOTICE DATE** 08/28/04

4. REQUEST FOR CHANGE

5. ASSOCIATE REQUEST

**EFFECTIVE DATE OF CHANGE**

6. COMMENDATION

7 MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Clocking out and leaving machinery locked out and not repaired without checking with supervisor or department head

**DETAILS**

On Friday, 8/27/04, Bobby, Roy, and Rocky was working on getting #2 beam carousel running after having it down for a couple of days to be repaired.

At 3:20 p.m. I came from cloth room to check on them and there was no one working on the carousel and it was not completed. When I got to the shop to see if they were there I noticed Bobby and Roy had clocked out. Rocky said he told them that he thought I had told him we had to get carousel repaired before we left today. I had planned to work over on carousel since it had been down three days but had not gotten with Bobby or Roy.

I talked with Bobby on Saturday, 8/28/04, and asked him why he left on Friday without checking with me first. Bobby said he had to be somewhere else and could not work over on Friday. I told Bobby that the carousel was his responsibility and he should check with department manager or supervisor before leaving for the day with machine down.

NOV 2

**ACTION TAKEN**

Placed notice in associate's file.

**DISTRIBUTION**

| | | | | | RECOMMENDED BY |
|---|---|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT | | Dudley Gregory |
| | DEPT. FILES | | MANAGER | | DEPARTMENT HEAD |
| | INDUSTRIAL RELATIONS | | ASST. MANAGER | | Perry Henderson |
| | OFFICE MANAGER | | OVERSEER | | OTHER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. | | |
| | PERSONNEL DEPT. | | SUPPLY ROOM | | SIGNATURE          DATE |

157-CS

WPH
000339

00415

## PERSONNEL NOTICE         WestPoint Stevens

| [X] INITIATED BY COMPANY | [ ] AT REQUEST OF ASSOCIATE |
|---|---|

| EMPLOYEE | EMPLOYEE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|
| Bobby Sanks | 32045 | 7 | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | |
|---|---|---|---|---|
| 041 Opelika Mill | Shop | | 1st | 2. ASSOCIATE COMPLAINT |
| | | | | 3. NOTICE OF CHANGE |

| SUPERVISOR | NOTICE DATE | |
|---|---|---|
| Dudley Gregory | 12/23/04 | 4. REQUEST FOR CHANGE |
| | | 5. ASSOCIATE REQUEST |

EFFECTIVE DATE OF CHANGE          6. COMMENDATION

7 MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Poor Work Performance

JAN 1 7

**DETAILS**

On Thursday, 12-23-04, Bobby went to change a trolley motor on Hoist ECL-8 in the cloth room. Bobby started working on this job before his lunch break at 10:45 a.m.

At 3:00 p.m., I was checking time cards to be sure all of the first shift had left for the Christmas holidays when I noticed Bobby had not clocked out. I sent a second shift electrician to check the cloth room to see if Bobby was still working on the hoist at the shearer. When the electrician did not come back, I went to the cloth room at 4:00 p.m. to see what the problem was with the hoist.

When I got to the cloth room Bobby was trying to get the trolleys for the hoist to work together. Bobby said the trolley motor was binding and he was sliding coupling away from the gearbox. The gearbox was not binding but was not engaged causing the hoist to bind as one side was pulling and the side Bobby had changed the motor on was not. After taking some rough measurements the coupling was not making up on gearbox so that it would turn, I had Bobby adjust it in and the gearbox started pulling correctly.

I noticed the other side did not stop like the side Bobby had worked on, so I asked Bobby to check the brakes on that trolley motor. Bobby stated the wheel needed adjusting so that it would touch the track better. I told Bobby that the wheel was ok but the hoist was causing the bridge to rock back and forth because the brake was not holding. Bobby tighten up on the brake a small amount and everything was right .

Bobby should have measured to be sure he had coupling the right distance so gearbox would work correctly. Bobby took over six hours to change a motor on trolley, which should have taken only two hours at the most.

**ACTION TAKEN**

This is an example of poor work performance as Bobby has been working on hoists for many years now. He should be able to know when a motor is not pulling  or stopping correctly. Bobby should have away to measure whether a coupling is positioned right or not.

Placed notice in associate's file.

| DISTRIBUTION | | | | | |
|---|---|---|---|---|---|
| [ ] | COST DEPT | [ ] | VICE-PRESIDENT | RECOMMENDED BY | |
| [ ] | DEPT. FILES | [ ] | MANAGER | Dudley Gregory | _Dudley Gregory_ |
| [ ] | INDUSTRIAL RELATIONS | [ ] | ASST.MANAGER | DEPARTMENT HEAD | |
| [ ] | OFFICE MANAGER | [ ] | OVERSEER | Perry Henderson | _Perry Henderson_ |
| [ ] | PAYROLL DEPT. | [ ] | PRODUCTION DEPT. | OTHER | |
| [ ] | PERSONNEL DEPT. | [ ] | SUPPLY ROOM | SIGNATURE          DATE | |

.157-CS

00415

WPH
000327

## PERSONNEL NOTICE          WestPoint Stevens

| [x] INITIATED BY COMPANY | | [ ] AT REQUEST OF ASSOCIATE | | |
|---|---|---|---|---|

| EMPLOYEE Bobby Sanks | | EMPLOYEE NUMBER 32045 | | TYPE OF NOTICE |
|---|---|---|---|---|
| FACILITY 041 Opelika Mill | DEPARTMENT Shop | ROOM | SHIFT First | 1. ASSOCIATE PROBLEM |

**TYPE OF NOTICE**
1. ASSOCIATE PROBLEM
2. ASSOCIATE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. ASSOCIATE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

| SUPERVISOR Dudley Gregory | NOTICE DATE 3/01/05 |
|---|---|
| EFFECTIVE DATE OF CHANGE 3/1/05 | 7 |

**SITUATION IN BRIEF**

employee request

**DETAILS**

I observed Bobby as he came into the shop at 6:53 a.m. this morning. Bobby went to the time clock

and punched his time card. He then approached me and asked to go back to the parking lot to check

his car's alarm system. He stated he didn't have time to get it turned off, because he had to come on in and

hit the time clock. I replied to Bobby " Okay ".

MAR    I

**ACTION TAKEN**

Placed notice in employees file.

| DISTRIBUTION | | | |
|---|---|---|---|
| [ ] COST DEPT | | [ ] VICE-PRESIDENT | |
| [ ] DEPT. FILES | | [ ] MANAGER | |
| [ ] INDUSTRIAL RELATIONS | | [ ] ASST.MANAGER | |
| [ ] OFFICE MANAGER | | [ ] OVERSEER | |
| [ ] PAYROLL DEPT. | | [ ] PRODUCTION DEPT. | |
| [ ] PERSONNEL DEPT. | | [ ] SUPPLY ROOM | |

RECOMMENDED BY
Dudley Gregory

DEPARTMENT HEAD
Perry Henderson

OTHER

SIGNATURE                DATE

.157-CS

**WPH
000325**

00415

# PERSONNEL NOTICE    WestPoint Stevens

| X | INITIATED BY COMPANY | | AT REQUEST OF ASSOCIATE |

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 Opelika Mill | Shop | | 1st |

**TYPE OF NOTICE**
1. ASSOCIATE PROBLEM
2. ASSOCIATE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. ASSOCIATE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

| SUPERVISOR | NOTICE DATE |
|---|---|
| Dudley Gregory | 3/24/05 |

EFFECTIVE DATE OF CHANGE

7

**SITUATION IN BRIEF**

hoist inspection problems

**DETAILS**

Discussed with Bobby today about signing off his P.M. cards and not completing the work. It was noticed that Bobby had signed off his P.M. card for the month of February when in fact he had not done the monthly hoist inspection. It was also discussed about the P.M. to change the load hook on the hoists, because there were several card request to do this, some dated in 2002. When asked when this was completed last Bobby could not give an answer, but he thought in 99. I checked two here in the shop and they were stamped 01-03, which is the procedure to keep a record of the hook change.

Discussed with Bobby that this was falsifying a record.

APR 5

**ACTION TAKEN**

If this or any other incident of this nature occurs, it will be considered falsification of records and disciplinary action will be taken up to and including termination.

Placed notice in employees file.

| DISTRIBUTION | | | RECOMMENDED BY |
|---|---|---|---|
| | COST DEPT | | VICE-PRESIDENT |
| | DEPT. FILES | | MANAGER |
| | INDUSTRIAL RELATIONS | | ASST. MANAGER |
| | OFFICE MANAGER | | OVERSEER |
| | PAYROLL DEPT. | | PRODUCTION DEPT. |
| | PERSONNEL DEPT. | | SUPPLY ROOM |

RECOMMENDED BY
Dudley Gregory

DEPARTMENT HEAD
Perry Henderson

OTHER

SIGNATURE          DATE

.157-CS

**WPH
000332**

00415



WPH
000333

PERSONNEL NOTICE          WestPoint Stevens

| X INITIATED BY COMPANY | AT REQUEST OF ASSOCIATE |

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 1. ASSOCIATE PROBLEM |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 2. ASSOCIATE COMPLAINT |
|---|---|---|---|---|
| 041 Opelika Mill | Shop | | 1st | 3. NOTICE OF CHANGE |

| SUPERVISOR | NOTICE DATE | 4. REQUEST FOR CHANGE |
|---|---|---|
| Dudley Gregory | 3/24/05 | 5. ASSOCIATE REQUEST |

| EFFECTIVE DATE OF CHANGE | 6. COMMENDATION |
|---|---|
| | 7   7 MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

cell phone use

**DETAILS**

Discussed with Bobby today about him being seen behind the supply room using his cell phone before break

time. Dudley and I walked out of the back of the shop, we noticed Bobby talking on his cell phone at approx.

8:43 a.m. Bobby scheduled break starts at 8:45 a.m. Bobby said that he had just got on his phone. We asked

about when he got his phone from his locker and he said he kept his phone in the hoist storage room in the

basement. Bobby was told that he is supposed to keep his phone in his personal locker or tool box. The cell

phone policy was reviewed with him.

MAR 3 0 2005

**ACTION TAKEN**

Placed notice in employees file.

| DISTRIBUTION | | RECOMMENDED BY |
|---|---|---|
| COST DEPT | VICE-PRESIDENT | Dudley Gregory |
| DEPT. FILES | MANAGER | DEPARTMENT HEAD |
| INDUSTRIAL RELATIONS | ASST.MANAGER | Perry Henderson |
| OFFICE MANAGER | OVERSEER | OTHER |
| PAYROLL DEPT. | PRODUCTION DEPT. | |
| PERSONNEL DEPT. | SUPPLY ROOM | SIGNATURE          DATE |

.157-CS

WPH
000314

00415

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 2, Part 5

# Exhibits to the Deposition of Bobby Sanks Dxs. 33-67

# Dx. 33

☐ COUNSELING REPORT         ☒ WARNING REPORT *

| EMPLOYEE | | EMPLOYEE NUMBER | COUNSELING DATE |
|---|---|---|---|
| Bobby Sanks | | 32045 | |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First | 12-18-89 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O'Neal | |

**SITUATION IN BRIEF**

Failure to perform Job Duty

**DETAILS**

A routine work order from #2 Spinning Room to check and repair a spinning frame came into the Shop at 2:45 p. m. on 12-17-89 and it was left for the second shift. Bobby looked at the work order and went to the #2 Spinning Room to see what the problem was. It was determined that the Pneumafil motor was bad.

Bobby asked the fixer to help but the fixer said he did not have time.

Bobby did not attempt to call his Supervisor and did not ask anyone else to help. Someone in the Shop could have helped Bobby because two people are scheduled on the off shifts for the reason of working together on jobs. ~~but~~

The frame stood eight hours until the third shift electrician came in, and he repaired the frame.

**ACTION TAKEN**

Counseled with Bobby concerning this. Disciplinary and discharge procedures were discussed with Bobby.

DEFENDANT'S
EXHIBIT
33
B. Sanks

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| HAROLD O' NEAL  *Harold O'Neal* | |
| DEPARTMENT HEAD | ADDITIONAL WITNESS, IF APPLICABLE |
| PERRY G. HENDERSON  *Perry G. Henderson* | |
| | SIGNATURES |

WP-1097-CS-REV. 8/82

# Dx. 34

West Point Pepperell

THIS IS THE
☐ FIRST  X☒SECOND  ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE ───┐

☐ COUNSELING REPORT          ☒ WARNING REPORT*

| EMPLOYEE | | |
|---|---|---|
| Bobby Sanks | EMPLOYEE NUMBER 32045 | COUNSELING DATE |

| FACILITY 041 Opelika Mill | DEPARTMENT Mechanical (11) | ROOM | SHIFT First | WARNING DATE 6-12-90 |

| SUPERVISOR Harold O' Neal | SUPERVISOR WITNESSING WARNING |

**SITUATION IN BRIEF**

Failure to Perform Job Duties

**DETAILS**

The sheaves on hoist in Spinning Room , Hoist EC-1, were completely worn out.  This hoist was inspected on 6-8-90 and the inspection sheet was dated 5-31-90 and no discrepancy was found.

The hoist went down Monday morning, 6-11-90 at 4:00 a. m.  The hoist stood the rest of the 3rd Shift, all of the First Shift and was started up on the 2nd Shift about 4:00 p.m.  Parts had to be made and the hoist was out of service for about 12 hours.

The hoist inspection form was reviewed and no discrepancy was noted. No discrepancy had been noted for a period of several months. inspection.

It would have taken some time for the sheaves to completely wear out.

**ACTION TAKEN**

Placed warning in Bobby's file concerning this.  Explained to Bobby the importance of the monthly inspections.  Displinary and discharge procedures were explained to Bobby.

DEFENDANT'S
EXHIBIT
34
B Sanks

| SUPERVISOR HAROLD O' NEAL | SUPERVISOR WITNESSING WARNING |
| *Harold O'neal* | |
| DEPARTMENT HEAD PERRY G. HENDERSON | ADDITIONAL WITNESS, IF APPLICABLE |
| *Perry G. Henderson* | SIGNATURES |

# Dx. 35

# WestPoint Pepperell

**FINAL NOTICE**

EMPLOYEE _Bobby Sanks_     JOB _____     DATE _6/15/90_

FACILITY _Opelika Mill_     DEPARTMENT _Shop_     ROOM _____     SHIFT _1st_

## ☐ LESS THAN INTOLERABLE OFFENSES

Your displinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| Failure to Perform Job Duty | 12/18/89 | 12/18/90 |
| Failure to Perform Job Duties | 6/12/90 | 6/12/91 |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before _12/18/90_ will result in your discharge. (2)
DATE

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| **FIRST GARNISHMENT** | | |
| **SECOND GARNISHMENT** | | |
| **THIRD GARNISHMENT** | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
DATE

EMPLOYEE SIGNATURE _Bobby Lee Sanks_     DATE _6/15/90_

IMMEDIATE SUPERVISOR _Terry Hawthorn By Ken Hawthorn_     DATE _6/15/90_

PREPARED BY _Ken Hawthorn_     DATE _6/15/90_

PERSONNEL MANAGER/DIRECTOR

ORIGINAL - PERSONNEL FILE

COPY 1 - TO EMPLOYEE

COPY 2 - DEPARTMENT FILE

(1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.
(2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.
(3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/ warning within the past 12 months.

DEFENDANT'S EXHIBIT 35 B. Sanks PENGAD 800-631-6989

WPH
000548

wP-1078-CS

# Dx. 36

# West Point Pepperell

] **COUNSELING REPORT**          ⊠ **WARNING REPORT***

*THIS IS THE
☐ FIRST  ⊠ SECOND  ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE — — — —

| EMPLOYEE | COUNSELING DATE |
|---|---|
| Bobby Sanks | |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First | 5-13-91 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal | Harold O' Neal |

**SITUATION IN BRIEF**

Failure to Perform Job Duties

**DETAILS**

It was noted that Bobby was behind on his Hoist and Elevator inspections.
He has not completed February, March and April on the Hoist inspections and the
Elevator inspections have not been done since December 1990.

I asked Bobby why his inspections were behind and he told me that there had
been a lot going on.  He also stated that he was almost positive that he had
turned in some Elevator inspections.  Bobby still had the P. M. cards in his work
slot that had not been signed off and one such card for December 1990 that had
not been signed off.

After further looking at some back inspections Bobby had failed to make
inspections on some other hoists,  On Hoist EC-1 in the Warper Room the
following inspections were missing:  September 1989, June 1990, October 1990
and December 1990,

**ACTION TAKEN**

Counseled with Bobby concerning not making his inspections.  Placed this
warning in his file.  Disciplinary and discharge procedures were explained
to Bobby.

**WPH
000541**

DEFENDANT'S EXHIBIT 34 B Sanks
(REGAL) 800-631-6989

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| HAROLD O' NEAL | HAROLD O' NEAL |
| DEPARTMENT MANAGER | EMPLOYEE |
| PERRY HENDERSON | |
| | SIGNATURES |

MAY 1 6 1991

P-1097-CS-REV. 10/89                                                01169

# Dx. 37

# West Point Pepperell

**FINAL NOTICE**

| EMPLOYEE | JOB | | DATE |
|---|---|---|---|
| BOBBY SANKS | 749 ELECTRICIAN | | 5/16/91 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| OPELIKA MILL | SHOP | | 1ST |

---

## ☑ LESS THAN INTOLERABLE OFFENSES

Your displinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| FAILURE TO PERFORM JOB DUTIES | 6/12/90 | 6/12/91 |
| FAILURE TO PERFORM JOB DUTIES | 5/13/91 | 5/13/92 |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before ___6/12/91___ will result in your discharge. (2)
   DATE

---

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| FIRST GARNISHMENT | | |
| SECOND GARNISHMENT | | |
| THIRD GARNISHMENT | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
   DATE

---

| EMPLOYEE SIGNATURE | DATE | IMMEDIATE SUPERVISOR | DATE |
|---|---|---|---|
| Bobby L. Sanks | 5/16/91 | Jerry M Henderson | 5/16/91 |
| | | PREPARED BY | DATE |
| | | Kay/Kenton | 5/16/91 |

PERSONNEL MANAGER/DIRECTOR

ORIGINAL - PERSONNEL FILE
COPY 1 - TO EMPLOYEE
COPY 2 - DEPARTMENT FILE

1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.
2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.
3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/ warning within the past 12 months.

MAY 2 0 1991

WPH
000537

MAY 1 6 1991

wP-1078-CS

DEFENDANT'S EXHIBIT 37 B. Sanks

# Dx. 38

# WestPoint Pepperell

☐ **COUNSELING REPORT**          ☒ **WARNING REPORT**•

*THIS IS THE
☐ FIRST  ☒ SECOND  ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE ‒ ‒ ‒ ‒

| EMPLOYEE | | | | | COUNSELING DATE |
|---|---|---|---|---|---|
| *Bobby Sanks* | | | | | |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| *041 Opelika Mill* | *Mechanical (11)* | | *First* | *1-08-92* |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| *Harold O' Neal* | *Harold O' Neal* |

**SITUATION IN BRIEF**

*Unsafe Act*

**DETAILS**

*On 1-08-92 at approximately 12:50 p.m. I observed Bobby working on Hoist Bridge Crane System No. One in Cloth Room. Bobby had his right arm and side against the open-type collector bars for the 240 vac power for this system. When I checked to insure that Bobby had the power switch locked-out I found the switch pulled but not locked-out as required by Shop safety rules.*

*The Lock-Out procedure has been discussed at length many times with Bobby and he has had previous counselings on this subject.*

DEFENDANT'S
EXHIBIT
38
B. Sanks

**ACTION TAKEN**

*Counseled with Bobby and told him warning was to be placed in his file for unsafe act. Disciplinary and discharge procedures were explained to Bobby.*

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| HAROLD O' NEAL  *Harold O'neal* | HAROLD O' NEAL  *Harold O'neal* |
| **DEPARTMENT MANAGER** | **EMPLOYEE** |
| PERRY G. HENDERSON  *Perry G Henderson* | *Bobby L Sanks* |
| | SIGNATURES |

FP-1097-CS-REV. 10/89

WPH
000527

01189

# Dx. 39

# WestPoint Pepperell

**FINAL NOTICE**

DEFENDANT'S
EXHIBIT
39
B. Sanks

| EMPLOYEE | | JOB | | DATE |
|---|---|---|---|---|
| *Bobby Sanks* | | 749 *Electrician* 1st | | 1/10/92 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| *Opezika Mill* | *Shop* | | 1st |

## ☑ LESS THAN INTOLERABLE OFFENSES

Your displinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| *Failure to preform job duties* | 5/13/91 | 5/13/92 |
| *Unsafe act - violation of lock out policy* | 1/8/92 | 1/8/93 |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before ___5/13/92___ will result in your discharge. (2)
__DATE__

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| FIRST GARNISHMENT | | |
| SECOND GARNISHMENT | | |
| THIRD GARNISHMENT | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
__DATE__

| EMPLOYEE SIGNATURE *Bobby Sanks* | DATE 1/10/92 | IMMEDIATE SUPERVISOR *Harold O'Neal* | DATE 1/10/92 |
|---|---|---|---|
| | | PREPARED BY *Ken Huston* | DATE 1/10/92 |
| | | PERSONNEL MANAGER/DIRECTOR | |

ORIGINAL - PERSONNEL FILE
COPY 1 - TO EMPLOYEE
COPY 2 - DEPARTMENT FILE

1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.
2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.
3) The date shown in the blank in this statement should be the anniversary date of the oldest written counselling/warning within the past 12 months.

WP-1076-CS   253217
6167WPPG

# Dx. 40

DEFENDANT'S
EXHIBIT
40
B. Sanks

# WEST POINT STEVENS

| ☐ COUNSELING REPORT | ☒ WARNING REPORT* | ☒ FIRST | **THIS IS THE** ☐ SECOND | ☐ THIRD |

**WARNING WITHIN 12 MONTHS
OF THIS DATE** . . . . . . . . ..

| EMPLOYEE | COUNSELING DATE |
|---|---|
| Bobby Sanks | 11-19-97 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE  < . . . . . |
|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical (11) | First | 12-19-97 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal | Dudley C. Gregory |

SITUATION IN BRIEF

Poor Job Performance

DETAILS

On 12-17-97, it was brought to my attention that the oiler on # 2 Beam Conveyor beside # 1 Slasher was empty.  Upon investigating it I found this to be correct.

The oiler beside # 1 Slasher was bone dry and the one on the other side had about 3/4 of an inch of oil in it.  These are manual oilers and will only oil if plunger is raised.

On November 30th inspection the lubrication was checked to be good.

Bobby has been talked to about job performance before and I find this to be poor.

ACTION TAKEN

A copy of this inspection for November is attached to this warning.
Disciplinary and discharge procedures were explained to Bobby.

| SUPERVISOR Harold O' Neal | SUPERVISOR WITNESSING WARNING |
|---|---|
| DEPARTMENT MANAGER Perry G. Henderson | EMPLOYEE |
| | SIGNATURES |

WP-1097-CS-REV.10/89

250939

01189

**WPH
000471**

## HOIST INSPECTION

TYPE OF HOIST _BCI_
MANUFACTURER _Yale_
LOAD RATING _1.5 ton_
SERIAL NUMBER _PC-40724_

HOIST NUMBER _8_
DATE INSPECTED _4-30-97_
LOCATION _Hoist rm_

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | Hook has not been change |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | ✓ | |
| LIMIT SWITCHES | | | ✓ | |
| CONTROL CONTACTS | | | ✓ | |
| OPERATORS CONTROL | | | ✓ | |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | ✓ | |
| OIL LEAKS | | | ✓ | NONE |
| CURRENT COLLECTORS | | | ✓ | |
| POWER LEADS | | | ✓ | |
| AIR LINES | | | ✓ | |
| LOAD HOOK BLOCK | | | ✓ | NONE Block has not been change |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | ✓ | |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |

INSPECTED BY: _Bobby R Slade_
REPAIRED BY: _____    APPROVED BY: _____

EC (ELECTRIC CABLE)
ECL (ELECTRIC CHAIN LINK)

ECR (ELECTRIC CHAIN ROLLER)
PCR (PNEUMATIC CHAIN ROLLER)

HCL (HAND HELD LINK)
PC (PNEUMATIC CABLE)

# Dx. 41

DEFENDANT'S
EXHIBIT
41
B. Sanks

# WEST POINT STEVENS

| [ ] COUNSELING REPORT | [X] WARNING REPORT* | [ ] FIRST | *THIS IS THE [X] SECOND | [ ] THIRD |

WARNING WITHIN 12 MONTHS
OF THIS DATE . . . . . . . . .

| EMPLOYEE | COUNSELING DATE |
|---|---|
| Bobby Sanks | 11-19-97 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE < . . . . . |
|---|---|---|---|---|
| 041 Opelika Mill | Mechanical (11) | | First | 08-06-98 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Harold O' Neal | |

SITUATION IN BRIEF

### Poor Job Performance - Hoist Inspections

DETAILS                                   Elevator Inspections

Bobby does a Hoist Inspection once a month on all hoists in the Plant and on all of our spare hoists in the basement.

Brenda does a report on what hoist inspection forms are missing, etc.

Bobby did his inspection for the month of July and on Brenda's report Bobby had done two inspections on hoist ECL-8. One was done on July 20 and the other inspection on the same hoist was done on July 21, 1998. It was also noted that Bobby did not do an inspection on hoist HCL-30. Both of these hoists are located in the basement hoist room. Bobby has been talked to about this and he should be paying more attention to what he is doing.

On Friday, July 31, 1998, it was noted by Perry Henderson during an environmental audit that the box used for opening the elevator door in case of an emergency - elevator stopped with someone on it, etc., had strapping tape wrapped around it which was very unsafe. I talked to Bobby about this and he told me that it was late on Friday evening when he put the tape on the box and he didn't have time to repair it. This box was noted by Perry Henderson about 2:00 p.m. Friday. It should have been repaired that day. It shouldn't have taken Bobby over one half hour to drill 3 or 4 holes and put some pop rivits into it or some small bolts.

                              Continued

ACTION TAKEN

Placed in Bobby's file as a warning. Disciplinary and discharge procedures were explained to Bobby.

RECEIVED
AUG - 7 1998

| SUPERVISOR HAROLD O' NEAL | *Harold O'neal* | SUPERVISOR WITNESSING WARNING | |
|---|---|---|---|
| DEPARTMENT MANAGER PERRY G. HENDERSON | *Perry G. Henderson* | EMPLOYEE | *Bobby L. Sanks* |

WP-1097-CS-REV.10/89                         SIGNATURES

250939                                                                01189

Attachment          Poor Job Performance - Hoist Inspections

It was also reported that the box had been taped for a long time and the tape had gotten old and ragged looking.  That is when it was re-taped.

After the box had been fixed with two bolts, the bolts were not braided on the inside of the box so someone not authorized could take them out.

This is very poor job performance and could have possibly caused someone to get hurt seriously.  There is no excuse for this.

Bobby has been talked to several times about how important the elevator and hoists in the plant are and should be kept in good safe working condition.

*WestPoint Stevens*
*Opelika Mill*

*Hoist Inspection*

DATE:     07-30-98

FOR MONTH OF:     July 1998          INSPECTOR:     BOBBY SANKS

| HOIST # | LOCATION | INSP. | COMMENTS |
|---------|----------|-------|----------|
| BC-1 | SPIN 1 | ✓ | |
| BC-2 | SPIN 1 | ✓ | |
| DL-1 | BASEMENT | ✓ | |
| DL-2 | BASEMENT | ✓ | |
| EC-8 | WEAVE 2 | ✓ | |
| EC-9 | WEAVE 2 | ✓ | |
| EC-10 | WEAVE 2 | ✓ | |
| ECL 5 | HOIST ROOM | ✓ | |
| ECL-6 | HOIST ROOM | ✓ | |
| ECL-7 | WINDER ROOM | ✓ | |
| ECL-8 | HOIST ROOM | ✓ | 2 Reports  ECL-8 |
| ECL-9 | CLOTH ROOM | ✓ | |
| ECL-10 | CLOTH ROOM | ✓ | |
| ECL-11 | HOIST ROOM | ✓ | |
| ECL-12 | HOIST ROOM | ✓ | |
| ECL-13 | HOIST ROOM | ✓ | |
| ECL-14 | HOIST ROOM | ✓ | |
| ECL-15 | WEAVE 2 | ✓ | |
| ECL-16 | HOIST ROOM | ✓ | |
| ECL-17 | SLASHER ROOM | ✓ | |
| ECL-18 | HOIST ROOM | ✓ | |
| ECL-19 | WINDER ROOM | ✓ | |
| ECL-20 | CLOTH ROOM | ✓ | |
| ECL-21 | HOIST ROOM | ✓ | |
| ECL-22 | SLASHER ROOM | ✓ | |
| ECL-23 | WEAVE 1 | ✓ | |
| ECL-24 | HOIST ROOM | ✓ | |
| ECL-25 | SLASHER ROOM | ✓ | |
| ECL-26 | SLASHER ROOM | ✓ | |
| ECL-27 | HOIST ROOM | ✓ | |
| ECL-28 | SLASHER ROOM | ✓ | |
| ECL-29 | HOIST ROOM | ✓ | |
| ECL-30 | WAREHOUSE 6-3 | ✓ | |
| ECL-31 | SHOP | ✓ | |
| ECL-32 | SLASHER ROOM | ✓ | |
| ECL-33 | SLASHER ROOM | ✓ | |
| ECL-34 | HOIST ROOM | ✓ | |
| ECL-35 | BATTERY ROOM | ✓ | |

PAGE 2

| HOIST # | LOCATION | INSP. | COMMENTS |
|---------|----------|-------|----------|
| ECL-36 | CLOTH ROOM | ✓ | |
| ECL-37 | SPIN 1 | ✓ | |
| ECL-38 | WASTE HOUSE | ✓ | |
| EPL-1 | CLOTH ROOM | ✓ | |
| EPL-2 | CLOTH ROOM | ✓ | |
| HCL-1 | A/C ROOM | ✓ | |
| HCL-2 | HOIST ROOM | ✓ | |
| HCL-5 | CARD ROOM | ✓ | |
| HCL-7 | WEAVE 2 BASEMENT | ✓ | |
| HCL-8 | CARPENTER SHOP | ✓ | |
| HCL-9 | SHOP | ✓ | |
| HCL 10 | CLOTH ROOM | ✓ | |
| HCL-18 | CARD ROOM | ✓ | |
| HCL-21 | HOIST ROOM | ✓ | |
| HCL-22 | COMPRESSOR ROOM | ✓ | |
| HCL-23 | COMPRESSOR ROOM | ✓ | |
| HCL-24 | HOIST ROOM | ✓ | |
| HCL-25 | CARD ROOM | ✓ | |
| HCL-26 | CARD ROOM | ✓ | |
| HCL-29 | HOIST ROOM | ✓ | |
| HCL-30 | HOIST ROOM | ✓ | NO REPORT |
| HCR-1 | DRAW-IN/CLOTH ROOM | ✓ | |
| MHL-1 | WEAVE 1 | ✓ | |
| MHL-2 | WEAVE 2 | ✓ | Weave 1 |
| MHL-3 | WEAVE 2 | ✓ | |
| MPL-1 | CLOTH ROOM | ✓ | |
| MPL-2 | CLOTH ROOM | ✓ | |
| PHL-1 | CARD ROOM | ✓ | |
| PL-1 | SHOP | ✓ | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



## HOIST INSPECTION

| | | |
|---|---|---|
| TYPE OF HOIST | *ECL* | |
| MANUFACTURER | *CMe* | |
| LOAD RATING | *1/5 Ton* | HOIST NUMBER *8* |
| SERIAL NUMBER | *KL-40624* | DATE INSPECTED *7/20/04* |
| | | LOCATION *Hoist Rm* |

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | ✓ | |
| LIMIT SWITCHES | | | ✓ | |
| CONTROL CONTACTS | | | ✓ | |
| OPERATORS CONTROL | | | ✓ | |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | *NONE* | |
| OIL LEAKS | | | | |
| CURRENT COLLECTORS | | | ✓ | |
| POWER LEADS | | | ✓ | |
| AIR LINES | | | *NONE* | |
| LOAD HOOK BLOCK | | | ✓ | |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | ✓ | |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |
| LABELING/MARKING OF HOIST & RAIL SYSTEM | | | ✓ | |

INSPECTED BY: *Bedford Steele*
REPAIRED BY: _____     APPROVED BY: _____

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)      HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)    PCR (PNEUMATIC CHAIN ROLLER)     PC (PNEUMATIC CABLE)

WPH
000455

HOIST INSPECTION

TYPE OF HOIST *ECL-*
MANUFACTURER *Yate*
LOAD RATING *1.5 ton*
SERIAL NUMBER *RL-40024*

HOIST NUMBER
DATE INSPECTED
LOCATION

| ITEM INSPECTED | CONDITION | | | COMMENTS |
|---|---|---|---|---|
| | POOR | FAIR | GOOD | |
| LOAD HOOK | | | ✓ | |
| LOAD CHAIN OR CABLE | | | ✓ | |
| MOTOR BRAKE (ADJ & WEAR) | | | ✓ | |
| LIMIT SWITCHES | | | ✓ | |
| CONTROL CONTACTS | | | ✓ | |
| OPERATORS CONTROL | | | ✓ | |
| HOIST TROLLEY | | | ✓ | |
| HAND CHAIN | | | NONE | |
| OIL LEAKS | | | ✓ | |
| CURRENT COLLECTORS | | | ✓ | |
| POWER LEADS | | | ✓ | |
| AIR LINES | | | NONE | |
| LOAD HOOK BLOCK | | | ✓ | |
| LUBRICATION | | | ✓ | |
| HOIST SUPPORTS | | | ✓ | |
| UNUSUAL NOISES | | | ✓ | |
| CABLE FASTENERS | | | ✓ | |
| GUIDES | | | ✓ | |
| ELEVATOR | | | ✓ | |
| OPERATORS | | | ✓ | |
| LABELING/MARKING OF HOIST & RAIL SYSTEM | | | ✓ | |

INSPECTED BY:
REPAIRED BY: _____        APPROVED BY: _____

EC (ELECTRIC CABLE)          ECR (ELECTRIC CHAIN ROLLER)      HCL (HAND HELD LINK)
ECL (ELECTRIC CHAIN LINK)    PCR (PNEUMATIC CHAIN ROLLER)     PC (PNEUMATIC CABLE)

# Dx. 42

# WESTPOINT STEVENS

## FINAL NOTICE

| EMPLOYEE Bobby Sanks | JOB Elec, 1st Gr | DATE 8/10/98 |
|---|---|---|
| FACILITY Opelika Mill | DEPARTMENT       ROOM       SHIFT | |

## ☑ LESS THAN INTOLERABLE OFFENSES

Your disciplinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| Poor Job Performance | 12/19/97 | 12/19/98 |
| Poor Job Performance | 8/6/98 | 8/6/99 |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before 12/19/98 DATE will result in your discharge. (2)

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| FIRST GARNISHMENT | | |
| SECOND GARNISHMENT | | |
| THIRD GARNISHMENT | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
DATE

| EMPLOYEE SIGNATURE Bobby L. Sanks DATE 8-11-98 | IMMEDIATE SUPERVISOR Jerry Osterlesson DATE 8-11-98 |
|---|---|
| | PREPARED BY K. Huim DATE 8/10/98 |
| | HUMAN RESOURCES MANAGER |

ORIGINAL - PERSONNEL FILE
COPY 1 - TO EMPLOYEE
COPY 2 - DEPARTMENT FILE

(1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.

(2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.

(3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/warning within the past 12 months.

WPH
000448



WP-1078-CS-REV. 1/96

# Dx. 43

**DEFENDANT'S EXHIBIT 43 B. Sanks**

# WEST POINT STEVENS

| | COUNSELING REPORT | X | WARNING REPORT* | | FIRST | *THIS IS THE | X | SECOND | | THIRD |

WARNING WITHIN 12 MONTHS
OF THIS DATE  . . . . . . . . . ..

| EMPLOYEE | COUNSELING DATE |
| --- | --- |
| Bobby Sanks | |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE  < . . . . . |
| --- | --- | --- | --- | --- |
| 041 Opelika Mill | | Mechanical (11) | First | 05-30-99 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
| --- | --- |
| Dudley Gregory | |

SITUATION IN BRIEF

Taking Unscheduled Breaks

DETAILS

On Sunday, 5-30-99, I found Bobby sitting in one of the back booths in the Card Room canteen at 8:20 a.m. I asked Bobby what he was doing and he stated he was doing nothing. I asked Bobby if he had anything that he needed to be working on and he said "yes". I told Bobby that he needed to get back on his job and he left the canteen. Bobby has been talked to before about taking breaks at times other than scheduled and in other canteens than the Shop. It was 25 more minutes before the Shop's first break.

**RECEIVED JUN 7 1999**

ACTION TAKEN

Discussed this incident with associate. Explained the break schedule for the Shop and that all breaks should be taken in the Shop. Discussed disciplinary and discharge procedures with associate. Placed warning in Bobby's file.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
| --- | --- |
| DUDLEY GREGORY  *Dudley Gregory* | |
| DEPARTMENT MANAGER  *Perry G. Henderson* | EMPLOYEE  *Bobby Sanks* |
| PERRY G. HENDERSON | |
| *6-2-99* | SIGNATURES |

WP-1097-CS-REV.10/89

250939

01189

WPH
000432

# Dx. 44

# W E S T P O I N T   S T E V E N S

**FINAL NOTICE**

| EMPLOYEE _Bobby Sanks_ | JOB _Electrician 1st Gr._ | DATE _6/9/99_ |
| FACILITY _Opelika Mill_ | DEPARTMENT _Shop_ | ROOM | SHIFT _1st_ |

---

## ☐ LESS THAN INTOLERABLE OFFENSES

Your disciplinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| _Poor Job Performance_ | _8/6/98_ | _8/6/99_ |
| _Poor Job Performance_ | _5/30/99_ | _5/30/00_ |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before _8/6/99_ will result in your discharge. (2)
  DATE

---

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| **FIRST GARNISHMENT** | | |
| **SECOND GARNISHMENT** | | |
| **THIRD GARNISHMENT** | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
  DATE

---

| EMPLOYEE SIGNATURE _Bobby M. Sanks_ | DATE _6-9-99_ | IMMEDIATE SUPERVISOR _Dudley Gregory_ | DATE _6/9/99_ |
| | | PREPARED BY _Ken Henderson_ | DATE _6/9/99_ |
| | | HUMAN RESOURCES MANAGER | |

ORIGINAL - PERSONNEL FILE
COPY 1 - TO EMPLOYEE
COPY 2 - DEPARTMENT FILE

(1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.

(2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.

(3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/warning within the past 12 months.

**WPH**
**000431**

WP-1078-CS-REV. 1/96



DEFENDANT'S
EXHIBIT
44
B Sanks

# Dx. 45

WPH
000413

# WestPoint Pepperell

☐ **COUNSELING REPORT**          ☒ **WARNING REPORT**\*

\*THIS IS THE
☐ FIRST ☒SECOND ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE — — —

| EMPLOYEE | | COUNSELING DATE |
|---|---|---|
| Bobby Sanks | Mill Shop | 11-19-97 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical(11) | First | 4-4-00 ◄ — — |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | Perry G. Henderson |

**SITUATION IN BRIEF**

Employee punched the time clock and left the plant and also left unattended vehicle parked in a "NO PARKING" area.

**DETAILS**

On Saturday, 4-1-00 as I was coming into the plant at the main entrance I noticed a van parked between the pedestrian and handicapped cross walk. The watchman went to the van to get the person to move his vehicle to clear the roadway.  He found that there was no one in the vehicle.

As I continued on into the plant I met Bobby Sanks in the aisle between the beam conveyor and main office leaving the plant.  I asked Bobby if the van parked in the roadway was his and he said "yes".  He stated he was running late and he parked there to jump out and run into the plant to punch his time card and then return to move his vehicle.

I discussed this incident with Bobby and he said he knew that it was against policy to leave the plant without permission and I also discussed with him of the hazard a parked vehicle on the street creates.

**ACTION TAKEN**

Read warning to employee.  Discipline and discharge procedures were explained. Place warning in file

DEFENDANT'S
EXHIBIT
45
B. Sanks
PENGAD 800-631-6989

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | Perry G. Henderson |
| DEPARTMENT MANAGER | EMPLOYEE |
| Perry G. Henderson | X |

SIGNATURES

WP-1097-CS-REV. 10/89

01189

# Dx. 46

# W E S T P O I N T   S T E V E N S

## FINAL NOTICE

EMPLOYEE: *Bobby Sanks*   JOB: *Electrician 1st Gr.*   DATE: *4/10/00*

FACILITY: *Opelika Mill*   DEPARTMENT: *Mechanical (11)*   ROOM:   SHIFT: *1st*

### ☑ LESS THAN INTOLERABLE OFFENSES

Your disciplinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| *Poor Job Performance – Taking Unscheduled Breaks* | *5-30-99* | *5-30-00* |
| *Leaving Plant & Leaving Unattended vehicle in "No Parking" Area* | *4-4-00* | *4-4-01* |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before *5-30-00* **DATE** will result in your discharge. (2)

### ☐ GARNISHMENTS (less than Intolerable Offense)

|  | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| FIRST GARNISHMENT |  |  |
| SECOND GARNISHMENT |  |  |
| THIRD GARNISHMENT |  |  |

This is to inform you that another violation of the garnishment rules before _____ **DATE** will result in your discharge. (3)

EMPLOYEE SIGNATURE: *Refused To Sign*   DATE: *4/10/00*   IMMEDIATE SUPERVISOR: *Dudley Gregory (AD)*   DATE: *4/10/00*

PREPARED BY: *Ken Henderson (AD)*   DATE: *4/10/00*

**HUMAN RESOURCES MANAGER**

ORIGINAL - PERSONNEL FILE
COPY 1 - TO EMPLOYEE
COPY 2 - DEPARTMENT FILE

(1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.

(2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.

(3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/warning within the past 12 months.

WPH
000410



DEFENDANT'S EXHIBIT
46
B. Sanks

WP-1078-CS-REV. 1/96

# Dx. 47

# WEST POINT STEVENS

| | | | | *THIS IS THE | | |
|---|---|---|---|---|---|---|
| [X] COUNSELING REPORT | [ ] WARNING REPORT* | [ ] FIRST | [ ] SECOND | [ ] THIRD |

WARNING WITHIN 12 MONTHS                    OF THIS DATE

| EMPLOYEE | COUNSELING DATE |
|---|---|
| Bobby Sanks | 06-11-02 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| 041 Opelika Mill | 11 Mechanical | | 1 | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | |

**SITUATION IN BRIEF**

Excessive Partial Absences

**DETAILS**

Bobby has six (6) partial absences in the last six (6) months, which is in violation of the attendance policy.

The dates of the partial absences are 12/20/01, 01/07/02, 02/03/02, 02/06/02, 04/26/02, and 05/17/02.

JUN 1 2 2002

**ACTION TAKEN**

Discussed these partials with Bobby and reminded him of the attendance policy. Explained to Bobby that he does not need to have another partial until after July 7th, 2002, to prevent further displinary actions. Explained displinary and discharge procedure to Bobby. Placed counseling in Bobby's file.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| DUDLEY GREGORY | |
| DEPARTMENT MANAGER | EMPLOYEE |
| PERRY G. HENDERSON | |

WP-1097-CS-REV.10/89                    SIGNATURES

250939                                                                    01189

WPH
000381



DEFENDANT'S EXHIBIT 47 B. Sanks

# Dx. 48

# WESTPOINT STEVENS

☒ **COUNSELING REPORT**          ☐ **WARNING REPORT***

*THIS IS THE
☐FIRST ☐SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE Bobby Sanks | ASSOCIATE NUMBER 32045 | COUNSELING DATE 4-24-04 |
|---|---|---|
| FACILITY 041 Opelika Mill | DEPARTMENT (11) Mechanical | ROOM | SHIFT | WARNING DATE |
| SUPERVISOR Dudley Gregory | SUPERVISOR WITNESSING WARNING | | | |

**SITUATION IN BRIEF**

Poor Job Performance
Section III-A-1G — O-1

**DETAILS**

On Saturday, 4-24-04, an order on hoist #EC-8 was wrote at 5:30AM. The 3rd shift troubleshooter checked it out and noted on order that control cable needed replacing due to shorted wire.

Bobby worked on replacing hand control cable all day Saturday on 1st shift. Bobby did not get hoist running on Saturday and left it locked out. Bobby worked on hoist Sunday morning, and turned it over for use around 10:00AM Sunday.

On Sunday, 4-25-04, another order was wrote around 5:30pm. This time someone raised hoist up and hit upper limit switch and hoist reversed and continued to run down.

**ACTION TAKEN**          (OVER) - next page -

Discussed this incident with Bobby. Explained displinary and discharge procedure to Bobby. Placed counseling in file.

DEFENDANT'S
EXHIBIT
48
B. Sanks
PENGAD 800-631-6989

| SUPERVISOR *[signature]* | SUPERVISOR WITNESSING WARNING |
|---|---|
| DEPARTMENT MANAGER *[signature]* | ASSOCIATE * |
| | SIGNATURES |

CC-062503-C/WR

ADS * Associate refused to sign out

WPH
000357

On Monday 4-26-04 Bobby was working on hoist and found pin bent and limit switch box cracked were hoist had run up too far before reversing on Sunday. I had Bobby get box off spare hoist at carpenter shop and Walter fixed shaft for switch cam. Once parts were assembled Bobby could not get hoist to work by control switches. He came to me at 5:00pm and said the hoist was blowing fuses when he manually raised it up and it hit upper limit switch. He said he would finish it tomorrow. I asked Bobby to get with 2nd shift troubleshooter and show him what Bobby was talking about so he could be working on problem. The 2nd shift electrician got the hoist to working, but when it hit the upper limit it went in reverse and you had to hit E-stop to stop it.

On Tuesday, 4-27-04 I checked hoist and found the upper limit switch bent where it would not fall back down to stop hoist from going in reverse. The switch pin and box had to be replaced again. When box was removed I found a piece of metal wrapped in tape stuck behind the limit switch to hold it against cam. The was only one screw holding the limit switch to mount plate and mounting plate only had one screw in it. This made the switch lose in box and not secure where it could possibly let hoist goo to high before reversing and damaging pin. Several parts had to be repaired and replaced due to poor maintenance. This hoist was working fine before control cable had to be replaced but Bobby had trouble

getting wiring correct for control cable. The other items should have been corrected on P.M.

Bobby has been working on hoists for years and should know how hand controls should be wired.

This counseling is for poor job performance.

WPH
000358

# Dx. 49

# WESTPOINT STEVENS

☐ **COUNSELING REPORT**     ☒ **WARNING REPORT***

*THIS IS THE
☒FIRST ☐SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE | ASSOCIATE NUMBER | COUNSELING DATE |
|---|---|---|
| Bobby Sanks | 32045 | 4-29-04 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| Opelika Mill Shop | | | 1st | 5-25-04 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | Dudley Gregory |

**SITUATION IN BRIEF**

Violation of Safe Work Practices
Section O-1-III-A1-h

**DETAILS**

see Attachment

DEFENDANT'S
EXHIBIT
49
B. Sanks

MAY 27 2004

**ACTION TAKEN**

Discussed this warning with Bobby and
explained Discipline And Discharge
Policy to Bobby

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dudley Gregory | |
| DEPARTMENT MANAGER | ASSOCIATE |
| Gerry H. Gibson | Bobby L. Sanks |
| | SIGNATURES |

CC-062503-C/WR

*Attachment 1;*

On Saturday 5/22/04 around 10:15 a.m. I was following-up on a hoist repair job that Bobby was performing to a bridge crane system in the slasher room. I noticed Bobby was fully involved in removing one of the tractor motors from the bridge crane system.

Bobby was working from a man-lift that he had positioned between number two slasher creel and the bridge crane. I checked to see if the power to the crane system was off and locked-out, and it was not. I called Bobby's attention to this and asked him to stop work and lock-out the disconnect for this system. I reminded Bobby that without proper lock-out it could very possibly result in a serious injury to himself.

Bobby stated he was leaving the power on so the slasher operators or cloth doffers could use the other hoists.

I told Bobby that improper lock-out was not excusable because it placed him in a dangerous position and we would take whatever actions we needed to do to allow the proper lock-out of equipment

# Dx. 50

**DEFENDANT'S EXHIBIT SC B. Sanks**

# WEST POINT STEVENS

| ☐ COUNSELING REPORT | ☒ WARNING REPORT | THIS IS THE |
|---|---|---|

☐ FIRST    ☒ SECOND    ☐ THIRD

WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE Bobby Sanks | ASSOCIATE NUMBER 32045 | COUNSELING DATE 04/29/04 |
|---|---|---|
| FACILITY 041 Opelika Mill | DEPARTMENT 11 Mechanical | ROOM | SHIFT 1st | WARNING DATE 02/22/05 |
| SUPERVISOR Dudley Gregory | | SUPERVISOR WITNESSING WARNING |

SITUATION IN BRIEF

Poor Work Performance
Section O-1-III-A1-g

DETAILS

On Friday, 2-11-05, Bobby came to me at 1:30 p.m. saying he had a hoist down in the cloth room he had been working on and could not find the problem with it and he needed some help. He said it would not work with the remote control unit or the cable pendant control. I sent Steve Barnes to see if he could help Bobby locate the problem with the hoist. Steve told me the reason the cable control would not work was because a wire was missing on the plug. It was 3:00 p.m. when I talked to Steve so I asked him to pass information on to Ed on the second shift. Bobby is responsible for keeping the back-up pendant cable units tested and ready to use.

Ed helped Bobby get the hoist working with the cable control by installing the missing wire. Ed started trouble shooting why the remote would not work and found a broken wire for the 24 volt control circuit from the remote to the hoist contactors. They replaced the flat cable and the hoist was ok.

Bobby had started working on this hoist before 11:00 a.m. and it was 4:45 p.m. when Bobby and Ed finished with it. Bobby has been working on the hoist job for more than fourteen years now and he should be the best trouble shooter in the plant on hoist problems. Bobby has been talked to about poor work performance on other occasions.

ACTION TAKEN

Discussed this incident with Bobby and reminded him he should know the hoists in this plant better than anyone. Discussed the Disciplinary and Discharge procedure with Bobby. Placed this warning in Bobby's file.

| SUPERVISOR DUDLEY GREGORY | *Dudley Gregor* | SUPERVISOR WITNESSING WARNING |
|---|---|---|
| DEPARTMENT MANAGER PERRY G. HENDERSON | *Perry G. Henderson* | ASSOCIATE ✱ |

SIGNATURES

CC-062503-C/WR

RECEIVED
FEB 23

✱ - employee refused to sign

WPH
000323

# Dx. 51

# WESTPOINT STEVENS

MAR 16

## FINAL NOTICE

| ASSOCIATE Bobby Sanks | ASSOCIATE NUMBER 32045 | JOB Electrician | | DATE 3-2-05 |
|---|---|---|---|---|
| FACILITY 041 | DEPARTMENT 11 Mechanical | ROOM | SHIFT 1st | |

## ☑ LESS THAN INTOLERABLE OFFENSES

Your disciplinary record presently includes the following written warnings for rules violation within the past 12 months.

| RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|
| Violation of Safe Work Practices | 5-25-04 | 5-25-05 |
| Poor Work Performance | 2-22-05 | 5-25-05 |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before <u>5-25-05</u> will result in your discharge. (2)
       DATE

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| FIRST GARNISHMENT | | |
| SECOND GARNISHMENT | | |
| THIRD GARNISHMENT | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
                                                                    DATE

| ASSOCIATE SIGNATURE X "Refused To Sign" X | DATE 3-15-05 | IMMEDIATE SUPERVISOR Perry Henderson (tds) | DATE 3-2-05 |
|---|---|---|---|
| (tds) | | PREPARED BY Amber Dale Stephens | DATE 3-2-05 |
| | | HUMAN RESOURCES MANAGER | |

ORIGINAL - PERSONNEL FILE
COPY 1 - TO ASSOCIATE
COPY 2 - DEPARTMENT FILE

(1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.
(2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.
(3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/warning within the past 12 months.

CC-062503-FN



# Dx. 52

**PERSONNEL NOTICE**
**DISCRIMINATION AND HARASSMENT**

# WESTPOINT STEVENS

| ASSOCIATE NAME | ASSOC. NUMBER | SEX | RACE | JOB TITLE | TYPE COMPLAINT |
|---|---|---|---|---|---|
| Bobby L. Sanks | 32045 | M | B | Electrician | ☑ DISCRIMINATION ☑ HARASSMENT |

| FACILITY | DEPARTMENT | SHIFT | BECAUSE OF: |
|---|---|---|---|
| Opelika Mill | Shop | 1st | ☑ RACE ☐ SEX ☐ RELIGION |

| SUPERVISOR | NOTICE DATE | |
|---|---|---|
| P. Henderson | 3-3-05 | ☐ N.O. ☐ DISABILITY ☐ AGE ☐ VET. ☐ _____ |

**Associate's statement:** Racial decrimation which Perry Henderson and Dudley Gregory has impose up on me. They have Single me out, Because of past complaints they have single out because of Race. Because they did not appericate a black person as me a black ~~nate~~ man complainting on them. Also they decrinating against me because I am the only one they have call in the office about my Job quality. All because of a personal ~~situa~~ Condition. Concern them.

★ Job Harrishment I give a 100% on my Job at all times. They feel that I am not doing enought. Every time I have a problem with a Sidewayton. And I Can't get the problem Solved. And ask for help the next day or so I am call in the office for a Conscial

Review the statement to be sure all present have the same understanding before signing. (Use additional sheets as necessary.)

| Bobby L. Sanks | 3-3-05 | [signature] | 3-3-05 |
|---|---|---|---|
| **Associate** | **Date** | **HR Representative** | **Date** |
| Wayne Price | 3-3-05 | | |
| **Witness** | **Date** | | |

## INVESTIGATION PROCEDURE

1. **Dates and times of incidents:** Associate did not give any specifics only said last couple of times he was wrote up - I cold get the dates from his file.

2. **Name(s) of accused:** Perry Henderson and Dudley Gregory.

3. **Where did incident take place?** Associate did not give any locations.

4. **Names, sex and race of witnesses, if any:** Associate did not give any witnesses - The following were interviewed as Shop Associates:

1. Steri Moss - M (B)     5. Donald Atwood - M (W)     9. James Botsford - M (W)
2. Robert Strozer - M (B)  6. Danny Oliver - M (B)
3. William Walton - M (W)  7. Eddie Hall - M (B)
4. Lodolphus Floyd - M (B) 8. Elijah Harris - M (B)

DEFENDANT'S EXHIBIT 50 B. Sanks PENGAD 800-631-6989

WPH
000315

5. Has the associate's ability to work been affected? _Say_ How? _____

6. Have similar incidents occurred before? _Yes_ When? _Associate did not give specifics but said when he had gotten written up._

7. Does the associate have any written records, diaries, logs, etc.? _unknown_ If so, make a part of the investigation file. _Associate stated not on him but he might have something in his head_

8. Has the associate discussed this matter with anyone else? _NO_ Who? _____

9. Are there any other associates who have the same concerns or similar ones? _NO_ Who? _____

10. Review associate's statement for any discrepancies between it and response to questions.

11. Stress to all parties during the investigation that they should not discuss with co-workers and that information about the investigation will only be revealed to those with "need to know."

12. Interview the accused with a witness in an attempt to get at the truth. Take good notes and write a detailed memo to keep with the investigation file.

13. Interview witnesses of the incident with a witness. Again, take good notes and write a detailed memo to keep with the investigation file.

14. Action taken: _An investigation was conducted. Both white and minority Shop associates were interviewed. No one verified there are any issues of race w/ Perry or Dudley. All the associates interviewed say Perry expects "you - everyone" to run their job. If they are not running their job, Perry will talk to them about it. None of the associates felt there was an issue of race, discrimination or harassment. The investigation is concluded and no findings of race discrimination_ (Use additional sheets if necessary.)

Communicate results to the complainant.

| _Amber Dale Stephens_ | F N | 3-15-05 | _Bobby L. Orr_ (A) 3-15-05 |
| Investigator | Sex Race | Date | _Refused to sign_ 3-15-05 |
| | | | Complainant  Date |
| _Wayne Price_ | | 3-15-05 | _Dean Franklin_  3-15-05 |
| Witness | | Date | Plant Manager  Date |

Copies to: Personnel Files
Director of HR
Corporate Compliance Official

WPH
000316

CC-070103-PN-D/H

**PERSONNEL NOTICE**
**DISCRIMINATION AND HARASSMENT**

# W E S T P O I N T  S T E V E N S

| ASSOCIATE NAME Bobby K. Sauls | ASSOC. NUMBER 32045 | SEX M | RACE B | JOB TITLE Electrician | TYPE COMPLAINT ☑DISCRIMINATION ☑HARASSMENT |
|---|---|---|---|---|---|
| FACILITY Chalk Mill | DEPARTMENT Shop | | SHIFT 1st | | BECAUSE OF: |
| SUPERVISOR P. Henderson | | | NOTICE DATE 3-3-05 | | ☑RACE ☐SEX ☐RELIGION ☐N.O. ☐DISABILITY ☐AGE ☐VET. ☐_____ |

**Associate's statement:** And this only happen to me. They have reunion my chance of getting a transfer, or any other Job, in the Company. This and other Complaints has been gling on for 5 years or more. Something must be done to stop this. I do not Intended to gi through this year looking over my shoulder Sholder.

_____

_____

_____

_____

_____

_____

Review the statement to be sure all present have the same understanding before signing. (Use additional sheets as necessary.)

| Bobby L. Sauls | 3-3-05 | [signature] | 3-3-05 |
|---|---|---|---|
| Associate | Date | HR Representative | Date |
| Wayne Price | 3-3-05 | | |
| Witness | Date | | |

## INVESTIGATION PROCEDURE

1. Dates and times of incidents: _____

_____

2. Name(s) of accused: _____

_____

3. Where did incident take place? _____

_____

4. Names, sex and race of witnesses, if any: _____

_____

5.  Has the associate's ability to work been affected?_____ How? _____

_____

6.  Have similar incidents occurred before?_____ When? _____

_____

7.  Does the associate have any written records, diaries, logs, etc.? _____ If so, make a part of the investigation file.

8.  Has the associate discussed this matter with anyone else?_____ Who? _____

_____

9.  Are there any other associates who have the same concerns or similar ones?_____ Who? _____

_____

10.  Review associate's statement for any discrepancies between it and response to questions.

11.  Stress to all parties during the investigation that they should not discuss with co-workers and that information about the investigation will only be revealed to those with "need to know."

12.  Interview the accused with a witness in an attempt to get at the truth. Take good notes and write a detailed memo to keep with the investigation file.

13.  Interview witnesses of the incident with a witness. Again, take good notes and write a detailed memo to keep with the investigation file.

14.  Action taken: _____

_____

_____

_____

_____

_____

                                                        **(Use additional sheets if necessary.)**

Communicate results to the complainant.

| Investigator | Sex | Race | Date | | Complainant | | Date |
|---|---|---|---|---|---|---|---|

| Witness | | | Date | | Plant Manager | | Date |
|---|---|---|---|---|---|---|---|

Copies to: Personnel Files
           Director of HR
           Corporate Compliance Official

CC-070103-PN-D/H

5. Has the associate's ability to work been affected? _____ How? _____

_____

6. Have similar incidents occurred before? _____ When? _____

_____

7. Does the associate have any written records, diaries, logs, etc.? _____ If so, make a part of the investigation file.

8. Has the associate discussed this matter with anyone else? _____ Who? _____

_____

9. Are there any other associates who have the same concerns or similar ones? _____ Who? _____

_____

10. Review associate's statement for any discrepancies between it and response to questions.

11. Stress to all parties during the investigation that they should not discuss with co-workers and that information about the investigation will only be revealed to those with "need to know."

12. Interview the accused with a witness in an attempt to get at the truth. Take good notes and write a detailed memo to keep with the investigation file.

13. Interview witnesses of the incident with a witness. Again, take good notes and write a detailed memo to keep with the investigation file.

Continued from pg. #1

14. Action taken:

or harassment were made. If you are not satisfied or disagree you need to follow the company's complaint procedure which is posted. You can talk with your Plant Manager or Division H.R. Mgr. next. If Bobby wishes, I will set up an appt. for him.

(Use additional sheets if necessary.)

Communicate results to the complainant.

| _Amber Nale Stephen_ F W 3-15-05 | "_Bobby L. Banks_ (ABS) 3-15-05 |
| Investigator   Sex   Race   Date | "Refused to Sign" 3-15-05 |
| _Wayne Price_ 3-15-05 | Complainant |
| Witness   Date | _Dean Faulk_ 3-15-05 |
| | Plant Manager   Date |

Copies to: Personnel Files
Director of HR
Corporate Compliance Official

WPH
000319

CC-070103-PN-D/H

At the end of the conversation Bobby stated to me that he would now sign this form + forgot his appt. with personnel. He then signed the form. (3-15-05
Amber Nale Stephen)

**PERSONNEL NOTICE**
**DISCRIMINATION AND HARASSMENT**

# WESTPOINT STEVENS

| ASSOCIATE NAME | ASSOC. NUMBER | SEX | RACE | JOB TITLE | |
|---|---|---|---|---|---|
| | | | | | |

| FACILITY | DEPARTMENT | | SHIFT |
|---|---|---|---|
| | | | |

| SUPERVISOR | | NOTICE DATE |
|---|---|---|
| | | |

**TYPE COMPLAINT**
☐ DISCRIMINATION   ☐ HARASSMENT

**BECAUSE OF:**
☐ RACE   ☐ SEX   ☐ RELIGION
☐ N.O.   ☐ DISABILITY   ☐ AGE
☐ VET.   ☐ _____

Associate's statement: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Review the statement to be sure all present have the same understanding before signing. (Use additional sheets as necessary.)**

| Associate | Date | HR Representative | Date |
|---|---|---|---|

| Witness | Date |
|---|---|

## INVESTIGATION PROCEDURE

1. Dates and times of incidents: _____

_____

2. Name(s) of accused: _____

_____

3. Where did incident take place? _____

_____

4. Names, sex and race of witnesses, if any: _____

_____

# Dx. 53

**PERSONNEL NOTICE**

WESTPOINT STEVENS

☐ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| | | | |
|---|---|---|---|
| ASSOCIATE _Stevie Moss_ | | ASSOCIATE NUMBER | **TYPE OF NOTICE** |
| FACILITY _041_ | DEPARTMENT _Shop_ | SHIFT _1st_ | 1 - ASSOCIATE PROBLEM |
| SUPERVISOR _P. Henderson_ | | NOTICE DATE _3-4-05_   ⑦ | 2 - ASSOCIATE COMPLAINT<br>3 - NOTICE OF CHANGE<br>4 - REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE | | | 5 - ASSOCIATE REQUEST<br>6 - COMMENDATION<br>7 - MISCELLANEOUS NOTICE |

SITUATION IN BRIEF

_Discussion & Investigation of complaint by Bobby Sanks."_

DETAILS

_See attached notes/Statement of Stevie MOSS_

DEFENDANT'S
EXHIBIT
53
B. Sanks

ACTION TAKEN

_Discussed Confidentiality rule._

WPH
000820

(Attach additional sheets as necessary)

| DISTRIBUTION | | |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | |
| | ☐ SUPPLY ROOM | |
| | ☐ | |

RECOMMENDED BY _____  3-4-05
DEPARTMENT MANAGER

ASSOCIATE (if necessary) _Stevie Mos_  3-4-05
OTHER

WB 1157-CS REV 11/97

SIGNATURE   DATES

00

Steve Moss    Amber Dale Stephens
3-4-05         3-4-05
3-4-05              Stevie Moss                    3-4-05

A.D.S. - Have you witnessed anything that you would feel racial to you or any other associate - "NO"

S.M. - Bobby has been in the shop office pretty regular + Lou - also - (I feel they are in trouble or something wrong)

S.M. - Walter, Steve, Larry - ? would stand around after break + smoke in shop

S.M. - It just seems some people get away w/ some things more than others - I don't know if it's racial though. @ one point there was a lot of standing around smoking in the basement/shop - That is pretty much stopped now - someone must have complained sometime last year - >

- Dudley came into the basement + Bobby + Dany were sitting in Bobby's room talking + Dudley said something to him about eating his food - Bobby asked Dudley to come on into room. ≈ 7:00 Am - Start of Shift

S.M - Don't feel Perry + Dudley have ever been racial discrim(m) to me or harassed me on the job. I can't see they've done anything to anybody else. I haven't seen anything myself.

S.M. - I don't know of anything else. Haven't been told anything by Bobby or anyone else.

A.D.S - I ask you to remember the confidentiality rule + not discuss this w/ anyone.

WPH 000821

WEST POINT STEVENS

# PERSONNEL NOTICE

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE William Ed Walton | | | | TYPE OF NOTICE |
|---|---|---|---|---|
| FACILITY 041 | DEPARTMENT Shop | | SHIFT 1st | ⑦ 1 - ASSOCIATE PROBLEM<br>2 - ASSOCIATE COMPLAINT<br>3 - NOTICE OF CHANGE<br>4 - REQUEST FOR CHANGE<br>5 - ASSOCIATE REQUEST<br>6 - COMMENDATION<br>7 - MISCELLANEOUS NOTICE |
| SUPERVISOR P. Henderson | | | NOTICE DATE 3-7-05 | |
| EFFECTIVE DATE OF CHANGE | | | | |

**SITUATION IN BRIEF**

"Discussion + Investigation of complaint by Bobby Sanks."

**DETAILS**

**ACTION TAKEN**

Discussed Confidentiality Rule

WPH
000822

(Attach additional sheets as necessary)

| DISTRIBUTION | | |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | 3-7-05 |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | DEPARTMENT MANAGER |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (If necessary) |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | 3-7-05 |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER |
| | ☐ SUPPLY ROOM | SIGNATURE          DATES |

WP-1157-CS-REV-11/97

3-7-05

- 1st heard about these comments today from you.
- Have not witnessed anything from Perry & Dudley.
- Perry & Dudley will get on your butt if you're not doing what you should —
  They are that way with everyone though.
- Bobby has not said anything to me.
- I have to help him w/ his hoists pretty regular. He's not really a trained electrician (school trained) — Sometimes he needs help. Some of the things yes he should know by now - he's done it over & over & over. Some are issues that it takes us a while to figure out
- Never heard anything racist or discriminatory come from Perry or Dudley. We all talk about them from time to time.

Al Walter
7 Mar 05

WPH
000823

PERSONNEL NOTICE

WESTPOINT STEVENS

☑ INITIATED BY COMPANY ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE | | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|---|

ASSOCIATE: Dolphus Floyd

| FACILITY Off | DEPARTMENT Shop | SHIFT 1st | |
| SUPERVISOR P. Henderson | | NOTICE DATE 3-7-05 | Ⓜ |
| EFFECTIVE DATE OF CHANGE | | | |

TYPE OF NOTICE
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Discussion & Investigation of Complaint by Bobby Sanks "

**DETAILS**

I don't feel that I have witness are have been discriminated against as a shop employee nor harrassed. They were a time that I felt I was over looked for a position that came open in the shop but after learning what the position required, work on every Sunday and coming back in all through the night, I found that I didn't want that responsibility.

**ACTION TAKEN**

See also attached notes..
Discussed Confidntiality

WPH
000824

(Attach additional sheets as necessary)

**DISTRIBUTION**
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ _____

| RECOMMENDED BY | 3-7-05 |
| DEPARTMENT MANAGER | |
| ASSOCIATE (if necessary) Dolphus Floyd | 3-7-05 |
| OTHER | |
| SIGNATURE | DATES |

00

3-7-05                    Lou Floyd

L.F.  Within the last month Bobby has told me
he felt like he was being discriminated/harassed
against, but he's told me that for years.
"They are always on me - With the work
load I have it's a lot." - not recently
he started - but probably for a couple of
years.

L.F.  Bobby has not had an electrical schooling -
he was just placed on the job - Bobby feels
like he may have unjustly been written
up.

L.F.  There's been times that Bobby has said
that he's been disciplined & just didn't
know what to do.  I try to stress to
the guys if they don't know - to
ask.

L.F.  "I haven't heard any racial slurs." I can't
say I've witnessed this from Perry &
Dudley."

                              Rodolphus Floyd
                              3-7-05
                              Ambulah Taylor
                              3-7-05

WPH
000825

# PERSONNEL NOTICE

*WEST POINT STEVENS*

☑ INITIATED BY COMPANY  ☐ AT REQUEST OF ASSOCIATE

| | | |
|---|---|---|
| ASSOCIATE *Elijah Harris* | ASSOCIATE NUMBER | TYPE OF NOTICE |
| FACILITY *041* | DEPARTMENT *Shop* | SHIFT *1st* |
| SUPERVISOR *P. Henderson* | NOTICE DATE *3/7/05* |
| EFFECTIVE DATE OF CHANGE | |

TYPE OF NOTICE
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

⑦

**SITUATION IN BRIEF**

*"Discussion + Investigation of Complaint by Bobby Sanks."*

**DETAILS**

**ACTION TAKEN**

WPH
000826

(Attach additional sheets as necessary)

| DISTRIBUTION | |
|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER |
| ☑ INDUSTRIAL RELATIONS | ☐ MANAGER |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. |
| | ☐ SUPPLY ROOM |

| | | |
|---|---|---|
| RECOMMENDED BY *(signature)* | | 3-7-05 |
| DEPARTMENT MANAGER | | |
| ASSOCIATE (if necessary) *Elijah Harris* | | 3-7-05 |
| OTHER | | |
| SIGNATURE | | DATES |

WP 1157-CS REV 11/97

3-7-05                    <u>Elijah Harris</u>

Once upon a time me & Dudley had an argument about paychecks — Dudley told me that he wouldn't give me my check unless I told him what Perry & I had said. B/C Dudley wasn't there

Perry brought it up in the break room about me holding up the iron

I told Perry & he talked to Dudley & Dudley Appologized

Bobby has not said anything to me.

As far as Bobby — Perry & Dudley expect you to "do your job & when you got to "assing off" they are going to talk to you about it.

They want you to stay busy — they've told everybody over & over. Do your 8 HRS & go home.

I've never heard them say anything racial or slurring. No harassment to me.

**WPH**
**000827**

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE Robert Strozer | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY 041 | DEPARTMENT Shop | SHIFT 1st | 1 - ASSOCIATE PROBLEM |
| | | | 2 - ASSOCIATE COMPLAINT |
| SUPERVISOR P. Henderson | | NOTICE DATE 3-7-05 | 3 - NOTICE OF CHANGE |
| | | | 4 - REQUEST FOR CHANGE |
| | | | (7) 5 - ASSOCIATE REQUEST |
| EFFECTIVE DATE OF CHANGE | | | 6 - COMMENDATION |
| | | | 7 - MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

"Discussion & Investigation of complaint by Bobby Sanks."

**DETAILS**

I have not witnessed Perry or Dudley being racially discriminatory or job harassing to Bobby or anyone. Bobby nor anyone has made any kind of comments about this to me.

**ACTION TAKEN**

Discussed Confidentially. Jule.

WPH
000828

(Attach additional sheets as necessary)

| DISTRIBUTION | | |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY [signature]   3-7-05 |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (If necessary) [signature]   03-07-05 |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER |
| | ☐ SUPPLY ROOM | SIGNATURE          DATES |

WP 1157-CS REV 11/97

PERSONNEL NOTICE                                    W E S T P O I N T   S T E V E N S

☑ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE Donald Craig Atwood | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY 041 | DEPARTMENT Shop | SHIFT 1st | ⑦ 1 - ASSOCIATE PROBLEM 2 - ASSOCIATE COMPLAINT 3 - NOTICE OF CHANGE 4 - REQUEST FOR CHANGE 5 - ASSOCIATE REQUEST 6 - COMMENDATION 7 - MISCELLANEOUS NOTICE |
| SUPERVISOR P. Henderson | | NOTICE DATE 3-4-05 | |
| EFFECTIVE DATE OF CHANGE | | | |

SITUATION IN BRIEF

" Discussion + Investigation of complaint by Bobby Sanks."

DETAILS

I have not witnessed any kind of racial disc. or job harassment towards Bobby Sanks or any other shop associate. I don't know of any thing like this going on in the shop. Bobby has not said anything to me.

ACTION TAKEN

Discussed the Confidentiality rule + not discussing with anyone.

**WPH 000829**

(Attach additional sheets as necessary)

**DISTRIBUTION**
- ☐ COST DEPT.
- ☐ DEPT. FILES
- ☐ INDUSTRIAL RELATIONS
- ☐ OFFICE MANAGER
- ☐ PAYROLL DEPT.
- ☐ HUMAN RESOURCES DEPT.

- ☐ VICE PRESIDENT
- ☐ GENERAL MANAGER
- ☐ MANAGER
- ☐ ASST. MANAGER
- ☐ DEPT. MANAGER
- ☐ PRODUCTION DEPT.
- ☐ SUPPLY ROOM
- ☐

| RECOMMENDED BY | | 3-4-05 |
|---|---|---|
| DEPARTMENT MANAGER | | |
| ASSOCIATE (if necessary) Craig Atwood | | 3-4-05 |
| OTHER | | |
| | SIGNATURE | DATES |

WP 1157-CS REV 11/97                                    0G

☑ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE | Danny Oliver | | ASSOCIATE NUMBER | | TYPE OF NOTICE |
|---|---|---|---|---|---|

FACILITY 041   DEPARTMENT Shop   SHIFT 1st

SUPERVISOR P. Henderson   NOTICE DATE 3-7-05

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
(7)  4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

"Discussion & Investigation of complaint by Bobby Sanks."

**DETAILS**

I have not seen anything that would be racially discriminating or harassing to me or anyone. Bobby has not said anything to me. The only thing I heard was last Tuesday I was near the break room & Dudley said Bobby I need to see you in the office.

**ACTION TAKEN**

Discussed Confidentiality Rule.

**WPH 000830**

(Attach additional sheets as necessary)

| DISTRIBUTION | | |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER  3-7-05 |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (if necessary)  3-7-05 |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | Danny L. Oliver |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER |
| | ☐ SUPPLY ROOM | |

SIGNATURE          DATES

WP-1167-CS REV 11/97                0

**PERSONNEL NOTICE**

W E S T P O I N T   S T E V E N S

☑ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| *Eddie Hall* | | | 1 - ASSOCIATE PROBLEM |
| FACILITY *041* | DEPARTMENT *Shop* | SHIFT *1st* | 2 - ASSOCIATE COMPLAINT |
| SUPERVISOR *P. Henderson* | | NOTICE DATE *3-4-05* | (7) 3 - NOTICE OF CHANGE / 4 - REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE | | | 5 - ASSOCIATE REQUEST |
| | | | 6 - COMMENDATION |
| | | | 7 - MISCELLANEOUS NOTICE |

**SITUATION IN BRIEF**

"Discussion + Investigation of complaint by Bobby Banks."

**DETAILS**

Perry + Dudley are the best folks to work for. They have never done anything to me that I felt was racial discr. or job harassing. I have never seen them do anything to anyone in the shop that would be racial. Bobby has not said anything to me about this situation, but Bobby + I don't talk that much anyway. There's some good people in the shop. I haven't seen any whites get away with anything that blacks don't.

**ACTION TAKEN**

Discussed the confidentiality rule - + not to discuss this matter with anyone.

WPH
000831

(Attach additional sheets as necessary)

| DISTRIBUTION | | | |
|---|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY | 3-4-05 |
| ☐ DEPT..FILES | ☐ GENERAL MANAGER | | |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | DEPARTMENT MANAGER | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (if necessary) | 3-4-05 |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | *Eddie L. Hall* | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER | |
| | ☐ SUPPLY ROOM | SIGNATURE | DATES |

WP 1157 CS REV 11/97                                                                06

**PERSONNEL NOTICE**     W E S T   P O I N T   S T E V E N S

☑ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE James Botsford | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|

FACILITY 041   DEPARTMENT Shop   SHIFT 1st

SUPERVISOR D. Henderson   NOTICE DATE 3-7-05

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE (7):
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

"Discussion + Investigation of complaint by Bobby Sanks."

**DETAILS**

I have not witnessed anything that is racial or harassing to myself or anyone else in the shop. This is the first I've heard of this when you brought it up. Bobby has not said anything to me and I haven't seen Perry or Dudley act any differently to anyone.

**ACTION TAKEN**

"Discussed Confidentiality rule w/ James."

WPH
000832

(Attach additional sheets as necessary)

**DISTRIBUTION**
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY _____ 3-7-05
DEPARTMENT MANAGER

ASSOCIATE (If necessary) James Botsford   3-7-05

OTHER

SIGNATURE     DATES

WP 1157 CS REV 11/97

# Dx. 54

# WEST POINT STEVENS

| ☐ COUNSELING REPORT | ☒ WARNING REPORT | **THIS IS THE** ☐ FIRST ☒ SECOND ☐ THIRD |
|---|---|---|

**WARNING WITHIN 12 MONTHS OF THIS DATE** _____

| ASSOCIATE Bobby Sanks | ASSOCIATE NUMBER 32045 | COUNSELING DATE 04/29/04 |
|---|---|---|

| FACILITY 041 Opelika Mill | DEPARTMENT 11 Mechanical | ROOM | SHIFT 1st | WARNING DATE 07/29/05 |
|---|---|---|---|---|

SUPERVISOR: Dudley Gregory

SUPERVISOR WITNESSING WARNING: *Perry G. Henderson*

**SITUATION IN BRIEF**
Section O-1-III-I-e
Excessive Tardies

**DETAILS**

Bobby has been tardy six times in the last six months.

The dates of Bobby's tardiness were as follows: 01/30/05; 02/04/05; 06/13/05; 06/20/05; 07/19/05; 07/27/05.

Bobby was aware of the company's policy concerning excessive tardiness. Bobby was aware that clocking in at 7.0 is considered being tardy since time is kept in tenths (.1) of an hour.

**ACTION TAKEN**

Discussed this warning with Bobby. Explained that this warning does not do away with these tardies. Explained Disciplinary and Discharge procedure to Bobby.

SUPERVISOR: DUDLEY GREGORY *(signature)*
DEPARTMENT MANAGER: PERRY G. HENDERSON *(signature)*
SUPERVISOR WITNESSING WARNING *(signature)*
ASSOCIATE: *Bobby Sanks*
SIGNATURES

CC-062503-C/WR



**WPH 000007**

# Dx. 55

# WEST POINT STEVENS

| ☐ COUNSELING REPORT | ☒ WARNING REPORT | THIS IS THE ☐ FIRST ☐ SECOND ☒ THIRD WARNING WITHIN 12 MONTHS OF THIS DATE  02/22/05 |
|---|---|---|

| ASSOCIATE Bobby Sanks | ASSOCIATE NUMBER 32045 | COUNSELING DATE 04/29/04 |
|---|---|---|
| FACILITY 041 Opelika Mill | DEPARTMENT 11 Mechanical    ROOM    SHIFT 1st | WARNING DATE 07/29/05 |

| SUPERVISOR Dudley Gregory | SUPERVISOR WITNESSING WARNING *Perry G. Henderson* |
|---|---|

**SITUATION IN BRIEF**

Section O-1-III-I-e
Excessive Tardies

**DETAILS**

Bobby has been tardy seven times in the last six months.
The dates of Bobby's tardiness were as follows: 01/30/05; 02/04/05; 06/13/05; 06/20/05; 07/19/05; 07/27/05; 07/29/05.
Bobby was aware of the company's policy concerning excessive tardiness.
Bobby was aware that clocking in at 7.0 is considered being tardy since time is kept in tenths (.1) of an hour.

**ACTION TAKEN**

Discussed this warning with Bobby.
Explained Disciplinary and Discharge procedure to Bobby.
Explained to Bobby this was his third warning within 12 months and he would be terminated.

| SUPERVISOR DUDLEY GREGORY *Dudley Gregory* | SUPERVISOR WITNESSING WARNING *Perry G.H. Henderson* |
|---|---|
| DEPARTMENT MANAGER PERRY G. HENDERSON *Perry G.H. Henderson* | ASSOCIATE |
| | SIGNATURES |

CC-062503-C/WR

DEFENDANT'S EXHIBIT
55
B. Sanks
PENGAD 800-831-6989

# Dx. 56

☐ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

| | | | |
|---|---|---|---|
| ASSOCIATE Bobby Sanks | | ASSOCIATE NUMBER | TYPE OF NOTICE |
| FACILITY 041 | DEPARTMENT Shop | SHIFT 1st | 1 - ASSOCIATE PROBLEM<br>2 - ASSOCIATE COMPLAINT<br>3 - NOTICE OF CHANGE |
| SUPERVISOR P. Henderson | | NOTICE / DATE 7/29/05 | ⑦ 4 - REQUEST FOR CHANGE<br>5 - ASSOCIATE REQUEST<br>6 - COMMENDATION |
| EFFECTIVE DATE OF CHANGE | | | 7 - MISCELLANEOUS NOTICE |

SITUATION IN BRIEF

"Discussion of Termination"

DETAILS

On 7/29/05 Bobby was tardy - which resulted in a 3rd Warning being issued. Perry asked me to sit in with him to cover this third Warning & termination. I (A. Stephens) told Bobby that he was tardy on 7/29/05 which resulted in a third Warning and we were terminating him - I hate it, but there is no way around it - he said he understood.

DEFENDANT'S EXHIBIT 56 B. Sanks

ACTION TAKEN

Sent to Personnel for exit interview and took jet his tools.

(Attach additional sheets as necessary)

| DISTRIBUTION | | | |
|---|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY | 7/29/05 |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | | |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | DEPARTMENT MANAGER | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | | |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | ASSOCIATE (if necessary) | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | | |
| | ☐ SUPPLY ROOM | OTHER | |
| | ☐ | SIGNATURE | DATES |

WB-1157-CS REV 11/97

# Dx. 57

# WESTPOINT STEVENS

## EXIT INTERVIEW

| NAME Bobby Sanks | DATE 7/29/05 |
| --- | --- |

**The Human Resources Manager or designee should ask the following questions on all separations:**

**I. VOLUNTARY SEPARATIONS**

A. Why are you leaving WPS? I was fired

*(Note: This should correspond with the reason checked on the separation notice.)*

B. Were you ( ✓ ) satisfied ( ) dissatisfied with your job with WPS? Why?

**II. INVOLUNTARY SEPARATIONS**

A. Do you understand why you are being separated from WPS?    ( ✓ ) yes    ( ) no

Comments: NONE

B. Do you think your separation could have been avoided?    ( ) yes    ( ✓ ) no

If yes, how?

**III. ALL SEPARATIONS**

A. Can you suggest ways we can make WPS a better place to work?    ( ) yes    ( ✓ ) no

If yes, how?

| How would you rate our: | Excellent | Good | Average | Fair | Poor |
| --- | --- | --- | --- | --- | --- |
| Advancement & Opportunity | | | | ✓ | |
| Benefits | | | ✓ | | |
| Communications | | | | ✓ | |
| Complaint Procedure | | | | ✓ | |
| Safety Program | | | | ✓ | |
| Supervision | | | | ✓ | |
| Training Program | | | | ✓ | |
| Wages | | | | ✓ | |
| Working Conditions | | | ✓ | | |

Other Comments: NONE

DEFENDANT'S
EXHIBIT
57
B. Sanks

*Linda J Henderson*
INTERVIEWER

*Bobby Lee Sanks*
ASSOCIATE

REVIEWED BY: *Michelle Epps*
HUMAN RESOURCES MANAGER    250867

ASSISTANT MANAGER

*Dean Franklin*
MANAGER

WP-1063-CS (REV. 12-00)    250867

22976-H

# Dx. 58

DEFENDANT'S
EXHIBIT
S 8
B. Sanks

WESTPOINT STEVENS

**SEPARATION NOTICE**

FACILITY: 061

NAME: *Bobby Sanks*

DEPARTMENT:

ASSOCIATE NO.: 32045

DATE: 7-29-05

OCCUPATION: 749 Electrician   SHIFT: 1   RATE:

DATE LAST HIRED (CSD): 10-1-70

FORWARDING ADDRESS: *P.O. Box 44*
*Salem, Al 36874*

DATE LAST WORKED: 7-29-05

SEPARATION DATE: 7-29-05

SEPARATIONS — Please check box opposite the reason for separation and explain below.

### VOLUNTARY
Gave notice of _____ days.
Leaving Active Employment ...................... ☐
Leaving Locality (explain below)* .............. ☐
Other Employment (explain below)* ............. ☐
Transportation .................................. ☐
Housing ......................................... ☐
Family Problems ................................. ☐
Health .......................................... ☐
Pay ............................................. ☐
Hours ........................................... ☐
Supervision ..................................... ☐
Work Conditions ................................. ☐
No Report (indicate follow-up) .................. ☐
Medical, Pregnancy or Other Leave Expired ....... ☐
Other (explain below) ........................... ☐
*No dissatisfaction could be identified

### INVOLUNTARY
Misconduct — Three written warnings within a 12-month period for offenses less than intolerable (Human Resources Manual — Section O-1, Part III-A) ...... ☑

### Other Involuntary
Job Elimination ................................. ☐
Temporary Employment Completed .................. ☐
No Work Available – Leave Expired ............... ☐
No Work Available – Probationary ................ ☐
Inability to Perform Required Job Duties ........ ☐
Garnishments .................................... ☐
Work Restriction Non-Occupational Origin ........ ☐
Other (explain below) ........................... ☐

### Intolerable Offenses:
(Policy Manual, Section O-1, Part III-B)
Intoxicants on Job .............................. ☐
Deadly Weapons .................................. ☐
Falsifying Records .............................. ☐
Dishonesty/Theft ................................ ☐
Fighting ........................................ ☐
Gross Insubordination ........................... ☐
Criminal Act Within/Outside Facility ............ ☐
Damage to Property of Company/Others ............ ☐
Dangerous Horseplay ............................. ☐
Endangering Life or Health of Self or Others .... ☐
Unauthorized Work Elsewhere While on Leave ...... ☐
Employment with Direct Competition .............. ☐

### OTHER
Promiscuous Behavior ............................ ☐
Sexual Misconduct ............................... ☐
Refusal to Cooperate in Investigation ........... ☐
Excessive Unexcused Absences .................... ☐
Sleeping on Job ................................. ☐
Misconduct Away From Facility ................... ☐
Refusal to Submit to Drug Test .................. ☐
Failure to Get Release of Garnishment ........... ☐
Other (explain below) ........................... ☐

### OTHER
(Include in Separation Rate, not Quit Rate)
Returning to School ............................. ☐
Military ........................................ ☐
Normal Retirement (Age 65) ...................... ☐
Delayed Retirement (After Age 65) ............... ☐
Early Retirement (Before Age 65) ................ ☐
Permanent Disability ............................ ☐
Workers' Compensation ........................... ☐
Death ........................................... ☐
Transfer to Other Facility ...................... ☐
Plant Close ..................................... ☐
Transfer to Exempt .............................. ☐
Other (explain below) ........................... ☐

EXPLANATION TO ASSOCIATE

*Three Written Warnings within a 12 month period —*

SUPERVISOR

DEPARTMENT MANAGER: *Perry A. Henderson*

### SEPARATION CHECKLIST
**TO BE COMPLETED BY THE HUMAN RESOURCES DEPARTMENT FOR ALL TERMINATIONS AND TRANSFERS**
(For any item which does not apply, check the Not Applicable blank)

1. Has the appropriate controller been contacted for information on any outstanding cash advances, accounts payable due the Company for any merchandise, etc.?
   Yes _____ N/A _____

2. Has Transportation Center been contacted for information on Company car, and air travel and auto rental credit cards and have these been surrendered to the Human Resources Department and returned to Transportation Center?
   Yes _____ N/A _____

IMPORTANT: See the back of this form for applicable statement(s) to be read to the separating employee if he or she is a participant in the Company's group plans for medical care coverage and life insurance and review continuation of medical/dental/vision coverage under COBRA. Also: use form WP-31199-CS for Exit Interview.

3. Have other items such as keys, entry cards, manuals and/or other Company properties been surrendered to the Human Resources Department?
   Yes _____ N/A _____

4. Does the employee's final paycheck need holding until all of the above items have been checked and cleared?
   Yes _____ N/A _____

5. Have "cards" such as Medical Coverage Identification Prescription Drug, Vision and Associate Purchase Card been surrendered to the Human Resources Department?
   Yes _____ N/A _____

REVIEWED BY:

ASSOCIATE: *Bobby L. Sanks*

HUMAN RESOURCES MANAGER:

ASSISTANT MANAGER:

PREPARER: *Linda Henderson*

MANAGER: *Dean Franklin*

CC-062503-SR

WPH
000011

**TWO YEAR ATTENDANCE RECORD**

NAME: Bobby Sanks    ASSOCIATE NO. 32045    CONT SERV DATE 10/01/70

FACILITY 041    DEPT 11    JOBNO 749    SHIFT 1    PHONE 749-4462

| ABSENCE CODES: | | | |
|---|---|---|---|
| D - Discipline | IO - Injury/Off Job | SC - School | V - Vacation | C. - Counselings |
| E - Excused | J - Jury Duty | SO - Sent Out — NWA | X - Other Absence | W. - Warnings |
| F - Funeral | LA - Lv. of Abs (Not FMLA) | SF - Sickness — Family | FA - First Aid Cases |
| H - Holiday | M - Military Duty | SS - Sickness — Self | OTHER CODE: DH - Hire Date | MD - Medical Cases |
| WC - Injury/Workers' Comp. | NR - No Report | U - Unexcused | T - Tardy    ※ - Begin FMLA Year | LT - Lost Time Cases |
| | | | PD - Partial Day | TD - Termination Date |

(Notes recorded on reverse side)

## 2005   2006

| What did You work on | | | | Time |
|---|---|---|---|---|
| | Monday | Out | | |
| | | In | | 3 0   JUL 25 |
| | | Out | | |
| | | In | | 6 9   JUL 25 |
| | Tuesday | Out | | |
| | | In | | 3 0   JUL 26 |
| | | Out | | |
| | | In | | 6 9   JUL 26 |
| | Wednesday | Out | | 3 0   JUL 27 |
| | | In | T | |
| | | Out | | 7 0   JUL 27 |
| | | In | | |
| | Thursday | Out | | |
| | | In | | 3 0   JUL 28 |
| | | Out | | |
| | | In | | 6 9   JUL 28 |
| | Friday | Out | | |
| | | In | | |
| | | Out | T | 7 0   JUL 29 |
| | | In | | |
| | Saturday | Out | | |
| | | In | | |
| | | Out | | |
| | | In | | |
| | Sunday | Out | | |
| | | In | | |
| | | Out | | |
| | | In | | |

Week Ending 7-31-05

Name *Bobby L. Banks*

2225-39H

**First timecard (top):**

Week Ending 6-19-05

Name (signature)

| | Monday | | Tuesday | | Wednesday | | Thursday | | Friday | | Saturday | | Sunday |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Out/In | JUN 13 | JUN 13 | JUN 14 | JUN 14 | JUN 15 | JUN 15 | JUN 16 | JUN 16 | JUN 17 | JUN 17 | JUN 18 | JUN 18 | | |

**Second timecard (bottom):**

| | Monday | | Tuesday | | Wednesday | | Thursday | | Friday | | Saturday | | Sunday |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Out/In | JUN 20 | JUN 20 | JUN 21 | JUN 21 | JUN 22 | JUN 22 | JUN 23 | JUN 23 | JUN 24 | JUN 24 | | | | |

2225-39H

**Top timesheet:**

| | Monday | | Tuesday | | Wednesday | | Thursday | | Friday | | Saturday | | Sunday | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | JUL 18 | JUL 18 | JUL 19 | JUL 19 | JUL 20 | JUL 20 | JUL 21 | JUL 21 | JUL 22 | JUL 22 | | | | | 40 |
| | 3.0 | 6.9 | 3.0 | 7.0 | 3.0 | 6.9 | 3.0 | 6.9 | 3.0 | 6.9 | NWS | NWS | | | |
| | 8 | | 8 | | 8 | | 8 | | 8 | | | | | | |

Out/In columns for: Monday, Tuesday, Wednesday, Thursday, Friday, Saturday, Sunday

Name: *Bobby F. Shah* (handwritten)

Week Ending: 7-24-05

**Bottom timesheet:**

| | Monday | | Tuesday | | Wednesday | | Thursday | | Friday | | Saturday | | Sunday | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | JUL 25 | JUL 25 | JUL 26 | JUL 26 | JUL 27 | | | | | | | | | | |
| | 3.0 | 6.9 | 3.0 | 6.9 | 7.0 | | | | | | | | | | |

Out/In columns for: Monday, Tuesday, Wednesday, Thursday, Friday, Saturday, Sunday

Name: (handwritten, illegible)

2225-39H

## Week 1 (Top)

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Date | JAN 24 | JAN 25 | JAN 26 | JAN 27 | JAN 28 | JAN 29 | JAN 30 |
| In | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Out | 6.8 | 6.9 | 6.9 | 6.9 | 6.8 | 6.9 | 7.0 |
| | 8 | 8 | 8 | 8 | 8 | 8 | 8 |

56

Week Ending 1-30-05

Name *Billy J. Smith*

2225-39H

## Week 2 (Bottom)

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Date | JAN 31 | FEB 1 | FEB 2 | FEB 3 | FEB 4 | FEB 5 | FEB 5 |
| In | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | | 3.0 |
| Out | 6.9 | 6.9 | 6.9 | 6.9 | 7.3 | 6.9 | |
| | 8 | 8 | 8 | 8 | 2.7 | 8 | Sun |

42.7

Week Ending 2-06-05

Name *Billy J. Smith*

2225-39H

# Dx. 59

# PERSONNEL NOTICE

**WestPoint Stevens**

| [X] INITIATED BY COMPANY | [ ] AT REQUEST OF ASSOCIATE |
|---|---|

| ASSOCIATE | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | |

| FACILITY | DEPARTMENT | ROOM | SHIFT | 7 |
|---|---|---|---|---|
| 041 Opelika Mill | | Mechanical (11) | First | |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Dudley Gregory | 9/08/03 |

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE:
1. ASSOCIATE PROBLEM
2. ASSOCIATE COMPLAINT
3. NOTICE OF CHANGE
4. REQUEST FOR CHANGE
5. ASSOCIATE REQUEST
6. COMMENDATION
7. MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

TIME CLOCK PUNCHING PROCEDURE

**DETAILS**

The shop time clock punches the time in tenths of the hour increments. So the hour is .0 ; 6 minutes after is .1 ; 12 minutes after is .2 ; 18 minutes after is .3 ; 24 minutes after is .4 ; 30 minutes is .5 ; 36 minutes after is .6 ; 42 minutes after is .7 ; 48 minutes after is .8 ; 54 minutes after is .9. Your time is paid in 1/4 of the hour so .1 to .3 equals 1/4 hour, .4 to .6 equals 1/2 hour, .7 to .8 equals 3/4 hour, and .9 to .0 equals 1 hour.

When you clock in you should punch your card between 12 minutes before and 1 minute before the hour of your scheduled shift. This would be 6.8 or 6.9 for first shift, 2.8 or 2.9 for second shift, and 10.8 or 10.9 for third shift. If the clock punches your time at 7.0, 3.0, or 11.0 you are charged with a tardy. If you are as late as 7.5, 3.5, or 11.5 you will be charged with a partial absence. Also, if you have to leave work early, if you punch out at 2.5, 10.5, or 6.5 you will be charged with a partial absence. Company policy states that six tardies or six partial absences within six months will result in displinary action.

Do not write anything except your name and week-ending date on your time card. If you forget to punch in or out get with your supervisor as soon as possible and he will make the necessary adjustment. If you are scheduled for a physical or breathing test , report to the clinic at your scheduled time then punch in at the shop when you get finished.

**ACTION TAKEN**

Placed notice in associates file.

| [ ] COST DEPT. | [ ] VICE PRESIDENT | RECOMMENDED BY |
|---|---|---|
| [ ] DEPT. FILES | [ ] MANAGER | DUDLEY GREGORY _Dudley Gregg_ |
| [ ] IND. RELATIONS | [ ] ASST. MANAGER | DEPARTMENT HEAD |
| [ ] OFFICE MANAGER | [ ] OVERSEER | PERRY G. HENDERSON |
| [ ] PAYROLL DEPT. | [ ] PROD. DEPT. | OTHER |
| [ ] PERSONNEL DEPT. | [ ] SUPPLY ROOM | SIGNATURE _Bobby Sanks_   DATE 9-8-03 |

WP-1157-CS

DEFENDANT'S EXHIBIT
59
B. Sanks
PENGAD 800-631-6989

# Dx. 60

# PERSONNEL NOTICE

☒ INITIATED BY COMPANY     ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | | | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|---|---|
| BOBBY SANKS | | | 32045 | 4 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| 041 OPELIKA MILL SHOP | | | FIRST |

| SUPERVISOR | NOTICE DATE |
|---|---|
| DON HILDRETH | 7-25-85 |

EFFECTIVE DATE OF CHANGE: 8-11-85

**TYPE OF NOTICE**
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

MERIT INCREASE

(Bobby has improved his abilities and it is felt this pay adjustment is warranted.)

**DETAILS**

CHANGE FROM:  Humidity and Air Con. Ctl. Tech  (Job 724)

         Dept:  10

         Shift:  1

         Rate of Pay:  $5.50 per hour

CHANGE TO:  Humidity and Air Con. Ctl. Tech (Job 724)

         Dept:  10

         Shift:  1

         Rate of Pay:  $5.85 per hour ✓  (Top $5.80 per hour)  (6.3%)

DEFENDANT'S EXHIBIT
60
B. Sanks

**ACTION TAKEN**

**DISTRIBUTION**
☐ COST DEPT
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM

RECOMMENDED BY

DEPARTMENT HEAD
PERRY. G. HENDERSON

OTHER

SIGNATURE          DATE

WP-1157-CS

WPH
000580

00415

# Dx. 61

[X] INITIATED BY COMPANY          [ ] AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Bobby Sanks | 32045 | 4 |

| FACILITY • DEPARTMENT • ROOM • SHIFT |
|---|
| 041 Opelika Mill Shop                 First |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Perry G. Henderson | 12-12-85 |

EFFECTIVE DATE OF CHANGE
12-29-85

**TYPE OF NOTICE**
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Merit Increase

Bobby has improved his abilities and it is felt this pay adjustment is warranted.

DETAILS

CHANGE FROM:  Hum & Air Con Ctl Tech  (Job 724)

Dept:  10

Shift:  1st

Rate of Pay:  $5.85

DEFENDANT'S
EXHIBIT
61
B. Sanks

CHANGE TO:  Hum & Air Con Ctl Tech  (Job 724)

Dept:  10

Shift:  1st

Rate of Pay:  $6.25    (Top $6.80)    (6.8% Increase)

12-31-85

ACTION TAKEN

| DISTRIBUTION | | RECOMMENDED BY |
|---|---|---|
| [ ] COST DEPT | [ ] VICE-PRESIDENT | |
| [ ] DEPT. FILES | [ ] MANAGER | |
| [ ] INDUSTRIAL RELATIONS | [ ] ASST. MANAGER | DEPARTMENT HEAD |
| OFFICE MANAGER | [ ] OVERSEER | Perry G. Henderson   Perry G. Henderson |
| PAYROLL DEPT. | [ ] PRODUCTION DEPT. | OTHER |
| PERSONNEL DEPT. | [ ] SUPPLY ROOM | |

| | SIGNATURE | DATE |

157-CS

WPH
000577

00415

# Dx. 62

EEOC FORM 131 (3/01)    U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| MIKE  McGILL<br>PLANT MANAGER<br>WEST POINT HOMES/STEVENS<br>2401 B 1ST AVENUE<br>OPELIKA,   AL   36801 | **Bobby L. Sanks** |
| | THIS PERSON (check one or both)<br>☐ Claims To Be Aggrieved<br>☐ Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**130-2005-06614** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act       [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act      [ ] The Equal Pay Act



DEFENDANT'S EXHIBIT
62
B. Sanks

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **26-MAY-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to _____ If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Sandra G. Figgers,<br>**Investigator**

*EEOC Representative*

Telephone: **(205) 212-2071**

**Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

WPH<br>001085

| Date<br>**May 10, 2006** | Name / Title of Authorized Official<br>**Bernice  Williams-Kimbrough,**<br>**District Director** | Signature<br>*Bernice W. Williams-Kimbrough* |
|---|---|---|

CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

☐ FEPA
☒ EEOC  130-2005-06614

_____ (State or local Agency, if any) _____ and EEOC

NAME (Indicate Mr., Ms., or Mrs.)
Mr. Bobby Lee Sanks

HOME TELEPHONE NO. (Include Area Code)
334-749-4462

STREET ADDRESS
330 Lee Road 175

CITY, STATE AND ZIP CODE
Salem, Alabama 36874

COUNTY
LEE

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME
West Point Pepperell Stevens

NO. OF EMPLOYEES/MEMBERS

TELEPHONE NUMBER (Include Area Code)
334-742-2221

STREET ADDRESS
2401 1st Avenue

CITY, STATE AND ZIP CODE
Opelika, Alabama 36801

RECEIVED
MAY 5 2006
E.E.O.C.
BIRMINGHAM DISTRICT

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS

CITY, STATE AND ZIP CODE

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☒ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ AGE   ☒ RETALIATION   ☒ OTHER (Specify) Harassment

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
July 29, 2005

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

This is an amendment to the original Charge of Discrimination that was filed on September 8, 2005. This amendment incorporates by reference all of the previous charges of discrimination as initially filed and amended as if set out in full herewith. This present amendment is made to include a Charge of Age Discrimination, under the laws as amended in 1987.

After reviewing the details of my claim with my lawyer, she concluded that it appears I have a charge of age discrimination. When she informed me of what the law says about age discrimination, I agree with her assessment. Here are the details that helped us to conclude that my Charge should be amended:

Just before I was terminated by West Point Stevens, I was told to team with a younger employee by the name of Mr. Danny Oliver. Mr. Oliver is approximately 20 years my junior--in his mid-to-late 30's. During the July 4, 2005-week, the plant shut down (as it does each year during July 4th week). However, the maintenance department continued to work, as it does each year. Last year was the first time that I was told to team with Mr. Oliver. He had been working in the maintenance department in the blowers division for about 5 years. The only experience and training that I am aware that Mr. Oliver had in my area (elevators and hoists division) was when I trained him during the shut down week of July 4, 2005. About a week after I was terminated, I was informed by another employee that Mr. Oliver had been moved into my former position.

I believe that, based upon my present knowledge of age discrimination, West Point Stevens discriminated against me because of my age when they terminated me and hired Mr. Danny Oliver to replace me.

My Commission expires: 12/03/08

☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary to meet State and Local Requirements)
Lateefah Muhammad   Lateefah Muhammad

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Bobby Lee Sanks

Bobby Lee Sanks

Date 5/04/2006   Charging Party (Signature)

SIGNATURE OF COMPLAINANT
Bobby Lee Sanks

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

4th day of May, 2006

WPH
001086

EEOC FORM 5 MAR 84   PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

EEOC CHARGE OF DISCRIMINATION
FORM 5 ATTACHMENT
STATEMENT OF BOBBY LEE SANKS

*130.2005.0661*

1. Bobby Lee Sanks.
   330 Lee Road 175 Salem, Alabama 36874.
   Post Office 44, Salem, Alabama 36874
   334-749-4462 home
   334-444-9757 cell
   SSN:
   Date of Birth:
   Race: African American (Black)
   Birth County: Lee County, Alabama
   Gender: Male

   RECEIVED
   EEOC
   JAN 2 7 2006
   BIRMINGHAM DISTRICT OFFICE

2. Employer: West Point Pepperell Stevens
   Date of Hire: October 1970
   Date of Termination: July 29, 2005
   Supervisor: Perry G. Henderson, plant engineer
         334-742-2202 office
         2401 1st Avenue
         Opelika, Alabama 36801

   Lead Man: Dudley Gregory, assistant supervisor to Henderson (Told by Henderson that
   Gregory is the immediate supervisor over the electrician and mechanical maintenance shop)
         334-742-2202 office; 334-742-2322 direct line
         2401 1st Avenue
         Opelika, Alabama 36801
   Human Resources Director: Woody Slauss
         334-742-2271 office
         2506 1st Avenue
         Opelika, Alabama 36801
   Personnel Director: Amberdale Stevens
         334-742-2221
         2401 1st Avenue
         Opelika, Alabama 36801

3. I, Bobby Lee Sanks, began working with West Point Pepperell Stevens in October 1970. I was
   hired in the Piece Good Department. I was trained to stack rolls of cloth materials on pallets
   that came off a belt line. About a year later, I was trained as a Cloth Table Operator Inspector.
   I worked in that position for about four years. Then I transferred to the Mill Department under
   Plant Manager Calvin Turner. I was trained in the Spinning Room as a Filling Doffer, under
   Head Spinning Room Supervisor Lamar Davis. I was later trained as a Warp Doffer. I worked
   in that position for about 8-to-10 years. During my last year in the Spinning Room Department,
   I was trained as an Overhauler of frames. My duty was to break down frames and put them
   back together with new parts or re-conditioned parts.

WPH
001087

130. 2005. 0066 14

Then, I signed the transfer roster for the Maintenance Shop. I think that took about 6-to-9 months. I applied because a Humidifier position was available in the shop. Later on, I received a call from my supervisor, informing me when I would be transferred to the Maintenance Shop. Under Supervisor Perry G. Henderson, I trained to repair humidity spray heads and to take diagnostic readings in all departments, confirming the right temperature, humidity and dew point readings. I worked with the chillers, main water and return water, refrigerator machines, water pumps. I recorded the readings every hour from these machines, stopped them when there was no work the next day or when the weather did not call for their use. I cleaned and maintained air washers throughout the mill. I changed out temperature and humidity charts in all the departments and air washers. I cleaned the huge water tanks atop of the mill and constantly re-built the humidity spray heads. I removed some of the humidity spray heads and replaced them.

RECEIVED
JAN 2 7 2006
BIRMINGHAM
U.S. DISTRICT COURT

After working under Henderson's supervision for about 6-to-9 months, I made my first Complaint against him to the Human Resource Director. He had refused to give me a raise. After six months in the position, I inquired about the automatic raise due to me. Henderson told me that he was working on it. After nine months had passed, I inquired of Henderson again about the raise and again he told me he was working on it. After about a year, I decided to go to the Human Resource Director, V.R. Dubois, at that time, and made my Complaint regarding the denial of my raise. From that time until I was terminated, Henderson seemed to have it in for me.

It was obvious to me that Henderson did not seem to like Black people, especially if they are dark-skinned like I am, and especially if they made a legitimate Complaint against him.

After about two years or more in the humidity area, I applied for a light bulb position that became available in the shop. The duties of that job were to replace and repair all bulbs and ballasts throughout the mill plant. I was probably in that position for about 2 or more years when Henderson said to me in a very harsh tone that "All of the emergency lights better be working." All of the workers in the maintenance shop were in the shop at the time. The power in the mill plant had shut down and we were standing around waiting for it to be restored, or waiting for further instructions from our supervisor when Henderson came up to me with an attitude and singled me out from among the other men. I felt harassed and humiliated by Henderson. I felt that he had no reason to treat me the way he did except that he was retaliating against me for making a Complaint against him regarding my raise.

Later on, I was assigned the Hoist and Elevator position. I was given on-the-job training. Henderson told me that I would be given all of the help I needed and that the company would work with me in anyway it can. He said this in the presence of Dudley Gregory and Harold O'Neal.

I was also trained to serve as a Troubleshooter for the entire mill plant. There were times when I was the only electrician present. There was some on-the-job training and sometimes I was sent away for training on new machines for the plant operation. All of this occurred during the first 10 years in the shop.

The last five years of working under the supervision of Henderson and Gregory have been pure hell for me. They stopped my troubleshooting training classes in the mill plant. They did not assign me to any troubleshooting tasks in the mill plant for five years. In the last six months prior to my termination, Henderson and Gregory called me into their office and assigned me back to troubleshooting. This assignment was in addition to the work I was doing as maintenance for the hoists and elevators.

There were times when repairs were left by other shifts for me to complete. One day, Henderson told me, in a very harsh and snappy voice, "All of those Bullard safety hooks better be checked and changed out." I again felt that I was being singled out by Henderson. I also felt that he was harassing and humiliating me. I reported this to Personnel Director Ken Henderson, at the time. I told him that Perry Henderson was talking to me as if I were a child and that I did not appreciate him talking to me that way. Plant manager Calvin Turner told me he talked with Perry in his office, and Perry denied that he raised his voice at me or cursed me.

Both Dudley Gregory and Perry Henderson have retaliated against me because of my complaints against Henderson. Gregory intensely questioned me regarding the funeral of a close friend of mine. He wrote me up for leaving my work station to turn the alarm off in my car after he had given me permission to do so. On another occasion, he wrote me up for leaving my work station to move my car after he had given me permission to do so. Both Gregory and Henderson have written me up for having to request assistance on completing a job that I needed help to do. Yet, they never brought anyone in to assist me as they had told me they would do if I needed help. The company discriminated between the races: 1) Whites get the better and easier work orders while Blacks are given the worse work orders; 2) More work is added to the jobs Blacks do and none to the jobs Whites do; 3) Whites can take smoke breaks at non-scheduled break times and there is nothing said about it, and Blacks cannot; 4) If two Blacks are seen talking, about questions regarding the job or anything, Gregory and Henderson want to know why the two Blacks are talking instead of working. And have said, "We're paying them to work, not to talk." But they have seen two whites talking and Gregory and Henderson only speak to them and say nothing about why they are talking instead of working; 5) Gregory caught a white employee making a part for his home and the employee admitted it, yet nothing was done about it, was not even reported to Henderson; 6) Gregory wrote me up several times for tardiness, yet he is often tardy and leaves early and no one writes him up or says anything about it; In over 25 years, no Black has been selected for the position of machinist, a position that is appointed and/or selected on a random basis, while every person appointed and/or selected has been White.

When I reported my concerns to Personnel Director Amber Stevens, she told me that maybe the problem is that Henderson may have something personal against me. There was at least one witness who heard her say this. He works in the payroll office. When the personnel director asked me what I would like to see done or happen to Gregory and Henderson, I told her I wanted the job harassment, job discrimination and personal retaliation to stop.

I have personally suffered as a result of the unjust treatment I have received from my employer. My termination caused me to lose my retirement, the income to support my family, and the health coverage that my family and I relied upon. My life has been ruined because of the

# Dx. 63

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

_____ (State or local Agency, if any) _____ and EEOC

NAME (Indicate Mr., Ms., or Mrs.)
Mr. Bobby Lee Sanks

HOME TELEPHONE NO. (Include Area Code)
334-749-4462

STREET ADDRESS
330 Lee Road 175

CITY, STATE AND ZIP CODE
Salem, Alabama 36874

COUNTY
LEE

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME
West Point Pepperell Stevens

NO. OF EMPLOYEES/MEMBERS

TELEPHONE NUMBER (Include Area Code)
334-742-2221

STREET ADDRESS
2401 1st Avenue

CITY, STATE AND ZIP CODE
Opelika, Alabama 36801

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS

CITY, STATE AND ZIP CODE

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ AGE  ☒ RETALIATION  ☒ OTHER (Specify) Harassment

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
July 29, 2005

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

Please see attached. Original Complaint was filed on September 8, 2005. This is an Amended Complaint.

DEFENDANT'S
EXHIBIT
63
B. Sanks

**WPH
000749**

☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

_Bobby Lee Sanks_
Bobby Lee Sanks

Date 1/26/2006    Charging Party (Signature)

My Commission expires: 12/03/08

NOTARY – (When necessary to meet State and Local Requirements)
Lateefah Muhammad  _Lateefah M. Muhammad_

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT
_Bobby Lee Sanks_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 26th day of January, 2006

EEOC CHARGE OF DISCRIMINATION
FORM 5 ATTACHMENT
STATEMENT OF BOBBY LEE SANKS

*130.2005.06614*

1. Bobby Lee Sanks.
   330 Lee Road 175 Salem, Alabama 36874.
   Post Office 44, Salem, Alabama 36874
   334-749-4462 home
   334-444-9757 cell
   SSN:
   Date of Birth:
   Race:  African American (Black)
   Birth County:  Lee County, Alabama
   Gender:  Male

2. Employer:  West Point Pepperell Stevens
   Date of Hire:  October 1970
   Date of Termination:  July 29, 2005
   Supervisor:  Perry G. Henderson, plant engineer
             334-742-2202 office
             2401 1st Avenue
             Opelika, Alabama 36801

   Lead Man:  Dudley Gregory, assistant supervisor to Henderson (Told by Henderson that
   Gregory is the immediate supervisor over the electrician and mechanical maintenance shop)
             334-742-2202 office; 334-742-2322 direct line
             2401 1st Avenue
             Opelika, Alabama 36801
   Human Resources Director:  Woody Slauss
             334-742-2271 office
             2506 1st Avenue
             Opelika, Alabama 36801
   Personnel Director: Amberdale Stevens
             334-742-2221
             2401 1st Avenue
             Opelika, Alabama 36801

3. I, Bobby Lee Sanks, began working with West Point Pepperell Stevens in October 1970.  I was
   hired in the Piece Good Department.  I was trained to stack rolls of cloth materials on pallets
   that came off a belt line.  About a year later, I was trained as a Cloth Table Operator Inspector.
   I worked in that position for about four years.  Then I transferred to the Mill Department under
   Plant Manager Calvin Turner.  I was trained in the Spinning Room as a Filling Doffer, under
   Head Spinning Room Supervisor Lamar Davis.  I was later trained as a Warp Doffer.  I worked
   in that position for about 8-to-10 years.  During my last year in the Spinning Room Department,
   I was trained as an Overhauler of frames.  My duty was to break down frames and put them
   back together with new parts or re-conditioned parts.

130. 2005. 06614

Then, I signed the transfer roster for the Maintenance Shop. I think that took about 6-to-9 months. I applied because a Humidifier position was available in the shop. Later on, I received a call from my supervisor, informing me when I would be transferred to the Maintenance Shop. Under Supervisor Perry G. Henderson, I trained to repair humidity spray heads and to take diagnostic readings in all departments, confirming the right temperature, humidity and dew point readings. I worked with the chillers, main water and return water, refrigerator machines, water pumps. I recorded the readings every hour from these machines, stopped them when there was no work the next day or when the weather did not call for their use. I cleaned and maintained air washers throughout the mill. I changed out temperature and humidity charts in all the departments and air washers. I cleaned the huge water tanks atop of the mill and constantly re-built the humidity spray heads. I removed some of the humidity spray heads and replaced them.

JAN 2 7 2006

After working under Henderson's supervision for about 6-to-9 months, I made my first Complaint against him to the Human Resource Director. He had refused to give me a raise. After six months in the position, I inquired about the automatic raise due to me. Henderson told me that he was working on it. After nine months had passed, I inquired of Henderson again about the raise and again he told me he was working on it. After about a year, I decided to go to the Human Resource Director, V.R. Dubois, at that time, and made my Complaint regarding the denial of my raise. From that time until I was terminated, Henderson seemed to have it in for me.

It was obvious to me that Henderson did not seem to like Black people, especially if they are dark-skinned like I am, and especially if they made a legitimate Complaint against him.

After about two years or more in the humidity area, I applied for a light bulb position that became available in the shop. The duties of that job were to replace and repair all bulbs and ballasts throughout the mill plant. I was probably in that position for about 2 or more years when Henderson said to me in a very harsh tone that "All of the emergency lights better be working." All of the workers in the maintenance shop were in the shop at the time. The power in the mill plant had shut down and we were standing around waiting for it to be restored, or waiting for further instructions from our supervisor when Henderson came up to me with an attitude and singled me out from among the other men. I felt harassed and humiliated by Henderson. I felt that he had no reason to treat me the way he did except that he was retaliating against me for making a Complaint against him regarding my raise.

Later on, I was assigned the Hoist and Elevator position. I was given on-the-job training. Henderson told me that I would be given all of the help I needed and that the company would work with me in anyway it can. He said this in the presence of Dudley Gregory and Harold O'Neal.

I was also trained to serve as a Troubleshooter for the entire mill plant. There were times when I was the only electrician present. There was some on-the-job training and sometimes I was sent away for training on new machines for the plant operation. All of this occurred during the first 10 years in the shop.

130.2005.06614

The last five years of working under the supervision of Henderson and Gregory have been pure hell for me. They stopped my troubleshooting training classes in the mill plant. They did not assign me to any troubleshooting tasks in the mill plant for five years. In the last six months prior to my termination, Henderson and Gregory called me into their office and assigned me back to troubleshooting. This assignment was in addition to the work I was doing as maintenance for the hoists and elevators.

There were times when repairs were left by other shifts for me to complete. One day, Henderson told me, in a very harsh and snappy voice, "All of those Bullard safety hooks better be checked and changed out." I again felt that I was being singled out by Henderson. I also felt that he was harassing and humiliating me. I reported this to Personnel Director Ken Henderson, at the time. I told him that Perry Henderson was talking to me as if I were a child and that I did not appreciate him talking to me that way. Plant manager Calvin Turner told me he talked with Perry in his office, and Perry denied that he raised his voice at me or cursed me.

Both Dudley Gregory and Perry Henderson have retaliated against me because of my complaints against Henderson. Gregory intensely questioned me regarding the funeral of a close friend of mine. He wrote me up for leaving my work station to turn the alarm off in my car after he had given me permission to do so. On another occasion, he wrote me up for leaving my work station to move my car after he had given me permission to do so. Both Gregory and Henderson have written me up for having to request assistance on completing a job that I needed help to do. Yet, they never brought anyone in to assist me as they had told me they would do if I needed help. The company discriminated between the races: 1) Whites get the better and easier work orders while Blacks are given the worse work orders; 2) More work is added to the jobs Blacks do and none to the jobs Whites do; 3) Whites can take smoke breaks at non-scheduled break times and there is nothing said about it, and Blacks cannot; 4) If two Blacks are seen talking, about questions regarding the job or anything, Gregory and Henderson want to know why the two Blacks are talking instead of working. And have said, "We're paying them to work, not to talk." But they have seen two whites talking and Gregory and Henderson only speak to them and say nothing about why they are talking instead of working; 5) Gregory caught a white employee making a part for his home and the employee admitted it, yet nothing was done about it, was not even reported to Henderson; 6) Gregory wrote me up several times for tardiness, yet he is often tardy and leaves early and no one writes him up or says anything about it; In over 25 years, no Black has been selected for the position of machinist, a position that is appointed and/or selected on a random basis, while every person appointed and/or selected has been White.

When I reported my concerns to Personnel Director Amber Stevens, she told me that maybe the problem is that Henderson may have something personal against me. There was at least one witness who heard her say this. He works in the payroll office. When the personnel director asked me what I would like to see done or happen to Gregory and Henderson, I told her I wanted the job harassment, job discrimination and personal retaliation to stop.

I have personally suffered as a result of the unjust treatment I have received from my employer. My termination caused me to lose my retirement, the income to support my family, and the health coverage that my family and I relied upon. My life has been ruined because of the

*L30, 2005, 0 66/4*

harassment, discrimination and retaliation against me. I believe this mistreatment of me by my employer occurred because of my race.

I am suffering health wise from the stress of all of this. I have high blood pressure. I am humiliated in the loss of my job, especially with the company stating that I was doing the worse job they had ever seen. I gave West Point Stevens Pepperell more commitment and hard work than the average worker there for more than 34 years. I think something can and should be done about how I have been mistreated by my former employer.

END OF STATEMENT

RECEIVED
EEOC

JAN 2 7 2006

BIRMINGHAM DISTRICT OFFICE

# Dx. 64

| Charge No. 130·2005, 06614 | Respondent West Point Stevens | Charging Party Sanks, Bobby L |
| --- | --- | --- |

| Date | Action | Entered | Reviewed/ |
| --- | --- | --- | --- |
| 1/27/06 | ISA assigned to process charge for CP. Attorney mailed charge (Amended) to office. ISA could not locate the original. ISA contacted Attorney who explained that CP had been told to write down his personal information and go to an attorney or come back to the office. Intake Staff - Wanda Osborne did not take the charge, so CP did go to his attorney who sent charge to office. ISA research found that no charge was taken but CP did say he wanted to file A. LAW Subile, ISA docket Atty charge for Amendment & send the Respondant. AR stated that they did not want Mediation, Exof #1 Intake Supv. states that CP was untimely by 2 days however had charge been taken when CP entered | | |

DEFENDANT'S EXHIBIT 9 Sanks

| Charge No. | Respondent | Charging Party | | |
|---|---|---|---|---|
| 130.2005 06614 | West Point Stevens | Stokes, Bobby L | | |
| **Date** | **Action** | | **Entered** | **Reviewed/** |

BDO then this would not have happened. ISA does not believe that the CP should be penalized because of our lack of the will to perform our jobs. CP worked 37 years and has been denied his retirement benefits. ISA believes that CP did went to file in Sep. and W. Osborn did not take it. I don't know the conversation that went on but CP did state on his Intake questionnaire that he wanted to file a law suit. Ms. Osborn knows that the only way CP can do that is to take a charge. Charge forwarded to Enforcement for further processing. The record will show that he was timely. CP stated that Ms. Osborn told him that he had until the 29th to file his charge. Investigator had a responsibility to take CP's charge.

WPH
001081

# CASE LOG

(Continue on Reverse)

| Charge No. 130·2005·06614 | Respondent West Point Stevens | Charging Party Sparks, Bobby L |
| --- | --- | --- |

| Date | Action | Entered By | Reviewed/ Approved |
| --- | --- | --- | --- |
| | CHARGE RECEIVED BY DISTRICT OFFICE | | |
| | CHARGE DOCKETED BY DISTRICT OFFICE | | |
| | 131 NOTICE OF CHARGE MAILED TO RESPONDENT | | |
| | Mike McGill Plant Manager 3101 B 1st Ave Opelika, AL 36801 | | |

WPH
001082

# Dx. 65

9-8-05

Bobby Sanks — DOH = Oct 1971 = Inspector Doffer

Term. 7-29-05 = tardiness

Westpoint Stevens

CP recd write up:
   — 1 — 5-25-04 + 2-22-05 write
   up with leave. = warning
   (write up for tardiness

3 within year = termination

05 — CP complained about immediate Plant Engineer
Supervisor, Perry Hardin
& asst. Dudley Gregory - Supervisor
actor. to HR
about harassing him (ie. not doing his
work properly etc.) CP stated he did'nt
have knowledge. (wrote up for not
performing job)
Investigation done & nothing found wrong

After complaining CP was late & subsequently
discharged. 3 incident in yr. period

No Claim



DEFENDANT'S
EXHIBIT
65
B Sanks

WPH
001096

# Dx. 66

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Birmingham District Office

Ridge Park Place-Suite 2000
1130 22nd Street, South
Birmingham, AL 35205
(205)212-2100
TTY (205)212-2112
FAX (205)212-2105

## PRE-DETERMINATION INTERVIEW

CHARGE NO. __130-2005-06614__

CONTACT MADE WITH:   CHARGING PARTY (X)  RESPONDENT ( )

NAME OF PERSON CONTACTED: Lateefah Muhammad is CP's Attorney

INVESTIGATOR:  Ollie M. Croom

CONTACT MADE:  In person ()  By phone (X)  Other: _____

SUMMARY OF INTERVIEW:

On August 17, 2006, I contacted the  above named person to conduct the pre-determination interview.  I informed her regarding the pending determination to be issued by the director. I informed her of the documentary evidence compiled during the investigation. I invited her to give any comments, or submit any additional information or documentation which she desires the Commission to consider. Charging Party alleges that the  Respondent subjected him to adverse terms and conditions of employment during his 43 years of service by harassing him. This charge was filed on 1-27-06. The charge does not give dates of events. The Charging Party failed to state a claim under Title VII.  This charge was amended on May 5, 2006. The Charging Party alleges that he was discharged on or around July 29, 2005. The Charging Party states that he was replaced by a younger employee, age/30. The record  indicates that the Charging Party believed that this occurred because of his race/Black, age/55, harassment, and color.



DEFENDANT'S
EXHIBIT
66
B. Sanks

WPH
001069

The evidence of record indicates that the Respondent filed bankruptcy under Chapter 11 of title 11 of the United State Code in the United States Bankruptcy Court for the Southern District of New York on June 1, 2003. The information was provided by Lester D. Sears, Bankruptcy Court Designated Responsible Officer, by letter dated May 17, 2006. Mr. Sears states that West Point received two charges from EEOC. The record reveals that on July 8, 2005, the Bankruptcy Court entered an order authorizing the sale of substantially all of the Debtors's assets. The sale closed on August 8, 2005. Pursuant to the Sale, the Debtors transferred substantially all of their assets and employees to the Purchasers, and ceased operations. The record reveals that the Debtors (Westpoint Stevens) lack the resources to defend against the claims and lack the funds from which to satisfy any judgement arising therefrom. The recommendation is to administratively close case and give the Charging Party a Notice of Right to Sue.

During the interview with the Charging Party's attorney I informed her that I was concluding the investigation. Charging Party's attorney was informed that the Charging Party would receive a RTS to pursue his case in Federal District Court, he will have 90 days to file, after the 90 days, the RTS will expired and it will not be renewed.

Signature:  _Ollie M. Croom_

# Dx. 67



*Handwritten note:* employed by Kelly Temporary Services. He was never a CV Holdings employee. Date below are in 2006. *[signature]* 6/21/07

```
=========================================================================
5933 SANKS, BOBBY                    090000              Part Time
=========================================================================


SANKS, BOBBY                    5933    090000
      ID IN   Dept  ACTIVITY       OUT  ID IN  Dept  ACTIVITY   OUT    TOTALS
Tue 09/05  553a                    430p                            10:00   10:00
Wed 09/06  555a                    430p                            10:00   20:00
Thu 09/07  555a                    430p                            10:00   30:00
Fri 09/08  555a                    430p                            10:00   40:00
Sat 09/09  556a                    233p                             8:00   48:00
  - Audit Suppressed -

 Acct:090000

             REG:    40:00      OT:      8:00

-------------------------------------------------------------------------

SANKS, BOBBY                    5933    090000
      ID IN   Dept  ACTIVITY       OUT  ID IN  Dept  ACTIVITY   OUT    TOTALS
Mon 09/11  556a                    433p                            10:00   10:00
Tue 09/12  602a                    442p                            10:15   20:15
Wed 09/13  601a                    434p                            10:00   30:15
Thu 09/14  557a                    436p                            10:00   40:15
Fri 09/15  556a                    606p                            11:30   51:45
Sat 09/16  555a                    600p                            11:30   63:15
  - Audit Suppressed -

 Acct:090000

             REG:    40:00      OT:     23:15

-------------------------------------------------------------------------

SANKS, BOBBY                    5933    090000
      ID IN   Dept  ACTIVITY       OUT  ID IN  Dept  ACTIVITY   OUT    TOTALS
Mon 09/18 1000p                    637a                             8:00    8:00
Tue 09/19  952p                    634a                             8:15   16:15
Wed 09/20 1004p                    632a                             8:00   24:15
Thu 09/21 1006p                    637a                             8:00   32:15
Fri 09/22  954p                    637a                             8:00   40:15
Sat 09/23  953p                    642a                             8:15   48:30
  - Audit Suppressed -

 Acct:090000

             REG:    40:00      OT:      8:30

-------------------------------------------------------------------------

SANKS, BOBBY                    5933    090000
      ID IN   Dept  ACTIVITY       OUT  ID IN  Dept  ACTIVITY   OUT    TOTALS
Mon 09/25  957p                    630a                             8:00    8:00
Tue 09/26 1001p                    630a                             8:00   16:00
Wed 09/27  957p                    633a                             8:00   24:00
Thu 09/28  956p                    630a                             8:00   32:00
Fri 09/29  956p                    640a                             8:15   40:15
Sat 09/30 1002p                    635a                             8:00   48:15
  - Audit Suppressed -

 Acct:090000

             REG:    40:00      OT:      8:15

-------------------------------------------------------------------------

SANKS, BOBBY                    5933    090000
      ID IN   Dept  ACTIVITY       OUT  ID IN  Dept  ACTIVITY   OUT    TOTALS
Mon 10/02  956p                    638a                             8:15    8:15
  - Audit Suppressed -

 Acct:090000

             REG:     8:15

-------------------------------------------------------------------------

Employee totals:
  Acct:090000     REG:   168:15      OT:     48:00

   Totals:        REG:   168:15      OT:     48:00
```

DEFENDANT'S EXHIBIT
6.T
B. Sanks
PENGAD 800-631-6989

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 2, Part 6

# Exhibits to the Deposition of Bobby Sanks Dxs. 68-71

# Dx. 68

IDA86711
SCREEN-ID: IDAS080A
REQUESTED BY: MICHAEL WIGFALL
DEPARTMENT: P/R CENTER ADMINISTRATION

EMPLOYEE EARNINGS SUMMARY

A    PAGE    1

EMPLOYEE:  BL SANKS            YEAR: NONE    COUNTRY: U.S.

| W/E PAY DATE | WORK DATE | PB BRCH CD | TSC | REG HOURS | PREM HOURS | GROSS PAY | W/H TAX | FICA | STATE TAX | CITY TAX | OTHER TAX | E.I.C | MISC DED | DED CDE | NET PAY | CHECK NO. | DIR DEP | BANK CTR CODE | PR BL/SL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/08/06 | 10/07/06 | 1056 | C | 8.25 | | 74.25 | 33.30 | 5.68 | 2.20 | .74 | | | | | 65.63 | 3798807 | 77 | 05 | 10-60 |
| 10/01/06 | 09/30/06 | 1056 | C | 40.00 | 8.25 | 471.38 | 33.30 | 36.06 | 19.21 | 4.71 | | | | | 378.10 | 3789807 | 77 | 05 | 10-60 |
| 09/24/06 | 09/23/06 | 1056 | C | 40.00 | 8.50 | 474.75 | 33.80 | 36.32 | 19.35 | 4.74 | | | | | 380.54 | 3782974 | 77 | 05 | 10-60 |
| 09/17/06 | 09/16/06 | 1056 | C | 40.00 | 23.25 | 673.88 | 51.55 | 51.55 | 27.81 | 6.73 | | | | | 524.12 | 3776199 | 77 | 05 | 10-60 |
| 09/10/06 | 09/09/06 | 1056 | C | 40.00 | 8.00 | 468.00 | 32.79 | 35.80 | 19.35 | 4.68 | | | | | 375.67 | 3769457 | 77 | 05 | 10-60 |
| 09/03/06 | 09/02/06 | 1056 | C | 40.00 | 3.00 | 400.50 | 24.56 | 30.64 | 16.09 | 4.00 | | | | | 325.11 | 3761929 | 77 | 05 | 10-60 |
| 08/27/06 | 08/26/06 | 1056 | C | 8.00 | | 64.00 | 4.90 | 4.90 | 1.85 | .64 | | | | | 55.61 | 3753939 | 77 | 05 | 10-60 |
| 08/20/06 | 08/19/06 | 1056 | C | 40.00 | 8.25 | 419.00 | 26.51 | 32.05 | 16.93 | 4.19 | | | | | 339.32 | 3745910 | 77 | 05 | 30-60 |
| 08/13/06 | 08/12/06 | 1056 | C | 40.00 | | 320.00 | 16.61 | 24.48 | 12.47 | 3.20 | | | | | 263.24 | 3743248 | 77 | 05 | 30-60 |
| 08/06/06 | 08/05/06 | 1056 | C | 40.00 | | 320.00 | 16.61 | 24.48 | 12.47 | 3.20 | | | | | 263.24 | 3736748 | 77 | 05 | 30-60 |
| 07/30/06 | 07/30/06 | 1056 | C | 40.00 | 8.25 | 419.00 | 26.51 | 32.05 | 16.93 | 4.19 | | | | | 339.24 | 3730417 | 77 | 05 | 30-60 |
| 07/23/06 | 07/23/06 | 1056 | C | 40.00 | 16.25 | 515.00 | 39.64 | 39.40 | 21.06 | 5.15 | | | | | 409.32 | 3723394 | 77 | 05 | 30-60 |
| 07/16/06 | 07/16/06 | 1056 | C | 40.00 | 10.00 | 440.00 | 28.61 | 33.66 | 17.87 | 4.40 | | | | | 355.46 | 3717317 | 77 | 05 | 30-60 |
| 07/09/06 | 07/02/06 | 1056 | 26 | 40.00 | 3.75 | 81.00 | 27.92 | 33.66 | 14.50 | 4.40 | | | | | 297.82 | 3706141 | 77 | 05 | 30-60 |
| 07/02/06 | 07/02/06 | 1056 | C | | 6.75 | 365.00 | 21.11 | 6.20 | 2.47 | .81 | | | | | 297.82 | 3709879 | 77 | 05 | 30-60 |
| 06/25/06 | 06/25/06 | 1056 | C | 40.00 | 3.75 | 385.00 | 21.11 | 27.92 | 14.50 | 3.85 | | | | | 291.52 | 3709228 | 77 | 05 | 30-60 |
| 06/18/06 | 06/18/06 | 1056 | C | 40.00 | 3.75 | 437.00 | 28.31 | 33.43 | 17.74 | 4.37 | | | | | 353.15 | 3691046 | 77 | 05 | 30-60 |
| 06/11/06 | 06/11/06 | 1056 | C | 40.00 | 1.75 | 437.00 | 28.31 | 33.43 | 17.74 | 4.37 | | | | | 353.15 | 3684442 | 77 | 05 | 30-60 |
| 06/04/06 | 06/04/06 | 1056 | C | 40.00 | 1.75 | 341.00 | 18.71 | 26.09 | 13.42 | 3.41 | | | | | 279.37 | 3677489 | 77 | 05 | 30-60 |
| 05/28/06 | 05/28/06 | 1056 | C | 40.00 | | 440.00 | 28.61 | 33.66 | 17.87 | 4.40 | | | | | 355.46 | 3671684 | 77 | 05 | 30-60 |
| 05/21/06 | 05/21/06 | 1056 | C | 40.00 | 14.25 | 491.00 | 36.24 | 37.56 | 20.04 | 4.91 | | | | | 392.25 | 3665603 | 77 | 05 | 30-60 |
| 05/14/06 | 05/14/06 | 1056 | C | 40.00 | 13.50 | 482.00 | 34.89 | 36.87 | 19.66 | 4.82 | | | | | 385.76 | 3656631 | 77 | 05 | 30-60 |

DEFENDANT'S EXHIBIT 8 B Sanks

PENGAD 800-631-6989

# Dx. 69



# OUR PEOPLE MAKE THE
# Difference **WAL★MART** Stores, Inc.

**EOE/M/F/D/V**
Equal Opportunity Employer – By Choice.          This application for employment will not be considered unless fully completed.
Please print your name as it appears on your Social Security card.

| SANKS | BOBBY | L | |
|---|---|---|---|
| Last Name | First Name | Middle Name | Social Security Number |

| P.O.BOX44  330LEE RD.175  SAEM  AL |
|---|
| Street Address |

| SALEM, AL 36874 | ( 334 ) 749-4462 | ( 334 ) 444-9757 |
|---|---|---|
| City, State, and Zip Code | Telephone Number | Alternate Telephone |

Yes ☐    No ☒    If yes:

Location _____    Dates of Employment _____

Have you ever been
employed by Wal-Mart or
any of its subsidiaries?          Reason for Leaving _____    Name employed under if now different

| NONE | 10.50 | IMMEDIATELY |
|---|---|---|
| List all positions for which you would like to be considered | Rate of pay expected | Date you can start work |

List relatives employed by Wal-Mart, their relationship and where they work. (If you live in California, do not answer.)

Peak Time ☒    Full Time ☒    Temp ☐          Yes ☒    No ☐          Yes ☒    No ☐
Type of employment you are seeking.

Are you 18 years of age or older?
If under 18, applicant will be required to
submit a birth certificate or a work certificate
as required by the state or federal laws.

Can you, after employment,
submit verification of your legal
right to work in the United States?

Elementary        High School                College/Tech
☐ or less    ☐ ☐ ☐ ☒        ☐ ☐ ☐ ☐          Yes ☐    No ☒
  8          1  2  3  4        1  2  3  4
Check the highest level or equivalent completed:

Will you now, or in the future,
require sponsorship for
employment visa status
(e.g., H-1B, visa status)?

Yes ☐    No ☒    _____
Are you currently a student?    Name of college, university or vo-tech attended

Availability - To help us consider you for a job that matches your availability,
please tell us the earliest time and the latest time you can work each day.

|  | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| Earliest Time | 06:00 | 05:00 | 05:00 | 05:00 | 05:00 | 05:00 | 05:00 |
| Latest Time | 14:00 | 17:00 | 17:00 | 17:00 | 17:00 | 17:00 | 15:00 |

Check if you are available to work: Days ☐  Evenings ☒  Nights ☐  Saturday ☒  Sunday ☒

First Name: _____

Please Print
Last Name: _____

Wal-Mart Stores, Inc. will provide a reasonable accommodation during the application and/or hiring process for individuals
with disabilities. Please advise us if you need assistance in the application and/or hiring process to accommodate a disability.

Employment History - List entire employment history, starting with your present employer. For any unemployed or self-employed periods show dates and location. **(Attach additional sheets if necessary.)**

If currently employed, may we contact your employer? Yes ☐  No ☒

| Company Name: WEST POINT STEVENS <br> Address: 2401 1ST. AVE OPLIKA <br> City/State/Zip: OPELIKA AL 36801 <br> Phone #: (334) 742-2223 | Your Job: MAINTENANCE <br> Supervisor's Name: PERRY HENDERSON <br> Dates Employed: UNASSIGNED <br> From: 10/15/1970   To: 7/28/2005 | Last Pay Rate: 15.25 <br> Reason for Leaving: TERMINATED UNJU STLY. |
|---|---|---|
| Company Name: <br> Address: <br> City/State/Zip: <br> Phone #: | Your Job: <br> Supervisor's Name: <br> Dates Employed: <br> From:   To: | Last Pay Rate: <br> Reason for Leaving: |
| Company Name: <br> Address: <br> City/State/Zip: <br> Phone #: | Your Job: <br> Supervisor's Name: <br> Dates Employed: <br> From:   To: | Last Pay Rate: <br> Reason for Leaving: |
| Company Name: <br> Address: <br> City/State/Zip: <br> Phone #: | Your Job: <br> Supervisor's Name: <br> Dates Employed: <br> From:   To: | Last Pay Rate: <br> Reason for Leaving: |
| Company Name: <br> Address: <br> City/State/Zip: <br> Phone #: | Your Job: <br> Supervisor's Name: <br> Dates Employed: <br> From:   To: | Last Pay Rate: <br> Reason for Leaving: |

List two (2) people (no relatives) you have worked with and whom we may contact for a reference if necessary.
Name: BARBRA THOMAS    Phone: (334) 705-0876
Name: VIRGINIA TURNER    Phone: (334) 745-3982

**If you reside in:**
**CA** - Do not disclose marijuana convictions (felony or misdemeanor) more than two years old.
**CO, MA, MD, NH, OK** - Do not disclose criminal records that are sealed, expunged or annulled.
**HI** - Do not answer the following questions.
**IL** - Do not disclose prior convictions that have been expunged, sealed or impounded under Section 5 of the Criminal Identification Act.
**WA** - Do not disclose convictions which occurred more than 7 years ago or for which you were released from prison more than 7 years ago.

Have you ever been convicted of a felony?  Yes ☐  No ☒   Have you ever been convicted of any type of theft or fraud or a violent crime?  Yes ☐  No ☒

If yes, on a separate sheet, identify the crime for which you were convicted, the date of the conviction and the location of the court in which you were convicted. Please provide any details you feel are relevant. Conviction of a crime will not automatically disqualify you from consideration for employment, but will be considered as part of an overall evaluation of your qualifications.

**IMPORTANT** - We are glad you are interested in joining the Wal-Mart team. Please read the following statement carefully before you sign and return this application. Wal-Mart Stores, Inc., in considering my application for employment, may verify the information set forth on this application and obtain additional background information relating to my background. I authorize all persons, schools, companies, corporations, credit bureaus and law enforcement agencies to supply any information concerning my background. I have read, understand and agree to this statement. (Please initial here.) _____

I understand that Wal-Mart Stores, Inc. has a commitment to maintain an alcohol/drug-free workplace and that Wal-Mart, unless prohibited by state law, requires a drug screening test as a part of its selection and hiring process. I understand that such drug screening will consist of the testing of a urine sample or other medically recognized test designed to detect traceable amounts of a controlled substance in my body. If after a second confirmatory test approved by SAMHSA, it is determined my specimen contains a controlled substance or was adultered or substituted, I will be disqualified from consideration for employment and any offer of employment will be withdrawn. I further understand and agree that if I am employed, I may be required to submit to alcohol/drug-testing under certain circumstances during my employment. I have read, understand, and agree to this statement. (Please initial here.) _____

I certify that the information on this application is correct and I understand that any misrepresentation or omission of any information will result in my disqualification from consideration for employment or, if employed, my dismissal. I understand that this application is not a contract, offer, or promise of employment and that if hired, I will be able to resign at any time for any reason. Likewise, the company can terminate my employment at any time with or without cause, unless otherwise required by law. I further understand that no one other than the President of Wal-Mart Stores, Inc., or Vice President of its People Division has the authority to enter into an employment contract or agreement with me, and that my at-will employment can be changed only by a written agreement signed by the President of Wal-Mart Stores, Inc. I have read, understand and agree to this statement. (Please initial here.) _____

I understand that this application is good only for sixty (60) days from today's date. If I still desire a position with the company after this application expires, it will be my responsibility to fill out a new application and file it with the company. Otherwise, the company will not consider me for employment after this application expires.

Date of Application: _____4/12/2006_____   Signature as shown on Social Security Card: _____

WPH
001013

# Dx. 70

Name: "BOBBY LEE" SANKS

Address: P.O. BOX 44

SALEM AL 36874

Did you complete High School ☑
GED ☐
College ☐
Technical School ☐

Degree obtained:

Other companies you've applied with in the last 2 years:

List five (5) places of employment starting with your most recent employer:

| Name/Type of Company | Supervisor's name | Telephone # | City/State | Your title | Start Date/End Date | Salary | Why did you leave? | Interviewer Use (Skills) |
|---|---|---|---|---|---|---|---|---|
| WEST POINT STEVENS | JERRY HENDERSON | 743-3521 | Valley AL West Point | BOBBY SANKS | July 1991 / 5.25 hr | Plant Closed / Terminated | | |

Today's Date: 10-18-05

Home Phone? ( 334 ) 749-4462
Answering Machine? Yes ☑ No ☐
Caller I.D.? Yes ☑ No ☐
Cellular Phone #(334) 744-5757
Have you ever been self-employed? Yes ☑ No ☐
Business name: BOBBY SANKS
Length of time: 3½ months
Position Desired:

How did you hear about us? NEWSPAPER
Will you commute 30 minutes to work?
Do you have your own automobile? YES
Do you have a clean driving record? Yes ☑ No ☐
If not, how do you plan to get to work?
When can you begin work?
What shifts can you work? 1st ☑ 2nd ☐ 3rd ☐ Any
What days of the week can you work? M T W TH F / All (Circle)
Are you able to pass a drug test RIGHT NOW? YES
Lowest Hourly Salary Acceptable: $10.00 / Part or Full Time (Circle)
Can you work in a Smoke Free Environment? YES

I hereby declare that all statements contained in this application are true and correct and understand that false or inaccurate information in the application will be the basis for termination. I understand that if employed, my employment will not be for any fixed period of time. I may be terminated by A-1 Employment, Inc. at any time. I also authorize A-1 Employment, Inc. to release the information contained herein and its findings and work history of my employment to other forms or persons upon request. I also understand and agree that I may be expected to work on a wide variety of job assignments in the Lee, Chambers and Macon County areas and agree to accept assignments for which I am qualified as they become available. I also understand my failure to report to A-1 Employment, Inc. for work will indicate I have quit. I further understand I am an employee of A-1 Employment, Inc. for a period of 180 days with each separate employer A-1 Employment, Inc. places me with and acknowledge I am ineligible for hire by any employer A-1 Employment, Inc. has referred me to without express written consent. I understand that my first check will have a deduction in the amount of $30.00 to cover the costs of my drug screening test. Dated: 10-18-05    Signature: B Bobby Lee Sanks

I hereby authorize A-1 Employment, Inc. to investigate my background inclusive of criminal activity and verify this information as well as examine any and all criminal records and arrests on file in all counties in the State of Alabama or any other state. In doing so, I understand that I am waiving my right of confidentiality concerning my criminal history. Dated: 10-18-03    Signature: B Bobby Lee Sanks
SS#

I hereby authorize and give full permission to A-1 Employment, Inc. and/or their medical company physician to send a specimen of my urine, saliva, hair, and/or blood to a laboratory for screening test using S.A.M.H.S.A. standards for the presence of illegal drugs, alcohol, or prescription medication taken without a prescription. I will hold all parties harmless, meaning I will not sue nor hold responsible for any alleged harm to me or interfering with my obtaining a job or continuing employment due to not submitting the tests or as a result of report of the test. This includes, but is not limited to possible clerical or laboratory error. This policy and authorization has been explained to me in a language I understand and I have asked any questions about the test and these questions have been answered to my satisfaction. I understand A-1 Employment, Inc. will require a drug screen whenever an on the job accident is reported in accordance with A-1 Employment, Inc.'s injury policy and this authorization is my consent. My refusal to submit to drug testing will be grounds for termination.    Dated: 10-18-05    Signature: B Bobby Lee Sanks
License #/State of Issue



DEFENDANT'S EXHIBIT 70    B. Sanks
PENGAD 800-631-6989

WPH
000970

(handwritten notes in margins:)
- electrical/mechanical maintenance
- main duties around plant
- Assembly
- Start October
- No bender

## PRE-APPLICATION QUESTIONNAIRE

1.  What is your name? *Bobby Lee Sams*

2.  Have you been here before? *No*

3.  Were we able to put you to work?

4.  Do you have access to a telephone? *yes*

5.  Do you have reliable transportation? *yes*

6.  What job(s) are you applying for? *Bently*

7.  What pay rate are you willing to start at? *$10.00 Per HR.*

8.  Are you willing to take a drug screen right now? *yes*

9.  Are you confident you can pass this drug screen right now? *yes*

10. Will you release your background history including your criminal record? *yes*

Dated: *10-18-05*    Signature: *Bobby Lee Sams*

I hereby authorize A-1 Employment, Inc. to investigate my background inclusive of criminal activity and verify this information as well as examine any and all criminal records and arrests on file in all counties in the State of Alabama or any other state. In doing so, I understand that I am waiving my right of confidentiality concerning my criminal history.

Dated: *10-18-05* Signature: *Bobby Lee Sams* SS#_____ License #/_____ State of Issue *Al.*

I hereby authorize and give full permission to A-1 Employment, Inc. and/or their medical company physician to send a specimen of my urine, saliva, hair, and/or blood to a laboratory for screening test using S.A.M.H.S.A. standards for the presence of illegal drugs, alcohol, or prescription medication taken without a prescription. I will hold all parties harmless, meaning I will not sue nor hold responsible for any alleged harm to me or interfering with my obtaining a job or continuing employment due to not submitting to the tests or as a result of report of the test. This includes, but is not limited to possible clerical or laboratory error. This policy and authorization has been explained to me in a language I understand and I have asked any questions about the test and these questions have been answered to my satisfaction. I understand A-1 Employment, Inc. will require a drug screen whenever an on the job accident is reported in accordance with A-1 Employment, Inc.'s injury policy and this authorization is my consent. My refusal to submit to drug testing will be grounds for termination.

Dated: *10-18-05*    Signature: *Bobby Lee Sams*

| Date | Employer | Company Name | Address | Phone Number |
|------|----------|--------------|---------|--------------|
| *10/27/05* | *AS* | *Benteler* *(BB)* | | *737-1768* |

Who Placed? *S*
What Pay? *800*  Job #_____
What Shift? *2*  Department?_____
Start Date? *10-29-05*  Supervisor? *Lamont Johnson*
What Job Title? *Qual Insp Robert Wurtz*
Interview Date/Time: *10-31-05  09:00 w/ Lamont Johnson*

Absences, remarks, follow-ups from interviews, & other comments: *prefer 1st* *2nd 2pm-10pm* *#750* *2-4-06 Quit!* *Qual Engr*

| Date | Employer | Company Name | Address | Phone Number |
|------|----------|--------------|---------|--------------|
|      |          |              |         |              |

Who Placed?_____
What Pay?_____  Job #_____
What Shift?_____  Department?_____
Start Date?_____  Supervisor?_____
What Job Title?_____

Absences, remarks, follow-ups from interviews, & other comments: *Stated after put him fin on it*

Interview Date/Time:

WPH
000971

3241F

IMPORTANT NOTE: If your response
is not received by   03/15/06
a determination may be made based
solely on information furnished by the
claimant.

    

# NOTICE OF CLAIM AND REQUEST FOR SEPARATION INFORMATION

Return to:

A 1 EMPLOYMENT INC
400 S 8TH ST STE 101
OPELIKA AL 36801

*Recd*

MAR 0 9 2006

ADJUDICATION SUPPORT
ROOM 3438
649 MONROE STREET
MONTGOMERY, AL  36131
FAX NUMBER 334 353-1265

The individual identified below has filed a claim for Unemployment Compensation benefits.

1. CLAIMANT'S NAME:  SANKS/BOBBY
2. SOCIAL SECURITY NO:
3. CLAIM DATE:      07/31/05
4. ACCT NUMBER:     0029252394

5. DATE MAILED: 03/07/06
6. EFFECTIVE DATE: 03/05/06
7. CALL-CENTER :  6001
8. TYPE OF CLAIM: A-01

The claimant identified you as his/her last employer and alleges the reason for separation to be:

27     VOLUNTARY QUIT DUE TO WORKING CONDS      LDW 02/03/06

**EMPLOYER RESPONSE (INSTRUCTIONS FOR COMPLETION ON REVERSE)**

9. Claimant's last day employed was _____ 2-4-06 _____
(If temporary layoff, enter expected date of recall: _____)

10. If the claimant earned wages or was paid vacation and/or sick pay or will receive a pension upon
termination with you **on or after the date shown in item #6.** above, complete the applicable
space(s) below:
a. GROSS WAGES   for hours worked. **(AFTER DATE IN #6)**   $ _____

b. HOLIDAY $ _____   paid for which holiday ?_____

c. VAC, SICK $_____   Was vacation pay for a specific time period following separation ?
(circle one) Yes  No If Yes what was the period ?_____ to _____

d. WARN PAY $_____   paid for period _____ to _____

e. PENSION $ _____   per month.  Effective date:_____

11. DISCHARGED. What was the date of the final incident that caused the discharge: _____

12. WARNING FOR SAME OR SIMILAR INCIDENT :(CIRCLE ONE)  YES  NO  WARNING DATE:_____

13  QUIT: Date quit: _2-4-06_  Reason for quit _____

14. REASON FOR SEPARATION: (ATTACH ADDITIONAL SHEET IF NECESSARY)
_Stated that the company had put a hiring freeze_
_on & he was past his 90 day temporary window,_
_so he quit_

WPH
000986

15: Enter your federal identification number: _____

_Lori Preston_          _Consultant_          _334-704-0677_   _3-9-06_
Print Name                    Title              Telephone No.    Date

# Dx. 71

Alabama Department of Industrial Relations

File Help

**Claimant Info**

SSN:
Name: SANKS/BOBBY
First Name: SANKS/BOBBY
Partial Program Code: UC

Prior Claim Date:
UCX
UCFE
CWC/Interstate

MI    Last Name:
Claim Type: **ADDITIONAL**
First Call Date: 03/06/06    Claim Date: 03/05/06
BYB: 07/31/05    BYE: 07/30/06
Suffix (Jr., II, SR):
Pop Name
DUA    TRA    CS: **RTM004**
EB    NK
V 0341

**Claimant Info 1**

Mailing Address
Change Name:        Yes | No
Change Address:     Yes | No
Street: P.O.BOX 44
Zip Code: 36874-
Driver's License:  318734
State: ALAB
U.S. State ID:

Residence Address
Different From Mailing Address:  Yes | No
Street:
City:
Zip:
State: ALAB
County: LEE    City: Salem

**Verified Name / SSN - As It Appeared on Claimant's Social Security Card**
First:   Yes | No
Email:   Yes | No

Email Address
MI    Last:

Mother's Maiden Name: SANKS
Verified Claimant:    Yes | No
U.S. Citizen:         Yes | No
Alien Number:

**Claimant Info 2**

State: ALAB
County: LEE
City: Salem
State:
County:

Phone:  Yes | No   (334) 749-4462
Date of Birth:
Gender:  ● Male  ○ Female
Veteran: ○ Yes  ● No

**ISSUES EXIST**

Audit History    EachFinding    IRS Verify    Print

ClmInfo | VPAQuestions | EmpHistory | ClaimDate | IntagDate | Issues | DUA | TRB | ViewWrap-up | Errors

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 08 2007

Daniel J. Somers
DANIEL J. SOMERS
CUSTODIAN OF RECORDS

DEFENDANT'S
EXHIBIT
7.)
B. Sanks

WPH
000909

Alabama Department of Industrial Relations

File  Help

SSN:
Name: SANKS/BOBBY

First Name:

Partial/Program Code: UC    Prior Claim Date:    UCX    UCFE    CWC/Interstate

MI:  Last Name:

Claim Type: ADDITIONAL    BYB: 07/31/05    Suffix (ex: JR, SR):

First Call Date: 03/06/06    Claim Date: 03/05/06    BYE: 07/30/06

DUA    TRA    EB    Tel:

CS: RTM0004    Pop Name:

V: 0341

**Additional Claim**

Page 1    Page 2    Page 3    Page 4

Are you filing a claim under the Disaster Unemployment Assistance?

Did you receive notification that you have TRA certification?    Yes    No

Has your address changed since you last filed?    Yes    No

Has your phone number changed since you last filed?    Yes    No    (334) 749-4462

Are you a US Citizen?    Yes    No

Have you worked since the last time you filed?    Yes    No

I have indicated that you have worked since you last filed, was the work you performed with the same employer you reported on your last claim?    Yes    No

Have you worked since    / /    Last Day Worked 02/03/2006    Reason for Separation  Quit

VRQuestions    Emp. History    Claim Date    Initial Date    Issues    DUA    TRA    View Wrap-up    Errors

Print

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000910



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000911

Alabama Department of Industrial Relations

File Help

SSN:
Name: SANKS/BOBBY
First Name:
MI:
Last Name:
Suffix (ex.JR,SR)

Potential Program Code: UC
First Claim Date:
Claim Type: ADDITIONAL
BYB: 07/31/05    BYE: 07/30/06

First Call Date: 03/06/06
Claim Date: 03/05/06
CS: R1M004

Additional Claim

**Page 1**

Since you last filed have you applied for or did you begin receiving a pension other than social security?

Since you last filed have you become self-employed?

Status: Yes No

Are you currently working on a commission basis?
Status: Yes No

Since you last filed have you applied for, or are you receiving worker's compensation due to a work related injury?
Issue: Yes No

Did you or will you receive Vacation Pay? Yes No

**Page 2**

Comment:

Comment:

Comment:

Comment:

Yes No

Yes No

Yes No

**Page 3**

Total Hours:

$ per hour

Yes No

**Page 4**

Claimant agrees with amount reported amount:

Print

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000912

Alabama Department of Industrial Relations

File Help

Name: SANKS/BOBBY

SSN:

First Name:    MI:    Last Name:

Penal/Program Code: UC    Prior Claim Date:    Claim Type: **ADDITIONAL**    Suffix (ex: JR, SR):

First Call Date: **03/06/06**    BYB:**07/31/05**  BYE:**07/30/06**  CS: **RITM004**

Claim Date: **03/05/06**    BYE:**03/06/06**    DUA    TRA    EB    ML    V.034i

Additional Claim

Page 1    Page 2    Page 3    Page 4

Did you or will you receive Holiday Pay?    [Yes] [No]

Claimant agrees with employer reported amount    [Yes] [No]

Did you or will you receive Sick Pay?    [Yes] [No]

Claimant agrees with employer reported amount    [Yes] [No]

Vac/Hol Pay    Total Hours    $ per hour    Total Hours    $ per hour    Total Hours    $ per hour

Claimant agrees with employer reported amount    [Yes] [No]

Have you worked for the federal government in the last 18 months?    [Yes] [No]

Did you serve on active duty in the military in the last 18 months?    [Yes] [No]

Do you elect to have 2% of your weekly benefit check withheld for Federal Income Tax?    [Yes] [No]

Print

Versn Info.    IVR Questions    Emp History    Claim Date    IntgState    Issues    DUA    TRA    View Wrap-up    Errors

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000913

Alabama Department of Industrial Relations

File Help

**Alabama**

Name: SANKS/BOBBY

First Name: [ ]  MI [ ]  Last Name: [ ]  Suffix (ex: JR, SR): [ ]

SSN: [ ]

Prior Claim Date: [ ]

Residual Program Code: UC    UCX    UCFE    CWD/Interstate

Claim Type: **ADDITIONAL**    BYB 07/31/05    BYE 07/30/06    CS: **RTM004**    Pop Name: [ ]

First Call Date: 03/06/06    Claim Date: 03/05/06

DUA    TRA    EB    MIL    V. 0341

**Employer History**

Employers:  A 1 EMPLOYMENT INC    WESTPOINT STEVENS INC

Disqual Start: [ ]    Disqual End: [ ]

Prior Last Day Wk: 12/23/2005    Prior Claim Date: [ ]

Interstate Agent?    Yes  No

Worked After Federal?    Yes  No    Where: [ ]

Issue    Disq?  Yes  No

| | 043 | 044 | 051 | 052 | 053 | 054 |
|---|---|---|---|---|---|---|
| 10 x WBA | | | | | | |
| 8 x WBA | | | | | | |
| | $11,098.88 | $11,867.93 | $12,113.25 | $14,741.07 | $3,489.63 | $3,733.12 |

WBA: 1760

Agree: Yes  No

Verified: Yes  No

Verified: Yes  No

Add Employer    Delete Employer

Print

CERTIFIED AND TRUE COPY OF ALA. DEPT OF INDUSTRIAL RELATIONS RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000914



CERTIFIED AND TRUE COPY OF ALA.
DEPT. OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 8 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000915



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000916



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000917

🔷 Alabama Department of Industrial Relations

File   Help

**Claimant Info**

SSN:

Name: SANKS/BOBBY

st Name:

Prior Claim Date:        UCX        UCFE        CWC/Interstate

MI:   Last Name:

Suffix (ex JR, SR)

Pop Name

Potential Program Code: UC

Claim Type: ADDITIONAL    BYB: 07/31/05    BYE: 07/30/06

First Call Date: 03/06/06    Claim Date: 03/05/06    CS: RTM004

DUA:    TRA:    EB:    RU:

V 0341

**Claimant Info 1**

Did you file for or receive unemployment benefits in another state
within the last 12 months?

Worked in another state in the last 18 months?

Worked since the last time you filed?

Did you receive notification that you have TRA certification?

Are you filing for DUA?

Are you filing for Extended Benefits?

Yes    No

— Existing Claim Information —
Existing WBA  $220.00        Existing MBA  $5,720.00
Claim Balance  $3,740.00        Penalty Balance
Overpay Balance

**Claimant Info 2**

Yes    No
Yes    No
Yes    No

— Potential Claim Information —
Potential WBA
Potential MBA

State Info

IBIU Received?    Yes    No

Recover TRA?    Yes    No

Cancel Claim?    Yes    No

Claim Info | IVRQuestions | Emp History | Claim Date | Interstate | Issues | DUA | TRA | View Wrap-up | Errors

AuditHistory | FactFinding | INS Verify | Print

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

Daniel J. Somers

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000918

**Fact Finding**

Tabs: Statements | Discharge-Emp | Discharge-Clmt | Quit | Absent/Tardy | Summary | Attempts

Claimant Name: BANKS/BOBBY
Claimant SSN:
Claim Date: 03/05/06

**BEN241 Status:**
- ○ Timely Received
- ○ Timely Mailed, Late Received
- ○ Mailed, Late
- ○ Not Received

Left message on: / /
○ to return call no later than / /
or decision will be made based on available information

**Separation resulted from:**
- ○ Voluntary Quit
- ○ Discharge
- ○ Now-unavailable
- ○ Other

**Claimant's Statement**
03/14/06 @ 7:50AM - LDW 02/04/06 - I WAS WORKING AN ASSIGNMENT AT BENTLEY. I HAD BEEN TOLD BY MY SUPERVISOR, JEFF, THAT I WOULD BE HIRED ON PERMANENT AFTER MY 90DAY PROBATION WAS OVER. THE COMPANY PUT ON A HIRING FREEZE & I WAS NOT HIRED PERMANENT. I WOULD HAVE BEEN MAKING $3 - $4 MORE PER HOUR & I FELT I HAD NO CHOICE BUT TO QUIT WHEN I WAS NOT HIRED ON PERMANENT.

**Employer's Statement**
Phone Number: (334)704-0877
03/13/06 @ 10:35AM - LDW 02/04/06 - HE HAD BEEN WORKING AN ASSIGNMENT FOR ABOUT 90 DAYS. HE WAS NOT HIRED ON PERMANENT BY THE COMPANY, SO HE QUIT. NOT SURE OF PERSON HE TOLD. HE HAD NOT BEEN TOLD HE WOULD BE HIRED ON PERMANENT. WE HAVE NO INFORMATION ON ANYONE TELLING HIM HE WOULD BE HIRED PERMANENT. HE WAS TOLD THAT AFTER 90 DAYS THE COMPANY MAY HIRE TEMPEES ON A PERMANENT BASIS.

Person Interviewed: LORI PRESTON
Interviewer: CRYSTAL DEAN
Title: CONSULTANT
Date: / /
Date: 03/13/2006

[ Print ]   [ Save ]   [ Cancel ]

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000919

Fact Finding

Claimant Name | SANKS/BOBBY

Statements | Discharge-Emp | Discharge-Clmt | Quit | Absent/Tardy | Summary | Attempts

Claimant SSN

Claim Date | 03/06/06

Did you quit your job due to:   Personal   Work Related   Other

Explain Other

Did you tell your employer the reason you quit?   Yes   No
If not, explain why you did not tell your employer

Did you quit because of working conditions?  Explain these conditions in detail (e.g. what person or factors created the problem?)   Yes   No   If yes, whom did you tell?   ???? / MGR

I WAS TOLD I WOULD BE HIRED PERMANENT, BUT I WAS NOT. I WOULD HAVE BEEN MAKING $3 - $4 MORE PER HOUR IF HIRED ON PERMANENT. I FELT I HAD NO CHOICE BUT TO QUIT.

How long did these conditions exist?

What action did you take to resolve the problem before you quit? (Example: did you ask for a transfer, leave of absence, file a grievance or talk to a supervisor? Explain what you did and when)

If you quit because of personal or other, explain in detail:

NOTHING.

What action did your employer take to resolve the problem?

Print   Save   Cancel

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000920



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 8 2007

DANIEL J. BOMERS
CUSTODIAN OF RECORDS

WPH
000921

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 2, Part 7

# Exhibits to the Deposition of Bobby Sanks Dxs. 72

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink    Page 1 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 2 of 32

## Client Status Sheet for BOBBY Lee SANKS (06/05/2007)

### Contact Information

| | |
|---|---|
| Contact Name: | BOBBY Lee SANKS |
| Address: | P O BOX 44SALEM, AL 36874 |
| Phone 1: | (334) 749-4462 |
| Phone 2: | (334) 444-9757 |
| E-Mail: | bobbysankss@aol.com |

### Alternate Contacts
None Entered

Demographics Information

## Miscellaneous Demographics Info

| | |
|---|---|
| Eligibility Date: | 10/23/2003 |
| Area/County of Residence: | Lee |
| Area/County of Residence type: | Not Entered |
| Area/County of Service | Lee |
| EES Client ID | Not Entered |
| Other Agency Client ID | Not Entered |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 7007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

## Personal

| | |
|---|---|
| Social Security Number | |
| Date of Birth | |
| Race | Not Self Identified |
| Gender | Male |
| Are you a single, separated, divorced or widowed individual with primary responsibility for one or more dependents under the age 18? | No |
| Number in Family | |
| Individual with Disability (For this question, disability means, a physical or mental impairment that substantially limits one or more of the major life activities of an individual.) | No |
| Education Status | Not attending school; High School graduate |
| Highest Grade Completed | High School Graduate |
| Have you served on Active Duty with the Armed Forces of the United States? | No |

## Veteran Information

| | |
|---|---|
| Are you a homeless veteran? | Not entered |
| Are you the spouse of any person who died on active military duty or of a military service-connected disability? | No |
| Are you a member of any member of the Armed Forces serving on active duty who at the time of this registration has been in any one or more of the following categories for more than 90 days: | N/A |
| Are you the spouse of any person who has a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a veteran who died while diagnosed with a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a military service member of the armed forces who is receiving transitional services prior to retirement or discharge from military service? | No |



WPH
000878

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink                    Page 2 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 3 of 32

## Migrant Worker

Do you believe that you are a Seasonal Farmworker/Migrant after reading the definitions?                    No

## Employment Status

| | |
|---|---|
| Employment status | Not Employed |
| Number of weeks not employed (at time of registration) during the prior 26 weeks | 0 |
| Interstate Worker | Not Entered |
| Unemployment Claimant | State Claimant |

## Citizenship

| | |
|---|---|
| Citizenship | U.S. Citizen |

## Dislocated Worker

| | |
|---|---|
| Have you been laid off or received a notice of layoff from your employer as a result of a reduction in the employer's workforce or received a notice of termination from your employer? | No |
| Have you been laid off or received a notice of layoff from your employer as a result of a permanent closing or major layoff? | No |
| Are you employed by an employer who has made a general announcement that the business will close within 180 days? | No |
| Are you employed by an employer who has made a general announcement that the business will close, without naming a specific date? | No |
| Were you self-employed and are now unemployed due to general economic conditions or a natural disaster in your community? | No |
| Are you a displaced homemaker? A displaced homemaker is an individual who was dependent on support from a family member whose support is no longer available, is unemployed or underemployed, and is having difficulty finding a job or finding a good job. | No |
| Are you unemployed as a result of military closures or realignments? | No |
| Are you unemployed due to multiple layoffs in a single local community, significantly increasing the total number of unemployed workers? | No |
| Are you unemployed due to emergencies or natural disasters which have been declared eligible for public assistance by the Federal Emergency Management Agency (FEMA)? | No |
| Statewide 15% Program ID | N/A |

## Alternative Trade Adjustment Assistance (ATAA)

| | |
|---|---|
| Date of 1st qualifying reemployment | |
| O*NET-SOC Title | |
| Employer | |
| Contact | |
| Address | |
| Address | |
| City | |
| State | |
| Zip | |
| Phone | |
| End of 26th Week | |
| Obtained Employment by end of 26 weeks | N/A |
| Hourly Wage | $0.00 |
| Hours worked per week | 0 |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000879

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink    Page 3 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 4 of 32

| Projected Annualized Re-employment Wage | $0.00 |
| Projected earnings are less than $50,000 | Yes |
| Full-time employment | N/A |
| Have you returned to your previous employer | N/A |
| Are you doing the same or similiar work for your previous employer, but in another division/facility | N/A |
| Estimated ATAA monthly benefit | $0.00 |

## Low Income

| Receives or is a member of a family that receives cash payments under a federal, state, or local income based public assistance program | No |
| Received an income, or is a member of a family that received a total family income for the six month period prior to application for the program involved that, in relation to family size, does not exceed the poverty line | No |
| Received an income, or is a member of a family that received a total family income, for the six month period prior to application for the program involved that, in relation to family size, does not exceed 70 percent of the lower living standard income level (LLSIL) for an equivalent period | No |
| Member of a household that receives, or has been determined within the six month period prior to application for the program involved to be eligible to receive, food stamps | No |
| Homeless individual | No |
| Disabled and own income meets the income requirements of a participant who receives cash payments under federal, state, or local income based public assistance programs | No |
| Disabled and own income is at the poverty line for a six month period prior to application for the program involved regardless of whether their family does not meet this income requirement | No |

## Public Assistance

| Supplemental Security Income (SSI) | Not entered |
| TANF Recipient | No |
| Number of Months on TANF/AFDC Cash Assistance | 0 months |
| State or Local Welfare (General Assistance) | Not entered |
| Food Stamps | Not entered |
| Subsidized housing | Not entered |
| Social Security Disability (SSDI) | Not entered |
| Other Assistance | Not entered |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

## Needs And Barriers

| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| LEP Primary Language | |
| LEP Primary Language (If Other selected above) | |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Poor Work History or Prospects | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |

WPH
000880

Cultural, social or geographic isolation.                    Not entered
Other social barriers not already indicated.                 Not entered

Eligibility
LE Job Service
WIA Adult (Local Formula)

### Self-Service Services

### Partner-Provided Services

Referrals
Client has no referrals yet.

Current Enrollments
**LE**

No open enrollments.

**RES**

No open enrollments.

**TAA/NAFTA-TAA**

No open enrollments.

**WIA**

No open enrollments.

**SCSEP**

No open enrollments.

**UC**

No open enrollments.

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

### Co-Registrations

No co-registrations have been entered for this client.

JUN 0 6 7007

### Employment History

| | |
|---|---|
| Title | MAINTENANCE WORKER |
| Company | WESTPOINT STEVENS INC |
| City | OPELIKA |
| State | AL |
| From Month | January |
| From Year | 2000 |
| To Month | April |
| To Year | 2004 |
| Desc. and Duties of the Job | PERFORMED ELECTRICAL AND MECHANICAL REPAIR |
| Contact Person | |
| Contact Person's Job Title | |
| Address | |
| City | |
| State | AL |

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH
000881**

Zip
Phone
Email
Wage                                    15.25
Wage Type                               Hourly
Wage Descriptor
Hours Per Week                          40-49
Explanation of Hours Per Week, If Unable to
Determine
Reason for leaving position             Fired

Title                                   Maintenance Mechanic/Electrical/Machinery
Company                                 West Point Stevens
City                                    Opelika
State                                   AL
From Month                              October
From Year                               1970
To Month                                July
To Year                                 2005

Desc. and Duties of the Job             Inspected machinery for safety standards. Repaired machinery
                                        and elevators. Troubleshooting on machinery. Some installation
                                        and setup. Some blueprint reading. Lubrication of machinery.
                                        Tested equipment before returning it to service. Used handtools
                                        and power tools. Hoisting.

Contact Person
Contact Person's Job Title
Address
City
State                                   AL
Zip
Phone
Email
Wage                                    0.00
Wage Type                               Hourly
Wage Descriptor
Hours Per Week                          Unknown
Explanation of Hours Per Week, If Unable to
Determine
Reason for leaving position

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

                                        Client Notes

Staff Name:                             Doris F. Kindell
Case Detail Page:                       Add Notes Page
Descriptor:                             General Note
Date:                                   11/30/2005
Notes:                                  11/30/05 7402 Called for Frontier Yarns, General Plant Technician, 236342.

Staff Name:                             Mary Thomas
Case Detail Page:                       Add Notes Page
Descriptor:
Date:                                   10/07/2005

WPH
000882

Notes:                              WANTS-UNIROYAL

Job Referrals
Job Title: MACHINE OPERATORS AND WELDERS
Company: BENTELER AUTOMOTIVE
Date of Referral: 01/21/2004
Date to Report:
Outcome Status: Not Hired
Station Desk: 7404
Office: 85740000

Job Title: Production Operators
Company: HIGHTEX INC
Date of Referral: 10/21/2005
Date to Report: 10/21/2005
Outcome Status: Not Hired
Station Desk: 7404
Office: 85740000

Job Title: FURNITURE PRODUCTION PERSONNEL
Company: LEONARD PETERSON & CO INC
Date of Referral: 01/26/2006
Date to Report: 01/26/2006
Outcome Status: Not Hired
Station Desk: 7426
Office: 85740000

Job Developments
No Job Developments Entered

Job Placements
No Job Placements Entered

LE (08/10/2005) - Wages Prior Registration

**First Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Second Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Third Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Fourth Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 7007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

LE (08/10/2005) - Wages After Exit

**First Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Second Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

WPH
000883

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink

Page 7 of 31

Case 3:06-cv-01092-MHT-CSC   Document 35-9   Filed 12/17/2007   Page 8 of 32

**Third Quarter Wages**

UI Wages are present.

Supplemental wages are not present in this quarter.

**Fourth Quarter Wages**

UI Wages are not present.

Supplemental wages are not present in this quarter.

**Fifth Quarter Wages**

UI Wages are not present.

Supplemental wages are not present in this quarter.

LE (08/10/2005) - Program Notes

No Program Notes Entered

LE (08/10/2005) - Job Service

Enrollment Start date  08/10/2005

Exit date            2006-01-26 00:00:00.0

LE (08/10/2005) - Job Service - Goals

LE (08/10/2005) - Job Service - Interests

No interests have been entered.

LE (08/10/2005) - Job Service - Service and Training Plan

| | |
|---|---|
| Service Type | Job Search Spec Labor Market Assistance |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | Opelika Career Center |
| Project Code | 000 |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | OPELIKA |
| Provider Address | 2300 FREDERICK RD Opelika, AL 36801 |
| Provider Phone | 3347495065 |
| Provider Fax | 3347455783 |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/07/2005 |
| Est. End Date | 10/07/2005 |
| Actual Start Date | 10/07/2005 |
| Actual End Date | 10/07/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH**

**000884**

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink                          Page 8 of 31

Case 3:06-cv-01092-MHT-CSC      Document 35-9      Filed 12/17/2007      Page 9 of 32

| Field | Value |
|---|---|
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Job Search Spec Labor Market Assistance |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | Opelika Career Center |
| Project Code | 000 |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | ES |
| Provider Address | 2300 FREDERICK RD Opelika, AL 36801 |
| Provider Phone | 3347495065 |
| Provider Fax | 3347455783 |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 08/10/2005 |
| Est. End Date | 08/10/2005 |
| Actual Start Date | 08/10/2005 |
| Actual End Date | 08/10/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 7007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000885

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink    Page 9 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 10 of 32

| Field | Value |
|---|---|
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS

JUN 06 7007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH**
**000886**

| Field | Value |
|---|---|
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000887

| Days | |
|------|--|
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |

CERTIFIED AND TRUE COPY OF A.L.A.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000888

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink          Page 12 of 31

Case 3:06-cv-01092-MHT-CSC     Document 35-9     Filed 12/17/2007     Page 13 of 32

| Field | Value |
|---|---|
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000889

| | |
|---|---|
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000890

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink                    Page 14 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 15 of 32

| | |
|---|---|
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000891

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink                    Page 15 of 31

Case 3:06-cv-01092-MHT-CSC     Document 35-9     Filed 12/17/2007     Page 16 of 32

| | |
|---|---|
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOWERS
CUSTODIAN OF RECORDS

**WPH**
**000892**

Name: BOBBY LEE SANKS - Part. ID: 618629 - Alabama JobLink

Page 16 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 17 of 32

| | |
|---|---|
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 0504 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |
| Service Type | Obtained Employment |
| Training Type | |
| O*NET-SOC | |
| CIP Code | |
| Training Agent ID | |
| Project Code | |
| Status | Completed |
| WtW Allocation Year | |
| Total Cost | 0.00 |
| Provider Name | |
| Provider Address | |
| Provider Phone | |
| Provider Fax | |
| Start Time | |
| End Time | |
| Hours Planned | 0.00 |
| Days | |
| Est. Start Date | 10/29/2005 |
| Est. End Date | 10/29/2005 |
| Actual Start Date | 10/29/2005 |
| Actual End Date | 10/29/2005 |
| Stationdesk | 7430 |
| Office | Opelika Career Center |
| Reason for Training Waiver | NA |
| Mandatory? | NA |
| Customer Satisfaction | NA |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

LE (08/10/2005) - Job Service - Service Gap Information

**Service Gap Info**

| Gap Start Date | Gap End Date |
|---|---|
| | |

WPH
000893

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink          Page 17 of 31

Case 3:06-cv-01092-MHT-CSC     Document 35-9     Filed 12/17/2007     Page 18 of 32

Office                                                        Station Desk

### LE (08/10/2005) - Job Service - Employment Plan

Occupational Assessment
and Career Research:

Justification for
Employment Goal:

Justification for Vocational
Goal:

Client Strengths:

Plan for Overcoming
Identified Barriers:

Assistive Technology Needs
for Achieving Goals:

Client Responsibilities and
Agency Responsibilities:

Economic Need Statement
and Planning:

Required Supportive
Services During Active
Participation:

Post Employment Needs:

Client Involvement
Statement:

Client Progress Review:

Additional Notes:

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

### LE (08/10/2005) - Job Service - Enrollment Notes

No Enrollment Notes Entered

### LE (08/10/2005) - Job Service - Needs and Barriers

| | |
|---|---|
| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Requires additional assistance to complete an educational program | No |
| Requires additional assistance to secure and hold employment | No |
| Learning Disability | No |
| Poor Work History | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |
| Cultural, social or geographic isolation | Not entered |
| Other Barriers | |

### LE (08/10/2005) - Job Service - Needs and Barriers Notes

No Enrollment Notes Entered

### LE (08/10/2005) - Job Service - Contact Snapshot

WPH
000894

Name: BOBBY LEE SANKS - Part. ID: 618629 - Alabama JobLink    Page 18 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 19 of 32

| Contact Name: | BOBBY Lee SANKS |
|---|---|
| Address: | P O BOX 44<br>SALEM, AL 36874 |
| Phone 1: | 334-749-4462 |
| Phone 2: | 334-444-9757 |
| Fax: | |
| E-Mail: | bobbysankss@aol.com |
| Web Site Address: | |

LE (08/10/2005) - Job Service - Demographics Snapshot

## Miscellaneous Demographics Info

| | |
|---|---|
| Eligibility Date: | 10/23/2003 |
| Area/County of Residence: | Lee |
| Area/County of Residence type: | Not Entered |
| Area/County of Service | Lee |
| EES Client ID | Not Entered |
| Other Agency Client ID | Not Entered |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

## Personal

| | |
|---|---|
| Social Security Number | 424729114 |
| Date of Birth | 06/01/1980 |
| Race | Not Self Identified |
| Gender | Male |
| Are you a single, separated, divorced or widowed individual with primary responsibility for one or more dependents under the age 18? | No |
| Number in Family | |
| Individual with Disability (For this question, disability means, a physical or mental impairment that substantially limits one or more of the major life activities of an individual.) | No |
| Education Status | Not attending school; High School graduate |
| Highest Grade Completed | High School Graduate |
| Have you served on Active Duty with the Armed Forces of the United States? | No |

## Veteran Information

| | |
|---|---|
| Are you a homeless veteran? | Not entered |
| Are you the spouse of any person who died on active military duty or of a military service-connected disability? | No |
| Are you the spouse of any member of the Armed Forces serving on active duty who at the time of this registration has been in any one or more of the following categories for more than 90 days: | N/A |
| Are you the spouse of any person who has a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a veteran who died while diagnosed with a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a military service member of the armed forces who is receiving transitional services prior to retirement or discharge from military service? | No |

## Migrant Worker

| | | |
|---|---|---|
| Do you believe that you are a Seasonal Farmworker/Migrant after reading the definitions? | No | **WPH**<br>**000895** |

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink                    Page 19 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 20 of 32

## Employment Status

| | |
|---|---|
| Employment status | Employed |
| Number of weeks not employed (at time of registration) during the prior 26 weeks | 0 |
| Interstate Worker | Not Entered |

## Selective Service

| | |
|---|---|
| Complies with selective service requirements? | Yes |

## Citizenship

| | |
|---|---|
| Citizenship | U.S. Citizen |

## Dislocated Worker

| | |
|---|---|
| Have you been laid off or received a notice of layoff from your employer as a result of a reduction in the employer's workforce or received a notice of termination from your employer? | No |
| Have you been laid off or received a notice of layoff from your employer as a result of a permanent closing or major layoff? | No |
| Are you employed by an employer who has made a general announcement that the business will close within 180 days? | No |
| Are you employed by an employer who has made a general announcement that the business will close, without naming a specific date? | No |
| Were you self-employed and are now unemployed due to general economic conditions or a natural disaster in your community? | No |
| Are you a displaced homemaker? A displaced homemaker is an individual who was dependent on support from a family member whose support is no longer available, is unemployed or underemployed, and is having difficulty finding a job or finding a good job. | No |
| Are you unemployed as a result of military closures or realignments? | No |
| Are you unemployed due to multiple layoffs in a single local community, significantly increasing the total number of unemployed workers? | No |
| Are you unemployed due to emergencies or natural disasters which have been declared eligible for public assistance by the Federal Emergency Management Agency (FEMA)? | No |
| Statewide 15% Program ID | N/A |

## Alternative Trade Adjustment Assistance (ATAA)

| | |
|---|---|
| Date of 1st qualifying reemployment | |
| O*NET-SOC Title | |
| Employer | |
| Contact | |
| Address | |
| Address | |
| City | |
| State | |
| Zip | |
| Phone | |
| End of 26th Week | |
| Obtained Employment by end of 26 weeks | N/A |
| Hourly Wage | $0.00 |
| Hours worked per week | 0 |
| Projected Annualized Re-employment Wage | $0.00 |
| Projected earnings are less than $50,000 | Yes |

CERTIFIED AND TRUE COPY OF ALA. DEPT OF INDUSTRIAL RELATIONS RECORDS.

JUN 06 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH

000896

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink

Page 20 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 21 of 32

| Full-time employment | N/A |
| Have you returned to your previous employer | N/A |
| Are you doing the same or similiar work for your previous employer, but in another division/facility | N/A |
| Estimated ATAA monthly benefit | $0.00 |

## Low Income

| Receives or is a member of a family that receives cash payments under a federal, state, or local income based public assistance program | No |
| Received an income, or is a member of a family that received a total family income for the six month period prior to application for the program involved that, in relation to family size, does not exceed the poverty line | No |
| Received an income, or is a member of a family that received a total family income, for the six month period prior to application for the program involved that, in relation to family size, does not exceed 70 percent of the lower living standard income level (LLSIL) for an equivalent period | No |
| Member of a household that receives, or has been determined within the six month period prior to application for the program involved to be eligible to receive, food stamps | No |
| Homeless individual | No |
| Disabled and own income meets the income requirements of a participant who receives cash payments under federal, state, or local income based public assistance programs | No |
| Disabled and own income is at the poverty line for a six month period prior to application for the program involved regardless of whether their family does not meet this income requirement | No |

## Public Assistance

| Supplemental Security Income (SSI) | Not entered |
| TANF Recipient | No |
| Number of Months on TANF/AFDC Cash Assistance | 0 months |
| State or Local Welfare (General Assistance) | Not entered |
| Food Stamps | Not entered |
| Subsidized housing | Not entered |
| Social Security Disability (SSDI) | Not entered |
| Other Assistance | Not entered |

## Needs And Barriers

| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| LEP Primary Language | |
| LEP Primary Language (If Other selected above) | |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Poor Work History or Prospects | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |
| Cultural, social or geographic isolation. | Not entered |
| Other social barriers not already indicated. | Not entered |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS

JUN 0 8 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000897

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink    Page 21 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 22 of 32

LE (08/10/2005) - Job Service - Eligibility Snapshot

LE Job Service
WIA Adult (Local Formula)

UC (07/31/2005) - Program Notes

No Program Notes Entered

UC (07/31/2005) - Unemployment Compensation

Enrollment Start date  07/31/2005
Exit date  2006-07-30 00:00:00.0

UC (07/31/2005) - Unemployment Compensation - Goals

UC (07/31/2005) - Unemployment Compensation - Interests

No interests have been entered.

UC (07/31/2005) - Unemployment Compensation - Service and Training Plan

UC (07/31/2005) - Unemployment Compensation - Service Gap Information

## Service Gap Info

| Gap Start Date | Gap End Date | |
| --- | --- | --- |
| Office | Station Desk | |

UC (07/31/2005) - Unemployment Compensation - Employment Plan

Occupational Assessment
and Career Research:

Justification for
Employment Goal:

Justification for Vocational
Goal:

Client Strengths:

Plan for Overcoming
Identified Barriers:

Assistive Technology Needs
for Achieving Goals:

Client Responsibilities and
Agency Responsibilities:

Economic Need Statement
and Planning:

Required Supportive
Services During Active
Participation:

Post Employment Needs:

Client Involvement
Statement:

Client Progress Review:

Additional Notes:

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. BOWERS
CUSTODIAN OF RECORDS

UC (07/31/2005) - Unemployment Compensation - Enrollment Notes

No Enrollment Notes Entered

**WPH**
**000898**

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink

Page 22 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 23 of 32

UC (07/31/2005) - Unemployment Compensation - Needs and Barriers

| | |
|---|---|
| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Requires additional assistance to complete an educational program | No |
| Requires additional assistance to secure and hold employment | No |
| Learning Disability | No |
| Poor Work History | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |
| Cultural, social or geographic isolation | Not entered |
| Other Barriers | |

UC (07/31/2005) - Unemployment Compensation - Needs and Barriers Notes

No Enrollment Notes Entered

UC (07/31/2005) - Unemployment Compensation - Contact Snapshot

| | |
|---|---|
| Contact Name: | BOBBY Lee SANKS |
| Address: | P O BOX 44<br>SALEM, AL 36874 |
| Phone 1: | 334-749-4462 |
| Phone 2: | 334-444-9757 |
| Fax: | |
| E-Mail: | bobbysankss@aol.com |
| Web Site Address: | |

UC (07/31/2005) - Unemployment Compensation - Demographics Snapshot

**Miscellaneous Demographics Info**

| | |
|---|---|
| Eligibility Date: | 10/23/2003 |
| Area/County of Residence: | Lee |
| Area/County of Residence type: | Not Entered |
| Area/County of Service | Lee |
| EES Client ID | Not Entered |
| Other Agency Client ID | Not Entered |

**Personal**

| | |
|---|---|
| Social Security Number | |
| Date of Birth | |
| Race | Not Self Identified |
| Gender | Male |
| Are you a single, separated, divorced or widowed individual with primary responsibility for one or more dependents under the age 18? | No |
| Number in Family | |
| Individual with Disability (For this question, disability means, a physical or mental | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000899

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink    Page 23 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 24 of 32

impairment that substantially limits one or more of the major life activities of an individual.)    No

| Education Status | Not attending school; High School graduate |
|---|---|
| Highest Grade Completed | High School Graduate |
| Have you served on Active Duty with the Armed Forces of the United States? | No |

## Veteran Information

| Are you a homeless veteran? | Not entered |
|---|---|
| Are you the spouse of any person who died on active military duty or of a military service-connected disability? | No |
| Are you the spouse of any member of the Armed Forces serving on active duty who at the time of this registration has been in any one or more of the following categories for more than 90 days: | N/A |
| Are you the spouse of any person who has a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a veteran who died while diagnosed with a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a military service member of the armed forces who is receiving transitional services prior to retirement or discharge from military service? | No |

## Migrant Worker

| Do you believe that you are a Seasonal Farmworker/Migrant after reading the definitions? | No |
|---|---|

## Employment Status

| Employment status | Employed |
|---|---|
| Number of weeks not employed (at time of registration) during the prior 26 weeks | 0 |
| Interstate Worker | Not Entered |

## Selective Service

| Complies with selective service requirements? | Yes |
|---|---|

## Citizenship

| Citizenship | U.S. Citizen |
|---|---|

## Dislocated Worker

| Have you been laid off or received a notice of layoff from your employer as a result of a reduction in the employer's workforce or received a notice of termination from your employer? | No |
|---|---|
| Have you been laid off or received a notice of layoff from your employer as a result of a permanent closing or major layoff? | No |
| Are you employed by an employer who has made a general announcement that the business will close within 180 days? | No |
| Are you employed by an employer who has made a general announcement that the business will close, without naming a specific date? | No |
| Were you self-employed and are now unemployed due to general economic conditions or a natural disaster in your community? | No |
| Are you a displaced homemaker? A displaced homemaker is an individual who was dependent on support from a family member whose support is no longer available, is unemployed or underemployed, and is having difficulty finding a job or finding a good job. | No |
| Are you unemployed as a result of military closures or realignments? | No |

WPH
000900

CERTIFIED AND TRUE COPY OF ALA. DEPT OF INDUSTRIAL RELATIONS RECORDS.

DANIEL J. ROBERTS CUSTODIAN OF RECORDS

JUN 06 2007

Name: BOBBY Lee SANKS - Part. ID: 618629 - Alabama JobLink

Page 24 of 31

Case 3:06-cv-01092-MHT-CSC    Document 35-9    Filed 12/17/2007    Page 25 of 32

| Are you unemployed due to multiple layoffs in a single local community, significantly increasing the total number of unemployed workers? | No |
|---|---|
| Are you unemployed due to emergencies or natural disasters which have been declared eligible for public assistance by the Federal Emergency Management Agency (FEMA)? | No |
| Statewide 15% Program ID | N/A |

## Alternative Trade Adjustment Assistance (ATAA)

| | |
|---|---|
| Date of 1st qualifying reemployment | |
| O*NET-SOC Title | |
| Employer | |
| Contact | |
| Address | |
| Address | |
| City | |
| State | |
| Zip | |
| Phone | |
| End of 26th Week | |
| Obtained Employment by end of 26 weeks | N/A |
| Hourly Wage | $0.00 |
| Hours worked per week | 0 |
| Projected Annualized Re-employment Wage | $0.00 |
| Projected earnings are less than $50,000 | Yes |
| Full-time employment | N/A |
| Have you returned to your previous employer | N/A |
| Are you doing the same or similiar work for your previous employer, but in another division/facility | N/A |
| Estimated ATAA monthly benefit | $0.00 |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. BOMERS
CUSTODIAN OF RECORDS

## Low Income

| Receives or is a member of a family that receives cash payments under a federal, state, or local income based public assistance program | No |
|---|---|
| Received an income, or is a member of a family that received a total family income for the six month period prior to application for the program involved that, in relation to family size, does not exceed the poverty line | No |
| Received an income, or is a member of a family that received a total family income, for the six month period prior to application for the program involved that, in relation to family size, does not exceed 70 percent of the lower living standard income level (LLSIL) for an equivalent period | No |
| Member of a household that receives, or has been determined within the six month period prior to application for the program involved to be eligible to receive food stamps | No |
| Homeless individual | No |
| Disabled and own income meets the income requirements of a participant who receives cash payments under federal, state, or local income based public assistance programs | No |
| Disabled and own income is at the poverty line for a six month period prior to application for the program involved regardless of whether their family does not meet this income requirement | No |

WPH
000901

## Public Assistance

| Supplemental Security Income (SSI) | Not entered |
|---|---|
| TANF Recipient | No |

| | |
|---|---|
| Number of Months on TANF/AFDC Cash Assistance | 0 months |
| State or Local Welfare (General Assistance) | Not entered |
| Food Stamps | Not entered |
| Subsidized housing | Not entered |
| Social Security Disability (SSDI) | Not entered |
| Other Assistance | Not entered |

## Needs And Barriers

| | |
|---|---|
| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| LEP Primary Language | |
| LEP Primary Language (If Other selected above) | |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Poor Work History or Prospects | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |
| Cultural, social or geographic isolation. | Not entered |
| Other social barriers not already indicated. | Not entered |

UC (07/31/2005) - Unemployment Compensation - Eligibility Snapshot

LE Job Service
WIA Adult (Local Formula)

LE (01/21/2004) - Wages Prior Registration

**First Quarter Wages**

UI Wages are not present.
Supplemental wages are not present in this quarter.

**Second Quarter Wages**

UI Wages are not present.
Supplemental wages are not present in this quarter.

CERTIFIED AND TRUE COPY OF ALA.
DEPT. OF INDUSTRIAL RELATIONS
RECORDS.

**Third Quarter Wages**

UI Wages are not present.
Supplemental wages are not present in this quarter.

JUN 06 2007

**Fourth Quarter Wages**

UI Wages are not present.
Supplemental wages are not present in this quarter.

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

LE (01/21/2004) - Wages After Exit

**First Quarter Wages**

UI Wages are present.
Supplemental wages are not present in this quarter.

**WPH
000902**

**Second Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Third Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Fourth Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Fifth Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

LE (01/21/2004) - Program Notes

| | |
|---|---|
| Customer Name: | BOBBY Lee SANKS |
| Staff Name: | NORMA J SPIVEY |
| Agency: | ES |
| Case Detail Page: | CONVERSION |
| Descriptor: | CONVERSION |
| Date: | 10/23/2003 |
| Notes: | 102303 7404 WANTS-UNIROYAL WPS 31 YRS S/E |

LE (01/21/2004) - Job Service

Enrollment Start date  01/21/2004
Exit date                      2004-01-21 00:00:00.0

LE (01/21/2004) - Job Service - Goals

LE (01/21/2004) - Job Service - Interests

No interests have been entered.

LE (01/21/2004) - Job Service - Service and Training Plan

LE (01/21/2004) - Job Service - Service Gap Information

**Service Gap Info**

| Gap Start Date | | Gap End Date | |
|---|---|---|---|
| Office | | Station Desk | |

LE (01/21/2004) - Job Service - Employment Plan

Occupational Assessment
and Career Research:

Justification for
Employment Goal:

Justification for Vocational
Goal:

Client Strengths:

Plan for Overcoming
Identified Barriers:

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000903

Assistive Technology Needs
for Achieving Goals:
Client Responsibilities and
Agency Responsibilities:

Economic Need Statement
and Planning:
Required Supportive
Services During Active
Participation:

Post Employment Needs:
Client Involvement
Statement:

Client Progress Review:
Additional Notes:

LE (01/21/2004) - Job Service - Enrollment Notes

No Enrollment Notes Entered

LE (01/21/2004) - Job Service - Needs and Barriers

| | |
|---|---|
| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Requires additional assistance to complete an educational program | No |
| Requires additional assistance to secure and hold employment | No |
| Learning Disability | No |
| Poor Work History | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |
| Cultural, social or geographic isolation | Not entered |
| Other Barriers | |

LE (01/21/2004) - Job Service - Needs and Barriers Notes

No Enrollment Notes Entered

LE (01/21/2004) - Job Service - Contact Snapshot

| | |
|---|---|
| Contact Name: | BOBBY SANKS |
| Address: | P O BOS 44 |
| | SALEM, AL 36874 |
| Phone 1: | 334-749-4462 |
| Phone 2: | |
| Fax: | |
| E-Mail: | |
| Web Site Address: | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS

JUN 06 7007

WPH
000904

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

LE (01/21/2004) - Job Service - Demographics Snapshot

## Miscellaneous Demographics Info

Eligibility Date:                                                          10/23/2003
Area/County of Residence:                                                  Lee
Area/County of Residence type:                                             Not Entered
Area/County of Service                                                     Lee
EES Client ID                                                              Not Entered
Other Agency Client ID                                                     Not Entered

## Personal

Social Security Number
Date of Birth
Race                                                                       Not Self Identified
Gender                                                                     Male
Are you a single, separated, divorced or widowed individual with primary
responsibility for one or more dependents under the age 18?                No
Number in Family
Individual with Disability (For this question, disability means, a physical or mental
impairment that substantially limits one or more of the major life activities of an   No
individual.)
Education Status                                                           Not attending school; High
                                                                           School graduate
Highest Grade Completed                                                    High School Graduate
Have you served on Active Duty with the Armed Forces of the United States?  No

## Veteran Information

Are you a homeless veteran?                                                Not entered
Are you the spouse of any person who died on active military duty or of a military
service-connected disability?                                              No
Are you the spouse of any member of the Armed Forces serving on active duty
who at the time of this registration has been in any one or more of the following   N/A
categories for more than 90 days:
Are you the spouse of any person who has a total disability permanent in nature
resulting from a military service-connected disability?                    No
Are you the spouse of a veteran who died while diagnosed with a total disability
permanent in nature resulting from a military service-connected disability?   No
Are you the spouse of a military service member of the armed forces who is
receiving transitional services prior to retirement or discharge from military   No
service?

## Migrant Worker

Do you believe that you are a Seasonal Farmworker/Migrant after reading the
definitions?                                                               No

## Employment Status

Employment status                                                         Employed
Number of weeks not employed (at time of registration) during the prior 26 weeks  0
Interstate Worker                                                         Not Entered

## Selective Service

Complies with selective service requirements?                             Yes

## Citizenship

WPH
000905

| Citizenship | U.S. Citizen |
|---|---|

## Dislocated Worker

| | |
|---|---|
| Have you been laid off or received a notice of layoff from your employer as a result of a reduction in the employer's workforce or received a notice of termination from your employer? | No |
| Have you been laid off or received a notice of layoff from your employer as a result of a permanent closing or major layoff? | No |
| Are you employed by an employer who has made a general announcement that the business will close within 180 days? | No |
| Are you employed by an employer who has made a general announcement that the business will close, without naming a specific date? | No |
| Were you self-employed and are now unemployed due to general economic conditions or a natural disaster in your community? | No |
| Are you a displaced homemaker? A displaced homemaker is an individual who was dependent on support from a family member whose support is no longer available, is unemployed or underemployed, and is having difficulty finding a job or finding a good job. | No |
| Are you unemployed as a result of military closures or realignments? | No |
| Are you unemployed due to multiple layoffs in a single local community, significantly increasing the total number of unemployed workers? | No |
| Are you unemployed due to emergencies or natural disasters which have been declared eligible for public assistance by the Federal Emergency Management Agency (FEMA)? | No |
| Statewide 15% Program ID | N/A |

## Alternative Trade Adjustment Assistance (ATAA)

| | |
|---|---|
| Date of 1st qualifying reemployment | |
| O*NET-SOC Title | CERTIFIED AND TRUE COPY OF ALA. |
| Employer | DEPT OF INDUSTRIAL RELATIONS |
| Contact | RECORDS. |
| Address | |
| Address | JUN 0 6 2007 |
| City | |
| State | |
| Zip | |
| Phone | DANIEL J. SOMERS |
| | CUSTODIAN OF RECORDS |
| End of 26th Week | 07/02/1900 |
| Obtained Employment by end of 26 weeks | N/A |
| Hourly Wage | $0.00 |
| Hours worked per week | 0 |
| Projected Annualized Re-employment Wage | $0.00 |
| Projected earnings are less than $50,000 | Yes |
| Full-time employment | N/A |
| Have you returned to your previous employer | N/A |
| Are you doing the same or similiar work for your previous employer, but in another division/facility | N/A |
| Estimated ATAA monthly benefit | $0.00 |

## Low Income

| | |
|---|---|
| Receives or is a member of a family that receives cash payments under a federal, state, or local income based public assistance program | No |
| Received an income, or is a member of a family that received a total family | |

WPH
000906

| income for the six month period prior to application for the program involved that, in relation to family size, does not exceed the poverty line | No |
| Received an income, or is a member of a family that received a total family income, for the six month period prior to application for the program involved that, in relation to family size, does not exceed 70 percent of the lower living standard income level (LLSIL) for an equivalent period | No |
| Member of a household that receives, or has been determined within the six month period prior to application for the program involved to be eligible to receive, food stamps | No |
| Homeless individual | No |
| Disabled and own income meets the income requirements of a participant who receives cash payments under federal, state, or local income based public assistance programs | No |
| Disabled and own income is at the poverty line for a six month period prior to application for the program involved regardless of whether their family does not meet this income requirement | No |

## Public Assistance

| Supplemental Security Income (SSI) | Not entered |
| TANF Recipient | No |
| Number of Months on TANF/AFDC Cash Assistance | 0 months |
| State or Local Welfare (General Assistance) | Not entered |
| Food Stamps | Not entered |
| Subsidized housing | Not entered |
| Social Security Disability (SSDI) | Not entered |
| Other Assistance | Not entered |

## Needs And Barriers

| Deficient in basic literacy skills | No |
| Limited English Language Proficiency | No |
| LEP Primary Language | |
| LEP Primary Language (If Other selected above) | |
| School dropout | No |
| Runaway | No |
| Parenting Teen | No |
| Offender | No |
| Poor Work History or Prospects | No |
| Substance Abuse | No |
| Older Worker | No |
| Child Care | No |
| Transportation | No |
| Cultural, social or geographic isolation. | Not entered |
| Other social barriers not already indicated. | Not entered |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

LE (01/21/2004) - Job Service - Eligibility Snapshot

LE Job Service
WIA Adult (Local Formula)

**WPH
000907**

If I have been referred to participate in the Worker Profiling and Reemployment Services (WPRS) Program, I understand that the above list of Reemployment Service activities is my service plan under the WPRS Program. I agree to participate in those Reemployment Service activities which are mandatory (those activities which are identified with a YES after Mandatory?), and understand that I could be denied unemployment compensation benefits if I fail to participate.

I certify that the information provided is true to the best of my knowledge and there is no intent to commit fraud. I am also aware that the information I have provided is subject to review and verification, and that I may be required to document its accuracy. I am subject to immediate termination if I am found ineligible after enrollment and may be prosecuted for fraud and/or perjury. I also authorize use of my Social Security Account Number voluntarily. I have been made aware of all Employment & Training Programs for which I am eligible. I certify that I have been given a copy of the client's complaint/hearing procedures, and have been informed of my rights and responsibilities. If I so request, a letter of my status will be provided.

_____     _____/_____/_____

Applicant Signature                                             Date

_____     _____/_____/_____

Parent / Guardian Signature                                  Date

_____     _____/_____/_____

Interviewer                                                        Date

VERIFICATION:

I have reviewed this application and find it to be complete, internally consistent and reasonable, and the eligibility determination correct.

_____     _____/_____/_____

Signature                                                          Date

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000908

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 2, Part 8

# Exhibits to the Deposition of Bobby Sanks Dxs. 73-76

# Dx. 73

## Alabama Department of Industrial Relations

File Help

SSN:

Name: SANKS/BOBBY L
First Name: BOBBY   MI:   Last Name:   Suffix (ex: JR, SR):

Potential Program Code: UC

Prior Claim Date: 04/19/04

Claim Type: NEW
First Call Date: 08/02/05

Claim Date: 07/31/05
BYE: 07/31/05   BYE: 07/30/06   CS: MPS001

Pop Name:

### Claimant Info

**Claimant Info 1**

Mailing Address:
Change Name?   Yes   No
Change Address?   Yes   No

Street: P O BOX 44
Zip Code: 36874-
City: Salem
State: ALAB

Residence Address:
Different From Mailing Address?   Yes   No

Driver's License:
US State ID:   ALAB
No.: 3187134

**Verified Name / SSN — As It Appeared on Claimant's Social Security Card**

First: BOBBY   MI:   Last: SANKS

Email?   Yes   No
Email Address:

Street: 330 LEE RD 175
State: ALAB
County: LEE
ZIP: 36874-
City: Salem

Mother's Maiden Name: SANKS

Verified Claimant?   Yes   No

US Citizen?   Yes   No
Alien Number:

**Claimant Info 2**

Phone?   Yes   No   (334) 749-4462
Date of Birth: 01/05/1951
Gender:   Male   Female
Veteran?   Yes   No

State: ALAB
County: LEE

AuditHistory   FactFinding   INS Verif   View Wrap-up   Print

IVR Info   IVR Questions   Emp History   Claim Date   InterState   Issues   DUA   TRA   Errors

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

DEFENDANT'S
EXHIBIT
7 3
B. Sanks

WPH
000922

Alabama Department of Industrial Relations

File Help

New Claim

SSN:

Name: SANKS/BOBBY L

First Name:    Last Name:    Suffix (ex:JR):

Partual Program Code: UC    Print Claim Date: 04/19/04

UCX    UCFE    Claim Type: NEW    BYB:07/31/05    BYE:07/30/06    Pop Name:

First Call Date: 08/02/05    Claim Date: 07/31/05    CS: MPS001

DWD/Interstate

Page 1 | Page 2 | Page 3 | Page 4 | Page 5

Are you filing a claim under Disaster Unemployment Assistance?

Did you receive notification that you have TRA certification?    Yes: [ ]  No: [ ]

Phone number: [334] 749-4462

Zip Code: 36874-

Are you a US Citizen?    Yes: [ ]  No: [ ]

Have you worked in another state in the last 18 months?    Yes: [ ]  No: [ ]

Do you regularly commute to Alabama for work?    Yes: [ ]  No: [ ]

Are you available for and seeking work in Alabama?    Yes: [ ]  No: [ ]

Did you file for or receive unemployment benefits in another state within the last 12 months?    Yes: [ ]  No: [ ]

Clm Info | IVR Questions | Emp History | Claim Date | InterState | Issues | BUIA | TRA | View Wrap-up | Error

Print

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 08 2007

DANIEL J. BOMENS
CUSTODIAN OF RECORDS

WPH
000923

Alabama Department of Industrial Relations

File  Help

New Claim

SSN:

Name: SANKS/BOBBY L

First Name:                    MI:        Last Name:

Prior Claim Date: 04/19/04     Claim Type: NEW     Suffix (ex:JR, SR):

Pseudo Program Code: UC          UCX          First Call Date: 08/02/05     Claim Date: 07/31/05     BYE: 07/30/06

UCX              UCFE              DCD/Interstate          DUA          CS: MPS001

Pop. Name:

Page 1

Date of Birth  01/05/1951          Gender

How many miles are you willing to travel one-way to a job?   30

What is the lowest hourly wage you will accept?   $  10.00   (ex: xx.xx)

Since the most recent Sunday, have you been mentally and physically able to work?   Yes  No

Are you available to accept full time work?   Yes  No

Are you available for all shifts in your normal trade or occupation?   Yes  No

Have you worked since   / /

Page 2          Page 3          Page 4          Page 5

Gender          ⦿ Male   ○ Female

Years of Education   12

Comment

Issue:   Yes  No

Issue:   Yes  No   Comment:

Comment

Print

Claim Info     W/PQuestions     Emp. History     Claim Date     IndusState     Issues     DUA     TRA     View Wrap-up     Error

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

_Daniel J. Somers_

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH
000924**



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000925

Alabama Department of Industrial Relations

File Help

New Claim

SSN:

Name: SANKS/BOBBY L

First Name: | | M.I. | Last Name: | | Suffix (ex. JR, SR): | |

Perental Program Code: UC    Prior Claim Date: 04/19/04    Claim Type: NEW    BYB: 07/31/05   BYE: 07/30/06

UC>    First Call Date: 08/02/05    Claim Date: 07/31/05    CS: MPS001

UCFE    CW/Chntestate    DUA    RSA    EB    Pop Name:

                                                                    Intl    V. 0341

**New Claim**

Page 1

Are you self-employed?    Yes    No

Are you currently working on a commission basis?    Yes    No

**Page 2**

Comment

Have you applied for or are you receiving worker's compensation due to a work related injury?    Yes    No
Comment

**Page 3**

Issue    Status    Issue    Status    Issue    Status

Have you applied for or are you receiving a pension, other than social security, from an employer you have worked for in the last 18 months?    Yes    No

Did you or will you receive Vacation Pay?    Yes    No    Total Hours    $ per hour

**Page 4**

Did you or will you receive Holiday Pay?    Yes    No    Total Hours    $ per hour

Claimant agrees with employer reported amount    Yes    No    Total Hours    $ per hour

Claimant agrees with employer disputed amount    Yes    No

**Page 5**

Claim Index    IVRQuestions    Emp History    Claim Date    Ineligible    Issues    DUA    TRA    View Wrap-Up    Errors

Print

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000926

Alabama Department of Industrial Relations

File Help

New Claim

SSN:
Name: SANKS/BOBBY L
First Name:
MI: Last Name:    Suffix (ex:JR,SR)
Potential Program Code: UC    Prior Claim Date: 04/19/04    Claim Type: NEW
UEX    UEX    First Call Date: 08/02/05    BYB: 07/31/05    BYE: 07/30/06    CS: MPS001
DOFE    Ck/Dr/Address    D/L:    FR:    EB:    Pop Name
NL    V: 0341

Page 1    Page 2    Page 3    Page 4    Page 5

Did you or will you receive Sick Pay?    Yes    No

Claimant agrees with employer reported amount    Yes    No    $ per hour

Warn Pay    Total Hours    $ per hour

Claimant agrees with employer reported amount    Yes    No

Have you worked for the federal government in the last 18 months?    Yes    No

Did you serve on active duty in the military in the last 18 months?    Yes    No

Do you elect to have ½ of your weekly benefit check withheld for Federal Income Tax?    Yes    No    $ per hour

Print

Clm Info    VRU Questions    Emp History    Claim Date    Interview Date    Issues    DUA    TPA    View Wrap-up    Errors

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

WPH
000927

JUN 0 8 2007

Daniel J. Somers

DANIEL J. SOMERS
CUSTODIAN OF RECORDS



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000928



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000930



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH**
**000931**

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000932

Fact Finding

Statements | Discharge Comp. | Discharge-Clmt | Quit | Absent/Tardy | Summary | Attempts

Claimant Name: SANKS/BOBBY L
Claimant SSN: 
Claim Date: 07/31/05

BEN241 Status: ● Timely Received ○ Timely Mailed/Late Received ○ Mailed Late ○ Not Received

Left message on 08/10/2005 to return call no later than 08/12/2005 or decision will be made based on available information.

Separation resulted from: ○ Voluntary Quit ● Discharge ○ No Work Available ○ Other

**Claimant's Statement:**

08/12/05@3:30pm/LDW 072905. I WAS FIRED ON 072905 FOR EXCESSIVE TARDYS. ACCORDING TO POLICY, YOU HAVE TO BE CLOCKED IN BY 659 AM. 7 AM IS LATE. I WAS NOT CLOCKED IN BY 7 AM. I WAS JUST A FEW SECONDS LATE. I HAD BEEN WARNED BEFORE ON 072205 ABOUT BEING TARDY. I HAD ALSO BEEN TARDY ON 072205, BUT I DIDNT GET THAT WARNING UNTIL THE DAY I WAS FIRED. I WAS TOLD ON 071205 THAT I ONLY WOULD BE ALLOWED 2 MORE TARDYS & I WOULD BE FIRED. I DID GET THE POLICY AT HIRE. THERE WAS NO REASON THAT I WAS LATE ON 072905. I WAS JUST RUNNING LATE. I DIDNT CALL TO LET ANYONE KNOW I WOULD BE LATE, BECAUSE I THOUGHT I WAS GOING TO MAKE IT.

**Employee's Statement:**

08/12/05@9AM / LDW 072905. MR SANKS WAS DISCHARGED ON 072905 BY ME & DEPT MGR PERRY HENDERSON FOR 3 WRITTEN WARNINGS WITHIN A ROLLING 12 MONTH PERIOD. THE FINAL INCIDENT OCCURRED ON 072905 WHEN MR SANKS WAS LATE FOR WORK AFTER PREVIOUSLY BEING VERBALLY WARNED FOR BEING TARDY ON 071205. HE WAS TOLD WHEN HE WAS WARNED ON 071205 THAT HE WAS ONLY ALLOWED 2 MORE TARDYS & IT WOULD RESULT IN A DISCHARGE. HE WAS LATE ON 072705 & THEN THE FINAL ONE THAT CAUSED HIS DISCHARGE WAS ON 072905. HE DIDNT CALL TO NOTIFY ANYONE HE WOULD BE LATE. MR SANKS SIGNED FOR THE POLICY ON 093005.

Person Interviewed: GREGG M
Interviewer: AMBER STEPHENS
Phone Number: (334)742-2321
Title: HR MGR
Date: 08/10/2005

Print | Save | Cancel

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000933

**Fact Finding**

Tabs: Claimant Name | SANKS/BOBBY L | Statements | Discharge-Emp | Discharge-Cint | Quit | Claimant SSN | Absent/Tardy | Summary | Claim Date | 07/31/05 | Attends

Person Interviewed: AMBER DALE STEPHENS

Claimant Discharged by: AMBER DALE STEPHENS   Title: HR MGR

Who interviewed his/her discharge?   Title/Position: HR MGR   Date: 08/16/2005

What incident caused his/her discharge?
MR SANKS WAS TARDY FOR WORK ON 072905. HE DIDN'T HAVE A VALID REASON FOR BEING LATE & FAILED TO CALL ANYONE TO NOTIFY THEM HE WOULD BE LATE.

Date of Final Incident: 07/29/2005   Date of Discharge: 07/29/2005

How?
3 WRITTEN WARNINGS WITHIN A ROLLING YEAR. MR SANKS WAS NOT ON HIS JOB AT THE START OF HIS SHIFT ON 072905.

Is there a rule, policy or agreement regarding this type of behavior?   Yes   No

Was policy violated?   Yes   No

Was claimant aware of the policy?   Yes   No

How/when was the claimant made aware?
SIGNED FOR POLICY AT HIRE

Did claimant attempt to comply?   Yes   No

Had claimant previously been warned about/suspended for this type of behavior?   Yes   No   Verbal   Written

By whom?
PERRY HENDERSON/DEPT MGR   When? 07/12/2005

Other Information:

Print   Save   Cancel

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 06 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH
000934**



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 8 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

**WPH
000935**



CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

JUN 0 6 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000936

# Dx. 74

**October 1997**     Week 41     257-747

**6 Monday** Steve Moss 279/86

257-4106

(1-334) Cell # 740-9519

**7 Tuesday**

**8 Wednesday**

October
S M T W T F S
1 2 3 4
5 6 7 8 9 10 11
12 13 14 15 16 17 18
19 20 21 22 23 24 25
26 27 28 29 30 31

**OCT 1 8 2**    October

○ FQ     **Thursday 9**

Physical Culture Day (J) **Friday 10**

Fri Day
◑ Yom Kippur (J) **Saturday 11**

Dudley Was Late Comming In for work Post 7 And

Day of the Race (M) **Sunday 12**

† Christian, ✡ Jewish, ☾ Islamic
Jewish holy days and Islamic (fady holy days) begin at sundown the day before.



PLAINTIFF'S
EXHIBIT
74
B. Shanks

# Dx. 75



October 1997    On Sund Nov 3.02

**20 Monday** They pull new wire to
The Slasive. And did not
Check it to make sure every-
thing were OK. 3rd Shift
Came in to Start up it did
not Startup Corrected. Burn
up a Transformer and cause

**21** Some other Problem. Any
Way it didn't run for the
3rd or the 1st shift
So who will get a Yellow
Paper for not knowing who
were the Proble m, and Fixing
it.

**22 Wednesday** STa-day Nov 16 02
Dudley Came In to hate After
7.08 hy. Georgia + Auburn
Game day.

---

Days He were feeling Bad
Sick

Dec 7 02    October/November

Sat-day Dudley Left Thursday **30**
Work early 2.50 Am

Sunday, Dec 8.02 Dudley
Came in to work Late
8.00 am in morning.

● NM         Halloween (US, C, M, UK)  Friday **31**
Jan 12 03
Dudley were late for work
Came In AT 7.10 AM.

Jan 26 03
Dudley Gregory Came In to
work at 7.50 AM.  Saturday **1**
Sunday, morning. And He left
work at 2. Pm Sunday of the
Same day. Super bowl Game day.

Sunday **2**

November
S M T W T F S
                1
2 3 4 5 6 7 8
9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28 29
30

PLAINTIFF'S
EXHIBIT
75
B. Santos

# Dx. 76

Wednesday 12-4-02 Dudley Gregory were late for work, come in

After 7:15 AM.

Thursday 12-05-02 Dudley did not come to work at all.



PLAINTIFF'S
EXHIBIT
76
B. Sanks



**July 1997**

**7 Monday**                                    Week 28

1- 614 - 791-8972

**8 Tuesday**

**9 Wednesday**

---

Leaving work Early

**July**

Feb 10 3                          Thursday 10

Dudley left work

early about 2. m

Sat day.

---

Leaving work Early    Handwere

here

Feb 2, 03 Dudley Gregory     Friday 11

left work about 2. Pm

Sunday - that's 2 day in a row

①

Dudley Come In late

O FO                              Saturday 12

7:80 AM Come In late Craig

And I were In the Cloth Rom

When he Drove By

July 13              Sunday 13

0 2

Sat day



September 1997

1 Monday   Labor Day (U.S. C)                    Week 36

                                        2444121
                                         ● 11M

September
Thursday 4

Friday 5

2 Tuesday

3 Wednesday   Tuesday Morning
7:03   Time. 7:03 pm
Dudley was left for work
I pass him coming down the
Steps from the Sister Room

Sept 3 02

Saturday 6

Sunday 7

July 1997    Feb 9 03    Sunday
Week 29

**14 Monday** Dudley Gregory Came
Into at 7.35 AM. New
Guy had Just left the Shop
with a Cup of Coffee and Said
he Saw Dudley Come In. He
Told Me.

**15 Tuesday**

**16 Wednesday**

**July**

**Thursday 17**

**Friday 18**

FM    **Saturday 19**

July
S  M  T  W  T  F  S
      1  2  3  4  5
6  7  8  9  10 11 12
13 14 15 16 17 18 19
20 21 22 23 24 25 26
27 28 29 30 31

Marine Day (J)  **Sunday 20**

May 3 + 4 0'5

February

Dudley ~~bol~~ eft work
Early ~~us~~ both days,
on this weekend off. But
he work.

Thursday 20

Friday 21

.FM

Saturday 22

February
S M T W T F S
            1
2 3 4 5 6 7 8
9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28

Sunday 23



**May 1997**    Week 19

**5 Monday** Battle of Puebla (M)    125/240
May Day Holiday (UK)—Children's Day (J)

Roy Lawson
748-6194

**6 Tuesday**    ● NM

Rofel
663-2221

**7 Wednesday**
749-6721
Jerome Ware

G The First of Muharram (New Year) **Thursday 8**

737-0435

Johnny Wms
Salem

\* On the 15th of June
03, Dudley Gregory came
to work at 7 am and left
early about 12:00 pm, that
is a parshal day, should count
against him, on Fathers Day

Mother's Day (M) **Saturday 10**

Mother's Day (US, C) **Sunday 11**

**August 1997**                    Week 33

*O, O2*      **August**

**11** Monday                    223/142

*Randall Price*
*334-283-3316*

O.FO

Thursday **14**

**12** Tuesday

Friday **15**

**13** Wednesday

Saturday **16**

August
S M T W T F S
              1  2
3  4  5  6  7  8  9
10 11 12 13 14 15 16
17 18 19 20 21 22 23
24 25 26 27 28 29 30
31

Sunday **17**

*So!*
*Dudley was Of*
*Work, But Left*
*Early.*

8-16-03 - Sat. day Dudley Gregory Came
to Work at 7 am and Left at 2:30 PM -
Leaving Early.

8-24-03 - Sunday Dudley Gregory Came to
work at ~~8:15am~~ and Left at 12:30 PM
Leaving work early. ALSO Dudley Gregory
Was

8-25-03 Dudley Gregory was 15 After ?
coming to Work.

8-30-03 Dudley Gregory Left Work at 1:05 PM
early to watch the Game.

INSPECTOR TICKET

STYLE_____

INSPECTOR_____

DATE_____

YARDS_____

LOOM NO._____

DEFECT_____

D1_____

D2_____

N1_____

N2_____

9-6,+7-03 Dudley Gregory Left work
both day early about 2:30 PM.

8-30,+31- not sure
8-23+24 - left work early @1:PM
both days

INSPECTOR TICKET

STYLE_____

INSPECTOR_____

DATE_____

YARDS_____

LOOM NO._____

DEFECT___*M. Blinds*___

D1___*33 X 50*___

D2___*39 X 80*___

N1_____

N2 *Septic Tank Air Fresh*

22nd March     12:30 PM

23rd March     11:15 AM

Dudley Gregory

April 5,

Dudley Gregory
This is his weekend off
But he come to work that Saturday.
And he was off that Sunday.
He had Told everyone in the
Shop that you had to take their weekend
Off. So he did not.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

# Exhibit 3

# Asset Purchase Agreement (WPH 000668-744)

ASSET PURCHASE AGREEMENT

by and among

WS TEXTILE CO., INC.,

NEW TEXTILE ONE, INC.,

NEW TEXTILE TWO, INC.,

TEXTILE CO., INC.,

WESTPOINT STEVENS INC.,

WESTPOINT STEVENS INC. I,

WESTPOINT STEVENS STORES INC.,

AND

J.P. STEVENS ENTERPRISES, INC.

Dated as of June 23, 2005

17481153\V-12

**WPH
000668**

# TABLE OF CONTENTS

**Page**

Article I. DEFINITIONS ........................................................................................................ 2

    1.1.     Certain Definitions.................................................................................... 2
    1.2.     Terms Defined Elsewhere in this Agreement ......................................... 12
    1.3.     Other Definitional and Interpretive Matters ........................................... 13

Article II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ............ 14

    2.1.     Purchase and Sale of Assets.................................................................... 14
    2.2.     Excluded Assets ...................................................................................... 17
    2.3.     Assumption of Liabilities........................................................................ 18
    2.4.     Excluded Liabilities ................................................................................ 20
    2.5.     Further Conveyances and Assumptions................................................... 21

Article III. CONSIDERATION.............................................................................................. 22

    3.1.     Consideration .......................................................................................... 22
    3.2.     Purchase Price Deposit ........................................................................... 22
    3.3.     Payment of Purchase Price...................................................................... 23

Article IV. CLOSING AND TERMINATION ........................................................................ 24

    4.1.     Closing Date............................................................................................ 24
    4.2.     Deliveries by Sellers .............................................................................. 24
    4.3.     Deliveries by Purchaser .......................................................................... 25
    4.4.     Termination of Agreement...................................................................... 26
    4.5.     Procedure Upon Termination.................................................................. 27
    4.6.     Effect of Termination.............................................................................. 27

Article V. REPRESENTATIONS AND WARRANTIES OF SELLERS................................... 28

    5.1.     Organization and Good Standing............................................................. 28
    5.2.     Authorization of Agreement ................................................................... 28
    5.3.     Conflicts; Consents of Third Parties ...................................................... 28
    5.4.     Reports; Financial Statements................................................................. 28
    5.5.     Title to Purchased Assets ........................................................................ 29
    5.6.     Taxes ...................................................................................................... 30
    5.7.     Real and Personal Properties .................................................................. 30
    5.8.     Intellectual Property................................................................................ 31
    5.9.     Contracts ................................................................................................. 33
                          34

- i -

5.10.    Employee Benefits ............................................................................. 34
5.11.    Employment Matters .......................................................................... 35
5.12.    Litigation ............................................................................................. 35
5.13.    Compliance with Laws; Permits ....................................................... 35
5.14.    Environmental Matters ...................................................................... 36
5.15.    Financial Advisors .............................................................................. 36
5.16.    Representations/Warranties; Schedules .......................................... 36
5.17.    Sufficiency of Assets .......................................................................... 36
5.18.    Equipment ........................................................................................... 37
5.19.    No Casualty ......................................................................................... 37
5.20.    Insurance ............................................................................................. 37
5.21.    Customers ........................................................................................... 37
5.22.    Suppliers ............................................................................................. 37
5.23.    Affiliate Transactions ....................................................................... 37
5.24.    Product Warranty ............................................................................... 37
5.25.    Inventories .......................................................................................... 38
5.26.    Notes and Accounts Receivable ......................................................... 38
5.27.    Bank Accounts .................................................................................... 38
5.28.    Signatories .......................................................................................... 38
5.29.    Foreign and Non-Debtor Affiliates .................................................. 38
5.30.    Labor Matters ..................................................................................... 38
5.31.    Employee Matters ............................................................................... 38
5.32.    Certain Payments ............................................................................... 39

Article VI. REPRESENTATIONS AND WARRANTIES OF PARENT, HOLDCO ONE,
HOLDCO TWO AND PURCHASER ............................................................................ 40

6.1.     Organization and Good Standing ...................................................... 40
6.2.     Authorization of Agreement .............................................................. 40
6.3.     Authorized Capital ............................................................................. 40
6.4.     Conflicts; Consents of Third Parties ................................................ 40
6.5.     Litigation ............................................................................................. 41
6.6.     Financial Advisors .............................................................................. 42
6.7.     Financial Capability ........................................................................... 42
6.8.     Condition of the Business .................................................................. 42

Article VII. post execution MATTERS .................................................................... 42

7.1.     Conduct After Execution of Agreement ........................................... 42
7.2.     Expense Reimbursement ..................................................................... 43
7.3.     Bankruptcy Court Filings .................................................................. 43

Article VIII. COVENANTS ......................................................................................... 44

8.1.     Access to Information ......................................................................... 44

- ii -

17481153\V-12

8.2.     Conduct of the Business Pending the Closing ............................................. 47
8.3.     Consents, Lien Releases and Notices................................................................. 50
8.4.     Regulatory Approvals ...................................................................................... 50
8.5.     Further Assurances........................................................................................... 51
8.6.     Confidentiality Following the Closing............................................................ 52
8.7.     Equity Commitment and Rights Offering ...................................................... 52
8.8.     Preservation of Records .................................................................................. 52
8.9.     Financial Statements ....................................................................................... 53
8.10.    Schedules ......................................................................................................... 54
8.11.    No Inconsistent Action .................................................................................... 54
8.12.    Accepted or Rejected Contracts....................................................................... 54
8.13.    Specific Enforcement of Covenants................................................................. 55
8.14.    Form of Transaction......................................................................................... 55
8.15.    Permits ............................................................................................................. 55
8.16.    Indemnity Agreement ...................................................................................... 56

Article IX. EMPLOYEES AND EMPLOYEE BENEFITS ............................................. 56

9.1.     Employment...................................................................................................... 56

Article X. CONDITIONS TO CLOSING ........................................................................ 58

10.1.    Conditions Precedent to Obligations of Parent and Purchaser ..................... 58
10.2.    Conditions Precedent to Obligations of Sellers ............................................. 60
10.3.    Conditions Precedent to Obligations of Parent, Purchaser and Sellers ........ 61
10.4.    Frustration of Closing Conditions.................................................................... 61
10.5.    Force Majeure ................................................................................................... 61

Article XI. TAXES .......................................................................................................... 62

11.1.    Transfer Taxes ................................................................................................. 62
11.2.    Purchase Price Allocation ............................................................................... 62
11.3.    Tax Reporting ................................................................................................... 62
11.4.    Cooperation and Audits ................................................................................... 63

Article XII. MISCELLANEOUS...................................................................................... 63

12.1.    No Survival of Representations and Warranties .............................................. 63
12.2.    Expenses ........................................................................................................... 63
12.3.    Injunctive Relief............................................................................................... 63
12.4.    Exclusive Remedy ............................................................................................ 64
12.5.    Submission to Jurisdiction; Consent to Service of Process ............................ 64
12.6.    Waiver of Right to Trial by Jury...................................................................... 64
12.7.    Entire Agreement; Amendments and Waivers ................................................ 65
12.8.    Governing Law ................................................................................................. 65
12.9.    Notices .............................................................................................................. 65

- iii -

WPH
000671

12.10.   Severability ................................................................................................. 
12.11.   Binding Effect; Assignment.......................................................................... 66
12.12.   Non-Recourse ................................................................................................ 66
12.13.   Publicity ........................................................................................................ 67
12.14.   Counterparts .................................................................................................. 67
................................................................................................................................ 67

EXHIBITS

| Exhibit A | Form of Escrow Agreement |
| Exhibit B | Registration Rights Agreement |
| Exhibit C | Rights Offering |
| Exhibit D | Subscription Agreement and Investor Questionnaire and Certification |
| Exhibit E | Shares and Rights Distribution Mechanism |
| Exhibit F | Form of Bill of Sale |
| Exhibit G | Form of Assignment and Assumption Agreement |
| Exhibit H | Form of Assignment of Trademarks |
| Exhibit I | Form of Assignment of Patents |
| Exhibit J | Form of Assignment of Copyrights |
| Exhibit K | Form of Assignment of Domain Names |
| Exhibit L | Form of Special Warranty Deed |
| Exhibit M | Form of Quit Claim Deed |
| Exhibit N | Form of Assignment and Assumption of Contracts and Real Property Leases |
| Exhibit O | Form of Certificate or Certificates (Seller) |
| Exhibit P | Form of Certificate or Certificates (Purchaser) |
| Exhibit Q | Equity Commitment Agreement |

- iv -

Exhibit R          Rights Offering Sponsor Agreement

Exhibit S          J.P. Stevens & Co., Inc. Indemnity Agreement

SCHEDULES

Schedule I          Company's Subsidiaries

Schedule 1.1(a)     Excluded Subsidiaries

Schedule 1.1(b)     Knowledge of Sellers

Schedule 5.3(a)     Conflicts

Schedule 5.3(b)     Third Party Consents

Schedule 5.4        Reports; Financial Statements

Schedule 5.5        Title to Purchased Assets

Schedule 5.6(a)     Taxes

Schedule 5.7(a)     Material Owned Real Property

Schedule 5.7(b)     Leased Real Property

Schedule 5.7(d)     Owned Real Property-Exceptions

Schedule 5.7(e)     Taxes on Real Properties

Schedule 5.8(a)     Intellectual Property-Owned

Schedule 5.8(b)     Intellectual Property-Licenses

Schedule 5.8(c)     Intellectual Property-Liens

Schedule 5.8(d)     Intellectual Property-Claims, Infringement, Oppositions

Schedule 5.8(e)     Intellectual Property-Maintenance Fees

Schedule 5.8(f)     Intellectual Property-Protection of Confidentiality

Schedule 5.9        Contracts

Schedule 5.10(a)    Employee Benefits-General

Schedule 5.10(c)    Employee Benefits-Effect of Transaction

Schedule 5.11       Accrued Vacation Pay

- v -

17481133\V-12

WPH
000673

Schedule 5.12        Litigation

Schedule 5.13        Permits

Schedule 5.14        Environmental Matters

Schedule 5.15        Financial Advisors

Schedule 5.18        Equipment

Schedule 5.19        Casualty

Schedule 5.20        Insurance

Schedule 5.21        Customers

Schedule 5.22        Suppliers

Schedule 5.23        Affiliate Transactions

Schedule 5.24        Product Warranty

Schedule 5.25        Inventories

Schedule 5.27        Bank Accounts

Schedule 5.29        Foreign and Non-Debtor Affiliates

Schedule 5.30        Collective Bargaining Agreements

Schedule 5.30(c)     Labor Matters-Exceptions

Schedule 5.31        Employee Matters

Schedule 5.32        Certain Payments

Schedule 6.4(a)      Conflicts (Purchaser)

Schedule 6.4(b)      Consents (Purchaser)

Schedule 8.1         Immaterial Owned Real Property

Schedule 8.2(a)      Conduct of the Business in Ordinary Course pending Closing

Schedule 8.2(b)      Actions Affecting the Transaction

Schedule 9.1(e)      COBRA

- vi -

174811531V-12

- vii -

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of June 23, 2005 (this "Agreement"), by and among WS Textile Co., Inc., a Delaware corporation ("Parent"), New Textile One, Inc., a Delaware corporation and wholly-owned direct subsidiary of Parent ("Holdco One"), New Textile Two, Inc., a Delaware corporation and wholly-owned direct subsidiary of Parent ("Holdco Two"), Textile Co., Inc., a Delaware corporation and indirect subsidiary of Parent and direct subsidiary of Holdco One and Holdco Two ("Purchaser"), WestPoint Stevens Inc., a Delaware corporation (the "Company"), and WestPoint Stevens Inc. I, a Delaware corporation, WestPoint Stevens Stores Inc., a Delaware corporation, and J.P. Stevens Enterprises, Inc., a Delaware corporation (each individually a "Subsidiary" and, together with the Company, each a "Seller" and, collectively, "Sellers").

### W I T N E S S E T H :

WHEREAS, Sellers and J.P. Stevens & Co., who is not a Seller hereunder ("J.P. Stevens") are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 1, 2003 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 03-13532) (the "Bankruptcy Case");

WHEREAS, certain terms used in this Agreement are defined in Section 1.1;

WHEREAS, Sellers are engaged in the business of manufacturing, marketing and distributing bed and bath home fashions products (such business and all other business conducted by Sellers, the "Business");

WHEREAS, subject to the terms and conditions set forth herein, Sellers are agreeing to sell the Purchased Assets either pursuant to a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code or in accordance with sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, Purchaser has agreed to acquire the Purchased Assets in exchange for which Purchaser will pay consideration consisting of a combination of cash, shares of Parent Common Stock, rights to acquire additional shares of Parent Common Stock and the assumption of specific liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereby agree as follows:

17481153\V-12

# ARTICLE I.

## DEFINITIONS

1.1.  <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u> or in other Sections of this Agreement, as identified in <u>Section 1.2</u>:

"<u>Adequate Protection Order</u>" means that certain Final Order Pursuant to Sections 361, 363, and 364(d)(1) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Providing the Pre-Petition Secured Lenders Adequate Protection, dated as of June 18, 2003, and includes the Stipulation and Order (i) Providing for Deposit into Escrow of Second Lien Adequate Protection Payments, (ii) Withdrawal of Adequate Protection Motion and (iii) Reservation of Subscription Rights and Remedies dated as of August 18, 2004 and approved by the Bankruptcy Court on August 23, 2004.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Ancillary Documents</u>" means the Escrow Agreement and the documents delivered pursuant to <u>Section 4.2</u> hereof.

"<u>AREH</u>" means American Real Estate Holding Limited Partnership.

"<u>Aretex</u>" means Aretex LLC.

"<u>Bidding Procedures Order</u>" means the order of the Bankruptcy Court, dated April 22, 2005, approving bidding procedures for the sale of all or substantially all of the Seller's assets.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"<u>Chapter 11 Plan</u>" means a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code which incorporates and implements the terms of this Agreement and is otherwise acceptable to Sellers, Purchaser and Aretex in their reasonable discretion.

"<u>Charisma Agreement</u>" means that certain license agreement between Official Pillowtex LLC and WestPoint Stevens, Inc., dated as of October 1, 2004 and amended as of December, 2004.

- 2 -

"Confirmation Order" means an Order confirming a Chapter 11 Plan and which makes the findings of fact and conclusions of law set forth in the defined term Sale Order plus such other findings and conclusions as Purchaser and Aretex may reasonably request, and is otherwise in form and substance acceptable to Sellers, Purchaser and Aretex in their reasonable discretion. An Order shall only be a "Confirmation Order", and the defined term "Confirmation Order" shall only be applicable under this Agreement, if, as contemplated by Section 7.3 hereof, the Bankruptcy Court determines by Order entered at the hearing to approve the Sale Order that the transactions contemplated by this Agreement shall be pursued through a Chapter 11 plan of reorganization or liquidation.

"Continuing Employees" means such current Employees of Sellers designated by Purchaser in a written notice to Sellers prior to the Closing Date as individuals to whom Purchaser intends to extend an offer of employment, and that have accepted Purchaser's offer of employment.

"Contract" means any written contract, indenture, note, bond, lease, license, or other agreement, whether entered into prior to or after the Petition Date.

"Cure Costs" shall mean the cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults, under those Accepted Contracts, Accepted Intellectual Property Licenses and Accepted Real Property Leases which Purchaser has directed Sellers to accept pursuant to Section 8.12(a) hereof.

"Current" means an obligation incurred or accrued after the Petition Date of the type indicated in the Ordinary Course of Business by one or more Sellers which is incurred or accrued in the Ordinary Course of Business and which is not yet due and payable as of the Closing Date.

"December Financial Statements" means the unaudited consolidated balance sheet as of December 31, 2004 and unaudited consolidated statements of income and cash flows for the year then ended of the Company and its subsidiaries previously delivered to the Purchaser.

"Debtors" means the Sellers and J.P. Stevens.

"DIP Credit Agreement" means that certain debtor in possession financing agreement, dated as of June 5, 2003, as amended, among Sellers, Bank of America, N.A. as Administrative Agent, Wachovia Bank, National Association as Syndication Agent and the other lenders parties thereto.

"Distributable Value" means the value of the Parent Shares and the Subscription Rights.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation

- 3 -

17481153\V-12

(design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee" means any current or former employee, officer, independent contractor, agent, consultant, leased employee or other contingent worker of any Seller.

"Employee Plan" means each (i) "employee benefit plan", as defined in Section 3(3) of ERISA, (ii) each employment, consulting, severance or other individual compensation agreement between a Seller and any Employee, and (iii) each plan, program, agreement or other arrangement providing bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship, or fringe benefits, which is now, or ever has been, maintained, contributed to, or required to be contributed to, for the benefit of any Employee.

"Environmental Law" means any foreign, federal, state or local statute, regulation, ordinance, order, decision or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"Environmental Liabilities" means the Liabilities resulting from (i) the failure to comply with or any violation of any requirement of an Environmental Law, (ii) the failure to obtain or comply with any required Environmental Permit, and/or (iii) Liabilities arising out of or relating to Hazardous Materials at, on, under, or emanating from Sellers' Properties or the business conducted thereupon.

"Environmental Permit" shall mean any Permit issued pursuant to an Environmental Law.

"Environmental Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching into the indoor or outdoor environment, or into or out of any property.

"Equity Commitment Agreement" means the agreement between AREH, Textile Holding, LLC and Parent in the form of Exhibit Q hereto.

- 4 -

WPH
000679

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"Escrow Agreement" means an Escrow Agreement executed by Purchaser, Sellers and Escrow Agent in substantially the same form and substance as Exhibit A attached hereto.

"Excluded Subsidiary" means any subsidiary of the Company listed on Schedule 1.1(a).

"Final Order" means an Order, the operation or effect of which has not been stayed, reversed, modified, or amended and as to which the time to appeal, petition for certiorari, or seek reargument, review or rehearing has expired and as to which no appeal, petition for certiorari or motion for reargument, review or rehearing was timely filed or, if timely filed, the Order has been affirmed by the highest court to which the Order was appealed or from which the reargument or rehearing was sought, or certiorari has been denied, and the time to file any further appeal or petition for certiorari or to seek further reargument or rehearing has expired.

"First Lien Lender Agreement" means that certain Second Amended and Restated Credit Agreement dated as of June 9, 1998 among the Company as Borrower, WestPoint Stevens (U.K.) Limited and WestPoint Stevens (Europe) Limited, as Foreign Borrowers, Bank of America, N.A., as Issuing Lender, Swingline Lender and Administrative Agent and the banks and other financial institutions at any time parties thereto, as amended to the date hereof.

"First Lien Lenders" means the financial institutions from time to time party to the First Lien Lender Agreement, together with their successors and assigns permitted by the First Lien Lender Agreement.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by any Seller, including all such artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government, governmental, quasi-governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

- 5 -

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body including petroleum and its by-products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Immaterial Owned Real Property" means each parcel of real property owned by the respective Sellers that is not a Material Owned Real Property.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all intellectual property rights used (including all Intellectual Property Licenses) or owned by any Seller, including: (i) all patents, patent applications, patent rights, patent disclosures and improvements thereto and all continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and assumed business names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications therefor and all registrations and renewals thereof, (iii) all copyrights (including moral rights and rights in all Internet web sites), and mask work rights and all registrations thereof and applications therefor, (iv) all Software and Technology, (v) all trade secrets, and (vi) all other intellectual property rights in whatever form or medium.

"Intellectual Property Licenses" means (i) any grant to a third Person of any right to use any of the Intellectual Property owned by any Seller, and (ii) any grant to any Seller of a right to use a third Person's intellectual property rights which is used by Seller.

"IRS" means the Internal Revenue Service.

- 6 -

"KERP Order" means collectively the October 23, 2003 and August 12, 2004 orders referenced in the definition of KERP Program below.

"KERP Program" means the key employee retention and severance program (including the severance program and the existing separation plan for salaried employees) as set forth in the Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1) Authorizing the Establishment of a Key Employee Retention Plan and the Motion of Debtors pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1) Approving the Extension of the Debtors' Key Employee Retention Plan, as modified, both of which were approved by separate order of the Bankruptcy Court on October 23, 2003 and August 12, 2004, respectively.

"Knowledge of Sellers" means the actual knowledge of those officers of Sellers identified on Schedule 1.1(b), and, in addition, as to the provisions set forth opposite their names, certain employees of Sellers as set forth on Schedule 1.1(b).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private), claims, investigations or any other proceedings by or before a Governmental Body.

"Liability" means any duty, debt, liability, claim or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Maine CBA" means that certain Collective Bargaining Agreement between the Company and the Union of Needletrades, Industrial and Textile Employees (AFL-CIO-CLC) dated April 11, 2004.

"Material Intellectual Property Licenses" means collectively all of the Intellectual Property Licenses listed on Schedule 5.8(b).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Owned Real Properties" means collectively, the Immaterial Owned Real Properties and the Material Owned Real Properties.

"Parent Common Stock" means the common stock of Parent, par value $.01 per share.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates issued by a Governmental Body.

"Permitted Exceptions" means (i) all covenants, conditions, restrictions, easements, rights of way and encumbrances of record as disclosed in policies of title insurance which have been delivered to Purchaser by Sellers prior to the date hereof; provided same are not being violated (or if violated, will not result in a forfeiture of the property or result in monetary liability in excess of $100,000 as to any individual property), do not unreasonably interfere with the continued operation of the Business as presently operated at the respective Owned Real Properties, and any such easements do not underlie the improvements at the respective Owned Real Properties unless servicing such improvements; (ii) statutory liens for (a) Current Taxes, (b) Taxes incurred after the Petition Date in the Ordinary Course of Business which are delinquent but with respect to which the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor and provided further that withholding payment during a valid contest is otherwise permitted by applicable Law and (c) Taxes incurred before the Petition Date and specifically assumed pursuant to Section 2.3(a)(x); (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business after the Petition Date that individually or in the aggregate do not exceed $100,000; provided, however, that such Liens shall not include any Liens that are junior to the Lien of the First Lien Lenders and the Second Lien Lenders or any other Liens that Purchaser takes free and clear of under the Sale Order and, if applicable, the Confirmation Order, or other applicable Law; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations are not being violated and do not unreasonably interfere with the present operation of the Business at the respective Owned Real Properties; and (v) security interest of a lessor of equipment or other personal property under a capital lease.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Products" means any and all products developed, manufactured, marketed or sold by any Seller at any time.

"Purchaser Material Adverse Effect" means a material adverse effect on the ability of Parent or Purchaser to consummate the transactions contemplated by this Agreement or perform its respective obligations under this Agreement.

"Purchaser Selection Hearing" means the hearing before the Bankruptcy Court held pursuant to the Bidding Procedures Order to determine the highest or best bid for substantially all of the assets of Sellers.

- 8 -

17481153IV-12

"Registration Rights Agreement" means the Registration Rights Agreement substantially in the form and substance attached hereto as Exhibit B.

"Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Environmental Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"Representative" means, as to a specified Person, any officer, director, agent, employee, member, manager, attorney, accountant, consultant, investment banker, broker or other representative of the Person specified.

"Rights Offering" means the delivery and exercise of Subscription Rights to acquire Parent Common Stock as described in Exhibit C hereto.

"Rights Offering Sponsor Agreement" means the agreement between AREH and Parent in the form of Exhibit R hereto.

"Sale Motion" means the motion or motions of Sellers seeking approval and entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Sellers approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby pursuant to Section 363 and 365 of the Bankruptcy Code. Without limiting the generality of the foregoing, such order shall find and provide, among other things, unless the Purchaser agrees otherwise in its sole and absolute discretion, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions relating to real property), with any other Liens attaching to the Purchase Price (which Liens are and shall be deemed to be fully satisfied and discharged as a result of the Closing and distributions contemplated by the Agreement); (ii) the Parent and Purchaser have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's-length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 12.5 hereof; (v) due and adequate notice of the sale was provided; (vi) the transfer of the Purchased Assets pursuant to this Agreement shall not be subject to "bulk-transfer" Laws; (viii) Purchaser shall have no successor liability as a result of its purchase of the Purchased Assets pursuant to this Agreement; (ix) this Agreement and the transactions contemplated hereby may be statutorily or similarly specifically enforced against and are binding upon, and not subject to rejection or avoidance by, Sellers or any trustee of Sellers under Chapter 7 or Chapter 11 of the Bankruptcy Code; (x) a release by Sellers of all causes of action, including Avoidance Actions, against Parent, Purchaser, Holdco One, Holdco Two, Aretex, AREH, and

- 9 -

17481153\V-12

Representatives; (xi) Purchaser shall not be required or deemed to purchase any Excluded Assets or assume any Excluded Liabilities, including any Liabilities under or relating to any pension plans or termination of any pension plan; (xii) Purchaser shall have no liability for tort Liabilities, including all Liabilities relating to personal injury and other tort claims of any nature and related matters, of Debtors and their Affiliates, or relating to the Business or any assets or properties of Debtors and their Affiliates; and (xiii) that the Parent Common Stock and Subscription Rights purchased, retained by and/or distributed to AREH or its affiliates, the First Lien Lenders and the Second Lien Lenders shall be received and retained by each of them free and clear of all Liens, claims and encumbrances of any nature. The Purchaser may, in its sole and absolute discretion and without any obligation to do so, agree to requested modifications to provisions which are primarily for Purchaser's benefit in the proposed form of sale order prior to its entry and if Purchaser agrees to such modifications, Sellers agree to submit the form of such modified sale order to the Bankruptcy Court as being reasonably acceptable to Sellers unless such modification materially and adversely effects Sellers. If any such modification is in fact made pursuant to the preceding sentence, the definition of Sale Order set forth herein shall be deemed modified to incorporate any such modification.

"Second Lien Lender Agreement" means that certain $165 million Second-Lien Credit Facility, dated as of June 29, 2001, among the Company, as Borrower, the banks and, other financial institutions from time to time parties thereto, and Deutsche Bank Trust Company Americas (f/k/a Bankers Trust Company), as Administrative Agent, as amended to the date hereof.

"Second Lien Lenders" means the financial institutions from time to time party to the Second Lien Lender Agreement, together with their successors and assigns permitted by the Second Lien Lender Agreement.

"Selection Order" means the order of the Bankruptcy Court to be entered following the Purchaser Selection Hearing approving this Agreement and the transactions contemplated by this Agreement and otherwise in form and substance reasonably acceptable to Purchaser and Seller.

"Seller Material Adverse Effect" means (i) a material adverse effect on the business, assets, properties, results of operations or financial condition of Sellers (taken as a whole), or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement and perform their obligations under this Agreement, other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Sellers operate; (iii) the effect of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; or (iv) the effect of any changes in applicable Laws or accounting rules.

17481153RV-12

WPH
000685

"Sellers' Properties" means collectively all of the Owned Real Properties and Leased Real Properties.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Subscription Rights" means the rights to acquire, for an aggregate consideration of $125,000,000, 14,250,000 shares of Parent Common Stock.

"Tax Authority" means any Governmental Body or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, the following intangibles owned or used by Sellers: all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings and other tangible embodiments of the foregoing in any form whether or not specifically listed herein, and all related similar intangibles that are used in, incorporated in, embodied in, displayed by, relates to, or is used or useful in the design, development, reproduction, maintenance or modification of, any of the Products.

"Trade Payables" means accounts payable to vendors or suppliers for goods or services delivered in connection with the Business; in no event will "Trade Payables" include any accounts payable to any employees or any royalties payable to any Person.

"WARN Act" means the Worker Adjustment and Retraining Notification Act.

- 11 -

WPH
000686

"Winddown Costs" means professional fees of the Debtors or a Trustee and other costs incurred by the estate after the Closing Date in connection with the winddown of the Debtors.

1.2.    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Accepted Contracts | 8.12(a) |
| Accepted Intellectual Property Licenses | 8.12(a) |
| Accepted Real Property Leases | 8.12(b) |
| Agreement | Preamble |
| Antitrust Division | 8.4(a) |
| Antitrust Laws | 8.4(b) |
| Asset Acquisition Statement | 11.2 |
| Assumed Liabilities | 2.3 |
| Avoidance Actions | 2.2(c) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | 4.2(a) |
| Business | Recitals |
| Cash Purchase Price | 3.1 |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.1(e) |
| Collective Bargaining Agreements | 5.30(a) |
| Company | Preamble |
| Company SEC Documents | 5.4 |
| Deposit Amount | 3.2 |
| ERISA Affiliate | 5.10(b) |
| Escrow Agent | 3.2 |
| Exchange Act | 5.4(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Matter | 1.1 (in Seller Material Adverse Effect definition) |
| Expense Reimbursement | 7.2 |
| FIRPTA | 4.2(d) |
| FTC | 8.4(a) |
| Indemnified Persons | 11.1 |
| J.P. Stevens | Preamble |
| Leased Real Properties | 5.7(b) |
| Leased Real Property | 5.7(b) |

- 12 -

WPH
000687

| Term | Section |
| --- | --- |
| Letter of Credit Purchase Price | 3.1 |
| Listed Employee Plan | 5.10(a) |
| Loss | 10.5 |
| Lost Profits | 10.5 |
| Material Contracts | 5.9 |
| Material Intellectual Property License | 5.8 |
| Material Owned Real Properties | 5.7(a) |
| Material Property Loss | 10.5 |
| Parent | Preamble |
| Parent Shares | 3.1 |
| Personal Property Leases | 5.7(g) |
| Petition Date | Recitals |
| Purchased Assets | 2.1(b) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Real Property Lease | 5.7(b) |
| Real Property Leases | 5.7(b) |
| Referee | 11.3 |
| Rejected Contracts | 8.12(a) |
| Subscription Rights | 3.1 |
| SEC | 5.4 |
| Securities Act | 5.4(a) |
| Seller | Preamble |
| Sellers | Preamble |
| Subsidiary | Preamble |
| Transfer Taxes | 11.1 |

1.3.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement.  Any capitalized terms used

- 13 -

174811531V-12

WPH
000688

in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

<u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

<u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

<u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

<u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

<u>Confirmation Order</u>. Whenever the phrase "and, if applicable, the Confirmation Order", or words to that effect are used herein, such phrase shall be applicable only to a Confirmation Order that has become a Final Order prior to September 15, 2005.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

ARTICLE II.

PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1.   <u>Purchase and Sale of Assets</u>.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Purchased Assets.

(b)     For all purposes of and under this Agreement, the term "Purchased Assets" shall mean all of the properties and assets of Sellers existing as of the Closing other than the Excluded Assets, whether or not related to the Business. Such Purchased Assets shall include the following:

- 14 -

17481153\V-12

(i)    all cash and cash equivalents of Sellers and all marketable securities owned by Sellers other than the securities specified in Section 2.2(a);

(ii)    all bank accounts, lockbox accounts, securities accounts and other accounts of Sellers and all phone numbers of Sellers plus all deposits, securities and other amounts or assets held in such accounts;

(iii)    all inventory of Sellers;

(iv)    all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers other than any deposits or prepaid charges and expenses paid in connection with and specifically allocable to any Excluded Assets;

(v)    all accounts receivable including the rights to all checks and other payments in transit, delivered or made in respect thereof and not yet deposited or credited and the right to endorse any such checks or payments;

(vi)    all of the Owned Real Properties designated by Purchaser as Purchased Assets pursuant to Section 2.1(c) and all rights of Sellers under all of the Real Property Leases designated by Purchaser as Purchased Assets pursuant to Section 2.1(c), together with all right, title and interest of Sellers, if any, in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(vii)    the Furniture and Equipment and all vehicles owned by Sellers;

(viii)    confidential and proprietary business information owned or used by Sellers;

(ix)    all rights of Sellers under or relating to the Charisma Agreement and all rights of Sellers under or relating to the Intellectual Property Licenses (other than any containing the "J.P. Stevens" name) designated by Purchaser as Purchased Assets pursuant to Section 2.1(c), in each case to the extent assignable under the terms of the respective license, pursuant to applicable Law or order of the Bankruptcy Court, or as a result of any consents obtained from other parties to such license pursuant to Section 8.3, and all other Intellectual Property (other than Intellectual Property Licenses) (other than any containing the "J.P. Stevens" name);

(x)    all rights of Sellers under or relating to the Contracts (other than Contracts referred to in Section 2.1(a)(vi), 2.1(a)(ix), and 2.1(a)(xiv), respectively, as to which such Sections shall apply) designated by Purchaser as Purchased Assets pursuant to Section 2.1(c) to the extent assignable under the terms of the respective Contract, pursuant to applicable Law or order of the Bankruptcy Court, or as a result of any consents obtained from other parties to such Contract pursuant to Section 8.3;

(xi)    all Documents that are used in, held for use in or intended to be used in, or that relate to, the Business or the assets or the properties of the Sellers, including Documents

- 15 -

**WPH**

**000690**

relating to Products, services, marketing, advertising, promotional materials, Intellectual Property, personnel files for Continuing Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises assumed by the Purchaser (other than the Documents specified in Section 2.2(b));

(xii)    all Permits owned or used by Sellers to the extent assignable under the terms of the respective Permits, pursuant to applicable Law or order of the Bankruptcy Court, or as a result of any consents obtained from the issuer of such Permits pursuant to Section 8.3;

(xiii)    all supplies owned or used by Sellers;

(xiv)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees (other than any such agreements included in any employment agreement with any such Employee) or with third parties to the extent relating to the Business or to the marketing process for the sale of assets of or reorganization of the Sellers or the Purchased Assets (or any portion thereof) to the extent assignable under the terms of the respective agreements or pursuant to applicable Law or order of the Bankruptcy Court or as a result of any consents obtained from such Employee or third party pursuant to Section 8.3;

(xv)    all rights and claims of Sellers under all insurance policies to the extent assignable under the terms of the respective insurance policies or pursuant to applicable Law or order of the Bankruptcy Court and the Sellers' rights to the proceeds thereof except those proceeds specifically relating to the Excluded Assets;

(xvi)    any rights, claims, offsets or causes of action of Sellers (other than Avoidance Actions) against third parties arising out of events occurring on or prior to the Closing Date;

(xvii)    all rights of Sellers under or pursuant to all warranties, representations and guarantees including those made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets, other than any warranties, representations and guarantees to the extent pertaining to any Excluded Assets;

(xviii)    all goodwill and other intangible assets associated with the Business, including the goodwill associated with the Intellectual Property;

(xix)    all rights of J.P. Stevens Enterprises, Inc. in and to the trademarks "Utica", "Cottoncale" and "Pipeline", which rights will be purchased by a newly created subsidiary of Purchaser; and

(xx)    all rights of Sellers under or relating to the Maine CBA.

(c)    At any time and from time to time prior to the date that is 7 days prior to the Closing Date, Purchaser shall have the right to designate in its sole and absolute discretion

- 16 -

any of the properties or assets of Sellers (other than assets described in Section 2.2(a), (b), (c), (d), (l) and (m)) as Purchased Assets and any properties or assets of Sellers, other than the Charisma Agreement, as Excluded Assets, in each case by giving written notice signed by an executive officer of Purchaser specifically referring to this Section 2.1(c) to Sellers setting forth by category or specific reference the properties or assets of Sellers so designated.  There shall be no increase or reduction in the Purchase Price if Purchaser elects to treat any properties or assets of Sellers as Purchased Assets or Excluded Assets.

2.2.    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall mean the following assets:

(a)    all shares of capital stock or other equity interest issued by any Seller or any Excluded Subsidiary and all securities convertible into, exchangeable or exercisable for, shares of capital stock or other equity interests issued by any Seller or any Excluded Subsidiary;

(b)    any minute books, stock ledgers, corporate seals and stock certificates of Sellers, Tax Returns and financial statements of Sellers, and corporate or other entity filings made by Sellers; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets and Sellers agree to preserve such records in accordance with Section 8.8 hereof;

(c)    all avoidance actions or similar causes of action of Sellers arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof (collectively, the "Avoidance Actions");

(d)    all amounts held in escrow pursuant to the Adequate Protection Order and all amounts held in escrow pursuant to the KERP Order (unless the amounts held in escrow pursuant to the KERP Order are to be returned to the Company pursuant to the terms of the KERP Order, in which case such amounts shall be paid to Purchaser in lieu of the Company);

(e)    all properties and assets of Sellers designated by Purchaser as Excluded Assets pursuant to Section 2.1(c) hereof;

(f)    (i) all Contracts other than Contracts designated as Purchased Assets pursuant to Section 2.1(c) and (ii) all rights of Sellers under or relating to all oral agreements to which any Seller is a party;

(g)    all Employee Plans, and all trust funds and contracts relating thereto, including pension plans;

(h)    all Permits, non-disclosure or confidentiality, non-compete or non-solicitation agreements other than those included as Purchased Assets pursuant to Section 2.1(b)(xii) and 2.1(b)(xiv);

- 17 -

17481153\V-12

WPH
000692

(i)     all rights and claims of Sellers under all insurance policies other than the rights and claims under the insurance policies included as Purchased Assets to Section 2.1(b)(xv);

(j)     all of the Owned Real Properties and Real Property Leases, in each case other than those specifically designated as Purchased Assets pursuant to Section 2.1(c) ;

(k)     all rights of Sellers under Intellectual Property Licenses and other Contracts other than those designated by Purchaser as Purchased Assets pursuant to Section 2.1(c);

(l)     all intercompany receivables of Sellers;

(m)     any Tax refunds, credits and rebates to the extent applied to Taxes of Sellers that are Excluded Liabilities;

(n)     all assets and properties of J.P. Stevens Enterprises, Inc., other than the assets referred to in Section 21(b)(xix);

(o)     rights of Sellers under or pursuant to warranties, representations and guaranties to the extent pertaining to Excluded Assets; and

(p)     all proceeds resulting from the liquidation of WestPoint Stevens (UK) Ltd.

2.3.     Assumption of Liabilities.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, only the specific liabilities of Sellers set forth below (collectively, the "Assumed Liabilities"):

(i)     Current accruals and related Cure Costs for those Accepted Contracts (including Accepted Real Property Leases and Accepted Intellectual Property Licenses) which Purchaser directed Sellers to accept pursuant to Section 8.12 for which Purchaser has not changed its direction prior to the Closing, or as to any Accepted Contract which Purchaser directed Sellers to accept pursuant to Section 8.12 where the hearing to determine the amount of Cure Costs is not held until after the Closing Date, current accruals and Cure Costs for such Accepted Contracts will be paid by Purchaser to the applicable counterparty promptly after an Order determining the amount of such Cure Costs is entered by the Bankruptcy Court (unless Purchaser has changed its direction to assume prior to entry of such Order);

(ii)     Current wages, salary and commissions for Employees payable by Sellers (provided, however, Assumed Liabilities shall be deemed to not include any other obligation to, or benefits for, Employees including any severance, continuation, bonuses or benefits payable in connection with change of control provisions or otherwise, except to the extent specifically assumed pursuant to Sections 2.3(a)(iii), 2.3(a)(iv), and 2.3(a)(v));

- 18 -

WPH
000693

(iii)    Up to $438,000 in Current bonuses payable pursuant to incentive plans for sales employees and retail store employees existing as of the date hereof;

(iv)    accrued vacation costs for the Continuing Employees to the extent accrued on Seller's books and records as of the Closing;

(v)    costs for reimbursement claims of Continuing Employees submitted after the Closing and related to medical and dental costs incurred by the Continuing Employees prior to Closing;

(vi)    Current premiums under insurance policies that are Purchased Assets;

(vii)    Current payroll Taxes payable by the Sellers in connection with the operation of its Business on or prior to the Closing Date;

(viii)    Current Trade Payables existing on the Closing Date (including accrued but unbilled Trade Payables);

(ix)    quarterly U.S. Trustee fees accrued and unpaid through the Closing Date;

(x)    real and personal property taxes and any miscellaneous secured claims related to Purchased Assets allowed in the Bankruptcy Case with priority over the liens of the First Lien Lenders and the Second Lien Lenders;

(xi)    Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement to the extent not exempt under Section 1146(c) of the Bankruptcy Code or otherwise;

(xii)    Current sales and use Taxes and similar Taxes including gross receipts Taxes plus up to an additional $645,000 of sales and use Taxes and similar Taxes including gross receipts Taxes (including, solely for this purpose, the Michigan Single Business Tax) whether incurred before or after the Petition Date;

(xiii)    any other accrued and unpaid expenses or obligations incurred by the Sellers prior to the Closing Date that Purchaser expressly agrees to assume in a writing signed by an executive officer of Purchaser that specifically refers to this Section 2.3(a)(xiii) delivered to the Company prior to the Closing Date;

(xiv)    up to $25,000,000 of Liabilities arising after the Petition Date in the Ordinary Course of Business that would have been recorded as "Customer Accommodations" in the line item "Accrued Liabilities" in a consolidated balance sheet of the Business prepared in accordance with GAAP and using the same accounting principles, policies and practices used in the preparation of the December Financial Statements; and

17481153\V-12

WPH
000694

(xv)    up to an aggregate of $3,000,000 in Winddown Costs, to be paid by Purchaser upon presentation by Debtors of invoices reflecting the payee, the amounts due and other reasonable documentation.

(b)    Nothing in this Section 2.3 shall prohibit Purchaser from asserting or pursuing any claims or offsets it may have against any Person related to any Assumed Liability or contesting any Assumed Liability, whether pursuant to any agreement or contract, under Law or in equity.

(c)    To the extent that any Liability under any clause of Section 2.3(a) exceeds the aggregate amount of such Liability specifically assumed by Purchaser pursuant to such clause, Purchaser shall, in its sole and absolute discretion, select which of such Liabilities it shall assume pursuant to such clause. Any such Liability under any such clause shall be deemed selected to be assumed by Purchaser under such clause if Purchaser makes payment or otherwise satisfied such Liability. In no event will Purchaser be required to or deemed to assume any Liability under any clause of Section 2.3(a) to the extent it exceeds any dollar limitation in such clause or is otherwise outside any other limitation in such clause.

2.4.    Excluded Liabilities.    Purchaser shall not assume, and shall be deemed not to have assumed, any Liabilities of the Debtors and their Affiliates or any other Liabilities related to or arising out of the Business or the Purchased Assets other than the Assumed Liabilities (all such Liabilities other than the Assumed Liabilities, collectively, the "Excluded Liabilities"). Debtors and their Affiliates, as applicable, shall be solely and exclusively liable for the Excluded Liabilities. Such Excluded Liabilities shall include the following:

(a)    all Liabilities existing prior to the Petition Date, other than priority claims assumed by Purchaser pursuant to Section 2.3(a)(x) or any claim assumed by Purchaser pursuant to Section 2.3(a)(xii);

(b)    all Liabilities of Debtors and their Affiliates under the DIP Credit Agreement;

(c)    except to the extent set forth in Sections 2.3(a)(ii), 2.3(a)(iii), 2.3(a)(iv), and 2.3(a)(v), all Liabilities of Debtors and their Affiliates to Employees including under or related to any Employee Plan including, but not limited to, any plan or arrangement providing pension benefits, bonus or incentive compensation, or any plan or arrangement providing retirement benefits or post retirement medical, life or other welfare benefits;

(d)    all Liabilities relating to amounts required to be paid by Debtors and their Affiliates hereunder;

(e)    all Environmental Liabilities of the Debtors and their Affiliates, including all Liabilities of Debtors and their Affiliates relating to or arising from any Environmental Release (and including all Liabilities relating to real properties owned or leased or formerly owned or leased by Debtors and their Affiliates including, but not limited, the formerly owned

- 20 -

WPH
000695

Piedmont Chemical Plant located at 410 Old Pelzer Road, Piedmont, SC) except Environmental Liabilities relating to the Purchased Assets that Purchaser would have liability for under any applicable Environmental Laws solely as a result of Purchaser owning or operating the Purchased Assets after Closing;

   (f) all Liabilities under or related to the KERP Program;

   (g) all Liabilities of Debtors and their Affiliates relating to Taxes accrued through or imposed on the Closing Date, except the Liabilities for Taxes to the extent set forth in Sections 2.3(a)(vii), 2.3(a)(x), 2.3(a)(xi) and 2.3(a)(xii) or Taxes otherwise expressly assumed herein;

   (h) all obligations under or in connection with the WARN Act or any state counterpart;

   (i) all intercompany Liabilities of Debtors and their Affiliates;

   (j) all tort Liabilities, including all Liabilities relating to personal injury and other tort claims of any nature and related matters, of Debtors and their Affiliates, or relating to the Business or any assets or properties of Sellers;

   (k) all Liabilities dischargeable in the Bankruptcy Case or of a type that would be dischargeable if a reorganization plan were confirmed under Chapter 11 of the Bankruptcy Code; (other than any such Liabilities specifically included in Assumed Liabilities pursuant to Section 2.3);

   (l) all Liabilities arising out of or relating to Excluded Assets;

   (m) all Liabilities of the Debtors and their Affiliates for legal fees and expenses, and fees and expenses of brokers, finders and financial advisors but without prejudice to the Purchaser's obligation to pay $5 million cash at closing pursuant to Section 3.1(a)(f) hereof; and

   (n) all Liabilities that the Sale Order, and, if applicable, the Confirmation Order, provides will not be assumed by Purchaser.

   2.5. Further Conveyances and Assumptions. From time to time at or following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its respective successors and assigns, the assumption of the liabilities and obligations expressly intended to be assumed by Purchaser under Section 2.3(a) of this Agreement, and to otherwise make effective the transactions contemplated hereby.

- 21 -

**WPH**<br>**000696**

ARTICLE III.

CONSIDERATION

3.1.    Consideration.

(a)    The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) cash in an amount equal to the lesser of (i) $120,000,000 and (ii) an amount necessary to pay indebtedness outstanding under the DIP Credit Agreement, including all outstanding principal, accrued and unpaid interest, fees, expenses or other amounts owing thereunder at the time of Closing (the "Cash Purchase Price"), (b) 10,500,000 shares of Parent Common Stock (the "Parent Shares"), (c) the Subscription Rights, (d) the assumption of the Assumed Liabilities, (e) tender of a back-to-back standby letter of credit or cash, not to exceed, in the aggregate $35,000,000, delivered or payable to the administrative agent under the DIP Credit Agreement (the "Letter of Credit Purchase Price"), backing up any trade payables and workers' compensation obligations, issued pursuant to Article 1.3 of the DIP Credit Agreement, together with documentation reflecting Purchaser's right to receive back any portion of the Letter of Credit Purchase Price in excess of any amounts not drawn under any such letters of credit; and (f) $5,000,000 in cash at Closing for payment of professional fees within the carveout set forth in Paragraph 8(a) of that certain Order, captioned Final Order (1) Authorizing Debtors-in-Possession to Obtain Financing, Grant Security Interests and Accord Priority Status Pursuant to 11 U.S.C. Sections 361, 364(c) and 364(d); (2) Authorizing Debtors to Use Cash Collateral Pursuant to 11 U.S.C. sections 361 and 363; and (3) Modifying Automatic Stay, approved by the United States Bankruptcy Court, dated June 18, 2003.

(b)    The recipients of the Parent Shares and Subscription Rights that are part of the Purchase Price will be given the opportunity to become parties to the Registration Rights Agreement and thereby be entitled to registration rights pursuant to the Registration Rights Agreement.

3.2.    Purchase Price Deposit. Pursuant to the terms of the Escrow Agreement, Purchaser shall deposit with Citibank, N.A., in its capacity as escrow agent (the "Escrow Agent"), the sum of $12,500,000 ("Deposit Amount"), by wire transfer of immediately available funds, to be released by the Escrow Agent and delivered to either Purchaser or the Company in accordance with the provisions of the Escrow Agreement. The Deposit Amount (together with all interest thereon) shall be distributed as follows:

(a)    if the Closing shall occur, the Deposit Amount shall be applied toward the Cash Purchase Price payable by Purchaser to Sellers under Section 3.3 hereof, with all interest thereon and any amount in excess of the Cash Purchase Price delivered to Purchaser;

(b)    if this Agreement is terminated by Sellers pursuant to Section 4.4(f), the Deposit Amount, together with all interest thereon, shall be delivered to the Sellers; or

- 22 -

(c)    if this Agreement is terminated for any reason other than by Sellers pursuant to <u>Section 4.4(f)</u>, the Deposit Amount, together with all interest thereon, shall be delivered to Purchaser.

3.3.    <u>Payment of Purchase Price</u>. (a) On the Closing Date, Purchaser shall, and Parent shall cause Purchaser to, (i) pay the Cash Purchase Price (less the Deposit Amount) to the administrative agent under the DIP Credit Agreement on behalf of Sellers, by wire transfer of immediately available funds into an account or accounts designated in writing by the administrative agent under the DIP Credit Agreement, (ii) deliver to the administrative agent under the DIP Credit Agreement on behalf of Sellers the Letter of Credit Purchase Price to satisfy obligations under the DIP Credit Agreement, and (iii) deliver the Parent Shares and the Subscription Rights on behalf of Sellers in accordance with the provisions of <u>Section 3.3(c)</u> hereof. On the Closing Date the Company and Purchaser shall cause the Escrow Agent to deliver the Deposit Amount and all accrued interest thereon as provided in <u>Section 3.2(a)</u> hereof.

(b)    The Parent Shares and Subscription Rights shall only be required to be delivered in reliance upon an exemption afforded by the Securities Act, Regulation D promulgated under the Securities Act, any applicable state and foreign securities laws and any rules and regulations promulgated pursuant thereto. As a condition of any issuance of Parent Shares and Subscription Rights to any particular Person, the Parent and Purchaser will require the execution of a definitive subscription agreement and an investor questionnaire and certification in the form of Exhibit D hereto and which will be completed by each such Person in a manner reasonably acceptable to Parent to evidence compliance with applicable exemptions.

(c)    The Parent Shares and the Subscription Rights shall be delivered as set forth in this <u>Section 3.3(c)</u>. Parent shall issue at the Closing or as soon thereafter as practicable (i) 4,198,845 Parent Shares to Aretex, in its capacity as a First Lien Lender, and (ii) 6,301,155 Parent Shares to the other First Lien Lenders on a pro rata basis pursuant to the instructions of the First Lien Agent. If the Distributable Value of the Parent Shares as determined by the Bankruptcy Court is less than the amount due to the First Lien Lenders under the First Lien Lender Agreement (such difference referred to as the "Shortfall"), then Parent shall allocate to the First Lien Lenders all or such portion of the Subscription Rights as necessary (based on the Bankruptcy Court's determination of Distributable Value of the Subscription Rights) up to an amount equal to the Shortfall, and the balance of the Subscription Rights, if any, shall be allocated to the Second Lien Lenders. Parent shall issue at the Closing or as soon thereafter as practicable (i) 39.989% of the Subscription Rights allocated as set forth above to the First Lien Lenders to Aretex, in its capacity as a First Lien Lender, (ii) the balance of the Subscription Rights allocated to the First Lien Lenders as set forth above to the other First Lien Lenders on a pro rata basis pursuant to the instructions of the First Lien Agent, (iii) 51.212% of the Subscription Rights allocated as set forth above to the Second Lien Lenders to Aretex, in its capacity as a Second Lien Lender, and (iv) the balance of the Subscription Rights allocated as set forth above to the Second Lien Lenders to the other Second Lien Lenders on a pro rata basis pursuant to the instructions of the Second Lien Agent. To the extent Aretex acquires any additional First Lien Debt or Second Lien Debt, it shall receive its pro rata share of Parent Shores and Subscription Rights in addition to the amounts specified above as a First Lien Lender or

- 23 -

Second Lien Lender as the case may be. An example of the method distribution is set forth at Exhibit E.

## ARTICLE IV.

## CLOSING AND TERMINATION

4.1.    Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or at such other place as the parties may designate in writing) at 10:00 a.m. (New York City time) on the date that is two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto; provided, that if such date occurs prior to forty-five (45) days after the later of the date of the entry of the Selection Order or the date of this Agreement the Closing shall take place on such forty-fifth day after such later date (or, if such day is not a Business Day, then on the next Business Day) unless Purchaser selects an earlier date by giving Sellers not less than two (2) Business Days notice of such date. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

4.2.    Deliveries by Sellers. At the Closing, Sellers shall deliver to Purchaser with respect to the Purchased Assets:

(a)    a duly executed bill of sale in the form of Exhibit F hereto (the "Bill of Sale");

(b)    a duly executed general assignment and assumption agreement in the form of Exhibit G hereto;

(c)    duly executed assignments of the trademark registrations and applications, patent registrations and applications, copyrights and domain names, in the form suitable for recording in the U.S. Patent and Trademark Office, substantially in the forms annexed as Exhibits H, I, J and K hereto, respectively, and general assignments of all other Intellectual Property;

(d)    duly executed special warranty deeds, as that term is commonly understood in the respective jurisdictions (subject only to Permitted Exceptions), substantially in the form of Exhibit L for each of the Material Owned Real Properties, quit claim deeds, as that term is commonly understood in the respective jurisdictions, substantially in the form of Exhibit M for each of the Immaterial Owned Real Properties, a certificate in compliance with the Foreign Investment in Real Property Tax Act ("FIRPTA") certifying that the respective Seller is

- 24 -

WPH
000699

not a person or entity subject to withholding under FIRPTA, a "No Mechanic's Lien" affidavit, GAP Undertaking, and all other customary title clearance documents required by the title insurance company issuing the policies with respect to each of the Owned Real Properties and each of the Leased Real Properties for which title insurance policies are being obtained by Purchaser, including, without limitation, a survey affidavit, executed by the appropriate Seller, together with any necessary state, county or municipal transfer declarations as required by Law.

(e)     a duly executed assignment and assumption of Contracts and Real Property Leases in the form of Exhibit N hereto;

(f)     the officer's certificate required to be delivered pursuant to Section 10.1(c);

(g)     all assignments and transfer instruments necessary to transfer control, ownership and signature authority of all bank accounts, lockbox accounts, securities accounts, and other accounts under the name of any Seller as of the Closing Date along with a schedule of all such bank accounts, lockbox accounts, securities accounts, and other accounts with account numbers, bank name and address and other information reasonably requested by Purchaser with respect thereto;

(h)     UCC-3 termination Statements, control agreement terminations and other release documents releasing all Liens of the agents and lenders under the DIP Credit Agreement;

(i)     all assignments and transfers of certificates of title and registrations for all vehicles owned by Sellers as of the Closing Date along with a schedule of all such vehicles and information reasonably requested by Purchaser with respect thereto;

(j)     a written notice to the Escrow Agent, executed by the Company, of the Closing pursuant to Section 3(e) of the Escrow Agreement;

(k)     the indemnity agreement executed by J.P. Stevens & Co., Inc. in the form of Exhibit S hereto, and the executed notice to its insurance company that it is entering into the indemnity agreement.

(l)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or any of its Affiliates designated by Purchaser pursuant to Section 12.11.

4.3.     Deliveries by Purchaser. At the Closing, Purchaser shall, and Parent shall cause Purchaser to, deliver pursuant to Section 3.3, as applicable:

(a)     the Cash Purchase Price (less the Deposit Amount), in immediately available funds, as set forth in Section 3.3 hereof;

(b)     the Parent Shares and the Subscription Rights in accordance with Section 3.3;

- 25 -

WPH
000700

(c)    a duly executed general assignment and assumption agreement in the form attached hereto as Exhibit G;

(d)    the officer's certificate required to be delivered pursuant to Section 10.2(e);

(e)    a duly executed assignment and assumption of Contracts and Real Property Leases in the form of Exhibit N attached hereto;

(f)    the Registration Rights Agreement executed by Parent; and

(g)    a written notice to the Escrow Agent, executed by Purchaser, of the Closing pursuant to Section 3(e) of the Escrow Agreement.

4.4.    <u>Termination of Agreement</u>. This Agreement may be terminated prior to the Closing as follows:

(a)    (i) by Purchaser, if the Closing shall not have occurred by the close of business on September 30, 2005, time being of the essence for the Closing, <u>provided</u>, that if the Closing shall not have occurred on or before September 30, 2005 due to a material breach of any representations, warrants, covenants or agreements contained in this Agreement by Purchaser, then Purchaser may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>, or (ii) by Sellers, if the Closing shall not have occurred by the close of business on October 31, 2005; <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before October 31, 2005 due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by any Seller, or due to the failure of the condition to Closing set forth in <u>Section 10.1(l)</u> relating to Section 8.9(d) to be satisfied, then Sellers may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>;

(b)    by mutual written consent of Sellers and Purchaser;

(c)    by Purchaser, if any of the conditions to the obligations of Purchaser set forth in <u>Sections 10.1</u> (other than <u>Sections 10.1(a)</u> and <u>(b)</u>) and <u>10.3</u> shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)    by Sellers, if any condition to the obligations of Sellers set forth in <u>Sections 10.2</u> (other than <u>Sections 10.2(a)</u> and <u>(b)</u>)and <u>10.3</u>) shall have become incapable of fulfillment other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by any Seller;

(e)    by Purchaser, if there shall be a breach by any Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which results in a failure of a condition set forth in <u>Sections 10.1(a)</u> or <u>(b)</u> and such breach has not been cured by the earlier of (i) twenty (20) Business Days after the giving of written notice by Purchaser to Sellers of such breach and (ii) September 30, 2005, time being of the essence for the Closing;

- 26 -

17481153\V-12

(f)     by Sellers, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which results in a failure of a condition set forth in Sections 10.2(a) or (b) and such breach has not been cured by twenty (20) Business Days after the giving of written notice by Sellers to Purchaser of such breach; provided, that Seller shall not have the right to terminate this Agreement if Purchaser has a right to terminate this Agreement at such time or would have the right to terminate with the passage of time;

(g)     by Sellers or Purchaser, if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(h)     by Purchaser or Sellers, if the Bankruptcy Court shall enter an order approving any sale or other disposition of the assets and properties of Sellers to a Person other than Purchaser or its Affiliates and Subsidiaries, or Sellers select, or announce a selection of, a Person other than Purchaser as the Successful Bidder (as defined in the Bidding Procedures Order) in the auction conducted pursuant to the Bidding Procedures Order;

(i)     by Purchaser, pursuant to the provisions of Section 10.5;

(j)     by Purchaser, if the Selection Order is not entered by July 13, 2005, time being of the essence for entry of such Order;

(k)     by Purchaser, if Sellers file a motion seeking to revoke or modify the Bidding Procedures Order without the prior written consent of Purchaser;

(l)     by Purchaser, pursuant to Section 7.3(b)(i) or 7.3(b)(ii); and

(m)     by Sellers, pursuant to Section 7.3(b)(i).

4.5.     Procedure Upon Termination. In the event of an election to terminate by Purchaser or Sellers, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, without further action by Purchaser or Sellers. If this Agreement is terminated as provided herein each party shall return to the other party all documents, work papers and other material of such other party furnished to it by such other party and in its possession and relating to the transactions contemplated hereby, whether so obtained before or after the date hereof.

4.6.     Effect of Termination. In the event that this Agreement is terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Parent, Purchaser or Sellers; provided, however, that the obligations and rights of the parties set forth in Section 3.2 and under the Escrow Agreement, Section 7.2 and Article XII hereof shall survive any such termination and shall be enforceable hereunder and Sellers shall remain liable to Parent and Purchaser for any breach occurring prior to termination.

- 27 -

WPH

000702

The sole and exclusive remedy of Sellers upon any such termination shall be as described in Section 12.4.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby jointly and severally represents and warrants to Parent and Purchaser that:

5.1.    Organization and Good Standing.  Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted and is qualified to do business in every jurisdiction where the conduct of its business requires it to be so qualified except where failure to so qualify would not reasonably be expected to have a Seller Material Adverse Effect.  Each Subsidiary is wholly owned directly or indirectly by the Company.  No Seller, other than J.P. Stevens Enterprises, Inc., is a subsidiary of J.P. Stevens & Co., Inc.

5.2.    Authorization of Agreement.  Subject to entry of the Selection Order, the Sale Order and, if applicable, the Confirmation Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and the Ancillary Documents and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement has and upon execution and delivery of all Ancillary Documents, such Ancillary Documents will be and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of each Seller and no other corporate action is necessary to authorize such agreements and such transactions.  This Agreement has been, and upon execution and delivery thereof all Ancillary Documents will be, duly and validly executed and delivered by each Seller party thereto and (assuming the due authorization, execution and delivery by the other parties hereto, the entry of the Selection Order, the Sale Order and, if applicable, the Confirmation Order) constitutes and will constitute the legal, valid and binding obligations of each Seller enforceable against such Seller in accordance with its respective terms, subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3.    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 5.3(a), the execution and delivery by each Seller of this Agreement and the Ancillary Documents, the consummation of the transactions contemplated hereby, or compliance by such Seller with any of the provisions hereof or thereof do not and will not (A) conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or (B) give rise to, (x) the creation of a Lien upon any

- 28 -

Seller's properties or assets or (y) a right of termination, cancellation or acceleration of any obligation or (z) a loss of a benefit under any provision of:

(i)     the certificate of incorporation and by-laws or comparable organizational documents of such Seller;

(ii)     subject to entry of the Sale Order and, if applicable, the Confirmation Order, any Contract or Permit to which such Seller is a party or by which any of the properties or assets of such Seller are bound other than such conflicts, violations, defaults, terminations or cancellations as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect;

(iii)     subject to entry of the Sale Order and, if applicable, the Confirmation Order, any Order of any Governmental Body applicable to such Seller or any of the properties or assets of such Seller; or

(iv)     subject to entry of the Sale Order and, if applicable, the Confirmation Order, any applicable Law.

(b)     Except as set forth on Schedule 5.3(b), and except to the extent not required if the Sale Order and, if applicable, the Confirmation Order, is entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Sellers in connection with the execution and delivery of this Agreement and the Ancillary Documents, the assignment of the Material Contracts, the assignment of the Real Property Leases, the assignment of Permits, the assignment of Material Intellectual Property Licenses, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Sellers of any other action contemplated hereby or thereby, except for:

(i)     compliance with the applicable requirements of the HSR Act;

(ii)     the entry of the Selection Order and the Sale Order or, if applicable, the Confirmation Order; and

(iii)     such other consents, waivers, approvals, Orders, permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect. The parties acknowledge and agree that Schedule 5.3(b) is not an admission that any consent to assignment or any contractual clause forbidding assignment that is listed on Schedule 5.3(b) is enforceable under or is overridden by Section 365 of the Bankruptcy Code or any other applicable Law.

5.4.     Reports; Financial Statements.

(a)     Except as set forth on Schedule 5.4, since January 1, 2004, the Company has filed all reports, schedules, forms, statements and other documents (including exhibits and

- 29 -

**WPH
000704**

other information incorporated therein) with the Securities and Exchange Commission (the "SEC") required to be filed by the Company (such documents, the "Company SEC Documents"). Except as set forth on Schedule 5.4, as of their respective dates, the Company SEC Documents complied in all material respects with the requirements of the Securities Act of 1933, as amended, (the "Securities Act") or the Securities Exchange Act of 1934, as amended, (the Exchange Act") as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to such Company SEC Documents, and, as of their respective dates, none of the Company SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Except as set forth on Schedule 5.4, the financial statements of the Company included in the Company SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as of their respective dates, were prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and present fairly in all material respects the financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

(b)     The December Financial Statements were prepared in accordance with GAAP applied on a consistent basis during the period involved (except as indicated in the notes thereto) and present fairly in all material respects the financial position of the Company and its consolidated Subsidiaries as of December 31, 2004 and the consolidated results of their operations and cash flows for the period then ended (subject to normal year-end audit adjustments).

5.5.     Title to Purchased Assets.  Except as set forth in Schedule 5.5, and other than the real property subject to the Real Property Leases, Intellectual Property licensed to Sellers and the personal property subject to the Personal Property Leases, Sellers own the Purchased Assets, and, subject to the entry of the Sale Order and, if applicable, the Confirmation Order, and consummation of the Closing, Purchaser will be vested with good title to the Purchased Assets, free and clear of all Liens other than Permitted Exceptions and Intellectual Property Licenses.

5.6.     Taxes.

(a)     Except as set forth on Schedule 5.6(a), and except for matters that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, (i) Sellers have timely filed all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers); (ii) except as to Taxes of Sellers the payment of which is prohibited or stayed by the Bankruptcy Code, all Taxes shown to be due and payable on such Tax Returns have been paid; (iii) the amounts set up as a provision for Taxes on the unaudited consolidated statement of Sellers' financial position as

- 30 -

WPH
000705

of December 31, 2004 are sufficient for the payment of all accrued and unpaid Taxes of Sellers, as of such date whether or not disputed; (iv) the statute of limitations with respect to all Tax Returns for Tax periods of the Sellers ending on or prior to December 31, 2000 (in the case of Tax Returns that have a four year statute of limitations, December 31, 1999) have expired; (v) no Tax Authority has asserted any additions to Tax to the Sellers; (vi) none of Sellers (a) during the last seven years has been a member of a consolidated, combined or unitary group (an "Affiliated Group") for federal, state or local income tax purposes other than an Affiliated Group of which the Company is the common parent and (b) has any transferee or successor liability in respect of Taxes (whether by contract or otherwise); and (vii) based on Sellers' best estimate, the amount of Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement to the extent not exempt under Section 1146(c) of the Bankruptcy Code or otherwise shall not exceed $500,000.

(b)     None of Sellers is a foreign person within the meaning of Section 1445 of the Tax Code.

5.7.    Real and Personal Properties.

(a)     Schedule 5.7(a) sets forth the street addresses and legal descriptions (which will be delivered no later than fifteen (15) days after the date of this Agreement pursuant to Section 8.10) of each parcel of real property owned by the respective Sellers that is necessary for or utilized in the operation of the Business, as well as each parcel of real property owned by the respective Sellers that contains a closed facility that has not otherwise been sold as of the date of this Agreement (each a "Material Owned Real Property" and, collectively, the "Material Owned Real Properties"). Each of the Sellers listed on Schedule 5.7(a) holds fee simple title to their respective Material Owned Real Properties, subject only to Permitted Exceptions. Except as set forth on Schedule 5.7(a), and except for recorded leases with railroads or utility providers shown on surveys previously provided to Purchaser, the Material Owned Real Properties are not subject to any leases or tenancies or other rights of occupancy. None of the Sellers has received notice that any of the improvements comprising the Material Owned Real Properties or the business conducted by the respective Sellers thereon is in violation of any building line, use or occupancy restriction, limitation, easement, condition or covenant of record. There are no physical defects in the buildings or other facilities or machinery or equipment located at any of the Material Owned Real Properties which individually or in the aggregate would reasonably be expected to have a Seller Material Adverse Effect.

(b)     Schedule 5.7(b) sets forth the street addresses of each parcel of real property that is leased by the respective Sellers (each a "Leased Real Property" and, collectively, the "Leased Real Properties"). The Leased Real Properties are leased to the respective Sellers listed on Schedule 5.7(b) pursuant to written leases (each a "Real Property Lease" and collectively, the "Real Property Leases"). With respect to each Leased Real Property, (i) the Seller that is the tenant under such Real Property Lease has not received any notice of default under the Real Property Lease in the twelve (12) month period prior to the date hereof. None of the Sellers has received notice that any of the improvements comprising the Leased Real Properties or the business conducted by the respective Sellers thereon is in material violation of

- 31 -

17481153\V-12

any building line, use or occupancy restriction, limitation, easement, condition or covenant of record. There are no physical defects in the buildings or other facilities or machinery or equipment located at any of the Leased Real Properties which individually or in the aggregate would reasonably be expected to have a Seller Material Adverse Effect.

(c)     Each facility located on the Material Owned Real Properties and Leased Real Properties is served by such utilities as are adequate to operate such facility at its current rate of production. Such utilities either enter the Material Owned Real Properties or Leased Real Properties through adjoining public streets or, if they pass through adjoining private land, do so in accordance with valid, permanent public or private easements which, following the Closing, will inure to the benefit of Purchaser, its successors and assigns (except that no representation is made herein with respect to any utility lines owned by Sellers or any of Seller's predecessors in interest that serve the Material Owned Real Properties located in Valley, Alabama and Opelika, Alabama for which easements, rights-of-way or other rights to retain, operate, use or maintain such utility lines were reserved or intended to have been reserved when the land(s) upon which such lines are located were sold or otherwise conveyed to third parties and, no representation is made herein as to utility lines owned by public or private third party utility providers which may cross private lands owned by third parties). All of said utilities are installed and operating (except with respect to any closed facilities where the utility service has been cancelled) and all installation and connection charges have been paid for in full.

(d)     Except as set forth on Schedule 5.7(d), the continued maintenance and operation of the Material Owned Real Properties as currently maintained and operated is not dependent on facilities located at any other property, and the continued maintenance and operation of any other property is not dependent on facilities located on any of the Material Owned Real Properties; no building or other improvement not part of an Owned Real Property relies on an Material Owned Real Property or any part thereof or any interest therein to fulfill any governmental requirement; and no building or other improvement on an Material Owned Real Property relies on any property not included within the Material Owned Real Property to fulfill any governmental requirement.

(e)     Except as disclosed in Schedule 5.7(e), there are no challenges or appeals pending regarding the amount of the Taxes on, or the assessed valuation of, any of the Material Owned Real Properties or, to the Knowledge of Sellers, the Leased Real Properties, and no special arrangements or agreements exist with any governmental authority with respect thereto. Except as set forth on Schedule 5.7(e), there are no Tax abatements with respect to Taxes on any of the Owned Real Properties or any of the Leased Real Properties. None of the Sellers has received notice of any new Tax assessment for any of the Material Owned Real Properties or, to the extent any Seller is liable for payment therefor, the Leased Real Properties, not otherwise included in any previous real estate Tax bill, requiring payments in excess of $100,000.

(f)     There is no pending or, to the Knowledge of Sellers, threatened condemnation proceeding, administrative action or judicial proceeding of any type relating to any of the Material Owned Real Properties or the Leased Real Properties, or other proceedings

- 32 -

WPH
000707

adversely affecting the current use, occupancy or value of the Material Owned Real Properties or the Leased Real Properties.

(g)    None of the Material Owned Real Properties is located within any flood plain or subject to any similar type of restriction for which any permits or licenses necessary for the use thereof have not been obtained.

(h)    With respect to leases of personal property involving annual payments in excess of $100,000 relating to personal property used by a Seller in the Business and to which a Seller is a party or by which its properties or assets are bound (collectively, the "Personal Property Leases"), to the Knowledge of Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any of the Personal Property Leases, in each case with such exceptions as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect and except as a result of the Bankruptcy Cases.

5.8.    Intellectual Property.  Schedule 5.8(a) sets forth a complete list of all material Intellectual Property (other than Intellectual Property Licenses) owned by Sellers which are either (a) subject to registrations and applications for registration or (b) to the Knowledge of Sellers, material unregistered trademarks, service marks, trade names and service names (whether or not any material unregistered trademark, service mark, trade name and service name was the subject of a registration or application which has expired or been abandoned).  The Sellers own all right, title and interest in the items set forth on Schedule 5.8(a) except as set forth otherwise on such Schedule and any Intellectual Property Licenses relating thereto.  Schedule 5.8(b) sets forth a complete list of all (i) written Intellectual Property Licenses and (ii) to the Knowledge of Sellers, oral Intellectual Property Licenses, except for in the case of both of the foregoing (i) and (ii) such Intellectual Property Licenses that do not involve annual payments by or to a Seller of more than $100,000. Notwithstanding the foregoing, Schedule 5.8(b) shall also include (i) all material written Intellectual Property Licenses and (ii) to the Knowledge of Sellers, material oral Intellectual Property Licenses, that in the case of both of the foregoing (i) and (ii) grant any right to use any trademark, service mark, trade name or service name, regardless of whether such Intellectual Property Licenses involve annual payments by or to a Seller of more than $100,000.  Except as set forth on Schedule 5.8(c), to the Knowledge of the Sellers, the Sellers own the right, title and interest in, or have licenses or all other rights necessary to use all material Intellectual Property free and clear of all liens other than Permitted Exceptions and Intellectual Property Licenses.  Except as set forth on Schedule 5.8(d), (i) there are no claims, investigations or Legal Proceedings that were asserted after the Petition Date that are pending as of the date hereof or, to the Knowledge of Sellers, threatened as of the date hereof against any Seller before any Governmental Body with regard to the ownership by Sellers of any of the Intellectual Property, (ii) Sellers have not received any written notice alleging that they have misappropriated any material Intellectual Property, or that any of the material Intellectual Property or the exercise of any material Intellectual Property right has infringed upon any intellectual property rights of third parties and to the Knowledge of Sellers, Sellers have a reasonable basis to believe no such claim may be successfully asserted by any third party, (iii) to the Knowledge of Sellers, no third party has infringed upon or

- 33 -

WPH
000708

misappropriated any of the Intellectual Property, (iv) there are no claims, investigations or Legal Proceedings that were asserted after the Petition Date that are pending as of the date hereof or, to the Knowledge of Sellers, threatened as of the date hereof against any Seller before any Governmental Body which challenge the legality, validity, enforceability, use or ownership of any Intellectual Property. Except as set forth on Schedule 5.8(e), to the Knowledge of Sellers, the Sellers have taken commercially reasonable efforts to pay all maintenance and renewal fees and take other maintenance actions that are required to be paid or taken as of the date hereof in connection with the registrations and applications set forth on Schedule 5.8(a). No Seller is in violation or default under any Intellectual Property License set forth on Schedule 5.8(b), except for violations or defaults disclosed on Schedule 5.8(b) or violations or defaults that are not material. To the Knowledge of Sellers, no other party is in violation or default that could be the basis of termination under any material Intellectual Property License granting any right to use any trademark, service mark, trade name or service name. None of the Sellers is subject to any agreement (other than Intellectual Property Licenses), or Order which restricts or impairs the use of any Intellectual Property except for Orders entered into in connection with the Bankruptcy Case as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect. Except as set forth on Schedule 5.8(f), Sellers have taken such efforts that are commercially reasonable in accordance with applicable industry standards to protect the confidentiality of any material trade secrets and other material confidential and proprietary business information included in the Purchased Assets. Sellers have used commercially reasonable efforts to cause each of their employees, consultants and independent contractors to enter into a written invention assignment agreement with the Sellers, where, in Seller's reasonable business judgment, such employees, consultants and independent contractors require such agreements. Notwithstanding anything to the contrary contained in this Section 5.8, none of the representations in Section 5.8 shall apply to off the shelf or shrink wrap Software that is generally available for purchase or license from a third Person and the term Intellectual Property License as used in this Section 5.8 shall be deemed to exclude such off the shelf or shrink wrap Software.

5.9.    Contracts.  Schedule 5.9 is a complete listing of all Contracts (other than purchase and sale orders entered into by Sellers in the Ordinary Course of Business and Real Property Leases) to which any Seller is a party or by which it or any of its properties or other assets is bound except for such Contracts that (i) do not restrict Seller from freely engaging in business and (ii) do not involve annual payments by or to any Seller of more than $250,000 (collectively, the "Material Contracts"). No Seller is in violation of or in default under any Material Contract to which it is a party or by which it or any of its properties or other assets is bound, except for violations or defaults disclosed on Schedule 5.9 or that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect. Sellers have made available to Purchaser true, correct and complete copies of all Material Contracts.

5.10.    Employee Benefits.

(a)    Generally.  Schedule 5.10(a) contains a true and complete list of each Employee Plan with respect to which Sellers have any obligation or liability, contingent or otherwise, for Employees (each such Employee Plan a "Listed Employee Plan"). The Sellers

- 34 -

will make available to the Purchaser true and complete copies of all documents, if any, embodying each Listed Employee Plan, including all amendments thereto; the three most recent annual reports filed (Form 5500 Series with applicable schedules) with respect to each Listed Employee Plan required under ERISA; the most recent summary plan description, if any, with respect to each Listed Employee Plan required under ERISA; the most recent favorable determination letter from the IRS, if applicable, with respect to each Employee Plan; and all material communications; if any, provided after January 1, 2003 to the Employees generally relating to each Employee Plan.

(b)    Multiemployer Plans.  None of Sellers nor any other trade or business that together with any Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA (an "ERISA Affiliate") has contributed to any Employee Plan that is a multiemployer plan as defined in Section 3(37) of ERISA.

(c)    Effect of Transaction.  Schedule 5.10(c) contains a list of all compensation and benefits which will or may be made by the Sellers, or any of their respective Affiliates, to any Employee which is contingent upon a change of control within the meaning of Section 280G of the Tax Code.

5.11.    Employment Matters.  Each Seller:  (1) is in compliance with all applicable federal and state laws and regulations respecting employment, employment practices, terms and conditions of employment and wages and hours, in each case, with respect to its Employees, except where the failure to be in compliance would not reasonably be expected to have individually or in the aggregate, a Seller Material Adverse Effect; (2) has withheld all amounts required by law or by agreement to be withheld from the wages, salaries and other payments to Employees and has remitted such withholding to the appropriate authorities and is not subject to any pending audit regarding the same; (3) is not liable for any arrears of wages, including vacation pay, overtime pay or pay equity adjustments or any taxes or any penalty for failure to comply with any of the foregoing; and (4) is not liable for any payment to any trust or other fund or to any governmental or administrative authority, with respect to unemployment compensation benefits, Social Security, or other benefits for Employees (other than routine payments to be made in the normal course of business and consistent with past practice). Schedule 5.11 contains a true and accurate list of accrued vacation pay for Employees as of June 17, 2005.

5.12.    Litigation.  Except as set forth on Schedule 5.12, there are no Legal Proceedings that were asserted after the Petition Date and pending as of the date hereof or to the Knowledge of Sellers, threatened as of the date hereof, against any Seller before any Governmental Body that (i) seeks to restrain, materially modify, prevent, or materially delay the consummation of the transactions contemplated by this Agreement or the Ancillary Documents, or (ii) questions the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by a Seller in connection with this Agreement or any of the Ancillary Documents.  Other than the Bankruptcy Case or obligations that will be discharged in the Bankruptcy Case, there is no Legal Proceeding that was asserted after the Petition Date and is

- 35 -

pending as of the date hereof that involves a dispute of more than $250,000 or seeks to obtain injunctive relief against any Seller.

5.13.    Compliance with Laws; Permits.  Except with respect to Environmental Laws (which are addressed in Section 5.14), each Seller (i) is in compliance with all Laws applicable to its respective operations or assets or the Business, except where the failure to be in compliance would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect and (ii) currently has all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.  Schedule 5.13 sets forth a list of all Permits owned or used by any Seller.

5.14.    Environmental Matters.  Except as set forth on Schedule 5.14 and except for facts, circumstances or conditions that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, (a) the operations of Sellers are in compliance with all applicable Environmental Laws and Environmental Permits, (b) none of Sellers is the subject of any outstanding Order with any Governmental Body respecting (i) Environmental Laws, (ii) a Remedial Action, or (iii) Environmental Permits, (c) there is no investigation, action or proceeding pending, or, to the Knowledge of Sellers, threatened that could reasonably be expected to result in Sellers incurring any material liability pursuant to any applicable Environmental Law, (d) the Sellers have not received any notice, report or other communication regarding (x) any violation of any Environmental Laws or any Environmental Permits, or (y) any Environmental Liabilities, including any investigatory, remedial or corrective obligations, relating to the Sellers, or that it is responsible (or partly responsible) for the removal, remediation, or other clean-up of any Hazardous Materials at, on, under, or emanating from the Sellers' Properties or properties used in connection with the Business, (e) the Sellers possess all Environmental Permits necessary for their respective operation, and all such Environmental Permits are valid and in good standing, and there is no pending, or to the knowledge of the Sellers, threatened action to revoke, modify, terminate or otherwise materially change the terms or conditions of any such Environmental Permits, and (f) there is (i) no friable asbestos contained in or forming a part of any building, building component, structure or office space included in the Sellers' Properties, (ii) no polychlorinated biphenyls are used, stored, or released on any of the Sellers' Properties, or (iii) there are no underground storage tanks or surface impoundments containing Hazardous Materials located on, under or at any of the Sellers' Properties.

5.15.    Financial Advisors.  Except as set forth on Schedule 5.15, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement.  No Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.16.    Representations/Warranties; Schedules.  Sellers makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Seller Material Adverse Effect.  The representations of Sellers

- 36 -

17481153\V-12

shall be unaffected by any investigation made heretofore or hereafter by or on behalf of Purchaser.

5.17.   Sufficiency of Assets.  The Purchased Assets and other assets and property owned or used by Sellers and which will be owned or used by Purchaser upon Closing together with the Excluded Assets, taken as a whole, are sufficient for the continued conduct of the business of Sellers as currently conducted.

5.18.   Equipment.  Schedule 5.18 lists all machinery, equipment, vehicles or furniture owned by a Seller with a depreciated book value of $100,000 or more and sets forth the original cost and current depreciated value of each such item listed by location.

5.19.   No Casualty.  Except as set forth on Schedule 5.19, as of the date hereof to the Seller's Knowledge, none of the assets of the Sellers has been affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that has not been repaired or restored and that would reasonably be expected to have a Seller Material Adverse Effect.

5.20.   Insurance.  The Sellers have in place insurance policies listed on Schedule 5.20.  Except as set forth on Schedule 5.20, all such policies are, and until Closing will remain, in full force and effect except for those policies, the failure to maintain which individually or in the aggregate, would not be reasonably expected to have a Seller Material Adverse Effect.  The Sellers have made available to Purchaser a description of such policies and any applicable self-insurance programs.

5.21.   Customers.  The attached Schedule 5.21 lists Sellers' ten (10) largest customers for the period beginning July 1, 2004 and ending on the date hereof.  As of the date hereof (except as set forth in such Schedule 5.21), Sellers have not received any notice that any such customer, and to the Knowledge of Sellers, no such customer, intends to terminate or materially reduce its business with Sellers and no such customer has terminated or materially reduced its business with Sellers from July 1, 2004 to the date hereof.

5.22.   Suppliers.  The attached Schedule 5.22 lists Sellers' twenty (20) largest vendors for the period beginning July 1, 2004 and ending on the date hereof.  As of the date hereof (except as set forth in such Schedule 5.22), Sellers have not received any notice that any such vendor, and to the Knowledge of Sellers, no such vendor, intends to terminate or materially reduce its business with Sellers and no such vendor has terminated or materially reduced its business with Sellers from July 1, 2004 to the date hereof.

5.23.   Affiliate Transactions.  Except as set forth on Schedule 5.23, no officer, manager, member or Affiliate (including any of the shareholders) of any Seller or any individual related by blood, marriage or adoption to any such individual or any entity in which any such Person or individual owns any beneficial interest, is a party to any agreement, contract, commitment or transaction with any Seller or has any interest in any property used by any Seller.

- 37 -

**WPH
000712**

5.24.   Product Warranty.  Except as set forth on Schedule 5.24, to the Knowledge of Sellers, all products manufactured, merchandised, serviced, distributed, sold or delivered by Sellers in connection with the Business during the six year period prior to the Closing Date have been in conformity with all applicable contractual commitments and all express or implied warranties.  No liability exists for replacement thereof or other damages in connection with such sales or deliveries during the six year period prior to the Closing Date except for liabilities which would not reasonably be expected to have a Seller Material Adverse Effect.  No products heretofore sold by Sellers in connection with the Business are now subject to any guarantee or warranty other than Sellers' standard terms and conditions of sale, except to the extent described on the attached Schedule 5.24.

5.25.   Inventories.  The inventory of Sellers is properly reflected, and appropriate reserves exist therefor, on the books and records of Sellers in accordance with GAAP.  All of the inventories of Sellers (other than inventory in transit, inventory at public warehouses and inventory held at other locations for finishing, which warehouses and other locations are listed on Schedule 5.25) are located at either the Owned Real Properties or the Leased Real Properties subject to the Real Property Leases.

5.26.   Notes and Accounts Receivable.  All notes and accounts receivable of Sellers (a) are valid receivables incurred in the ordinary course of business and (b) are properly reflected on Sellers' books and records and properly reserved for with respect to doubtful accounts, all in accordance with GAAP.

5.27.   Bank Accounts.  Schedule 5.27 hereto sets forth a complete and accurate list of all bank accounts, lockbox accounts, securities accounts, and other accounts maintained by the Sellers with any bank or other financial institution, as of the date hereof, which Schedule shall be updated as of the Closing Date.

5.28.   Signatories.  All of the domestic Subsidiaries of the Company, other than J.P. Stevens & Co., Inc., are signatories to this Agreement except those that have no assets (other than insignificant assets not used in the Business).

5.29.   Foreign and Non-Debtor Affiliates.  Except as set forth on Schedule 5.29, (i) none of the assets of the Sellers' foreign Affiliates are used in operation of the Business, (ii) none of the assets of the Business are used in the operation of any of Sellers' foreign Affiliates, and (iii) none of Sellers' foreign Affiliates have the right to use the name "WestPoint" or any rights to use any Intellectual Property of Sellers.  None of the Sellers' foreign Affiliates are signatories to this Agreement.  Sellers are all debtors in the Bankruptcy Case and have no domestic non-debtor Affiliates except for those Affiliates with insignificant assets.

5.30.   Labor Matters.

(a)     Schedule 5.30 identifies all collective bargaining agreements covering Employees of Sellers (collectively, the "Collective Bargaining Agreements").  The Company

- 38 -

I7481153IV-12

made available to Purchaser correct and complete copies of all such Collective Bargaining Agreements including any amendments or supplements thereto or related agreements(including any side letter, supplemental agreement or memorandum of understanding that would materially alter a Collective Bargaining Agreement). The Company has informed Purchaser of all material communications and current written proposals of the Sellers, or any union in all ongoing negotiations with representatives of any unions representing any organized employee groups and all material matters on which any tentative agreements have been reached in the course of such negotiations.

(b)    The Company has made available to Purchaser a true, correct and complete list of all employees (including inactive employees and employees on leave) and independent contractors of the Sellers who are members of an organized labor unit or union covered by any of the Collective Bargaining Agreements, their current respective positions or job classifications and their current respective wage scales or salaries, as the case may be.

(c)    Except as set forth in Schedule 5.30(c):

(i)    None of the Sellers has breached or otherwise failed to comply in any material respect with any provision of any Collective Bargaining Agreement or other labor union contract applicable to persons employed by Sellers (because of the transactions contemplated by this Agreement or otherwise), and there are no material grievances outstanding against any Seller under any such agreement or contract;

(ii)    As of the date hereof, to the Knowledge of Sellers, there is no union organizing activity, petition or application pending before the National Labor Relations Board or other labor relations boards or tribunals seeking certification or any change in certification of a labor union with respect to any employees of any Seller;

(iii)    As of the date hereof, there is no strike, slowdown, work stoppage, labor action or lockout, or, to the Knowledge of Sellers, express threat thereof, by or with respect to any employees of Sellers; and

(iv)    As of the date hereof, no Sellers have received any written notice of any, and to the Knowledge of Sellers, there is no unfair labor practice or analogous complaint, application or claim against any Seller pending before the National Labor Relations Board or any similar board or agency or before any court of competent jurisdiction or any other forum.

5.31.    Employee Matters. Schedule 5.31 contains a true, correct and complete list of all the unrepresented, non-unionized Employees (including inactive Employees and Employees on leave) employed on June 17, 2005, and any officer of Sellers or any Employee in a supervisory or managerial role employed on June 17, 2005, their respective (i) positions or job classifications, (ii) wage scales or salaries, as the case may be, (iii) annual target bonus and/or annual target sales commissions, and (iv) target long-term incentive payments, in each case as of such date. With respect to the foregoing clauses (ii) through (iv), disclosure may be in the form of either a written description or copies of any applicable plan,

- 39 -

policy or program with regard to employees subject to company-wide policies; provided, however, that disclosure shall be on an individual basis with regard to all exceptions from such company-wide policies or from any other individual arrangements.

5.32.    Certain Payments.  Except as set forth on Schedule 5.32, from the date which is 30 days prior to the date hereof through the date hereof, Sellers have not made any payments in excess of $25,000 under, in respect of or pursuant to the KERP Program or fees and expenses of any broker, finder or financial advisor of Sellers.

## ARTICLE VI.

## REPRESENTATIONS AND WARRANTIES OF PARENT, HOLDCO ONE, HOLDCO TWO AND PURCHASER

Parent, Holdco One, Holdco Two and Purchaser each hereby jointly and severally represents and warrants to Sellers that:

6.1.    Organization and Good Standing.  Each of Parent and Purchaser is an entity duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority to own, lease and operate its properties and to carry on is business as now conducted.

6.2.    Authorization of Agreement.  Each of Parent and Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Documents and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement has, and upon execution and delivery of all Ancillary Documents, such Ancillary Documents will be, and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of each of Parent and Purchaser.  This Agreement has been, and upon execution and delivery thereof all Ancillary Documents will be,  duly and validly executed and delivered by each of Parent and Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement constitutes legal, valid and binding obligations of each of Parent and Purchaser enforceable against each such entity in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3.    Authorized Capital.

(a)    As of and after giving effect to the Closing, (i) the authorized capital of Parent shall consist of 200,000,000 shares of common stock and 10,000,000 shares of preferred stock, (ii) 15,750,000 shares of Parent Common Stock will be issued and outstanding, and (iii) 14,250,000 shares of Parent Common Stock will be reserved for issuance pursuant to the

17481153\V-12

Subscription Rights. As of the Closing, the authorized capital of Purchaser shall consist of 10,000 shares of common stock and 1,000 shares of preferred stock, of which 200 shares will be issued and outstanding and held equally by Holdco One and Holdco Two. Except as set forth in the Equity Commitment Letter, as of the Closing, no other shares of capital stock of Parent or Purchaser will be issued or issuable pursuant to outstanding options, agreements, exchangeable securities or otherwise.

(b)    The shares of Parent Common Stock to be issued pursuant to the terms hereof and upon exercise of the Subscription Rights will, as of the Closing, be duly authorized and, upon issuance pursuant to the terms hereof or upon payment of the purchase price therefor pursuant to the Rights Offering, validly issued, fully paid and non-assessable.

6.4.    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 6.4(a), the execution and delivery by Parent and Purchaser of this Agreement and the Ancillary Documents, the consummation of the transactions contemplated hereby or thereby , or compliance by Parent and Purchaser with any of the provisions hereof or thereof do not and will not (A) conflict with, or result in any violation or default (with or without notice or lapse of time or both) under, or (B) give rise to a right of termination or cancellation under any provision of:

(i)    the certificate of incorporation and by-laws or comparable organizational documents of Parent and Purchaser;

(ii)    any Contract or Permit to which Parent or Purchaser is a party or by which any of the properties or assets of Parent or Purchaser are bound, other than such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect;

(iii)    any Order of any Governmental Body applicable to Parent or Purchaser or any of the properties or assets of Parent or Purchaser as of the date hereof; or

(iv)    any applicable Law.

(b)    Except as set forth on Schedule 6.4(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Parent or Purchaser in connection with the execution and delivery of this Agreement and the Ancillary Documents, the compliance by Parent or Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

- 41 -

WPH
000716

6.5.    <u>Litigation</u>.  As of the date hereof, there are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Parent or Purchaser, or to which Parent or Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.  As of the date hereof, Parent or Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.6.    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Parent or Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.7.    <u>Financial Capability</u>.  Purchaser will have, and Parent will cause Purchaser to have, at the Closing sufficient funds available to pay the Cash Purchase Price. Purchaser has delivered to the Company copies of the fully executed Equity Commitment Agreement and the Rights Offering Sponsor Agreement, pursuant to which it will obtain such funds.

6.8.    <u>Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in <u>Article V</u> hereof and each of Parent and Purchaser acknowledges and agrees that, except for the representations and warranties contained herein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Each of Parent and Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, each of Parent and Purchaser has relied on the results of its own independent investigation and the representations, warranties, covenants and agreements of Sellers set forth herein.

6.9    <u>Aretex's Holdings</u>.  Aretex (i) as a First Lien Lender, holds a claim as of June 17, 2005 in the approximate face amount of $193,503,839.26, plus interest, (reduced by any payments made after the date hereof) representing not less than 39.989% of the amount due to all First Lien Lenders; and (ii) as a Second Lien Lender, holds an allowed claim in the approximate face amount of $84,500,000, plus interest, and representing not less than 51.212% of the amount due to all Second Lien Lenders.

ARTICLE VII.

POST EXECUTION MATTERS

7.1.    <u>Conduct After Execution of Agreement</u>.  Each Seller agrees that neither it nor its Affiliates nor its Representatives will, after execution of this Agreement (a) solicit, initiate, encourage, enter into, conduct or continue any discussions (other than with

- 42 -

**WPH**
**000717**

other Qualified Bidders (as defined in the Bidding Procedures) prior to the Purchaser Selection Hearing), or enter into any agreement or understanding, with any Person other than the Purchaser, regarding the transfer, directly or indirectly, of any capital stock of, or any other interest in, any Seller or any material portion of any Seller's assets or business (including by way of license), or (b) disclose any non-public information relating to any Seller or afford access to the properties, books or records of any Seller to any Person other than the Purchaser, that may be considering acquiring an interest in any Seller or any material portion of any Seller's assets unless such Person first enters into an appropriate confidentiality agreement with the Sellers. If any Seller receives any request for information or indication of interest from any Person regarding a possible acquisition, such Seller shall promptly disclose to the Purchaser the identity of such Person, such receipt of such request or indication of interest and shall provide the Purchaser with copies of any correspondence or other written material received by such Seller setting forth any material terms or conditions of such possible acquisition.

7.2.    Expense Reimbursement. In the event that this Agreement is terminated by Purchaser pursuant to Section 4.4(a), 4.4(c), 4.4)(d), 4.4(e), 4.4(g), 4.4(h), 4.4(i), 4.4(j), 4.4(k) or 4.4(l), Sellers agree to pay to Purchaser, upon such termination, reimbursement of up to $1,000,000 of the out of pocket expenses, including, without limitation, reasonable attorneys' fees and costs, consultant fees and costs, travel costs, title, survey and search costs and other out-of-pocket costs incurred by Purchaser from and after the date hereof to such date of termination (the "Expense Reimbursement"), as a super priority administrative expense and Debtors will promptly seek any further authority needed in connection with the same.

7.3.    Bankruptcy Court Filings.

(a)    Pursuant to the Bidding Procedures Order, Sellers have sought authority to sell their assets and take actions related thereto and shall seek entry of the Selection Order and the Sale Order by the Bankruptcy Court. The Sellers shall seek to cause the Sale Order to be entered simultaneously with, or within three (3) Business Days following, the entry of the Selection Order. Unless the Bankruptcy Court determines by Order entered at the hearing to approve the Sale Order that the transactions contemplated by this Agreement shall be pursued through a Chapter 11 plan of reorganization or liquidation, the transactions shall proceed in accordance with this Agreement and pursuant and subject to the Sale Order. If the Bankruptcy Court: (i) determines by Order entered at the hearing to approve Sale Order that the transactions contemplated by this Agreement shall be pursued through a Chapter 11 plan of reorganization or liquidation; and (ii), prior to September 15, 2005, the Confirmation Order shall have been entered and shall have become a Final Order, then the transaction set forth herein shall proceed based on the Chapter 11 Plan and the Confirmation Order. The September 15, 2005 date is of the essence. In the event that clause (ii) above is not satisfied, the transactions contemplated by this Agreement shall proceed in accordance with the terms of this Agreement and pursuant and subject to the Sale Order.

(b)    (i) If the Bankruptcy Court in a statement on the record at the Purchaser Selection Hearing indicates that it is prepared to enter the Sale Order within two (2) Business Days after the Purchaser Selection Hearing (the "Initial Sale Order Entry Period") except for the

- 43 -

WPH
000718

omission of either clause (viii) and/or (xii) of the definition of "Sale Order", then within two (2) Business Days of the end of the Initial Sale Order Entry Period, Purchaser shall either (x) waive in writing clause (viii) and/or (xii) to the extent not acceptable to the Bankruptcy Court, (y) terminate this Agreement, which right may be exercised by Purchaser only within two (2) Business Days following the Initial Sale Order Entry Period, or (z) not waive those conditions and not terminate this Agreement, provided, that if Purchaser does not waive in writing the requirement that the Sale Order contain those provisions or terminate this Agreement within such time period, then Sellers may terminate this Agreement within two (2) Business Days after the expiration of the period within which Purchaser may terminate this Agreement pursuant to this Section 7.3(b)(i), which right may be exercised by Sellers only within such two (2) Business Days.

(ii) If the Bankruptcy Court (x) in a statement on the record at the Purchaser Selection Hearing indicates that is not prepared to enter, within the Initial Sale Order Entry Period (A) any sale order with respect to the transactions contemplated by this Agreement or (B) the Sale Order except for the omission of either clause (viii) and/or (xii) of the definition of "Sale Order", or (y) fails to enter the Sale Order during the Initial Sale Order Entry Period, then the Purchaser may terminate this Agreement within two (2) Business Days following the Initial Sale Order Entry Period, which right may be exercised by Purchaser only within such two (2) Business Days.

(c)     Purchaser and Sellers agree that they will assist in obtaining entry of the Selection Order, the Sale Order and if necessary, the Confirmation Order, and a finding of adequate assurance of future performance by Purchaser, by taking the following actions: furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary written assurance of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) and if applicable, Section 1129(a)(3) of the Bankruptcy Code. In the event the entry of the Selection Order, the Sale Order or the Confirmation Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal. Sellers shall seek approval of the Selection Order, the Sale Order and the Confirmation Order, if any, only in accordance with the terms and conditions thereof.

(d)     Sellers agree that they will comply in all respects with the terms and conditions of the Bidding Procedures Order, the Selection Order, the Sale Order and, if applicable, the Confirmation Order, and will not file a motion seeking to revoke, modify or amend any such order after it is entered without Purchaser's prior written consent.

ARTICLE VIII.

COVENANTS

8.1.    Access to Information. (a) Sellers agree that, prior to the Closing Date, Purchaser shall be entitled and Sellers shall afford Purchaser the opportunity, through the respective Representatives of Purchaser or its Affiliates, to make such investigation of the assets,

- 44 -

WPH
000719

properties, employees, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as Purchaser determines and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted upon reasonable advance notice. Sellers shall cause their Representatives to cooperate with Purchaser and Purchaser's or its Affiliates' Representatives in connection with such investigation and examination, and Purchaser, its Affiliates and their Representatives shall use their reasonable efforts to minimize any disruption to the Business.

(b)    The Sellers shall promptly deliver to Purchaser all financial, management or operational reports delivered to any agent and/or the lenders under the DIP Credit Agreement or consultants for the same. The Sellers shall promptly deliver to Purchaser such copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by the Sellers, or by any Person in connection with or related to the Sellers, the Business, the Purchased Assets or the Assumed Liabilities. The Sellers shall promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding as Purchaser may reasonably request. Without limiting the generality of this Section 8.1, if requested by Purchaser, Sellers, upon reasonable notice, shall provide access to the Sellers' Properties to Purchaser, its Affiliates and their respective Representatives for purposes of conducting such building inspections and environmental assessments as Purchaser determines. Purchaser agrees that, in the event that an inspection or environmental assessment results in a determination that invasive sampling may be necessary, Purchaser will not conduct such invasive sampling without first obtaining Seller's consent, provided that such consent will not be unreasonably withheld. To the extent that any applicable lease or sublease (whether any Seller is a lessor/sublessor or lessee/sublessee) restricts the ability of any Seller to grant access to any property, the Seller shall use commercially reasonable efforts to provide for such access to Purchaser, its Affiliates and their respective Representatives. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information subject to any confidentiality obligations to which Sellers are bound as of the date of this Agreement; provided Sellers shall take commercially reasonable efforts to obtain waivers of such confidentiality obligations.

(c)    From and after the date hereof, Parent may designate up to two individuals as Parent's and Purchaser's representatives to monitor the conduct and operations business of the Sellers on a day-to-day basis. Such persons shall be given full access by Sellers to all of the books, records and premises of the Business as they may reasonably request. From and after the date hereof:

(i)    Sellers shall, not later than 7:00 a.m. on each Thursday and simultaneously with delivery to the Company's controller, deliver to such representatives the "accounts payable register" setting forth all payments proposed to be made by Sellers, including the name of the proposed payee and the amount. If, prior to 2:00 p.m. on such date any of such representatives notifies Sellers that any such payment in excess of $1,000 (other than payroll for hourly employees) would be in violation of the terms and provisions of this Agreement, Sellers shall not

- 45 -

WPH
000720

make such payment unless and until resolved as set forth in clause (v) below. If Sellers fail to deliver such register by 7:00 a.m. on any such Thursday, then the 2:00 p.m. deadline referred to above shall be extended for each hour that delivery of such schedule is late so that such representatives have two consecutive hours on a Business Day to review such schedule, provided, that if such two hour period extends past 5:00 p.m. Eastern Time, such representatives shall have such time at the commencement of the next Business Day (beginning at 8:00 a.m. Eastern) to complete their review.

(ii)     Sellers shall advise Purchaser of all applicable information pertaining to any proposed wire transfer not less than two hours on a Business Day prior to the time such wire is proposed to be sent. If prior to the expiration of such two hours any of such representatives notifies Sellers that any such payment by wire would be in violation of the terms and provisions of this Agreement, Sellers shall not make such payment unless and until resolved as set forth in clause (v) below;

(iii)     Sellers shall provide Purchaser with a schedule of all proposed "manual checks" (i.e, checks not on the accounts payable register) not less than two hours on a Business Day prior to any such checks being issued. If prior to the expiration of such two hours any of such representatives notifies Sellers that any such payment would be in violation of the terms and provisions of this Agreement, Sellers shall not make such payment unless and until resolved as set forth in clause (v) below;

(iv)     Sellers shall provide Purchaser with a schedule of letters of credit proposed to be issued not less than two hours on a Business Day prior to any such letter of credit being issued. If prior to the expiration of such two hours any of such representatives notifies Sellers that any such issuance of letter of credit would be in violation of the terms and provisions of this Agreement, Sellers shall not issue such letter of credit unless and until resolved as set forth in clause (v) below;

(v)     Any disputed payments or issuance of a letter of credit hereunder shall not be made by Sellers unless and until resolved by agreement of Purchaser, Parent and Sellers or a determination by the Bankruptcy Court is made that such payment or issuance of a letter of credit does not violate the terms and provisions of this Agreement. Purchaser and Parent agree to cooperate with Sellers to resolve any such issue and, if not so resolved, to obtain an expedited determination by the Bankruptcy Court with respect to any such payment or payments;

(vi)     Failure of Sellers to make any payment or issuance of a letter of credit disputed by any representative prior to resolution of the issue shall not constitute a breach of any representation, warranty, covenant or agreement by Sellers under this Agreement. Representatives may give notice hereunder by telephone communication, confirmed by email, to the General Counsel of the Company at the email address set forth in Section 12.9, or such other Person as the Company shall designate to Purchaser pursuant to Section 12.9. Sellers shall notify the representatives by telephone communication and email at the numbers and email addresses provided by such representatives from time to time.

- 46 -

(d)     Sellers shall use commercially reasonable efforts to identify on Schedule 8.1, (i) each parcel of Immaterial Owned Real Property by street address (or no street address exists, by city and state), together with a legal description or tax identification number, which Schedule 8.1 shall be delivered to Purchaser not later than ten days following the entry of the Sale Order, together with copies of relevant deeds and other title and survey documents in the respective Sellers' possession and (ii) all Permits necessary to operate the retail stores operated by Sellers.

### 8.2.     Conduct of the Business Pending the Closing.

(a)     Except (1) as set forth on Schedule 8.2(a), (2) as required by applicable Law, or (3) with the prior written consent of Purchaser in its sole and absolute discretion, during the period from the date of this Agreement to and through the Closing Date, Sellers shall:

(i)     conduct the Business only in the Ordinary Course of Business, including, without limitation, with respect to (a) the pricing and terms of sale of inventory, (b) the timing, discounting and other practices in connection with the collection of accounts receivable, (c) the timing and other practices for payment of account payables and (d) compensation, bonuses, benefits and severance payable to Employees, subject to and in accordance with the further limitations set forth in Section 9.1(a);

(ii)     use their commercially reasonable efforts to (a) keep their assets intact and maintain their assets in at least as good a condition as their current condition (reasonable wear and tear excepted), (b) preserve the present business operations, organization and goodwill of the Business, and (c) preserve the present relationships with customers and suppliers of the Business;

(iii)     perform in all material respects its obligations arising after the Petition Date under any Contract (including Real Property Leases);

(iv)     comply in all material respects with all applicable Laws that relate to or affect its assets and business or such Person's ownership and/or use or operation thereof, including the timely, complete and correct filing of all reports and maintenance of all records required by any Governmental Authority to be filed or maintained;

(v)     continue to use and operate all assets and all aspects of its business used or operated by the Sellers as of the date hereof in a manner consistent with prior practice and in accordance in all material respects with all applicable Laws, and not enter into any contract nor otherwise act, nor suffer or permit any other Person to act, to restrict, interfere with or prevent the use or operation of such assets or business;

(vi)     promptly notify Purchaser in writing of any incidents or accidents occurring on or after the date hereof involving any assets or property owned or operated by the Sellers that resulted or could reasonably be expected to result in damages or losses to any portion of the business of the Sellers or damages in excess of $100,000;

(vii)     promptly notify Purchaser in writing of the existence of any adverse business conditions arising on or after the date hereof threatening the continued, normal business operations of the Sellers or of any agreement, consent or order of any Governmental Authority involving any of the Sellers;

(viii)     promptly notify Purchaser of any Legal Proceeding of the type described in Section 5.12 commenced after the date hereof and/or, to the Knowledge of Sellers, threatened after the date hereof against the Sellers;

(ix)     provide prompt written notice to Purchaser (i) of any change in any of the information contained in the representations and warranties made by the Sellers in Article V hereof or any exhibits or schedules referred to herein or attached hereto, including any Schedules and shall promptly furnish any information that Purchaser may reasonably request in relation to such change; provided, however, that such notice shall not operate to cure any breach of the representations and warranties made by the Company herein or any exhibits or schedules referred to herein or attached hereto, including any Schedules; and

(x)     provide prompt written notice to Purchaser of the occurrence of any event that results in or would reasonably be expected to result in a failure to satisfy any of the conditions set forth in Article X.

(b)     Except (1) as set forth on Schedule 8.2(b), (2) as required by applicable Law, or (3) with the prior written consent of Purchaser in its sole and absolute discretion, during the period from the date of this Agreement to and through the Closing Date, Sellers shall not:

(i)     take any action as a result of which any representation or warranty of the Sellers made in Article V would be rendered untrue or incorrect if such representation or warranty were made immediately following the taking or failure to take such action;

(ii)     make or rescind any material election relating to Taxes, settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent Tax Returns;

(iii)     subject any of the Purchased Assets to any Lien, except for Liens existing as of the date hereof;

(iv)     acquire any material properties or assets other than in the Ordinary Course of Business, or enter into any partnership, joint venture or similar arrangement (including, but not limited to, the contemplated joint venture with a Pakistani company for the formation and operation of a manufacturing facility near Lahore, Pakistan), or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Seller's assets other than inventory in the Ordinary Course of Business and obsolete or worthless equipment permitted to be sold pursuant to the DIP Credit Agreement;

- 48 -

WPH
000723

(v)     cancel, compromise or settle any debt or claim or waive or release any right in excess of $20,000 individually and $250,000 in the aggregate or, in connection with Trade Payables, accounts payable to employees for travel and entertainment expense, workers' compensation payments, or trade receivables, other than in the Ordinary Course of Business;

(vi)     enter into any commitment for capital expenditures in excess of $250,000 for all commitments in the aggregate except for capital expenditure projects described by project and amount as line items as set forth on Schedule 8.2(b) hereof not to exceed the amount for each such category as described and set forth in such schedule;

(vii)     enter into, modify or terminate any labor or Collective Bargaining Agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(viii)     incur any Indebtedness other than in the Ordinary Course of its Business;

(ix)     assign, modify, cancel, otherwise impair or permit to lapse any Material Contract (other than expiration in accordance with the terms thereof as a result of the passage of time and other than Real Property Leases as to which Section 8.2(b)(x) applies ) involving annual expenditures, purchases or revenues in excess of $100,000 annually;

(x)     assign, sublease, amend in any material respect, terminate, exercise (or waive) or permit to lapse any options to renew, options to expand or options to purchase pursuant to any Real Property Leases involving expenditures in excess of $100,000 annually (other than expiration in accordance with the terms thereof as a result of the passage of time);

(xi)     make any payments (a) in respect of professional fees for attorneys and accountants except to the extent and on the timing permitted under existing interim compensation and fee application procedures (other than professional fees payable to ordinary course professionals to the extent authorized to be paid under the existing Order of the Bankruptcy Court signed on 6/3/03 Authorizing Retention and Compensation of Professionals Utilized in the Ordinary Course of Business), (b) under, in respect of or pursuant to the KERP Program (other than the existing scheduled payment for the second quarter of 2005 pursuant to the KERP Order), or fees and expenses of any financial advisor of Sellers (other than monthly fees in currently approved amounts pursuant to existing procedures) or (c) in respect of fees and expenses of any broker or finder of Sellers except as consented to by Purchaser and except for such fees and expenses of a broker or finder relating to the sale of real property by Sellers which are approved by the Bankruptcy Court prior to June 30, 2005; or

(xii)     agree to do anything prohibited by this Section 8.2.

(c)     During the period from the date of this Agreement to and through the Closing Date, Sellers shall not declare, authorize, make or enter into a commitment to make (x) any dividend, distribution or other payment in respect of any Seller's capital stock or other equity or rights to acquire the same or engage in any similar payment or distribution or (y) any payment, prepayment or distribution with respect to any Indebtedness of the Sellers other than

- 49 -

**WPH
000724**

payments in respect of the DIP Credit Agreement as required or permitted pursuant to the terms of the DIP Credit Agreement or payment pursuant to the Adequate Protection Order.

8.3.    <u>Consents, Lien Releases and Notices</u>.  Sellers shall use their commercially reasonable efforts, and Purchaser shall, and Parent shall cause Purchaser to, reasonably cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, the consents and approvals listed in <u>Schedule 5.3(b)</u> hereof; <u>provided</u>, <u>however</u>, that neither Sellers nor Purchaser shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested; <u>provided</u>, <u>further</u>, however, that Sellers shall be obligated to initiate any Legal Proceedings necessary, at the Purchaser's expense, to obtain any such consent or approval, unless Seller's counsel reasonably believes that Sellers have no good faith basis to initiate any such proceeding, in which event Purchaser may seek authority from the Bankruptcy Court to do so on the Sellers' behalf and Sellers will not object to such application by Purchaser. Sellers shall provide Parent and Purchaser, for their approval, a proposed form of request for consent not later than five (5) days following the date of the Sale Order. Sellers shall send initial requests for such consents in the form approved by the Purchaser not later than two (2) Business Days following the date Purchaser designates any applicable asset as a Purchased Asset. Sellers shall use their commercially reasonable efforts to obtain, prior to the Closing, and deliver to Purchaser releases of all Liens on all of the Purchased Assets. Sellers shall, at the request of Purchaser and at Purchaser's expense if so requested after the Purchaser Selection Hearing, provide additional actual or publication notice of the "free and clear sale" to those Persons, and in the manner, requested by Purchaser.

8.4.    <u>Regulatory Approvals</u>.

(a)    If necessary, Parent, Purchaser and Sellers shall (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within ten (10) Business Days after the later of the date of the entry of the Selection Order and the date of this Agreement in the case of all filings required under the HSR Act and within four weeks in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission (the "<u>FTC</u>"), the Antitrust Division of the United States Department of Justice (the "<u>Antitrust Division</u>") or any other Governmental Body in respect of such filings or such transactions and (iii) cooperate with each other in connection with any such filing. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 8.4</u> as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees,

- 50 -

officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Parent, Sellers or Purchaser, as the case may be). Parent or Purchaser shall not be obligated to share a copy of their HSR Act filing or drafts thereof with Sellers.

(b)    Sellers shall use commercially reasonable efforts to initiate the transfer of all Permits included in the Purchased Assets owned or used by any Seller into the name of Purchaser effective as of the Closing Date. Each such party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(c)    Each of Parent, Purchaser and Sellers shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) asserting that any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Sellers shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding. Each of Purchaser and Sellers shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, in complying with this Section 8.4, neither Purchaser nor any of its Affiliates shall be required to (i) divest any assets or discontinue or modify any of its operations or (ii) accept or become subject to any condition or requirement unacceptable to Purchaser in its sole and absolute discretion. No party shall withdraw any such filing or submission prior to the termination of this Agreement without the written consent of the other party.

8.5.    Further Assurances. Each of Parent, Purchaser and Sellers shall use its commercially reasonable efforts to take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement. Parent and Purchaser shall use their commercially reasonable efforts to cause the fulfillment at the earliest practicable date of all of the conditions to the obligations to consummate the transactions contemplated by this Agreement set forth in Sections 10.2 and 10.3. Sellers shall use their commercially reasonable

- 51 -

17483153\V-12

efforts to cause the fulfillment at the earliest practicable date of all of the conditions to the obligations to consummate the transactions contemplated by this Agreement set forth in Sections 10.1 and 10.3. At the Purchaser's sole cost and direction, Sellers shall have prepared and duly executed assignments of any non-U.S. trademark registrations and applications and non-U.S. patent registrations and applications in a form suitable for recording in the applicable foreign intellectual property offices. For U.S. trademark registrations and applications and U.S. patent registrations and applications, Sellers shall ensure that the owner of each trademark and patent registration and application, as set forth on Schedule 5.8(a), is also listed as the current owner as shown in the U.S. Patent and Trademark Office's records for each such trademark and patent registration and application.

8.6.  Confidentiality Following the Closing. Sellers acknowledge that from and after the Closing, all non-public information relating to the Business, including, but not limited to the Purchased Assets and the Assumed Liabilities, will be valuable and proprietary to Purchaser and its Affiliates. Sellers agree that, from and after the Closing, neither the Sellers nor any of their Affiliates or Representatives will disclose to any Person any non-public information relating to the Purchaser and its Affiliates, or the Business, including but not limited to the Purchased Assets and the Assumed Liabilities, except as required by law. The provisions of this Section 8.6 shall survive the Closing.

8.7.  Equity Commitment and Rights Offering. Simultaneously with the execution of this Agreement, Purchaser has delivered to Sellers an executed copy of each of the Equity Commitment Agreement and the Rights Offering Sponsor Agreement. It is expressly understood by the parties hereto that the aggregate net proceeds to be received by Purchaser in connection with the exercise of the Subscription Rights, the Rights Offering Sponsor Agreement and the Equity Commitment Agreement shall be $312,000,000. Each of Parent and Purchaser hereby agrees to take all actions that are necessary to consummate the Rights Offering, including, if necessary, enforcing its rights under the Equity Commitment Agreement and the Rights Offering Sponsor Agreement, to cause the other parties thereto to perform their respective duties, obligations and covenants thereunder. Each of Parent and Purchaser agrees that it will not release any party to the Equity Commitment Agreement and the Rights Offering Sponsor Agreement from any of its duties, obligations and covenants under such agreements without the Company's prior written consent.

8.8.  Preservation of Records. Sellers, Parent and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (except as provided below) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against Sellers or Purchaser or any of their Affiliates or in order to enable Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby. In the event Sellers or Purchaser wishes to destroy such records before or after that time, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and

- 52 -

17481153\V-12

expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.9.    Financial Statements

(a)    Sellers shall provide AREH and its representatives with such access to and copies of the books and records of Sellers and their subsidiaries as may be required in order for AREH and its Affiliates and subsidiaries to prepare any financial statements, including historical or pro forma financial statements, for inclusion or incorporation by reference by AREH or its Affiliates and subsidiaries in filings by any of them with the SEC, including, without limitation, any registration, proxy or information statement or any periodic or current report under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC (each a "Report" and collectively "Reports"). Sellers shall use commercially reasonable efforts to provide to AREH unaudited consolidating balance sheets and income statements covering the periods covered by each consolidated financial statement required to be delivered by the Sellers pursuant to Section 8.9(d) below.

(b)    Sellers shall use their best efforts to cause their finance and accounting personnel, including, but not limited to, their Chief Financial Officer, to provide AREH, its subsidiaries and their respective representatives with such assistance as AREH shall reasonably request in order to permit AREH and its subsidiaries to prepare any Report and comply with any requirement pursuant to the Sarbanes-Oxley Act of 2002 and the rules and regulations of the SEC thereunder with respect to Sellers. Sellers shall continue to maintain their books and records, so as to enable the preparation and review or audit, as applicable, by an independent public accounting firm of financial statements meeting the requirements of Regulation S-X of the SEC and in accordance with GAAP.

(c)    Sellers shall use their best efforts to cause and permit the independent registered public accounting firm or firms that have audited, or will audit pursuant to paragraph (d), their consolidated financial statements as of December 31, 2003 and 2004 and for each of the years during the three year period ended December 31, 2004 (and if the financial statements for any subsidiaries included in such consolidated financial statements or which otherwise are required to be presented separately have been audited by any independent registered public accounting firm other than the firm auditing the consolidated financial statements of the Company, such firm or firms as well) to provide AREH, its Affiliates and subsidiaries and their respective representatives with such assistance as AREH shall reasonably request in order to permit AREH and its Affiliates and subsidiaries to prepare and file any Report, including, without limitation, by issuing or providing an original executed copy of any required audit report or consent to the inclusion of such report and the identification of such audit firm or firms as experts.

(d)    In furtherance of the covenants contained in paragraphs (a) – (c), Sellers shall prepare and deliver to Purchaser prior to the Closing, consolidated financial statements of the Company meeting the requirements of Regulation S-X of the SEC applicable to an Annual Report on Form 10-K as of December 31, 2003 and 2004 and for each of the three years during

- 53 -

WPH

000728

the three year period ended December 31, 2004. Such financial statements shall be prepared in accordance with GAAP consistently applied throughout the periods involved (except as maybe indicated in the notes thereto) and shall be audited by Ernst & Young LLP or another independent registered public accounting firm reasonably acceptable to AREH, and shall be accompanied by a signed currently dated report covering all three years by Ernst & Young LLP or such other independent registered accounting firm reasonably acceptable to AREH. Sellers also shall prepare and deliver to Purchaser prior to the Closing consolidated financial statements of the Company for each of its fiscal quarters (including the corresponding period for the preceding fiscal year) for which a Quarterly Report on Form 10-Q is required to have been filed during the fiscal year ending December 31, 2005 through and including the Closing Date, meeting the requirements of Regulation S-X of the SEC applicable to Quarterly Reports on Form 10-Q. Such quarterly financial statements shall be prepared in accordance with GAAP (except as permitted by Form 10-Q of the SEC).

        8.10.  <u>Schedules</u>. Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. No later than fifteen (15) days after the date of this agreement, Sellers will deliver legal descriptions for each of the Material Owned Real Properties.

        8.11.  <u>No Inconsistent Action</u>. No Seller shall take any action that is inconsistent with the Sellers' obligations under this Agreement.

        8.12.  <u>Accepted or Rejected Contracts</u>.

        (a)    For each Material Contract (other than Real Property Leases) listed on <u>Schedule 5.9</u> and each Material Intellectual Property License listed on <u>Schedule 5.8(b)</u>, the Sellers shall timely indicate to Purchaser whether or not, in connection with the Bankruptcy Cases, the Company or any of its Subsidiaries, as the case may be, desires to accept or reject or prior to the date hereof has accepted or rejected such Material Contract or Material Intellectual Property License. From and after the date hereof, the Purchaser, in its sole and absolute discretion, may direct the Sellers to cause each such Material Contract or Material Intellectual Property License not accepted or rejected prior to the date hereof, to be either accepted or rejected, and the Sellers shall accept or reject each such Material Contract or Material Intellectual Property License in accordance with the Purchaser's direction effective as of the Closing (any Material Contracts and Material Intellectual Property Licenses so accepted hereby at the direction of Purchaser are referred to herein as the "<u>Accepted Contracts</u>" and "<u>Accepted Intellectual Property Licenses</u>," as applicable). Purchaser shall provide Sellers with at least 14 days notice prior to a hearing to determine Cure Costs of the Accepted Contracts and Accepted Intellectual Property Licenses.

        (b)    For each Real Property Lease listed on <u>Schedule 5.7(b)</u>, the Sellers shall timely indicate to Purchaser whether or not, in connection with the Bankruptcy Cases, the

17481153\V-12

WPH
000729

Company or any of it Subsidiaries, as the case may be, desires to accept or reject or prior to the date hereof has accepted or rejected, such Real Property Lease. From and after the date hereof, the Purchaser, in its sole and absolute discretion, may direct the Sellers to cause each such Real Property Lease not accepted or rejected prior to the date hereof, to be either accepted or rejected, and the Sellers shall accept or reject each such Real Property Lease in accordance with the Purchaser's direction effective as of Closing (any Real Property Leases so accepted hereby at the direction of the Purchaser are referred to herein as the "Accepted Real Property Leases").

(c)    Any motions filed with, and the proposed orders submitted to, the Bankruptcy Court seeking authorization to, or any proceedings undertaken to, accept or reject any one or more of the Material Contracts, Material Intellectual Property Licenses or Real Property Leases shall be satisfactory in form and substance to the Purchaser in its reasonable discretion. The Purchaser's written consent shall be required prior to the Sellers (i) compromising or commencing litigation with respect to any Material Contract, Material Intellectual Property Licenses or Real Property Lease, or (ii) making material payments required to be made under the Bankruptcy Code in connection therewith.

8.13.    Specific Enforcement of Covenants. The Sellers acknowledge that irreparable damage may occur in the event that any of the covenants and agreements of the Sellers set forth in this Section 8.13 or in any other part of this Agreement were not timely performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that Purchaser and Parent shall be entitled to an injunction or injunctions, without the posting of any bond, to prevent or cure any breach of this Section 8.13 or any breach of such other covenants or agreements of the Sellers, and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which it may be entitled at law or in equity. In the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this sentence or is without jurisdiction with respect to any matter provided for in this sentence or is otherwise without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

8.14.    Form of Transaction. The Sellers, Parent and Purchaser hereby agree that the acquisition of the Purchased Assets pursuant to this Agreement is intended to be treated as a taxable transaction for U.S. federal income tax purposes. The Sellers, Parent and Purchaser hereby further agree to continue to review the relevant information of the Sellers and to discuss the acquisition structure. If the Parent and Purchaser desire to modify the structure of the acquisition of the Purchased Assets pursuant to this Agreement, the structure of such acquisition and this Agreement shall be accordingly modified subject to the consent of the Sellers, which consent shall not be unreasonably withheld or delayed.

8.15.    Permits. Following the date hereof, Sellers shall from time to time, at the request of Purchaser use their commercially reasonable efforts to assist Purchaser with preparing such applications or other documents necessary or desirable in connection with applications for or transfers of Permits to Purchaser. Until any necessary Permits are transferred

17481153\V-12

WPH
000730

or issued to Purchaser, and to the extent not prohibited by Law or the terms of such Permits except where such prohibitions are overridden by order of the Bankruptcy Court or by other applicable Law, Sellers hereby grant to Purchaser effective at the Closing, and Purchaser shall have, the right and license to use such Permits of Sellers as Purchaser shall determine. The provisions of this Section 8.15 shall survive the Closing.

        8.16.   Indemnity Agreement. The Company shall cause its subsidiary, J.P. Stevens & Co., Inc. to execute and deliver to Purchaser and Parent at the Closing, the indemnity agreement in the form of Exhibit S and a notice to its insurance company that it is entering into the indemnity agreement.

ARTICLE IX.

EMPLOYEES AND EMPLOYEE BENEFITS

        9.1.   Employment.

        (a)    No Material Employment Changes. Without Purchaser's prior written consent, no increase shall be made in the compensation, bonuses or commissions payable, or to become payable, by it to any Employees except as required by Employment Agreements existing as of the date hereof and except for such increases in annual salary as are made in the Ordinary Course of Business and are reflected in the budget for Sellers for calendar year 2005 delivered to Purchaser prior to the date hereof. Sellers shall make no arrangement for any new Employee Plan relating to Employees, and no material change shall be effected in management, personnel policies or employee benefits.

        (b)    Employee Hirings. On or before the Closing Date, the Purchaser shall extend offers of employment to such Employees as it determines on such terms as it considers to be competitive in the marketplace.

        (c)    Terms of Employment. Sellers hereby expressly acknowledge and agree that the Purchaser shall have the right to fix the level of compensation and benefits and other terms and conditions of employment to be provided to Continuing Employees, and that the Purchaser may modify the terms and conditions of employment of any Continuing Employee from time to time and may terminate the employment of any Continuing Employee at any time.

        (d)    No Rights to Employment. Nothing expressed or implied in this Agreement is intended to confer upon any Employee or his or her legal representatives any rights or remedies, including, without limitation, any rights of employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.

        (e)    Benefits. As of the Closing Date, the Purchaser or an ERISA Affiliate thereof will offer continuation coverage for the duration of the coverage period required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), as set forth in Section 4980B(f)(2)(B) of the Tax Code (and the regulations thereunder), under the health care plans covering the Continuing Employees after the Closing to the M&A Qualified

- 56 -

WPH
000731

Beneficiaries (as defined below). An "M&A Qualified Beneficiary" is (i) any Employee who incurred a "qualifying event" (within the meaning of Section 4980B(f)(3) of the Tax Code and the regulations thereunder) prior to, or in connection with, the Closing if his or her last employment with the Sellers prior to incurring such qualifying event was associated with the Purchased Assets or (ii) any eligible dependent of an Employee described in clause (i) above. For purposes of clause (i) of the preceding sentence, an Employee's last employment will be deemed to be associated with the Purchased Assets unless the Employee's last employment was associated with Sellers' Cluett or Virginia Craft operations. In addition, any Employee who is actively employed by the Sellers immediately prior to the Closing Date and who continues in employment with the Sellers after the Closing Date for the purpose of winding down the affairs of the Debtor shall be treated as having incurred a qualifying event on the closing date. Notwithstanding the foregoing, a person will not be considered an M&A Qualified Beneficiary if (i) such person's COBRA continuation coverage expired or was terminated prior to the Closing or (ii) such person had not made a COBRA continuation coverage election and the period of time for making a COBRA continuation coverage election (as set forth in Section 4980B(f)(5) of the Tax Code and regulations thereunder) has expired. Schedule 9.1(e) states the name and address of each M&A Qualified Beneficiary, the date on which the qualifying event occurred, the date on which COBRA continuation coverage expires, the reason the M&A Qualified Beneficiary is entitled to COBRA continuation coverage, and the offices, facilities or plants at which the Employee worked.

(f)     Credit for Past Service. As of the Closing Date, the Purchaser or an ERISA Affiliate thereof will offer health plan coverage to Continuing Employees. The Purchaser shall either continue the health plan offered by the Sellers prior to the Closing Date or establish another health plan as the Purchaser determines in its sole discretion. Purchaser and its Affiliates shall be under no obligation to grant Continuing Employees credit in any of its employee benefit plans for any past service with the Sellers, for eligibility and vesting purposes or otherwise. It is understood and agreed that the Purchaser shall have the right, in its sole discretion, to amend, modify, or terminate such plans at any time. Nothing herein shall entitle any Continuing Employees to any coverage or benefits under any employee benefit plans of any Affiliate of Purchaser.

(g)     Cooperation. Purchaser shall cooperate with Sellers in providing reasonable access to Continuing Employees so that such Employees may assist on an incidental basis only in the winddown of the Sellers' operation following the Closing Date, provided Sellers furnish reasonable advance notice to Purchaser of the reason and extent of such access. Sellers will cooperate with Purchaser as is reasonably requested by Purchaser in connection with extending any offers of employment to Employees. Sellers will exercise their commercially reasonable efforts to cause Persons who are to become Continuing Employees to provide Purchaser with such information as may be requested by Purchaser to enroll such Person in any benefit plan of Purchaser and to execute Purchaser's form of confidentiality agreement and acknowledgement of Purchaser's ethics policies.

- 57 -

ARTICLE X.

CONDITIONS TO CLOSING

10.1. <u>Conditions Precedent to Obligations of Parent and Purchaser</u>. The obligation of Parent and Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, as of the Closing Date, of each of the following conditions (any or all of which may be waived by Parent or Purchaser in their sole discretion in whole or in part to the extent permitted by applicable Law, such waiver to be in writing signed by an executive officer of Parent or Purchaser referencing this section and the specific condition to be waived):

(a)    All representations and warranties of the Sellers in this Agreement or in any exhibit, schedule or document delivered pursuant hereto shall be true, complete and correct in all respects (with respect to representations and warranties qualified or limited by materiality or Seller Material Adverse Effect) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case when made (unless cured as provided in <u>Section 4.4(e)</u>) and as of the Closing Date as if made on the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true, complete and correct in all respects (with respect to representations and warranties qualified or limited by materiality or Seller Material Adverse Effect) or in all material respects (with respect to representations and warranties not so qualified or limited), as of such earlier date.

(b)    All of the terms, covenants and conditions to be complied with and performed by the Sellers on or prior to the Closing Date (other than the covenants contained in <u>Section 8.2 (a)(i), Sections 8.2(b)(iii)</u> through <u>(xi)</u>, <u>Section 8.2(b)(xii)</u> (to the extent it relates to commitments to do items covered in <u>Sections 8.2(b)(iii)</u> through <u>(xi)</u>, <u>Section 8.2(c)</u>, and <u>Section 8.9(d)</u>, as to which <u>Section 10.1(l)</u> applies) shall have been complied with or performed in all material respects and all breaches of any such covenants in the aggregate do not result in a Seller Material Adverse Effect.

(c)    Purchaser shall have received a certificate or certificates, dated as of the Closing Date, executed on behalf of the Company, by an authorized executive officer thereof, in the form of the attached Exhibit O.

(d)    Any Governmental Authorities whose consent is required for consummation of the transactions contemplated hereby (other than the HSR Act as more particularly described in <u>Section 10.3(c)</u>) shall have issued all consents required for the transactions contemplated hereby, without any unreasonable condition or limitation.

(e)    There shall not be in effect any Law or Order of any Governmental Body of competent jurisdiction restraining, enjoining or otherwise preventing consummation of the transactions contemplated by this Agreement.

(f)    [Intentionally Omitted]

- 58 -

(g)    Purchaser, in its reasonable discretion, shall be satisfied with the terms and conditions of the Ancillary Documents (with Purchaser deemed to be satisfied with Ancillary Documents with respect to which forms have been attached hereto to the extent the Ancillary Documents delivered at Closing are in the form of such attachments).

(h)    The title company selected by Purchaser shall be committed to issue, at normal premium rates an ALTA Owner's Title Insurance Policy for each of the Material Owned Real Properties and an ALTA Leasehold Title Insurance Policy for each of the Leased Real Properties for which the Real Property Lease or a memorandum thereof has been placed of record (or may be placed of record in accordance with the terms of the Real Property Lease), insuring Purchaser's fee or leasehold interest, as applicable, in an amount equal to the fair market value of each of the Material Owned Real Properties and such amount as is customary for leasehold title policies with respect to the Leased Real Properties, subject only to the Permitted Exceptions, together with extended coverage over the so-called "general" exceptions, (to the extent available in the respective States where the Material Owned Real Properties and Leased Real Properties are located) and such endorsements as Purchaser may reasonably request.

(i)    The amount of Current Trade Payables to be assumed by Purchaser under Section 2.3(a)(viii) shall not exceed $47,500,000 in the aggregate;

(j)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(k)    As of the Closing Date, neither Sellers nor Purchaser and its Affiliates shall have received any notice from a Governmental Body, no Order shall have been issued stating and no Governmental Body shall have taken any position in any action before the Bankruptcy Court or any other Governmental Body, asserting, that Purchaser is required under Law or otherwise to purchase any Excluded Assets or to assume any Excluded Liabilities, which notice, Order or position has not been withdrawn with prejudice or dismissed with prejudice by a Final Order of the Bankruptcy Court and/or a court of competent jurisdiction;

(l)    Sellers shall have fully complied with and performed their obligations set forth in Sections 8.2(a)(i), Sections 8.2(b)(iii) through (xi), Section 8.2(b)(xii) (to the extent it relates to commitments to do items covered in Sections 8.2(b)(iii) through (xi)), Section 8.2(c) and Section 8.9(d) hereof;

(m)    The amount of all obligations (other than those in respect of letters of credit issued in respect of trade payables and workers compensation obligations) outstanding under the DIP Credit Agreement shall not exceed $120,000,000, and the amount of all obligations outstanding in respect of letters of credit issued in respect of trade payables and workers compensation obligations shall not exceed $35,000,000;

(n)    Assuming the accuracy of the representation set forth in Section 6.9 hereof, the Bankruptcy Court shall have determined, in the Sale Order and, if applicable, the Confirmation Order, that Aretex (i) as a First Lien Lender, shall have an allowed claim in the

- 59 -

WPH
000734

face amount of $193,503,839.26, plus interest, (reduced by any payments made after the date hereof) and be entitled to not less than 39.989% of any securities or other property or assets delivered and allocated among the First Lien Lenders; and (ii) as a Second Lien Lender, shall have an allowed claim in the face amount of $84,500,000, plus interest, and be entitled to not less than 51.212% of any securities or other property or assets delivered and allocated among the Second Lien Lenders; and

      (o)    The Distributable Value shall have been determined by the Bankruptcy Court.

      10.2.   <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, as of the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law, such waiver to be in writing signed by an executive officer of each of the Sellers referencing this section and the specific condition to be waived):

      (a)    the representations and warranties of Parent and Purchaser set forth in this Agreement or in any exhibit, schedule or document required to be delivered in accordance with the terms of this Agreement shall be true, complete and correct in all respects (with respect to representations and warranties qualified or limited by materiality or Purchaser Material Adverse Effect) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case as of the date hereof (unless cured as provided in <u>Section 4.4(f)</u>) and as of the Closing Date as if made on the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true, complete and correct in all respects as of such date (with respect to representations and warranties qualified or limited by materiality or Purchaser Material Adverse Effect) or in all material respects (with respect to representations and warranties not so qualified or limited), as of such earlier date;

      (b)    All of the terms, covenants and conditions to be complied with and performed by Purchaser on or prior to the Closing Date shall have been complied with or performed in all material respects and all breaches of any such covenants in the aggregate do not result in a Purchaser Material Adverse Effect;

      (c)    Purchaser shall have delivered, or Parent shall have caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>;

      (d)    Seller, in its reasonable discretion, shall be satisfied with the terms and conditions of the Ancillary Documents (with Seller deemed to be satisfied with Ancillary Documents with respect to which forms have been attached hereto to the extent the Ancillary Documents delivered at Closing are in the form of such attachments); and

      (e)    Seller shall have received a certificate or certificates, dated as of the Closing Date, executed on behalf of the Purchaser, by an authorized executive officer thereof, in the form of the attached Exhibit P.

10.3.    Conditions Precedent to Obligations of Parent, Purchaser and Sellers. The respective obligations of Parent, Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions (any or all of which may be waived by Parent, Purchaser and Sellers in whole or in part to the extent permitted by applicable Law, such waiver to be in writing signed by an executive officer of Parent, Purchaser or the applicable Seller, referencing this section and the specific condition to be waived):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby as of the Closing Date;

(b)    the Bankruptcy Court shall have entered the Selection Order, the Sale Order and, if applicable, the Confirmation Order; and

(c)    the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted as of the Closing Date.

10.4.    Frustration of Closing Conditions. Neither Sellers nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

10.5.    Force Majeure. If, prior to Closing, any damage or loss to any of the Sellers properties and assets, including, without limitation, the Owned Real Properties and the Leased Real Properties, occurs due to fire, flood, riot, theft, act of God or other casualty, or by reason of condemnation, and if individually or in the aggregate the Losses associated therewith that are not covered by any insurance or condemnation awards exceeds $25,000,000 (such Loss, a "Material Property Loss"), then Purchaser may terminate this Agreement with no cost or obligation on the part of Purchaser. "Loss" means the sum of the reasonably estimated total cost necessary to repair or replace the damage or loss to any such asset, plus the amount of Lost Profits associated with such Loss minus reasonably estimated insurance recoveries or condemnation awards that will be assigned to Purchaser, all as reasonably determined by Purchaser and as set forth by Purchaser in writing to Sellers describing such calculation of Loss. "Lost Profits" means the amount of profits lost or reasonably expected to be lost in connection with the operation of the Business as a result of any damage or loss to any of the properties or assets during the period from the date of such damage or Loss to the expected date of completion of any rebuilding or replacement of such damaged property or asset, all as reasonably determined by Purchaser and as set forth by Purchaser in writing to Sellers describing such calculation of Lost Profits. Sellers shall cooperate with Purchaser and provide such information as reasonably necessary for Purchaser to determine such Lost Profits.

- 61 -

WPH
000736

ARTICLE XI.

TAXES

11.1.   <u>Transfer Taxes</u>.  Purchaser shall be responsible for (and shall indemnify and hold harmless Sellers and their respective directors, officers, employees, Affiliates, agents, successors and permitted assigns (the "<u>Indemnified Persons</u>") against any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>").  Sellers shall, however, seek to include (to the extent permitted under applicable Law) in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Section 1146(c) of the Bankruptcy Code.  To the extent that any Transfer Taxes are required to be paid by Sellers (or such Transfer Taxes are assessed against Seller), Purchaser shall promptly reimburse Seller, as applicable, for such Transfer Taxes.  Sellers and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes; provided, however, Sellers may initially pay any Transfer Taxes (for which Purchaser shall promptly reimburse Sellers) and, thereafter, in reliance on Section 1146(c) of the Bankruptcy Code (if applicable) apply for a refund (which refund shall be remitted to the Purchaser to the extent such Transfer Taxes were previously reimbursed by Purchaser).  Sellers and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

11.2.   <u>Purchase Price Allocation</u>.  As soon as reasonably practicable after the Closing Date, the Purchase Price for the Purchased Assets shall be determined and allocated in accordance with a statement provided by Purchaser to Sellers (the "<u>Asset Acquisition Statement</u>").  The Asset Acquisition Statement as prepared by Purchaser shall be final provided the entries in the Statement are reasonable.  Sellers and Purchaser shall allocate the Purchase Price among Sellers and among the Purchased Assets of each Seller as specified in the Asset Acquisition Statement.  In accordance with the Asset Acquisition Statement and Section 1060 of the Tax Code and the Treasury Regulations issued thereunder, Purchaser shall prepare and file Form 8594 and any exhibits thereto and any other forms or supplements required to be filed.  All income Tax Returns and reports filed by Purchaser and Sellers shall be prepared consistently with such Asset Acquisition Statement.

11.3.   <u>Tax Reporting</u>.

(a)     Purchaser shall prepare and file (or cause to be prepared and filed) on behalf of the Sellers all Tax Returns, whether related to income taxes or non-income taxes, required to be filed or that Purchaser otherwise deems appropriate, including the filing of amended Tax Returns, for all Tax periods through and including any Tax period that includes the Closing Date.  Purchaser shall furnish a completed copy of any such Tax Return (including any supporting workpapers) to be filed by Purchaser to Sellers for Sellers' review at least thirty (30) days prior to the due date for filing such returns.  Sellers shall have the right to raise reasonable objections to such Tax Returns.  In the event that the parties are unable to resolve in good faith

- 62 -

1748115\V-12

any dispute prior to fifteen (15) days before the due date, the parties shall jointly request that an independent accountant mutually agreed upon by Sellers and Purchaser (the "Referee") to resolve any dispute as promptly as possible; provided, however, that Purchaser's position shall prevail provided such position is reasonable. If the Referee is unable to make a determination with respect to a disputed issue prior to the date which is five (5) days prior to the due date for the filing of the Tax Return in question, then Purchaser may file such Tax Return on the due date therefor without such determination having been made and without Sellers' consent. Notwithstanding the filing of such Tax Return, the Referee shall make a determination with respect to the disputed issue in accordance with this Section 11.3. All fees and expenses of the Referee shall be paid by Purchaser.

(b)     Purchaser shall pay, and indemnify and hold harmless Sellers and the Indemnified Persons against, all Taxes of the Sellers included in the Assumed Liabilities. Sellers shall indemnify and hold harmless Purchaser against, all Taxes of Sellers that are included in Excluded Liabilities pursuant to Section 2.4(g).

11.4.   Cooperation and Audits. Purchaser, its affiliates and the Sellers shall cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes. Each of the Sellers shall deliver to the Purchaser any written notices, information, documents or records received from any Tax Authority for taxable periods prior to the Closing Date, within five (5) days of receipt of such notices, information, documents or records. Without limiting the generality of the foregoing, the Sellers shall execute on or prior to the Closing Date a power of attorney authorizing Purchaser to correspond, sign, collect, negotiate, settle and administer all Tax payments and Tax Returns.

ARTICLE XII.

MISCELLANEOUS

12.1.   No Survival of Representations and Warranties. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

12.2.   Expenses. Except as otherwise provided in this Agreement, each of Sellers, Parent and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby; provided, that Purchaser shall pay all filing fees with respect to the HSR Act payable in connection with this Agreement.

- 63 -

WPH
000738

12.3.   Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief, without the requirement to post any bond, with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement; provided, however, Sellers shall not be entitled to any injunctive relief or other equitable remedy for any reason until after the Closing has occurred.  Subject to the limitations in the preceding proviso and in Section 12.4, the rights set forth in this Section 12.3 shall be in addition to any other rights which a party hereto may have at law or in equity or pursuant to this Agreement.

12.4.   Exclusive Remedy.  The parties hereto agree that prior to the Closing, the right, if any, to receive the Deposit Amount pursuant to Section 3.2 shall be the sole and exclusive remedy that Sellers have against Purchaser for any claim or action or liability arising out of or related to this Agreement or the Ancillary Documents or any termination of this Agreement.  Such payment of the Deposit Amount shall be liquidated damages and Sellers and Purchaser agree in advance that actual damages would be difficult to ascertain and that the amount of such liquidated damages is a fair and equitable amount to reimburse Sellers, as applicable, for damages sustained by them prior to Closing.

12.5.   Submission to Jurisdiction; Consent to Service of Process.

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.9 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.9.

- 64 -

WPH
000739

12.6.   <u>Waiver of Right to Trial by Jury</u>. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.7.   <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.8.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without regard to the conflict of laws principles thereof.

12.9.   <u>Notices</u>. Except as specifically contemplated by or permitted in <u>Section 8.1(c)</u>, all notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, to:

WestPoint Stevens Inc.
507 W. 10th Street
West Point, GA  31833
Facsimile:  (706) 645-4396
Attention:  General Counsel
Email:      humphries.clay@wpstv.com

- 65 -

WPH
000740

With a copy (which shall
  not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile:   (212) 310-8007
Attention:   Ted S. Waksman, Esq.
             Michael F. Walsh, Esq.

If to Purchaser or Parent, to:

Textile Co., Inc.
WS Textile Co., Inc.
100 South Bedford Road
Mt. Kisco, New York 10549
Facsimile:   (914) 242-9282
Attention:   Felicia Buebel, Esq.

With a copy to:

Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Facsimile:   (212) 768-6800
Attention:   Peter D. Wolfson, Esq.

12.10. <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.11. <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement (other than AREH pursuant to <u>Section 8.9</u>), including any Person who is party to, or benefits from the assumption of, any Assumed Liability. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, Parent or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents

- 66 -

WPH
000741

shall be void; provided, however, that Purchaser may, prior to Closing, designate any one or more of its Affiliates to purchase, and transfer to any Affiliate, its rights under this Agreement to purchase, any Purchased Asset. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any permitted assignment, the references in this Agreement to Sellers, Parent or Purchaser shall also apply to any such assignee unless the context otherwise requires. Nothing herein shall prevent Parent, Purchaser or their permitted assignees from assigning this Agreement or any rights or obligations hereunder or transferring any Purchased Assets to any Person after the Closing Date.

12.12. <u>Non-Recourse</u>. Except for fraud, no past, present or future director, officer, employee, incorporator, member, partner or equityholder of Sellers, Parent or Purchaser or their Affiliates shall have any liability for the respective obligations or liabilities of such Person under this Agreement or any agreement entered into in connection herewith or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.13. <u>Publicity</u>. Prior to the Closing, none of the Purchasers, Parent or Sellers shall issue, and after the Closing, none of Sellers shall issue, any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of the party intending to issue such release, disclosure is otherwise required by applicable Law, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided the party intending to issue such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

12.14. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

- 67 -

**WPH
000742**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

WS TEXTILE CO., INC.

By:    /s/ Jon F Weber
       Name:
       Title:


TEXTILE CO., INC.

By:    /s/ Jon F Weber
       Name:
       Title:


NEW TEXTILE ONE, INC.

By:    /s/ Jon F Weber
       Name:
       Title:


NEW TEXTILE TWO, INC.

By:    /s/ Jon F Weber
       Name:
       Title:


**WPH
000743**

J7481153\V-12

SELLERS:

WESTPOINT STEVENS INC.

By:    /s/ M.L. Fontenot
       Name:  M.L. "Chip" Fontenot
       Title:  President and Chief Executive
              Officer

WESTPOINT STEVENS INC. I

By:    /s/ Lester D. Sears
       Name:  Lester D. Sears
       Title:  President

WESTPOINT STEVENS STORES INC.

By:    /s/ Lester D. Sears
       Name:  Lester D. Sears
       Title:  Vice President

J.P. STEVENS ENTERPRISES, INC.

By:    /s/ Lester D. Sears
       Name:  Lester D. Sears
       Title:  President

**WPH
000744**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 4

# Affidavit of Perry Henderson

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

Bobby Sanks,                        )
                                    )
      Plaintiff,          )
                                    )
v.                                  )        C. A. No.: 3:06-CV-1092-T
                                    )
WestPoint Stevens, Inc., and        )
WestPoint Home, Inc.                )
                                    )
      Defendants.         )

---

## AFFIDAVIT OF PERRY HENDERSON

---

**COMES NOW**, Perry Henderson, who, after being duly sworn, deposes and states:

1.  I am over the age of twenty-one (21), and competent to give this Affidavit.

2.  I was formerly employed by WestPoint Stevens, and subsequently by WestPoint Home, Inc., as Maintenance Department Manager. I am currently retired.

3.  I reside at 8560 Lee Road 146, Opelika, Alabama 36804.

4.  I know Bobby Sanks. Sanks worked under my supervision in the shop. Sanks was previously under the supervision of Harold O'Neal and, after O'Neal retired, under the supervision of Dudley Gregory.

5.  On or about May 4, 1985, Sanks' request for transfer to a position in the shop as a Humidifier and Air Control Technician was approved. Sanks was later promoted to Electrician 3rd Grade, then Electrician 2nd Grade, and, ultimately, to Electrician 1st

Grade. In spite of these promotions, Sanks was not a competent electrician. Sanks could not follow a schematic. Sanks could not follow logical electrical plans. If Sanks were given a component to work on, he would hunt and peck and swap out parts until it finally worked.

6.  Sanks' failure as an electrician was both motivational and ability. Despite on-the-job training and training in the form of special courses at the plant, Sanks had difficulty mastering such jobs as disassembling and reassembling hoist controls, even though Sanks was the primary shop employee on the hoist. As to motivation, Sanks would avoid work if he could. Sanks would often go home clean at the end of the day.

7.  After Sanks had been instructed and trained, I expected Sanks to be able to do what he had been trained to do on his own. If the job required more than one person in order to assist the other, another person was assigned.

8.  I never cursed Sanks, raised my voice with him, or spoke harshly to Sanks. I was direct with Sanks, as I was with all employees, and sometimes spoke sternly to Sanks and other employees, especially if I was speaking to them about their safety or the safety of others. In all of my conversations with Sanks, Sanks never reacted as if he were offended by the manner in which I had spoken with him.

9.  Some shop employees complained that they should make more money than Sanks, because Sanks was at top pay, and they were compelled to help Sanks run his job.

10. There were no automatic raises in the shop. Raises were based on the percentage of the job that an employee had learned. When should have an employee learned 100 percent of his job,

2

he was at top pay. Although Sanks was at top pay, Sanks never learned 100 percent of his job.

11. I was frequently forced to give Sanks counselings and warnings. I frequently gave Sanks personnel notices, which are not discipline, when discipline would have been justified. I gave personnel notices, instead of discipline, in order to motivate Sanks, and, frequently, to save his job, because another warning would have resulted in the termination of Sanks' employment.

12. Bobby Sanks never complained to me about being discriminated against because of his race. I never heard Bobby Sanks make a race discrimination complaint to anyone. I never knew Sanks to complain about other African-Americans in the shop being discriminated against. I am aware that towards the end of his employment, Sanks made a complaint about discrimination to Human Resource Director Amber Stephens. I cooperated with Amber Stephens in her investigation of Sanks' complaint.

13. I never heard Bobby Sanks complain about being discriminated against because of his color. There were employees in the shop whose complexion was darker than Sanks. These included Roy Lawson, a machinist (pipe fitter), and Lodolphus Floyd, a 1st grade electrician and leadman.

14. I never heard Sanks complain that whites got easier jobs or that whites got longer breaks. I never heard Sanks complain about smoke breaks. Sanks did not smoke. As far as I could see, the rule was applied evenly. The general rule was that smoking

3

during a break was allowed, but not at other times. With respect to talking, the rule

was that one could not stand around and talk, but an employee may talk and work,

provided the work is done.

15. There were about the same number of blacks and whites in the shop. *Delete this sentence )*

16. ~~When Danny Oliver, a black male, was transferred to the shop, there was a hiring~~

~~freeze because the plant was going to close.~~ When Sanks' employment was

terminated, there was a hiring freeze. Accordingly, no one was hired to replace

*, a black males , add*

Sanks. Danny Oliver had the responsibility of overseeing the blowers and took on

the additional responsibility of hoist duties. Oliver had worked with Bobby Sanks,

and, after Sanks left, Royce Crane personnel were brought in to help train Oliver on

the hoists, which were important due to safety concerns.

17. Dudley Gregory was sometimes tardy. However, Dudley Gregory, was a supervisor,

not a rank-and-file employee. Moreover, Gregory was never tardy six times within

six months within more than ten years of Sanks' termination.

18. In addition to Roy Lawson, who was classified as a machinist, John T. Edwards

worked as a machinist. Both Lawson and Edwards are black.

19. The plant at which Sanks worked closed in November 2006. Sanks would have lost *Add*

his job no later than November 4, 2006, due to the plant closure. *that have my signature or initial*

20. The documents Bates Numbered WPH000001-000667 are genuine, accurate, and

*add ➤ that I have knowledge of*

complete copies of the documents from the personnel file of Bobby Sanks, created by

or transmitted to or from WestPoint, and kept and stored by WestPoint in the ordinary course of business.

Dated this 4th day of December , 2007.

Respectfully submitted,

_Perry Henderson_
Perry Henderson

## DECLARATION PURSUANT TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12-4 , 2007.

_Perry Henderson_
Perry Henderson

5348737.1

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

Bobby Sanks,                           )
                                       )
    Plaintiff,                      )
                                       )
    v.                              )        C. A. No.: 3:06-CV-1092-T
                                       )
WestPoint Stevens, Inc., and           )
WestPoint Home, Inc.,                  )
                                       )
    Defendants.                     )
                                       )

# Exhibit 5

# Affidavit of
# Dudley Gregory

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

---

## AFFIDAVIT OF DUDLEY GREGORY

---

**COMES NOW**, Dudley Gregory, who, after being duly sworn, deposes and states:

1. I am over the age of twenty-one (21), and competent to give this Affidavit.

2. I was formerly employed by WestPoint Stevens, and subsequently by WestPoint Home, Inc., as Mechanical Shop Foreman.

3. I reside at 342 Cherokee Trail, Tallassee, Alabama 36078.

4. I know Bobby Sanks. Sanks worked under my supervision in the shop. Sanks was previously under the supervision of Harold O'Neal,. I succeeded O'Neal when he retired.

5. Sanks was ultimately promoted to Electrician 1st Grade. In spite of being promoted and being at top pay, Sanks was not a competent electrician. Sanks could not follow a schematic. Sanks could not follow logical electrical plans. If Sanks were given a

component to work on, he would hunt and peck and swap out components until it finally worked.

6. Sanks' failure as an electrician was both motivational and ability. Despite on-the-job training and training in the form of special courses at the plant, Sanks had difficulty mastering such jobs as disassembling and reassembling hoist controls, even though Sanks was the primary shop employee on the hoist. As to motivation, Sanks would avoid work if he could. Sanks would often go home clean at the end of the day.

7. After Sanks had been instructed and trained, I expected Sanks to be able to do what he had been trained to do on his own. If the job required more than one person in order to assist the other, another person was assigned.

8. I never heard Perry Henderson curse Sanks, raise his voice with Sanks, or spoke harshly to Sanks. Henderson was direct with Sanks, as he was with all employees, and sometimes spoke sternly to Sanks and other employees, especially if he was speaking to them about their safety or the safety of others. I never saw Sanks react as if he were offended by the manner in which Henderson had spoken with him.

9. Some shop employees complained that they should make more money than Sanks, because Sanks was at top pay, and they were compelled to help Sanks run his job.

10. There were no automatic raises in the shop. Raises were based on the percentage of the job that an employee had learned. When an employee should have learned 100 percent of his job, he was at top pay. Although Sanks was at top pay, Sanks never learned 100 percent of his job.

2

11.     Perry Henderson was frequently forced to give Sanks counselings and warnings. Sanks frequently received personnel notices, which are not discipline, when discipline would have been justified. Henderson said he gave personnel notices, instead of discipline, in order to motivate Sanks, and, frequently, to save Sanks' job, because another warning would have resulted in the termination of Sanks' employment.

12.     Bobby Sanks never complained to me about being discriminated against because of his race. I never heard Bobby Sanks make a race discrimination complaint to anyone. I never knew Sanks to complain about other blacks in the shop being discriminated against. I am aware that towards the end of his employment, Sanks made a complaint about discrimination to Human Resource Director Amber Stephens. I cooperated with Amber Stephens in her investigation of Sanks' complaint, as did Perry Henderson.

13.     I never heard Bobby Sanks complain about being discriminated against because of his color. There were employees in the shop whose complexion was darker than Sanks. These included Roy Lawson, a machinist (pipe fitter), and Lodolphus Floyd, a 1st grade electrician and leadman.

14.     I never heard Sanks complain that whites got easier jobs or that whites got longer breaks. I never heard Sanks complain about smoke breaks. Sanks did not smoke. The rule was applied evenly. The general rule was that smoking was allowed during a break, but not at other times. With respect to talking, the rule was that one could

not stand around and talk, but employees may talk while working, provided the work
is done.

15.    There were about the same number of blacks and whites in the shop.

*Delete this sentence*

16.    ~~When Danny Oliver, a black male, was transferred to the shop, there was a hiring~~
~~freeze.~~ When Sanks' employment was terminated, there was a hiring freeze because
the plant was going to close. Accordingly, no one was hired to replace Sanks. Danny
Oliver had the responsibility *a black male,* of overseeing the blowers and took on the additional
responsibility of hoist duties. Oliver had worked with Bobby Sanks, and, after Sanks
left, Royce Crane personnel were brought in to help train Oliver on the hoists, which
were important due to safety concerns.

17.    I was sometimes tardy. However, I was a supervisor, not a rank-and-file employee. I
was never tardy six times within six months within more than ten years of Sanks'
termination.

18.    In addition to Roy Lawson, who was classified as a machinist, John T. Edwards
worked as a machinist. Both Lawson and Edwards are black.

19.    The plant at which Sanks worked closed in November 2006. Sanks would have lost
his job no later than November 4, 2006, due to the plant closure.

Dated this *5th* day of *December*, 2007.

Respectfully submitted,

*Dudley Gregory*

Dudley Gregory

4

**DECLARATION PURSUANT TO 28 U.S.C. 1746**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5 , 2007.

Dudley Gregory

5349101.1

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 6

# Plaintiff's Responses to Requests to Admit

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

BOBBY SANKS,                        )
                                    )
        **Plaintiff,**              )
v.                                  )       C. A. No. 3:06-CV-1092-T
                                    )
WESTPOINT STEVENS, INC., and        )
WESTPOINT HOME, INC.,               )
                                    )
        **Defendant.**             )
_____    )

## DEFENDANTS' FIRST REQUEST FOR ADMISSIONS TO THE PLAINTIFF – MERGED WITH ANSWERS AND AMENDED ANSWERS

### REQUESTS

1.    Admit you were terminated from employment with WestPoint Stevens, Inc., on July 29, 2005 (WPS 000004).

ANSWER:    Admit.

2.    Admit you were employed by WestPoint Stevens, Inc. at the time your employment was terminated on July 29, 2005.

ANSWER:    Admit.

3.    Admit on July 29, 2005, the date of termination of your employment from WestPoint Stevens, Inc., your supervisor was Dudley Gregory.

ANSWER:    Deny.  **The Plaintiff was told by V. R. Dobbs, human resource manager at the time, that Perry G. Henderson was his supervisor, not Dudley Gregory.**

4.    Admit on July 29, 2005, the date of termination of your employment from WestPoint Stevens, Inc., your manager was Perry Henderson.

ANSWER:    Deny.  **See the above response in Item #3.**

5.    Admit you signed and acknowledged receipt of "A Guidebook for Hourly Associates" Booklet (hereinafter "Guidebook") on July 14, 2004 (WPH 000343; 000755-818).

ANSWER:    The Plaintiff does not recall.

**AMENDED RESPONSE:  Admit, based upon the information disclosed to his attorney.**

6.    Admit you signed and acknowledged publication of the Human Resources Policy Manual on July 14, 2004 (WPH 000343).

ANSWER:    The Plaintiff does not recall.

**AMENDED RESPONSE:  Admit, based upon the information disclosed to his attorney.**

7.    Admit you were aware of the WestPoint policies on discipline and corrective action outlined in the Guidebook (WPS 000790-803).

ANSWER:    Admit.

8.    Admit you were aware that WestPoint policy states that three warnings within a twelve month period results in termination of employment (WPS 000795).

ANSWER:    Admit.

9.    Admit you came under the supervision of Perry Henderson when you accepted the position of Humidifier and Air Control Technician on or about May 4, 1985 (WPH 000582).

ANSWER:    Admit.

10.    Admit you received a pay increase on August 11, 1985, from $5.50 to

2

$5.85 per hour approved by Perry Henderson (WPS 000580).

  ANSWER: Deny. **The Plaintiff states that he did not receive a raise until after he filed his complaint against Perry Henderson for denying him. The Plaintiff did not receive the raise until about six months later.**

  11. Admit you received a pay increase on December 29, 1985, from $5.85 to $6.25 per hour approved by Perry Henderson (WPS 000577).

  ANSWER: Deny. **The Plaintiff states that he received the [raise] in about two weeks after he filed [his] complaint with Dobbs.**

  12. Admit you received a pay increase on June 15, 1986, from $6.25 to $6.50 per hour approved by Perry Henderson.

  ANSWER: Admit.

  13. Admit you received a pay increase on October 5, 1986, from $6.50 to $6.87 per hour approved by Perry Henderson (WPS 000575).

  ANSWER: Admit.

  14. Admit you received a pay increase on June 29, 1987, from $6.87 to $7.22 per hour approved by Perry Henderson (WPS 000572).

  ANSWER: Admit.

  15. Admit you received a pay increase on September 27, 1987, from $7.22 to $7.51 per hour approved by Perry Henderson.

  ANSWER: Admit.

  16. Admit you received a pay increase on December 27, 1987, from $7.51 to $7.81 per hour approved by Perry Henderson (WPS 000567).

  ANSWER: Admit.

17.    Admit you received a pay increase on November 27, 1988, from $7.81 to $8.12 per hour approved by Perry Henderson.

ANSWER:    Admit.

18.    Admit you received a pay increase on March 27, 1989, from $8.12 to $8.76 per hour approved by Perry Henderson (WPS 000559).

ANSWER:    Admit.

19.    Admit you received a pay increase on October 2, 1989, from $8.76 to $9.00 per hour approved by Perry Henderson (WPS 000556).

ANSWER:    Admit.

20.    Admit you received a pay increase on December 18, 1989, from $9.00 to $9.36 per hour approved by Perry Henderson.

ANSWER:    Admit.

21.    Admit you received a pay increase on April 16, 1990, from $9.36 to $9.83 per hour approved by Perry Henderson (WPS 000550).

ANSWER:    Admit.

22.    Admit you received a pay increase on February 18, 1991, from $9.83 to $10.22 per hour approved by Perry Henderson.

ANSWER:    Admit.

23.    Admit you received a pay increase on March 18, 1991, from $10.22 to $10.73 per hour approved by Perry Henderson (WPS 000543-544).

ANSWER:    Admit.

24.    Admit you received instruction of the Time Clock Punching Procedure on September 8, 2003, explaining how time was recorded and what constituted a tardy (WPS

000010).

ANSWER:    The Plaintiff cannot or deny. [sic]

**AMENDED ANSWER:  Admit, based upon the information disclosed to his attorney.**

25.    Admit you were never employed by WestPoint Home, Inc.

ANSWER:    The Plaintiff cannot admit or deny.

**AMENDED ANSWER:  Admit, based upon the information disclosed to his attorney.**

26.    Admit you were aware of the WestPoint policy on Equal Employment Opportunity/Anti-Harassment/Retaliation outlined in the Guidebook (WPS000761).

ANSWER:    Admit, however, it was not followed by everyone.

27.    Admit you were aware of the WestPoint policy on attendance that is in the Guidebook (WPS 000771-774).

ANSWER:    Admit, however, it did not apply to everyone.

28.    Admit you were aware of the WestPoint policy on tardiness that is in the Guidebook (WPS 000775).

ANSWER:    Admit, however, it did not apply to everyone.

29.    Admit you were aware of the WestPoint procedure for reporting complaints and problems, including discrimination and harassment (WPS 000782-786).

ANSWER:    Admit.

30.    Admit WestPoint's procedure for reporting complaints and problems is in the Guidebook (WPS 000782-786).

ANSWER:    Admit, however, the procedure did not apply when making a

5

complaint.

31.     Admit WestPoint's procedure for reporting complaints and problems is posted in the plant (WPS 000819).

ANSWER:     Admit, however, the procedure did not apply when making a complaint.

32.     Admit Dudley Gregory is over 40 years of age.

ANSWER:     The Plaintiff cannot admit or deny.  **The Plaintiff does not know and has never known the age of Dudley Gregory.**

33.     Admit Perry Henderson is over 40 years of age.

ANSWER:     Admit.

**AMENDED ANSWER:  The Plaintiff cannot admit or deny.  The Plaintiff does not know and has never known the age of Perry Henderson.**

34.     Admit you worked maintaining hoists for WestPoint Stevens for approximately fourteen years.

ANSWER:     The Plaintiff admits that maintaining hoists was one of his job descriptions.

35.     Admit on April 29, 2004, you were counseled for poor job performance because a hoist was not properly maintained or repaired (WPH 000356-358).

ANSWER:     Admit.

36.     Admit on March 25, 2004, you were warned for working on a crane system which was not locked out (WPH 000351-352).

ANSWER:     Admit.

37.     Admit on February 11, 2005, you could not determine what was causing a

hoist not to work properly (WPS 000323).

ANSWER:    Admit.

38.    Admit on February 22, 2005, you were given a written warning for poor work performance because you were unable to determine what was wrong with a hoist (WPH 000323).

ANSWER:    Admit.

39.    Admit you were given a Final Notice on March 2, 2005, that another violation of policy before May 25, 2005, would result in discharge (WPH 000322).

ANSWER:    Admit.

40.    Admit you complained about discrimination and harassment by Perry Henderson and Dudley Gregory on March 3, 2005 (WPH 000315-320).

ANSWER:    Admit.

41.    Admit that your discrimination complaint against Perry Henderson and Dudley Gregory was investigated by Amber Stephens in Human Resources (WPS 000315-320; 000820-832).

ANSWER:    The Plaintiff cannot admit or deny. **The Plaintiff states that he was told an investigation was conducted, however, no credible evidence of such was ever presented to him.**

42.    Admit Amber Stephens interviewed nine shop associates who gave statements regarding your claims of discrimination (WPS 000820-832).

ANSWER:    The Plaintiff cannot admit or deny. **The Plaintiff states that he was told nine shop associates gave statements regarding his claims of discrimination, and that he reviewed the information disclosed to his attorney; however, no credible**

**evidence of any shop associates' statement was ever presented to him.**

43.    Admit none of the associates interviewed confirmed your claims of discrimination (WPS 000820-832).

ANSWER:    The Plaintiff cannot admit or deny.  **Please see above response in Item #42.**

44.    Admit you were given a written warning on July 29, 2005, because you had incurred six tardies in six months (WPS 000007).

ANSWER:    Admits.

45.    Admit you were tardy on January 30, 2005.

ANSWER:    Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

46.    Admit you were tardy on February 4, 2005.

ANSWER:    Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

47.    Admit you were tardy on June 13, 2005.

ANSWER:    Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

48.    Admit you were tardy on June 20, 2005.

ANSWER:    Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

49.    Admit you were tardy on July 19, 2005.

ANSWER:    Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

50.     Admit you were tardy on July 27, 2005.

ANSWER:     Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

51.     Admit you were tardy on July 29, 2005.

ANSWER:     Deny.  **The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work.**

52.     Admit you were given a written warning on July 29, 2005, for being tardy the seventh time in six months (WPS 000006).

ANSWER:     Deny.  **The Plaintiff states that he did not receive a written warning for being tardy.  He received a written termination notice.**

53.     Admit your employment was terminated on July 29, 2005, for having three written warnings within a twelve month period (WPS 000004).

ANSWER:     The Plaintiff admits that he was told he was being terminated.

54.     Admit you stated during your exit interview that you understood why you were being terminated (WPH 000005).

ANSWER:     The Plaintiff admits that he understood that his termination was a result of the discriminatory practices against him at WestPoint Stevens and WestPoint Home.

55.     Admit you made no allegations during your exit interview about discrimination (WPH 000005).

ANSWER:     The Plaintiff admits that no allegations were made during the exit interview since his previous complaint was still outstanding, and since he believes his termination was a result of his previous complaints.

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BOBBY LEE SANKS,  )
    Plaintiff,  )
      )
v.  )   CASE NO.: 03-06cv1092-MHT-CSC
      )
WESTPOINT STEVENS, INC.  )
  et al.,  )
    Defendants.  )

COPY

## PLAINTIFF'S AMENDED RESPONSE TO
## DEFENDANTS' FIRST REQUEST FOR ADMISSION

The Plaintiff, by and through his attorney of record, submits this Plaintiff's Response to Defendants' First Request for Admission to the Defendants, by and through their counsel of record. The Plaintiff submits the following:

1. Admit;

2. Admit;

3. Deny. The Plaintiff was told by V.R. Dobbs, human resource manager at the time, that Perry G. Henderson was his supervisor, not Dudley Gregory;

4. Deny. See the above response in Item #3;

5. Admit, based upon the information disclosed to his attorney;

6. Admit, based upon the information disclosed to his attorney;

7. Admit;

8. Admit;

9.   Admit;

10.   Deny.  The Plaintiff states that he did not receive a raise until after he filed his complaint against Perry Henderson for denying him.  The Plaintiff did not receive the raise until about six months later;

11.   Deny.  The Plaintiff states that he received the raised in about two weeks after he filed has complaint with Dobbs;

12. through 23.  Admit;

24.   Admit, based upon the information disclosed to his attorney;

25.   Admit, based upon the information disclosed to his attorney;

26.   Admit, however, it was not followed by everyone;

27.   Admit, however, it did not apply to everyone;

28.   Admit; however, it did not apply to everyone;

29.   Admit;

30.   Admit, however, the procedure did not apply when making a complaint;

31.   Admit, however, the procedure did not apply when making a complaint;

32.   The Plaintiff cannot admit or deny.  The Plaintiff does not know and has never known the age of Dudley Gregory;

33.   The Plaintiff cannot admit or deny.  The Plaintiff does not know and has never known the age of Perry Henderson;

34.   The Plaintiff admits that maintaining hoists was one of

2

his job descriptions;

35. Admit;

36. Admit;

37. Admit;

38. Admit;

39. Admit;

40. Admit;

41. The Plaintiff cannot admit or deny. The Plaintiff states that he was told an investigation was conducted, however, no credible evidence of such was ever presented to him;

42. The Plaintiff cannot admit or deny. The Plaintiff states that he was told nine shop associates gave statements regarding his claims of discrimination, and that he reviewed the information disclosed to his attorney; however, no credible evidence of any shop associates' statement was ever presented to him;

43. The Plaintiff cannot admit or deny. Please see above response in Item #42;

44. Admits;

45. through 51. Deny. The Plaintiff states that the original time clock was not working and a dummy clock was used that did not work;

52. Deny. The Plaintiff states that he did not receive a written warning for being tardy. He received a written termination notice;

3

53.    The Plaintiff admits that he was told he was being terminated;

54.    The Plaintiff admits that he understood that his termination was a result of the discriminatory practices against him at WestPoint Stevens and WestPoint Home;

55.    The Plaintiff admits that no allegations were made during the exit interview since his previous complaint was still outstanding, and since he believes his termination was a result of his previous complaints.

Respectfully submitted,

Lateefah Muhammad    (Ala. Code MUH001)
ATTORNEY FOR PLAINTIFF

Lateefah Muhammad, Attorney At Law, P.C.
Post Office Box 1096
Tuskegee, Alabama 36087
(334) 727-1997 telephone and facsimile
lateefahmuhammad@aol.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Amended Response to Defendants' First Request for Admissions to James C. Pennington, Esquire and Fred Suggs, Jr., Esquire, attorneys for Defendants, by sending it to OGLETREE DEAKINS, P.C., 300 North Main Street, Post Office Box 2757, Greenville, South Carolina 29602, in the United States Mail, postage prepaid, and by facsimile, on this 31st day of May, 2007.

Lateefah Muhammad

4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 7

# Performance Chronology

PERFORMANCE CHRONOLOGY

BOBBY SANKS

| Date | Type | Misconduct | Alleged Discriminatory Basis | Transcript | Dx. | Bates No. |
|---|---|---|---|---|---|---|
| May, 1986 | | | Sanks alleges he complained about not receiving a 90 day increase about one year after transferring to the department in May, 1985 | 142:3-143:12 238:11-13 | 25 | |
| 9/21/1987 | Personnel Notice | Improper use of lockout | None | | 32 | 571 |
| 10/27/1987 | Personnel Notice | Interferring with the work of others | Retaliation for Wage Complaint | 169:14-170:15 | 32 | 570 |
| 2/27/1988 | Personnel Notice | Interferring with the work of others | Retaliation for Wage Complaint | 173:1-11 | 32 | 566 |
| 3/1/1988 | Counseling | Interferring with the work of others | Retaliation for Wage Complaint | 173:13-20 | 32 | 565 |
| 2/23/1989 | Personnel Notice | Dust mask could not be fitted because of facial hair | None | | 32 | 560 |
| 4/19/1989 | Counseling | Failure to repair lights | Race/Retaliation for Wage Complaint | 174:8-23 175:7-11 | 32 | 558 |
| | | | **One Year Until Next Alleged Discrimination** | | | |
| 5/8/1989 | Personnel Notice | Improper lockout | None | | 32 | 557 |
| 12/18/1989 | Written Warning | Failure to perform job duties | None | 184:18-23 | 33 | |
| 3/10/1990 | Personnel Notice | Safety violation | None | | 32 | 552 |
| 3/10/1990 | Counseling | Failure to comply with dust mask regulations | None | 168:21-181:14 | 32 | 553 |
| 3/26/1990 | Personnel Notice | Taking unscheduled break | Race/Retaliation for Wage Complaint | 177:4-23 | 32 | 551 |
| | | | **Two Years Until Next Alleged Discrimination** | | | |
| 6/12/1990 | Written Warning | Failure to perform job duties | None | 184:18-23 | 34 | |
| 5/1/1991 | Personnel Notice | Improper lockout | None | | 32 | 539 |
| 5/13/1991 | Written Warning | Failure to perform job duties | None | 186:11-19 | 36 | |
| 1/8/1992 | Written Warning | Working on machine without proper lockout | None | 187:17-20 | 38 | |
| 1/17/1992 | Personnel Notice | Wasting time | Race/Retaliation for Wage Complaint | 178:4-12 | 32 | 524 |
| 4/23/1993 | Personnel Notice | Taking too long to make a repair | Race/Retaliation for Wage Complaint | 178:13-23 | 32 | 512 |
| | | | **Two Years Until Next Alleged Discrimination** | | | |
| 12/20/1993 | Personnel Notice | Attendance Notice | None | | 32 | 508 |

PERFORMANCE CHRONOLOGY

BOBBY SANKS

| 4/11/1995 | Counseling | Failure to carry out duties properly | Race/Retaliation for Wage Complaint | 179:3-13 | 32 | 495 |
|---|---|---|---|---|---|---|
| 6/9/1995 | Personnel Notice | Abuse of break schedule and telephone usage | None | | 32 | 494 |
| 11/4/1995 | Personnel Notice | Failure to properly maintain equipment | Race/Retaliation for Wage Complaint | 179:15-18 | 32 | 490 |
| | | | **Two Years Until Next Alleged Discrimination** | | | |
| 2/9/1996 | Personnel Notice | Safety violation | None | | 32 | 483 |
| 11/19/1997 | Counseling | Failure to properly inspect | Race/Retaliation for Wage Complaint | 179:19-180:5 | 32 | 473 |
| 12/18/1997 | Personnel Notice | Lubricator found empty | None | | 32 | 470 |
| 12/19/1997 | Written Warning | Failure to properly inspect | None | 189:7-19 | 40 | |
| 3/9/1998 | Personnel Notice | Failure to comply with dust mask regulations | None | | 32 | 468 |
| 3/26/1998 | Personnel Notice | Failure to properly inspect | Race/Retaliation for Wage Complaint | 180:6-12 | 32 | 467 |
| | | | **Two Years Until Next Alleged Discrimination** | | | |
| 5/2/1998 | Personnel Notice | Failure to properly inspect | None | | 32 | 457 |
| 8/6/1998 | Written Warning | Failure to properly inspect and repair | None | 190:13-16 | 41 | |
| 8/8/1998 | Personnel Notice | Poor job performance | None | | 32 | 447 |
| 10/2/1998 | Personnel Notice | Poor job performance | None | | 32 | 435 |
| 5/30/1999 | Written Warning | Taking unscheduled break | None | 191:14-192:4 | 43 | |
| 6/11/1999 | Personnel Notice | Wasting time | None | | 32 | 430 |
| 7/29/1999 | Personnel Notice | Failure to properly inspect | None | | 32 | 428 |
| 4/4/2000 | Written Warning | Violating time clock policy | Discriminatory, but cannot identify | 194:23-196:16 | 45 | |
| | | | **Four Years Until Next Alleged Discrimination** | | | |
| 10/28/2002 | Personnel Notice | Failure to properly troubleshoot and repair hoist | None | | 32 | 374 |
| 4/6/2004 | Personnel Notice | Safety violation | None | | 32 | 360 |
| 4/29/2004 | Counseling | Failure to repair hoist | Race | 199:13-203:6 | 48 | |
| 5/17/2004 | Personnel Notice | Poor maintenance on hoist | None | | 32 | 344 |
| 8/28/2004 | Personnel Notice | Failure to repair | None | | 32 | 339 |

PERFORMANCE CHRONOLOGY

BOBBY SANKS

| 12/23/2004 | Personnel Notice | Poor work performance | None | | 32 | 327 |
|---|---|---|---|---|---|---|
| 2/22/2005 | Written Warning | Unable to find problem and took too long to repair | Race/Disparate Treatment | 204:15-205:21 205:19-206:8 | 50 | |
| 3/3/2005 | | | Sanks Complains to HR of Discrimination by Henderson and Gregory While Receiving His Final Notice - Investigation Finds No Evidence to Support Sanks' Allegations | | 52 | |
| 3/24/2005 | Personnel Notice | Failure to inspect | None | | 32 | 332 |
| 7/29/2005 | Written Warning | Sixth tardy in six months occurring on 7/27/05 | None | 225:5-15 | 54 | |
| 7/29/2005 | Written Warning | Seventh tardy occurring on 7/29/07 | None | 227:11-15 | 55 | |
| 7/29/2005 | Termination | Three written warnings within twelve months | None | 236:12-17 | 58 | |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 8

# Affidavit of Amber Stephens

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **Bobby Sanks,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No.: 3:06-CV-1092-T** |
| | ) | |
| **WestPoint Stevens, Inc., and** | ) | |
| **WestPoint Home, Inc.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### AFFIDAVIT OF AMBER STEPHENS

---

**COMES NOW**, Amber Stephens, who, after being duly sworn, deposes and states:

1.    I am over the age of twenty-one (21), and competent to give this Affidavit.

2.    I reside at 1816 2nd Court, Lanett, Alabama  36863.

3.    I was formerly employed by WestPoint as Human Resource Manager.

4.    On or about March 2, 2005, I brought Bobby Sanks into my office to issue him a

Final Notice and to allow Bobby Sanks to review his personnel file, as he had

previously requested.  I explained the Final Notice from top to bottom and notified

Bobby Sanks that he had to avoid any other written warnings before May 25, 2005, or

his employment would be terminated.  Before I could complete my explanation,

Sanks blurted out, "This isn't right, I have been racially discriminated against and job

harassed."  Sanks explained that his written warning, dated February 22, 2005, was

incorrect. Sanks complained that neither he nor anyone in the shop could disassemble and reassemble a hoist. Assembly and disassembly was for the manufacturer.

5.    Bobby Sanks rambled on about the hoists for a long time. I discontinued my discussion about the Final Notice and just listened to Bobby Sanks. The meeting lasted about half an hour, and Mr. Sanks left, because it was near the end of his shift.

6.    After meeting with Bobby Sanks, I telephoned Woody Sluss and Tim Wilbanks to report Sanks' claims. Woody Sluss and Tim Wilbanks directed me to complete the investigation and prepare the discrimination and harassment forms. I continued my investigation the next day.

7.    The following day, March 3, 2005, I continued my interview with Mr. Sanks, with Industrial Engineer Wayne Price as a witness. I introduced Mr. Price to Bobby Sanks and explained that Mr. Price was merely a witness. Sanks did not object. Sanks made a holographic statement on the form. I then completed the form.

8.    I asked Bobby Sanks to give me specifics – names, examples, witnesses, dates, times (who, what, when, and where). Sanks had no specific alleged racial comments to him or to anyone by Perry Henderson, Dudley Gregory, or others in the shop. Sanks just claimed that he was being harassed and discriminated against by being warned on May 25, 2004, and February 22, 2005.

9.    Sanks admitted to me that he had not previously complained.

10.   Sanks would not name any witnesses.

11.   All of Sanks' complaints related to the written warnings he had been given, specifically, the warnings on May 25, 2004, and February 22, 2005.

12.   Bobby Sanks admitted he had not discussed his complaints with anyone else and admitted he was not aware of others with similar complaints.

13.   Between March 3, 2005, and March 15, 2005, I interviewed nine (9) shop associates, selected at random, since Mr. Sanks had named no witnesses. I believe the nine (9) interviewees would have told me if they thought Perry Henderson and Dudley Gregory had mistreated Mr. Sanks because of his race. Not one of those interviewed substantiated Bobby Sanks' claims. I spoke with Dudley Gregory and Perry Henderson as part of my investigation.

14.   When I explained the results of my investigation to Bobby Sanks, Mr. Sanks said he did not want to continue the investigation by meeting with the plant manager. Bobby Sanks signed the investigation form.

15.   After my meeting with Bobby Sanks on March 15, 2005, Mr. Sanks never raised with me again the issue of discrimination.

16.   The documents Bates Numbered WPH 001092 and WPH 001094 are genuine and accurate copies of documents received by WestPoint's Plant Manager, Mike McGill, from the EEOC, kept and stored by WestPoint in the ordinary course of business.

17.   The documents Bates Numbered WPH000001-000667 are genuine, accurate, and complete copies of the documents from the personnel file of Bobby Sanks, created by

3

or transmitted to or from WestPoint, and kept and stored by WestPoint in the ordinary course of business.

Dated this 11th day of December, 2007.

Respectfully submitted,

*Amber Stephens*

Amber Stephens

## DECLARATION PURSUANT TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December, 11, 2007.

*Amber Stephens*

Amber Stephens

5349289.1

4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Bobby Sanks, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    C. A. No.: 3:06-CV-1092-T |
| | ) |
| WestPoint Stevens, Inc., and | ) |
| WestPoint Home, Inc., | ) |
| | ) |
|     Defendants. | ) |
| | ) |

# Exhibit 9

# EEOC Charge Timeline



Bobby Sanks EEOC Charge Timeline

May 4, 2006 — Sanks' Amended EEOC Charge adding age

January 27, 2006 — Sanks' EEOC charge alleging race, color, retaliation and harassment but not age

January 25, 2006

September 8, 2005 — Sanks' visit to EEOC without filing a charge

180 days

August 30, 2005

August 5, 2005 — Sanks allegedly learned he was replaced with a younger employee

July 29, 2005 — Termination of Sanks' Employment (Dx. 56-58) which Sanks admitted in his deposition was not discriminatory

180 days

March 3, 2005 — Complaint to WestPoint about discrimination (Dx. 52)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 10

# Unpublished Cases

### *Bradley v. Florida Dept. of Transp.*
### *Daniels v. Mobile*
### *Evans v. Pemco Aeroplex, Inc.*
### *Meneffee v. Montgomery County Bd. Of Educ.*
### *Potts v. Conecuh-Monroe Counties Gas District*
### *Wadibia v. Auburn University*

# *Bradley v. Florida Dept. of Transp.*

*2002 U.S. Dist. LEXIS 27475, *; 16 Fla. L. Weekly Fed. D 334*

LAURIE BRADLEY, Plaintiff vs. FLORIDA DEPARTMENT OF TRANSPORTATION, Defendant.

CASE NO.: 4:01CV342-RH

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, TALLAHASSEE DIVISION

2002 U.S. Dist. LEXIS 27475; 16 Fla. L. Weekly Fed. D 334

November 11, 2002, Decided
November 12, 2002, Filed; November 12, 2002, Entered on Docket

**DISPOSITION: [*1]** Defendant's motion for summary judgment granted. All other pending motions denied as moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee brought an action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and 42 U.S.C.S. § 1981a, asserting claims for sexual harassment and retaliation. Following discovery, defendant employer moved for summary judgment on all claims.

**OVERVIEW:** The employer argued that the employee's claims were procedurally defective as they were untimely and the employee failed to exhaust administrative remedies pursuant to 42 U.S.C.S. 2000e-5(e). The employee conceded that the events occurred mostly in 1996, but she did not file her EEOC charge until 2001. The employee offered three theories to support her assertion that the action was timely: (1) that her claims could be piggybacked to those of other employees under the single-filing rule; (2) that the employer actively misled her concerning the validity of her charge such that the time for her to file her charge of discrimination was equitably tolled until she learned of the "actual" findings of the investigation; and (3) that the employee continued to suffer the adverse affects of her "demotion," which rendered it a continuing violation. The employee's arguments were rejected. The claims lacked sufficient similarity to allow invocation of the single-filing rule, the employee was armed with a suspicion that she had been sexually harassed and a general knowledge of her rights, and the continuing pay disparities were the lingering effects of a discrete retaliatory act--her demotion.

**OUTCOME:** The employer's motion for summary judgment was granted.

**CORE TERMS:** single-filing, continuing violation, demotion, equitable, summary judgment, tolling, similarity, discrete, retaliatory, harassment, discriminatory, piggybacking, sexual harassment, time frame, non-filing, employment decisions, sufficiently similar, conciliation, retaliation, grievance, dividend, notice, discriminatory acts, discriminatory treatment, similarly situated, undisputed, awareness, disparity, lawsuit, matter of law

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
*HN1* Under the familiar standard, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c).

Civil Procedure > Summary Judgment > Standards > General Overview
Labor & Employment Law > Discrimination > Actionable Discrimination
*HN2* The United States Court of Appeals for the Eleventh Circuit has recognized that summary

judgment frequently proves inappropriate in employment discrimination claims because they often turn on an employer's motivation and intent.

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Jurisdiction
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN3* The single-filing rule permits a plaintiff to bootstrap her non-filed charge to a preexisting charge that was filed with the proper administrative body provided that (1) the charge being relied upon was timely and not otherwise defective; and (2) the individual claims of the filing and non-filing plaintiffs arose out of similar discriminatory treatment in the same time frame.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Jurisdiction
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Reasonable Cause & Conciliation
*HN4* The circuit courts have employed varying methods to determine whether claims are sufficiently similar to permit piggybacking, ranging from a showing of similar circumstances and temporal proximity to a requirement that the administrative charge relied upon has alleged discrimination against a class to which the claimant belongs. Even under the broadest standard, whether an administrative charge will suffice to permit piggybacking depends to a large degree on the type of work unit involved. Where the grievances arise in a modest size work unit mere similarity of the grievances within the same general time frame suffices to permit the single filing rule. But where the grievances are alleged to arise throughout a large group, the lack of conciliation of one individual grievance does not necessarily mean that conciliation efforts would be unavailing if the EEOC and the employer were alerted to the broad scope of the claim. Though an administrative claim in such circumstances need specify that a claimant purports to represent a class or others similarly situated, there must be some indication that a grievance affects a group of individuals defined broadly enough to include those who seek to piggyback. Such a claim alerts the EEOC that more is alleged than an isolated act of discrimination and affords sufficient notice to an employer to explore conciliation with the affected group.

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Jurisdiction
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview
*HN5* In the context of a discrimination claim, the objective of the piggybacking rule is to allow non-filing plaintiffs to rely on the charges of filing plaintiffs when it would be a "useless act" for the non-filing plaintiffs to file their own charges.

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Jurisdiction
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview
*HN6* In the context of a discrimination claim, the law of the Eleventh Circuit has evolved from (1) allowing invocation of the single-filing rule by non-filing members of a class that has a named representative who filed an administrative charge, to (2) allowing invocation of the single-filing rule by non-filing plaintiffs or intervenors who have a co-plaintiff in the same action who filed a charge, to (3) allowing invocation of the single-filing rule in a lawsuit in which no plaintiff filed a charge but in which the plaintiff unsuccessfully attempted to intervene in an earlier action brought by a person who filed a charge.

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Jurisdiction
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview
*HN7* In the context of a discrimination claim, under Calloway, the litmus for piggybacking an

administrative charge is whether the filing and non-filing plaintiffs arise out of similar "discriminatory treatment."

Governments > Legislation > Statutes of Limitations > Tolling
*HN8* Oral statements plainly are material to the issue of equitable tolling because actual knowledge destroys any possible basis for applying the equitable tolling doctrine.

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview
Governments > Legislation > Statutes of Limitations > Tolling
*HN9* When an employee is generally aware of his rights, ignorance of specific legal rights or failure to seek legal advice should not toll the notification period.

Labor & Employment Law > Discrimination > Actionable Discrimination
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN10* The United States Supreme Court held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. However, in the hostile environment context, so long as an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability.

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN11* Continuing effects of prior discrimination are not actionable once the 300-day filing period has lapsed.

Civil Rights Law > Practice & Procedure > Continuing Violations
Labor & Employment Law > Discrimination > Actionable Discrimination
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > Continuing Violations
*HN12* The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., claim to lapse.

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Actionable Discrimination
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN13* A claim arising out of an injury which is "continuing" only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period.

Governments > Legislation > Statutes of Limitations > General Overview
Labor & Employment Law > Discrimination > Actionable Discrimination
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN14* The continuing violation doctrine, such as it remains following Morgan, is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.

**COUNSEL:** For LAURIE BRADLEY, Plaintiff: LISA CATHERINE LAMBERT, LAW OFFICE OF RICHARD E JOHNSON, TALLAHASSEE, FL. RICHARD ERROL JOHNSON, LAW OFFICE OF RICHARD E JOHNSON, TALLAHASSEE, FL.

For FLORIDA DEPARTMENT OF TRANSPORTATION, Defendant: JOEL STEVEN CARTER, HENRY BUCHANAN HUDSON ETC, TALLAHASSEE, FL.

**JUDGES:** Robert L. Hinkle, United States District Judge.

**OPINION BY:** Robert L. Hinkle

**OPINION**

**ORDER GRANTING SUMMARY JUDGMENT**

Plaintiff Laurie Bradley brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981a, asserting claims for sexual harassment and retaliation. Following discovery, defendant moved for summary judgment on all claims. For the reasons set forth in this order, I grant the motion.

**Standard of Review**

*HN1*⚓Under the familiar standard, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) **[*2]** ; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *HN2*⚓The Eleventh Circuit has recognized that summary judgment frequently proves inappropriate in employment discrimination claims because they "often turn on an employer's motivation and intent." Chapman v. AI Transport, 229 F.3d 1012, 1025 (11th Cir. 2000) (en banc) (quoting Delgado v. Lockheed-Ga. Co., 815 F.2d 641, 644 (11th Cir. 1987)). However, "motivation and intent" are not at issue in this case. At issue here is the applicability of the single filing, equitable tolling, and continuing violation doctrines to undisputed facts. Accordingly, the summary judgment rules apply in this case just as in any other and "no thumb [will] be placed on either side of the scale." Id. at 1026.

**Relevant Facts & Procedural History**

Plaintiff began working for defendant Department of Transportation ("DOT") in May 1994. She worked originally as an administrative secretary, but was reassigned in February 1995 as an Administrative Assistant Level III for the Turnpike's Planning and Program Office in Tallahassee. The reassignment necessitated a move **[*3]** from the first to the third floor of the Turnpike Building. Her duties in the new position included the provision of secretarial and office support. She was subject to the direct supervision of Terry Denham, but provided secretarial and office support for a number of public information employees in the office, including Rudy Maloy, who was at the time a DOT Public Involvement Manager Level 4 in the Turnpike Office. Mr. Maloy had no unilateral power to hire, fire, or discipline plaintiff, though he certainly enjoyed greater authority than would a typical co-employee and, viewing the facts in favor of plaintiff, he had authority to assign her duties and judge her performance of those duties. It is during this time--from February to May 1996--that plaintiff alleges (and I assume for summary judgment purposes) that she was subject to unwelcome touching, kissing, and sexual innuendo by Mr. Maloy. [1]

**FOOTNOTES**

1 Naturally, all facts must be construed in favor of the plaintiff as nonmovant. In this instance, even if the court assumes outright the truth of plaintiff's substantive factual allegations, the result is the same. The disposition of this motion turns upon the application of legal principles to undisputed procedural facts that are distinct from the substantive allegations of harassment.

**[*4]** On May 28, 1996, plaintiff lodged a complaint concerning Mr. Maloy, prompting an investigation headed by Martie Taylor of DOT's Minority Programs Office (MPO). Ms. Taylor submitted in August 1996 a draft report to her supervisor Ruth Dillard. Ms. Taylor's draft report credited plaintiff's allegations; however, the final report issued by Ms. Dillard stated that the MPO was unable to conclude whether plaintiff's

allegations were well-founded. Plaintiff was apprised of Ms. Dillard's final determination and Ms. Dillard told plaintiff that plaintiff had the right to file a charge of discrimination with the FCHR or EEOC. Plaintiff was not told that Ms. Taylor's draft report had recommended a finding of "cause." Plaintiff sought reassignment within DOT and accepted a Level II position--a move that did not immediately reduce her pay, but which resulted over time in a relative pay reduction, denied her job opportunities available only to Level III employees, and otherwise stigmatized her with the "mark of 'demotion.'" In her new position plaintiff received all available legislative pay raises while receiving merit and other pay increases as well. Plaintiff did not file a complaint with the **[*5]** FCHR or EEOC prior to commencing this action.

In January 2001 plaintiff was notified by an interested citizen that Ms. Taylor's original MPO report had recommended a probable cause finding. Plaintiff filed this action on July 27, 2001. Plaintiff subsequently filed a charge with the EEOC and obtained a right-to-sue letter dated March 14, 2002. Her complaint was amended accordingly. The pleadings and papers leading to amendment of the complaint made plain that the plaintiff's claim would rely (for reasons that shall become apparent) upon the single-filing rule, the doctrine of equitable tolling, and a claim of continuing violation. Defendant moved for summary judgment on all claims, anticipating and addressing each of these legal doctrines. [2] Plaintiff responded, a hearing was held, supplemental briefing was requested, and the supplemental briefs were received and considered.

### FOOTNOTES

2 The defendant also made substantive Title VII summary judgment arguments that are not addressed given that summary judgment is granted on the procedural grounds.

## [*6] Motion for Summary Judgment

### A. Basis for Summary Judgment

The Defendant argues that plaintiff's claim is procedurally defective by virtue of its untimeliness and plaintiff's failure to exhaust administrative remedies. See 42 U.S.C. 2000e-5(e). Plaintiff candidly concedes that "though the events in this case occurred mostly in 1996, plaintiff did not file her EEOC charge until 2001." Plaintiff offers three theories to support her assertion that the action nevertheless is timely: (1) that her claims may be piggybacked to those of other DOT employees under the single-filing rule, (2) that DOT actively misled her concerning the validity of her charge such that the time for her to file her charge of discrimination was equitably tolled until she learned of the "actual" findings of the MPO's 1996 investigation, and (3) that plaintiff continues to suffer the adverse affects of her "demotion," which renders it a continuing violation under which "each pay day starts a new clock running until the pay inequity is remedied." For the reasons discussed below, I find none of these reasons sufficient to salvage plaintiff's failure to exhaust administrative **[*7]** remedies or to bring this action in an otherwise timely manner.

### B. The Single-Filing Rule

HN3 The single-filing rule permits a plaintiff to bootstrap her non-filed charge to a preexisting charge that was filed with the proper administrative body provided that "(1) the charge being relied upon [was] timely and not otherwise defective; and (2) the individual claims of the filing and non-filing plaintiffs [arose] out of similar discriminatory treatment in the same time frame." Calloway v. Partners Nat'l Health Plans, 986 F.2d 446, 449 (11th Cir. 1993). Plaintiff seeks to rely upon the charges filed by four non-party DOT employees during the time frame in which plaintiff suffered harassment.

It appears that each of the four complainants filed timely, non-defective charges of discrimination, thus satisfying the first element of the single-filing rule. [3] However, even cursory examination of the plaintiff's claim and those of the four complainants reveals that they did not arise from sufficiently similar discriminatory treatment. As plaintiff observes, each of the four filed gender discrimination charges of some description against a DOT higher-up; but that is where **[*8]** the similarities end. None of the four complainants worked in the same office as plaintiff (or the same district--the Turnpike District), while two of the four were located in other cities. Obviously, therefore, none worked with or otherwise accused Mr. Maloy of sexual harassment. Nothing in the charges relied upon suggests a collective sexual harassment problem, any nexus to Mr. Maloy specifically or, frankly, anything more than the coincidental fact that in an

organization the size of DOT, at least four charges of gender discrimination were pending between October 1995 and March 1997. Absent is any link between the plaintiff's claim and those upon which she relies.

**FOOTNOTES**

3 Incidentally, it appears that at least three of the four charges were brought within the same "time frame" as plaintiff's, i.e., no later than 300 days from a time in which plaintiff alleges harassment was occurring. See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1220 (11th Cir. 2001) (rearward scope or "time frame" of an ADEA opt-in is limited to those plaintiffs who allege discriminatory treatment within 300 days before the representative charge is filed). The Speed complaint, however, was brought prior to the first instance of harassment alleged by plaintiff and therefore cannot be relied upon. Id. at 1223-24 (forward scope or "time frame" of an ADEA opt-in class ends on the date the representative charge is filed). Given the absence of "sufficient similarity" between the plaintiff's claims and the charges upon which she relies, I have no occasion to determine whether the relied-upon charges must have been pending, either administratively or as legal actions, when this action was filed.

[*9] HN4 The circuit courts have employed varying methods to determine whether claims are sufficiently similar to permit piggybacking, with standards ranging from a showing of similar circumstances and temporal proximity to a requirement that the administrative charge relied upon have alleged discrimination against a class to which the subsequent claimant belongs. See generally Howlett v. Holiday Inns, Inc., 49 F.3d 189, 195 (6th Cir. 1995) (surveying various standards). But under even the broadest standard, "whether an administrative charge will suffice to permit piggybacking by subsequent plaintiffs . . . depends to a large degree on the type of work unit involved." Id. The Howlett court quotes the Second Circuit's decision in Tolliver v. Xerox Corp., 918 F.2d 1052 (2d Cir. 1990), which though of only persuasive authority in this circuit, is nonetheless relevant to the plaintiff's claim of sufficient similarity in this case:

> Where the grievances arise in a work unit of modest size . . . mere similarity of the grievances within the same general time frame suffices to permit the "single filing rule." . . . However, where the grievances are [*10] alleged to arise throughout a large group, the lack of conciliation of one individual grievance does not necessarily mean that conciliation efforts would be unavailing if the EEOC and the employer were alerted to the broad scope of the claim. Though we do not think the administrative claim in such circumstances need specify that the claimant purports to represent a class or others similarly situated, there must be some indication that the grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim. Such a claim alerts the EEOC that more is alleged than an isolated act of discrimination and affords sufficient notice to the employer to explore conciliation with the affected group.

Id. at 1058. A similar principle was at work in Hipp when the Eleventh Circuit noted that HN5 "the objective of the piggybacking rule is to allow non-filing plaintiffs to rely on the charges of filing plaintiffs when it would be a 'useless act' for the non-filing plaintiffs to file their own charges." Hipp, 252 F.3d at 1225 (quoting Grayson v. K-Mart Corp., 79 F.3d 1086, 1103 (11th Cir. 1996)). [*11] The plaintiff in this case cannot argue that the charges upon which she relies were so similar as to render her filing a "useless act." See also 4 Lex K. Larson, Employment Discrimination § 70.03[2][b] (2d ed. 2002) (discussing Calloway and suggesting that single-filing rule is appropriate only where "the other person's charge clearly identified the present plaintiff as a victim of the alleged discrimination, either individually or as a member of a class").

The rationale employed in Tolliver and Hipp is prompted by and in keeping with the larger purpose of the formal charge as a condition precedent: to give the employer prompt notice of a complaint against it and to give the EEOC an opportunity to attempt conciliation before a civil action is filed. Grayson, 79 F.3d at 1102-03; see also De Medina v. Reinhardt, 222 U.S. App. D.C. 371, 686 F.2d 997, 1012 (D.C. Cir. 1982) (applying single-filing rule in case against large employer where subsequent claim was so similar to initial charge that "no conciliatory purpose would be served by filing separate EEOC charges"). If the plaintiff at bar were permitted to bypass the administrative process, no meaningful [*12] administrative investigation or conciliation effort regarding her claims would ever occur, and the congressional intent to

require such procedures would be frustrated for, again, the process undertaken with respect to the complaints upon which she seeks to rely cannot be characterized as a substitute or proxy given the plain fact that the cases were not related in any way to her allegations.

Plaintiff argues that a number of cases have applied the single-filing rule in fact situations "much more disparate" than those at bar. Plaintiff cites but one Eleventh Circuit case, Alexander v. Fulton County, 207 F.3d 1303, 1333 (11th Cir. 2000), for this proposition, arguing that under Alexander a single-filing analysis need not "bother with details such as whether all charging parties worked on the same floor of the same building or complained about the same offender." Plaintiff ignores critical distinctions between Alexander and this case, however, the most obvious being that Alexander involved a class action "alleging a 'pattern or practice' of employment discrimination against white personnel . . . ." Id. at 1313. There is no suggestion in this case that the earlier **[*13]** complaints alleged a pattern or practice of sexual harassment of which the acts at issue were reflective, nor is there any serious question that a single filing would be appropriate were that in fact the case. But it is not.

Under the plaintiff's broad application of Alexander, the mere existence of a temporally proximate sex harassment claim pending at any DOT office within the state would qualify as sufficiently similar to permit piggybacking of any other gender discrimination claim by any other DOT employee. But for the temporal proximity requirement, this reading would render virtually every sex harassment claim ever filed within DOT as "sufficiently similar" to plaintiff's, for every claim will a fortiori involve harassment by a DOT employee and nearly all cases will allege supervisory misconduct. If these broad similarities were "sufficiently similar" to permit piggybacking, then the single-filing exception would have by now swallowed the legislative notice and administrative exhaustion rule. It has not. Plaintiff cites no other case, and I have found none, supporting such a broad reading of the single-filing rule. The other-jurisdictional cases cited by plaintiff are inapposite. **[*14]** [4]

## FOOTNOTES

[4] EEOC v. Huttig Sash & Door Co., 511 F.2d 453 (5th Cir. 1975) addressed the "sole issue" of "whether after the termination of a charging party's private suit the EEOC can bring suit predicated on, but not limited to, the same charge." Id. at 454. EEOC v. E.I. DuPont de Nemours & Co., 373 F. Supp. 1321 (D.C. Del. 1974) stands for the unremarkable and inapposite proposition that "the Commission need not confine itself to the particular symptom of discrimination identified by a charge if a reasonable investigation of that charge uncovers a root source of discrimination responsible for that and other violations of Title VII." Id. at 1336 (emphasis added). McBride v. Delta Airlines, 551 F.2d 113 (6th Cir. 1977) held that a district judge must not "restrict the scope of [a] class more narrowly than the ambit of the EEOC investigation that the individual's complaint might reasonably have been expected to stimulate." Id. at 115. Each of these cases involved "root" or system-wide problems of which the individual claim was reflective--a situation not present here. The same is true of the remaining cases cited by plaintiff, see Wheeler v. Am. Home Prods. Corp., 563 F.2d 1233 (5th Cir. 1977) (class members denied class status permitted to rely on single filing principle); Tolliver v. Xerox Corp., 918 F.2d 1052 (2d Cir. 1990) ("There must be some indication that the [relied upon] grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim."), except for Streeter v. Joint Indus. Bd., 767 F. Supp. 520 (S.D.N.Y. 1991), which involved "nearly identical patterns of sexual discrimination and harassment" and relied for its holding upon an earlier district court case involving allegations of "a system of discrimination." Id. at 524.

**[*15]** Finally, I note that [HN6] the law of this circuit has evolved from (1) allowing invocation of the single-filing rule by non-filing members of a class that has a named representative who filed a charge, to (2) allowing invocation of the single-filing rule by non-filing plaintiffs or interveners who have a co-plaintiff in the same action who filed a charge, to (3) allowing invocation of the single-filing rule in a lawsuit in which no plaintiff filed a charge but in which the plaintiff unsuccessfully attempted to intervene in an earlier action brought by a person who filed a charge. See Calloway, 986 F.2d at 450. While this may indicate a limited willingness to broaden the scope of the single-filing rule within reason, the plaintiff at bar urges upon this court a quantum expansion to embrace the rule under circumstances in which she failed to file a timely charge and never sought to intervene in an earlier lawsuit brought by a person who filed a charge. [5] If the single-filing rule can be invoked in these circumstances, then non-filers will be substantially better off

procedurally than persons who file timely administrative charges as contemplated by Title VII. This is because [*16] persons who file administrative charges will be required to file their lawsuits within 90 days after receiving a right-to-sue letter, whereas non-filers will be able to delay (apparently indefinitely), see whether the filers obtain a settlement or prevail at trial or on appeal, and only then decide whether to bring a lawsuit. Allowing this procedure would add a layer of delay that Congress sought to foreclose.

**FOOTNOTES**

5 Two of the four complainants relied upon, Cocalis and Speed, filed no legal action.

The upshot is that this is not a proper single-filing situation on the facts. Different DOT employees purportedly discriminated against the five persons at issue (the four administrative filers and the non-filing plaintiff in the case at bar) on separate occasions, for separate asserted reasons, and under distinct circumstances. Plaintiff does not suggest a common plan or other systemic nexus between these claims, and any administrative investigation or conciliation attempt necessarily would (and in fact did) look to [*17] the specific circumstances of each charge. The claims lack "sufficient similarity" to allow invocation of the single-filing rule.

Perhaps attuned to the tenuous factual similarities between the claims, plaintiff proffered at the hearing the novel argument that the cases were "sufficiently similar" not based upon the nature of the underlying harassment, but upon another common thread--the investigation in each of the claims. The court invited supplemental briefing on this point, which failed to produce any authority for the proposition that similarities among allegedly "rigged" investigative outcomes supports a piggybacking claim. Reflecting upon the purposes of the notice and administrative exhaustion requirements, I am equally unable to justify piggybacking on such a basis. Moreover, the investigation is not the "discriminatory treatment" at issue. HN7 Under Calloway, the litmus for piggybacking is whether the filing and non-filing plaintiffs arise out of similar "discriminatory treatment." Calloway, 986 F.2d at 449.

Were it otherwise, and were there some authority to extend the single-filing rule to similarities among the investigations conducted with regard to [*18] various claimants, the investigations here lack the requisite similarity. None of the four complainants received an "unsubstantiated" finding of the sort plaintiff received. In fact, two resulted in "cause" determinations; one was closed by the MPO after the EEOC failed to find "cause"; and the fourth (the Speed complaint, which did not arise in the same time frame as plaintiff's) was a non-harassment case that resulted in a finding of no cause. Thus, even if the plaintiff's allegations of a "whitewash" were credited and viewed as a form of retaliation (a proposition lacking any citation to legal authority), the single-filing theory would not salvage her claims.

**C. Equitable Tolling**

Plaintiff next relies on the doctrine of equitable tolling to salvage her admittedly tardy filing. More specifically, her argument embraces equitable estoppel--which requires an allegation of misconduct by the party against whom the doctrine is employed--and traditional equitable tolling--which refers to plaintiff's failure, despite due diligence, to obtain necessary information to file suit within the limitations period. See generally Browning v. AT&T Paradyne, 120 F.3d 222, 226 (11th Cir. 1997). [*19]

The thrust of plaintiff's argument is that Ms. Dillard "whitewashed" plaintiff's complaint against Mr. Maloy as evidenced primarily by the fact that Ms. Dillard, as Ms. Taylor's supervisor, rewrote Ms. Taylor's initial report so that the MPO ultimately deemed plaintiff's charges "unsubstantiated" rather than founded on probable cause. Anticipating the obvious argument that plaintiff "knew" she had been sexually harassed regardless of what conclusion Ms. Dillard or the MPO might draw, the plaintiff argues that she "knew" Mr. Maloy had harassed her in a sexual manner, but that she reasonably relied upon Ms. Dillard's expert (if "rigged") opinion that Mr. Maloy's behavior did not constitute "sexual harassment" in a technical, legal sense.

Plaintiff cites a number of cases condemning misleading statements by employers as a general matter, but conspicuously absent is any citation of authority that an internal investigator bears a duty to reveal a subordinate initial investigator's conclusions or anything other than the ultimate conclusions reached as a

result of the investigation. More important, it is formally undisputed on this record that "Ruth Dillard explained to plaintiff that they **[*20]** were not saying she [plaintiff] was not telling the truth, but that they could not make a determination based on the evidence," and that "Ruth Dillard also specifically advised plaintiff that she had other options and that she could go outside of DOT and file a charge of discrimination with FCHR and EEOC, and that if she did, there was a strict policy against retaliation." [6] Likewise, the plaintiff "knew that she had the option of filing charges of discrimination and a lawsuit, but consciously chose not to at that time because 'that turns my life in complete turmoil again, and the whole office into gossip chambers . . . .'" [7] It may be added that the acts that plaintiff alleges are garden variety sexual harassment, including allegations that Maloy gave her shoulder massages reaching toward her breasts, placed his hands on her waist and hips, hugged her, and "forcibly kissed her on the lips" and, later, on the cheek. Given plaintiff's actual knowledge of her right to file a formal charge of discrimination and her personal opinion that the acts constituted sexual harassment, it cannot be said that the employer lulled her into complacency merely by concluding that her claims lacked **[*21]** substantiating independent evidence.

## FOOTNOTES

[6] Plaintiff responded that this statement was "undisputed," though she characterized it as immaterial because the notice was not written. *HN8*Oral statements plainly are material to the issue of equitable tolling because "actual knowledge destroys any possible basis for applying the 'equitable tolling' doctrine . . . ." Ball v. Abbot Adver., Inc., 864 F.2d 419, 421 (6th Cir. 1988) (quoted approvingly in Santini v. Cleveland Clinic Florida, 232 F.3d 823, 825 (11th Cir. 2000)).

[7] Plaintiff formally disputes this statement, but only on grounds that she would have filed a timely charge if she had known of the initial probable cause finding. Plaintiff apparently would not dispute the substance of the statement to the extent it is relevant to prove actual knowledge of her rights.

Even if the report itself were "rigged" or the affair "whitewashed" as plaintiff alleges, plaintiff cannot avoid the fact that she was apprised of her right to file with **[*22]** the FCHR and EEOC and that she was armed with a general awareness of her substantive rights. This alone will bar application of the equitable estoppel and equitable tolling doctrines under McClinton v. Alabama By-Prods. Corp., 743 F.2d 1483 (11th Cir. 1984), in which the Eleventh Circuit held that an employer's failure to post a requisite notice of employee rights:

> will equitably toll the 180-day notification period, but only until the employee acquires *general* knowledge of his right not to be discriminated against on account of age, or the means of obtaining such knowledge. We do not think it necessary to toll the notification period up to the time that the employee obtains knowledge of his *specific* rights under the ADEA and/or the existence of the 180-day filing period. Once an employee suspects that he may have been discriminated against on account of age and is also generally aware of his legal right to obtain redress for that wrong, he possesses sufficient knowledge to enable him to vindicate his rights, if he so desires. *HN9*When an employee is generally aware of his rights, ignorance of specific legal rights or failure to seek legal advice should **[*23]** not toll the 180-day notification period.

Id. at 1486 (emphasis in original). While the plaintiff alleges that her employer overtly misled her, the undisputed facts show that she was armed with a suspicion that she had been sexually harassed and a general knowledge of her rights, including specific knowledge of her right to file (without fear of reprisal) a charge with the FCHR or EEOC. The doctrine of equitable tolling cannot save her claims under these circumstances. See also Carter v. West Publ'g Co., 225 F.3d 1258, 1265-66 (11th Cir. 2000) (equitable tolling denied where employer attempted to keep secret its discriminatory stock-awarding policies but "everybody knew" discrimination was occurring); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1435 (11th Cir. 1998) (ADEA charge-filing period might have been equitably tolled if plaintiff "had no reason to believe he was a victim of unlawful discrimination"); Ross v. Buckeye Cellulose, 980 F.2d 648, 660 (11th Cir. 1993) (same); Id. at 661 n.19 ("The inquiry into whether equitable concerns justify tolling the limitations period focuses **[*24]** on whether appellants knew or reasonably should have known that [the employer] operated in a discriminatory manner, not on whether appellants had enough evidence to prosecute successfully their disparate impact claims at trial."); Templeton v. W. Union Tel. Co., 607 F.2d

89, 91 (5th Cir. 1979) (finding employer's failure to advise employee of time limitations governing his right to sue irrelevant where employee had actual knowledge of his rights); Greene v. Loewenstein, Inc., 99 F. Supp. 2d 1373, 1380 (S.D. Fla. 2000) ("The period for filing a timely charge of discrimination begins to run when the facts that support the charge or apparent or should be apparent 'to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff.'") (quoting Ross, 980 F.2d at 660) (emphasis in original).

## D. Continuing Violation

The plaintiff's final argument is that her demotion and concomitant loss of income comprise a "continuing violation" that renders her filing timely. At a minimum, plaintiff argues, whether a continuing violation exists depends upon whether one views her demotion as a factually discrete **[*25]** event with continuing consequences or as an ongoing wrong.

*HN10*The Supreme Court recently held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106 (2002). However, in the hostile environment context, so long as an act contributing to the claim occurs within the filing period, "the entire time period of the hostile environment may be considered by a court for purposes of determining liability." Id. at 2074; see also Shields v. Ft. James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that the Court "essentially rejected the 'continuing violation doctrine' . . . allowing courts to view allegations of hostile work environment as 'a single unlawful employment practice'").

Plaintiff here alleges a discrete retaliatory act--her demotion. The continuing pay disparities are merely the lingering effects of that discrete act. *HN11*Continuing effects of prior discrimination are not actionable once the 300-day filing period has lapsed. Morgan, 122 S. Ct. at 2072 **[*26]** ("Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."); United States Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977) (otherwise neutral system that perpetuates effects of prior discrimination not actionable); Carter v. West Publ'g Co., 225 F.3d 1258, 1263-64 (11th Cir. 2000) ("The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful. . . . The emphasis is not upon the effects of earlier employment decisions; rather, it is upon whether any present violation exists.") (quoting Delaware State Coll. v. Ricks, 449 U.S. 250, 258, 101 S. Ct. 498, 504, 66 L. Ed. 2d 431 (1980)); see also Vitello v. Liturgy Training Publ'ns, 932 F. Supp. 1093, 1098 (N.D. Ill. 1996) (holding as a matter of law on motion to dismiss that "retaliation by demotion was in the nature of an isolated employment decision rather than a recurring act" which "had a degree of permanence that not only should have triggered [plaintiff's] awareness of and duty **[*27]** to assert his rights, but in fact did so . . . .").

Plaintiff correctly distinguishes the Evans line of decisions from those following Bazemore v. Friday, 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986). Plaintiff errs, however, in broadly asserting that under Calloway v. Partners National Health Plans, a case is necessarily a continuing violation case where "the present harm is reflected in the employee's paycheck." A finer distinction must be drawn. Namely, Calloway concerned an employer who *hired* plaintiff at a discriminatorily lower rate of pay and *continued* to pay her discriminatorily reduced wages. Calloway, 986 F.2d at 448. Accord Beavers v. Am. Cast Iron Pipe Co., 975 F.2d 792 (11th Cir. 1992) (failure to afford insurance for non-resident employee dependents a continuing violation because it is "the direct result of on-going policy").

The same is true of the only other case relied upon by plaintiff: Goodwin v. General Motors Corp., 275 F.3d 1005, 1010 (10th Cir. 2002). Goodwin concerned what it described as "disparities in pay" characterized by a minority employee receiving **[*28]** a "significantly lower salary than similarly-situated white employees." Id. at 1007. This was true from the date of her hire and was a fact that she "did not know about--and had no way of discovering." Id. at 1008. The Goodwin court cited Bazemore for the proposition, undoubtedly true, that "pay discrimination must be viewed as a continually recurring series of violations . . . ." Id. at 1010. But in this case there is no suggestion of pay *discrimination,* i.e., a structural disparity between plaintiff's pay and that of similarly situated employees, or even that the plaintiff's diminished pay rate is *itself* a product of ongoing retaliatory motives harbored by her employer. Instead, plaintiff points to a disparity between what she receives and what she would receive had she not been retaliated against--but this disparity is merely a lingering effect of the discrete and overt (and time-barred) retaliatory demotion.

The Bazemore decision itself concerned an employer who had not "'made all [its] employment decisions in a wholly nondiscriminatory way.'" 478 U.S. at 396 n.6 (Brennan, J., concurring) (adopted **[*29]** as Court opinion) (quoting Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 309, 97 S. Ct. 2736, 53 L. Ed. 2d 768 (1977)). At issue in Bazemore was the perpetuation of a systemically discriminatory pay structure, not a tangential diminution in pay resulting from a single, overtly discriminatory or retaliatory employment decision. It would ignore the very distinctions that separate Bazemore and Evans to hold that all "paycheck cases" fall under Bazemore.

The Bazemore opinion distinguished itself from Evans by the very fact that the Evans plaintiff "made no allegation that the seniority system itself was intentionally designed to discriminate." Bazemore, 478 U.S. at 396 n.6 (Brennan, J., concurring). Because there was no systemic discriminatory practice at the time the Evans plaintiff filed suit, "there simply was no violation of Title VII." Id. Likewise, the Bazemore opinion distinguished Hazelwood by the fact that in Hazelwood, the employer made its relevant employment decisions "in a wholly nondiscriminatory way." Id. Accord Delaware State Coll. v. Ricks, 449 U.S. 250, 258, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) **[*30]** (dismissal not a continuing violation where it is the inevitable effect of a prior discrete discriminatory decision to deny tenure). Also analogous to the facts here is the recent decision by the Eleventh Circuit in Carter. As described:

> Plaintiffs assert a single discriminatory act--West's discriminatory employee stock program-- followed by neutral, nondiscriminatory consequences--payment of dividends. The act of paying male employees a dividend flows from the inevitable consequence of West's allegedly discriminatory practice of offering only men the opportunity to purchase stock. . . . Even though West's distribution of dividends gave present effect to its alleged past discrimination, the payment of dividends did not constitute a continuing violation because it operated in a neutral manner. West distributed dividends to each shareholder, regardless of their gender, based on the amount of stock owned. This payment of dividends represents just the type of neutral act that Evans and Ross indicate is not a continuing violation, but a mere continuing effect.

Carter, 225 F.3d at 1265. Similarly, there is no allegation in this case that the DOT **[*31]** is perpetuating systemic discrimination in its pay structure or that each paycheck is cut to plaintiff with a wink and a retaliatory nod. Rather, she claims that a discrete retaliatory demotion of which she was painfully aware has resulted in a neutral and nondiscriminatory tangential diminution in her pay. That diminution in pay, and any other detriments associated with her demotion, are not motivated by any current intent to retaliate; they are the natural and neutral consequences of her re-positioning within the department. Plaintiff is treated in precisely the same manner as similarly situated employees whose position within DOT was not the result of retaliation. This can fairly be characterized only as a continuing effect of the sort more properly addressed under Evans, while the retaliatory demotion that I assume for present purposes to have occurred is on the order of a "discrete, discriminatory act" that would be time barred even if "related to acts alleged in timely filed charges." Morgan, 122 S. Ct. at 2072. Accordingly, plaintiff's claim is time-barred.

This result comports with the purpose of _HN12_ the continuing violation doctrine, which "does not exist **[*32]** to give a second chance to an employee who allowed a legitimate Title VII claim to lapse." Roberts, 835 F.2d at 800. There can be no dispute that the retaliatory act at issue here "was sufficiently permanent in nature so as to 'trigger an employee's awareness of and duty to assert his or her rights.'" Id. (quoting Berry v. Bd. of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983)). The doctrine thus is unavailable even if the pay diminution is viewed as a series of discrete acts because the employer "was able to injure [the employee] again only because she knowingly failed to exercise [her] rights." Id. at 801. The conclusion the Roberts court drew from these principles applies equally to this case: _HN13_ "[A] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." Id.

The record in this case reveals indisputably that plaintiff was aware of her demotion to a Level II position; indeed, plaintiff states that she "found the job herself." Plaintiff asserts that this demotion was **[*33]** involuntary in the sense that it was the lesser of two evils (between demotion and continuing to work for Mr. Maloy), but this observation is at best irrelevant to whether she was aware of her rights at the time, and, at worst, the ostensibly involuntary nature of the demotion fuels the argument that it should have "triggered [plaintiff's] awareness of and duty to assert [her] rights." Id. at 800; see also Vitello v. Liturgy

Training Publ'ns, 932 F. Supp. 1093, 1098 (N.D. Ill. 1996) (holding as a matter of law that "retaliation by demotion was in the nature of an isolated employment decision rather than a recurring act" which "had a degree of permanence that not only should have triggered [plaintiff's] awareness of and duty to assert his rights, but in fact did so . . . .").

HN14 The continuing violation doctrine, such as it remains following Morgan, "is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." Hipp, 252 F.3d at 1222; see also Martin v. Nannie & the Newborns, Inc., 3 F.3d 1410, 1415 n.6 (10th Cir. 1987) [*34] ("If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine . . . ."). Plaintiff's arguments not only fail to identify the distinction between Bazemore and Evans cases, but they fail to appreciate the underlying purpose of the continuing violation doctrine. The detriments plaintiff alleges as a result of her demotion--whatever those detriments may be--are as a matter of law the lingering effects of a prior retaliatory act. Accordingly, the continuing violation doctrine will not salvage her otherwise untimely complaints.

**Conclusion**

For these reasons,

IT IS ORDERED:

Defendant's motion for summary judgment (document 66) is GRANTED. The clerk shall enter judgment stating, "Plaintiff's claims are dismissed with prejudice." All other pending motions (documents 100 and 101) are DENIED AS MOOT. The clerk shall close the file.

SO ORDERED this 11th day of November, 2002.

Robert L. Hinkle

United States District Judge

Service: **Get by LEXSEE®**
Citation: **2002 US Dist LEXIS 27475**
View: Full
Date/Time: Wednesday, November 28, 2007 - 9:52 AM EST

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

\* Click on any Shepard's signal to Shepardize® that case.

**LexisNexis®**   About LexisNexis  |  Terms & Conditions  |  Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# *Daniels v. Mobile*

2005 U.S. Dist. LEXIS 44875, *

SHERITA DANIELS, Plaintiff, vs. MOBILE REGISTER, INC., a/k/a MOBILE PRESS REGISTER, INC., Defendant.

CIVIL ACTION NO 04-0832-L

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

2005 U.S. Dist. LEXIS 44875

June 24, 2005, Decided

**CORE TERMS:** notice, summary judgment, sexual harassment, formal charge, female, correspondence, human resources, resignation, signature, sexual harassment, race discrimination, attachment, verified, drafted, administrative remedies, sexually harassed, discriminatory act, box, relieved, employment practice, intake, reply, forwarded, sex, failed to exhaust, file a charge, allegations contained, moving party, questionnaire, transpired

**COUNSEL:** [*1] For Sherita Daniels, Plaintiff: Larry C. Moorer, LEAD ATTORNEY, Mobile, AL.

For Mobile Register, Defendant: Thomas M. O'Hara, LEAD ATTORNEY, McDowell Knight Roedder & Sledge, L.L.C., Mobile, AL.

**JUDGES:** KRISTI D. LEE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** KRISTI D. LEE

**OPINION**

**ORDER**

This matter is before the court on the following: defendant's motion for summary judgment and supporting brief (Docs. 5, 6); plaintiff's brief in opposition (Doc. 17), defendant's reply (Doc. 20) and plaintiff's response to motion for summary judgment and corrected affidavit (Docs. 22, 23) [1]

**FOOTNOTES**

[1] On May 25, 2005 the undersigned Magistrate Judge entered an order converting defendant's motion to dismiss to a motion for summary judgment and directing plaintiff to submit a corrected affidavit containing an original signature. (Doc. 21) See Griffith v. Wainwright, 772 F.2d 822, 825, n. 6 (11th Cir.1985), citing Barker v. Norman, 651 F.2d 1107, 1128-29 & n. 26 (5th Cir. Unit A 1981)(court has an obligation to allow the parties to remedy obvious defects in summary judgment materials)

[*2] The parties have previously executed their written consent to the exercise of jurisdiction in this action by a United States Magistrate Judge, in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, (Doc. 11) and the matter has been referred to the undersigned. (Doc. 12) The court having reviewed the briefs of the parties, along with the evidentiary submissions makes the following finding of facts and conclusions of law.

**I. Procedural History**

Plaintiff's complaint arises out of her employment with the Mobile Press Register. ("MPR"). On December

30, 2004 plaintiff filed the instant suit against defendants alleging, in sum, during the course of her employment by defendant she was sexually harassed by another employee of defendant on five occasions when the employee "rubbed her hands across Plaintiff's buttocks" (Doc. 1) [2] Plaintiff contends that she reported each incident to "supervisory personnel of the [defendant]" but that she was given no assistance in the matter. (Id.) Plaintiff further alleges that "[d]efendant has a policy of not assisting female employees when they complain of sexual harassment [*3] in the workplace" and seeks compensatory and punitive damages against defendant for its alleged actions. (Id.) Plaintiff further seeks reinstatement of her position "at full salary and benefits" along with a "a preliminary and permanent injunction enjoining the Defendant... from maintaining or continuing the policies, practices, customs, and usages of denying...or otherwise interfering with the Plaintiff's right to equal employment opportunities without discrimination." (Id.)

**FOOTNOTES**

2 Plaintiff's complaint includes a single count alleging sex discrimination/sexual harassment. (Doc. 1)

In response to plaintiff's complaint, defendant filed a motion to dismiss (which the court has now converted to a motion for summary judgment) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds, in sum, that (1) plaintiff failed to exhaust her administrative remedies, (2) that her complaint alleging sexual discrimination is not reasonably related to her EEOC [*4] charge alleging race discrimination and (3) that plaintiff's action is time barred because she failed to file her judicial complaint within ninety (90) days of her receipt of the EEOC's notice of right to sue letter. (Docs. 5, 6) On May 13, 2005 plaintiff filed a response in opposition to defendant's motion to dismiss along with an affidavit in support. (Doc. 17) On May 23, 2005, defendant submitted a reply brief with additional evidentiary submissions. (Doc. 20) On May 25, 2005 the court entered an order converting the defendant's motion to dismiss to a motion for summary judgment and allowing plaintiff ten days in which to submit any sur-reply along with a "cured" affidavit. (Doc. 21) On June 9, 2005 plaintiff submitted a response to defendant's reply brief, along with a corrected affidavit. (Docs. 22, 23) As set forth in detail below, upon consideration of all matters presented, and after reviewing the record in a light most favorable to the plaintiff, [3] the court determines that the defendant's motion for judgment as a matter of law is due to be **GRANTED.**

**FOOTNOTES**

3 The Court, when ruling on a motion for summary judgment, "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir.2004) (citations omitted).

## [*5] II. Factual Background

1. Plaintiff, Sherita Daniels was employed by the defendant from approximately April 25, 1977 until October 22, 2003. (Doc. 1)

2. Plaintiff alleges that on five occasions over a nine month period beginning in November 2002, Patricia Dougherty, an employee of defendant in the position of Accounts Payable Supervisor, "without plaintiff's consent rubbed her hands across plaintiff's buttocks." (Doc. 1, para. 8) Plaintiff states that after the incident she complained to both the Assistant Director and the Director of Human Resources but she was given "no assistance." (Id. at para. 9)

3. On October 8, 2003, plaintiff turned in her resignation and was relieved of her duties on October 10, 2003. [4] (Doc. 1) At the time of her resignation, plaintiff was employed as an Accounts Payable Bookkeeper. (Id.)

**FOOTNOTES**

4 Plaintiff asserts that she gave her two weeks notice on October 8, 2003 but was relieved of her duties on October 10, 2003. (Doc. 1)

4. On January 16, 2004 plaintiff sent **[*6]** a letter to the EEOC wherein she outlined the nature of the harassment allegations and requested "assistance in an investigation into the situation because I feel like justice should be done." (Doc. 1, attachment)

5. On January 29, 2004 in response to plaintiff's January 16, 2004 letter, the EEOC, wrote plaintiff informing her that "[t]he office has competed [sic] its analysis of your letter...[and] have determined that the facts presented...do not describe a violation of any statute enforced by this commission." (Doc. 20, Exhibit A) Specifically, plaintiff was advised that the EEOC found that plaintiff's allegations "failed to state a prima facie claim" and that "the harassment [as outlined in her letter] was not so pervasive and severe as to compel the resignation." (Id.) Finally, the EEOC instructed plaintiff that "regardless of the EEOC's assessment of the merits of

> your claim, you, nevertheless *have a right to file a charge of discrimination with this agency."
> "Should you elect to file a charge* the EEOC would exercise its statutory and regulatory authority to determine the scope of its investigation. Accordingly, we would elect not to investigate and would **[*7]** take no action other than immediate dismissal of such a charge for failure to describe a violation of Federal law." (Id.) (emphasis added)

6. Plaintiff responded to the EEOC's letter on February 21, 2004 as follows:

> In receipt of your letter explaining that the nature of my claim was not pervasive and severe, *I am filing a claim of discrimination claim [sic] because I am a African American female and Patricia Dougherty is a white female.* If it had been myself that had been reported for sexual harassment against a white person; I would have been terminated at that time.

> When I reported Patricia Dougherty to human resources for sexual harassment, it was not because she is white it was because she was wrong by touching me inappropriately in the workplace. I don't know if Patricia Dougherty is bisexual or not, all I know is that I am not bisexual or lesbian and do not choose to be and I do not find the touch of another female amusing.

(Doc. 20, Exhibit B) (emphasis added)

7. By letter dated March 15, 2004, the EEOC acknowledged receipt of plaintiff's February 21, 2004 letter as follows:

> We are in receipt of your correspondence received in this **[*8]** office whereby you have elected to file a complaint with the EEOC.

> In order for the Commission to complete action in this matter, it is necessary that we obtain a perfected charge executed by you under penalty of perjury. An appropriate charge has been drafted for your signature which satisfies the statutory and procedural requirements for the filing of a charge.

> Please date and sign each copy of the enclosed charge of discrimination in the lower left hand corner indicated by the X marks and return it the undersigned within 30 days of the date of this letter. If the executed charges are not returned within this time, the charge will be administratively closed for lack of a valid charge and no further action will be taken.

(Doc. 20, Exhibit C)

8. Based on plaintiff's allegations, the EEOC prepared a Charge of Discrimination and forwarded to plaintiff for her signature. On the charge form under the section entitled "Discrimination Based On" the box labeled "race" has been marked with an "x". [5] The body of the charge of discrimination states, in full, as follows:

I was employed with the above named employer from April 25, 1977 to October 22, 2003. I was sexually **[*9]** harassed by Patricia Dougherty, Accounts Payable Supervisor. I reported the incidents to Tammy Hall, Assistant Human Resources Director, who in turn reported it to Leigh Stringfellow, Director of Human Resources. No disciplinary action was taken against Patricia Dougherty, so I turned in my two weeks notice on October 8, 2003, and was relieved of my duties on October 10, 2003.

I am filing a claim of discrimination because I am an African American female and Patricia Dougherty is a White female. When I reported Patricia Dougherty to human resources for sexual harassment, it was not because she is White, it was because she was wrong by touching me inappropriately in the work place. I began to look for employment elsewhere.

I believe that I have been discriminated against because of my race, Black, which is in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 1, attachment)

**FOOTNOTES**

**5** The charge form identifies the following types of discrimination and directs complainants to "check appropriate box(es)": race, color, sex, religion, national origin, retaliation, age, disability, other. (Doc. 1, attachment)

**[*10]** 9. On April 8, 2004, plaintiff signed the charge of discrimination forwarded to her by the EEOC. (Doc. 1, attachment) The completed charge bearing plaintiff's signature was received by the EEOC on April 12, 2004. (Doc. 6, Exhibit E)

10. On April 20, 2004 the EEOC issued a Notice of Charge of Discrimination which it forwarded to the defendant. (Doc. 20, Exhibit E) The notice advises defendant that a "charge of discrimination has been filed against your organization under Title VII of the Civil Rights Act." (Id.) Under the heading "Circumstances of Alleged Discrimination" the box labeled "race" has been checked. (Id.)

11. The EEOC subsequently issued a Dismissal and Notice of Right to Sue. The notice is signed by an EEOC employee and dated April 21, 2004. (Doc. 6, Exhibit B)

12. Plaintiff received the Dismissal and Notice of Right to Sue from the EEOC on October 2, 2004. (Doc. 1, attachment) **6**

**FOOTNOTES**

**6** No explanation has been given by either party for the nearly six (6) month time lapse between the signature date on the Dismissal and Notice of Right to Sue and the date plaintiff contends that she received the notice. In support of her claim that she received the Notice of Right to Sue on October 2, 2004 plaintiff has attached to her complaint a copy of an envelope from the EEOC addressed to plaintiff and date stamped September 29, 2004. (Doc. 1, attachment) Defendant has not offered any argument in opposition. For the purposes of defendant's motion for summary judgment, the court takes plaintiff's allegations as true and resolves all reasonable inferences in favor of plaintiff. The court further notes that while plaintiff's complaint states that she received the Notice of Right to Sue on October 2, 2004, in her affidavit submitted in support of her brief in opposition, plaintiff maintains that she received the notice on October 3, 2004. (Docs. 1, 22)

**[*11]** 13. On December 30, 2004 plaintiff filed the instant suit against defendants alleging, in sum, that on five (5) separate occasions during the course of her employment she was subjected to sexual harassment by an employee of the defendant. (Doc. 1) Specifically, plaintiff alleges that "[o]n or about November 8, 2002, April 1, 2003, April 4, 2003, May 22, 2003 and August 5, 2003, Patricia Doughtery [an

employee of defendant] ...without Plaintiff's consent, rubbed her hands across Plaintiff's buttocks." (Id.) Plaintiff contends after each of the alleged incidents she reported the conduct to "supervisory personnel of the [defendant]"..." [however] [n]o assistance was given to [her] by Defendant [] concerning [the] complaints against Patricia Doughterty." (Doc. 1) Plaintiff alleges that "[d]efendant has a policy of not assisting female employees when they complain of sexual harassment in the workplace." (Id.) Plaintiff voluntarily resigned her employment on October 8, 2003.

14. On December 30, 2004 plaintiff filed the instant complaint against defendants alleging claims of sexual harassment and sexual discrimination. (Doc. 1)

15. On April 4, 2005, in response **[*12]** to plaintiff's complaint, defendant filed the instant motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds, in sum, as follows: (1) plaintiff failed to file a formal charge with the EEOC within 180 days of the last allegedly discriminatory act; (2) plaintiff's complaint alleging sexual harassment is not reasonably related to the untimely charge of discrimination based on race; and (3) the action is time-barred for plaintiff's failure to file the complaint within ninety (90) days of receipt of notice to sue. (Doc. 6)

### III. Summary Judgment Standard

In support of their respective briefs on defendant's motion to dismiss the parties have relied on documents outside the pleadings. While some of the documents referred to by the parties may be considered central to plaintiff's claim such that they could be considered part of the pleadings, plaintiff has also submitted an affidavit in support of her opposition brief. Under Rule 12(b)(6), where the Parties have presented "matters outside the pleadings," the court in its discretion may treat a Rule 12(b)(6) motion as a motion for **[*13]** summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b), 56; Jones v. Automobile Ins. Co. of Hartford, Conn., 917 F.2d 1528, 1532 (11th Cir.1990). Accordingly, the court has previously entered an order converting the motion to dismiss to a motion for summary judgment. (Doc. 21) See Fed.R.Civ.P. 12(b) [7]; Property Management & Investments, Inc. v. Lewis, 752 F.2d 599, 604 (11th Cir.1985) ("once the court decides to accept matters outside the pleading, it must convert the motion to dismiss into one for summary judgment").

### FOOTNOTES

[7] Rule 12(b) contains a conversion clause which provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b).

**[*14]** Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). [8] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id. "If the nonmoving party fails to makes 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))(footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to **[*15]** be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted). However, the mere existence of any

factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

**FOOTNOTES**

8 Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

[*16] With this legal framework in mind, the court now turns to the specific grounds upon which defendant bases its motion for summary judgment.

## IV. Failure to Exhaust Administrative Remedies

*Plaintiff's Letters to EEOC*

Defendant argues that plaintiff has not exhausted her administrative remedies based on sex since she failed to file a formal charge with the EEOC within 180 days of the last allegedly discriminatory act. (Doc. 6) Specifically, defendant argues that despite plaintiff's characterization of her January 16, 2004 letter to the EEOC as a "charge", it is, in fact, not a charge since it "does not meet the procedural or statutory requirements of a formal charge of discrimination" since it was not "verified" nor was it accepted by the EEOC as a charge. (Id.)

Plaintiff's complaint identifies her January 16, 2004 letter to the EEOC as a charge and maintains that thereafter, on April 8, 2004 she "signed a formal charge." (Doc. 1) Specifically, plaintiff contends that on January 16, 2004, she "filed a charge of sexual harassment with the [EEOC] and on April 8, 2004 signed a formal charge." (Id.) In support of her brief in opposition, plaintiff has submitted [*17] her affidavit wherein she states, in pertinent part:

> On or about January 16, 2004, I filed charges with the EEOC in Birmingham, AL asserting that I had been sexually harassed by Patricia Doughtery, an employee of the Defendant....I was advised by the EEOC that the complaint was received in its Birmingham office on January 29, 2004. After reviewing my charges, the EEOC drafted a Charge of Discrimination complaint and forwarded it to me for my signature.

(Doc. 22, Affidavit of Sherita Daniels) However, plaintiff's affidavit fails to mention the correspondence that ensued between plaintiff and the EEOC *after* her January 16, 2004 letter and *before* the EEOC completed the formal charge for her to execute in March 2004. 9

**FOOTNOTES**

9 The evidence before the court reflects that plaintiff corresponded with the EEOC on two occasions - January 16, 2004 and February 21, 2004. (Doc. 6, Exhibit D; Doc. 20, Exhibit B)

As a threshold matter, the court must first determine whether plaintiff's correspondence to [*18] the EEOC constitutes a "charge". "Prior to filing a Title VII action ... a plaintiff first must file a charge of discrimination with the EEOC." Gregory v. Georgia Dep't of Human Resources, 355 F.3d 1277, 1279 (11th Cir.2004). In order to obtain judicial consideration of a Title VII claim, the EEOC charge must be filed within 180 days after the last alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). The

purpose of this requirement that a plaintiff exhaust his administrative remedies prior to filing a judicial complaint is twofold. First, is the belief that the EEOC "should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." Gregory, 355 F.3d at 1279. Secondly, and equally important, is that the charge requirement serves to notify the employer of the allegations made against it. Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1319 (11th Cir.2001). See also Bost v. Federal Express Corp., 372 F.3d 1233, 1238-39 (11th Cir. 2004) (ADEA)("The filing **[*19]** of a charge of discrimination with the EEOC initiates 'an integrated, multi-step enforcement procedure' that enables the EEOC to detect and remedy various discriminatory employment practices" including the following steps: "(1) prompt notice from the EEOC to the employer that a charge has been filed; and (2) investigation of the charge by the EEOC.")

The EEOC regulations state that "[a] charge shall be in writing and signed and shall be verified" and should contain the following information: "(1) the full name, address, and telephone number of the person making the charge ...; (2) The full name and address of the person against whom the charge is made, if known ...; (3) A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices ...; (4) If known, the approximate number of employees of the respondent employer ...; and (5) A statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a state or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency." 29 C.F.R. § 1601.9 **[*20]** ; 29 C.F.R. § 1601.12(a). "Notwithstanding [the general rule], a charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Id. at § 1601.12(b).

Courts have grappled with the issue of what constitutes a "charge" for purposes of the EEOC. The determination of whether a document, *other* than a verified charge form, constitutes a "charge" sufficient to satisfy the exhaustion requirement, focuses on a common theme - - the nature of the information provided in the document and whether the EEOC treated the document in question as a "charge" and acted accordingly. See Bost v. Federal Express Corp., 372 F. 3d at 1240-41 (intake questionnaire, which the EEOC did not treat as a charge of discrimination, did not constitute an EEOC charge); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1319 (11th Cir.2001) (verified intake questionnaire *may* constitute a charge in limited instances); Moore v. Alabama State Univ., 945 F. Supp. 235, 239-240 (M.D.Ala. 1996) (letter **[*21]** to EEOC constituted proper charge, court specifically noted that "the EEOC stated in its January 22, 1996 letter to Plaintiff that she 'filed [her] charge on March 29, 1994'"); Brook v. City of Montgomery, Ala., 916 F. Supp. 1193, 1202 (M.D.Ala., 1996) (ADEA) (Two-page, type-written letter to the EEOC which was treated as a charge by the EEOC fulfilled the requirements of 29 C.F.R. § 1626.8(b)).

In Malone v. K-Mart Corp., 51 F. Supp.2d 1287, 1299 (M.D.Ala., 1999), the district court for the Middle District of Alabama held that a plaintiff's letter to the EEOC, together with attachments, constituted an EEOC charge. The court reasoned that the letter satisfied the requirements of 29 C.F.R. § 1601.12, conveyed plaintiffs present intent to file an EEOC charge, and was treated as a charge by the EEOC. Id. Similarly, in Wilkerson v. Grinnell Corp., the Eleventh Circuit Court of Appeals held that a verified intake questionnaire that included the basic information suggested by the EEOC may constitute a charge for purposes of the statute of limitations "when the circumstances of the case would convince **[*22]** a reasonable person that the charging party manifested her intent to activate the administrative process." 270 F.3d at 1321.

In the present case, plaintiff's January 16, 2004 letter to the EEOC identified defendant as her employer, identified the alleged harasser and included a description of the harassment. However, the letter was not verified. While the letter did not contain *all* of the information required under 29 C.F.R. § 1601.9; 29 C.F.R. § 1601.12, it was arguably sufficient. [10] However, the correspondence that transpired between the EEOC and plaintiff reveals that the EEOC did not consider plaintiff's January 16, 2004 letter to be a formal charge and it was not treated as such by the agency. (Doc. 20, Exhibit A) The EEOC did not draft a formal charge for plaintiff to execute based on the allegations contained in the January 2004 letter, nor is there any evidence that the EEOC notified plaintiff's employer of the allegations contained therein. See Bost v. Federal Express Corp., 372 F. 3d at 1240 (ADEA)("There is no evidence in the record that the EEOC did anything in response to Bost's intake **[*23]** questionnaire and affidavit. The EEOC did not send a notice of a charge ... Instead, the EEOC sent notice of a charge of discrimination only after Bost filed his formal charge....") Rather, the EEOC informed plaintiff that it did not believe the allegations contained in the letter stated a claim and advised that if she chose to file a charge based on *those* allegations the agency would

issue an immediate dismissal. (Doc. 20, Exhibit A) Plaintiff then submitted a *second* letter on February 21, 2004 wherein she acknowledges the EEOC's evaluation of her January letter indicating that the basis of her claim was, in fact, race discrimination. (Doc. 20, Exhibit B) After receiving this second letter from plaintiff, the EEOC drafted a formal charge based on plaintiff's claim of racial discrimination and returned it to plaintiff for her signature. (Doc. 20, Exhibit C)

**FOOTNOTES**

10 For example, plaintiff did not include her telephone number or the address of the defendant.

There is no evidence before the court that the EEOC **[*24]** considered plaintiff's January 2004 letter to be a charge. Rather, the record supports a contrary interpretation. After reviewing the January 2004 letter, the agency advised plaintiff that her allegations were insufficient and if she elected to file a charge based on *those* allegations the EEOC would issue an immediate dismissal. No other action was taken by the EEOC in response to plaintiff's January 2004 letter. Accordingly, the court finds that plaintiff's January 2004 letter to the EEOC does not constitute a formal charge. However, the court reaches the opposite conclusion with respect to plaintiff's February 2004 letter wherein plaintiff alleges, for the first time, that her complaints are based on race. (Doc. 20, Exhibit B) In response to plaintiff's second letter, the EEOC drafted a Charge of Discrimination which was forward to plaintiff for her signature. (Doc. 20, Exhibits C, D) Moreover, in the March 15, 2004 transmittal letter to plaintiff, the EEOC stated: "We are in receipt of your correspondence received in this office whereby *you have elected to file a complaint with EEOC.*" (Doc. 20, Exhibit C) (emphasis added). Plaintiff was advised that the enclosed charge "satisfies **[*25]** the statutory and procedural requirements for the filing of a charge" and plaintiff was instructed to sign and date the charge and "return it to the [EEOC] within 30 days of the date of this letter." (Id.) Upon receipt of the executed charge the EEOC then notified defendant of the charge and issued a Dismissal and Notice of Right to Sue. (Doc. 20, Exhibit E; Doc. 6, Exhibit B) Thus, in light of the correspondence that transpired between plaintiff and the EEOC, the court finds that plaintiff's February 2004 letter was treated as a complaint by the EEOC. 11 The defect in the letter - namely the lack of verification, was "cured" when plaintiff signed and returned the "perfected" charge to the EEOC pursuant to the agency's instructions. See Moore v. Alabama State University, 945 F. Supp. at 240. 12

**FOOTNOTES**

11 Plaintiff argues that her January 2004 letter was a "charge" and that any deficiencies were subsequently "cured" when she signed the formal charge of discrimination prepared by the EEOC. (Doc. 17) However, plaintiff does not make this argument with regard to her February 2004 letter. In fact, plaintiff first acknowledges the February 2004 letter in her sur-reply wherein she states: "In Plaintiff's 2/21/04 letter to the EEOC, Plaintiff informed EEOC that her charges against Patricia Dougherty were based on the fact that she had been sexually harassed by her, and not because she was white." (Doc. 22) While the court is mindful that its function is not to be an advocate on behalf of either *represented* party in this action, it would be remiss if it failed to consider all the evidence presently before it on defendant's motion for summary judgment.

The EEOC regulations provide that a charge may be amended to cure any technical defects or omissions. 29 C.F.R. § 1601.12(b) provides, in relevant part, that:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12(b). **[*26]**

12 The Code of Federal Regulations provides that "'a charge is sufficient when the Commission receives

from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" Edelman, 535 U.S. at 110 n. 2, 122 S.Ct. at 1148 n. 2 (quoting 29 C.F.R. § 1601.12(b)(1997)). An unverified but otherwise valid charge may be verified after the time for filing a charge has expired. Id. at 1151-52.

*Timeliness of Charge*

Having determined that plaintiff's February 2004 letter constitutes a charge, the court now turns to the timeliness issue. It is undisputed that plaintiff tendered her resignation on October 8, 2003. Plaintiff maintains that she gave two weeks notice in her resignation but that she was "relieved" of her duties on October 10, 2003. (Doc. 1) Defendant argues that the date of the last discriminatory act would be the date plaintiff tendered her resignation and not her last day of employment. (Doc. 6, p. 5) Plaintiff's formal EEOC charge **[*27]** indicates that the last allegedly discriminatory act occurred on October 10, 2003. (Doc. 20, Exhibit D)

In order to be considered timely, plaintiff's discrimination charge needed to be filed within 180 days of the last allegedly discriminatory act. Assuming October 10, 2003 was the date of the last allegedly discriminatory act, plaintiff's charge would need to be filed on or before April 8, 2004 in order to be deemed timely. **13** The court finds that plaintiff's February 2004 letter constituted a Charge of Discrimination and the verified Charge received by the EEOC on April 12, 2004 relates back to the date of the February 2004 letter. See 29 C.F.R. § 1601.12(b). Montgomery v. Atlanta Family Restaurants, Inc., 752 F. Supp. 1575, 1580 (N.D. Ga. 1990)(holding that plaintiff's attorney's letter which manifested an intent to activate Title VII's machinery constituted a charge of discrimination which was timely filed and therefore, the charge subsequently signed by plaintiff relates back to the date of the original charge) Thus, the court need not reach the issue of whether the limitations period began to run on the date plaintiff tendered **[*28]** her resignation or on the last day of her employment. Accordingly, plaintiff's charge of discrimination filed on February 21, 2004 was filed well within the 180 day time period.

**FOOTNOTES**

**13** The court need not address defendant's argument that the 180 day period began running on the date plaintiff tendered her resignation since the court has concluded *infra* that a valid charge was filed in February 2004.

**V. Reasonably Related**

Having concluded that plaintiff's EEOC charge was timely filed, the court now addresses the issue of whether the EEOC charge signed by plaintiff on April 8, 2004 and received in the offices of the EEOC on April 12, 2004, is reasonably related to the claim of sexual harassment alleged in plaintiff's judicial complaint.

Defendant argues that plaintiff failed to exhaust her administrative remedies as to her sexual harassment claims since her EEOC charge identifies her claim as being based solely on race. Specifically, defendant argues that plaintiff's EEOC charge alleges a claim **[*29]** "solely [for] race discrimination" and "[plaintiff's] complaint makes claims of sex discrimination and sexual harassment that are not reasonably related to the allegations of race discrimination made in her April 12, 2004 EEOC charge." (Doc. 6, p. 8)

Plaintiff argues that "at all relevant time [she] was of the opinion she had filed a charge of sexual harassment." (Doc. 22) While plaintiff does not contest the fact that she read and signed the charge form prepared by the EEOC, she maintains that "she would have sought to amend the complaint form if she had know the information placed on it by the EEOC was not in support of a sexual harassment charge." (Doc. 17) Notwithstanding the correspondence between plaintiff and the EEOC she argues that she "has labored under the honest belief she had filed a sexual harassment claim, and that she had exhausted her administrative remedies pertaining to same." (Doc. 22) **14**

**FOOTNOTES**

**14** It is unclear whether plaintiff was proceeding *pro se* at the time she was corresponding with the EEOC. Regardless of her status, plaintiff may not absolve herself of any responsibility regarding the content of the EEOC complaint. Plaintiff's correspondence with the EEOC in January and February indicates that she has an understanding of the process and of her rights under the discrimination statutes. See McNight v. Dormitory Auth., 995 F. Supp. 70, 77 n. 2 (N.D.N.Y.1998)(the court did not include as part of the charge allegations contained in a letter plaintiff presented to the state human rights agency intake officer, who allegedly used the letter to draft the charge signed by plaintiff. The court reasoned plaintiff presumably read the charge and concluded even an unrepresented person should have amended the charge to make it accurate before signing it.)

**[*30]**  While a plaintiffs complaint is generally "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination" the Eleventh Circuit has held that courts must be "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." Gregory, 355 F.3d at 1280 (internal citation omitted). "Charges filed with the EEOC must be liberally construed because they are made by persons who are unfamiliar with the technicalities of formal pleadings and who usually do not have the assistance of an attorney." Tillman v. City of Boaz, 548 F.2d 592, 593 (5th Cir.1977) **15**

**FOOTNOTES**

**15** Decisions of the former Fifth Circuit rendered prior to October 1, 1981 constitute binding authority in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The Eleventh Circuit Court of Appeals has held that "[a] plaintiff's charge filed with the EEOC need not be identical **[*31]** to the subsequently filed judicial action." See Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir.1989); Liberti v. Walt Disney World Co., 912 F. Supp. 1494, 1502 (M.D.Fla.1995). "As long as the allegations in the judicial complaint and proof are "reasonably related" to charges in the administrative filing and "no material differences" between them exist, the court will entertain them....[j]udicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review [are] not appropriate." Wu, 863 F.2d at 1547 (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970)). A claim is deemed to be reasonably related to an underlying EEOC charge of discrimination when the allegations fit within any of the following categories: (1) the claim was expressly raised in the pleadings before the EEOC's administrative law judge; (2) the claim might reasonably be expected to be considered in a diligent investigation of those issues expressly raised in the EEOC charge; or, (3) **[*32]** the claim was in fact considered during the EEOC investigation. Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir.1985).

In her sur-reply, plaintiff acknowledges, for the first time, her additional correspondence with the EEOC. **16** Plaintiff contends that in her February 21, 2004 letter to the EEOC she "informed EEOC that her charges against Patricia Dougherty were based on the fact that she had been sexually harassed by her, and not because she was white." (Doc. 22) While plaintiff's February 2004 letter to the EEOC does discuss the sexual harassment allegations, plaintiff also acknowledges receiving the "letter [from the EEOC] explaining that the nature of my claim was not pervasive and severe" and states that she is *"filing a claim of discrimination claim [sic] because I am a African American female and Patricia Dougherty is a white female. If it had been myself that had been reported for sexual harassment against a white person; I would have been terminated at that time."* (Doc. 20, Exhibit B) (emphasis added) A reasonable interpretation of plaintiff's letter is that, upon learning that the EEOC found no merit in her sexual harassment allegations, she resubmitted **[*33]** her allegations and changed her theory of discrimination to one based on race.

**FOOTNOTES**

**16** The February 21, 2004 letter from plaintiff to the EEOC was submitted by defendant in support of its

reply brief filed with the court on May 23, 2005. (Doc. 20, Exhibit B)

After receiving plaintiff's February 21, 2004 letter, the EEOC drafted the following charge which was forwarded to plaintiff for her signature: [17]

> I was employed with the above named employer from April 25, 1977 to October 22, 2003. I was sexually harassed by Patricia Dougherty, Accounts Payable Supervisor. I reported the incidents to Tammy Hall, Assistant Human Resources Director, who in turn reported it to Leigh Stringfellow, Direct of Human Resources. No disciplinary action was taken against Patricia Dougherty, so I turned in my two weeks notice on October 8, 2003, and was relieved of my duties on October 10, 2003.

> I am filing a claim of discrimination because I am an African American female and Patricia Dougherty is a White female. When I reported **[*34]** Patricia Dougherty to human resources for sexual harassment, it was not because she is White, it was because she was wrong by touching me inappropriately in the work place. I began to look for employment elsewhere.

> I believe that I have been discriminated against because of my race, Black, which is a violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 1, attachment) On the charge form under the section entitled "Discrimination Based On" the box labeled "race" has been marked with an "x". (Id.) [18]

**FOOTNOTES**

[17] The charge drafted by the EEOC incorporates information contained in both of plaintiff's letters to the EEOC in January 2004 and February 2004.

[18] The court is mindful that "the failure to place a check mark in the correct box is [not] a fatal error [and] [i]n the context of Title VII, no one--not even the unschooled-- should be boxed out." Sanchez v. Standard Brands, Inc., 431 F.2d 455 at 463. Accordingly, the court's conclusion regarding the scope of plaintiff's EEOC complaint does not hinge on this technicality, but, rather, is based on the context of the correspondence that transpired between plaintiff and the EEOC, the Charge of Discrimination, the Notice of Discrimination and the Dismissal and Notice of Right to Sue.

**[*35]** Plaintiff signed the charge as drafted and returned it to the EEOC. Upon receiving plaintiff's perfected charge, the EEOC issued a Notice of Charge of Discrimination to defendant and issued a Dismissal and Notice of Right to Sue to plaintiff. (Doc. 20, Exhibit E; Doc. 6, Exhibit B) After receiving a Notice of Right to Sue, plaintiff filed a judicial complaint against defendants alleging a claims of sexual harassment. The complaint alleges, in pertinent part, as follows:

> 8. On or about November 8, 2002, April 1, 2003, April 4, 2003, May 22, 2003 and August 5, 2003, Patricia Dougherty, at all relevant times employed by Defendant Mobile Register as an Accounts Payable Supervisor, without Plaintiff's consent, rubbed her hands across Plaintiff's buttocks.

> 9. After each said unconsented to touching by Patricia Dougherty, Plaintiff complained to supervisory personnel of the Defendant Mobile Register, in particular to Tami Hall, Assistant Human Resources Director for the Defendant Mobile Register and to Leigh Stringfellow, Director of Human Resources for the Defendant Mobile Register. No assistance was given to Plaintiff by Defendant Mobile Register concerning Plaintiff's complaints **[*36]** against Patricia Doughtery.

> 10. As a direct an proximate result of being sexually harassed by Patricia Dougherty, and the Defendant Mobile Register having provided no assistance to Plaintiff concerning her complaints, on or about October 8, 2003 Plaintiff turned in her resignation and was relieved of her duties at

Defendant Mobile Register October 10, 2003.

(Doc. 1)

Defendant argues that plaintiff's EEOC charge "would not have prompted the EEOC to investigate claims that MPR allegedly engaged in sex discrimination and sexual harassment of all of its female employees." (Doc. 6, p. 10) While the EEOC charge does include some information relating to the alleged sexual harassment, it states *unequivocally* that it is based on race. (Doc. 20, Exhibit D) Moreover, the Notice of Charge of Discrimination issued by the EEOC advises defendant that a "charge of discrimination has been filed against your organization under Title VII of the Civil Rights Act." (Doc. 20, Exhibit E) Under the heading "Circumstances of Alleged Discrimination" the box labeled "race" has been checked. (Id.) [19]

**FOOTNOTES**

[19] See ftnt. 17.

[*37] In the present case, there is no reason to believe that conduct constituting sexual harassment would have fallen within the scope of the investigation of plaintiffs charge of race discrimination. Thus, the court finds that plaintiff's sexual harassment allegations are not reasonably related to the EEOC charge alleging race discrimination. See Terrell v. McGuire, 2003 U.S. Dist. LEXIS 16751, 2003 WL 22213132 (D.Kan., August 27, 2003)(unexhausted sexual harassment claim is not reasonably related to plaintiff's claim of race discrimination); Crawford v. Bank of America, 986 F. Supp. 506, 508 (N.D.Ill., 1997) (finding allegation of race discrimination not like or reasonably related to sexual harassment); Lee v. Junior College Dist., 1995 WL 363723 (E.D. Mo. Mar 08, 1995), aff'd 91 F.3d 148 (8th Cir. 1996)(Table) (same). The court's finding is bolstered by the correspondence that transpired between plaintiff and the EEOC. The EEOC had previously addressed plaintiff's sexual harassment allegations advising that the agency had read her allegations and concluded that she failed to present a prima facie case. While the EEOC advised plaintiff of her right [*38] to file a complaint based on those claims, she was told that if she chose to do so, the agency would issue and immediate dismissal. (Doc. 6, Exhibit A) Plaintiff then submitted a second letter to the EEOC wherein she predicated her allegations on race. After receiving this second letter, the EEOC then drafted a charge based on plaintiff's allegations of racial discrimination.

Because of the significant discrepancy in theory between plaintiff's EEOC charge and her complaint in district court, the Court concludes that the claim in plaintiff's district court complaint is not "like or related" to the claim alleged in her EEOC charge. Plaintiff's claim of sexual harassment is beyond the scope of her EEOC charge. Since plaintiff failed to exhaust the required administrative procedures for a sexual harassment claim, and as her time for filing an EEOC charge for that claim has expired, the Court finds that summary judgment is due to be granted in favor of the defendant.

**CONCLUSION**

In the final analysis, the court finds that plaintiff has failed to exhaust her administrative remedies relating to the sexual harassment claim contained in her complaint and therefore, the court lacks [*39] subject matter jurisdiction over her claim of sexual harassment. Accordingly, defendant's motion for summary judgment is **GRANTED.**

**DONE and ORDERED** this the 24<th> of June 2005.

/s/ Kristi D. Lee

**UNITED STATES MAGISTRATE JUDGE**

**JUDGMENT**

In accordance with the Order entered on this date on Defendant's motion for summary judgment and supporting brief (Docs. 5, 6); Plaintiff's brief in opposition (Doc. 17), Defendant's reply (Doc. 20) and Plaintiff's response to motion for summary judgment and corrected affidavit (Docs. 22, 23), in which the

court entered judgment in favor of Defendant as to all claims alleged against in Plaintiff's complaint; it is hereby **ORDERED, ADJUDGED** and **DECREED** that Plaintiff's action be and is hereby **DISMISSED** with prejudice.

**DONE** and **ORDERED** this the 24<th> day of June 2005.

/s/ Kristi D. Lee

**UNITED STATES MAGISTRATE JUDGE**

Service:  **Get by LEXSEE®**
Citation:  **2005 US Dist. LEXIS 44875**
View:  Full
Date/Time:  Monday, November 19, 2007 - 1:39 PM EST

\* Signal Legend:

● - Warning: Negative treatment is indicated

Ⓠ - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment

◆ - Positive treatment is indicated

Ⓐ - Citing Refs. With Analysis Available

❶ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

 LexisNexis®  About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# *Evans v. Pemco Aeroplex, Inc.*

*1998 U.S. Dist. LEXIS 22954, ***

ELLIOT EVANS, Plaintiff, vs. PEMCO AEROPLEX, INC., Defendant.

Civil Action No. CV96-S-2801-S

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

1998 U.S. Dist. LEXIS 22954

February 20, 1998, Decided
February 23, 1998, Filed, Entered

**DISPOSITION:** **[*1]** Defendant's motion for summary judgment granted, and all claims of plaintiff dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employee filed a suit against defendant employer for discrimination on the basis of his race and disability under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 24 U.S.C.S. § 2000e et seq., the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.S. § 12101 et seq., and 42 U.S.C.S. § 1981. The United States District Court granted summary judgment for the employer. The employee appealed.

**OVERVIEW:** The employee was a diabetic and unable to work at heights. He was assigned work as an aircraft cleaner, which required work at heights, and he filed a discrimination charge with the Equal Employment Opportunity Commission. He was later placed on medical leave until a position was created to accommodate him. The employee argued summary judgment was improper. The court held summary judgment was proper because there were no factual issues as to the (1) ADA claim as there was no direct evidence of a discriminatory attitude by the employer correlating to his alleged disability; and (2) the employee was not disabled because there was no evidence of the nature of the diabetes, which did not substantially limit any major life activity, and he did not have a record of a substantially limiting impairment under 42 U.S.C.S. § 12102 (2)(C). The Civil Rights Act of 1991, 24 U.S.C.S. § 2000e et seq., was not violated because there was no disparate treatment; several alleged harassment incidents were not severe or pervasive enough to create a hostile work environment; and the acts of other employees could not be imputed to the employer, who did not have actual or constructive notice thereof.

**OUTCOME:** The court affirmed the district court's grant of the employer's summary judgment motion.

**CORE TERMS:** impairment, deposition, disability, summary judgment, harassment, climbing, heights, diabetes, hostile, supplied, pervasive, walking, prima facie case, work environment, duration, average persons, retaliation, performing, mellitus, severe, climb, rack, general population, discriminatory, constructive, depainter, disabled, genuine, noose, disparate treatment

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Supporting Materials > Affidavits
*HN1* Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. A moving party discharges this burden by showing or pointing out to the court that there is an absence of evidence to support the non-moving party's case. Fed. R. Civ. P. 56 permits the movant to

discharge such burden with or without supporting affidavits. When a moving party has discharged its burden, a non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule
Civil Procedure > Summary Judgment > Evidence
*HN2* In deciding whether a moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in such party's favor. Inferences in favor of a non-movant are not unqualified. Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment. Evidence that is merely colorable, conclusory, or conjectural does not create a genuine issue of material fact.

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
*HN3* If a reasonable fact-finder evaluating the evidence can draw more than one inference from the facts, and if such inference introduces a genuine issue of material fact, then the court should not grant summary judgment. A genuine dispute about a material fact exists if the evidence is such that a reasonable jury could return a verdict for a nonmoving party. The bottom line is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Civil Rights Law > General Overview
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens
*HN4* To establish a prima facie case of discrimination under the Americans with Disabilities Act, a plaintiff must demonstrate: (1) that he has a disability; (2) that he is a qualified individual, that is, that he can perform the essential functions of the job position he holds or seeks, with or without reasonable accommodation being made by an employer, 42 U.S.C.S. § 12111(8); and, (3) that he was discriminated against because of his disability. 42 U.S.C.S. § 12132. A plaintiff must show that an employer had actual or constructive knowledge of his disability.

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
*HN5* See 42 U.S.C.S. § 12111(8).

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
*HN6* See 29 C.F.R. § 1630.2(m).

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > General Overview
*HN7* The Americans with Disabilities Act defines the concept of disability in a manner that includes any individual: (A) who has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; or (B) who has a record of such an impairment; or (C) who is regarded as having such an impairment. 42 U.S.C.S. § 12102(2). When applying such definition, three questions must be asked: (1) is the condition an impairment?; (2) does the impairment substantially limit a major life activity?; and (3) what qualifies as a major life activity?

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Enforcement
Governments > Legislation > Interpretation
Labor & Employment Law > Discrimination > Disability Discrimination > Enforcement
*HN8* Courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission for guidance when interpreting the Americans with Disabilities Act. An agency's interpretation of a statute it is charged with enforcing should be given considerable weight, and should not be disturbed unless it appears from the statute or legislative history that Congress

intended a different construction.

Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview
Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
*HN9*⚓The Equal Employment Opportunity Commission's administrative interpretations of the Americans with Disabilities Act define a physical impairment as including: (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine. 29 C.F.R. § 1630.2(h)(1).

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities
*HN10*⚓A physical impairment, standing alone, is not necessarily a disability as contemplated by the Americans with Disabilities Act (ADA). The ADA requires that the impairment substantially limit one or more of an individual's major life activities.

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
*HN11*⚓The definitions of major life activity and substantial limitation are closely allied. Major life activities are the basic activities that average persons can perform with little or no difficulty, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. Substantially limits means either the total inability or a severe restriction on the ability to perform a major life activity, in terms of condition, manner, or duration, as compared to the general population. The determination of whether an individual is disabled depends on the effect the impairment has on a particular individual's life, and not simply on the name or diagnosis of the impairment. 29 C.F.R. §§ 1630.2(i), 1630.2(j)(1).

Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > General Overview
*HN12*⚓Equal Employment Opportunity Commission includes walking and working among its lists of those functions constituting major life activities. For example, 29 C.F.R. § 1630.2(i) provides that major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i) provides that the term major life activities adopt the definition of the term major life activities found in the regulations implementing section 504 of the Rehabilitation Act, codified at 34 C.F.R.§ 104. Major life activities are such basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. The list is not exhaustive. Other major life activities include, but are not limited to, sitting, standing, lifting, reaching. 29 C.F.R. pt. 1630, app. § 1630.2(i), at 402.

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities
*HN13*⚓Climbing is not a basic, necessary function and the court does not consider it to qualify as a major life activity under the Americans with Disabilities Act.

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > General Overview
*HN14*⚓The phrase "substantially limits" refers to an individual who is: (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a

particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). The Equal Employment Opportunity Commission instructs that the following factors should be considered in determining whether a particular individual is substantially limited in a major life activity: (i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
*HN15*⚓When individuals claim that they are substantially limited in the major life activity of working, their condition must significantly restrict their ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities.

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
*HN16*⚓The following factors, along with those listed in 29 C.F.R. § 1630.2(j), should be considered in regard to a claim that an individual is substantially limited in the major life activity of working: the geographical area to which an individual has reasonable access; the job from which an individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region, from which an individual is also disqualified because of the impairment, broad range of jobs in various classes. 29 C.F.R. § 1630.2(j)(3)(ii)(A), (C).

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Regarded With Impairment
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > General Overview
*HN17*⚓The Equal Employment Opportunity Commission's interpretive guidance lists three different ways in which an individual may satisfy the definition of being regarded as having a disability: (1) an individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment; (2) an individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or (3) an individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment. 29 C.F.R. pt. 1630, app. § 1630.2(1), at 404.

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
*HN18*⚓In order to carry the burden of establishing that a defendant regarded him as substantially limited from working, a plaintiff must present evidence, expert or otherwise, relating to his vocational skills or training, the geographical area to which he has access, or the number and type of jobs which demand similar training from which he would also be disqualified because of his disability.

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview
*HN19*⚓An impairment does not substantially limit the ability to work merely because it prevents a person from performing either a particular specialized job or a narrow range of jobs. Nor does the inability to perform a single, particular job constitute a substantial limitation in the major life activity of working.

Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Disparate Treatment > Statutory Application > Americans With Disabilities Act
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview
*HN20*⚓To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected

expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action.

Civil Rights Law > General Overview
Labor & Employment Law > Affirmative Action > General Overview
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
*HN21* To establish a claim for a racially hostile work environment, a plaintiff must show that he: 1) belongs to a protected class; 2) is subjected to unwelcome harassment; 3) the harassment is based on his race; 4) the harassment affects a term, condition, or privilege of his employment, in that it was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment; and 5) respondeat superior.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Amendments
*HN22* Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond the purview of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 24 U.S.C.S. § 2000e et seq. In evaluating whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, courts must examine the totality of circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Torts > Vicarious Liability > Employers > General Overview
*HN23* Where an employee seeks to hold his employer directly liable for the acts of co-employees, he must show an employer knew or should have known of the alleged acts and failed to take prompt remedial action. A plaintiff can prove an employer's knowledge of harassment by showing that she complained to higher management. A plaintiff also can prove an employer's knowledge by showing that the harassment was pervasive enough to charge an employer with constructive knowledge.

Business & Corporate Law > Agency Relationships > Types > Employee & Employer
Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements
Torts > Vicarious Liability > Employers
*HN24* An employer may be indirectly liable for the acts of its employees if (1) a harasser acts within the scope of his employment in perpetrating the harassment or (2) a harasser acts outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the agency relationship.

Labor & Employment Law > Employer Liability > General Overview
*HN25* The United States Court of Appeals for the Eleventh Circuit has considered the following factors to determine if harassment is sufficiently pervasive to provide constructive notice to an employer: the remoteness of the location of the harassment as compared to the location of management; whether the harassment occurs intermittently over a long period of time; whether the victims were employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment.

**COUNSEL:** For ELLIOT EVANS, plaintiff: Richard A Meelheim, Cynthia Forman Wilkinson, MEELHEIM WILKINSON & MEELHEIM PC, Birmingham, AL.

For PEMCO AEROPLEX, INC., defendant: David M Lawson, Abdul K Kallon, BRADLEY ARANT ROSE & WHITE, Birmingham, AL.

**JUDGES:** C. Lynwood Smith Jr., United States District Judge.

**OPINION BY:** C. Lynwood Smith Jr.

OPINION

**MEMORANDUM OPINION**

Elliott Evans alleges Pemco Aeroplex, Inc. discriminated against him on the basis of his race (African-American) and disability (diabetes) in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 24 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and 42 U.S.C. § 1981. The action is before the court on Pemco's motion for summary judgment. Upon consideration of pleadings, briefs, and evidentiary submissions, the court concludes the motion is due to be granted.

## I. FACTS

### A. Work in Excess of Plaintiff's Restrictions

Pemco refurbishes aircraft at a facility **[*2]** adjacent to the Birmingham, Alabama airport. Elliott Evans has worked for Pemco or its predecessors [1] at that facility since 1956. Evans was diagnosed with diabetes mellitus during 1966, and since then he has labored under a physician's restriction to not climb or work at heights. [3] (Plaintiff's deposition at 22-23.)

**FOOTNOTES**

1 The record reveals that one of those predecessors was Hayes International Corporation.

3 Plaintiff also walks with an "unsteady gait," but it is not clear whether that condition is a result of his diabetic condition. (Plaintiff's deposition exhibit 3.)

Plaintiff was not required to perform duties that violated his physician's restrictions until about December of 1994 (id. at 21, 23, 50-51), when he was assigned to the position of "cleaner" on a "crew" of employees supervised by Carl Bonds. (Bonds deposition at 7, 9.) The members of Bonds' crew were required to climb and work at heights in order to clean areas inside aircraft. [4] (*Id.* at 10, 57.)

**FOOTNOTES**

4 According to Carl Bonds, Evans' position "required climbing. ... You have to get on the aircraft to do the job." (Bonds deposition at 23.)

**[*3]** When Carl Bonds first directed Evans to climb, Evans balked: he told Bonds that his physician had instructed him not to do so. (Plaintiff's deposition at 25; Bonds deposition at 10.) Bonds conferred with employees in Pemco's medical and personnel departments, but they were unable to confirm Evans' alleged work restrictions. [5] (Bonds deposition at 11-12.) Instead, the medical department showed Bonds a "physician's release to return to work," allegedly saying that Evans could work with no restrictions. [6] (Bonds deposition at 17-18.) Evans claims he climbed and worked at heights for a period thereafter, because Bonds threatened him: "do this or [else]." (Plaintiff's deposition at 28, 33.) Bonds denies that, claiming he instructed Evans to refrain from climbing. (Bonds deposition at 20.)

**FOOTNOTES**

5 In opposition to summary judgment, plaintiff submitted "attending physician's reports" for Elliott Evans from 1988 and 1991 on letterhead for Hayes International Corporation, one of Pemco's predecessors. The 1988 report restricted Evans from climbing or working at heights. The 1991 report restricted him only from working at heights, and noted he was "previously unable to climb." (Plaintiff's

exhibits 14, 19.) **[*4]**

6 Elliott Evans claims that release was not the release provided to Pemco by his doctor. In support of that claim, he presents the March 20, 1995 letter of his physician, Dr. James G. Davis, which states:

> Elliott Evans came by my office and picked up a copy of the physician's release for return to work. Someone has marked the capacity section for Mr. Evans. It was not done in this office. Please correct that statement as soon as possible. The diagnosis is Tenosynovitis ["inflammation of a tendon sheath," Dorland's Illustrated Medical Dictionary 1558 (W.B. Saunders *et al.* eds., 28th ed. 1994)], and arthritis. This is work related.

(Plaintiff's exhibit 8.) That letter merely states that the "work capacity" section of the release should not have been completed. It provides no insight into what restrictions (if any) Dr. Davis imposed.

Evans obtained a verification of his work restrictions from Dr. Steve Hunt on February 17, 1995, and presented the following letter to Pemco's medical and personnel departments shortly thereafter:

> I request that Mr. Evans not be involved **[*5]** in work activities that involve climbing or working at heights, due to the risk of hypoglycemia from his diabetes treatment regimen and also because of his unsteady gait.

(Plaintiff's deposition exhibit 3.)

That verification was closely followed by a charge of discrimination which Evans filed with the EEOC on February 21, 1995:

> I have a disability which restricts climbing. The company has accommodated my restriction for almost 30 years. However, since February 1995, the company has refused to accomod [sic] my disability and has harassed me in the performance of my duties.
>
> Carl Bonds, Supervisor, has given me no reason for his refusal to accommodate my disability nor has he indicated why he is harassing me.
>
> I believe that I am being discriminated against in violation of the Americans with Disabilities Act as well as Title VII of the 1964 Civil Rights Act, as amended, in that White employees under Mr. Bonds supervision are not being harassed.

(Plaintiff's deposition exhibit 8.)

In March or April of 1995, Pemco transferred Evans to another department, and he has not climbed or worked at heights since that time. (Plaintiff's deposition at 18; Bonds **[*6]** deposition at 22.)

## B. Medical Leave Because of Restrictions

Elliott Evans participated in a United Auto Workers strike against Pemco that lasted almost eleven months: from June of 1996 until April 20, 1997. (Plaintiff's deposition at 16.) Following the strike, Pemco recalled Evans to work as a "depainter" in its wash rack department. (Marks deposition at 14.)

Pemco adopted a policy requiring that all persons returning to work after the strike be able to perform all functions of their positions, so that the greatest amount of work could be performed by the smallest number of employees. 7 (Marks deposition at 21-22.) Thus, Evans' supervisor, Guy Marks, referred Evans and four other returning strikers to Pemco's medical department when each related physicians' restrictions limiting the functions he or she could perform. (*Id.* at 16.) The medical department attempted to identify a position which would not require that Evans climb or work at heights. (Marks deposition at 26-28.) All such positions were filled, however, and Pemco eventually placed Evans on medical leave. (Plaintiff's deposition at 53, 61-63, 153-54; Marks deposition at 26-27.)

**FOOTNOTES**

7 Pemco claims that it was overmanned prior to the strike, because extra employees were required to perform functions that employees with medical restrictions were incapable of performing. (Marks deposition at 21-22.)

[*7]  Plaintiff filed an amended charge of discrimination with the EEOC on April 25, 1997, alleging:

> My employee [sic] terminated me on or about April 9, 1997 alleging that they were unable to accommodate me. These [sic] were several jobs and [sic] that I could do within my medical restrictions and I could have easily been accommodated for my disability. In addition, I believe I have been terminated and retaliated against because of my disability and because I filed a Charge of Discrimination and subsequent law suit against Pemco.

(Plaintiff's deposition exhibit 5.)

Pemco recalled Evans from medical leave on June 2, 1997, and assigned him a position in the wash rack department. (Marks deposition at 37-39.) The supervisors of that department created the position for plaintiff. According to Guy Marks: "I think we started doing that job for Mr. Evans to have something to do." (*Id.* at 79.)

Evans presently performs the duties of a "depainter" in Pemco's "gear shop." (Marks affidavit P 2.) In that position, he strips, washes, degreases, brightens, and "allodizes" various parts of aircraft. (Plaintiff's deposition at 13; Bonds deposition at 8.)

**C. Race Discrimination**

[*8]  Evans also claims he suffered race discrimination while working for Pemco. According to him:

> 1. Carl Bonds constantly watched the African-American employees, assigned them the most difficult work, insisted that they perform their work, and "pestered" them. (Plaintiff's deposition at 65, 68, 71, 77.)

> 2. Carl Bonds forced plaintiff to climb, but would allow white employees with climbing restrictions to refrain from climbing. (*Id.* at 66, 67.)

> 3. Carl Bonds intimidated African-American employees by making statements such as: "You do this or...." (*Id.* at 77.)

> 4. Guy Marks constantly criticized plaintiff's work performance, told plaintiff he was too slow, and always sought plaintiff out when he was not at his work station. (*Id.* at 163-68.)

> 5. Guy Marks directed a racial slur towards plaintiff by saying "Eenie, Meeny, Miny, Moe" and pointing to plaintiff with the word "Moe." (*Id.* at 159-60.) Evans found that phrase offensive, because he believes it usually is completed by saying "catch a nigger by the toe." (*Id.* at 160.)

Furthermore, Evans claims he was exposed to the following offensive materials:

> 1. In 1991 or 1992, and again [*9]  in 1994 or 1995, plaintiff viewed a document entitled "Nigger Application" which alluded to numerous offensive racial stereotypes. (Plaintiff's deposition at 90-91, 96-97; plaintiff's exhibit 20.)

> 2. Sometime before December of 1994, co-employee Brownell Franklin showed plaintiff a picture of a noose which was hung in Franklin's office. (*Id.* at 133-37.)

3. Plaintiff viewed a noose at the Pemco facility sometime between December of 1994 and March of 1995. (*Id.* at 136-37.)

4. Between December of 1994 and March of 1995, he saw the letters "KKK" written on a box at Pemco's facility. (*Id.* at 137-38.)

## II. SUMMARY JUDGMENT STANDARD

*HN1*⊕Summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." Rule 56(c), *Fed.R.Civ.P.* (emphasis added). The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided **[*10]** at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *Celotex*, 477 U.S. at 324, 106 S. Ct. 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Jeffery*, 64 F.3d at 593.

*HN2*⊕In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. **[*11]** "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, *HN3*⊕if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). The bottom line is "whether **[*12]** the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. 2512.

## III. ADA DISCRIMINATION

Congress passed the Americans with Disabilities Act of 1990 (ADA) for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress sought "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(8). To achieve those purposes, the Act commands that

> no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Thus, Evans bears the burden of proving by a preponderance of the **[\*13]** evidence that defendant intentionally discriminated against him because of his disability. That can be done either by direct or circumstantial evidence. When, as here, the evidence of intent is circumstantial in nature, [8] the Supreme Court has prescribed an analytical process to evaluate the strength of plaintiff's proof. In three decisions rendered over two decades, the Supreme Court "developed a formula for shifting evidentiary burdens between plaintiff and defendant which permits the establishment of intentional discrimination without direct evidence of unlawful motivation." A.C. Modjeska, *Employment Discrimination Law* § 1:09, at 39-40 (3d ed. 1996). The order and allocation of burdens of proof, persuasion, and production were first defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). [9] The analytical structure developed **[\*14]** by that trilogy has three steps, the ultimate goal of which is that of "progressively ... sharpening the inquiry into the elusive factual question of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 506, 113 S. Ct. at 2746 (quoting *Burdine*, 450 U.S. 248 at 255 n.8, 101 S. Ct. 1089 at 1094 n.8).

## FOOTNOTES

[8] Plaintiff broadly argues "that he has provided sufficient direct evidence to prove discrimination." (Brief in opposition to summary judgment at 19.) "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) (emphasis supplied). Plaintiff has produced no evidence of actions or statements by Pemco reflecting a discriminatory attitude which correlate to his alleged disability. This court thus finds there is no direct evidence of disability discrimination.

[9] Although the Eleventh Circuit has not explicitly held to the following effect, it nevertheless is widely agreed that the burden-shifting analysis expressed in *McDonnell Douglas* and its progeny, and applied in Title VII disparate treatment cases, is similarly followed in deciding cases brought under the ADA. *See* McNemar v. The Disney Store, Inc., 91 F.3d 610, 619 (3d Cir. 1996), *cert. denied*, 519 U.S. 1115, 117 S. Ct. 958, 136 L. Ed. 2d 845 (1997); Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 761 n.2 (5th Cir. 1996), *cert. denied*, 519 U.S. 1115, 117 S. Ct. 958 (1997); *see also* Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), *cert. denied*, 519 U.S. 1118, 117 S. Ct. 964, 136 L. Ed. 2d 849 (1997)(implicitly using burden-shifting framework); Johnson v. Boardman Petroleum, Inc. 923 F. Supp. 1563 (S.D. Ga. 1996); Lewis v. Zilog, Inc., 908 F. Supp. 931 (N.D. Ga. 1995).

**[\*15]** The first step is satisfied when the plaintiff establishes a *prima facie* case. *HN4*To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he has a disability; (2) that he is a "qualified individual" (*i.e.*, that he can perform the essential functions of the job position he holds or seeks, with or without reasonable accommodation being made by the employer [10]); and, (3) that he was discriminated against because of his disability. *See* 42 U.S.C. § 12132; *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996). In addition, a plaintiff must show that the employer had actual or constructive knowledge of his disability. *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996).

## FOOTNOTES

[10] *HN5* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). *See also* *HN6* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

**[\*16]** At the second stage of analysis, the burden of production shifts to defendant to rebut the presumption of intentional discrimination thus raised by a prima facie case, by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093. If defendant does so, then in the final step of the inquiry plaintiff must show by a preponderance of the evidence that defendant's stated reasons are mere pretexts for unlawful, discriminatory motives. *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093.

## A. The Prima Facie Case - Is Plaintiff "Disabled"?

*HN7* The ADA defines the concept of "disability" in a manner that includes any individual:

(A) who has a *physical or mental impairment* that *substantially limits* one or more of the *major life activities* of such individual; or

(B) who has a *record of* such an impairment; or

(C) who is *regarded as having* such an impairment.

*See* 42 U.S.C. § 12102(2). When applying that definition, three questions must be asked: (1) *is the condition an "impairment"?*; (2) *does the impairment* **[\*17]** *"substantially limit" a major life activity?*; and (3) *what qualifies as a "major life activity"?*

## 1. Is plaintiff's condition an "impairment"?

The ADA does not define those conditions constituting a "physical or mental impairment." Instead, that phrase, and many other significant terms in the Act, are only defined in regulations promulgated by the Equal Employment Opportunity Commission [11] pursuant to authority delegated by Congress, [12] and, in the "Interpretive Guidance on Title I of the Americans With Disabilities Act" attached as an appendix to those regulations. Those regulations are not binding on this court. Nevertheless, *HN8* "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ... for guidance" when interpreting the ADA. *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Moreover, the Supreme Court has long recognized that an agency's interpretation of a statute it is charged with enforcing should be given "considerable weight," and should not be disturbed unless it appears from the statute or legislative history that Congress intended a different construction.

[When] Congress **[\*18]** has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 433, 434, 91 S. Ct. 849, 854-55, 28 L. Ed. 2d 158 (1971)(administrative interpretations "entitled to great deference"). The Chevron standard is applied by the Eleventh Circuit in the context of ADA claims. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996).

## FOOTNOTES

11 *See* 29 C.F.R. § 1630.

12 *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA).

**[\*19]** *HN9*

The EEOC's administrative interpretations of the ADA define a "physical impairment" as including:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or ....

29 C.F.R. § 1630.2(h)(1).

Dorland's Illustrated Medical Dictionary defines diabetes as a disorder

> characterizes by excessive urine excretion (polyuria), as in diabetes mellitus and diabetes insipidus. When used alone, the term refers to diabetes mellitus.

Dorland's Illustrated Medical Dictionary 456 (W.B. Saunders et al. eds, 28th ed. 1994). Nevertheless, it should be observed that diabetes mellitus "occurs in two major forms: *insulin-dependent diabetes mellitus* (type I) and *non-insulin dependent diabetes mellitus* (type II), which differ in etiology, pathology, genetics, age of onset, and treatment." *Id.* at 457. Plaintiff presents no evidence on the form of diabetes mellitus from which he suffers.

Moreover, **[*20]** plaintiff presents no evidence on the effects of his diabetic condition (whatever its true form may be) on day-to-day activities, other than climbing or working at heights. This court is aware that hundreds of thousands of Americans function well in their chosen vocations, despite being diagnosed with some form of diabetes. Where a plaintiff presents a paucity of evidence on the nature of his alleged impairment, or its effects on his daily activities, summary judgment is appropriate. *See Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 271 (9th Cir. 1996)(affirming summary judgment where there was no evidence, beyond plaintiff's own testimony, to establish an impairment).

Notwithstanding the paucity of plaintiff's proof, the EEOC's broad definition of an "impairment," coupled with the clinical diagnosis of "diabetes," arguably are sufficient to establish that plaintiff has an "impairment," even if just barely sufficient. Nevertheless, as the following discussion shall demonstrate, plaintiff presents no evidence establishing the other components of the first element of a *prima facie* case (disability): *i.e.,* there is no evidence that plaintiff was "substantially **[*21]** limited" in a "major life activity," possessed a "record of" such, or was "regarded as" suffering from such an impairment.

### 2. Does plaintiff's alleged impairment "substantially limit" a "major life activity"?

**HN10**"A physical impairment, standing alone ... is not necessarily a disability as contemplated by the ADA. ... The ADA requires that the impairment substantially limit one or more of the individual's major life activities." *Gordon,* 100 F.3d at 911 (citations omitted)(emphasis supplied). [12]

### FOOTNOTES

12 *See also* I B. Lindemann & P. Grossman, *Employment Discrimination Law* 276 (3d ed. 1996):

**HN11**

> The definitions of "major life activity" and "substantial limitation" are closely allied. "Major life activities" are the basic activities that average persons can perform with little or no difficulty, "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." "Substantially limits" means either the total inability or a severe restriction on the ability to perform a major life activity (in terms of condition, manner, or duration) as compared to the general population. The determination of whether an individual is "disabled" [therefore] depends on the effect the impairment has on the particular individual's life, and not simply on the name or diagnosis of the impairment. [*Quoting* 29 C.F.R. §§ 1630.2(i), 1630.2(j)(1).]

**[*22]** Evans never specifies which of his major life activities are substantially limited, but makes the following argument:

> Mr. Evans is impaired in his ability to walk, climb, and work at heights. Mr. Evans has been restricted from working at heights and climbing indefinitely because of his diabetes and unsteady gait. Mr. Evans is not restricted from performing a job but abroad [sic] range of jobs that require climbing or working at heights. ...

(Brief in opposition to summary judgment at 17 (emphasis supplied).) *HN12*✧The EEOC includes "walking" and "working" among its lists of those functions constituting "major life activities." For example, 29 C.F.R. § 1630.2(i) provides that:

> (i) *Major Life Activities* means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. [Emphasis supplied.]

Further, the Interpretative Guidance attached as an Appendix to that section elaborates as follows:

### Section 1630.2(i) Major Life Activities

This term adopts the definition of the term "major life activities" found in the regulations implementing section 504 of the Rehabilitation **[*23]** Act at 34 CFR part 104. "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching. ...

29 C.F.R. Pt. 1630, App. § 1630.2(i), at 402 (citations omitted)(emphasis supplied).

It first should be noted that EEOC regulations and interpretive guidance do not provide that climbing is a major life activity. Moreover, this court agrees with the Fifth Circuit, which held that *HN13*✧"climbing is not such a basic, necessary function and this court does not consider it to qualify as a major life activity under the ADA." *Robinson v. Global Marine Drilling Company*, 101 F.3d 35, 37 (5th Cir. 1997)(quoting *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 758 n.2 (5th Cir. 1996)).

The more difficult question is whether Evans' impairment of diabetes substantially limits the **[*24]** major life activities of walking or working. That phrase, "substantially limits," also is not defined by the ADA, but implementing regulations instruct that *HN14*✧it refers to an individual who is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The EEOC further instructs that the following factors should be considered in determining whether a particular individual is substantially limited in a major life activity:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

### a. Walking

Evans' only evidence of a limitation on his ability to walk is an unauthenticated record from **[\*25]** Dr. Steve Hunt, reflecting that he walks with an "unsteady gait." (Plaintiff's deposition exhibit 3.) That evidence does not distinguish Evans from "the average person in the general population," however. 29 C.F.R. § 1630.2(j)(1). It also does not provide insight into "the nature and severity of the impairment," "the duration of the impairment," or the "long term impact" of the impairment. 29 C.F.R. § 1630.2(j)(2). Moreover, it is "clear that moderate difficulty or pain experienced while walking does not rise to the level of a disability." *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997); *see also Kelly v. Drexel University*, 94 F.3d 102, 106-07 (3rd Cir. 1996)(hip disease which caused slow walking, especially while climbing stairs, was not disabling); *Graver v. National Engineering Co.*, 1995 U.S. Dist. LEXIS 10405, 1995 WL 443944 at * 11 (N.D. Ill. Jul. 25, 1995)(walking with pronounced limp and experiencing substantial pain while walking was not substantial limitation).

### b. Working

Evans also claims he is precluded from "abroad [sic] range of jobs that require climbing or working at heights." (Brief in opposition to summary judgment **[\*26]** at 17.)

> *HN15* When individuals claim that they are substantially limited in the major life activity of working, their condition "must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities."

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)(quoting *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir.), *amended on reh'g*, 102 F.3d 1118 (11th Cir.1996))(emphasis supplied).

*HN16* The following factors (along with those listed in 29 C.F.R. § 1630.2(j)) should be considered in regard to such a claimed limitation:

> (A) The geographical area to which the individual has reasonable access;
>
> ...
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes). **[\*27]**

29 C.F.R. § 1630.2(j)(3)(ii)(A), (C); *see also Gordon*, 100 F.3d at 911-12 (quoting regulations). Evans presents absolutely no evidence bearing upon those factors. Yet, such evidence is explicitly called for by the EEOC's Interpretative Guidance:

> The terms "numbers and types of jobs" and "number and types of other jobs" ... require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (*e.g.*, "few," "many," "most") from which an individual would be excluded because of an impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(j), at 403 (emphasis added). Those terms are "not intended to require an onerous evidentiary showing." *Id.* Nevertheless, by failing to present any comparative employment data, plaintiff has not met even this slight burden.

This court therefore concludes that Evans has failed to demonstrate that his impairment substantially limits any major life activity.

### 3. Does plaintiff have a record of a disability?

Even so, Evans still may be considered "disabled" if he "has a record" of an impairment which substantially **[\*28]** limits a major life activity. 42 U.S.C. § 12102(2)(B). Evans claims he does have "a record" of a substantially limiting impairment, because he "has provided substantial evidence from various treating physicians that he had a record at Pemco of a physical impairment as early as 1988, again in 1991 [,] and again in 1995." (Brief in opposition to summary judgment at 18.) In support of that assertion, Evans presents an "Attending Physician's Report" dated September 18, 1988, prepared by Dr. James G. Davis for Pemco's predecessor, Hayes International Corporation. (Plaintiff's exhibit 14.) That report records a diagnosis of "diabetes mellitas [sic]," and states that Evans is not "fully capable" of climbing or working at heights, but it does not impose any restrictions. (*Id.*)

Evans also relies upon a similar report dated July 8, 1991. [13] (Plaintiff's exhibit 19.) That report records a diagnosis of tendinitis, and states that Evans is not "fully capable" of climbing. (*Id.*) Nevertheless, the report provides that plaintiff is "fully capable" of working at heights. (*Id.*)

---

**FOOTNOTES**

13 The physician's signature on that report is illegible.

---

**[\*29]** Finally, Evans presents a record from Pemco's medical services department dated March 29, 1995, which provides that he will be permitted to return to work under the following restrictions: "Mr. Evans [should] not be involved in work activities that involve climbing or working at heights..." (Plaintiff's exhibit 21.)

None of those reports demonstrates a "record" of a substantially limiting impairment, as required by EEOC regulations.

> (k) *Has a record of such impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

29 C.F.R. § 1630.2(k)(emphasis supplied). Furthermore, the interpretive guidance demonstrates that an employer must possess some record of a substantially limiting impairment.

> This part of the definition is satisfied if a record relied upon by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. There are many types of records that could potentially **[\*30]** contain this information, including, but not limited to, education, medical, or employment records.

29 C.F.R. Pt. 1630, App. § 1630.2(k), at 404 (emphasis supplied).

None of the records relied upon by Evans demonstrate an impairment that "substantially limits" a "major life activity." All are silent on "the nature and severity of the impairment," "the duration or expected duration of the impairment," and the "long term impact" of the impairment. 29 C.F.R. § 1630.2(j)(2). Moreover, they provide no distinction between Evans and "the average person in the general population." 29 C.F.R. § 1630.2(j)(1). Consequently, this court finds that Evans has not fulfilled his burden of demonstrating a record of a disability.

## 4. Was plaintiff "regarded as" disabled?

Nevertheless, even if an individual cannot satisfy either the first part of the ADA's definition of "disability," or the second, "record of" portion, he still may be able to satisfy the third prong of the definition, providing that a person who is "regarded" by an employer "as having such an impairment" -- *i.e.*, one that substantially limits a major life activity -- is an individual with a disability. 42 U.S.C. § 12102 [*31] (2) (C). *HN17* The EEOC Interpretive Guidance lists three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

> (1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

> (2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

> (3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(1), at 404.

Evans makes the following argument to claim he was "regarded as" having a disability:

> Mr. Evans has also established that Pemco regarded him as having such an impairment or disability. When Pemco required that Mr. Evans be 100% able to return to work with no restriction they regarded him as being so disabled that he could not work.

(Brief in opposition to summary judgment at 19 (emphasis supplied).)

For purposes of summary judgment, this court will accept Evans' contention [*32] that Pemco considered him unable to work in any job requiring climbing or working at heights. That finding does not end the inquiry, however.

The determination of whether an employer "regarded" an employee as substantially limited in the ability to work is a mixed question of law and fact. *Bridges v. City of Bossier*, 92 F.3d 329, 333 (5th Cir. 1996). "The underlying factual question is how many and which jobs involve [plaintiff's restrictions]," while "the legal issue presented ... is whether disqualification from [those] jobs involving [plaintiff's restrictions] constitutes a substantial limitation in the major life activity of working." *Id.* at 333, 334.

In resolving the factual issue, Evans must present specific evidence that his restrictions, as perceived by Pemco, prevented him from performing either an entire class of jobs or a broad range of jobs in various classes. *See id.* at 333 ("we can rule out most of the jobs listed by [plaintiff] because of a lack of record evidence. [Plaintiff] points to no record evidence that law enforcement personnel are routinely exposed to extreme trauma, and we find none"). Once the [*33] court determines "how many and which jobs" involve Evans' perceived restrictions, it must determine if disqualification from those jobs would constitute a substantial limitation on the major life activity of working. *Id.* at 334.

In the present action, Evans has presented no evidence of "how many and which jobs" at Pemco require climbing or working at heights. That failure alone is sufficient to find that he has failed to meet his burden of demonstrating that he was "regarded as" disabled. *See Ballard v. Vulcan Materials Company*, 978 F. Supp. 751, 756 (W.D. Tenn. 1997):

> *HN18* In order to carry [the burden of establishing that defendant regarded him as substantially limited from working], a plaintiff must present evidence, expert or otherwise, relating to his vocational skills or training, the geographical area to which he has access, or the number and type of jobs which demand similar training from which he would also be disqualified because of

his disability.

Nevertheless, Evans' testimony could be construed to establish that the job of "depainter" in the wash rack department requires climbing and working at heights, and that he was **[\*34]** "regarded as" foreclosed from working in that position when he returned from the strike. [14]

### FOOTNOTES

[14] This court refers to the "depainter" position in the wash rack department, as it existed when plaintiff attempted to return to work after the strike. The evidence indicates that defendant considered plaintiff unable to perform that job because of his medical restrictions, and placed him on medical leave. Plaintiff later was assigned to the wash rack department, but defendant created that position "for Mr. Evans to have something to do." (Marks deposition at 79.)

This court thus must determine the "legal issue" of whether disqualification from the position of depainter in the wash rack department constitutes a substantial limitation on the major life activity of working. *Bridges v. Bossier*, 92 F.3d at 334.

*HN19* An impairment does not substantially limit the ability to work merely because it prevents a person from performing either a particular specialized job or a narrow range of jobs. Nor does **[\*35]** the inability to perform a single, particular job ... constitute a substantial limitation in the major life activity of working.

*Happy Herman's Cheshire Bridge, Inc. v. Stewart*, 117 F.3d 1278, 1285 (quoting *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1133 (11th Cir.), *amended on reh'g*, 102 F.3d 1118 (11th Cir.1996)). Evans' testimony merely indicates that Pemco regarded him as substantially limited in the "single, particular job" of "depainter" in the wash rack department.

This court therefore concludes that Evans has failed to demonstrate he was "regarded as" having an impairment which substantially limits a major life activity. Accordingly, this court concludes that Evans has not demonstrated that he is an individual with a "disability." He therefore has not demonstrated a *prima facie* case, and summary judgment is appropriate on his ADA claims.

## IV. RETALIATION

Plaintiff's complaint does not state a claim for retaliation, but he testified during deposition that Pemco retaliated against him for filing his first charge of discrimination with the EEOC. According to plaintiff, Pemco accommodated other employee's **[\*36]** restrictions after the 1996-97 strike, but did not accommodate his restrictions because of his EEOC charge and lawsuit. (Brief in opposition to summary judgment at 20-22.)

The familiar burden-shifting scheme developed by the Supreme Court for disparate treatment claims under Title VII and the ADA applies equally well to ADA retaliation claims. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *Donnellon v. Fruehauf Corporation*, 794 F.2d 598, 600, *reh'g denied*, 800 F.2d 267 (11th Cir. 1986). *HN20* To establish a *prima facie* case of retaliation plaintiff must show: (1) statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Pemco argues that plaintiff cannot demonstrate the requisite causal connection between the protected activity and adverse employment action, because six months passed between commencement of this action and Pemco's refusal to return Evans to work. Evans fails to respond to Pemco's argument, and summary judgment **[\*37]** therefore is appropriate for that reason alone. *See Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995) ("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue"); *see also Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997);

*Southern Nevada Shell Dealers Association v. Shell Oil*, 725 F. Supp. 1104, 1109 (D. Nev. 1989).

Even if Evans established a *prima facie* case, he presented no evidence rebutting Pemco's articulated reason for refusing to immediately return him to work. Pemco claims it did not return Evans to work because financial conditions required that the greatest amount of work be performed by the smallest number of employees. (Brief in support of summary judgment at 18-19; Marks deposition at 21-23.) Thus, Evans and other employees with medical restrictions on their job duties were placed on temporary medical leave, or in positions which did not implicate their restrictions.

To demonstrate that explanation is mere pretext for discrimination, Evans must present evidence that **[*38]** Pemco allowed another employee with similar restrictions to work without medical leave, or that a position existed in which he could have worked regardless of his restrictions. Evans' most persuasive evidence pertains to Pemco employee John Henry Parker. Parker also was restricted from climbing, but he was allowed to work for approximately one week after the strike. (Marks deposition at 23.) There was a discrepancy in Parker's records, however, and Pemco's medical department allowed him to work while they attempted to confirm Parker's restrictions with his doctor. (*Id.* at 22-23.) After one week, Pemco could neither confirm nor discount Parker's restrictions, and he also was placed on medical leave. (*Id.* at 78-79.) Therefore, the only other identifiable employee with restrictions similar to Evans was treated in a similar manner. Furthermore, Evans presents no evidence that other jobs were available which he could perform regardless of his restrictions.

Evans also has presented no evidence indicating that financial concerns associated with medical restrictions were not the "real reason" for his medical leave. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). **[*39]** Summary judgment accordingly is appropriate on the retaliation claim.

## V. TITLE VII DISCRIMINATION

### A. Disparate Treatment

Evans also "avers that he has been discriminated against on the basis of his race, African American, in job assignments, promotions, and other terms and conditions of employment." (Complaint P 9.) Defendant moves for summary judgment, to the extent Evans seeks to recover under a theory of disparate treatment. (Brief in support of summary judgment at 13-15.) Plaintiff provides absolutely no argument indicating that he was subject to disparate treatment. [15] (*See* brief in opposition to summary judgment at 22-24.) Plaintiff's failure to respond to defendant's argument warrants summary judgment. *See Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995)("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue"); *see also Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997); *Southern Nevada Shell Dealers Association v. Shell Oil*, 725 F. Supp. 1104, 1109 (D. Nev. 1989). **[*40]**

### FOOTNOTES

[15] Plaintiff broadly argues "that he has provided sufficient direct evidence to prove discrimination." (Brief in opposition to summary judgment at 19.) "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990)(emphasis supplied). Plaintiff has produced no evidence of actions or statements by Pemco reflecting a discriminatory attitude which correlate to his alleged race. This court thus finds there is no direct evidence of race discrimination.

### B. Hostile Work Environment

Evans raises only his hostile work environment claims in opposition to defendant's motion for summary judgment on his Title VII claims. (Brief in opposition to summary judgment at 22-24.) *HN21* To establish a claim for a racially hostile work environment, plaintiff must show that he: 1) belongs to a protected class; 2) was **[*41]** subjected to unwelcome harassment; 3) the harassment was based on his race; 4) the harassment affected a term, condition, or privilege of his employment, in that it was sufficiently severe or

pervasive to alter the conditions of his employment and create an abusive working environment; and 5) *respondeat superior. See Perryman v. West*, 949 F. Supp. 815, 822 (M.D. Ala. 1996); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1987). Pemco alleges Evans cannot fulfill the fourth or fifth elements of a *prima facie* case.

## 1. The alleged harassment was neither severe nor pervasive

Evans has offered a plethora of evidence to support his hostile work environment claim. However, much of that evidence is irrelevant or inadmissible. [16] This court only will consider Evans' testimony that:

> a. Sometime before December of 1994, Brownell Franklin showed him a picture of a noose which hung in his office for five months. (*Id.* at 133, 137.)

> b. Evans was exposed to a noose at Pemco's facility on one occasion between December of 1994 and March of 1995. (*Id.* at 136-37.)

> c. He viewed the letters "KKK" at Pemco's facility on one **[*42]** occasion between December of 1994 and March of 1995. (*Id.* at 137-38.)

> d. He also saw a "Nigger Application" in 1991 or 1992 and again in 1994 or 1995. (*Id.* at 90-91, 96-97.)

## FOOTNOTES

[16] This court will not consider the "Eenie, meenie, minie, moe" statement attributed to Guy Marks. (Plaintiff's deposition at 159-60.) To construe that as evidence of a racially hostile work environment would implicate the Fifth Circuit Court of Appeals as a racist body: "OSHA is merely playing a rational version of eenie-meenie-minie-moe so as to select someone neutrally for an inspection." United States Department of Labor v. Kast Metals Corp., 744 F.2d 1145, 1155 (5th Cir. 1984)(emphasis supplied). This court will treat the utterance in the same way: assuming Guy Marks made the remark, it will be considered a neutral method of choosing an employee to perform a job.

This court also will not consider plaintiff's exhibit 15: twenty-three identical, unsworn, unauthenticated, typed statements by alleged Pemco employees attesting to discrimination by Pemco and Carl Bonds. All exhibits must be authenticated before they may be considered at the summary judgment stage. *See First National Life Insurance Company v. California Pacific Life Insurance Company*, 876 F.2d 877, 881 (11th Cir. 1989); *White v. Wells Fargo Guard Services*, 908 F. Supp. 1570, 1579 (M.D. Ala. 1995); *Williams v. Eckerd Family Youth Alternative*, 908 F. Supp. 908, 911 (M.D. Fla. 1995)("for a document to be considered in support of or in opposition to a motion for summary judgment, it must be authenticated by an affidavit that meets the requirements of the summary judgment rule"); *Burnett v. Stagner Hotel Courts, Inc.*, 821 F. Supp. 678, 683 (N.D. Ga. 1993); *aff'd*, 42 F.3d 645 (11th Cir. 1994) ("In order for a document to be considered in support of or opposition to a motion for summary judgment it must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(a) and the affiant must be a person through whom the exhibits could be admitted into evidence").

Plaintiff also relies upon Carl Bonds testimony that he found several nooses in his office (Bonds deposition at 26-28), and upon Guy Marks' testimony that he heard racial jokes at Pemco. (Marks deposition at 57.) Plaintiff cannot rely upon those incidents to demonstrate a hostile work environment, because there is no evidence that he was aware of them until depositions were taken in this action. *See* Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995)("some of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment").

**[*43]** Pemco argues that such evidence does not demonstrate an objectively hostile work environment. HN22 "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris v. Forklift Systems Inc.*, 510 U.S. 17 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993).

In evaluating whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, courts must examine the totality of circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S. Ct. at 371. After careful consideration of the entire record, this court concludes that the conduct of which Evans complains is neither sufficiently severe nor pervasive to create an environment that a reasonable person would find hostile or abusive.

The exact frequency of the five alleged instances of racist conduct is impossible to **[*44]** determine from Evans' testimony, but they clearly were not contemporaneous. Rather, they were separated by a period of months or, possibly, a period of years. This court acknowledges that nooses and the letters "KKK" not only are offensive to African-Americans, they also could be perceived as physically threatening. Even so, and most importantly, Evans has presented no evidence indicating that the alleged conduct had any effect on his work performance. This court thus concludes that Evans has failed to present adequate evidence that the alleged harassment was sufficiently severe or pervasive to affect a term or condition of his employment, and summary judgment is appropriate.

## 2. Pemco cannot be held liable for the acts of its agents

Pemco also is entitled to summary judgment on the hostile work environment claim, because Evans has produced insufficient evidence to hold it liable under the doctrine of *respondeat superior*. <sup>HN23</sup>Where, as here, Evans seeks to hold his employer directly liable for the acts of co-employees, [17] he must show:

> the employer knew or should have known of the harassment and failed to take prompt remedial action. … A plaintiff can **[*45]** prove an employer's knowledge of harassment by showing that she complained to higher management. …

> …

> A plaintiff also can prove an employer's knowledge by showing that the harassment was pervasive enough to charge the employer with constructive knowledge.

*Faragher v. City of Boca Raton*, 111 F.3d 1530, 1538 (11th Cir.)*(en banc), cert. granted*, 511 U.S. 978, 118 S. Ct. 438, 139 L. Ed. 2d 337 (1997). Evans presents no evidence that he complained to "higher management" about the alleged harassment. [18] Thus, he must show "that the harassment was pervasive enough to charge [Pemco] with constructive knowledge."

### FOOTNOTES

[17] <sup>HN24</sup>An employer also may be indirectly liable for the acts of its employees if (1) a harasser acts within the scope of his employment in perpetrating the harassment or (2) a harasser acts outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the agency relationship. Faragher v. City of Boca Raton, 111 F.3d at 1536. Plaintiff does not suggest that Pemco could be indirectly liable for the alleged harassment, and this court's review of the record finds no facts establishing indirect liability. Thus, this court will limit its review to Pemco's direct liability for the alleged harassment. **[*46]**

[18] In fact, plaintiff offers no evidence that he complained to anyone regarding the alleged harassment. This court's independent review of the record demonstrates that plaintiff made complaints, but does not identify to whom those complaints were made, or their ranking with Pemco's corporate structure. (See plaintiff's deposition at 74, 94, 101, 104-05.) Without evidence that plaintiff complained to someone who "was considered higher management" this court cannot impute actual knowledge to Pemco. Reynolds v. CSX Transportation, Inc., 115 F.3d 860, 867 (11th Cir. 1997).

The inquiry into the pervasiveness of harassment for purposes of determining constructive knowledge is wholly separate from the inquiry for purposes of determining whether a term or condition of employment has been adversely affected. *Faragher v. City of Boca Raton*, 111 F.3d at 1538. *HN25*⚓The Eleventh Circuit has considered the following factors to determine if harassment is sufficiently pervasive to provide constructive notice to an employer:

> the remoteness of the location of the harassment **[*47]** as compared to the location of management; whether the harassment occurs intermittently over a long period of time; whether the victims were employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment.

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997). The parties present no evidence on the location of Pemco's management or on Evans' status as a part-time or full-time employee. Even so, this court finds that the conduct complained of was not sufficiently pervasive to place Pemco on notice, because it occurred intermittently over a period of five years and plaintiff only raises five discrete instances of harassment. Pemco cannot be charged with constructive knowledge of the alleged harassment, and summary judgment is appropriate.

## VI. CONCLUSION

For the foregoing reasons, this court concludes that defendant is entitled to summary judgment on all claims. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this the 20th day of February, 1998.

C. Lynwood Smith Jr.

United States District Judge

### ORDER

In accordance with the memorandum **[*48]** opinion entered contemporaneously herewith, it is ORDERED that defendant's motion for summary judgment is **granted,** and all claims of plaintiff are dismissed. Costs are taxed to plaintiff. The clerk is directed to close this file.

**DONE** this the 20th day of February, 1998.

C. Lynwood Smith Jr.

United States District Judge

Service: **Get by LEXSEE®**
Citation: **1998 U.S. Dist. LEXIS 22954**
View: Full
Date/Time: Wednesday, December 12, 2007 - 4:33 PM EST

* Signal Legend:
🔴 - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
(A) - Citing Refs. With Analysis Available
(i) - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# *Meneffee v. Montgomery County Bd. Of Educ.*

*137 Fed. Appx. 232, \*; 2005 U.S. App. LEXIS 12286, \*\**

EDWARD L. MENEFEE, JR., Plaintiff-Appellant v. MONTGOMERY COUNTY BOARD OF EDUCATION, TINA MINOTT, in her individual and official capacity as Principal of Southlawn Middle School, Defendants-Appellees

No. 04-14185 Non-Argument Calendar

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

137 Fed. Appx. 232; 2005 U.S. App. LEXIS 12286

June 21, 2005, Decided
June 21, 2005, Filed

**NOTICE: [\*\*1]** NOT FOR PULBICATION

**PRIOR HISTORY:** Appeal from the United States District Court for the Middle District of Alabama. D.C. Docket No. 03-00449-CV-A-N

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employee sued appellee employer under Title VII, alleging that the employer subjected the employee to a hostile work environment based on sexual harassment and that the employer retaliated against the employee for complaining about the harassment. The employee appealed the order of the United States District Court for the Middle District of Alabama which granted summary judgment to the employer.

**OVERVIEW:** The employee contended that his administrative charge concerning his hostile work environment claim was timely filed since acts of harassment occurred within the statutory filing period. The employee also argued that he established a prima facie case of retaliation based on the denial of a promotion and two instances of involuntary transfers. The appellate court first held that the employee's hostile work environment claim was time-barred since the alleged harassing acts which occurred within the statutory period before the claim was asserted were not sexual in nature and thus were not part of the same hostile work environment practice indicated by prior acts. Further, retaliation was not shown where the decision-makers responsible for the promotion were unaware of the employee's discrimination complaints, one transfer was rescinded before it had any harmful effect on the employee, and the other transfer did not involve a reduction in pay, prestige, or responsibility as required to show an adverse employment action.

**OUTCOME:** The order granting summary judgment to the employer was affirmed.

**CORE TERMS:** hostile work environment, retaliation, actionable, sexual, prima facie case, employment practice, time period, gender-related, tangible, causal, protected activity, decision-makers, time-barred, harassment, retaliated, classroom, reduction, rescinded, prestige, hostile

**LEXISNEXIS(R) HEADNOTES**
Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN1* See 42 U.S.C.S. § 2000e-5(e)(1).

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
*HN2* ⚓A hostile work environment claim is time barred if it is not filed within the time limit of 42 U.S.C.S. § 2000e-5(e)(1). In determining whether the claim is timely filed, it does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claims occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period. For an act to be considered part of an actionable hostile work environment claim, it must be of a sexual or gender-related nature.

Labor & Employment Law > Discrimination > Retaliation > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview
*HN3* ⚓See 42 U.S.C.S. § 2000e-3(a).

Labor & Employment Law > Discrimination > Retaliation > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview
*HN4* ⚓To prevail on a claim of retaliation under Title VII, a plaintiff must establish three elements: (1) that he engaged in an activity protected under Title VII, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action.

Labor & Employment Law > Discrimination > Actionable Discrimination
*HN5* ⚓To establish an adverse employment action, an employee must show a serious and material change in the terms, conditions, or privileges of employment as viewed by a reasonable person in the circumstances. Although proof of direct economic consequences is not required in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. A transfer to a different position can be adverse if it involves a reduction in pay, prestige, or responsibility. The decision to transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action.

Labor & Employment Law > Discrimination > Retaliation > General Overview
*HN6* ⚓To establish a causal connection for retaliation purposes, a plaintiff must show that the decision-makers were aware of protected conduct and that the protected activity and an adverse employment action were not wholly unrelated.

**COUNSEL:** For Edward L. Menefee, Jr., Appellant: Juraldine Battle-Hodge, Attorney at Law, MONTGOMERY, AL; Janice D. Spears-Turk, Law Offices of J.D. Spears-Turk, MONTGOMERY, AL

For Montgomery County Board of Education, Appellee: James R. Seale, Hill, Hill, Carter, Franco, Cole & Black, P.C., MONTGOMERY, AL

For Tina Minott, Appellee: James R. Seale, MONTGOMERY, AL; Elizabeth Brannen Carter, Hill, Hill, Carter, Franco, Cole & Black, MONTGOMERY, AL

**JUDGES:** Before TJOFLAT, BIRCH and BARKETT, Circuit Judges.

**OPINION**

[*233]  PER CURIAM:

The district court gave Montgomery County Board of Education (the "Board") and Tina Minott ("Minott") summary judgment on Edward L. Menefee, Jr's ("Menefee") Title VII claims of "Sexual Harassment Hostile Working Environment," Count I, and "Retaliation," Count II, and dismissed without prejudice appellant's pendent state law claims. Menefee now appeals. We affirm.

We begin our review by addressing Menefee's Count I claim. *HN1*⚓"A charge [under Title VII] shall be filed within one hundred and eighty days after the alleged **[**2]** unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). *HN2*⚓"A claim is time barred if it is not filed within [this] time limit[]." AMTRAK v. Morgan, 536 U.S. 101, 109, 153 L. Ed. 2d 106, 122 S. Ct. 2061, 2070 (2002). In determining whether a hostile work environment claim has been timely filed, "it does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claims occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117, 122 S. Ct. at 2074. "A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Id. at 120, 122 S.Ct. at 2076. For an act to be considered part of an actionable hostile work environment claim, it must be of "a sexual or gender-related nature." See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) **[**3]** (holding that, before acts are considered in determining whether the severe or pervasive requirement is met, "statements and conduct must be of a sexual or gender-related nature").

The district court found that the complained-of acts that occurred in April 2002, and the complained-of acts that occurred prior to April 2002, were not part of the same actionable hostile work environment practice. See Morgan, 536 U.S. at 120, 122 S.Ct. at 2076. Menefee disagrees, of course. The April 2002 complained-of acts consist of (1) Minott hiding in Menefee's classroom and throwing her forearm into Menefee as she passed him, (2) Minott standing in the doorway to Menefee's classroom and preventing Menefee from entering, and (3) Minott stopping Menefee and telling him that the school was hers and laughing. Menefee simply lists these acts with the pre-April 2002 complained-of acts and asserts that all are part of the same actionable hostile work environment practice. His problem is that he has not supported this assertion with material evidence.

For example, he failed to show that the acts that occurred in April 2002 could be considered to have a sexual or gender-related nature. **[**4]** See Gupta, 212 F.3d at 583. On their face, they do not appear to be sexual in nature, and he provided no evidence, other than conclusory allegations, **[*234]** to support the proposition that the April 2002 conduct was based on his gender. Because Menefee failed to present evidence that would yield a reasonable inference that the April 2002 complained-of acts and the pre-April 2002 complained-of acts are part of the same actionable hostile work environment practice, the date of the last act of the hostile work environment practice is March 14, 2002 (the day that Menefee alleged that Minott rubbed his arm "in an inappropriate sexually harassing manner"). Because March 14, 2002 is more than 180 days prior to the date the EEOC charge was filed, his hostile work environment claim is time-barred. See 42 U.S.C. 2000e-5(e)(1); Morgan, 536 U.S. at 109, 122 S.Ct. at 2070. Because the hostile work environment claim is time-barred, we need not address his arguments that he established a prima facie case of hostile work environment harassment. We turn then to Menefee's Count II claim.

Menefee contends that the district court erred in concluding **[**5]** that he failed to establish a prima facie case of retaliation; He appears to claim that the failure of the Board to consider him for the HIPPY program [1] and his involuntary transfer to FEWS Secondary-Alternative School ("FEWS") constitute actionable retaliation. He appears also to claim that his transfer to Houston Hills Jr. High School ("Houston Hills") constituted actionable retaliation.

---

## FOOTNOTES

1 HIPPY is an abbreviation for Home Instruction Program for Preschool Youngsters.


Title VII prohibits retaliation in the employment arena:

HN3⊼It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). HN4⊼To prevail on a claim of retaliation under Title VII, a plaintiff **[**6]** must establish three elements: (1) that he engaged in an activity protected under Title VII, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action. Gupta, 212 F.3d at 587.

HN5⊼To establish an adverse employment action, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment … [,]as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). Although proof of direct economic consequences is not required in all cases, the asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Id. "[A] transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." Hinson v. Clinch County, Georgia Bd. Of Educ, 231 F.3d 821, 829 (11th Cir. 2000). "The decision to . . . transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action." **[**7]** Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001).

HN6⊼"To establish a causal connection, a plaintiff must show that 'the decision-makers were aware of the protected conduct' and 'that the protected activity and the adverse employment action were not wholly unrelated.'" Gupta, 212 F.3d at 590 (internal citations omitted).

Here, the district court did not err in concluding that Menefee failed to make **[*235]** out a prima facie case of retaliation. Disagreeing, he argues that three actions constituted actionable retaliation: (1) the failure of the Board to promote him to the HIPPY program, (2) his transfer to FEWS, and (3) his transfer to Houston Hills. ² First, because Menefee failed to show that the decision-makers responsible for promotions to the HIPPY program were aware of his complaints against Minott, he failed to establish, albeit via circumstantial evidence, a causal link between the failure to promote and his complaints. See Gupta, 212 F.3d at 590. Next, he conceded in his deposition that he never reported to FEWS nor was he ever told to report to FEWS. Because the transfer to FEWS was never effected (that is, **[**8]** it appears that it was rescinded) and he presented no evidence to show that he suffered any tangible harm from the transfer, he failed to establish that the transfer constituted an adverse employment action. See Pennington, 261 F.3d at 1267. Lastly, he failed to show that he suffered a reduction in pay, prestige, or responsibility in connection with his transfer to Houston Hills; in other words, an adverse employment action did not occur. See Hinson, 231 F.3d at 829. In sum, Menefee failed to establish a prima facie case of retaliation.

## FOOTNOTES

2 Menefee alleged in his complaint that Minott retaliated against him by refusing to sign Menefee's sign-out sheet and knocking the paper to the floor and the Board retaliated against him by assigning him to Capitol Heights Jr. High School. In his brief, he does not reasssert these claims. We therefore consider them abandoned. See Lambrix v. Singletary, 72 F.3d 1500, 1506 n.11 (11th Cir. 1996).

AFFIRMED.

Service: **Get by LEXSEE®**
Citation: **2005 US App LEXIS 12286**
View: Full
Date/Time: Wednesday, November 28, 2007 - 9:56 AM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

 LexisNexis®

About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# *Potts v. Conecuh-Monroe Counties Gas District*

*2000 U.S. Dist. LEXIS 11822, *; 78 Empl. Prac. Dec. (CCH) P40,156*

JOHN E. POTTS, Plaintiff, vs. CONECUH-MONROE COUNTIES GAS DISTRICT, Defendant.

CA 99-0889-C

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

2000 U.S. Dist. LEXIS 11822; 78 Empl. Prac. Dec. (CCH) P40,156

August 1, 2000, Decided

**DISPOSITION:** [*1] Defendant's motion for summary judgment GRANTED and plaintiff's complaint DISMISSED WITH PREJUDICE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer moved for summary judgment as to plaintiff employee's complaint, which claimed that plaintiff's termination was the result of racial discrimination and in retaliation for the filing of his charge of race discrimination in violation of Title VII of the Civil Rights Act of 1964.

**OVERVIEW:** Plaintiff employee, a Native American, filed a race discrimination charge with the Equal Employment Opportunity Commission, regarding his employment with defendant. Plaintiff was terminated after a heated discussion and a threat of physical harm to a superior. Plaintiff filed suit alleging a hostile work environment and that he was terminated as a result of racial discrimination and in retaliation for filing his charge of race discrimination. The court granted defendant's motion for summary judgment. Plaintiff's retaliatory and discriminatory claims failed because plaintiff failed to satisfy his ultimate burden of proving that he was terminated either because of his race or in retaliation for filing a charge of race discrimination. Plaintiff's racial harassment claim failed because the conduct established by plaintiff was not sufficiently severe or pervasive enough to alter his terms or conditions of employment.

**OUTCOME:** Defendant's motion for summary judgment was granted because plaintiff failed to prove that he was terminated because of his race or to establish a hostile working environment racial harassment claim.

**CORE TERMS:** depo, termination, harassment, truck, started, nigger, knife, summary judgment, reservation, supervisor, welding, bunch, highway, pipe, bore, discriminatory, talking, casino, threatening, severe, decal, citation omitted, physically, facie, warning, fight, retaliatory, heritage, genuine, pretext

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
*HN1* Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview
*HN2* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview
HN3⚡The clear language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. A complete failure of proof by the non-movant on an element essential to his case renders all facts immaterial, so the movant is entitled to judgment as a matter of law. The substantive law will identify which facts are material.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview
HN4⚡On a motion for summary judgment, the court must inquire whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict--whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Supporting Materials > Affidavits
HN5⚡The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Fed. R. Civ. P. 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When the burden of proof at trial belongs to the nonmovant, the moving party need not support its motion with affidavits or other similar materials negating the opponent's claim, but rather, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file. Once this initial demonstration is made, Fed. R. Civ. P. 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Need for Trial
HN6⚡Forbidding reliance upon pleadings precludes a party from choosing to wait until trial to develop claims or defenses relevant to the summary judgment motion. This effectuates the purpose of summary judgment which is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. Thus, mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists. In other words, there is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.

Civil Procedure > Summary Judgment > Standards > General Overview
HN7⚡In considering whether the defendant is entitled to summary judgment, the magistrate judge views the facts in the light most favorable to the plaintiff.

Evidence > Procedural Considerations > Circumstantial & Direct Evidence
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Circumstantial & Direct Evidence
HN8⚡In a Title VII of the Civil Rights Act of 1964 disparate treatment case, a plaintiff must prove intentional discrimination. A plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence, or statistical evidence.

Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion
Evidence > Procedural Considerations > Circumstantial & Direct Evidence
Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
HN9⚡When a plaintiff attempts to prove intentional discrimination in violation of Title VII of the Civil Rights Act of 1964 using circumstantial evidence, the court applies the shifting burden framework established by the United States Supreme Court. Under this framework, the plaintiff has the initial

burden of establishing a prima facie case of discrimination. If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent. The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its action. If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination. The same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the McDonnell Douglas presumption.

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
Labor & Employment Law > Discrimination > Racial Discrimination > Employment Practices > Discharges
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens
HN10⬇️ In order to make out a prima facie case of discriminatory termination on account of race, a plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse job action; (3) his employer treated similarly-situated employees outside his classification more favorably; and (4) he was qualified to do the job.

Labor & Employment Law > Discrimination > Retaliation > General Overview
HN11⬇️ To establish a prima facie case of retaliation, a plaintiff must show (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action.

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
HN12⬇️ Where the defendant has volunteered a legitimate, nondiscriminatory reason for the plaintiff's termination, there is no need for a district court to engage in the McDonnell Douglas analysis.

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
HN13⬇️ The reason offered by an employer for an action does not have to be a reason that the judge or jurors would act on or approve. Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's termination. The explanation provided must be legally sufficient to justify a judgment for the defendant.

Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion
Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens
HN14⬇️ The plaintiff's burden of demonstrating pretext merges with the ultimate burden of persuading the court that he has been the victim of intentional discrimination. He may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
HN15⬇️ Once a defendant articulates a legitimate, non-discriminatory reason for its action, the initial inference of discrimination "drops" from the case. The burden then shifts back to the plaintiff to show that the proffered reason was pretext for intentional discrimination and that the defendant intentionally discriminated against him. A plaintiff may show pretext and survive summary judgment by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons.

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Severe & Pervasive Standards

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment

HN16⊥To establish a hostile working environment racial harassment claim under Title VII of the Civil Rights Act of 1964 based on harassment by a supervisor, an employee must show: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on his race; (4) that the harassment was sufficiently severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Harassing Conduct
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment

HN17⊥There is both a subjective and an objective component that must be considered in determining whether harassing conduct was sufficiently severe or pervasive to alter the plaintiff's terms or conditions of employment. The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

HN18⊥The following four factors should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

Labor & Employment Law > Affirmative Action > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

HN19⊥Title VII of the Civil Rights Act of 1964 simply cannot be used as a shield to protect against physically threatening and humiliating conduct that is not race-based, rather, such protection must necessarily come from an enlightened and sensitive employer.


**COUNSEL:** For JOHN E. POTTS, plaintiff: Julian L. McPhillips, Jr., Esq., Montgomery, AL.

For JOHN E. POTTS, plaintiff: Aaron J. Luck, McPhillips, Shinbaum, Gill & Stoner, Montgomery, AL.

For CONECUH-MONROE COUNTIES GAS DISTRICT, defendant: William C. Tidwell, III, Esq., Hand Arendall, L.L.C., Mobile, AL.

**JUDGES:** WILLIAM E. CASSADY, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** WILLIAM E. CASSADY


**OPINION**


**MEMORANDUM OPINION AND ORDER**

This cause is before the Court on the defendant's motion for summary judgment (Doc. 14; *see also* Doc. 15

(brief in support of the motion for summary judgment)), the plaintiff's response in opposition to the summary judgment motion (Doc. 18), the defendant's reply brief (Doc. 21), plaintiff's response to the defendant's reply brief (Doc. 24), and the parties' oral arguments on July 13, 2000. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings, including disposition of this motion. (See Doc. 26 ("In accordance with the provisions of 28 U.S.C. 636 **[*2]** (c) and Fed.R.Civ.P. 73, the parties in this case hereby voluntarily consent to have a United States magistrate judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.")) Upon consideration of the contents of the briefs, all pertinent materials submitted in support of the briefs, and the arguments of counsel, the Court **GRANTS** the motion for summary judgment on plaintiff's claims and **ORDERS** that plaintiff's complaint be **DISMISSED WITH PREJUDICE**. [1]

**FOOTNOTES**

1 Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (See Doc. 26 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of a district court."))

**FINDINGS OF FACT**

1. Plaintiff, John E. Potts, is of Native American heritage. **[*3]** (Doc. 18, Plaintiff's Exhibit 1, Deposition of John E. Potts, at 10-11 & 13-14) He is a descendant of the Monack tribe of Creek Indians (id. at 10-11) and is an official member of the Atmore Creek Indians, having at least one-quarter Indian blood (id. at 14).

2. Potts began his employment with the defendant in August of 1993 (id. at 9) as a pipe fitter/welder (id. at 32). Over the course of his employment, plaintiff performed numerous and varied duties which included laying pipe, setting meters and welding pipes. (See id. at 35-39) Plaintiff was informed of a job opening at Conecuh-Monroe Counties Gas District (hereinafter, "Conecuh-Monroe Gas") by Jerry Johnson and Pete Hicks. (Id. at 31 & 98; see also id. at 97 (Potts' testimony that Johnson had something to do with him getting a job with Conecuh-Monroe Gas); see Doc. 18, Exhibit 3, Deposition of Gerald Borden, at 14 (Jerry Johnson recommended Potts to him))

3. Plaintiff's job as a pipe fitter/welder placed him in the construction department of Conecuh-Monroe Gas as opposed to the service/appliance department of the defendant. (Doc. 18, Exhibit 1, Potts depo., at 43; see Doc. 18, Exhibit 2, Deposition **[*4]** of Jerry Johnson, at 17 ("We have got a construction department and a service department. Johnny was in the construction part most of the time. When we needed him, he would help us.")) At all times, Mike Presley was plaintiff's direct supervisor. (Doc. 18, Exhibit 1, Potts depo., at 36 & 43)

4. Jerry Johnson, a service technician with Conecuh-Monroe Gas for twenty-three years (Doc. 18, Exhibit 2, Johnson depo., at 3), and the service supervisor of the defendant since approximately 1980 (id. at 15; Doc. 18, Exhibit 1, Potts depo. at 46), worked under the direct supervision of Mike Presley (Doc. 18, Exhibit 2, Johnson depo., at 6; see also Doc. 18, Exhibit 3, Borden depo., at 13 (Johnson reported to Presley); Doc. 18, Exhibit 4, Deposition of Mike Presley, at 13). [2] Johnson supervised Potts only when the two men worked together; otherwise, Presley supervised Potts inasmuch as Presley was the general foreman and Potts was hired to perform construction work rather than service work. (See Doc. 18, Exhibit 2, Johnson depo., at 14-16; Doc. 18, Exhibit 3, Borden depo., at 8 (Mike Presley was the general foreman at Conecuh-Monroe Gas)) In other words, when Potts performed service **[*5]** department work Johnson was his supervisor; otherwise, Presley was Potts' supervisor. (See Doc. 18, Exhibit 2, Johnson depo., at 18; Doc. 18, Exhibit 3, Borden depo., at 10 ("As is typical with any organizational chart, anyone above you on that chart is your supervisor. Whether they are called a service supervisor or foreman or transmission tech supervisor, anyone you are below in that organizational chart, you are under their supervision."))

**FOOTNOTES**

2 The none-too-cooperative deponent was arrested on numerous occasions throughout high school, and

perhaps thereafter, for fighting and disorderly conduct. (*See id.* at 11-13) It was Johnson's testimony that he never threatened to fight with Potts because "if [he] want[s] to fight, [he] fight[s]." (Doc. 18, Exhibit 2, Johnson depo., at 56)

5. Johnson is of Creek and Cherokee descent, according to what he has been told by his parents and grandparents, but is not a member of any tribe or Indian organization and does not really consider himself to be an Indian. **[\*6]** (Doc. 18, Exhibit 2, Johnson depo., at 53-54; *see also* Doc. 18, Exhibit 1, Potts depo., at 58-59 ("Some of his kin people claim to have some Indian heritage on them, but whether he is a member of the reservation or any reservation tribe, I have no idea. I mean, you know, so far as I know, he has no documentation or anything, you know, to my knowledge."))

Q What do you think of Indians?

A I have no problem with them.

Q What about being like a bunch of negroes? Do you have a problem with that?

A What I meant by that, they are wanting everything for nothing. They accuse the white man. The white man is taking all the blame for them. Johnny, he is just on and on and on and on.

Q So, basically, you believe that black people are wanting something for nothing?

A Yes.

Q All black people?

A No.

Q How many? Half?

A About a third of them probably.

Q About a third?

A The ones sitting around on the street down on the corner down here waiting on a hand-out.

(Doc. 18, Exhibit 2, Johnson depo., at 54)

6. Approximately one to one and one-half years prior to November 19, 1996, Potts began having problems with Johnson. (*See* **[\*7]** Doc. 18, Exhibit 1, Potts depo. at 47-48) On one occasion, while digging a hole with a backhoe on Wolf Log Road, Johnson started hollering at him, cussing him and then stepped on the backhoe blade and grabbed his collar. (*Id.* at 50 & 52) Potts characterized Johnson's demeanor following completion of the digging of the hole, as follows: "He started talking about this, that -- you know, what I was doing wrong, fussing and carrying on, first one thing and then another. . . . He told me if I didn't like the way he was doing things, that we'd go to the woods and settle it." (*Id.* at 51) Potts admitted, however, that on this occasion, Johnson never said anything racial or ethnic in character (*id.* at 52) and, in addition, admitted that prior to this time no one else had joked or kidded him about his Indian heritage and that any physical confrontations or problems that occurred all involved Johnson (*see id.* at 53). During this period of time, Potts kept matters to himself and did not inform Presley or anyone else about his problems with Johnson because he chalked everything up to normal working conditions. (*Id.* at 53-54) "I had--working construction you run up on all kind **[\*8]** of incidents. You know, lot of times though, you know, you know a job's only going to last so long. So instead of causing trouble, getting fired or something like that you just kind of tolerate certain incidents and just go on about your business." (*Id.* at 54)

7. On another occasion prior to November 19, 1996, while working on installing a gas main somewhere on Highway 31, Johnson began a normal diatribe of cussing, hollering and screaming because he perceived that the work was not getting done because everyone was spending too much time at the water cooler

drinking water. (*Id.* at 54-55) The following day, Johnson left the gas company without a water keg on his truck and when the water keg on Potts truck got close to where Johnson and Presley were working, Presley asked for the water keg to be left with them. (*Id.* at 55) Thereafter, the following occurred: "I told him it looked like to me Jerry didn't need no water keg because he complained about us drinking so much water that he, you know, must have undoubtedly been able to get along without it. Well, that's when he [Jerry] got mad again. . . . Jerry, again, asked me if I wanted to go to the woods and settle it. . . **[*9]** . It all kind of blew up after that, but Mike separated us. We went on, cooled down and things kind of got back to normal." (*Id.* at 55 & 56) Again, Johnson did not make any comments about Potts' Indian heritage during this physical confrontation on Highway 31 (*see id.* at 57-58), but between the log road incident and the Highway 31 incident such remarks had been made by Johnson (e.g., Indians not being any better than a bunch of Niggers) to the point that Potts was finding them "hard to tolerate." (*Id.* at 58) Potts reiterated that no employee of the defendant other than Johnson ever used any racially derogatory language or slurs to him or about him. (*See id.* at 60) However, Potts did complain to Presley about Johnson's harassing treatment of him. (*See id.* at 84-88) "It was made plain to me that Jerry Johnson was my supervisor, I was to take orders from him and that there was nothing wrong with the way he was treating me." (*Id.* at 84)

8. Potts testified that on more than one occasion, Johnson made the comment that Indians were no better than welfare Niggers. (*Id.* at 60-61) According to Potts, these comments were made in the presence of just about every employee **[*10]** in the office, out in the field and in the shop where the workers assembled each morning. (*Id.* at 61) On or about November 15, 1996 (*id.* at 121), prior to the Alabama/Auburn football game, when the workers were gathering in the shop, a discussion about casinos on Indian reservations came up and during that discussion Johnson commented that the Indians on reservations were "like a bunch of damn Niggers wanting something for nothing." (*Id.* at 66; *see also id.* at 64-67; *cf.* Doc. 18, Exhibit 2, Johnson depo., at 29 & 33-34 (Potts provoked him to say that the Creek Indians, plaintiff's people, were like a bunch of Niggers or Negroes, wanting something for nothing, by running his mouth about the casino business in Atmore and complaining about the white man taking Indian land)) [3] Barry Stewart, a construction worker at the defendant, was present during the conversation regarding a gambling casino on the Indian reservation and heard Johnson comment that the Indians on the reservation were like a bunch of Niggers. (*See* Doc. 18, Exhibit 5, Barry Stewart depo. at 5)

**FOOTNOTES**

[3] Johnson tries to discipline himself to say black people most of the time, and never calls a black person Nigger to his/her face, but, on occasion, when no black people are present, refers to black people as Niggers. (Doc. 18, Exhibit 2, Johnson depo., at 37)

**[*11]** 9. Mike Presley gave the following relevant testimony about comments made by Johnson about Indians:

Q Did you ever witness or did you ever hear Mr. Jerry Johnson make any disparaging remarks about Indians?

A No, not that I recall. You know, people -- everybody around here might joke, you know. But as far as just pointing one out and saying something about it, no.

Q Explain to me about joking.

A Well, everybody has nicknames. They call me "Shorty" and like that.

Q But I am talking specifically about Indians at this point. Do you recall any type of remarks or comments made by Mr. Jerry Johnson about Indians?

A Not just 100 percent to say he was just directing it right at Johnny, no.

Q Again, I am asking you about Indians; not John. We can talk about John in a second.

A He might have made some about the history, you know, just small talk about the history of

the Indians.

. . .

Q What would be some of the things that he talks about with the history of Indians that you are telling me about?

A Just like where they come from and how long they have been over here and just stuff like that. He don't discuss a lot of that with me, no.

. . .

Q Now, with regard to John Potts, in **[\*12]** particular, do you recall any type of comments or remarks made by Mr. Jerry Johnson about John Potts being an Indian?

A Well, he knew he had Indian in him.

Q Did he make any remarks about that?

A He may have called him an Indian.

Q What would he have said?

A Let's go to work or something. He might have called him, Hey, Indian, or something like that. I am not 100-percent sure on that.

Q But you recall things of that nature?

A I have heard it, yes.

Q Who were those comments made in the presence of, besides yourself?

A Everyone that works here.

Q What about Mr. Borden?

A I don't know about him now. A lot of time he wouldn't be out back with us while we are getting ready to go to work.

Q What about Mr. Fred Kelley, would he have heard any of that?

A I'm not sure about that.

Q When you said everyone who works here, what did you mean?

A The group here that usually reports here in Evergreen.

Q Would Mr. Jerry Parker have been part of that group that reports here?

A He was. A lot of mornings he wouldn't be out back with us, you know, when we were getting ready to go to work. He would come in and get him some coffee, but I don't know if he heard him or not.

Q But you heard **[\*13]** him and you recall?

A I have heard the Indian remark, him being an Indian.

Q About on how many occasions do you recall hearing this?

A I don't know.

Q More than once?

A Yes, I have heard it more than once.

Q Would he have done it more than maybe once a week?

A I don't know. I didn't keep a document of it. It is possible, yes.

Q Did you ever mention or report this type of behavior to any one of your supervisors?

A No, because it was in a joking manner, from what I heard.

Q Mr. Johnson thought it was a joke?

A Yeah, and Johnny did too, as far as what I am aware of, because he never came to me and told me that the remarks that anybody was making to him bothered him or he wanted them to quit.

Q . . . Any other instances with regard to John Potts, in particular, being an Indian?

A Not that I can just pinpoint, no.

Q Let me ask you this: There has been some testimony about an occasion where John Potts and Jerry Johnson and, now, I think we know that Barry Stewart were present, where John and Jerry were evidently discussing a casino or an attempt to get a casino nearby and Jerry Johnson made some type of a comment with regard to, Indians are like a bunch of Niggers or a bunch **[\*14]** of Negroes. Do you recall hearing that?

A I didn't hear it out of their mouth, no. I heard everybody else talking that it could have been said, but I didn't hear him say it.

. . .

Q Would you consider the statements that were made by Mr. Johnson with regard to Indians being like a bunch of Niggers or Negroes, would you consider that a disparaging remark or a discriminatory remark?

A Not in a joking manner; not when everybody -- I mean, you take a bunch of people working there and everybody has got nicknames and they joke with one another. It was never presented that Johnny, either it was hurting his feelings or if he was even saying that was against him, because he joked a lot of times with everybody else.

Q What did he joke about?

A Just calling a lot of people nicknames.

Q What did he call them?

A Well, he called Franklin Williamson the Hog; Barry Stewart Rooter.

. . .

Q So you felt all of this was done in a playful manner, in your opinion?

A That's right. And no one, neither one of them has come to me, or anybody has said, I don't like those remarks. I would like him to quit.

Q If someone would have come to you and said that, what would you have done?

A Well, I would **[*15]** have taken the appropriate action, talked to them, made them stop. And if they didn't do that, you know, write them up, reprimand them.

(Doc. 18, Exhibit 4, Presley depo., at 14-20)

10. A third physical confrontation eventually occurred between Potts and Johnson, once again on Highway 31 (*see* Doc. 18, Exhibit 1, Potts depo., at 70-75), on November 19, 1996 (Doc. 15, Exhibits 1-3 to Potts depo.). This confrontation took place after Potts made complaints to management about Johnson. (Doc. 18, Exhibit 1, Potts depo., at 70) "I never specifically said 'racial slurs' because I figured all of them had heard it, or just about all of them except for Mike. So, you know, I felt like all of them was -- when I said 'harassment', I felt like all of them was aware of the type harassment I was going through." (*Id.*)

11. On this third occasion, Potts and Johnson were out in the field running service to a house when the father of the person they were running service to, a man Potts previously worked with, stopped to talk with the plaintiff. (*Id.* at 72-73) During the ten minutes Potts initially spoke to Arthur Wilder, Johnson glared at him. (*Id.* at 73)

Anyway, Arthur **[*16]** goes back around the house, he looks, I reckon just checking his daughter's trailer out, you know, she just set it up. I went back over there and started to work. Well, when Arthur come back out from around the house and doing his little tour of his daughter's trailer, he come back over there where I was working at and stopped for a minute before he left. Well, that's when Jerry goes to hollering and screaming from the road. Well, I turned around then and told him, you know, 'I'm taking a break, Jerry'. Well, about that time, you know, Arthur kind of gets upset because he can tell Jerry's done getting bent out of shape and told me, he said, 'I don't want to get you in trouble', he said 'I'll go ahead and leave'. But anyway, Arthur went ahead and left, so I started back to work.

Well, I was doing some welding[;] when I flipped my hood up Jerry was standing in front of me. All right. He commenced to cussing and fussing and carrying on, first one thing, then another, raising sand. Well, it completely got out of control, that's when he run his hand in his pocket. Now, Jerry had been rumored to have threatened several people with knives, okay? I mean, Doug Williams -- like I said, poor **[*17]** Doug's passed away. But there's enough people in the shop that can verify that the man got after him with a machete.

Well, when he run his hand in his pocket down there that's when I figured he was going for . . . his knife. Well, I told him, I said, "Boy", I said, "I hope you do come out of there with a knife". I had a hammer laying right there beside me. I ain't going to lie to you, I was fixing to lay his head wide open if he come out [of] there with a knife.

. . . Well, when he come out of his pocket he didn't bring nothing out with him, nothing. No cigarette lighter, no knife, nothing.

Well, he was already up there in my face getting mad and bent out of shape and stuff and screaming. I told him, I said, "Look boy", I said, "If you want a knife", I said, "I'll give you a knife". And I said, "I hope you do try to cut me". I did, I opened my knife up and handed it to him; held it out for him. I would rather him to have took that knife and me standing there with that hammer in my hand than me go back to welding and he come up behind me with a knife. . . . I told him then, I said, "Jerry", I said, "The best thing for you to do is get away from me". No, I told him to get out of **[*18]** my face. He turned around and then said, "I ain't in your face". I said, "Jerry, get away from me". I was done mad now. A man shouldn't be pushed to the point to where he's ready to take a hammer and beat somebody's brains out. But that man had done gotten to the point to where something had to happen. . . . Well, anyway, he went on back there and sat on that trailer back there. I went ahead and finished welding the pipe.

(*Id.* at 73-77)

12. It was after this Highway 31 trailer incident that Potts made most of his complaints about Johnson to Mike Presley and Gerald Borden (*see id.* at 79) no doubt prompted, at least in part, by the company's decision to issue a written warning to both men for their actions on November 19, 1996 (*compare id. with id.* at 81). Both men refused to sign the employee warning report (*see id.* at 81-83; *see* Exhibit 2 to Potts depo.) [4] and instead, each prepared a written statement of the incident (*see, e.g.*, Doc. 18, Exhibit 1, Potts depo., at 90). Potts statement, dated January 27, 1997, reads in its entirety as follows:

On January 3, 1997 I, John E. Potts received an employee warning report, which is included in this report. **[\*19]** I was told I was to read and sign it, upon reading I realized not only was it incomplete but it was very inaccurate. Since the incident took place on November 19, 1996 I assumed short memory was to blame. Being aware of the fact that this was to go on my permanent record and that the incident was reported inaccurately, I refused to sign it and was asked to write my version.

About two months after Jerry and I started working together, I was operating the backhoe, Jerry obviously did not like the way I was working because he was yelling and making motions with his hands. I did not appreciate the way he was acting but I tried to overlook it in order to get along with him. Unfortunately, I must have messed up the dig I was making really bad because Jerry stood on the top edge of the blade and made a motion with his hands like he was going to grab my shirt collar only to brush it, as if he had changed his mind. He later denied touching my shirt collar.

In the discussion that followed Jerry stated that if I was not pleased with the way things were going we could go to the woods to settle it. In light of Jerry's tone of voice and the circumstances surrounding the situation there was no **[\*20]** doubt in my mind that he was challenging me to fight in order to settle the matter. Knowing it would cost us our jobs, I chose not to fight. I did tell him that if he ever touched me in anger that we would fight, but we would not make it to the woods before we did. Jerry denied having touched my collar, but verified the remarks were made.

While Jerry and I have been working together, there have been several times in which he inappropriately shouted, screamed and yelled at me. Jerry has belittled and embarrassed me in front of strangers and friends alike with his treatment of and his actions toward me. I have endured all of this in order to keep my job and try to get along.

About three weeks before the second incident I went to Mike and told him Jerry was getting worse and was constantly rushing, shouting at me to hurry up. I told Mike that Jerry's constant fussing was beginning to be more than I could handle and I felt like I was going to have to somehow, slow him down. Mike's comment was for me not to let things get out of hand and not to start a fight with Jerry.

The second incident occurred on Highway 31 north during the month of June or July. Henry Palmer, myself, and one of **[\*21]** the part-time help were putting the line down and Jerry was fusing it together ahead of us, most of the time, around a curve out of our sight. Once again, I was not performing to his expectations. Jerry accused me of being slow and the reason that I was so slow was because I was taking too many trips to the water cooler. Jerry, once again, remarked that we could take this to the woods if I did not like it. This challenge, issued by Jerry, was witnessed by Mike Presley. The cause of this incident is still uncertain and not agreed upon.

During the meeting that followed it was brought up that I was probably under a lot of stress, having just been through a divorce. Mike Presley also made it clear to me that Jerry was my boss and I was subject to his orders. Mike Presley also stated that Jerry had always talked to people this way and no one else had thought anything about it and he could not see why it should bother me. Mike later denied saying this. This meeting gave me the impression that my stress was the blame for me losing my temper. I also understood that I was to take orders from Jerry and should be willing to take any verbal abuse that he might throw my way. It was never made **[\*22]** clear how much water I could consume or how many trips to the water cooler I was allowed to make. Since this issue was not addressed and nothing was said to Jerry about

his treatment of me, I must assume I did indeed abuse my water privileges. In the months to follow I was treated for a kidney infection. My physician told me the best preventive measure would be to drink plenty of fluids.

On November 19, 1996, Jerry and I had left to run a service on Highway 31 south. When we arrived on the job site, I put the signs out and was setting up my welding equipment. I was missing the C-clamps and went back to town and purchased two more. I came back to the job site and continued with my duties. A short time later the father of the customer we were servicing stopped by to see if we needed anything. I recognized him as a person I had worked with for many years. I had not seen him for several years and I stopped to talk with him. I noticed Jerry standing behind me glaring at me and I started paying attention to Author's watch. Taking into account the time before I started paying attention to the time, I believe I could not have talked more than fifteen minutes. I have since talked to Author [*23] Wilder and he will verify that we talked for no more than fifteen minutes. After I started back to work Author came around the trailer to ask more questions about what might be needed of him in order to get the gas hooked up to the trailer. This is when Jerry started to yell from the highway. Not wanting to be humiliated and belittled in front of an old friend[,] I replied, in the same tone as he had used, that I was taking a break. Keep in mind that on this particular day we had started work at seven a.m. and it was now after nine. Author got upset, said he did not want to get me in trouble, and left.

I started back to work and Jerry was still at the road making the bore. I had my welding shield on doing some brushing on a weld on a high pressure line that was to go under a major state highway. When I raised my hood Jerry was standing in front of me. I stopped to see what he wanted and he started to argue. After seeing he was not going to leave and continued to argue I took my welding hood off. The argument took place in my work area which was about six foot by six foot. I never left my work area. We continued to argue and both of us were getting angrier. I had heard rumors of [*24] Jerry making threats with a knife and when Jerry went into his pocket I thought he was going to get his knife. When Jerry said he did not have a knife, I offered him mine. I had no intention of being cut, verbally abused, nor harassed any longer. I felt I could not continue to work under these conditions. My personal safety, well being, and peace of mind were worth more than this.

Seeing that things had gotten well out of hand and that bodily harm could result, I told Jerry that the best thing for him to do would be to get out of my face. He said that he was not in my face. I then replied that he had best get away from me. When I went to slide the pipe under the road, the hose to the boring tool was still in the hole and I had to wait for it to be removed. Even with all the time lost putting out signs, going back to town, and our arguing I had welder four joints of pipe together, the tap was welded in position in the hole, the no-blow was welded on top of the main pipe, the valve was welded on the other end, and I still had the test on at 12:50 p.m.

It was suggested in the meeting that Jerry was in my work area because he had to get to the radio to call Mike about his problem with [*25] me. Taking into account the completion time of the job and the fact that I was in my work area during the argument, I say he had no problem to call about. Even if he did need to use the radio, Unit 26 had a working radio and was closer to where he was working.

I have been [a] construction worker for many years and have worked under various conditions on many jobs. I have never encountered the type of treatment or verbal abuse as I have been subjected to while working for this company. As a welder I have a good reputation and do good quality work when given a reasonable amount of time.

Jerry Johnson, to the best of my knowledge, has a limited knowledge of the type of work I do as a welder. I am not complaining about him being my boss but I do not believe he is qualified to tell me how to do or how long it should take me to complete my job. His help or suggestions are welcome and in most cases appreciated. Jerry has challenged me to fight two times, this has been witnessed by Mike Presley and verified by Jerry Johnson in the presence of Jerry Parker. I cannot comprehend why a company would allow their employees to be treated in such

a manner nor why they did nothing to remedy the **[\*26]** situation when it was presented to them.

(Doc. 15, Exhibit 1 to Potts' depo.) Johnson's written statement reads in its entirety as follows:

The bore took 45 minutes to complete. I checked my beeper clock when bore started and when it came out on other side of Hwy 31.

Meanwhile when I started the bore, second time, first came out shallow, a black man pulled up on high side of drive beside bore pit and stopped. The pierce arrow was far enough in bank that I let go from holding back end up and got out of bore pit[,] walked over to truck, said good morning[;] he wanted to know if we knew where to set meter[.] I replied yes the woman was home and she would leave door open to get in to connect furnace[.] I told him it probably would take all day to get gas line to trailer[.] He said okay "I was just checking." I started back to bore pit when welding machine shut off. Johnny come walking up driveway [and] commenced talking to the man[.] I got back in bore pit to watch marks on hose to know how far pierce arrow was under road. When it was about across, I got out of bore pit[,] got on ditch witch and dug exit pit across highway[.] While I was digging hole[, **[\*27]** ] Johnny and [the] man pulled down driveway to [the] welding truck [and] started to talking. What they were talking about I don't know or care. When the bore come out I looked at the beeper clock[.] It took 45 minutes to make the bore. I walked across the road and hollered to Johnny about finishing welding pipe before state man came by[;] exit pit was dug close to shoulder of Hwy. Johnny replied, I'm on break[;] I replied[,] you don't get a 45 minute break. He wouldn't finish welding[; instead, he] kept on talking to the man. I called Mike on [the] radio to see if he would come to [the] job site, [but] he said he couldn't right then but he would if I needed him to[.] I said disregard, that[']s okay[.] After I called Mike [the] man left. Johnny was mad about [me] calling Mike to come down. I went to welding truck to get [a] Pepsi cola out and set in truck and drank it. I finished the Pepsi[,] got out of [the] truck to light a cigarette when Johnny started running his mouth about don't never talk to him in front of his friends. Hollering at him [,] I said I didn't holler at you, I said you needed to finish welding pipe up. He was mad then about **[\*28]** me calling Mike[.] I reached in my pocket to get my lighter out[] when he said what are you going to do pull a knife on me and I said one Johnny I'm getting my lighter out and don't need a knife for you. He then reached and got his knife out of his pocket and said take mine, I hope you do. I replied[,] Potts one of us is fixing to get hurt you or me one! A few more words was said [and then] I turned and went back to where [the] bore pit was before [the] fight broke out. After things cooled down[,] nothing else was said. Johnny finished welding [the] pipe and asked if I would help push it under [the] highway[.] I said yes, but let me back pierce arrow up[.] We completed [the] job with nothing else said[.]

About previous verbal warnings[:] We have received only one to my knowledge [and] that was up on Hwy 31 North at bore site with directional boring machine. When Johnny[,] Mike and I discussed it in his office it pretained (sic) to [the] same incident. Mike contends this is the third time. If this is the third time[,] I [would] like to know [the] dates of these warnings[.] A record should be kept if its that important [and] not just someone's **[\*29]** word to be taken. If no dates can be verified[,] I consider [that] only one [prior] verbal warning [was given.]

(Doc. 15, Exhibit 2 to Potts depo.; *see* Doc. 18, Exhibit 2, Johnson depo., at 20 (testified that Potts would not do his work on this occasion but instead insisted on talking to "some black guy down there. I don't know who it was. I didn't ask him.")).

## FOOTNOTES

4 This report reads in its entirety as follows:

On November 19, 1996, Jerry Johnson called Mike Presley on the radio and wanted Mike to come to the job site because he was having a problem with Johnny Potts. Mike was unable to go to the job site then because of his work assignments.

Mike asked Jerry Parker if he would meet with him and the two employees concerning the matter that occurred on the 19th. They met on Friday the 22nd.

Jerry Johnson stated that while he was boring Highway 31, Johnny stopped welding to talk to a man for 45 minutes that did not work for Conecuh-Monroe. Jerry said that he stopped and told Johnny that he needed to get the pipe welded-up so that they could get the pipe under the highway. When he told Johnny this, Johnny started arguing and wanted to fight. Jerry stated that he reached into his pocket to get his lighter and Johnny thought he was going for his knife so Johnny asked him if he wanted to use his knife. Jerry said that he walked away from him and went back to work.

Johnny Potts stated that he was talking to a friend that had stopped by to see him. He said the friend was asking him if anyone had to be home with the work that they were doing. He said that while he was talking to his friend Jerry was yelling and screaming at him from the highway. Johnny said that his friend got upset and left. After his friend left Johnny thought that Jerry was going to pull a knife on him.

Johnny said that he did not talk to his friend for 45 minutes and that Jerry did not know what they were talking about. Johnny also stated that he had the pipe welded-up by the time the bore was made.

Both employees have received previous verbal warnings to stop arguing on the job. Jerry Parker and I made it clear that the appropriate action would be taken the next time this took place. It seemed that nothing was resolved concerning this conflict.

(Doc. 15, Exhibit 3 to Potts depo.)

[*30]  13. Potts also spoke with Jerry Parker about this specific incident and told him he was being harassed, as reflected in his written statement. (Doc. 18, Exhibit 1, Potts depo., at 92-93) Potts did not say anything to Parker on this occasion about race or ethnic remarks made by Johnson but testified Parker knew about such comments since he was present in the shop when one of those comments was made. (*Id.* at 93)

14. After this third incident, Potts made several comments to Mike Presley about things getting worse with Johnson. (*Id.* at 91; *see id.* (Potts would tell Presley, "It looks like it's going down[.]"))

15. Potts filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 5, 1997. (Doc. 15, Exhibit A)

Since 1995, and on a continuing basis, I have been subjected to racial slurs about my Native American race, by my foreman. I have been employed since 1993, and I was assigned to work under my present foreman, Jerry Johnson, during 1995. Although Mr. Johnson made racial slurs towards me prior to 1995, the slurs and discriminatory treatment increased after he was assigned to be my foreman. Additionally, Mr. Johnson [*31] has made derogatory statements about my visits to the reservation for dental appointments, and has made critical statements about Native American gambling enterprises. I informed Jerry Johnson that I did not appreciate his treatment of me, however, he told me that we could go out to the woods to settle the matter.

Jerry Johnson, Foreman, has stated in the presence of my co-workers that ". . . an Indian is no better than a Nigger." Although I have complained to the general foreman and general manager about the harassment, I was informed that there was nothing wrong with the way Johnson speaks to me.

I believe that I am being discriminated against on the basis of my race, Native American, in violation of Title VII of the 1964 Civil Rights Act, as amended.

(*Id.*)

16. On March 20, 1997, Jerry Johnson was issued an employee warning report by General Manager Gerald Borden. (Doc. 15, Exhibit 9 to Potts depo.) The company statement on this report reads as follows: "You have made statements to John E. Potts which are racially offensive, and which amount to racial harassment in the course of employment." (*Id.*) The warning decision on the report states: "The District has **[\*32]** a policy which absolutely forbids racial harassment in any form. Such conduct will not be tolerated, and you are strongly warned and admonished to refrain from all such conduct in the future. You shall not take any retaliatory action against John E. Potts for making this complaint." (*Id.*) ⁵

**FOOTNOTES**

⁵ Johnson admitted to Borden that he had made all statements attributed to him by Potts in the EEOC charge but stated that they were made "mostly in a joking form[.]" (Doc. 18, Exhibit 2, Johnson depo., at 39)

17. The Conecuh-Monroe Counties Gas District personnel handbook reads, in pertinent part, as follows:

7.3.3. Group Two Offenses. Group Two offenses are defined as instances of unacceptable conduct by an employee which are very serious and may constitute grounds for dismissal upon the first occurrence of such conduct, unless mitigating circumstances, as determined by the general manager, render lesser discipline more appropriate. Examples of Group Two offenses include, but are not limited to, the following **[\*33]** types of situations:

7.3.3.17. Harassment - any form of harassment including sexual, racial, political, and religious of another employee or the public[.]

(Doc. 18, Exhibit 6) Borden considered it discrimination for Johnson to have said "Indians are like a bunch of Niggers[]" and this was why he was reprimanded under company policy. (*See* Doc. 18, Exhibit 3, Borden depo., at 42-43) Borden explained the mitigating circumstances that spared Johnson's job: "Mr. Johnson's explanation of the statements that had been made and were made, were made as they are done normally by a bunch of guys working together, cutting up, kidding, not serious kinds of things, made me feel like that it did not warrant a firing. A reprimand, yes." (*Id.* at 45) Thereafter, the following discussion took place:

Q Do you have any black employees here?

A Yes.

Q If I am understanding you correctly, the term "nigger" would be just cutting up?

A Not necessarily.

Q Please explain.

A It depends on how it was said.

Q As it was said by Mr. Jerry Johnson, is that just cutting up to you?

A Yes, it was.

Q That was just cutting up?

A Yes, sir.

Q **[\*34]** Do you think that any of the black employees, if they overheard it, would have been

offended?

A About the Little Mowac?

Q No. About Indians being like a bunch of Niggers.

A I can't address how somebody would feel. I don't know. I assume they might. Some people don't. Some blacks in my employment call other blacks Niggers.

(*Id.* at 45-46)

18. Johnson's rebuttal statement to this warning, made on or about March 21, 1997, reads, in pertinent part, as follows:

In no form or fashion have I made any discriminatory remarks about his heritage of being Indian descent in a serious manner. Everything ever said about Johnny usually was brought up by him, myself or fellow co-workers[] while sitting around [the] break table in [the] warehouse drinking coffee and talking about anything and everything[.] Most times[,] the Indian subject was brought up by Johnny! For instance[,] he read in the paper one morning about the legislators was (sic) going to turn down [a] bill for placing a casino on reservation land in Atmore[.] So, everyone at [the] table voiced there (sic) opinion about the casino. I asked Johnny why did they deserve a casino when no-one **[*35]** else did in the state. Johnny replied, the Creek land didn't belong to the state [but rather] was Indian land[.] I said[,] so we pay taxes . . . which helps to support the reservation don't we? He said[,"]Yes, ain't it nice.["] I said if you all can have one why can't we. Johnny said because you're not Indian[;] you can come and spend your money at the casino and not have to drive to Biloxi [and] besides when we get it I'll have a big check. I told Johnny the Bingo Palace didn't get my money[,] I know the casino wouldn't[.] Then Johnny started laughing and jokingly saying won't it be nice, I might be able to quit work and let you support me. Well[, the] conversation kept on about why should they have a casino and we couldn't. Johnny said if it wasn't for the white man lying and cheating us we would still have all our lands. I replied, "Johnny[,] we didn't take your land and we didn't have slaves[.] It was our ancestors[,] not us[,] who took your lands and brought the slaves over. But we're still paying for things our ancestors did!["] I told Johnny they were like a bunch of Negroes thinking white men owed them a living for things our ancestors did two **[*36]** hundred years ago[.]

On to the matter about remarks made about Johnny going to the dentist on the reservation. All I've ever said to him was why not find another dentist, you've been there twice for the same problem, you do know we have dental insurance[,] don't you? His reply was yea (sic) but this is free and I can visit around while my work on my parcel (sic) is being fixed and if they can't fix them I can get a new set made at no cost.

If Johnny was uncomfortable with our discussion about his Indian heritage he never mentioned it to me or anyone else to my knowledge. During his time frame from 1995 to present day, I've been to his home on weekends and holidays during 1995 working on an 18 ft utility trailer for him and I to build and use for hauling equipment around. I've also been to his home during same time frame to show him how to dig his sweet potatoes with a middle buster, after work hours[.]

My closing statement is if his problem with me has been going on since 1994 (sic) why wait until now to accuse me of racial discrimination. I honestly believe these charges were made in retaliation for the incident that happened on [the] work site in November [of] 1996, **[*37]** which he wasn't happy with the results.

If I'm guilty of any racial remarks about him being of Indian descent, then 90% of the employees at Conecuh Monroe Gas district office in Evergreen is guilty of [the] same thing[.] Everyone here jokes with him about being Indian. Johnny's main problem is he doesn't like me telling him what to do. He's mentioned this to Mike before[.] He doesn't want anyone but Mike

to be his boss. Finally[,] the only other remark made by me is sometimes when we're leaving [the] office I'll say are you really lill (sic) MOWAC, which he doesn't mind I guess because he has it on [his] truck door[.]

(Doc. 15, Exhibit 9 to Potts depo.)

19. Either on the 21st or 22nd of March, 1997, Johnson threatened Potts saying, "'If I lose my job over this, I'm coming to Flatrock[.]" (Doc. 18, Exhibit 1, Potts depo., at 115) Potts believed that Johnson was making a threat upon his life. (*Id.* at 115 & 116) Potts did not tell anybody about Johnson's threat because he felt that management had turned its back on him but instead, the following day told Johnson, "Boy[,] . . . that's the last time you better ever threaten me again[.]" (*Id.* at 117 **[*38]** & 118)

20. The EEOC, during their investigation, noted that ninety percent of the employees of Conecuh-Monroe Gas made jokes about Potts' national origin and plaintiff admitted that such joking went on but that he could not remember the content of those jokes because they were not tinged with anger like the comments made by Johnson. (*Id.* at 125-126)

21. The "Little Mowac" sticker or decal placed on the driver's side of plaintiff's work truck [6] offended Potts but he made no request that it be removed because he felt that if he "let them know it bothered [him], there [would] just be more coming behind it." (*Id.* at 126-130; *but cf.* Doc. 18, Exhibit 2, Johnson depo., at 35 (Johnson testified that Potts was proud of the sticker because he "laughed and carried on and giggled about it.")) Plaintiff felt that the decal was a reference to his heritage as opposed to his small stature even though he was not a member of the unrecognized Mowa tribe. (*See* Doc. 18, Exhibit 1, Potts depo., at 128-130) The decal remained on Potts' truck for approximately the final two years of his employment (*see id.* at 169); plaintiff does not know who placed the decal on his truck but his **[*39]** suspicions are that it was placed there by Jerry Johnson and/or Franklin Williamson since both men directed his attention to it (*see id.* at 129). According to Barry Stewart, only Potts' truck had a sticker/decal. (Doc. 18, Exhibit 5, Deposition of Barry Stewart,. at 7; *see id.* at 8 (no one else had his name or nickname on his truck); *but cf.* Doc. 18, Exhibit 3, Borden depo., at 35-36 (most of the employees had their name on the door of their truck, for example, Ray Madden had "Ray-Ray", and some had "Roll Tide" or "War Eagle")) Johnson took the decal off the truck after plaintiff's employment was terminated. (Doc. 18, Exhibit 2, Johnson depo., at 36)

**FOOTNOTES**

[6] Borden was aware of the decal but never asked what it meant. (*See* Doc. 18, Exhibit 3, Borden depo., at 35-36)

22. On August 1, 1997, Mike Presley evaluated Potts' performance for the preceding year. (*See* Doc. 18, Exhibit 1, Potts depo., at 131) Presley rated Potts' overall job performance as good and specifically rated as good plaintiff's job **[*40]** understanding, job performance, job productivity and dependability. (Doc. 15, Exhibit 9-1 to Potts depo.) The only rating lower than good was plaintiff's cooperation rating which was listed as fair. (*Id.*) [7] Presley specifically noted the following regarding Potts' cooperation: "Seems to work OK with someone not in the supervisor level. Seems to have questions about orders that are given [and] refused to standby on an emergency leak call when I told him to do so." (Doc. 15, Exhibit 9-1 to Potts depo.) In addition, Presley made the following general comments: "The quality of work he does has been fine, you don't have to go behind him to repair leaks or rework anything that he has done. Improvements that I recommend would be a better attitude towards work and improve on the time it takes to run a service line." (*Id.*) Presley discussed the evaluation with Potts on August 8, 1997 and noted on the form that plaintiff did not agree with the evaluation. (*See id.*) The reason Potts did not agree with the evaluation was because his memory of the standby leak incident, as set forth below, differed from Presley's. (*See* Doc. 18, Exhibit 1, Potts depo., at 134-135)

He [Mike **[*41]** Presley] come around and said, "They got a call down there, cut the gas line, what about hanging around and see if they're going to need you". Well, when he said that, you know, I [am] thinking, hang around, I got people to meet. Am I going to even get paid for it even. So, I said "Mike", I said, "I got somebody I'm suppose to meet" and I said, "Why don't you do it, or can't you do it"? Well, I done forgotten what was said after that, but he got rather

p'od and walked off.

Well, I come back through the shop then and followed him over here to the truck clean across the shop. I told him, I said "Mike", I said, "Go on", I said, "I'll call [those] people and tell them I can't get there". By that time, he was done good and mad, so he [said], "No, just go on", so I went on.

But he put on my evaluation that I had refused, which I never refused, I asked him, "Why don't you do it?" I never said, "I will not do it" or "I'm not going to" or whatever, you know, I just -- when he asked me what about hanging around I said, "Why don't you do it?"

(*Id.* at 136-137) [8] Therefore, on August 8, 1997, after reading the evaluation, Potts told Presley that he had not refused to stay **[*42]** for the call and when Presley twice insisted that plaintiff had refused to stay (*see id.* at 138-139), the following occurred:

On the third time I said, "Mike", I said, "You know good and well that's not the way it happened", I said, "If you insist on saying that's the way it happened", I said, "I'm going to call you a liar to your face". Well, he said, "I might want to call you a liar". Well, that's when I threatened him, I said, "If you call me a liar", I said, "You're going to pick your butt up off the floor". Now, that is -- I did. I mean, I got upset over it. I mean, for somebody that had lied to me and [to] turn around wanting to call me a liar, I got upset, yes. . . . I think I might have put some profanity in it.

(*Id.* at 139-140) Thereafter, Potts and Presley took their heated evaluation discussion into Gerald Borden's office. (*See id.* at 141-142) At some point, Borden leaned over his desk and holding his thumb and forefinger just a little bit apart told Potts that he was that close to being fired if he did not quiet down. (*Id.* at 143)

And I'm sitting there. I mean, I'm sitting in the chair just like this here, and in this position and **[*43]** I'm thinking to myself, "If I don't calm down", what's he talking about? I said, "Mr. Borden", I said, "You can fire me if you want to but", I was going to say, "You need to understand what's happening out back". About that time, he come out of his chair and leaned across and said, "Okay, you're fired", that was it.

(*Id.*) Borden described the reasons for plaintiff's firing, as follows: "No. 1, he probably would have been fired, following an evaluation, for threatening his supervisor. He probably would have been fired for that. I would have had to think about that and hear all sides of the story. The reason he was fired instantly was he said, Fire me. So I obliged him." (Doc. 18, Exhibit 3, Borden depo., at 55-56) Either that same day or a few days later, Potts went back to get a termination slip from Borden for unemployment compensation purposes; Borden refused his request telling the plaintiff, "'I'm not going to give anything to you, in fact, if you don't get out of here, I'm going to call the police and have them escort you off the premises'." (Doc. 18, Exhibit 1, Potts depo., at 147 & 148)

**FOOTNOTES**

**7** Presley's previous evaluations of Potts' performance, specifically those dated January 4, 1995, August 15, 1995, and August 7, 1996, reflect nothing less than excellent or good ratings. (Doc. 18, Exhibit 3, Borden depo., at 22-28) **[*44]**

**8** According to Potts, this standby leak incident occurred as much as a month or more before his yearly evaluation. (*Id.* at 137)

23. Mike Presley testified that the quality of the work plaintiff did was fine and that the only time he had a problem with Potts not obeying an order was one day when he asked the plaintiff to stay after 5:00 p.m. for a cut gas line and the plaintiff responded that he did not want to stay. (Doc. 18, Exhibit 4, Presley depo., at 5)

24. At some time during the course of his employment when plaintiff claimed in his discrimination charge that the discrimination had begun, Potts socialized with Jerry Johnson outside of work. (*Compare* Doc. 18, Exhibit 1, Potts depo., at 100 *with* Doc. 15, Exhibit 9 to Potts depo.) More specifically, Potts built a trailer for Johnson and Johnson showed Potts how to dig sweet potatoes. (*Id.*)

25. According to Gerald Borden, the first inclination he had that Potts was complaining of race discrimination was when he received written notice of the charge of discrimination from the EEOC. (Doc. 18, Exhibit 3, Borden depo., at 33-34) **[*45]** It was Borden's testimony that Potts never voiced any concern that he was being discriminated against or that other employees were speaking about his Indian heritage. (*Id.* at 39) Borden testified that he never heard the Indians/Niggers comment made by Johnson. (*Id.* at 40) "Mr. Johnson stated to me upon the investigation following this EEOC notice that he had made such statements. I think that is in writing, and he received a written reprimand from me for making those statements. That should all be in the file." (*Id.*)

26. The EEOC ruled in Potts' favor following his termination. (Doc. 18, Exhibit 1, Potts depo., at 133)

## CONCLUSIONS OF LAW

### A. Summary Judgment Standard.

1. **HN1** Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (**HN2** "The mere existence of some alleged factual dispute between the parties **[*46]** will not defeat an otherwise properly supported motion for summary judgment."). 9 **HN3** The clear language of Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A complete failure of proof by the non-movant on an element essential to his case renders all facts immaterial, so the movant is entitled to judgment as a matter of law. *Id.* at 323, 106 S. Ct. at 2553; *see Bennett v. Parker*, 898 F.2d 1530, 1532 (11th Cir. 1990) ("Facts in dispute cease to be 'material' facts when the plaintiff fails to establish a prima facie case."), *cert. denied*, 498 U.S. 1103, 111 S. Ct. 1003, 112 L. Ed. 2d 1085 (1991).

## FOOTNOTES

9 The substantive law will identify which facts are material. 477 U.S. at 248, 106 S. Ct. at 2510. The Supreme Court concluded in *Anderson* "that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255, 106 S. Ct. at 2514.

**[*47]** 2. **HN4** This Court must inquire "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict--'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512 (citation omitted) (emphasis in original). **HN5** The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. When the burden of proof at trial belongs to the nonmovant, as is the case here, the moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim," *id.*, but rather, "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324, 106 S. Ct. at 2553. **[*48]** Once this initial demonstration is made, Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*, quoting Fed.R.Civ.P. 56(e).

> *HN6*⟐Forbidding reliance upon pleadings precludes a party from "choosing to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995). In other words, there is no genuine issue for trial "where the record taken as a whole could not lead a rational **[*49]** trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538(1986).

3. *HN7*⟐In considering whether the defendant is entitled to summary judgment, the Magistrate Judge has viewed the facts in the light most favorable to the plaintiff. *Belcher v. City of Foley*, 30 F.3d 1390, 1392 (11th Cir. 1994). Therefore, what the undersigned has stated the facts to be in this opinion may not be the facts that would be established at trial. *See id.* at 1393 (citation omitted).

## B. Wrongful Termination Claim in Violation of Title VII.

4. Plaintiff claims that his termination was the result of racial discrimination and in retaliation for the filing of his charge of race discrimination with the EEOC on March 5, 1997. *HN8*⟐In a Title VII disparate treatment case, a plaintiff must prove intentional discrimination. *See Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320-1322 (11th Cir. 2000); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 & 1267 (11th Cir. 1999). A plaintiff "may use three different kinds of evidence of discriminatory **[*50]** intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Potts seeks to show discrimination using circumstantial evidence. (*See* Pretrial Document)

> *HN9*⟐
>
> When a plaintiff attempts to prove intentional discrimination in violation of Title VII using circumstantial evidence, we apply the now familiar shifting burden framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. . . . If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent. . . . The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its·action. . . . If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really **[*51]** pretext for unlawful discrimination.

*Schoenfeld, supra*, 168 F.3d at 1267 (citations omitted). "The same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the *McDonnell Douglas* presumption." *Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999), citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

5. *HN10*⟐In order to make out a prima facie case of discriminatory termination on account of race, plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse job action; (3) his employer treated similarly-situated employees outside his classification more favorably; and (4) he was qualified to do the job. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted). *HN11*⟐""To establish a prima facie case of retaliation, a plaintiff must show (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and

the adverse action.'" *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1281 (11th Cir. 1999) **[*52]** (citation omitted). **HN12** The Court has grouped together the prima facie cases of racially motivated/retaliatory termination as this step of the analysis offers no real obstacles in addressing the ultimate question of whether the defendant wrongfully terminated the plaintiff because where, as here, the defendant has volunteered a legitimate, nondiscriminatory reason for the plaintiff's termination, there is no need for a district court to engage in the *McDonnell Douglas* analysis, *Wright, supra*, 187 F.3d at 1305 n.24, citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715-716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983); *cf. Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) ("*Aikens* . . . mandates that at least with respect to the employer's proffered nondiscriminatory reason, the prima facie case is no longer relevant -- it has 'dropped out' of the inquiry."). **10**

**FOOTNOTES**

**10** If the Court was to engage in this analysis, such analysis might well be fatal to plaintiff's claim of wrongful termination on the basis of race but not his retaliation claim. The conclusion respecting the race-based termination claim might be reached because plaintiff cannot satisfy his burden of showing "that his conduct was similar to that of dissimilarly treated employees of another race[,]" *Abel v. Dubberly*, 210 F.3d 1334, 1338-1339 (11th Cir. 2000), since the only person he compares himself to, Jerry Johnson, is also a descendent of Creek Indians. However, the prima facie case of retaliatory termination is easily met. *See Cline, supra*, 206 F.3d at 660 ("The prima facie requirement for making a Title VII claim 'is not onerous,' . . . and poses 'a burden easily met.'"). It is stipulated that plaintiff engaged in statutorily protected expression in filing his charge of race discrimination with the EEOC on March 5, 1997 and that plaintiff was terminated some five months later on August 8, 1997. Moreover, the Court must find that the remaining prima facie element of a causal link between the protected expression and the adverse action has been satisfied in this case given the Eleventh Circuit's broad construction of that element. *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) ("'[A] plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"); *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991) ("'The causal link in the [retaliatory discharge] formula [is not] the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant.'"). Borden's knowledge of Potts' EEOC charge of discrimination at the time he terminated the plaintiff, standing alone, is sufficient to prove at this stage in the proceedings a causal link between the protected conduct and the adverse job action. *See id.* 141 F.3d at 1460-1461.

**[*53]** 6. As heretofore alluded to, the plaintiff's prima facie case of both discriminatory and retaliatory termination may be rebutted by the defendant's proffer of a legitimate, nondiscriminatory reason for the termination. *Wright, supra*, 187 F.3d at 1292 & 1305. **HN13** "The reason offered by an employer for an action '"does not have to be a reason that the judge or jurors would act on or approve."' . . . Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature." *Schoenfeld, supra*, 168 F.3d at 1269 (citations omitted).

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [termination]. The explanation provided must be legally sufficient to justify a judgment for the defendant.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-255, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981) **[*54]** (internal citation and footnotes omitted). Here the defendant has proffered a legitimate, nondiscriminatory reason for plaintiff's termination, namely, his direct threat to Mike Presley, that if Presley called him a liar, he [Presley] was going to have to pick his butt up off the floor and his failure to calm himself down following a heated exchange with Presley. The Court does not hesitate in finding that the defendant has satisfied its burden of production in this regard.

7. In an effort to establish that the reason offered by the defendant for his termination is a mere pretext for

unlawful race discrimination and in retaliation for filing the EEOC charge of discrimination, plaintiff contends that Jerry Johnson committed a Level 2 offense, like plaintiff, albeit a different offense than that which he committed, yet was not terminated for his conduct. [HN14]The plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that []he has been the victim of intentional discrimination. He may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's [*55] proffered reason is unworthy of credence." *Burdine, supra,* 450 U.S. at 256, 101 S. Ct. at 1095 (citation omitted).

> [HN15]Once a defendant articulates a legitimate, non-discriminatory reason for its action, the initial inference of discrimination "drops" from the case. . . . The burden then shifts back to the plaintiff to show that the proffered reason was pretext for intentional discrimination and that the defendant intentionally discriminated against him. . . . A plaintiff may show pretext and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons."

*Schoenfeld,* 168 F.3d at 1269 (citations omitted). The Court finds that Potts simply cannot create a genuine issue of material fact on the issue of pretext by comparing himself to Johnson since Johnson is a descendant of Native Americans the same as plaintiff. It avails plaintiff nothing to argue that a discriminatory reason motivated Borden to fire him since Johnson, another Native American, was not terminated for a comparable, albeit not the same, offense. Moreover, [*56] plaintiff has offered no evidence that Borden, Presley, or any other supervisory personnel of the defendant, made any comments of a racial or retaliatory nature either at the time of his termination or between the filing of his EEOC charge of discrimination and his termination. *Cf. Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361-1366 (11th Cir. 1999) (lengthy discussion of pretext), *cert. denied,*    U.S.    , 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000). In fact, there is no indicia of record that plaintiff was terminated because of his race as opposed to the reason given. Plaintiff has admitted that he lost his temper with Presley over Presley's yearly evaluation and physically threatened Presley. What fueled Potts' anger was the fair rating Presley gave him in the category of cooperation, as opposed to good or excellent, because of what Presley described as plaintiff's refusal to standby on an emergency leak call when told to do so. Potts admittedly called Presley a liar regarding this incident and also admitted to threatening Presley because his supervisor would not admit that his documentation of this incident was [*57] incorrect and thereby, in Potts' mind, had called him a liar. Even Potts' recollection of the underlying incident is that Presley asked him to stay at work after 5:00 p.m. for an emergency leak call and that he initially demurred by suggesting or asking that Presley stay since he was supposed to meet some people after work. Certainly, individuals' perception of conversations and actions can differ, as they did here, but the Court finds nothing surreptitiously unreasonable about Presley's documentation of the incident. Accordingly, the Court sees plaintiff's termination for what it was, a termination arising after a heated discussion and a threat of physical harm to a superior, [11] rather than a calculated retaliatory and race-based means by which to rid the company of the plaintiff. Therefore, the Court finds that the plaintiff has failed to offer any material evidence sufficient to demonstrate pretext in the defendants' legitimate, non-discriminatory reason for his termination.

**FOOTNOTES**

11 The Court considers Potts' termination to have arisen "in the heat of the moment" which sets it in stark contrast to the company's punishment of Johnson for violating the same category of offense that plaintiff violated, albeit not the same exact offense. This is but an additional reason why the company's differential treatment of Potts and Johnson cannot be viewed as a pretext for unlawful or retaliatory discrimination.

[*58] 8. Because plaintiff cannot rebut defendant's legitimate, nondiscriminatory reason for his termination, his retaliatory and discriminatory termination claims must fail. Plaintiff simply has not satisfied his ultimate burden of proving that he was terminated either because of his race or in retaliation for filing a charge of race discrimination with the EEOC.

## C. Hostile Working Environment Racial Harassment.

9. [HN16]To establish a hostile working environment racial harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on his race; (4) that the harassment was sufficiently severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *St. Hilaire v. The Pep Boys--Manny, Moe & Jack*, 73 F. Supp. 2d 1350, 1364 (S.D.Fla. 1999) (citation omitted); *cf. Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (delineating elements of a hostile-environment sexual-harassment **[\*59]** claim under Title VII), *cert. denied,*   U.S.  , 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000).

10. The Court will focus solely upon the fourth element of plaintiff's hostile working environment racial harassment claim because, though a close call, it is clear that the harassment to which Potts was subjected was not sufficiently severe or pervasive enough to alter the terms and conditions of his employment and create an abusive working environment. [HN17]There is both a subjective and an objective component that must be considered in determining whether harassing conduct was sufficiently severe or pervasive to alter the plaintiff's terms or conditions of employment. *See Mendoza, supra*, 195 F.3d at 1246.

The employee must "subjectively perceive" the harassment as sufficiently

> severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim . . . subjectively perceive[s] . . . to be abusive." Furthermore, "the objective severity of harassment should be judged from **[\*60]** the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"

> The objective component of this analysis is somewhat fact intensive. [HN18]Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Id.* (internal citations omitted); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-1522 (11th Cir. 1995) ("In deciding whether a hostile environment was created factors to consider include the frequency **[\*61]** of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work.").

11. The Court finds that the harassing conduct which Potts has alleged was not sufficiently severe or pervasive to alter the terms or conditions of his employment. Construing the evidence in the light most favorable to Potts, he has presented evidence of four categories of harassing conduct: (1) one specific occasion, during the course of a coffee table conversation about whether gambling should be legalized on Indian reservations, in which Johnson commented that reservation Indians were like a bunch of Niggers wanting something for nothing; (2) three instances in which Johnson yelled and cursed at him and was physically confrontational while working at certain job sites; (3) Johnson's constant "Hey, Indian" comments; and (4) plaintiff's work truck being adorned with the decal "Little Mowac." In analyzing this conduct in the context of the four factors outlined in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993), **[\*62]** as set forth above, the Court finds two of the factors-- interference with job performance and severity--decidedly absent from the conduct established by Potts and the other two factors--physically threatening or humiliating conduct and frequency of the harassing conduct--for the most part lacking and therefore, insufficient to compensate for the absence of the first two identified factors.

12. While Potts has presented evidence that Johnson's conduct was physically threatening and humiliating on three occasions during his approximately four years of employment with the defendant, on none of these occasions did Johnson use racial slurs or otherwise denigrate plaintiff's heritage. This omission is important because it leads inexorably to the conclusion that Johnson's conduct was not race driven, it being contrary to common sense that a supervisor guilty of racial harassment would refrain from racial epithets during those times when he is physically threatening an employee and roundly yelling at and cursing the employee, but rather, was perforce driven by Johnson's unredeemable and self-loathing boorish, bullying, offensive and unpleasant character and personality. *HN19*⚓Title VII simply cannot **[\*63]** be used as a shield to protect against physically threatening and humiliating conduct that is not race-based, *see St. Hilaire, supra*, 73 F. Supp. 2d at 1363 ("Title VII does not address generally offensive or unpleasant conduct. . . . Title VII does not provide a cause of action for employees who are exposed to harassment that has no reference to race, sex or national origin."); rather, such protection must necessarily come from an enlightened and sensitive employer.

13. Second, nothing in the evidence of record indicates that Johnson's conduct impaired Potts' job performance. Potts' job performance was consistently rated as good by his immediate supervisor, Mike Presley, with one exception that had nothing to do with Johnson. More importantly, on each of the three physically threatening incidents, the "Nigger/want something for nothing" incident, those occasions when Johnson said "Hey, Indian," and each day plaintiff saw "Little Mowac" on his truck's door, Potts successfully completed his job duties without the need to take off the remainder of the day or the following day. Accordingly, Johnson's conduct did not impair Potts' job performance.

14. Third, none of the **[\*64]** conduct alleged by Potts is severe. While Johnson's comparison of reservation Indians' support for casino gambling on reservations to a "bunch of Niggers wanting something for nothing" was insensitive and offensive it is not severe given the context in which the comment arose. It was during a coffee table conversation about legislation dealing with casino gambling on Indian reservations in Alabama, a not unemotional subject raised by Potts, the plaintiff himself commenting that the white man had taken Indian land, that Johnson made his pea-brain comment. Moreover, Johnson's physically threatening behavior can, at best, be described as generally offensive, not severe, since that conduct was not tinged with racial epithets. Johnson's "Hey, Indian" comments, comments which Presley, not Potts, identified, cannot even be described as offensive, much less severe, since they were made in a joking manner not unlike the joking that freely took place among employees of the defendant. Finally, Potts offered no evidence that Johnson was the individual who placed the "Little Mowac" sticker and therefore, this fact adds nothing to the severity issue.

15. Finally, aside from the "Little Mowac" decal **[\*65]** that was on plaintiff's truck every day, for the final two years of Potts' employment, and Johnson's perhaps weekly "Hey, Indian" comment, the conduct asserted by Potts was not frequent. Besides these two categories of conduct, Potts has established a single specific instance of racially abusive language and three instances of physically threatening but non-racial behavior. These instances occurred over a twenty-seven month period and therefore, were "far too infrequent to alter the conditions under which [the plaintiff] was required to perform his job." *Mendoza, supra*, 195 F.3d at 1249 (citation omitted). Moreover, to the extent the "Little Mowac" decal and "Hey, Indian" comments establish the frequency factor, this evidence does not create a jury question on Potts' racial harassment claim because plaintiff has offered no evidence that Johnson placed the decal on his truck and, as importantly, has no evidence that the "Hey, Indian" comments were delivered in a derogatory manner as opposed to the joking manner which Presley described.

16. In light of the foregoing, the Court finds that the conduct established by Potts was not sufficiently severe or pervasive enough **[\*66]** to alter his terms or conditions of employment and therefore, his racial harassment claim fails.

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is due to be **GRANTED** and therefore, plaintiff's complaint is due to be **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this the 1st day of August, 2000.

**WILLIAM E. CASSADY**

**UNITED STATES MAGISTRATE JUDGE**

**JUDGMENT**

In accordance with the memorandum opinion and order entered on this date, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the defendant's motion for summary judgment be **GRANTED,** that plaintiff's complaint be **DISMISSED WITH PREJUDICE,** and that the costs of this action be taxed to the plaintiff.

**DONE** this the 1st day of August, 2000.

**WILLIAM E. CASSADY**

**UNITED STATES MAGISTRATE JUDGE**

      Service: **Get by LEXSEE®**
     Citation: **2000 US Dist LEXIS 11822**
        View: Full
Date/Time: Wednesday, November 28, 2007 - 9:53 AM EST

\* Signal Legend:
 - Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
I - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

**LexisNexis®**  About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# *Wadibia v. Auburn University*

*1999 U.S. Dist. LEXIS 14122, **

E. CHUMA WADIBIA, Plaintiff, v. AUBURN UNIVERSITY, et al., Defendants.

CIVIL ACTION NO. 98-0722-BH-M

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

1999 U.S. Dist. LEXIS 14122

August 26, 1999, Decided
August 26, 1999, Filed

**DISPOSITION: [*1]** Defendants' motion for summary judgment (Doc. 20) GRANTED and JUDGMENT entered in favor of the defendants, Auburn University and R. Lee Evans, and against the plaintiff, E. Chuma Wadibia, said plaintiff to have and recover nothing of the defendants. Costs taxed against the plaintiff.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved for summary judgment in plaintiff's action alleging discrimination on the basis of his race and national origin, retaliation, and a racially hostile environment in violation of Title VII, and state law claims of breach of contract and intentional infliction of emotional distress.

**OVERVIEW:** Plaintiff was employed by defendants in connection with a professional experiential program designed to help students apply their knowledge in patient care settings. Plaintiff was involved in an altercation with another employee and received poor performance evaluations. Plaintiff was terminated after refusing to discuss his performance issues. He brought an action against defendants, alleging violation of Title VII and state law claims of breach of contract and intentional infliction of emotional distress. The court granted summary judgment to defendants, finding that the single racial slur that plaintiff claimed he heard in the workplace did not create as a matter of law a hostile work environment. Plaintiff failed to establish that defendants' explanation for terminating him was pretextual for purposes of his disparate treatment and retaliation claims. The breach of contract claim was barred by U.S. Const. amend. XI, and plaintiff presented no evidence from which to find outrageous conduct.

**OUTCOME:** The motion for summary judgment was granted, and judgment was entered in favor of defendants and against plaintiff. Plaintiff offered no evidence showing that defendants' legitimate, nondiscriminatory reason for terminating plaintiff, his substandard performance, was pretext for unlawful discrimination.

**CORE TERMS:** faculty, rotation, presentation, pharmacy, summary judgment, harassment, genuine, matter of law, admits, undisputed, retaliation, deposition, emotional distress, confrontation, conversation, hostile, tenure, clinical, law claims, prima facie case, outrageous, workplace, racially, faculty members, formal presentations, cardiology, supervisor, complains, weekly, hostile work environment

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
*HN1* Summary judgment not only is proper, but shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants

Civil Procedure > Summary Judgment > Standards > Genuine Disputes

*HN2* The movant on a motion for summary judgment bears the initial burden of showing the court that no genuine issues of material fact exist to be decided at trial. The moving party discharges this burden by showing or pointing out the absence of evidence to support the non-moving party's case. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule
Civil Procedure > Summary Judgment > Evidence
Civil Procedure > Summary Judgment > Standards > Genuine Disputes

*HN3* In deciding whether the moving party has met its burden on a motion for summary judgment, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and to resolve all reasonable doubts in that party's favor. However, inferences in favor of the non-movant are not unqualified. Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment. Moreover, evidence that is merely colorable or conjectural does not create a genuine issue of material facts.

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality

*HN4* If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. However, a genuine dispute about a material fact only exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The bottom line is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Labor & Employment Law > Discrimination

*HN5* The law is well settled that there is no individual liability under Title VII.

Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Rights Law > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Remedies > Punitive Damages

*HN6* The governing statute on punitive damages under Title VII or 42 U.S.C.S. § 1981 specifically provides that punitive damages may not be recovered against a state agency. 42 U.S.C.S. § 1981a(b)(1).

Labor & Employment Law > Affirmative Action > General Overview
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

*HN7* To set forth a prima facie case of hostile work environment based upon race, a plaintiff must establish that: (1) he belongs to a protected class; (2) he was subject to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition or privilege of employment; and (5) respondeat superior.

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions

*HN8* Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII.

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions

*HN9* Discourtesy or rudeness should not be confused with racial harassment, and a lack of racial sensitivity does not, alone, amount to actionable harassment under Title VII.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions

*HN10* Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
*HN11* The standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender or racial-related jokes, and occasional teasing. The court has made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
*HN12* To rise to the level of a racially hostile work environment, there must be a steady barrage of opprobrious racial comments.

Labor & Employment Law > Discrimination
Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion
*HN13* An isolated remark by a co-worker is not enough to be actionable under Title VII.

Labor & Employment Law > Discrimination
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Harassing Conduct
*HN14* Conversations regarding performance issues do not constitute harassment under Title VII simply because they cause the employee distress.

Labor & Employment Law > Discrimination
*HN15* Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its action.

Civil Procedure > Summary Judgment > Evidence
Labor & Employment Law > Discrimination
Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Compensation
*HN16* To survive summary judgment in a Title VII action, the plaintiff must present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > General Overview
*HN17* An employment action is not adverse in a disparate treatment claim merely because the employee dislikes it or disagrees with it.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Compensation
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof
*HN18* In determining whether employees are similarly situated for purposes of establishing a prima facie case of disparate treatment, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct.

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview
*HN19* Once the employer has articulated a legitimate, non-discriminatory reason for its action in a disparate treatment claim, the plaintiff must then establish that the proffered reason was not the true reason for the employment decision.

Labor & Employment Law > Discrimination > Retaliation > General Overview
*HN20* To establish a prima facie case of retaliation, a plaintiff must show (1) a statutorily protected

expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action.

Labor & Employment Law > Discrimination > Retaliation > General Overview
*HN21* An employee who seeks protection under the opposition clause of Title VII must have a good faith, reasonable belief that her employer has engaged in unlawful discrimination. 42 U.S.C.S. § 2000e-(3)a. The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Labor & Employment Law > Discrimination > Retaliation > General Overview
*HN22* Once the plaintiff establishes a prima facie case of retaliation, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. If the employer offers legitimate reasons, the plaintiff at the summary judgment stage must then submit evidence sufficient to create a genuine factual issue as to whether the employer's proffered explanation is a pretext for retaliation.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview
*HN23* For a plaintiff to recover under the tort of outrage, he must prove: (1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview
*HN24* In order to support a cause of action for the tort of outrage, the conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury
Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview
*HN25* The determination as to whether a statement or action is sufficiently extreme or outrageous to support a cause of action for outrageous conduct is, in the first instance, one for the trial court to make as a matter of law.

**COUNSEL:** For E. CHUMA WADIBIA, plaintiff: La Quetta M. Golden, Gulfport, MS.

For AUBURN UNIVERSITY, defendant: Theresa Renee Jenkins, Esq., Balch & Bingham, Montgomery, AL.

For AUBURN UNIVERSITY, R. LEE EVANS, defendants: David Boyd, Balch & Bingham, Montgomery, AL.

For AUBURN UNIVERSITY, R. LEE EVANS, defendants: Lee Ford Armstrong, Auburn University, Auburn, AL.

**JUDGES:** W B Hand, SENIOR DISTRICT JUDGE.

**OPINION BY:** W B Hand

**OPINION**

**FINDINGS OF FACT; CONCLUSIONS OF LAW AND ORDER**

This action is before the Court on defendants' motion for summary judgment (Doc. 20). In his complaint, as amended, the plaintiff alleges that he was discriminated against on the basis of his race and national origin by subjecting him to a racially hostile environment and that he was retaliated against for complaints of

alleged discrimination and harassment. Upon consideration of the motion, plaintiff's response in opposition **[*2]** thereto (Docs. 28 and 29) and all other pertinent portions of the record, the Court concludes that the defendants' motion is due to be granted.

FINDINGS OF FACT

The Court, based upon the pleadings and both documentary and testimonial evidence submitted by the parties, specifically finds that the following material facts are undisputed or uncontroverted:

1. The plaintiff, Dr. Chuma Wadibia (Wadibia), was employed at Auburn University's School of Pharmacy from July 1, 1996, through February 10, 1999, as a full-time Assistant Professor. He is a black male who is a native of Nigeria. Wadibia did not have a contract with the individual defendant, Dean R. Lee Evans.

2. Wadibia's complaint in this action was filed on July 10, 1998, and amended to include a retaliatory termination claim on May 28, 1999 (Doc. 26). In addition to his statutory Title VII claims of a racially hostile work environment and retaliation, Wadibia alleges that his Fifth and Fourteenth Amendment rights were violated when he was placed on administrative leave with pay. Finally, Wadibia asserts state law claims of breach of contract and intentional infliction of emotional distress.

3. Wadibia's specific assignment **[*3]** was the Department of Clinical Pharmacy Practice ("the Department") with his practice site in Mobile, Alabama. Auburn and the University of South Alabama College of Medicine (USA) located in Mobile, have a cooperative arrangement whereby Auburn Pharmacy students, as part of their curriculum, gain clinical experience working in facilities operated by USA. This program is referred to as the professional experiential program.

4. Wadibia does not dispute that the aforementioned professional experiential program is designed to provide students the opportunity to apply their didactic knowledge in supervised patient care settings. It is further undisputed that students may elect to participate in various five week rotations such as family practice or cardiology. Successful completion of these rotations is required for graduation. As part of this program, students "present" information regarding patients to faculty. Both formal and informal presentations are generally required. Informal presentations are made to the student's particular preceptor (faculty advisor) while formal presentations are made to a group of preceptors.

5. Wadibia was expected to supervise some of the Auburn students **[*4]** who were enrolled in the experiential program. He was also expected to work with physicians and others from the Division of Cardiology at USA as a consultant on clinical pharmacology and collaborative research matters. Other Auburn faculty members in the Department, including Dr. Eileen Holland (Holland) and Dr. Mike Chicella, had similar assignments at USA.

6. The Auburn faculty assigned to USA in Mobile were supervised by Dr. Robert S. Smith (Smith), Head of the Department. Dr. Smith's office was located at Auburn University in Auburn, Alabama.

7. Prior to his actual employment, Wadibia was advised by Dr. Smith in a letter dated May 29, 1996:

> Your specific practice responsibilities will be to develop a Pharmaceutical care practice within the Department of Cardiology at the University of South Alabama College of Medicine. This practice should enable you to precept two students for approximately 35 weeks each year. Faculty may request additional students if they desire. Your scholarship interests should be developed in compliance with the research interests of the Department of Cardiology. In addition, all of your pharmaceutical care practice should be compatible with the **[*5]** directions and desires of the Department of Pharmacy at USA Hospital. Each pharmacy practice faculty member is responsible for a mutually-determined amount of classroom teaching in the department's team-taught therapeutics course. This usually amounts to approximately 20-25 classroom hours each year.

Smith Decl. at Exhibit 1.

8. Mike Blakely (Blakely) was an employee of USA who served as the Pharmacy Director of USA's hospital,

otherwise known as the University of South Alabama Medical Center or USAMC. Eric Dawson (Dawson) was an employee of USA who also held an adjunct appointment with Auburn University. One of Dawson's responsibilities was to evaluate daily the appropriateness of all prescribed restricted antibiotics.

9. Wadibia does not dispute that the Auburn faculty seemed concerned about his competence almost from the time of his arrival. He testified in his deposition that Mike Blakely "was sending Eileen Holland and Eric Dawson to be following me around and be asking me questions . . . trying to find out what I knew and what I didn't know . . trying to evaluate my skills, my competence, my ability to do my job." Wadibia Depo. at p. 64/10-18.

10. Although Wadibia **[*6]** argues that he "was fully qualified to perform his tasks" (Wadibia Brief in Opposition at 1), he does not dispute that both students and faculty expressed concern within months of his arrival about his performance and competence. The evaluations and student comments concerning Wadibia's first lecture in a pharmacology course offered to USA medical students were poor.

11. In April, 1997, Wadibia complained to Paula Berger, EEO Compliance Officer for USA, that Mike Blakely was harassing him because of his race. In his written complaint, Wadibia alleged that Blakely made derogatory comments. On deposition, however, Wadibia testified that the derogatory comments were being addressed as "you, hey, you." Wadibia Depo. at pp. 66/22-23 and 67/1-2. According to Wadibia's deposition testimony, Blakely simply made him uncomfortable by monitoring him too closely, not addressing him "professionally," questioning his credentials and telling him that his work was full of flaws. *Id.* at pp. 64/11-21 and 67/1-5.

12. It is undisputed that USA investigated Wadibia's allegations against Blakely and found no evidence to suggest that Wadibia was being harassed or discriminated against on the basis **[*7]** of his race. Auburn's only involvement with respect to this complaint, or its resolution, was to provide requested information to USA. Wadibia never complained about Blakely again and admits that he did not encounter further problems with Blakely. Wadibia Depo. at p. 69/2-11.

13. Wadibia also does not dispute that, in the summer of 1997, he failed to make necessary arrangements prior to the arrival of students assigned to his rotation. As a result, the students reported to USA without appropriate orientation and instruction. Although Wadibia complains that "Dr. Holland constantly interfered with [his] professional judgment with respect to his students" (Wadibia Brief in Opposition at 2), he does not dispute that on this occasion Holland took care of his students and reminded him that she would cover for him if he was unable to meet his students and that he should let her know if and when such arrangement was necessary. Wadibia agreed that he would do so.

14. Wadibia has presented no evidence to contradict Holland's testimony concerning the complaints of students about Wadibia throughout the summer of 1997 and the fact that she shared this information with Smith, the Department **[*8]** Head.

15. Two black students participated in the cardiology rotation during the course of Wadibia's employment. The first was G.B., whose rotation occurred in May of 1997. The second was L.A. whose rotation occurred in October of 1997.

16. Although Wadibia complains that "Dr. Holland harshly criticized one of [his] students and made a racially derogatory remark about the student" (Wadibia Brief in Opposition at 2), he does not identify the student about whom such alleged criticism or remark was leveled. In his deposition, Wadibia states only that Holland "kept asking me the grading I was going to give [G.B.]." Wadibia Depo. at p. 57/11-15. With respect to L.A., Wadibia testified only that Holland "made comments like, you know, she was dumb, she was way behind where she should have been on her rotation." *Id.* at p. 59/2-4.

17. G.B. made a formal presentation to the faculty on or about May 1, 1997. According to Holland, the student's presentation was poor and included numerous mistakes which were not corrected by Wadibia. Holland was very concerned that the recommendations made by G.B. during the presentation, if made and followed by clinicians, would cause significant patient **[*9]** harm and possible death. Holland declared that it was these concerns and not race that prompted her to question Wadibia's evaluation of G.B.'s performance. (Holland Decl. at P 12).

18. In September, 1997, Dr. Smith instructed the Auburn faculty working at USA to hold weekly meetings to enhance communication and efficiency within the group. USA employees who were involved with Auburn's program, like Blakely and Dawson, were invited to participate in the weekly meetings. These meetings also served as an opportunity for student presentations. Holland, who was the most senior faculty member, was to coordinate the weekly meetings. Wadibia does not dispute that he frequently failed to attend these meetings, arrived late and/or left early.

19. L.A. was the first student to participate in a clinical rotation after the institution of the weekly meetings and was the only student completing a rotation at USA at that particular time. L.A. was a marginal student who failed to pass a prior rotation at another facility. Wadibia Depo. at p. 139/2-16. As stated above, Wadibia served as L.A.'s preceptor.

20. It is undisputed that L.A. made a formal presentation to the faculty several weeks into her **[*10]** rotation which was among the poorest the faculty had ever seen. Following this presentation, the faculty discussed L.A.'s performance and the necessity that it improve if she expected to successfully complete the rotation. Although Wadibia complains about Holland's interference, he neither disputes that she volunteered to work with L.A. to improve her performance or that on October 14, 1997, L.A. herself sought Holland's assistance with regard to L.A.'s preparation for her next formal presentation to the faculty. [1]

**FOOTNOTES**

1 L.A. sought Dr. Holland's assistance the day following an informal presentation given by L.A. which led Dr. Holland to again question Dr. Wadibia's efforts to teach L.A. During Holland's conversation with Wadibia after L.A.'s informal presentation, Holland suggested that Wadibia provide L.A. with a mid-point evaluation identifying areas in which L.A. needed improvement. During this same conversation, Wadibia admitted that he was not going on rounds with L.A. and that she was being allowed in patient care situations without supervision despite the faculty's prior decision that she not be allowed to engage in such activities independently.

**[*11]** 21. Wadibia does not dispute that he and other faculty believed that L.A.'s performance improved drastically subsequent to Holland's intervention. It is also undisputed that L.A. publicly thanked Holland for her assistance and sent her a thank you card "for being caring and understanding." (Holland Decl. at P 8). Holland reported to Auburn that L.A.'s strengths were an analytical mind and her diligence. (*Id.* at P 8 and Exhibit 1).

22. On October 15, 1997, the faculty's weekly meeting was scheduled to begin at 12:00 p.m. but Wadibia arrived approximately 30 minutes late and only after being paged by Holland. Faculty members first discussed their activities since the last meeting. Wadibia was asked not only about significant drug interaction involving cardiovascular drugs but what, if any, efforts he had made to assist L.A.

23. L.A. then joined the October 15, 1997 meeting to make her formal presentation. During the question and answer portion of the presentation, Wadibia stood up to leave and told Holland that he needed to speak with her outside. Although their descriptions differ in some respects, each admits that a confrontation between the two occurred.

24. According to Wadibia, **[*12]** he "confronted Holland about her constant interference into his professional judgment with his students; her constant hostile and demeaning attitude towards him in the presence of his students and her constant challenges of his instructions and authority given to his students [and] during the course of an explosive conversation between [himself] and Holland, used a racial epithet … by referring to him as a 'nigger boy'." Wadibia Brief in Opposition at 2. Dr.

25. Holland agreed that Wadibia confronted her and told her that she was not his supervisor, that she had no right to question him about his activities or his students and that, if she had a problem with him, she should talk to Dr. Smith, the Department Head. According to Holland, she then told Wadibia that she was concerned about Auburn's students and had already communicated to Dr. Smith her opinion that Wadibia was incompetent and not providing a good educational experience for the students. Holland contends that she then told Wadibia that she needed to return to the presentation and that the hallway was not the place

to have a discussion. According to Holland, it was then that Wadibia told her that he was not finished **[\*13]** with her; moved towards her shaking his finger in her face; acted in a threatening and violent manner coming very close to physical contact; called her an "idiot fool"; knocked a bulletin board off the wall; and was generally out of control. *See*, Holland Decl. at P 9; Wadibia Depo. at pp. 87-96.

26. Immediately after the confrontation with Wadibia, Holland returned to L.A.'s presentation. When the faculty told L.A. that her performance was improved, L.A. gave the credit to Holland. (Holland Decl. at P 9; Smith Decl. at P 11). Shortly after L.A. completed her presentation, Holland reported to Dr. Smith and others that she was in fear for her safety. (Holland Decl. at PP 9 and 10). Dr. Smith believed Holland was genuine and sincere in her concern. (Smith Decl. at P 8).

27. The following day, Dr. Smith spoke with Wadibia, who confirmed that the confrontation with Holland had occurred. Wadibia reported that, during the confrontation, Holland had referred to him as "nigger boy." When thereafter confronted with Wadibia's accusation, Holland adamantly denied making the alleged comment. (Smith Decl. at P 9; Holland Decl. at P 9). The Court need not make an impermissible credibility determination, **[\*14]** however, inasmuch as Wadibia testified at his deposition that this comment allegedly made by Holland was the only racial slur he ever heard in the workplace. Wadibia Depo. at p. 48/4-14.

28. Wadibia has also maintained that Holland was not his supervisor but merely his "co-worker." Wadibia Depo. at p. 50/7-9. It was, in fact, Holland's alleged intrusion and interference with Wadibia's activities when she had no authority to supervise him which forms the basis for the hostile environment claim herein asserted by Wadibia.

29. Wadibia does not dispute either that Dr. Smith consulted with the Dean of the School of Pharmacy, Dr. Lee Evans, regarding the appropriate action to take under the circumstances or that together Dr. Smith and Dr. Evans decided to temporarily remove Wadibia from the workplace "to facilitate a timely investigation of alleged complaints." (Smith Decl. at P 10 and Wadibia Depo. at Exhibit 20). On October 17, 1997, Wadibia was advised by Smith and Evans over the telephone that he was being placed on "Administrative Leave With Pay" and a letter to this effect was sent to Wadibia that same day. (*Id.*) The student Wadibia was supervising at this time, previously identified **[\*15]** as L.A., was reassigned for the remainder of that rotation.

30. On October 18, 1997, Wadibia filed a complaint with Auburn's AA/EEO Office. He alleged that, in connection with the Holland incident and the resulting leave, he was being subjected to racial harassment and workplace discrimination. Subsequent to its investigation, the Auburn AA/EEO Office advised Wadibia that it

> could find no evidence to support [his] allegation that [Holland's] treatment of [Dr. Wadibia] was in any way negatively influenced by [his] race . . .[and] that Dr. Holland has not violated the University's policy prohibiting discrimination on the basis of race. With regard to the complaint against the School of Pharmacy, I could find no evidence that your temporary administrative leave was related to your race.

(Wadibia Depo. at Exhibit 22). The EEOC came to the same conclusion concerning the complaint Wadibia filed with the EEOC on October 22, 1997. (*Id.* at Exhibit 36).

31. Although Wadibia complains that "members of management . . . failed to correct the hostile environment by disciplining Dr. Holland for her behavior" (Wadibia Brief in Opposition at 3), he does not contend that **[\*16]** Dr. Smith either failed in a timely fashion to adequately investigate the matter or did not counsel Holland as he claimed regarding the inappropriateness of racial slurs. Wadibia also admits that, following his return to work on or about November 17, 1997, he had no further problems with Holland. Wadibia Depo. at p. 124/19-23 and p. 125/1-9.

32. Wadibia does not dispute that no public statements were made regarding his being placed on leave or about the circumstances which prompted the leave. Even the members of the Department of Clinical Pharmacy were not advised and only those who were witnesses were involved in any way. Except for the essential involvement of the USA witnesses and USA's AA/EEO Officer, the entire matter was handled within

the confines of Auburn's Pharmacy School administration.

33. Although he argues that his "supervisor stopped assigning students to [him]" and that subsequent to his EEOC complaints his "student teacher ratio had dropped drastically" (Wadibia Brief in Opposition at p. 3), Wadibia has presented no evidence that any specific student's request to be assigned to him was ever denied. According to his deposition testimony, student assignments are **[*17]** made at Auburn's main campus by an individual identified only as Diane Beck [2] and any student's request for assignment to a particular precept will be granted if possible. Wadibia Depo. at pp. 125/21-23; 127/17-23; and 128/1-5. Wadibia has proffered no evidence that Auburn took any action to discourage or prevent any student from participating in Wadibia's rotation. Nor has he contradicted or disputed the evidence that he received poor evaluations from students regarding his clinical rotation and teaching. *See e.g.*, Smith Decl. at P 25 and Exhibit 5.

## FOOTNOTES

2 Dr. Wadibia has presented no evidence that Diane Beck possessed or exercised any supervisory authority over his activities.

34. Wadibia also argues that his "supervisor further verbally advised him that he wouldn't get tenure" but admits that this same "supervisor wrote Plaintiff and denied making the statement." Wadibia Brief in Opposition at p. 3. However, it is undisputed that Wadibia read and understood Auburn's policy regarding tenure and knew that he **[*18]** would not even be eligible for tenure consideration until 2002. Wadibia Depo. at pp. 165/10-12; 164/22-23 and 165/1. Wadibia admits that he was never told that he would be denied the various steps in the tenure consideration process. *Id.* at p. 167/20-22.

35. Wadibia's 1996-1997 performance evaluation ranked his performance as "average" and indicated that "a senior faculty member should be assigned to mentor Dr. Wadibia during the next 2-3 years of his development." Wadibia Depo. at Exhibit 37. It is undisputed that, in addition to this formal evaluation signed by Wadibia on September 3, 1997, Dr. Smith had spoken on numerous occasions with Wadibia regarding performance related issues and ultimately concluded that Wadibia refused to accept any constructive criticism regardless of the source. (Smith Decl. at P 26). Despite Wadibia's general allegations, there is no evidence that his performance evaluation following his October 1997 complaints was less than it would have been absent the complaints.

36. Wadibia does not deny that, in early January of 1998 during a conversation with Dr. Smith, he warned Smith "not to try anything" and that, as a result, Smith advised him in writing **[*19]** that such a "warning" was totally inappropriate and unprofessional. (Smith Decl. at P 16 and Exhibit 3).

37. On or about June 1, 1998, Smith met with Wadibia to evaluate Wadibia's performance for the prior academic year. Wadibia refused to accept Smith's assessment of his performance. Wadibia does not dispute that, instead, he made numerous threatening statements, including a threat of negative publicity for the University as well as Smith personally, if Smith evaluated his performance at a level lower than Wadibia believed he deserved. *See*, Wadibia Depo. at Exhibit 26. Upon his return to Auburn after this meeting with Wadibia, Smith advised Wadibia in writing that his behavior and comments constituted insubordination and

any further threats to [Smith], other faculty members, staff and/or employee of USA will not be tolerated. In addition, insubordination will result in appropriate personnel action within the University. I am willing to work through this situation, but only if you develop an ability to accept and respond positively to constructive criticism.

(*Id.*)

38. Dr. Smith and Dean Evans continued their discussions about whether Wadibia's employment **[*20]** should be terminated. On July 9, 1998, Dr. Smith sent a follow-up letter to Wadibia and explained that Wadibia's attitude toward him in the June meeting had made it impossible to discuss various performance issues. Consequently, Smith set forth in this letter the areas in which Wadibia would be required to improve his performance. Wadibia was advised that, in addition to improving his teaching and research skills and his

relationships with faculty and colleagues, he must accept constructive criticism. Wadibia was also reminded that, under Auburn University policy, a third year or mid-tenure review would be conducted prior to his thirty-second month of employment. Dr. Smith offered to help Wadibia prepare his review material. (Wadibia Depo. at Exhibit 27).

39. Later in July, after months of deliberation, Dean Evans and Dr. Smith came to the conclusion that Wadibia's performance and willingness to cooperate were so deficient that, without prompt and drastic improvement, his employment would have to be terminated. On July 31, 1998, timely written notice ³ was given to Wadibia that his contract with Auburn would not be continued after January 31, 1999. Wadibia was also told, however, **[*21]** that his noncontinuation might be reconsidered if he were to make satisfactory improvements in specific areas. He was instructed to submit documentation of his interactions and activities with Auburn faculty as well as the Pharmacy Director and to provide Dr. Smith with a monthly written report of his efforts to improve in the deficient areas. (Wadibia Depo. at Exhibit 28). It is undisputed that Wadibia failed to modify his performance and failed to submit the documentation required under the July 31, 1998 letter. Dr. Smith attempted on several occasions to meet and/or speak with Wadibia to discuss Wadibia's performance. Wadibia refused to meet or speak with Dr. Smith. (Smith Decl. at P 18).

### FOOTNOTES

₃ Dr. Wadibia had a 12-month appointment but less than three years of service so the notice period applicable to him under Auburn's Faculty Handbook was "six months prior to noncontinuation date." (Smith Decl. at P 23 and Exhibit 4 at 3:25).

40. On September 14, 1998, Dr. Smith again wrote Wadibia expressing his concern **[*22]** about Wadibia's refusal to discuss performance issues. *See*, Wadibia Depo. at Exhibit 29. In October of 1998, Smith requested that Wadibia meet with him to discuss his goals for the 1998-99 academic year and to discuss preparation of the material for the third-year review due February or March of 1999 in the event his non-continuation was reconsidered. *See*, Wadibia Depo. at Exhibit 30 and Smith Decl. at P 19. Wadibia refused to meet with Smith until November 1998. Smith expressed regret that Wadibia had failed to meet with him sooner to address the deficiencies outlined in the July 1998 letter. (Wadibia Depo. at Exhibits 31 and 32).

41. In late January 1999, Dean Evans with the input of Dr. Smith reviewed Wadibia's performance since the July 1998 notice of non-continuation was issued. In their opinion, Wadibia had failed to improve his performance sufficiently in the specified areas and had failed to provide the required documentation. As a result, the University terminated Wadibia's employment effective February 10, 1999. (Smith Decl. at P 22).

42. Wadibia has failed to present evidence that the reasons given for his termination, namely his sub-standard job performance and **[*23]** unwillingness to cooperate, were pretextual. The Court therefore agrees that, even if Wadibia's complaints in October of 1997 somehow affected the termination decision, a proposition in support of which no evidence has been offered beyond some mere coincidence of time, the same employment decision would have been made for legitimate reasons unrelated to race or these complaints.

CONCLUSIONS OF LAW

*HN1*Summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . ." F.R.Civ.P. 56(c). *HN2*The movant bears the initial burden of showing the court that no genuine issues of material fact exist to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" the absence of evidence to support the non-moving party's case. **[*24]** *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995), quoting, *Celotex*, 477 U.S. at 325, 106 S. Ct. at 2553-54. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Jeffery*, 64 F.3d at 593; *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553.

**HN3** In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256, 257 (11th Cir. 1989). However, inferences in favor of the non-movant are not unqualified. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable (*see, Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory (*see,* **[*25]** *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural does not create a genuine issue of material facts.

**HN4** If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). However, a "genuine" dispute about a material fact only exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594, *quoting, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. at 2512.

As applied to this action, it is first evident that, to the extent Wadibia asserts a Title VII claim against Dean Evans, it is due to be dismissed. **HN5** The law **[*26]** in this Circuit is well settled that there is no individual liability under Title VII. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1520 n. 3 (11th Cir. 1995); *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1994); *Hamm v. Lakeview Community Hosp.*, 950 F. Supp. 330, 333 (M.D. Ala. 1996). Wadibia cites no legal support, and none exists, for his contention that Evans' mere "authority to hire and fire" renders him an "employer" within the meaning of Title VII either in his individual or official capacity.

Wadibia's opposition to summary judgment on his punitive damage claim under either Title VII or § 1981 against Auburn University is similarly specious. **HN6** The governing statute specifically provides that punitive damages may not be recovered against a state agency such as Auburn University. 42 U.S.C. § 1981a(b)(1). Wadibia ultimately admits as much when he states "Auburn may be shielded from punitive damage award through Title VII and Section 1981 claims." Wadibia Brief in Opposition at 6. Wadibia then argues, however, that he **[*27]** is nonetheless entitled to pursue punitive damages "through his state law claim of intentional infliction of emotional distress." *Id.* Wadibia again fails to cite any legal support for this proposition and none exists.

**HN7** To set forth a *prima facie* case of hostile work environment based upon race, Wadibia must establish that: (1) he belongs to a protected class; (2) he was subject to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition or privilege of employment; and (5) respondeat superior. *Dudley v. Wal-Mart Stores, Inc.*, 931 F. Supp. 773, 790 (M.D. Ala. 1996), *citing, Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982). Although dealt with in the context of a sexual harassment claim, the Supreme Court generally reviewed hostile environment liability in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 2283-84, 141 L. Ed. 2d 662 (1998) and concluded, *inter alia*:

> **HN8** "Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment to violate **[*28]** Title VII. [4]

> **HN9** "Discourtesy or rudeness should not be confused with racial harassment" and ... "a lack of racial sensitivity does not, alone, amount to actionable harassment." [5]

> **HN10** "Simple teasing," . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of

employment." [6]

The Supreme Court then emphasized:

> [HN11] These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." . . . Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender [or racial]-related jokes, and occasional teasing." . . . We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeal have headed this view.

*Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283-84 (internal citations omitted).

Consequently, there does exist the ultimate support, despite Wadibia's contention to the contrary, for *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) [*29] [HN12] (To rise to the level of a racially hostile work environment, "there must be a steady barrage of opprobrious racial comments.") and *Dudley*, 931 F. Supp. at 791 (same).

## FOOTNOTES

4 524 U.S. at 786, 118 S. Ct. at 2283, *quoting, Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S. Ct. 2058, 32 L. Ed. 2d 343 (1972).

5 524 U.S. at 787, 118 S. Ct. at 2283, *quoting*, 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1996).

6 524 U.S. at 788, 118 S. Ct. at 2283, *quoting, Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75,    , 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998).

As applied to this case, Wadibia contends that during his October 1997 "explosive conversation" with Holland, she referred to him as "nigger boy." Wadibia admits that this is the only racial slur he ever heard in the workplace. Holland adamantly denies ever saying such a thing. [*30] However, even if this solitary comment was made, it did not create as a matter of law a hostile work environment. The law could not be more precise. [HN13] An isolated remark by a co-worker is not enough to be actionable. Wadibia's reliance on alleged comments by Holland regarding black students for which he was preceptor is equally unavailing. The comments on which Wadibia relies are also insufficient as a matter of law to constitute a racially hostile environment. Finally, Wadibia's complaints concerning inquiries about his work and students do not, alone or in conjunction with the aforementioned alleged comments, constitute impermissible racial harassment. [HN14] Conversations regarding performance issues do "not constitute harassment simple because they cause the employee distress. *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir.), *cert. denied*, 525 U.S. 963, 119 S. Ct. 407, 142 L. Ed. 2d 330 (1998). The Court agrees that Wadibia has failed to proffer any evidence that these work-related discussions or inquiries were improper or occurred because of his race or national origin. Wadibia's self-serving, speculative testimony that he was [*31] subjected to this "interference" because of his race or national origin does not, as a matter of law, create a genuine issue of material fact. *Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991)("Conclusory [HN15] allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its action."), *quoting, Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989); *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir. 1983)(Summary judgment proper because plaintiffs "failed to present the district court with any evidence beyond their subjective beliefs, which alone did not constitute a material issue."). *See also, Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)("To [HN16] survive summary judgment, the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice.").

To the extent Wadibia asserts a disparate **[*32]** treatment claim in paragraphs 19 and 20 of his complaint, this claim relates solely to Auburn's decision to place Wadibia, but not Holland, on administrative leave with pay pending an investigation into the confrontation between the two. The Court concludes that this claim fails. The Court agrees that Wadibia's paid leave could not reasonably be considered an adverse employment action so as to trigger federal anti-discrimination laws. *See e.g., Doe v. DeKalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998)("an *HN17*employment action ... is not adverse merely because the employee dislikes it or disagrees with it."). The Court also agrees that Wadibia has failed to establish that he and Holland were similarly situated relative to the episode between them, a confrontation which Wadibia admittedly initiated and described as "explosive." *See e.g., Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)("In *HN18*determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct."). Finally, the Court agrees that, **[*33]** even if Wadibia had established a prima facie case of disparate treatment concerning the decision to subject him alone to paid leave pending the investigation, he has failed to establish that Auburn's explanation is false or pretextual and that the real reason is racial animus. *See, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993) *HN19*(Once the employer has articulated a legitimate, non-discriminatory reason for its action, plaintiff must then establish "that the proffered reason was not the true reason for the employment decision."); *Walker v. Nationsbank of Florida*, 53 F.3d 1548, 1557 (11th Cir. 1995)(same).

Wadibia also alleges that he was retaliated against for filing a complaint with Auburn's AA/EEO Office on October 18, 1997 and his EEOC charge of discrimination on October 22, 1997. *HN20*To establish a *prima facie* case of retaliation, Wadibia must show (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997); **[*34]** *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993). The Eleventh Circuit has recently held *HN21*"an employee who seeks protection under the opposition clause [of Title VII, 42 U.S.C. § 2000e-(3)a] must have a 'good faith, reasonable belief' that her employer has engaged in unlawful discrimination." *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351, 1999 WL 335389 (11th Cir. 1999), *quoting, Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997). "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Id., citing, Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n. 2 (11th Cir.1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry").

*HN22*Once the plaintiff establishes a *prima facie* case of retaliation, the employer must proffer a legitimate, non-discriminatory reason for **[*35]** the adverse employment action. *Raney*, 120 F.3d at 1196; *Reichhold Chemicals*, 988 F.2d at 1572. If the employer offers legitimate reasons, the plaintiff at the summary judgment stage must then submit evidence sufficient to create a genuine factual issue as to whether the employer's proffered explanation is a pretext for retaliation. *Raney*, 120 F.3d at 1196-97.

As applied to the case at bar, Wadibia can at best only be said to have established that he was terminated in late January 1999, over a year after he filed his October 1997 complaints of discrimination. Any contention that he was denied tenure or that his student assignments diminished in retaliation for those complaints is purely specious. Even if the Court accepted the premise, which is does not, that Wadibia submitted sufficient evidence to establish that (1) his EEOC charges were based on his objectively reasonableness belief as "measured against existing substantive law" that his employer has engaged in an unlawful employment practice and (2) there existed a causal connection between those charges and his termination, Wadibia has failed to submit any evidence sufficient **[*36]** to create a jury issue as to whether the reasons stated by his employer, namely his substandard performance, inability to accept constructive criticism and lack of cooperation, were a pretext for retaliation. Consequently, defendants are entitled to judgment as a matter of law on the retaliation claim.

Wadibia also asserts a state law claim for breach of contract which he essentially admits is barred by the Eleventh Amendment to the extent it is asserted against Auburn, a state agency. [7] Wadibia urges, however, that the claim should be viable against Dr. Evans, the individual defendant, merely because he "is not so

protected [by the Eleventh Amendment] in his individual capacity." Wadibia Brief in Opposition at 9. Wadibia has, however, failed to proffer any evidence to support this claim as against Evans. Although Wadibia did have a contract with Auburn, he did not have a contract with Dean Evans in his individual capacity and the contract with Auburn did not entitle him to tenure absent his satisfaction of certain conditions precedent.

## FOOTNOTES

7 Wadibia has failed to cite any legal authority by which such a claim against Auburn would not be held so barred.

[*37] Similarly, Wadibia's state law claim for outrageous conduct and intentional infliction of emotional distress is barred by the Eleventh Amendment as to both Auburn and Evans in his official capacity and is nonetheless without evidentiary support. HN23 For a plaintiff to recover under the tort of outrage, he must prove: "(1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.*, 923 F. Supp. 1481, 1491 (M.D. Ala. 1996), *quoting, Jackson v. Alabama Power Co.*, 630 So. 2d 439, 440 (Ala. 1993). *See also, Perkins v. Dean*, 570 So. 2d 1217, 1219 (Ala. 1990)(same); *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)("In HN24 order to support a cause of action for the tort of outrage, the conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency [*38] and be regarded as atrocious and utterly intolerable in a civilized society."). HN25 The determination as to whether a statement or action is sufficiently extreme or outrageous to support a cause of action for outrageous conduct is, in the first instance, one for the trial court to make as a matter of law. *Grimsley v. Guccione*, 703 F. Supp. 903, 907 (M.D. Ala. 1988), *citing, Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985) and *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).

Wadibia bases his outrage claim on the same allegations that form the basis of his other claims. He has cited no case in which the Alabama Supreme Court has held that the type of conduct about which he complains constitutes outrageous conduct. Moreover, he has presented no evidence from which this Court or a jury could find extreme or aggravated conduct much less conduct which goes beyond "all possible bounds of decency" or could be characterized as "atrocious and utterly intolerable in a civilized society." Accordingly, defendants are entitled to summary judgment on this the only remaining state law claim.

Inasmuch a Wadibia has failed [*39] to address any other of the arguments made by the defendants in support of summary judgment, the Court concludes that Wadibia does not oppose summary judgment on any of his other claims or assertions in this litigation.

CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that no genuine material issue of fact exists and that the defendants are entitled to judgment as a matter of law. It is therefore **ORDERED** that defendant's motion for summary judgment (Doc. 20) be and is hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendants, Auburn University and R. Lee Evans, and against the plaintiff, E. Chuma Wadibia, said plaintiff to have and recover nothing of the defendants. Costs are taxed against the plaintiff.

DONE this 26th day of August, 1999.

W B Hand

SENIOR DISTRICT JUDGE

## JUDGMENT

It is **ORDERED, ADJUDGED** and **DECREED** that defendants' motion for summary judgment (Doc. 20) be and is hereby **GRANTED** and that **JUDGMENT** be and is hereby entered in favor of the defendants, Auburn

University and R. Lee Evans, and against the plaintiff, E. Chuma Wadibia, said plaintiff to have and recover nothing of the defendants. **[*40]** Costs are taxed against the plaintiff.

DONE this 26th day of August, 1999.

W B Hand

SENIOR DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **1999 US Dist LEXIS 14122**
View: Full
Date/Time: Wednesday, November 28, 2007 - 9:52 AM EST

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis**®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

# Exhibit 11

# Notices of Charge (WPH 001092 & 1094)

EEOC FORM 131 (5/01)

**U. S. Equal Employment Opportunity Commission**

| | PERSON FILING CHARGE |
|---|---|
| MIKE MCGILL<br>PLANT MANAGER<br>WEST POINT HOMES/STEVENS<br>2401 B 1ST AVENUE<br>OPELIKA,  AL    36801 | **Bobby L. Sanks** |

THIS PERSON (check one or both)

[X]  Claims To Be Aggrieved

[ ]  Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**130-2005-06614**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X]  Title VII of the Civil Rights Act          [ ]  The Americans with Disabilities Act

[ ]  The Age Discrimination in Employment Act    [ ]  The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ]  No action is required by you at this time.

2. [ ]  Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X]  Please provide by    **24-APR-06**    a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to  this request will make it easier to conclude our investigation.

4. [ ]  Please respond fully by                       to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. [ ]  EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by to
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Linda-Sue  Ross,**
**Investigator Support Asst**

*EEOC Representative*

Telephone:  **(205) 212-2103**

**Birmingham District Office - 420**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

**See enclosed copy of charge of discrimination.**

WPH
001092

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **Mar 24, 2006** | **Bernice  Williams-Kimbrough,**<br>**District Director** | *Bernice Williams-Kimbrough* |

EEOC FORM 131 (5/01)                    **U. S. Equal Employment Opportunity Commission**

| | PERSON FILING CHARGE |
|---|---|
| **MIKE MCGILL**<br>**PLANT MANAGER**<br>**WEST POINT HOMES/STEVENS**<br>**2401 B 1ST AVENUE**<br>**OPELIKA,   AL   36801** | **Bobby L. Sanks** |

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**130-2005-06614**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act          [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act          [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [X]  No action is required by you at this time.

2. [ ]  Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ]  Please provide by                        a statement of your position on the issues covered by this charge, with copies of any
supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate
the charge. A prompt response to  this request will make it easier to conclude our investigation.

4. [ ]  Please respond fully by                        to the enclosed request for information and send your response to the EEOC
Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this
request will make it easier to conclude our investigation.

5. [ ]  EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or
expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information,
or any inquiry you may have should be directed to:

|  |  |
|---|---|
| **Sandra G. Figgers,**<br>**Investigator**<br>*EEOC Representative*<br><br>Telephone:  **(205) 212-2071** | **Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |

Enclosure(s): [ ] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

**ISSUES: Discharge, Discipline, Harassment**

**DATE(S) (on or about):  EARLIEST: 07-29-2005   LATEST: 07-29-2005**

**WPH**
**001094**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **Mar 16, 2006** | **Bernice  Williams-Kimbrough,**<br>**District Director** | *Bernice Williams-Kimbrough* |

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Bobby Sanks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No.: 3:06-CV-1092-T |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 12

# WARN Notices
# (WPH 001355-1358)



September 5, 2006

Dear Associate:

This letter is to notify you that a decision has been made to permanently close the Opelika Greige Plant. According to the Federal Worker Adjustment and Retraining Notification Act (Public Law 100-379), this letter is being provided to give you advanced notice of the plant closing.

Terminations will occur between November 4, 2006, and November 18, 2006. You will be notified of your exact termination date as soon as possible. There will not be any bumping or displacement rights due to the closing of the plant. Once completed all terminations will be permanent.

We sincerely regret that this decision has to be made at this time; however, we must continue to adjust and align our production capabilities to remain competitive in a global economy. Thank you for your contributions to the Opelika Plant. If there are any questions concerning this notice, you can contact me at 334.742.2238.

Sincerely,

*Dean Franklin*

Dean Franklin
Plant Manager

WPH
001355



September 5, 2006

Mr. Gary Fuller
Mayor City of Opelika
204 South Seventh Street
Opelika, Alabama 36801

Dear Mayor Fuller:

This letter is to notify you that WestPoint Home, Inc. has announced it will permanently close the Opelika Greige Plant. In accordance with the Federal Workers Adjustment and Retraining Notification Act (Public Law 100-379), details concerning the plant closing are as follows.

The address of the plant is 2401 First Avenue, Opelika, Alabama. Termination of associates will occur between November 4, 2006, and November 18, 2006. The closing of the plant will affect approximately 325 associates, and once completed will be permanent. Associates will not be able to exercise bumping or displacement rights.

I will be the contact person. If you have any questions or need additional information, you can call me at 334.742.2238.

Sincerely,

*Dean Franklin*

Dean Franklin
Plant Manager

WPH
001356



September 5, 2006

Mr. Bill English
Chairman Lee County Board of Commissioners
215 South Ninth Street
Opelika, Alabama 36801

Dear Chairman English:

This letter is to notify you that WestPoint Home, Inc. has announced it will permanently close the Opelika Greige Plant. In accordance with the Federal Workers Adjustment and Retraining Notification Act (Public Law 100-379), details concerning the plant closing are as follows.

The address of the plant is 2401 First Avenue, Opelika, Alabama. Termination of associates will occur between November 4, 2006, and November 18, 2006. The closing of the plant will affect approximately 325 associates, and once completed will be permanent. Associates will not be able to exercise bumping or displacement rights.

I will be the contact person. If you have any questions or need additional information, you can call me at 334.742.2238.

Sincerely,

Dean Franklin
Plant Manager

WPH
001357



September 5, 2006

Mr. Ray Clenney
State Dislocated Workers Unit
Alabama Department of Economic Development
Workforce Development Division
P.O. Box 5690
Montgomery, AL 36103

Dear Mr. Clenney:

This letter is to notify you that WestPoint Home, Inc. has announced it will permanently close the Opelika Greige Plant. In accordance with the Federal Workers Adjustment and Retraining Notification Act (Public Law 100-379), details concerning the plant closing are as follows.

The address of the plant is 2401 First Avenue, Opelika, Alabama. Termination of associates will occur between November 4, 2006, and November 18, 2006. The closing of the plant will affect approximately 325 associates, and once completed will be permanent. Associates will not be able to exercise bumping or displacement rights.

I will be the contact person. If you have any questions or need additional information, you can call me at 334.742.2238.

Sincerely,

Dean Franklin
Plant Manager

WPH
001358

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Bobby Sanks, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | C. A. No.: 3:06-CV-1092-T |
| ) | |
| WestPoint Stevens, Inc., and ) | |
| WestPoint Home, Inc., ) | |
| ) | |
|     Defendants. ) | |
| ) | |

# Exhibit 13

# Affidavit of
# Lawrence Williams

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Bobby Sanks, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C. A. No.: 3:06-CV-1092-T |
| | ) |
| WestPoint Stevens, Inc., and | ) |
| WestPoint Home, Inc. | ) |
| | ) |
| Defendants. | ) |

---

## AFFIDAVIT OF LAWRENCE WILLIAMS

---

**COMES NOW**, Lawrence Williams, who, after being duly sworn, deposes and states:

1.    I am over the age of twenty-one (21), and competent to give this Affidavit.

2.    I am employed by WestPoint Home, Inc., as _Director EEO and Compliance_.

3.    I reside at _28 East 28th Street New York, NY 10016_.

4.    WestPoint Stephens, Inc. commenced bankruptcy proceedings on June 1, 2003, in the United States Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of Title 11 of the United States Code, under case number 03-13532 (RDD).  The proceedings remain pending, although WestPoint Stevens, Inc. is insolvent.

5.    Pursuant to an order of the Bankruptcy Court dated July 8, 2005, substantially all of the assets of WestPoint Stevens, Inc. were sold to WestPoint Home, Inc., and

the sale closed on August 8, 2005, as set forth in the Asset Purchase Agreement. The document Bates numbered WPH000668-744 for reference in this case is a genuine and complete copy of the Asset Purchase Agreement, kept in the ordinary course of business by WestPoint.

6.    Bobby Sanks was never employed with WestPoint Home, Inc., only by WestPoint Stevens, Inc.

7.    WestPoint Stevens, Inc. has no assets or ability to pay any judgment against it.

8.    The plant at which Sanks worked closed in November 2006.  Sanks would have lost his job no later than November 4, 2006, due to the plant closure.

9.    The documents Bates numbered WPH001355-1358 are genuine, accurate, and complete copies of the WARN Notices for the plant closing, created by or transmitted to or from WestPoint, and kept and stored by WestPoint in the ordinary course of business.

Dated this _29th_ day of November, 2007.

Respectfully submitted,

Lawrence Williams

**DECLARATION PURSUANT TO 28 U.S.C. 1746**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 29_, 2007.

Lawrence Williams

2

5356845.1

3